# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

## No. 04-10325-P

---

### UNITED STATES OF AMERICA,

Plaintiff-Appellee,

vs.

### MEIER JASON BROWN,

Defendant-Appellant.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA

---

### BRIEF OF APPELLEE

---

LISA GODBEY WOOD
UNITED STATES ATTORNEY

Amy Lee Copeland
Assistant United States Attorney
United States Attorney's Office
100 Bull Street, Suite 201
Savannah, Georgia 31401
(912) 652-4422
Attorneys for Appellee

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,    )
                             )
        Appellee,            )
                             )
vs.                          )    No. 04-10325-P
                             )
MEIER JASON BROWN,           )
                             )
        Appellant.           )

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

COMES NOW the United States of America, by and through Lisa Godbey Wood, United States Attorney for the Southern District of Georgia, and files its Certificate of Interested Persons and Corporate Disclosure Statement pursuant to 11th Circuit Rule 26. 1 as follows:

Bell, III, William

Copeland, Amy Lee

Darden, Richard

Edenfield, Honorable B. Avant

Ertel, Jeffrey Lyn

C-1 of 2

Frentzen, William K.

Newman, Joseph D.

Samuel, Donald F.

Wood, Lisa Godbey

This 16th day of May, 2005.

LISA GODBEY WOOD
UNITED STATES ATTORNEY

Amy Lee Copeland
Assistant United States Attorney
Georgia Bar No. 186730

C-2 of 2

## STATEMENT REGARDING ORAL ARGUMENT

Since this appeal arises from the imposition of the death penalty, the government believes that oral argument is warranted. If the death penalty were not involved, the government would not request oral argument since the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. See generally Fed. R. App. P. 34(a)(2).

# TABLE OF CONTENTS

Certificate of Interested Persons and

    Corporate Disclosure Statement ............................. C-1 of 2

Statement Regarding Oral Argument ............................... i

Table of Contents .......................................... ii

Table of Authorities ....................................... vi

Statement of Jurisdiction .................................. xiii

Statement of the Issues ...................................... 1

Statement of the Case ....................................... 3

    1. Course of proceedings and disposition in the court below ........... 3

    2. Statement of the facts. .................................. 4

        a. Sallie Gaglia ..................................... 5

        b. Diane Brown ...................................... 10

        c. Meier Jason Brown ................................. 11

    3. Statement of the standards of review. ...................... 11

Summary of the Argument ...................................... 17

Argument and Citation of Authority .............................. 20

    1.    The district court properly denied Brown's motion to suppress.

        (Brown's issue V) .................................... 20

        a. Facts .......................................... 20

        b. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2.   The district court did not abuse its discretion when it did not hold an evidentiary hearing to resolve Brown's motion to suppress photographic identification. (Brown's issue VII)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

3.   The Court lacks jurisdiction to review the magistrate judge's grant of the motion to quash filed by DFACS. (Brown's issue IX)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

4.   The district court did not abuse its discretion by admitting photographs of Gaglia's body at the crime scene; alternatively, any error was harmless. (Brown's issue XII) . . . . . . . . . . . . . . . . . . . . . 33

        a. Rule 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        b. Harmless error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

5.   The district court did not plainly err when it allowed certain testimony at the guilt and penalty phases of trial. (Brown's issue IV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        a. The guilt phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        b. The penalty phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

6.   Since this case involved a capital crime, the district court properly death-qualified potential jurors. (Brown's issue XIV) . . . . . . . . . . 46

7.    The district court properly refused to bifurcate voir dire. (Brown's issue XIII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

8.    The district court did not plainly err by asking jurors about their beliefs concerning the death penalty.  (Brown's issue III) . . . . . . . 49

9.    The district court properly dismissed a potential juror  for cause. (Brown's issue X) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

10.    The district court's unobjected-to slip of the tongue, or court reporter's error, in voir dire does not warrant a new trial. (Brown's issue XV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

11.    Ring v. Arizona (Brown's issue XI) . . . . . . . . . . . . . . . . . . . . . . 58

12.    The victim's family's feelings about the death penalty do not constitute Brady material.  (Brown's issue VIII) . . . . . . . . . . . . . . 61

13.    The trial court properly denied Brown's motion for judgment of acquittal on the pecuniary gain aggravating factor; alternatively, even if error existed, it was harmless.  (Brown's issue II) . . . . . . . . . . . 64

       a. Pecuniary gain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

       b. Harmless error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

14.    The district court did not abuse its discretion when it denied Brown's motions for authorization to obtain a forensic social worker and an expert on future dangerousness. (Brown's issue VI) . . . . . . . . . . . 71

a. The forensic social worker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

b. The future dangerousness expert . . . . . . . . . . . . . . . . . . . . . . . . 79

15. The district court did not deprive Brown of his confrontation rights when it denied his motion to reconstruct the record without a hearing. (Brown's issue I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Certificate of Word Count . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

# TABLE OF AUTHORITIES

## CASES

Adams v. Texas, 448 U.S. 38, 100 S. Ct. 2521 (1980) . . . . . . . . . . . . . . . . . . . . . . 55

Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087 (1985) . . . . . . . . . . . . . . . . . . . 73

Berkemer v. McCarty, 468 U.S. 420, 104 S. Ct. 3138 (1984) . . . . . . . . . . . . . . 25

Booth v. Maryland, 482 U.S. 496, 107 S. Ct. 2529 (1987) . . . . . . . . . . . . . . . . 64

Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963) . . . . . . . . . . . . . . . . 61, 62

Brown v. Jones 255 F.3d 1273 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 51

California v. Beheler, 463 U.S. 1121, 103 S. Ct. 3517 (1983) . . . . . . . . . . . . . . 26

California v. Green, 399 U.S. 149, 90 S. Ct. 1930 (1970) . . . . . . . . . . . . . . . . . 46

Chandler v. Moore, 240 F.3d 907(11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 45

Conklin v. Schofield, 366 F.3d 1191 (11th Cir. 2004),

    cert. denied, ___ U.S. ___, 125 S. Ct. 1703 (2005) . . . . . . . . . . . . . . . . . . 73

*Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354

    (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41, 43, 44, 45

Grayson v. Thompson, 257 F.3d 1194 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . 78

Grigsby v. Mabry, 758 F.2d 226 (8th Cir. 1985)(en banc) . . . . . . . . . . . . . . . . 48

Hain v. Gibson, 287 F.3d 1224 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 64

Hines v. Cockrell, 57 Fed. Appx. 210, 2002 WL 31956173 at *6 (5th Cir. 2002),

    cert. denied, 540 U.S. 827, 124 S.Ct. 51 (2003) . . . . . . . . . . . . . . . . . . . . 16

Jacobs v. Singletary, 952 F.2d 1282 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 37

*Lockhart v. McCree, 476 U.S. 162, 106 S. Ct. 1758 (1986) . . . . . . . . . 46, 47, 48

Marsh v. Butler County, Alabama, 268 F.3d 1014 (11th Cir. 2001) (en banc) . . 86

Matthews v. Price, 83 F.3d 328 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 17

Minnesota v. Murphy, 465 U.S. 420, 104 S. Ct. 1136 (1984) . . . . . . . . . . . . . . 25

Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966) . . . . . . . . . . . . . . . . 25

Moore v. Armour Pharmaceutical Co., 927 F.2d 1194 (11th Cir. 1991) . . . . . . . 14

Morgan v. Illinois, 504 U.S. 719, 112 S. Ct. 2222 (1992) . . . . . . . . . . . . . . . . . 51

Oregon v. Mathiason, 429 U.S. 492, 97 S. Ct. 711 (1977) . . . . . . . . . . . . . . . . . 25

Payne v. Tennessee, 501 U.S. 808, 111 S. Ct. 2597 (1991) . . . . . . . . . . . . . . . . 64

Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . 44

Ramsey v. Bowersox, 149 F.3d 749 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 51

*Reese v. Delo, 94 F.3d 1177 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 62, 63

Riley v. Dretke, 362 F.3d 302 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 72

Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002) . . . . . . . . . . . . . . . . . . . 59

*Robison v. Maynard, 829 F.2d 1501 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . 63

Skipper v. South Carolina, 476 U.S. 1, 106 S. Ct. 1669 (1986) . . . . . . . . . . . . . 80

Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . 39, 40

Stewart v. Dugger, 877 F.2d 851 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . 56

Tallahassee Mem. Reg. Med. Ctr. v. Bowen, 815 F.2d 1435 (11th Cir. 1987) . . . 86

Tuilaepa v. California, 512 U.S. 967, 972, 114 S. Ct. 2630, 2635 (1994) . . . . . . 63

*United States v. Allen, ___ F.3d ___, 2005 WL 1005101 at *2

    (8th Cir. May 2, 2005)(en banc) . . . . . . . . . . . . . . . . . . . . . . . . . 59, 60, 61

United States v. Arditti, 955 F.2d 331 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . 15

United States v. Bagley, 473 U.S. 667, 105 S. Ct. 3375 (1985) . . . . . . . . . . . . . 62

*United States v. Barnette, 390 F.3d 775 (4th Cir. 2004) . . . . . . . . . . . . . . . . . 67

*United States v. Beale, 921 F.2d 1412 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . 31

United States v. Bernard, 299 F.3d 467 (5th Cir. 2002),

    cert. denied, 539 U.S. 928, 123 S.Ct. 2572 (2003) . . . . . . . . . . . . . . . 66, 71

*United States v. Boyd, 131 F.3d 951 (11th Cir. 1997)(per curiam) . . . . . . . . . 87

United States v. Bowers, 660 F.2d 527, (5th Cir. Unit B 1981) . . . . . . . . . . . 36, 37

*United States v. Brown, 342 F.3d 1245 (11th Cir. 2003),

    cert. denied, ___ U.S. ___, 125 S.Ct. 37 (2004) . . . . . . . . . . . . . 15, 33

United States v. Butler, 102 F.3d 1191 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . 35

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . 66, 67

United States v. Cooper, 203 F.3d 1279 (11th Cir. 2000) . . . . . . . . . . . . . . . . . 31

United States v. DeMasi, 40 F.3d 1306 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . 58

United States v. Drury, 396 F.3d 1303 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . 15

United States v. Gunn, 369 F.3d 1229 (11th Cir. 2004), cert. denied, ___ U.S.

    ___, 125 S.Ct. 324 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Higgs, 353 F.3d 281 (4th Cir. 2003),

    cert. denied, __ U.S. __, 125 S.Ct. 627 (2004) . . . . . . . . . . . . . . . . . . 59, 61

United States v. Jernigan, 341 F.3d 1273 (11th Cir. 2003) . . . . . . . . . . . . . . . 35

United States v. Kaiser, 545 F.2d 467 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . 37

United States v. Labansat, 94 F.3d 527 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . 16

United States v. Lebron-Gonzalez, 816 F.2d 823 (1st Cir. 1987) . . . . . . . . . . . 57

United States v. McCue, 643 F.2d 394 (6th Cir. 1981) . . . . . . . . . . . . . . . . . . 58

United States v. McRae, 593 F.2d 700 (5th Cir. 1979) . . . . . . . . . . . . . . . 36, 37

United States v. Mesa, 247 F.3d 1165 (11th Cir. 2001) . . . . . . . . . . . . . . . . . 86

United States v. Moya, 74 F.3d 1117 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . 25

*United States v. Muegge, 225 F.3d 1267 (11th Cir. 2000)

    (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20, 27, 29

*United States v. Noone, 913 F.2d 20 (1st Cir. 1990) . . . . . . . . . . . . . 16, 50, 51

United States v. Olano, 507 U.S. 725, 113 S. Ct. 1770 (1993) . . . . . . . . . . . 15, 41

United States v. Ortiz, 315 F.3d 873 (8th Cir. 2002), cert. denied, 540 U.S.

    1073, 124 S.Ct. 920 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 39

United States v. Osoba, 213 F.3d 913 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . 16

United States v. Paul, 217 F.3d 989 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . 71

United States v. Peaden, 727 F.2d 1493 (11th Cir. 1984) . . . . . . . . . . . . . . . . 45

United States v. Peters, 403 F.3d 1263 (11th Cir. 2005) . . . . . . . . . . . . . . . . 16

*United States v. Phillips, 812 F.2d 1335(11th Cir. 1987) . . . . . . . . . . . . . 28, 29

United States v. Renfro, 620 F.2d 497 (5th Cir. 1980) . . . . . . . . . . . . . . . . . .  33

*United States v. Robinson, 367 F.3d 278 (5th Cir. 2004),

    cert. denied, ___ U.S. ___, 125 S.Ct. 623 (2004) . . . . . . . . . . . . 16, 59, 60

United States v. Rodriguez, 398 F.3d 1291 (11th Cir. 2005) . . . . . . . . . . . . . . 52

United States v. Rosa, 493 F.2d 1191 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . 58

United States v. Sampson, 245 F. Supp.2d 327 (D. Mass. 2003) . . . . . . . . . . . . 60

United States v. Schlei, 122 F.3d 944 (11th Cir. 1997) . . . . . . . . . . . . . . . . . 15

United States v. Simms, 385 F.3d 1347 (11th Cir. 2004),

    cert. denied, ___ U.S. ____, 125 S.Ct. 1872 (2005) . . . . . . . . . . . . . . . . 14

United States v. Sneed, 732 F.2d 886 (11th Cir. 1984) . . . . . . . . . . . . . . . . . 31

United States v. Soundingsides, 820 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . 36

United States v. Spence, 163 F.3d 1280 (11th Cir. 1998) . . . . . . . . . . . . . . . 16

United States v. Tinoco, 304 F.3d 1088 (11th Cir. 2002) . . . . . . . . . . . . . . . 35

United States v. Villabona-Garnica, 63 F.3d 1051 (11th Cir. 1995) . . . . . . . 20, 21

United States v. Waldon, 363 F.3d 1103 (11th Cir. 2004),

    cert. denied, ___ U.S. ___, 125 S.Ct. 208 (2004) . . . . . . . . . . . . . . . . . 68

United States v. Williams, 400 F.3d 277 (5th Cir. 2005),

    cert. denied, ___ U.S. ____, 125 S.Ct. 1611 (2005) . . . . . . . . . . . . . . . 49

*Wainwright v. Witt, 469 U.S. 412, 105 S. Ct. 844 (1985) . . . . . . . . . . . . . . . 55

## STATUTES

18 U.S.C. §1111 ............................................. xiii, 3

18 U.S.C. §1114 ............................................. xiii, 3

18 U.S.C. §1958 ............................................... 69

18 U.S.C. §2114 ............................................. xiii, 3

18 U.S.C. §3232 ............................................... xiii

18 U.S.C. §3592(c)(6) ...................................... 60, 70

18 U.S.C. §3592(c)(8) ................................ 60, 64, 66, 69

18 U.S.C. §3593(a) ............................................ 59

18 U.S.C. §3593(b) ............................................. 4

18 U.S.C. §3593(b)(1) ........................................ 48

18 U.S.C. §3593(c) ........................................... 45

18 U.S.C. §3593(d) ........................................... 59

18 U.S.C. §3595(a) ........................................... xiii

18 U.S.C. §3595(c)(2) ........................................ 70

18 U.S.C. §3742 ............................................. xiii

21 U.S.C. §848(q)(9) ...................................... 16, 72

28 U.S.C. §636(b)(1)(A) ...................................... 33

28 U.S.C. §1291 ............................................. xiii

## RULES

Fed. R. App. P. 10(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Fed. R. App. P. 32(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Fed. R. App. P. 34(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Fed. R. Crim. P. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Fed. R. Evid. 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Fed. R. Evid. 801(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. Evid. 803(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## STATEMENT OF JURISDICTION

In the guilty phase of a bifurcated proceeding, a jury convicted Appellant Meier Jason Brown on one count of murder within a federal jurisdiction in violation of 18 U.S.C. §1111; on one count of murder of a federal employee in violation of 18 U.S.C. §1114; and on one count of robbery of federal property in violation of 18 U.S.C. §2114. [Doc 272] In the penalty phase on the murder counts, the jury recommended that Brown be sentenced to death. [Doc 275] Thus, the district court imposed the death penalty on the capital counts and a 300 month sentence on the robbery counts. [Doc 276-Pg 2] After the district court denied Brown's motion for new trial [Doc 289], Brown's timely appeal ensued. [Doc 297] The Court has jurisdiction over this appeal pursuant to 18 U.S.C. §3595(a), 28 U.S.C. §1291 and 18 U.S.C. §3742.  Venue was appropriately placed in the Southern District of Georgia under 18 U.S.C. §3232 and Fed. R. Crim. P. 18.

## STATEMENT OF THE ISSUES

In this death penalty appeal resulting from the fatal stabbing of a postal worker to obtain three money orders totaling $1,175.00, appellant Meier Jason Brown raises fifteen issues:

1.  Since Brown was not in custody when he confessed to investigators that he murdered Sallie Louise Gaglia, did the district court properly deny his motion to suppress?

2.  Where Brown failed to demonstrate that photo spreads shown to witnesses were unduly suggestive, did the district court abuse its discretion when it refused to hold an evidentiary hearing on a motion to suppress the photographic identification?

3.  Because Brown did not appeal the magistrate judge's grant of a motion to quash to the district court, does this Court lack jurisdiction to review the magistrate judge's ruling?

4.  Did the district court act within its discretion, or commit harmless error, by admitting six photographs of Gaglia's body at the crime scene?

5.  Did the district court plainly err when it permitted, at the guilt phase, a witness to testify about an excited utterance of Brown's mother, and at the penalty phase, a witness to testify about the effect of her sister's murder on her sister's family?

1

6.   In light of Supreme Court precedent allowing death qualification of a jury in a capital case, did the district court properly do so here?

7.   In light of this precedent and the Federal Death Penalty Act's provisions for a unitary jury, did the district court correctly perform a single voir dire and require the same jury to hear the guilt and penalty phases of the trial?

8.   Did the district court conduct voir dire in a manner so as to allow the selection of an impartial jury?

9.   Where a venire person told the district court that she would determine whether to impose the death penalty based upon her own values rather than the court's instructions, did the court properly dismiss her for cause?

10.   Does an unobjected-to slip of the tongue (or court reporter's error) in voir dire warrant a new trial?

11.   Is the Federal Death Penalty Act constitutional where nothing in the Act prevents the government submitting statutory aggravating and intent factors to the grand jury for inclusion in an indictment?

12.   Is Brown unable to demonstrate a <u>Brady</u> violation where he makes an unsubstantiated allegation that the victim's family did not want the government to seek the death penalty; even if that statement were correct, would it be inadmissible in the penalty phase?

13.  Where the evidence demonstrated that Brown murdered Gaglia to obtain postal money orders, did the district court properly deny Brown's motion for judgment of acquittal on the pecuniary gain aggravating factor; alternatively, even assuming error, where the jury found six other aggravating factors supporting the imposition of the death penalty, is any error harmless?

14.  Did the district court act within its discretion by denying Brown's motion for authorization to obtain two experts, where those proposed experts' work would have duplicated the work of other experts and where fact witnesses, testifying in mitigation, adequately testified about the issues?

15.  Because the district court held no *ex parte* conferences with defense counsel about funding for two experts, did the district court properly deny Brown's motion to reconstruct the record without a hearing?

## STATEMENT OF THE CASE

**1. Course of proceedings and disposition in the court below.**

By superseding indictment, a federal grand jury indicted Brown on one count of murder within a federal jurisdiction in violation of 18 U.S.C. §1111; on one count of murder of a federal employee in violation of 18 U.S.C. §1114; and on one count of robbery of federal property in violation of 18 U.S.C. §2114. [Doc 137] On the murder counts -- which carried a sentence of imprisonment for life or

the death penalty -- the grand jury made seven special findings, including that Brown intentionally killed the victim; committed the offenses in an especially heinous, cruel, and depraved manner in that it involved serious physical abuse to the victim; and committed the offenses in the expectation of the receipt of anything of pecuniary value.  [Doc 137-Pg 3; Doc 138]

As required by the Federal Death Penalty Act, the district court held a bifurcated trial.  See 18 U.S.C. §3593(b).  In the guilt/innocence phase of trial, the jury first found Brown guilty on all three counts. [Doc 272; Doc 293-Pgs 1049-50] In the penalty phase on the murder counts, the jury unanimously found the existence of seven aggravating factors that warranted imposition of the death penalty and recommended that sentence. [Doc 275] Accordingly, the district court imposed the death penalty on the murder counts and a 300 month sentence on the robbery counts. [Doc 276-Pg 2] After the district court denied Brown's motion for new trial [Doc 289], Brown's timely appeal (with new appellate counsel) ensued. [Doc 297; Doc 305] Brown remains incarcerated. [Doc 276-Pg 2]

## 2. **Statement of the facts.**

Using a kitchen knife, Brown fatally stabbed a postmistress in rural Fleming, Georgia, to obtain money orders to make his girlfriend's mortgage and bankruptcy trustee payments.  Pertinent facts follow.

### a. Sallie Gaglia

Sallie Gaglia worked Saturdays as a relief postmistress in the Fleming post office. [Doc 291-Pgs 575, 695] The post office itself is a small, white cinder block building; patrons enter through the front door into an area containing a table with postal supplies, post office boxes, and immediately to the left of the boxes, a small service counter, set in a window, where customers may transact their business with postal employees. [Doc 291-Pgs 567-568; Govt's Exs 1A, 1B, 1C; Doc 292-Pgs 696-697; Govt's Ex 2] The postal employees actually work in area separate from the public space; except for a locked door, the only passage between the two areas is a 3 ½ feet by 1 ½ to 2 feet opening in the window. [Doc 291-Pgs 567-569, 605, 608, 616] Given the size of the town,[1] the post office has approximately 100 post office boxes. [Doc 292-Pg 700]

On November 30, 2002 – two days after Thanksgiving – a postal customer retrieved mail from Post Office Box 327. [Doc 291-Pg 569-570] Different members of the Morgan and the Brown families (including Meier Jason Brown) received mail in that box, and postal employees had experienced problems with family members without keys asking for all the mail. [Doc 292-Pgs 699-700,

---

[1] Fleming is located in Liberty County, Georgia, approximately 14 miles off of Interstate 95 via Exit 87. According to the 2000 Census, it has 1,050 citizens. See www.census.gov. Given the size of the town and frequent contact with the post mistress, almost all of the witnesses from Fleming refer to Gaglia as "Ms. Sallie."

5

702-703] Thus, when Gaglia (who was sorting mail in the back of the post office with another postal worker) heard a key enter box 327, saw a light shined through, and watched a hand empty the box, she spoke to the customer. [Doc 291-Pgs 569-571]

Gaglia first wished the customer a good morning and said, "'[O]h, they left you in charge of the key today.'" [Doc 291-Pg 570] She received no response, so she asked, "'[W]hich one are you?'" [Doc 291-Pg 570] After three inquiries, Gaglia's co-worker, Darlene Washington, heard the man state a name that "began with the M, whatever, the first three names that he said. And then as he was going out the door, he said Jason." [Doc 291-Pg 570] Washington clarified that she thought he said Meier. [Doc 291-Pg 576] In fact, Meier Jason Brown was authorized to receive mail from box 327. [Doc 292-Pgs 699-700; Govt's Ex 8]

About 10:25 or 10:30 that morning, Frank Kania went to the post office to collect his mail. [Doc 291-Pg 627] He asked Gaglia if all the mail was out; she responded affirmatively; and Kania thanked her. [Doc 291-Pgs 628-619] Gaglia was alone when Kania left. [Doc 291-Pg 643]  For the next two minutes, Kania sat in his truck and thumbed through his mail. [Doc 291-Pg 629] He then noticed a black man, wearing a hooded sweatshirt and riding toward the post office. [Doc 291-Pgs 629-630] As Kania drove off, he looked into his rear view mirror and saw the man enter the post office. [Doc 291-Pgs 630-631]

6

Driving by the post office at 10:30 or 10:35 that morning, Chris Bowen saw a black man with slender build, between 5'10" and 6'0" tall, dressed in dark clothing and on a bicycle, blocking the front door of the post office. [Doc 291-Pgs 644-646] Bowen thought it odd: The man wore white gloves, but the morning was not cold. [Doc 291-Pg 646] Since the road is 30 feet from the post office's door and he was driving 10 mph, Bowen got a straight view of the man, and in fact, the men stared at each other. [Doc 291-Pg 647] Bowen drove on. [Doc 291-Pg 647]

At about 10:45 that morning, Jennifer Zech and her boyfriend went to the Fleming post office to retrieve his mail. [Doc 291-Pgs 581, 583, 597, 600] When she walked in, the post office was empty; Zech waited a few minutes, thinking that the postmistress was in the back room. [Doc 291-Pgs 584-585] When no one appeared, Zech put her hands on the counter and leaned over. [Doc 291-Pgs 585-586] At first, she thought she saw a balled-up jacket on the floor; she then realized that the postmistress, Gaglia, was laying on the ground in a fetal position near a pool of blood. [Doc 291-Pgs 585-587] When Gaglia did not move or make any noise, Zech began screaming. [Doc 291-Pg 588]

Zech's boyfriend, Stephen Nichols, ran into the post office, saw two blood spots on Gaglia's back, and ran out to flag down a passing motorist to get help. [Doc 291-Pgs 588, 601-603] After he succeeded, Nichols returned to the post office and pulled himself through the window separating the customer area from

7

the postal area. [Doc 291-Pg 604] It was a tight fit for Nichols (6'2 ½", 175 pounds): He estimated that the window was 3 ½ feet by 1 ½ or 2 feet. [Doc 291-Pg 608] Nichols, who previously had been an EMT, did not touch Gaglia because it was apparent that she was dead. [Doc 291-Pg 609] He unlocked the door separating the postal and customer areas and waited for emergency personnel to arrive. [Doc 291-Pgs 605, 609]

Meanwhile, the motorist went to a house a couple of blocks from the post office, where he spoke to Linda Ashcraft's husband. [Doc 291-Pgs 614-615] Both Ashcrafts are certified firefighters, and when they learned that someone in the post office needed help, they grabbed their radios and equipment, called 911, and sped there. [Doc 291-Pgs 615-616] Ashcraft ran into the back office and saw Sallie Gaglia – a lifelong friend – lying on the floor. [Doc 291-Pgs 616-617] Ashcraft saw knife wounds and a lot of blood; she was unable to find a pulse, or using her stethoscope, a heartbeat. [Doc 291-Pg 617] Because the body was still warm, they began doing CPR, but a knife wound in Gaglia's chest spurted blood with every compression. [Doc 291-Pgs 618-619] When Ashcraft again attempted to call the 911 dispatcher, she discovered that a phone that had been on the floor near Gaglia's body was on – leading her to believe that Gaglia had tried to call for help. [Doc 691-Pgs 618-619, 625] In fact, the handset had a bloodstain on it. [Doc 292-

8

Pg 777] An EMT arrived with deputy sheriffs; the EMT pronounced Gaglia dead. [Doc 291-Pg 620] She was 48 years old. [Doc 292-Pg 796]

That afternoon, postal inspectors determined that money orders in the amount of $500, $500, and $175 were missing. [Doc 292-Pgs 689-691] A GBI crime scene specialist found an adding machine – bearing a bloodstain caused by a 90 degree drop – with 175 lighted on the display and a tape depicting the numbers 500 plus .90, plus 500 plus .90 and then 175 with a division sign. [Doc 292-Pgs 689, 776-777; Govt's Exs 6, 9-FF, 9-GG][2] Looking at the tape, Gaglia's boss testified that there was no reason, when adding postal money orders, to hit the division sign. [Doc 291-Pgs 698-699]

On December 2, 2002, Mark Kaponen, M.D., performed an autopsy of Gaglia's body. [Doc 292-Pg 795] She had been stabbed to death by a knife with both a blunt and a sharp edge. [Doc 292-Pgs 810, 817] Gaglia's body had ten stab wounds, including two defensive wounds, and two superficial, triangular-shaped abrasions that suggested that Gaglia's attacker continued to stab her even after the knife had broken. [Doc 292-Pgs 798-809] Gaglia suffered a potentially fatal wound to her liver. [Doc 292-Pg 811] One of the stabs, however, passed "into the

---

[2] When issuing multiple money orders for one customer, Gaglia's practice was to use the adding machine (rather than a small calculator near the window) to add the amounts and fees. [Doc 292-Pg 697] For money orders up to $500, the post office charged a fee of $.90. [Doc 292-Pg 698]

portion of the heart where blood is being pumped from the right ventricle into the lungs. . ." [Doc 292-Pgs 799-800] That wound would have caused the pericardial sac to fill quickly, and within minutes, Sallie Gaglia's death. [Doc 292-Pgs 800, 811]

### b. Diane Brown

Diane Brown met Meier Jason Brown in May 2002. [Doc 292-Pg 707] "Almost immediately," he began to live with her in Savannah. [Doc 292-Pgs 707-709] In fall 2002, Diane was arrested for obstruction and hindering an officer's investigation, which led to problems with her employment as a state correctional officer. [Doc 292-Pg 710] Coastal State Prison thus suspended her for two weeks with pay, which ended on November 8, 2002. [Doc 292-Pg 711] After November 8, the prison suspended Brown without pay pending the results of the court hearing. [Doc 292-Pg 711]

Diane's financial situation suffered "a big setback." [Doc 292-Pg 712] Because she was in a bankruptcy at the time, she owed $175 every two weeks to the trustee. [Doc 292-Pg 712] Additionally, she had to make her mortgage payment, and catch up some arrearage, in the amount of $927 each month. [Doc 292-Pgs 712, 725] Brown was aware of Diane's plight. [Doc 292-Pg 713]

Diane spent two nights, including the night of November 29, at Brown's mother's home – one of several mobile homes on a lot in Fleming referred to as

10

the Morgan compound or the Morgan residence. [Doc 292-Pgs 714-716] After Diane woke on the morning of November 30, she left Fleming to check her house in Savannah, 20 minutes away. [Doc 292-Pgs 717-718] Brown called her at some point, so she drove to Fleming to pick him up. [Doc 292-Pgs 721-722] On the way back to Savannah, the couple stopped to buy cigarettes, gin, and malt liquor, and Brown showed her three money orders. [Doc 292-Pgs 723-725] Brown told Diane "that the two for $500 should be enough to take care of the mortgage. And the one for 175 would take care of the bankruptcy." [Doc 292-Pg 725]

On Monday, December 2, Brown and Diane went to a bank to cash one of the money orders[3]; she needed to send the correct amount to the mortgagee. [Doc 292-Pgs 727-728] Afterwards, they went to a post office in Savannah and bought a money order. [Doc 292-Pg 730] Later that day, they traveled to Fleming, where Brown's mother, Sadie, gave him a card, apparently from someone at the Liberty County Sheriff's Department, and Diane learned that Sallie Gaglia had been murdered. [Doc 292-Pgs 733-734]

### c. Meier Jason Brown

A Silent Witness hotline received a tip that Meier Jason Brown murdered Gaglia. [Doc 302-Pg 67] Thus, on December 5, 2002, officers simultaneously

---

[3] Bank surveillance photos show the couple laughing, smiling, and chatting. [Doc 292-Pgs 728, Govt's Ex 20]

11

conducted two consent searches. [Doc 292-Pgs 893-894, 901, 904; Doc 302-Pg 99] One search, at Sadie Brown's mobile home, resulted in the seizure of a brown jacket; using DNA analysis, two blood stains on the jacket matched Gaglia's blood.[4]  [Doc 292-Pgs 865, 896, Ex. 5]

The second search, involving eight law enforcement officers, occurred at Diane Brown's house.[5] [Doc 292-Pg 901] Postal Inspector Rushwin knocked, Brown answered, and Diane consented to a search. [Doc 292-Pgs 902, 904] Investigators ultimately seized Brown's tennis shoes, which had a sole similar to the imprint on the counter of the post office and receipts for two of the money orders stolen from the Fleming post office.  [Doc 292-Pgs 842, 906] When Detective Chuck Woodall of the Liberty County Sheriff's Department arrived, he and Inspector Rushwin interviewed Brown. [Doc 292-Pg 908]

Brown first gave an account similar to that recited by Gaglia's co-worker, Darlene Washington. [Doc 292-Pg 909] He biked to the Fleming post office, opened Post Office Box 327, exchanged pleasantries with Sallie Gaglia (who asked his name and wished him a happy holiday), and left. [Doc 292-Pg 909]

---

[4]  The probability of randomly selecting an unrelated individual with the same DNA profile was 1 in 25 quadrillion in the Caucasian population, and 1 in 100 quadrillion in the African-American population. [Doc 292-Pgs 873-874] A quadrillion equals one million billion. [Doc 292-Pg 875]

[5]  This search will be discussed in greater detail in conjunction with Brown's argument about the denial of his motion to suppress.

Brown then visited with a friend, went home, and did not return to the post office. [Doc 292-Pg 909]

Brown later revised his story to include the purchase of three money orders. [Doc 292-Pg 910] In this second version, Brown told investigators that he stole $1300 from a secret hiding place maintained by a cousin and that he went to the post office to buy money orders ($500, $500, and $175) for Diane's bankruptcy and mortgage payment. [Doc 292-Pg 910]

Brown then told investigators the final version: He took a knife from his mother's kitchen and went to the post office to rob Gaglia. [Doc 292-Pgs 911-912] Brown asked for three money orders, which Gaglia imprinted. [Doc 292-Pg 911] When she went to the desk to use the adding machine, Brown put socks on his hands, jumped over the counter, tripped, fell into her, and cut her. [Doc 292-Pgs 911, 916] After he cut her, he thought, "'I could do time for the robbery if I got caught . . . damn, she knows me. So, [he] had to kill her.'" [Doc 292-Pg 911] He did. [Doc 292-Pg 911] Brown grabbed Gaglia's wallet, crawled through the counter window, discarded the socks on his hands and the knife as he biked home, and threw his clothes into the washing machine (which had a load of laundry running). [Doc 292-Pgs 911-912] Diane picked him up 45 to 60 minutes later. [Doc 292-Pg 912] During the interview, Brown called his mother and told her not to hate him; it was an accident. [Doc 292-Pg 913] Investigators arrested Brown

13

and gave him his <u>Miranda</u> warnings. [Doc 292-Pg 913] Brown went through his statement once more. [Doc 292-Pg 915] At trial, the jury heard a recorded statement made by Brown on December 6, 2002, the day after the search, where he again confessed to murdering Sallie Gaglia. [Doc 292-Pgs 930-963; Govt's Exs 32-B, 32-C, 32-D]

After the jury convicted him on murder and robbery counts and found that the district court should impose the death penalty, this appeal ensued. Additional facts, as necessary, will be set forth in the argument section.

### 3. Statement of the standards of review.

In reviewing the disposition of a motion to suppress, the Court considers the district court's findings of fact for clear error and reviews its legal conclusions *de novo*. <u>United States v. Muegge</u>, 225 F.3d 1267, 1269 (11th Cir. 2000)(per curiam). "'The appellate court should construe the facts in the light most favorable to the party who prevailed below'" – in this case, the government. <u>Id.</u> (cit. omitted).

The Court reviews the denial of an evidentiary hearing for an abuse of discretion. <u>See</u> <u>United States v. Simms</u>, 385 F.3d 1347, 1358 (11th Cir. 2004), <u>cert. denied</u>, ___ U.S. ___, 125 S.Ct. 1872 (2005).

The Court reviews an order to quash only for abuse of discretion. <u>Moore v. Armour Pharmaceutical Co.</u>, 927 F.2d 1194, 1197 (11th Cir. 1991); <u>see also</u>

14

United States v. Arditti, 955 F.2d 331, 345 (5th Cir. 1992)(arising in context of criminal case).  However, where a party fails to object to or appeal a magistrate judge's decision to the district court, the Court lacks jurisdiction to review the magistrate judge's ruling.  See United States v. Brown, 342 F.3d 1245, 1246 (11th Cir. 2003), cert. denied, ___ U.S. ___, 125 S.Ct. 37 (2004).

The Court reviews the district court's evidentiary rulings for a clear abuse of discretion.  United States v. Drury, 396 F.3d 1303, 1315 (11th Cir. 2005).  "Evidentiary errors 'do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted.'" Id. (cits. omitted).

Under the plain error standard of review, the Court has discretion to correct an error where (1) an error occurred, (2) the error was plain, (3) the error affected substantial rights, and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.  United States v. Olano, 507 U.S. 725, 732-36, 113 S. Ct. 1770, 1777-79 (1993).

"The conduct of a voir dire examination of a jury is committed to the sound discretion of the district court." United States v. Schlei, 122 F.3d 944, 994 (11th Cir. 1997).  The failure to object to the manner in which the court conducted voir

dire subjects that claim to plain error review. United States v. Noone, 913 F.2d 20, 36 (1st Cir. 1990).

The Court reviews the constitutionality of a statute *de novo*, construing it, if possible, "'to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.'" United States v. Robinson, 367 F.3d 278, 290 (5th Cir. 2004), cert. denied, ___ U.S. ___, 125 S.Ct. 623 (2004).

The Court reviews the district court's dismissal of a juror for cause for an abuse of discretion; however, the trial court's finding of cause must be based upon "'sufficient inquiry.'" United States v. Spence, 163 F.3d 1280, 1283 (11th Cir. 1998).

The Court reviews the denial of a motion for judgment of acquittal *de novo*. United States v. Peters, 403 F.3d 1263, 1268 (11th Cir. 2005). If the motion challenges the sufficiency of the evidence, the Court review that issue *de novo*, drawing all reasonable inferences in the government's favor. Id.

The Court reviews the district court's decision to deny funds under 21 U.S.C. §848(q)(9) for an abuse of discretion. Hines v. Cockrell, 57 Fed. Appx. 210, 2002 WL 31956173 at *6 (5th Cir. 2002), cert. denied, 540 U.S. 827, 124 S.Ct. 51 (2003); cf. United States v. Osoba, 213 F.3d 913, 915 (6th Cir. 2000)(providing for *de novo* review for denial of expert funds under Criminal Justice Act); United States v. Labansat, 94 F.3d 527 (9th Cir. 1996)(same);

16

Matthews v. Price, 83 F.3d 328, 335 (10th Cir. 1996)(specifying standard for denial of expert services generally).

## SUMMARY OF THE ARGUMENT

Brown raises a total of fifteen issues on appeal, encompassing challenges to pretrial, trial, voir dire, death penalty, and posttrial rulings.

Brown asserts three claims arising from pretrial matters. First, he contests the denial of his motion to suppress his confession (which he gave without Miranda warnings) on the evening of the search of Diane Brown's house. Viewing the facts in the light most favorable to the government, Brown was not in custody when he made that statement, so the district court properly denied his motion to suppress. Second, the district court did not abuse its discretion when it refused to hold an evidentiary hearing on Brown's motion to suppress photographic identification; Brown never identified what was unduly suggestive about the photo spread shown to witnesses. Third, the Court lacks jurisdiction to review the magistrate judge's granting of a motion to quash: Brown did not appeal that disposition to the district court.

As for Brown's two challenges to evidentiary rulings, the district court either acted within its discretion, or committed harmless error, when it permitted jurors to view six photographs of the victim taken at the crime scene. Also, the court did not plainly err when it allowed trial testimony of an excited utterance of

17

Brown's mother or when it permitted Sallie Gaglia's sister to testify about the effect of Gaglia's death on her family. Contrary to Brown's contentions, neither vein of testimony constituted testimonial hearsay.

Brown's five voir dire claims relate to how the district court death qualified potential jurors. Since this case involved a capital crime, the district court could, in fact, death qualify jurors, and in doing so, properly refused to bifurcate voir dire or empanel separate juries for the guilt and penalty phases. For the first time on appeal, Brown quarrels with the district court's phrasing of questions intended to ascertain venire person's views of the death penalty; however, the district court's voir dire allowed the parties to identify unqualified jurors. As for removing jurors for cause, the district court properly did so when confronted with a juror who admitted that her "internal values," not the court's instructions, would guide her vote on the death penalty. Finally, the district judge's slip of the tongue, or a court reporter error, made in voir dire does not warrant a new trial.

Brown challenges the imposition of the death penalty on four grounds. First, he maintains that the Federal Death Penalty Act is unconstitutional because it requires the government to file a notice of intent to seek the death penalty, rather than charge at least one aggravating factor in the indictment. Here, however, the government filed a notice, and the grand jury indicted Brown on intent and statutory aggravating factors – meeting both statutory and constitutional demands.

Second, whether or not the victim's family supports imposition of the death penalty is irrelevant to the penalty phase of trial, so Brown cannot demonstrate a violation of <u>Brady v. Maryland</u> based on his allegation that the government withheld this type of information from him.  Third, in that Brown killed Sallie Gaglia to receive postal money orders, the district court properly denied his motion for judgment of acquittal on the pecuniary gain aggravating factor; even if error exists, it was harmless.  Fourth, assuming that a constitutional basis exists requiring the funding of non-psychiatric experts, the district court did not err when it denied Brown's motions to authorize funds for two experts – experts who would have presented testimony that repeated the testimony of other experts and fact witnesses.

This denial of expert funds also serves as the basis for Brown's last claim. Brown asked the Court to remand this case to the district court to reconstruct the record; allegedly, the district court or magistrate judge held *ex parte* conferences with trial defense counsel on the funding of these experts.  On limited remand, presented with no evidence to that effect by Brown and with the court staff's recollection that no such conferences occurred, the district court  properly resolved Brown's motion without a hearing.

## ARGUMENT AND CITATION OF AUTHORITY

Brown raises fifteen issues on appeal, encompassing pretrial, trial, voir dire, death penalty, and post trial challenges. Each argument will be discussed in turn.

### 1. The district court properly denied Brown's motion to suppress. (Brown's issue V)

As detailed in the fact section at pages 13-14, Brown gave three statements to the police: one at Diane Brown's residence, the second after he was arrested, and the third the next day in a police station interrogation room. He received Miranda warnings before giving his second and third statements, but not his first. In the district court [Doc 37, Doc 185, Doc 205] and on appeal, Brown contends that the first statement resulted from custodial interrogation, necessitating Miranda warnings, and that the second and third statements came "hot on the heals [sic] of the tainted confession." [Br. of Appellant at 60] Thus, he argues that all three statements should have been suppressed. [Br. of Appellant at 52-72] Reviewing the facts in the light most favorable to the government, the party that prevailed below, see Muegge, 225 F.3d at 1269, Brown's claim fails.

#### a. Facts

On December 5, 2002, at 3:45 p.m., eight law enforcement officers arrived at Diane Brown's residence. [Doc 292-Pg 901][6] An officer in the front yard had a

---

[6] In ruling on the suppression issue, the Court may consider evidence presented at the suppression hearing and at trial. United States v. Villabona-

shotgun for the initial contact with the occupants of the house; after that point, officers remained, but the shotgun returned to the squad car. [Doc 302-Pgs 64-65] Other officers knocked on the door, but no weapons were drawn. [Doc 292-Pg 901] Meier Jason Brown answered; Postal Inspector Rushwin spoke to Diane in another room; and although investigators had a search warrant, they conducted the search with Diane's consent. [Doc 292-Pgs 902-903; Doc 302-Pgs 66, 99-100]

Inspector Rushwin walked through the house and spied a pair of shoes with a tread similar to that on the postal counter. [Doc 302-Pgs 71-72; Doc 292-Pgs 904-905] Rushwin then identified himself to Brown, told Brown that he was investigating Gaglia's murder, explained that investigators were talking to people that may have been in the post office that day, and asked Brown, who was sitting in the living room and smoking, if he would speak with investigators. [Doc 292-Pg 906] Brown agreed. [Doc 292-Pg 906] Rushwin "advised [Brown] that he was not in custody. He wasn't under arrest, and that he was free to go at any time." [Doc 302-Pg 41]

After Rushwin said that they would talk at the Chatham County Police Department, Brown went to retrieve his shoes. [Doc 302-Pgs 41-42] In accordance with his standard operating procedure during searches, Rushwin followed Brown. [Doc 302-Pg 42] Brown reached for his shoes – the same pair

---

Garnica, 63 F.3d 1051, 1056 (11th Cir. 1995).

that Rushwin noticed earlier – and Rushwin said that the officers would be taking them as evidence. [Doc 302-Pgs 41-42] Brown, who did not have another pair, did not want to go to the police station in his stocking feet, and agreed to talk to officers at Diane's house. [Doc 302-Pgs 42-43]

Rushwin and Brown sat down at the dining room table. [Doc 302-Pg 43] Given Brown's acquaintance with Detective Woodall of the Liberty County Sheriff's Department, Rushwin decided to wait for the detective to come to Diane's house. [Doc 302-Pgs 43-44] While awaiting Woodall, Rushwin "again informed Jason that he wasn't under arrest, not in custody, and he was free to go at any time." [Doc 302-Pg 44]  During the wait, Brown "sat around and smoked, and did whatever he wanted to do." [Doc 302-Pg 44] Detective Woodall arrived around 5:00 p.m. [Doc 302-Pgs 59, 71] During interviews, Detective Woodall neither carries a weapon nor allows other officers to carry weapons. [Doc 302-Pg 97]

After Detective Woodall and Brown exchanged small talk, Detective Woodall and Rushwin again told Brown "that he wasn't under arrest, in custody and, you know, he was free to leave at any time." [Doc 302-Pgs 46] Brown said he understood. [Doc 302-Pg 46] Detective Woodall elaborated:

> . . . I told him initially he was not under arrest.  I told him numerous times that – I mean, that he was free to leave.  Several times he asked about getting things.  And we talked about – I told him specifically he

could do anything he wants.  We were in his house with his consent and the consent of the young lady.

[Doc 302-Pg 95] Brown did move about the house, and Detective Woodall, sensing that Brown did not like talking in front of people,[7] asked Brown if he would be more comfortable in another room. [Doc 302-Pg 95] Brown agreed, and while the men moved to the TV sitting room, Brown got a soda and a cigarette. [Doc 302-Pg 50] Inspector Rushwin recalled pauses in the questioning: "[Brown] smoked.  He drank sodas, watched television at one point.  He and I talked about the Atlanta Falcons, and small talk at times, too." [Doc 292-Pg 915]

Brown eventually confessed to murdering Gaglia. [Doc 302-Pg 52] At some point, he asked to talked to his mother and to Diane. [Doc 302-Pg 53] "And he was told . . . that he could do whatever he wanted to do, and had been told that throughout the interview." [Doc 302-Pg 53] While Brown spoke to neither woman at that time, he later called his mother (without asking for permission to use the phone) and spoke to Diane alone in the room. [Doc 302-Pgs 53, 57-58] With that one exception, a law enforcement officer always remained in Brown's presence. [Doc 302-Pg 75]

---

[7] Describing this point of the interview, Inspector Rushwin testified that the search was going on, "there was a lot of law enforcement people in there," and "Diane Brown would go back and forth," looking at Brown – all of which distracted Brown and "broke up the interview." [Doc 302-Pgs 49-50]

Inspector Rushwin placed Brown under arrest at 9:14 p.m. that evening (approximately four hours after the interview began), advised Brown of his Miranda rights, and took a formal statement from Brown. [Doc 302-Pgs 59-60; Doc 292-Pg 914]   On the way to the Liberty County jail that night, Detective Woodall contacted the deputy transporting Brown to see if Brown was hungry; Brown "asked [Woodall] to stop by and get him a couple of hamburgers with anything but mayonnaise and onions." [Doc 302-Pgs 89-90] Woodall did. [Doc 302-Pg 90] The next morning, having been advised of his Miranda rights again, Brown made the tape-recorded confession that was played at his trial. [Doc 302-Pgs 90-92; Doc 292-Pgs 297-963; Govt's Exs. 32-B, 32-C, 32-D][8]

---

[8] Although the Court examines the evidence in the light most favorable to the government, for the sake of balance the government briefly recounts Brown's testimony at the suppression hearing and Diane's testimony at trial. According to Brown, the police had their guns drawn when he answered the door, and the officers said, "Police, search warrant." [Doc 302-Pg 124] An officer grabbed Diane, and another one directed him to sit in a chair, where he looked out a window and saw officers with pistols and one with a shotgun. [Doc 302-Pg 125] The police never told him that he could leave. [Doc 302-Pg 126] Brown admitted that the officers let him smoke and drink sodas. [Doc 302-Pg 133]

On direct examination, Diane (a government witness) testified that she gave officers consent to search. [Doc 292-Pgs 736-737] On cross-examination, however, she said that 10 or 12 officers, with guns drawn, "rushed in" her house, and as she looked at the window, she saw a sheriff with a shotgun in the air. [Doc 292-Pgs 752-753] Officers were treating her somewhat roughly and "running from room to room to room." [Doc 292-Pg 753] Diane described it as "very frightening. . . still frightening." [Doc 292-Pg 753]

24

### b. Discussion

Although officers did not read Brown Miranda warnings prior to his first statement, Brown was not in custody at the time. Miranda's requirements adhere only "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning . . ." Miranda v. Arizona, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630 (1966); see also Minnesota v. Murphy, 465 U.S. 420, 430, 104 S. Ct. 1136, 1144 (1984)(describing custody, for Miranda purposes, as "'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest"). "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151 (1984). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996).

Miranda warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." Oregon v. Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977)(finding suspect not in custody under Miranda where officers initiated

contacted with Mathiason, interviewed him at police station, informed him that they suspected him of committing a burglary, and falsely informed him that his fingerprints were found at the scene, and Mathiason admitted his participation in burglary).  Indeed, "'[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.'" California v. Beheler, 463 U.S. 1121, 103 S. Ct. 3517, 3519 (1983)(following Mathiason and finding Miranda warnings not necessary in first interview where Beheler called police to report a murder, told them that his stepbrother had killed the victim, and later accompanied police to the station to give a statement).

Here, investigators spoke with Brown for approximately 4 hours; told him that he was free to leave at least three times; allowed him to move freely about Diane's house (albeit with an escort, a standard operating procedure during a search); let him smoke, drink sodas, and watch TV; did not prevent him from using a phone to call his mother or from speaking with his girlfriend; did not have guns in the interview room; did not handcuff him; and tried to ensure his comfort. Two Eleventh Circuit cases, analyzing similar facts, demonstrate that Brown was not in custody when he spoke to law enforcement officers at Diane's house.

26

First, in United States v. Muegge, 225 F.3d 1267, 1268 (11th Cir. 2000)(per curiam), military investigators sought to question Muegge, a civilian employee, in an ongoing child pornography investigation. At the request of investigators, Muegge's supervisor directed him to appear for questioning at a secure site that remained locked at all times. Id. at 1269. Investigators interviewed Muegge for 2½ hours, and Muegge remained an additional ½ hour while his statement was reduced to writing. Id. Like all visitors to the military investigators' building, Muegge was escorted the entire time; investigators even accompanied him on two cigarette breaks outside the building. Id. Both investigators told Muegge that he did not have to answer their questions and that he was free to leave. Id. The investigators did not read Muegge any Miranda warnings before or during the interview, and Muegge admitted his viewing of pornography on a government computer. Id.

Reversing the district court, the Court found that Muegge was not in custody during this interview. Id. at 1271. Looking to whether an innocent individual in that situation would feel free to leave, the Court made this statement: "If the individual being questioned were innocent, and was told directly he might leave, in the absence of evidence to the contrary the interrogation was non-custodial as a matter of law." Id. The Court acknowledged that certain situations might place such extensive restraints on a suspect's freedom that telling him that

27

he was free to leave could not cure the custodial aspect of the interview. Id. However, no such situation arose here: Muegee was explicitly told he could leave, he came and left on his own, he was given a beverage and two cigarette breaks, all visitors to the military investigator's building required an escort, and the secure facility did not require a key to leave. Id. An innocent person in Muegge's position would have felt free to leave at any time and would not have felt a restraint on his movement amounting to a formal arrest. Id. Thus, Muegge was not in custody during this questioning. Id.

Second, in United States v. Phillips, 812 F.2d 1335, 1356 (11th Cir. 1987) (per curiam), officers were investigating a straw purchase, by pawn shop owners, of a firearm that was eventually used in a murder. During the investigation, officers asked one of the owners, Finkelstein, to come to the station; Finkelstein agreed. Id. at 1357. Two officers questioned him at the station; Finkelstein was not arrested, handcuffed, or locked into the interview room. Id. While neither officer told Finkelstein that he was free to leave, he actually could have left the police station at any time. Id. Although Finkelstein was apprehensive when officers asked questions, a detective told him that they were only investigating the murder and that Finkelstein's cooperation would be helpful. Id. Finkelstein then gave an inculpatory statement. Id. Phillips, the other owner, went to the station later that day and told the officers that "'[w]hatever . . . [Finkelstein] says is what

28

happened." Id. at 1357-58. The government later prosecuted the two pawn shop owners on firearms charges. Id. at 1358-59.

Reversing the district court, the Court found that this interview did not result from custodial interrogation, so no Miranda warnings were required. Id. at 1362. While the interview occurred at a police station and officers suspected that the defendants had committed a firearms offense, these factors did not trigger Miranda: A coercive environment does not equate to an arrest-type situation, and the officer's unarticulated plan has no bearing on the "in custody" determination. Id. at 1361. The men could have left the police station at any time, and there was no suggestion that the officers "resorted to physical or psychological pressure of any sort in order to obtain the statements. . . ." Id. at 1362.

As in Muegge and Phillips, Brown was not in custody when he gave an incriminating statement to officers during the search of Diane Brown's house. Accordingly, the district court properly denied his motion to suppress.

2.    **The district court did not abuse its discretion when it did not hold an evidentiary hearing to resolve Brown's motion to suppress photographic identification. (Brown's issue VII)**

Prior to trial, Brown filed a motion to suppress photographic identification, in which he claimed that the photo spreads showed to witnesses contained photographs of Brown that were unduly suggestive. [Doc 44-Pg 1] The motion indicated that "[c]ounsel knows nothing concerning the manner in which the

arrays were presented to the witness or what, if anything impermissibly suggestive was said to the witnesses during the presentation of the photographic array." [Doc 44-Pgs 1-2] Thus, Brown asked for a hearing on his motion and for suppression of the identifications "unless the government can show that the identifications made were **not** the result of impermissibly suggestive photographic arrays." [Doc 44-Pgs 2-3]

At a motions hearing, trial defense counsel conceded that the out-of-court identification "may not have been" suggestive but that he had only seen photostatic copies, not the actual photographs. [Doc 302-Pgs 22-23, 25] After the trial prosecutor indicated that the originals were available for inspection, the magistrate judge made this statement: "And if, after viewing them, that causes you to think that some type of suggestive technique was used in this case, then the Court will be pleased to, upon a showing of that, hold a hearing." [Doc 302-Pg 27] At the conclusion of the hearing, the magistrate judge renewed his promise of a hearing if Brown discovered "additional information about any suggestive procedure." [Doc 302-Pgs 149-150] Brown did not supplement his motion. Noting that Brown never explained or showed how the procedures were unduly suggestive or otherwise improper, the district court denied his motion without a hearing. [Doc 223-Pg 1] This decision was proper.

To determine whether a district court properly admits identification evidence, the Court "must inquire whether the police used an impermissibly suggestive procedure to obtain the identification" and if so, "whether the identification was unreliable." United States v. Beale, 921 F.2d 1412, 1432-33 (11th Cir. 1991).[9] Brown's motion only suggested that the photographic array was unduly suggestive and indicated that Brown did not know how officers displayed the photographs to the witnesses; indeed, Brown's counsel acknowledged at the motions hearing that the photographs may not have been unduly suggestive at all. [Doc 44-Pg 1; Doc 302-Pgs 22-23]

"'[W]here a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion." United States v. Cooper, 203 F.3d 1279, 1285 (11th Cir. 2000)(finding no evidentiary hearing warranted even where defendants "promise" to prove at hearing matters not specifically alleged in motion); see also United States v. Sneed, 732 F.2d 886, 888 (11th Cir. 1984)(per curiam)(noting also that defendant bears the burden on the issue). Trial testimony established that the photographs were not unduly suggestive. Two witnesses

---

[9] Brown's brief focuses only on the second prong of this test. [Br. of Appellant at 83-86] As demonstrated in the text, he has not made the threshold showing: that the photo display was unduly suggestive.

31

testified that they viewed photo spreads, that no one told them anything about the photographs, and that they selected the photograph of Brown by themselves. [Doc 291-Pgs 633-634, 649-650 ; Govt's Ex 3, Govt's Ex 4]  The photo spreads themselves showed, respectively, 6 and 12 photographs of mustachioed African-American men, approximately 30 years old, and within a six-inch height range of each other. [Govt's Ex 3, Govt's Ex 4]  Brown cross-examined these witnesses about their identifications and asked the district court for a cautionary instruction with regard to the mug shots.  [Doc 291-Pgs 633, 635-643, 651-656]

Thus, the district court did not abuse its discretion when it denied Brown's motion without a hearing. Even if it did, any error was harmless: The evidence against Brown, including his confessions, was overwhelming.  See Beale, 921 F.2d at 1433 (subjecting unreliable photographic identifications to harmless error rule).

3.     **The Court lacks jurisdiction to review the magistrate judge's grant of the motion to quash filed by DFACS.  (Brown's issue IX)**

Brown subpoenaed the Liberty County Department of Family and Children Services ("DFACS") for the production of "[a]ny and all material relating to Sadie Brown and/or Roy Morgan [Brown's mother and half-brother], their living and health circumstances, and any information regarding their residence. . . ." [Doc 232-Appendix A] DFACS responded with a motion to quash, arguing that this confidential information could be released only upon issuance of a court order.

32

[Doc 232-Appendix A at ¶¶2-3]  After considering DFACS' files *in camera*, the magistrate judge granted the motion to quash on this basis:

> . . . the Court has determined that they contain no information relevant to defendant's case and no information that would warrant disclosure of these typically confidential records.  In fact, defendant's name is not even referenced in any of these records . . . .

[Doc 239, Doc 249-Pg 1]

The docket sheet does not reveal, and Brown never argues, that he sought review of this order by the district court.  See generally 28 U.S.C. §636(b)(1)(A) (allowing both magistrate judge's determination of pretrial issues and district court's review of that determination).  Accordingly, the Court lacks jurisdiction to review the magistrate judge's order quashing the production of DFACS' records. See United States v. Brown, 342 F.3d 1245, 1246 (11th Cir. 2003)(following former Fifth Circuit precedent that appeals from a magistrate judge's order must first be made to district court for an appellate court to have jurisdiction); see also United States v. Renfro, 620 F.2d 497, 500 (5th Cir. 1980).[10]

4.    **The district court did not abuse its discretion by admitting photographs of Gaglia's body at the crime scene; alternatively, any error was harmless. (Brown's issue XII)**

Prior to trial, Brown moved to preclude the admission of "gruesome and highly prejudicial color photographs" of Gaglia or to require the government to

---

[10] As noted in the Brown decision, the Solicitor General takes the opposite view.  Brown, 342 F.3d at 1246.  Despite this fact, Brown is binding precedent.

use black and white photographs. [Doc 47-Pgs 1, 6] Noting that cases to the effect that the admission of such photographs fell within the sound discretion of district courts, the trial judge denied Brown's motion "subject to relevancy and other objections at trial." [Doc 223-Pg 2] Over Brown's continuing objection, the government displayed at trial six photographs of Gaglia's body as it appeared in the early afternoon of November 30. [Doc 292-Pgs 762, 771-774; Govt's Exs 9-O, 9-P, 9-Q, 9-T, 9-X, 9-Y]  Three photographs display the body; one focuses on the left side of Gaglia's face and chest area (the site of a fatal wound); one shows wounds on her back; and the last shows a desk and its contents in the center, with Gaglia's body only at the bottom of the image. [Doc 292-Pgs 771-774]

Brown appears to acknowledge that the photographs were relevant evidence under Federal Rule of Evidence 401. [Br. of Appellant at 100]  His argument instead focuses on the balancing test of Federal Rule of Evidence 403, which allows the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."  Specifically, Brown asserts that the photographs lacked probative value because they "in no way depicted the actual state at the time of the crime" and that the images were unduly prejudicial "because of the gruesome nature of the artificial condition of the body and surrounding area." [Br. of Appellant at 102] While implying that the introduction of the photographs may have been harmless as to guilt, Brown asserts that their

34

display was harmful with regard to the penalty phase. [Br. of Appellant at 102]

His arguments lack merit.

### a. Rule 403

In reviewing claims under Rule 403, the Court examines the evidence in the light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact. United States v. Jernigan, 341 F.3d 1273, 1284 (11th Cir. 2003). The rule is "'an extraordinary remedy which should be used sparingly,' and, indeed, the trial court's discretion to exclude evidence as unduly prejudicial is 'narrowly circumscribed.'" United States v. Butler, 102 F.3d 1191, 1199 (11th Cir. 1997); see also United States v. Tinoco, 304 F.3d 1088, 1120 (11th Cir. 2002)(recognizing that the balance should be struck in favor of admissibility).

To support his assertion that the photographs "in no way depicted the actual state at the time of the crime," Brown argues that the images reflected the resuscitation efforts undertaken and did reflect the manner in which Jennifer Zech and Stephen Nichols found Gaglia's body – i.e., curled in a fetal position with two spots of blood on her back. [Br. of Appellant at 101] Brown complains specifically that "the amounts of blood in and around the body were not present when [Gaglia] was discovered. [Br. of Appellant at 101] As a factual premise, that statement is

35

not necessarily true: Even before attempts to revive Gaglia began, there was a lot of blood on the floor and around the body. [Doc 292-Pg 623]

The amount of blood aside, Brown committed a brutal, visceral crime – stabbing a woman with a kitchen knife multiple times in the back and chest, until the knife broke, as she attempted to defend herself – and the photographs were probative as to the nature of Gaglia's injuries, the manner in which she died, and the fact that her murder reflected heinous, cruel, and depraved actions, and serious physical abuse. See, e.g., United States v. Ortiz, 315 F.3d 873, 897 (8th Cir. 2002) (finding graphic photographs of victim's bloody corpse had significant probative value because they showed the manner of death and supported the government's contention that the crime was particularly heinous and depraved), cert. denied, 540 U.S. 1073, 124 S.Ct. 920 (2003); United States v. Soundingsides, 820 F.2d 1232, 1243 (10th Cir. 1987)(finding "undeniably gruesome" photos had considerable probative value to prove the nature of the victim's injuries, the cause of her death, and the defendant's malice aforethought); United States v. Bowers, 660 F.2d 527, 529-30 (5th Cir. Unit B 1981)(finding color photograph of child's lacerated heart was probative of government's case that defendant used cruel and excessive physical force against her child); United States v. McRae, 593 F.2d 700, 707 (5th Cir. 1979)(finding photographs were "not pretty even to the hardened eye," but "[n]either . . . was the crime").

36

As for prejudice, "[r]elevant evidence is inherently prejudicial," but Rule 403 only guards against unfair prejudice. Id. "The introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair." Jacobs v. Singletary, 952 F.2d 1282 (11th Cir. 1992)(discussing photographs in context of habeas corpus ruling, not in context of Rule 403). Here, the district court cautioned the government not to introduce many photographs [Doc 292-Pg 773],[11] which ensured that the case contained no "parade of horrors." McRae, 593 F.2d at 707; cf. United States v. Kaiser, 545 F.2d 467, 476 (5th Cir. 1997)(finding that admission of photographs of victim at crime scene not unduly prejudicial; "although they are upsetting, we cannot say that they are in any respect more gruesome or shocking than is inherent in any visual record of a murder"). Brown suggests other methods of proving these facts (use of the autopsy photos or a diagram), but the existence of alternatives does not render the crime scene photographs prejudicial. Cf. Bowers, 660 F.2d at 530 (stating that defense's offer to stipulate as to cause of death did not preclude government from presenting proof on issue).

---

[11] Indeed, after the government published the third picture, the judge called counsel to a side bar conference and said, "I want you to have adequate opportunity to demonstrate the position of the body. But I think this is enough." [Doc 292-Pg 773] After noting that the body's position became more relevant after the defense's cross-examination of Linda Ashcraft, a trial prosecutor promised to "streamline it." [Doc 292-Pg 773]

Thus, the district court did not abuse its discretion when it admitted the six crime scene photographs.

### b. Harmless error

Even assuming that the district court's evidentiary ruling constituted an abuse of discretion, any error was harmless. Various witnesses placed Brown at the post office at relevant times, and Brown confessed to murdering Gaglia. [Doc 291-Pgs 569-571, 627, 629-631, 644-647; Doc 292-Pgs 911-913, 930-963] In light of the overwhelming evidence of Brown's guilt, allowing these photographs constituted harmless error in the guilt phase. See United States v. Gunn, 369 F.3d 1229, 1236 (11th Cir. 2004)(stating that error harmless where other convincing evidence supports verdict and error had no substantial influence on verdict), cert. denied, ___ U.S. ___, 125 S.Ct. 324 (2004).

Brown maintains that the admission of the six photographs constituted harmful error in the penalty phase. [Br. of Appellant at 102] Although the government did not show the photographs again in the penalty phase, the trial prosecutor referenced them in closing argument:

> Why is this justice? Because [Brown] committed the offenses in an especially heinous, cruel, and depraved manner involving serious physical abuse to the victim.
>
> You've seen the photographs of the crime scene, and what [Brown] did to Sallie Gaglia. You heard from Dr. Kaponen, and you saw from the autopsy photographs. You saw what he did to her.

38

Did that involve serious physical abuse?  Of course[] it did.

[Doc 293-Pg 1173] The government's argument was proper.  See Ortiz, 315 F.3d

at 897 (finding graphic crime scene  photographs supported government's

contention that crime was heinous and depraved).

Brown relies on Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003), a case

with significantly different facts, to support his harmful error argument. [Br. of

Appellant at 102] There, the defendants killed the victim by blunt force trauma to

the head due to a savage beating.  Id. at 1222-23.  Fearing that the victim was alive

and could identify them, the attackers then stabbed him 50 to 60 times, with only 2

stab wounds occurring before death.  Id. at 1223-24.  During the penalty phase of

the case, the state presented six photographs of the victim's body at the crime

scene – photographs that displayed the victim's numerous post-mortem wounds,

large gash wounds, exposed intestines, swollen face, and black eye.  Id. at 1224,

1227.  Finding that the murder was especially heinous, atrocious, and cruel, the

jury delivered death sentences.  Id. at 1224.

Using those photographs in the Spears  penalty phase suffered from one

fatal flaw: State law defined that aggravating factor as involving conscious

suffering, and minimal evidence suggested that the victim was conscious or even

alive during the stabbing.  Id. at 1226-28.  Further, the state did not introduce the

photographs during the guilt/innocence phase of trial, "seeming deliberately to

await the second stage to present the more gruesome photographs solely for their shock value." Id. at 1228. Thus, on habeas review, the Tenth Circuit found that the photographs deprived the defendants of their constitutional right to a fundamentally fair sentencing hearing. Id. at 1229.

Brown's penalty phase differs markedly from that in Spears. The government did not show the photographs at all then; in accordance with the jury instruction on the aggravating factor [Doc 293-Pgs 1206-1207], the jury could properly consider these photographs; and as indicated by the bloodied telephone handset that was on and near Gaglia's body when the first responders arrived, Gaglia survived her stabbing, if only for a few minutes. [Doc 292-Pgs 618-619, 625, 777, 799-800]

5.   **The district court did not plainly err when it allowed certain testimony at the guilt and penalty phases of trial. (Brown's issue IV)**

Citing Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004), Brown maintains that the district court impermissibly permitted the jury to consider hearsay during the guilt and penalty phases of the trial. [Br. of Appellant at 42-52] Brown points to two guilt phase, and one penalty phase, exchanges that he deems offensive. Brown suggests that he preserved his objection to all three portions of testimony via a pretrial motion. [Br. of Appellant at 44, 52] In fact, the cited motion and the order denying it discuss Brown's claim that the Federal Death Penalty Act is unconstitutional in part because it permits a capital

sentencing jury to consider hearsay and "by necessarily implication" denies the defendant of confrontation and cross-examination rights. [Doc 39-Pg 10; Doc 183-Pg 5; Doc 204] With one exception, the Court reviews Brown's claims for plain error. See generally Olano, 507 U.S. 725 at 732-36, 113 S. Ct. at 1777-79.

### a. The guilt phase

Brown identifies two exchanges that he believes violates Crawford. First, Darlene Washington, Gaglia's co-worker who sorted mail with her on the morning of November 30, testified (without objection) that she overheard Gaglia speaking to a postal customer, who eventually identified himself as "Jason." [Br. of Appellant at 51; Doc 291-Pgs 569-571] Brown takes issue with the district court's admission of Washington's testimony about the customer's identification of himself. [Br. of Appellant at 52] Brown cannot show any error, much less plain error, under Crawford.

Crawford applies to testimonial hearsay – e.g., "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Crawford, 124 S. Ct. at 1374. The man's statement to Gaglia in the post office, identifying himself as "Jason," does not amount to testimonial hearsay. Thus, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford . . . flexibility in [the] development of hearsay law – . . . as would an approach that exempted such statements from Confrontation

Clause scrutiny altogether." Id. In any event, it is probably not hearsay at all. See Fed. R. Evid. 801(d)(2) (noting that an admission of a party-opponent, offered against that party, does not constitute hearsay). Even if it were impermissibly admitted hearsay, its admission was harmless: According to the investigators who interviewed Brown and Brown's recorded statement, Brown admitted that he spoke with Gaglia on his first visit to the post office and that Gaglia asked, and he stated, his name. [Doc 292-Pgs 909, 934]

> Second, Brown objects to his cousin's testimony to this effect:

> My cousin Rodney answered the phone, and he gave the phone to his mother, which is Aunt Sadie. And she was like, "Meier, where you at? Meier, you didn't kill that lady, no." She started crying, and I left.

[Doc 291-Pg 669] At trial, Brown objected to the admission of this testimony because Sadie Brown had died and he could not cross-examine her about this statement. [Doc 291-Pg 667] The trial prosecutor noted that Sadie's "unavailability . . . is not a factor" since the government sought to introduce her exclamation, and district court, with the promise to "monitor it closely," agreed. [Doc 291-Pg 669][12] The witness then gave the answer reproduced above. [Doc 291-Pg 669]

---

[12] The trial prosecutor suggested a limiting instruction, but defense counsel believed one would not be helpful. [Doc 291-Pg 667]

As with the prior testimony, this account is not testimonial hearsay; it is non-testimonial hearsay falling within a recognized evidentiary exception left untouched by Crawford. See Fed. R. Evid. 803(2)(excepting from hearsay rule an excited utterance, or "[a] statement made while the declarant was under the stress of excitement caused by the event or condition").

Brown cannot demonstrate error under Crawford in the admission of this nontestimonial hearsay.

### b. The penalty phase

In the penalty phase of trial, Catherine Webb – Sallie Gaglia's older sister and next door neighbor – testified about her sister's family life: Sallie was married to Joe Gaglia and had two sons, Scott (23) and Craig (18). [Doc 293-Pgs 1084-1085] According to Webb, her nephews were, respectively, finishing a college education and completing Army medic training. [Doc 293-Pgs 1085-1086] After his mother's murder, Craig delayed going to college, hoping that the wait would allow him "such a state of mind that he could concentrate on his education." [Doc 293-Pg 1086] Without objection, Webb described the current emotional state of Joe, Sallie's widower:

> Today, as a matter of fact, I just spoke with him just a few minutes
> ago. He could not appear. His emotional state, he is going through
> therapy. This has been extremely difficult for him. And we remain
> very close. And he – I have kept him in touch [sic] all along the way.
> And he knew that under the advi[c]e of his therapist, and a counseling
> group that he had gone to with other family members that have lost

43

close[] loved ones, that he could not, he could not manage to go through this court hearing.

[Doc 293-Pgs 1086-1087] Webb then paid tribute to her sister's willingness to help others, her faith, her love of her family, and her goodness. [Doc 293-Pgs 1087-1088] Brown now maintains that Webb's testimony about her nephews and brother-in-law "is nothing but hearsay" and that Crawford applies to the penalty phase in a capital case. [Br. of Appellant at 46-50] Brown cannot demonstrate plain error.

Even assuming that the Confrontation Clause applies in the penalty phase of a capital case, see generally Proffitt v. Wainwright, 685 F.2d 1227, 1255-57 (11th Cir. 1982), Brown cannot show a Crawford violation for the same reason identified above: Webb's statements did not relate testimonial hearsay, the crux of Crawford's concern. See Crawford, 124 S. Ct. at 1374. Indeed, Webb's testimony about her sister's family – which was necessarily her family, too – probably was not hearsay at all. Webb had personal knowledge of her sister's marriage to Joe, the birth of her nephews, and the fact that her nephews were in college and training to be an Army medic. See Fed. R. Evid. 602 (allowing witness to testify as to personal knowledge). Webb also could give an option "rationally based on

[her] perception . . .," see Fed. R. Evid. 701, which would allow her to testify that her brother-in-law and nephews were distraught over Sallie's murder.[13]

The Federal Rules of Evidence – which do not apply in this phase of the proceeding[14] – govern these considerations, but analysis under the Confrontation Clause does not change the result. To the extent that Webb's testimony was not hearsay, there are no Confrontation Clause issues. See United States v. Peaden, 727 F.2d 1493, 1500, n. 11 (11th Cir. 1984)(noting dearth of cases extending Confrontation Clause protection to evidence that is not hearsay). "The Sixth Amendment guarantees a defendant an adequate opportunity to cross-examine adverse witnesses." Chandler v. Moore, 240 F.3d 907, 918 (11th Cir. 2001) (discussing Confrontation Clause in context of state capital penalty phase). Hearsay evidence is admissible at a capital sentencing, subject to one caveat: A defendant must be given the opportunity to rebut hearsay information. Id. Even if

---

[13] Brown cites two passages from the government's closing argument, at pages 1198 and 1175 (not 1199 and 1176) of the transcript, that allegedly "exploited Ms. Webb's impermissible hearsay testimony." [Br. of Appellant at 47] As demonstrated above, Webb's testimony was not hearsay, and certainly not testimonial hearsay as contemplated by Crawford. Further, Brown objected to neither passage at trial.

[14] In a death penalty case, a sentencing jury may consider information regardless of its admissibility under the Federal Rules of Evidence "except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. §3593(c).

Webb's testimony amounted to hearsay, Brown chose not to cross-examine her [Doc 293-Pg 1001] and did not attempt to rebut her testimony – i.e., that Sallie Gaglia's husband and sons were profoundly affected by her death – in his portion of the penalty phase. He was given the opportunity to do both things, however, so no Confrontation Clause violation occurred. Id.[15]

### 6.    Since this case involved a capital crime, the district court properly death-qualified potential jurors. (Brown's issue XIV)

The superseding indictment charged Brown with two crimes punishable by death. [Doc 137-Pgs 1-2] Accordingly, in voir dire, the district court extensively questioned potential jurors about their beliefs about the death penalty. On appeal, as before the district court [Doc 103], Brown labels this questioning as error because it led to his being "tried by a jury predisposed to convict him in violation of the Fifth, Sixth, and Eighth Amendments . . . ." [Br. of Appellant at 107-108] The Supreme Court has rejected this argument. Lockhart v. McCree, 476 U.S.

---

[15] As a practical matter, Brown's trial counsel may very well have preferred Webb to testify about the impact of Sallie Gaglia's death on her husband and sons. Undoubtedly, Webb was devastated by her sister's murder. In describing the effect of Sallie's slaying on her husband and sons, though, Webb acted as a filter, rather than exposing the jury to the raw grief of Sallie Gaglia's closest relatives. There can be no doubt that Joe, Scott, and Craig Gaglia mourn Sallie's death, leaving the traditional aims of the Confrontation Clause – 1) ensuring that a witness will make his statement under oath, 2) forcing the witness to submit to cross-examination, "the greatest legal engine ever invented for the discovery of the truth," and 3) permitting the jury to assess the credibility of the witness by observing his demeanor – a bit hollow here. See California v. Green, 399 U.S. 149, 158, 90 S. Ct. 1930, 1935 (1970)(discussing purpose of confrontation).

162, 173, 106 S. Ct. 1758, 1764 (1986)(holding that "the Constitution does not

prohibit the States from 'death qualifying' juries in capital cases"). Thus, the

district court properly questioned potential jurors during voir dire.

7.    **The district court properly refused to bifurcate voir dire. (Brown's issue XIII)**

In a closely related (and preserved [Doc 95, Doc 171-Pg 4]) issue, Brown

asserts that the district court should have held a bifurcated voir dire – and possibly

empaneled two different juries – to address guilty and penalty issues. [Br. of

Appellant at 103-107] Brown supposes that "jurors who are 'death qualified' are

undoubtedly predisposed to convict a defendant" because "[t]he presumption that

the defendant is not guilty is entirely subordinated to the issue of punishment."

[Br. of Appellant at 104-105][16]  Brown is mistaken.

First, Brown's argument appears to be conceptually the same as his

preceding argument: Death-qualifying jurors during voir dire prejudices him.

Again, that practice is constitutionally permissible. See Lockhart, 476 U.S. at 173,

106 S. Ct. at 1764.  Indeed, the Lockhart court reached that conclusion after

assuming that studies presented by the death penalty defendant were "both

---

[16] As a factual matter, during voir dire the district court repeatedly
reminded the panels of venire persons that Brown entered the case with a
presumption of innocence, that the government bore the burden of proof beyond a
reasonable doubt, and that the jury was to decide his guilt or innocence. [Doc
295-Pgs 14-18, 42-44, 66-68, 70-71, 97-98, 123-127, 154-55]

methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries." Id.[17] Turning to this case, the district court tried to minimize these effects in question 31 of the juror questionnaire, which asked each potential juror if his "opinion regarding the death penalty [would] influence [him] in deciding the guilt of the defendant." [Doc 295-Pg 160]

Second, the district court could not empanel a different jury to determine whether to impose the death penalty: The Federal Death Penalty Act requires in this case that the penalty hearing be conducted "before the jury that determined the defendant's guilt." 18 U.S.C. §3593(b)(1). This provision both "aligns practice under the federal death penalty law with the general practice in capital cases, which are ordinarily tried before a unitary jury" and reflects that "constitutional challenges by defendants to unitary capital jury procedures have

---

[17] Brown relies on Grigsby v. Mabry, 758 F.2d 226 (8th Cir. 1985)(en banc), calling it "instructional" as to Brown's claim that "the denial of a bifurcated trial in a death penalty case violates the Eighth Amendment's prohibitions against cruel and unusual punishment." [Br. of Appellant at 106] While Brown acknowledges that the Supreme Court reversed Grigsby, his brief fails to make clear that Lockhart reversed Grigsby. See Grigsby v. Mabry, 758 F.2d 226 (8th Cir. 1985) (en banc), rev'd sub nom Lockhart v. McCree, 476 U.S. 162, 106 S. Ct. 1758 (1986).

To the extent Brown claims that the district court denied him a bifurcated trial, he is incorrect: The court held separate guilt and penalty phase trials, although it conducted a single voir dire.

48

failed." United States v. Williams, 400 F.3d 277, 281 (5th Cir. 2005)(per curiam)(vacating district court's order purporting to empanel non-death penalty-qualified jury to hear guilt/innocence phase of trial), cert. denied, ___ U.S. ___, 125 S.Ct. 1611 (2005).

## 8.   The district court did not plainly err by asking jurors about their beliefs concerning the death penalty.   (Brown's issue III)

The district judge conducted a generalized voir dire, in open court, with the three panels of venire persons. [Doc 295] The judge and attorneys for both sides then met with each potential juror individually to discuss death penalty issues. [Doc 290, Doc 291] Excerpting from the individual voir dire sessions,[18] Brown now contends that the way the district court phrased certain questions amounted to the court's "implicitly instruct[ing] the jurors erroneously about the proper role of aggravating an [sic] mitigating circumstances." [Br. of Appellant at 33-34] Brown

---

[18]   Brown states in a footnote that "Dorothy Rentz, a juror who was selected by the parties and was polled at the conclusion of both guilt-innocence and penalty phases of the trial was not (to the best of defendant's ability to find) ever questioned in court." [Br. of Appellant at 34, n. 2] Rentz' voir dire, and the timing of Brown's claim, are discussed in the final footnote of this brief.

never objected to any of these questions during voir dire,[19] and he can demonstrate no plain error here.

According to Brown, the district court's "hypothetical questions . . . unmistakably suggested to the [potential] jurors that the sentence of death would be appropriate *unless* mitigating factors outweighed any aggravating factors." [Br. of Appellant at 34] As an initial matter, "[p]rospective jurors would have had to make a series of inferential leaps before their minds could have settled on the misapprehension ascribed by the defendant." United States v. Noone, 913 F.2d 20, 35 (1st Cir. 1990)(finding arguably misleading inquiry in voir dire presented no reversible error under either harmless or plain error standard).  Assuming venire persons made the requisite mental leap, Brown identifies two possible effects from the district court's voir dire inquiries: Potential jurors may have been predisposed to decide his sentence based upon the voir dire questions, not upon the jury instructions, and those questions may have engendered a "possibility that

---

[19]   Brown complains that his "counsel's participation in voir dire was essentially relegated to that of a spectator." [Br. of Appellant at 40] The record refutes this contention.  With six of the venire persons cited by Brown, for instance, the district court specifically invited counsel to ask questions of the potential juror; Brown's counsel did so once. [Doc 290-Pgs 135-136, 256, 336; Doc 291-Pgs 415, 429, 502] Also, a review of the first few pages of voir dire demonstrates that trial defense counsel objected to the form of questions [Doc 290-Pgs 29, 54, 90], asked the trial judge to inquire into a particular area with a juror [Doc 290-Pg 100], and asked, or had an opportunity to ask, questions of the venire persons. [Doc 290-Pgs 114, 122, 126]

many of these jurors may not even have qualified had the question been posed correctly." [Br. of Appellant at 40]

Brown's first supposition fails. This Court has "stated in numerous cases . . . that jurors are presumed to follow the court's instructions." Brown v. Jones 255 F.3d 1273, 1280 (11th Cir. 2001)(collecting cases); see also United States v. Noone, 913 F.2d 20, 33 (1st Cir. 1990)(stating that even if voir dire inquiries "left prospective jurors in doubt, at the time. . .the district court clarified the matter in its final jury charge"). Brown acknowledges that the charge was correct. [Br. of Appellant at 39, n. 3]

Second, the questions adequately allowed the parties to qualify potential jurors. "The Constitution. . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." Morgan v. Illinois, 504 U.S. 719, 729, 112 S. Ct. 2222, 2230 (1992). Part of the right to an impartial jury is "an adequate *voir dire* to identify unqualified jurors." Id. "'Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.'" Id. at 729-30, 2230. In capital cases, the "crucial disqualification issue" is "whether the prospective jurors would automatically vote for or against the death penalty. . . ." Ramsey v. Bowersox, 149 F.3d 749, 757 (8th Cir. 1998).

51

Here, the entire voir dire process – including the juror questionnaire and the questions excerpted by Brown – allowed the district court and the parties to empanel an impartial jury.  In the questionnaire, questions 29 through 36 probed each potential juror's beliefs about the death penalty, including any automatic opposition to or support of that punishment; a sliding scale by which the venire person could rate his feelings about capital punishment; any effect that that determination would have on the guilt phase; the ability to weigh aggravating and mitigating factors; and any racial overtones in its imposition. [Doc 295-Pgs 159-162] The district court's individual voir dire allowed the parties to discuss these answers with each potential juror, make additional inquiry where needed, weed out any unqualified jurors, and select an impartial jury.  Brown's speculation to the contrary – i.e., "the possibility that many of these jurors may not even have qualified had the question been posed correctly" – does not justify plain error relief.  See United States v. Rodriguez, 398 F.3d 1291, 1299-1300 (11th Cir. 2005) (stating that defendant does not meet burden of showing effect on substantial rights under plain error test where effect of error is uncertain).  Again, proper jury instructions on mitigating and aggravating circumstances negated any error in these questions.  Noone, 921 F.2d at 36 (finding either harmless error, or plain error, where proper jury instruction corrected any arguably misleading voir dire question).

52

## 9.    The district court properly dismissed a potential juror for cause. (Brown's issue X)

Brown next challenges the district court's dismissal for cause of potential juror number 247, Kristin Fahey. [Br. of Appellant at 91-93] According to Brown, Fahey's "answers demonstrated her ability to be open-minded (albeit appropriately hesitant) about the imposition of the death penalty," so her dismissal constituted error. [Br. of Appellant at 92] Because Fahey indicated that her decision would be guided by her "internal values," rather than on the instructions given by the district judge, the court properly dismissed her for cause.

Going over Fahey's response to the juror questionnaire's inquiry about whether she had formed an opinion about Brown's guilt, the court noted that Fahey – who had read every article in the local newspaper about Gaglia's murder – had written *"guilty and not sure."* [Doc 290-Pgs 198- 199][emphasis in original] Fahey affirmed that she could make her decision based on the evidence in the case. [Doc 290-Pg 199] Fahey's questionnaire also indicated that she *"personally oppose[d] the death penalty in some cases"* and that she *"oppose[d] the death penalty as a punishment."* [Doc 290-Pg 199][emphasis in original]  When asked if she could impose the death sentence under any circumstances, Fahey replied, "I'm not sure that I could, sir." [Doc 290-Pg 200] Her opposition was not so firm, however, as to prevent her from imposing the death penalty ever. [Doc 290-Pgs

53

200-201] With regard to this case specifically, the district judge and Fahey had

this exchange:

> THE COURT: From what you know about this case, could you listen to the evidence and consider — in other words, not rule out at the start the death sentence?
>
> JUROR: I'm not sure that I could, sir.  It seems to be a very, very difficult thing for me to have to decide.
>
> THE COURT: Okay.  I gather in this case that you could not or would have great difficulty imposing the death sentence [assuming that Brown is guilty].
>
> JUROR: Yes, sir.

[Doc 290-Pg 201]  Fahey then told the district court that she would not rule out

imposing the death sentence. [Doc 290-Pg 201]

Noting the seeming inconsistencies in Fahey's position, a trial prosecutor

asked her "at what point [she] would begin to consider the imposition of a death

sentence." [Doc 290-Pg 202] Fahey gave this reply:

> It is very difficult for me to answer.  I guess in my background as a psychotherapist, I have learned for so long to suspend judgment from people, to not judge anyone that it has become almost a habit.  So, it is very difficult to think about being placed in a position where I would have to make judgments and judge whether someone lives or dies.

[Doc 290-Pg 202] Fahey then had the exchange with defense counsel, excerpted in

Brown's brief, wherein she indicated that she had not ruled out the possibility of a

54

death penalty and wanted to hear everything. [Doc 290-Pgs 203-204] Questioned

by a trial prosecutor, Fahey's voir dire concluded as follows:

> MR. NEWMAN: Ms. Fahey, would you make your decision on the ultimate punishment in this case based on your internal set of values or on what the law is that Judge Edenfield will give you to apply, which by your oath as a juror you would be sworn to follow?
>
> JUROR: I believe I would probably make the decision based upon my own internal values.
>
> MR. NEWMAN: Even if those might conflict and be different than what Judge Edenfield is telling the jury to apply?
>
> JUROR: Yes.

[Doc 290-Pg 205] The district judge described Fahey as "altogether candid" in this

last remark, which gave him "grave concern that she is qualified." [Doc 290-Pgs

206-207]   Over Brown's objections, the district court disqualified Fahey for

cause. [Doc 290-Pg 215]

"[T]he State may bar from jury service those whose beliefs about capital

punishment would lead them to ignore the law or violate their oaths." Adams v.

Texas, 448 U.S. 38, 50, 100 S. Ct. 2521, 2529 (1980).  To determine whether the

district court properly excused Fahey for cause due to her views about the death

penalty, the Court considers those views would "'prevent or substantially impair

the performance of [her] duties as a juror in accordance with [her] instructions and

[her] oath.'" Wainwright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985)

(adopting test from Adams).   "[T]his standard does not require that a juror's bias

55

be proved with 'unmistakable clarity.'" Id. Even where the printed record may be unclear, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be able to faithfully and impartially apply the law," entitling the trial judge's findings to deference. Id. at 425-26, 852-53.

The record here is clear: Potential juror Fahey admitted that she would probably base her decision on her "own internal values," rather than the law charged by the judge as required by the juror's oath. [Doc 290-Pg 205] If the passages cited by Brown somehow muddy Fahey's statement of her intent, the Court should defer to the district judge's impressions of her – namely, that although at times she seemed to struggle with the issue, in the end, Fahey candidly admitted that she would not necessarily follow the law or the court's instructions. [Doc 290-Pgs 206] Accordingly, the district court properly dismissed potential juror Fahey for cause. Cf. Stewart v. Dugger, 877 F.2d 851, 855 (11th Cir. 1989)(affirming dismissal of juror for cause where juror had grave problems with imposition of death penalty but allowed that he might be able to impose it in a case like Charles Manson's).

**10.    The district court's unobjected-to slip of the tongue, or court reporter's error, in voir dire does not warrant a new trial. (Brown's issue XV)**

In individual voir dire of Tamara Brewer, the transcript reflects this statement by the district judge: "Now, you understand that the defendant has

56

entered a plea of guilty." [Doc 291-Pg 499] Neither party objected. The judge then stated that the law presumes Brown not guilty and that the government must demonstrate Brown's guilt beyond a reasonable doubt. [Doc 291-Pgs 499-500] Brewer became a member of the jury. [Doc 291-Pg 535; Doc 293-Pg 1052]

In preliminary instructions, the district court informed the jury that it must determine whether Brown was guilty or not guilty, that the government had the burden of proving guilt beyond a reasonable doubt, and that Brown had no burden to prove his innocence. [Doc 291-Pgs 543, 546-547] In the final instructions, the judge reiterated these principles. [Doc 293-Pgs 991-992] After the jury returned a verdict of guilty and during the penalty phase, defense counsel read a stipulation to the effect that Brown had agreed to plead guilty in exchange for a life sentence without parole. [Doc 293-Pg 1167]

Calling the district court's initial statement to juror Brewer – i.e., that Brown had entered a plea of guilty – a "slip of the tongue," Brown argues he is entitled to a new trial. [Br. of Appellant at 111-113] As an initial matter, an equally plausible explanation exists: The court reporter inadvertently failed to transcribe "not" before "guilty," which may explain why neither the trial prosecutors nor defense counsel corrected the judge. Cf. United States v. Lebron-Gonzalez, 816 F.2d 823, 830 (1st Cir. 1987)(noting that error in jury instruction "seems so obvious that, had this dereliction been brought to the court's attention,

57

it would have promptly and adequately clarified any misunderstanding," and surmising that error due to reporter's transcription or "wholly unintended and unprejudicial comment of the judge").

Even assuming that the district court made a slip of the tongue, Brown presents no reversible error. See, e.g., United States v. DeMasi, 40 F.3d 1306, 1321-22 (1st Cir. 1994)(finding district court's comments on the evidence, "although problematic, are isolated snippets culled from over thirty pages of generally cautious, careful, and correct instructions. At most, the statements were inadvertent slips of the tongue with limited prejudicial force."); United States v. McCue, 643 F.2d 394 (6th Cir. 1981)(per curiam)(finding that judge's inadvertently using "convict," instead of "acquit," at one point in jury instructions did not constitute reversible error); United States v. Rosa, 493 F.2d 1191, 1195 (2d Cir. 1974)(finding harmless error where judge instructed that "guilt or innocence" of defendant should be determined beyond a reasonable doubt, because judge correctly instructed jury on burden of proof and presumption of innocence).

## 11.    Ring v. Arizona (Brown's issue XI)

Where the government intends to seek the death penalty, the Federal Death Penalty Act ("FDPA") requires the prosecutor to file a notice with the district court stating that the circumstances of the offense and specific aggravating factors

justify capital punishment.   18 U.S.C. §3593(a).  Although prosecutors must submit aggravating factors to the unanimous review of a trial jury, 18 U.S.C. §3593(d), the FDPA imposes no statutory obligation for a grand jury to charge those factors in an indictment.  Relying on Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002),[20] Brown renews his contention that the FDPA is facially unconstitutional because it allows the imposition of a death sentence based on the government's notice, rather than a grand jury's indictment.  [Br. of Appellant at 93-99; Doc 39, Doc 183, Doc 204] Brown's claim fails.

"[T]he government is required to charge, by indictment, the statutory aggravating factors it intends to prove to render a defendant eligible for the death penalty . . . ." United States v. Robinson, 367 F.3d 278, 284 (5th Cir. 2004) (noting Fifth Amendment requirement); accord United States v. Allen, ___ F.3d ___, 2005 WL 1005101 at *2 (8th Cir. May 2, 2005)(en banc); United States v. Higgs, 353 F.3d 281, 298 (4th Cir. 2003), cert. denied, ___ U.S. ___, 125 S.Ct. 627 (2004).  In this case, the grand jury's first indictment charged one statutory

---

[20] Ring examined the constitutionality of a state death penalty scheme that required the trial judge to examine aggravating and mitigating circumstances and then to determine whether to impose the death penalty. Ring, 536 U.S. at 592, 122 S. Ct. at 2434. The Court held that the Sixth Amendment required that a jury (not a judge) find the existence of these aggravating factors because they operated as "'the functional equivalent of an element of a greater offense.'" Id. at 609, 2443. Because Ring did not contend that his indictment was constitutionally defective, the Court did not reach that argument. Id. at 597, 2437, n. 4.

aggravating factor: that Brown "committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to Sallie Louise Gaglia (18 U.S.C. §3592(c)(6))." [Doc 15-Pgs 2-3] A superseding indictment included this allegation, as well as a second statutory aggravating factor: that Brown "committed the offenses in expectation of the receipt of anything of pecuniary value (18 U.S.C. §3592(c)(8))." [Doc 137-Pgs 2-3] In addition to indicting these statutory aggravating factors, the government also filed the notice required by the FDPA. [Doc 136]

Brown maintains that by indicting these statutory aggravating factors, the government impermissibly "attempted to constitutionalize the facially unconstitutional" FDPA, which requires only notice. [Br. of Appellant at 94] "'A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.'" Robinson, 367 F.3d at 290 (cit. omitted). The FDPA is not facially unconstitutional: While nothing in the Act requires prosecutors to charge aggravating factors in an indictment, nothing in the Act inhibits them from doing so. Id.; accord Allen, 2005 WL 1005101 at *9; see also United States v. Sampson, 245 F. Supp.2d 327, 330-338 (D. Mass. 2003)(finding FDPA constitutional and distinguishing United States v. Jackson and Blount v. Rizzi). This practice "preserves the constitutionality of

FDPA prosecutions." Allen, 2005 WL 1005101 at *9. Uninhibited by a proscription in the FDPA, the government charged statutory aggravating factors in the indictment, complying with constitutional requirements.

Brown faults the indictment for failing to include nonstatutory aggravating factors. [Br. of Appellant at 99] A single statutory aggravating factor "elevate[s] the available statutory maximum sentence from life imprisonment to death." Id. at *2. "Because nonstatutory aggravating factors do not increase the available punishment to which a defendant might be subjected, they are not required to be alleged in the indictment." Higgs, 353 F.3d at 299.

The FDPA is not facially unconstitutional. Here, the government complied with both constitutional and statutory requirements: The grand jury's indictment contained two statutory aggravating factors and the government filed notice of its intent to seek the death penalty. Thus, the district court properly rejected Brown's claim.

## 12.    The victim's family's feelings about the death penalty do not constitute Brady material. (Brown's issue VIII)

Brown next maintains that "upon information and belief, the government withheld materially favorable evidence as it related to punishment" in violation of the obligations imposed by Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). [Br. of Appellant at 86-87] According to Brown, "sometime after the verdict, it was revealed that the victim's husband had communicated with the

61

Department of Justice that he supported the resolution of this case by a guilty plea and sentence of life in prison without the possibility of parole." [Br. of Appellant at 87, n. 19] Brown argues that if this information is true, it is material and grounds for reversal. [Br. of Appellant at 86]

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97. Under Brady, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." Id. Even assuming that Brown correctly assesses the Gaglia family's feelings about the death penalty in this case, those sentiments do not constitute material evidence in the death penalty phase. See Reese v. Delo, 94 F.3d 1177, 1183 (8th Cir. 1996)(stating that the family's opposition to capital punishment "'is not a material circumstance, and there was no violation of discovery principles in not disclosing this opposition'").

Further, disclosing the family's sentiment (if any) against the death penalty would not have affected the outcome of the proceedings: Any such testimony

62

would not have been relevant or admissible. First, to determine whether a defendant eligible for the death penalty should, or should not, receive that sentence, the jury may consider "relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." Tuilaepa v. California, 512 U.S. 967, 972, 114 S. Ct. 2630, 2635 (1994). The Gaglia family's feelings about the death penalty are not relevant:

> An individual's personal opinion of how the sentencing jury should acquit its responsibility, even though supported by reasons, relates to neither the character or record of the defendant nor to the circumstances of the offense.

Robison v. Maynard, 829 F.2d 1501, 1505 (10th Cir. 1987)(finding that victim's sister's opposition to death penalty properly excluded since defense attempted to introduce this testimony to incite an arbitrary response).

Second, in light of the district judge's instruction, the family's views would have been inadmissible in the penalty phase of the trial: "[T]he Court will not allow any witness to make a recommendation to the jury that you should take his life or that you should spare his life. That is a direct invasion of the jury's province." [Doc 293-Pg 1055] Brown's trial counsel stated that he understood and that he had instructed all of his witnesses to that effect. [Doc 293-Pgs 1055-1056] Because the jury must exercise the conscience of the community in determining whether or not to impose the death penalty, the district court correctly imposed this limitation. See Robison, 829 F.2d at 1505; see also Reese, 94 F.3d at 1183

(describing a criminal prosecution as "a public matter . . . not a contest between the defendant and his victims, or their relatives").

Moving from witnesses generally to the victim's family members specifically, the family members may very well have been precluded from testifying about what they believed to be the appropriate sentence. See Booth v. Maryland, 482 U.S. 496, 502, 107 S. Ct. 2529, 2533 (1987), overruled on other grounds, Payne v. Tennessee, 501 U.S. 808, 830, n. 2, 111 S. Ct. 2597, 2611, n. 2 (1991)(leaving undisturbed the holding in Booth that "the admission of a victim's family members' characterizations and opinions about . . . the appropriate sentence violates the Eighth Amendment); see also Hain v. Gibson, 287 F.3d 1224, 1238-39 (10th Cir. 2002)(recognizing exception in Payne prohibiting family members to testify about appropriate sentence and collecting cases from Fifth, Eighth, and Tenth Circuits so holding).

13.    **The trial court properly denied Brown's motion for judgment of acquittal on the pecuniary gain aggravating factor; alternatively, even if error existed, it was harmless. (Brown's issue II)**

In the superseding indictment, the grand jury made seven special findings on counts one and two, including that Brown "committed the offenses in the expectation of the receipt of anything of pecuniary value" as contemplated by 18 U.S.C. §3592(c)(8). [Doc 137-Pgs 2-3] This statutory aggravating factor also

appeared on the special verdict form. [Doc 275-Pg 3] In the government's closing

argument, the trial prosecutor made only these remarks about pecuniary gain:

> Why is this justice? The defendant committed the offenses in the expectation of the receipt of anything of pecuniary value. And that is obvious. He went there to rob her. He went there to get these money orders. $1,175 in money orders, and her wallet. That is what her life was worth to him. It was worth taking for that.

[Doc 293-Pgs 1174-1175] In response, defense counsel argued that Brown killed

Gaglia not for money, but because she could identify him. [Doc 293-Pgs 1185-

1186]

The district court instructed the jury that an aggravating factor was "the

defendant committed the offenses [i.e., the capital counts in the indictment] in the

expectation of the receipt of anything of pecuniary value"; it defined "pecuniary

gain" as the expectation of the receipt of anything of economic value, benefit, or

advantage" and explained that "[t]here is no requirement that the government

prove that something of value actually changed hands, only that the defendant

expected to receive something of value." [Doc 293-Pgs 1201, 1206-1207] In

recommending the death penalty, the jury found the presence of all aggravating

factors – including pecuniary gain, another statutory factor, and five non-statutory

aggravating factors. [Doc 275]

Before the district court [Doc 277; Doc 292-Pg 982; Doc 293-1055] and on

appeal [Br. of Appellant at 30-33], Brown challenges only the imposition of the

pecuniary gain aggravating factor. Specifically, he argues that 18 U.S.C. §3592(c)(8) contemplates the availability of this aggravating factor only where "pecuniary gain . . . is expected as a result of the murder, not as a result of a robbery that resulted in a murder." [Br. of Appellant at 31] Thus, Brown seems to contemplate the applicability of this factor only in a murder-for-hire situation. Because the district court properly permitted the jury to consider the pecuniary gain aggravating factor in this case, Brown is not entitled to relief. Alternatively, if this determination constituted error, it was harmless in light of the remaining six unchallenged aggravating factors.

### a. Pecuniary gain

The Federal Death Penalty Act includes the following statutory aggravating factor:

> **Pecuniary gain.** – The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

18 U.S.C. §3592(c)(8). One circuit has found that §3592(c)(8) requires pecuniary gain from the murder itself, not the underlying felony. See United States v. Chanthadara, 230 F.3d 1237, 1263 (10th Cir. 2000)(considering jury instructions and limiting this aggravating factor to "situations where 'pecuniary gain' is expected "to follow as a direct result of the [murder]" ). The Fifth Circuit has agreed with Chanthadara and found that the evidence was legally insufficient to

support application of the aggravating factor in that case.  See United States v. Bernard, 299 F.3d 467, 483 (5th Cir. 2002)(rejecting government's argument that the murders were a necessary step in implementing the carjacking and finding instead that motivation for murders was to prevent the victims from reporting the crime to the police).

One circuit has distinguished Chanthadara and Bernard and found that the pecuniary gain aggravating factor properly applied in a carjacking case.  In United States v. Barnette, 390 F.3d 775 (4th Cir. 2004), Barnette murdered a driver during a carjacking; he drove the car to his ex-girlfriend's home, where he killed her in front of her mother.  Noting that Chanthadara involved an erroneous jury instruction,[21] the Fourth Circuit found that the district court's jury instructions linked the pecuniary gain factor to the murder of the carjacking victim, thus preventing any error under Chanthadara.  Barnette, 390 F.3d at 806-807.  Unlike Bernard, where the Fifth Circuit concluded that the defendants murdered the victims to avoid detection, Barnette's testimony "indicate[d] that he wanted transportation . . .and needed money.  He got both by killing [the victim]."  Id. at 807-08.

---

[21] "The pecuniary gain instruction challenged here required the jury to determine whether 'the offense' was committed in expectation of pecuniary gain. The instruction failed to specify the 'offense' to which referred was the homicide, not the underlying robbery, and thereby failed to impose a necessary limitation." Chanthadara, 230 F.3d at 1264.

This case aligns more closely with <u>Barnette</u> than with <u>Chanthadara</u> or <u>Bernard</u>. The district court's penalty phase jury instructions, including the pecuniary gain charge, referred to the two murder counts of the indictment, not the robbery charge. [Doc 293-Pgs 1201, 1205-1206] According to Brown's confession, which was played at trial, he went to the post office with a kitchen knife and placed socks on his hands; he kept the knife and his hands below the counter, out of Gaglia's view. [Doc 292-Pgs 938-940] He requested three money orders totaling $1,175 – an amount that would pay Diane Brown's bills. [Doc 292-Pg 940] As Gaglia prepared the money orders, Brown jumped across the counter, stabbed her repeatedly, grabbed the money orders, stole her wallet, and left through the front door. [Doc 292-Pgs 941-943] While Brown said that he "went there to rob the lady," intended to "scare her, put her in shock with the knife," and stabbed her because he realized she would recognize him [Doc 292-Pg 956], the jury could reasonably believe that Brown killed Gaglia for money. <u>Cf.</u> <u>United States v. Waldon</u>, 363 F.3d 1103, 1110-12 (11th Cir. 2004)(per curiam)(noting, in context of a charging decision in indictment, that government properly sought death qualified jury where evidence that defendant shot victim in course of robbery could have been supported a finding that murder was for pecuniary gain, and acknowledging government's argument that jury rejected factual theory and

68

found that defendant killed victim to avoid detection), <u>cert. denied</u>, ___ U.S. ___, 125 S.Ct. 208 (2004).

Another factor supports the use of the enhancement in this case. Section 3592(c)(8) encompasses two qualifying acts: commission of the offense "as consideration for the receipt of . . . anything of pecuniary value" or commission of the offense "in expectation of the receipt[] of anything of pecuniary value." 18 U.S.C. §3592(c)(8). The district court charged only on the latter principle. [Doc 293-Pg 1206] It premised its decision on 18 U.S.C. §1958, the murder-for-hire statute, which applies to an "intent that a murder be committed. . . as consideration for the receipt of, or as consideration for a promise or agreement to pay anything of pecuniary value." [Doc 289-Pgs 1-2] In contrast, the §3592(c)(8) also uses "in the expectation of the receipt[] of anything of pecuniary value," which "fairly read, means that Congress also wanted to target those who kill others to get money from *them*." [Doc 289-Pg 2][emphasis in original] With an appropriately limited jury instruction, the jury properly considered whether Gaglia's murder occurred "in expectation of the receipt[] of anything of pecuniary value," in this case, postal money orders. Thus, the district court properly denied Brown's motion for judgment of acquittal.

**b. Harmless error**

Even assuming that the district court should have granted Brown's motion, any error was harmless: The jury found one statutory and five non-statutory aggravating factors [Doc 275], none of which Brown challenges on appeal. "The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." 18 U.S.C. §3595(c)(2). Even absent consideration of the pecuniary gain aggravating factor, the jury would have reached the same verdict.

Here, the unanimous jury found beyond a reasonable doubt that one statutory and five non-statutory aggravating factors (other than pecuniary gain) supported imposition of the death penalty:

1. Brown committed the offenses in an especially heinous, cruel, and deprave d manner in that they involved serious physical abuse to Sallie Louise Gaglia (see 18 U.S.C. §3592(c)(6));

2. Brown caused injury, harm, and loss to Gaglia and her family;

3. The manner of Brown's commission of the offenses was intended to reduce the likelihood of detection;

4. Gaglia was a postal service employee killed in the performance of her official duties;

5. Brown had previously committed an array of other criminal acts; and

6.     Repeated prior efforts to rehabilitate and deter Brown from criminal conduct had failed.

[Doc 275-Pgs 3-4]   As excerpted above, the trial prosecutor's reference in closing arguments to the pecuniary gain factor was brief; instead, the bulk of the argument focused on the heinous nature of the crime, the senselessness of the killing, and Brown's lack of remorse. [Doc 293-Pgs 1172-1174, 1177-1179, 1197, 1199-1200] Given the findings about these other aggravating factors, error (if any) in submitting the pecuniary gain factor to the jury was harmless.  See, e.g., Bernard, 299 F.3d at 484-85 (finding existence of at least five other aggravating factors made pecuniary gain error harmless); United States v. Paul, 217 F.3d 989, 1001 (8th Cir. 2000)(finding existence of two other aggravating factors made pecuniary gain error harmless).

## 14. The district court did not abuse its discretion when it denied Brown's motions for authorization to obtain a forensic social worker and an expert on future dangerousness. (Brown's issue VI)

Prior to trial, Brown sought, and obtained, funding for an investigator, an expert on blood pattern and crime scene reconstruction, a mitigation specialist, a psychologist, a DNA expert, and a shoe print expert. [Doc 5, Doc 7, Doc 17, Doc 19, Doc 18, Doc 21, Doc 28, Doc 30, Doc 145, Doc 152, Doc 153, Doc 162] Relevant to this appeal, the district court denied funding for a forensic social worker and an expert on Brown's future dangerousness to prison staff and inmates. [Doc 174, Doc 179, Doc 213] In doing so, the court found that a forensic

71

social worker would merely duplicate the work of the psychologist and mitigation specialist (who had been retained to investigate Brown's family, background, and social history), and that the latter expert's subject matter (Brown's future dangerousness) could be covered by the testimony of fact witnesses, the psychologist, and the mitigation specialist. [Doc 213]

On appeal, Brown maintains that the district court's denial of funding for these non-psychiatric experts violates constitutional principles announced in Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087 (1985), and contravenes the statutory requirements of 21 U.S.C. §848(q)(9). Neither argument has merit.

Brown premises part of his claim on 21 U.S.C. §848(q)(9), which allows the district court to authorize funding "[u]pon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence . . . ." [Br. of Appellant at 72-73, 77-78] For services to be "reasonably necessary," Brown must show a "substantial need" for the requested assistance. Riley v. Dretke, 362 F.3d 302, 307(5th Cir. 2004).

Brown also relies on Ake, which held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in

72

evaluation, preparation, and presentation of the defense." <u>Ake</u>, 470 U.S. at 83, 105 S. Ct. at 1096. Here, Brown did not seek a psychiatrist: He sought a forensic social worker and a future dangerousness expert. [Doc 174, Doc 179] Although "the Supreme Court has not yet extended <u>Ake</u> to non-psychiatric experts," the Eleventh Circuit has "assume[d], for sake of argument, that the due process clause could require the government to provide non-psychiatric expert assistance to an indigent defendant upon a sufficient showing of need." <u>Conklin v. Schofield</u>, 366 F.3d 1191, 1206 (11th Cir. 2004), <u>cert. denied</u>, ____ U.S. ____, 125 S.Ct. 1703 (2005).

If <u>Ake</u> extends to non-psychiatric experts, the Court must determine (1) whether Brown timely requested expert assistance; (2) whether the trial court reasonably denied that request; and (3) whether the denial rendered Brown's trial fundamentally unfair. <u>Id</u>.[22] "In determining the reasonableness of the trial court's refusal to provide independent expert assistance, [the Court] consider[s] only the facts available to the trial judge when he made a ruling on the particular motion." <u>Id</u>. at 1208. Thus, this inquiry "'necessarily turns on the sufficiency of [Brown's] explanation as to why he needed an expert.'" <u>Id</u>. As for the third prong, the Court considers whether any <u>Ake</u> error "'had substantial and injurious effect or influence

_____

[22] The government does not dispute that Brown made a timely request for funding for these two experts.

73

in determining the jury's verdict.'" Id. at 1206.  Under either §848(q)(9)  or Ake, Brown cannot demonstrate that the district court abused its discretion by denying expert funding.

### a.  The forensic social worker

Brown first asked the district court to authorize funds to obtain a forensic social worker for the following reasons:

- "Using material gathered by the mitigation specialist to provide a comprehensive social history to include a narrative and interpretation of [Brown's] environment and social functioning.  In order for the judge, juries, and US attorney to understand [Brown's] actions, the actions must be placed in an extensive social history of [Brown's] life."

- "Conducting comprehensive interviews in a clinical fashion with an eye to impact on [Brown]."

- "Conduct[ing] diagnostic, but sensitive collateral interviews to tell [Brown's] story."

- "Serv[ing] as an expert witness."

[Doc 174-Pgs 1-2]

Brown also attached an affidavit from an attorney with the Federal Death Penalty Resource Counsel Project, who described the "retention of experts to investigate, evaluate and present information concerning capital clients' social history and background" as "an essential component of the defense of virtually every capital case." [Doc 174-Ex. A at 2] The affiant allowed that federal district courts have appointed mitigation specialists, while retained counsel often spent

74

private funds on forensic social workers; indeed, the affiant's description suggested that the roles of a forensic social worker and mitigation specialist overlap. [Doc 174-Ex. A at 3-4] However, the affiant believed that both a mitigation specialist and a forensic social worker could be used in this case because "defense counsel's investigative plan [did] not contemplate any duplication of work" by the two. [Doc 174-Ex. A at 3-5]

The district court's denial of Brown's request for a forensic social worker was reasonable. The court previously approved the hiring of a mitigation specialist and a psychologist, and found that a forensic social worker "would simply duplicate" their work. [Doc 21, Doc 30, Doc 213-Pgs 1-2] Again, the affidavit accompanying Brown's motion acknowledges an overlap: "While some mitigation investigators also serve as testifying experts, it is a common practice for mitigation specialists to work as investigators in support of the work of forensic social workers as well as . . . psychologists. . . ." [Doc 174-Aff. at 4] Neither the mitigation specialist nor the psychologist testified at the guilt or penalty phase of trial.[23]

_____

[23] Brown argues that the allotment of funds for a mitigation specialist "is of no consequence to this analysis" because the specialist failed to compile a background investigation or social history; she allegedly "did nothing a mitigation specialist is supposed to do." [Br. of Appellant at 81, n. 18]

Contrary to Brown's assertion, it is consequential to this analysis: The district court approved funds for a mitigation specialist. Whether or not she

75

The failure to grant funds for a forensic social worker also did not render Brown's trial fundamentally unfair. As for Brown's social history, the jury, via 14 defense witnesses, obtained a comprehensive view of Brown's "environment and social functioning," as well as hearing "[Brown's] story." [Doc 174-Pgs 1-2] The jury first heard from Brown's father, who testified that he left the family (his ex-wife Sadie's 8 sons) when Brown was 7 years old and "ain't been back." [Doc 293-Pg 1097] The elder Brown's disappearance came after his stepson tried to cut him with a razor, and he shot his stepson. [Doc 293-Pgs 1097-1099]

The jury then learned from a former neighbor that Brown grew up in a home chock full of "fights, and a lot of misbehavior, things going on like drinking, fighting, drugs . . . [a]ll kinds of weird activities," cursing, loud noise, music, and gunshots – all of which led to frequent visits from the sheriff. [Doc 293-Pgs 1104-1106] The neighbor was aware of stabbings at the home and of a child's drowning in the septic tank. [Doc 293-Pg 1104] She described Brown's childhood as "bad chaotic, very bad," detailed "[v]ery poor" living conditions, and testified that Brown's mother did all she could but that the boys raised themselves. [Doc 293-Pgs 1108]

---

performed adequately does not factor into the district court's determination to deny funds for an overlapping expert, especially since the specialist's allegedly sloppy work was not brought to the court's attention. Indeed, at a pretrial conference, trial counsel said, "I think most of the money on expert witnesses in this case has gone to mitigation experts." [Doc 259-Pg 22]

One of Brown's sisters-in-law confirmed the neighbor's description of Brown's home life. She lived in Fleming, at the family compound, for a few months, where she found that moments of peace alternated with "somebody yelling at you, or screaming at you, and wanting to gut you." [Doc 293-Pgs 1136-1137] At times, the atmosphere was chaotic and violent. [Doc 293-Pg 1137] She and some of Brown's siblings and their spouses testified that Brown always cared for his mother, would lose jobs to take care of her, took her to dialysis, and slept on the floor of his mother's room. [Doc 293-Pgs 1116, 1121-1122, 1140]

The defense called two former employers. Both of them called Brown a dependable, good worker. [Doc 293-Pg 1144-1145, 1154] One of them, a long-time friend, described Brown's home as a "crack house," with "at least every weekend something, either arguing, fighting, shooting, stabbing." [Doc 293-Pg 1153] That witness also described how Brown's father used crack in front of Brown. [Doc 293-Pg 1154]

A school teacher and a school social worker testified, too. The teacher noted a lack of interest by Brown's parents in any school issues. [Doc 293-Pgs 1127-1128] When she learned of Gaglia's murder, the teacher said, "I felt to myself that he must have let an awful lot of anger out at that time that he had pinned up from all those years to do something like that. As a ninth grader, I never imagined that he would ever do anything like that." [Doc 293-Pg 1129] The

77

social worker also noted that Brown was very well mannered and even tempered, but that he had a "tenseness sort of anger" about him. [Doc 293-Pg 1133]

Brown's final mitigation witness was Detective Chuck Woodall, who took Brown's confession. [Doc 293-Pg 1159] Detective Woodall knew Brown in a "professional manner" for at least 8 years due to the number of calls at Brown's family compound and Brown's criminal history. [Doc 293-Pgs 1160-1161] Detective Woodall described those calls as relating to "fights, domestic problems, shooting, stabbings, alcohol, drug sales, robberies." [Doc 293-Pg 1161] As for the "bad state of repair" of Sadie Brown's home, Woodall made this statement: "I don't want to use the word [squalor] because it is not quite that bad.  But they lived a very poor life.  But they lived.  I mean, they survived." [Doc 293-Pg 1162] Detective Woodall also described Brown as intelligent, with street sense, and knowing right from wrong; he told the jury that Brown had been very remorseful, sobbing and crying, during his confession. [Doc 293-Pgs 1164-1165]

Brown dismisses this testimony a "disjointed, incomprehensible collection of stories that ultimately failed to relate personally to Mr. Brown." [Br. of Appellant at 81] Brown is mistaken: Hearing from these witnesses, not a forensic social worker, did not render his trial fundamentally unfair. Cf. Grayson v. Thompson, 257 F.3d 1194, 1232 (11th Cir. 2001)(finding trial not fundamentally unfair where counsel highlighted evidence from a doctor tending to show lack of

78

intent, which was ground for proposed expert). Despite lacking an expert's gloss, these witnesses (who had known Brown for years) relayed the unsettling circumstances of Brown's life – poverty, a childhood punctuated by violence and death, and chaos – which Brown managed by hiding anger under a thin veneer of civility.

### b. The future dangerousness expert

Brown also submitted an *ex parte* application for authorize to obtain a future dangerousness expert, who would "[c]onsult with attorneys and render expert testimony as to [Brown's] future endangerment to staff, other inmates, and the community" and who would "[r]ender [an] expert opinion as to the Federal Bureau of Prisons' ability to safely incarcerate inmates and prevent or minimize a risk of escape and risk of harm to other inmates, prison personnel and the community." [Doc 179-Pg 1] Citing Supreme Court precedent that future dangerousness evidence "'must be considered potentially mitigating,'" the district court allowed Brown "to fully present future non-dangerousness mitigation evidence." [Doc 213-Pg 1] Noting that fact witnesses would suffice (as in the Supreme Court case), and that Brown had the services of a mitigation specialist and psychologist, the district court denied Brown's motion. [Doc 213-Pg 1][24]

---

[24] The issue later arose when the government moved in limine to prevent Brown from offering any testimony about the Bureau of Prison's ability to prevent future dangerousness; the district court granted that motion. [Doc 242]

The district court's denial of this motion was reasonable. As noted by the district court, the Supreme Court has stated that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." Skipper v. South Carolina, 476 U.S. 1, 5, 106 S. Ct. 1669, 1671 (1986). In that case, Skipper sought to introduce testimony of two jailers and a regular visit to the jail that he had "'made a good adjustment'" during his time spent in jail, but the state trial court prohibited it. Id. at 3, 1670. The Court found its exclusion was harmful because the witnesses were disinterested, especially since the jailers "would have had no particular reason to be favorably predisposed toward one of their charges." Id. at 8, 1673. Skipper suggests, and the district court agreed, that lay testimony sufficiently establishes this "potentially mitigating" factor. Thus, the district court's denial of Brown's motion was reasonable.

The lack of a future dangerousness expert did not render Brown's penalty phase fundamentally unfair: The government put up no evidence of future dangerousness, and two former jailers testified for Brown on this issue. In the penalty phase, the government called six witnesses – four of whom were Sallie Gaglia's family or friends. [Doc 293-Pgs 1082-1096] The other two witnesses (a parole officer who had supervised Brown and a police officer) testified about Brown's criminal history. [Doc 293-Pgs 1069-1081] Neither man opined about

Brown's behavior while previously incarcerated or about how Brown would act in any future incarceration.[25]

Brown presented two lay witnesses directly on the issue of future dangerousness. First, the across-the-street neighbor who testified about the chaos at Brown's home also testified that she had been the Assistant Jail Administrator in Liberty County, Georgia. [Doc 293-Pgs 1109-1110] In that capacity, she saw Brown, whom she described as "a very good inmate." [Doc 293-Pgs 1109-1110] Brown had been selected as a trustee; the trustee jobs are reserved for inmates with "a good attitude, and a good disposition, [and] very clean," and Brown made "[a] very good trustee." [Doc 293-Pg 1110] While in jail, Brown participated in church activities, sang well, and gained a reputation as "real good in his Bible." [Doc 293-Pg 1111] The witness testified that the jail had no disciplinary problems

---

[25]     The trial prosecutor's closing argument referred to Brown's criminal history, not his risk of danger to inmates, prison administrators, or the community in the future:

> . . . Repeated prior efforts to rehabilitate and to deter the defendant
> from criminal conduct have failed.
>
> There was not a whole lot of evidence offered with respect to this.
> But you heard that he was a trustee at the Liberty County jail. You
> heard that he had been in prison before. You heard that he
> understood right from wrong.

[Doc 293-Pg 1176]

with Brown. [Doc 293-Pg 1111]  The Assistant Jail Administrator in Chatham County, Georgia, also testified that Brown never engaged in acts of violence or caused disciplinary problems while in that facility. [Doc 293-Pgs 1125-1126]

In short, the jury heard from the fact witnesses (two jailers) that Brown had been a model prisoner.  As the district court noted, Brown had two other arrows in his quiver – a psychologist and mitigation specialist – if the jury required additional testimony about his lack of future dangerousness. [Doc 213-Pg 1]

## 15.    The district court did not deprive Brown of his confrontation rights when it denied his motion to reconstruct the record without a hearing. (Brown's issue I)

During the pendency of this appeal, Brown filed a Motion to Transfer Jurisdiction to the District Court for Construction of the Record.   In that motion, Brown asserted that "[a]s a result of conversations with trial counsel, it was determined that a number of *ex parte* hearings concerning the appointment of expert witnesses were conducted between the district court and [his] counsel . . .In at least one of these hearings, the district court took a proffer of evidence, heard oral argument and subsequently denied the defense the expert [it] had requested." [Mot. at 4] Brown asked the Court to remand the case to district court "with instructions to ensure that the record is complete and, if necessary, re-construct the record relevant to any issues that may be pursued on appeal." [Mot. at 11] The government noted that the district court had denied funds to hire 1) a forensic

social worker and 2) an expert on Brown's future dangerousness to prison staff and inmates. [Govt's Resp to Brown's Mot to Transfer at 2] Thus, this Court remanded the case to the district court for two "limited purposes":

> (1) determining whether there are, in fact, any missing transcripts of ex parte hearings on the applications for funding for a forensic social worker or an expert on [Brown's] future dangerousness to prison staff and inmates, or both, and

> (2) if the district court determines there are such missing transcripts, it should attempt to reconstruct, as provided in Fed. R. App. P. 10(e), those materials.

[Order, 12-3-04, at 2]

Immediately following remand, Brown filed no motions in district court. [Doc 313-Pg 2, n. 5] Thus, two months after the Court's order, the district court concluded that there were "no 'missing transcripts,' so there [was] nothing to reconstruct." [Doc 313-Pg 2] In reaching its conclusion, the district court searched for evidence of hearings before the district, not magistrate, judge; consulted with the court reporter and staff; and indicated that it had been "meticulous about thoroughly documenting all motions and rulings" since this case involved the death penalty. [Doc 313-Pgs 1-2] The district court also described two recorded pretrial conferences, indicating that trial counsel mentioned the future dangerousness expert at one. [Doc 313-Pg 2] Noting that defense counsel never proffered a reconstruction of the record, the district court invited counsel to move

83

the Court to amend its order "if they are able to point to any evidence that they in good faith believe should alter this finding." [Doc 313-Pg 2]

Brown sought reconsideration. [Doc 314] For the first time, he indicated that the conversations at issue may have occurred with the magistrate judge; he then faulted the district court for not contacting trial counsel and the magistrate judge to attempt to reconstruct the record. [Doc 314-Pgs 3-4] Although noting that the magistrate judge and his staff "report no recollection of any un-recorded contacts with defense counsel concerning any substantive matters," the district court denied Brown's motion because Brown never generated a reconstruction of any unrecorded conversation and never suggested what a hearing might show. [Doc 315] "At most [counsel] impl[ied], in a *footnote*, that something *could* turn up." [Doc 315][emphasis in original] Thus, the district court found that Brown did not show good cause for a hearing. [Doc 315]

Brown now challenges the district court's resolution of his motion to reconstruct the record. [Br. of Appellant at 24-29] According to Brown, there were unrecorded conversations; the district court should have held a hearing to reconstruct these conversations; and Brown should have been present at these hearings to preserve his Confrontation Clause rights. His claims lack merit.

First, after consulting its records, the court reporter, the district court staff, and the magistrate judge and his staff, the district court concluded that "there are

84

no 'missing transcripts,' so there is nothing to reconstruct." [Doc 313-Pg 2; Doc 315] Brown, however, suggests that "trial counsel's recollection is more accurate that the district and magistrate court's," and points to "objective evidence supporting trial counsel's recollection." [Br. of Appellant at 28] In a motions hearing, the magistrate judge made this statement:

> . . . I want to see defense counsel.  There's something you filed that puzzled me a bit.  And I want to – it is something that can be heard ex parte.   It doesn't pertain to the government. . . .

[Doc 302-Pg 175] Brown's argument suffers from a fatal flaw: The magistrate judge held the motions hearing on July 9, 2003, but trial counsel did not file the motions seeking appointment of a forensic social worker and a future dangerousness expert – the subjects of the remand order – until, respectively, July 18, 2003, and July 31, 2003. [Doc 174; Doc 179; Doc 302] This excerpt hardly refutes the district court's findings that neither the magistrate judge nor it held any *ex parte* conferences on the motions seeking appointment of those two experts.

Second, the district court did not abuse its discretion when it did not hold a hearing on Brown's motion.  This Court ordered it first to determine whether there were, "in fact, any missing transcripts of <u>ex parte</u> hearings on the applications for funding for a forensic social worker or an expert on [Brown's] future dangerousness to prison staff and inmates, or both"; if there were, the district court was to attempt to reconstruct the record as provided in Fed. R. App. P. 10(e).

[Order, 12-3-04, at 2] Having properly determined that no *ex parte* conferences took place, the district court had nothing to reconstruct.[26]

Finally, Brown would have had no right to be present under either the Confrontation Clause or Due Process Clause. The former is a trial right, and while the latter may be broader, Brown never maintains that he has personal knowledge of any *ex parte* communications between his trial counsel and the district or

---

[26] Brown suggests that the lack of a hearing prevented him from correcting and supplementing the record on two other matters: counsel's lack of access to juror questionnaires and a portion of the voir dire of a juror that apparently was not transcribed. [Br. of Appellant at 29-30, n. 11] Both of these matters were, or should have been, known prior to the filing of the motion to reconstruct the record. As to the former, when counsel traveled to review the sealed records contained in the clerk's file, counsel did not receive copies of the jury questionnaires. [Br. of Appellant at 30, n. 11] The sealed records formed the basis of the motion to reconstruct, so Brown could have raised the jury questionnaire issue in that motion. As to the latter, the court reporter filed the jury trial transcripts with the clerk on January 12 and January 13, 2004 – approximately ten months before Brown asked this Court for remand (November 19, 2004). Additionally, Brown never raised either matter in the motion for reconsideration filed in the district court upon remand. [Doc 314]

In any event, these claims fell outside the scope of the remand order, making it arguable that the district court would have had to consider them even if it held a hearing. Cf. United States v. Mesa, 247 F.3d 1165, 1170-71 (11th Cir. 2001)(finding that district court, on a remand for resentencing, was not required to consider an argument that the defendant should have raised in a prior sentencing and on appeal). Also, given that Brown raised these contentions for the first time in a footnote of his appellate brief, he did not adequately preserve them for review. See Marsh v. Butler County, Alabama, 268 F.3d 1014, 1024, n. 5 (11th Cir. 2001) (en banc); see also Tallahassee Mem. Reg. Med. Ctr. v. Bowen, 815 F.2d 1435, 1446, n. 16(11th Cir. 1987).

magistrate judge.  See United States v. Boyd, 131 F.3d 951, 954 (11th Cir. 1997)(per curiam).  Even if there were a need for a hearing, Brown would have no right to be there; his presence would have been "'useless, or the benefit but a shadow.'" Id. (cit. omitted).

## CONCLUSION

For these reasons, the government respectfully requests the Court to affirm

the conviction and death sentence of Appellant Meier Jason Brown.

Respectfully submitted this _16_ day of May, 2005.


LISA GODBEY WOOD
UNITED STATES ATTORNEY


Amy Lee Copeland
Georgia Bar No. 186730
Assistant United States Attorney

U. S. Attorney's Office
100 Bull Street, Suite 201
Savannah, Georgia 31401
(912) 652-4422

## CERTIFICATE OF WORD COUNT

Pursuant to Federal Rule of Appellate Procedure 32(a)(7), undersigned counsel hereby certifies that the word processing system, used to prepare this Brief of Appellee, has counted 21,609 words which is in excess of the maximum. However, the government has filed simultaneously with this brief a Motion for Leave to File Brief in Excess of Page Limit.

LISA GODBEY WOOD
UNITED STATES ATTORNEY

Amy Lee Copeland
Georgia Bar No. 186730
Assistant United States Attorney

U. S. Attorney's Office
100 Bull Street, Suite 201
Savannah, Georgia 31401
(912) 652-4422

89

## CERTIFICATE OF SERVICE

I hereby certify that one copy of the foregoing Government's Brief of the

Appellee has been mailed to the following:

>Don F. Samuel, Esq.
>Garland, Samuel & Loeb
>3151 Maple Drive, N.E.
>Atlanta, Georgia 30305
>
>Jeffrey L. Ertel
>Federal Defender Program, Inc.
>100 Peachtree Street, Suite 1700
>Atlanta, Georgia 30303

and that, pursuant to 11th Cir. R. 31-5(c), this brief was electronically uploaded to

the Eleventh Circuit Court of Appeals' website, www.ca11.uscourts.gov, on this

date at 12:00 p.m.

This 16th day of May, 2005.

Amy Lee Copeland
Assistant United States Attorney
Georgia Bar No. 186730

U. S. Attorney's Office
100 Bull Street, Suite 201
Savannah, Georgia 31401
(912) 652-4422

90