IN THE

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

---

NO. 04-10325-P

---

MEIER JASON BROWN

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA

Respondent-Appellee.

---

A DIRECT APPEAL OF A CONVICTION AND
DEATH SENTENCE IN A CRIMINAL CASE
IMPOSED IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA, SAVANNAH DIVISION

---

REPLY BRIEF OF APPELLANT

Jeffrey L. Ertel
State Bar No. 249966
Federal Defender Program, Inc.
100 Peachtree Street
Suite 1700
Atlanta, Georgia  30303
(404)688-7530

Donald F. Samuel
State Bar No. 624475
Garland, Samuel & Loeb
3151 Maple Road
Atlanta, Georgia 30305
dfs@gsllaw.com
(404)262-2225

COUNSEL FOR APPELLANT, MR. BROWN

## CERTIFICATE OF INTERESTED PERSONS

Counsel hereby certifies that the following have an interest in the outcome of this case:

(a)    William Bell, Trial Counsel for Appellant;

(b)    Meier Jason Brown, Defendant-Appellant;

(c)    Amy Copeland, Counsel for Appellee;

(d)    Richard Darden, Trial Counsel for Appellant;

(e)    Jeffrey L. Ertel, Appellate Counsel for Defendant-Appellant;

(f)    B. Avant Edenfield, United States District Court Judge

for the Southern District of Georgia;

(g)    Willaim Frentzen, Counsel for Appellee;

(h)    Joseph Newman, Counsel for Appellee;

(I)    Donald F. Samuel, Appellate Counsel for Defendant-Appellant.

## STATEMENT OF TYPE STYLE AND SIZE

Pursuant to 11th Cir. Rule 28-2(d), the type style and size of this brief is

TIMES NEW ROMAN, 14 POINT.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

CERTIFICATE OF TYPE SIZE AND STYLE . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

ARGUMENT AND CITATIONS OF AUTHORITY . . . . . . . . . . . . . . . . . . . . 1

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# TABLE OF AUTHORITIES

## SUPREME COURT CASES:

*Beck v. Alabama, 447 U.S. 625, 638 (1980)* . . . . . . . . . . . . . . . . . . . 11

*Berkemer v. McCarty, 468 U.S. 420, 442 (1984)* . . . . . . . . . . . . . . . . . . 17

*Brady v. Maryland, 373 U.S. 83 (1963)* . . . . . . . . . . . . . . . . . . . . . . 24

*Chapman v. California, 386 U.S. 18 (1967)* . . . . . . . . . . . . . . . . . . . . 6

*Crawford v. Washington, 125 S.Ct. 1354, 1359 (2004)* . . . . . . . . . . . . . 9,10,12,13

*Francis v. Franklin, 471 U.S. 307 (1975)* . . . . . . . . . . . . . . . . . . . . 7,8

*Gardner v. Florida, 430 U.S. 349, 357 (1977)* . . . . . . . . . . . . . . . . . . . 11

*Godfrey v. Georgia, 446 U.S. 420 (1980)* . . . . . . . . . . . . . . . . . . . . . 4

*In Re Winship, 397 U.S. 358 (1970)* . . . . . . . . . . . . . . . . . . . . . . . 8

*Lambrix v. Singletary, 520 U.S. 518, 537 (1997)* . . . . . . . . . . . . . . . . . 4

*Lowenfield v. Phelps, 484 U.S. 231, 238-39 (1988)* . . . . . . . . . . . . . . . . 11

*McCleskey v. Kemp, 481 U.S. 279, 313 (1987)* . . . . . . . . . . . . . . . . . . . 4

*Miranda v. Arizona, 384 U.S. 436, 458 (1966)* . . . . . . . . . . . . . . . . . . . 16

*Monge v. California, 524 U.S. 721, 732 (1998)* . . . . . . . . . . . . . . . . . . 11

*Murray v. Giarratano, 492 U.S. 1, 8-9 (1989)* . . . . . . . . . . . . . . . . . . . 11

*Ring v. Arizona, 536 U.S. 584 (2002)* . . . . . . . . . . . . . . . . . . . . . . 7

## Supreme Court Cases Cont.:

*Simmons v. South Carolina*, 512 U.S. 154, 161-62 (1994) . . . . . . . . . . . . . . . . . 11

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) . . . . . . . . . . . . . . . . . . 17

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) . . . . . . . . . . . . . . . . . 11,26

*Yarborough v. Alvarado*, 124 S.Ct. 2140, 2147 (2004) . . . . . . . . . . . . . . . . . . 17

*Yates v. Evatt*, 500 U.S. 391 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Hasting*, 461 U.S. 499, 505 (1983) . . . . . . . . . . . . . . . . . . . . 26

*United States v. Olano*, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 13

## CIRCUIT COURT CASES:

*Chandler v. United States*, 218 F.3d 1305, 1360(11th Cir. 2000) . . . . . . . . . . . . . 6

*Davis v. Allsbrooks*, 778 F.2d 168, 171-72 (4th Cir. 1985) . . . . . . . . . . . . . . . . . 17

*King v. Allstate Insurance Co.*, 906 F.2d 1537, 1543 (11th Cir. 1990) . . . . . . . . . 8

*Spears v. Mullins*, 343 F.3d 1215 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Bernard*, 299 F.3d 467, 483 (5th Cir. 2002) . . . . . . . . . . . . . . . . 5

*United States v. Brown*, 342 F.3d 1245 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . 25

*United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) . . . . . . . . . . . . . 24

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) . . . . . . . . . . . . . . . 22

*United States v. Hernandez*, 896 F.2d 513, 521 (11th Cir. 1990) . . . . . . . . . . . . . 27

## Circuit Court Cases Cont.:

*United States v. Joe, 8 F.3d 1488, 1497 (10th Cir. 1993)* . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Kapelushnik, 306 F.3d 1090, 1093 (11th Cir. 2002)* . . . . . . . . . . . 1

*United States v. Lee, 274 F.3d 485 (10th Cir. 2001)* . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. McGuffin, 2005 WL 1526109 (10th Cir. 2005)* . . . . . . . . . . . . . . . 9

*United States v. Muegee, 225 F.3d 1267 (11th Cir. 2000)* . . . . . . . . . . . . . . 19,20,21

*United States v. Phillips, 812 F.2d 1355 (11th Cir. 1987)* . . . . . . . . . . . . . 19,20,21

*United States v. Ortiz, 315 F.3d 873 (8th Cir. 2002)* . . . . . . . . . . . . . . . . . . . . 29

*United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005)* . . . . . . . . . . . . 13

## STATUTORY PROVISIONS:

Title 18 U.S.C.

§ 3592(c)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

§ 3595(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**I.    The District Court Erred in Denying Mr. Brown the Right to Be Present and to Cross Examine Witnesses When this Court Remanded the Case so as to Construct the Record**

The Government contends that no error occurred when the district court entered an order without conducting an adequate inquiry into whether *ex parte* communications occurred between trial counsel and the court.[1] Appellant filed a Motion to Unseal files when they became aware that certain documents, filed with the district court under seal, had not been unsealed upon conviction and sentencing. It was during this preliminary investigation that trial counsel informed current counsel that certain *ex parte* communications occurred. Finding no transcripts of these communications, Appellant made attempts to contact the court reporter to determine if there were any such transcripts. Having no success, Appellant filed a Motion for Remand and/or to Reconstruct the record. As the Notice of Appeal had been filed before current counsel was appointed, the Motion had to be filed in this Court as the filing of a Notice of Appeal divests the district court of jurisdiction in the case. *United States v. Kapelushnik*, 306 F.3d 1090, 1093 (11th Cir. 2002).

This Court granted the Motion for Remand/Reconstruction and limited jurisdiction was transferred to the district court. Without contacting current

---

[1]    Mr. Brown uses the term "court" in reference to both the magistrate and district courts.

1

counsel and without conducting a hearing, the district court determined, after a limited inquiry, that no such communications took place between the district court and trial counsel and issued an order accordingly. Appellant sought reconsideration noting that trial counsel indicated the *ex parte* communications could have occurred with the magistrate court and cited to a specific reference in the transcript where the magistrate did seek to have such conversations with trial counsel. (*See*, Doc 302 at 175). The district court apparently contacted the magistrate court and his staff who could not say affirmatively that no *ex parte* communications took place. Rather, the magistrate stated only that he could not recall. (*See* Doc. 315 at n. 1).

The government appears to contend that the district courts actions were justified because of a failure on current counsel's behalf, i.e., counsel did not move to reconstruct the record pursuant to Rule 10(c). However, Appellant asserts that it is completely reasonable, in fact expected, that the district court, upon remand from the Circuit Court with directions, would contact all the relevant parties and discuss what needed to occur. Rather than faulting Appellant, the district court's unilateral actions deprived Appellant of his right to counsel, his right to be present and right of confrontation at a critical stage of the proceedings.

In a footnote, the Government also contends that any infirmity in the record

2

as it relates to the missing voir dire of Juror Dorothy Rentz and/or missing juror questionnaires is somehow Appellant's fault because "both of these matters were, or should have been known prior to the filing of the motion to reconstruct the record." (G. Brief at 86, n. 26). The government's position is unsupportable. First, counsel became aware of the fact that there is no voir dire of juror Rentz when he was preparing Appellant's initial brief. He raised the issue at the first practical proceeding - - the filing of direct appeal. As the government correctly notes, even the remand order was limited in its scope.

Secondly, as it pertains to the juror questionnaires, Appellant filed a motion to unseal all files, which was granted by this Court. It is reasonable for counsel to believe that, in accordance with this Court's order, all files were unsealed and made available to current counsel. Counsel is still unaware of whether any juror questionnaires are still in existence, but can only rely on comments of the district court to infer that they are, but have not been disclosed to Appellant. Thus, current counsel for Appellant raised these issues immediately upon discovery and the issues cannot be deemed waived.

**II.  The Trial Court Erred in Denying Appellant's Motion for Directed Verdict on the Aggravating Circumstance of Pecuniary Gain and Erred in Refusing to Instruct the Jury Regarding the Proper Scope of the Pecuniary Gain  Aggravating Circumstance**

The government's position on this issue centers solely on the argument that the murder in this case was committed specifically for pecuniary gain.  The government's position is unfounded.  It is beyond question that there must be some evidentiary support for an aggravating circumstance.  *See, McCleskey v. Kemp*, 481 U.S. 279, 313 n. 37 (1987)("It would be improper and often prejudicial to allow jurors to speculate as to aggravating circumstances wholly without support in the evidence."); *Lambrix v. Signletary*, 520 U.S. 518, 537 (1997) (appellate court must determine whether the evidence supports the existence of the aggravating circumstance), *Godfrey v. Georgia*, 446 U.S. 420 (1980).

Here, there was no evidence submitted to support a finding that the murder was committed for pecuniary gain (*See*, 18 U.S.C. § 3592 (c)(8)).  The only evidence on the motive for the killing came from Appellant's statement.  He testified that he went to the post office with the intent only to rob and the knife was along to scare the postmaster.  Appellant contended that only after he had ordered the money orders (and there is no testimony that Ms. Gaglia had not already given them to Appellant) did he realize that Ms. Gaglia would be able to identify him and that was the reason he decided to kill her.  Thus, the motive for the killing was not

4

pecuniary gain, it was to eliminate a witness. The fact that Appellant also took Ms. Gaglia's wallet is of no consequence to this issue as that was also an after-the-fact occurrence. Again, there is no testimony and/or evidence that Appellant went to the post office with the intent to kill Ms. Gaglia so he could steal her wallet.

This case is factually on all fours with *United States v. Bernard*, 299 F.3d 467, 483 (5th Cir. 2002), where the court found insufficient evidence to establish the pecuniary gain statutory aggravating circumstance where the killing was an after-the-fact occurrence designed to prevent witnesses from testifying. Because there was no evidence to support the jury's finding on the pecuniary gain statutory aggravating circumstance, the district court erred in denying Appellant's Motion for Judgement of Acquittal on this topic.

The government asserts that the error is harmless because the jury found one other statutory aggravating circumstance (18 U.S.C. §3595(c)(2)) and the existence of four non-statutory aggravating circumstances. (*See* G. Brief at 70). This does not carry the day. As the government admits in other portions of its brief, the jury was presented with significant mitigation. (*See*, G. Brief at 76-78). The federal system is one in which the jury is directed to weigh the mitigating factors against the aggravating factors. (*See*, Doc. 293 at 1058). If the jury finds that the aggravating factors outweigh the mitigating factors they may impose a sentence of

5

death, but they do not have to. If however, the jury finds that the mitigating factors

outweigh the aggravating factors, the jury is directed to impose a sentence of life

without parole. *See, Chandler v. United States*, 218 U.S. 1305, 1360, n. 32 (11ᵗʰ

Cir. 2000). *See also*, Doc. 293 at 1213 (instruction that jury is never required to

impose a death sentence). Here because there was considerable mitigating

evidence presented, the government cannot prove beyond a reasonable doubt that

the error of charging the pecuniary gain aggravating circumstance was harmless.

*See Chapman v. California*, 386 U.S. 18 (1967).

### III. The Trial Court Repeatedly Erred During Voir Dire by Asking Jurors Whether They Would Be Willing to Return a Life Sentence *If* Mitigating Circumstances Were Presented That Would Make a Life Sentence Appropriate

The government contends that the repeated burden shifting questions

proposed by the district court during voir dire did not render the trial

fundamentally unfair because the voir dire process afforded the opportunity to

select an impartial jury. (*See* G. Brief at 51). The government's argument misses

the mark. The question is not whether the voir dire process was unfair, the issue is

that the judge's questions shifted the burden of proof in the penalty phase of a trial.

The government must try to cloud the issue and deflect the analysis because it

concedes as it must that the district court's questions were erroneous. (*See*, G.

Brief at 52 ("proper jury instructions on mitigating and aggravating circumstances

6

negated any error in these questions.")).

Lastly, the government mistakenly argues that Appellant failed to object to the district court's questioning. It is clear that trial counsel made a general objection to the manner in which the district court was asking questions during voir dire that would cause jurors to prejudge the case. (*See*, Doc. 290 at 273). However, assuming that this objection was not sufficient to preserve the issue, Appellant can still prevail under the plain error standard. First, an instruction (or in this case series of questions) that requires the defendant to justify a life sentence is appropriate erroneously places the burden on the defendant rather than the government. Thus there is error. Secondly, pursuant to long-standing Supreme Court death penalty jurisprudence, the error was plain. *See Francis v. Franklin, supra.* Third, the error affected Appellant's substantial rights - - perhaps the most fundamental of rights - - the right to have each and every element of the offense proven by the government beyond a reasonable doubt. *See, Ring v. Arizona, supra.* Lastly, the error seriously affected the fairness, integrity and public reputation of the judicial proceeding in that jurors were instructed, via the court's repeated burden shifting questions, that once convicted, it was the defendant's obligation to show why a death sentence should not be imposed. Clearly, the public perception of a criminal proceeding would be diminished if it were shown that rather than the

government having to prove one's guilt, it was up to the individual to proves one's innocence. Thus this was error that warrants relief under any standard of review.

It is now beyond cavil that the government bears the burden of proving each and every element of the offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358 (1970). Further, aggravating circumstances which must be found before a death sentence may be imposed, are considered elements of the offense which the government must likewise prove beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584 (2002). Where the court incorrectly instructs the jury on the burden of proof, structural error occurs and reversal is automatic. *Sullivan v. Louisiana*, 508 U.S. 275 (1993). Similarly, where the court improperly instructs the jury that the defendant has the burden of disproving an element of the offense, error occurs that cannot be considered harmless. *See, Francis v. Franklin*, 471 U.S. 307 (1985); *Yates v. Evatt*, 500 U.S. 391 (1991). Such error occurred here and relief is warranted.[2]

---

[2]    The fact that the district court gave appropriate instructions at the conclusion of the penalty phase does not correct the error. Where two conflicting instructions would create confusion in the mind of a reasonable juror, error that cannot be considered harmless occurs. *See, King v. Allstate Insurance Co.*, 906 F.2d 1537, 1543 (11th Cir. 1990) ("A jury cannot be expected to apply mutually conflicting jury instructions, where each set makes sense independent of the other.").

**IV.    The District Court Erred in Allowing Hearsay Testimony in Both the Guilt/innocence and Penalty Phase Portions of Mr. Brown's Capital Trial in Violation of Th Fifth, Sixth, and Eight Amendments to the United States Constitution**

Initially, Appellant disputes the standard of review articulated by the Government. This claim should not be analyzed under an abuse of discretion standard. Instead, this Court must undertake *de novo* review. *See, United States v. McGuffin*, 2005 WL1526109 (10th Cir. 2005)(unpublished opinion) ("When a defendant contends that a district court ruling violated his rights under the Confrontation Clause, we review *de novo* whether an error occurred and, if so, whether the error was harmless beyond a reasonable doubt.") *citing, United States v. Joe,* 8 F.3d 1488, 1497 (10th Cir.1993). Secondly, the Government's assertion that a plain error standard should apply (at the very least to the penalty phase testimony) is misplaced as Appellant clearly objected to the admission of hearsay testimony in his pretrial motion. (*See* Doc. 36 at 10). Thirdly, Appellant contends that the exceptions to the hearsay rule upon which the Government relies, do not survive *Crawford.*

The Government asserts that the hearsay testimony offered by Appellant's cousin at the guilt phase of trial was not testimonial in nature and therefore *Crawford* does not apply. This argument is unfounded. In *Crawford,* the Supreme Court did not define "testimonial hearsay" but cited a short, non-exhaustive list of

9

examples. Although the complained of testimony does not specifically fall under one of the examples, it clearly was hearsay procured for trial. Appellant, in police custody at the time, after purportedly confessing, is allowed to call his mother. As he is talking to his mother, a government witness is present to overhear her reaction. This situation is similar to the government having a tape recorder hooked up to the phone to record the conversation. The hearsay was "testimonial" and *Crawford* applies.

Further, the government cannot show that the error was harmless. The hearsay testimony was admitted for one purpose, to corroborate that Appellant had confessed to the crime. The government felt the need to bolster its contention that Appellant voluntarily confessed and did so by introducing impermissible hearsay. This Court should reverse Appellant's conviction.

The Government contends that *Crawford* does not apply to the penalty phase of a capital trial because the death penalty statute specifically states that the rules of evidence to do not apply. (G. Brief at 45, n. 14). However, the statute was written before the Supreme Court decided *Crawford*. Further, the Government's assertion that the rules of evidence are suspended at the sentencing phase of a capital trial is wrong. While the rules are relaxed, the Court still can, indeed, must exclude evidence that is irrelevant, unduly prejudicial or unreliable. *See, United*

*States v. Lee*, 274 F.3d 485 (10th Cir. 2001).

Further, it strains credulity to believe that *Crawford*, which focused on the reliability of the testimony and how it could be tested only through cross-examination, would not apply at the penalty phase of a capital trial where courts must undertake extraordinary steps to ensure reliability. As the Supreme Court has repeatedly emphasized, "the Constitution places special constraints on the procedures used to convict an accused of a capital offense and sentence him to death. The finality of the death penalty requires a 'greater degree of reliability' when it is imposed." *Murray v. Giarratano*, 492 U.S. 1, 8-9 (1989) (internal citations omitted); *see also Monge v. California*, 524 U.S. 721, 732 (1998) (observing that there is an "acute need for reliability in capital sentencing proceedings"); *Simmons v. South Carolina*, 512 U.S. 154, 161-62 (1994); *Lowenfield v. Phelps*, 484 U.S. 231, 238-39 (1988); *Beck v. Alabama*, 447 U.S. 625, 638 (1980); *Gardner v. Florida*, 430 U.S. 349, 357 (1977); and *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion).

The government next asserts that the testimony of Ms. Webb, the victim's sister, is "probably not hearsay" or if it is, it is not testimonial. Clearly, the portions of Ms. Webb's testimony that pertained to the victim's husband and sons, was rank hearsay. While Ms. Webb could testify to objective facts within her

11

personal knowledge, i.e., the victim was married and had two sons, one of whom was in college and one in the military, she could not testify to information that was necessarily predicated on hearsay, i.e., the victim's husband was too distraught to attend the trial, the husband, because of the crime, had to undergo counseling, that, upon advise of his therapist, the husband could not testify at the penalty phase, the son's mental state, because of the crime, caused him to forgo a college education. Thus, the admission of this portion of Ms. Webb's testimony was error under *Crawford.*

The error that cannot be considered harmless. First, Ms. Webb's testimony gave the false impression that the husband supported a death sentence, but because of his emotional state could not appear at the trial. Upon information and belief, Appellant is now aware that Mr. Gaglia, in fact, supported resolution of the case with a guilty plea and sentence of life without parole. The false impression created by Ms. Webb's testimony was further exacerbated when the government, in its closing argument, claimed that a death sentence was "justice" because of the "loss to her family. And you heard from her family. And you heard about Joe and the kids, Scott and Craig, and why they could not be here. I don't think I can say anything more about this *that what they said themselves.*" (Doc. 293 at 1175). Thus, the government's case for death relied heavily upon Ms. Webb's improper

12

testimony.

Assuming *arguendo* that this Court must review this issue under a plain error standard, the facts here still warrant relief. Under this Court's precedent, in order to meet the plain error standard, the defendant must satisfy a four part test: (1) there was error; (2) the error was plain; (3) the error affected substantial rights; and (4) the error seriously affects the fairness, integrity, or public perception of judicial proceedings. *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005).[3] Admission of hearsay testimony in support of a death sentence was error. Further, pursuant to the Supreme Court's Eighth Amendment jurisprudence and *Crawford v. Washington*, the error was plain. Third, the error affected substantial rights of Appellant in that the error contributed to the jury imposing the ultimate punishment - - a sentence of death. Fourth, the error seriously affected the fairness and integrity of the judicial proceeding in that Appellant was sentenced to death based on testimony he could not rebut and that has since, upon information and belief, been proven to be unreliable. Thus, under any review Appellant has demonstrated error that warrants a new sentencing proceeding.

---

[3]     Appellant contends that this Court's addition of a fourth prong is contrary to the standard articulated by the Supreme Court in *United States v. Olano*, 507 U.S. 725 (1993).

13

**V.    The District Court Erred in Denying Mr. Brown's Motion to Suppress Statements Which Were Obtained in Violation of *Miranda V. Arizona***

A.    Facts

On December 5, 2002, a number of law enforcement officials conducted two searches. The first at the home of Appellant's mother and the second at the home of Appellant's girlfriend, Diane Brown (hereinafter "Diane"). Appellant and Diane were at Diane's residence when law enforcement officers arrived. Diane heard a knock on the door and as she went to answer it, with Appellant right behind her. As she approached the door, she could see out of the window, numerous law enforcement officers, one of whom was standing with a shotgun in the air. (Doc. 292 at 751). When she eventually opened the door, ten or twelve officers, with guns drawn, rushed past her and into the house. (*Id.* at 752-53). Once inside, one of the officers "snatched the chair from my dining room table, snatched it around and told Jason to sit there and don't move." (*Id.* at 753). Before Appellant was allowed to sit down, however, an officer searched him. (Doc 302 at 124). At some point one of the officers at the house told Appellant "if [he got] up that was going to be the worse [sic] mistake [he] could possibly make." (*Id.* at 126). Appellant and his girlfriend were physically separated. (Doc. 292 at 753-54).

After Postal Inspector Rushwin walked through the house and determined that the shoes he spied in Diane's bedroom would be taken as evidence (because he

believed the tread pattern matched one found at the crime scene), he approached Appellant. Rushwin claims[4] that he informed Appellant that "he was not in custody. He wasn't under arrest, and that he was free to go at any time." (Doc. 302 at 41). Rushwin also asked Appellant if he would be willing to be interviewed at the Chatham County Police Department to which Appellant agreed. However, when Appellant attempted to retrieve his shoes Rushwin told him they were being held as evidence in the case. (*Id.* at 41-42). Because he had no other shoes, and because it was the middle of winter, Appellant decided he would not go to Chatham County. (*Id.* at 42-43). Instead, Appellant was kept at Diane's house awaiting the arrival of Liberty County Police Detective, Chuck Woddall, who Rushwin had summoned to conduct the interview. (*Id.* at 43-44). Any time Appellant attempted to move within the house, he was escorted by law enforcement. (*Id.* at5 69; 75; 125).

Approximately 40 minutes after police first entered the home, Detective Woddall arrived and purportedly also advised Appellant "he wasn't under arrest, in custody, and you know, he was free to leave at any time." (*Id.* at 46). During the entire time that Appellant was being interrogated, numerous other officers were conducting a search of Diane's home and otherwise controlling the location. In

---

[4]    Appellant, however, testified that no law enforcement agent ever told him he was not under arrest, or that he was free to leave. (Doc. 302 at 125-26).

fact, police presence was so omnipresent, that the interrogation was ultimately moved into another room.  (*Id*. at 49-50).

Appellant initially admitted to going to the post office, but denied any involvement in the robbery/killing.  (*Id*. at 46-48).  Getting nowhere, the officers decided to conduct a classic "good cop - - bad cop" routine and Detective Woodall left the interrogation and another officer entered.  That officer told Appellant that he was lying.  (*Id*. at 51; 118-19).  When Appellant still did not confess, Woodall returned and told Appellant that police had found evidence in Diane's house that indicated someone there had been involved in the killing.  (*Id*. at 52-54).  After being informed of this, and after approximately 5 and ½ hours after law enforcement took control of Diane's house, Appellant gave a statement wherein he confessed to the killing.  (*Id*. at 53; 59-60).   Immediately thereafter, Appellant was placed under arrest and only then advised of his *Miranda* warnings.  (*Id*. at 59).

B.    Argument and Authority

By its very terms, the protections announced in *Miranda v. Arizona*, 384 U.S. 436, 458 (1966), only apply to custodial interrogations.  Custodial interrogations are defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of

action in any significant way." *Yarborough v. Alvarado*, 124 S.Ct. 2140, 2147 (2004). In determining whether a person who has not been formally arrested is actually in custody for *Miranda* purposes, the Court has consistently held that the relevant inquiry is whether " a reasonable person in the suspect's position would have understood his situation" to be one of custody. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). In other words, given the circumstances of the interrogation, "would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "Though informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody, it is not a talismanic factor." *Davis v. Allsbrooks*, 778 F.2d 168, 171-72 (4th Cir.1985). Even where such an admonishment is given, objective factors still may establish that the defendant was in custody.

The Government while recognizing this concept, ignores the objective facts present here instead relying on the assertion that because Appellant was purportedly told he was not under arrest, that he was free to move about the house, he smoked, drank sodas and watched television. (*See* G. Brief at 26). These factors alone or in combination do not change the fact that a reasonable person would have felt free to leave Diane Brown's home on December 5.

17

The following are a list of relevant objective facts which establish custody:

(1)  Appellant was at his residence[5] when 10 to 12 police officers, with guns drawn, rushed into the house;

(2) Once inside, police directed Appellant to sit down and not move;

(3) Appellant was told that if he did attempt to move, it could be the worse [sic]  mistake he ever made;

(4) Police immediately separated Appellant from his girlfriend, Diane Brown;

(5) Police immediately searched the house and found incriminating evidence;

(6)  While police searched the house, at least one deputy sheriff brandishing a shotgun was stationed outside, but in clear view of anyone, including Appellant, who was  in the livingroom of the home;

(7) When Inspector Rushwin addressed Appellant, he informed him that he investigating the robbery/murder that had occurred at the Fleming Post Office on November 30 and that police had found incriminating evidence in Diane's house;

(8) From the instant law enforcement entered the home, Appellant was accompanied by a police officer, if and whenever he attempted to move;

(9) When Appellant did want to move within his house, he asked the police for permission to do so;

(10) When Appellant agreed to leave the house on December 5, he was told he could not take his shoes because they were being held as evidence in the robbery/murder;

---

[5]    While Appellant also, at times lived with his mother, he also resided with Diane Brown.  (Doc. 292 at 745).

(11) Appellant was not advised of his *Miranda* warnings until 5 and ½ hours after police arrived, and until 4 hours after the interrogation began; and

(12) After Appellant confessed, he was immediately arrested.

Given these facts, it was entirely reasonable for Appellant to believe he was not free to leave.

The Government's reliance on *United States v. Muegee*, 225 F.3d 1267 (11th Cir. 2000)[6] and *United States v. Phillips*, 812 F.2d 1355 (11th Cir. 1987) is misplaced and those cases are easily distinguished from the facts in this case. In *Muegee*, this Court found that the defendant was not in custody because: (1) he voluntarily went to a the military facility to meet with investigators; (2) although the interview was conducted in a secured facility, one did not need a key to exit the building; (3) although he was escorted throughout the facility, that was a regulation implemented for the facility; (4) he was told he did not have to answer any questions and that he was fee to leave;[7] (5) after the defendant made an incriminating statement, he was allowed to leave on his own; and (6) he was not

---

[6]    Although this Court in *Muegee*, held that the analysis should be what a reasonable *innocent* person would believe, this standard has never been adopted by the Supreme Court and Appellant contends its use here would be a misinterpretation of Supreme Court precedent.

[7]    The defendant did not assert that the investigators did not tell him he did not have to answer questions and that he was free to go, instead, he testified that he did not recall if the investigators so advised him.

arrested until over eight months had elapsed.

Similarly, in *United States v. Phillips*, this Court found that the defendant was not in custody when he gave his statement and thus, no *Miranda* warnings were required. In so finding, the Court relied on certain facts that are not present in the instant case: (1) the defendant in *Phillips* voluntarily agreed to the interrogation taking place at the police station; (2) he drove himself to the interrogation; (3) he had a long-standing relationship with one of the officers, having daily contact for a period of time; (4) only two officers were present when the interrogation took place; and (5) the defendant testified that the officers did nothing to prevent him from leaving.

In contrast to *Muegee* and *Phillips*, Appellant did not voluntarily agree to meet with law enforcement. Instead, police with guns drawn, initiated contact with Appellant in his home. His liberty was restrained and he was constantly escorted by police officers when he attempted to move.[8] Numerous police officers were present inside the residence during the interrogation and for an extended period, Appellant could see a sheriff's deputy stationed outside the home brandishing a shotgun. Even though Appellant was in his girlfriend's home, he always sought

---

[8]    While one would expect to be escorted in a secured military facility like that involved in *Muegee*, one would not expect to be escorted by police inside one's own home.

20

permission from police when he wanted to move somewhere. Although the police in this case indicated[9] they advised Appellant that he was not under arrest and that he was free to go, they never advised him that he did not have to answer any questions. After Appellant made an inculpatory statement he was not allowed to leave but was immediately placed under arrest and only then advised of his *Miranda* warnings. These differences in objective facts make *Muegee* and *Phillips* distinguishable.

In determining the "custody" aspect of *Miranda*, this Court should look to a myriad of relevant factors which are indicia of custody. The Eighth Circuit has outlined a non-exhaustive list of such indicia which include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave, or request the officers to do so, that the suspect was not considered under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during questioning;
>
> (3) whether the suspect initiated contact with law

---

[9]    This Court, in *Muegee*, found that the interrogation was non-custodial because the defendant "was told directly he might leave, [thus] *in the absence of evidence to the contrary*, the interrogation was non-custodial." *United States v. Muegee*, 225 F.3d 1269. Here, *there is evidence to the contrary* - - Appellant testified unequivocally that he *was not* advised that he was free to leave, and no one testified that Appellant was ever advised he did not have to answer any questions.

enforcement or voluntary acquiesced to official requests;

(4) whether strong arm tactics or deceptive stratagems were employed by law enforcement;

(5) whether the atmosphere of the questioning was police dominated; and

(6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). The first three factors are considered to "mitigate" and presence of one or more would tend to show the questioning was non-custodial. The final three factors are considered to be coercive and indicative that the suspect was in custody during the questioning period.

In the instant case, there are few, if any mitigating factors and all of the *Griffin* coercive factors are present. (1) Appellant was never advised that the questioning was voluntary. At best, he was told that he was not under arrest and free to leave. (2) His movement was not unrestrained. He was told to sit down and not move, and when he did seek to move, he asked permission and was escorted by law enforcement. (3) He did not voluntarily agree to meet with law enforcement but was instead, accosted in his home by 10 or 12 police officers with guns drawn. (4) There were strong arm tactics employed as Detective Woodall testified that they planned and executed the classic, "good cop - bad cop" routine.

22

(5) The atmosphere of the questioning was police dominated as a large number of officers were in and about the house. In fact, the police presence was so dominant, the interrogating officers decided to move into another room to finish the interrogation.[10]    (6) Appellant was arrested immediately after making an inculpatory statement,

Under any examination of the objective facts present in this case, a reasonable person in Appellant's situation on December 5, 2002, would have believed that he was not free to leave. Because Appellant was in custody at the time he was interrogated, and because police did not advise him of his *Miranda* warnings, this Court must conclude that any statements made by Appellant should have been suppressed. Because the district court allowed these statements to be admitted in the Government's case-in-chief, this Court must vacate Appellant's conviction.

## VII. The Trial Court Erred in Refusing to Conduct an Evidentiary Hearing on Appellant's Motion to Suppress Improper and Suggestive Identification Evidence

The Government asserts that there was no error in denying Appellant an evidentiary hearing on photo identifications because Appellant failed, in his

---

[10]    The fact that the interrogation ultimately moved into another room away from the other police officers is not a critical factor. Appellant knew that the police were still in the remainder of the house exercising complete control over it.

23

Motion, to assert that the procedures utilized by the police were suggestive. (*See* G. Brief at 30). The Government further cites *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) for the proposition that "[W]here a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require the district court hold a hearing . . ." (G. Brief at 31). The Government's assertion and reliance on Cooper is misplaced because Appellant clearly asserted, in his pretrial motion that the out of court identification procedures utilized by law enforcement were unreliable and unduly suggestive. (Doc. 45 at ). Thus, Appellant alleged facts - - the out of court identification procedures were unreliable - - that if proven to be true would have required the grant of relief. Appellant was entitled to an evidentiary hearing on the admissibility and the district court erred in not conducting one.

## VIII. The Government Withheld Favorable Material Evidence in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution and *Brady V. Maryland*, 373 U.S. 83 (1963), and its Progeny

The government contends that evidence of the victim's husband being in favor of a sentence of life without parole is not favorable or exculpatory under *Brady v. Maryland, supra*, and its progeny. The government is wrong. At trial Ms. Webb testified at length that the victim's husband was devastated by the loss and would have been there to testify for the government in its quest to obtain a

24

death sentence had his therapist not advised him against it. When the government introduced this evidence, the husband's stance on a death sentence became relevant and material to rebut the misimpression created, i.e., that he was in favor of a death sentence. Had this information been disclosed, and the jury's misconception corrected, there is a reasonable likelihood the jury would not have imposed a death sentence.

## IX.    The Court Erred in Granting the Motion to Quash Mr. Brown's Subpoena for the Production of DFACS Records

The Government asserts that this Court lacks jurisdiction to review the magistrate's decision to quash Appellant's subpoena for the production of DFACS records because Appellant failed to object to the magistrate's ruling in the district court. Further, the Government cites *United States v. Brown*, 342 F.3d 1245 (11th Cir. 2003) as support for this proposition. Assuming *arguendo* that Appellant did fail to raise an objection in the district court, that does not prevent this Court from exercising its supervisory powers over lower courts to address the merits of this claim.

It is now well settled that "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in

25

the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). It is likewise well settled, that "in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress," *United States v. Hasting*, 461 U.S. 499, 505 (1983). Thus, this Court has the power, indeed the duty, to ensure that the courts below did not deprive Appellant of a fair trial and reliable capital sentencing procedure. One such aspect of this duty is to review this issue on its merits.

## XII. The District Court Erred in Allowing the Introduction of Gruesome Photographs

Initially, Appellant takes issue with the Government's characterization that "Brown appears to acknowledge that the photographs were relevant evidence." (G. Brief at 34). Appellant contends that the photographs, because they did not accurately depict the crime scene or the position of the body - - i.e., the blood on the floor was smeared and the body grotesquely contorted because of resuscitation efforts - - were not relevant.[11] Appellant also objects to the Government's

---

[11]    Appellant believes that the Government Brief contains a typographic error when it asserts that "Brown argues that the images reflected the resuscitation efforts undertaken *and did reflect* the manner in which Jennifer Zech and Stephen Nichols found Gaglia's body." (G. Brief at 35)(emphasis added). Appellant believes the passage should read "did *not* reflect." However, if this passage does

characterization of the evidence, specifically, that "the knife broke" during the attack. (G. Brief at 36). While the medical examiner did testify that one or two of the superficial wounds could have been inflicted by stabbing after a knife had broken, he also testified that there was no part of the knife found in the victim, and there was no part of a broken knife found at the scene. Further, Appellant, in his confession, never said the knife broke. In fact, his stated the opposite when he told authorities that he threw the knife (not the broken knife) into the woods.

Assuming the relevancy of the photographs, the district court erred in allowing the admission because the prejudicial effect substantially outweighed their probative value. While a district court must exercise caution in excluding otherwise relevant evidence pursuant to a Rule 403 challenge, the court's power is not so "narrowly circumscribed" so as to render the analysis a mere formality. The Court still must determine the probative value of the photographs and then weigh it against the prejudice that will result from introduction. Further, in instances where "the government has a strong case without the [evidence] then the prejudice to the defendant will more likely outweigh the marginal probative value. *See United States v. Hernandez,* 896 F.2d 513, 521 (11th Cir. 1990).

---

not contain a typographical error, Appellant asserts that he is alleging the photographs did not reflect the manner in which the mentioned witnesses discovered the body.

Here, the Government concedes, as it must, that the crime scene photographs depicted the body *after* resuscitation efforts but tries to minimize this fact by asserting that "even before attempts to revive [her] there was a lot of blood on the floor and around the body." (G. Brief at 36). The Government then asserts that the photographs were probative as to the nature of the injuries, the manner in which she died, and that the crime "reflected heinous, cruel, and depraved actions, and serious physical abuse." (*Id.*). The Government's contentions fail because the photographs do not depict the scene created by the crime, instead they reflect the scene artificially modified.[12]

The Government's assertion that the crime scene photos were probative because they depicted the wounds is flawed as the autopsy photographs submitted into evidence more accurately, indeed with unmistakable clarity, depict the nature of the wounds. Thus, the crime scene photos were cumulative and the probative value minimal. The assertion that the photos depicted the manner in which the victim died is clearly refuted by the fact that the photos showed the body *after* resuscitation efforts and thus were not probative to the manner of death. Lastly,

---

[12]    None of the cases cited by the Government in support of admission addressed the case where the crime scene photos were modified due to resuscitation efforts. In each of the cases cited by the Government, the appellate court found no abuse of discretion because the photos accurately depicted either the nature of the body, or the wounds inflicted.

28

the photos, because they did not depict the body or the scene as it resulted from the crime alone, had little probative value as to the heinousness of the crime.[13]  With little probative value, the prejudicial effect of the photos warranted exclusion.

The Government contends that even if it was error to admit the photographs, the error was harmless both as to guilt and as to punishment.  The Government's contention as to punishment is clearly refuted by the cases it relies upon and its own argument.  In its argument that the photographs had probative value, the Government relies upon *United States v. Ortiz*, 315 F.3d 873 (8th Cir. 2002), and claims that photographs are relevant to "support the government's contention that the crime was particularly heinous and depraved." (G. Brief at 36).  Further, the Government specifically asserts that the photos establish that the crime "reflected heinous, cruel, and depraved actions, and serious physical abuse." (*Id.*).  This language tracks the statutory aggravating circumstance relied upon at trial and found by the jury as a basis for imposing a death sentence.  As noted above, the photographs did not depict the body in the position it was found and therefor could

---

[13]   In footnote 11 the Government appears to offer another reason for introduction, i.e., the position of the body.  However, the photographs, in no way, depicted the position of the body as a result of the crime.  The pictures show Ms. Gaglia sprawled on her back, arms flailed over her head, and blood smeared across her face.  There can be no assertion that this was the way the body left as a result of the crime. (*See* Doc. 291 at 587; 602 (victim in a fetal position with half dollar sized blood stains on her back)).

29

not reflect the nature of the offense.  In fact the photographs effectively modified

the crime scene to make it look like the crime was more heinous and depraved than

it actually was.

The Government's attempt to distinguish *Spears v. Mullins*, 343 F.3d 1215

(10th Cir. 2003) misses the mark.  The issue is not that state law defined an

aggravating factor in a specific manner, the issue is whether the Government used

photographs that did not accurately reflect the body or scene to argue and support a

death sentence.  There, the photographs showed wounds inflicted after death which

was not probative of the state law statutory aggravating factor.  Here, because the

body was moved, and the crime scene altered, the photographs were not probative

of the nature of the crime.  In either instance, admission of the photographs was

error that cannot be considered harmless.

## CONCLUSION

For the forgoing reasons this Court should reverse Mr. Brown's convictions

and sentences.

Dated, this the 5th day of July, 2005.

Respectfully submitted,

JEFFREY L. ERTEL
State Bar No. 249966
Federal Defender Program, Inc.
100 Peachtree Street
Suite 1700
Atlanta, Georgia 30303
(404) 688-7530

DONALD SAMUEL
State Bar No. 624475
GARLAND, SAMUEL & LOEB, P.C.
3151 Maple Drive, N.E.
Atlanta, Georgia 30305
(404) 262-2225
dfs@gsllaw.com

ATTORNEYS FOR MR. BROWN

31

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7), undersigned

counsel hereby certifies that the word processing system used to prepare this Brief

has counted 7,169 words.

JEFFREY L. ERTEL
State Bar No. 249966
COUNSEL FOR MR. BROWN

Federal Defender Program, Inc.
100 Peachtree Street, Suite 1700
Atlanta, Georgia 30303
(404) 688-7530

32

# US Court of Appeals, 11th Circuit - Brief Upload Result Page

Successfully Received Appellant - Reply Brief for Docket #04-10325 at July 05, 2005 03:57:13 PM from Jeffrey Lyn Ertel (015893661)

# PLEASE NOTE: All submissions are subject to review.

View Uploaded Brief

Upload Another Brief

## Please Logout When You Are Done
## E-Mail EDF Support

**07/05/2005 03:57:13 PM US Court of Appeals for the 11th Judicial Circuit.**

## CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the forgoing pleading upon

counsel for the Government by hand delivery at the following address:

> Amy Lee Copeland, Esq.
> William Frentzen, Esq.
> Assistant United States Attorney
> P.O. Box 8970
> Savannah, Georgia 31412

Dated, this the 5th day of July, 2005.