# APPENDIX 1

COUNTY OF CHATHAM)

STATE OF GEORGIA)

## AFFIDAVIT

Comes the undersigned, William Bell, and after being properly sworn deposeth and says as follows, to:wit:

1. I am over the age of 18 and competent to make this affidavit.

2. I am an attorney in private practice in Savannah, Georgia. I was appointed to represent Jason Meier Brown in 2003 after he was indicted for the murder of Sallie Louise Gaglia. Later, attorney Richard Darden was also appointed as "learned counsel" and was lead counsel.

3. When I was appointed to this case it was not known if the Department of Justice would actually seek the death penalty. The local United States Attorney's Office, some members of the victim's family, and the state prosecutor in Liberty County (Mr. Tom Durden) all agreed that this case could be settled with a sentence of life without the possibility of parole in return for a guilty plea in federal court. Mr. Brown also agreed. That agreement was prepared and presented to the Department of Justice, but ultimately then Attorney General Ashcroft refused to allow this resolution and insisted that the United States seek the death penalty.

4. I had not been involved with a death penalty case in approximately 15

1

years prior to my appointment to represent Mr. Brown.  I prosecuted a death penalty case as an assistant district attorney in approximately 1986.  I acted as lead counsel in the guilt/innocence phase and was not actively involved in the punishment phase.  Sometime around 1989 I was appointed as second chair in a Superior Court of Chatham County case to represent a client facing the death penalty, however, that case concluded almost immediately with a guilty plea due to proof of the client's mental retardation and the wishes of the victims family.  I am not "death penalty qualified or certified" in order to be qualified to be appointed to a death penalty case in Superior Court.  I spoke with David Bruck who was with the Federal death Penalty Resource Counsel.  This is a group that provides form pleadings and makes suggestions about how to go about getting necessary funding for federal capital trials, how to be sure that qualified counsel are appointed, etc.  Based upon Mr. Bruck's suggestions, I requested that the Magistrate Judge adopt a case budget for funding various stages of the case.  The Magistrate Judge declined to do that, saying that a case budget would not be done in this case.

5.  I had almost no experience in conducting an investigation into the type of evidence that is used by the defense at capital sentencing.  My only prior experience with this type of investigation had been in a case I worked on approximately 15 years earlier which concluded very quickly before the mitigation

2

investigation really started. I had never before witnessed someone else conducting such an investigation. I had no training in how to conduct such an investigation.

6. I had an assistant, Bobbye Rae now remarried with a last name of Gerard, who at that time was my secretary/paralegal and my office manager. The only other employee at my office during this time was a part time secretary.

7. It was important that we get funding for someone to conduct an investigation into mitigating circumstances and into Mr. Brown's background and social history. On the recommendation of David Bruck we hired Laura Blankman as our mitigation investigator. Before we even put in the motion for funds for her, we told her that the judge was likely to only approve $7500.00 and would not approve any more money. We told her that if she did not want to handle the case for that amount then we would look for someone else. We also told her that the case would come to trial very quickly. She agreed to handle the case under these constraints.

8. Ms. Blankman's responsibility was to gather a background and social history for the sentencing phase of the case and to help with any mental health issues that were pertinent to capital sentencing. She did not do her job. She completely dropped the ball. She did not give us one piece of paper pertaining to any investigation she did (other than perhaps a bill). She found no witnesses, she

3

gave us no reports.

9. Because Blankman had done no mitigation work, we asked the Court for additional funds for a separate forensic social worker. That request was denied. It was left largely to me to attempt to conduct the type of mitigation investigation that is necessary for a capital case when I had never done such an investigation. Later, Laura Blankman told us she would come to the trial and work for free, but she did not show.

10. Shortly before trial we received from the Government a report compiled by the Postal Service regarding the offense and Mr. Brown's background and social history. Because of how late it was provided in the process we were not able to determine how effectively to use the information it contained. I have been shown Appendix D to the federal habeas corpus petition and that is the report we received shortly before trial.

11. Ultimately we were provided approximately $18,800.00 for experts and investigators in this case. This was broken down as follows: $2,250.00 for a blood splatter expert, Paul Kish; $1,500.00 for a psychologist, James Maish to assess competency and sanity; $7,500.00 for a mitigation investigator, Laura Blankman; $525.00 for a shoe print expert, Kenneth Zercie, $2,000.00 for Ronald Ostrowski, a DNA expert, and $4630.00 for Frank Bennett, an investigator who mostly served

4

subpoenas and interviewed the guilt phase witnesses.  I was advised by Mr. Bruck that this was an extraordinarily low amount for preparing and presenting a complete defense in a federal capital trial.

12.  During the penalty phase of the trail, we introduced a stipulation that Mr. Brown had offered to plead guilty in return for a sentence of life imprisonment without the possibility of parole.  After the jurors were presented with that information they appeared visibly upset.  They shook their heads at each other, some jaws dropped, and I was convinced that it was a mistake introducing the stipulation.

13.  I have reviewed Appendix K-1, a report prepared by Dr. Sally Johnson from Butner FCI .  She was the mental health expert who did the court appointed mental health examination of Mr. Brown for the Government.  This report was never disclosed to the defense.  Had we known about her report at the time of sentencing we would have either used her testimony or sought the assistance of our own expert.  Her report shows that the prison classification and mental health experts believed that Mr. Brown was not a person who would be dangerous in the future in a prison setting.

Further affiant sayeth not.

WILLIAM BELL

Sworn to me this the
9th day of May, 2008.

NOTARY PUBLIC

My commission expires: 8|14|09