APPENDIX  3

## AFFIDAVIT OF SARA FLYNN

Comes now Sara Flynn, before the undersigned officer duly licensed to administer oaths and swears or affirms as follows:

1. My name is Sara Flynn and I am over the age of eighteen. The information contained in this affidavit is based on my personal knowledge and I am competent to testify.

2. I am presently self-employed as a mitigation specialist. My address is 5513 Roosevelt Blvd, #204, Jacksonville, Florida 32244. I have a Bachelor of Science degree in psychology from the University of North Carolina, Chapel Hill. In 1998, I obtained my Masters degree in Social Work also from the University of North Carolina at Chapel Hill.

3. I have been working as a mitigation specialist since 1997 when I was working for The Center for Death Penalty Litigation, in Durham, North Carolina. I continued in that employment until 2003, when I re-located to Jacksonville and went into private practice. I have been retained as a mitigation specialist in capital cases in Georgia, North Carolina, Alabama, Florida, Louisiana, and Tennessee. In my capacity as a mitigation specialist I have had occasion to testify in both state and federal courts. I estimate that I have either been appointed or consulted as a mitigation specialist in over 100 cases.

1

4. I have been retained by the Attorney for Meier Jason Brown to conduct a mitigation investigation. I have obtained various records pertaining to Mr. Brown and his family including but not limited to school records, prison records, jail records court documents. I have also interviewed Mr. Brown, his family, friends, teachers and other individuals who have had contact or a relationship with Mr. Brown over the course of his life. Based on my investigation I have compiled a social history detailing relevant portions of Mr. Brown's life. The social history I have compiled is the type of information mitigation specialists routinely compile for the penalty phase of a capital trial. It is set out herein.

5. Meier's mother was Sadie Morgan Brown of Fleming, GA. Between 1960 and 1970, Sadie had seven children, all of whom were boys and had different fathers (except two who were twins). Their names are (in birth order): Roy Morgan, Leo Morgan, Levi Morgan, Dexter Morgan, Glen (Sir Kay) Morgan, Nita Brown and Meier Brown. The fathers of some of these children occasionally came around, but they did not support their children. Often the men who fathered Sadie's children drank heavily and as would be expected, so do their offspring. For instance, Henry Green drank heavily, and his sons, Leo and Levy do as well. Similarly, Pelham, Meier's father is an alcoholic and so is Roy Morgan's father.

6. Sadie was married to Pelham Brown when Meier was born and Meier

2

grew up believing Pelham was his father, but other family members say that Clarence Jackson was really Meier's father. Meier has never met Mr. Jackson. Pelham fathered Sadie's sixth child, Nita, who was about 18 months old when Meier was born. When Meier was fourteen, Sadie had another son, Ralton Brown, whose father was a man named Leland Frazier.

7. Meier's grandparents, Bernice and Sam Morgan, Sr., owned a parcel of property on Leroy Cofer Highway that became know as the Morgan compound. Bernice and Sam, Sr. had thirteen children who were raised on the property and, many of whom continued to live there in adulthood. Sadie had a trailer next door to her mother and father. Her sisters, Bernice and Mary Alice Blizzard, )and her children lived there today). Mary Alice still lives next door to the trailer where Sadie used to live. Mary Alice lived at Bernice's with her children Antonio (a.k.a. Tony), Latoya, Robert and Keon. Another sister, Vancile, lived at Bernice's with her children Margaret Ray, Cedric, Edward and Richard Morgan. Ollie Morgan Smith and her children Alphonso, Richard and Tyrone Blige lived on the compound as well. Another sister, Willie Bell and her husband, Anthony Williams, lived on the property with their children Connie, Marilyn, Gregory and Jeston. At least nineteen people lived next door to Meier in his grandmother's house until he reached ninth grade, when the house burned down.

3

8. The police were always concerned when a woman got pregnant at the Morgan property. Liberty County Sheriff's Department Detective, Charles Woodall recalls that the Morgan property was no place to raise a family. It was not a safe environment for children. The poverty was extreme. When you were there, you could tell there was no clean living going on. The able bodied men did not work at regular jobs because they sold drugs instead. Nutrition and medical attention were very poor. There was no intellectual stimulation for a child. The homes were filthy dirty with holes in the floors and rooms crammed full of junk so dense you could not walk through. The carpets were threadbare. It was "nasty, sordid, disgusting. Children were completely unsupervised, and they were always in danger. One child, Quincy Waye, drowned in the septic tank at the compound. It was reported that the child had "wandered off." No charges were brought against Janice Richardson, the child's aunt who was supposed to be babysitting at the time and the Sheriff's Department concluded that the child was chasing a ball that was found floating in the septic tank. Still another time, when Meier was in the ninth grade and Ralton and Keon were preschool age, Ralton and Keon started Sadie's trailer on fire. Meier was supposed to be babysitting and he fell asleep only to wake to find the toddlers in Sadie's bedroom which by then was in flames. They all got out before the trailer was consumed in flames. Consequently, Meier

4

and Ralton moved in with their maternal grandmother until their mother could get another trailer. The fire at Sadie's happened the same year the house next door to Sadie's trailer had been accidently started on fire by Meier's Uncle Junior.

9. Almost every male in Meier's family drank, and still drinks, alcohol excessively on the compound. This includes all of Meier's uncles and all of his male (and several female) first cousins. Almost everybody on the Morgan property smoked marijuana and sold drugs at one point or another. People drank and smoked marijuana underneath the tree in the front yard every day. "Caretakers" were drunk and high all day, and according to Phil Arp, Meier's probation officer who had many dealings with the Brown family (including Roy, Daryl, Jason, and Sam Morgan) related that there was "a party going on at the trailers almost every weekend with a lot of drinking."

10. All of the children living in the cluster of trailers where Meier grew up drank alcohol during childhood. Meier started drinking when he was 12 years old. Meier, Chester, Tyrone and sometimes Richard would take lunch money and buy beer at the Short Cut store. They drank to get drunk several days every week. By age 18 or 19, Meier was drunk *every* day.

11. It was reported that the older children were raising the younger ones alone. According to Gloria Boyd, the "[o]lder boys were trouble and there was no

5

father figure around" on the Morgan Compound. In Meier's case, his brother Roy, "took care of" Meier when adults were not to be found. Roy was a drug user who started out smoking marijuana and moved on to crack cocaine. He encouraged his younger brothers to develop drug habits because he thought that if they were using drugs he would always have some.

12. In this environment, Meier also started smoking marijuana when he was twelve years old. By age eighteen he was a daily marijuana and crack smoker. In 2000, he began smoking considerably more crack than he had before. Ralton knew Meier had a crack problem from the time Ralton was 17 or 18 years old, *i.e.*, at the time of the crime in this case.

13. Meier was given drugs by many relatives on the compound. Cedric, Tony, Glen (a.k.a. Sir Kay), Uncle Anthony, cousin Roger Underwood, all sold crack cocaine, powder cocaine, and marijuana – mostly to people from Richmond Hill. They had many customers and made enough money to support the Morgan clan's own drug habits. (Telephone interview with Det. Woodall on 1-10-08). All of this happened in front of and around every person living on that property, including the children. (Telephone interview with Det. Woodall on 1-10-08).[1]

---

[1]Sam Walthour also sold drugs at the Morgan property. Sam Walthour was severely beaten, hog tied, shot and killed in 1998 the same night that Edward Morgan, Meier's cousin, was murdered at Sam's house.

14. Meier's father, shot Meier's oldest brother, Roy. On the night of the shooting, Meier, who was seven years old, was with his mother in her bedroom when he heard Roy and Pelham arguing in the bathroom right next door. They began to "scuffle" and Meier heard a gunshot - - Pelham had shot Roy, who apparently had pulled a knife on Pelham during the scuffle. Pelham believed that Roy would have cut his throat with a razor if he had not shot him. The police came and took Pelham to jail and he never lived there again. He would, however, visit the compound to "party."

15. Violence was so prevalent on the Morgan Compound that the Sheriff's Office was called to the Morgan property then two or three times every week, and often five times a week. The Morgans/Browns and law enforcement officials knew each other so well they were on a first name basis. It was through these repeated responses to the compound that Detective Woodall came to know Meier. The calls to the Sheriff's office were about drugs, domestic violence, shootings, stabbings, robberies and burglaries. At the time, there were people living in four trailers on the property. Detective Woodall recalls a typical call where Sam Morgan and Deborah Jenkins got into an argument and one shot or stabbed the other. When Detective Woodall responded to the call, Meier was in the trailer where the attacks had occurred.

7

16. The police responding to the Morgan compound was common place. Some of the instances are reflected in police reports that I was able to obtain (from Detective Woodall's recollection, there are either a number of responses that were not recorded in official police reports or those reports are no longer available). The following incident reports present a day in the life on Meier Brown on the compound:

08/02/95 – Liberty County Sheriff's Office - maintaining a disorderly house on the compound. Curtis Morgan is the offender and the complainant is E. Eason.

12/17/95 – Liberty County Sheriff's Office - criminal trespassing at the compound. Debra Morgan is charged with Criminal Trespass; Roy Morgan is the complainant.

04/07/96 – Liberty County Sheriff's Office - burglary at St. Paul's Missionary Baptist Church on the compound. Roy Morgan is charged with Burglary. Samuel Scott is the complainant. Someone kicked the church door in, stole two amplifiers, and left.

06/10/96 – Liberty County Sheriff's Office - battery at the compound. Sadie Brown and Ralton Brown witnessed Roy Morgan assault a child. When Officer Pike reported to the ER, a DFACS worker, Ms. Freeman, was on the scene. Thirteen year old Ralton Morgan had been punched and kicked by his older brother, Roy, for no apparent reason. A DFACS worker told Sadie Brown that if Roy Morgan was allowed to remain in the home, then Ralton would be removed. Sadie Brown promised to press charges against Roy in order to keep Ralton in the home.

2/24/97 – Liberty County Sheriff's Office, - Maintaining a Disorderly House. The complainant was Shawn Fields. Sam Morgan and Debra Jenkins were reported to the police and were both found intoxicated (Debra

8

registered .25 and Sam .15 on a Breathalyzer) when officers responded to the scene.   It was the second time officers had reported to the scene that day (they had been there an hour earlier).

03/29/98 – Liberty County Sheriff's Office - aggravated assault at the compound.   Sam Morgan had been punched in the head by Tony Blizzard. Blizzard had demanded that Sam give him $40.00 he owed him.  When Sam said he would have to pay the next day, Tony attacked him.

05/31/98 – Liberty County Sheriff's Office - battery at the compound.  Sam Morgan and Debra Jenkins were drunk and fighting.  The report reads: "I walked to the bedroom where I located both Debra Jenkins and Sam Morgan.  Mr. Morgan had the knife to Debra's chest area and stated that I'm going to fucking kill you.  I was right next to Mr. Morgan when I walked into the bedroom.  I told Mr. Morgan to put the knife down and he switched hand s and then threw it on the bed."  Debra Jenkins admitted that she had scratched Sam on the chest with her fingernails.  Levi Morgan said Debra had walked over to where Sam was talking with friends and hit him in the eye. Both Sam and Debra were drunk.

08/01/98 – Liberty County Sheriff's Office.  Tony Blizzard is charged with Strong Arm Robbery and Battery at the compound.  Sinclair Williams is the victim. Sinclair Williams had gone to Tony's house with a gun and an argument erupted.  Williams shot his gun into the air.  Tony and three others forcibly removed the gun from Mr. Williams by beating him repeatedly about the head and shoulders, emptied the firing chamber by shooting into the ground, threw the gun into the woods, and told Williams to leave.

08/08/98 – Liberty County Sheriff's Office - disorderly conduct at the compound.  Debra Jenkins and Sam Morgan were arguing when Sam called the police. When the police arrived, Debra was using a lot of profanity and the officer advised her to calm down or he would take her to jail. She retorted, "You ain't going to do a fucking thing." The officer arrested her and took her to jail where she registered .297 and .300 on the intoxilyzer.

10/02/98 – Liberty County Sheriff's Office - family violence battery at the compound.  Glenn Morgan is charged with battery. The victim is Roy

Morgan. Glen had punched Roy in the face several times before leaving the property.

10/07/98 – Liberty County Sheriffs Office - Glen Morgan is charged with battery. The victim is Donald Pyett.

02/04/99 – police officer dispatched to the compound when Sam Morgan called to report Debra Jenkins for stealing his food stamps. When the officer arrived, both Sam and Debra were drunk.

02/05/99 – Family Violence Incident Report - Sam Morgan fired a shotgun at Debra Ann Jenkins at their residence. Sam said Debra had hit him and spoken disparagingly of his deceased mother. Sam was arrested and taken to the Liberty County Jail.

03/10/99 – Liberty County Sheriff's Office - battery at the compound. Deak (a.k.a. Detrickson Davis) punched Gregory Carter in the mouth and tore his shirt when the victim refused to pay Deak $20.00 he said the victim owed him.

04/08/99 – Liberty County Sheriff's Office - family violence report - Roy Morgan was the complainant and Patricia Akpan (Dexter's wife) was the offender. When the officers arrived at 6724 Leroy Coffer Highway, Roy and Patricia were fighting over a TV remote control. The officer's report says: "This is a continuous situation at this residence." They were told that if they were summoned to the residence again that night, Disorderly House charges would be pursued.

04/27/99 – Liberty County Sheriff's Office - Roy Morgan summoned the police to the compound because he wanted his brother removed from the residence.

09/06/99 – Liberty County Sheriff's Office - aggravated assault at the Compound. Ernestine Morgan called the police when Alice Harley stabbed the victim, Cathy West. West was later treated at St. Joseph Hospital in Savannah and required 27 stitches.

09/11/99 – Liberty County Sheriff's Office - recorded an incident report at the compound. complainant, Wesley Miller, had been attending a funeral at St. Paul's Missionary Baptist Church when Darryl Morgan, Glen Morgan, James Harley and Vinnie Miller attacked and beat him.   They also broke out his car windows with his wife and three month old baby in the vehicle.

11/03/99 – Liberty County Sheriff's Office - burglary at the compound. The complainant, Sam Morgan, said Janice Richardson (his sister-in-law) had stolen a TV from his trailer.

12/15/99 – Liberty County Sheriff's Office - theft at the compound.   Kia Robinson reported that Nick Morgan (a.k.a. Nicholas Johnson) and Rodney Morgan (a.k.a. Ralton Brown) had stolen a CD from her car.

01/02/00 – Liberty County Sheriff's Office - robbery at the compound.  It reads: "Investigation disclosed that… [Eddie] Robinson and [Jeffrey Charles] Miller while en route to Savannah, GA, stopped at 6700 Leroy Coffer Highway, Fleming, GA, (Morgan residence) to purchase a crack-rock (crack-cocaine).  During the transaction negotiations, things got out of hand and Robinson was beat and asked to render his wallet.  Miller was also assaulted and robbed of $120.00 and a cell phone.   They identified three offenders." (Clifford John Smiley, Roy Lornell Morgan, and Jeffrey Charles Miller).  Tony Bizzard was arrested for robbery and criminal attempt to possess and use crack.

01/06/00 – Liberty County Sheriff's Office - family violence report -  Roy Morgan called the police because his cousin, Tyrone Blige, had struck him with a fire poker.  Apparently they had been arguing over some food (macaroni). Mr. Blige was not present when the police arrived on this date but he was arrested the next day after he confessed to the crime.

01/09/00 – Liberty County Sheriff's Office - theft at the compound. Darryl Morgan robbed Tony Blizzard and stole $110.00 from him while he was asleep. Everyone had been drinking the night before. Tony and Darryl then got into a fight and the police arrived at 7:00 a.m.   Detective Woodall was notified.

11

05/05/00 – Liberty County Sheriff's Office - public drunkenness at the compound. The offender was Sam Morgan and the complainant was Ben Towery. When the police arrived, Sam Morgan was in the yard yelling at everyone. After a warning by the police, he went inside but the police were later called again and had to return to the residence because Sam had resumed his yelling. They arrested him and took him to the Liberty County Jail.

07/30/00 – Liberty County Sheriff's Office - battery at the compound. Darryl Morgan had climbed into a window and beaten Margie Loretta Morgan while she was asleep in her bed. He also took $160.00 out of her rear pocket and attempted to pull at her pants. The offender then fell asleep on the couch and that is where he was when the police arrived. Both parties were drunk. The police did not find any money on Darryl Morgan. Margie Morgan said she had been drinking all day, beginning in the morning.

10/18/00 – Liberty County Sheriff's Office - aggravated assault at the compound. Sinclair Williams shot at Sam Morgan when they were arguing over a woman. Detective Woodall was called to the scene. Roy Morgan, Sadie Brown and Roger Blizzard were all present when Det. Woodall arrested Williams and took his shotgun.

11/04/00 – Liberty County Sheriff's Office - "accidental damage" at the compound. Mary Alice Blizzard and Nicholas Johnson report to the police that they heard gunshots outside their residence and one of the bullets entered the house and lodged in the wall.

05/19/01 – Liberty County Sheriff's Office - battery at the compound. Gregory Morgan said that Tony Blizzard asked him not to tell people Gregory was his brother. They argued and Tony hit Morgan in the face and head.

10/22/01 – Liberty County Sheriff's Office - family violence report - battery at the compound. Sam Morgan called the police because his common law wife, Debra Jenkins, had scratched him on the back of his neck and torn his shirt off during a drunken argument. This was the second visit to the residence the police had made that day.

12

Although the above incidents have been memorialized in writing, there were also many other incidents of violence that simply went unreported. For example, Debra Jenkins stabbed Sam Morgan, Jr., in the eye. He chose not to report it to the police for fear that Debra would be incarcerated. He did not even go to the doctor for treatment. He is now blind in that eye.

17. Eventually the conditions at the Morgan Compound came to the attention to the Department of Family and Children Services. When Ralton and Keon were 10-11 years old, DFACS found Keon in the house unsupervised. Keon was removed from his mother's custody and placed in foster care for 24 hours until his mother could be located. Keon's DFACS caseworker, Michelle Holtzclaw, filed a CPS crisis intake report after she determined that Keon was being left alone for long periods of time. When Ms. Holtzclaw subsequently interviewed Keon's mother, Mary Alice Blizzard, she found that she "did not see the seriousness of her choice to leave Keon alone. She told Ms. Holtzclaw that she thought he was old enough to look after himself." The court placed Keon under DFACS supervision for six months.

18. Ms. Holtzclaw noted that the family was living a "chaotic and disorganized lifestyle." Further, she recognized that Mary Alice's parenting skills

13

were inadequate in that she: "ignores situations that pose a danger to her child; there is a lack of stimulation in the home environment; there is no apparent plan or routine to child rearing; and she has an aversion to parenting or household responsibilities." Ms. Holtzclaw observed a lack of impulse control in that: "family members seek immediate gratification without regard to long term consequences; act without thinking; and neglect children through consistent attempts to meet their own needs first." The case worker further reported that "the parent places all responsibility for solving problems on the child; there is a chaotic rather than systematic approach to problems; and parents do not seem to learn from experience. Further, the parent's unmet needs take precedence over attending to the needs of the child."

19. Dorothy (a.k.a. Dot) Morgan Miller, one of Meier's maternal aunts, also had children but they lived off of the compound, not far from the rest of the Morgan clan. Dot did not allow her children to spend any time at their grandmother's house or on the Morgan property in general. She did not believe it was an appropriate environment in which to raise children and she would not allow her children to go there without her supervision. Though they lived less than a mile from the property, Dot's children knew nothing about the events that occurred there because their mother did not want them to experience the chaotic,

14

irresponsible, drug and alcohol inflamed environment in which their cousins were being reared.

20. There were numerous deaths, often violent, associated with Meier's family. For example Ponda Davis was Detrickson Davis' sister. She was murdered in 2000 being cut up with a machete; Robert (a.k.a. Boy) Johnson, Jr. Meier's maternal cousin, was murdered in Savannah in 1998; Deardrew Miller, also a maternal cousin was murdered at the age of 19; Edward Morgan, a maternal first cousin was murdered in 1998; Sam Walthour, a close family friend, was severely beaten, hog tied, shot and killed the same night that Edward Morgan was murdered; Quincy Waye, a two year old son of Chester Morgan and Trena Waye drowned in the septic tank; Errol Bizzard Meier's uncle, and Mary Alice Blizzard's husband He was killed in a truck wreck in 1983 when Meier was 13 years old; Benjamin Blige, the father of Ollie Morgan's children, died in 1986 when a train hit his car and cut his head off; Curtis Morgan, who was married to Debra Jenkins' mother, Maggie, drank himself to death when Meier was about 30 years old.

21. Despite being reared in this drug infested, violent environment, Meier turned out to be a good and caring person. Meier spent a lot of time with his Aunt Ernestine when he was very young. She was a lifelong alcoholic who also suffered from epilepsy, and she was very mean. She stabbed more people than anyone

15

could count.  She was jailed, but never for more than a day.  She had the police cowed when she got out because she "raised cain" in the jail. Sadies's children were scared of Ernie because she was "real strict."  She beat them.  She cut a step-granddaughter, Trena Waye, with a broken beer bottle one time.  After which Meier held her bleeding face with a towel.

22.  Ernestine had grand mal seizures starting sometime in the 1980s.  Meier was the only cousin who was not afraid to tend to her when they first started occurring.  The other children ran away but he stayed with her and she taught him how to care for her during a seizure.  He could tell when she was going to have one because her left arm would jump involuntarily.  He had to move the furniture and ask her to sit on the floor.  Afterward, he put rubbing alcohol on her temples and under her nose; he also put cold compresses on her forehead.  If he could get her red and white pill in time, he could sometimes prevent her from having a seizure. The seizures lasted about twenty seconds.  She had the seizures regularly.

23.  Meier also took care of his ailing mother.  Dr. Glenn Carter of Hinesville, GA, became Sadie's physician in December 1982, when Meier was twelve years old.  He attended her until shortly before her death in 2003.  Dr. Carter reports that  Sadie was not well educated and did not understand her illness. She seemed intellectually slow.  She was an insulin dependent diabetic at age forty

16

(when Ralton was born), and her diabetes was very aggressive. She had difficulty complying with doctor's instructions. Her kidneys failed in the mid 1990s (when Meier was about 25 years old). Dr. Carter describes her as "one of those poor blacks."

24. Meier took Sadie to the doctor and to her dialysis treatments on a regular basis. He did more than anyone to make sure his mother got the medical attention she required. When she became completely disabled, Meier bathed her when she could not take care of herself. Meier also took Sadie to have laser surgery at the Emory Clinic in Atlanta in 1993. Sadie was blind in both eyes before the surgery but afterward, she regained her sight in one eye.

25. Unlike his father, uncles, and siblings, Meier was not violent and did not fight. He was scared of people on the compound. Meier always avoided confrontation. He never fought. He was very easily intimidated. Postal Inspector T.E. Barnell of the Postal Inspection Service, Southeast Division, conducted a "Background Investigation of Meier Jason Brown," and prepared an "Inspection Service Report" dated February 26, 2003. The persons interviewed reported that Meier, unlike others on the compound, was not a violent person. For example, "Both Glen Brown and Sadie Brown stated that Meier Jason Brown was not prone to violence and did not have a temper." Rodney Brown indicated that "Meier is a

17

good kid and I don't know him to have a mean bone in his body." Gregory Carter recalled that "Meier Brown wouldn't hurt a fly." Employers described him as " extremely quiet and didn't bother people"; "No violent outrages and seemed very normal"; "Meier was well mannered and courteous and she saw no signs of violent or erratic behavior"; "Meier was not a violent man and was a soft-spoken man"; "Meier always seemed like a calm, cool, collected guy";  no "problems with Meier except maybe a suspended license and issues with drinking alcohol, but never fighting or anything like that." His probation officer, Irving Frazier, described Brown as well mannered and polite. He said he never witnessed or had knowledge of any violent tendencies or erratic behavior by Brown.  Similarly, teachers from The Bradwell Institute where Meier went to school between 1984 and 1990 said that "Brown did not stand out as a troublemaker;"  "If Brown was a troubled student he would have remembered;" and Brown "never had any discipline problems."

26.  Meier went to Liberty County Elementary School (the school is no longer in existence) from 1975-82. He was known to his friends and teachers as Jason. Gloria C. Boyd is a retired school social worker with the Liberty County Board of Education;  she worked at Liberty County Elementary School from 1977-98. She personally met with Sadie Brown to discuss Meier's truancy problems (he

18

missed three weeks of school in 2nd, 3rd, 4th and 6th grades). She got the impression that Sadie had an illness that prevented her from competently managing her children. She reported:

> [Sadie] was concerned but she was ill and the older boys had to take care of the younger children. She said the older boys were trouble too and there was no father figure around. The older children were raising the younger ones alone... She said the mom was in the hospital many times when she visited the residence.

Ms. Boyd recently reaffirmed these observations and stated that there was nothing much that could have been done about truancy because Meier's mother was ill and the older siblings were responsible for making sure the younger siblings got on the bus in the morning. However, the older siblings were young too and could not be held legally responsible for their younger siblings' absences at school.

27. Meier attended Hinesville Middle School from 1982-84. The school no longer exists. Meier attended high school at the Bradwell Institute from 1984-1990. Linda Jones taught English at Bradwell from 1984-86 and remembers Meier well. Meier failed the ninth grade once and passed the second time because she took pity on him – he had missed too many days when his mother's and grandmother's houses burned in unrelated incidents. Ms. Jones reports that "she got the impression that [Meier] was sad and had no one. She said he was a quiet student and stayed to himself. She said he did not do his homework." When she

19

contacted Meier's mother to talk with her about Meier's truancy, Sadie did not respond.

28. Sometimes if Jason cut up in her class, Ms. Jones would tell him to come see her on the break. He was always shy and quiet. She cannot imagine Jason killing anyone. He had a nice smile, but he rarely smiled. She really cared about him. He would not take up for himself. She reported, again, that he always looked sad, like no one cared about him. It was almost like "this was supposed to happen to me." She didn't see him in 10th grade.

29. Joan Hollingsworth was the principal when Meier was at the Bradwell Institute. She recalls the general issue of truancy for many of the children living on the Morgan property. She reports that there was a lack of parental guidance and there were family problems that prevented most of the children from doing well in school. She said Sadie's children looked after themselves and did not attend school regularly. A school social worker, Vanessa Parker (who had previously taught Meier history), got involved with Ralton when he was excessively absent from school. She made home visits at Sadie's trailer on Leroy Coffer Highway. She said some people would not have wanted to go inside the house. It was easy to tell a lot of people lived there. The children circulated through the residences on the property but no one seemed to know what each child was doing. No one was

20

supervising their homework or their individual well-being.

30. Meier dropped out of school at age 19 to care for his mother; he was in the eleventh grade.

31. According to Postal Service reports, Meier worked at the Richmond Hill County Services for 4 months in 1988. Ms. Lee said he was courteous, but was terminated because he stole and pawned some tools. When Dexter, Meier's half-brother, finished high school (he dropped out in the 11th grade), Sadie took him to work with her and asked if he could help out in the maintenance department. When he learned enough, he moved to Atlanta where he worked as a maintenance man in an apartment complex. Nita[2] moved to Atlanta shortly after Dexter and they worked together at the apartment complex. Later, Meier moved to Atlanta and worked in maintenance with his brothers for a while. In 1996, he moved back to Fleming to take care of his mother who was in bad health. Her diabetes was worsening and she had lost a leg and one eye as a result. Meier took her to doctor's appointments. He made sure she took her medicine. He cooked for her and cleaned the house. He helped out a lot.

32. Ralton and Meier worked for a tree cutting company together from

---

[2]After Meier moved back to Atlanta his brother Nita died of AIDS. Postal Inspector Barnell interviewed one of Meier's employers who reported that this death "was a big loss for Meier, and that Meier took it hard."

2001-2002. They worked hard. Meier encouraged Ralton to keep working. Meier also worked at the Ramada Inn in Richmond Hill for several months in 2002. According to Postal Service Reports Henna Mehta stated that Meier was extremely quiet and did not bother people, but he was terminated because he did not perform his work satisfactorily. Meier worked for Wallette Proman doing yard work in August of 2002. She reported that he was a good worker and she was satisfied with his work, which he performed in the evenings after working at the Ranada Inn. She said he was well-mannered and she saw no signs of violent behavior.

33. Meier worked at Atlanta Underground during late 2002. Greg Barfield, his supervisor reported to the Postal Service that Meier was a "good guy" and was always "calm, cool, and collected." He said that Meier was a good worker, but that they had a strict "three-strikes" rule on being late to work and that Meier was late several times and did not come to work once and so was terminated. He reported that the homicide was "a waste, because Meier was a good guy." Meier's foreman at Atlanta Underground said Meier was a good worker and "did anything he asked him to do." However, he was terminated because he was late three times in violation of the "three strikes' policy. Meier also worked for James Wainwright doing construction work off and on for four years. Mr. Wainwight reported that Meier was not a violent man and that he was soft-spoken.

34. When Meier was working, half of everything he made went to Sadie. He gave her half of his income for years. He thought she should not have to work since she was ill and needed to stay home.

35. Meier's criminal record before the offense in this case was not extensive or violent. It involved drugs and alcohol, and/or crimes to get money for each. In 1990 when he was 20 years old he was convicted of possession of marijuana. He was also convicted of DUI in 1990. Two years later he was convicted of forgery. He was also convicted of driving without a license and DUI in 1992, and received a 6 month suspended sentence. In 1992, he was charged with his third DUI, and with driving with a expired tag, no proof of insurance, and driving with a suspended license. In 1995, Meier was charged with his fourth DUI and driving without a license. In 1996 he was charged with robbery, forgery, theft by taking, and his fifth DUI. He received a five year sentence, and was paroled in 1999. He was charged with financial transaction card theft which was dismissed, but his parole was revoked and he served several months in prison. In 2002 he was arrested for his sixth DUI. He was arrested for the instant offense in December of 2002.

36. Meir was incarcerated at the Liberty County Jail in 1991 when he spent 3 days there for a forgery charge prior to being released on his own recognizance.

23

In 1992 he served two days in the Liberty County jail as the result of his second DUI conviction. In 1995 he served 10 days in the Liberty County Jail for another DUI and/or open container and/or driving on a suspended license conviction. In 1996 he was incarcerated in the Liberty County Jail while awaiting the resolution of charges including robbery (unarmed), forgery, theft by taking, and driving under the influence. He was sentenced on September 11, 1997, and went to prison.

37. Meier was first incarcerated at Coastal Correctional Facility (for classification) and then Muskogee State Prison (18 months). While at Muskogee State Prison, Meier was employed in the prison work force doing maintenance work for the City of Columbus under the Director of Public Services, Rufus Riggs. In this position, Meier would be picked up from the prison and taken off cite to a fuel station where he would work, without supervision, for his daily shift. Mr. Brown was reported to have "performed admirably," was "dependable," "conscientious," and "tried to do a good job every day." He was paroled June 14, 1999.

38. In September 2000, he was arrested for financial transaction fraud. While that charge was dismissed, his parole (from the 1996 charges) was revoked and he spend approximately 5 months in jail and then went to prison. In the

Liberty County Jail, Meier's behavior and cooperation led to his being made a trustee and he was given access to less secure areas of the jail. A review of the Liberty County Jail records reveals that in his time there he was never cited for any incidents of any kind. Further, he was an active member in the religious programs available.

39. Meier served his time for the parole revocation at Coastal Correctional Facility (for classification) and then Montgomery State Prison for 8 months. A review of Meier's Department of Corrections (which encompasses all of the facilities where he was housed) reveals that he had only two very minor non-violent citations, both in August of 2001, and both for failing to follow orders (failure to move bed as instructed and failure to clean showers as directed).

40. Meier's time at the Chatham County Jail was a result of his incarceration for the instant offense. He was jailed there from December 6, 2003 to July 29, 2003, and again from September 26, 2003 until his conviction and sentence resulted in his transfer to the United States Bureau of Prisons in November 2003. A review of the Chatham County Jail records again reveals that Mr. Brown received no disciplinary reports of any kind and presented no management problems.

41. The two month gap in Meier's Chatham County Jail stay was a result of

25

a court ordered mental health evaluation that was conducted at the Federal Medical Center at Butner North Carolina. This facility was originally designed as an experimental treatment center for violent offenders. Although Meier was facing a capital murder prosecution, his history, demeanor and behavior led to his classification as low risk and placement in general population. Once again, Meier presented absolutely no management or disciplinary problems while at the facility.

42. Meier was sent to FCI Butner for a mental health evaluation pre-trial because defense counsel had indicated that they intended to present mental health evidence at sentencing. Meier arrived at Butner on August 4, 2003. He was returned to Savannah September 26, 2003. During his 50 + days of evaluation, he was seen by Sally Johnson, M.D. (a psychiatrist), and was also administered psychological and personality tests. Progress notes were kept during the 8 weeks of evaluation. The evaluation culminated in a report that was placed under seal with the Court.

43. In her report, Sally Johnson documented that she had unsuccessfully sought collateral information about Meier's social history and background from trial and sentencing defense counsel. She also detailed that Meier is not an anti-social personality or a psychopath, and that he was not a risk to others in a prison setting. Relevant excerpts from her reports and progress notes include the

following:

> At the outset of this evaluation, pertinent collateral information was requested from both the defense and prosecuting attorneys. A packet of information was promptly received from the U.S. Attorney's Office...Written and telephone requests for collateral information from Defense Attorney William Bell did not result in receipt of any collateral information. Report at 2.

> .....................

> Few sources of collateral information were available in regard to Mr. Brown's early history.

> ...................

> It appears that when Mr. Brown was not incarcerated he was a major source of support for his mother during her later years.

> .................

> He denied any cocaine or prescription drug abuse. During the phone conversation with Attorney Darden, he mentioned Mr. Brown's use of cocaine. Mr. Brown was questioned again about his cocaine use. He then did admit that he had used cocaine. Again he denied that this was persistent drug abuse and stated that he had not used any for an extended period of time.

> ...........

> Initially Mr. Brown was placed in the 1E seclusion unit with Mental Health Department as a result of the need for further observation given his current charges. During the early part of this evaluation it was the administrations decision that the study should take place in that environment. Eventually, that opinion changed and he was allowed to be integrated into the open population of the mental health unit. He completed the evaluation in that status....He appeared particularly careful not to put himself in any situation where he could be responsible for someone else's behavior or might get pulled into an altercation.

........

He was able to accurately assess situations around him and to conduct his behavior in such a way as to maintain his own safety and not impose on others.

........

Available history on Mr. Brown did not support evidence of a conduct disorder with onset before the age of 15. There is not sufficient evidence that he had a pervasive pattern of disregard for or violations of the rights of others since the age of 15, as indicated by the identified criteria for diagnosis of Antisocial Personality Disorder. He does have a persistent pattern of criminal behavior and the focus of his current clinical situation is his adult anti-social behavior, not specifically a mental disorder. Nonetheless, he does not demonstrate chronic history of organized criminal behavior; instead he has a history interspersed with a variety of relatively minor charges until the time of the alleged offenses.

.........................

Review of his behavior while incarcerated indicated [he] does not identify that he ever presented as a problematic inmate. Except for minor disciplinary infractions related to housekeeping issues, he has no history of problems with staff or other inmates.

Butner progress notes included the following entries:

He was evaluated as a LOW risk to exhibit behavior that would pose a risk of harm to self or others ....After considering the above information, this patient may be housed in open population.

8/11/03      Pt does not appear to be a management problem.

8/14/-15/03  attempts to reach defense unsuccessful

| 8/15/03 | explained unsuccessful attempts to reach attorneys and got names and numbers of some family members |
|---|---|
| 8/20/03 | Alcohol abuse (provisional) |
| 8/21/03 | phone interview with Darden tomorrow; "Darden's office was faxed requests for collateral as it is unclear whether attorney Bell ever forwarded this." |
| 8/22/03 | "He has not talked to attorneys or written to them since at Butner" |

9/8/03 "Have not received collateral from attorney Darden. Called him this a.m.

"Can tie up evaluation as soon as receive/review remaining collateral."

44. Meier met Diane Brown in May of 2002 when he flagged her down in traffic and they exchanged phone numbers. At the time Diane Brown had been a correctional officer working for the Georgia Department of Corrections at Coastal Correctional Facility for twelve years. She was forty three years old and Meier was thirty-two. They moved in together. Diane, who had been involved in a series of abusive relationships, fell in love with Meier almost immediately. He was different than her husbands. He was mild-mannered, thoughtful, courteous and kind. He was especially fond of Whitney, Diane's daughter, and welcomed the

29

role of acting as a loving father to her.

45. Diane and Meier also shared an addiction to alcohol. Both were heavy drinkers, drinking together every day with Meier drinking beer and Diane gin. Diane describes herself as a functional alcoholic, drinking too much but still holding down a job to support her family. In the beginning of their relationship Meier was also working, first for Kentucky Fried Chicken in Hinesville, then as a maintenance man for a Ramada Inn in Richmond Hill. Meier eventually lost his KFC job because he had a suspended license and could not get back and forth to work.

46. Then in November of 2002, Diane was suspended without pay from her job with the Georgia Department of Corrections. Her suspension stemmed from her arrest for providing false information to a police officer who arrested Meier in July of 2002. With Meier not working, and Diane's ex-husband not current on his child support obligations, Diane told Meier that either he needed to start helping to support her and Whitney or he would have to move out. Meier could not find work and moved back in with his mother, Sadie. Although they were not living together every day, Diane and Meier continued to see each other regularly and were hopeful of reconciling. She spent the night before the crime at Sadie's house, and she and Meier were together until his arrest on December 5, 2003.

30

47. I have been advised that the Judge in this case would have admitted testimony from the appointed defense mitigation investigator regarding whether Mr. Brown would pose a danger to others if sentenced to a prison term. Based upon everything I have learned, it is my opinion that Mr. Brown would not have been dangerous to others in a prison setting. The experts at Butner found that Mr. Brown was not dangerous, and if his past behavior is a predictor of his future behavior then Mr. Brown would not have been a danger to others if sentenced to life imprisonment in 2003.

48. The information that I have just provided in this affidavit is the type of information routinely gathered by mitigation witnesses in capital cases. The family members, teachers, friends, employers, and others I have reported in this affidavit along with the records I have referenced, were available in 2003 when Mr. Brown was arrested, tried, convicted and sentenced to death. Further, the people referenced in this affidavit would have been willing to testify to the matters I have reported herein.

Further affiant sayeth naught.

State of Florida
County of Duval


SARA FLYNN

Sworn to me this the 9th
day of May, 2008

for Sara B. Flynn who produced FLDL# F45078261949O as ID.

NOTARY PUBLIC

My commission expires:

DENNIS V. CHRISTIE
MY COMMISSION # DD 395786
EXPIRES: May 12, 2009
Bonded Thru Notary Public Underwriters

32