UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| MEIER JASON BROWN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | No. CV407-085 |
| | ) | Underlying CR403-001 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**GOVERNMENT'S COMPREHENSIVE RESPONSE
TO BROWN'S MOTION PURSUANT TO 28 U.S.C. §2255**

COMES NOW the United States of America, by and through Edmund A.

Booth, Jr., United States Attorney for the Southern District of Georgia, and

responds to Meier Jason Brown's 28 U.S.C. §2255 motion. For the reasons below,

Brown's motion should be denied after an evidentiary hearing limited to the issue

of whether the Court submitted a juror, Dorothy Rentz, to voir dire.

## BACKGROUND[1]

Using a kitchen knife, Brown fatally stabbed a postmistress in rural Fleming, Georgia, to obtain money orders to make his girlfriend's mortgage and bankruptcy trustee payments.   The Eleventh Circuit's opinion, United States v. Brown, 441 F.3d 1330, 1337-43 (11th Cir. 2006), contains a recitation of relevant facts.  For the Court's convenience, the government reproduces the facts contained in its appellate brief.

### a.  Sallie Gaglia

Sallie Gaglia worked Saturdays as a relief postmistress in the Fleming post office. [Doc 291-Pgs 575, 695] The post office itself is a small, white cinder block building; patrons enter through the front door into an area containing a table with postal supplies, post office boxes, and immediately to the left of the boxes, a small service counter, set in a window, where customers may transact their business with postal employees. [Doc 291-Pgs 567-568; Govt's Exs 1A, 1B, 1C; Doc 292-Pgs 696-697; Govt's Ex 2] The postal employees actually work in an area separate from the public space; except for a locked door, the only passage between the two

---

[1]  Two housekeeping matters.  First, this brief cites to documents in the criminal case, CR403-001, as "Doc" and to documents in the civil case, CV 407-085, as "CV Doc."  Second, in the argument section, the government reproduces Brown's statement of the issue for clarity, not because it agrees with the formulation of those issues.

areas is a 3 ½ feet by 1 ½ to 2 feet opening in the window.   [Doc 291-Pgs 567-569, 605, 608, 616] Given the size of the town,[2] the post office has approximately 100 post office boxes. [Doc 292-Pg 700]

On November 30, 2002 – two days after Thanksgiving – a postal customer retrieved mail from Post Office Box 327. [Doc 291-Pg 569-570] Different members of the Morgan and the Brown families (including Meier Jason Brown) received mail in that box, and postal employees had experienced problems with family members without keys asking for all the mail.   [Doc 292-Pgs 699-700, 702-703] Thus, when Gaglia (who was sorting mail in the back of the post office with another postal worker) heard a key enter box 327, saw a light shined through, and watched a hand empty the box, she spoke to the customer. [Doc 291-Pgs 569-571]

Gaglia first wished the customer a good morning and said, "'[O]h, they left you in charge of the key today.'" [Doc 291-Pg 570] She received no response, so she asked, "'[W]hich one are you?'" [Doc 291-Pg 570] After three inquiries, Gaglia's co-worker, Darlene Washington, heard the man state a name that "began

---

[2]  Fleming is located in Liberty County, Georgia, approximately 14 miles off of Interstate 95 via Exit 87. According to the 2000 Census, it has 1,050 citizens. See www.census.gov.  Given the size of the town and frequent contact with the post mistress, almost all of the witnesses from Fleming refer to Gaglia as "Ms. Sallie."

with the M, whatever, the first three names that he said.  And then as he was going out the door, he said Jason." [Doc 291-Pg 570] Washington clarified that she thought he said Meier. [Doc 291-Pg 576] In fact, Meier Jason Brown was authorized to receive mail from box 327. [Doc 292-Pgs 699-700; Govt's Ex 8]

About 10:25 or 10:30 that morning, Frank Kania went to the post office to collect his mail. [Doc 291-Pg 627] He asked Gaglia if all the mail was out; she responded affirmatively; and Kania thanked her. [Doc 291-Pgs 628-619] Gaglia was alone when Kania left. [Doc 291-Pg 643]   For the next two minutes, Kania sat in his truck and thumbed through his mail. [Doc 291-Pg 629] He then noticed a black man, wearing a hooded sweatshirt and riding a bicycle toward the post office. [Doc 291-Pgs 629-630] As Kania drove off, he looked into his rear view mirror and saw the man enter the post office. [Doc 291-Pgs 630-631]

Driving by the post office at 10:30 or 10:35 that morning, Chris Bowen saw a black man with slender build, between 5'10" and 6'0" tall, dressed in dark clothing and on a bicycle, blocking the front door of the post office. [Doc 291-Pgs 644-646] Bowen thought it odd: The man wore white gloves, but the morning was not cold. [Doc 291-Pg 646] Since the road is 30 feet from the post office's door and he was driving 10 mph, Bowen got a straight view of the man, and in fact, the men stared at each other. [Doc 291-Pg 647] Bowen drove on. [Doc 291-Pg 647]

At about 10:45 that morning, Jennifer Zech and her boyfriend went to the Fleming post office to retrieve his mail. [Doc 291-Pgs 581, 583, 597, 600] When she walked in, the post office was empty; Zech waited a few minutes, thinking that the postmistress was in the back room. [Doc 291-Pgs 584-585] When no one appeared, Zech put her hands on the counter and leaned over. [Doc 291-Pgs 585-586] At first, she thought she saw a balled-up jacket on the floor; she then realized that the postmistress, Gaglia, was lying on the ground in a fetal position near a pool of blood. [Doc 291-Pgs 585-587] When Gaglia did not move or make any noise, Zech began screaming. [Doc 291-Pg 588]

Zech's boyfriend, Stephen Nichols, ran into the post office, saw two blood spots on Gaglia's back, and ran out to flag down a passing motorist to get help. [Doc 291-Pgs 588, 601-603] After he succeeded, Nichols returned to the post office and pulled himself through the window separating the customer area from the postal area. [Doc 291-Pg 604] It was a tight fit for Nichols (6'2 ½", 175 pounds): He estimated that the window was 3 ½ feet by 1 ½ or 2 feet. [Doc 291-Pg 608] Nichols, who previously had been an EMT, did not touch Gaglia because it was apparent that she was dead. [Doc 291-Pg 609] He unlocked the door separating the postal and customer areas and waited for emergency personnel to arrive. [Doc 291-Pgs 605, 609]

Meanwhile, the motorist went to a house a couple of blocks from the post office, where he spoke to Linda Ashcraft's husband. [Doc 291-Pgs 614-615] Both Ashcrafts are certified firefighters, and when they learned that someone in the post office needed help, they grabbed their radios and equipment, called 911, and sped there. [Doc 291-Pgs 615-616]  Ashcraft ran into the back office and saw Sallie Gaglia – a lifelong friend – lying on the floor. [Doc 291-Pgs 616-617] Ashcraft saw knife wounds and a lot of blood; she was unable to find a pulse, or using her stethoscope, a heartbeat. [Doc 291-Pg 617] Because the body was still warm, they began doing CPR, but a knife wound in Gaglia's chest spurted blood with every compression. [Doc 291-Pgs 618-619] When Ashcraft again attempted to call the 911 dispatcher, she discovered that a phone that had been on the floor near Gaglia's body was on – leading her to believe that Gaglia had tried to call for help. [Doc 691-Pgs 618-619, 625]  In fact, the handset had a bloodstain on it. [Doc 292-Pg 777]  An EMT arrived with deputy sheriffs; the EMT pronounced Gaglia dead. [Doc 291-Pg 620] She was 48 years old. [Doc 292-Pg 796]

That afternoon, postal inspectors determined that money orders in the amounts of $500, $500, and $175 were missing. [Doc 292-Pgs 689-691] A GBI crime scene specialist found an adding machine – bearing a bloodstain caused by a 90 degree drop – with 175 lighted on the display and a tape depicting the numbers

500 plus .90, plus 500 plus .90 and then 175 with a division sign. [Doc 292-Pgs 689,  776-777; Govt's Exs 6, 9-FF, 9-GG][3]  Looking at the tape, Gaglia's boss testified that there was no reason, when adding postal money orders, to hit the division sign. [Doc 291-Pgs 698-699]

On December 2, 2002, Mark Kaponen, M.D., performed an autopsy of Gaglia's body. [Doc 292-Pg 795] She had been stabbed to death by a knife with both a blunt and a sharp edge. [Doc 292-Pgs 810, 817] Gaglia's body had ten stab wounds, including two defensive wounds, and two superficial, triangular-shaped abrasions that suggested that Gaglia's attacker continued to stab her even after the knife had broken. [Doc 292-Pgs 798-809] Gaglia suffered a potentially fatal wound to her liver. [Doc 292-Pg 811]  One of the stabs, however, passed "into the portion of the heart where blood is being pumped from the right ventricle into the lungs. . ." [Doc 292-Pgs 799-800] That wound would have caused the pericardial sac to fill quickly, and within minutes, Sallie Gaglia's death. [Doc 292-Pgs 800, 811]

---

[3]  When issuing multiple money orders for one customer, Gaglia's practice was to use the adding machine (rather than a small calculator near the window) to add the amounts and fees. [Doc 292-Pg 697] For money orders up to $500, the post office charged a fee of $.90. [Doc 292-Pg 698]

### b. Diane Brown

Diane Brown met Meier Jason Brown in May 2002. [Doc 292-Pg 707] "Almost immediately," he began to live with her in Savannah. [Doc 292-Pgs 707-709] In fall 2002, Diane was arrested for obstruction and hindering an officer's investigation, which led to problems with her employment as a state correctional officer. [Doc 292-Pg 710] Coastal State Prison thus suspended her for two weeks with pay, which ended on November 8, 2002. [Doc 292-Pg 711] After November 8, the prison suspended Brown without pay pending the results of the court hearing. [Doc 292-Pg 711]

Diane's financial situation suffered "a big setback." [Doc 292-Pg 712] Because she was in a bankruptcy at the time, she owed $175 every two weeks to the trustee. [Doc 292-Pg 712] Additionally, she had to make her mortgage payment, and catch up some arrearage, in the amount of $927 each month. [Doc 292-Pgs 712, 725] Brown was aware of Diane's plight. [Doc 292-Pg 713]

Diane spent two nights, including the night of November 29, at Brown's mother's home – one of several mobile homes on a lot in Fleming referred to as the Morgan compound or the Morgan residence. [Doc 292-Pgs 714-716] After Diane woke on the morning of November 30, she left Fleming to check her house in Savannah, 20 minutes away. [Doc 292-Pgs 717-718] Brown called her at some

8

point, so she drove to Fleming to pick him up. [Doc 292-Pgs 721-722] On the way back to Savannah, the couple stopped to buy cigarettes, gin, and malt liquor, and Brown showed her three money orders. [Doc 292-Pgs 723-725] Brown told Diane "that the two for $500 should be enough to take care of the mortgage. And the one for 175 would take care of the bankruptcy." [Doc 292-Pg 725]

On Monday, December 2, Brown and Diane went to a bank to cash one of the money orders[4]; she needed to send the correct amount to the mortgagee. [Doc 292-Pgs 727-728] Afterwards, they went to a post office in Savannah and bought a money order. [Doc 292-Pg 730] Later that day, they traveled to Fleming, where Brown's mother, Sadie, gave him a card, apparently from someone at the Liberty County Sheriff's Department, and Diane learned that Sallie Gaglia had been murdered. [Doc 292-Pgs 733-734]

### c. Meier Jason Brown

A Silent Witness hotline received a tip that Meier Jason Brown murdered Gaglia. [Doc 302-Pg 67] Thus, on December 5, 2002, officers simultaneously conducted two consent searches.[5] [Doc 292-Pgs 893-894, 901, 904; Doc 302-Pg

---

[4] Bank surveillance photos show the couple laughing, smiling, and chatting. [Doc 292-Pgs 728, Govt's Ex 20]

[5] The officers also had search warrants in the event that they could not obtain consent.

99] One search, at Sadie Brown's mobile home, resulted in the seizure of a brown jacket; using DNA analysis, two blood stains on the jacket matched Gaglia's blood.[6]   [Doc 292-Pgs 865, 896, Ex. 5]

The second search, involving eight law enforcement officers, occurred at Diane Brown's house.[7] [Doc 292-Pg 901] Postal Inspector Rushwin knocked, Brown answered, and Diane consented to a search. [Doc 292-Pgs 902, 904] Investigators ultimately seized Brown's tennis shoes, which had a sole similar to the imprint on the counter of the post office and receipts for two of the money orders stolen from the Fleming post office.  [Doc 292-Pgs 842, 906] When Detective Chuck Woodall of the Liberty County Sheriff's Department arrived, he and Inspector Rushwin interviewed Brown. [Doc 292-Pg 908]

Brown first gave an account similar to that recited by Gaglia's co-worker, Darlene Washington. [Doc 292-Pg 909] He biked to the Fleming post office, opened Post Office Box 327, exchanged pleasantries with Sallie Gaglia (who asked his name and wished him a happy holiday), and left. [Doc 292-Pg 909]

---

[6]  The probability of randomly selecting an unrelated individual with the same DNA profile was 1 in 25 quadrillion in the Caucasian population, and 1 in 100 quadrillion in the African-American population. [Doc 292-Pgs 873-874] A quadrillion equals one million billion. [Doc 292-Pg 875]

[7]  This search will be discussed in greater detail in conjunction with Brown's argument about the denial of his motion to suppress.

Brown then visited with a friend, went home, and did not return to the post office. [Doc 292-Pg 909]

Brown later revised his story to include the purchase of three money orders. [Doc 292-Pg 910] In this second version, Brown told investigators that he stole $1300 from a secret hiding place maintained by a cousin and that he went to the post office to buy money orders ($500, $500, and $175) for Diane's bankruptcy and mortgage payment. [Doc 292-Pg 910]

Brown then told investigators the final version: He took a knife from his mother's kitchen and went to the post office to rob Gaglia. [Doc 292-Pgs 911-912] Brown asked for three money orders, which Gaglia imprinted. [Doc 292-Pg 911] When she went to the desk to use the adding machine, Brown put socks on his hands, jumped over the counter, tripped, fell into her, and cut her. [Doc 292-Pgs 911, 916] After he cut her, he thought, "'I could do time for the robbery if I got caught . . . damn, she knows me.  So, [he] had to kill her.'" [Doc 292-Pg 911] He did. [Doc 292-Pg 911] Brown grabbed Gaglia's wallet, crawled through the counter window, discarded the socks on his hands and the knife as he biked home, and threw his clothes into the washing machine (which had a load of laundry running). [Doc 292-Pgs 911-912] Diane picked him up 45 to 60 minutes later. [Doc 292-Pg 912] During the interview, Brown called his mother and told her not

11

to hate him; it was an accident. [Doc 292-Pg 913] Investigators arrested Brown and gave him his <u>Miranda</u> warnings. [Doc 292-Pg 913] Brown went through his statement once more.  [Doc 292-Pg 915] At trial, the jury heard a recorded statement made by Brown on December 6, 2002, the day after the search, where he again confessed to murdering Sallie Gaglia. [Doc 292-Pgs 930-963; Govt's Exs 32-B, 32-C, 32-D]

After the jury convicted him on murder and robbery counts and found that the district court should impose the death penalty, Brown's appeal ensued.  The Eleventh Circuit affirmed his conviction and sentence, and the Supreme Court denied his petition for writ of certiorari.  <u>See</u> <u>Brown v. United States</u>, ___ U.S. ___, 127 S. Ct. 1149 (Jan. 22, 2007).  Brown then filed this counseled §2255 motion raising 17 claims.

### ARGUMENT AND CITATION OF AUTHORITY

As set forth in the government's initial response, Brown's claims suffer from one of two infirmities.  First, Brown litigated a number of the issues that he now raises on direct appeal.  He cannot attach a new label to these claims and relitigate them in his §2255 motion.  <u>See</u> <u>United States v. Nyhuis</u>, 211 F.3d 1340, 1343 (11th Cir. 2000)(refusing to revisit Nyhuis' immunity claim raised on direct appeal but repackaged as a due process claim on collateral attack since a "rejected

claim does not merit rehearing on a different, but previously available, legal theory").

Second, Brown's claims are procedurally defaulted, and his claims of ineffective assistance of counsel do not amount to cause to overcome that default. To obtain collateral relief on errors to which no contemporaneous objection was made and which were not raised on direct appeal, Brown "must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 167-68, 102 S. Ct. 1584, 1594 (1982). This standard is "a significantly higher hurdle than would exist on direct appeal." Id. at 166, 1593. To demonstrate prejudice, the second prong, Brown "must shoulder the burden of showing, not merely that the errors at his trial [or sentencing] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial [or sentencing] with error of constitutional dimensions." Id. at 170, 1596 (emphasis in original).

"Constitutionally ineffective assistance of counsel can constitute cause" under Frady. Holladay v. Haley, 209 F.3d 1243, 1254 (11th Cir. 2000). In order to do so, however, the claim of ineffective assistance must have merit. United

States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000).[8]

To demonstrate ineffective assistance of counsel, a §2255 petitioner must show that counsel's performance was deficient – i.e., that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" – and that the deficient performance prejudiced the defense – i.e., that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). Judicial scrutiny of counsel's performance is "highly deferential," with "every effort . . . made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 2065. Courts indulge a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and a defendant must overcome the presumption that the challenged action may be sound trial strategy. Id. Thus, "[t]here are countless ways to provide effective assistance in any given case." Id. "The purpose of ineffectiveness review is not to grade counsel's

_____

[8] A petitioner need not show cause under the fundamental miscarriage of justice exception – i.e., "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Mills, 36 F.3d at 1055. Brown makes no actual innocence claims here.

14

performance"; "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000)(en banc).

In capital cases challenging a death sentence, this standard applies, too:

> Where, as here, the petitioner contends that, but for counsel's errors, he would not have received a sentence of death, we consider "whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. . . ."

Newland v. Hall, 527 F.3d 1162, 1184 (11th Cir. 2008).

Counsel has a duty to investigate. Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. That duty carries these consequences:

> . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 691, 2066. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." Id.

15

Brown, as the petitioner, "continually bears the burden of persuasion. . . ." Chandler, 218 F.3d at 1315. This burden, while not insurmountable, is heavy due to the strong presumption in favor of competence. Id. at 1314. An ambiguous or silent record is insufficient. Id. at 1314, n. 15. The fact that trial counsel "admits that his performance was deficient matters little" since the standard is an objective one. Id. at 1315. When analyzing the performance of an experienced trial attorney, "the presumption that his conduct was reasonable is even stronger." Id.

Richard Darden and William Bell represented Brown at trial. Although Bell has experience in criminal defense work, Darden particularly has experience in death penalty cases. Darden's experience in this area is demonstrated at a pretrial conference in September 2003 [Doc 259], where he and the Court talk extensively about Darden's work as a death penalty lawyer. Under Chandler, this experience is due respect.

With these legal standards in mind, the government now turns to the claims advanced by Brown.

**1. Counsel unreasonably and prejudicially addressed the issue of the local prosecutors' agreement that this ought not to be a death penalty case. [CV Doc 51-Pgs 9-11]**

Brown offered to plead guilty to avoid the death penalty, a fact that the parties introduced by stipulation. In closing arguments in the penalty phase,

Darden told the jurors that this offer occurred very early in the case, well before trial. Using an affidavit obtained from a juror, Brown now attempts to impeach the verdict.

Prior to trial, Brown and the trial prosecutors entered into a conditional plea agreement, which the government agreed to submit to the Department of Justice and Attorney General for review. [CV Doc 12-Pgs 1-2] Brown acknowledged that the government could not "bind the Department of Justice's ultimate decision regarding whether to seek the death penalty in this case,"[9] but contingent upon the Attorney General's agreement, the government agreed to represent that a life sentence would be appropriate. [CV Doc 12-Pg 2] The Attorney General instead directed the government to seek the death penalty against Brown.

At the conclusion of Brown's case in the penalty phase of trial, Darden read this stipulation:

> In United States of America vs. Meier Jason Brown, Stipulation: The defendant in the above-named indictment, Meier Jason Brown, agreed to plead guilty to the charges set forth in the indictment in exchange

---

[9] A local United States Attorney's Office must submit death penalty cases to a capital case review panel, with the Attorney General making the final decision about whether to seek the death penalty. See United States Attorney's Manual, §§9-10.030 to 9-10.040. The local office may send a conditional plea agreement to the review panel as part of this process, and the office also makes a recommendation to the Attorney General on whether the death penalty should be sought. Id. at §§9-10.080(A)(11), §9-10.110.

for a life sentence with no possibility of parole.

[Doc 293-Pg 1167] Darden addressed this stipulation during his closing argument:

> . . . This case has never been about guilt and innocence.  It never was.
>
> [Brown] confessed from day one.  And as you know, he offered to plead guilty in this case in exchange for a life sentence in December of last year.
>
> We don't want to be here.  I didn't want to put the family through this.  I didn't want to put you through this.  Unfortunately, circumstances bring us to this point.  And for that, I apologize.

[Doc 293-Pg 1180] Later, Darden advocated for a sentence of life imprisonment, arguing that Brown would pose no further threat to society in the structured environment of prison; that Brown confessed and cooperated; and that Brown was remorseful. [Doc 293-Pg 1188] Darden then argued:

> [Brown] has accepted responsibility.  We now know that he did everything he could to try to plead guilty to this case.  He submitted an offer to the government, and said, "look, we won't go to trial.  I will do the rest of my life in prison."  I will never be released.  He has accepted responsibility.

[Doc 293-Pg 1189] The government did not mention the stipulation in its initial or rebuttal closing.

Darden thus made a tactical decision to inform the jury about Brown's attempt to plead guilty in December 2002, almost a year before the jury trial.  This tactical decision did not constitute deficient performance: Darden used the

18

stipulation to demonstrate Brown's remorse and acceptance of responsibility for Gaglia's murder.  While Brown argues that Darden performed deficiently since the "stipulation did not say *when* [Brown] had agreed to plead guilty"[CV Doc 8-Pg 8], Darden told the jury in closing arguments exactly when Brown entered into this agreement – "December of last year." [Doc 293-Pg 1180] Given that Darden did not perform deficiently, Brown cannot make the required showing under Strickland.

Brown focuses attempts to show ineffective assistance by way of two affidavits.  First, Bell's affidavit includes this averment:

> During the penalty phase of trail [sic], we introduced a stipulation that Mr. Brown had offered to plead guilty for a sentence of life imprisonment without the possibility of parole.  After the jurors were presented with that information they appeared visibly upset.  They shook their heads at each other, some jaws dropped, and I was convinced that it was a mistake introducing the stipulation.

[CV Doc 53-App. 1 at ¶12] Bell – in hindsight – thus questioned Darden's tactical decision.  This after-the-fact assessment does not suffice.  See Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (requiring judicial scrutiny to make "every effort . . . to eliminate the distorting effects of hindsight").

Brown's second affidavit – obtained by interviewing Bruce Little, the jury foreperson – fares no better.  Little states in pertinent part as follows:

3. After we found Mr. Brown guilty we went on to the penalty phase of the trial. Almost the first thing we heard from the defense was that Mr. Brown had agreed to plead guilty in exchange for a sentence of life without parole. It was our understanding from the stipulation the defense read that Mr. Brown offered to plead guilty only after the case went to the jury and we were deliberating whether he was guilty. A number of us were angered by the fact that Mr. Brown only offered to plead after he had heard the evidence against him.

4. I have been advised that the jurors were mistaken about Mr. Brown offering to plead guilty only after all of the evidence was presented during the guilt proceeding. Representatives of Mr. Brown have informed me that Mr. Brown actually offered to plead guilty well before the trial began. That was never made clear to us and had we known that it would have had a considerable impact on my decision to sentence Mr. Brown to death. This is so because by offering to plead guilty early on, Mr. Brown demonstrated his willingness to accept responsibility for what he had done and would have shown me that he was remorseful for his actions.

[CV Doc 13-Pgs 2-3, ¶¶3-4] Little later made this statement:

8. On top of the fact that we mistakenly believed Mr. Brown only offered to plead guilty during the trial, we were never informed that the Government had agreed to allow him to plead guilty and receive a life sentence. We were under the impression that even though Mr. Brown offered to plead guilty, the Government never thought that life without parole was an appropriate sentence. . . If I had been made aware that the local United States Attorneys who were prosecuting the case had actually signed an agreement allowing Mr. Brown to be sentenced to life without parole if the Attorney General of the United States approved, that would have impacted my decision to impose a death sentence and I likely would not have done so. . . .

[CV Doc 13-Pgs 5-6, ¶8][10]

Little's affidavit thus faults Darden for failing to make an argument that Darden actually made. Having been informed by Brown's "representatives" that Brown offered to plead guilty early in the case, Little says that this fact would have had "considerable impact" because "by offering to plead guilty early on, Mr. Brown demonstrated his willingness to accept responsibility for what he had done and would have shown me that he was remorseful for his actions." [CV Doc 13-Pg 3, ¶4] As quoted above, Darden told the jury that Brown had offered to plead guilty early on and asked the jury to consider Brown's willingness to do so as a manifestation of Brown's remorse and acceptance of responsibility. [Doc 293-Pgs 1180, 1189]

These considerations aside, the Court should reject Little's affidavit for a more fundamental reason: It is not competent evidence. At the end of the guilt phase of trial, the Court told the jurors that "Your deliberations, of course are secret. You will never have to explain your verdict to anyone." [Doc 293-Pg 1045] This pattern instruction, see Eleventh Circuit Pattern Jury Instructions (Criminal), basic instruction 11 at p. 31 (2003 ed.), was honored in the breach

---

[10] Brown also submitted the notes that Little made during the trial of the case, but the notes do not mention the stipulation about the guilty plea. [CV Doc 33]

when Brown sent investigators, without court permission, to interview jurors, including Little. [CV Doc 13-Pg 6, ¶9] This contact also violated a local rule. See S.D. Ga. L.R. 83.8 (stating that "[n]o party, attorney, or other person shall, without Court approval, make or attempt any communication relating to any feature of the trial of any case with any regular or alternate juror who has served in such case, whether or not the case was concluded by verdict").  The Court should refuse to consider Little's affidavit and other fruits from Brown's contact in the disposition of Brown's case.  See United States v. Venske, 296 F.3d 1284, 1291-92 (11th Cir. 2002)(finding no abuse of discretion where district court excluded juror's affidavit after defendant violated local rule prohibiting contact with jurors); see also  Cuevas v. United States, 317 F.3d 751, 754 (7th Cir. 2003)(finding no abuse of discretion in district court's refusal to consider in §2255 motion evidence obtained from juror interviews done by Cuevas' private investigator in violation of court's no contact rule).

Second, and irrespective of the provisions of the local rule, Little's affidavit is not competent evidence demonstrating prejudice under the rules of evidence. Little avers that the stipulation made jurors "angry" and that certain facts would have had a "considerable impact" on Little's decision to impose the death penalty. [CV Doc 13-Pgs 2-3, ¶¶3-4, 8] An evidentiary rule prohibits the use of these

observations by Little:

> Upon inquiry into the validity of a verdict . . ., a juror may not testify
> as to any matter or statement occurring during the course of the jury's
> deliberations or to the effect of anything upon that or any other juror's
> mind or emotions as influencing the juror to assent to or dissent from
> the verdict . . . or concerning the juror's mental processes in
> connection therewith. . . A juror's affidavit or evidence of any
> statement by the juror may not be received on a matter about which
> the juror would be precluded from testifying.

Fed. R. Evid. 606(b); see generally Venske, 296 F.3d at 1290 (noting Rule

606(b)'s exclusion of statements involving "the jury's deliberative process" and

the "mental impressions of [a] juror"); cf. Sola v. United States, 152 F.3d 920 at

*1 (2d Cir. 1998)(unpub.)(stating in §2255 case that "[a] verdict, once announced

in open court. . . , may not later be impeached by a juror" despite one juror's "later

misgivings about the correctness of the verdict").  Rule 606(b) sprang from the

common-law rule against admission of jury testimony to impeach a verdict,

including these concerns:

> . . . [F]ull and frank discussion in the jury room, jurors' willingness to
> return an unpopular verdict, and the community's trust in a system
> that relies on the decisions of laypeople would all be undermined by a
> barrage of postverdict scrutiny of juror conduct.

Tanner v. United States, 483 U.S. 107, 121, 107 S. Ct. 2739, 2748 (1987); see also

Davis v. United States, 47 F.2d 1071, 1072 (5th Cir. 1931)(stating common law

rule against impeachment of verdict).

Darden performed in a constitutionally reasonable manner, and Brown has not demonstrated prejudice. Bell's affidavit employs hindsight, and Little's affidavit (if considered at all) faults Darden for not making an argument that Darden actually made. Brown's first claim fails.

## 2. Counsel unreasonably and prejudicially addressed the issue of the victim's husband's (and other family members') agreement with a sentence of life in this case. [CV Doc 51-Pgs 12-14]

Brown next faults trial counsel for failing to cross-examine Sallie Gaglia's family members about their feelings on the death penalty and their knowledge of the circumstances of Brown's formative years. [CV Doc 8-Pgs 10-14; CV Doc 51-Pgs 12-14] Brown bases his claim on "sympathetic stories" about Brown's upbringing that family members told to a postal inspector. [CV Doc 8-Pgs 10-11; CV Doc 51-Pg 12][11] As an initial matter, Gaglia's relatives informed the trial prosecutors that they were in favor of seeking the death penalty. Even accepting Brown's view, he is not entitled to relief for two reasons. Given the resolution of a substantially similar issue on direct appeal, Brown may not relitigate his claim here. Alternatively, the resolution of that issue demonstrates that Brown cannot

---

[11] In his earlier motion, Brown relies, too, on Little's affidavit. [CV Doc 8-Pgs 10-11, notes 2-3] Rather than again addressing this issue, the government refers to its earlier discussion of why the Court should not consider this affidavit in ruling on Brown's motion.

show prejudice.

Brown argued on direct appeal that the government, in violation of Brady v. Maryland, withheld evidence that Gaglia's husband was opposed to the death penalty. [CV Doc 50-Exhibit A at 86-88] Brown's appellate claim was that this evidence was material for the following reason:

> As noted above . . ., the victim impact evidence can be some of the most compelling evidence in support of a death sentence. Conversely, should the victim's family not want the jury to impose a death sentence, that evidence can be some of the most compelling for a sentence of life in prison.

[CV Doc 50-Exhibit A at 86-87] The government responded that this evidence was not material under Brady because it was not relevant or admissible. [CV Doc 50-Exhibit B at 61-64]

> The Eleventh Circuit agreed with the government's position:

> . . . This evidence was not material, and therefore could not violate Brady, because it was neither relevant or admissible; indeed, there is no reasonable (or even remote) probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. . . .

Brown, 441 F.3d at 1352.  The Eleventh Circuit reached this result after analyzing Booth v. Maryland, 482 U.S. 496, 107 S. Ct. 2529 (1987), and Payne v. Tennessee, 501 U.S. 808, 111 S. Ct. 2597 (1991), and concluding that "the Booth prohibition against evidence of family members' opinions and characterizations of

25

the crime, the defendant, and the appropriate sentence remains good law." Brown, 441 F.3d at 1351. The Court found it "immaterial" under Booth that "a family member's opinion would have been offered in opposition to the death penalty, just as it would be improper if the expressed opinion supported the application of the death penalty." Id. at 1351, n. 8. Finally, the Eleventh Circuit found that this Court's ruling that it would not "allow any witness to make a recommendation to the jury that you should take his life or that you should spare his life" [Doc 293-Pg 1055] to be "fully consonant" with Booth and Payne. Id. at 1352.

Brown now chastises trial counsel for "ineffectively and prejudicially" not using information about "the victim's family members' opposition to the death penalty." [CV Doc 51-Pg 12] As the Eleventh Circuit found, this evidence was irrelevant and inadmissible. Brown cannot repackage his claim and relitigate it in this forum. See Nyhuis, 211 F.3d at 1343. Alternatively, the Eleventh Circuit's holding demonstrates why Brown cannot show prejudice: Evidence about the family members' stance on the death penalty was immaterial, even if it was favorable to Brown.

Brown did not raise on direct appeal the possibility of the Gaglia family's testifying about his upbringing, but the Eleventh Circuit opinion suggests that this testimony, too, would have been off-limits. See Brown, 441 F.3d at 1351.

Specifically, Booth prohibits "evidence of family members' opinions and characterizations of the crime, the defendant, and the appropriate sentence. . . ." Id. (emphasis added).  It is doubtful that the three testifying family members – Catherine Webb, Betty Cox, and David Clark – could have permissibly testified about their opinion of Brown.  Even if they could have, Webb and Clark told postal inspectors that Brown's family life was chaotic and violent; indeed, Clark's wife had been held up at gunpoint by one family member. [CV Doc 15-Pgs 7-8] These observations mirrored the testimony of Brown's 14 witnesses at the penalty phase of trial.  See Brown, 441 F.3d at 1364 (summarizing testimony of mitigation witnesses).

One final point bears mentioning.  Trial counsel did not cross-examine the family members who testified at the sentencing phase. [Doc 293-Pgs 1091, 1093, 1095] This decision may very well have reflected a desire not to antagonize Gaglia's family (and concomitantly anger the jury).  Brown's current claim urges a treacherous course for trial counsel to plot, especially since there are no guarantees that the grieving family members would have portrayed Brown sympathetically.  Perhaps the family members would have testified about Brown's upbringing – but perhaps the family members would have then used that testimony as a springboard to say why Brown deserved the death penalty.  This course would have been both

inflammatory and violative of <u>Booth</u> and <u>Payne</u>.

Given the Supreme Court precedent and resolution on direct appeal counseling against his position, Brown has not demonstrated ineffective assistance of counsel.

The government will address Brown's claim regarding the closing argument [CV Doc 51-Pg 13] in its response to Brown's sixth claim.

### 3. Counsel unreasonably and prejudicially addressed Detective Woodall's conclusion as a seasoned detective that, from the evidence and Meier Brown's history, the victim's death was not planned and that Woodall agreed with the local prosecutors that life in prison was the appropriate punishment. [CV Doc 51-Pgs 14-20]

Detective Charles Woodall of the Liberty County Sheriff's Department testified at the penalty phase of trial on Brown's behalf. [Doc 293-Pgs 1159-1166] Calling Woodall's testimony "cursory and totally lacking in detail," Brown faults trial counsel for not effectively using Woodall. [CV Doc 51-Pg 15] According to Brown, Woodall "*could have* testified in detail about a variety of mitigating subjects," including Brown's "horrific upbringing," the "'countless' [police] responses" to the Morgan compound, the violence and blight at the compound, Brown's non-violent tendencies, and how Gaglia's murder was "completely out of character for Mr. Brown." [CV Doc 51-Pgs 15-19] To the extent that Brown challenges the trial prosecutor's statements in closing argument about Woodall

28

[CV Doc 51-Pgs 19-20], the government responds to those allegations as part of claim 6. Facts pertinent to this claim follow.

### a. Facts

Woodall was present when Brown confessed to Gaglia's murder, largely because Brown had requested his presence in light of the history between the two men. [Doc 293-Pgs 1159-1160] Woodall had known Brown for seven or eight years due to a "lot of calls" at the Morgan residences, where Brown grew up. [Doc 293-Pgs 1160-1161] When asked how many calls had been generated from the Morgans, Woodall made this statement:

> In ten years, I couldn't estimate a guess. Once a week sometimes. Sometimes as many as five or ten times a week. It just depended on what was going on, what time of year it was. We were out there a lot.

[Doc 293-Pg 1161] Woodall testified that these calls included "call[s] for services, fights, domestic problems, shootings, stabbings, alcohol, drug sales, robberies," and an incident where a child drowned in the septic tank. [Doc 293-Pgs 1161, 1163] While Brown's mother was a "very nice lady," her home was in "a bad state of repair," was almost squalid, and reflected "a very poor life." [Doc 293-Pg 1162]

After discussing Brown's background, Woodall testified as follows:

I was asked to come and give my opinion about this case or my

> thoughts on this case as it pertains to this particular homicide. Having talking [sic] to [Brown], and having been familiar with the case and all the facts of the case, I –

[Doc 293-Pg 1163] At this point, the prosecutor objected that Woodall was traveling into "the prohibit[ed] area," and the Court agreed. [Doc 293-Pg 1163] The "prohibited area" was the Court's "not allow[ing] any witness to make a recommendation to the jury that you should take [Brown's] life or that you should spare his life.  That is a direct invasion of the jury's province." [Doc 293-Pg 1055] After the objection, Woodall testified that Brown was remorseful, sobbing and crying during most of his confession, and truthful in his disclosures. [Doc 293-Pg 1164]

On cross-examination, Woodall described Brown as "intelligent," with a lot of "good common sense . . . street sense." [Doc 293-Pg 1165] Based upon 20 to 25 face-to-face encounters, Woodall believed Brown to know right from wrong. [Doc 293-Pg 1165] While remorseful for the killing during his confession, Brown was equally remorseful for his fiancee, Diane, and regretted that "his life was over with." [Doc 293-Pg 1166]

### b. Argument

Brown cannot demonstrate deficient performance or prejudice in his trial counsel's treatment of Woodall.

First, Brown mistakenly claims that trial counsel failed to elicit certain testimony from Woodall and ignores that Woodall testified about those very matters. For instance, Brown says that Woodall "would have testified that in his years with the Liberty County Sheriff's Department he became familiar with Mr. Brown from the 'countless' responses he made to the Morgan Residence, and that he estimates law enforcement were making 2 to 3 calls to the Morgan residence [sic] per week and this practice lasted 8 years." [CV Doc 51-Pgs 16-17] As quoted above, Woodall did testify about the number and frequency of calls to the Morgan residence and even attributed a higher number of calls at trial than in his affidavit. [Doc 293-Pg 1161] According to Brown, Woodall also would have described his mother's problems with her children – particularly how she had "lost control of them" and how her boys "fought all of the time" and had to be thrown "out of the house on a regular basis." [CV Doc 51-Pg 18] However, when trial counsel asked Woodall about Brown's relationship with his mother, Woodall described her as "decent," "respectful," and helpful, but said, "[a]s far as her relationship with Meier or specifically about any of the boys, I can't really tell you." [Doc 293-Pg 1162] Brown, too, faults trial counsel for not eliciting Woodall's opinion that the residence was "nasty, sordid, [and] disgusting," but Woodall's testimony suggested as much: "I don't want to use the word [squalor]

31

because it is not quite that bad.  But they lived a very poor life. . . ." [CV Doc 51-Pg 19; Doc 293-Pg 1162]

Second, Brown mentions several incidents that Woodall alluded to and other witnesses testified about.  Woodall mentioned that the sheriff's department received a number of calls for "drug sales." [Doc 293-Pg 1161] Brown now says that his trial attorneys should have elicited testimony that Brown's brothers were "major drug dealers" who sold drugs "open[ly] and notorious[ly] on the property." [CV Doc 51-Pg 17] Brown ignores that another witness, Jimmie Wainwright, described the property as "a crack house" with people using crack cocaine in front of Brown. [Doc 293-Pgs 1153-1154] Brown also contends that Woodall could "have further graphically described" the violence on the property and given "specific instances of violence witnessed by Brown." [CV Doc 51-Pg 17] Again, Woodall testified that the sheriff's department responded to calls for "fights, . . . shootings, stabbings, . . .robberies." [Doc 293-Pg 1161] Other witnesses testified about specific acts.  Pelham Brown, Brown's father, acknowledged that he shot his son Roy after Roy tried to cut him with a razor – and left the family after "that trouble." [Doc 293-Pg 1099] A former neighbor, Alexis Andrews, testified that shots were "fired numerous times," that she was aware of stabbings at the Morgan residence, that gunshots at the home were not unusual.  [Doc 293-Pgs 1104, 1107]

32

Patricia Morgan, Brown's sister-in-law, said that the house would be peaceful but "then in a moment. . . somebody is yelling at you, or screaming at you, and wanting to gut you." [Doc 293-Pg 1137]

In response to Brown's argument that he needed other expert witnesses to present "coherent testimony relating to the background, upbringing, and social context of his life," the Eleventh Circuit found that the record contradicted this claim and offered this assessment of Brown's mitigating evidence:

> At the penalty phase, Brown presented fourteen witnesses who testified about Brown and his childhood.  Those witnesses described the deplorable conditions under which Brown was raised, noting that there were frequent fights in his home, that his parents used drugs, that his father left the home after shooting a stepson when Brown was seven, that a child died at Brown's home after drowning in a septic tank, and that the police were frequently called to break up fights, shootings, and stabbings.

Brown, 441 F.3d at 1364.  Given the testimony presented by Brown's 14 witnesses, it is difficult to see how additional explanation by Detective Woodall would have tipped the balance.

Finally, Brown believes that counsel should have elicited Woodall's testimony that

> . . . from all he knew of Mr. Brown and his past, and from the Detective's experience as an officer, Mr. Brown was not a violent offender, and there was nothing in his past that indicated Mr. Brown would or could be a danger to anyone.  Based on his thirty plus years

of experience as a law enforcement officer, he did not believe that Mr. Brown took the knife to the post office with the intention of stabbing anyone. He knew that this crime was completely out of character for Mr. Brown.

[CV Doc 51-Pg 19] It appears that Woodall tried to testify to these opinions but that that testimony would have contravened the Court's prior ruling. [Doc 293-Pgs 1055, 1163] Brown does not challenge this ruling, which the Eleventh Circuit addressed as part of Brown's Brady challenge on direct appeal:

> The district judge ruled that he would "not allow any witness to make a recommendation to the jury that you should take [Brown's] life or that you should spare his life. That is a direct invasion of the jury's province." That ruling is fully consonant with the Supreme Court's holdings in Booth and Payne. . . .

Brown, 441 F.3d at 1352.

Brown has demonstrated no deficient performance or prejudice in counsel's questioning of Woodall.

**4. Defense counsel unreasonably and prejudicially failed to conduct the diligent investigation into Meier Brown's background and social history the Fifth, Sixth, and Eighth Amendments require. [CV Doc 51-Pgs 20-32]**

Brown's fourth claim challenges the investigation into his background and social history made by trial counsel. In his initial motion, Brown details the "nasty compound" that he and his family called home [CV Doc 8-Pgs 20-22], the drug and alcohol abuse rampant on the compound [CV Doc 8-Pgs 23-25], the violence

34

and frequent police activity at the compound [CV Doc 8-Pgs 25-34], the contents of DFACS records [CV Doc 8-Pgs 34-36], the deaths in his family [CV Doc 8-Pgs 36-37], his tender side (including his care for his mother) [CV Doc 8-Pgs 37-41], his education [CV Doc 8-Pgs 41-44], his employment history [CV Doc 8-Pg s 44-46], his criminal record [CV Doc 8-Pgs 46-47], his being a "model prisoner" [CV Doc 8-Pgs 47-50], his relationship with Diane [CV Doc 8-Pgs 50-51], and his evaluation at FMC Butner pursuant to Rule 12.2. [CV Doc 8-Pgs 51-54]

Trial counsel adequately investigated and presented the areas listed in Brown's motion, as demonstrated by the testimony of the 14 mitigating witnesses called by Brown and by some of the government's witnesses.[12]  The following list details mitigating witnesses who testified about these matters; the nature of their testimony; and the pages of the transcript at which that testimony appeared. (Government witnesses are starred.)

| Witness | Subject | Pages of transcript [Doc 293] |
|---|---|---|
| *Irwin Frazier | criminal history | 1069-1075 |
| *Randy Garman | criminal history | 1075-1081 |

---

[12]  Diane testified at the guilt phase of trial. [Doc 292-Pg 707] The Butner report is addressed in claim 7.

35

| Pelham Brown (Brown's father) | upbringing, shooting of stepbrother, violence at compound, work history | 1096-1101 |
|---|---|---|
| Alexis Andrews (lived near Morgan compound and assistant jail administrator) | bad activities at Morgan compound, shootings, stabbings, child drowning in septic tank, frequency of police calls, conduct as a young child ("mannerful"), chaotic and "very poor" living conditions, conduct while in jail | 1102-1114 |
| Beverly Bonaparte (Brown's sister) | care for mother, work history, criminal history, quiet nature/tender side | 1114-1119 |
| Joseph Bonaparte (Brown's brother-in-law) | nice, likeable person, work history, care for his mother, tender side | 1119-1124 |
| John Wilcher (assistant jail administrator) | conduct in jail | 1125-1126 |
| Linda Jones (Brown's English teacher for 2 years) | education, parents never present, "never gave me any problem," polite, fact that Brown's house had burned, average IQ | 1126-1130 |
| Vanessa Parker (school social worker) | education, speaking with Sadie, medications, quiet, well-mannered child but tense | 1131-1134 |
| Patricia Morgan (sister-in-law) | work history, "very sweet, very good natured," Morgan compound as chaotic and violent, Brown peaceful, cared for his mother, good with her children | 1134-1141 |
| Steve Murray (manager at McDonald's) | work history, dependable and good worker | 1144-1146 |

| Davis Williams (church friend) | attendance at church, care for his mother, well-trained and humble child | 1146-1148 |
|---|---|---|
| Rev. B.T. Smith (pastor) | church attendance | 1150-1152 |
| Jimmy Wainwright (subcontractor) | work history, violence and drug use at Morgan compound, Brown's drug use, good worker and dependable | 1153-1158 |
| Dexter Morgan (Brown's brother) | "really loving guy" | 1158-1159 |
| Charles Woodall (Detective, Liberty Co. Sheriff's Department) | criminal history, numerous problems at/calls to Morgan compound, bad health of Brown's mother, "very poor life" and near-squalid living conditions, Brown's remorse | 1159-1166 |

Assessing the quantity and quality of the lay witness testimony presented in the mitigation case, the Eleventh Circuit found that the Court properly denied funds for a forensic social worker and a future dangerousness expert. Brown, 441 F.3d at 1363-65.

Brown now makes four specific claims with regard to the mitigation evidence presented by trial counsel. First, he argues that trial counsel presented harmful and incorrect evidence by introducing Vanessa Parker's testimony during sentencing. [CV Doc 51-Pgs 21-23] Second, Brown claims that trial counsel presented a thumbnail sketch of his life. [CV Doc 51-Pgs 23-26] Third, Brown

renews his argument from claim 3 that trial counsel should have elicited more extensive testimony from Detective Woodall. [CV Doc 51-Pg 26]  Finally, Brown claims that his trial counsel acted unreasonably by "fail[ing] to obtain the meaningful services of a mitigation investigator or mental health professional." [CV Doc 51-Pgs 26-31] The government relies on his discussion of Detective Woodall's testimony in claim 3 and addresses the other three allegations below.

### a. Vanessa Parker's testimony

Brown argues that trial counsel presented harmful and incorrect evidence through the testimony of Vanessa Parker, a school social worker who interacted with Brown 10 or 15 years before trial. [Doc 293-Pg 1131] Brown claims that Parker erroneously stated that as a student, he was enrolled in alternative school, took medication, and showed signs of anger. Brown assumes that Parker was describing his brother, Ralton, instead of him – although  Brown does not support his assumption with any cites to the record or an affidavit.

In any event, Brown's assumption ignores the strong likelihood that Parker may have been mistaken about historical and biographical details of Brown's background but maintained a vivid memory of the child's demeanor.  He places significant weight on Parker's description of Brown:

There was a little anger, but it wasn't anger directed at me or at the

school officials.  I don't know whether it was his situation or whatever.  But is wasn't a very overt kind of anger, but it was a tenseness sort of anger.

[Doc 293-Pg 1133]  Brown argues that Parker must have been mistaken, because other witnesses did not describe Brown as angry. [CV Doc 51-Pg 22]

Brown, however, ignores the testimony of his ninth grade English teacher, Linda Jones, who first explained why she believed that Brown was "sad":

Well, sometimes he would sit in class and he wouldn't say very much. I mean, you know, he was sort of – he stayed to himself.  You have to watch that quiet student just as much as you have to watch the other students, because they don't say anything.  And you never know what is wrong or what they're thinking or anything.

But he never bothered anybody.

[Doc 293-Pg 1129] Jones then described her reaction to hearing about Brown's murdering Gaglia:

I felt to myself that he must have let an awful lot of anger out at that time that he had pinned up from all those years to do something like that.

[Doc 293-Pg 1129] Although Brown argues that he "was sad, not angry" [CV Doc 51-Pg 22], Jones characterized him as both.

Brown also fails to identify any unreasonable conduct or resulting prejudice, stating only that "[h]ad the requisite investigation been conducted, [trial counsel] would have known [that Parker's testimony contained factual errors]."  [CV Doc

51-Pgs 21-23] It is unclear whether Parker's testimony actually was factually inaccurate.  As for Parker's testimony about Brown's anger – perhaps the most salient point here – Jones testified similarly.

Even if Parker's testimony were inaccurate on the minor points (alternative school, medication), Brown's argument – i.e., that trial counsel's unawareness of these inaccuracies demonstrates an unreasonable investigation into his background and social history – makes an unwarranted logical leap.  Parker's mistakes related to minor nuances in Brown's early years.  Whether Brown was enrolled in the alternative school, or took medication for ADHD was insignificant to trial counsel's investigation of Brown's background and social history.  Trial counsel uncovered many aspects of Brown's background and social history and presented them amply through fourteen witnesses.  Brown, 441 F.3d at 1364.

Besides, these "mistakes" hardly made a difference.  No one referred to alternative school or medication in closing arguments.  Brown's only assertion of prejudice comes from an argument made by the government in its appellate brief, to wit:

> The affirmatively wrong evidence that was admitted by defense sentencing counsel allowed current counsel for the Government to write in her appellate brief that Petitioner's "poverty, a childhood punctuated by violence and death, and chaos," was not mitigating because Mr. Brown "managed" it "by hiding anger under a thin

veneer of civility."

[CV Doc 51-Pg 21] As an initial matter, the government did not argue whether or not this evidence was mitigating in its brief, just whether Brown's lay witnesses presented mitigation evidence adequately without resort to an expert. Here is the actual quote:

> Despite lacking an expert's gloss, these witnesses (who had known Brown for years) relayed the unsettling circumstances of Brown's life – poverty, a childhood punctuated by violence and death, and chaos – which Brown managed by hiding anger under a thin veneer of civility.

[CV Doc 50-Exhibit B at 85]

In any event, Brown's argument seems to be that he did not display anger as a child, and the government's appellate brief referred to his "hiding anger"; it is hardly a contradiction. Ultimately, Brown cannot show the prejudice required for relief: He has not demonstrated "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Newland, 527 F.3d at 1184.

### b. Thumbnail sketch of his life

Next, Brown argues that "jurors were provided only a thin sketch of [his] life." [CV Doc 51-Pg 23] Brown lists these details that purportedly indicate the limited scope of mitigation testimony presented during the penalty phase: (1) trial

counsel failed to tie dangerousness of the Morgan compound to Brown, and failed to describe the conditions and lack of supervision at the compound, (2) trial counsel failed to describe how Brown came to use drugs, and (3) trial counsel failed to mention additional examples of Brown's loving character.  [CV Doc 51-Pgs 23-26] The Eleventh Circuit's opinion largely undercuts Brown's claims.  It found that Brown's lay witnesses presented coherent testimony on the "background, upbringing, and social context of [Brown's] life" and summarized that testimony.  Brown, 441 F.3d at 1364.

In addition to the Eleventh Circuit's assessment, the record belies Brown's claim.  As to the "violence at the Morgan compound" assertion, many of the witnesses – notably, Pelham Brown, Alexis Andrews, Patricia Morgan, Jimmy Wainwright, and Detective Woodall –  testified about this fact.  Similarly, trial counsel presented significant testimony demonstrating the poor living conditions and lack of supervision at the compound, presenting it through these witnesses – Alexis Andrews, Linda Jones, Vanessa Parker, and Detective Woodall.  This testimony led the Eleventh Circuit to conclude that Brown had presented a coherent account of the "deplorable conditions" of the compound.  Id.  Brown does not claim that additional evidence of the conditions at the Brown compound should be presented; instead he argues that the evidence that was presented could

have been presented differently.  Here, Brown has failed to satisfy his burden of showing that trial counsel acted unreasonably.  <u>Newland</u>, 527 F.3d at 1084 ("petitioner must establish that no competent counsel would have taken the action that his counsel did take.") (quoting <u>Chandler v. United States</u>, 218 F.3d 1305, 1315 (11th Cir. 2000)).  Brown also fails to demonstrate how trial counsel's method of presenting this evidence was prejudicial.

Brown next argues that trial counsel were ineffective by not demonstrating how he began to use drugs.  Brown concedes that some evidence was presented on his drug use, but contends that more could have been presented.  This is not the standard; Brown must demonstrate that trial counsel acted unreasonably and that the conduct created prejudice.  <u>Newland</u>, 527 F.3d at 1184 (quoting <u>Strickland</u>, 466 U.S. at 687, 104 S. Ct. at 2064).  Also, Brown has failed to allege that any error committed by trial counsel created prejudice.  Presenting additional evidence of drug use could have reasonably inspired a less favorable view of Brown than jurors already had.  This is a reasonable strategic decision, rather than prejudicial error.  See <u>Jones v. Page</u>, 76 F.3d 831, 846 (7th Cir. 1996)(recognizing that failure to introduce evidence of long history of substance abuse is a reasonable tactical decision because such evidence can be a double-edged sword-just as likely to function as an aggravating factor as a mitigating one).

43

Finally, Brown alleges that trial counsel failed to present sufficient evidence demonstrating Brown's loving character.  This argument is flawed as well.  Four witnesses – Beverly Bonaparte, Joseph Bonaparte, Patricia Morgan, and Davis Williams – testified to Brown's efforts to take care of family members.  The decision by trial counsel to not proceed with additional presentations of the "loving character" of Brown was likely motivated by strategy, not error.

### c.  Failure to obtain meaningful mitigation services

Brown contends that his trial counsel failed to "obtain meaningful services of a mitigation investigator or mental health professional." [CV Doc 51-Pg 26] He argues that the mitigation specialist, Laura Blankman, never performed the services for which she was hired.  [CV Doc 51-Pgs 26-31] The government assumes *arguendo* that Blankman failed to do so.

Brown bases his argument on the conclusory premise that substandard performance of a court approved defense expert constitutes unreasonable and prejudicial conduct by trial counsel.  He does not provide any authority for this premise.  In fact, a mitigation specialist's failure to perform does not automatically render trial counsel ineffective.  Broom v. Mitchell, 441 F.3d 392, 407-11 (6th Cir. 2006); cf. Chandler, 218 F.3d at 1313 (noting that "complete failure to present mitigation evidence does not necessarily constitute deficient performance, even if

mitigation evidence is available").

In <u>Broom</u>, the defendant claimed that his trial counsel acted ineffectively during the mitigation phase of his trial. <u>Id</u>. To support this claim, Broom argued, among other things, that "that the mitigation expert assigned to the case did not provide any services for him." <u>Id</u>. at 407. The <u>Broom</u> court found that trial counsel acted reasonably, despite the failure of the mitigation specialist. In addressing the performance of Broom's trial counsel, the Court found that "although Broom may have benefitted from some psychiatric explanation of the impact of his upbringing on his psyche, his counsel were not objectively unreasonable in failing to present this testimony because most, if not all, was presented in some form during mitigation." <u>Id</u>. at 408. The Court distinguished Broom from other cases where trial counsel were found to be ineffective, pointing out "[t]his is not a case in which counsel was or should have been alerted to additional probative evidence about the petitioner, and the counsel then failed to research the evidence." <u>Id</u>. at 409 (comparing <u>Broom</u> to <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005)).

Further, the Court explained that Broom's trial counsel had done significantly more than the trial counsel in <u>Harries v. Bell</u>, 417 F.3d 631, 638 (6th Cir. 2005), a case where the petitioner succeeded in an ineffective assistance of

counsel claim.  The Court distinguished Broom's trial counsel's conduct from the counsel in Harries, explaining that Broom's counsel had not "refuse[d] expert assistance or ignore[d] signs of mental illness.  Rather, Broom's counsel attempted to obtain psychological testimony[13] as well as the services of a mitigation expert in addition to contacting his family members, his school, and the prison.  Their actions were not objectively unreasonable."  In essence, the Broom court held that where trial counsel had made reasonable attempts to enlist the services of a mitigation specialist, and where counsel succeeded in presenting a substantial mitigation case, trial counsel acted reasonably, regardless of the performance of the approved mitigation specialist.

The facts and the circumstances of Brown's sentencing phase are analogous to Broom.  Brown's trial counsel pursued every available avenue of discovering and presenting mitigation evidence.  Trial counsel did not refuse expert assistance or ignore signs of mental illness.[14]  Furthermore, trial counsel presented a coherent picture of the background, upbringing, and social context of Brown's life.  Brown,

---

[13]  Broom's trial counsel had requested and received funds for a psychologist, but Broom stonewalled the mental health expert.  The Court held that the trial counsel did not act unreasonably in failing to seek out an additional psychologist after Broom's interaction with the first expert.

[14]  In fact, trial counsel sought and obtained funds for a pretrial psychological examination. [Doc 28, Doc 30]

441 F.3d at 1364.  Regardless of Blankman's performance, Brown has failed to demonstrate that trial counsel acted unreasonably.

With regard to his post-conviction mitigation specialist and "mental health experts," Brown points only to their belief as to his future dangerousness: They opine that he would not pose a danger to others if sentenced to life imprisonment. [CV Doc 51-Pgs 30-31] This ground has been plowed.  On direct appeal, Brown challenged the denial of funds for a future dangerousness expert, which the district court denied due to the availability of lay testimony on this issue.  Brown, 441 F.3d at 1364.  The Eleventh Circuit summarized the testimony of Alexis Andres and John Wilcher as follows:

> Brown presented the testimony of the Assistant Jail Administrator for Liberty County, who said that Brown had been a stellar inmate in the past, had no disciplinary problems while in jail, had been appointed a jail trustee (a position reserved for inmates with a positive attitude and a good disposition), had served admirably as a jail trustee, had never engaged in acts of violence while in jail, and had actively participated in church and choir activities while in jail.  Additionally, he presented the testimony of the Assistant Jail Administrator for Chatham County, who likewise testified that Brown had not engaged in any acts of violence or caused any disciplinary problems while he was housed in the Chatham County Jail.

Id. at 1364-65.  The Eleventh Circuit affirmed the denial of funds for a future dangerousness expert, finding that "the ample lay testimony presented on [future dangerousness], and the ease with which the jury could understand it."  Id. at

47

1365.  Brown cannot use his current motion to make an end-run around this finding.

Finally, in an attempt to demonstrate prejudice, Brown concludes that he had a trial "significantly different than the trial he might have had if represented by" effective counsel.  [CV Doc 57-Pg 31]  He relies on Williams v. Washington, 59 F.3d 673 (7th Cir. 1995), Collier v. Turpin, 177 F.3d 1184 (11th Cir. 1999), and Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527 (2003), for determining whether the trial was "significantly different," and thus whether a new trial is required.  Williams is so factually different from Brown's case that it offers little, if any, guidance on the principle matter.  In Williams, the petitioner, along with her husband, was accused of engaging in indecent liberties with a child.  The trial counsel called no witnesses other than the petitioner and her husband, and performed almost no preparation for the petitioner's case.  At the conclusion of the trial, the petitioner was sentenced to twelve years in prison; no capital sentence was sought.  The Williams court determined that the trial counsel had completely failed to investigate the petitioner's mitigation case, "in all of its manifestations." Williams, 59 F.3d at 682.  Brown's reliance on this case is misplaced.  He cites this case only because the Court concluded that the trial counsel was ineffective; he ignores all other dissimilarities.

Brown also relies on <u>Collier</u>.  Brown goes into greater detail in his analysis of <u>Collier</u>, explaining that several character witnesses were presented during the sentencing phase of Collier's case, but that the trial counsel was still found ineffective.  Brown correctly explains that quantity of mitigation witnesses alone is not enough to demonstrate reasonable conduct by trial counsel.  However, Brown ignores the basis for the Court's determination of unreasonable conduct by Collier's trial counsel.  In <u>Collier</u>, the trial counsel conceded that they were ineffective, but blamed the judge for their conduct rather than themselves.  Collier's trial counsel presented ten witnesses in less than ninety minutes.  During this minimal examination trial counsel asked irrelevant questions regarding the truth and veracity of the defendant, a matter of little importance outside of the guilt phase of the trial.  When trial counsel did deviate from the veracity questions, it primarily posed questions which "could not reasonably have aided the jury in its sentencing determination."  <u>Collier</u>, 177 F.3d at 1201.

Brown's trial counsel's conduct during sentencing is not in any way comparable to Collier's trial counsel.  During Brown's sentencing, trial counsel elicited testimony detailing Brown's upbringing, his personality, and his social context.  The Eleventh Circuit confirmed the comprehensive nature of trial counsel's presentation in its opinion on Brown's appeal.  <u>Brown</u>, 441 F.3d at 1364.

Brown points to <u>Wiggins</u> as a standard for determining whether trial counsel acted prejudicially. <u>Wiggins</u> can be distinguished from Brown's trial in a number of ways. First, the <u>Wiggins</u> trial court approved funds to the trial counsel for procurement of a forensic social worker, but counsel declined to utilize the funds. Second, trial counsel abandoned its investigation into Wiggins' social history after cursory review of the presentence investigation report, and ignored other available leads. Finally, Wiggins' trial counsel's failure to investigate was because of inattention rather than any strategic choices. Conversely, Brown's trial counsel requested and was denied funds for additional experts; Brown's trial counsel ramped up their investigation into mitigation as sentencing approached; and any error in investigation was not due to inattention, but unsatisfactory expert performance. <u>Wiggins</u> does not provide a basis for establishing prejudice in Brown's case.

<u>Williams</u>, <u>Collier</u>, and <u>Wiggins</u> did not deal with unsatisfactory performance by a mitigation specialist. Rather, each deals with clearly unreasonable conduct by the attorney representing the defendant at trial. In contrast, <u>Broom</u> directly addresses the issue at hand. Just as in <u>Broom</u>, Brown's trial counsel presented a thorough mitigation case in spite of the poor performance of the mitigation specialist. And just as in <u>Broom</u>, the Court should find that the petitioner has

failed to demonstrate that the trial counsel acted unreasonably or prejudicially.

This claim fails.[15]

## 5.  Defense counsel unreasonably and prejudicially failed to present expert mental health testimony and records, in violation of the Fifth, Sixth, and Eighth Amendments. [CV Doc 51-Pgs 33-50]

Brown contends that trial counsel acted unreasonably and prejudicially by failing to investigate Brown's mental health, by failing to present expert testimony on Brown's mental health during sentencing, and by failing to speak to the Government's expert in any meaningful manner.  To support this argument, Brown presents affidavits of two mental health experts who have identified various mitigating factors that could have been presented during the sentencing phase. [CV Doc 57-Pgs 34-39]  Brown also alleges that trial counsel failed to properly request funding for future dangerousness expert, James Aiken.  He then argues that trial counsel should have spoken with Government's witness Dr. Sally Johnson at greater length regarding her evaluation of Brown.

Finally, Brown argues that the failure of counsel to present mental health evidence during sentencing should not require a showing of Strickland prejudice.

---

[15]  The government raises a housekeeping matter.  Brown relies partly on the unsigned affidavit of Bobbye Gerard, who formerly worked Bell's secretary. [CV Doc 51-Pgs 28-29, n. 19] The government understands that Gerard refuses to sign that affidavit.  Thus, the Court should strike it and not consider its contents in this proceeding.

[CV Doc 57-Pg 49]   Alternatively, Brown argues, if prejudice is required, "case law indicates that the absence of a mental health expert at sentencing, or the poor performance of one, frequently results in a finding of prejudice."  [CV Doc 57-Pg 50]  Each of these arguments will be addressed in turn.

### a.  Brown's current expert opinions

Brown argues that two mental health experts have reviewed his background information and have examined him.  He claims that they have determined that he suffers from certain mental diseases or defects which could have been considered mitigating.  The experts group their findings under the headings: Social History; Mental Disease and Defect; Not an anti-social personality disorder; and, Not likely a danger in the future.  [CV Doc 57-Pgs 35-39]  As a general premise, Brown's presentation of additional expert testimony is not sufficient to show unreasonable conduct or prejudice.  See Reynolds v. Bagley, 498 F.3d 549, 557 (6th Cir. 2007)("a postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial.").  However, even if the Court determines that Brown's claims are sufficient to warrant deeper inquiry, the information provided by these experts is not adequate to demonstrate unreasonable or prejudicial conduct by trial counsel.

Under the heading "Social History," Brown's two experts generally describe

52

aspects of Brown's history that indicate that he was caring and that he is cognitively adept. The government addressed the lay testimony surrounding these issues in the section "Thumbnail Sketch of Brown's Life" of claim 4. Summarizing that section, Brown's caring attributes could have easily been considered a double edged sword which might have just as easily angered jurors as invoked sympathy. As for Brown's cognitive ability, whether Brown excelled in arithmetic, as described in the Brown's expert's affidavits, is inconsequential to the reasonableness of trial counsel's conduct. Additionally, it seems hard to imagine how the absence of mental health expert testimony on Brown's math skills created prejudice given the presence of intense aggravating factors.

The entire content of Brown's experts' discussion entitled "Mental Disease and Defect" consists of discussion of Brown's drug and alcohol use and dependency. As stated above, testimony regarding illegal substance abuse can just as easily aggravate as mitigate. In addition, Brown concedes that some testimony regarding his use of cocaine was given during the sentencing phase. Brown does not demonstrate unreasonable or prejudicial conduct regarding trial counsel's presentation of his drug and alcohol use.

Brown's experts make assertions under the heading "Not an anti-social personality disorder" regarding Brown's disposition as a child and his disposition

53

as an inmate.  Additionally, Brown's experts describe his outgoing personality. Testimony to the same effect was given by nearly every mitigation witness defense counsel introduced.  The information that Brown's experts detail is not new or additional, rather it is a restatement of the same testimony given by the mitigation witnesses.  Brown has failed to demonstrate how trial counsel's failure to provide additional testimony, which restates the same information provided by other witnesses is unreasonable or prejudicial.

Finally, under the heading "Not likely a danger in the future," Brown's experts claim that his character and good conduct while incarcerated indicate that he would not have posed a risk of future dangerousness.  Again, these experts are presenting information which was addressed thoroughly during the sentencing phase of Brown's trial.  Specifically, Alexis Andrews and John T. Wilcher testified about Brown's conduct while incarcerated.  [Doc 293-Pgs 1102-1114, 1125-1126] Indeed, the Eleventh Circuit found that the lay testimony adequately covered the issue of Brown's future dangerousness so as not to warrant expert testimony. Brown, 441 F.3d at 1364-65.

Failure to provide repetitive testimony is not unreasonable.  Even if trial counsel's conduct could be found to be unreasonable Brown has failed to demonstrate how the absence of this testimony resulted in prejudice.

**b. Request for future non-dangerousness expert**

Brown also claims that his trial counsel did not properly request funding for a future non-dangerousness expert James Aiken. Brown argues that trial counsel failed to present Aiken's credentials, and that this failure resulted in the trial court's decision to deny additional funds for the expert. This argument ignores the basis for the Court's two denials of funding. The Court first denied funding for the future dangerousness expert because it determined that the future dangerousness expert would duplicate the work of the mitigation specialist and the psychologist. The Court denied the funding the second time because it felt that the expert's testimony would duplicate the testimony of the other experts and fact witnesses. Brown points out that the second order, denying funds, determined that Aiken intended to testify on the prevention of future dangerousness generally, not Brown's individualized dangerousness. At no point did the trial court decide to deny funds because of trial counsel's presentation of Aiken's qualifications. The reasonableness of trial counsel's actions is not dependent on Aiken's subsequent affidavit describing his qualifications to testify. Rather, trial counsel's reasonableness should be based on counsel's conduct at the time of the trial. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Also, Brown has failed to demonstrate prejudice, given that Aiken would have provided information already

55

discussed by Andrews and Wilcher.  In any event, the Eleventh Circuit resolved this issue against Brown, see Brown, 441 F.3d at 1364-65, so he may not litigate it here.

### c.  Failure to speak to FMC Butner evaluators

Brown finally claims that trial counsel should have discussed Brown's evaluation at FMC Butner with the examining physician, Dr. Sally Johnson. Brown's counsel did not have access to this report prior to trial under Fed. R. Crim. P. 12., which is discussed in response to claim 7.

### d.  Prejudice

Brown, in anticipation that he will be unable to demonstrate prejudice, argues that his claim of ineffective assistance of counsel should succeed regardless of prejudice.  Specifically, Brown asserts that "[t]o have neither a mitigation investigator nor a mental health expert per force requires relief without a showing of prejudice." [CV Doc 51-Pg 49][emphasis added]

Brown cites United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039 (1984), as authority for his assertion that "[the failure of counsel to perform at all on the critical issue of mental health and capital sentencing] is equivalent to the absence of counsel on a critical issue in a capital case and ought to require per se reversal." [CV Doc 51-Pg 49]   The court in Cronic did not address whether there was any

parallel between performance of counsel regarding mental health and absence of counsel on a critical issue in a capital case.  Further, Cronic found that the circumstances in that case did not warrant reversal in the absence of a showing of actual ineffectiveness.  Id. at 2051.  The Cronic court held that the following are of the magnitude to show per se ineffective counsel: (1) the total absence of counsel, (2) an accused is denied counsel at a critical stage of proceedings (3) counsel fails to subject the prosecution's case to meaningful adversarial testing, or (4) circumstances are so prejudicial to accused that counsel could not render effective assistance.  Frazier v. Secretary for the Dept. of Corr's, 197 Fed. Appx. 868, 871 (11th Cir. 2006)(quoting Cronic, 466 U.S. at 659-61, 104 S.Ct. 2039).  However, the Court held that, apart from these circumstances, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors undermined the reliability of the finding of guilt.

Brown's position, that a specific showing of prejudice should not be required for failing to present evidence of mental health, is untenable.  In Frazier, the Eleventh Circuit made it clear that the Cronic standard of finding per se ineffectiveness without prejudice applies only to a "very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all."  Id. (quoting

Chadwick v. Green, 740 F.2d 897, 901 (11th Cir. 1984)).  Given the Eleventh

Circuit's view of Brown's trial counsel's presentation of mitigation evidence during

sentencing, counsel's conduct did not fall into the "narrow spectrum" of

particularly "egregious" conduct to which Cronic applies.

Brown argues in the alternative that if a showing of prejudice is required,

then "absence of a mental health expert at sentencing, or the poor performance of

one, frequently results in a finding of prejudice." [CV Doc 57-Pg 50]  Brown

reaches the conclusion that prejudice is *frequently* found in these circumstances,

but fails to provide any factual support for why this result should be the same in

this case.  Brown provides a list of cases; each case including a discussion of

mental health expert testimony, and each case including a finding of prejudice.

This list provides no analytical basis for concluding that prejudice existed in

Brown's case.  Ultimately, Brown fails to demonstrate any prejudice resulting

from trial counsel's conduct pertaining to mental health expert testimony.

**6.  The prosecutors committed misconduct in violation of the Fifth and Eighth Amendments. [CV Doc 51-Pgs 50-52]**

Brown's sixth claim has two parts.  First, he contends that the government

committed prosecutorial misconduct and violated Brady v. Maryland when it

disclosed a postal inspector's report thirteen days before trial. [CV Doc 8-Pgs 70-

71, CV Doc 51-Pgs 50-52] Second, Brown maintains that portions of the closing argument rendered the trial fundamentally unfair. [CV Doc 8-Pgs 71-73; CV Doc 51-Pgs 51-52] Each argument will be addressed in turn.

### a.  The postal inspector's report

On February 26, 2003, Postal Inspector T.E. Barnell submitted a report entitled "Background Investigation of Meier Jason Brown" for the government to use in rebuttal of Brown's mitigation case at the penalty phase of trial. [CV Doc 15][emphasis in original][16] The report described interviews with seven of Brown's family members [USAO1749-1752], Brown's education in the Liberty County school system [USAO1752-1753], the Fleming community [USAO1754-1757], Brown's employment history [USAO1757-1758], and Brown's stints on probation and parole. [USAO1759] Inspector Barnell submitted 37 exhibits – all memoranda of interviews that he conducted to prepare his report. [USAO1759-1762]

As the previous description of the report suggests, the information Inspector Barnell garnered had nothing to do with Brown's guilt or innocence, save for a single exception.  Barnell recorded this information about his interview with Sadie Brown:

---

[16]  Rather than cite to the page number of the document, the government will cite to the more prominent USAO number on the bottom of the page.

Ms. Brown stated that she did not believe that Meier Jason Brown could have killed the Postmaster. Ms. Brown was advised that we heard Meier Jason Brown's side of the telephone conversation on December 5, 2002 when he told her that he did. Ms. Brown stated that he said "Moma [sic] I love you" and repeated this again. Ms. Brown stated that he then said "it was an accident". Ms. Brown said that she has talked to him since then and he said he admitted killing the lady to keep Diane Brown from being arrested and taking her child away from her. Ms. Brown explained that Meier Jason Brown told her that he (Meier Jason Brown) was told Diane Brown would be arrested and they would take her child unless he admitted to killing the postmaster.

[USAO1766] This information came out at trial. Dietruchsun Davis, Brown's cousin, testified that he heard Sadie Brown's end of the conversation; she said, "Meier, where you at? Meier, you didn't kill that lady, no." [Doc 291-Pg 669]

In any event, Brown contends that disclosure of this report 13 days before trial violated Brady. To support his claim that the report contained exculpatory evidence, Brown catalogs that his minister and some Morgan relatives visited the Gaglia widower, that the interviewees typically said that he was not violent or temperamental, and that he had a good employment history and a minimal criminal record. [CV Doc 51-Pg 51; CV Doc 8-Pgs 13, 40, 44-46] Brown acknowledges that his trial counsel read the report, and then "picked some witnesses to testify, and put them on the witness stand." [CV Doc 8-Pg 56]

"[T]he suppression by the prosecution of evidence favorable to an accused

upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963). Brady does not obligate the government "to furnish a defendant with information that he already has or, with any reasonable diligence, he can obtain himself." United States v. McMahon, 715 F.2d 498, 501 (11th Cir. 1983). As for the evidence impacting on his conviction (i.e., a description of his phone call to his mother), Brown was a party to that call and thus aware of what was said. Brown also faults the government for not earlier producing information about his childhood, family, education, work history, and criminal past – about all of which Brown possessed superior knowledge. He can hardly argue that he was not aware of these things and consequently unable to obtain this information. See Smith v. Wainwright, 777 F.2d 609, 615 n. 5 (11th Cir. 1985)(noting no Brady violation for failure to turn over personal information because "[b]oth Smith's traumatic childhood and his institutionalization at the Arthur Dozier School for Boys are obviously part of his life history and, therefore, are matters of which Smith should be aware"). Brown's Brady claim fails.

### b. The prosecutor's closing arguments

The second part of Brown's prosecutorial misconduct claim concerns

statements made in the prosecutors' closing arguments at the sentencing phase. In analyzing these statements, the Court "must evaluate whether or not there is a reasonable probability that the result of the sentencing proceeding would have been different" absent any improper remarks. Duren v. Hopper, 161 F.3d 655, 663 (11th Cir. 1998). In its evaluation, the Court may consider whether the evidence against Brown at sentencing was overwhelming; whether the sentencing judge instructed the jury to confine itself to the evidence in recommending a sentence; and whether the prosecutor's remark was brief. Id.

As in Duren, the evidence against Brown was overwhelming. He confessed to murdering Gaglia. Brown, 441 F.3d at 1340-42. A medical examiner testified that Gaglia had been stabbed ten times, with two of the wounds potentially fatal within a short period of time. Id. at 1339. Investigators found a jacket at Brown's mother's house with blood stains that matched the DNA from Gaglia's blood. Id. at 1340. Investigators found at Diane's house a pair of shoes with a tread matching the distinctive shoe print left at the crime scene. Id. Brown killed Gaglia for postal money orders to pay Diane's mortgage and bankruptcy trustee. Id. at 1342. A cousin testified to Brown's mother's excited utterance on a telephone call, "Meier, you didn't kill that lady, no." Id. at 1340.

The prosecutors' remarks were proper. Even if not, there was

overwhelming evidence against Brown, and the challenged remarks were brief. An analysis of each remark follows.

i. "Sorry excuse of a human being"

Brown misstates one of the statements made in the rebuttal closing: He claims that the prosecutors said that "Mr. Brown was a 'sorry excuse of a human being. . . .'" [CV Doc 51-Pg 52][emphasis added] Here is what the prosecutor said:

> As Mr. Frentzen has pointed out to you, it is the real Meier Jason Brown [t]hat is shown in that bank video still from the First Union, leering and grinning with Diane Brown, that sorry excuse for a human being . . . .

[Doc 293-Pg 1197][emphasis added] As this excerpt demonstrates, "that sorry excuse for a human being" referred to Diane Brown, not Meier Jason Brown.

ii. "More value than words can express"

Brown (continuing his mistaken reference) next claims that the "sorry excuse for a human being" language was made worse by the prosecutor's describing Gaglia as having "more value than words can express." [CV Doc 51-Pg 52] The record again reveals that Brown has misconstrued the argument. Instead of comparing Gaglia's worth to Brown's, the prosecutor stressed that Gaglia's life had far more value than the relatively small sum of money leading to her demise.

The excerpted passage below immediately follows the one on the previous page:

> . . . [T]hey are exchanging the value of Sallie Gaglia's life[.] $1,175, plus what was in her[] wallet, equals one human life, who raised two fine boys, who was a wonderful wife to her husband, a wonderful sister to her sisters and brother, who was the pillar of the community, whose life had more value than words can [] express, and who never harmed a sole [sic] in her life . . . .

[Doc 293-Pgs 1197-1198] By describing Gaglia's life as worthy (and of a value in excess of $1,175), the prosecutor conveyed to the jury the impact of Gaglia's death on her family, which was proper. Cf. Duren v. Hopper, 161 F.3d 655, 662 (11th Cir. 1998)(finding "no impropriety in the prosecutor's remark concerning the impact on the victim's family" where prosecutor described loss as "profound").[17]

### iii. "Marching orders"

Brown next challenges the prosecutor's reference to Detective Woodall in the rebuttal closing argument, which was made in response to Brown's argument. [CV Doc 8-Pg 72; CV Doc 51-Pg 52] The Court should evaluate the prosecutor's comments in light of the defense argument that generated this response. See generally Darden v. Wainwright, 477 U.S. 168, 179 106 S. Ct. 2464, 2470 (1986).

---

[17] Although Brown botches the references both to his girlfriend and to the amount of money over which he killed Gaglia, he nonetheless suggests that this argument carried racial overtones – i.e., "[i]n the case of a black man convicted of killing a white women [sic] in rural Southeast Georgia, such comparisons of 'worth' speak unconstitutional volumes." [CV Doc 8-Pg 71] Nothing in the record supports that contention.

Detective Woodall testified at the penalty phase of trial. [Doc 293-Pgs 1159-1166] Woodall testified about his professional relationship with Brown and the crime-ridden, almost squalid conditions of his home life. [Doc 293-Pgs 1159-1163] Woodall apparently began to recommend to the jury that Brown receive a sentence of life imprisonment, until the prosecutor's objection cut him off. [Doc 293-Pg 1163] Woodall then stressed Brown's remorse during his tearful confession, although Woodall acknowledged that Brown was equally remorseful about Diane Brown and began sobbing only when "talking about himself."  [Doc 293-Pgs 1164, 1166] Brown made this argument about Detective Woodall:

> We heard from Detective Woodall in this case.  You know, he was one of the detectives that worked this case.  He knows about this case, and he knows the defendant, that he wanted to come in and say a few words for him.  He felt that it was important.  And I think it was important, too.
>
> I've been doing this quite a while.  And I certainly don't ever recall any detective on any case I've ever worked coming in and testifying on the behalf of a defendant.  I have never seen it happen.  I'm sure maybe he got some pressure from his coworkers.  I don't know.  But he is an honorable man and I appreciate what he did.

[Doc 293-Pgs 1191-1192]

> The prosecutor made this response:
>
> Now, Detective Woodall has had a relationship with Meier Jason Brown.  And in a small community like Liberty County, a detective on the police department or a sheriff's department is a very powerful

person. It is almost an exalted position. But Detective Woodall's power doesn't extend passed [sic] the confines of Liberty County. And you as a jury sitting here representing not only the Savannah Division of Federal Court with people from Liberty, Bryan, and Effingham and Chatham Counties, you speak a verdict for the Southern District of Georgia.

Judge Edenfield is a Judge of the United States District Court for the Southern District of Georgia. Mr. Frentzen and I are prosecutors for the United States Attorney['s] Office for the Southern District of Georgia. You do not take your marching orders from Detective Chuck Woodall of the Liberty County Sheriff's office.

And why has the Congress of the United States chosen to give a trial jury such as yourselves this ultimate, and this difficult power? Because some crimes are so horrible that the easy way out is not the right course to take. It is a difficult course where you go back into that jury room, and you discuss the case. And everybody sets their piece out. And everybody talks about just how much remorse Meier Jason Brown has shown for what is left of Sallie Louise Gaglia.

[Doc 293-Pgs 1196-1197]

The prosecutor's response was not improper. Although the remarks urged

the jury to discount Woodall's testimony, the prosecutor stressed that the jury,

which spoke "for the Southern District of Georgia," had to deliberate and reach a

verdict as to the death penalty. Cf. Davis v. Kemp, 829 F.2d 1522, 1529-30 (11th

Cir. 1987)(finding that prosecutor's argument that "[p]unishment can't be decided

by the Sheriff" proper where jury was instructed as to importance of task and

prosecutor informed jury that it alone could determine appropriate sentence);

Dutton v. Brown, 788 F.2d 669, 675 (10th Cir. 1986)(finding appropriate prosecutorial remarks that "merely underscored that the jury was part of the whole system of justice, and within that system it had a grave responsibility").  Brown has not demonstrated any error in counsel's failure to object on this ground.

iv.  "December 7, 1941"

Here is the final portion of the closing argument challenged by Brown:

> A community, a country can deal with dangers from without. December 7, 1941, we made a response.  September 11, 2001, we made a response.  I submit to you that November 30, 2002, calls for, demands a response which sanctifies, recognizes the life of Sallie Louise Gaglia and says by your verdict of the ultimate punishment that yes, your life has great value. . . .

[Doc 293-Pgs 1198-1199] The prosecutor then told the jury that it had a "difficult, difficult task" to undertake; urged it to "carefully, carefully weigh[] the evidence"; and stated that "[w]e expect the most careful consideration, sifting and thorough, of all the evidence in this case . . . ." [Doc 293-Pg 1199] Brown now deems the prosecutor's references to Pearl Harbor and 9/11 as "fundamentally unfair" and "creat[ing] an intolerable risk that the death penalty was imposed for improper and unconstitutional reasons." [CV Doc 8-Pg 73]

"[T]he fact that an argument by a defense counsel or prosecutor has emotional overtones does not independently indict it as improper."  Brooks v.

Kemp, 762 F.2d 1383, 1405 (11th Cir. 1985)(en banc), vacated, 478 U.S. 1016, 106 S. Ct. 3325 (1986), opinion reinstated, 809 F.2d 700 (11th Cir. 1987).  The prosecutor's argument here was a "war on crime" argument – albeit one that urged the jury to consider carefully the evidence in determining whether to sentence Brown to death.  The Eleventh Circuit considered a war on crime argument in Davis v. Kemp, 829 F.2d 1522, 1527 (11th Cir. 1987).  In Davis, the prosecutor "analogized the role of the jury and the role of soldiers fighting for their country" and said (in pertinent part) that

> . . . [I]n order to protect our country and preserve it, keep it where it is and keep it free, [soldiers] must occasionally go into battle and kill people.  It's the same principal that applies here, and I submit, Freddie Davis and people like him are just as much as an enemy of this country as soldiers who have fought against this country in war. In fact, even more because these soldiers are fighting for their own country.

Id. at 1527.  Distinguishing this argument from the one in Brooks, where the prosecutor suggested that the jurors should "forego an individualized consideration of Brooks' case and instead choose execution because he was part of the broad 'criminal element' terrorizing American society," Brooks, 762 F.2d at 1414, the Eleventh Circuit found that the Davis argument made no such suggestion.  Davis, 829 F.2d at 1527.  "Instead, the prosecutor emphasized the evidence in this particular case and the duty of the jury to impose a sentence of

death if they deemed it appropriate under the particular circumstances of the crime Davis committed." Id. While the prosecutor here asked for a "response," invoking military responses in great national tragedies, he stressed to the jury its need to weigh carefully the evidence, sift through the facts, and avoid a snap judgment ("we don't expect any decision in one hour on this matter"). [Doc 293-Pg 1199] Even if emotional, the argument was proper.

Alternatively, if the argument was improper, it did not render Brown's sentencing fundamentally unfair. In this analysis, the Court must evaluate these remarks in the context of the entire proceeding and determine "whether there is a reasonable probability that, but for those arguments, the death verdict would not have been given." Brooks, 762 F.2d at 1413. This single, brief comment was "isolated and certainly did not permeate the entire trial." United States v. Rodriguez, 765 F.2d 1546, 1560 (11th Cir. 1985)(finding prosecutor's reference in closing argument to lack of patriotism by Ramirez, a Cuban immigrant, was improper but that case against Ramirez was substantial and comment was an isolated one). Indeed, the prosecutors' closing arguments went largely to the aggravating factors to be considered by the jury, and in the rebuttal closing specifically, the prosecutor repeatedly reminded the jury to consider the evidence thoroughly and embark upon its decision with great care. [Doc 293-Pgs 1195-

69

1196, 1197, 1199] As in <u>Brooks</u>, 762 F.2d at 1415, the Court's instructions

"focused attention on the individualized facts and circumstances of the case,"

including the jury's consideration of mitigating and aggravating factors. [Doc 293-

Pgs 1201-1224]  As noted above, the evidence against Brown was overwhelming,

and the jury found the existence of all statutory and non-statutory aggravating

factors in reaching its verdict. [Doc 275-Pgs 3-4]

Ultimately, "the emphasis of the entire proceeding adequately insured that

the jury would base its decision on a consideration of the individualized facts

before it," not on the prosecutor's plea for a "response."  See <u>Brooks</u>, 762 F.2d at

1415.  Brown has not demonstrated that the penalty phase of his trial was

fundamentally unfair, so the Court should deny him §2255 relief on this ground.

**7.  <u>The Court and the government violated petitioner's Fifth, Sixth, and Eighth Amendment rights by not disclosing the government's mental health expert's report. [CV Doc 51-Pgs 53-54]</u>**

Prior to trial, Brown filed a "Notice of Intent to Introduce Expert Testimony

Relating to Mental Disease or Defect of [sic] any Other Mental Condition of the

Defendant Bearing on the Issue of Guilt or Punishment," which sought to reserve

the right to introduce testimony regarding his mental health "during the penalty

70

phase of trial." [Doc 161][18] The government responded by moving for a psychiatric or psychological examination of Brown in accordance with Fed. R. Crim. P. 12.2 and 18 U.S.C. §§4241(b) and 4242(a). [Doc 167]

The magistrate judge granted the government's request for an examination under Rule 12.2 and ordered that "the results and reports of the examination shall be submitted exclusively" to him. [Doc 172-Pg 3] The magistrate judge stressed that the report "MUST NOT BE DISCLOSED to any attorney for the government or the defendant until further order of the Court." [Doc 172-Pg 3][emphasis in original] The order concluded that as required by Rule 12.2(c)(2), "the results and report shall remain under seal and will not be disclosed to the parties unless the defendant confirms an intent to offer expert evidence on mental condition during the sentencing phase of the case." [Doc 172-Pg 3]

With these marching orders, Brown went to FMC Butner, where Sally Johnson, M.D., a consulting psychiatrist, and Carlton Pyant, a Butner staff psychologist, evaluated him. [Doc 234; CV Doc 25] Johnson and Pyant's report concluded the following:

Specifically in response to the question of the Court, it is this

---

[18] At a motions hearing, Brown's attorney clarified that there were no grounds for questioning Brown's competency to stand trial and that Brown would not pursue an insanity defense. [Doc 172-Pg 2]

evaluator's opinion that there is no specific mental condition that bears on the issue of punishment in a capital case. Mr. Brown does not appear to have ever suffered from a mental disease or defect which would render him unable to appreciate the nature and quality or wrongfulness of his acts such as might mitigate the punishment against him.

[CV Doc 25-Pg 17] As directed by the magistrate judge, Dr. Johnson sent this report under seal to Judge Smith, and the clerk filed the psychiatric report as a sealed document. [CV Doc 53-App. 8 at ¶3; Doc 234] The government had not seen a copy of this report until Brown attached it as an exhibit to his §2255 motion.

Despite the fact that the magistrate judge directed this psychiatric report not to be disclosed to the parties and that Dr. Johnson's affidavit says that she sent the report under seal to Judge Smith, Brown nonetheless accuses the government of prosecutorial misconduct for failing to turn over this report. [CV Doc 8-Pgs 73-74; CV Doc 51-Pgs 53-54] Because the magistrate judge and Dr. Johnson complied with Rule 12.2(c), Brown's claim fails.

When a capital defendant intends to introduce expert evidence relating to a mental disease, defect, or condition bearing on the issue of punishment, he must notify the government of this intention in writing. Fed. R. Crim. P. 12.2(b). After the government receives this notice, the Court may, upon the government's

motion, order a mental examination of the defendant.  Fed. R. Crim. P.

12.2(c)(1)(B).  Rule 12.2 also governs the disclosure of the results and reports of a

capital sentencing examination, to wit:

> The results and reports of any examination conducted solely under
> Rule 12.2(c)(1) after notice under Rule 12.2(b)(2) must be sealed and
> must not be disclosed to any attorney for the government or the
> defendant unless the defendant is found guilty of one or more capital
> crimes and the defendant confirms an intent to offer during
> sentencing proceedings expert evidence on mental condition.

Fed. R. Crim. P. 12.2(c)(2).  If disclosure occurs under Rule 12.2(c)(2), the

defendant "must disclose to the government the results and reports of any

examination on mental condition conducted by the defendant's expert about which

the defendant intends to introduce expert evidence."  Fed. R. Crim. P. 12(c)(3).

Under Rule 12.2, the magistrate judge properly ordered that the report

"MUST NOT BE DISCLOSED to any attorney for the government or the

defendant until further order of the Court." [Doc 172-Pg 3][emphasis in original]

Disclosure of this report never became an issue at the penalty phase because

Brown never "confirm[ed] an intent to offer during sentencing proceedings expert

evidence on mental condition."  Fed. R. Crim. P. 12.2(c)(2).  Thus, Brown has not

demonstrated prosecutorial misconduct based upon the government's failure to

disclose a report that had not been disclosed to the government.

After the government cited Rule 12.2 in its initial response, Brown made this claim: "[I]f Fed. R. Crim. P. 12.2(c)(2) requires non-disclosure of material exculpatory evidence to the defense, then it violates the Fifth and Eighth Amendments." [CV Doc 51-Pgs 53-54] It is difficult to characterize as exculpatory a report that concludes that Brown suffered from no mental disease or defect that might mitigate the punishment against him.  [CV Doc 25-Pg 17] Even assuming that this evidence was exculpatory, Brown has not demonstrated a constitutional violation.

Fifth Amendment challenges to Rule 12.2 have been rejected by various courts.  See United States v. Hall, 152 F.3d 381, 399-400 (5th Cir. 1998) (collecting cases from Second and Fourth Circuits to this effect), abrogated on other grounds, United States v. Martinez-Salazar, 528 U.S. 304, 120 S. Ct. 774 (2000).  Indeed, the rule itself was amended to address Fifth Amendment concerns raised in Estelle v. Smith, 451 U.S. 454, 101 S. Ct. 1866 (1981).  Estelle involved a defendant that did not introduce or express an intent to introduce psychiatric evidence at trial; nonetheless, the trial court ordered him to submit to a mental health examination, and the prosecutor presented information garnered from the examination to convince the jury to impose the death penalty.  Id. at 466, 1874. The Supreme Court thus held that the government could not introduce this

evidence in the penalty phase because the defendant was subjected to a mental health examination without being given a Miranda warning. Id. at 462-63, 1872-73. The Court allowed that a "different situation arises where a defendant intends to introduce psychiatric evidence at the penalty phase." Id. at 472, 1878. As currently written, Rule 12.2(c)(4) addresses the concerns of Estelle and provides for admission of the expert's report only if the defendant "has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2)." Fed. R. 12.2(c)(4)(B); see also 1983 Advisory Committee Notes (noting that rule "amended to more accurately reflect the Fifth Amendment considerations at play" in light of Estelle). In any event, neither party introduced this report at trial, so no Fifth Amendment violation occurred. Cf. United States v. Patane, 542 U.S. 630, 641-42, 124 S. Ct. 2620, 2629 (2004)(plurality op.)(finding that self-incrimination clause, as protected by Miranda, did not warrant suppression of firearm after defendant made voluntary but unwarned statements since "[p]otential violations [of Miranda] occur, if at all, only upon the admission of unwarned statements into evidence at trial").

Brown never elaborates on what Eighth Amendment violation occurred by his notifying the Court of his intent to present penalty phase evidence of his mental condition and by the Court's ordering an examination under the auspices of

Rule 12.2. [CV Doc 51-Pg 52] Unlike Brown's Fifth Amendment claim, the contours of a cruel and unusual punishment claim in this context are not immediately apparent. Absent further explanation by Brown, the government cannot address or analyze his conclusory claim.

**8. The death penalty is imposed in an arbitrary and discriminatory manner under the Federal Death Penalty Act ("FDPA"). [CV Doc 51-Pgs 55-61]**

Brown's eighth claim takes two permutations. First, Brown contends that statistical information suggests that "an African-American male charged with killing a white female in the South is more likely to receive the death penalty than any other combination of victim/defendant and race/gender," meaning that the imposition of the death penalty was discriminatory and in violation of the Fifth and Eighth Amendments. [CV Doc 51-Pg 60] Considering that Brown murdered a federal employee on federal property while the victim was performing her job duties, this statistical data is largely irrelevant. Second, Brown states that his case received "a very low amount of funding," which rendered a "substantially higher chance of ending with a death sentence than [] a case with average or higher funding." [CV Doc 51-Pgs 60-61] Brown's claims fail.

**a. Brown's statistical information**

Brown supports his claim about the death penalty's impact based upon race,

gender, and location of the parties with an unsigned declaration and copy of an

affidavit prepared by the Director of the Federal Death Penalty Resource Counsel

Project for use in another case. [CV Doc 53-Appendices 9-10]  The probative

value of these unsigned documents is minuscule.  Cf. United States v. Cortez, 757

F.2d 1204, 1208 (11th Cir. 1985)(finding no abuse of discretion where district

court refused to sever trial based upon defendant's showing, which consisted of

only unsigned affidavits).  Even if the Court considers these documents, the

Supreme Court and various circuits have denied similar claims based upon

statistical information.

   The Supreme Court described the Department of Justice's death penalty

policy as follows:

> In January 1995, the [DOJ] instituted a policy, known as the death
> penalty protocol, that required the Attorney General to make the
> decision whether to seek the death penalty once a defendant had been
> charged with a capital-eligible offense. . . The charging decision
> continued to be made by one of the 93 United States Attorneys
> throughout the country, but the protocol required that the United
> States Attorneys submit for review all cases in which they had
> charged a defendant with a capital-eligible offense.

United States v. Bass, 536 U.S. 862, 863, 122 S. Ct. 2389 at n* (2002)(per

curiam).

   Brown now has submitted a declaration that catalogs how many cases in

which Attorneys General Ashcroft and Gonzales did and did not authorize the death penalty and racial and gender characteristics of the victims, which can be summarized as follows:

**Gonzales authorized – 81**

| | |
|---|---|
| 52 | Black, Hispanic, other victims |
| 19 | White male victims |
| 10 | White female victims |

**Gonzales not authorized – 328**

| | |
|---|---|
| 271 | Black, Hispanic, other victims |
| 48 | White male victims |
| 9 | White female victims |

**Ashcroft authorized – 139**

| | |
|---|---|
| 86 | Black, Hispanic, other victims |
| 18 | White male victims |
| 34 | White female victims |
| 1 | No victim |

**Ashcroft not authorized – 487**

| | |
|---|---|
| 373 | Black, Hispanic, other victims |
| 87 | White male victims |
| 25 | White female victims |
| 2 | No victim |

[CV Doc 51-App. 9 at ¶8]

Brown also has attached an affidavit that contains this information.  The DOJ authorized capital prosecutions in 18% (435/2,407) of the cases it has reviewed.  [CV Doc 51-App. 10 at ¶6] The racial composition of the 435 capital defendants is as follows:

| | | |
|---|---|---|
| African-American | 223 | 51% |
| Caucasian | 115 | 27% |
| Latino | 78 | 18% |
| Other | 19 | 4% |

[CV Doc 51-App. 10 at ¶7] The affidavit further states that "[o]f the 61 federal

death sentences imposed by juries since 1988, 41 have come from the traditional 'death belt' states." [CV Doc 51-App. 10 at ¶8] The affidavit does not identify which states are "death belt" states, and its only mention of Georgia is that Georgia juries have returned 3 federal death sentences since 1988. [CV Doc 51-App. 10 at ¶8] Georgia is well behind the leaders – Texas (11), Missouri (8), and Virginia (6). [CV Doc-App. 10 at ¶8]

After quoting liberally from the declaration and affidavit, Brown concludes that "an African-American male charged with killing a white female in the South is more likely to receive the death penalty than any other combination of victim/defendant and race/gender" in violation of the Fifth and Eighth Amendments. [CV Doc 51-Pg 60] Brown also notes that "this was not considered properly to be a death penalty case by the relevant actors in Georgia," rendering the Attorney General's decision "an arbitrary Washington decision." [CV Doc 8-Pgs 74-75] For the reasons below, Brown's contentions fail.

### *Discovery*

Brown is not entitled to discovery on these claims, which are essentially selective prosecution assertions.  In United States v. Armstrong, 517 U.S. 456, 458,  116 S. Ct. 1480, 1483 (1996), the Court considered the showing necessary for a defendant to be entitled to discovery on a claim that the prosecutor singled

him out for prosecution based on race.  A selective prosecution claim is "an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."  Id. at 463, 1486.  The standard for selective prosecution is "a demanding one" because it asks a court "to exercise judicial power over a 'special province' of the Executive."  Id. at 464, 1486.  The Attorney General and United States Attorneys have "broad discretion" to enforce federal criminal laws, although that discretion is subject to constitutional constraints.  Id.  "A defendant may demonstrate that the administration of a criminal law is 'directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive' that the system of prosecution amounts to 'a practical denial' of equal protection of the law."  Id. at 464-65, 1486.  Thus, the claimant must show that a federal prosecutorial policy had a discriminatory effect and was motivated by a discriminatory purpose.  Id. at 465, 1487.  "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted."  Id.  The Court concluded that the defendant's showing – including an affidavit of an employee of the Federal Public Defender that averred all crack defendants represented by the office were black and a newspaper article  – did not suffice to warrant discovery on defendants' selective prosecution claim.  Id. at 471, 1489.

The Court later applied Armstrong in the death penalty realm.  In United States v. Bass, 536 U.S. 862, 122 S. Ct. 2389 (2002)(per curiam), Bass asserted that the government sought the death penalty against him because of his race. The appellate court determined that Bass had made a credible showing that similarly situated individuals of a different race were not prosecuted based upon Bass' providing nationwide statistics demonstrating that "the United States charges blacks with a death-eligible offense more than twice as often as it charges whites . . . ." Id. at 863, 2389.   The Supreme Court reversed the appellate court, making this finding:

> Even assuming that the Armstrong requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decision-makers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*.

Id. at 863-64, 2389 (emphasis in original).  As in Armstrong, the Court found that Bass' showing did not warrant discovery on his selective prosecution claim.

*No Eighth Amendment claim*

Beyond the discovery context, the Supreme Court has considered "whether a complex statistical study that indicates a risk that racial considerations enter into capital sentencing determinations proves that [a petitioner's] capital sentence is unconstitutional under the Eighth or Fourteenth Amendment." McCleskey v.

Kemp, 481 U.S. 279, 282-83, 107 S. Ct. 1756, 1762 (1987).  There, McCleskey, a

black man, killed a white police officer during a robbery in Georgia.  The jury

recommended, and the trial court imposed, a death sentence on McCleskey.  In his

federal habeas proceeding, McCleskey presented a statistical study that purported

to show a disparity in the imposition of the death sentence in Georgia based on the

race of the victim and (to a lesser extent) the race of the defendant.  Id. at 286,

1764.

The Court first considered McCleskey's equal protection claim, which it

described as follows:

> As a black defendant who killed a white victim, McCleskey claims
> that the Baldus study demonstrates that he was discriminated against
> because of his race and because of the race of his victim.  In its
> broadest form, McCleskey's claim of discrimination extends to every
> actor in the Georgia capital sentencing process, from the prosecutor
> who sought the death penalty and the jury that imposed the sentence,
> to the State itself that enacted the capital punishment statute and
> allows it to remain in effect despite its allegedly discriminatory
> application.

Id. at 292, 1767.  Like every other court that had considered similar challenges, the

Supreme Court rejected McCleskey's claim.  Id.

To prevail on an equal protection claim, McCleskey had to demonstrate that

the decision-makers in his case acted with discriminatory purpose.  Id. at 292,

1767.  Although the Court had accepted statistics as proof of intent to discriminate

in certain limited contexts, McCleskey's statistical showing was insufficient. Id. at 293, 1767. First, the decision to impose the death penalty "rest[s] on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of a particular offense" – rendering improper an inference of discrimination from general statistics. Id. at 294, 1768. Second, unlike in Title VII cases, the state of Georgia had "no practical opportunity to rebut the [] study": The jurors could not be called to explain their verdict, and the prosecutor had "wide discretion" in the death penalty decision, which counseled against calling them years after the fact to determine why that decision was made. Id. at 296, 1769. Moreover, it was not necessary to seek a rebuttal because "a legitimate and unchallenged explanation for the decision was apparent from the record" – i.e., McCleskey committed a capital offense. Id. at 297, 1769. Finally, "[i]mplementation of [the murder] laws necessarily requires discretionary judgments," and "[t]he unique nature of the decisions at issue . . . also counsels against adopting such an inference from the disparities indicated by" the statistics. Id. at 297, 1770. Thus, the Court found that McCleskey failed to prove a Fourteenth Amendment violation via statistics.

As for McCleskey's Eighth Amendment argument, the Court examined its precedent in death penalty cases and found that those decisions "have identified a

constitutionally permissible range of discretion in imposing the death penalty." Id. at 305, 1774. These precedents precluded McCleskey's argument that his sentence was "'disproportionate to the crime in the traditional sense.'" Id. The Court then rejected that McCleskey's argument that the Georgia capital punishment system was arbitrary and capricious in application due to the fact that racial considerations may influence those decisions. Id. at 308, 1775. McCleskey's "[s]tatistics at most may show only a likelihood that a particular factor entered into some decisions." Id. at 308, 1776. There is "some risk of racial prejudice influencing a jury's decision in a particular case," but statistics cannot serve as the "constitutional measure of an unacceptable risk of racial prejudice influencing capital sentencing decisions." Id. at 309, 1776. Capital sentencing requires "individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant," but the "inherent lack of predictability of jury decisions does not justify their condemnation." Id. at 311, 1777. The Court reached this conclusion:

> In light of the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants, we hold that the [] study does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process.

Id. at 313, 1778.

The Fifth Circuit considered FDPA claims in United States v. Jones, 287 F.3d 325 (5th Cir. 2002). Presenting statistics similar to Brown's, Jones argued that "the death sentence in his case was applied, in part, because of a 'systematic pattern of racial discrimination by the Attorney General of the United States,' which violated his rights under Fifth and Eighth Amendments." Id. at 332. The Fifth Circuit found that "[t]o make a substantial showing of the denial of a federal right in this instance, Jones must show that he was treated differently under the FDPA than others who were similarly situated." Id. Jones failed to meet his burden.

In seeking a certificate of appealabililty in district court, Jones relied on statistics in a DOJ report that showed federal death penalty sentences according to race, which (Jones said) demonstrated that he was the victim of racial discrimination. Id. at 333. The district court rejected his claim: The statistics did not show that he was singled out for prosecution, but similarly situated defendants were not, and nothing in the record showed selective prosecution. Id. On appeal, Jones claimed that the statistics demonstrated racial discrimination "because, of the six individuals on death row as of July 20, 2000, for having committed homicides involving interracial victims, five were black and one was white." Id.

Much like Brown's, Jones' statistics showed Attorney General Reno's death penalty determinations, to wit:

### Reno authorized – 159

| | |
|---|---|
| 44 | White defendants |
| 71 | Black defendants |
| 32 | Hispanic defendants |
| 12 | Other defendants |

Id.

The Fifth Circuit found that these statistics did not suffice to meet the threshold requirement that Jones was singled out for prosecution under the FDPA and that similarly situated defendants were not.  Id.  In this regard, "'the requirements for a selective-prosecution claim draw on ordinary equal protection standards.  The claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose.  To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted.'" Id., quoting Armstrong, 517 U.S. at 465, 116 S. Ct. 1480; accord United States v. Brimite, 102 Fed. Appx. 952, 956 (6th Cir. 2004)(finding that Brimite's recitation of statistics from death penalty prosecutions not relevant to establishing that similarly situated individuals of other races could have been prosecuted but were not).

As for Jones' claim that 5 of the 6 federal death row defendants were black

men involved in interracial murders, the Fifth Circuit analyzed statistics cited by

Jones – particularly the 159 interracial homicides considered by the Attorney General.

Jones, 287 F.3d at 334.  Here are the comparisons:

**Interracial homicides considered – 159     Interracial homicides/DP – 51**

| 20 | White defendants | 7 | White defendants |
|----|------------------|---|------------------|
| 87 | Black defendants | 30 | Black defendants |
| 39 | Hispanic defendants | 9 | Hispanic defendants |
| 13 | Other defendants | 5 | Other defendants |

Id.  Based upon these numbers, "the Attorney General selected approximately one-

third from each ethnic group except Hispanic, from which she selected about one-

fourth."  Id.

The Fifth Circuit thus rejected Jones' argument that the Attorney General

conducted interracial death penalty authorizations on a discriminatory basis.  Id. at

334-35.  It deemed "unconvincing" a "snapshot statistic of conditions on a single day,

without more."  Id. at 335.  Thus, these statistics did not demonstrate that "Jones was

singled out for prosecution under the FDPA, whether for an interracial homicide or

otherwise, but that others similarly situated were not."  Id.

Finally, the Fifth Circuit rejected an argument similar to Brown's "death belt"

claim.  Jones – a Texan –  blamed an "arbitrary factor of geography" for his death

sentence.  Id.  Specifically, he claimed that "although federal law applies equally

87

throughout the states, federal death penalty cases originate only or primarily from those states, such as Texas, that also have a high propensity to pursue the death penalty under state law." Id. The Court noted that state law had no effect on the federal prosecutions and that 49 of 94 federal districts recommended death penalty prosecutions. Id. Ultimately, Jones failed to show that any of those states, including Texas, influenced the United States Attorney's offices to prosecute, or refrain from prosecuting, death penalty cases. Id.

These cases demonstrate that Brown is not entitled to discovery on his selective prosecution claims and that Brown's Eighth Amendment challenge fails.

### b. Funding in Brown's case

According to Brown's figures, the Court paid $18,403 in expert costs and $144,421 in attorney's fees.[19]   [CV Doc 51-Pg 60] The second part of Brown's argument is that this funding was "significantly lower than the national mean for funding such cases" and that "there is a direct correlation between the amount of funds provided for the defense of a case and whether the defendant receives the death penalty." [CV Doc 51-Pgs 60-61] Brown cites nothing in support of these statements.

---

[19] The attorneys' fees figure appears to encompass only trial – and not appellate – work. From a review of the docket sheet in this case, neither Donald F. Samuel nor Jeffrey L. Ertel (Brown's appellate counsel) submitted CJA funding requests to the district court.

The only thing addressing these statements comes from trial counsel's affidavits.

First, Bell's affidavit states as follows:

> Ultimately we were provided approximately $18,800.00 for experts and investigators in this case.  This was broken down as follows: $2,250.00 for a blood splatter expert, Paul Kish; $1,500.00 for a psychologist, James Maish[,] to assess competency and sanity; $7,500.00 for a mitigation investigator, Laura Blankman; $525.00 for a shoe print expert, Kenneth Zercie[;] $2,000.00 for Ronald Ostrowski, a DNA expert[;] and $4630.00 for Frank Bennett, an investigator who mostly served subpoenas and interviewed the guilt phase witnesses.  <u>I was advised by Mr. Bruck [who was with the Federal Death Penalty Resource Counsel] that this was an extraordinarily low amount for preparing and presenting a complete defense in a federal capital trial.</u>

[CV Doc 53-App. 1 at ¶¶4, 11][emphasis added]  Darden adds these observations:

> It was understood that the Court was not going to provide much in the way of funds for experts and investigators and that the case was going to go to trial very quickly.  Very little money was provided, and the case went to trial fast.

[CV Doc 53-App. 4 at ¶7]

Brown's funding claims are puzzling.  First, neither of his trial attorneys claims that the Court refused to pay their fee applications as submitted, cut the number of hours on those applications, or otherwise provided a financial disincentive to prepare the case thoroughly. Second, as for expert funding, Brown asked for 10 experts and received funding for six of them, as demonstrated by the following chart:

| Doc | Motion | Order Doc | Mag. Judge | District Court |
|---|---|---|---|---|
| 5 | investigator[20] | 7 | granted | |
| 17 | blood pattern and crime scene reconstruction expert | 19 | granted | |
| 18 | mitigation specialist (to investigate Brown's family, background, social history) | 21 | granted | |
| 28 | psychological analysis/expert | 30 | granted | |
| 145 | DNA expert | 153, 162 | granted | |
| 150 | jury selection consultant | 153 | denied | no review sought |
| 151 | false confession expert | 153 | denied | no review sought |
| 152 | shoe print expert | 153, 162 | granted | |
| 174 | forensic social worker to explain social history of Brown's life | 195 | denied; duplicates work of mitigation specialist, psychologist | Appealed via doc 208.  Denied in doc 213 on same grounds as magistrate. |

---

[20] The Court later approved additional funds for the investigator. [Doc 160]

| 179 | expert on future dangerousness to prison staff and inmates | 195 | denied; unnecessary due to open access to prison, education, employment record | Appealed in doc 208, denied in doc 213; Brown may present this evidence via fact witnesses, psychologist, mitigation specialist. |
|-----|-----|-----|-----|-----|

Brown appealed the denial of funds for his forensic social worker and future dangerousness expert, and the Eleventh Circuit affirmed the denial of that funding on direct appeal. See Brown, 441 F.3d at 1363-65.

Brown never identifies what expert witnesses he wished to call or what additional time trial counsel wanted to spend in preparation for this case but could not do so because of funding concerns. To the extent that Brown broadly claims that trial counsel "unreasonably failed to spend sufficient time on this case, and failed effectively to seek necessary funding to investigate and present [his] defense," the government assumes that the particulars of these allegations are subsumed in Brown's other ineffective assistance of counsel claims and will address them as part of claim 9. [CV Doc 8-Pg 75]

## 9. Other instances of ineffective assistance of counsel. [CV Doc 51-Pgs 61-79]

Brown raises a laundry list of ineffective assistance of counsel claims in his initial motion [CV Doc 8-Pgs 76-101] and elaborates on some of those claims in his

comprehensive brief [CV Doc 51-Pgs 61-79] The government addresses each cluster of contentions in turn.   The paragraph citations in each heading refer to the paragraphs assigned to the contentions in Brown's motion [CV Doc 8] at pages 76-101.

> \*        **Failure to investigate leads suggesting Brown's innocence [¶¶2-11]**

Brown characterizes his theory of defense as "someone other than [he] did the crime." [CV Doc 8-Pg 76] After cataloging counsel's efforts to that end, Brown argues that counsel could have done more.

First, Penny Banks [¶4] told a postal inspector that she saw a small blue car parked in front of the post office about 10:45 a.m. on the day of the murder. [CV Doc 34]   Brown characterizes Banks' statement as relaying "information that someone other than Mr. Brown was at the scene at the time of the crime." [CV Doc 8-Pg 78] At 10:45 a.m., however, Jennifer Zech and her boyfriend, Stephen Nichols, had their Hyundai Elantra (a small car) parked in front[21] of the post office as they discovered Gaglia's body. [Doc 291-Pgs 584, 600-601] The volunteer firefighter who first responded to the post office testified that "[t]here was a car sitting there" when she arrived. [Doc 291-Pg 616]  Bowen and Kania, the witnesses who saw Brown riding

---

[21]  Nichols testified that it was on the left-hand side of the post office. [Doc 291-Pg 601]

near the post office, placed him there between 10:25 and 10:35 a.m. [Doc 291-Pgs 627-629, 644-645] Given that the car described by Banks appears to be the car driven by the people who discovered Gaglia's dead body, Banks' statement does not aid Brown's case.

The next three claims raised by Brown – about Pastor Alfred Banks, Alford Woods, and Levi Lecounte [¶¶5-7] – all go to leads provided to authorities. [CV Doc 8-Pgs 78-80] Banks, for instance, said he saw "a white Lincoln leaving the area at a high rate of speed." [CV Doc 51-Pg 72] Lecounte is "a convicted felon with a long history of violent criminal behavior [who] lived in the area and drove a white Lincoln." [CV Doc 51-Pg 72] In discovery documents produced to trial counsel, the confidential source who informed authorities about Brown told investigators that "the Lincoln had nothing to do with it. . .the Lincoln was in the area Saturday morning 'doing things you guys don't approve of.'" [CV Doc 40-Pg 2]  It is hard to fault trial counsel for failing to independently investigate these leads where the leads had been disproved by police and their client confessed to murdering Gaglia, was found with shoes with a tread matching the distinctive footprint on the postal counter, and had in his possession money order receipts from the ones stolen from Gaglia.  Indeed, the Eleventh Circuit noted "the overwhelming evidence of Brown's guilt."  Brown, 441 F.3d at 1350.  Given these factors, counsel did not perform deficiently when they did

not corroborate Banks, Woods, and Lecounte's claims.  See generally Strickland, 466 U.S. at 690, 104 S. Ct. at 2066 (stating that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").

A forensic examination by the postal inspectors showed that "[a] single hair fragment exhibiting Negroid racial characteristics was recovered from the decedent transport sheet. . ." but that one of Brown's hairs had not been offered for comparison purposes. [CV Doc 38]  Brown next deems trial counsel ineffective for failing to argue the government's animus in failing to pursue a hair comparison ("the Government was not interested in finding the true perpetrator") and for failing to have the hair analyzed by an independent defense expert. [¶¶8-9] Again, the government had substantial arrows in its quiver – a confession, a DNA analysis – and Brown had little to gain by pushing for the government to obtain more evidence against him. Counsel could have reasonably feared that the Negroid hair on Gaglia's body would have matched Brown's hair.

Brown's next argument misstates factual information.  He contends that McLendon's search warrant affidavit recites information, attributed to the confidential source ("CS"), that is not contained in memorandum of interview ("MOI") prepared after talking with the CS. [¶¶10-11] In that MOI, prepared on

December 3, 2002, the CS called the Liberty County Sheriff's Office with information about Gaglia's murder and said that Brown did it because he needed money. [CV Doc 40]

> Brown asserts that the following language is contained in neither of the MOI:
>
> Brown stated he went over the counter in the Post Office and surprised the lady coming from the restroom and had to kill her because she knew him. Brown threw the knife into a wooded area while riding the bicycle from the Fleming Post Office south on Fleming Loop Road back to the Morgan Residence.

[CV Doc 8-Pg 82; CV Doc 39-¶7]

This recitation accurately paraphrases the information contained in the MOI. With regard to the first sentence in the search warrant affidavit, the MOI states as follows:

> [The CS] said Brown went through the box at the counter line. He said the woman may have been in the bathroom, then surprised him when she came out of the bathroom, she knew him.

[CV Doc 40] With regard to the second sentence, the MOI again conveys substantially the same information:

> [The CS] said the weapon may be in the woods. They said Jason threw it in the woods near the log cabin house with the green roof. They said he came back that way.

[CV Doc 40] This description apparently sufficed to pinpoint where the CS said that Brown threw the knife. Rather than "glaring discrepanc[ies]" and misrepresentations,

95

the search warrant affidavit paraphrases information obtained from the CS.

**\*      Failure to secure Diane Brown's presence at the evidentiary hearing [¶¶12-14]**

The government analyzes these arguments in conjunction with Claim 12. Rather than repeating that analysis, the government incorporates it herein.

**\*      Erroneous charge of court [¶15]**

Brown has withdrawn this claim in light of the record of the case. [CV Doc 51-Pg 68, n. 32]

**\*      Plain error review on appeal [¶¶16-21]**

Brown next contests a number of issues resolved against him on direct appeal. [CV Doc 8-Pgs 86-91] He contends that he received ineffective assistance based upon trial counsel's failure to object in district court, which resulted in plain error review on appeal.  Recent Eleventh Circuit precedent dooms his claim:

> When a claim of ineffective assistance is based on a failure to object to an error committed by the district court, that underlying error must at least satisfy the standard for prejudice that we employ in our review for plain error. . . It would be nonsensical if a petitioner, on collateral review, could subject his challenge of an unobjected-to error to a lesser burden by articulating it as a claim of ineffective assistance.

Gordon v. United States, 518 F.3d 1291, 1298 (11th Cir. 2008).   Thus, the Eleventh Circuit has rejected Brown's argument that "[c]ontrary to plain error, *Strickland* prejudice is a  much easier burden to satisfy." [CV Doc 51-Pg 65]   To the extent that

the Eleventh Circuit found no plain error in the claims discussed below, Brown cannot succeed on a §2255 petition by repackaging those claims under plain error rubric.

### *The DFACS records (¶17)*

Brown subpoenaed the Liberty County Department of Family and Children Services ("DFACS") for the production of "[a]ny and all material relating to Sadie Brown and/or Roy Morgan [Brown's mother and half-brother], their living and health circumstances, and any information regarding their residence. . . ." [Doc 232-Appendix A] DFACS responded with a motion to quash, arguing that this confidential information could be released only upon issuance of a court order. [Doc 232-Appendix A at ¶¶2-3] After considering DFACS' files *in camera*, the magistrate judge granted the motion to quash on this basis:

> . . . the Court has determined that they contain no information relevant to defendant's case and no information that would warrant disclosure of these typically confidential records.  In fact, defendant's name is not even referenced in any of these records . . . .

[Doc 239, Doc 249-Pg 1]  On direct appeal, the Eleventh Circuit found that it lacked jurisdiction to review the magistrate judge's order because Brown did not appeal the ruling to this Court.  Brown, 441 F.3d at 1352.

As contemplated by Gordon, Brown cannot meet the prejudice standard

required for plain error based upon trial counsel's failure to appeal the magistrate

judge's order to this Court.  The prejudice prong of plain error requires a showing that

an error affects a party's substantial rights, "which almost always requires that the

error 'must have affected the outcome of the proceedings.'" United States v.

Rodriguez, 398 F.3d 1291, 1299 (11th Cir. 2005).  The defendant bears the burden

of persuasion to show prejudice, and this burden "is anything but easy."  Id.  The

error must "actually make a difference: . . . if the effect of the error is uncertain so that

we do not know which, if either, side it helped the defendant loses."  Id. at 1300.

Here, the magistrate judge found that the DFACS records contained no mention

of Brown's name, "no information relevant to [Brown's] case and no information that

would warrant disclosure of these typically confidential records." [Doc 249-Pg 1]

Brown represents that the "DFACS files, although not mentioning [him] by name,

describe the horrific conditions, documented by agents of the State of Georgia, that

[he] grew up in." [CV Doc 51-Pg 67] Again, the fact that Brown grew up in "horrific

conditions" has never been in dispute; trial counsel "presented fourteen witnesses

who testified about Brown and his childhood," including "the deplorable conditions

under which he was raised."  Brown, 441 F.3d at 1364.  Given the questionable help

of the DFACS records and the ample evidence of Brown's childhood and home

presented in the penalty phase, Brown cannot shoulder his heavy burden of showing

prejudice.  His ineffective assistance claim fails in this regard.

### The Motion to Prevent Death Qualification (¶18)

Brown asserts that the Eleventh Circuit found that it was "'without power to consider'" the argument concerning Brown's motion to prevent death qualification voir dire that the magistrate judge denied and trial counsel did not appeal to this Court.  [CV Doc 8-Pg 87] Brown ignores the very next sentence of the Eleventh Circuit's opinion: "Nevertheless, even if the issue were properly presented to us, we would readily reject the argument on the merits."  Brown, 441 F.3d at 1353.  Based upon Lockhart v. McCree, 476 U.S. 162, 106 S. Ct. 1758 (1986), the Eleventh Circuit found that Brown's claim failed because "the district court properly death-qualified the jury before the guilt phase of trial."  Brown, 441 F.3d at 1353.

Brown is entitled to no relief on his ineffective assistance claim based upon a failure to preserve this argument.

### The Motion for Bifurcated Voir Dire (¶19)

As for his motion for bifurcated voir dire, Brown contends that "the Eleventh Circuit found that trial counsel's failure [to appeal the magistrate judge's ruling to this Court] deprived [the Eleventh Circuit] of 'jurisdiction to consider the ruling on appeal.' *United States v. Brown,* 441 F.3d at 1353." [CV Doc 8-Pg 87]  Brown again fails to note the very next sentence of the opinion: "But, even if the parties are correct

that the issue has been properly presented, Brown's argument fails on the merits."

Brown, 441 F.3d at 1353.  After analysis of the case law and the Federal Death

Penalty Act, the Eleventh Circuit reiterated that "even if the question were properly

presented, we would be constrained to reject it." Id. at 1354.  Having obtained plain

error review, Brown cannot relitigate this issue under the rubric of ineffective

assistance.

### *Questioning during voir dire (¶20)*

As he did on direct appeal, Brown challenges the Court's phrasing of questions

during voir dire. [CV Doc 8-Pgs 87-90] As Brown acknowledges [CV Doc 8-Pg 90],

the Eleventh Circuit reviewed this claim for plain error.  See Brown, 441 F.3d at

1354-56.  The appellate court found that "[t]here was no error, plain or otherwise,"

and that even if there were, this Court explicitly corrected any error by properly

instructing the jury before deliberations. Id. at 1355-56. Given the resolution against

Brown under a plain error standard on direct appeal, Brown's ineffective assistance

claim premised on a failure to preserve this error fails.  See  Gordon, 518 F.3d at

1298.

### *Tamara Brewer (¶21)*

In individual voir dire of Tamara Brewer, the transcript reflects this statement

by the district judge: "Now, you understand that the defendant has entered a plea of

guilty." [Doc 291-Pg 499] Neither party objected, and on direct appeal, the Eleventh Circuit reviewed this claim for plain error. Brown, 441 F.3d at 1357-58. The Court primarily attributed the error to a transcription error, but even if this Court misspoke, the appellate court determined that it did not affect Brown's substantial rights. Id. at 1358. Again, this plain error review by the Eleventh Circuit requires denial of Brown's ineffective assistance claim premised on the failure to preserve an objection.

### * Dorothy Rentz (¶22)

The government disputes Brown's assertion that the Court and counsel did not subject a juror, Dorothy Rentz, to voir dire and questioning about the death penalty. The government maintains that Rentz was subject to voir dire and that the government has written evidence to substantiate this proposition. The government acknowledges that the Court must hold an evidentiary hearing to resolve this limited issue.

### * The instruction about a mitigating factor (¶23)

Brown next contends that his trial attorneys should have objected to this definition of a mitigating factor given by the Court: "A *mitigating* factor is any fact or circumstance that might indicate, or tend to indicate, that the sentence of death may

not be justified." [CV Doc 8-Pgs 91-92; Doc 293-Pg 1058][22] According to Brown,

"[t]his instruction, like the Court's questioning during voir dire, presupposes that

once a guilty verdict is reached, death is automatically the appropriate punishment

and a life sentence can only be imposed if the jurors find mitigation that warrants it."

[CV Doc 8-Pg 91] Brown concludes that this instruction and the voir dire "relieved

or lessened the Government of its burden of proving that a death sentence is

appropriate." CV Doc 8-Pgs 91-92]

Brown ignores the remainder of the preliminary charge in the penalty phase.

Among other things, the Court instructed the jury as follows:

> Now, as in the guilt phase of the trial, the burden here is on the
> government to prove both that the defendant is eligible for the death
> penalty and that the death penalty is justified. The law does not require
> the defendant to prove that the death penalty is undeserved or that the
> life sentence is more appropriate. Nor, is he required to produce any
> evidence at all; and, if the defendant elects not to testify, you cannot
> consider that in any way in your deliberations.

[Doc 293-Pg 1058] After defining "mitigating factor" for the jury, the Court then

stressed in its preliminary instructions that the government carried the burden of

proof. Additionally, with regard to the voir dire questioning, the Eleventh Circuit

---

[22] Although unchallenged by Brown, the Court gave a similar definition of "mitigating factor" in its final penalty phase instructions to the jury immediately before it listed the nine mitigating factors to be considered by the jury. [Doc 293-Pgs 1210-1212]

pointed to a later instruction that cured any defect: It "plainly told the jury that it could impose a life sentence even if it found no mitigating factors and explicitly made clear that a jury is never required to impose a death sentence." Brown, 441 F.3d at 1355-56.[23]

Because the Court reminded the jury that the government had the burden of proof and later gave an instruction informing the jury that it was never required to impose a death sentence, Brown's challenge to the definition of "mitigating factor" employed in the preliminary penalty phase instructions fails.

**\* The prosecutor's closing argument (¶24)**

Brown next challenges this portion of the closing argument in the guilt phase of trial, which Brown mistakenly identifies as the "penalty phase closing":

> But the postal inspectors led by Ms. McLendon here, who takes her job seriously, as did every Post Office employee that you saw take this stand, and just like a captain in the United States Army, when they have one of their people down in the field, they're going to bring them back and they're going to do everything they can do lawfully and properly so that justice is done, so that a proceeding like this is conducted by this Judge in a courtroom like this, with equipment like this, so you can make a fair, proper, reasoned, calm decision that follows the law that Judge Edenfield will soon give you. . . .

[Doc 293-Pg 1036; CV Doc 8-Pg 92] This argument, in the rebuttal closing, was in

---

[23] The instruction that the Eleventh Circuit cited is found at page 1213 of the trial transcript.

response to Brown's argument that the government's case did not amount to proof beyond a reasonable doubt and that the government's evidence did not "move the meter." [Doc 293-Pgs 1021-1034] Immediately before the quoted remarks, the prosecutor challenged Brown's assertions about "the unvarnished, occasionally clashing, unsubsidiary, secondary, substantially unimportant things about the evidence in this case." [Doc 293-Pg 1035]

Brown now maintains that this argument both constituted impermissible prosecutorial vouching and referenced the military "while the United States was engaging in the 'War on Terror' after the attacks on the World Trade Center" in "a deliberate attempt to appeal to the passions and prejudice of the jury." [CV Doc 8-Pg 92]

*Vouching*

First, the prosecutor's statement did not constitute impermissible prosecutorial vouching. Vouching occurs when "the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness's credibility." United States v. Cano, 289 F.3d 1354, 1365 (11th Cir. 2002). To apply this test, the Court considers whether "(1) the prosecutor placed the prestige of the government behind the witness by making explicit assurances of the witness's credibility, or (2) the prosecutor implicitly vouched for the witness's credibility by implying that evidence

104

not formally presented to the jury supports the witness's testimony." United States v. Castro, 89 F.3d 1443, 1457 (11th Cir. 1996). "The prohibition against vouching does not forbid prosecutors from arguing credibility, which may be central to the case; rather, it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." United States v. Hernandez, 921 F.2d 1569, 1571 (11th Cir. 1991). Vouching claims are subject to harmless error review, and require reversal only where the prosecutor's remarks were improper and prejudiced the defendant's substantive rights. United States v. Hernandez, 145 F.3d 1433, 1438 (11th Cir. 1998).

Here, the trial prosecutor's argument responded to Brown's insinuation that the government's case had been sloppily compiled, with many holes in the evidence. The trial prosecutor stressed the postal inspectors' care, but the prosecutor "did not suggest that the jury ought to find [the inspectors] credible because [they were] government agent[s] or because the government found [them] credible." United States v. White, 2008 WL 747616 at *10 (11th Cir. March 21, 2008)(unpub.) (suggesting no improper vouching where "prosecutor reminded the jury of [the agent's] lengthy experience as an agent and of the details of his investigation of the case"); cf. United States v. Wilkerson, 411 F.3d 1, 8 (1st Cir. 2005)(finding no improper vouching where government argued, in response to defense counsel's

assertions that the officers fabricated their stories, that if the officers had wanted to lie, they could have lied more effectively).

Alternatively, even if these remarks constituted improper vouching, any error was harmless. As the Eleventh Circuit found (with regard to Brown's photo identification claim), there was "overwhelming evidence of Brown's guilt, including Brown's confession, the recovered money orders, and the DNA samples of the victim's blood found on his jacket. . . ." Brown, 441 F.3d at 1350. Thus, Brown's claim fails in this regard.

### *The military references*

The trial prosecutor likened Inspector McLendon to "a captain in the United States Army, when they have one of their people down in the field, they're going to bring them back . . . ." [CV Doc 8-Pg 92] Brown characterizes this military reference as an incantation of the War on Terror – and a deliberate attempt to inflame the jury. [CV Doc 8-Pg 92] Brown's supposition is not a natural one: It is a far leap to go from an Army reference to the War on Terror. In any event, the argument was not improper, but even if it was, it caused no harmful error.

Statements in a closing argument "calculated to inflame the jury" and "to persuade the jurors to render a decision based on their emotional response to [a defendant's] behavior, rather than the evidence introduced at trial" are improper.

106

United States v. Hands, 184 F.3d 1322, 1333 (11th Cir. 1999)(finding improper closing argument due in part to prosecutor's multiple repetitions of words "monster," "vicious," "wicked," and "maniac").  The trial prosecutor's argument – likening a postal inspector to an Army captain – is nowhere near the caliber of argument in Hands.  Here, too, the Court instructed the jury prior to closing arguments that "anything the lawyers say is not evidence in the case" and that "[w]hat the lawyers tell you is not binding upon you." [Doc 293-Pg 993] These instructions may rectify any improper prosecutorial statements.  See United States v. Jacoby, 955 F.2d 1527, 1541 (11th Cir. 1992).  Although these statements were innocuous, even assuming error, it was harmless due to the overwhelming evidence of Brown's guilt.  This claim fails.

### * Matthew Meuller's DNA testimony (¶¶25-26)

Brown next contends that the government elicited irrelevant testimony from Matthew Meuller, a DNA analyst with Bode Technology Group, in that Meuller testified that he had done DNA work following the September 11, 2001, attack on the World Trade Center. [CV Doc 8-Pgs 92-93] Brown also asserts that trial counsel failed to object to Meuller's quantifying his results. [CV Doc 8-Pgs 93-95] Neither argument has merit.

*Meuller's work on the World Trade Center DNA (¶25)*

The government qualified Meuller, a DNA analyst with Bode, as an expert witness. [Doc 292-Pgs 855-859] After asking about Meuller's educational background, continuing education, number of DNA samples analyzed, the type of DNA analysis performed by Bode, and Bode's casework, the trial prosecutor asked this question, and Meuller replied, as follows:

Q.    Was the Bode Technology Group recently involved in some high profile DNA analysis?

A.    Yes. Actually, most recently, we were involved with identifying some remains from the World Trade Center tragedy in New York.

[Doc 292-Pg 859] At that point, Bell volunteered, "If it may help, we're not going to make a Daubert challenge." [Doc 292-Pg 859] The trial prosecutor then noted that "the jury is entitled to hear about his experience," and the Court responded, "That means you can spend less time qualifying him. But you have every right to demonstrate his expertise." [Doc 292-Pg 859] Although Meuller's testimony was mentioned by the government in its initial closing argument [Doc 293-Pg 1005], the quoted testimony was the only reference to Bode's involvement in the World Trade Center identifications. Brown now claims that this testimony was "a blatant attempt to inflame the passions of the jury," and that his trial counsel's failure to object constituted ineffective assistance of counsel. [CV Doc 8-Pg 93]

108

The government's question was proper, so trial counsel's failure to object did not constitute deficient performance. First, to give expert testimony, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This question went to Meuller's experience. Second, Brown fails on the prejudice prong. This question was a single question in a murder trial. The government did not attempt to capitalize on any connection between Meuller, Bode Technology Group, and the World Trade Center. Instead after considering all of the evidence – the overwhelming evidence – against Brown, the jury convicted him of murdering Sallie Gaglia. Brown's ineffective assistance claim fails.

*Quantifying the results (¶26)*

The Eleventh Circuit summarized Meuller's testimony[24] that Brown now deems objectionable:

> . . . [Meuller] testified that the DNA profile of those samples matched the DNA profile of Sallie Gaglia's blood. He further stated that the probability of randomly selecting an unrelated individual with the same DNA profile is one in 25 quadrillion . . . from the Caucasian population and one in 100 quadrillion from the African-American population, leading him to conclude that "within a reasonable degree of scientific certainty, Sallie Gagila [sic] is the source of the major component profile obtained from the . . . jacket."

Brown, 441 F.3d at 1340. Brown maintains that trial counsel should have prevented

---

[24] This testimony is found at pages 873-876 of the trial transcript.

Meuller "from quantifying his results and effectively informing the jury that there was absolutely no chance the DNA could belong to anyone but the victim." [CV Doc 8-Pgs 94-95]

Courts rely on quantified DNA results.  See, e.g. United States v. Bennafield, 287 F.3d 320, 324-25 (4th Cir. 2002); United States v. Wright, 215 F.3d 1020, 1027-28 (9th Cir. 2000); cf. Brown, 441 F.3d at 1340. This evidence was relevant: It had a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." See Fed. R. Evid. 401. Relevant evidence is inherently prejudicial – but warrants exclusion only if "its probative value is substantially outweighed by the danger of unfair prejudice." See Fed. R. Evid. 403; see also United States v. Edouard, 485 F.3d 1324, 1346 (11th Cir. 2007)(noting inherent prejudice of relevant evidence). Brown may not like this testimony, but he never argues (much less demonstrates) why it was unfairly prejudicial.

In his comprehensive brief, Brown also claims that the counsel should have objected to the Court's eliciting testimony that a quadrillion – a million billion – would be nine times the earth's population. [Doc 293-Pgs 874-875; CV Doc 51-Pg 76] Brown says that this clarification "prevented the jury from harboring (if they were so inclined) any doubt." [CV Doc 51-Pg 76] Again, this clarification was relevant to

110

the understanding of what a quadrillion was, and at the conclusion of the guilt phase, the Court instructed the jury not to assume from any of its statements that it had any opinion on any of the issues in the case. [Doc 293-Pg 993]  If Brown's objection here is an ultimate issue claim, an expert "in the form of an opinion. . . otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704(a).

**\* Brown's IQ (¶¶28-29)**[25]

Brown's claim about his IQ stem from this exchange between the prosecutor and Linda Jones, Brown's ninth-grade teacher and a defense witness:

Q.    Ms. Jones, are you aware that Mr. Brown was tested to have a 113 IQ?

A.    No, sir.  That was not what his permanent record stated.

Q.    What did that state?
. . . . . .

A.    When I looked at it, it had a 99.

Q.    Okay.  How does that – how does a 99 –

A.    That is average.

Q.    Were you aware that later on he was tested to have a 113 IQ?

A.    No, I'm not.

---

[25]  There is no paragraph 27; Brown's claims skip from 26 to 28. [CV Doc 8-Pgs 93, 95]

111

[Doc 293-Pg 1130]

Brown now grouses that his IQ is not above average and that counsel should have objected because "the jury was led to believe, in the penalty phase of trial, that [Brown] was well above average intellectually, instead of at or below average (which is clearly mitigating)."   [CV Doc 8-Pg 95; CV Doc 51-Pg 77] Brown also contends that the prosecutor lacked "a good faith basis to believe [Brown] had a 113 IQ as the records from FCI Butner indicated an IQ of 90." [CV Doc 51-Pg 76] As discussed in response to claim 7, the government did not have access to the FMC Butner records prior to trial by virtue of Fed. R. Crim. P. 12.2, so Brown's latter claim is unfounded.

Again, Jones testified that Brown had an IQ of 99 – an average IQ.  [Doc 293-Pg 1130] The FMC Butner report, obtained by Brown in preparation for his §2255 motion, states that he has an "IQ score of 90 which falls in the Average range of intellectual functioning." [Doc 234-Pg 15] Thus, the only testimony about Brown's IQ was that it was average, which jibes with the Butner report.  The trial prosecutor's questions were not testimony, as the Court instructed the jury during the guilt phase. [Doc 293-Pg 993][26] Because the evidence was that Brown had an average IQ, his

---

[26] Brown cites notes made by the foreperson, Bruce Little, with this notation in the margin : "113 IQ Above Average." [CV Doc 33-Pg 4] For the reasons set forth in the discussion of claim 1, the Court should not consider these notes in Brown's attempt to impeach the verdict.

contention of being sentenced based on materially inaccurate information fails. [CV Doc 51-Pg 77]

Brown argues that Darden compounded the dispute over his IQ by acknowledging that he did not know Brown's IQ. [CV Doc 8-Pg 95; CV Doc 51-Pg 77] Here are Darden's remarks in context:

> This murder was not planned, ladies and gentlemen. *They talked about my client having an IQ of 113. And I don't know whether this is the case or not.* But I will say this. My client doesn't have the ability to organize a murder. Obviously, if he did, he would never have been arrested. But if you just think about it for a moment, he lives near the Post Office. Everybody knows him. He gets on the bicycle. He takes a knife. He puts socks on his hands, and he rides a bicycle down to the Post Office and commits a robbery. Gets on the bicycle and rides back home.
>
> Now, is that the plan of someone that is going to commit a murder? You need to think about that. That is insane. That's not a plan of someone who is premeditating to do anything. . . .

[Doc 293-Pgs 1186-1187][emphasis added to highlight challenged remarks]

Taken in its entirety, Darden's argument was directed toward the threshold eligibility requirements defining "the defendant's intent and role in committing the offenses" – like whether Brown acted intentionally in killing or inflicting serious bodily injury on Gaglia, or intentionally participating in an act where lethal force or violence would be used. [Doc 293-Pgs 1204-1205] Darden sought to spare his client's life by arguing that Gaglia's murder had not been planned. Indeed, the trial

prosecutor made this acknowledgment in rebuttal:

> And if you believe Meier Jason Brown and his version of what happened, as set forth in his December 6th confession that the killing was an accident, then that is probably the appropriate decision you should make. If you believe the defendant's story that this was a terrible accident, then the crime doesn't warrant the ultimate sanction.
>
> But if you don't believe that is what took place here, then you've got a difficult task to wrestle with.

[Doc 293-Pg 1196] The fact that Darden did not know Brown's exact IQ is irrelevant.

### * Darden's closing argument (¶¶30-32)

Brown also takes issue with Darden's penalty phase closing argument, specifically Darden's dislike of arguing the case, forgiveness arguments, and reference to Brown as the killer. [CV Doc 8-Pg 96; CV Doc 51-Pgs 77-79]

First, the "hate" comment – taken in context – reflected Darden's acknowledgment of how difficult it was for an attorney to argue a death penalty case, not "just how much he disliked representing the 'killer' who should not be forgiven" (as Brown says). [Doc 293-Pg 1180; CV Doc 8-Pg 96] Reviewing that portion of the argument in its entirety, Darden worried about what to say to the jury since the issue had been reduced to a moral one and that he and Brown had done everything they could to avoid trial. [Doc 293-Pg 1180] Here are the comments leading up to and

114

following his "hate these days" remark:

> What we're really talking about here is justice. And it is a difficult thing to explain. It really is. I mean, what words do you use to try to explain to someone what justice and mercy is? You really have to look into your heart for that.
>
> I don't think lawyers are trained to do this. I don't know who is. Unfortunately, we have to do it. This is our responsibility. *I hate these days*. I've done this before and I absolutely hate it. This is an awesome responsibility.
>
> I have been representing this man for a year. I know him. Life is precious. And I don't want you to kill him. It is just that simple. Life is just too precious.

[Doc 293-Pgs 1180-1181][emphasis added to highlight challenged remark]

Darden's argument clearly did not inform "the jury just how much he disliked representing the 'killer' who should not be forgiven when he said 'I hate these days. I've done this before and I absolutely hate it.' (Tr. 1180)." [CV Doc 51-Pgs 77-78] Instead, Darden acknowledged the "awesome responsibility" placed on him in the quest to obtain "justice and mercy" from the jury for his client.

Second, Brown asserts that Darden "misinformed the jury that the victim's family had not forgiven Meier when they did." [CV Doc 51-Pg 77] The government adopts its response to claim 2 herein. Even if certain members of Gaglia's family believed that life imprisonment would be a just fate for Brown, that is a far cry from forgiving Brown for murdering their wife, their mother, their sister. In any event,

taken in context, Darden's argument was proper.  Immediately before his discourse on forgiveness, Darden argued, "You are absolutely never, never required to come with a vote for [the] death penalty under any circumstances.  I don't care how bad the circumstances are.  You have that individual choice.  And you are not required to do so." [Doc 293-Pg 1182] Darden then reminded the jury that its role was "to administer justice to everybody that is involved in this case" and that "this case is not the worst of the worse" so as to warrant the death penalty. [Doc 293-Pgs 1182-1183]

> Finally, Darden's reference to the "killer" was as follows:

> [The prosecutor] tells you that Meier did not show this victim mercy.  I agree.  He did not.  But, you know, we have a better understanding of mercy than the killer does.  If we don't we shouldn't be in the courtroom.  And if we don't, that is not showing justice.  That is revenge.  And it is absolutely wrong.

[Doc 293-Pg 1184] Again, taken in context, Darden asked the jury to show mercy on his client.

Brown relies on two cases, King v. Strickland and Horton v. Zant, in an attempt to prove that he received constitutionally ineffective assistance of counsel. [CV Doc 51-Pgs 78-79] These cases are significantly different.  In Horton, defense counsel called no witnesses and introduced no evidence in the sentencing phase of a capital trial.  Horton v. Zant, 941 F.2d 1449, 1461 (11th Cir. 1991).   In addition to presenting no mitigating evidence, counsel called his client a "worthless man," said

that the prosecutor's closing "made me hate my client," and told the jury that the attorneys were appointed and merely doing their "civic duty." Id. at 1462.  These facts demonstrated deficient performance.  Id. at 1463.  Horton demonstrated prejudice since he had mitigating evidence that could have been presented and since his "counsel's argument to the jury raise[d] the distinct possibility that [counsel] . . . encouraged rather than discouraged the jury to impose the death penalty."  Id.

Similarly, in King v. Strickland, 714 F.2d 1481 (11th Cir. 1983)("King I"), vacated, 467 U.S. 1211, 104 S. Ct. 2651 (1984)(vacating for consideration in light of Strickland v. Washington), on remand, King v. Strickland, 748 F.2d 1462 (11th Cir. 1984)(adhering to prior decision)("King II"), "counsel admitted that he was unprepared for the penalty stage of trial, because he had not adequately discussed sentencing with his client nor had he carefully searched for mitigating evidence." King I, 714 F.2d at 1490.  Thus, counsel called a single witness in the mitigation case, although he reminded the jury of two guilt phase witnesses and relayed a conversation that counsel had with King's prior attorney.  Id. at 1490.  King's attorney then "made a closing argument that may have done more harm than good," unnecessarily stressing the horror of the crime and his status as an appointed representative.  Id. at 1491.  "In effect, counsel separated himself from his client, conveying to the jury that he had reluctantly represented a defendant who had committed a reprehensible

crime." Id. The argument, combined with the lack of mitigating evidence, denied King effective assistance of counsel. Id.; King II, 748 F.2d at 1464-65.

In contrast, counsel here called "fourteen witnesses who testified about Brown and his childhood," including the "deplorable conditions under which Brown was raised, noting that there were frequent fights in his home, that his parents used drugs, that his father left the home after shooting his stepson when Brown was seven, that a child died at Brown's home after drowning in a septic tank, and that the police were frequently called to break up fights, shootings, and stabbings." Brown, 441 F.3d at 1364. Rather than calling his client "worthless" or suggesting that he was only at trial because he had been appointed, Darden told the jury that he knew Brown and did not want the jury to kill him. [Doc 293-Pgs 1180-1181] Darden argued that the statutory aggravating circumstances did not apply. [Doc 293-Pgs 1185-1186] He stated, too, that the murder had not been planned or premeditated. [Doc 293-Pgs 1186-1187] Darden then discussed the mitigating factors, noting that the defense witnesses were "important" to the jury's understanding of "where Meier came from." [Doc 293-Pg1187] Darden went through the mitigating factors. [Doc 293-Pgs 1188-1191] He also said that Detective Woodall's testimony on Brown's behalf was the first time in his extensive career that he had seen a police officer testify for a defendant. [Doc 293-Pgs 1191-1192] Darden encouraged the jury to hold it against him, not Brown, for

"anything [he said or did] during this case that offends any of you . . . ." [Doc 293-Pg 1192] In short, Darden presented evidence in mitigation and argued to save Brown from the death penalty.

Brown cannot show deficient performance or prejudice in the closing arguments.  His claim should be denied.

### * The 33 conclusory allegations (¶33)

In its preliminary response, the government argued that the 33 instances of ineffective assistance of counsel were merely conclusory allegations insufficient to support Brown's bid for §2255 relief.  See Caderno v. United States, 256 F.3d 1213, 1217 (11th Cir. 2001), citing Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991)(petitioner unentitled to habeas relief when claims raised are merely "'conclusory allegations unsupported by specifics'" (cit. omitted)); see also United States v. Jones, 614 F.2d 80, 82 (5th Cir. 1980)(wholly conclusory claim unsupported by factual allegations or proof is without merit and may be denied without hearing); Ward v. United States, 486 F.2d 305, 306 (5th Cir. 1973)(upholding district court's denial of relief under section 2255 since petitioner failed to set forth specific facts in support of his conclusory claims); Rodriguez v. United States, 473 F.2d 1042, 1043 (5th Cir. 1973)(no hearing required where petitioner alleged no facts to establish truth of claims beyond bare conclusory allegations).  In response, Brown listed three claims

that "have merit on their face," to wit:

   1)    counsel's failure "to make adequate and timely requests for continuances in order to prepare for trial";

   2)    counsel's failure to "make sufficient showing of need to obtain funds for expert assistance"; and

   3)    counsel's failure "to adequately protect [Brown's] constitutional rights during all stages of [his] trial including, but not limited to, [his] rights under the Confrontation Clause. . . The record in this case is devoid of the information needed to determine if the prosecution utilized their peremptory challenges in a racially or gender motivated manner in violation of Batson v. Kentucky . . . or J.E.B. v. Alabama ex rel T.B. . .

[CV Doc 51-Pg 70]

   *Failure to move for a continuance*

   The first claim – concerning continuances – appears to be triggered by defense counsel's receipt of a report prepared by the postal service and given to defense thirteen days before trial. [CV Doc 51-Pg 70; CV Doc 53-Appendix 1 at ¶10, Appendix 4 at ¶9] Darden avers that "We did not ask for a continuance after receiving the report because we knew that the judge would not continue the case." [CV Doc 53-Appendix 4 at ¶9] This report has been discussed in conjunction with claim 6, and it contained evidence about Brown's background – of which he had unique knowledge. Given the substance of this report, Brown's claims of prejudice ring hollow.

   The record also demonstrates that trial counsel also asked for a date certain for

120

trial. At the September 9, 2003, pretrial conference, Darden asked "if we can perhaps come to some type of an agreement today as [to] a projected date" for trial since he and Bell had "a lot of other cases." [Doc 259-Pg 18] Darden then requested a starting date of November 10, but the Court had other obligations and scheduled the trial to begin the week of November 3. [Doc 259-Pgs 18-19] At the October 2, 2003, status conference, the Court commented, "Still November 3rd is the date," and Darden replied, "Yes, sir, we're ready." [Doc 298-Pg 3] Although Brown claims that he received the postal inspector's report 13 days before trial, (again) it contained evidence about his life and background, which was equally (if not more) available to him than the government.

### *Failure to make proper showing of need for funds*

The government has addressed this argument in response to claim 5, and it refers to that argument to demonstrate why there is no deficient performance or prejudice here.

### *Failure to safeguard constitutional rights*

Brown's claim asserts that trial counsel "failed to adequately protect [his] constitutional rights during all stages of [his] trial including, but not limited to, [his] rights under the Confrontation Clause." [CV Doc 51-Pg 70] Brown does not specify what witnesses he was unable to confront, so the government is at a loss at how to

respond to his claim.  Brown previously raised claims under the Confrontation Clause on direct appeal – involving the testimony of Darlene Washington and Dietrechsun Davis in the guilt phase, and Catherine Webb in the penalty phase – but the Eleventh Circuit resolved these claims against him.  See Brown, 441 F.3d at 1358-61.  To the extent Brown seeks to rehash those claims here, he cannot do so.  See  United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000).

The second part of Brown's claim is that "[t]he record in this case is devoid of the information needed" to determine whether the government's peremptory challenges violated Batson or J.E.B. [CV Doc 51-Pg 70] The only illumination of this claim that Brown offers is in conjunction with claim 17 of his initial motion, where he claims that the attorneys' discussions about peremptory strikes was not recorded. [CV Doc 8-Pg 119] The government incorporates its response to claim 17 herein to demonstrate why counsel rendered constitutionally effective assistance of counsel.

**10.  The government suppressed information favorable to the defense in violation of the Fifth, Sixth, and Eighth Amendments to the Constitution. [CV Doc 51-Pgs 79-82]**

Brown next maintains that the government suppressed material exculpatory evidence when it failed to disclose a draft of a search warrant affidavit. According to Brown, this draft "contained a paragraph that was relevant to [his] penalty phase defense – that he, through no fault of his own, was raised in a chaotic, depraved, and

violent environment." [CV Doc 51-Pg 80] Paragraph 12 of the draft affidavit states

as follows:

> During my investigation into this matter, I have coordinated closely with
> members of the Liberty County Sheriff['s] Department, Hinesville, Ga.
> They have reported to me during the past several years [that] they have
> had many occasions to meet with an interview various occupants of the
> residence described in this affidavit. It is the collective opinions of
> these local law enforcement officers that on nearly every instance there
> was excessive amounts of alcohol or illegal substances in use by persons
> residing [at] or visiting the residence. On many of these occasions, the
> purpose of the visits by law enforcement were for crimes of violence in
> which weapons were often used to inflict serious harm to other persons
> at or in the residences. On almost every occasion, persons in the
> residences routinely flee at the site [sic] of arriving law enforcement
> officers.

[CV Doc 42-¶12] This paragraph was not in the final version of the search warrant

affidavit. [CV Doc 39] As a draft, too, it should not automatically be deemed

established fact.

Nonetheless, as argued in response to Claim 6, Brady does not obligate the

government "to furnish a defendant with information that he already has or, with any

reasonable diligence, he can obtain himself." McMahon, 715 F.2d at 501. Brown

undoubtedly was aware of the alcohol, drugs, violence, and weapons at his home.

Indeed, he called 14 witnesses to testify in the penalty phase about his childhood and

the "deplorable conditions" under which he was raised. See Brown, 441 F.3d at

1364. Detective Woodall, for instance, detailed a number of professional visits to the

123

home.    [Doc 293-Pgs 1159-1166] To the extent Brown argues that the draft demonstrates that Postal Inspector McLendon "would have testified under oath" as to these matters,  her testimony about what the Liberty County Sheriff's Department told her about the Morgan compound would not have tipped the balance: There is no reasonable probability of a different outcome at trial.  See United States v. Bagley, 473 U.S. 667, 678, 105 S. Ct. 3375, 3381 (1985)(recognizing that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial"). Brown is not entitled to relief on this claim.

## 11.  Mr. Brown's convictions and death sentences were imposed based upon unreliable DNA evidence in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. [CV Doc 51-Pgs 104-105]

At the trial in November 2003, Matthew James Meuller, an analyst with Bode Technology Group, testified that DNA testing indicated that blood stains on Brown's jacket matched Gaglia's blood. [Doc 292-Pgs 865-867] According to Meuller, the probability of randomly selecting an unrelated individual with this DNA profile was 1 in 25 quadrillion in the Caucasian population and 1 in 100 quadrillion in the African-American population. [Doc 292-Pgs 873-874][27] Mueller concluded that Gaglia was the source of the DNA material on the jacket. [Doc 292-Pg 876]

---

[27]  A quadrillion is a million billion. [Doc 292-Pg 875]

Brown's §2255 motion made this claim:

> Since that time it has been determined that analysis done at the Bode laboratories is unreliable.  *See,* Illinois: STATE POLICE CANCEL DNA ANALYSIS PACT, Crime Control Digest, Aug 26, 2005. Because of Bode's incompetence, the State of Illinois revoked its contract with the company and admitted that approximately 1,200 samples that Bode had previously tested in the criminal context, would have to be retested.

[CV Doc 8-Pgs 104-105] Citing again to the "Crime Control Digest," Brown's brief also asserts that "Bode Technology Group analysts failed to identify <u>semen</u> in more than 20 percent of 2,000 tissues taken from rape crime scenes." [CV Doc 51-Pg 83][emphasis added] Brown does not attach the "Crime Control Digest" to support his claims.

Courtesy of the internet,[28] undersigned counsel found an article in the <u>New York Times</u>, available at <u>www.nytimes.com/2005/08/20/national/20lab.html,</u> discussing Bode's failure to recognize semen on evidence which is attached as Exhibit A.  Bode's general manager subsequently sent a letter to customers, dated February 17, 2006, and available at <u>www.bodetech.com/documents/Bode_ISO-ISP_Letter_to_Customers.pdf,</u> attached as Exhibit B, making these statements:

> In addition, I would like to provide you with information regarding our

---

[28]  On June 24, 2008, counsel googled the phrase "Bode Technology Group Illinois" and found the two documents cited in the text.  Counsel also has attached the newspaper article and letter from Bode to which she refers.

contract with the Illinois State Police (ISP). As we shared with you previously, the Illinois State Police announced in August 2005 their intent to terminate their contract with Bode. At the time of that announcement, there was significant publicity and some suggestions that the decision was made because of quality of our work. The concern that the ISP had was related to the sperm searches we performed, not our DNA analysis. We worked closely with the ISP to address their concerns while ensuring our ability to provide the very best possible service. Unfortunately, the ISP ultimately decided to cancel the contract but I am pleased to inform you that we have no outstanding issues with the ISP.

As acknowledged by Brown, the Illinois State Police's dissatisfaction sprang from forensic services related to sperm and semen. [CV Doc 51-Pg 83] This case did not involve sperm or semen analysis, and Brown never identifies (no matter how sketchily) any problems with Bode's DNA analysis. It is also hard to fault the trial prosecutors and defense counsel for failing to prognosticate that two years after trial Bode Technology Group would lose a single contract with a law enforcement agency based upon a method of analysis completely irrelevant to the case.

Even putting aside these issues, Brown still cannot demonstrate prejudice. Irrespective of the DNA evidence, evidence supporting his conviction included his verbal and recorded confessions [Doc 292-Pgs 911-915, 930-963; Govt's Exs 32-B, 32-C, 32-D]; his tennis shoes, which had a distinctive tread similar to an imprint on the postal counter [Doc 292-Pgs 842, 906]; and the receipts from, and a bank videotape of Brown and his girlfriend cashing – within hours of the murder – the

postal money orders that cost Gaglia her life. [Doc 292-Pgs 727-728, 842, 906; Govt's Ex 20] Even if Bode's sperm-analysis woes somehow affect a trial that occurred two years before those woes began, ample evidence still supported the jury's finding of guilt.

**12. Petitioner's convictions and death sentence were unconstitutionally obtained as a result of an unreliable coerced confession in violation of Miranda v. Arizona, and the Fifth, Sixth, and Eighth Amendments to the United States Constitution, and counsel ineffectively presented this issue. [CV Doc 51-Pgs 84-86]**

On direct appeal, Brown challenged the denial of his motion to suppress, claiming that he was in custody (and thus required Miranda warnings) when he first confessed to police at Diane Brown's house on December 5, 2002. [CV Doc 50-Exhibit A at 52-72] The Eleventh Circuit rejected that argument. See Brown, 441 F.3d at 1343-1349. Brown testified at the suppression hearing, but Diane did not. Her trial testimony gave her version of Brown's interview by investigators. [Doc 292-Pgs 736-759] Brown now contends that he received ineffective assistance when his trial attorneys failed to secure Diane's presence at the suppression hearing. [CV Doc 51-Pgs 84-86]   Brown also distinguishes between the voluntariness and reliability of his confession. [CV Doc 51-Pgs 85-86]

### a. Facts

On December 5, 2002, at 3:45 p.m., eight law enforcement officers arrived at

Diane Brown's residence. [Doc 292-Pg 901] An officer in the front yard had a shotgun for the initial contact with the occupants of the house; after that point, officers remained, but the shotgun returned to the squad car. [Doc 302-Pgs 64-65] Other officers knocked on the door, but no weapons were drawn. [Doc 292-Pg 901] Meier Jason Brown answered; Postal Inspector Rushwin spoke to Diane in another room; and although investigators had a search warrant, they conducted the search with Diane's consent.  [Doc 292-Pgs 902-903; Doc 302-Pgs 66, 99-100]

Inspector Rushwin walked through the house and spied a pair of shoes with a tread similar to that on the postal counter. [Doc 302-Pgs 71-72; Doc 292-Pgs 904-905] Rushwin then identified himself to Brown, told Brown that he was investigating Gaglia's murder, explained that investigators were talking to people that may have been in the post office that day, and asked Brown, who was sitting in the living room and smoking, if he would speak with investigators. [Doc 292-Pg 906] Brown agreed. [Doc 292-Pg 906] Rushwin "advised [Brown] that he was not in custody.  He wasn't under arrest, and that he was free to go at any time." [Doc 302-Pg 41]

After Rushwin said that they would talk at the Chatham County Police Department, Brown went to retrieve his shoes.  [Doc 302-Pgs 41-42] In accordance with his standard operating procedure during searches, Rushwin followed Brown. [Doc 302-Pg 42] Brown reached for his shoes – the same pair that Rushwin noticed

128

earlier – and Rushwin said that the officers would be taking them as evidence. [Doc 302-Pgs 41-42] Brown, who did not have another pair, did not want to go to the police station in his stocking feet, and agreed to talk to officers at Diane's house. [Doc 302-Pgs 42-43]

Rushwin and Brown sat down at the dining room table. [Doc 302-Pg 43] Given Brown's acquaintance with Detective Woodall of the Liberty County Sheriff's Department, Rushwin decided to wait for the detective to come to Diane's house. [Doc 302-Pgs 43-44] While awaiting Woodall, Rushwin "again informed Jason that he wasn't under arrest, not in custody, and he was free to go at any time." [Doc 302-Pg 44] During the wait, Brown "sat around and smoked, and did whatever he wanted to do." [Doc 302-Pg 44] Detective Woodall arrived around 5:00 p.m. [Doc 302-Pgs 59, 71] During interviews, Detective Woodall neither carried a weapon nor allowed other officers to carry weapons. [Doc 302-Pg 97]

After Detective Woodall and Brown exchanged small talk, Detective Woodall and Rushwin again told Brown "that he wasn't under arrest, in custody and, you know, he was free to leave at any time." [Doc 302-Pgs 46] Brown said he understood. [Doc 302-Pg 46] Detective Woodall elaborated:

> . . . I told him initially he was not under arrest.  I told him numerous times that – I mean, that he was free to leave.  Several times he asked about getting things.  And we talked about – I told him specifically he

could do anything he wants. We were in his house with his consent and the consent of the young lady.

[Doc 302-Pg 95] Brown did move about the house, and Detective Woodall, sensing that Brown did not like talking in front of people,[29] asked Brown if he would be more comfortable in another room. [Doc 302-Pg 95] Brown agreed, and while the men moved to the TV sitting room, Brown got a soda and a cigarette. [Doc 302-Pg 50] Inspector Rushwin recalled pauses in the questioning: "[Brown] smoked. He drank sodas, watched television at one point. He and I talked about the Atlanta Falcons, and small talk at times, too." [Doc 292-Pg 915]

Brown eventually confessed to murdering Gaglia. [Doc 302-Pg 52] At some point, he asked to talk to his mother and to Diane. [Doc 302-Pg 53] "And he was told . . . that he could do whatever he wanted to do, and had been told that throughout the interview." [Doc 302-Pg 53] While Brown spoke to neither woman at that time, he later called his mother (without asking for permission to use the phone) and spoke to Diane alone in the room. [Doc 302-Pgs 53, 57-58] With that one exception, a law enforcement officer always remained in Brown's presence. [Doc 302-Pg 75]

Inspector Rushwin placed Brown under arrest at 9:14 p.m. that evening

---

[29] Describing this point of the interview, Inspector Rushwin testified that the search was going on, "there was a lot of law enforcement people in there," and "Diane Brown would go back and forth," looking at Brown – all of which distracted Brown and "broke up the interview." [Doc 302-Pgs 49-50]

(approximately four hours after the interview began), advised Brown of his Miranda rights, and took a formal statement from Brown. [Doc 302-Pgs 59-60; Doc 292-Pg 914]  On the way to the Liberty County jail that night, Detective Woodall contacted the deputy transporting Brown to see if Brown was hungry; Brown "asked [Woodall] to stop by and get him a couple of hamburgers with anything but mayonnaise and onions." [Doc 302-Pgs 89-90] Woodall did. [Doc 302-Pg 90] The next morning, having been advised of his Miranda rights again, Brown made the tape-recorded confession that was played at his trial. [Doc 302-Pgs 90-92; Doc 292-Pgs 297-963; Govt's Exs. 32-B, 32-C, 32-D]

Brown testified at the suppression hearing. [Doc 302-Pgs 123-140] According to him, the police had their guns drawn when he answered the door, and the officers said, "Police, search warrant." [Doc 302-Pg 124] An officer grabbed Diane, and another one directed him to sit in a chair, where he looked out a window and saw officers with pistols and one with a shotgun. [Doc 302-Pg 125] The police never told him that he could leave. [Doc 302-Pg 126] Brown admitted that the officers let him smoke and drink sodas. [Doc 302-Pg 133] Brown, however, suggested that he confessed because "[t]he officer said they were going to lock [Diane] up, and take her child." [Doc 302-Pg 128] Before being transported to jail, Brown asked to speak to Diane to tell "her I wanted to get these people out of her house as quickly as

possible." [Doc 302-Pg 137]

Diane did not testify at the suppression hearing. At the outset, Darden stated that he had subpoenaed her but that "the marshals have had a difficult time contacting her" and that all attempts to locate her had been "'unsuccessful." [Doc 302-Pg 3] Darden then made this representation:

> It may be that we will not need her. It depends on how the evidence develops in the case. But what we would like [to] do is move forward. And if we do need her, make [an] additional attempt to have her appear at a later date.

> But as it appears now, I don't believe we will need her testimony.

[Doc 302-Pg 3]

Diane testified as a government witness at trial. On direct examination, she testified that she gave officers consent to search. [Doc 292-Pgs 736-737] On cross-examination, however, she said that 10 or 12 officers, with guns drawn, "rushed in" her house, and as she looked at the window, she saw a sheriff with a shotgun in the air. [Doc 292-Pgs 752-753] Officers were treating her somewhat roughly and "running from room to room to room." [Doc 292-Pg 753] Diane described it as "very frightening. . . still frightening." [Doc 292-Pg 753] Brown told Diane that he had confessed "because they said they were going to arrest [her] and take [her] child from [her]." [Doc 292-Pgs 760-761]

132

The district court denied Brown's motion to suppress.

### b. The Eleventh Circuit

Brown challenged the denial of his motion to suppress on direct appeal. [CV Doc 50-Exhibit A at Pgs 52-72][hereinafter "Br. of Appellant"] Brown stated that Diane's trial testimony corroborated his testimony at the evidentiary hearing and noted that Eleventh Circuit precedent permitted that court to "consider evidence at trial in reviewing the decision on a Motion to Suppress." [Br. of Appellant at 59, n. 7] The government, too, summarized Diane's trial testimony and acknowledged that "[i]n ruling on the suppression issue, the Court may consider evidence presented at the suppression hearing and at trial." [CV Doc 50-Exhibit B at 20, 24, n. 6 & n. 8][hereinafter "Br. of Appellee"] The Eleventh Circuit appeared to consider only Brown's suppression hearing testimony[30] and found "critical" two factual findings by

---

[30]   Brown makes much ado about this point.  In his initial motion, he stated, "the Circuit Court pointed out that trial counsel never asked the district court to reconsider its earlier decision in light of [Diane's] testimony at trial." [CV Doc 8-Pg 113] When the government pointed out in turn that the Eleventh Circuit's opinion lacked any language to that effect [CV Doc 50-Pgs 14-15], Brown responds as follows:

> However, as averred earlier, it was not in the Eleventh Circuit's opinion that counsel was questioned about the request to reconsider (which was never made), it was during oral argument that the Eleventh Circuit does not transcribe.

[CV Doc 51-Pg 85] With Brown's clarification in mind, undersigned counsel –

the magistrate judge: "first, that Brown was repeatedly told he was not under arrest and was free to leave at any time; and second, that Brown *understood* he was not under arrest and was free to leave at any time."  441 F.3d at 1346 (emphasis in original).

The Eleventh Circuit held that these factual findings were not clearly erroneous:

> The record amply supports the findings that Brown was repeatedly told he was not under arrest and was free to leave *and* that he understood that warning, indeed that he expressly said he understood those words. Although Brown's account was sharply different, the magistrate judge, who observed the witnesses, was free to believe those he found trustworthy and discredit the testimony of those who were not.

Brown, 441 F.3d at 1346-47.  Thus, after reviewing the totality of the circumstances, the Eleventh Circuit found that Brown was not in custody when he gave his first confession to the police and that this Court properly denied Brown's motion to suppress.  Id. at 1347.

### c.  Brown's claims

Brown argues that Diane's trial testimony corroborated his suppression hearing testimony. [CV Doc 8-Pgs 112; CV Doc 51-Pg 85]  As did Brown, Diane testified that a number of officers entered her home, guns drawn, and told Brown to sit in a

---

who argued the case on direct appeal – does not remember whether the Eleventh Circuit asked that particular question at oral argument.

chair. [Doc 292-Pgs 752-753; Doc 302-Pgs 123-124] Diane confirmed that Brown told her that he confessed because the officers threatened to arrest Diane and take away her child. [Doc 292-Pgs 760-761; Doc 302-Pg 128] Diane's testimony, however, never addressed what the officers told Brown about his arrest status or freedom to leave or to move about the house – the "critical" fact-findings made by the magistrate judge.  See Brown, 441 F.3d at 1346-47.  To the extent that Brown rehashes the suppression claim he made on appeal [CV Doc 8-Pgs 105-114], he may not relitigate it on collateral attack.  See Nyhuis, 211 F.3d at 1343 (11th Cir. 2000).

In any event, counsel did not perform deficiently in the handling of the suppression hearing or the suppression issue on appeal.  As noted above, counsel and the Marshals Service attempted to locate Diane prior to the suppression hearing, to no avail. [Doc 302-Pg 3] It is difficult to fault trial counsel in these circumstances. Irrespective of Diane's whereabouts, Darden made a strategic decision that he would not need her testimony at the suppression hearing. [Doc 302-Pg 3] This decision proved correct, mainly because Diane's eventual trial testimony added very little to the issue of whether Brown was under arrest or free to leave during his questioning by police.  These considerations aside, Brown argued, and the government acknowledged, that the Eleventh Circuit could consider trial testimony in reviewing the resolution of a suppression motion, but the Eleventh Circuit confined its focus to

the suppression hearing testimony.  Counsel did not perform deficiently, and Brown suffered no prejudice.

### d.  Voluntariness vs. reliability

Brown finally argues that his confession was "unconstitutionally obtained and therefore unreliable." [CV Doc 51-Pg 86] As argued previously, the Eleventh Circuit rejected Brown's argument on direct appeal that his confession had been unconstitutionally obtained.  See Brown, 441 F.3d at 1343-49.  The two cases Brown cites about the reliability of his confession, Johnson v. Mississippi and Crane v. Kentucky, are distinguishable. [CV Doc 51-Pg 85]

First, in Johnson v. Mississippi, 486 U.S. 578, 580, 108 S. Ct. 1981, 1984 (1988), Johnson's death sentence had been predicated, in part, on a violent felony conviction subsequently vacated by the state of New York. On state review, the Mississippi Supreme Court disavowed any reliance on the fact that the New York conviction related to only one aggravating factor and that the other two aggravating factors did not turn on this evidence.  Id. at 584, 1985.  The Supreme Court vacated the sentence of death because "the error here extended beyond the mere invalidation of an aggravating circumstance supported by evidence that was not otherwise admissible."  Id. at 590, 1989.  Instead, "the jury was allowed to consider evidence that has been revealed to be materially inaccurate."  Id.

136

Johnson does not apply here. According to Brown, Diane's trial testimony corroborated his suppression hearing testimony, and the Court made factual findings (upheld on appeal) in favor of the government. Having failed to show any materially inaccurate evidence illuminated by Diane's testimony, Johnson provides no relief.

Second, here is the issue presented in Crane v. Kentucky, 476 U.S. 683, 684, 106 S. Ct. 2142, 2143 (1986):

> Prior to his trial for murder, petitioner moved to suppress his confession. The trial judge conducted a hearing, determined that the confession was voluntary, and denied the motion. At trial, petitioner sought to introduce testimony about the physical and psychological environment in which the confession was obtained. His objective in doing so was to suggest that the statement was unworthy of belief. The trial court ruled that the testimony pertained solely to the issue of voluntariness and was therefore inadmissible. The question presented is whether this ruling deprived petitioner of his rights under the Sixth and Fourteenth Amendments to the Federal Constitution.

The Court found that the Kentucky courts erred in foreclosing Crane's efforts to introduce this testimony since "evidence about the manner in which a confession was obtained is often highly relevant to its reliability and credibility." Id. at 691, 2147.

In contrast to Crane, this Court did not exclude evidence about the manner in which Brown's confession was obtained. To that end, Diane testified on cross-examination about the environment surrounding Brown's confession, including Brown's statement to her that he had confessed because the officers threatened to

137

arrest Diane and take away her child. [Doc 292-Pgs 760-761] In closing arguments,

Bell argued extensively that Brown made a false confession, including this passage:

> These guys are coming in there, as Diane Brown said, with shotguns
> outside, guns drawn. They go through and clear it. Tell them where to
> sit. Interrogate them. Reject the first statement, reject the second one.
> He is worried about the one person he loves more than anybody in the
> world besides maybe – with the exception of probably his mother – is
> Diane Brown. And he says to them, and it is in the statement, "promise
> me you won't arrest her if I make this statement."
>
> You hear that. She's facing a potential charge in a death penalty case.
> That is motivation.

[Doc 293-Pg 1022] Although the Court first determined the voluntariness of Brown's

confession, the jury later heard evidence and argument about the reliability of that

confession as contemplated by Crane. Brown has demonstrated no error in this

regard.

**13.  Petitioner's convictions and death sentence were imposed based upon unreliable eyewitness identifications in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. [CV Doc 51-Pgs 86-87]**

According to their testimony at trial, both Frank Kania and Chris Bowen saw

an African-American man in a dark sweatsuit on a bicycle outside the post office

around the time that Gaglia was murdered. [Doc 291-Pgs 627, 629-630, 644-646]

Kania and Bowen identified that man as Meier Jason Brown after looking at a series

of mug shots. [Doc 291-Pgs 633-634, 641, 650] On cross-examination, Kania

acknowledged that "I vaguely seen his face" [sic] and that in selecting Brown's photograph, he told investigators that "that's the closest resemblance to the man that I seen." [Doc 291-Pgs 640-641] Similarly, Bowen testified on cross-examination that he "couldn't say exactly a hundred percent" about his identification of Brown and that he told investigators, "if anything, I'd have to say it is this fellow right here." [Doc 291-Pg 651]

Bell referred to Kania and Bowen in the closing argument. [Doc 293-Pgs 1016-1017, 1026-1027] He argued, "They see him ride up there.  We don't deny that Meier Brown went to the Post Office that day. . . ." [Doc 293-Pg 1016] Bell later attacked the strength of Kania and Bowen's identification:

Frank Kania, does he move the meter? Blue/black jogging outfit.[31] Supposedly a positive ID.  But you know, people try real hard in court. When he first testified under direct, did you see the person in the photo spread, yes.  Did you pick him out.  Yes.  Cross-examination, well, kind of sort of looked like this fellow here.  So, we're uncertain of that.  But if you accept that was Meier Jason Brown, he's in a blue/black jogging outfit.

So, even if you assume that Frank Kania saw my client ride up to the Post Office, it doesn't explain this.  It raises more questions about clothing.  So, I don't think we move on the meter.

Chris Bowen, he reinforces dark jogging outfit.  Did you see if [sic] the

---

[31]  Brown's cousin, Dietrechsun Davis, testified that Brown had been wearing a brown jacket. [Doc 291-Pg 662] The DNA analysis came from the blood stains on Brown's jacket. [Doc 292-Pgs 865-867]

photo spread?  Yes.  Cross-examination, well, he's sort of slender like this fellow here.  Again, that is not positive ID. So let's accept for the sake of argument that was Meier.  We don't move the meter because it doesn't explain the clothing.  Wrong outfit.

[Doc 293-Pg 1026]

On direct appeal, Brown argued that the Court erred when it did not conduct an evidentiary hearing on Brown's motion to suppress improper and suggestive identification evidence. [Br. of Appellant at 82-86] The Eleventh Circuit found that the lack of a hearing did not amount to an abuse of discretion.  See Brown, 441 F.3d at 1350.  Pertinent to Brown's §2255 proceeding, the Eleventh Circuit also found as follows:

> Moreover, as the government correctly observes, any error arising from purportedly improper identification evidence would be subject to harmless error analysis. . .  At trial, two witnesses [Kania and Bowen] testified that they saw Brown at the Post Office and selected him from a photo lineup.  Those witnesses were effectively cross-examined regarding their identifications, one telling the jury that Brown was "the closest resemblance" to the man he saw at the Post Office and the other stating that although he was not one hundred percent sure, he thought Brown was the person he observed.  Given the overwhelming evidence of Brown's guilt, including Brown's confession, the recovered money orders, and the DNA samples of the victim's blood found on his jacket, any conceivable errors related to the two identifications were harmless because "there is no reasonable probability that the evidence complained of might have contributed to the conviction." . . . .

Brown, 441 F.3d at 1350.

The Eleventh Circuit's finding of harmless error eviscerates Brown's

140

supposition that trial counsel's proper litigation of the issue would have resulted in a not guilty verdict in the guilt phase, or a life sentence in the penalty phase. [CV Doc 8-Pg 115, n. 35] Having demonstrated no prejudice, Brown's claims fail.

**14.   Petitioner was deprived of his right to be present at all proceedings in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. [CV Doc 51-Pgs 87-89]**

Brown contends that he had a constitutional right to be present at a September 9, 2003, pretrial conference and at "bench conferences and other critical stages of the proceedings wherein relevant and critical issues were discussed and decided." [CV Doc 8-Pg 116; CV Doc 51-Pg 87] Brown contends that his absence from these proceedings "deprived him of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution." [CV Doc 8-Pg 116]

As an initial matter, the Eighth Amendment is not implicated by Brown's current claim. "The right of a criminal defendant to be present at trial has three bases: the Confrontation Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and Federal Rule of Criminal Procedure 43." United States v. Novaton, 271 F.3d 968, 997 (11th Cir. 2001). "Other circuit courts of appeals have concluded that Rule 43's protections are broader than those afforded both by the Sixth Amendment and by due process, and thus if the rule does not require a defendant's presence at a given proceeding, neither does the Constitution." United

States v. Boyd, 131 F.3d 951, 953, n. 3 (11th Cir. 1997)(collecting cases). The Eleventh Circuit, however, has not explicitly addressed the relative breadth of Rule 43. See United States v. Parrish, 427 F.3d 1345, 1348 (11th Cir. 2005). Nonetheless, Brown has not made a Rule 43-based challenge, so the government analyzes his claims only under the Fifth and Sixth Amendment rights.

Analyzing the Sixth Amendment right first, a defendant's Confrontation Clause right to be present is a trial right. Boyd, 131 F.3d at 954. A defendant has no Sixth Amendment right to be present at a pretrial conference regarding trial procedure or the orderly conduct of trial. See United States v. Barth, 424 F.3d 752, 762 (8th Cir. 2005)(combining Sixth Amendment and Rule 43 analysis and finding no right to be present at pretrial conference where no testimony was heard or discussed, no decisions regarding the admissibility of evidence discussed, and no objections to jury instructions made); see also United States v. Cole, 246 Fed. Appx. 112, 116-17 (3d Cir. 2007)(finding no Confrontation Clause violation where defendant not present at pretrial conference discussing empaneling anonymous jury); cf. Fed. R. Crim. P. 43(b)(3) (stating that defendant's presence not required at "a conference or hearing on a question of law").

This pretrial conference involved discussions of the lack of a psychiatric issue in the case [Doc 259-Pgs 3-4, 29], the number of juror strikes for each side [Doc 259-

Pgs 4-5], issues about voir dire and juror questionnaires [Doc 259-Pgs 5-6, 30-35, 39-42], expert witness funding [Doc 259-Pgs 6-8, 20-22, 26], whether to allow the defense to introduce evidence of plea negotiations [Doc 259-Pgs 8-12], Brown's clothing at trial [Doc 259-Pgs 12-13], how the trial would be structured with regard to statutory aggravating factors [Doc 259-Pgs 14-17], the trial date [Doc 259-Pgs 17-20], the presentation of the mitigation case [Doc 259-Pgs 22-24], whether the jury would work weekends and be sequestered [Doc 259-Pgs 24-26], the amount of time needed for the guilt phase [Doc 259-Pgs 27-28], possible evidentiary issues that would arise [Doc 259-Pgs 29-30], whether Brown would testify [Doc 259-Pgs 36-38], and who would be lead counsel [Doc 259-Pgs 40-41]. These discussions concerned the orderly conduct of trial, see Barth, 424 F.3d at 762, and Brown's absence did not "'interfere with his opportunity for effective cross-examination of the trial witnesses.'" Boyd, 131 F.3d at 954. Thus, Brown has not demonstrated a Sixth Amendment violation.[32]

Brown's Fifth Amendment claim fares no better. "Under the Due Process

---

[32] To the extent Brown suggests that he should have been present at bench conferences [CV Doc 8-Pg 116], the Eleventh Circuit has held that "a bench conference, attended by appellant's counsel and called to discuss an evidentiary matter. . ., is not a critical stage of the trial proceedings at which appellant has a right to be present." United States v. Vasquez, 732 F.2d 846, 849 (11th Cir. 1984)(per curiam).

Clause, 'a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." Parrish, 427 F.3d at 1348. Brown's absence from the pretrial conference did not offend the Due Process Clause because he was competently and effectively represented by counsel, and his presence "would have contributed nothing substantial to his opportunity to defend since the matters discussed predominantly involved questions of law." United States v. Veatch, 674 F.2d 1217, 1226 (9th Cir. 1981)(finding no due process violation based upon defendant's absence from pretrial conference). Brown offers only that his presence would have allowed him to "lodged his [unspecified] objections." [CV Doc 51-Pg 87] This conclusory statement is insufficient to demonstrate that he could have assisted counsel or the Court in a way that would have resulted in a more reliable hearing. See Boyd, 131 F.3d at 954. Brown's due process claim fails.

Seeking to show some constitutional basis for his presence at the September 9 pretrial conference, Brown accuses the Court of improper behavior:

> [H]ad Mr. Brown been present to hear trial counsel and this Court discuss thwarting any post-conviction relief, he would have been warranted in demanding that trial counsel file a Motion to Recuse this Court because of the appearance of impropriety. . . .

[CV Doc 51-Pg 87, n. 37] Brown's earlier motion identified pages 35 to 38 of the

transcript as demonstrating the thwarting of "any ineffective assistance of counsel challenge in post-conviction proceedings," including the fact that the Court "went so far as to indicate that he would require Mr. Brown to affirm he voluntarily waived his right to testify on the record in order to protect counsel." [CV Doc 8-Pg 116]

In the allegedly offensive passage cited by Brown, the district judge spoke of his trying death penalty cases as a defense attorney and that the system required him "to anticipate somebody is going to come after me, and I've got to be able to explain." [Doc 259-Pgs 35-36] The judge noted his conundrum, in his past life as a trial attorney, of letting the defendant testify (and jeopardizing his case) or advising him not to testify (and risking the defendant's saying, after conviction, that his attorney would not let him testify). [Doc 259-Pg 36] Darden, based upon his death penalty trial experience, offered that "[y]ou . . . just have to put the defendant on the stand and perfect the record" about the decision whether to testify. [Doc 259-Pg 37] The Court stated that it would put Brown on the stand to determine whether he would testify and noted "Of my own volition, I require that in every case, and I have done it for years." [Doc 259-Pg 38] This exchange occurred:

> MR. DARDEN:     I know you do it.  I have tried cases with you, and you did that.
>
> THE COURT:      I'm trying to protect him.

145

[Doc 259-Pg 38] At the close of the government's case, the Court determined from Brown that he knew he could testify but decided not to do so. [Doc 292-Pgs 977-979]

It is difficult to see how this exchange was designed to "thwart[] any post-conviction relief." [CV Doc 51-Pg 87, n. 37] Instead, the Court took the same measures it takes in all cases where a defendant does not want to testify: It informed the defendant of his right to testify on the record, insured that the defendant was satisfied with his legal representation, and required the defendant to state on the record whether or not he wished to testify.  To the extent that this route prevents ineffective assistance of counsel, certainly the defendant benefits by having his wishes known about whether to testify.  This allegation of improper conduct lacks merit and does not save Brown's constitutional claim.

## 15. The manner in which the government would carry out petitioner's execution violates the Eighth Amendment. [CV Doc 51-Pgs 89-92]

In his initial motion, Brown contended that his execution under the current Bureau of Prisons ("BOP") protocol would violate the Eighth Amendment, but he asserted that this challenge was not appropriate at this time since his execution was not imminent and he could bring this claim in a 42 U.S.C. §1983 action. [CV Doc 8-Pgs 117-118] The government agrees that Hill v. McDonough, 547 U.S. 573, 126 S. Ct. 2096 (2006), permits an inmate to challenge the circumstances of his confinement,

including a proposed execution method, under §1983, although Brown must be mindful of the limitations period. See generally McNair v. Allen, 515 F.3d 1168 (11th Cir. 2008).

Despite his earlier suggestion that this issue was not ripe, Brown's comprehensive brief now maintains that §2255 "is also an appropriate means for challenging the method of execution" and challenges the federal death penalty protocol in light of Baze v. Rees, ___ U.S. ___, 128 S. Ct. 1520 (2008).

The Baze petitioners – Kentucky death row inmates – acknowledged that "the lethal injection procedure, if applied as intended, will result in a humane death." Id. at 1526. The inmates contended, however, that Kentucky's injection protocol was unconstitutional under the Eighth Amendment because of a "risk that the protocol's terms might not be properly followed, resulting in significant pain." Id. The Court's plurality opinion found that the "petitioners have not carried their burden of showing that the risk of pain from maladministration of a concededly humane lethal injection protocol, and the failure to adopt untried and untested alternatives, constitute cruel and unusual punishment." Id. It thus upheld lethal injection and the Kentucky protocol.

Kentucky (and the federal government) use a three-drug series to effect lethal injection -- sodium thiopental (also known as Pentothol), pancuronium bromide, and

potassium chloride.  Id. at 1527, 1532.  "The proper administration of the first drug ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs.  Id. at 1527.  The Baze petitioners' claim hinged "on the improper administration of the first drug, sodium thiopental . . . ."  Id. at 1533.  In rejecting that claim, the Court noted four safeguards in the Kentucky protocol:  the presence of medical personnel, 10 practice sessions per year, an hour to establish the primary and backup IVs, and the redirection of chemicals to the backup site if the prisoner remains conscious after 60 seconds.  Baze, 128 S. Ct. at 1533-34.

Citing these four safeguards, Brown now contends that "[u]pon information and belief, the federal execution protocols do not comport with those found constitutional in Baze. . . ." [CV Doc 51-Pgs 91-92][33] Contrary to Brown's supposition, the federal protocol comports with Baze.  First, the lethal substances must be administered by "qualified personnel," with modifications in the procedure permitted "based on the recommendation of on-site medical personnel utilizing their clinical judgment." Amicus Br., 2007 WL 4351595 at *34. These qualified personnel

_____

[33]  In its determination in Baze, the Court noted the United States' amicus brief, which attached as an appendix the BOP's lethal injection protocol.  Id. at 1527.  This Court may find that brief and appendix at 2007 WL 4351595, to which the government will cite.  There are also federal regulations discussing implementation of the death sentence in federal cases.  See 28 C.F.R. §§26.1-26.5.

must have "necessary training or experience in the specific function they will perform in implementing the federal death sentence." Id. Second, rather than the hour "to establish both the primary and backup IVs" contemplated by the Kentucky procedure, see Baze, 128 S. Ct. at 1534, the federal protocol does not permit the presence of the condemned individual in the execution room until 30 minutes before the scheduled implementation of the death sentence. Amicus Br., 2007 WL 4351595 at *34. At that time, qualified personnel begin the venous catheterization. Id. Access via the femoral vein is preferred, but if peripheral venous access is required, "two separate lines shall be inserted in separate locations and determined to be patent by qualified personnel." Id. In peripheral venous access cases, the first line is for administration of the three-drug dose, and the second line is a back-up. Id. The federal protocol requires qualified personnel to determine that the dose of sodium pentothal has rendered the individual unconscious before those personnel may administer the pancuronium bromide and potassium chloride. Id. The BOP protocol also addresses what to do if the condemned individual has not died within five minutes after completion of the second syringe of potassium chloride. Id

In fact, the federal protocol is a lot like the Kentucky protocol examined in Baze. Brown lists ten[34] features of the Kentucky protocol – he describes them as

---

[34] While his list ends with (11), he omits (4).

providing "numerous safeguards, oversight, and accountability" [CV Doc 51-Pgs 90-

91] – which compare favorably to the federal protocol, as demonstrated below:

| Kentucky protocol cited by Brown | Comparable federal protocol, signified by ¶ within protocol found at 2007 WL 4351595 at *34 |
|---|---|
| 1. written verification by designated persons of date and time task completed | ¶J – requiring qualified personnel to document fact, time, and order of administration of substances |
| 2. explicit list of preferential sites for IV insertion | ¶H – preference for venous catheterization via femoral vein; peripheral venous access also authorized. |
| 3. team members must check for infiltration before allowing chemicals to flow into body | ¶¶G-H – requiring saline solution administration at a slow rate to keep line open |
| 4. number 4 omitted | |
| 5. limit of IV access to one hour | ¶G – inmate brought into execution room only 30 minutes before scheduled time |
| 6. requires inmate's unconsciousness before injecting pancuronium bromide | ¶J – personnel cannot administer pancuronium bromide and potassium chloride until inmate unconscious |
| 7. requires moving to secondary site if inmate remains conscious after 60 seconds | ¶H – no similar provisions, but uses 5 gram dose of sodium pentothal (a fast-acting barbituate sedative) in first instance as compared to Kentucky's use of 2 to 3 grams. See Baze, 128 S. Ct. at 1527-28. |
| 8. requires three grams of sodium pentothal | ¶H – again, federal protocol requires 5 grams |

| 9.  specific professional standards for team members | ¶A – requires use of qualified personnel |
|---|---|
| 10.  requires training "at least a specific number of times prior to an actual execution" | ¶D – requires qualified personnel to "have necessary training or experience in the specific function they will perform in implementing the federal death sentence" |
| 11.  provisions for stay of execution after execution has commenced | 28 C.F.R. §26.3(b) provides for no stay where prisoner has filed for executive clemency unless President interposes |

Given the similarity between the federal and Kentucky protocol and Baze's rejection of an Eighth Amendment claim on the latter, Brown's current challenge to the federal protocol fails.  Cf. Baze, 128 S. Ct. at 1530 (noting that Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment").  Indeed, Baze suggests a safe harbor for any "substantially similar" protocol, Id. at 1537, and the federal protocol falls within those bounds.

**16.  Petitioner was denied his rights to due process, equal protection, and a reliable capital sentencing proceeding when juror Dorothy Rentz was seated without the trial court or counsel exploring her attitudes on the death penalty in violation of the Fifth, Sixth, and Eighth Amendments to the Constitution. [CV Doc 51-Pgs 92-93]**

As the government acknowledged in its preliminary response [CV Doc 50-Pg 16], an evidentiary hearing is required to resolve this factual dispute.  Again, the

government's position is that Rentz was subjected to voir dire, but for whatever reason, that voir dire was not recorded or transcribed.  In fact, the government has retained copies of a trial prosecutor's notes made during jury selection reflecting that the Court subjected Rentz to voir dire.

**17.  <u>Petitioner was denied his right to meaningful appellate review because of an incomplete record compiled by the district court in violation of the Fifth, Sixth and Eighth Amendments to the Constitution. [CV Doc 51-Pgs 93-94]</u>**

Brown's final argument contends that he could not obtain meaningful appellate review of Rentz' voir dire given its omission from the transcript. [CV Doc 8-Pg 120; CV Doc 51-Pgs 93-94] The government anticipates that the evidentiary hearing testimony will demonstrate that Rentz participated fully in the voir dire process, which would vitiate Brown's claim.

The second permutation of Brown's meaningful appellate review claim involves <u>Batson</u>.  The transcript notes "***Pause for the jury selection by strikes.***" [Doc 291-Pg 530][emphasis in original] After counsel completed by the strikes, the Court asked at sidebar if there were any <u>Batson</u> challenges. [Doc 291-Pg 533] Brown raised no challenge. [Doc 291-Pg 534] Although the government noted that <u>Brown's</u> "first twenty strikes were Caucasians," it declined to make a <u>Batson</u> challenge. [Doc 291-Pg 534]   Although this information is on the record, Brown asks for more:

After voir dire of all the jurors, the Court and counsel retired to another

room outside the presence of the jurors and each side exercised its peremptory strikes. That process was not recorded thereby depriving Petitioner of his right to meaningful appellate review.

[CV Doc 8-Pg 119][35] Brown is not entitled to relief.

The Court Reporter Act requires the recording of "all proceedings in criminal cases in open court." 28 U.S.C. §753(b)(1) (emphasis added); see, e.g., United States v. Jenkins, 442 F.2d 429, 438 (5th Cir. 1971)(holding that a charge conference in chambers is not a proceeding in open court and need not be reported). "While it is the responsibility of the court to preserve the record, a defendant may waive the requirements of §753(b), either expressly or by implication." United States v. Amico, 486 F.3d 764, 778 (2d Cir. 2007).

Since the Court Reporter Act did not require transcription of the peremptory strike discussions at counsel table, Brown was not entitled to reporting of those conversations. In any event, the recording and reporting of conversations at counsel table seems to be bad practice; among other things, his suggested taping appears designed to capture attorney work product and privileged conversations between a defendant and his attorney and among the prosecutors.

Even assuming the propriety of recording these conversations, Brown never

---

[35] Brown correctly notes that he did not raise the recordation of discussions surrounding peremptory strikes in any fashion on direct appeal. [CV Doc 51-Pgs 93-94]

identifies any prejudice stemming from the lack of a record. No one made a challenge under <u>Batson v. Kentucky</u>, and his jury was racially mixed. <u>Cf.</u> <u>Houston v. United States</u>, 419 F.2d 30 (5th Cir. 1969)(rejecting §2255 challenge based upon failure to record conversation between judge and jury foreperson). Indeed, given the trial prosecutor's notation that <u>Brown</u> used his first 20 peremptory strikes to eliminate white jurors [Doc 291-Pg 534], Brown's concerns about a potential, unnoticed <u>Batson</u> violation by the government appear misplaced.

## CONCLUSION

For these reasons and the reasons stated in its preliminary response, the government asks the Court to deny Meier Jason Brown's 28 U.S.C. §2255 motion.

Respectfully submitted this 10th day of July, 2008.

EDMUND A. BOOTH, JR.
UNITED STATES ATTORNEY


BY:   s/ Amy Lee Copeland
      Amy Lee Copeland
      Assistant United States Attorney
      Georgia Bar No. 186730
      United States Attorney's Office
      Post Office Box 8970
      Savannah, Georgia  31412
      (912) 652-4422

154

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

This 10th of July, 2008.

EDMUND A. BOOTH, JR.
UNITED STATES ATTORNEY


BY:   s/ Amy Lee Copeland
      Amy Lee Copeland
      Assistant United States Attorney
      Georgia Bar No. 186730
      United States Attorney's Office
      Post Office Box 8970
      Savannah, Georgia 31412
      (912) 652-4422