IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


UNITED STATES OF AMERICA    )
                            )
                            )
VS.                         )   403CR001
                            )   407CV085
                            )
MEIER JASON BROWN           )


      The Deposition of JEFFREY ERTEL taken by counsel for the United States on the 14th day of April, 2008, in the Office of the United States Attorney, 100 Bull Street, Savannah, Georgia, beginning at 11:05 a.m.


For the United States:      AUSA CARLTON R. BOURNE JR.
                            AUSA KENNETH CROWDER
                            U.S. Attorney's Office
                            Augusta, GA 30901


For Mr. Ertel:              H. DONNIE DIXON
                            7 E. Congress Street
                            Savannah, GA 31401


DRAKE REPORTING, P.C.
P.O. BOX 30574
SAVANNAH, GEORGIA 31410
(912) 897-3936

2

I N D E X

Preliminaries............................  3

Examination by Mr. Bourne................  4

Examination by Mr. Crowder.............. 20

Examination by Mr. Dixon................ 37

Reexamination by Mr. Crowder............ 41

Reexamination by Mr. Bourne............. 46

Reexamination by Mr. Dixon.............. 47

Certificate............................. 49

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

3

MR. CROWDER:  This is Charlie Bourne.  We're with the U.S. Attorney's Office, and we're here in the matter of United States versus Meier Jason Brown, 403CR001 and 407CV085.  We're here by agreement of counsel to take your deposition in this case.  Have you ever given a deposition before?

MR. ERTEL:  No.

MR. CROWDER:  Have you ever sat in on one or taken one?

MR. ERTEL:  Yes.

MR. CROWDER:  Okay.  Well, you know the general rules.  He's here to just to elicit some information from you.  If you're at all confused by what he's asking -- Mr. Bourne's going to do the questioning -- go ahead and ask him to rephrase it or restate or whatever.

Normally, in depositions, I suggest counsel reserve objections, but I think, because of the nature of this case, if you all want to state an objection, please do so and, if Charlie needs to amend his question or whatever, he will do that.  Just in general terms, he's going to ask you to look at some documents and ask you some questions regarding Mr. Brown's case.  If you have any questions or need to consult with Mr. Dixon, feel free to do so or if you want to interpose any objections or not answer any questions, just state the basis thereto.  With that, I'm

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

4

going to turn it -- will you swear the witness?

JEFFREY ERTEL, SWORN

EXAMINATION

BY MR. BOURNE:

Q    Thank you.  Mr. Ertel, thanks for agreeing to meet with me.  Mr. Dixon told me from the beginning that you wanted to be interviewed on this because of various reasons.  Mr. Dixon and I believed this would probably be the best way to conduct this interview, make sure there's a record of it, an accurate record, and go from there.  It is my intention -- correct me if I'm wrong -- it is my intention to provide this information, whatever's received, to the Court at some point.

As Ken said, we're here pursuant to Judge Edenfield's order and I'm going to make that an exhibit, I guess Deposition Exhibit 1.  I think you've already seen it.

MR. DIXON:  We are familiar with that, yes.

MR. CROWDER:  Do you all have a copy?

MR. DIXON:  I'm almost positive.  Yes, we have. We have that copy.

Q    I'd kind of like to work backwards if I could. The District Court referred this matter to us.  As the attorney for Mr. Brown, did you have contact with any of the jurors?

A    Personally, I talked to, I believe, one

Jeffrey Ertel 4/14/08                    Drake Reporting, P.C.

5

gentleman who is -- I don't know if it's Skidmore Island, but it was a gated community.

MR. DIXON:  Skidaway Island.

A       Skidaway Island.  I called, spoke to his wife. He was on the golf course.  He called me back, asked me if he had to speak to me.  I told him he didn't and he chose not to, and I can't remember his name for the life of me.

Q       Did you make arrangements for others to contact the jurors?

A       Yes.

Q       And who were some of those others?

A       They were people that worked in my office, secretaries, investigators.  And I work for the Federal Defender program in Atlanta, so that will give you a reference.  There was a mitigation person who I hired independently.  Her name was Sarah Flynn.  She's in Jacksonville, Florida.  There's a couple of students, I think.  If you want their names, I can give you their names, but just general support staff and investigators in our office.

Q       How did you meet with these people, the investigators and the secretaries, how did you meet with them and what instructions did you give them?

A       I had made arrangements -- I had asked for volunteers to go, and all of these folks volunteered.  We

*Jeffrey Ertel 4/14/08*            *Drake Reporting, P.C.*

6

met formally in the hotel room, somebody's hotel room.  We stayed at the Hampton Inn.  It's out -- it's not downtown, but there's a Hampton Inn.  I can't remember the name of the street.  We met in a room --

Q     Stephenson?

A     Yes, yes.  Met in somebody's room.  I gave them instructions on going to see the jurors.  There were about, all total with me, including me, there were about 14 of us.  Not about.  There were 14 of us.  I gave them instructions to make sure that they, you know, when they contacted the jurors, to make sure that the jurors knew that we were representing Meier Brown, that they were working for me, and that if they asked if they had to talk to us, we were to tell them no, they didn't have to talk to us.  If they didn't want to talk to us, we told them to tell them "Thank you for your time" and then go on your way.

Q     And how did you assign who was going to go to see whom?

A     Other than making sure that at least there was -- there were two people in each group.  There was always two, and one of them was a notary and one of them had experience interviewing jurors before, and that's how.  And as far as going to see jurors, there was no selection on, you know, you're going to go see this person.

Q     Did each team have more than two jurors?

A    I think two teams had three and everybody else had two.  If my -- I think there were 16 total, so I think that's the way it broke down, 16 total jurors.

Q    And then you had the guy at Skidaway Island?

A    And one other one that we -- I don't think -- I could be wrong.  I could have talked to her on the phone. I don't have really any specific recollection.  Somebody spoke to her on the phone.  I'm not sure if it was me, and she also opted not to speak to us, whether it was just that I was in the room when whoever was talking to them, but as I recall, it was a female.

Q    Were all the jurors contacted by telephone in advance?

A    No.

Q    So it was just people just showed up?

A    Right.  The only ones that were contacted by phone were ones that we couldn't get to their door and knock on their door.  Otherwise people would have gone up and knocked on the door.

Q    Did you give any type of instructions to these folks that helped you in writing?  Did you have any written instructions to them?

A    No.  The only thing I will say, we supplied them with the voir dire transcript and the juror questionnaire from the person.  I did not create any.  Those documents

8

were just given to the interviewers.

Q      That kind of leads me to my next question.  How did you get the list of jurors?

A      Just from the transcript.

Q      From the trial transcript?

A      Yes.

Q      How about the contact information?

A      I would imagine from the juror questionnaires that were also in -- I believe I got those out of one of the trial attorneys' files.

Q      Did you -- and I hesitate to use this word, but did you target any specific jurors?  In other words, did you only think of going to a certain -- did you just have a list that you randomly assigned or did you pick out specific jurors you wanted specific investigators to go to?

A      No.  We just sent them out.  There was no -- no juror was targeted.  We wanted to get every juror.  We wanted to interview every juror, but there was no assignment of people to talk to specific jurors.

Q      How many jurors were ultimately contacted?

A      I don't know.  I want to say ten or 12.  I think probably 12.  I don't know.  The vast majority of them. The only ones that weren't contacted were people that weren't home.  It wasn't for lack of effort.

Q      The ten or 12 that you're referring to, that

included jurors and alternates?

A    Yes.

Q    I saw that the affidavit of Mr. Little was submitted with the pleading.  Were there any other affidavits taken?

A    Yes.

Q    Did you just make a tactical decision not to include those?

A    That's correct.

Q    Excuse me just a minute.  (Conferred with Mr. Crowder)  Would you be willing to turn over any of those affidavits?

A    I would be willing --

Q    If we request.

A    Right.  I would be willing.  I think ultimately that -- I have an ethical -- I'm sort of in an ethical quandary.  I think the client, Mr. Brown, has the ultimate say-so on that.  I don't have any objection personally to turning them over, but I think I would have to ask him first and then -- at least, that's what I think.

Q    So if we did make the decision to ask for those, you would consult with him and then let us know?

A    I would do that, yes.

Q    Okay.  You already mentioned how they were contacted.  The information, the contact information, you

said, was basically from the file, from the public record?

A     Correct, and then I would imagine my investigator went and did, you know, updated it by using ChoicePoint or one of the various databases, but just to get a valid, current address.

Q     And approximately what time frame was this that you all met at the Hampton Inn and then went out?

A     Well, if I'm not mistaken, it was probably January, early January, 10th, 12th, 13th, whatever that Saturday was.  I know the petition was due on the 22nd.  So it would have been before the 22nd, but I, for the life of me, now I can't remember the exact date, but it was the Saturday before or --

Q     And that was '08, January of '08?

A     Yes, '08.

Q     How many days were you in town to conduct these interviews?  Just the one day?

A     Just the one day, just Saturday.  I think everybody was contacted Saturday, and I think we had some follow-up contact with Mr. Little to end up getting the affidavit signed and notarized and everything.

Q     Did investigators prepare reports on their contact with the jurors and submit that to you?

A     Some did.  I have some memos on that.

Q     Was there any instruction with the investigator

11

as to how they were to respond to you, whether it be orally or in writing or a report or anything like that?

A    I think I asked all of them for reports. I don't think that I got all of them. I was more interested in reports of the people that I thought we might get affidavits from. But I think I probably got -- I'm guessing, but maybe six memos.

Q    I know this is an obvious question, but let me ask. None of these jurors initiated contact with you. You and your investigators initiated the contact with them?

A    That's correct.

Q    With regard to Mr. Little, the same is true with him; you contacted him?

A    That's correct.

Q    The affidavit that was prepared, was that prepared after he was initially interviewed and then the affidavit prepared and then returned to him for him to review it and sign it?

A    That's correct.

Q    In the group that met, you mentioned the secretaries, the students, the investigators. Was local counsel present?

A    No. He didn't even know we were -- I don't even know if he was on at the time. He might have been officially on, but he had no -- I never talked to him about

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

12

this.

Q    You didn't seek the Court's permission before you did this?

A    No.

Q    Now, I'm going to back up a little bit.  How did you first come to be into this case?

A    I was contacted by -- I think -- I can't remember her name -- Margaret O'Donnell many years -- or 2003, I think, asking me if I would see if Don Samuel would take over Mr. Brown's representation, and she knew I knew Don.  So I put a call in to Don and he said he would take the case, but only if I would be co-counsel with him.  So we sought --

Q    Were you in the Public Defenders Office during this time?

A    Yes.  I've been in the Public Defenders Office since 1996 with a brief leave.  And so Don and I came and did the direct appeal.  When cert was denied off the direct appeal, I spoke with -- they call it the National Resource Council.  They were having difficulty finding lawyers.  They asked me to stay on the case.  So I got permission from my boss and we sent a letter to the Chief Judge in the Northern District and sought appointment and Judge Edenfield appointed me in, I want to say, June.

Q    You said the Chief Judge in the Northern

13

District?

A    That's correct.

Q    Did you have to get his permission to --

A    I don't know how -- I think we sent him a letter saying that we were going to seek employment and, if there was a problem with that, to get back to me.  I don't think he actually ever sort of gave permission.  He was just notified that we were --

Q    Is this the first case you've handled in the Southern District of Georgia?

A    I was briefly -- I'm not sure I ever made an appearance.  I was briefly involved in one probably in '93 or '94.  I think we filed something in the Southern District, but then it was dismissed and sent back to State Court.  It was Blankenship versus Zant, I think.  It was a habeas case, and it stayed with Judge Edenfield for probably about three days, if I'm not mistaken, a very short time.  I never showed up in court.  We filed and I think Terry Jackson was local counsel on that one too.

Q    In order to become counsel of record in this case, what steps did you have to pursue?

A    Just to fill out the *pro hac vice* stuff and submit that, and then part of that is obtaining local counsel and that was -- Terry Jackson agreed to be local counsel.

*Jeffrey Ertel 4/14/08*            *Drake Reporting, P.C.*

14

Q      How did you find out what you were supposed to do?

A      I think I went on the website.

Q      Which website?

A      The Southern District website.

Q      Did you consult with the local rules with regard to your admission?

A      I believe I did.  I think that's the only way I would know what to do.  Yeah, I looked at the local rules as far as being admitted.

Q      I'm going to show you Deposition Exhibit 2 and see if that rings a bell.  Here's another copy, Mr. Dixon. This Deposition Exhibit 2 is a copy of Local Rule 83.4 which talks about entering a *pro hac vice* appearance in a court, permission to practice in a particular case.

A      I think that -- I'm assuming.  I can't -- I have no independent recollection that I actually read this, but I think I did because I think I followed all the steps that I needed to for admission.  So I'm pretty sure I did, but I -- you know.  I'm not trying to be evasive.

Q      I've read your statement.  Let's just jump right into it.  Why did you seek to contact the jurors without the Court's permission?

A      I didn't -- I didn't think I needed the Court's permission because I'd consulted the local criminal rules.

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

15

This was a criminal case originally. It was a criminal jury. I consulted the local criminal rules of the Southern District and I didn't see anything in there. And then I thought it was odd because I know we have such a prohibition in the Northern District. I went and looked at the Northern District rules and found it was, I think, Rule 47 or 47.3. There was also one in the civil rules in the Northern District. So I said, well, maybe it's Rule 47. I went and looked at Rule 47 in the Southern District, civil, which is juries or jurors, but it's selection. It wasn't there. I skimmed the, I guess, the table of contents to see if there's anything else in there that I thought would apply and I didn't see anything. And so I just didn't see the rule.

Q    And now, having read Judge Edenfield's order, you're aware there is a prohibition?

A    I'm aware of it. I'm aware of Rule 83.9 now, yeah.

Q    Did you go back and look at that rule after you got this order?

A    Yeah.

Q    And 83.8, I think, is what it is. It's in the same section. 83 is the admission of the attorney. 83.8 is the relations with the jury. I'm going to show you that definition, Exhibit 3. Here you go. Now, you see that

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

16

83.8 says, the last sentence, that you can't contact the jurors without Court approval?

A     Yes.

Q     And you had just not seen that provision before?

A     No, I didn't see it.

Q     Even though it was in the same section as the admission by an attorney in a particular case?

A     I did not see it.

Q     All right.  As the Court pointed out in its order, the preamble to the criminal rules -- did you see that?

A     Only after the Court's order.

Q     Right.  And I don't even know if I have a copy of that, but that references the fact that they are to be -- hold on a second.  Yeah, it's part of the local civil rules, but the preamble to the local criminal rules says, "These local rules for the administration of criminal cases are supplemental in nature and are to be construed consistently with the general applicable local rules."  And that's in the front of the criminal section.  Did you think, after reading that, that you needed to look a little harder at the civil rules or did it just not --

A     I didn't read that.  I did not read the historical note before when I read -- I read the rules and I did not, until the Judge's order, I didn't -- I wasn't

17

even aware that that's what the historical note said.

Q    Whenever you sought admission in this case, you had to fill out a form?

A    That's right.

Q    Where did you get that form from?

A    Off the website, the Southern District website.

Q    All right.  And I'm going to call that Deposition Exhibit 4 and give you and Mr. Dixon that and ask you to take a look at that.  Did you get this and read it?

A    Yes.

Q    And I think the date you signed it is a typo. It says 9th December of 2008, but that should be '7, right?

A    That's correct.

Q    And then Mr. Jackson signed it the 10th day of January of 2008?

A    Right.

Q    The sentence that is of some concern to me is right there above the date, your date, "Petitioner further certifies that he has read and is familiar with and will comply with the local rules."  Did you read that before you signed it?

A    Yes.

Q    Did you read the local rules before you signed it?

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

18

A    I skimmed most -- I skimmed -- I read all of the criminal rules, the rules themselves.  I did not read and memorize all of the civil rules.  I skimmed the civil rules.  I thought I was familiar with them.

Q    I understand.  The reports that your investigators made back to you, did they relay -- and while this might not have anything to do with what we're here for, I just want to ask you.  Did they relay the attitude of the jurors in speaking with them?  Did they end up saying, "This juror was upset, this juror was not upset," anything like that?

A    I didn't have any reports of any juror being upset.  Nobody -- if it happened, nobody reported that to me.

Q    Did you get a report with regard to a juror named Paul Cooper of Richmond Hill?

A    I don't know.  I can't recall.  I don't think so.

Q    Mr. Cooper claimed that this was upsetting to him and brought back emotions that he had tried to forget.  And he said he was interviewed by two females.  Would they have been investigators, do you know, a black female and a white female?

A    Well, there were three African-American women.  One's an investigator; two are secretaries.  The

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

19

secretaries were with -- were not the lead.  They were always with somebody there, an investigator or a lawyer.

Q    Mr. Cooper said that when he asked the ladies when this was going to be over, he was told that they said -- one of them said, "Never.  This will never be over.  You will always be a part of this."  Was that in any report that you were given?

A    No.

Q    Hold on just a second.  (Conferred with Mr. Crowder)  I see from what you've referred to that the Northern District does have a rule that prohibits contact.  Have you contacted jurors in the past?

A    Yes, but not in federal cases.  I've done them in state cases, state habeas cases.  As a matter of fact, it's the norm.  Let me take that back.  We have, after trials -- I also do trials.  After trials, often the judge will say, tell the jurors in our presence, "If you'd like to talk to the lawyers afterwards, feel free to do that." And in that case, we will -- we might go out and wait and talk to jurors.  But that's -- I've never sought formal permission from the court to interview jurors.

Q    Based on that, you've never talked to jurors in a federal case before?

A    Other than, like I say, after the trial, you know, when the judge says, "Feel free to talk to the

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

20

attorneys if you want to."

Q I don't remember the rule in the Northern District. Do you have to get the Court's permission to speak to the jurors?

A Yes. Yes.

Q You mentioned this was in January that you went and saw these folks, and I see that Mr. Jackson signed his consent of designated local counsel the 10th of January. Do you think it was before then or after then?

A I think it was right around then. I know it was Saturday. If the 10th was a Friday, Mr. Jackson was probably on the case by then.

Q I think January the 10th was a Thursday.

A I think we -- the 12th sounds familiar to me and I think that's when we saw them.

Q Did you ever ask Mr. Jackson about the local practice of contacting jurors?

A No, I did not.

MR. BOURNE: Mr. Crowder's going to ask you a few questions.

EXAMINATION

BY MR. CROWDER:

Q I'm just going to follow up a little bit on that. The investigators and secretaries that came down and interviewed the jurors on the 12th of January or

*Jeffrey Ertel 4/14/08*               *Drake Reporting, P.C.*

21

thereabouts, you said they've had experience doing this before?

A    Some.  Secretaries, no.  This was a first for them.  They were there solely as witnesses.  When I do these, I will send out always teams of two to avoid any, you, that there's a witness that you're not berating jurors.  You're to be polite.  You're to be -- you know.  I don't want any --

Q    Okay.  All these people were employed by the Federal Defender program?

A    No.  One is employed as a private contractor out of Jacksonville.  That's Sarah Flynn.  Two of them were students, law students that aren't currently employed.  They were working as interns.

Q    Volunteer interns?

A    Right.  And the rest, I think, all the rest were employees of the Federal Defender program.

Q    Now, have you, in your experience doing death penalty type cases or contacting jurors since '92 when you've been licensed, what other districts, federal districts, have you represented defendants in?  Has it just been the Northern and Southern Districts?

A    Just the Northern and Southern, yeah.  I've represented people in other states, but they've been state proceedings.

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

22

Q    Now, in the Northern District, have you ever asked the Court for permission to interview a juror?

A    No.  Let me let you know I've never done a federal death penalty case in the Northern District.  I've always had state -- people that had state convictions in federal court or in state court, State of Georgia.  So I've never -- this was the first capital federal case that I've had.

Q    So if somebody had a 2255 in the Northern District of Georgia, I take it you represented people in those matters that were state cases?

A    2254s, yeah.

Q    2254, excuse me.

A    Correct.

Q    And so the local rules in the Northern District of Georgia do not prohibit you from contacting state jurors in those cases?

A    That's correct.

Q    But you've never had occasion to contact jurors or ask the Court to contact jurors in a federal case?

A    No, not that I recall.

Q    Has anybody in your office, to your knowledge, asked the Court for that?

A    I think the rule just came in like in 2004.  So I think it's a relatively new rule.

23

Q      Prior to 2004, then they could contact the jurors because there was no local rule?

A      I believe so.  I think it was 2004.  I'm not sure, but yeah.

Q      What is your understanding of how the districts are divided around the country in terms of local rules that prohibit contact with jurors in federal cases?

A      I've only looked at the Northern and Southern now.

Q      You haven't been to seminars where they talked about, you know, X number of districts?

A      No.

Q      Okay.  I'm going to go through your statement, if we could, and we're going to attach that.  What number are we up to?  4?  This will be 5.  Okay.  Do you have a copy?  I'll just give her this when we're done if that's all right.  It says you've, going to the second line of the first paragraph, you've represented indigent death sentence inmates in capital habeas corpus proceedings in both state and federal courts.  How many of these people have you represented?  Estimate if you can.

A      It's got to be more than 20.  I think I have seven or eight cases currently.  You know, it's got to be more than 20.

Q      What percentage of your work is devoted to 2254

24

and 2255 work versus trial work?

A    I have a full federal defender caseload as well as what amounts to a full -- we have a capital habeas unit and I have about seven or eight of those cases currently, which is about a full caseload for a capital habeas unit attorney.  So it's 50-50, but I think most of my time is spent doing trial work.

Q    Do you only do habeas work in death penalty cases?

A    Yes.

Q    Was there any distinction or difference in your job when you were made a senior litigation attorney versus a staff attorney?

A    I'm just a supervisor now.  I have supervisory authority and I also do a little bit of -- you know, we train the new people and stuff like that.

Q    Going to the second paragraph, it says that you were appointed by the Eleventh Circuit in April 2004 with Don Samuel to represent Meier Jason Brown.  Was that your first formal connection to this case?

A    Yes.

Q    Because it was in the Eleventh Circuit, you didn't do anything in the Southern District of Georgia?

A    We moved for remand because -- let me think of why.  And we got a limited remand to Judge Edenfield.  He

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

25

never -- oh, that was about whether there was missing transcripts. We had -- we believed there might have been some discussion between counsel and the judge about funding, and we didn't have that. We asked for a remand. The Eleventh Circuit remanded back to Judge Edenfield who then issued an order and said, "No, there were no communications." So that is -- if there's any contact in the District Court, that was it. I never appeared, but it was just --

Q    You didn't do the *pro hac vice* at that time either because -- or did you?

A    No. This was the first *pro hac vice*.

Q    Okay. Is this the only other district court you've been admitted to *pro hac vice*, the Southern District of Georgia?

A    I think so, yes.

Q    The direct appeal, it looks like, was denied before or in June of 2007. Does that sound right?

A    No. Well, certiorari was denied December 22nd, I think -- no, January 22nd --

Q    '07?

A    '07. And then I was hoping that they were going to get somebody else to take the case on direct appeal and then, when they couldn't, they asked me. That's when I --

Q    So the 2255 motion -- now, you understand that's

26

a civil proceeding in the Southern District of Georgia?

A    My understanding is that it's considered criminal.  It's sort of quasi-civil.  It's criminal attacking the sentence, but it's civil rules govern is my understanding.

Q    You would have seen the notices, the captions, where it listed a civil case number?

A    Right, and I filed under the civil case number. Yeah, I think I -- I think they do a dual.  They want it filed under the criminal and the civil.

Q    Okay.  That's where you check that it's got a related case and you would reference the civil or criminal case number so that they're both -- the Court's aware that they're both pending?

A    Just from the clerk telling me that, when I file something in the civil docket, I also have to electronically file it in the criminal docket.  That's all. I don't know, but that's what I've been doing.  I don't know if that's accurate.

Q    Now, when you came down in January with the team of 14 people, did you go out and interview anybody?  I know you talked about interviewing somebody by telephone, but were you one of the seven teams?

A    I was one of the seven teams and both of my people were in the gated community.  So I attempted to call

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

27

the woman -- I think the other one was a woman, and I don't think I had any luck. I don't know if I left a message. I think she was contacted later by somebody else.

Q    Is that about the same size group that you used in the state cases that you've sent investigative teams to interview jurors?

A    If we could get that many, yeah, we'll take as many teams as we can, but usually it's more like four.

Q    Four people?

A    Yeah. We get volunteers in the state cases, but this was the first time anybody ever used secretaries because I didn't have enough volunteers to do.

MR. BOURNE:  People didn't mind the idea of coming to Savannah either, did they?

A    No. I think that was a plus.

Q    Now, I think you mentioned this to Mr. Bourne, but it says that you routinely employ -- that the process by which you sought to interview people is a process you routinely employ in the representation of death sentence state inmates. Was there anything different other than perhaps the size of the group?

A    No.

Q    Was there anything different about what you did here?

A    Nothing.

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

28

Q      And in those cases, you don't contact the state court judge?

A      No.  There's nothing in Georgia, as far as I know, there's nothing that says we have to.

Q      Have you ever tried to contact the state court judges?

A      In one case that I had, we actually did depositions of the jurors.  So the judge was involved in that, but I think that was after we initially got affidavits and then the judge agreed to do depositions of everyone.  But other than limited -- I take that back.  I think there might have been another case where the jurors wouldn't talk to us.  So we asked for the judge to allow us to do depositions and it was denied.

Q      Okay.  I'm looking at page two of the statement here that's Exhibit 5.  At the beginning sentence, you consulted the local criminal rules to see if contacting jurors was prohibited.  And then going on from there, it says you were surprised to find that the Southern District of Georgia did not have a local criminal rule like the Northern District does concerning juror contact.  Being surprised -- and we'll go on in a minute to talk about what exactly you did in terms of looking at other parts of the rules -- but did you conduct anybody, any counsel?

A      No, I didn't.

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

29

Q    When you made these plans to go down to see -- you came down on January 12th.  How long were the plans in effect that you rounded up your group of 14 and made hotel reservations?

A    A week or two.  We came down on the 11th and interviewed them the morning of the 12th, and I think everybody left the afternoon or evening of the 12th.

Q    Okay.  So that was something that was sort of planned out maybe right after the new year?

A    I would say yeah.  I would say maybe the end of December, probably more the beginning of January, probably only a week or too.

Q    Now, when would you have contacted Mr. Jackson to sign off on you as local counsel?

A    Either the day he did or the day before.

Q    So that was right around the same week where you were bringing the group down here?

A    Right.

Q    Did you tell him you were going to be in town?

A    No, I don't think I did.

Q    You didn't ask him anything about, you know, local procedure or whether, you know, "Have you ever heard of anybody doing these kinds of things?"

A    No, I didn't.

Q    You didn't contact trial counsel?

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

30

A    Not about this.  I've talked to them before.

Q    Who was trial counsel?

A    William Bell and Richard Darden.

Q    You would have gotten some information from them in terms of their file?

A    Yeah.  They both gave me their files, actually, probably on direct appeal.  Mr. Bell gave me the files when we had the direct appeal case.  Mr. Darden sent them probably over the summer, his files.

Q    And in terms of when it says here -- I'm looking at the second paragraph -- "I double-checked the Southern District's local rules and again found no such prohibition."  You've mentioned to Mr. Bourne that you now see a prohibition in there.  Is it just something you missed in going through?

A    Yes.  When I say "the local rules," I went back through the local criminal rules because I -- you know, whether it's right or wrong, I believed that, because this was a criminal jury, that the criminal rules applied and I didn't read the historical note.  So I didn't even think that there was any possibility of any incorporation.  So I looked at the local criminal rules, and then I went back and I looked at Rule 47 of the Southern District's civil rules to see.  I figured, well, if ours is 47, it's probably 47 in theirs.  And I looked and it was not.  There

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

31

was no prohibition there either.

Q    Okay.  And I'm going now, you know, back three or four months in time to your mindset, but because you were surprised, did that give you any inkling that you should call somebody in the local bar who is more conversant with the practice in terms of that?

A    It didn't.  It probably should have, but it didn't.

Q    Okay.  You instructed the people -- I'm going to the last paragraph on page two.  "Before sending people out, we had a meeting during which I instructed them to clearly identify themselves as working for me," and I'm skipping some information, "but if the juror requested, to give him or her one of my business cards.  Further, I instructed them to be polite.  If any juror asked if he or she had to speak with us, to instruct that juror that he or she did not."  And then you were to thank them for their time if they didn't want to speak to you and then leave.  I think you've said this earlier, but just to be clear, that was something you verbally gave the instructions to?

A    That's correct.

Q    Everybody, every team that went out, I think you said earlier, had somebody who had prior to this done these kinds of interviews?

A    I think so.  I think so.

32

Q    Have you ever heard back any negative comments about any of those people in terms of behavior or demeanor?

A    No.

Q    What is your experience in terms of percentages, if you will, or estimates, what percentage of jurors are willing to talk to you in these kinds of cases?

A    I'm surprised at the number that do, you know, that we show up and knock on their door and say who we are, who we represent, and what we're doing.  I'd say it's more than 50 percent and often they'll invite you into their house.  That happens a lot.

Q    What exactly -- say in this case, say a juror, you knocked on his or her door and they said, "Okay, you're with Federal Defender and you're representing the defendant.  Come on in."  What would you tell them?

A    Well, we would ask them what their impressions were.  We're trying to find out what happened.  It's not a secret; we're trying to investigate whether there was any improper juror conduct.  So we'll ask them questions about the trial.  Did they have any contact; what were the bailiffs like; that type of thing.

Q    Improper juror conduct in any respect?

A    Mostly, we're looking for were there questions that were not recorded; did they have any questions.  For instance, I was involved in a state case where we found out

33

that the jurors actually had a question for the judge about no parole. They asked the bailiff, and the bailiff answered the question without taking it to the judge. That is just an example of the type of, you know, juror misconduct that might be out there.

Q    In Mr. Brown's case, when you went down there for these interviews on or about January 12th, did you have anything specific in mind you were going to ask jurors about or was it more open-ended, you know, was there any misconduct?

A    Open-ended. It was strictly an information gathering.

Q    You said you obtained affidavits from a number of jurors, not just the one that was attached to your motion?

A    Right; from two others, I think.

Q    Two others. What number of the jurors that were down here agreed to talk to you, do you remember?

A    I would think that there's at least six. Like I said, I spoke to that gentleman for probably two or three minutes, but it had nothing to do with the case. At least six.

Q    If we go into something that is, you know, that you feel like you can't answer for attorney-client privilege or whatever, feel free to say no, but I'm going

to ask questions.  With regards to the people who talked to you, were the stories entirely consistent with what Mr. Little's affidavit was?

MR. DIXON:  I think what we would invoke attorney-client privilege.

Q    That's fine.  I felt like as I asked that, that that was probably something -- but you got affidavits from three people?

A    I believe that's right, Mr. Little and two others, I think.

Q    Mr. Little's affidavit, he would have been interviewed by your two investigators?

A    That's correct.

Q    And then they prepared the affidavit?

A    They came back to the hotel, told me what transpired in the interview.  And the investigator and I -- I sat at the computer and we wrote out the affidavit as the investigator, you know, told me the information.  I put it in the form it's in.  I think we e-mailed it or FedEx'd it back to Mr. Little.  He looked at it, and I think he signed it without change.  And I think we instructed him -- I'm not even sure -- it's not in front of me, but I think we had him initial each page.  I'm not sure.  That's often something we do so that there can be no doubt that is the affidavit he signed and there's been no modification by

*Jeffrey Ertel 4/14/08*          *Drake Reporting, P.C.*

35

anybody.

Q    Was that the same procedure employed with the other two people?

A    No.  The other two people, the people out in the field spoke to the juror, got whatever information there was, and they actually handwrote it there, is my recollection right now.  I believe that's the way.  It was just done at the spot and, like I said, each team had a notary.  Mostly our secretaries are all notaries.  So they would be there to notarize it.

Q    Sure.  I take it efforts were made to contact all 16 of the jurors?

A    That was my intention.

Q    Is that 12 jurors and four alternates?

A    That's what I recall.

Q    How many were unable to even -- you were unable to even reach?  Do you know?

A    I think four.  I think we contacted in some form 12, I think.  I mean it might be more or less, but we tried to contact everybody.

Q    Do you have in your file notes or memoranda or even handwritten notes from any of the investigators or from you, you know, "Juror number 14, couldn't contact"?  Is that still around?

A    It's still around.  There are memos in there.  I

36

don't think there are any handwritten notes.

Q    What I would suggest in this case is that you -- whatever you feel you want to provide to us that will then be seen by the Court in this proceeding, we'll pass along. And, if there's anything that's confidential or attorney-client protected, which I know there is going to be certain things, we're going to ask you to provide whatever you're willing to provide, basically. We're not going to later come to you and say, "Give us this or give us that." If there's something that you feel like you can provide to us, please do. If there's not, you know, maybe by the time that you read and sign the deposition -- that'll be 30 days -- if you can just provide to us whatever information you will, I think that's the best way to handle that. Did you have any follow-up conversations with anybody after that weekend?

A    I think just Mr. Little.

Q    Just Mr. Little.

A    I don't know if there were conversations. That would have been -- my investigator is the person that dealt with him. I never talked to Mr. Little. So I felt it best to have the person that did the interview. And I don't know if he called him or if they just communicated by e-mail. I'm not sure how that went, but there was some contact. I don't know if it was by phone or e-mail.

*Jeffrey Ertel 4/14/08*              *Drake Reporting, P.C.*