37

Q    Okay.  And all those contacts with Mr. Little would have been prior to the date of his declaration?

A    Yes.  He may have called once afterwards to make sure everything was okay.

Q    But clerical, to just make sure, "You guys got the thing I sent back"?

A    Right.  No substance after.

Q    Since that date -- we'll use his date, the date of his declaration, January 17th, 2008 -- other than maybe one follow-up phone conversation with him, there have been no communications with any of the other jurors?

A    No.

Q    Okay.  And we have attached this as Exhibit 5.

MR. BOURNE:  It's a little bit unusual to have a deposition in a case like this, but thank you for coming down and agreeing to speak with us.  Thank you, Mr. Dixon. Do you have any questions you'd like to --

MR. DIXON:  Yeah.  I've got a few things I want to address, if I might.

MR. BOURNE:  Sure.

MR. CROWDER:  Absolutely.

EXAMINATION

BY MR. DIXON:

Q    To clarify a few points I think were earlier made, in your assignments of teams to interview jurors, did

38

you attempt to pair someone that had experience in this with someone who was more of a clerical person?

A    That's right.

Q    To your recollection, did every team have at least one experienced person on there?

A    Yes, and I think the one thing that there's a caveat on is one team, the experienced person was actually a law student, but she had done juror interviews before.

Q    You were asked a question by one of these gentlemen if any teams were specifically assigned to specific jurors.  Do you recall that?

A    Yes.

Q    And your answer was no?

A    Right.

Q    Now, was there a person on your team named Jenny Moore?

A    Yes.

Q    Did you ascertain that Jenny Moore was actually from Effingham County or Chatham County?

A    Yes.

Q    Did you ascertain that Jenny Moore actually was distantly related to one of the jurors?

A    Yes.

Q    Because of that, did you specifically not assign Jenny Moore to that juror?

39

A     Yes.

Q     You did not actually conduct an interview of anyone.  Is that correct?

A     With the --

Q     Other than make contact because both of them refused to talk to you?

A     That's correct.

Q     Well, one of them you couldn't get and the other one declined, correct?

A     That's correct, yes.

Q     Could there have been some persons that held over until Sunday after the original Saturday to follow up on interviews or do you recall?

A     There might have been.  There might have been. If it is, it was Saturday and Sunday, but I don't -- my recollection is most -- the only thing I have is I thought maybe one of the groups -- people that stayed, but I don't think they did any more interviews, at least not that I recall.  There was supposed to be -- somebody was there to watch -- there was a basketball game or something that they were looking forward to, or a football game.  It was a football game.

MR. BOURNE:  On TV?

A     Yeah.  They were going to watch the football game that night.  As a matter of fact, it was the

investigator who got Mr. Little's affidavit.  He was going to -- he and the person he was teamed with was going to watch one of the playoff games, I believe.

Q    If I may clarify that, you mentioned that you had briefly a case in 1993 or 1994, the Blankenship case?

A    That's right.

Q    It was in District Court, but it was a state habeas, correct?

A    It was a 2254, yes.

Q    Were you employed at that time by the Federal Public Defender or were you --

A    No.  I was at Georgia Resource Center at the time.  I was a staff attorney with them.

Q    Let me direct your attention to the time period when you were looking at the local rules prior to these interviews.  You had indicated, I believe, that you looked both in the civil and criminal rules and did not see the prohibition, correct?

A    Yes.

Q    Did you express your surprise to anyone that you do not find such a rule?

A    Yes.  I mean my boss, Stephanie Kearns, and I discussed it.  She had to approve everybody coming down here.  I told her, I said, you know, "I can't believe that they don't have one.  I'm pretty sure they're going to have

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

41

one after we're done."

Q    Other than Ms. Kearns, do you recall anyone else you might have --

A    A number of people.  You know, it was probably everybody that I took down there.  I probably said it in their presence.

Q    Now, correct me if I'm wrong.  This is the first federal death penalty case you've ever had the occasion to be involved in, I mean in the habeas context?

A    That's right.  That's right.

MR. DIXON:  I think that's all the questions I have.  Do you gentlemen have some follow-ups?

MR. CROWDER:  Yeah, if that's all right.

MR. DIXON:  Sure.

REEXAMINATION

BY MR. CROWDER:

Q    What was the name of the investigator that got Mr. Little's affidavit?

A    Jordan D-A-Y-A-N.

Q    He's investigator in your office?

A    That's correct.

Q    How long has he been there, roughly?

A    Well, he came on right after the Eric Rudolph case resolved itself.  So it hasn't been all that long.  I think he worked as a contract -- independent contractor on

42

the Rudolph case and then --

Q    Stayed on permanent?

A    -- we hired him after that.

Q    Okay.  You mentioned there was an investigator named -- I think you said Jenny Moore?

A    Jenny Moore is a secretary.

Q    A secretary, and she's from Effingham County and she was related to one of the --

A    I don't know if she's from Effingham or Chatham County.  She's actually related to Mr. Little.

Q    Did she contact Mr. Little ahead of time?

A    I specifically told her not to.  Did not want any --

Q    Was her name given to Mr. Little by Mr. Dayan?

A    Dayan.  I don't think so.  I wasn't there, so I don't know.

Q    You didn't tell him to do that?

A    No, I definitely did not.  I told him not to.

Q    Now, can you find out for us, and I'll ask that you provide this information if you could, the names of the two investigators who would have interviewed Juror Cooper, if you can ascertain that information?  I think Mr. Bourne indicated there was two females, one white, one African-American.  If you can't, if you could just let us know that you can't, but if you can, find out from them.  I

43

would also like to know -- do you think he's one of the ones who gave an affidavit?

A    I don't think so, and I don't think I have a memo on it either.  So I don't know.  My lawyer --

MR. DIXON:  If my notes are correct, it was Calie Jones and a Stribling.

A    Valencia Stribling, V-A-L-E-N-C-I-A, S-T-R-I-B-L-I-N-G, I believe is her name.  She's a secretary.  Calie, C-A-L-I-E, Jones is an investigator with the Federal Defender.

Q    How long has she been an investigator?

A    About 25 years.

Q    All with the Federal Defender?

A    That's my understanding.

Q    Ms. Stribling, how long has she been in your office?

A    I think she's the receptionist.  I take that back.  She has been there less than two years.

Q    Was this a volunteer thing or were people paid overtime or comp time?

A    I think they got comp time.  I mean their expenses were paid and I think then our boss gave them comp time, only for the secretaries.  Investigators and lawyers have salaries, so we don't --

Q    Right.  Sounds familiar.  Now, your boss, you

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

44

mentioned you had a conversation.  What was her name again?

A    Stephanie Kearns.

Q    Is she the Federal Defender for --

A    She's the, yes, the Executive Director.

Q    Executive Director.  And you mentioned to her, in approving this trip for this number of people, that there was no rule and you were surprised by that?

A    Yes.

Q    Did she offer anybody's name down in the Southern District of Georgia that you could contact to make sure?

A    No.  I don't think there was any discussion.

Q    What was the nature -- I know it with somewhat in jest, but what was the nature of "They'll have a rule after we finish this"?

A    I figured if we went out and had any success with any of the jurors, that there might be a movement to have a local rule to prohibit contacting jurors.

Q    Is that what happened in Atlanta?  Is that how -- you were there, obviously, when that rule came about?

A    I don't know how that came about.  I honestly don't.  I don't know.  I think it was Judge Evans, who was the Chief Judge at the time, just instituted this rule, and I don't know if there was anything that precipitated it. Like I said, I think it was 2004, but it might have been

45

before then, but it's -- I know that there was a story that I heard that a former lawyer in our office interviewed jurors when there was no rule, and he was called up before Judge Murphy, and I don't know when that was.  I think it was in the 90s.

Q    And Judge Murphy was not happy about the interview process?

A    Apparently, one of the jurors called him and complained that he had been contacted about the case, and I don't know the details.  It wasn't my case and I just heard the story after Judge Edenfield's order.

Q    Had there been a local rule, what would you have -- had you known about the local rule that was in existence, what would you have done?

A    I think, out of an abundance of caution, I would have asked for the Judge's permission, if I would have seen that rule.  Even without the historical note, I probably would have then asked for the Judge's permission.

Q    Just to be clear, I don't think it's a historical note.  I think it's just a prefatory note to the rule.

MR. BOURNE:  A preamble, I think.

Q    I don't think they have historical notes.

A    In my copy, in the West, it's listed as a historical note.  I know the Judge says in the preamble,

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

46

but whatever it is, I think we're talking about the same thing.

MR. BOURNE:  Let me just show you this and see if this is it.

Q    Because it may be something different we're talking about.

A    It is.  This is the language, but the book that I had, the West book, has a black -- in bolded black is "historical note" and then this language appears after it.

MR. BOURNE:  Okay, and we'll mark that as well.

MR. CROWDER:  Exhibit 6, and I don't know that we have a copy for you, Mr. Dixon.

REEXAMINATION

BY MR. BOURNE:

Q    I just have one last question.  The timing is a curiosity to me.  You're coming down here.  You've got a bunch of people from Atlanta coming down.  It's about the same time that you're having contact with Mr. Jackson to get him to sign on as local counsel.  Did you not think to ask him, "Is there any prohibition against contacting" -- the local rules -- I mean you were surprised enough to mention it to your boss, but you didn't mention it to your local counsel?

A    No.  I've known Terry.  Terry used to be on the Board of Directors at the Resource Center.  I've known

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

47

Terry since 1992, since I got here.  He was local counsel in the Blankenship case.  I read the -- I thought I read the rules sufficiently.  You know, I just didn't see it.  I didn't think it was, you know.  I think I asked Terry to sign on.  He signed on so I could get admitted and he helped me file some pleadings.  We had some problems with the electronic filing, but other than that, I haven't involved Terry at all.

MR. BOURNE:  Thank you, sir.

MR. DIXON:  Thank you.

MR. CROWDER:  I take it he'll read and sign.

(NOTE:  Off the record.)

MR. DIXON:  I think my client has something to say.

REEXAMINATION

BY MR. DIXON:

Q     Are you sorry you caused this kind of problem?

A     Yes.  Obviously, I missed a rule that was pretty apparent on its face and, you know, I apologize.

Q     Was it inadvertent?

A     Definitely.

Q     Have you ever been accused of any kind of impropriety like this before?

A     No.

Q     How long have you been practicing law?

*Jeffrey Ertel 4/14/08*                     *Drake Reporting, P.C.*

48

A    Since 1992.

Q    Is it your desire to apologize to the Court and make this right the best way you can?

A    Yes.

MR. BOURNE:  We don't have any questions.

WHEREUPON, THIS DEPOSITION WAS CONCLUDED AT 12:02 P.M.

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

49

C E R T I F I C A T E

I hereby certify that the foregoing transcript is a true and complete record of the testimony, taken and transcribed by me and/or under my supervision, in the captioned proceeding;

That I am neither a relative nor employee of any of the parties or attorneys nor financially interested in the outcome of the action;

That the original transcript shall be furnished to the U.S. Attorney, Savannah Division, Southern District of Georgia.

THIS CERTIFICATION is expressly withdrawn and denied upon the disassembly of the foregoing transcript of proceedings and/or any exhibits or any part thereof, for any purpose, unless said disassembly is by the undersigned certified court reporter and/or under the auspices of Drake Reporting, P.C., and the signature and original seal is attached thereto.

SO WITNESS MY HAND AND OFFICIAL SEAL at Savannah, Chatham County, Georgia, this 20th day of April, 2008.

_Linda C. Drake_ , GA. B-757

Linda C. Drake, C.C.R., C.V.R.

*Jeffrey Ertel 4/14/08*                    *Drake Reporting, P.C.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

**UNITED STATES OF AMERICA**

v.                          403CR001
                            407CV085

**MEIER JASON BROWN**

**ORDER**

After convicting Meier Jason Brown of robbing and murdering a federal employee within federal jurisdiction, a jury (and thus this Court) sentenced him to death. Doc. # 276, *aff'd*, *U.S. v. Brown*, 441 F.3d 1330 (11th Cir. 2006), *cert. denied*, 127 S.Ct. 1149 (2007). Brown, who is indigent, successfully moved this Court for appointment of counsel to assist him in filing a 28 U.S.C. § 2255 motion. 403CR001, doc. ## 327, 328.

Counsel just filed Brown's § 2255 motion. 407CV085. Doc. # 8. It cites an affidavit from the trial jury's foreman, Bruce Little. *See, e.g., id.* at 10 n. 2; doc. # 9-2 at 16. Little relates his belief that, had he been provided certain information, he would have voted for a life sentence for Brown. Doc. # 9-2 at (docket screen page) 21. He attests that he voluntarily agreed to meet and speak with Brown's representatives. *Id.* Little also evidently provided them with the notes he made during trial. Doc. # 8 at 95 n. 32; doc. # 9-9 at 44; *see also* 403CR001, doc. # 271 at 5 (note-taking by the jury is permitted at trial in this district).

That, in turn, compels the Court to question whether counsel violated S.D.GA.Loc.R. 83.8, which in pertinent part states:

No party, attorney, or other person shall, *without Court approval*, make or attempt any communication relating to any feature of the trial of any case with any regular or alternate juror who has served in such case,

whether or not the case was concluded by verdict.

(Emphasis added). The rule[1] is designed to, among other things, ensure jurors' post-verdict privacy, if not safety.[2] *See U.S. v. Giraldi*, 858 F. Supp. 85, 86 (S.D. Tex. 1994), cited in *Com. v. Silva*, 864 N.E.2d 1, 5 (Mass. 2007), and in D. Weinstein, *Protecting a Juror's Right to Privacy: Constitutional Constraints and Policy Options*, 70 TEMP.L.REV. 1, 39 n. 274 (Spring 1997).

Of course, it matters not that a given juror did not mind being contacted, as evidently is the case here. What matters is that jurors in this case were contacted *at all* without Court approval. And while it's conceivable that Little contacted Brown's counsel on his own, that seems unlikely. More likely is that counsel, directly or through a surrogate, contacted Little as well as other jury members. Yet, there is no evidence of

---

[1] It is part of this Court's local *civil* rules but the preamble to the Court's local *criminal* rules reminds that "[t]hese Local Rules for the Administration of Criminal Cases are supplemental in nature, and are to be construed consistently with the generally applicable Local [Civil] Rules...." *See* online "LOCAL RULES FOR THE ADMINISTRATION OF CRIMINAL CASES" at 1. http://www.gas.uscourts.gov/lr/lcrimr1.htm. (site as of 2/4/08).

[2] As one encyclopedic source summarizes:

> Jurors have postverdict privacy rights. The court bears the burden of preventing substantial threats to the administration of justice and preserving jurors' entitlement to privacy and protection against harassment even *after* trial, and its power to prevent harassment of jurors does not end upon the termination of the case. It may protect jurors against harassment, not only from journalists, but also from those interested in the criminal network from which the convictions emanated.

50A C.J.S. JURIES § 511 (*Matters subsequent to trial or discharge of jury*) (Dec. 2007) (footnotes omitted).

DEPOSITION EXHIBIT

PENGAD-Bayonne, N.J.

the prior Court approval required by Rule 83.8.

Brown's counsel, admitted *pro hac vice* (407CV085, doc. # 7) is charged with knowledge of this Court's rules. If attorney Jeffrey L. Ertel knowingly and willfully violated Rule 83.8, then he is subject to criminal contempt. *See, e.g., U.S. v. Bernardine,* 237 F.3d 1279, 1282 (11th Cir. 2001).

The Court therefore refers this matter to the U.S. Attorney for 18 U.S.C. § 401(3)[3] and 18 U.S.C. § 402 criminal prosecution purposes,[4] specifically for obstructing the administration of justice. *Cf. U.S. v. Warlick,* 742 F.2d 113, 117

(4th Cir. 1984) (contempt sanctions arising from pretrial contact with jurors); *U.S. v. Kozel,* 908 F.2d 205, 208 (7th Cir. 1990) (Government prosecuted attorney for criminal contempt arising from violation of local court rule authorizing contempt finding against person who exercised the privileges of a member of the bar of the court prior to admission; upholding the conviction, the Seventh Circuit noted that the rule was sufficiently specific to inform a reasonable person that entering an appearance without having joined the district bar was conduct covered and forbidden by the rule).

This  4  day of February, 2008.

---

[3]  18 U.S.C. § 401 provides in its entirety that

> [a] court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as--
>
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions;
>
> (3) Disobedience or resistance to its lawful writ, process, order, *rule,* decree, or command.

(Emphasis added). "A local rule is the equivalent of a standing order of the district court, *Jones v. Central Bank,* 161 F.3d 311, 313 (5th Cir.1998); and a standing order is an order for § 401(3) purposes. *Seymour v. United States,* 373 F.2d 629, 631 (5th Cir.1967)." *U.S. v. Herrera,* 2001 WL 422627 at * 3 (5th Cir. 2001) (unpublished).

[4]  *See In re U.S.,* 398 F.3d 615, 618 (7th Cir. 2005) ("In the rare situations when a prima facie case of criminal contempt has been made out, and the contempt is not committed in the judge's presence (and thus amenable to summary disposition), the judge *must* turn the matter over to a prosecutor rather than assume an inquisitorial role inappropriate to the Judicial Branch") (emphasis added); *accord Romero v. Drummond Co., Inc.,* 480 F.3d 1234, 1243 (11th Cir. 2007).

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

# LR 83. ATTORNEYS, COURT FACILITIES, AND BUSINESS - Amendments

## ATTORNEYS -- GENERAL

**LR 83.1 Roll of Attorneys.** The bar of this Court shall consist of those persons heretofore admitted to practice in this Court and those who may hereafter be admitted in accordance with this rule.

**LR 83.2 Eligibility.** Any attorney who is a member in good standing of the State Bar of Georgia is eligible for admission to the bar of this Court.

### LR 83.3 Procedure for Admission.

(a) Each applicant for admission to the bar of this Court shall file with the Clerk a written petition, on the form provided by the Clerk, setting forth his residence and office address, and the other courts to which he has been admitted to practice. The petition shall be signed by two members in good standing of the bar of this Court who recommend his admission.

(b) The Clerk shall furnish each petitioner with a set of instructions on the procedure for admission in the particular division of the Court where the petition is filed. A petition in the proper form will be presented to a judge of this Court. The petitioner will make suitable arrangements thereafter with the Clerk for his appearance and admission in open court or in chambers in accordance with the Court's instructions.

(c) When a petition is called, one of the members of the bar of this Court shall move the admission of the petitioner. When admitted, the petitioner shall take an oath in the following form:

> I do solemnly swear or affirm that I will support the Constitution of the United States; that I will bear true faith and allegiance to the government of the United States; that I will maintain the respect due to the courts of justice and judicial offices; that I will well and faithfully discharge my duties as an attorney and officer of this Court; and that I will demean myself uprightly and according to the law and the recognized standards of ethics of the legal profession. So help me God.

(d) The petitioner, after taking the foregoing oath, will then sign the roll of attorneys in the division where admitted and will pay to the Clerk the prescribed enrollment fee.

### LR 83.4 Permission to Practice in a Particular Case.

(a) Georgia bar members who reside in this district or maintain their principal place of business in this district shall not appear before this Court via *pro hac vice* admission, but instead must join this Court's bar, even to represent someone in one (or an occasional) case.

(b) Any attorney not subject to LR 83.4(a), but who is in good standing with the bar of another federal district court, may be permitted to appear and participate in a particular case before this Court, whether civil or criminal, with the prior approval of this Court, subject to the following conditions:

> (1) *pro hac vice* counsel must designate, by a writing filed in the case in which appearance is sought, some willing member of this Court's bar upon whom motions and papers may be served. For that designation to be

DEPOSITION EXHIBIT 2

effective, such local counsel must enter a written appearance in the case.

(2) *pro hac vice* counsel also must: (i) certify, in a writing filed with this Court, membership in good standing of a federal district court; and (ii) file with the Clerk of this Court a certificate of good standing from that court.

(c) Any attorneys representing the United States Government, or any agency thereof, may appear and participate in particular actions or proceedings in an official capacity without a petition for admission, provided the attorney is a member of a federal district court's bar. Any such attorney so appearing shall certify to the Court in writing that he or she has read and is familiar with the local rules. Further, unless excused from doing so by the presiding judge, any such attorney shall be accompanied at hearings and trials by an Assistant United States Attorney of this district who shall also review and sign pleadings.

### LR 83.5 Disbarment and Discipline.

(a) Any attorney who appears in a case or proceeding, or who represents a party in interest in a case or proceeding, may for good cause shown, and after notice and hearing, be disbarred, suspended from practice for a definite time, reprimanded, or subjected to such other discipline as the Court may deem proper.

(b) If any attorney appearing in a case or proceeding, or representing a party in interest in a case or proceeding, has been disbarred or suspended from the practice of law by the State Bar of Georgia or the courts of the State of Georgia or any other state, or has been convicted of a felony or any crime involving moral turpitude, such attorneys may be provisionally suspended forthwith from practice before this Court; and, unless good cause to the contrary is shown within thirty (30) days from the date of such suspension or conviction, an order of disbarment shall be entered.

(c) Any person who is not admitted to the bar of this Court or who has been disbarred or suspended, and who exercises in this Court any of the privileges as a member of its bar, or pretends to be entitled to do so, shall be in contempt of this Court and subjected to appropriate punishment.

(d) The standards of professional conduct of attorneys appearing in a case or proceeding, or representing a party in interest in such a case or proceeding, are governed by the Georgia Bar Rules of Professional Conduct and the American Bar Association's Model Rules of Professional Conduct. When a conflict arises, the Georgia Bar Rules of Professional Conduct shall control. A violation of any of these rules in connection with any matter pending before this Court may subject the attorney to appropriate disciplinary action.

(e) The notice of hearing for any proceeding to be conducted under subparagraph (a) of this Rule shall include the specifications of charges and complaints against any member of the bar considered by the Court for disciplinary action, the time by which a response thereto shall be made, and the time, date and place of any hearing therein.

(f) Any disciplinary proceedings under this Rule shall be closed except that the Court may, in its discretion, open to the public any such proceeding when justice so requires or when the subject of any disciplinary action so requests.

(g) Where in a matter pending before an Article I Judge it appears that any attorney appearing in case or proceeding, or representing a party in interest in such case or proceeding, has violated any of the

in a criminal case or being substituted for counsel then of record in the case, upon being associated with or replacing counsel or upon being retained by a party or parties to the case, shall notify the Clerk in writing of his appearance in the case. Counsel so registered as counsel of record will not be relieved of such responsibility except upon order of the Court as hereinafter prescribed.

(d) Whenever a party has appeared by attorney, he may not thereafter appear or act in his own behalf in the action or proceeding, or take any step therein, unless an order of substitution shall first have been made by the Court, after notice to the attorney by such party and to the opposite party, provided, that the Court may hear a party in open court, notwithstanding the fact that he has appeared or is represented by an attorney.

(e) No attorney shall withdraw his appearance in any action or proceeding, either civil or criminal, except by leave of the Court as hereinafter prescribed.

(f) When an attorney dies, or is removed or suspended or ceases to act as such as hereinafter prescribed, a party to an action or proceeding for whom he was acting as attorney must, before any further proceedings are had in the action on his behalf, appoint another attorney or appear in person, unless such party is already represented by another attorney. Failure to so act or to so appear in person and to furnish his address to the Clerk shall constitute a default on his part.

(g) If an attorney for any party is examined as a witness in an action or proceedings, and gives testimony on the merits, he shall not argue the merits of the case or proceeding, either to the Court or jury, except with the permission of the Court.

(h) Only one attorney on each side shall examine or cross examine a witness, and not more than two (2) attorneys on each side shall argue the merits of an action or proceeding unless the Court shall otherwise prescribe.

**LR 83.7 Withdrawal as Attorney of Record.** Attorneys representing parties in any case, desiring to have their names stricken of record, shall so request one of the District Judges of this Court, in writing and in duplicate, through the Clerk of this Court, and shall disclose that such attorney has given due notice to his client of his intention to withdraw from the case, and shall specify the manner of such notice to the client, attaching copy of the notice. Such notice to the client shall be given at least ten (10) days prior to the request to the Court. Upon the filing of the request with the Clerk, a copy thereof shall forthwith be mailed to the client and within ten (10) days thereafter, such request shall be presented by the Clerk to the District Judge for his action thereon. Ordinarily, counsel will not be allowed to withdraw after pretrial if such withdrawal will delay the trial of the case, in which event the attorney shall continue as responsible for the handling of the case.

**LR 83.8 Relations with Jury.** All attempts to curry favor with juries by fawning, flattery, or pretending solicitude for their personal comfort are unprofessional. Suggestions of counsel, looking to the comfort or convenience of jurors and propositions to dispense with argument or peremptory challenges, should be made to the Court out of the presence of the jury or its hearing. Before and during the trial, a lawyer shall avoid conversing or otherwise communicating with a juror on any subject, whether pertaining to the case or not. No party, attorney, or other person shall, without Court approval, make or attempt any communication relating to any feature of the trial of any case with any regular or alternate juror who has served in such case, whether or not the case was concluded by verdict.

**LR 83.9 Leaves of Absence.** An application by an attorney for a leave of absence shall be in writing, listing all cases by name and number for which protection is desired by the attorney. Said

DEPOSITION
EXHIBIT
3

# United States District Court
## Southern District of Georgia

FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2008 JAN 10 PM 12: 04

CLERK___E. Baca___
SO. DIST. OF GA.

| | |
|---|---|
| Meier Jason Brown | ) |
| **Plaintiff** | ) CASE NO.: 4-07-cv-00085 |
| | ) |
| v. | ) Appearing on behalf of: _____ |
| United States of America | ) Meier Jason Brown |
| **Defendant.** | ) |
| | ) **(Plaintiff/Defendant)** |

### APPLICATION FOR ADMISSION PRO HAC VICE

**Petitioner,** Jeffrey Lyn Ertel , hereby requests permission to appear pro hac vice in the subject case filed in the _____ Division of the United States District Court for the Southern District of Georgia. **Petitioner** states under penalty of perjury that (he/she) is a member in good standing of the Bar of the following United States Court, Northern District of Georgia .
**Petitioner** states further that (he/she) is eligible for admission under Local Rule 83.4 and that (he/she) does not reside or maintain an office for the practice of law in the Southern District of Georgia.

**Petitioner** designates George Terry Jackson as local counsel. His/her business address is provided below in the Consent of Designated Local Counsel.
**Petitioner** further certifies that (s)he has read, is familiar with, and will comply with the Local Rules of the Southern District of Georgia.

This __9th__ day of __December__, 2008.

_____
(Signature of **Petitioner**)

### CONSENT OF DESIGNATED LOCAL COUNSEL

I, George Terry Jackson , designated local counsel for the subject case, agree to readily communicate with opposing counsel and the Court regarding the conduct of this case and accept papers when served and recognize my responsibility and full authority to act for and on behalf of the client in all proceedings related to this case, including hearings, pretrial conferences and trials, should the **Petitioner** fail to respond to any Court order for appearance or otherwise.

This __10th__ day of __January__, 2008

386600
Georgia Bar Number

(912) 232-2646
Business Telephone

_____
Signature of Local Counsel

Jackson & Schiavone
(Law Firm)

1111 Bull Street
(Business Address)

Savannah, Georgia 31401
(City, State, Zip)

_____
(Mailing Address)

**DEPOSITION EXHIBIT
4**
PENGAD-Bayonne, N.J.

## STATEMENT OF JEFFREY ERTEL

I am a lawyer licensed to practice in the State of Georgia since 1992. In that time, I have continuously represented indigent death sentenced inmates in capital habeas corpus proceedings in both state and federal courts. Since 1996, I have been employed with the Federal Defender Program, Inc., in Atlanta Georgia as a staff attorney. In February of 2006, I was made Senior Litigation Attorney, a position I currently hold.

In April of 2004, Mr. Donald Samuel and I were appointed by the Eleventh Circuit to represent Meier Jason Brown, who had been convicted and sentenced to death in the United States District Court for the Southern District of Georgia. Mr. Samuel and I litigated the direct appeal and when the conviction and death sentence were affirmed on appeal, we filed a Petition for Writ of Certiorari with the United States Supreme Court which was ultimately denied. Thereafter, in June of 2007, I was appointed to represent Mr. Brown in his post conviction proceedings pursuant to 28 U.S.C. §2255.

Mr. Brown's 2255 petition was due in January and I began the process of investigating his case. As part of that investigation I sought to interview the people who served on the jury which found Mr. Brown guilty and sentenced him to death. This is a process that I routinely employ in the representation of death sentenced state inmates pursing post-conviction remedies and is the norm for attorneys in



DEPOSITION EXHIBIT

5

PENGAD-Bayonne, N. J.

capital post-conviction representation. Because Mr. Brown was convicted in a criminal proceeding in federal court, I consulted the Local Criminal Rules for the Southern District of Georgia to see if contacting jurors was prohibited. I was surprised to find that the Southern District did not have a Local Criminal Rule (like the Northern District does) concerning juror contact.

In order to be sure I had not overlooked something, I checked with the Northern District Rules and found that Rule 47.3 of both the Local Criminal and Civil Rules prohibited juror contact without permission of the Court. I double checked the Southern District's Local Rules and again found no such prohibition. Even though I did not believe the Local Civil Rules applied to Mr. Brown's case, I checked the Southern District's Civil Rule 47, which I believed was the rule that dealt with jurors, and again found nothing that would prohibit me from interviewing jurors.

Believing that I was permitted to interview jurors, I gathered a number of people and set out to find and interview as many of the jurors as I could locate. Before sending people out we had a meeting during which, I instructed them to clearly identify themselves as working for me, Jeffrey Ertel, the attorney who represented Mr. Brown, and that if a juror requested, to give him or her one of my business cards. Further, I instructed them to be polite and if any juror asked if he or she had to speak with us, to instruct that juror that he or she did not. Lastly, in the

event any juror said they did not want to speak with them, they were to thank the juror for his time and leave. A number of jurors were contacted by various people, either in person or by telephone, and a number of jurors spoke with us, a few declined and still a few more could not be contacted. As a result of this investigation, an affidavit from the foreman was obtained. Believing that interviewing jurors was permitted, I attached this affidavit as an appendix to the 2255 petition I filed in Mr. Brown's case.

The first time I knew that there was any hint of a problem, was when I received Judge Edenfield's Order referring my conduct to the United States Attorney's Office for investigation. Only after reading the Judge's Order was I aware of the Local Civil Rule he cited to.

Jeffrey Ertel

LOCAL RULES FOR THE ADMINISTRATION OF CRIMINAL CASES

(Matters of a civil, general, or administrative nature are addressed in LR 1, *et seq.* These Local Rules for the Administration of Criminal Cases are supplemental in nature, and are to be construed consistently with the generally applicable Local Rules, *supra*.)

DEPOSITION
EXHIBIT
6
PENGAD-Bayonne, N. J.

*TC*

# The Deposition of JEFFREY ERTEL 4/14/08

## Page 1 to Page 49

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:  Drake Reporting, P.C.

**Drake Reporting, P.C.**
**P.O. Box 30574**

**Savannah, GA  31410**
**Phone:  (912) 897-3936**
**FAX:  (912) 897-3778**

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA    )
                            )
                            )
VS.                         ) 403CR001
                            ) 407CV065
                            )
MEIER JASON BROWN           )

The Deposition of JEFFREY ERTEL taken by counsel for the United States on the 14th day of April, 2008, in the Office of the United States Attorney, 100 Bull Street, Savannah, Georgia, beginning at 11:05 a.m.

For the United States:      AUSA CARLTON R. BOURNE JR.
                            AUSA KENNETH CROWDER
                            U.S. Attorney's Office
                            Augusta, GA 30901

For Mr. Ertel:              H. DONNIE DIXON
                            7 E. Congress Street
                            Savannah, GA 31401

DRAKE REPORTING, P.C.

## Page 2

INDEX

Preliminaries........................... 3
Examination by Mr. Bourne................ 4
Examination by Mr. Crowder.............. 20
Examination by Mr. Dixon................ 37
Reexamination by Mr. Crowder........... 41
Reexamination by Mr. Bourne............ 46
Reexamination by Mr. Dixon............. 47
Certificate............................ 49

## Page 3

MR. CROWDER:    This is Charlie Bourne. We're with the U.S. Attorney's Office, and we're here in the matter of United States versus Meier Jason Brown, 403CR001 and 407CV085. We're here by agreement of counsel to take your deposition in this case. Have you ever given a deposition before?

MR. ERTEL:    No.

MR. CROWDER:    Have you ever sat in on one or taken one?

MR. ERTEL:    Yes.

MR. CROWDER:    Okay. Well, you know the general rules. He's here to just to elicit some information from you. If you're at all confused by what he's asking -- Mr. Bourne's going to do the questioning -- go ahead and ask him to rephrase it or restate or whatever.

Normally, in depositions, I suggest counsel reserve objections, but I think, because of the nature of this case, if you all want to state an objection, please do so and, if Charlie needs to amend his question or whatever, he will do that. Just in general terms, he's going to ask you to look at some documents and ask you some questions regarding Mr. Brown's case. If you have any questions or need to consult with Mr. Dixon, feel free to do so or if you want to interpose any objections or not answer any questions, just state the basis thereto. With that, I'm

## Page 4

going to turn it -- will you swear the witness?

JEFFREY ERTEL, SWORN

EXAMINATION

BY MR. BOURNE:

Q    Thank you. Mr. Ertel, thanks for agreeing to meet with me. Mr. Dixon told me from the beginning that you wanted to be interviewed on this because of various reasons. Mr. Dixon and I believed this would probably be the best way to conduct this interview, make sure there's a record of it, an accurate record, and go from there. It is my intention -- correct me if I'm wrong -- it is my intention to provide this information, whatever's received, to the Court at some point.

As Ken said, we're here pursuant to Judge Edenfield's order and I'm going to make that an exhibit, I guess Deposition Exhibit 1. I think you've already seen it.

MR. DIXON:    We are familiar with that, yes.

MR. CROWDER:    Do you all have a copy?

MR. DIXON:    I'm almost positive. Yes, we have. We have that copy.

Q    I'd kind of like to work backwards if I could. The District Court referred this matter to us. As the attorney for Mr. Brown, did you have contact with any of the jurors?

A    Personally, I talked to, I believe, one

## Page 5

gentleman who is -- I don't know if it's Skidmore Island, but it was a gated community.

MR. DIXON:     Skidaway Island.

A     Skidaway Island. I called, spoke to his wife. He was on the golf course. He called me back, asked me if he had to speak to me. I told him he didn't and he chose not to, and I can't remember his name for the life of me.

Q     Did you make arrangements for others to contact the jurors?

A     Yes.

Q     And who were some of those others?

A     They were people that worked in my office, secretaries, investigators. And I work for the Federal Defender program in Atlanta, so that will give you a reference. There was a mitigation person who I hired independently. Her name was Sarah Flynn. She's in Jacksonville, Florida. There's a couple of students, I think. If you want their names, I can give you their names, but just general support staff and investigators in our office.

Q     How did you meet with these people, the investigators and the secretaries, how did you meet with them and what instructions did you give them?

A     I had made arrangements -- I had asked for volunteers to go, and all of these folks volunteered. We

## Page 6

met formally in the hotel room, somebody's hotel room. We stayed at the Hampton Inn. It's out -- it's not downtown, but there's a Hampton Inn. I can't remember the name of the street. We met in a room --

Q     Stephenson?

A     Yes, yes. Met in somebody's room. I gave them instructions on going to see the jurors. There were about, all total with me, including me, there were about 14 of us. Not about. There were 14 of us. I gave them instructions to make sure that they, you know, when they contacted the jurors, to make sure that the jurors knew that we were representing Meier Brown, that they were working for me, and that if they asked if they had to talk to us, we were to tell them no, they didn't have to talk to us. If they didn't want to talk to us, we told them to tell them "Thank you for your time" and then go on your way.

Q     And how did you assign who was going to go to see whom?

A     Other than making sure that at least there was -- there were two people in each group. There was always two, and one of them was a notary and one of them had experience interviewing jurors before, and that's how. And as far as going to see jurors, there was no selection on, you know, you're going to go see this person.

Q     Did each team have more than two jurors?

## Page 7

A     I think two teams had three and everybody else had two. If my -- I think there were 16 total, so I think that's the way it broke down, 16 total jurors.

Q     And then you had the guy at Skidaway Island?

A     And one other one that we -- I don't think -- I could be wrong. I could have talked to her on the phone. I don't have really any specific recollection. Somebody spoke to her on the phone. I'm not sure if it was me, and she also opted not to speak to us, whether it was just that I was in the room when whoever was talking to them, but as I recall, it was a female.

Q     Were all the jurors contacted by telephone in advance?

A     No.

Q     So it was just people just showed up?

A     Right. The only ones that were contacted by phone were ones that we couldn't get to their door and knock on their door. Otherwise people would have gone up and knocked on the door.

Q     Did you give any type of instructions to these folks that helped you in writing? Did you have any written instructions to them?

A     No. The only thing I will say, we supplied them with the voir dire transcript and the juror questionnaire from the person. I did not create any. Those documents

## Page 8

were just given to the interviewers.

Q     That kind of leads me to my next question. How did you get the list of jurors?

A     Just from the transcript.

Q     From the trial transcript?

A     Yes.

Q     How about the contact information?

A     I would imagine from the juror questionnaires that were also in -- I believe I got those out of one of the trial attorneys' files.

Q     Did you -- and I hesitate to use this word, but did you target any specific jurors? In other words, did you only think of going to a certain -- did you just have a list that you randomly assigned or did you pick out specific jurors you wanted specific investigators to go to?

A     No. We just sent them out. There was no -- no juror was targeted. We wanted to get every juror. We wanted to interview every juror, but there was no assignment of people to talk to specific jurors.

Q     How many jurors were ultimately contacted?

A     I don't know. I want to say ten or 12. I think probably 12. I don't know. The vast majority of them. The only ones that weren't contacted were people that weren't home. It wasn't for lack of effort.

Q     The ten or 12 that you're referring to, that

## Page 9

included jurors and alternates?

A   Yes.

Q   I saw that the affidavit of Mr. Little was submitted with the pleading. Were there any other affidavits taken?

A   Yes.

Q   Did you just make a tactical decision not to include those?

A   That's correct.

Q   Excuse me just a minute. (Conferred with Mr. Crowder) Would you be willing to turn over any of those affidavits?

A   I would be willing --

Q   If we request.

A   Right. I would be willing. I think ultimately that -- I have an ethical -- I'm sort of in an ethical quandary. I think the client, Mr. Brown, has the ultimate say-so on that. I don't have any objection personally to turning them over, but I think I would have to ask him first and then -- at least, that's what I think.

Q   So if we did make the decision to ask for those, you would consult with him and then let us know?

A   I would do that, yes.

Q   Okay. You already mentioned how they were contacted. The information, the contact information, you

## Page 10

said, was basically from the file, from the public record?

A   Correct, and then I would imagine my investigator went and did, you know, updated it by using ChoicePoint or one of the various databases, but just to get a valid, current address.

Q   And approximately what time frame was this that you all met at the Hampton Inn and then went out?

A   Well, if I'm not mistaken, it was probably January, early January, 10th, 12th, 13th, whatever that Saturday was. I know the petition was due on the 22nd. So it would have been before the 22nd, but I, for the life of me, now I can't remember the exact date, but it was the Saturday before or --

Q   And that was '08, January of '08?

A   Yes, '08.

Q   How many days were you in town to conduct these interviews? Just the one day?

A   Just the one day, just Saturday. I think everybody was contacted Saturday, and I think we had some follow-up contact with Mr. Little to end up getting the affidavit signed and notarized and everything.

Q   Did investigators prepare reports on their contact with the jurors and submit that to you?

A   Some did. I have some memos on that.

Q   Was there any instruction with the investigator

## Page 11

as to how they were to respond to you, whether it be orally or in writing or a report or anything like that?

A   I think I asked all of them for reports. I don't think that I got all of them. I was more interested in reports of the people that I thought we might get affidavits from. But I think I probably got -- I'm guessing, but maybe six memos.

Q   I know this is an obvious question, but let me ask. None of these jurors initiated contact with you. You and your investigators initiated the contact with them?

A   That's correct.

Q   With regard to Mr. Little, the same is true with him; you contacted him?

A   That's correct.

Q   The affidavit that was prepared, was that prepared after he was initially interviewed and then the affidavit prepared and then returned to him for him to review it and sign it?

A   That's correct.

Q   In the group that met, you mentioned the secretaries, the students, the investigators. Was local counsel present?

A   No. He didn't even know we were -- I don't even know if he was on at the time. He might have been officially on, but he had no -- I never talked to him about

## Page 12

this.

Q   You didn't seek the Court's permission before you did this?

A   No.

Q   Now, I'm going to back up a little bit. How did you first come to be into this case?

A   I was contacted by -- I think -- I can't remember her name -- Margaret O'Donnell many years -- or 2003, I think, asking me if I would see if Don Samuel would take over Mr. Brown's representation, and she knew I knew Don. So I put a call in to Don and he said he would take the case, but only if I would be co-counsel with him. So we sought --

Q   Were you in the Public Defenders Office during this time?

A   Yes. I've been in the Public Defenders Office since 1996 with a brief leave. And so Don and I came and did the direct appeal. When cert was denied off the direct appeal, I spoke with -- they call it the National Resource Council. They were having difficulty finding lawyers. They asked me to stay on the case. So I got permission from my boss and we sent a letter to the Chief Judge in the Northern District and sought appointment and Judge Edenfield appointed me in, I want to say, June.

Q   You said the Chief Judge in the Northern

**Page 13**

District?

A    That's correct.

Q    Did you have to get his permission to --

A    I don't know how -- I think we sent him a letter saying that we were going to seek employment and, if there was a problem with that, to get back to me. I don't think he actually ever sort of gave permission. He was just notified that we were --

Q    Is this the first case you've handled in the Southern District of Georgia?

A    I was briefly -- I'm not sure I ever made an appearance. I was briefly involved in one probably in '93 or '94. I think we filed something in the Southern District, but then it was dismissed and sent back to State Court. It was Blankenship versus Zant, I think. It was a habeas case, and it stayed with Judge Edenfield for probably about three days, if I'm not mistaken, a very short time. I never showed up in court. We filed and I think Terry Jackson was local counsel on that one too.

Q    In order to become counsel of record in this case, what steps did you have to pursue?

A    Just to fill out the pro hac vice stuff and submit that, and then part of that is obtaining local counsel and that was -- Terry Jackson agreed to be local counsel.

**Page 14**

Q    How did you find out what you were supposed to do?

A    I think I went on the website.

Q    Which website?

A    The Southern District website.

Q    Did you consult with the local rules with regard to your admission?

A    I believe I did. I think that's the only way I would know what to do. Yeah, I looked at the local rules as far as being admitted.

Q    I'm going to show you Deposition Exhibit 2 and see if that rings a bell. Here's another copy, Mr. Dixon. This Deposition Exhibit 2 is a copy of Local Rule 83.4 which talks about entering a pro hac vice appearance in a court, permission to practice in a particular case.

A    I think that -- I'm assuming. I can't -- I have no independent recollection that I actually read this, but I think I did because I think I followed all the steps that I needed to for admission. So I'm pretty sure I did, but I -- you know. I'm not trying to be evasive.

Q    I've read your statement. Let's just jump right into it. Why did you seek to contact the jurors without the Court's permission?

A    I didn't -- I didn't think I needed the Court's permission because I'd consulted the local criminal rules.

**Page 15**

This was a criminal case originally. It was a criminal jury. I consulted the local criminal rules of the Southern District and I didn't see anything in there. And then I thought it was odd because I know we have such a prohibition in the Northern District. I went and looked at the Northern District rules and found it was, I think, Rule 47 or 47.3. There was also one in the civil rules in the Northern District. So I said, well, maybe it's Rule 47. I went and looked at Rule 47 in the Southern District, civil, which is juries or jurors, but it's selection. It wasn't there. I skimmed the, I guess, the table of contents to see if there's anything else in there that I thought would apply and I didn't see anything. And so I just didn't see the rule.

Q    And now, having read Judge Edenfield's order, you're aware there is a prohibition?

A    I'm aware of it. I'm aware of Rule 83.9 now, yeah.

Q    Did you go back and look at that rule after you got this order?

A    Yeah.

Q    And 83.8, I think, is what it is. It's in the same section. 83 is the admission of the attorney. 83.8 is the relations with the jury. I'm going to show you that definition, Exhibit 3. Here you go. Now, you see that

**Page 16**

83.8 says, the last sentence, that you can't contact the jurors without Court approval?

A    Yes.

Q    And you had just not seen that provision before?

A    No, I didn't see it.

Q    Even though it was in the same section as the admission by an attorney in a particular case?

A    I did not see it.

Q    All right. As the Court pointed out in its order, the preamble to the criminal rules -- did you see that?

A    Only after the Court's order.

Q    Right. And I don't even know if I have a copy of that, but that references the fact that they are to be -- hold on a second. Yeah, it's part of the local civil rules, but the preamble to the local criminal rules says, "These local rules for the administration of criminal cases are supplemental in nature and are to be construed consistently with the general applicable local rules." And that's in the front of the criminal section. Did you think, after reading that, that you needed to look a little harder at the civil rules or did it just not --

A    I didn't read that. I did not read the historical note before when I read -- I read the rules and I did not, until the Judge's order, I didn't -- I wasn't

### Page 17

even aware that that's what the historical note said.

Q    Whenever you sought admission in this case, you had to fill out a form?

A    That's right.

Q    Where did you get that form from?

A    Off the website, the Southern District website.

Q    All right. And I'm going to call that Deposition Exhibit 4 and give you and Mr. Dixon that and ask you to take a look at that. Did you get this and read it?

A    Yes.

Q    And I think the date you signed it is a typo. It says 9th December of 2008, but that should be '7, right?

A    That's correct.

Q    And then Mr. Jackson signed it the 10th day of January of 2008?

A    Right.

Q    The sentence that is of some concern to me is right there above the date, your date, "Petitioner further certifies that he has read and is familiar with and will comply with the local rules." Did you read that before you signed it?

A    Yes.

Q    Did you read the local rules before you signed it?

### Page 18

A    I skimmed most -- I skimmed -- I read all of the criminal rules, the rules themselves. I did not read and memorize all of the civil rules. I skimmed the civil rules. I thought I was familiar with them.

Q    I understand. The reports that your investigators made back to you, did they relay -- and while this might not have anything to do with what we're here for, I just want to ask you. Did they relay the attitude of the jurors in speaking with them? Did they end up saying, "This juror was upset, this juror was not upset," anything like that?

A    I didn't have any reports of any juror being upset. Nobody -- if it happened, nobody reported that to me.

Q    Did you get a report with regard to a juror named ▓▓▓▓▓▓▓ of Richmond Hill?

A    I don't know. I can't recall. I don't think so.

Q    ▓▓▓▓▓▓▓ claimed that this was upsetting to him and brought back emotions that he had tried to forget. And he said he was interviewed by two females. Would they have been investigators, do you know, a black female and a white female?

A    Well, there were three African-American women. One's an investigator; two are secretaries. The

### Page 19

secretaries were with -- were not the lead. They were always with somebody there, an investigator or a lawyer.

Q    Mr. Cooper said that when he asked the ladies when this was going to be over, he was told that they said -- one of them said, "Never. This will never be over. You will always be a part of this." Was that in any report that you were given?

A    No.

Q    Hold on just a second. (Conferred with Mr. Crowder) I see from what you've referred to that the Northern District does have a rule that prohibits contact. Have you contacted jurors in the past?

A    Yes, but not in federal cases. I've done them in state cases, state habeas cases. As a matter of fact, it's the norm. Let me take that back. We have, after trials -- I also do trials. After trials, often the judge will say, tell the jurors in our presence, "If you'd like to talk to the lawyers afterwards, feel free to do that." And in that case, we will -- we might go out and wait and talk to jurors. But that's -- I've never sought formal permission from the court to interview jurors.

Q    Based on that, you've never talked to jurors in a federal case before?

A    Other than, like I say, after the trial, you know, when the judge says, "Feel free to talk to the

### Page 20

attorneys if you want to."

Q    I don't remember the rule in the Northern District. Do you have to get the Court's permission to speak to the jurors?

A    Yes. Yes.

Q    You mentioned this was in January that you went and saw these folks, and I see that Mr. Jackson signed his consent of designated local counsel the 10th of January. Do you think it was before then or after then?

A    I think it was right around then. I know it was Saturday. If the 10th was a Friday, Mr. Jackson was probably on the case by then.

Q    I think January the 10th was a Thursday.

A    I think we -- the 12th sounds familiar to me and I think that's when we saw them.

Q    Did you ever ask Mr. Jackson about the local practice of contacting jurors?

A    No, I did not.

MR. BOURNE:    Mr. Crowder's going to ask you a few questions.

EXAMINATION

BY MR. CROWDER:

Q    I'm just going to follow up a little bit on that. The investigators and secretaries that came down and interviewed the jurors on the 12th of January or

## Page 21

thereabouts, you said they've had experience doing this before?

A    Some. Secretaries, no. This was a first for them. They were there solely as witnesses. When I do these, I will send out always teams of two to avoid any, you, that there's a witness that you're not berating jurors. You're to be polite. You're to be -- you know. I don't want any --

Q    Okay. All these people were employed by the Federal Defender program?

A    No. One is employed as a private contractor out of Jacksonville. That's Sarah Flynn. Two of them were students, law students that aren't currently employed. They were working as interns.

Q    Volunteer interns?

A    Right. And the rest, I think, all the rest were employees of the Federal Defender program.

Q    Now, have you, in your experience doing death penalty type cases or contacting jurors since '92 when you've been licensed, what other districts, federal districts, have you represented defendants in? Has it just been the Northern and Southern Districts?

A    Just the Northern and Southern, yeah. I've represented people in other states, but they've been state proceedings.

## Page 22

Q    Now, in the Northern District, have you ever asked the Court for permission to interview a juror?

A    No. Let me let you know I've never done a federal death penalty case in the Northern District. I've always had state -- people that had state convictions in federal court or in state court, State of Georgia. So I've never -- this was the first capital federal case that I've had.

Q    So if somebody had a 2255 in the Northern District of Georgia, I take it you represented people in those matters that were state cases?

A    2254s, yeah.

Q    2254, excuse me.

A    Correct.

Q    And so the local rules in the Northern District of Georgia do not prohibit you from contacting state jurors in those cases?

A    That's correct.

Q    But you've never had occasion to contact jurors or ask the Court to contact jurors in a federal case?

A    No, not that I recall.

Q    Has anybody in your office, to your knowledge, asked the Court for that?

A    I think the rule just came in like in 2004. So I think it's a relatively new rule.

## Page 23

Q    Prior to 2004, then they could contact the jurors because there was no local rule?

A    I believe so. I think it was 2004. I'm not sure, but yeah.

Q    What is your understanding of how the districts are divided around the country in terms of local rules that prohibit contact with jurors in federal cases?

A    I've only looked at the Northern and Southern now.

Q    You haven't been to seminars where they talked about, you know, X number of districts?

A    No.

Q    Okay. I'm going to go through your statement, if we could, and we're going to attach that. What number are we up to? 4? This will be 5. Okay. Do you have a copy? I'll just give her this when we're done if that's all right. It says you've, going to the second line of the first paragraph, you've represented indigent death sentence inmates in capital habeas corpus proceedings in both state and federal courts. How many of these people have you represented? Estimate if you can.

A    It's got to be more than 20. I think I have seven or eight cases currently. You know, it's got to be more than 20.

Q    What percentage of your work is devoted to 2254

## Page 24

and 2255 work versus trial work?

A    I have a full federal defender caseload as well as what amounts to a full -- we have a capital habeas unit and I have about seven or eight of those cases currently, which is about a full caseload for a capital habeas unit attorney. So it's 50-50, but I think most of my time is spent doing trial work.

Q    Do you only do habeas work in death penalty cases?

A    Yes.

Q    Was there any distinction or difference in your job when you were made a senior litigation attorney versus a staff attorney?

A    I'm just a supervisor now. I have supervisory authority and I also do a little bit of -- you know, we train the new people and stuff like that.

Q    Going to the second paragraph, it says that you were appointed by the Eleventh Circuit in April 2004 with Don Samuel to represent Meier Jason Brown. Was that your first formal connection to this case?

A    Yes.

Q    Because it was in the Eleventh Circuit, you didn't do anything in the Southern District of Georgia?

A    We moved for remand because -- let me think of why. And we got a limited remand to Judge Edenfield. He

### Page 25

never -- oh, that was about whether there was missing transcripts. We had -- we believed there might have been some discussion between counsel and the judge about funding, and we didn't have that. We asked for a remand. The Eleventh Circuit remanded back to Judge Edenfield who then issued an order and said, "No, there were no communications." So that is -- if there's any contact in the District Court, that was it. I never appeared, but it was just --

Q    You didn't do the pro hac vice at that time either because -- or did you?

A    No. This was the first pro hac vice.

Q    Okay. Is this the only other district court you've been admitted to pro hac vice, the Southern District of Georgia?

A    I think so, yes.

Q    The direct appeal, it looks like, was denied before or in June of 2007. Does that sound right?

A    No. Well, certiorari was denied December 22nd, I think -- no, January 22nd --

Q    '07?

A    '07. And then I was hoping that they were going to get somebody else to take the case on direct appeal and then, when they couldn't, they asked me. That's when I --

Q    So the 2255 motion -- now, you understand that's

### Page 26

a civil proceeding in the Southern District of Georgia?

A    My understanding is that it's considered criminal. It's sort of quasi-civil. It's criminal attacking the sentence, but it's civil rules govern is my understanding.

Q    You would have seen the notices, the captions, where it listed a civil case number?

A    Right, and I filed under the civil case number. Yeah, I think I -- I think they do a dual. They want it filed under the criminal and the civil.

Q    Okay. That's where you check that it's got a related case and you would reference the civil or criminal case number so that they're both -- the Court's aware that they're both pending?

A    Just from the clerk telling me that, when I file something in the civil docket, I also have to electronically file it in the criminal docket. That's all. I don't know, but that's what I've been doing. I don't know if that's accurate.

Q    Now, when you came down in January with the team of 14 people, did you go out and interview anybody? I know you talked about interviewing somebody by telephone, but were you one of the seven teams?

A    I was one of the seven teams and both of my people were in the gated community. So I attempted to call

### Page 27

the woman -- I think the other one was a woman, and I don't think I had any luck. I don't know if I left a message. I think she was contacted later by somebody else.

Q    Is that about the same size group that you used in the state cases that you've sent investigative teams to interview jurors?

A    If we could get that many, yeah, we'll take as many teams as we can, but usually it's more like four.

Q    Four people?

A    Yeah. We get volunteers in the state cases, but this was the first time anybody ever used secretaries because I didn't have enough volunteers to do.

MR. BOURNE:    People didn't mind the idea of coming to Savannah either, did they?

A    No. I think that was a plus.

Q    Now, I think you mentioned this to Mr. Bourne, but it says that you routinely employ -- that the process by which you sought to interview people is a process you routinely employ in the representation of death sentence state inmates. Was there anything different other than perhaps the size of the group?

A    No.

Q    Was there anything different about what you did here?

A    Nothing.

### Page 28

Q    And in those cases, you don't contact the state court judge?

A    No. There's nothing in Georgia, as far as I know, there's nothing that says we have to.

Q    Have you ever tried to contact the state court judges?

A    In one case that I had, we actually did depositions of the jurors. So the judge was involved in that, but I think that was after we initially got affidavits and then the judge agreed to do depositions of everyone. But other than limited -- I take that back. I think there might have been another case where the jurors wouldn't talk to us. So we asked for the judge to allow us to do depositions and it was denied.

Q    Okay. I'm looking at page two of the statement here that's Exhibit 5. At the beginning sentence, you consulted the local criminal rules to see if contacting jurors was prohibited. And then going on from there, it says you were surprised to find that the Southern District of Georgia did not have a local criminal rule like the Northern District does concerning juror contact. Being surprised -- and we'll go on in a minute to talk about what exactly you did in terms of looking at other parts of the rules -- but did you conduct anybody, any counsel?

A    No, I didn't.

## Page 29

Q    When you made these plans to go down to see -- you came down on January 12th. How long were the plans in effect that you rounded up your group of 14 and made hotel reservations?

A    A week or two. We came down on the 11th and interviewed them the morning of the 12th, and I think everybody left the afternoon or evening of the 12th.

Q    Okay. So that was something that was sort of planned out maybe right after the new year?

A    I would say yeah. I would say maybe the end of December, probably more the beginning of January, probably only a week or too.

Q    Now, when would you have contacted Mr. Jackson to sign off on you as local counsel?

A    Either the day he did or the day before.

Q    So that was right around the same week where you were bringing the group down here?

A    Right.

Q    Did you tell him you were going to be in town?

A    No, I don't think I did.

Q    You didn't ask him anything about, you know, local procedure or whether, you know, "Have you ever heard of anybody doing these kinds of things?"

A    No, I didn't.

Q    You didn't contact trial counsel?

## Page 30

A    Not about this. I've talked to them before.

Q    Who was trial counsel?

A    William Bell and Richard Darden.

Q    You would have gotten some information from them in terms of their file?

A    Yeah. They both gave me their files, actually, probably on direct appeal. Mr. Bell gave me the files when we had the direct appeal case. Mr. Darden sent them probably over the summer, his files.

Q    And in terms of when it says here -- I'm looking at the second paragraph -- "I double-checked the Southern District's local rules and again found no such prohibition." You've mentioned to Mr. Bourne that you now see a prohibition in there. Is it just something you missed in going through?

A    Yes. When I say "the local rules," I went back through the local criminal rules because I -- you know, whether it's right or wrong, I believed that, because this was a criminal jury, that the criminal rules applied and I didn't read the historical note. So I didn't even think that there was any possibility of any incorporation. So I looked at the local criminal rules, and then I went back and I looked at Rule 47 of the Southern District's civil rules to see. I figured, well, if ours is 47, it's probably 47 in theirs. And I looked and it was not. There

## Page 31

was no prohibition there either.

Q    Okay. And I'm going now, you know, back three or four months in time to your mindset, but because you were surprised, did that give you any inkling that you should call somebody in the local bar who is more conversant with the practice in terms of that?

A    It didn't. It probably should have, but it didn't.

Q    Okay. You instructed the people -- I'm going to the last paragraph on page two. "Before sending people out, we had a meeting during which I instructed them to clearly identify themselves as working for me," and I'm skipping some information, "but if the juror requested, to give him or her one of my business cards. Further, I instructed them to be polite. If any juror asked if he or she had to speak with us, to instruct that juror that he or she did not." And then you were to thank them for their time if they didn't want to speak to you and then leave. I think you've said this earlier, but just to be clear, that was something you verbally gave the instructions to?

A    That's correct.

Q    Everybody, every team that went out, I think you said earlier, had somebody who had prior to this done these kinds of interviews?

A    I think so. I think so.

## Page 32

Q    Have you ever heard back any negative comments about any of those people in terms of behavior or demeanor?

A    No.

Q    What is your experience in terms of percentages, if you will, or estimates, what percentage of jurors are willing to talk to you in these kinds of cases?

A    I'm surprised at the number that do, you know, that we show up and knock on their door and say who we are, who we represent, and what we're doing. I'd say it's more than 50 percent and often they'll invite you into their house. That happens a lot.

Q    What exactly -- say in this case, say a juror, you knocked on his or her door and they said, "Okay, you're with Federal Defender and you're representing the defendant. Come on in." What would you tell them?

A    Well, we would ask them what their impressions were. We're trying to find out what happened. It's not a secret; we're trying to investigate whether there was any improper juror conduct. So we'll ask them questions about the trial. Did they have any contact; what were the bailiffs like; that type of thing.

Q    Improper juror conduct in any respect?

A    Mostly, we're looking for were there questions that were not recorded; did they have any questions. For instance, I was involved in a state case where we found out

## Page 33

that the jurors actually had a question for the judge about no parole. They asked the bailiff, and the bailiff answered the question without taking it to the judge. That is just an example of the type of, you know, juror misconduct that might be out there.

Q    In Mr. Brown's case, when you went down there for these interviews on or about January 12th, did you have anything specific in mind you were going to ask jurors about or was it more open-ended, you know, was there any misconduct?

A    Open-ended. It was strictly an information gathering.

Q    You said you obtained affidavits from a number of jurors, not just the one that was attached to your motion?

A    Right; from two others, I think.

Q    Two others. What number of the jurors that were down here agreed to talk to you, do you remember?

A    I would think that there's at least six. Like I said, I spoke to that gentleman for probably two or three minutes, but it had nothing to do with the case. At least six.

Q    If we go into something that is, you know, that you feel like you can't answer for attorney-client privilege or whatever, feel free to say no, but I'm going

## Page 34

to ask questions. With regards to the people who talked to you, were the stories entirely consistent with what Mr. Little's affidavit was?

MR. DIXON:    I think what we would invoke attorney-client privilege.

Q    That's fine. I felt like as I asked that, that that was probably something -- but you got affidavits from three people?

A    I believe that's right, Mr. Little and two others, I think.

Q    Mr. Little's affidavit, he would have been interviewed by your two investigators?

A    That's correct.

Q    And then they prepared the affidavit?

A    They came back to the hotel, told me what transpired in the interview. And the investigator and I -- I sat at the computer and we wrote out the affidavit as the investigator, you know, told me the information. I put it in the form it's in. I think we e-mailed it or FedEx'd it back to Mr. Little. He looked at it, and I think he signed it without change. And I think we instructed him -- I'm not even sure -- it's not in front of me, but I think we had him initial each page. I'm not sure. That's often something we do so that there can be no doubt that is the affidavit he signed and there's been no modification by

## Page 35

anybody.

Q    Was that the same procedure employed with the other two people?

A    No. The other two people, the people out in the field spoke to the juror, got whatever information there was, and they actually handwrote it there, is my recollection right now. I believe that's the way. It was just done at the spot and, like I said, each team had a notary. Mostly our secretaries are all notaries. So they would be there to notarize it.

Q    Sure. I take it efforts were made to contact all 16 of the jurors?

A    That was my intention.

Q    Is that 12 jurors and four alternates?

A    That's what I recall.

Q    How many were unable to even -- you were unable to even reach? Do you know?

A    I think four. I think we contacted in some form 12, I think. I mean it might be more or less, but we tried to contact everybody.

Q    Do you have in your file notes or memoranda or even handwritten notes from any of the investigators or from you, you know, "Juror number 14, couldn't contact"? Is that still around?

A    It's still around. There are memos in there. I

## Page 36

don't think there are any handwritten notes.

Q    What I would suggest in this case is that you -- whatever you feel you want to provide to us that will then be seen by the Court in this proceeding, we'll pass along. And, if there's anything that's confidential or attorney-client protected, which I know there is going to be certain things, we're going to ask you to provide whatever you're willing to provide, basically. We're not going to later come to you and say, "Give us this or give us that." If there's something that you feel like you can provide to us, please do. If there's not, you know, maybe by the time that you read and sign the deposition -- that'll be 30 days -- if you can just provide to us whatever information you will, I think that's the best way to handle that. Did you have any follow-up conversations with anybody after that weekend?

A    I think just Mr. Little.

Q    Just Mr. Little.

A    I don't know if there were conversations. That would have been -- my investigator is the person that dealt with him. I never talked to Mr. Little. So I felt it best to have the person that did the interview. And I don't know if he called him or if they just communicated by e-mail. I'm not sure how that went, but there was some contact. I don't know if it was by phone or e-mail.

## Page 37

Q    Okay. And all those contacts with Mr. Little would have been prior to the date of his declaration?

A    Yes. He may have called once afterwards to make sure everything was okay.

Q    But clerical, to just make sure, "You guys got the thing I sent back"?

A    Right. No substance after.

Q    Since that date -- we'll use his date, the date of his declaration, January 17th, 2008 -- other than maybe one follow-up phone conversation with him, there have been no communications with any of the other jurors?

A    No.

Q    Okay. And we have attached this as Exhibit 5.

MR. BOURNE:    It's a little bit unusual to have a deposition in a case like this, but thank you for coming down and agreeing to speak with us. Thank you, Mr. Dixon. Do you have any questions you'd like to --

MR. DIXON:    Yeah. I've got a few things I want to address, if I might.

MR. BOURNE:    Sure.

MR. CROWDER:    Absolutely.

EXAMINATION

BY MR. DIXON:

Q    To clarify a few points I think were earlier made, in your assignments of teams to interview jurors, did

## Page 38

you attempt to pair someone that had experience in this with someone who was more of a clerical person?

A    That's right.

Q    To your recollection, did every team have at least one experienced person on there?

A    Yes, and I think the one thing that there's a caveat on is one team, the experienced person was actually a law student, but she had done juror interviews before.

Q    You were asked a question by one of these gentlemen if any teams were specifically assigned to specific jurors. Do you recall that?

A    Yes.

Q    And your answer was no?

A    Right.

Q    Now, was there a person on your team named Jenny Moore?

A    Yes.

Q    Did you ascertain that Jenny Moore was actually from Effingham County or Chatham County?

A    Yes.

Q    Did you ascertain that Jenny Moore actually was distantly related to one of the jurors?

A    Yes.

Q    Because of that, did you specifically not assign Jenny Moore to that juror?

## Page 39

A    Yes.

Q    You did not actually conduct an interview of anyone. Is that correct?

A    With the --

Q    Other than make contact because both of them refused to talk to you?

A    That's correct.

Q    Well, one of them you couldn't get and the other one declined, correct?

A    That's correct, yes.

Q    Could there have been some persons that held over until Sunday after the original Saturday to follow up on interviews or do you recall?

A    There might have been. There might have been. If it is, it was Saturday and Sunday, but I don't -- my recollection is most -- the only thing I have is I thought maybe one of the groups -- people that stayed, but I don't think they did any more interviews, at least not that I recall. There was supposed to be -- somebody was there to watch -- there was a basketball game or something that they were looking forward to, or a football game. It was a football game.

MR. BOURNE:    On TV?

A    Yeah. They were going to watch the football game that night. As a matter of fact, it was the

## Page 40

investigator who got Mr. Little's affidavit. He was going to -- he and the person he was teamed with was going to watch one of the playoff games, I believe.

Q    If I may clarify that, you mentioned that you had briefly a case in 1993 or 1994, the Blankenship case?

A    That's right.

Q    It was in District Court, but it was a state habeas, correct?

A    It was a 2254, yes.

Q    Were you employed at that time by the Federal Public Defender or were you --

A    No. I was at Georgia Resource Center at the time. I was a staff attorney with them.

Q    Let me direct your attention to the time period when you were looking at the local rules prior to these interviews. You had indicated, I believe, that you looked both in the civil and criminal rules and did not see the prohibition, correct?

A    Yes.

Q    Did you express your surprise to anyone that you do not find such a rule?

A    Yes. I mean my boss, Stephanie Kearns, and I discussed it. She had to approve everybody coming down here. I told her, I said, you know, "I can't believe that they don't have one. I'm pretty sure they're going to have

## Page 41

one after we're done."

Q    Other than Ms. Kearns, do you recall anyone else you might have --

A    A number of people. You know, it was probably everybody that I took down there. I probably said it in their presence.

Q    Now, correct me if I'm wrong. This is the first federal death penalty case you've ever had the occasion to be involved in, I mean in the habeas context?

A    That's right. That's right.

MR. DIXON:    I think that's all the questions I have. Do you gentlemen have some follow-ups?

MR. CROWDER:    Yeah, if that's all right.

MR. DIXON:    Sure.

REEXAMINATION

BY MR. CROWDER:

Q    What was the name of the investigator that got Mr. Little's affidavit?

A    Jordan D-A-Y-A-N.

Q    He's investigator in your office?

A    That's correct.

Q    How long has he been there, roughly?

A    Well, he came on right after the Eric Rudolph case resolved itself. So it hasn't been all that long. I think he worked as a contract -- independent contractor on

## Page 42

the Rudolph case and then --

Q    Stayed on permanent?

A    -- we hired him after that.

Q    Okay. You mentioned there was an investigator named -- I think you said Jenny Moore?

A    Jenny Moore is a secretary.

Q    A secretary, and she's from Effingham County and she was related to one of the --

A    I don't know if she's from Effingham or Chatham County. She's actually related to Mr. Little.

Q    Did she contact Mr. Little ahead of time?

A    I specifically told her not to. Did not want any --

Q    Was her name given to Mr. Little by Mr. Dayan?

A    Dayan. I don't think so. I wasn't there, so I don't know.

Q    You didn't tell him to do that?

A    No, I definitely did not. I told him not to.

Q    Now, can you find out for us, and I'll ask that you provide this information if you could, the names of the two investigators who would have interviewed Juror Cooper, if you can ascertain that information? I think Mr. Bourne indicated there was two females, one white, one African-American. If you can't, if you could just let us know that you can't, but if you can, find out from them. I

## Page 43

would also like to know -- do you think he's one of the ones who gave an affidavit?

A    I don't think so, and I don't think I have a memo on it either. So I don't know. My lawyer --

MR. DIXON:    If my notes are correct, it was Calie Jones and a Stribling.

A    Valencia Stribling, V-A-L-E-N-C-I-A, S-T-R-I-B-L-I-N-G, I believe is her name. She's a secretary. Calie, C-A-L-I-E, Jones is an investigator with the Federal Defender.

Q    How long has she been an investigator?

A    About 25 years.

Q    All with the Federal Defender?

A    That's my understanding.

Q    Ms. Stribling, how long has she been in your office?

A    I think she's the receptionist. I take that back. She has been there less than two years.

Q    Was this a volunteer thing or were people paid overtime or comp time?

A    I think they got comp time. I mean their expenses were paid and I think then our boss gave them comp time, only for the secretaries. Investigators and lawyers have salaries, so we don't --

Q    Right. Sounds familiar. Now, your boss, you

## Page 44

mentioned you had a conversation. What was her name again?

A    Stephanie Kearns.

Q    Is she the Federal Defender for --

A    She's the, yes, the Executive Director.

Q    Executive Director. And you mentioned to her, in approving this trip for this number of people, that there was no rule and you were surprised by that?

A    Yes.

Q    Did she offer anybody's name down in the Southern District of Georgia that you could contact to make sure?

A    No. I don't think there was any discussion.

Q    What was the nature -- I know it with somewhat in jest, but what was the nature of "They'll have a rule after we finish this"?

A    I figured if we went out and had any success with any of the jurors, that there might be a movement to have a local rule to prohibit contacting jurors.

Q    Is that what happened in Atlanta? Is that how -- you were there, obviously, when that rule came about?

A    I don't know how that came about. I honestly don't. I don't know. I think it was Judge Evans, who was the Chief Judge at the time, just instituted this rule, and I don't know if there was anything that precipitated it. Like I said, I think it was 2004, but it might have been

### Page 45

before then, but it's -- I know that there was a story that I heard that a former lawyer in our office interviewed jurors when there was no rule, and he was called up before Judge Murphy, and I don't know when that was. I think it was in the 90s.

Q    And Judge Murphy was not happy about the interview process?

A    Apparently, one of the jurors called him and complained that he had been contacted about the case, and I don't know the details. It wasn't my case and I just heard the story after Judge Edenfield's order.

Q    Had there been a local rule, what would you have -- had you known about the local rule that was in existence, what would you have done?

A    I think, out of an abundance of caution, I would have asked for the Judge's permission, if I would have seen that rule. Even without the historical note, I probably would have then asked for the Judge's permission.

Q    Just to be clear, I don't think it's a historical note. I think it's just a prefatory note to the rule.

MR. BOURNE:    A preamble, I think.

Q    I don't think they have historical notes.

A    In my copy, in the West, it's listed as a historical note. I know the Judge says in the preamble,

### Page 46

but whatever it is, I think we're talking about the same thing.

MR. BOURNE:    Let me just show you this and see if this is it.

Q    Because it may be something different we're talking about.

A    It is. This is the language, but the book that I had, the West book, has a black -- in bolded black is "historical note" and then this language appears after it.

MR. BOURNE:    Okay, and we'll mark that as well.

MR. CROWDER:    Exhibit 6, and I don't know that we have a copy for you, Mr. Dixon.

REEXAMINATION

BY MR. BOURNE:

Q    I just have one last question. The timing is a curiosity to me. You're coming down here. You've got a bunch of people from Atlanta coming down. It's about the same time that you're having contact with Mr. Jackson to get him to sign on as local counsel. Did you not think to ask him, "Is there any prohibition against contacting" -- the local rules -- I mean you were surprised enough to mention it to your boss, but you didn't mention it to your local counsel?

A    No. I've known Terry. Terry used to be on the Board of Directors at the Resource Center. I've known

### Page 47

Terry since 1992, since I got here. He was local counsel in the Blankenship case. I read the -- I thought I read the rules sufficiently. You know, I just didn't see it. I didn't think it was, you know. I think I asked Terry to sign on. He signed on so I could get admitted and he helped me file some pleadings. We had some problems with the electronic filing, but other than that, I haven't involved Terry at all.

MR. BOURNE:    Thank you, sir.

MR. DIXON:    Thank you.

MR. CROWDER:    I take it he'll read and sign.

(NOTE:    Off the record.)

MR. DIXON:    I think my client has something to say.

REEXAMINATION

BY MR. DIXON:

Q    Are you sorry you caused this kind of problem?

A    Yes. Obviously, I missed a rule that was pretty apparent on its face and, you know, I apologize.

Q    Was it inadvertent?

A    Definitely.

Q    Have you ever been accused of any kind of impropriety like this before?

A    No.

Q    How long have you been practicing law?

### Page 48

A    Since 1992.

Q    Is it your desire to apologize to the Court and make this right the best way you can?

A    Yes.

MR. BOURNE:    We don't have any questions.

WHEREUPON, THIS DEPOSITION WAS CONCLUDED AT 12:02 P.M.

**Page 49**

CERTIFICATE

I hereby certify that the foregoing transcript is a true and complete record of the testimony, taken and transcribed by me and/or under my supervision, in the captioned proceeding;

That I am neither a relative nor employee of any of the parties or attorneys nor financially interested in the outcome of the action;

That the original transcript shall be furnished to the U.S. Attorney, Savannah Division, Southern District of Georgia.

THIS CERTIFICATION is expressly withdrawn and denied upon the disassembly of the foregoing transcript of proceedings and/or any exhibits or any part thereof, for any purpose, unless said disassembly is by the undersigned certified court reporter and/or under the auspices of Drake Reporting, P.C., and the signature and original seal is attached thereto.

SO WITNESS MY HAND AND OFFICIAL SEAL at Savannah, Chatham County, Georgia, this 17th day of April, 2008.

_____, GA. B-757

Linda C. Drake, C.C.R., C.V.R.

BSA                    The Deposition of JEFFREY ERTEL 4/14/08                    XMAX(1/14)

**Concordance Report**

Unique Words: **1,012**

Total Occurrences: **2,901**

Noise Words: **384**

Total Words In File: **9,682**

Single File Concordance

Case Sensitive

Noise Word List(s): **NOISE.NOI**

Cover Pages = **2**

Includes **ALL** Text Occurrences

Dates **ON**

Includes Pure Numbers

Possesive Forms **ON**

---

**- - DATES - -**

**April, 2004** [1] 24:18
**April, 2008** [1] 49:21
**December** [1] 29:11
**December 22nd** [1] 25:19
**December of 2008** [1] 17:13
**January** [6] 10:9; 20:6, 8, 25; 26:20; 29:11
**January 10th** [1] 10:9
**January 12th** [2] 29:2; 33:7
**January 17th, 2008** [1] 37:9
**January 22nd** [1] 25:20
**January of 08** [1] 10:14
**January of 2008** [1] 17:16
**January the 10th** [1] 20:13
**June** [1] 12:24
**June of 2007** [1] 25:18

---

**- - 0 - -**

**07** [2] 25:21, 22
**08** [3] 10:14, 15

---

**- - 1 - -**

**1** [1] 4:16
**10th** [5] 10:9; 17:15; 20:8, 11, 13
**11th** [1] 29:5
**12** [5] 8:21, 22, 25; 35:14, 19
**12:02** [1] 48:6
**12th** [7] 10:9; 20:14, 25; 29:2, 6, 7; 33:7
**13th** [1] 10:9
**14** [5] 6:8, 9; 26:21; 29:3; 35:23
**16** [3] 7:2, 3; 35:12
**17th** [2] 37:9; 49:21

**1992** [2] 47:1; 48:1
**1993** [1] 40:5
**1994** [1] 40:5
**1996** [1] 12:17

---

**- - 2 - -**

**2** [2] 14:11, 13
**20** [2] 23:22, 24
**2003** [1] 12:9
**2004** [5] 22:24; 23:1, 3; 24:18; 44:25
**2007** [1] 25:18
**2008** [4] 17:13, 16; 37:9; 49:21
**2254** [3] 22:13; 23:25; 40:9
**2254s** [1] 22:12
**2255** [3] 22:9; 24:1; 25:25
**22nd** [4] 10:10, 11; 25:19, 20
**25** [1] 43:12

---

**- - 3 - -**

**3** [1] 15:25
**30** [1] 36:13

---

**- - 4 - -**

**4** [2] 17:8; 23:15
**403CR001** [1] 3:3
**407CV085** [1] 3:4
**47** [6] 15:7, 8, 9; 30:23, 24, 25
**47.3** [1] 15:7

---

**- - 5 - -**

**5** [3] 23:15; 28:16; 37:13
**50** [1] 32:10
**50-50** [1] 24:6

---

**- - 6 - -**

**6** [1] 46:11

---

**- - 7 - -**

**7** [1] 17:13

---

**- - 8 - -**

**83** [1] 15:23
**83.4** [1] 14:13
**83.8** [3] 15:22, 23; 16:1
**83.9** [1] 15:17

---

**- - 9 - -**

**90s** [1] 45:5
**92** [1] 21:19
**93** [1] 13:12
**94** [1] 13:13
**9th** [1] 17:13

---

**- - A - -**

**Absolutely** [1] 37:21
**abundance** [1] 45:15
**accurate** [2] 4:10; 26:19
**accused** [1] 47:22

**action** [1] 49:9
**address** [2] 10:5; 37:19
**administration** [1] 16:17
**admission** [5] 14:7, 19; 15:23; 16:7; 17:2
**admitted** [3] 14:10; 25:14; 47:5
**advance** [1] 7:13
**affidavit** [12] 9:3; 10:21; 11:15, 17; 34:3, 11, 14, 17, 25; 40:1; 41:18; 43:2
**affidavits** [6] 9:5, 12; 11:6; 28:10; 33:13; 34:7
**African-American** [2] 18:24; 42:24
**afternoon** [1] 29:7
**afterwards** [2] 19:18; 37:3
**agreed** [3] 13:24; 28:10; 33:18
**agreeing** [2] 4:5; 37:16
**agreement** [1] 3:4
**allow** [1] 28:13
**alternates** [2] 9:1; 35:14
**amend** [1] 3:19
**amounts** [1] 24:3
**answer** [3] 3:24; 33:24; 38:13
**answered** [1] 33:3
**anybody** [7] 22:22; 26:21; 27:11; 28:24; 29:23; 35:1; 36:16
**anybody's** [1] 44:9
**apologize** [2] 47:19; 48:2
**apparent** [1] 47:19
**Apparently** [1] 45:8
**appeal** [6] 12:18, 19; 25:17, 23; 30:7, 8
**appearance** [2] 13:12; 14:14
**appeared** [1] 25:8
**appears** [1] 46:9
**applicable** [1] 16:19
**applied** [1] 30:19
**apply** [1] 15:13
**appointed** [2] 12:24; 24:18
**appointment** [1] 12:23
**approval** [1] 16:2
**approve** [1] 40:23
**approving** [1] 44:6
**approximately** [1] 10:6
**April** [2] 24:18; 49:21
**aren't** [1] 21:13
**arrangements** [2] 5:8, 24
**ascertain** [3] 38:18, 21; 42:22
**asking** [2] 3:13; 12:9
**assign** [2] 6:17; 38:24
**assigned** [2] 8:14; 38:10
**assignment** [1] 8:19
**assignments** [1] 37:25
**assuming** [1] 14:16
**Atlanta** [3] 5:14; 44:19;

46:17
**attach** [1] 23:14
**attached** [3] 33:14; 37:13; 49:19
**attacking** [1] 26:4
**attempt** [1] 38:1
**attempted** [1] 26:25
**attention** [1] 40:14
**attitude** [1] 18:8
**Attorney** [1] 49:11
**attorney** [7] 4:23; 15:23; 16:7; 24:6, 12, 13; 40:13
**Attorney's** [1] 3:2
**attorney-client** [3] 33:24; 34:5; 36:6
**attorneys** [3] 8:10; 20:1; 49:8
**auspices** [1] 49:17
**authority** [1] 24:15
**avoid** [1] 21:5
**aware** [5] 15:16, 17; 17:1; 26:13

---

**- - B - -**

**B-757** [1] 49:24
**backwards** [1] 4:21
**bailiff** [2] 33:2
**bailiffs** [1] 32:21
**bar** [1] 31:5
**Based** [1] 19:22
**basically** [2] 10:1; 36:8
**basis** [1] 3:25
**basketball** [1] 39:20
**behavior** [1] 32:2
**believe** [10] 4:25; 8:9; 14:8; 23:3; 34:9; 35:7; 40:3, 16, 24; 43:8
**believed** [3] 4:8; 25:2; 30:18
**Bell** [2] 30:3, 7
**bell** [1] 14:12
**berating** [1] 21:6
**bit** [4] 12:5; 20:23; 24:15; 37:14
**black** [3] 18:22; 46:8
**Blankenship** [3] 13:15; 40:5; 47:2
**Board** [1] 46:25
**bolded** [1] 46:8
**book** [2] 46:7, 8
**boss** [5] 12:22; 40:22; 43:22, 25; 46:22
**BOURNE** [12] 4:4; 20:19; 27:13; 37:14, 20; 39:23; 45:22; 46:3, 10, 14; 47:9; 48:5
**Bourne** [4] 3:1; 27:16; 30:13; 42:22
**Bourne's** [1] 3:14
**brief** [1] 12:17
**briefly** [3] 13:11, 12; 40:5
**bringing** [1] 29:17
**broke** [1] 7:3
**Brown** [5] 3:3; 4:23; 6:12; 9:17; 24:19
**Brown's** [3] 3:22; 12:10; 33:6

---

bunch [1] 46:17
business [1] 31:14

- - C - -

C-A-L-I-E [1] 43:9
C.C.R. [1] 49:25
C.V.R. [1] 49:25
Calie [2] 43:6, 9
call [5] 12:11, 19; 17:7;
26:25; 31:5
capital [4] 22:7; 23:19;
24:3, 5
captioned [1] 49:6
captions [1] 26:6
cards [1] 31:14
case [42] 3:5, 18, 22;
12:6, 12, 21; 13:9, 16, 21;
14:15; 15:1; 16:7; 17:2;
19:19, 23; 20:12; 22:4, 7,
20; 24:20; 25:23; 26:7, 8,
12, 13; 28:7, 12; 30:8;
32:12, 25; 33:6, 21; 36:2;
37:15; 40:5; 41:8, 24;
42:1; 45:9, 10; 47:2
caseload [2] 24:2, 5
cases [15] 16:17; 19:13,
14; 21:19; 22:11, 17;
23:7, 23; 24:4, 9; 27:5,
10; 28:1; 32:6
caused [1] 47:17
caution [1] 45:15
caveat [1] 38:7
Center [2] 40:12; 46:25
cert [1] 12:18
CERTIFICATION [1]
49:13
certified [1] 49:17
certifies [1] 17:20
certify [1] 49:3
certiorari [1] 25:19
change [1] 34:21
Charlie [2] 3:1, 19
Chatham [3] 38:19;
42:9; 49:21
check [1] 26:11
Chief [3] 12:22, 25;
44:23
ChoicePoint [1] 10:4
chose [1] 5:6
Circuit [3] 24:18, 22;
25:5
civil [15] 15:7, 9; 16:15,
22; 18:3; 26:1, 4, 7, 8, 10,
12, 16; 30:23; 40:17
claimed [1] 18:19
clarify [2] 37:24; 40:4
clear [2] 31:19; 45:19
clerical [2] 37:5; 38:2
clerk [1] 26:15
client [2] 9:17; 47:13
co-counsel [1] 12:12
coming [5] 27:14;
37:15; 40:23; 46:16, 17
comments [1] 32:1
communicated [1]
36:23
communications [2]
25:7; 37:11

community [2] 5:2;
26:25
comp [3] 43:20, 21, 22
complained [1] 45:9
complete [1] 49:4
comply [1] 17:21
computer [1] 34:17
concern [1] 17:18
concerning [1] 28:21
CONCLUDED [1] 48:6
conduct [6] 4:9; 10:16;
28:24; 32:19, 22; 39:2
Conferred [2] 9:10; 19:9
confidential [1] 36:5
confused [1] 3:13
connection [1] 24:20
consent [1] 20:8
considered [1] 26:2
consistent [1] 34:2
consistently [1] 16:19
construed [1] 16:18
consult [3] 3:23; 9:22;
14:6
consulted [3] 14:25;
15:2; 28:17
contact [29] 4:23; 5:8;
8:7; 9:25; 10:20, 23; 11:9,
10; 14:22; 16:1; 19:11;
22:19, 20; 23:1, 7; 25:7;
28:1, 5, 21; 29:25; 32:20;
35:11, 20, 23; 36:25;
39:5; 42:11; 44:10; 46:18
contacted [14] 6:10;
7:12, 16; 8:20, 23; 9:25;
10:19; 11:13; 12:7; 19:12;
27:3; 29:13; 35:18; 45:9
contacting [6] 20:17;
21:19; 22:16; 28:17;
44:18; 46:20
contacts [1] 37:1
contents [1] 15:11
context [1] 41:9
contract [1] 41:25
contractor [2] 21:11;
41:25
conversant [1] 31:6
conversation [2] 37:10;
44:1
conversations [2]
36:15, 19
convictions [1] 22:5
Cooper [4] 18:16, 19;
19:3; 42:21
copy [8] 4:18, 20;
14:12, 13; 16:13; 23:16;
45:24; 46:12
corpus [1] 23:19
Council [1] 12:20
counsel [16] 3:4, 16;
11:22; 13:19, 20, 24, 25;
20:8; 25:3; 28:24; 29:14,
25; 30:2; 46:19, 23; 47:1
country [1] 23:6
County [5] 38:19; 42:7,
10; 49:21
couple [1] 5:17
course [1] 5:5
Court [12] 4:13, 22;

13:15; 16:2, 9; 22:2, 20,
23; 25:8; 36:4; 40:7; 48:2
court [9] 13:18; 14:15;
19:21; 22:6; 25:13; 28:2,
5; 49:17
Court's [6] 12:2; 14:23,
24; 16:12; 20:3; 26:13
courts [1] 23:20
create [1] 7:25
criminal [21] 14:25;
15:1, 2; 16:10, 16, 17, 20;
18:2; 26:3, 10, 12, 17;
28:17, 20; 30:17, 19, 22;
40:17
CROWDER [10] 3:1, 8,
11; 4:18; 20:22; 37:21;
41:13, 16; 46:11; 47:11
Crowder [2] 9:11; 19:10
Crowder's [1] 20:19
curiosity [1] 46:16
current [1] 10:5
currently [3] 21:13;
23:23; 24:4

- - D - -

D-A-Y-A-N [1] 41:19
Darden [2] 30:3, 8
databases [1] 10:4
date [8] 10:12; 17:12,
19; 37:2, 8
day [6] 10:17, 18; 17:15;
29:15; 49:21
Dayan [2] 42:14, 15
days [3] 10:16; 13:17;
36:13
dealt [1] 36:20
death [6] 21:18; 22:4;
23:18; 24:8; 27:19; 41:8
December [3] 17:13;
25:19; 29:11
decision [2] 9:7, 21
declaration [2] 37:2, 9
declined [1] 39:9
defendant [1] 32:15
defendants [1] 21:21
Defender [8] 5:14;
21:10, 17; 32:14; 40:11;
43:10, 13; 44:3
defender [1] 24:2
Defenders [2] 12:14, 16
Definitely [1] 47:21
definitely [1] 42:18
definition [1] 15:25
demeanor [1] 32:2
denied [5] 12:18; 25:17,
19; 28:14; 49:13
DEPOSITION [1] 48:6
Deposition [4] 4:16;
14:11, 13; 17:8
deposition [4] 3:5, 6;
36:12; 37:15
depositions [4] 3:16;
28:8, 10, 14
designated [1] 20:8
desire [1] 48:2
details [1] 45:10
devoted [1] 23:25
difference [1] 24:11

difficulty [1] 12:20
dire [1] 7:24
direct [7] 12:18; 25:17,
23; 30:7, 8; 40:14
Director [2] 44:4, 5
Directors [1] 46:25
disassembly [2] 49:14,
16
discussed [1] 40:23
discussion [2] 25:3;
44:12
dismissed [1] 13:14
distantly [1] 38:22
distinction [1] 24:11
District [27] 4:22; 12:23;
13:1, 10, 14; 14:5; 15:3,
5, 6, 8, 9; 17:6; 19:11;
20:3; 22:1, 4, 10, 15;
24:23; 25:8, 14; 26:1;
28:19, 21; 40:7; 44:10;
49:11
district [1] 25:13
District's [2] 30:12, 23
Districts [1] 21:22
districts [4] 21:20, 21;
23:5, 11
divided [1] 23:6
Division [1] 49:11
DIXON [12] 4:17, 19;
5:3; 34:4; 37:18, 23;
41:11, 14; 43:5; 47:10,
13, 16
Dixon [7] 3:23; 4:6, 8;
14:12; 17:8; 37:16; 46:12
docket [2] 26:16, 17
documents [2] 3:21;
7:25
Don [5] 12:9, 11, 17;
24:19
door [5] 7:17, 18, 19;
32:8, 13
double-checked [1]
30:11
doubt [1] 34:24
downtown [1] 6:2
Drake [2] 49:17, 25
dual [1] 26:9
due [1] 10:10

- - E - -

e-mail [2] 36:24, 25
e-mailed [1] 34:19
early [1] 10:9
Edenfield [4] 12:24;
13:16; 24:25; 25:5
Edenfield's [3] 4:14;
15:15; 45:11
effect [1] 29:3
Effingham [3] 38:19;
42:7, 9
effort [1] 8:24
efforts [1] 35:11
eight [2] 23:23; 24:4
electronic [1] 47:7
electronically [1] 26:17
Eleventh [3] 24:18, 22;
25:5
elicit [1] 3:12

emotions [1] 18:20
employ [2] 27:17, 19
employed [5] 21:9, 11, 13; 35:2; 40:10
employee [1] 49:7
employees [1] 21:17
employment [1] 13:5
end [3] 10:20; 18:9; 29:10
entering [1] 14:14
Eric [1] 41:23
ERTEL [3] 3:7, 10; 4:2
Ertel [1] 4:5
Estimate [1] 23:21
estimates [1] 32:5
ethical [2] 9:16
Evans [1] 44:22
evasive [1] 14:20
evening [1] 29:7
Everybody [1] 31:22
everybody [6] 7:1; 10:19; 29:7; 35:20; 40:23; 41:5
exact [1] 10:12
exactly [2] 28:23; 32:12
EXAMINATION [3] 4:3; 20:21; 37:22
example [1] 33:4
Excuse [1] 9:10
excuse [1] 22:13
Executive [2] 44:4, 5
Exhibit [8] 4:16; 14:11, 13; 15:25; 17:8; 28:16; 37:13; 46:11
exhibit [1] 4:15
exhibits [1] 49:15
existence [1] 45:14
expenses [1] 43:22
experience [5] 6:22; 21:1, 18; 32:4; 38:1
experienced [2] 38:5, 7
express [1] 40:20
expressly [1] 49:13

-- F --

face [1] 47:19
fact [3] 16:14; 19:14; 39:25
familiar [5] 4:17; 17:20; 18:4; 20:14; 43:25
Federal [8] 5:13; 21:10, 17; 32:14; 40:10; 43:10, 13; 44:3
federal [11] 19:13, 23; 21:20; 22:4, 6, 7, 20; 23:7, 20; 24:2; 41:8
FedEx'd [1] 34:19
Feel [1] 19:25
feel [6] 3:23; 19:18; 33:24, 25; 36:3, 10
felt [2] 34:6; 36:21
female [3] 7:11; 18:22, 23
females [2] 18:21; 42:23
field [1] 35:5
figured [2] 30:24; 44:16
file [6] 10:1; 26:15, 17;

30:5; 35:21; 47:6
filed [4] 13:13, 18; 26:8, 10
files [4] 8:10; 30:6, 7, 9
filing [1] 47:7
fill [2] 13:22; 17:3
financially [1] 49:8
find [6] 14:1; 28:19; 32:17; 40:21; 42:19, 25
finding [1] 12:20
fine [1] 34:6
finish [1] 44:15
first [10] 9:20; 12:6; 13:9; 21:3; 22:7; 23:18; 24:20; 25:12; 27:11; 41:7
Florida [1] 5:17
Flynn [2] 5:16; 21:12
folks [3] 5:25; 7:21; 20:7
follow [2] 20:23; 39:12
follow-up [3] 10:20; 36:15; 37:10
follow-ups [1] 41:12
followed [1] 14:18
football [3] 39:21, 22, 24
foregoing [2] 49:3, 14
forget [1] 18:20
form [4] 17:3, 5; 34:19; 35:18
formal [2] 19:20; 24:20
formally [1] 6:1
former [1] 45:2
forward [1] 39:21
found [3] 15:6; 30:12; 32:25
Four [1] 27:9
four [4] 27:8; 31:3; 35:14, 18
frame [1] 10:6
free [4] 3:23; 19:18, 25; 33:25
Friday [1] 20:11
front [2] 16:20; 34:22
full [3] 24:2, 3, 5
funding [1] 25:4
furnished [1] 49:10

-- G --

GA [1] 49:24
game [4] 39:20, 21, 22, 25
games [1] 40:3
gated [2] 5:2; 26:25
gathering [1] 33:12
gave [8] 6:6, 9; 13:7; 30:6, 7; 31:20; 43:2, 22
gentleman [2] 5:1; 33:20
gentlemen [2] 38:10; 41:12
Georgia [13] 13:10; 22:6, 10, 16; 24:23; 25:15; 26:1; 28:3, 20; 40:12; 44:10; 49:12, 21
Give [1] 36:9
give [9] 5:14, 18, 23; 7:20; 17:8; 23:16; 31:4,

14; 36:9
given [4] 3:5; 8:1; 19:7; 42:14
golf [1] 5:5
gotten [1] 30:4
govern [1] 26:4
group [6] 6:20; 11:20; 27:4, 21; 29:3, 17
groups [1] 39:17
guess [2] 4:15; 15:11
guessing [1] 11:7
guy [1] 7:4
guys [1] 37:5

-- H --

habeas [8] 13:16; 19:14; 23:19; 24:3, 5, 8; 40:8; 41:9
hac [5] 13:22; 14:14; 25:10, 12, 14
Hampton [3] 6:2, 3; 10:7
HAND [1] 49:20
handle [1] 36:15
handled [1] 13:9
handwritten [2] 35:22; 36:1
handwrote [1] 35:6
happens [1] 32:11
happy [1] 45:6
harder [1] 16:22
hasn't [1] 41:24
haven't [2] 23:10; 47:7
he'll [1] 47:11
He's [2] 3:12; 41:20
he's [3] 3:13, 20; 43:1
heard [4] 29:22; 32:1; 45:2, 10
held [1] 39:11
helped [2] 7:21; 47:6
Here's [1] 14:12
hereby [1] 49:3
hesitate [1] 8:11
Hill [1] 18:16
hired [2] 5:15; 42:3
historical [8] 16:24; 17:1; 30:20; 45:17, 20, 23, 25; 46:9
Hold [1] 19:9
hold [1] 16:15
home [1] 8:24
honestly [1] 44:21
hoping [1] 25:22
hotel [4] 6:1; 29:3; 34:15
house [1] 32:11

-- I --

I'd [3] 4:21; 14:25; 32:9
I've [15] 12:16; 14:21; 19:13, 20; 21:23; 22:3, 4, 6, 7; 23:8; 26:18; 30:1; 37:18; 46:24, 25
idea [1] 27:13
identify [1] 31:12
imagine [2] 8:8; 10:2
impressions [1] 32:16

Improper [1] 32:22
improper [1] 32:19
impropriety [1] 47:23
inadvertent [1] 47:20
include [1] 9:8
included [1] 9:1
incorporation [1] 30:21
independent [2] 14:17; 41:25
independently [1] 5:16
indicated [2] 40:16; 42:23
indigent [1] 23:18
information [13] 3:12; 4:12; 8:7; 9:25; 30:4; 31:13; 33:11; 34:18; 35:5; 36:14; 42:20, 22
initial [1] 34:23
initially [2] 11:16; 28:9
initiated [2] 11:9, 10
inkling [1] 31:4
inmates [2] 23:19; 27:20
Inn [3] 6:2, 3; 10:7
instance [1] 32:25
instituted [1] 44:23
instruct [1] 31:16
instructed [4] 31:9, 11, 15; 34:21
instruction [1] 10:25
instructions [6] 5:23; 6:7, 9; 7:20, 22; 31:20
intention [3] 4:11, 12; 35:13
interested [2] 11:4; 49:8
interns [2] 21:14, 15
interpose [1] 3:24
interview [12] 4:9; 8:18; 19:21; 22:2; 26:21; 27:6, 18; 34:16; 36:22; 37:25; 39:2; 45:7
interviewed [8] 4:7; 11:16; 18:21; 20:25; 29:6; 34:12; 42:21; 45:2
interviewers [1] 8:1
interviewing [2] 6:22; 26:22
interviews [7] 10:17; 31:24; 33:7; 38:8; 39:13, 18; 40:16
investigate [1] 32:18
investigative [1] 27:5
investigator [13] 10:3, 25; 18:25; 19:2; 34:16, 18; 36:20; 40:1; 41:17, 20; 42:4; 43:9, 11
Investigators [1] 43:23
investigators [13] 5:13, 19, 22; 8:15; 10:22; 11:10, 21; 18:6, 22; 20:24; 34:12; 35:22; 42:21
invite [1] 32:10
invoke [1] 34:4
involved [5] 13:12; 28:8; 32:25; 41:9; 47:8
Island [4] 5:1, 3, 4; 7:4
issued [1] 25:6

-- J --

Jackson [8] 13:19, 24; 17:15; 20:7, 11, 16; 29:13; 46:18
Jacksonville [2] 5:17; 21:12
January [14] 10:9, 14; 17:16; 20:6, 8, 13, 25; 25:20; 26:20; 29:2, 11; 33:7; 37:9
Jason [2] 3:3; 24:19
JEFFREY [1] 4:2
Jenny [6] 38:15, 18, 21, 25; 42:5, 6
jest [1] 44:14
job [1] 24:12
Jones [2] 43:6, 9
Jordan [1] 41:19
Judge [14] 4:14; 12:22, 23, 25; 13:16; 15:15; 24:25; 25:5; 44:22, 23; 45:4, 6, 11, 25
judge [9] 19:16, 25; 25:3; 28:2, 8, 10, 13; 33:1, 3
Judge's [3] 16:25; 45:16, 18
judges [1] 28:6
jump [1] 14:21
June [2] 12:24; 25:18
juries [1] 15:10
Juror [2] 35:23; 42:21
juror [21] 7:24; 8:8, 17, 18; 18:10, 12, 15; 22:2; 28:21; 31:13, 15, 16; 32:12, 19, 22; 33:4; 35:5; 38:8, 25
jurors [56] 4:24; 5:9; 6:7, 11, 22, 23, 25; 7:3, 12; 8:3, 12, 15, 19, 20; 9:1; 10:23; 11:9; 14:22; 15:10; 16:2; 18:9; 19:12, 17, 20, 21, 22; 20:4, 17, 25; 21:7, 19; 22:16, 19, 20; 23:2, 7; 27:6; 28:8, 12, 18; 32:5; 33:1, 8, 14, 17; 35:12, 14; 37:11, 25; 38:11, 22; 44:17, 18; 45:3, 8
jury [3] 15:2, 24; 30:19

-- K --

Kearns [3] 40:22; 41:2; 44:2
Ken [1] 4:14
kinds [3] 29:23; 31:24; 32:6
knock [2] 7:18; 32:8
knocked [2] 7:19; 32:13
knowledge [1] 22:22

-- L --

lack [1] 8:24
ladies [1] 19:3
language [2] 46:7, 9
last [3] 16:1; 31:10;
46:15
law [3] 21:13; 38:8; 47:25
lawyer [3] 19:2; 43:4; 45:2
lawyers [3] 12:20; 19:18; 43:23
lead [1] 19:1
leads [1] 8:2
leave [2] 12:17; 31:18
Let's [1] 14:21
letter [2] 12:22; 13:4
licensed [1] 21:20
life [2] 5:7; 10:11
limited [2] 24:25; 28:11
Linda [1] 49:25
line [1] 23:17
list [2] 8:3, 14
listed [2] 26:7; 45:24
litigation [1] 24:12
Little's [4] 34:3, 11; 40:1; 41:18
Local [1] 14:13
local [36] 11:21; 13:19, 23, 24; 14:6, 9, 25; 15:2; 16:15, 16, 17, 19; 17:21, 24; 20:8, 16; 22:15; 23:2, 6; 28:17, 20; 29:14, 22; 30:12, 16, 17, 22; 31:5; 40:15; 44:18; 45:12, 13; 46:19, 21, 23; 47:1
looks [1] 25:17
lot [1] 32:11
luck [1] 27:2

-- M --

majority [1] 8:22
Margaret [1] 12:8
mark [1] 46:10
matter [4] 3:3; 4:22; 19:14; 39:25
matters [1] 22:11
mean [5] 35:19; 40:22; 41:9; 43:21; 46:21
meet [3] 4:6; 5:21, 22
meeting [1] 31:11
Meier [3] 3:3; 6:12; 24:19
memo [1] 43:4
memoranda [1] 35:21
memorize [1] 18:3
memos [3] 10:24; 11:7; 35:25
mention [2] 46:22
mentioned [9] 9:24; 11:20; 20:6; 27:16; 30:13; 40:4; 42:4; 44:1, 5
message [1] 27:2
mind [2] 27:13; 33:8
mindset [1] 31:3
minute [2] 9:10; 28:22
minutes [1] 33:21
misconduct [2] 33:5, 10
missed [2] 30:15; 47:18
missing [1] 25:1
mistaken [2] 10:8; 13:17
mitigation [1] 5:15
modification [1] 34:25
months [1] 31:3
Moore [6] 38:16, 18, 21, 25; 42:5, 6
morning [1] 29:6
Mostly [2] 32:23; 35:9
motion [2] 25:25; 33:15
moved [1] 24:24
movement [1] 44:17
MR [36] 3:1, 7, 8, 10, 11; 4:4, 17, 18, 19; 5:3; 20:19, 22; 27:13; 34:4; 37:14, 18, 20, 21, 23; 39:23; 41:11, 13, 14, 16; 43:5; 45:22; 46:3, 10, 11, 14; 47:9, 10, 11, 13, 16; 48:5
Mr [47] 3:13, 22, 23; 4:5, 6, 8, 23; 9:3, 10, 17; 10:20; 11:12; 12:10; 14:12; 17:8, 15; 18:19; 19:3, 9; 20:7, 11, 16, 19; 27:16; 29:13; 30:7, 8, 13; 33:6; 34:2, 9, 11, 20; 36:17, 18, 21; 37:1, 16; 40:1; 41:18; 42:10, 11, 14, 22; 46:12, 18
Ms [2] 41:2; 43:15
Murphy [2] 45:4, 6

-- N --

name [9] 5:7, 16; 6:3; 12:8; 41:17; 42:14; 43:8; 44:1, 9
named [3] 18:16; 38:15; 42:5
names [3] 5:18, 19; 42:20
National [1] 12:19
nature [4] 3:17; 16:18; 44:13, 14
needs [1] 3:19
negative [1] 32:1
night [1] 39:25
Nobody [1] 18:13
nobody [1] 18:13
norm [1] 19:15
Normally [1] 3:16
Northern [15] 12:23, 25; 15:5, 6, 8; 19:11; 20:2; 21:22, 23; 22:1, 4, 9, 15; 23:8; 28:21
notaries [1] 35:9
notarize [1] 35:10
notarized [1] 10:21
notary [2] 6:21; 35:9
NOTE [1] 47:12
note [8] 16:24; 17:1; 30:20; 45:17, 20, 25; 46:9
notes [5] 35:21, 22; 36:1; 43:5; 45:23
notices [1] 26:6
notified [1] 13:8
number [11] 23:11, 14; 26:7, 8, 13; 32:7; 33:13, 17; 35:23; 41:4; 44:6
modification [1] 34:25
-- O --

O'Donnell [1] 12:8
objection [2] 3:18; 9:18
objections [2] 3:17, 24
obtained [1] 33:13
obtaining [1] 13:23
obvious [1] 11:8
Obviously [1] 47:18
obviously [1] 44:20
occasion [2] 22:19; 41:8
odd [1] 15:4
offer [1] 44:9
Office [3] 3:2; 12:14, 16
office [6] 5:12, 20; 22:22; 41:20; 43:16; 45:2
OFFICIAL [1] 49:20
officially [1] 11:25
oh [1] 25:1
Okay [16] 3:11; 9:24; 21:9; 23:13, 15; 25:13; 26:11; 28:15; 29:8; 31:2, 9; 32:13; 37:1, 13; 42:4; 46:10
okay [1] 37:4
One's [1] 18:25
ones [4] 7:16, 17; 8:23; 43:2
Open-ended [1] 33:11
open-ended [1] 33:9
opted [1] 7:9
orally [1] 11:1
order [9] 4:15; 13:20; 15:15, 20; 16:10, 12, 25; 25:6; 45:11
original [3] 39:12; 49:10, 18
originally [1] 15:1
ours [1] 30:24
outcome [1] 49:9
overtime [1] 43:20

-- P --

P.C. [1] 49:18
P.M. [1] 48:6
page [3] 28:15; 31:10; 34:23
paid [2] 43:19, 22
pair [1] 38:1
paragraph [4] 23:18; 24:17; 30:11; 31:10
parole [1] 33:2
part [4] 13:23; 16:15; 19:6; 49:15
parties [1] 49:8
parts [1] 28:23
pass [1] 36:4
Paul [1] 18:16
penalty [4] 21:19; 22:4; 24:8; 41:8
pending [1] 26:14
People [1] 27:13
people [31] 5:12, 21; 6:20; 7:15, 18; 8:19, 23; 11:5; 21:9, 24; 22:5, 10; 23:20; 24:16; 26:21, 25;

27:9, 18; 31:9, 10; 32:2; 34:1, 8; 35:3, 4; 39:17; 41:4; 43:19; 44:6; 46:17
**percent** [1] 32:10
**percentage** [2] 23:25; 32:5
**percentages** [1] 32:4
**period** [1] 40:14
**permanent** [1] 42:2
**permission** [12] 12:2, 21; 13:3, 7; 14:15, 23, 25; 19:21; 20:3; 22:2; 45:16, 18
**person** [10] 5:15; 6:24; 7:25; 36:20, 22; 38:2, 5, 7, 15; 40:2
**Personally** [1] 4:25
**personally** [1] 9:18
**persons** [1] 39:11
**petition** [1] 10:10
**Petitioner** [1] 17:19
**phone** [5] 7:6, 8, 17; 36:25; 37:10
**pick** [1] 8:14
**planned** [1] 29:9
**plans** [2] 29:1, 2
**playoff** [1] 40:3
**pleading** [1] 9:4
**pleadings** [1] 47:6
**please** [2] 3:18; 36:11
**plus** [1] 27:15
**point** [1] 4:13
**pointed** [1] 16:9
**points** [1] 37:24
**polite** [2] 21:7; 31:15
**positive** [1] 4:19
**possibility** [1] 30:21
**practice** [3] 14:15; 20:17; 31:6
**practicing** [1] 47:25
**preamble** [4] 16:10, 16; 45:22, 25
**precipitated** [1] 44:24
**prefatory** [1] 45:20
**prepare** [1] 10:22
**prepared** [4] 11:15, 16, 17; 34:14
**presence** [2] 19:17; 41:6
**present** [1] 11:22
**pretty** [3] 14:19; 40:25; 47:18
**Prior** [1] 23:1
**prior** [3] 31:23; 37:2; 40:15
**private** [1] 21:11
**privilege** [2] 33:25; 34:5
**pro** [5] 13:22; 14:14; 25:10, 12, 14
**problem** [2] 13:6; 47:17
**problems** [1] 47:6
**procedure** [2] 29:22; 35:2
**proceeding** [3] 26:1; 36:4; 49:6
**proceedings** [3] 21:25; 23:19; 49:15
**process** [3] 27:17, 18;

45:7
**program** [3] 5:14; 21:10, 17
**prohibit** [3] 22:16; 23:7; 44:18
**prohibited** [1] 28:18
**prohibition** [7] 15:5, 16; 30:13, 14; 31:1; 40:18; 46:20
**prohibits** [1] 19:11
**protected** [1] 36:6
**provide** [7] 4:12; 36:3, 7, 8, 11, 13; 42:20
**provision** [1] 16:4
**Public** [3] 12:14, 16; 40:11
**public** [1] 10:1
**purpose** [1] 49:16
**pursuant** [1] 4:14
**pursue** [1] 13:21

-- Q --

**quandary** [1] 9:17
**quasi-civil** [1] 26:3
**question** [7] 3:19; 8:2; 11:8; 33:1, 3; 38:9; 46:15
**questioning** [1] 3:14
**questionnaire** [1] 7:24
**questionnaires** [1] 8:8
**questions** [11] 3:21, 22, 25; 20:20; 32:19, 23, 24; 34:1; 37:17; 41:11; 48:5

-- R --

**randomly** [1] 8:14
**reach** [1] 35:17
**read** [18] 14:17, 21; 15:15; 16:23, 24; 17:9, 20, 21, 24; 18:1, 2; 30:20; 36:12; 47:2, 11
**reading** [1] 16:21
**reasons** [1] 4:8
**recall** [8] 7:11; 18:17; 22:21; 35:15; 38:11; 39:13, 19; 41:2
**received** [1] 4:12
**receptionist** [1] 43:17
**recollection** [5] 7:7; 14:17; 35:7; 38:4; 39:16
**record** [6] 4:10; 10:1; 13:20; 47:12; 49:4
**recorded** [1] 32:24
**REEXAMINATION** [3] 41:15; 46:13; 47:15
**reference** [2] 5:15; 26:12
**references** [1] 16:14
**referred** [2] 4:22; 19:10
**referring** [1] 8:25
**refused** [1] 39:6
**regard** [3] 11:12; 14:6; 18:15
**regarding** [1] 3:22
**regards** [1] 34:1
**related** [4] 26:12; 38:22; 42:8, 10
**relations** [1] 15:24

**relative** [1] 49:7
**relatively** [1] 22:25
**relay** [2] 18:6, 8
**remand** [3] 24:24, 25; 25:4
**remanded** [1] 25:5
**remember** [6] 5:7; 6:3; 10:12; 12:8; 20:2; 33:18
**rephrase** [1] 3:15
**report** [3] 11:2; 18:15; 19:6
**reported** [1] 18:13
**reporter** [1] 49:17
**Reporting** [1] 49:18
**reports** [5] 10:22; 11:3, 5; 18:5, 12
**represent** [2] 24:19; 32:9
**representation** [2] 12:10; 27:19
**represented** [5] 21:21, 24; 22:10; 23:18, 21
**representing** [2] 6:12; 32:14
**request** [1] 9:14
**requested** [1] 31:13
**reservations** [1] 29:4
**reserve** [1] 3:16
**resolved** [1] 41:24
**Resource** [3] 12:19; 40:12; 46:25
**respect** [1] 32:22
**respond** [1] 11:1
**rest** [2] 21:16
**restate** [1] 3:15
**returned** [1] 11:17
**review** [1] 11:18
**Richard** [1] 30:3
**Richmond** [1] 18:16
**Right** [11] 7:16; 9:15; 16:13; 17:17; 21:16; 26:8; 29:18; 33:16; 37:7; 38:14; 43:25
**right** [21] 14:21; 16:9; 17:4, 7, 13, 19; 20:10; 23:17; 25:18; 29:9, 16; 30:18; 34:9; 35:7; 38:3; 40:6; 41:10, 13, 23; 48:3
**rings** [1] 14:12
**room** [5] 6:1, 4, 6; 7:10
**roughly** [1] 41:22
**rounded** [1] 29:3
**routinely** [2] 27:17, 19
**Rudolph** [2] 41:23; 42:1
**Rule** [6] 14:13; 15:6, 8, 9, 17; 30:23
**rule** [20] 15:14, 19; 19:11; 20:2; 22:24, 25; 23:2; 28:20; 40:21; 44:7, 14, 18, 20, 23; 45:3, 12, 13, 17, 21; 47:18
**rules** [35] 3:12; 14:6, 9, 25; 15:2, 6, 7; 16:10, 16, 17, 19, 22, 24; 17:21, 24; 18:2, 3, 4; 22:15; 23:6; 26:4; 28:17, 24; 30:12, 16, 17, 19, 22, 24; 40:15, 17; 46:21; 47:3

-- S --

**S-T-R-I-B-L-I-N-G** [1] 43:8
**salaries** [1] 43:24
**Samuel** [2] 12:9; 24:19
**Sarah** [2] 5:16; 21:12
**sat** [2] 3:8; 34:17
**Saturday** [7] 10:10, 13, 18, 19; 20:11; 39:12, 15
**Savannah** [3] 27:14; 49:11, 20
**say-so** [1] 9:18
**saying** [2] 13:5; 18:10
**SEAL** [1] 49:20
**seal** [1] 49:18
**second** [5] 16:15; 19:9; 23:17; 24:17; 30:11
**secret** [1] 32:18
**Secretaries** [1] 21:3
**secretaries** [9] 5:13, 22; 11:21; 18:25; 19:1; 20:24; 27:11; 35:9; 43:23
**secretary** [3] 42:6, 7; 43:9
**section** [3] 15:23; 16:6, 20
**seek** [3] 12:2; 13:5; 14:22
**selection** [2] 6:23; 15:10
**seminars** [1] 23:10
**send** [1] 21:5
**sending** [1] 31:10
**senior** [1] 24:12
**sentence** [6] 16:1; 17:18; 23:18; 26:4; 27:19; 28:16
**seven** [4] 23:23; 24:4; 26:23, 24
**She's** [4] 5:16; 42:10; 43:8; 44:4
**she's** [3] 42:7, 9; 43:17
**show** [4] 14:11; 15:24; 32:8; 46:3
**sign** [6] 11:18; 29:14; 36:12; 46:19; 47:5, 11
**signature** [1] 49:18
**signed** [9] 10:21; 17:12, 15, 22, 24; 20:7; 34:20, 25; 47:5
**sir** [1] 47:9
**six** [3] 11:7; 33:19, 22
**size** [2] 27:4, 21
**Skidaway** [3] 5:3, 4; 7:4
**Skidmore** [1] 5:1
**skimmed** [4] 15:11; 18:1, 3
**skipping** [1] 31:13
**solely** [1] 21:4
**Somebody** [1] 7:7
**somebody** [8] 19:2; 22:9; 25:23; 26:22; 27:3; 31:5, 23; 39:19
**somebody's** [2] 6:1, 6
**someone** [2] 38:1, 2
**somewhat** [1] 44:13
**sorry** [1] 47:17

sort [4] 9:16; 13:7; 26:3; 29:8
sought [5] 12:13, 23; 17:2; 19:20; 27:18
sound [1] 25:18
Sounds [1] 43:25
sounds [1] 20:14
Southern [17] 13:10, 13; 14:5; 15:2, 9; 17:6; 21:22, 23; 23:8; 24:23; 25:14; 26:1; 28:19; 30:11, 23; 44:10; 49:11
speak [6] 5:6; 7:9; 20:4; 31:16, 18; 37:16
speaking [1] 18:9
specific [7] 7:7; 8:12, 15, 19; 33:8; 38:11
specifically [3] 38:10, 24; 42:12
spent [1] 24:7
spoke [5] 5:4; 7:8; 12:19; 33:20; 35:5
spot [1] 35:8
staff [3] 5:19; 24:13; 40:13
State [2] 13:14; 22:6
state [18] 3:18, 25; 19:14; 21:24; 22:5, 6, 11, 16; 23:19; 27:5, 10, 20; 28:1, 5; 32:25; 40:7
statement [3] 14:21; 23:13; 28:15
States [1] 3:3
states [1] 21:24
stay [1] 12:21
Stayed [1] 42:2
stayed [3] 6:2; 13:16; 39:17
Stephanie [2] 40:22; 44:2
Stephenson [1] 6:5
steps [2] 13:21; 14:18
stories [1] 34:2
story [2] 45:1, 11
street [1] 6:4
Stribling [3] 43:6, 7, 15
strictly [1] 33:11
student [1] 38:8
students [4] 5:17; 11:21; 21:13
stuff [2] 13:22; 24:16
submit [2] 10:23; 13:23
submitted [1] 9:4
substance [1] 37:7
success [1] 44:16
sufficiently [1] 47:3
suggest [2] 3:16; 36:2
summer [1] 30:9
Sunday [2] 39:12, 15
supervision [1] 49:5
supervisor [1] 24:14
supervisory [1] 24:14
supplemental [1] 16:18
supplied [1] 7:23
support [1] 5:19
supposed [2] 14:1; 39:19
surprise [1] 40:20

surprised [6] 28:19, 22; 31:4; 32:7; 44:7; 46:21
swear [1] 4:1
SWORN [1] 4:2

-- T --

table [1] 15:11
tactical [1] 9:7
talk [12] 6:13, 14, 15; 8:19; 19:18, 20, 25; 28:13, 22; 32:6; 33:18; 39:6
talked [9] 4:25; 7:6; 11:25; 19:22; 23:10; 26:22; 30:1; 34:1; 36:21
talking [3] 7:10; 46:1, 6
talks [1] 14:14
target [1] 8:12
targeted [1] 8:17
team [7] 6:25; 26:20; 31:22; 35:8; 38:4, 7, 15
teamed [1] 40:2
teams [8] 7:1; 21:5; 26:23, 24; 27:5, 8; 37:25; 38:10
telephone [2] 7:12; 26:22
telling [1] 26:15
ten [2] 8:21, 25
terms [8] 3:20; 23:6; 28:23; 30:5, 10; 31:6; 32:2, 4
Terry [7] 13:19, 24; 46:24; 47:1, 4, 8
testimony [1] 49:4
Thank [5] 4:5; 6:15; 37:16; 47:9, 10
thank [2] 31:17; 37:15
thanks [1] 4:5
that'll [1] 36:13
theirs [1] 30:25
There's [2] 5:17; 28:3
there's [12] 4:9; 6:3; 15:12; 21:6; 25:7; 28:4; 33:19; 34:25; 36:5, 10, 11; 38:6
thereabouts [1] 21:1
thereof [1] 49:15
thereto [2] 3:25; 49:19
They'll [1] 44:14
they'll [1] 32:10
they're [3] 26:13, 14; 40:25
they've [2] 21:1, 24
three [6] 7:1; 13:17; 18:24; 31:2; 33:20; 34:8
Thursday [1] 20:13
timing [1] 46:15
total [3] 6:8; 7:2, 3
town [2] 10:16; 29:19
train [1] 24:16
transcribed [1] 49:5
transcript [6] 7:24; 8:4, 5; 49:3, 10, 14
transcripts [1] 25:2
transpired [1] 34:16
trial [8] 8:5, 10; 19:24; 24:1, 7; 29:25; 30:2;

32:20
trials [3] 19:16
trip [1] 44:6
true [2] 11:12; 49:4
turning [1] 9:19
TV [1] 39:23
type [4] 7:20; 21:19; 32:21; 33:4
typo [1] 17:12

-- U --

U.S. [2] 3:2; 49:11
ultimate [1] 9:17
ultimately [2] 8:20; 9:15
unable [2] 35:16
undersigned [1] 49:16
understand [2] 18:5; 25:25
understanding [4] 23:5; 26:2, 5; 43:14
unit [2] 24:3, 5
United [1] 3:3
unusual [1] 37:14
updated [1] 10:3
upset [3] 18:10, 13
upsetting [1] 18:19

-- V --

V-A-L-E-N-C-I-A [1] 43:7
Valencia [1] 43:7
valid [1] 10:5
vast [1] 8:22
verbally [1] 31:20
versus [4] 3:3; 13:15; 24:1, 12
vice [5] 13:22; 14:14; 25:10, 12, 14
voir [1] 7:24
Volunteer [1] 21:15
volunteer [1] 43:19
volunteered [1] 5:25
volunteers [3] 5:25; 27:10, 12

-- W --

wait [1] 19:19
wanted [4] 4:7; 8:15, 17, 18
watch [3] 39:20, 24; 40:3
we'll [6] 27:7; 28:22; 32:19; 36:4; 37:8; 46:10
We're [4] 3:1, 4; 32:17; 36:8
we're [12] 3:2; 4:14; 18:7; 23:14, 16; 32:9, 18, 23; 36:7; 41:1; 46:1, 5
website [5] 14:3, 4, 5; 17:6
week [3] 29:5, 12, 16
weekend [1] 36:16
weren't [2] 8:23, 24
West [2] 45:24; 46:8
whatever's [1] 4:12
Whenever [1] 17:2
WHEREUPON [1] 48:6

white [2] 18:23; 42:23
whoever [1] 7:10
wife [1] 5:4
William [1] 30:3
willing [5] 9:11, 13, 15; 32:6; 36:8
withdrawn [1] 49:13
WITNESS [1] 49:20
witness [2] 4:1; 21:6
witnesses [1] 21:4
woman [2] 27:1
women [1] 18:24
word [1] 8:11
words [1] 8:12
work [7] 4:21; 5:13; 23:25; 24:1, 7, 8
worked [2] 5:12; 41:25
working [3] 6:12; 21:14; 31:12
wouldn't [1] 28:13
writing [2] 7:21; 11:2
written [1] 7:21
wrong [4] 4:11; 7:6; 30:18; 41:7
wrote [1] 34:17

-- Y --

Yeah [9] 14:9; 15:21; 16:15; 26:9; 27:10; 30:6; 37:18; 39:24; 41:13
yeah [6] 15:18; 21:23; 22:12; 23:4; 27:7; 29:10
year [1] 29:9
years [3] 12:8; 43:12, 18
you'd [2] 19:17; 37:17
You've [2] 30:13; 46:16
you've [12] 4:16; 13:9; 19:10, 22; 21:20; 22:19; 23:17, 18; 25:14; 27:5; 31:19; 41:8

-- Z --

Zant [1] 13:15