IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA    .

.

vs.    . CR 403-001

.

MEIER JASON BROWN    . Savannah, Georgia

. November 4, 2003

VOLUME II of V

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE B. AVANT EDENFIELD

UNITED STATES DISTRICT JUDGE

Court Reporter:    Lora H. Carter
Official Court Reporter
United States District Court
P. O. Box 8552
Savannah, Georgia 31412
Tel.  912-650-4065

*Proceedings reported by stenotype; transcript produced by computer-aided transcription.*

A P P E A R A N C E S:


FOR THE GOVERNMENT:

        WILL FRENTZEN
        JOSEPH NEWMAN
        ASSISTANT U.S. ATTORNEY
        P. O BOX 8970
        Savannah, GA. 31412



FOR DEFENDANT:


        RICHARD DARDEN
        219 W. York Street
        Savannah, GA  31412

        WILLIAM BELL
        420 W. Broughton Street
        Savannah GA. 31410

*[NOTE: Whereupon, Court reconvened on the 4th day of November, 2003, at 8:30 a.m.. Court opened by the Marshal.]*

THE COURT: Good morning, ladies and gentlemen. We are in the process of doing individual voir dire or voir dire. It doesn't make any difference how you pronounce it. It i s from the French "to speak the truth."

I would anticipate that we will complete this process by 12:30. Of course, that is only an estimate. Then we will have a qualified panel and make the jury selection. The parties are given a right to make certain peremptory challenges. Then we will seat a jury. And the remainder of you who are not seated will have, of course, served your jury time, and you will be free to go.

I know it is not very interesting sitting out and counting these panels and all of the lights, or whatever you do. But if you will bear with us, we'll get on with the project.

I will see counsel and all court officials in the room.

MARSHAL: All rise.

***[Note: Whereupon, Court convened in the jury room for continued voir dire.]***

MARHSAL: The first one is Juror No. 150, Gloria McIvory.

THE COURT:  Good morning, Ms. McIvory.  How are you?

JUROR:  Fine, thank you.

THE COURT:  You live in Liberty County.

JUROR:  I do.

THE COURT:  What community?

JUROR:  I live in the Lyman Hall Subdivision?

THE COURT:  Is that in Midway?

JUROR:  Yes, sir.

THE COURT:  Lyman Hall was one of the signers of the Declaration of Independence.  I know you know a whole lot about it.  Are you familiar with that?

JUROR:  Yes, sir.  I am.

THE COURT:  Georgia had the thirteenth signature from the Thirteenth Colony.

I called you in because, as I told you earlier, the law requires me to ask you some questions out of the presence of the other members of the jury.  What I ask you will still be under your oath.  I remind you of that.

JUROR:  Yes, sir.

THE COURT:  Now, did you hear any discussion of this at the time of the occurrence, or at or around the killing?

JUROR:  Only that it had occurred.

THE COURT:  Did you know the deceased, the victim?

JUROR:  No, sir, I did not.

THE COURT:  Do you know the defendant?

JUROR:  No, sir.

THE COURT:  To the best of your knowledge, there is no relationship between you and the victim or the defendant?

JUROR:  No, sir.

THE COURT:  Now, you mentioned that someone was arrested and convicted of first degree forgery?

JUROR:  Yes, sir, that was me.

THE COURT:  Yes.  You were convicted in the Superior Court of Chatham County.  And then you say you have had your rights restored?

JUROR:  Yes, I have.

THE COURT:  Now, you also say you have no opinion about the death penalty as a punishment?

JUROR:  No, sir, I do not.

THE COURT:  The law provides that under certain circumstances the jury may impose the death sentence.  You understand that?

JUROR:  Yes, sir.

THE COURT:  If the circumstances and the facts, are significant in your view justified, could you vote to put the person to death?

JUROR:  Yes, sir, I could.

THE COURT:  If you felt there were mitigating circumstances, meaning something that would lessen the penalty, could you vote to impose a sentence less than death, which in this case would be life imprisonment without the benefit of parole?

JUROR:  Yes, sir.

THE COURT:  You understand there are two questions that the jury must decide in this case.  That is, they must first decide whether the government has produced sufficient evidence to prove the defendant guilty of the crime.  And you recalled that I told you that evidence must remove all reasonable doubt.  And if the government proves that to your satisfaction beyond a reasonable doubt, then you should find the defendant.  If the government does not produce evidence sufficient to convince you beyond a reasonable doubt, then you must be able to vote that the defendant is not guilty, and acquit him.   Do you understand that?

JUROR:  Yes, sir.

THE COURT:  Then if, and only if, there is sufficient evidence to convince you of his guilt beyond a reasonable doubt do we take up the issue of punishment.  As I explained, there are two alternative punishments:   One is death, which means he will executed, and the other is life imprisonment without the benefit of parole.  If the jury finds him guilty, could you vote for a sentence of death if

there were aggravating circumstances that would justify a verdict of death?

JUROR:  Yes, sir.

THE COURT:  And if there were circumstances to mitigate the punishment, meaning there was something that convinces you that life imprisonment without the benefit of parole is the more appropriate sentence, could you vote for a sentence of life imprisonment without the possibility of parole?

JUROR:  Yes, sir, I believe I can.

THE COURT:  Under your oath, you are saying that you could do that.

JUROR:  Yes, sir.

THE COURT:  And would you do that pursuant to the evidence and the law as I will instruct you?

JUROR:  Yes, sir.

THE COURT:  Now, any questions?

MR. NEWMAN:  What type of work did your husband do?

JUROR:  He worked in the State of New York for Consolidated Edison, a gas company.

MR. NEWMAN:  How long did he work there?

JUROR:  About 17 or 19 years.

MR. NEWMAN:  Did you live in New York State as well?

JUROR:  No.

MR. NEWMAN:  You never lived there.

JUROR:  No, I did not.

MR. NEWMAN:  And you say you have been convicted.

JUROR:  That was on a forgery charge.  I was at the time on drugs.

MR. NEWMAN:  What drugs were you using?

JUROR:  Crack cocaine.

MR. NEWMAN:  And that was about four years ago.

JUROR:  That was 14 years ago.

THE COURT:  Do you feel that you were treated fairly?

JUROR:  Yes, I do.

THE COURT:  Do you have any resentment or hostility toward law enforcement or any court officials as a result of your conviction?

JUROR:  No, I do not.

THE COURT:  And I believe you said that was the Superior Court of Chatham County?

JUROR:  Yes, sir.

THE COURT:  Do you remember who the judge was?

JUROR:  No, sir, I do not remember.

THE COURT:  How long did you remain -- what kind of sentence did you receive?

JUROR:  I was sent to the Women State Correctional

Institute in Milledgeville, and then to a transitional facility near Macon Georgia.

MR. DARDEN:  I assume that you entered a plea of guilty.

JUROR:  Yes, sir.

MR. DARDEN:  Under the First Offender Act?

JUROR:  Yes, sir.

MR. DARDEN:  And you successful, in every respect as a result of that, you have successfully completed your probation.

JUROR:  The probation was for a first offender. But it was like revoked, and I received community service. I completed all that.

THE COURT:  Did you have some problem while you were on probation?

JUROR:  Yes, sir.

THE COURT:  What the reason for the revocation?

JUROR:  Failure to report.

MR. DARDEN:  Under the First Offender Act, the rights are restored, and there is no --

MR. NEWMAN:  Your Honor, I think Mr. Darden is stating a fact which he does not know.

THE COURT:  Well, I let it rest there.

And, Ms. McIvory, wait outside while I discuss with it the lawyers.

[Juror left the room.]

THE COURT:  What does the document you have there purport to say, Mr. Newman?

MR. NEWMAN:  It is an NCIC printout.  And it comports with what she has stated, that her sentence was probated, but was then revoked.  And, Your Honor, under the First Offender a revocation of that sentence generally wipes out the first offender status.

MR. DARDEN:  That's right.  That's true.

THE COURT:  I do not know.

MR. DARDEN:  You can have a probation, successfully complete the remainder, and then you are not adjudicated guilty.  This is speculation, but she may have filed a motion to restore it, or completed her probation, and was never adjudicated guilty, and it just went away.

MR. NEWMAN:  Your Honor, I can resolve this issue. I am not moving to strike her for cause.

THE COURT:  All right.  Marshal, bring her back in a minute.

Ms. McIvory, you are to return at 1:00 clock.  You are free to leave at this time, but return at 1:00.  Do not discuss the questions asked of you in there, nor the answers you gave.

[Juror left the room.]

THE COURT:  Call the next juror.

MARHSAL:  No. 212, Kathy Stokes.

THE COURT:  Good morning, Ms. Stokes, how are you?

JUROR:  Fine, thank you.

THE COURT:  Ms. Stokes, I told you that pursuant to the responsibility I have, I have to ask you some questions out the presence of the other members of the jury.

JUROR:  Yes, sir.

THE COURT:  You say that you oppose the death penalty morally, spiritually, or religiously?

JUROR:  I guess I don't have an open mind.

THE COURT:  You have a right to your belief.  No one --

JUROR:  I got to thinking, you know, after I left, if it had been my people, my daughter had been involved, I may have a change of heart.

THE COURT:  Well, can you tell us because we want to know if you oppose the death penalty.

JUROR:  Well, you know, Judge --

THE COURT:  Remember, there are no right or wrong answers, just a truthful answer.

JUROR:  In truth, I don't -- I don't have the heart to do something like that.  I have never, I just don't have the heart to vote to put someone to death.

THE COURT:  Now, does that mean under no circumstances could you be part of a jury that put someone

to death?

JUROR:  I really don't know.

THE COURT:  Well, you mentioned that if something happened to your daughter --

JUROR:  I guess I would to be in that place, you know.

THE COURT:  What place is that now?

JUROR:  If it had to do something like that with my people, I would.

THE COURT:  If the victim was not your daughter or a member of a family, could you vote for a death sentence if the evidence justified it?

JUROR:  Without hearing it, I guess if they could prove it, you know.

THE COURT:  Let's say this.  That on the evidence alone the defendant is found guilty of having committed a murder, the government brought forth the proof beyond a reasonable doubt that he was in indeed the person that committed the murder, then you have a question of punishment.

JUROR:  Okay.

THE COURT:  So, let's assume for the purpose of our discussion -- and, of course, it has not been proven that he committed the murder -- that the government produces to your satisfaction evidence beyond a reasonable doubt,

could you vote for a verdict of guilty?

JUROR:  Yes.

THE COURT:  Then assuming a verdict of guilty, you understand then there is a question of the punishment.

You may, the jury has a right to consider putting him to death, voting for his execution, or they have the right to consider a sentence for life imprisonment without the benefit of parole?

JUROR:  Yes, sir.

THE COURT:  Now, could you vote, or are there circumstances in which you could vote for the death penalty?  We are not trying to force you but we do need that answer.

JUROR:  I guess I don't have an open mind and heart.

THE COURT:  What does that mean?  Two questions are on the table.  Could you vote for the death or as you indicated in your affidavit or questionnaire, you are opposed to the death?

JUROR:  I guess, really you know, I mean, I'm an honest person.  I guess I could.

THE COURT:  You guess you could.  But, I have to get you to confront this.  Because if you are selected, you would come in this very room and you have to judge.  Judging is difficult work.

JUROR:  Yes, sir.

THE COURT:  You will take an oath that you will judge.

JUROR:  Yes, sir.

THE COURT:  The people being judge, both the government and the defendant have a right, and the Court has a right, to have some idea of what your true beliefs are. This guessing won't suffice.

JUROR:  Yes, sir.

THE COURT:  If the defendant is found guilty of having committed the crime set forth in the indictment, with you as one of the judges consider the aggravating circumstances and if you find them compelling, could you vote for the death sentence?

JUROR:  If proven.

THE COURT:  Let's assume that.

JUROR:  If it is cold blooded murder, yes, I could.

THE COURT:  Any questions, Mr. Newman?

MR. NEWMAN:  Yes, Your Honor.

MR. FRENTZEN:  Ms. Stokes, I have an additional question.  You indicate on your form that you don't think you could even serve in this case.

JUROR:  That's where I make a long story short. In '99, we had a wrongful death matter, and I don't know what happened.  It was just sort of like putting me in a

difficult imbalance, a chemical imbalance.    I'm better.

THE COURT:  But you feel better?

MR. FRENTZEN:  You filled this questionnaire out on Thursday.  When were you having all of these problems?

JUROR:  Well, that was back two years.

MR. FRENTZEN:  Yes, Ma'am, but you filled out this questionnaire last Thursday, and you say you don't think you could serve.

JUROR:  I mean, I'm a person with anxiety.  I don't know that I could put anyone to death.  I believe in life.  I had like a -- I don't know.  It was just difficulty for me at the time.  And after I left, I thought it through more.

THE COURT:  Then in answer to Question 40, you say *I don't believe in the death penalty.  41*, you answer, *I don't believe in the death penalty.*  You say, *I'm sorry, I have an anxiety problem, and could not serve in this case.*  Are you over all of those problems today?

JUROR:  I am always going to be an anxious person.

THE COURT:  Assumed that anxiety, do you think you could serve and meet the responsibility as a juror?

JUROR:  Yes, sir.

THE COURT:  Don't tell anyone the questions that were asked of you or your answers.  I will need you to come back at 1:00 this afternoon.

JUROR: All right, sir.

[Juror left the room.]

MR. FRENTZEN: Your Honor, we move to strike this juror based on the responses on her form. She as done a 180 degree turnaround here today. Her answers are completely opposite today than what they were on the form which was just completed last week.

MR. DARDEN: Judge, we have all sort. She has indicated that she could impose the death penalty. The example was given. The facts may bear it out, and she said if it was a cold-blooded killing, yes, she could consider the death penalty.

THE COURT: She is awfully unstable here.

MR. FRENTZEN: Your Honor, again, she went out of her way to make that known in the questionnaire. She said over and over she is against the death penalty.

MR. DARDEN: And yet, she says under certain circumstances I could impose the death penalty.

THE COURT: For purpose of this hearing, I think that she is qualified. I don't believe she gave truthful answers. For some reason she wants to serve on this jury.

MR. NEWMAN: Might I just suggest apart from her answers as to the death penalty question, that the Court ask her question qualifying her general fitness. And, Your Honor, would the Court bring her back in and ask her about

the medication she is taking?

THE COURT:  Yes, I will do that.

[Juror Stokes returned to the room.]

THE COURT:  Ms. Stokes, I need to ask you some additional questions about your statement that you don't think you could serve.  Who is your doctor?

JUROR:  Well, Dr. Ramsey was my doctor, but he is retired.  Basically I don't have a doctor now, not at the present.

THE COURT:  What is the kind of medication?

JUROR:  Well, I'm on a HRT.

THE COURT:  Do you take any antidepressants or any medication like that?

JUROR:  Yes, well I did, but they didn't work.  And one of them, I reacted to.  It wasn't helping.  So I quit taking them.

THE COURT:  Nothing helped you so you ceased taken them.  When did you cease taking your medications?

JUROR:  About a year ago.

THE COURT:  And do you live by yourself?

JUROR:  No, sir.

THE COURT:  With whom do you live?

JUROR:  My husband.

THE COURT:  What is his occupation?

JUROR:  He is retired disability.  He had back

surgery.

THE COURT:  What was his job?

JUROR:  Motor Fleet truck driver.

THE COURT:  Does anyone else live with you in the home?

JUROR:  No, sir.  And he is on medication.

THE COURT:  What kind of medications does he take?

JUROR:  He takes Ibuprofen.  He has muscle relaxers, pain pills, only if necessary, which he takes them very seldom.

THE COURT:  Are there periods of time when you are unable to cope or anything of that nature?

JUROR:  Yes, sir, at one time I just felt like I couldn't get up and go.

THE COURT:  When was the last time you felt like you couldn't get up?

JUROR:  About a year ago.

THE COURT:  Do you think you have gotten better?

JUROR:  A lot better after I ceased taking the medicine.

THE COURT:  Who did you say was your doctor?

JUROR:  Dr. Ramsey.

THE COURT:  Where is he located?

JUROR:  Off Eisenhower, but he was my doctor all the way around, and I have gone to Dr. Kestin.

THE COURT:  When was the last time you saw either of them?

JUROR:  Dr. Ramsey, I saw him -- I'm trying to think.  It hadn't been that long .

THE COURT:  Did you tell him that you were off your medicines?

JUROR:  I didn't tell him.  He told me that he didn't think he could help me any more.

THE COURT:  Did he recommend a psychologist or psychiatric?

JUROR:  Yes, sir, but they made we worse.

THE COURT:  All right.  Ms. Stokes, I have concern about placing you on the jury because of your medical condition.  So, I think I'm going to excuse you.

JUROR:  Okay.

THE COURT:  You are free to go home.  Don't tell anyone out there that you are free to leave, and do not discuss the questions asked of you or the answers you gave. And thank you very much.

JUROR:  Okay.

[Juror left the room.]

MR. DARDEN:  Your Honor, would you note the exception?

THE COURT:  Yes.  I believe a person that is on the verge of breakdown, if we were to put her on the jury,

the results would be too bad for her.

MARSHAL:  The next is No. 164, Ms. Smalls.

THE COURT:  Ms. Smalls, how are you?

JUROR:  Fine.

THE COURT:  As I said the other day, I am required to ask you some questions out of the presence of everyone else.  That is a microphone.  We are have to record everything.  If you do not understand my questions, let me know, and I will repeat it.

JUROR:  Yes, sir.

THE COURT:  You live here in Savannah.  Liberty County?

JUROR:  Yes, sir.

THE COURT:  You have been a victim of a burglary, and some relative was the victim of a vehicular homicide in New York back in 1982.

JUROR:  Right.

THE COURT:  You were the victim of a burglary, and someone in your family was the victim of a homicide in New York back in 1982.

JUROR:  Right.

THE COURT:  Was there ever any trial growing out of any either one of these incidents or any arrest made?

JUROR:  This was no arrest made in the homicide.

I don't know when the trial took place. We weren't notified of anything. But the burglary, we discovered who did it, but nobody was ever prosecuted.

THE COURT: Right. You have made several donations to the Policemen Fund.

JUROR: Yes.

THE COURT: Was that in New York or in Savannah?

JUROR: Both.

THE COURT: Right. And you had a brother convicted of felony in New York. What was that a felony, do you recall?

JUROR: I really can't -- it is so long ago I really can't recall. But I think it wasn't to do with drugs. It was something else. Oh, I know. A fellow was shot and killed, and it seems that there had been an argument earlier that day. And my brother supposedly was on the scene, and he said "shoot him, shoot him". But there was no shooting. But later on, the fellows came back and they got together, but my brother was no place on the scene. The fellow shot him and killed him. And my brother was arrested for that.

THE COURT: Was he convicted? You said he was convicted.

JUROR: Oh, yeah, he was convicted. He went to jail.

THE COURT:  You feel like he should not have been convicted then.  Is that correct?

JUROR:  No, not necessarily.  He started -- from the way it went, he seemed to have started it.  He was in the middle of the mix.

THE COURT:  So, you don't have any resentment toward the police or the courts for his conviction.

JUROR:  No.

THE COURT:  All right.  Now, you didn't know anything about this case until you got here.

JUROR:  No.

THE COURT:  Ms. Smalls, the government, as I explained to you Thursday, under our system of justice is required to produced evidence to the jury, a fair and impartial jury that removes all reasonable doubt of their minds except that of guilt.  You understand that.

JUROR:  Yes, sir, I understand that.

THE COURT:  If you are convinced after hearing all of the testimony that the defendant did commit the crime, that is the murder involved, and the other crimes, is there any reason you feel you could not vote for a verdict of guilty?

JUROR:  No, there is no reason why I feel I couldn't do it.

THE COURT:  If you do have a reasonable doubt,

that the government has not proven its case, could you vote for an acquittal.

JUROR:  Yes, I could.

THE COURT:  Let's assume for this discussion the jury found him guilty, then the question of punishment arises in this case, and that addresses itself to the jury. And the choices would be the death penalty, that is a execution by the state; or, life imprisonment without possibility of parole.

Now, in arriving at that decision, the jury should listen to any aggravating circumstances that might shed light on the type of defendant you are dealing with, the circumstances of the killing, and all surrounding circumstances.  They should also listen to mitigating evidence; that is, things that might lessen or be considered by the jury as worthy of not putting him to death.

If you are on that jury, could you vote for the death sentence if you felt like it was the one justified?

JUROR:  If I felt it was justified, yes, I could.

THE COURT:  And if you felt that even though he was guilty, but some lesser punishment was more appropriate, could you vote for life imprisonment without benefit of parole?

JUROR:  Yes, I could do that.

THE COURT:  Is there anything in your background

that you consider that these people, the government and the defendant, should know about you that has not been asked or contained in this affidavit which they have, or questionnaire, which they have a copy of it?

JUROR:  I don't think so.  I'm pretty dull.

THE COURT:  Okay.  Well, those are good citizens. We are all hopefully a little dull.

JUROR:  Yes.

THE COURT:  You think that race discrimination is still very much of a problem in our society?

JUROR:  It is.

THE COURT:  Now, would the question of a defendant's race or the victim who was alleged to have been a white woman, would that make any difference in any decision you are called upon to make?

JUROR:  No, I wouldn't judge him on his race.  I would just judge as a man.

THE COURT:  And you wouldn't judge because it was a white female that some lesser punishment should be --

JUROR:  No, no bearing.

THE COURT:  It would no bearing.

MR. NEWMAN:  Ms. Smalls, did you work outside the home, Ma'am?

JUROR:  Yes.

MR. NEWMAN:  What type of work did you do?

JUROR: I was a customer service representative for New York Telephone Company for approximately 31 years.

MR. NEWMAN: Thank you.

THE COURT: Mr. Darden?

MR. DARDEN: Nothing, sir.

THE COURT: Ms. Smalls, I'm going to ask you to not reveal any questions asked of you or any responses you made.

JUROR: Right.

THE COURT: You are free to leave with one strong admonition. Be back at 1:00 o'clock.

JUROR: Okay.

[Juror Left the Room.]

MARSHAL: The next will be 157, Patricia Payne.

THE COURT: Ms. Payne, how are you? Won't you have a seat. Ms. Payne, as I indicated to you when we began this process, I'm required to talk to you out of the presence of the other people. You are still under oath. In front of you is microphone. All of the answers are recorded. Copies of the questionnaire you completed are in hands of the government and the defense counsel. They will return all of these when we are through with them. So, we will not invade your privacy beyond that necessary to make the decisions that we're charged with making.

You live up in Springfield. You have lived there

most of your life?

JUROR:  No.  I have lived there the last eighteen years.

THE COURT:  Where did you live before that?

JUROR:  Sumpter, South Carolina.

THE COURT:  Was that your home, Sumpter?

JUROR:  Yes, that was where I was born and raised.

THE COURT:  What kind employment have you engaged in?

JUROR:  I have been a credit union manager for like fifteen years.  And I sell real estate briefly.  Credit union management mainly.

THE COURT:  Yes.  By whom, what credit union are you employed by?

JUROR:  Georgia Pacific in Garden City.

THE COURT:  You are married.

JUROR:  Yes.

THE COURT:  Your husband's occupation?

JUROR:  He buys salvaged auto parts.

THE COURT:  What is the name of his business; does he have --

JUROR:  He works for Grainger.  It is owned LKQ Auto Parts.

THE COURT:  Okay.  That is out the Garden City or Port Wentworth.

JUROR:  Yes.

THE COURT:  All right.  Now, you have made contributions to various police funds, and the Rape Crisis Center.  Your father was convicted of aggravated assault.  This happened in the mid to late 1970s, *I was a teenager in high school.  That happened in Sumpter, South Carolina.*

I know that must be an upsetting experience for you.

JUROR:  Yes.

THE COURT:  Do you have any resentment against courts or lawyers, or policemen as a result of that experience?

JUROR:  No.

THE COURT:  I note on the other hand you have made contributions to police funds.

JUROR:  Right.

THE COURT:  And the Rape Crisis Center.

JUROR:  Right.

THE COURT:  In the case, you would be, if you are on the jury, required to make a couple of real important decisions.  The government alone has the responsibility or burden to prove to you and all of the members of the jury that the defendant committed the crime with which he is charged.  The defendant is not required to prove anything.  You recall that I said that to you the other day; do you

not?

JUROR:  Yes, sir.

THE COURT:  If the government persuaded you with its evidence in the courtroom that he indeed was guilty, could you vote for a guilty conviction?

JUROR:  Yes, sir.

THE COURT:  If you had a reasonable doubt as to his guilt, could you vote a not guilty verdict?

JUROR:  Yes, sir.

THE COURT:  Now, you said that you had heard something about this before you came to court.

JUROR:  I vaguely remember the news.

THE COURT:  Vaguely remember the news.

JUROR:  Yes.  Not a lot of the details.

THE COURT:  You did not know anything about the female victim or the defendant.  Is that correct?

JUROR:  No, sir.  That's correct.

THE COURT:  So, do you have any opinion as to his guilt or not?

JUROR:  No, sir.

THE COURT:  Could you set aside everything you may have heard about this case and make your verdict based on what does or does not occur in the courtroom?

JUROR:  Yes.

THE COURT:  No problem with that.

JUROR:  No.

THE COURT:  Now, if the jury were to decide that he indeed is guilty, the government had sufficient proof to convince you as a fair and impartial juror that he indeed was guilty, the question of punishment arises.  And that punishment decision resides totally with the jury.  There is a choice between death; that is, execution, legal execution; or, life imprisonment without parole.

Now, I believe from what you have said you have no problem with the death penalty.

JUROR:  Correct.

THE COURT:  Now, the jury should listen very carefully.  That is an important part of the case.  There may be aggravating circumstances, something that is the particularly bad about the defendant or the way the crime was committed.  Those are called aggravating circumstances. If there are something about his background or something worthy of sympathy, or whatever, that is called mitigating circumstances.  You understand that.

JUROR:  Yes.

THE COURT:  Now, the jury may look at the aggravating circumstances and pronounce a death sentence. You understand that.

JUROR:  Yes.

THE COURT:  But they are not to do that

automatically.  They are to look at both sides of this very difficult problem.  You understand that.

JUROR:  Oh, yes.

THE COURT:  Would you automatically vote for the death sentence if you found him guilty?

JUROR:  No.

THE COURT:  Would you listen to the mitigating circumstances in making that decision?

JUROR:  Yes.

THE COURT:  Is there anything in your background or anything that you would change in answer to this questionnaire if you had to do it over again, or do you think that you answered it correctly?

JUROR:  I think it is correct.

THE COURT:  Mr. Newman.

MR. NEWMAN:  No questions, Your Honor.

THE COURT:  Mr. Darden.

MR. DARDEN:  Ms. Payne, you indicated that you strongly support the death penalty.  Is that correct?

JUROR:  That's correct.

MR. DARDEN:  You feel that it is not administered enough in this country?

JUROR:  That's hard to answer.  I guess -- basically, I guess I do.

MR. DARDEN:  Thank you.  That's all I have.

THE COURT: Ms. Payne, you are on the short list. I ask you that come back at 1:00 o'clock. Do not tell any of the people out there what you have been asked or your answers. But be prepared to wait a while at 1:00 o'clock. We will hopefully get a jury this afternoon.

JUROR: Okay. Thank you.

[Juror Left the Room.]

MARSHAL: 101, Mr. Washington.

THE COURT: Hey, Mr. Washington, how are you this morning?

JUROR: I'm fine.

THE COURT: Mr. Washington, you live here in Chatham County; do you not?

JUROR: Yes.

THE COURT: How long have you lived here; or, are you a lifelong resident of Chatham County?

JUROR: Yes, sir.

THE COURT: Your education?

JUROR: Tenth.

THE COURT: And you work with the City of Savannah Sanitation Department.

You recall that you filed or completed certain questions, and you answered those truthfully; did you not?

JUROR: Yes.

THE COURT: The law requires that I ask you some

questions out the presence of everyone else.  Just to remember to answer loud enough so those people down there can hear.  That is a microphone in front of you.  And everything is being recorded.

You said you had a brother convicted of a crime.

JUROR:  Yes.

THE COURT:  Who was that brother and what was the crime that he committed?

JUROR:  It was like my uncle had killed my brother.

THE COURT:  Your uncle killed your brother.  How long ago was that?

JUROR:  Probably about nine years.  Well, I think it might have been a little longer than nine years.

THE COURT:  Was he tried.

JUROR:  Yes, but he didn't do much time though.

THE COURT:  He didn't do much time.  Do you think that he should have done more time?

JUROR:  Yeah, especially if you take somebody's life.

THE COURT:  Now, in this case, the government has the burden, as we call it, to convince the jury.  And let's assume that you are on the jury.  They have to convince you with evidence that removes all reasonable doubt that the defendant committed the crime in this case.  Could you

convict him if you were convinced that he did commit the crime.

JUROR:  Sure can.

THE COURT:  Would you vote him not guilty if you had a reasonable doubt?

JUROR:  No.

THE COURT:  So, you could acquit him.  Is that correct?

JUROR:  Yeah.

THE COURT:  Now, you understand that the defendant is a black male.  The victim was a white female.  You understand that.

JUROR:  Yeah.

THE COURT:  Now, you have said that the race of the victim and the race of the defendant would be matters you would consider.

JUROR:  Yes, that is true.

THE COURT:  And you have every right to your opinion.  Would you explain that for us, Mr. Washington?

JUROR:  I feel like, you know, if a person you know, committed a crime like this, you know, I feel like they should get life, you know, because, you know, I mean, the death penalty, I don't feel like that is punishment enough, you know.  I feel like if they're serving time, you know, like life imprisonment, you know, they have a lot of

time to think about what they did.

THE COURT: Right. The law provides in this case that the jury would chose, if they found him guilty, between execution, that is death, or life without parole. In making that decision, the jury should consider, legally, what is called aggravating circumstances; that is, bad things. You understand what aggravating circumstances are.

JUROR: Sure.

THE COURT: Speak up a little bit. Your answer is yes.

JUROR: Yes.

THE COURT: And they should consider mitigating circumstances.

JUROR: True.

THE COURT: If there was something in the defendant's background that might be worthy of some degree of consideration that would lessen the punishment, could you consider that?

JUROR: No, not really, because if the person committed the crime, you know, and took somebody's life you know, I mean, you can't bring them back.

THE COURT: So now, could you consider imposing a death penalty?

JUROR: No, because that, I mean, like, you know, if you going -- I mean, if you are going to --

THE COURT:  Are you oppose to the death penalty?

JUROR:  Yes.  Sure.

THE COURT:  Is your opposition to the death penalty completely fixed?  I mean, this is your opinion; or, could you be brought or persuaded to change that opinion, you think?

JUROR:  No, because I mean, if you are going to give a person the death penalty, it's like you are committing the same crime the person already did.

THE COURT:  So, under no circumstances could you vote to impose a death sentence?

JUROR:  No, I can't.

THE COURT:  How about waiting out there with the marshal for just a minute, and let me talk to the lawyers.

[Juror Left the Room.]

THE COURT:  Well, as you hear, it takes all kinds.

MR. DARDEN:  He doesn't think the death penalty is serious enough.

THE COURT:  That's right.

MR. DARDEN:  Let him rot in prison.  We want him, Judge.

THE COURT:  I know, but I think he is disqualified.

MR. DARDEN:  Unfortunately, I think he probably is, too.  It takes all kinds.

THE COURT:  Bring him back.  We had not heard this particular answer yet; have we?

MR. DARDEN:  No, sir.

THE COURT:  Mr. Washington, you don't have to be seated.  I'm going to excuse you.  You are free to leave the courthouse.  Don't tell anybody the questions I asked of you or the answers you made.  Thank you for being prompt.

JUROR:  All right.  Thank you.

[Juror Left the Room.]

MARSHAL:  The next one will be Ms. Bennett,201.

THE COURT:  Ms. Bennett, how are you this morning?

JUROR:  Fine, and you.

THE COURT:  Fine.

JUROR:  Good.

THE COURT:  That is the microphone in front of you.  Don't be nervous about it.  The law requires that I ask you these questions out of the presence of the other people.  If you do not understand anything I say, for goodness sakes, let me know, and I will explain it.  Do you understand that?

JUROR:  Yes, sir.

THE COURT:  If you would answer yes or no when appropriate or explain, because we have to make a record. Would you do that?

JUROR:  Yes, sir.

THE COURT:  All right.  You have lived in Savannah how long?

JUROR:  Almost six years.

THE COURT:  How many?

JUROR:  Six.

THE COURT:  Six.  Where did you live before that?

JUROR:  In Ocala, Florida.

THE COURT:  In Ocala, Florida.  What is your job?

JUROR:  I'm guest services, the Desoto Hilton.

THE COURT:  What have you done before that?

JUROR:  I worked as a marketing manager for ADT.

THE COURT:  ADT.

JUROR:  Home security.

THE COURT:  All right.  Your husband is a chef?

JUROR:  Yes.

THE COURT:  Where does he work?

JUROR:  At the Oyster Bar on Wilmington Island.

THE COURT:  You have a child aged 30.

JUROR:  Yes.

THE COURT:  What is that child's occupation.

JUROR:  J. C. Penney's Men Department.

THE COURT:  Is he --

JUROR:  She.

THE COURT:  She.

JUROR:  Yes.

THE COURT: All right. You are a member of Calvary Baptist church.

JUROR: That is my home church.

THE COURT: Right. You have had jury service previously.

JUROR: I was called last year, but --

THE COURT: But not selected.

JUROR: Right.

THE COURT: Your father was victim of an aggravated assault. How long ago was that?

JUROR: In 1962.

THE COURT: Where was that?

JUROR: In Ocala.

THE COURT: In Ocala. Was there any arrest made?

JUROR: Yes.

THE COURT: Was the person tried or convicted?

JUROR: Yes.

THE COURT: Did you feel that the law acted properly in that case?

JUROR: Yes.

THE COURT: You contribute to police funds?

JUROR: Yes.

THE COURT: In this case, the government would have the responsibility to convince you, if you are on the jury, that the defendant is guilty of the crimes charged in

the indictment.  And the proof must remove all reasonable doubt.  You understand that.

JUROR:  Yes.

THE COURT:  If the government should produce evidence that convinces you that the defendant is guilty of the crime of murder, such that you have no reasonable doubt, could you vote for a guilty verdict?

JUROR:  Yes.

THE COURT:  If you had a reasonable doubt, not a fanciful doubt, but a reasonable doubt, could you vote to acquit him or set him free?

JUROR:  Yes.

THE COURT:  Now, if the jury should find him guilty, then the choice of punishment is up to the jury alone.  That choice is death or life imprisonment without parole.  And in making that sentence, the jury must look to aggravating and mitigating circumstances.  Aggravating means bad or something vile or heinous.  And mitigating means something that speaks in his favor.  You understand that.

JUROR:  Right.

THE COURT:  Now, you say you strongly oppose the death penalty as a punishment.  Is that correct?

JUROR:  Yes.

THE COURT:  Now, is your resistance or opposition to the death penalty so strong that you could not vote for

the death penalty?

JUROR:  Yes.

THE COURT:  So, it is one that you have come to the conclusion that there is no way you could vote to put someone to death.

JUROR:  Right.

THE COURT:  And that would be regardless of the crime or regardless of the offense.  Is that correct?

JUROR:  That's correct.

THE COURT:  Now, there are many bad things that happen in this country.  There have been a series of bad things.  But for you, regardless of any of those cases, you would not vote to put anyone to death.  Is that correct?

JUROR:  No -- that is correct.

THE COURT:  That is correct?

JUROR:  Yes, sir.

THE COURT:  In this case, you know you could not vote to put him to death.  Is that correct?

JUROR:  That's correct.

THE COURT:  I appreciate your candor.  I'm going to excuse you.

Mr. Darden, do you have any questions?  I should have asked.

MR. DARDEN:  No, sir, I don't.

THE COURT:  Don't reveal the questions I have

asked of you or the answers you made. You are free to leave. The clerk will send you your compensation. I appreciate your honesty and your candor.

JUROR: Thank you.

[Juror Left the Room.]

MARSHAL: Number 22, Julie Vann.

THE COURT: I'm going to the question on this one. She has written it out.

MR. DARDEN: Yes, sir.

THE COURT: Good morning, Ms. Vann.

JUROR: Good morning.

THE COURT: Even though there is a number of people here, just relax. You are required, or at least I am, to talk to you about some matters out of the presence of the other members of the jury.

JUROR: Okay.

THE COURT: How long have you lived in Savannah?

JUROR: Most of my life. I was gone for about three years.

THE COURT: So, you consider yourself a long time native Savannahian. You know this is a case where the defendant is alleged to have murder someone.

JUROR: Yes, sir.

THE COURT: Assuming that he is found guilty of murder, the jury alone would have to fix the punishment.

You understand that.

JUROR:  Uh-uh.

THE COURT:  Answer, if you would.

JUROR:  Yes.

THE COURT:  And you have written *I do not believe that we humans have the right to put another human being to death based upon my religious belief.  And I strongly oppose the death sentence.*

In this case, if he is indeed found guilty, the jury has a choice of punishments to make.  That is, put him to death, execution or the second choice would be life imprisonment without parole.

Is your religious, moral, personal beliefs so strongly against the death penalty that under no circumstances you could vote to put someone to death?

JUROR:  Yes, sir.

THE COURT:  Regardless of the facts, you simply could not bring yourself to vote for a death penalty.  Is that correct?

JUROR:  That's correct.

THE COURT:  Despite the nature of the crime, and all crimes that you know about, your answer would be the same.  You could not vote for the death sentence.

JUROR:  Yes, sir.

MR. DARDEN:  Ms. Vann, there have been a lot of

horrible things that have happened in the world just in the last eight to ten years.  And I'm sure you are aware of those things.  Can you imagine yourself in any of those cases being willing to impose the death sentence?

JUROR:  No, sir.

MR. DARDEN:  Thank you.  That's all I have.

THE COURT:  Ms. Vann, I'm going to excuse you.  We all appreciate your honesty, your candor.  You are free to leave.  But do not reveal to the other people out there the questions asked of you or the responses you made.

JUROR:  No, sir.

[Juror Left the Room.]

MARSHAL:  The next one will be Mr. Hill, 122.

THE COURT:  Good morning, Mr. Hill.

JUROR:  Hey.

THE COURT:  Mr. Hill, as I explained to you the other day, I have to ask you a number of questions out of the presence of the other members of the jury.  Now, you live in Bryan County.  How long have you lived in this area?

JUROR:  In the Savannah area?

THE COURT:  Yes.

JUROR:  Since '82.

THE COURT:  You were born and reared out in Texas.

JUROR:  Yes, sir.

THE COURT:  Big Springs.  You own a jewelry store.

What is the name of that business?

JUROR:  The Gold Mender.

THE COURT:  Where is it located?

JUROR:  Hinesville.

THE COURT:  Hinesville.  Your wife is your co-owner.  And you have two small children.

JUROR:  Yes, sir.

THE COURT:  Now, this crime is alleged to have occurred in Liberty County.  You understand that.

JUROR:  Yes, sir.

THE COURT:  Did you know the victim or any member of her family?

JUROR:  No, sir.

THE COURT:  Do you know the defendant or any member of his family?

JUROR:  No, sir.

THE COURT:  Did you hear any discussions of this after it happened?

JUROR:  No, sir, not that I recall.

THE COURT:  But you say you have heard or read something about it.

JUROR:  Yes, sir.

THE COURT:  Do you remember anything you heard about it?

JUROR:  I just remember that it was a lady, some

lady was shot in the Post Office.  And I didn't even know they caught the guy until here.

THE COURT:  Right.  Well, the question of his guilt or innocence must be determined.  He has entered a plea of not guilty, and that will form one of the issues.  It then becomes the government's responsibility to convince a fair and impartial jury that in fact he is the person who committed the crime, and the proof must remove all reasonable doubt as to his guilt.

If you are convinced that he indeed is the person that is guilty and the government has proven him guilty beyond a reasonable doubt, could you vote for a conviction?

JUROR:  Yes, sir.

THE COURT:  If you are sitting in judgment of this man are not convinced, you have a reasonable doubt, could you vote for an acquittal?

JUROR:  Yes, sir.

THE COURT:  Can you put aside anything you might have heard, and you say you don't remember much about it, and decide the case based upon the evidence or the insufficiency of the evidence in the courtroom?

JUROR:  Yes, sir.

THE COURT:  No problem with that?

JUROR:  No, sir.

THE COURT:  Let's make an assumption here.  And it

is only hypothetical. Let's assume that the jury finds him guilty. Are you with me?

JUROR: Yes, sir.

THE COURT: Now let's assume that the question of punishment is before the jury. As I explained earlier, in this particular type of case, the jury alone decides punishment. You understand that.

JUROR: Yes, sir.

THE COURT: Now, in making that decision, the jury must consider aggravating circumstances; that is, something that enhances the gravity of the crimes, something about it that is particular vile or whatever. Would you consider such evidence?

JUROR: Yes, sir.

THE COURT: If you felt that evidence was sufficient, could you vote for a death penalty?

JUROR: Yes, sir.

THE COURT: Now, there may be mitigating evidence, something that says the death sentence would be not be appropriate. The life imprisonment would be more appropriate. If you, listening to the evidence, found that, could you vote for life imprisonment without possibility of parole?

JUROR: Yes, sir.

THE COURT: So, you would not automatically vote

for a death sentence or the life sentence?

JUROR:  No, sir.

THE COURT:  Would you base your decision on the evidence and the law that I would give to you?

JUROR:  Yes, sir.

THE COURT:  You note that you strongly support the death penalty.

JUROR:  Yes, sir.

THE COURT:  Notwithstanding -- and you have every right do that.  And don't draw any implication that I'm voicing otherwise.  But you would still give him the benefit of fairness and the government the benefits of fairness and obey the law, and listen to the evidence, and make that decision from that, and nothing else.

JUROR:  Yes, sir.

THE COURT:  Now, is there anything in your background that the parties should know about that I have not asked you or is not in this questionnaire?

JUROR:  I don't think so.

THE COURT:  Insofar as you know, you are qualified to serve in this case.

JUROR:  Yes, sir.

THE COURT:  Mr. Newman, any questions?

MR. NEWMAN:  No, Your Honor.

THE COURT:  Mr. Darden?

MR. DARDEN: Mr. Hill, just one question. Do you feel that a sentence of life in prison without parole imposes an economic hardship on taxpayers?

JUROR: No, sir.

MR. DARDEN: Thank you. That's all I have.

THE COURT: Mr. Hill, you are going to be on the list at 1:00 o'clock. So, you may go. Be back at 1:00 o'clock. Do not discuss the questions asked of you or the answers you gave.

JUROR: Yes, sir.

[Juror Left the Room.]

MARSHAL: 237, Ms. Foy.

THE COURT: Good morning, Ms. Foy.

JUROR: Hi.

THE COURT: Will you have a seat there. Ms. Foy, the other day I mentioned that I needed to ask you questions outside the presence of the other people regarding certain beliefs and propositions of law. Do you recall that?

JUROR: Yes.

THE COURT: You are still under oath. That is the microphone in front of you. We're recording all of the questions and answers. If you would speak up loud enough so that those people in the room are able to hear you, I would be grateful.

Now, you have lived most of your life in Savannah

or all of your life in Savannah?

JUROR:  Yes.

THE COURT:  You are presently employed by -- well, you explain to me.

JUROR:  I work two jobs.  Southeast Lung Critical Care, and Wal-Mart.

THE COURT:  Okay.  What is your job at Southeast Critical Care?

JUROR:  Medical Records Tech.

THE COURT:  And at Wal-Mart, what is your --

JUROR:  Cake decorator.

THE COURT:  All right.  You served on a jury at the Chatham County courthouse about seven years ago.

JUROR:  Yes, approximately.

THE COURT:  Do you remember much about it?  Could you tell us anything about it?

JUROR:  It was a drug case.

THE COURT:  A drug case.

JUROR:  Yes, sir.

THE COURT:  Were either of the these lawyers involved to the best of your knowledge?  I don't mean with the drugs but with the case.

JUROR:  No.  No.  Huh-uh.

THE COURT:  Did the jury arrive at a verdict?

JUROR:  Yes, that night.  I guess maybe it was

between 8 and 9:30.  I know it was dark when I left.

THE COURT:  Was the defendant convicted or turned loose?

JUROR:  Yes.

THE COURT:  He was convicted.

JUROR:  Yes.

THE COURT:  Now you say your brother's car was stolen, and was found in Dekalb County sometime after.  And you have a -- Gilbert Walker and Michael Walker are members of the Savannah Police Department.  They are your brothers.

JUROR:  Well, actually they are like a brother to me.  My father raised them.  I mean when they are maybe --

THE COURT:  So, you were still part of the same family.

JUROR:  Yes.

THE COURT:  Even though you are not blood bothers or sisters.

JUROR:  Yes.

THE COURT:  Now, you note that some member of your family, Stacy Johnson, was convicted of felony drugs, and your sister, Bonnie Foy --

JUROR:  Bennie Foy, Jr. is my nephew.

THE COURT:  Kidnapped family and held in their home in Fort Lauderdale, Florida about 15 years ago.  Now, was the sister convicted here or some place else?

JUROR:  No.  She was convicted here.

THE COURT:  Now, from those experiences with law enforcement, do you have any resentment or dislike of law enforcement?

JUROR:  No, I don't know.

THE COURT:  Do you feel that your sister and nephew were mistreated in any way by the law enforcement, the prosecutors, or the court system?

JUROR:  No, I don't.

THE COURT:  You felt like the system gave them the justice and process they were entitled to.

JUROR:  Yes.

THE COURT:  Now, you have heard nothing about this case before you came here.  Is that correct?

JUROR:  No, I haven't.

THE COURT:  The government, under our system, as you recall from the state, which is very similar in many ways, has -- first of all, both sides are entitled to a fair and impartial judge and jury.  You understand that.

JUROR:  Yes.

THE COURT:  But in this case, the jury will make most, if not all, of the decisions that are critical.  The Court, the Judge, must guide the jury with instructions.  But the jury will make a determination whether or not the defendant is guilty.  It is the responsibility of the

government to prove his guilt beyond a reasonable doubt. Not all doubt, but beyond a reasonable doubt.

If the government has proved sufficient to remove all reasonable doubt from your mind, could you vote a verdict of guilty?

JUROR: Yes.

THE COURT: If you have a reasonable doubt, not a fanciful doubt, but a real doubt, could you vote for an acquittal?

JUROR: Yes.

THE COURT: Now, let's assume that the jury finds him guilty beyond a reasonable doubt. They return a verdict in the courtroom and say we find the defendant guilty. Then I will give a charge that tells about punishment. I will tell you how to consider those factors. I'm not going to give it to you here now, but I will give you some of it.

The jury is given a choice. They may impose a death penalty, because this is what is called a capital crime. If they return a death sentence, then assume he would be executed, put to death by the law. Or, there is another possibility. The jury could find him guilty and still return a sentence or find that a sentence of life imprisonment without possibility of parole is the more appropriate sentence.

Now, in making that decision, the jury should

consider any aggravating factors; that is, something that is particular retched or bad or evil, if there are such, that each side will be given an opportunity to talk about the appropriate punishment, and make certain evidence available.

The defendant or in the record itself there may be mitigating circumstances, circumstances that should be considered in lessening the punishment back to life imprisonment without possibility of parole.

If you felt after hearing all of the facts and circumstances, and all of the evidence and the charge, that death was the appropriate sentence, execution, could you vote a death sentence?

JUROR:  Yes.

THE COURT:  If you felt that death was not the appropriate sentence, but life imprisonment without the benefit of parole, could you find against the death penalty and life imprisonment without benefit of parole?

JUROR:  Yes.

THE COURT:  So, you come with no fixed opinion one way or the other.  You would follow the evidence and the law as I explain it to you.  Listen to other members of the jury and listen to the evidence, and make your decisions on that and nothing else.  Is that correct?

JUROR:  Correct.

THE COURT:  Now, is there anything in that

affidavit -- not affidavit, questionnaire, that you would change if you had to fill it out again?

JUROR:  No, I won't.

THE COURT:  Is there anything about you or your background that you feel the Court and the lawyers should know about in making the decision?

JUROR:  No.

THE COURT:  Any question, Mr. Newman?

MR. NEWMAN:  No, Your Honor.

THE COURT:  Any question, Mr. Darden?

MR. DARDEN:  No, sir.

THE COURT:  Ms. Foy, I'm going to ask you to be back at 1:00 o'clock for final jury selection.  Hopefully, we will be through by that time.  Now, you are free to leave the courthouse, but be back promptly at 1:00 o'clock.  Satisfy your restaurant needs.

JUROR:  Okay.

THE COURT:  Don't tell anybody the questions I have asked of you or the answers you made.

JUROR:  Okay.

[Juror Left the Room.]

MARSHAL:  233, Mr. Stillwell.

THE COURT:  Mr. Stillwell, how are you this morning?

JUROR:  Fine, sir.  How about you?

THE COURT:  Mr. Stillwell, you recall the other day that I told you that I would have to interview each one of you out of the presence of the other people.  And that is what we're do here this morning.  You are still under oath. In front of you is a microphone.  The people here are listening to your answers.  We're recording everything. There will be later a type volume made.  But presently, everybody needs to be able to hear you.  So, speak up loud enough.

If you don't understand any question I ask of you, let me repeat it, and explain it to you so that you can give an honest answer.

JUROR:  Okay.

THE COURT:  How long have you lived in this area, Mr. Stillwell?

JUROR:  Since 1968.

THE COURT:  Where were you born in reared?

JUROR:  Cooper Hill, Tennessee.

THE COURT:  That is up about on the Georgia border, as I recall.

JUROR:  Yes, sir.

THE COURT:  A great constitutional law case came out of the Cooper Hill.  I will give those lawyers a little quiz on it.

Do you remember it, Mr. Darden?

MR. DARDEN:  Would that be the Scopes Trial, Your Honor?

THE COURT:  No. Lord, no.  It is about a smelting operation, interstate commerce.  Mr. Newman?

MR. NEWMAN:  Your Honor, I believe it was during the 1930s, the New Deal.

THE COURT:  That he's right.  Well, you go to the head of the class.  Okay.  And you go back to school, Mr. Darden.

MR. DARDEN:  I probably need to.

THE COURT:  No.  Now, tell us, you are in ornamental horticulture and design.  You study that in college.

JUROR:  Yes, sir.

THE COURT:  Where did you attend college?

JUROR:  The University of Tennessee.

THE COURT:  Right.  And you are self employed contractor doing remodelling.

JUROR:  Right.

THE COURT:  How long have you been self employed?

JUROR:  For about thirteen years.

THE COURT:  Your wife is a parapro.  Would you --

JUROR:  Yes, sir, that is the like a teacher's aide.  And it is a professional --

THE COURT:  Okay, paraprofessional.  Well, I

understand.  You are active in your church.

JUROR:  Yes, sir.

THE COURT:  The First Baptist Church of Pembroke. You were on a jury in Bryan County.  Is that correct?

JUROR:  Yes, sir, in superior court.

THE COURT:  What was the nature of the trial?  Was it criminal or civil?

JUROR:  It was civil.

THE COURT:  Did the jury arrive at a verdict in the case?

JUROR:  Yes, sir.

THE COURT:  In this case, you say you may have read about something in the newspaper, but you are uncertain.

JUROR:  No.  I'm pretty sure I read briefly just a news account of the --

THE COURT:  Did you form any opinion to the guilt or innocence of the defendant?

JUROR:  No, sir.

THE COURT:  Could you put everything you may have read in the newspaper aside and make any decision based upon the evidence in the courtroom or the insufficiency of the evidence?

JUROR:  Sure.

THE COURT:  Now, in this case, the defendant is

charged with murder of a victim who was a white female.  He is a black male.  Would the race of the victim or the defendant make any, any impact upon you whatsoever?  Would that cause you to lean one way or the other in the slightest regard?

JUROR:  No, sir.

THE COURT:  Now, the government has the responsibility to prove the defendant guilty beyond a reasonable doubt.  The defendant is not required to prove his innocence.  You understand that.  You accept that.

JUROR:  Yes, sir.

THE COURT:  Now, if the government proves him guilty to your satisfaction, assuming you are on the jury, beyond a reasonable doubt, could you vote for a verdict of guilty?

JUROR:  Yes, sir.

THE COURT:  If you have a reasonable doubt, would you vote not to convict him, in other words, to acquit him?

JUROR:  Yes, sir.

THE COURT:  Now, assuming that the jury finds him guilty -- that was just for an assumption purpose -- the question of punishment is up to the jury in this case.  The jury is going it be confronted with two possibly punishments; life imprisonment without benefit of parole or the death sentence, meaning that the government would

execute him, put him to death.  You understand that.

JUROR:  Yes, sir.

THE COURT:  Before making that critically important decision, the jury will have to -- we would have a hearing in the courtroom.  The jury would listen to aggravating circumstances.  Those are things that are particularly out to be considered because they are bad or denote some wicked propensity or acts.

JUROR:  Yes, sir.

THE COURT:  Or mitigating, that shows that the punishment should be softened, that death would be inappropriate.

Now, if there were sufficient aggravating circumstances, could you vote to impose the death sentence?

JUROR:  Yes, sir.

THE COURT:  If there were mitigating circumstances, and you were thought that death was not the appropriate sentence, could you vote for life imprisonment without benefit of parole?

JUROR:  Yes, sir.

THE COURT:  Now, I note that you strongly support the death penalty.

JUROR:  Yes, sir.

THE COURT:  Would that push you to vote for a death sentence without giving consideration to the

alternative punishment?

JUROR:  No, sir.

THE COURT:  Is there anything in this questionnaire that you completed that you would change now?

JUROR:  No, sir.

THE COURT:  Is there anything about you or your background that you feel in all candor the Court and the lawyers and parties in this case should know that we have not asked you?

JUROR:  No.

THE COURT:  Any questions, Mr. Newman?

MR. NEWMAN:  No, Your Honor.

THE COURT:  Mr. Darden?

MR. DARDEN:  Mr. Stillwell, what is it about the death penalty that makes you a stronger supporter of it?

JUROR:  I feel that -- I knew that question was coming up when I answered it that way.  I feel it is deterrent in a capital, you know, against capital crimes. But I feel, you know, if it is not used properly or if it is just, you know, the law is there, but it is never used, so what deterrent is that?  And, you know, aggravating circumstances and mitigating circumstances do come into play in those factors.

MR. DARDEN:  Do you have anything, any thoughts in your mind as to what type of case the death penalty could

you be reserved for?

JUROR:  Murder, and probably taking another life would probably be it.

MR. DARDEN:  Yes, sir.  Would it be fair to say that you think you it should be considered in all murder cases?

JUROR:  Again, that would be considered, you know, considering the circumstances.  I'm not sure about that. No.

MR. DARDEN:  You think life imprisonment imposes an economic hardship on taxpayers?

JUROR:  Yes.

MR. DARDEN:  Let me ask you this:  Have you sufficiently recovered from the Tennessee/Georgia game to serve on this jury?

JUROR:  No.

THE COURT:  Well, we're recovering from Jacksonville.

JUROR:  And I thank Jacksonville for that.

THE COURT:  You are free to leave, but you are to be back at 1:00 o'clock for final jury selection.  I hope that we will complete this process by then.

Don't reveal any questions that were asked of you or any answers you made.  I would suggest that you get lunch, relax and come back by that time.

JUROR:  Okay.

[Juror Left the Room.]

MARSHAL:  No. 84, Ms. Knight.

MR. DARDEN:  Your Honor, could we consider a five minute break after this young lady?

THE COURT:  Yes.  Ms. Knight, how are you this morning?  Don't be nervous is the first thing I wish to tell you.  The law requires that I interview you in the presence of these people but out the presence of the other jurors.  You understand that.

JUROR:  Yes, sir.

THE COURT:  Are you nervous here?

JUROR:  Yes.

THE COURT:  Well, I assure you that no one, no one wants to embarrass you or probe unduly.  So, just relax.  Take a good deep breath.  Smile, you've got a good smile.  Open that mouth and don't clinch it.  There is a microphone right in front of you.  This lady over here is recording everything.  If you don't understand anything I ask of you, let me know, and we'll spend whatever time is necessary.

You were born up in Tennessee; were you not?

JUROR:  Yes, sir.

THE COURT:  You live in Port Wentworth, and have for a long time, 28 years.  You are a bus driver for Laidlaw.

JUROR:  Yes, sir.

THE COURT:  I assume that is the school bus driver.

JUROR:  Yes, sir.

THE COURT:  You have three children.  Do they live at home?

JUROR:  No, sir.

THE COURT:  What is their occupation, the one that is 27, what does that child --

JUROR:  She's the mother of four.

THE COURT:  The 25 year-old.

JUROR:  She works for neurologist associates.

THE COURT:  And the 22 year-old.

JUROR:  She has two baby.

THE COURT:  What does her husband do?

JUROR:  He is a plumber.

THE COURT:  What does the 27 year-old's husband do?

JUROR:  He works for a millwright union.

THE COURT:  All right.  Have you served on the jury before?

JUROR:  Yes, sir.

THE COURT:  That was here in the court.

JUROR:  Yes, sir.

THE COURT:  Was I the judge; or, do you remember?

JUROR:  No, I don't remember.

THE COURT:  Was it is criminal or a civil case?

JUROR:  I'm pretty sure it was a criminal case, because it was dealing with drugs.

THE COURT:  Was the defendant or the defendants found guilty?

JUROR:  Yes, sir.

THE COURT:  You served on a civil case.

JUROR:  Yes, sir.

THE COURT:  Did the jury arrive at a verdict?  Did you they return a verdict in that case, too?

JUROR:  No, sir, it was settled.

THE COURT:  Settled.  You have a daughter whose house was broken into.

JUROR:  Yes, sir.

THE COURT:  You don't remember hearing anything about this incident or occurrence before you got to court.

JUROR:  No, sir.  I don't watch TV.

THE COURT:  I'm sorry.

JUROR:  I don't watch TV.

THE COURT:  You don't watch TV.  Now, the defendant is a black male.  The victim is alleged to have been a white female.  Would those facts make you tilt one way or the other in the slightest degree?

JUROR:  No, sir, we're all the same.

THE COURT: All the same. All right. Now, if you are selected to serve on the jury, as you might recall, the jury would make a decision of whether or not the defendant was guilty or not. You understand that.

JUROR: Yes, sir.

THE COURT: And the government would have to prove, that is convince you, beyond a reasonable doubt that the defendant committed the crime as alleged in the indictment. You understand that.

JUROR: Yes, sir.

THE COURT: If the government convinces you beyond a reasonable doubt that indeed the defendant committed the crime, could you vote for the verdict of guilty?

JUROR: Yes, sir.

THE COURT: If you were not convinced, would you vote a not guilty verdict?

JUROR: Yes, sir.

THE COURT: Now, let's assume for purposes of this discussion that the defendant were found guilty. In the other cases you've served, then you have turned it back over to the judge; right? The judge imposed the sentence.

JUROR: Yes, sir.

THE COURT: In this case, it is different. The jury has to impose the sentence. Do you understand that from what I said the other day?

JUROR:  Yes, sir.

THE COURT:  And if he is found guilty, the jury would have a choice between sentencing him to death, which means he would be executed; or, to sentence him to life imprisonment without possibility of parole.  In making that decision, the jury should listen to all of the facts and circumstances and weigh them, including any aggravating circumstances, anything that kinds of heats it up, or something in his background or whatever that convinces them that death is the more appropriate sentence.

If you were convinced beyond a reasonable doubt that there were aggravating circumstances that warranted the death penalty, could you vote for the death penalty.

JUROR:  I think so.

THE COURT:  You think so.  You are not certain?

JUROR:  I don't know, because I don't know the circumstances.

THE COURT:  But let's assume that there were bad circumstances.  You say you support the death penalty.  But could you vote for it if you thought the facts and circumstances justified it?

JUROR:  Yes, sir.

THE COURT:  All right.  If you felt like even though he was guilty that was there were mitigating evidence, that is something good or not so bad that made

life imprisonment without the possibility of parole the better sentence, could you vote for that, too?

JUROR:  Yes, sir.

THE COURT:  So, you would listen to the evidence, and make your decision both as to the guilt and to the proper punishment.  Is that correct?

JUROR:  Yes, sir.

THE COURT:  Now, is there anything in this questionnaire, Ms. Knight, that you would change if you had to fill it out again?

JUROR:  No, sir.

THE COURT:  Is there anything about you or your background that you feel this Court and the lawyers and the parties should know about?

JUROR:  No, sir.

THE COURT:  I'm going to ask that you come back at 1:00 o'clock for final jury selection.  Now, do not tell anybody out there.  You are free to leave the courthouse with the strong admonition to be back at 1:00 o'clock.  We will hopefully be able to start the final selection.

Mr. Newman, do you have any questions?

MR. NEWMAN:  No, Your Honor.

THE COURT:  Mr. Darden, any questions?

MR. DARDEN:  No, sir.

THE COURT:  Don't reveal to anyone what I have

asked of you or your answers.  Will you do that?

JUROR:  Yes, sir.

[Juror Left the Room.]

THE COURT:  Mr. Darden, we'll take a five minute recess.

[Brief Recess.]

THE COURT:  All right.  Bring in the next juror.

MARSHAL:  No. 35, Mr. Jones.

THE COURT:  Hey, Mr. Jones.  How are you this morning?

JUROR:  I'm doing well.  How about yourself?

THE COURT:  Fine.

JUROR:  Good.

THE COURT:  I know you are tired of seeing this courthouse.  But believe it or not, we're going much faster than courts normally go.

JUROR:  Okay.

THE COURT:  That is not to say that is fast enough for any of you.

You were a Midwesterner, Wichita, Kansas.  How long have you lived in the south?

JUROR:  Ten years.

THE COURT:  What is your occupation?

JUROR:  I'm a systems specialist.  I troubleshoot aircraft systems.

THE COURT:  All right.  You are employed by --

JUROR:  Yes, sir, at Gulfstream.

THE COURT:  Gulfstream.  You hold a civil engineering technical degree.

JUROR:  That's my wife actually.  I hold an associate degree in liberal arts.

THE COURT:  Is she employed out at the same place?

JUROR:  No, sir.

THE COURT:  Is she employed outside of the home?

JUROR:  Yes.

THE COURT:  By whom is she employed?

JUROR:  Thomas-Hutton Engineering.

THE COURT:  Yes, I know them.  You have had numerous car break-ins.

JUROR:  Yes, I lived in New York City for four years.

THE COURT:  You were a member of the Coast Guard, and you were on the bordering.

JUROR:  Yes, sir.

THE COURT:  I always have a fourth amendment case coming out that, extraterritorial jurisdiction and all of that.  Then you were a deputy for the Chatham County Sheriff's Department.

JUROR:  Yes, sir.

THE COURT:  How long did you serve in that

capacity?

JUROR:  For Chatham County?

THE COURT:  Yes.

JUROR:  Just about four months before Gulfstream called me.

THE COURT:  I assume your aspirations were not to make that a career, but it was a fill-in job.

JUROR:  It was originally a career plan, but then due to the some of the qualifications that I had in aircraft, the offer was better.

THE COURT:  This was more appealing.

JUROR:  Yes.

THE COURT:  Do you know any of these lawyers in your career in law enforcement?

JUROR:  I don't believe so.

THE COURT:  All right.  You have three cousins who have been convicted of assault, drug convictions, and weapons charges.

JUROR:  Yes, sir.

THE COURT:  Was that back in the Midwest or here?

JUROR:  Actually I grew up in Southern California. So, it was in the Southern California area.

THE COURT:  Right.  Do you hold any resentment toward federal or state authorities as a result of these incidents?

JUROR:  No, sir.

THE COURT:  Do you feel that they received all of the protection that the law should and could afford them?

JUROR:  I believe so.

THE COURT:  Now, you indicated that you saw or believed you heard something about this case when it was in news.

JUROR:  Yes.

THE COURT:  Have you any opinion that you could not get out of your mind; or, could you listen to the evidence and make the decision on that, and that alone?

JUROR:  Yes, sir.

THE COURT:  Would that be difficult for you?

JUROR:  No, sir.

THE COURT:  Now, the defendant in this case is a black male.

JUROR:  Yes.

THE COURT:  The victim is alleged to have been a white female.  You understand that.

JUROR:  Yes, sir.

THE COURT:  Would the race of the victim or the defendant influence any decision, however slight?

JUROR:  No, sir.

THE COURT:  Have you ever served on a jury before?

JUROR:  No, sir.

THE COURT:  This is what we refer to, and I explained the other day, as a criminal case.  In this case, the government has the obligation, the burden of proof, they must prove beyond a reasonable doubt that the defendant committed the crime as charged in the indictment.  The defendant is not required to prove his innocence.  You understand that.

JUROR:  Yes.

THE COURT:  If the government satisfies you that he, with competent proof, that he committed the crime in question, and the proof removes all reasonable doubt, could you vote for a conviction?

JUROR:  Yes.

THE COURT:  If you are not satisfied, if you have a doubt, could you vote for an acquittal even though you say he probably did it, but I do have a doubt?  Would you vote for an acquittal under those circumstances?

JUROR:  I would weigh the evidence.

THE COURT:  But you would not convict him unless you were sure he was guilty; would you?

JUROR:  Yes, sir.  Yes, sir.

THE COURT:  So, if you had a reasonable doubt, you would not vote for the conviction; would you?

JUROR:  I understand.  Yes.  Yes, Your Honor.

THE COURT:  I'm trying -- I think you are

answering correctly, but we're getting the yeses and nos kind of mixed up.

JUROR: Okay.

THE COURT: You said that if you were convinced beyond a reasonable doubt that he was guilty, according to the proof, you would vote for a guilty verdict.

JUROR: Yes.

THE COURT: If you were not convinced, you would not vote for a guilty verdict?

JUROR: No, if I was not convinced.

THE COURT: I think you answered it right to start with. You have no opinion regarding the death penalty as a punishment.

JUROR: No. I used to be very for it. But over the last few years I've been really reviewing my own convictions on that things of that nature.

THE COURT: Now, in this case, let's assume you are on the jury, and a conviction on the guilt phase is brought about it. This jury is going to be faced with a choice of a death sentence, meaning that the defendant will be executed; or, life imprisonment without possibility of parole. You say that you have been re-examining your own belief.

If he is guilty, and we are already beyond that, the government and the circumstances of the case may present

aggravating circumstances that the jury would consider or mitigating circumstances that would tend to withdraw the death penalty and make life imprisonment.

Now, under our oath and under your conscience as a candid person, if there are sufficient aggravating circumstances would you consider those and if they were adequate, could you vote in favor of a death sentence?

JUROR: That is the one area that I have had kind of an issue with on this. I prefer -- when you described the first and the second phase of the way the trial will be, I rather have the second phase be something that you made the decision on.

THE COURT: In this case --

JUROR: So, when you brought it up, I was like -- I've been soul searching a lot on that. And I can truthfully say I don't know.

THE COURT: Well, are you convinced that you -- I hate to press you, but I have to.

JUROR: Yes, sir, I understand.

THE COURT: Could you vote for the death penalty in the abstract; or, is your conviction against it so strong that under no circumstances could you vote for a death penalty?

JUROR: I believe I could vote for it if it needed to be done. Yes.

THE COURT: All right. By that, while you would have some reluctance, you don't foreclose the possibility of voting for a death sentence?

JUROR: No, I don't.

THE COURT: By the same token, if there were mitigating circumstances that in your view should result in a sentence less than death, you could vote that, then I assume?

JUROR: Yes, sir.

THE COURT: But you would listen to the evidence and listen to any aggravating circumstances or mitigating circumstances, and under your oath, you would follow my instructions; would you not?

JUROR: Yes, sir. Yes, sir.

THE COURT: If the circumstances demanded, you would vote for the death penalty.

JUROR: Yes, sir.

THE COURT: Mr. Newman, any questions?

MR. NEWMAN: No, Your Honor.

THE COURT: Mr. Darden, any questions?

MR. DARDEN: No, Your Honor.

THE COURT: Mr. Jones, you are to be back at 1:00 o'clock for final jury selection. You are free to leave. Do not discuss the questions I have asked of you or the responses you've made.

JUROR: Yes, sir.

THE COURT: You might want to get lunch and be back.

JUROR: All right, sir.

[Juror Left the Room.]

MARSHAL: 124, Mr. Little.

THE COURT: Mr. Little, would you have a seat here?

JUROR: Yes, sir.

THE COURT: Good morning.

JUROR: Good morning, how you are you doing?

THE COURT: Mr. Little, we're going to ask you some questions this morning regarding matters that you might not want to discuss, but the law requires that I bring you in here and out of the presence of the other members of the panel and ask you these questions.

JUROR: Yes, sir.

THE COURT: You are still under oath. Everything has being said is being recorded. That is a microphone in front of you. Everyone in here is authorized to be here.

You were born and reared in Albuquerque.

JUROR: Yes.

THE COURT: When did you come into this area of the world?

JUROR: I moved to Atlanta, Georgia when I was 15.

Actually I was born in New Mexico, but I wasn't there long. We moved to the San Francisco area, San Mateo, moved to Atlanta when I was 15. I lived down here, I guess about eight years ago, and then moved away, and been back about five and a half years down here.

THE COURT:  You are a general manager of a restaurant.

JUROR:  Yes.

THE COURT:  Which one is that?

JUROR:  Logan's Roadhouse.

THE COURT:  Where is that located?

JUROR:  It is on Abercorn across from Home Depot.

THE COURT:  Okay.  What is the bill of fare there? What do you kind of specialize in?

JUROR:  Steaks are primary, steaks, ribs, chicken, shrimp, seafood.

THE COURT:  You are married.

JUROR:  Yes.

THE COURT:  Is your wife employed?

JUROR:  No.  She's a housewife.  She stays at home.

THE COURT:  The defendant is a black male.  The alleged victim was a white female.  Would those facts influence any decision you are called upon to make?

JUROR:  Not at all.

THE COURT:  Not at all.

JUROR:  No.  I grew up -- my father was black, and my mother is white.  So I've always been very impartial.

THE COURT:  Right.  Now, your home was broken into in the year of 2000.  Was there any apprehension of anyone for that?

JUROR:  No.  Huh-uh.

THE COURT:  You think you've heard about the case from some of your employees.

JUROR:  Yeah.  Yeah.

THE COURT:  Did you arrive at any opinion as to the guilt or the innocence of the defendant?

JUROR:  No, not at all.

THE COURT:  Can you listen to the evidence that would be brought into the courtroom and on that alone make your decision as to the guilt?

JUROR:  Definitely.

THE COURT:  Now, that would present no difficulty for you?

JUROR:  No.

THE COURT:  Under our system -- have you served on a jury previously?

JUROR:  No.

THE COURT:  Well, under our system, the government assumes the responsibility to convince a fair and impartial

jury and each member of that panel that the defendant committed the crime in question, and the proof must remove all reasonable doubt.  If you are convinced that he did commit the crime alleged in the indictment, and you have no reasonable doubt otherwise, could you vote for a conviction?

JUROR:  Yes.

THE COURT:  If you have a reasonable doubt, would you vote for an acquittal, that is to turn him loose?

JUROR:  Yes.

THE COURT:  Now, with that, let's assume that's found guilty, and we're not deciding that obviously, but we have to make certain assumptions.  Then the guilt, the punishment in this case is reserved to the jury.  You understand that.

JUROR:  Yes, sir.

THE COURT:  That is out of the ordinary.  Normally the judge does that.  If he is guilty of a capital crime, then the punishment that the jury will consider is either execution, that is the death penalty; or, life in prison without benefit of parole.  You understand that.

JUROR:  Yes.

THE COURT:  Now, in making that decision, the jury is to listen to all of the evidence.  If there are aggravating circumstances, that is bad things, and you are convinced that there are bad things, could you vote for a

death penalty?

JUROR:  Yes.

THE COURT:  If you decide that there is sufficient mitigating evidence, mitigating meaning less, or something that lessens the impact, could you vote for life imprisonment without benefit of parole?

JUROR:  Yes.

THE COURT:  Now, in making that decision, would you listen to the evidence, both as to mitigating and aggravating circumstances before you make that decision?

JUROR:  Definitely.

THE COURT:  Would you make your decision based upon the evidence or the insufficiency of the evidence without anything else affecting your judgment?

JUROR:  Yes.

THE COURT:  Now, if you had to complete this questionnaire again, would your answers be the same?

JUROR:  Of course.

THE COURT:  Is there anything about you or your background that you think the Court or the parties should know in making a decision whether or not to select you as a member of the jury?

JUROR:  Like I said, I think the biggest thing is I was raised by a black father and white mother, and I've always been very impartial to race.  It doesn't affect me.

THE COURT:  Any questions, Mr. Newman?

MR. NEWMAN:  No, Your Honor.

THE COURT:  Mr. Darden?

MR. DARDEN:  No, sir.

THE COURT:  You are going to be on the short list. I don't know whether you can go and eat in your own restaurant, but be back at 1:00 o'clock.

JUROR:  Okay.

THE COURT:  Do not discuss the questions I have asked of you or the responses you made.

JUROR:  Understood.  Thank you.

[Juror Left the Room.]

MARSHAL:  No. 125, Ms. Elze.

THE COURT:  Good morning, Ms. Elze, spelled E-l-z-e; right?

JUROR:  Correct.

THE COURT:  Ms. Elze, don't be nervous.  I'm going to smile, and I want you to smile.  No one is going to pick on you.  You are a little nervous; aren't you, or not?

JUROR:  Always.  Just hyper.

THE COURT:  Ms. Elze, as I explained the other day, I have to ask you a number of questions out of the presence of the other people.  You understand that.

JUROR:  Yes, sir.

THE COURT:  And I need you to answer yes or no.

That is a microphone there.  This lady is recording everything.  Will you answer yes?

JUROR:  Oh, yes.

THE COURT:  Speak up loud enough so that everyone in the room is able to hear you.

You were born in Lewisburg, Pennsylvania.

JUROR:  Yes.

THE COURT:  There is a federal prison in Lewisburg; do you know that?

JUROR:  Yes.

THE COURT:  Did you ever go out and visit that prison?

JUROR:  Yes.  I had friends that were the children of the warden.

THE COURT:  Okay.  How long was it that you moved down here?

JUROR:  Ten years ago, a little over ten years ago.

THE COURT:  You moved here from where?

JUROR:  Massachusetts.

THE COURT:  How long did you live in Massachusetts?

JUROR:  Eight years.

THE COURT:  Now, what has been your employment?  Have you been a CPA all of the time?

JUROR: From the time in Massachusetts forward.

THE COURT: Yes. You passed the examination in what year?

JUROR: '90, I think.

THE COURT: Okay. You are self employed.

JUROR: Yes.

THE COURT: Where is your office located?

JUROR: In my house.

THE COURT: You do not do any work for any of the lawyers to the best of your knowledge.

JUROR: Not these, no.

THE COURT: You are divorce.

JUROR: Yes.

THE COURT: What your husband's occupation.

JUROR: Computer engineer.

THE COURT: You understand that in this case that the defendant is a black male; the victim was a white female.

JUROR: Yes.

THE COURT: Would the race of the victim or the defendant make the slightest bit of difference in making the decision as to his guilt or the proper punishment?

JUROR: No.

THE COURT: Now, you have never served on jury.

JUROR: No.

THE COURT:  And you were a victim of a very serious crime yourself.

JUROR:  Yes.

THE COURT:  Was there ever any arrest for that?

JUROR:  No.

THE COURT:  What was the race of the person who --

JUROR:  White.

THE COURT:  White.  You had a cousin who was guilty of trafficking stolen goods across state lines.

JUROR:  Yes.

THE COURT:  Did you have any feeling that he was improperly treated?

JUROR:  No.

THE COURT:  You have no resentment towards judicial authorities or the law enforcement officials.

JUROR:  No.

THE COURT:  In this case the defendant is presumed to be innocent.  He does not have to prove that he is innocent.  You understand that.

JUROR:  Yes.

THE COURT:  Before he is convicted, he has a right to a trial before a fair and impartial jury.  The government must produce evidence, proof, that he indeed is guilty.  And the proof must remove all reasonable doubt.  If the government should produce that evidence that removes all

reasonable doubt from your mind, could you vote for a verdict of guilty?

JUROR: Yes.

THE COURT: If you have a reasonable doubt, you have a doubt, a reasonable doubt, could you vote for an acquittal; that is, a verdict of not guilty?

JUROR: Yes.

THE COURT: Now assuming that the defendant is found guilty. We're not -- we're just doing that hypothetically, you understand. The jury is going to have at the decide the punishment. You understand that, or I'm telling you that they will.

JUROR: Yes.

THE COURT: The punishment, if he is found guilty of a capital offense of murder, the punishment would be death, that is he would be executed; or, he could sentenced to life imprisonment without benefit of parole. Now, in making that decision, the jury should consider aggravating circumstances, bad things about him, records, whatever, or mitigating circumstances, that that would soften or lessen, or provide some explanation so that death would not be the appropriate punishment.

Could you make your decision based upon the evidence in the case and the aggravating or mitigating circumstances?

JUROR:  Could I ask you a question?

THE COURT:  Sure.

JUROR:  In evaluating mitigating or the aggravating circumstances, are there parameters which guide us --

THE COURT:  Yes.  I would define --

JUROR:  As far as it is automatically --

THE COURT:  Nothing is automatic.

JUROR:  Okay.

THE COURT:  I would define what aggravating and mitigating was at the time.

JUROR:  And if we decide that there are aggravating circumstances, does that mean that it would --

THE COURT:  Automatically, no.

JUROR:  Do we still have the choice of death or --

THE COURT:  You still would have the choice.

JUROR:  Okay.

THE COURT:  There is no requirement that a jury put him to death.

JUROR:  Okay.

THE COURT:  But if you felt that the circumstances warranted it, could you vote for the death penalty?

JUROR:  Yes.

THE COURT:  If you felt that there were sufficient mitigating circumstances, could you vote not to put the

death penalty on him and vote for life imprisonment without benefit of parole?

JUROR:  Yes.

THE COURT:  So, you are not opposed to the death penalty.  And if it is proper, you could enforce it.

JUROR:  Yes.

THE COURT:  By the same time, you wouldn't do it automatically.

JUROR:  No.

THE COURT:  You would listen to the evidence and the instructions of the Court.

JUROR:  Yes.

THE COURT:  Questions, Mr. Newman?

MR. NEWMAN:  No, Your Honor.

MR. DARDEN:  None, Your Honor.

THE COURT:  Ms. Elze, you are on the short list.  You go get something to eat and be back here at 1:00 o'clock hopefully, we will have completed this process, and we'll make an final jury selection this afternoon.  In the meantime, I prefer you to leave the courthouse and not come back until a little before one.

Don't discuss the questions I have asked of you and the answers you gave.

JUROR:  Yes, sir.

[Juror Left the Room.]

MARSHAL:  The next one will be 105, Ms. Jervis.

MR. NEWMAN:  Your Honor, with regard to this next juror, I am a member of the same civic club that she is, but she didn't seem to recognize me during the voir dire.  It is the Coastal Therapy Dog.

MR. DARDEN:  Your Honor, that --

MR. NEWMAN:  It is my rat terrier that is the official member.

THE COURT:  Good morning, Ms. Jervis.

JUROR:  Hi.

THE COURT:  Ms. Jervis, don't be nervous.  We are in here, no one is going to embarrass you or humiliate you.  As I explained the other day, I need to ask you some questions out of the presence of the other jurors and in the presence of the parties.  You understand that.

JUROR:  Uh-uh.

THE COURT:  That is a microphone in front of you.  You are still under oath.  We're recording everything that transpires.  So, speak up loud enough so that everyone in the courtroom is able to hear you.

JUROR:  Okay.

THE COURT:  You are a registered nurse.

JUROR:  Yes, sir.

THE COURT:  By whom are you employed?

JUROR:  Candler Hospital.

THE COURT:  You have a couple of children.

JUROR:  Yes, sir.

THE COURT:  Are they employed?

JUROR:  My son is in the Master's Program at Georgia.  And my daughter is a biology major at Armstrong.

THE COURT:  What was the occupation of your husband when you were living together?

JUROR:  He was a music representative for Yamaha Music.

THE COURT:  Yamaha Music.

JUROR:  Uh-uh.

THE COURT:  Does he live in Savannah?

JUROR:  No, sir.  He lives in California.

THE COURT:  Have you lived in Savannah most of your life?

JUROR:  Yes, sir.

THE COURT:  What was your maiden name?

JUROR:  Veal.

THE COURT:  Hill.

JUROR:  Veal.

THE COURT:  You didn't know anything or don't remember hearing anything about this case until you came to Court.  Is that correct?

JUROR:  That's correct.

THE COURT:  Have you served on a jury previously?

JUROR:  No, sir.

THE COURT:  In this case, the defendant is presumed to be innocent.  You understand that?

JUROR:  Yes, sir.

THE COURT:  He has a right and the government has a right to a fair and impartial jury.  You understand that.

JUROR:  Yes, sir.

THE COURT:  The government would have to convince that fair and impartial jury that the defendant committed the crime as alleged in the indictment.  The evidence must be strong you have to remove all reasonable doubt from the minds of a fair and impartial juror.  Do you consider yourself fair and impartial?

JUROR:  Yes, sir.

THE COURT:  If the government were to bring evidence sufficient to remove any reasonable doubt from your mind, could you vote for his conviction?

JUROR:  Yes, sir.

THE COURT:  And if you were not convinced, would you vote for an acquittal or a verdict of not guilty?

JUROR:  Yes, sir.

THE COURT:  Now, if the jury were convinced and found him guilty, then the question of punishment becomes an issue.  The jury in this case must decide the punishment.  You understand that.

JUROR: Yes, sir.

THE COURT: The punishment is a choice between death, that is, he would be executed; or, life imprisonment without the benefit of parole. You understand that.

JUROR: Yes, sir.

THE COURT: If he is convicted of one of the capital offenses. You note in your questionnaire, *I have no opinion about the death penalty as a punishment.*

If in making that decision, or in making that decision, the juror and the jury are authorized to consider mitigating circumstances and aggravating circumstances. Aggravating meaning something that is bad that the jury ought to consider whether or not to impose the death sentence. And mitigating evidence that would lessen or soften or speak to good qualities regarding the defendant.

Now, if the government, if he is guilty and the government proves that there are aggravating circumstances, could you impose the death sentence?

JUROR: I would have to hear what the circumstances were.

THE COURT: Yes. I am saying assuming there are egregious or bad circumstances.

JUROR: Yeah, but they would have to be bad.

THE COURT: They would have to be bad. You are not under all circumstances opposed to the death penalty

then, I gather.

JUROR:  No.

THE COURT:  Under the right circumstances you would vote for the death -- and I'm saying theoretically -- you can vote for the death penalty?

JUROR:  Yeah.

THE COURT:  But if there were mitigating circumstances or if you felt that the death sentence was not warranted, you could vote for life imprisonment without parole.

JUROR:  That's correct.

THE COURT:  Mr. Newman, Mr. Frentzen, any questions.

MR. NEWMAN:  No, Your Honor.

THE COURT:  Under your oath, you say there are circumstances wherein you could vote for the death sentence.

JUROR:  Yeah.

MR. DARDEN:  No questions, Your Honor.

THE COURT:  No questions.  Well, you are going to be on the final list for jury selection.  So, we hope to resume about 1:00 o'clock with the final selection.  So, you have from now to then.  You may go and get lunch.  Be back at 1:00 o'clock.

Don't tell anybody the questions I have asked of you or the responses you made.

JUROR:  Okay.

[Juror Left the Room.]

MARSHAL:  No. 232, Mr. Green.

THE COURT:  Good morning, Mr. Green.

JUROR:  How are you doing, sir?

THE COURT:  Won't you have a seat.  I note that you come from Rome, Georgia originally.

JUROR:  Right, sir.

THE COURT:  How long have you lived down in the Savannah area?

JUROR:  Well, I was in the military, and I was stationed here at Hunter in the early '50s.  And then I came back in the '70s -- no, I came back in late '69.  And I retired.

THE COURT:  What did you retire from?

JUROR:  The Air Force.

THE COURT:  Air Force.

JUROR:  Yes, sir.

THE COURT:  What was the rank you held at the time of your --

JUROR:  Tech Sergeant.

THE COURT:  Tech Sergeant.  You have four children.  They are no longer children.  But four adults.

JUROR:  No, sir.  Right.

THE COURT:  What are their occupations?

JUROR:  One is, he is a computer processor.  And he works for Lockwood & Greene Engineering.  And my other son -- I have only one son here.  And this son here, he works at a reprocessing center.  And I don't recall the name of it, sir.

THE COURT:  That's all right.

JUROR:  Then I have a daughter who in Wichita, Kansas.  And she is a salesclerk out there.  And I have a daughter in Hagerstown, Maryland, who is a banker.

THE COURT:  All right.  Has your wife ever been employed outside of the home?

JUROR:  She works part time now, sir.

THE COURT:  For whom?

JUROR:  For Hallmark Greeting Cards.  She only works two or three hours a week.

THE COURT:  That is one of the local outlets.

JUROR:  Yes, at Hunter.

THE COURT:  At Hunter.  You served on a state jury before?

JUROR:  Yes, sir.

THE COURT:  That was a civil case.

JUROR:  No, sir, it was a criminal case.

THE COURT:  A criminal case.  What was the defendant charged with?

JUROR:  He was charged with possession of a drugs.

THE COURT:  Was he found guilty or not?

JUROR:  Well, sir, after the prosecution presented their case, the judge dismissed it.  So the jury didn't make a verdict.

THE COURT:  You did not have to come to a conclusion.

JUROR:  Yes.

THE COURT:  Now, you heard something with about this on TV and in the newspaper.

JUROR:  Right.

THE COURT:  This incident, this alleged crime.  Would you be able to put that out of your mind and make a decision based upon the evidence that would occur in the courtroom?

JUROR:  Well, sir, having retired from the Post Office, it was of particular interest to me.  And I have followed it rather closely.  Probably I could.  Yes, sir.

THE COURT:  Well, the government and the defendant are entitled to a fair and impartial jury.  The jury should be able to make the decision based upon the evidence in the courtroom or the insufficiency of the evidence, and nothing else.

JUROR:  Yes, sir.

THE COURT:  I'm asking you can you do that.  Can you under our oath say I can do that?  Or if you can't do

it, then that is fine, too.

JUROR:  I can, sir.

THE COURT:  You can.  All right.  You understand that the defendant is a black male.

JUROR:  Yes, sir.

THE COURT:  The victim, alleged, was a white female.

JUROR:  Yes, sir.

THE COURT:  Would that make any difference to you?

JUROR:  No.

THE COURT:  I assume in your career at the Post Office and in the Air Force you had relationships with members of all races.

JUROR:  Yes, sir.

THE COURT:  And do you have any particular problem with any race?

JUROR:  No, sir.

THE COURT:  Now, the defendant is presumed to be innocent.  He has entered a plea of not guilty.  You understand that.

JUROR:  Yes, sir.

THE COURT:  The government then must assume the responsibility to prove, that is to convince a fair and impartial jury that he indeed is guilty.  And the guilt must remove all reasonable doubt.  If the government's proof

should remove all reasonable doubt, could you vote for a verdict of guilty?

JUROR:  Yes, sir.

THE COURT:  If you have a reasonable doubt, could you vote not guilty?

JUROR:  Yes, I could.

THE COURT:  Now, if he is found guilty, let's assume a hypothetical situation.  If the defendant is found guilty of the offense charged in the indictment, the question of punishment is reserved for the jury.  You understand that.

JUROR:  I do.

THE COURT:  And the punishment would be a choice between the death sentence, that means he would be executed; or, life imprisonment without possibility of parole.  Now, in making that decision, the jury would listen to aggravating circumstances that might warrant the death penalty or mitigating evidence, or the facts and circumstances of the case itself might be mitigating so that the death penalty should not be imposed, but a lesser sentence of life imprisonment without benefit of parole.

Now, if he is convicted, could you listen to the evidence as to aggravating or mitigating evidence?

JUROR:  Yes, sir.

THE COURT:  Would you automatically vote for the

death sentence if you find him guilty?

JUROR: No, sir.

THE COURT: Would you consider the mitigating evidence in assessing the proper punishment?

JUROR: Yes, sir.

THE COURT: Now, is there anything in this questionnaire that you would change if you had to fill it out again?

JUROR: I don't think so.

THE COURT: You think you've answered everything correctly.

JUROR: Yes, sir.

THE COURT: Is there anything in your background that you consider that the parties ought to know and the Court ought to know in making the selection of you as a juror?

JUROR: No, sir.

THE COURT: How long were you employed by the Post Office?

JUROR: Eighteen years.

THE COURT: What was your position?

JUROR: As a window --

THE COURT: A window clerk.

JUROR: Yes, sir.

THE COURT: I asked you the other day, what office

did you work in?

JUROR: Well, I worked primarily out of the Bingfield Station, but I worked at all stations at one time or another. In fact, most of them are no longer open.

THE COURT: That is here in Savannah.

JUROR: Yes, sir.

THE COURT: You worked in this building?

JUROR: In this building, yes, sir.

THE COURT: Did you know the deceased?

JUROR: No, sir.

THE COURT: Did you know anybody that knew her?

JUROR: No, sir.

THE COURT: And you don't know the defendant or any of the lawyers?

JUROR: No, sir.

THE COURT: Now, you were a federal Post Office employee. Do you think that in any way would influence your decision?

JUROR: No, sir, I don't think so.

THE COURT: Can you assure the defendant and the Court that you would give him every benefit of the doubt and follow the law, listen to the evidence and make your decision based upon that, and nothing else?

JUROR: Yes, sir.

THE COURT: You would do that?

JUROR:  Yes, sir.

THE COURT:  Mr. Newman.

MR. NEWMAN:  No questions, Your Honor.

THE COURT:  Mr. Darden.

MR. DARDEN:  Mr. Green, I sense that you are struggling with this a little bit.  And I can certainly understand that.  What is the American Postal Union, what do y'all exactly do?

JUROR:  That is the union for the Postal Service employees.

MR. DARDEN:  And you are still an active member of that?

JUROR:  I have my postal insurance, my health insurance through them.

MR. DARDEN:  Yes, sir.

JUROR:  So, I'm not an active member.  I'm just, I guess, more or less an associate.  I don't know how I would put that.  I'm still a member.  But, you know --

MR. DARDEN:  But it is organization somewhat like the military.  I mean, it is a brotherhood that you support other members.  Is that correct?

JUROR:  I don't know what you mean by that, sir.

MR. DARDEN:  Well, I mean, I would assume that it has thousands of members.  Is that correct?

JUROR:  Yes, sir.  Yes, sir.

MR. DARDEN:  And y'all kind of look out for each other, and make sure that you, you know, get legislation passed in support the Postal Union.

JUROR:  Yes, sir, I would say that.

MR. DARDEN:  Postal workers' salaries, benefits and all that type of thing.  Is that correct?

JUROR:  Yes, sir.

MR. DARDEN:  And you don't think that would have any bearing on your ability to serve in this case?

JUROR:  No, sir.

MR. DARDEN:  Let me ask you this.  And I know this may seem a little strange.  But if you were in the defendant's position -- and I know you are not -- would you feel comfortable with someone like you sitting on the jury, having that relationship with the Postal department?

JUROR:  I might have reservations about it, sir.

MR. DARDEN:  Yes, sir.  I mean, that would just be natural; would it not?

JUROR:  Yes, sir, it would.

MR. DARDEN:  And certainly you could understand that; couldn't you?

JUROR:  Yes, sir.

MR. DARDEN:  That's all I have.  Thank you.

THE COURT:  Mr. Green, you are qualified.  You are to return here at 1:00 o'clock for jury selection.  Go get

something to eat.  Don't tell anybody the questions we have asked of you or the answers you've made.

JUROR:  Sir, may I add one other thing?

THE COURT:  Sure.

JUROR:  I'm almost 72, and I do have a couple of physical problems.  I have macular degeneration, and I have cataracts.

THE COURT:  I do, too.

JUROR:  And I have problems reading.  And I surely have problems -- I don't drive at night any more.

THE COURT:  Well, I'll take care of that.  I think you will be all right.  I sympathize.  I have the macular degeneration, too.

JUROR:  I also have arthritis in my knee.

THE COURT:  Is it the wet or dry kind?

JUROR:  It's dry.

THE COURT:  I have the dry kind, too.  Thank you. I will see you at 1:00 o'clock.

JUROR:  Okay.

[Juror Left the Room.]

THE COURT:  Okay.  Call the next.

MARSHAL:  No. 234, Brenda Gordon.

THE COURT:  Hey, Ms. Gordon, how are you this morning?

JUROR:  I'm fine.

THE COURT: I guess you are tired of waiting out there in the courtroom.

JUROR: Yes, I am.

THE COURT: Well, I apologize. But this is an arduous process that takes some time.

You are originally from LaGrange, Georgia.

JUROR: Yes, I am.

THE COURT: How long have you lived in -- you've lived up in the Springfield for a number of a years, though.

JUROR: Yes, I have.

THE COURT: Now, in this case, you understand that the defendant is presumed to be innocent. Do you have any problem with the presumption of innocence?

JUROR: I don't.

THE COURT: You are under oath, and if you would answer into that microphone. We're trying to record everything. You worked at an elementary school as a --

JUROR: You do work at nan elementary school.

THE COURT: What school is that?

JUROR: Ebenezer.

THE COURT: What was your husband's work?

JUROR: He worked at IP in the chemical lab?

THE COURT: International Paper Company.

JUROR: Uh-uh.

THE COURT: What do your three children do?

JUROR:  Children do.  My oldest is a chemical engineer at the sugar refinery.  The middle child is a pharmacist.  He's in charge of the Wal-Mart pharmacies around this area.  And my daughter is in college.

THE COURT:  Where is she --

JUROR:  In Chicago.

THE COURT:  In Chicago, what school?

JUROR:  She has just changed.  I don't know.

THE COURT:  Okay.  And you don't remember hearing anything about this case?

JUROR:  No, I don't.

THE COURT:  All right.  Now, have you served on a jury before?

JUROR:  Yes, I have.

THE COURT:  That was in Effingham County?

JUROR:  It was.

THE COURT:  Was that a civil or criminal case?

JUROR:  Civil.

THE COURT:  Did the jury, was the jury able to reach a verdict?

JUROR:  We were.

THE COURT:  Now, in the case, the defendant is presumed to be innocent, as I expressed to you earlier.  The government has to convince a fair and impartial jury that he committed the crime with which he is charged.  And the

evidence must remove all reasonable doubt.  You understand that?  Would you answer?

JUROR:  Yes, I do.

THE COURT:  If the government convinces you beyond a reasonable doubt that indeed committed the crime, that he is the person who committed the crime as alleged in the indictment, could you vote for a verdict of guilty?

JUROR:  Yes, I could.

THE COURT:  And if you are not convinced --

JUROR:  Then I could not.

THE COURT:  You could not.  That was the other side.  If the jury finds him guilty, unanimously finds him guilty, then the jury in this instance has to set the punishment.  You understood that from what I said the other day; do you not?

JUROR:  Yes, I understood.

THE COURT:  The choices are death, he would be put to death, executed by the government; or, life imprisonment without the benefit of parole.  Now, if the circumstances justified it, if there were aggravating circumstances, could you vote for the death sentence?

JUROR:  I believe I could.

THE COURT:  You think you could.  And, of course, there may be mitigating circumstances that would make life imprisonment the proper sentence.  Could you listen to the

mitigating evidence, and if you felt that the death sentence was not warranted, vote a verdict of life imprisonment without benefit of parole?

JUROR:  I could.

THE COURT:  But you are prepared; are you not, to vote for the death sentence, and you would listen to the evidence in making that decision?

JUROR:  I would listen to the evidence and make the decision.

THE COURT:  And if the decision, if the evidence warranted it, you could vote for the death sentence.

JUROR:  I could.

THE COURT:  All right.  Any questions, Mr. Newman?

MR. NEWMAN:  No, Your Honor.

THE COURT:  Any questions, Mr. Darden?

MR. DARDEN:  No, sir.

THE COURT:  Well, you go get something to eat, and be back at 1:00 o'clock.  Don't tell anybody the questions I have asked of you or your answers.

JUROR:  Okay.  1:00 o'clock.

THE COURT:  1:00 o'clock.

[Juror Left the Room.]

MARSHAL:  No. 10, Mr. Neal.

THE COURT:  Mr. Neal, how are you?

JUROR:  I'm doing fine, Your Honor.

THE COURT:  Mr. Neal, you remember the other day I said I was going to have to bring each of you in here, or enough of you, and talk to you personally and ask you questions out of the presence of the other people.  You recall that.

JUROR:  Yes, sir.

THE COURT:  You are still under oath.  You recognize that.

JUROR:  Yes, sir.

THE COURT:  That is microphone in front of you there.  So, if you would speak loudly enough so that everybody in the room can here you, and we're making a record of everything that is being said.

You were born in Columbus, Georgia.  You are living in Hinesville.  How long have you lived in Liberty County?

JUROR:  Since '92.

THE COURT:  '92.

JUROR:  Yes, sir.

THE COURT:  You are a truck mechanic.

JUROR:  Track mechanic, sir.

THE COURT:  Track mechanic.  That is railroad track?

JUROR:  Tank, military.

THE COURT:  Tank.  So, you work for an

independent -- are you employed by the government or an independent contractor?

JUROR:  Yes, sir, the state government.

THE COURT:  The state government.  You work in the armor or tank.  I assume you work on the Abrams tank.

JUROR:  Yes, sir.

THE COURT:  Is that a still a tank?

JUROR:  It is a good tank.

THE COURT:  Good.  It won the Gulf War; didn't it?

JUROR:  Uh-uh.

THE COURT:  Is your wife employed?

JUROR:  Yes, sir.

THE COURT:  What is her job?

JUROR:  She's a mail handler at the Expedite.  Expedite is right here on Bull Street.

THE COURT:  Right.  Now, in this case, the defendant is a black male.  The victim is alleged to be a white female.  You understand that.

JUROR:  Yes, sir.

THE COURT:  Would that make the slightest bit of difference in either deciding guilt or not guilt or punishment to you?

JUROR:  No, sir.

THE COURT:  Did you hear anything about this case when it occurred or this incident?

JUROR: No, sir.

THE COURT: You didn't know that a case had occurred until you got here.

JUROR: Until I got here, I didn't know anything about it.

THE COURT: You didn't hear any talk about it in the shop last year when it occurred.

JUROR: No, sir.

THE COURT: All right. And you have never served on a jury before?

JUROR: No, sir.

THE COURT: Now, the defendant has entered a plea of not guilty, and he is presumed to be innocent. You understand that.

JUROR: Yes, sir.

THE COURT: The government must prove his guilt beyond a reasonable doubt before a conviction would be authorized. Do you understand that?

JUROR: Yes, sir.

THE COURT: If the government's proof should remove all reasonable doubt from your mind, could you vote for a verdict of guilty?

JUROR: Yes, sir.

THE COURT: If you have a doubt, could you vote for a verdict of not guilty? In other words, you have a

reasonable doubt, you might even believe he is guilty, but you still have a reasonable doubt. Could you vote for the verdict of not guilty?

JUROR: I don't think so.

THE COURT: You don't think you could vote him not guilty?

JUROR: If he is guilty, I can vote guilty.

THE COURT: Right. But how if you are not convinced that he's guilty?

JUROR: If I'm not convinced that he's guilty, then I have to vote not guilty.

THE COURT: Right. Now, you understand that if he is guilty the jury has to decide the punishment; you understand that?

JUROR: Yes, sir.

THE COURT: Your choices are these, let's assume, that he can be put to death; that is, he would be executed by the government. You understand that.

JUROR: Yes, sir.

THE COURT: By the prison authority. Or, the jury may consider mitigating circumstances and decide that he should be allowed to live and sentence to life imprisonment without benefit of parole.

Now, there may be aggravating circumstances that make the jury believe that death is the appropriate

sentence.  If that it is your conviction, could you vote for a death sentence?

JUROR:  Yes, sir.  Uh-uh.

THE COURT:  And you have no conscientious objections to the imposition of the death sentence.  Is that correct?

JUROR:  No, sir.

THE COURT:  But if you feel like under all the facts and circumstances of the case, that life imprisonment would be the more appropriate sentence, you could vote for that, too.  Is that correct?

JUROR:  Yes, sir.

THE COURT:  So, you would listen to the evidence, the instructions of the law that I would give at the appropriate time, put anything out of your mind, and make your decision based upon that and nothing else.  Is that correct?

JUROR:  Yes, sir.

THE COURT:  Now, where you say *If the defendant were found guilty of a capital count, would you automatically vote for life imprisonment without the possibility of parole, regardless of the facts and aggravating evidence?*

You said that you would vote automatically for the life without parole.  Do you understand that?

JUROR:  Uh-uh.

THE COURT:  Well, is that still your answer?

JUROR:  I'm not sure about that.  I strongly believe in the death penalty.

THE COURT:  Okay.  So, you may an error there. While you believe in the death penalty, you wouldn't automatically put him to death.  You would listen to the evidence.

JUROR:  I would have to listen to the evidence.

THE COURT:  And you would not automatically vote for life imprisonment without possibility of parole.  Is that right?

JUROR:  Yes, sir.

THE COURT:  In other words, you would be bound by the law and the evidence, and your conviction after the trial; would you not?

JUROR:  Yes, sir.

THE COURT:  Mr. Newman, do you have any questions?

MR. NEWMAN:  None, Your Honor.

THE COURT:  Mr. Darden?

MR. DARDEN:  None.

THE COURT:  Mr. Neal, you are going to be on the short list for jury selection at 1:00 o'clock.  We're moving toward that direction.  Now, you are free to leave and go get something to eat.  But do not tell anybody the questions

that were asked of you or the answers you gave.  You understand that?

JUROR:  Yes, sir.

THE COURT:  Be back promptly at 1:00 o'clock.  Hopefully, we will be finished with this, and we can start soon after 1:00 o'clock.  You are free to leave the courthouse.

[Juror Left the Room.]

MARSHAL:  No. 68, Mary Brock.

THE COURT:  Hey, how are you, Ms. Brock?

JUROR:  Fine.  Thank you.

THE COURT:  You recall the other day I told you that I would have to ask you some questions out of the presence of the other people.  You look a little nervous.  Relax.

JUROR:  Okay.

THE COURT:  Smile.

JUROR:  Okay.

THE COURT:  And that is a microphone in front of you.  You are under oath.  We're trying to record all of these answers.  Everyone in the room is authorized to be here.  This should not take too long.

You are a church secretary.

JUROR:  Yes, sir.

THE COURT:  By which church are you employed?

JUROR:  Independent Presbyterian Church.

THE COURT:  That's over here.

JUROR:  Right.

THE COURT:  I'm a member there also, you know.

JUROR:  I learned that after court on Thursday, sir.

THE COURT:  Did you?  Okay.  Well, is your husband -- your husband is an Episcopal priest.

JUROR:  Yes, sir.

THE COURT:  What church does he serve?

JUROR:  St. Michael and All Angels.

THE COURT:  All right.  Where did you attend college?

JUROR:  Furman University in Greenville, South Carolina.

THE COURT:  Okay.  I notice you are Phi Cappa Phi Honor Society.  You did quite well.  Your children are what age?

JUROR:  I have no children.

THE COURT:  No children.  Your brother-in-law is James G. Beck, Jr.  And he is police chief in Augusta, Georgia.

JUROR:  No, sir.  That was my uncle.  That was my father's brother-in-law.  And that was some years ago that he was.

THE COURT:  Okay.  I misread it.  You said it plainly here.  And you don't remember in anything about the news that surrounded the case.

JUROR:  I had a vague recollection of hearing about a postal employee being murdered.  But I have remembered no details, sir.

THE COURT:  So that would not influence any decision?

JUROR:  No, sir.

THE COURT:  Now, the defendant has entered an plea of not guilty.  Before the defendant could be convicted, he must convicted on evidence that removes all reasonable doubt from a fair and impartial jury, and each member of that panel.  Do you understand that?

JUROR:  Yes, sir.

THE COURT:  Now, he is presumed to be innocent.  Assuming that the government produces the proof that removes all reasonable doubt from your mind, you are convinced that he is guilty, can you vote for a guilty verdict?

JUROR:  Yes, sir.

THE COURT:  If you have a doubt, you say well, I think he probably did it, but I'm really not convinced beyond a reasonable doubt, could you vote for the verdict of not guilty?

JUROR:  Oh, yes.

THE COURT:  Now, you state that you have no opinion about the death penalty as a punishment.

JUROR:  Right.

THE COURT:  Have you not thought about it a long time?

JUROR:  Yes, sir, I have.  And the reason that I marked that is that I guess I'm in the middle on it.  The statement that I support the death penalty seemed too strong, and I opposed the death penalty seemed too strong.  I think that it is a appropriate punishment for certain crimes.

THE COURT:  Yes.  Would one of the crimes be murder?

JUROR:  Yes, sir.

THE COURT:  But I gather that not every murder --

JUROR:  Right.

THE COURT:  -- you would vote the death penalty?

JUROR:  Right.

THE COURT:  Is there any particular type of crime that you would or would not vote to for a death penalty?

JUROR:  I think particularly cruel crimes against children would be something that would lean me toward a death penalty on punishment.

THE COURT:  But your normal tendency would be not to punish by death?

JUROR:  Not without aggravating circumstances.

THE COURT:  Okay.  You have used an magic word here.  Let's assume that the jury found the defendant guilty beyond a reasonable doubt.

JUROR:  Right.

THE COURT:  Then the question of punishment is reserved exclusively for the jury.  Their choices would be death, which means he would be executed by the prison system; or, life without benefit of parole.  In making that decision, the jury would consider aggravating circumstances. You understand, if there were any.

JUROR:  Right.

THE COURT:  And mitigating circumstances, that that would soften and result in life imprisonment without benefit of parole.  If there were sufficient aggravating circumstances, could you vote for a death sentence?

JUROR:  Yes, sir, I could.

THE COURT:  If there were mitigating circumstances that you felt dictated a sentence of life imprisonment without benefit of parole, could you vote for that?

JUROR:  Yes, sir.

THE COURT:  Now, if you had to complete this questionnaire again, would your answers be the same insofar as you remember?

JUROR:  Yes, sir.

THE COURT:  Is there anything -- now I think I asked you this.  The race of the defendant is black.  The victim was white.  Would that make any difference to you?

JUROR:  No, sir.

THE COURT:  You believe there is definitely a race problem in this country.

JUROR:  Yes, sir, I do.

THE COURT:  Is there anything else that we should know about you that I have not asked or is not in this questionnaire that should be revealed in this room in order to assist the parties to make a decision about your qualifications?

JUROR:  I don't know of anything, sir.

THE COURT:  Mr. Newman.

MR. NEWMAN:  No questions, Your Honor.

THE COURT:  Mr. Darden?

MR. DARDEN:  Ms. Brock, you know Karl Knoche?

JUROR:  I have not met him, but he is an elder at the church where I work.  So, I deal with his name.  I type his name into bulletins and schedules and that sort of thing.

MR. DARDEN:  So, you don't have any type of relationship with him.

JUROR:  No, sir.

MR. DARDEN:  You don't discuss things with him.

JUROR:  No, sir.  I think I talked with him on the phone one time to let him know a member of his care group had been hospitalized.  And it is my job to report that to elders.  But beyond that, I wouldn't know him if he walked into the room.

MR. DARDEN:  Thank you.

THE COURT:  You are on a list that will meet.  You are to be back at 1:00 o'clock.  You are free until that time.  I would suggest that you get some food.

JUROR:  Right.

THE COURT:  Do not reveal any of the questions I have asked of you or any of the responses you've made.

JUROR:  Okay.  Thank you.

[Juror Left the Room.]

MARSHAL:  The next one will be 52, Mr. Beattie.

THE COURT:  Hi, Mr. Beattie, how are you?

JUROR:  Very well.  Thank you.

THE COURT:  Mr. Beattie, as you recall the other day I indicated that there were some questions that I could ask you in the group, and then there would be questions that I would have to ask you individually.  You are still under oath.  If you will listen to the questions, answer as directly as you can.  There is a microphone in front of you. We're recording everything.  And everyone in the room needs to be able to hear your answer.

Now, you recall that -- first of all, you were in journalism.  What is your present occupation?

JUROR:  I manage a branch office for an industrial equipment company based out of Atlanta.

THE COURT:  What is the name of that business?

JUROR:  It is called Pye Barker Supply Company.

THE COURT:  Right.  And you are divorced.

JUROR:  That's correct.

THE COURT:  Is your wife or former wife employed?  Or you know not.

JUROR:  As far as I know.  I don't know.

THE COURT:  You have no children.

JUROR:  Correct.

THE COURT:  You are in the Folk Music Society.

JUROR:  Correct.

THE COURT:  Is there any particular folk music to which you have a strong appeal?

JUROR:  Well, I'm a dance caller.  I call square dances.

THE COURT:  Have you ever heard of Bradley Kincaid?

JUROR:  No, I can't say I have.

THE COURT:  Okay.  Just testing you.  Now, they have not heard of him either.  Now, you understand that the race of the defendant is a black male.

JUROR:  Correct.

THE COURT:  The race of the victim in this case was a white female.

JUROR:  Yes, sir.

THE COURT:  Would those facts make any difference to you either for or against the defendant or the government?

JUROR:  No.

THE COURT:  Completely neutral on that regard?

JUROR:  Yes.

THE COURT:  Now, the defendant has entered a plea of not guilty as I explained.  He does not have to prove his innocence.  The government has to convince a fair and impartial jury, and each member of it that he did commit the crime, and that proof must be strong enough to remove all reasonable doubt except that he is guilty.

If the government can prove to your satisfaction that the defendant is guilty, and his guilt has been demonstrated beyond a reasonable doubt, could you vote for a verdict of guilty?

JUROR:  Yes, I could.

THE COURT:  If you have a reasonable doubt, even though you think well, he probably did it, but I have a reasonable doubt, could you vote for a verdict of not guilty?

JUROR:  Yes, I could.

THE COURT:  Now you understand that in this case if he is found guilty the jury would make the decision as to punishment.

JUROR:  Correct.

THE COURT:  And their choices would be a death sentence, wherein he would be executed by the prison authorities, or life imprisonment without benefit of parole. In making that decision, the jury should consider aggravating circumstances, that that would indicate bad purpose, ill motive or whatever.  And I would define that for you, and give you those.  Or mitigating circumstances, that that would speak to his benefit or soften the blow.

If there were sufficient aggravating circumstances, could you vote for the death penalty?

JUROR:  Reluctantly, I could, yes.

THE COURT:  You have no philosophical, antagonism to that to the extent that you could not bring yourself to do it.  Is that correct?

JUROR:  I would say I could vote for it in the extreme of cases, the most extreme of cases.

THE COURT:  The most extreme of cases, all right. So, your natural inclination in this and all other cases would be to impose a sentence less than death?

JUROR:  Most likely, yes.

THE COURT: Most likely.

JUROR: Again, we have to look at the circumstances.

THE COURT: What would you define as an extreme case?

JUROR: I would say an set of aggravating circumstances, remorsefulness on the part of the perpetrator, and no mitigating circumstances.

THE COURT: Mr. Newman, questions?

MR. NEWMAN: Mr. Beattie, you said you get a lot of your or some information from magazines. What magazines to you subscribe to or regularly read?

JUROR: *News Week*, *Atlantic*, computer magazines. That is all I can think of at the moment.

MR. NEWMAN: Going to the questions that the Court asked you in the questionnaire about discrimination in our society, you checked the line that says *I feel death penalty is applied unfairly against minorities.*

Do you have a sense as you have watched and participated in these proceedings to this point that there is any invidiousness in the underlying procedures going on here?

JUROR: No.

MR. NEWMAN: Thank you, sir.

THE COURT: You indicate that you also read or

heard about this, and read something about it at the time or surrounding it.

JUROR:  Correct.

THE COURT:  Is there any information that you have that would influence your decision if you are selected to serve on the jury?

JUROR:  I can't think of any.

THE COURT:  You could listen to the evidence in the courtroom and on that, and nothing else, make your decision?

JUROR:  I could.

THE COURT:  Mr. Beattie, I am going to ask you that you return at 1:00 o'clock for final jury selection. I'm not sure we'll start at 1:00 o'clock, but we will start as soon as we can after that.  Do not make known to anybody the questions asked of you or the responses you made.  You are free to leave.

JUROR:  Very good.  Thank you.

[Juror Left the Room.]

MARSHAL:  The next one is Barbara A. Brown.

THE COURT:  Ms. Brown, how are you this morning?

JUROR:  Fine.

THE COURT:  Ms. Brown, if you will sit there.  The law requires that I ask you questions out of the presence of the other people.  You are under oath.  That is a microphone

in front of you.  If you would speak loud enough so that the people in the room will hear you.

The first thing I want to tell you is relax. We're not going to pick on you or abuse you in any way.  We just need to ask you certain questions.

JUROR:  Okay.

THE COURT:  I'm going to cut right through the chase on this one, gentlemen.

MR. DARDEN:  Yes, sir.

THE COURT:  I note that Question 29 you say *I'm a Christian and Exodus 20 tells me, accordingly, God, thou shall not kill.  And I strongly oppose the death penalty as a punishment.*

Is that a fair reading of the answer that you gave?

JUROR:  Yes, it is.

THE COURT:  And you also said that you could not vote for the death penalty in Question 32.  Is that right?

JUROR:  Right.  Right.

THE COURT:  Now, you have every right to your belief.  We all hopefully have beliefs.  But I need to probe just a little bit on the that.

JUROR:  Okay.

THE COURT:  Is your opinion, that is your feeling regarding the death penalty so strong that under no

circumstances could you vote to execute someone?

JUROR:  Absolutely, under no circumstances.

THE COURT:  So, in this case, and in all other cases that you can imagine, you would not be a party to imposing a death sentence?

JUROR:  No, I would not be a party.

THE COURT:  Is there any other question, Mr. Darden?

MR. DARDEN:  No, sir.

THE COURT:  I'm going to excuse you.  Certainly you have a right to that.  You may leave.  You have done your service.

JUROR:  Okay.

THE COURT:  But don't tell anyone else the questions I have asked of you or the answers you made.  And thank you.  Ms. Brown.

JUROR:  All right.

[Juror Left the Room.]

MARSHAL:  The next one will be 154, Ms. Carver.

THE COURT:  How are you this morning?

JUROR:  Great, how are you?

THE COURT:  Fine.  You have three years of criminal justice.

JUROR:  Yes, but no degree.

THE COURT:  No degree.  How long have you lived in

Savannah?

JUROR:  Since I have five.

THE COURT:  Where did you attend college?

JUROR:  Armstrong.

THE COURT:  Are you still enrolled?

JUROR:  No.

THE COURT:  What aspirations did you have when you took criminal justice?  Did you think that would be the career you would like to follow?

JUROR:  At that time, yes.

THE COURT:  What did you see yourself as doing when you graduated, if you had graduated?

JUROR:  I had really wanted to get another degree in chemistry, and do forensics.

THE COURT:  Chemistry, well that is two different hard sciences, and what we might say soft science.  You are married to the computer engineer.  By whom is he employed?

JUROR:  Verizon Wireless.

THE COURT:  And you are employed by?

JUROR:  Wilmington Island Beverage.

THE COURT:  And you serve sometimes as a bartender.

JUROR:  Yes.

THE COURT:  And you know Mr. Darden?

JUROR:  Yes.

THE COURT:  You had much relationship with him?

JUROR:  No, his children used to go to school with my children.  And I know his wife, but I don't know him that well.

THE COURT:  All right.  Is his wife employed outside of the home; or, do you know her as an social --

JUROR:  I don't know her from work.  We just have a mutual friend.

THE COURT:  All right.  How often would you say you saw Mr. Darden?

JUROR:  I think the last time I saw him was like probably five month ago at the Y.

THE COURT:  Right.  Well, I'm delighted he goes.  He has too much free time.  Your father works for him.

JUROR:  No.

THE COURT:  Or works with him sometimes.

JUROR:  Yeah.

THE COURT:  What does your father do?

JUROR:  He's an defense attorney.

THE COURT:  Who is that?

JUROR:  William Cox.

THE COURT:  William Cox.  Well, it took me a long time to cut through the chase.  I had no idea.  Of course, I know your father, too, pleasantly.  Your father has been in the defense, a well-known defense lawyer in this community.

Have you ever worked in his office?

JUROR:  Yes, I have.

THE COURT:  Did you work in his preparation of defense in criminal cases?

JUROR:  No, I did not.  I just basically did a receptionist when his secretaries were out.

THE COURT:  Yes.  Do you have a feeling that the defense lawyers and the defendants have an uphill battle?

JUROR:  No.

THE COURT:  Do you have any antagonism toward law enforcement or prosecuting lawyers?

JUROR:  No, I don't.

THE COURT:  All right.  And it has been several years since you've helped your father.

JUROR:  Yes.

THE COURT:  All right.  You understand, do you not, that the defendant is presumed to be innocent?

JUROR:  Yes, sir.

THE COURT:  And the government must prove his guilt beyond a reasonable doubt before a conviction would be authorized.

JUROR:  Yes.

THE COURT:  If the government can convince or does convince you so that you have no reasonable doubt, could you vote for a guilty verdict?

JUROR:  Yes, I could.

THE COURT:  If you have a reasonable doubt, would you vote for a verdict of not guilty?

JUROR:  If I had a reasonable doubt, yes.

THE COURT:  Now, you understand in this case that in the jury finds him guilty, then the jury will decide the question of punishment.  You understand that.

JUROR:  Uh-uh.

THE COURT:  The punishment choices would be a death penalty, which means he would be executed in due time; or, life imprisonment without benefit of parole.  You understand that.

JUROR:  Yes.

THE COURT:  Now, in making that decision, the jury is authorized to consider aggravating circumstances, things that should be considered negatively against the defendant or mitigating circumstances, things that would be a positive.  Could you do that?

JUROR:  Yes.

THE COURT:  If you were convinced, one, that he was guilty, and there were sufficient aggravating circumstances, could you vote in favor of the death penalty?

JUROR:  Yes.

THE COURT:  If you were not convinced or if you thought that the mitigating circumstances outweighed the

aggravating circumstances, could you vote for life imprisonment without benefit of parole?

JUROR:  Yes.

THE COURT:  Is there anything in this questionnaire that you completed the other day that you would change?

JUROR:  Not to my knowledge.

THE COURT:  Is there anything about you or your background or experiences that the Court or the parties need to know?

JUROR:  No.  I think the only thing I would add is that I kind of get the feeling that you're asking about, since my father is a defense attorney that I would stray to the side of the defense.

THE COURT:  Sure.

JUROR:  But I also have -- my uncle is a police officer.  So I kind of have both sides.

THE COURT:  I think that is fair question.  Since your father is a defense attorney, are you sympathies more with the defendant than the prosecution?

JUROR:  I would say no.  Just because I have family members that are on, you know, both sides.

THE COURT:  Have you discussed this case or jury service with your father?

JUROR:  No.

THE COURT:  Mr. Newman, any questions?

MR. NEWMAN:  Just briefly, Your Honor. Ms. Carver, good morning.  I'm Joe Newman.  This is Will Frentzen.  We're prosecutors in the case.  I worked with your dad twenty-five years ago in the District Attorney's office.

Your father has been appointed to represent capital cases; right?

JUROR:  Right.

MR. NEWMAN:  And he very successfully handled a case that ended up, I believe, being tried in Macon where he was appointed out of Liberty County.  Is that right?

JUROR:  I'm really not sure which case you are talking about.

MR. NEWMAN:  I believe it was where five people were murdered.  Your father was lead lawyer on that case.

JUROR:  Yes, he was.

MR. NEWMAN:  When that case was going on, did you talk to -- did your father talk to you about his work in the investigation of that case, since I know he worked on that quite hard?

JUROR:  In all honesty, yes, I did discuss some points with him.

MR. NEWMAN:  Did he discuss with you his thoughts, feelings, about capital punishment?

JUROR:  No, he did not.

MR. NEWMAN:  Did you discuss with your dad your, at that time, feelings and thoughts about capital punishment?

JUROR:  No, I did not.

MR. NEWMAN:  Were your feelings and thoughts about capital punishment some years ago the same as you have expressed in the questionnaire the Court asked you to fill out?

JUROR:  Yes.

MR. NEWMAN:  Thank you.  Nothing further.

MR. DARDEN:  I have nothing, Your Honor.

THE COURT:  Ms. Carver, I'm going to ask you to be back at 1:00 o'clock for final jury selection.  Don't discuss your answers or the questions asked of you.  You are free to leave the courthouse with the strong admonition to be back at 1:00 o'clock.

JUROR:  Thank you.

[Juror Left the Room.]

MARSHAL:  No. 19, Mr. Wilson.

THE COURT:  Hey, how are you, Mr. Wilson?

JUROR:  All right, sir.

THE COURT:  Mr. Wilson, you are originally from Virginia, I note.

JUROR:  Yes, sir.

THE COURT:  You recall the other day I said that I would have to ask each one of you questions outside the presence of the other people.

JUROR:  Yes, sir.

THE COURT:  And you are still under oath.  That is a microphone in front of you.  If you will speak loud enough so that everyone can hear, we can move through this fairly briefly.  Once again, nothing is meant to embarrass you.

How are you employed?

JUROR:  I work in Allenhurst, Georgia.  I'm an estimator.  We install subdivision, paved roads and such.

THE COURT:  Okay.  By what company are you employed?

JUROR:  Dennis Waters' Development.

THE COURT:  Waters Development.  You have work in that capacity for the number of years?

JUROR:  I have worked for Mr. Waters for a number of years.  I have worked as an estimator for probably four or five years.

THE COURT:  So, you go out and estimate, and then you bid sometimes, or negotiate with the people who want the work done?

JUROR:  Yes, sir.  Primarily we get plans drawn up by engineers.

THE COURT:  And so much concrete and fill work,

and grubbing and soil preparation, and site preparation and all of that.

JUROR:  Yes, sir.

THE COURT:  All right, sir.  Is your wife -- she's a homemaker.  You have two children, 27 and 22.  Are you they living in the home?

JUROR:  One is, the 22 year-old is.

THE COURT:  What is the other one's occupation?

JUROR:  The other one is in the Air Force.

THE COURT:  The 22 year-old is --

JUROR:  He works for Garden City, I believe.

THE COURT:  In what capacity does he work?

JUROR:  Grounds crew, I guess.

THE COURT:  Grounds crew.  Okay.  Now you work down at Allenhurst, which is in Liberty County.  Is that right?

JUROR:  That's correct.

THE COURT:  But you live in Bloomingdale, which is in Chatham County.

JUROR:  Off of Highway 204.  It is considered Bloomingdale.

THE COURT:  Right.  You can't remember whether you heard about this, but you might have.

JUROR:  I remember nothing about it.

THE COURT:  Can you assure us that no influence,

that anything you have heard would influence your decision as a member of the jury in this case?

JUROR:  Yes, I believe that.

THE COURT:  And so you would listen to the evidence and make that decision of whether the defendant is guilty and the proper punishment on what you hear in the courtroom and nothing else.  Is that correct?

JUROR:  That's correct.

THE COURT:  Now, in the case, the defendant is a black male.  The victim is a white female.  Would those facts make any difference to you?

JUROR:  No, Your Honor.

THE COURT:  Not in the slightest?

JUROR:  No, Your Honor.

THE COURT:  The defendant has entered a plea of not guilty.  And he is presumed to be innocent.  You understand that.

JUROR:  Yes.

THE COURT:  He does not to prove his innocence, in other words, because he is presumed innocent.

JUROR:  Yes, sir.

THE COURT:  The government must prove his guilt beyond a reasonable doubt before a verdict of guilty would be authorized.  You understand that.

JUROR:  Yes, Your Honor.

THE COURT: Now, if you are selected to serve on the jury, if the government meets its obligation to prove him guilty beyond a reasonable doubt, could you vote for a verdict of guilty?

JUROR: Yes, Your Honor.

THE COURT: And if you have a reasonable doubt, in other words, let's say you think he is probably guilty, but I've got a doubt, would you vote for the verdict of not guilty?

JUROR: If I doubt he is guilty?

THE COURT: Yes.

JUROR: I will vote not guilty.

THE COURT: Right. Now, you understand in this case if the jury were to decide that he was guilty, then the jury must decide the punishment.

JUROR: Yes, Your Honor.

THE COURT: The choices would be, if they find him guilty of a capital crime, would be death, meaning that he would be executed, or life imprisonment without benefit of parole. You understand that.

JUROR: Yes, sir.

THE COURT: Now in deciding whether to impose the death penalty or life imprisonment without benefit of parole, the jury may consider aggravating circumstances. You know what -- and I would define later on what

aggravating circumstances are; or, mitigating circumstances. In other words, things that the jury might consider to lessen the punishment.  Would you listen to the aggravating and mitigating circumstances?

JUROR:  Yes, Your Honor.

THE COURT:  And if you felt, after you have listen to the evidence, one, that he was guilty and there were sufficient aggravating circumstances, could you vote for a death penalty?

JUROR:  Yes, Your Honor.

THE COURT:  If you felt there were sufficient mitigating circumstances, could you vote for life imprisonment without benefit of parole?

JUROR:  Yes, Your Honor.

THE COURT:  All right.  Any question, Mr. Newman.

MR. NEWMAN:  No, Your Honor.

THE COURT:  Mr. Darden?

MR. DARDEN:  Sir, you indicated, I believe you retired from the army.  Is that correct?

JUROR:  That's correct, yes.

MR. DARDEN:  What did you do in army?

JUROR:  I was in aviation.  I was an UH-1 Technical Inspector, Huie Helicopter.

MR. DARDEN:  Huie helicopter.  What rank were you?

JUROR:  E-7.

MR. DARDEN:  Thank you, sir.  That's all I have.

THE COURT:  Mr. Wilson, I'm going to ask you that you excuse yourself.  Come back at 1:00 o'clock.  I suggest that you get something to eat.  Don't discuss the questions I have asked or the answers you gave.  Hopefully around 1:00 o'clock or soon thereafter, we can begin final jury selection.

JUROR:  Yes, sir.

[Juror Left the Room.]

MARSHAL:  193, Mr. Leon Bryant, Jr.

THE COURT:  Hey, Mr. Bryant, how are you?

JUROR:  Fine.

THE COURT:  Mr. Bryant, you are an native and lifelong resident of Savannah; or, did you move here from somewhere else?

JUROR:  Lifelong.

THE COURT:  Right.  Now, you are employed at Allstate Insurance.

JUROR:  Yes, sir.

THE COURT:  What are your duties there?

JUROR:  I'm Allstate Insurance Agency.

THE COURT:  Okay.  Where is your business located?

JUROR:  Waters Avenue, 5208 Waters Avenue.

THE COURT:  Your wife is on the faculty at Armstrong.

JUROR:  Yes.

THE COURT:  What is her --

JUROR:  She's a professor, teaching dental hygiene education.

THE COURT:  All right.  You have one child.

JUROR:  One child.

THE COURT:  You recall the other day I told you that I would have to interview each one of you separately and out of the presence of the other people.  You are under oath.  I will ask you a few questions.

You understand first of all that the defendant is a black male and the victim was a white female.  You understood that.

JUROR:  Yes, sir.

THE COURT:  Would the race of the victim or the race of the defendant influence your decision as to guilt or punishment or any other thing regarding the case?

JUROR:  No, sir.

THE COURT:  The next question I will tell or inform you about is the defendant has entered a plea of not guilty.  The law presumed presumes him to be innocent.  You understand that.

JUROR:  Yes, sir.

THE COURT:  And he does not have to prove his innocence.  You understand that.

JUROR:  Yes, sir.

THE COURT:  The government must convince a fair and impartial jury, and each member of it.  That he is guilty.  And the evidence must remove all reasonable doubt.  You understand that.

JUROR:  Yes, sir.

THE COURT:  Now, in the government meets its obligation and convinces you, if you are on the jury, that he is guilty beyond a reasonable doubt, could you vote for a conviction?

JUROR:  Yes, sir.

THE COURT:  If you have a reasonable doubt, would you vote for a verdict of not guilty?

JUROR:  Yes, sir.

THE COURT:  Now, you understand in this case if he is found guilty, then the jury must decide the punishment; not the judge.  You understand that.

JUROR:  Yes, sir.

THE COURT:  Then the punishment choices would be the death penalty, meaning he would be executed; or, life imprisonment without benefit of parole.  In making that decision, the jury should listen to all of the aggravating circumstances and the mitigating circumstances.  Mitigating means lessening of the punishment, that that may be said good about a defendant; aggravating, bad that may be said

about him or his conduct.

Now, could you do that?

JUROR:  Yes, sir.

THE COURT:  If you felt that there were sufficient aggravating circumstances, could you vote for the death penalty?

JUROR:  Possibly.

THE COURT:  Possibly.  Let's discuss that.  You could vote the if you felt like the circumstances warranted it.  Is that correct?

JUROR:  Yes, sir.

THE COURT:  But you realize the gravity and importance of it.

JUROR:  Yes, sir.

THE COURT:  If you felt like there were sufficient mitigating circumstances, you could vote not to impose the greater sentence of death, but the lesser sentence of life imprisonment without benefit of parole?

JUROR:  Yes, sir.

THE COURT:  Now, you heard something about this case at about the time the incident occurred.  Is that correct?

JUROR:  Yes.

THE COURT:  Do you recall exactly the source of the information?

JUROR:  Just the newspaper.

THE COURT:  Did you form any opinion as to the defendant's guilt as a result of that?

JUROR:  No.  To be honest with you, I vaguely remember it.

THE COURT:  Could you put anything out of your mind and base your decision strictly on the evidence that is brought forth in the courtroom, and nothing else?

JUROR:  Yes, sir.

THE COURT:  Questions, Mr. Newman.

MR. NEWMAN:  No, Your Honor.

MR. DARDEN:  No, sir.

THE COURT:  Mr. Bryant, I'm going to ask you that you excuse yourself and not tell anybody about the questions I have asked of you or the answers you gave.  And come back at 1:00 o'clock.  We will start the final jury selection as near to that time as we can.

JUROR:  Thank you.

[Juror Left the Room.]

MARSHAL:  No. 8, Mr. Bevill.

THE COURT:  Hey, Mr. Bevill.

JUROR:  Good morning.

THE COURT:  Have a seat there.  You are Kenneth Mitchell Bevill.

JUROR:  Yes, sir.

THE COURT:  You have lived in Richmond Hill how long?

JUROR:  Almost six years, sir.

THE COURT:  Before that, where were -- you were born and reared, and lived all around here.

JUROR:  In Savannah, Georgia, on 66th Street, sir.

THE COURT:  Right.  You are an electrician.

JUROR:  Yes, sir.

THE COURT:  You are employed by Rabee Electric?

JUROR:  No, sir.  L'Oreal, U.S.A.

THE COURT:  L'Oreal U.S.A.  Before that you worked for Rabee.

JUROR:  Yes, sir.

THE COURT:  What is your specific job?  What do you mostly?

JUROR:  I'm facility electrician.  I take care of the facilities around the plant.  I also work on the machines, the packaging machines there in the plant.

THE COURT:  What is the business of L'Oreal?

JUROR:  They used to be old Carson Products of Savannah.

THE COURT:  Okay.  That explains.  They are in the hair treatment.

JUROR:  Ethnic hair care.  Yes, sir.

THE COURT:  Your wife is an eye technician.

JUROR:  Yes, sir.  He works for Dr. Dagan Hart at Georgia eye Institute.

THE COURT:  All right.  Dr. Dagan Hart.  You heard that.

Now, do you remember hearing anything about this case?

JUROR:  No, sir.

THE COURT:  You have served on a state jury one time.

JUROR:  Two of them.

THE COURT:  Two of them.

JUROR:  Yes, sir.

THE COURT:  Were those criminal or civil cases?

JUROR:  Criminal cases.

THE COURT:  And that was in Chatham County or Bryan?

JUROR:  Bryan County.

THE COURT:  Bryan County.  So, you went over to Pembroke.

JUROR:  Yes, sir.

THE COURT:  What were the defendants charged with in each case?

JUROR:  I think one of them was a robbery and the other was a resisting an arrest.

THE COURT:  Were you the foreman of the jury in

either case?

JUROR:  Yes, sir, I was.

THE COURT:  In which case were you foreman?

JUROR:  In the resisting arrest.

THE COURT:  What was the verdict of the jury in those two cases?

JUROR:  The robbery was a guilty verdict.  And the other was a not guilty.

THE COURT:  Not guilty, all right.

JUROR:  Yes, sir.

THE COURT:  Now, if you heard anything about this case, as you remember, it was on television.

JUROR:  If I would have heard it, it would have been there.

THE COURT:  But could you put anything you might have heard about this case out of your mind and make any decision based upon the evidence that is brought forth here in court?

JUROR:  If y'all see fit to put me on this jury sir, then I will take and weigh all the evidence.

THE COURT:  All right.  Let me ask you.  The defendant has entered a plea of not guilty.  You understand that.

JUROR:  Yes, sir.

THE COURT:  The law presumes him not guilty.  The

government must prove his guilt beyond a reasonable doubt, the same as in the state system.

JUROR:  Yes, sir.

THE COURT:  If you have a reasonable doubt, you should not convict him.  You understand that.

JUROR:  Right.

THE COURT:  If you are convinced beyond a reasonable doubt, are you prepared to sign a verdict of guilty?

JUROR:  Yes, sir I am.

THE COURT:  You understand in this case the jury would set punishment.

JUROR:  Yes, sir.

THE COURT:  The choices, if he is found guilty of a capital offense, is either death by execution or life imprisonment without possibility of parole.

I note that you say you don't have any opinion as to the death penalty as a punishment.

JUROR:  Yes, sir.

THE COURT:  Can I take that -- well, let me ask you a theoretical question.  If the defendant is found guilty, and the Court instructs you that the death penalty is a possible punishment and that you should listen to the evidence and determine whether there was sufficient aggravating circumstances to find justification to impose a

death sentence, could you vote for a death sentence?

JUROR:  Yes, sir, I could.

THE COURT:  If you were not sure, or you thought there were mitigating circumstances or something that brought about a lesser punishment or life imprisonment without benefit of parole, could you vote for that?

JUROR:  Yes, sir, I could.

THE COURT:  But you would listen to the evidence and make that decision according to the instructions of the Court?

JUROR:  Yes, sir, based on the evidence.

THE COURT:  And you do not have an objection to capital punishment that would prevent you in certain cases from voting a death penalty.  Is that correct?

JUROR:  No, sir.

THE COURT:  That is correct; is it not?

JUROR:  Yes, sir.

THE COURT:  Any questions, Mr. Newman.

MR. NEWMAN:  No, Your Honor.

THE COURT:  Mr. Darden?

MR. DARDEN:  No, sir.

THE COURT:  Mr. Bevill, I'm going to ask you that you return at 1:00 o'clock.  We will hopefully around that time we will begin final jury selections.  You should get something to eat.  Be back promptly at one or slightly

before.  And we hopefully will complete this process today and get the trial under way.

Don't discuss the questions I have asked of you or the answers you have made.

JUROR:  Yes, sir.

THE COURT:  You are free to leave.

JUROR:  Thank you.

[Juror Left the Room.]

MARSHAL:  No. 227, Ms. Brewer.

THE COURT:  Good morning, Ms. Brewer.  How are you?

JUROR:  Fine, how are you?

THE COURT:  I know you are getting tired of staying out there.  This room doesn't have any windows here. It is getting pretty old also.

You recall the other day that I told you that I would have to interview each one of you and ask you additional questions; do you not?

JUROR:  Yes, I do, Your Honor.

THE COURT:  And that had to be done out of presence of the other members of the jury.  You are under oath.  That is a microphone there in front of you.  And everything is going being recorded.  I need to answer loudly enough so that everyone in this jury room is able to here you.

You are a transportation representative.  By whom are you employed?

JUROR:  Kerr-MaGee.

THE COURT:  Kerr-McGee.  What does a transportation representative do?

JUROR:  I arrange the transportation of our product.

THE COURT:  You have been on the federal and a state jury.

JUROR:  I have served only on a state.

THE COURT:  Okay.  On a state, and that was a civil case.

JUROR:  It was.

THE COURT:  Do you remember the case?

JUROR:  I do.

THE COURT:  What was it?

JUROR:  It was a personal injury suit.

THE COURT:  That about five years ago.

JUROR:  It was about five years ago.

THE COURT:  Was the jury able to arrive at a verdict?

JUROR:  Yes, sir.

THE COURT:  You had a sister who was robbed at gunpoint while employed as a night auditor at Richmond Hill. You have had various matters stolen from you.  And your

stepfather was a sergeant with the Savannah Police Department, and was chief of police in Camilla, Georgia. And you have a nephew who is a policeman in Effingham County, Georgia.

Now, you understand that the defendant has entered a plea of guilty.

JUROR:  Yes, Your Honor.

THE COURT:  The law presumes him to be not guilty. You understand that.

JUROR:  I do.

THE COURT:  And the responsibility is on the government to convince a fair and impartial jury, and each member of it, that he is guilty of the offense charged, and his guilt must be demonstrated beyond a reasonable doubt. You understand that.

JUROR:  I do.

THE COURT:  If the government is able to prove his guilt beyond a reasonable doubt, could you vote for his conviction?

JUROR:  I'm sorry.

THE COURT:  If you are convinced that he is guilty beyond a reasonable doubt, could you return a verdict of guilty?

JUROR:  I could.

THE COURT:  If you are not convinced, could you

vote for a verdict of not guilty?

JUROR:  I could.

THE COURT:  Now, you understand in this case, and I believe you say you remember something your mother-in-law in this case talking to you about it.

JUROR:  My mother.

THE COURT:  Mother.  Could you put that out of your mind and make your decision based upon evidence in the case in the courtroom?

JUROR:  I could, Your Honor.  I wrote that down simply because I don't remember any of the details.  Just something in the back of my mind.

THE COURT:  Anyway, it won't sway you one way or the other.

JUROR:  No.

THE COURT:  Now, you understand if he is found guilty, then the jury must assess punishment.  That choice would be a sentence of death, meaning he would be executed or life imprisonment without benefit of parole.  You have responded the Question 31, *While I do support the death penalty as a punishment when there has been another life taken, I personally would have difficulty rendering that sentence.*

In other words, you have no qualms legally about people being executed for their crimes.  But you wouldn't

want to be the one that brought that about.

JUROR:  That's correct.

THE COURT:  Now, let's go farther, because without being mean, I've got to ask you several questions.  Now, if you are serving on the jury, the jury has found him guilty, I would then give you instructions about aggravating and mitigating evidence.  Aggravating is that that compounds or indicates bad characteristics about someone.  You understand.

JUROR:  Yes.

THE COURT:  And mitigating means there is something to be said in that person's favor, because of whatever reason.

Now, if he is found guilty, and in this second decision that must be made, if there were sufficient aggravating circumstances, could you vote for the death penalty?

JUROR:  I could.

THE COURT:  And if you were convinced that there were mitigating circumstances that made life imprisonment without benefit of parole the more appropriate sentence, could you vote for that?

JUROR:  I could.

THE COURT:  Mr. Newman, any questions.

MR. NEWMAN:  No questions, Your Honor.

THE COURT:  Mr. Darden, any questions.

MR. DARDEN:  No, Your Honor.

THE COURT:  Ma'am, I am going to ask that you return for jury selection at 1:00 o'clock.  I suggest a you get something to eat.  Do not reveal to anyone the questions I have asked or the responses you've made.  Hopefully, we will be able to complete this process this afternoon.  And those who are selected will have to begin their trial work.  And those who are not selected are free to leave.  Meanwhile, come back at 1:00 o'clock promptly or a few minutes before.

[Juror Left the Room.]

MARSHAL:  No. 208, Michael Hyatt.

THE COURT:  How are you, Mr. Hyatt?

JUROR:  Pretty good, sir.  How are you doing today?

THE COURT:  Fine.  Mr. Hyatt, you live down in Liberty County.

JUROR:  That's correct.

THE COURT:  How long have you lived in this area?

JUROR:  In Liberty County, I've been a resident since October of '95.

THE COURT:  And you were born in Miami.

JUROR:  Correct.

THE COURT:  Where did you attend school?

JUROR:  I attended school in Bethlehem High School which is in Holmes County, Florida.

THE COURT:  You have lived in the general area. You've lived here how long in this area?

JUROR:  In this area, in and out since '92 until '95.  And in '95, I bought a house and became a resident.

THE COURT:  You are an electrician by trade.

JUROR:  Yes, sir.

THE COURT:  Do you have a certificate as a electrician?

JUROR:  No.  I'm not a licensed electrician.

THE COURT:  You are employed by whom?

JUROR:  Williams Electric.

THE COURT:  You do work at Fort Stewart and Hunter.

JUROR:  Correct.

THE COURT:  They have certain government contracts.

JUROR:  Yes, sir.

THE COURT:  Do you have to undergo any security clearances?

JUROR:  The only clearance -- no, not really.

THE COURT:  Are you married?

JUROR:  No, sir, not at this time.

THE COURT:  You are divorced, in other words.

JUROR:  That's correct.

THE COURT:  Where does your ex-wife live?

JUROR:  Both of them live in Florida.

THE COURT:  Okay.  Both of them.  So, you have a brother-in-law, or a former brother-in-law, or maybe it's not --

JUROR:  No.  He's still a brother-in-law.  He married my sister.

THE COURT:  And he is a federal prison guard over in North Augusta, South Carolina.

JUROR:  Yes, sir.

THE COURT:  You have had a break-in, in your house.  Is that correct?

JUROR:  Yes, sir, that's correct.

THE COURT:  You heard something about this case when it occurred, or the incident.

JUROR:  Yes, sir, I have.

THE COURT:  Do you remember anything about it?

JUROR:  Not too much.  I don't pay much attention to the news.

THE COURT:  So, you have no conviction as to the defendant, whether he is guilty or not guilty.

JUROR:  No, sir.

THE COURT:  Is that correct?

JUROR:  That's correct.

THE COURT: Now, you understand that the defendant has entered a plea of not guilty. And that will form the issue that must be decided in this case.

JUROR: Yes, sir.

THE COURT: The law presumes him to be not guilty. And the only way he can be convicted is if the government can prove with competent evidence that his guilt is demonstrated beyond a reasonable doubt. You understand that.

JUROR: Yes, sir, I understand.

THE COURT: If the government can produce that evidence, could you vote for a conviction of guilty?

JUROR: If it is proven --

THE COURT: Beyond a reasonable doubt.

JUROR: -- beyond a reasonable doubt, yes, I can.

THE COURT: If you should have a reasonable doubt, could you vote for his acquittal?

JUROR: Yes, I could.

THE COURT: Now, you understand in this case that if the defendant is convicted, then the jury, not the judge, will decide the punishment.

JUROR: Yeah, I understand.

THE COURT: And the choice would be between a death sentence, meaning he would be executed; or, life imprisonment without benefit of parole. Do you understand

that?

JUROR: Yes, sir.

THE COURT: In making that decision, the jury is going to consider aggravating circumstances, that that speaks badly about a person. You know, I don't know what it will be, but I will define what aggravating circumstances are.

JUROR: Okay.

THE COURT: And mitigating circumstances, that that can be said in favor or on behalf of someone that would speak to good characteristics or conduct. Do you understand that?

JUROR: Yes, sir.

THE COURT: Now, after you heard all of the evidence, the aggravating circumstances, if any, and the mitigating circumstances, if any, if you felt that the death penalty was justified, could you vote for it; or, do you have any conscientious objections to the death penalty?

JUROR: No, I don't have no problem with that.

THE COURT: So, you could vote for it.

JUROR: Yes, sir.

THE COURT: If you were convinced that the mitigating circumstances and evidence warranted a punishment other than death, could you vote for that?

JUROR: Yes, sir.

THE COURT:  Mr. Newman, do you have any questions of the juror?

MR. NEWMAN:  No, Your Honor.

THE COURT:  Mr. Darden?

MR. DARDEN:  No, sir.

THE COURT:  Mr. Hyatt, I'm going to ask that you return at 1:00 o'clock for final jury selection.  I suggest that you get something to eat.  And don't discuss the questions I have asked of you or the answers you gave.  And be back a few minutes before one.

JUROR:  No problem, sir.

THE COURT:  You are free to leave the Court.

[Juror Left the Room.]

MARSHAL:  202, Ms. Shuman.

THE COURT:  How are you, Ms. Shuman?

JUROR:  I'm fine.

THE COURT:  You recall that I told you that I would have to interview each of you out of the presence of the other people.

JUROR:  Yes, sir.

THE COURT:  Everyone is in this area that we're using as a courtroom.  And you are still under oath.  There is a microphone there in front you.  We're recording everything.  So, if you would answer loudly enough, using yes or no where that is appropriate, or extending your

answer if need be, and allowing everybody to hear it, we will be able to move faster.

JUROR: Okay.

THE COURT: You are born in Washington, D.C. How long have you lived in this area?

JUROR: I've lived in Georgia since I was ten -- well, seven. I have seven.

THE COURT: Since you were seven.

JUROR: Yes. And I'm 40.

THE COURT: You are an office manager for Dr. Ramsey who is an insurance -- you serve him as an insurance clerk.

JUROR: I did, until he retired two years ago.

THE COURT: Is a physician or dentist?

JUROR: He was a gynecologist.

THE COURT: Gynecologist. Did you recognize any of his patients out here today?

JUROR: Yes, I did.

THE COURT: Who did you recognize in particular?

JUROR: Kathy Stokes and Lynette Waldhour. And I don't think her name was Stephens at the time, but it was Richardine Stephens now.

THE COURT: Okay. Have you known Ms. Stokes for a long time?

JUROR: As long as I have worked for Dr. Ramsey,

which was like eleven years.

THE COURT:  She was a constant patient of his.

JUROR:  Yes.  Yes.

THE COURT:  Okay.  I will stop there.  But she had some problems; did she not.

JUROR:  Yes, she did.

THE COURT:  All right.  Now, what is your husband's occupation?

JUROR:  We run an inert landfill.  So, he is in construction.

THE COURT:  Where is that located?

JUROR:  On Highway 17.

THE COURT:  All right.  You have some stepchildren.

JUROR:  Yes, sir, I have one.

THE COURT:  You have 23 year-old.  Is that 23 year-old living at home?

JUROR:  No, sir, she's not.

THE COURT:  Is she married?

JUROR:  No, sir, she's student at Georgia Southern.

THE COURT:  Right.  And the 21 year-old?

JUROR:  She is married.  And she is also a student.  And she lives in Statesboro also.

THE COURT:  Right.  You have never served on a

jury before.

JUROR: No, sir.

THE COURT: Your house has been burglarized, you have your purse stolen.

JUROR: Right.

THE COURT: Your father and your ex-husband worked at Reidsville State Prison as a guard.

JUROR: Yes, sir.

THE COURT: Your brother had a drug and DUI, and resisted arrest. How long ago was that?

JUROR: I want to say about seven, six or seven years ago.

THE COURT: Did you attend his trial or the hearing?

JUROR: No, sir.

THE COURT: Did you ever visit him when he was in jail?

JUROR: I did visit him when he was in jail.

THE COURT: Where was he in jail?

JUROR: He was in Claxton for a little while. And then he was in Moultrie.

THE COURT: Do you remember the lawyers who were involved in the case?

JUROR: I don't think there were any lawyers.

THE COURT: All right. Do you feel that he in any

way was mistreated or wrongly convicted?

JUROR:  No.  No.

THE COURT:  Okay.  So, you have no resentment toward the government.

JUROR:  Oh, no.  No, sir.

THE COURT:  Or law enforcement.  Do you understand that in this case that the defendant has entered a plea of guilty, and he is presumed to be not guilty?  You understand that.

JUROR:  Yes, sir.

THE COURT:  You understand further that he does not have to prove his innocence.

JUROR:  Yes, sir.

THE COURT:  Now, the government according to our system of justice must prove his guilt to a fair and impartial jury, and each member of it, and the proof must remove any reasonable doubt as to his guilt.  You understand that.

JUROR:  Yes, sir.

THE COURT:  Now, if, after listening to all of the evidence and the charge of the Court, you are convinced that he indeed is guilty and his guilt has been demonstrated beyond a reasonable doubt, could you find him guilty?

JUROR:  Yes, sir.

THE COURT:  And if you have a reasonable doubt,

could you find him not guilty?

JUROR:  Yes, sir.

THE COURT:  Now, you understand in this case if he is found guilty, the jury must set the punishment.

JUROR:  Yes, sir.

THE COURT:  That choice of punishment would be either death, meaning he would be executed, or life imprisonment without benefit of parole.  You understand those are the choices?

JUROR:  Yes, sir.

THE COURT:  I would tell you without going into all of the details that you must listen to any aggravating circumstances that would bear unfavorably upon him or his conduct.  You understand that.

JUROR:  Yes, sir.

THE COURT:  And mitigating circumstances, that would reflect favorably on him.  You understand that.

JUROR:  Yes, sir.

THE COURT:  Could you do that?

JUROR:  Yes, sir.

THE COURT:  Now you say you support the death penalty in certain cases.

JUROR:  Yes, sir.

THE COURT:  So, if there were sufficient aggravating circumstances, could you vote for the death

penalty in this case.

JUROR: If it was sufficient, yes, sir.

THE COURT: If it were sufficient.

JUROR: Yes, sir.

THE COURT: And could you listen to the mitigating circumstances, and if you could considered them to be sufficient to justify a punishment other than the death sentence, could you vote for life imprisonment without benefit of parole?

JUROR: Yes, sir.

THE COURT: If you had to complete this questionnaire again, would your answers be the same?

JUROR: Yes, sir.

THE COURT: Do you know of anything in your background or your beliefs that you should divulge to the Court or to the parties in helping them to make a selection as to your qualification to serve on the jury?

JUROR: No, sir, other than answering the questions the way I have, and being very truthful about everything, I don't have anything.

THE COURT: From what you say now, you do not rule out the death penalty?

JUROR: No, sir.

THE COURT: Mr. Newman, any questions?

MR. NEWMAN: No, Your Honor.

THE COURT: Mr. Darden?

MR. DARDEN: No, sir, no questions.

THE COURT: Ms. Shuman, I'm going to have ask you to be back at 1:00 o'clock for final jury selection. Hopefully, soon after that, we can begin and conclude that phase. I know we have imposed upon you. But there is no way we could have moved it faster, I believe.

So, do not reveal to anyone the questions that were asked of you or the answers you gave.

JUROR: Okay.

THE COURT: Go ahead and have lunch.

JUROR: That sounds great. Thank you.

[Juror Left the Room.]

MARSHAL: 196, Ms. Burgess.

THE COURT: How are you, Ms. Burgess?

JUROR: Fine. Thank you.

THE COURT: Ms. Burgess, as you recall the other day, I told you I would have to interview each of you separately. So, you are still under oath. And in front of you is microphone. There is a court reporter recording everything. And all of the people in here are the ones who are authorized to be here.

If you have any questions or you don't understand any question, let me know, and I will try to explain it to you.

JUROR:  Okay.

THE COURT:  You just relax.  Don't be uptight.  No one is going to pick on you.

JUROR:  All right.

THE COURT:  I can tell you a bit nervous.  But you just relax.  I assure you that we'll get through this thing, and you will not regret it very much.

You were born and reared in Savannah, I gather.

JUROR:  Yes, sir.

THE COURT:  Where did you go to college?

JUROR:  I went to Armstrong two years.

THE COURT:  You are a billing manager.  By whom are you employed?

JUROR:  Dr. McAleer, Dr. Simpkin.  And it is called Medical and Rehab Psychology.

THE COURT:  What do they do?

JUROR:  Their both Ph.D psychologists.  They do counseling.

THE COURT:  Your husband is a golf course superintendent.

JUROR:  Yes, sir.

THE COURT:  Where does he work?

JUROR:  At Henderson Golf Course.

THE COURT:  Does that make him a county or a city employee?

JUROR:  I really don't have any idea.

THE COURT:  Okay.  I can't remember whether or not you had heard anything, or do not recall hearing anything about this case before you came to court.

JUROR:  No, sir.

THE COURT:  The defendant is accused of having committed what where we refer to as capital crimes.  He has entered a plea of not guilty.  The law presumes him to be not guilty.  You understand that.

JUROR:  Yes, sir.

THE COURT:  The only way he can be convicted is by a jury.  The jury, as I would explain and do explain, would have to be convinced of his guilt beyond a reasonable doubt.  If the government, who has the sole responsibility to prove his guilt, he doesn't have to prove his innocence, but if they convince you, and you are on the jury, that he is guilty beyond a reasonable doubt, could you vote for a guilty verdict?

JUROR:  Yes, sir.

THE COURT:  If you are not convinced beyond a reasonable doubt, could you vote for the verdict of not guilty?

JUROR:  Yes, sir.

THE COURT:  Now, if the jury were to find him guilty, the jury alone would have to decide the proper

punishment.  You understand that?

JUROR:  Uh-uh.

THE COURT:  Their punishment choices are either death, that is an execution, or life imprisonment without benefit of parole.  You understand those choices?

JUROR:  Uh-uh.

THE COURT:  If you would say yes, I would appreciate it.

JUROR:  Yes.

THE COURT:  All right.  Now, in making that decision, the jury would listen or would be given some evidence or instructions regarding maybe aggravating circumstances, that that would bear unfavorably on the defendant.  You understand that.

JUROR:  Uh-uh.

THE COURT:  They may also be given mitigating circumstances or facts, that which would bear favorably or speak against imposing the death sentence.

Now, if you are selected, could you listen to the aggravating and mitigating circumstances --

JUROR:  Yes, sir.

THE COURT:  -- with a open mind?

JUROR:  Yes, sir.

THE COURT:  If you felt that there were sufficient aggravating circumstances and that the death penalty was

authorized, could you vote for the death penalty?

JUROR: Yes, sir.

THE COURT: If you felt that the aggravating circumstances were insufficient or that the mitigating circumstances convinced you that some sentence less than death was a proper punishment, would you vote for life imprisonment without benefit of parole?

JUROR: Yes, sir.

THE COURT: Now, in this, many people made errors. You would not automatically vote for a death penalty then. You would listen to the evidence and make the decision from it.

JUROR: Yes, sir.

THE COURT: So when you answered Question 33, *If I found him guilty, would you automatically vote for the death sentence,* you put yes. Is that in error?

JUROR: Well, yes. I didn't understand the mitigating circumstances.

THE COURT: Right. Now, is there anything other than that you would change in this questionnaire, if you had to fill it out again?

JUROR: I don't think so.

THE COURT: Is there anything in your background that you should disclose to the Court or to the parties, that they need to know in deciding whether or not to select

you as a member of the jury?

JUROR:  No, sir.

THE COURT:  Mr. Newman, any questions?

MR. NEWMAN:  No, sir.

THE COURT:  Mr. Darden?

MR. DARDEN:  Nothing, Your Honor.  Thank you.

THE COURT:  Ms. Burgess, I'm going to ask that you leave the courthouse, eat, and come back at 1:00 o'clock for jury selection.

JUROR:  Okay.

THE COURT:  Do not discuss with anyone the questions asked or your responses.

JUROR:  Okay.  Thank you.

THE COURT:  Thank you, Ms. Burgess.  That was not bad as you thought it would be; was it.

JUROR:  Well, it wasn't good.

[Juror Left the Room.]

MARSHAL:  Number 231, Ms. Green.

THE COURT:  Ms. Green, how are you this morning?

JUROR:  Fine, how is everybody?

THE COURT:  Fine.  If you will have a seat.  We are nearing what we think might be the end of this process.

JUROR:  Okay.

THE COURT:  Ms. Green, you have lived in Chatham County.  You are born in Stugart, Germany.

JUROR:  Yes, sir.

THE COURT:  I assume your dad was in the Armed Forces.

JUROR:  Yes, sir.

THE COURT:  Where was he from originally?

JUROR:  Crestview, Florida.

THE COURT:  How long have you live in and around Savannah?

JUROR:  Almost ten years.

THE COURT:  What kind of work or occupation do you have?

JUROR:  I work at Wendy's.

THE COURT:  You are a cashier there?

JUROR:  Yes, sir.

THE COURT:  How long have you worked for Wendy's?

JUROR:  Six months.

THE COURT:  Before that, who did you work for?

JUROR:  I just had my baby, so I wasn't working.

THE COURT:  Your baby is nine months.

JUROR:  Yes, sir.

THE COURT:  Who keeps her?

JUROR:  Well, he is ten months now.

THE COURT:  Ten months, who keeps that child?

JUROR:  My grandmother.

THE COURT:  You give with your grandmother?

JUROR:  No, I stay with my mother.

THE COURT:  So, your grandmother is rearing your child; or, does she keep him just while you are at work?

JUROR:  She keeps him while I'm at work.

THE COURT:  So, you pick up the child when you get off work?

JUROR:  Yes, sir.

THE COURT:  You are a member of Savannah Christian Church?

JUROR:  Yes, sir.

THE COURT:  Where is that located?

JUROR:  Out on Highway 17.

THE COURT:  Okay.  Now, did you hear anything about this case before you came to court?  Do you remember hearing anything about it?

JUROR:  No, sir.

THE COURT:  Now, the defendant is a black male. The victim is alleged to have been a white female.  Would that make any difference to you in any decision you are called upon to make, either for or against his guilt or the appropriate punishment.

JUROR:  No, sir.

THE COURT:  Now, the defendant has entered a plea of not guilty.  He is presumed to be innocent or not guilty, you understand that.

JUROR:  Yes, sir.

THE COURT:  He does not have to prove that he's innocent.  The government, the prosecutors must prove that he is guilty.  And they must convince a fair and impartial jury that he is guilty beyond any reasonable doubt.  You understand that.

JUROR:  Yes, sir.

THE COURT:  If you are convinced after you hear the evidence that indeed he is guilty beyond a reasonable doubt, could you vote for a verdict of guilty?

JUROR:  Yes, sir.

THE COURT:  If you have a reasonable doubt after you have heard all of the evidence and the instructions of the Court, could you vote for a verdict of not guilty?

JUROR:  Yes, sir.

THE COURT:  Now, if the jury should find him guilty beyond a reasonable doubt, in this case, the jury must decide the punishment.  Do you understand that?

JUROR:  Yes, sir.

THE COURT:  They would have a choice of punishment, either sentence him to death, meaning he would be executed; or, life imprisonment without benefit of parole.  Do you understand the jury must make that decision?

JUROR:  Yes, sir.

THE COURT:  Now, you have said that you have no

opinion about the death penalty as a punishment.  Is that correct?

JUROR:  Correct.

THE COURT:  Under certain circumstances as a member of the jury, could you put your name down to take someone's life?

JUROR:  Yes, sir.

THE COURT:  So, I would explain to you that certain aggravating circumstances may be considered by the jury to decide whether or not a defendant should be executed.  You understand that.

JUROR:  Yes, sir.

THE COURT:  And if you heard that and thought there were sufficient aggravating circumstances, you could vote for the death penalty.

JUROR:  Yes, sir.

THE COURT:  On the other hand, there may be mitigating circumstances, that is something that speaks favorably for the defendant or lessens the punishment.  If there are sufficient mitigating circumstances, could you vote for life imprisonment without benefit of parole?

JUROR:  Yes, sir.

THE COURT:  And would you listen to the evidence, the charge, that is the instructions of the Court, and make your decisions based upon that, and nothing else?

JUROR:  Yes, sir.

THE COURT:  Any question, Mr. Newman?

MR. NEWMAN:  Yes, Your Honor.

Ms. green, you attended a technical school for a while.

JUROR:  Yes, sir.

MR. NEWMAN:  Was that Savannah Voc-Tech.

JUROR:  Yes, sir.

MR. NEWMAN:  What program did you take up there?

JUROR:  Computer science.

MR. NEWMAN:  How far along did you get?

JUROR:  Right before I had my daughter.  So, it was like -- I had just started in the program.

MR. NEWMAN:  Okay.  Thank you.

THE COURT:  Mr. Darden?

MR. DARDEN:  Nothing, Your Honor.

THE COURT:  Ms. Green, I'm going to ask that you go and get lunch and return at 1:00 o'clock.

JUROR:  Okay.

THE COURT:  Don't reveal any questions that were asked of you, or any responses you made.

JUROR:  Yes, sir.

THE COURT:  We hope to get under way with final jury selection about 1:00 o'clock.  Thank you.  And you may leave at this point.

JUROR:  Thank you.

[Juror Left the Room.]

THE COURT:  Now, gentlemen, are there any challenges to anybody that I have ruled qualified so far that you have not voiced, anything you want to revisit?

MR. DARDEN:  I don't believe so on the part of the defendant, Your Honor.

THE COURT:  Mr. Newman.

MR. FRENTZEN:  Nothing from the government.

THE COURT:  All right.  What I propose to do is have the marshal seat them beginning in the jury box, seat them as we have outlined.  You know from the first one to this last one.  Those five are kind of an insurance policy. They will not be seated.  But if somebody has a heart attack or sick, I plan to be able to substitute them.

Marshal, you will try to seat them in the order. Come around behind the government's bench, and use that all the way back.  Then, of course, if that does not seat them, you will bring them up.

I want you to retain that five, and ten more people.  That ten people kept down in the grand jury room and that five in the courtroom until we've got this.

You go through them right now.  Tell them to be back, and send somebody down to the grand jury with them or use one of those witness rooms back there to put the ten of

them in.  Chances are I will not have to call on them.  But they will be here, and I will not have to delay.

MR. DARDEN:  May I ask a question?

THE COURT:  Sure.

MR. DARDEN:  Judge, when we strike the jury, I know we will pass the paper back and forth.

THE COURT:  Right.

MR. DARDEN:  Will you call on each individual juror to stand so we can eyeball them?

THE COURT:  No.  They will be seated.  You might strike the tenth one, and then later select or delete the first one.  It will not be the state system where you please stand.  That way is a great way to strike, the one they use in Florida.  But you might give out of your strikes, because you don't know what he has stricken, and he doesn't know what you have stricken.

When I used in Florida, and I did it because that is the way they do it.

MR. DARDEN:  I'm grief stricken.

THE COURT:  No, the best I can do for you, Richard, is line them up the way you've got them, because I will not know which one you are considering at any time.  It is the way we've always done it.

MR. DARDEN:  I have never picked a jury in that fashion.

THE COURT: Well, you have, too, because that is the way we've always done it here.

MR. DARDEN: I have? I think in the trials I had with you before we considered juror number one and then number two.

THE COURT: No, no. You are confusing it. Never have done it. We stand them and ask them to give the biographical information. But during selection, it rambles all over the place. I never know who is striking whom until it is all over.

MR. DARDEN: In other words, we can go fishing anywhere we want to.

THE COURT: That's right. Now, you remember those last four people selected are going to it be the alternates.

MR. DARDEN: Right. I understand that.

THE COURT: So, you've got 22 strikes, 20 regular, and 2 for the alternates.

MR. DARDEN: But the last jurors chosen will be the alternates.

THE COURT: Yes.

MR. DARDEN: You are not going to draw them out?

THE COURT: No. I would prefer to do that. I always think I could keep them interested.

MR. DARDEN: I know they won't let you do that any more.

THE COURT: The Eleventh Circuit has a disagreement with that. That is fine with me. So the last four will be the alternates.

Now, I think you've gotten an abundance of information. Let's start back at 10 after one. I want you to have a chance to review your notes. But I want them to go fast then, because you had them all night. And you know pretty much who you are going to get rid of. And undoubtedly, one of you will do a favor for the other. It always happens that way or used to when I was striking them. You wonder why they struck one, because you were going to get rid of the same person.

But any other matters that we need to take care of?

MR. FRENTZEN: Judge, I just assume that we're going to move our stuff over and get ready to roll.

THE COURT: Absolutely. All is out in the courtroom from now on.

MR. DARDEN: Judge, I have one other question. Is this jury going to be sequestered?

THE COURT: Yes.

MR. DARDEN: Could you please instruct the jury that is being done not at the request of the defense?

THE COURT: Absolutely.

MR. DARDEN: Or the government, if they want to

tell them that.

THE COURT: Okay. Mr. Clerk, if you will clean up all of this, and make sure there's not one iota of evidence left in here, or a document for a jury to see. I mean, expunge it.

*[NOTE: Whereupon the Court returned to the courtroom as follow:]*

THE COURT: Ladies and gentlemen, we have gone through a lengthy process of qualifying the jury. We have enough people qualified to begin the ultimate selection process.

For those of you who are unfamiliar with court procedures, the parties, now, that 60 people are qualified, are given an opportunity to make peremptory challenges; that is, they may release without giving you any reason even though you are legally qualified and have been found legally qualified by the Court.

This process works as follow: The marshal will circulate is list between the two. That is what they will be doing. So, if you will be patience with us just a little longer, and you can see the advantage of being on time. We've been waiting about thirty minutes.

I am going to sequester the jury so that you will be a guest of mine at a local hotel. I shall provided that you will be here on time. You will have a comfortable bed

and food.

The lawyers will present their case in order.  So, I make that observation to you at this time.

Marshal, will you begin the selection process.

MARSHAL:  Yes, sir.

THE COURT:  We had, lawyers, we had a juror who was sick outside.  I think you've been made familiar with that.  That person was named, what, Mr. Clerk?

CLERK:  Christina Miles, Your Honor.

THE COURT:  I wish to take the first person that was chosen above 60, and insert that person in that place.

CLERK:  No. 227, Tamara Brewer.

THE COURT:  Ms. Brewer.

MR. DARDEN:  What was Ms. Miles' number?

CLERK:  226.

MR. DARDEN:  Thank you.

THE COURT:  Marshal, you may circulate the list.

*[NOTE:  Pause for the jury selection by strikes.]*

THE COURT:  Ladies and gentlemen, I think we're nearing the end.  So, if you will bear with us, I know it is not the most comfortable facility, particularly with this number of people involved.

I want to say this because I might forget to tell you later.  We have made grave imposition upon your time.  I

am aware of that.  That is the reason why I have to insist that everybody be on time.  Because we've been dealing with 150 people.  We started off with about 250.  So, you see if you are thirty minutes late, and there is 200 people, well, that is a hundred hour of time that people could not move forward.  We cannot do anything in court until everyone what has been selected and chosen is here.  We can't start with one absent as you know.

But you have been very gracious.  You have been very responsive.  You have tried to be candid.  And you have performed admirably the duties of citizenship.  I am genuinely pleased to have worked with you.

I know that these are stressful situations.  You are in an foreign area.  You have heard a great deal about courts and courthouses and judges and lawyers, and law enforcement officials.  It is probably an environment that most of you would not chose to visit voluntarily, at least not very often.

But yet, you have responded, almost without exception timely.  Your answers have been forthright.  We have discussed beliefs that I am required to discuss with you.  And you ought to have a right to have those beliefs protected.  It is only in this limited context that inquiry is justified.

So, most of you will be departing shortly.  I can

say this, that you have performed your role.  And I would anticipate it would be three years as a minimum before any of you would be called back to Federal Court.

Let me explain to you how we constitute a jury. We are completely different from the state.  Every four years we are required to empty our jury box in its entirety. Then we use a computer system of the citizens in this district.  We ask them, if we need 40,000 people to serve, if we think that 40,000 would be enough to serve for the four years.  And remember when I say that number, this includes the Augusta, Statesboro, Dublin, Waycross, and Brunswick.

We have other judges, Judge Alaimo, Judge Bowen, Judge Moore.  And Judge Nangle is a judge that assist us. So, court is generally going on some place in this south Georgia area in Federal Court almost every day.  And we constitute this jury box for four years.  So, if we need 40,000, maybe a half million names that are in the box or on the rolls of citizens who are eligible, we ask it to randomly select 40,000.  Then you get the inquiry, and your name ends up in the box.  But all of that is taken out year after next.  We will go through it again.

Your name might be randomly selected, and it might.  I have been in these parts for almost seven decades, and my name has never been selected for a federal jury.  I

told my wife if she is selected, shelve to come.  Both of us are selected over in the state court of Chatham County and the superior court.  I go when I'm called and she does also.

The court reporter, the clerk, all of us occasionally find ourselves on jury duty.  I believe it is so important that I will grant them exception.  Obviously sometimes, health, death, and sickness require that someone not be able to serve at a particular time.  But we jealously guard excusing people.

I hope you understand how you came to be here.  We said about a month ago when I realized this case was going to be coming up, I decided I needed an unusual number of jurors.  So, I tell the clerk's office to summon 300 or whatever number I said at the time.  They did not pull out the individual name.  There again, we had a random choice from the computer service.

When we had all of you in the other day and you filled out the questionnaire, we scrambled you again.  We did it by hand that time out a box.  So, that is how you ended up here today.

All right, gentlemen, let's bring it to a completion.

May I see counsel at side bar?

[NOTE:  Sidebar Conference.]

THE COURT:  Are there any *Batson* challenges?

MR. DARDEN:  We don't have any.

MR. NEWMAN:  Has the Court followed the strikes?

THE COURT:  No.  I have not followed any of them.

MR. NEWMAN:  There is some characteristic and unique they have exercised.

THE COURT:  What was that characteristic?

MR. NEWMAN:  We're not making a **Batson** challenge.

THE COURT:  What is the characteristic?

MR. NEWMAN:  I think their first twenty strikes were Caucasians.

MR. DARDEN:  He says he is not making a **Batson** challenge.

THE COURT:  I know.  I still would like to know. A juror as a right to serve.  And if it is proven or there are indications it is racial, then it calls into question the fairness of the panel.

MR. NEWMAN:  We're not making a **Batson** challenge.

THE COURT:  All right.  The government is not making one.  Is the defendant?

MR. DARDEN:  No, Your Honor.

THE COURT:  All right.

                [NOTE:  Sidebar Conference

                Concluded.]

MARSHAL:  Ladies and gentlemen in the jury box, at this time I need you to please exit the jury box, and stand

in the middle of the aisle, unless your name is called again.

THE COURT:  Mr. Clerk, proceed to seat the jury.

CLERK:  Yes, sir.  Ladies and gentlemen, as you hear your name called, please come forward and be seated as directed by the marshal.

Charles Capers.

Linda Cota.

Patricia Colson.

Helen McClinton.

Dorothy Rentz.

Rose Mary Taylor.

Paul Cooper.

Patricia Taylor.

Tamara Brewer.

Mike Polese.

Donna Knight.

Bruce Little.

Catherine Jervis.

Brenda Gordon.

Christopher Neal.

Mary Ann Brock.

THE COURT:  Mr. Frentzen, is the group of people as seated consistent with your record as those who are to be

seated?

MR. FRENTZEN:  It is yes, Your Honor.

THE COURT:  Mr. Darden, the same question.

MR. DARDEN:  It is, Your Honor.

THE COURT:  Ladies and gentlemen, you have been previously sworn.  I have told you that you would be sequestered.  That means that I'm going to assign the marshal to look after you.  You will be housed at court expense.  You will be fed, and you will be on a schedule.  The marshal will make arrangements for you to receive your clothes and personal effects, medicine, whatever you need.

This is the Court's choice.  I have not asked the lawyers their opinion about whether to sequester you or not.  I say that so you will not wonder if one or both of the lawyers wanted you to sequestered.  That is the Court's choice, and I have employed it.

Is there anyone who doesn't understand the fact that you will be sequestered now?  I know it will impose some hardship on you and your family.  But under the circumstances, the Court has elected to follow this procedure.  I'm not going to ask you whether you prefer it or not.  But that decision was made for you.

If there is anyone who has a claustrophobic feeling, or have some other reason they can't do it, I will hear from you.  But I hope I don't hear a word.  And I don't

hear a word.

Mr. Clerk, swear the jury. Listen to oath ladies and gentlemen, and please stand.

CLERK: Ladies and gentlemen, would you stand and raise your right hands, please. Would you answer I do as a group at the completion of the oath.

You and each you do solemnly swear that you will well and truly try and true deliverance make in the case now on trial, and render a true verdict according to the law and the evidence, so help you God.

JURORS IN UNISON: I do.

THE COURT: Have a seat. Ladies and gentlemen, my remarks are address to you who have rendered jury service, and you have rendered it just as surely as if you were seated. At least you know by now that we could not have functioned, we could not go forward without your presence here today.

So I'm going to excuse you, all of you except Ms. Foy, who was late, and two jurors who were late the other day. They shall remain in the courtroom and not leave without the Court's permission. I will address you when I have time.

Ladies and gentlemen, on behalf of the officers of the Court, the lawyers and everyone else, I'm truly grateful for your appearance here today and the last several days. I

hope you understand from the this how essential jury service and how critical it is for you to be on time, to answer questions truthfully, because we cannot operate these judicial system, either federal or state, without your corporation and your honest answers.

The clerk's office will mail to you your compensation within a few days, as soon as we can process. I will excuse you at this time.

The lawyers will need some moment. This is your room. You will see a lot of it. You are not to discuss the case or how you got to be here or your philosophy regarding anything regarding the case.

As you will note, throughout this proceeding, when you go and come from the jury room or enter the courtroom, we will stand. We want you to know that you have a position of great trust. And that standing is way of reminding you that you are judges, judges of the facts. In this case, your duty is expansive as any known to the law. I want you to remember that at all times. Don't become petty, don't just anything. Simply follow my instructions. And the case will go expeditiously.

Marshal, will you take the jury to the jury room.

MARSHAL:  All rise.

*(Note:  Jury out.)*

MARSHAL:  Court is back in session.  Be seated can

come to order.

THE COURT:  I was told by the marshal there was need to have a conference with you.

MR. FRENTZEN:  Briefly, Your Honor, two matters, I think from the government.

THE COURT:  All right.

MR. FRENTZEN:  The first is with regard to the rule of sequestration.  The government assumes that is going to be invoked.

THE COURT:  Yes.

MR. FRENTZEN:  We, of course, will honor that. But we just to note for the record that pursuant to statute there are family members of the deceased who will be testifying only during the punishment phase, if we get to a punishment phase.  And they are present in the courtroom, and will be present in the courtroom during the course of the trial.

THE COURT:  I think that is authorized.  Is it not?

MR. FRENTZEN:  It is, Your Honor.

MR. DARDEN:  We certainly have no objection, Your Honor.

THE COURT:  All right.

MR. FRENTZEN:  The second matter is simply, Your Honor, this is Mr. Milton Hooper.  He was from the Middle

District of Georgia.  And he will be assisting us with the presentation of our exhibits.  And we simply wanted to introduce him to the Court.

THE COURT:  I saw him earlier.  I have signed an order commanding the marshals what to do and what not to do.  Is there a marshal present?

MARSHAL:  Yes, sir.

THE COURT:  Marshal, you will get a copy of that order.  The clerk will supply it to you now.  Make sure that all of the deputy marshals read that.  You are in charge.  Those instructions relate how you are to handle that responsibility.

Ms. Armstrong is the person in charge; is she not?

MARSHAL:  Yes, sir.

THE COURT:  Is she in the jury room?

MARSHAL:  She is.

THE COURT:  Make sure she receives a copy of it.

MARSHAL:  Yes, sir.

THE COURT:  Is there anything else, Mr. Frentzen?

MR. FRENTZEN:  Nothing from the government.

THE COURT:  The rule of sequestration is invoked.  By virtue of the number of witnesses that were called earlier, I think we all agreed, or I have agreed that you did not have to them all present at any one time.  But I charge counsel for enforcing the rule of sequestration,

including not having the witnesses or your witnesses discussing the case with one another.  If you have any uncertainty about the rules of sequestration, I will review those with you?

MR. FRENTZEN:  I don't believe that is necessary, Your Honor.

THE COURT:  Mr. Darden, you and Mr. Bell.

MR. BELL:  We understand, Your Honor.

THE COURT:  Fine.  And you will enforce it.

MR. BELL:  Yes, sir.

THE COURT:  I will have a jury brought in.  I will give them some preliminary instructions.  Then we will have opening statements.

Marshal, bring the jury in.

MARSHAL:  All rise.

[Note: Jury seated.]

THE COURT:  Ladies and gentlemen, you have been sworn to try certain issues in the case of the United States of America versus Meier Jason Brown.  You have participated in the jury selection process.  But let me again introduce to you the lawyers.  The lawyers are the people who have investigated the case, interviewed the witnesses, and who will have a very high profile here in the courtroom.

The lead prosecutor for the government, he is referred to as an Assistant United States Attorney, an

Assistant United States Attorney for the Southern District of Georgia, Mr. Frentzen.  His colleague on the other end is Mr. Joseph Newman, who is long time United States Attorney for the Southern District of Georgia.

Mr. Newman, would you stand and would you introduce the case agent?  I have forgotten her name.

MR. NEWMAN:  Yes, sir.  The case agent for the Postal Service is Marla McLendon.

THE COURT:  On the other side, Mr. Darden.

Mr. Darden, I will let you again introduce yourself.

MR. DARDEN:  Good afternoon, ladies and gentlemen. My name is Richard Darden.  And this is William Bell, co-counsel.

THE COURT:  Of course, you have seen the defendant.

MR. DARDEN:  Meier Jason Brown is the defendant.

THE COURT:  You will see various assistant United States attorneys come.  There will be Deputy United States Marshals in the courtroom.  I will have to confer with them from time to time.  And on occasions, I will have to meet with the lawyers at side bar, if they decide there's a problem or they foresee a problem, or if the Court foresees a problem.  Don't be distracted by that.  We are not trying to keep you from knowing everything that you need to know.

And it is simply a way of expediting and refining the issues so that we can move forward without great delay.

Again, I remind you that the case will be divided into the two phases. The first phase, which we are about to begin, is for determination of what we refer to as a guilt or not guilty stage as to the defendant as to whether he committed the crimes as charged in the indictment.

Only if you find that the defendant is guilty of a capital charge will you be allowed to proceed to the second phase. Then you will determine the availability and the appropriateness of a sentence of death or some other sentence.

I will provide you with instructions at each stage. Together with my legal assistants, I hope to have you a written copy, each one of you, of the instructions. I will review those with you here in open court.

Now, in this first phase, by your verdict, you will decide the disputed issues of fact. I will decide all questions of law that arise during the trial, and give you the charge before you deliberate.

Because you are called upon to decide the facts of the case, you should, of course, give careful attention to the testimony and the evidence presented for your consideration during the trial. To that extent, I will have each of you provided a legal pad and a pencil or some

writing instrument.

You are not required to keep notes.  Often people with better remember the evidence if they don't take notes, because they find taking notes is a distraction.  So, the choice is entirely yours.

I will ask that you write your name own the legal pad.  That becomes your own personal property as far as I'm concerned.  You will not take that away in the evening.  You will leave it in the jury room.  Everything will be locked. The marshals will make sure it is sure back there, so you will not have to worry about lawyers and judges, or any court official examining your notes.  But you are not required to do that.  We just simply want you to identify which pad is yours.

Because you will be called upon to decide the facts of the case, you must keep an open mind and should not form or state any opinion about the case one way or the other until you have heard all of the evidence.

We obviously cannot deliver all of the evidence to you in one fell swoop.  Each witness must give the testimony that is legally admissible.  It is not like a street conversation when you can talk about hearsay and give your opinions in normal conversation.

The law of evidence has evolved over hundreds, maybe even thousands of years.  It is my responsibility to

try to know rules of evidence, and the lawyers, too.  When they disagree, they will object.  I will make a ruling.  I will try to be somewhat prompt in make that ruling.  And whether I rule in their favor or against them is of no concern.  I'm not favoring either one by my ruling.  I am simply trying to enforce the law as I understand it.  And there is often genuine conflicts in the law.  But that is not of any concern to you.

I am afraid that sometimes people misunderstand a judge's ruling.  They think by favoring one side or saying I affirm or the objection is meritorious in some way that is the indication that the judge favors that side.  It has nothing to do with that.

One of the great stresses of serving on the jury is to comply with the condition not to discuss the case among yourselves.  You are going to be in recesses.  You are generally strangers to each other.  About the only thing common you have to discuss is the case.  I forbid under your oath not to discuss the case or your own feelings regarding anything that might be part of the case.

As I suggest, the weather, and sports, and history, and many things are suitable for your discussions, but not the case.

There will be a newspaper provided for you.  There might be articles appearing in the local press, or media,

but you are not to listen or read any that have.  The marshals will have their instructions regarding what is proper and what is improper.

During the trial of course, I have told you that I will have to work with lawyers sometimes out of your presence.  Nothing is meant to conceal from you anything that is essential for your understanding of the case.  This case will not last an unduly lengthy period of time, I am told, by the lawyers.  So, we hope to work somewhat longer hours.  But we will not stay here unduly.  I know you are tired.  You are in a strange environment.  Yet, we want to make maximum be efficiency of your time.

Now, I remind you of what I have said to you on several questions.  This case begins with an indictment.  An indictment in the criminal a merely an accusation.  An accusation has to be supported with competent evidence, that is proof.  The proof will come to you from that witness stand and the various documents.

The government has the burden of providing you with evidence at that overcomes the presumption of innocence, and removes all reasonable doubt except that of guilt.

Proof beyond a reasonable doubt is a proof of such a convincing nature that you would be willing to rely and act upon it without hesitation in the most important of your

own affairs.

I have said that the government has burden of producing the evidence. The defendant is not required to prove his innocence or produce any evidence at all. You said that you understand that. Yet, the defendant may produces evidence if he so choses.

Now, you decide credibility or believability of what you hear every day. Almost from the time you wake up, you are listening to radio or television or reading the newspaper. And you are hearing someone soliciting you to buy or purchase, or to attend something or another. They say it is the cheapest price that you will ever find. Well, you take that with a grain of salt, and you judge credibility. That is called common sense. To a large extent, that is what you will be doing here in the courtroom. You will be judging the credibility of the witnesses.

Remember, some of the witnesses will be frightened. They will be as you were when you arrived. This is a strange environment. Except, they will be examined and cross examined about things that are often unpleasant and that happened a while ago. So, remember that you may believe or disbelieve any witness in whole or in part. Because you are the only judges of the facts. So, look at them, and make your own decision. I will give you

more about that later.

Then there will be evidence that I will admit, documents and other matters, you are to consider that.

If you elect to take notes, of course, do not let that distract you from hearing the testimony of the various witnesses.

The indictment charges certain offenses. As I told you earlier, those are for legal purposes called counts. Count 1 charges felony murder within a federal jurisdiction. Count 2 charges felony murder of a federal employee. Count 3 charges assault with intent to rob federal property.

In order to establish these offenses, the government must prove to your satisfaction beyond a reasonable doubt each of the following essential elements. And I will review these again with you at the end of the case.

Count 1, the essential elements is that the victim, Sallie Louise Gaglia was killed.

Secondly, what has to be proven beyond a reasonable doubt that the defendant caused the death of the victim as charged in the indictment.

Thirdly, that the death of the victim occurred as a consequence of, and while the defendant was knowingly and willfully engaged in perpetrating the crime of robbery as

charged in the indictment.

And four, that the killing occurred within the territorial jurisdiction of the United States, such as a federal Post Office.

Count 2, the essential elements of offense are that the victim, Sallie Louise Gaglia, was killed.

Secondly, that the defendant caused the death of the victim as charged in the indictment.

And thirdly, that the death of the victim occurred as a consequence of, and while the defendant was knowingly and willfully engaged in the perpetrating the crime of robbery, as charged.

There is a slight difference in Counts 1 and 2.

And four, that the victim as a federal officer or employee, and was at the time of the killing engaged in the performance of her official duties.

Count 3, the essential elements, once again that which must be proven beyond a reasonable doubt is that the defendant, Meier Jason Brown, assaulted a person having lawful charge, control, or custody of mail matters, other property of the United States. And secondly, while committing the assault, the defendant intended to rob or steal such mail matters or money, or property of the United States, and thirdly, that in committing such robbery, the defendant wounded Sallie Louise Gaglia or put her life in

jeopardy by use of a dangerous weapon.  And fourthly, that the defendant acted willfully and knowingly.

You are going to hear me use the word *knowingly* many times.  I am define that word for you.  The word *knowingly*, as that term will be used in Court and in these instructions here and later, means that the act was done voluntarily and intentionally, and not because of mistake or accident.

The word *willfully*, as I intend that word to mean, and as it will be used in these instructions, means that an act was committed voluntarily and purposefully with a specific intent to do something the law forbids; that is to say with a bad purpose either to disobey or disregard the law.

As I told you, lawyers are critical to administration of justice.  Witnesses testify in increments. I will have to rule on what is admissible.  The lawyers understand that.  One witness cannot sit in the witness chair and say ladies and gentlemen, this was what happened. So, it comes in bits and pieces.

At the outset, the lawyers are allowed to give you an opening statement.  That is what they think the evidence will prove or show, so that you can connect the dots when these witnesses give these bits and pieces of testimony.  We call that an opening statement.

Let me remind you that nothing the lawyers say is evidence.  But it is highly worthy of your consideration.  The government is afforded opportunity in the moment to give you its opening statement.  And defendant may follow that with an opening statement.  Neither one of them are required to give you an opening statement.  There again, I remind you that those are not evidence.  They are simply a preview of coming events.

Mr. Frentzen, are you ready to begin your opening statement?

MR. FRENTZEN:  I am, Your Honor.

THE COURT:  You may use such exhibits and charts.  And maybe you should explain to us what all of these consoles are, Mr. Frentzen.

MR. FRENTZEN:  I will, Your Honor.  These consoles are hopefully how we're going to be able to show our exhibits during the course of the trial.  I don't expect to be using any of these during the course of my opening, but only this one chart that I have just to facilitate the discussion.

THE COURT:  Gentlemen, you may position yourself in such place as you want from time to time to observe the charts.

MR. DARDEN:  Thank you, Your Honor.

MR. FRENTZEN:  May I proceed, Your Honor.

THE COURT:  Yes.

MR. FRENTZEN:  Thank you, Judge.

May it please the Court, members of the jury, November 30, 2002 started out as a normal day for Sallie Louise Gaglia.  She would have had no way of knowing when she awoke that morning that several hours later she would be dead, stabbed to death by that man, the defendant, Meier Jason Brown.

The evidence in this case will show that Sallie Gaglia lived in Fleming, Georgia.  She lived there with her husband, Joe.  They had two children, Craig and Scott Gaglia.

November 30, 2002 was Saturday, a Saturday of Thanksgiving weekend last year.  For many people, probably most of you, it was a day for relaxing, Thanksgiving turkey, maybe shopping, college football.  For Sallie Gaglia, she was going to work.  Sallie was the Postmaster Relief for the Post Office in Fleming, Georgia.

The postmaster is the person who would run the Post Office on the days when the normal postmaster didn't work or couldn't work.  That Sallie, that was every Saturday and other days as needed.  So, on this Saturday, Sallie drove in to work.  She lived about a mile from the Post Office in Fleming.  She drove her mini van that mile to the Post Office.

She would have gotten in to work about 7:45 in the morning, and opened up the Post Office there in Fleming.

I want to show you this diagram.  This is a diagram similar to the Post Office in Fleming.  It is a duplicate of the Post Office in Fleming if the roof was removed from the Post Office.  This would be a front door.  It is a small building with a mall front lobby area.  The Post Office boxes are here for people to come in and get their mail, and a small service window for them to get things from the Post Office.

There's door here, but you will hear this door remained locked most of the time.  And this is how customers could get in to the Post Office.  This is the back area, and this is with Sallie would work.  She worked filling up the mail for these P. O. Boxes, and dealing with customers as they came in through this service window and over this counter.

About 8:00 o'clock that morning, a coworker, Darlene Washington, came in to work.  Darlene was rural carrier.  She would drive and deliver mail for people in Fleming.  But she would get in every morning and get her mail ready to deliver.  So, about 8:00 o'clock she came in and joined Sallie.

Darlene would work around here, you'll hear, and get her mail ready to take out on her route.  So, that

morning, they worked together, and they talked.  During the course of that morning, while Darlene was still there, a man came to the Post Office.  It was the defendant, Meier Jason Brown.

He came in and he came over to a P. O. Box, one of these P. O. boxes here, number 327 where his family would receive mail.

He came in.  And there were a number of different people who were authorized to get mail from that box.  You will hear that while he was checking the mail for that box Sallie asked "which one are you".  And then he identified himself and he said "Jason", Meier Jason Brown.

After he got his mail and after identifying himself, defendant left the Post Office.  Unfortunately for Sallie, he would be back.

Around 9:30 or 9:45, Darlene left.  She went out to go deliver the mail, leaving Sallie alone in the Post Office except for whatever customers came.  Around 10:30 that morning, a customer came in to get his mail, a man by the name of Frank Kania.  And he came in and got his mail from one of the P. O. boxes, and he talked to Sallie briefly, and then he left, coming outside and getting into his truck where he sat there for a minute thumbing through his mail.  Mr. Kania was the last person to see Sallie Gaglia alive except for the defendant.

Before he pulled away from the front of the Post Office, he noticed a man on a bicycle riding toward the Post Office.  He later identified that man as the defendant.  And as he was pulling away, he saw the man get off the bicycle and go inside the Post Office.

The evidence in the case will show that the defendant came into the Post Office.  He came over the counter window where Sallie was working, and Sallie came to help him.  And he wanted three postal money orders in amount that will be significant to you during the course of the trial, $500, $500, and $175.

Sallie would imprint these money orders on a machine that was on this counter, on her side of the counter next to the window.  She would imprint these money orders.  And then she went over to this desk here.  And on the corner of the desk there was an adding machine.  She was adding in the amounts of the money orders, 500, 500, and 175.  And the charges for each of the money orders.

While she was taking his order and imprinting those money orders, and while she was going over to the adding machine to add up the money orders, the defendant was covering his hands with socks that he brought with him.  And then he took out a kitchen knife, a steak knife that he had brought with him.  When Sallie's back was turned and she was working at this desk, he jumped over the counter through

this service window, and he attacked her.

He stabbed Sallie Gaglia over, and over, and over again.  The evidence will show he stabbed her twice in her arm.  He stabbed her twice in the chest.  And he stabbed her six times in the back.  He stabbed her ten times altogether. And the evidence will show he tried to stab her more times.

After this attack, Sallie was laying on the floor. He took the three money orders that she had imprinted.  Then he looked around and on this chair right here over by the door, he saw her purse.  And he went into her purse and took her wallet.

Still leaving Sallie lying on the floor, he jumped back over the counter, back through this service window and left out of the Post Office.

Outside of the Post Office, he got back on his bike and was trying to get away.  You'll hear that another man drove by the front of the Post Office that morning, a man named Chris Bowen.  And he saw a man on a bicycle that he later identified as the defendant.  And he noticed that the man had something covering his hands, what he thought were white gloves -- those white socks -- as he passed by.

The defendant left on his bicycle, and rode his bicycle back toward his residence where he lived with his mother and other family members.  His mother's name is Sadie Brown.  He rode about a mile to Sadie Brown's house.  On the

way, he through the knife and the socks in a heavily wooded area, and those were never recovered.

At Sadie Brown's house, he got on the telephone, and he started calling his girlfriend, a woman named Diane Brown who lived in Savannah, asking her to come and get him.

Back at the Post Office, when the defendant was trying to get a ride out of the Fleming and get to Savannah, a young couple came into the Post Office, and they saw Sallie's body. And they ran for help. And they government First Responders. And they got EMTs out there, but it was too late to save Sallie. She was dead.

The Liberty County Sheriff's Office started to arrive. Investigators from the United States Postal Inspection Service started to arrive. And they formed a Task Force, and they started looking for clues about who had done this.

They have found a couple of significant clues at Post Office. For one thing, they noted the discrepancy between the amount of money in the Post Office and the money orders that were supposedly sold, these three money orders. So, they knew something had been stolen from the Post Office.

Also on this counter top here, they were able to find a shoe print, a print from a shoe that had been up on top of that counter.

As the investigation was going on, and they were looking in the crime scene, the defendant was trying to wash his clothes at his mother's residence.  As you will hear, he forgot, or he didn't wash thoroughly enough one significant item of clothing.

His ride arrived.  He had been able to get Diane Brown on the phone, and she came to get him, pick him up and take him out of the Fleming, back toward Savannah.  On the way, they stopped on Highway 17 and I-95.  And then went to the Racetrack Gas Station.  And the defendant bought some cigarettes.  And then they went across the parking lot to the liquor store.  There, the defendant bought himself some beer and Diane Brown some gin.

And outside that liquor store, shortly after this crime had occurred, he took out the three money orders that has been stolen from the Post Office, and he showed them to Diane Brown.

Diane Brown and the defendant had been dating each other for several months.  Diane Brown had lost her job recently.  She had debts to pay.  And the defendant knew about these debts.  The amount of those debts were, she owed a little more than $900 for the mortgage.  And she owed $175 for a bankruptcy payment.  And those are the amounts of the money orders that he had ordered ask stole from the Post Office, for what he was going to use to take care of Diane

Brown's debts.  He showed her those money orders, and he told her that would take care of her debts.

A couple of days later on December 2nd of 2002, Diane Brown and the defendant are caught on videotape at Diane Brown's bank.  This is the Monday following that Saturday when the banks are opened.  And they were cashing one of the $500 money order that the defendant had stolen from Sallie Gaglia and from the Post Office.  They cashed that money order, and then they went down to the main Post Office on Fahm Street in Savannah, and they bought another money order for $423, put that together with one of the 500-dollar money order, and mailed that off for Diane Brown's mortgage payment.

Then they took the 175-dollar money order, and mailed that off for Diane Brown's bankruptcy payment.

By December 5 th, 2002, searches were conducted with permission from Sadie Brown at her residence in Fleming, and Diane Brown at her residence in Savannah.

At Sadie Brown's residence, the investigators were able to find -- as I told you, there is an important piece of clothing that the defendant forgot to get rid of or forgot to wash.  And that is a brown jacket that the defendant was wearing on the morning that he went down to the Post Office.

You will hear scientific evidence that on that

jacket, on the right sleeve and on the right bottom part of the jacket, they found human blood.  They conducted DNA analysis, and they were able to match the blood on that jacket with Sallie Louise Gaglia, on this jacket found in the defendant's residence.

At Diane Brown's house during the search, they found several important pieces of evidence.  They found receipts from the postal money orders that had been stolen when Sallie Gaglia was killed.  They found a blue pair of Lutz brown tennis shoes, the defendant shoes.  You will hear that those shoes matched shoe print that was taken from the counter top at the Fleming Post Office.

Then most important of all, the most important piece of evidence in the case, at Diane Brown's residence, the investigators found the defendant, Meier Jason Brown. He was there.  And they asked could they talk to them.  He said, "sure, I'll talk to you."

And he started out by lying to them.  First, he told them that he had gone to the Post Office once that morning to check the mail, but he left and he never came back.

Then he changed his story.  He said, "well, he had gone back."  But he had stolen $1,300 from his cousin and gone down there, and that was how he was able to buy those money orders.  And then he confessed.  He gave it up.  He

confessed.  He told them what he had done.

He told them about going down to the Post Office that second time.  He told them that he went to rob the Post Office.  He told them about bring the socks.  He told them about bringing the knife.  He told them about jumping over the counter.  He told them he attacked Sallie Gaglia, and he told them that he had killed Sallie Gaglia.  He told them that he had stolen those money orders.  He confessed.  He confessed to the officers who were there.

He wanted Diane Brown brought into the courtroom so he could tell her what he had done.  He picked up the phone and he called his mother to tell her what he had done.

The following morning, he confessed again.  And that was tape recorded.  He agreed to talk again, and he confessed again.  And that was captured on tape.

Ladies and gentlemen, you are going to be able to hear that evidence.  You are going to be able to hear from his own mouth in his own words his confession.

At the conclusion of the case, ladies and gentlemen, you will have heard the eyewitnesses put the defendant at the scene of the crime.  Physical evidence ties the defendant to the crime.  And he confessed.  In his own words, you will hear he did it.  He committed this crime. He robbed Sallie Gaglia, and he killed Sallie Gaglia.

At the conclusion of the case, we will be able to

speak to you again.  We'll ask you to follow the evidence and apply it to the Court's instructions and the law, and come to the only conclusion consistent with the evidence and the law that the defendant rob Sallie Gaglia and killed Sallie Gaglia and the guilty of all three counts in the indictment.

Thank you.

THE COURT:  Mr. Darden.

MR. DARDEN:  Thank you.  Mr. Frentzen, Judge, ladies and gentlemen, good afternoon.  Again, my name is Richard Darden.  I and Mr. Bell represent the defendant in this case.

In the beginning, the Judge told you I was lead counsel in this case.  And for the purposes of what we're going to do that is really not important for you to know. I'm sure you will hear from Mr. Bell as often as I hear from me.

Mr. Frentzen as outlined the evidence in this case.  And it may surprise you to hear a lawyer say this. But I'm not going to stand here and tell you there is no evidence in this case.  Quite frankly, there is some evidence.  However, I would ask you to fulfill your duties as jurors in this case and, consider all of the evidence.

As you will quickly see, there are some inconsistencies in this evidence.  There is a lack of the

physical evidence in this case.

And Judge in this case is going to give you some special instructions how you handle statements made by the defendants.

I will say this. There's nothing more important than you will do here this week. You have been chosen from 60 people to sit in judgment of another human being. That is an awesome responsibility in itself. But you have been chosen to possibly do even more than. Because as you know, if you chose to return a verdict of guilty in this case, you will then decide the fate of another human being. And, ladies and gentlemen, that is an awesome responsibility.

I see the concern in every one of your eyes. Some of you look frighten. I will be the first to tell you, I'm scared to death. This is an awesome responsibility.

The reason you were chosen to sit on this jury is because you told us and the government certain things. First, you told us that you will be fair, not only to the government, but to the defendant. You told us you would keep an open mind. We're asking that you do that.

You told us that you presumed this man to be innocent. You told us that you would place the burden on the government. We have no burden in this case, and you indicated to us that you had no problem with that whatsoever. All that we ask in this case is that you

fulfill your obligations as juror.  You do everything you told us you would do when you raised your right hand and took that oath.  And I am absolutely confident that you will make right decision in this case.

Thank you very much.

THE COURT:  Marshal, pass out the pads for the jury, and the pencils or pens.

The only thing I want you to do is put your name on it so that it identifies yours as distinct from others.

The rule of sequestration is invoked, and has been invoked.  So, all of the witnesses other than the designated witnesses are to remain outside the courtroom.

Mr. Frentzen, you may begin your presentation.

MR. FRENTZEN:  Thank you, Judge.  Your Honor, the government calls Darlene Washington.

CLERK:  For the record, Ma'am, please state your name and your occupation.

WITNESS:  Darlene Marie Washington, rural carrier.

**DARLENE MARIE WASHINGTON**, after having been duly sworn, and called as a witness by the government testifies as follows.

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q    Good afternoon, Ms. Washington.  Ma'am, could you tell us where you live, please?

A    Hinesville.

Q    You said you are a rural carrier.

A    Yes.

Q    Who do you work for, Ma'am?

A    The Post Office.

Q    How long have you been employed by the Post Office?

A    Since '95.

Q    How long have you been working for the Post Office in Fleming?

A    Since '98.

THE COURT:  Ms. Washington, will you speak up so that all of these ladies and gentlemen and these gentlemen over here need to be able to hear you.

Q    If you could just repeat.  How long have you been working for the Post Office in Fleming, Ma'am?

A    Since '98.

Q    What are your responsibilities as an rural carrier?

A    Sort mail, and get it into delivery order, and deliver mail.

Q    Did you know Sallie Louise Gaglia?

A    Yes.

Q    How did you know her?

A    She was a coworker.

Q    How long had y'all worked together?

A    Since '98, since I worked at the Post Office in

Fleming.

Q    When did Sallie work?

A    On Saturdays and when the postmaster needed time off.

Q    Did you know what Sallie's hours were?

A    No, not exactly.

Q    Generally, who would you arrive first if the morning, yourself or Sallie?

A    Sallie.

Q    What were your usual hours?

A    My usual hours were from 8:30 to about 12:54 somewhere along in there.

Q    Ma'am, I'm going to ask you, if you could, look at that monitor in front of you.  I would like to show you what has been marked as Government's Exhibit 1A.

A    I can't see it.

Q    I'm sorry, Ma'am.  If you could lean over just a little bit, maybe you can see it.  Can you see that now?

A    Yes.

Q    Is that a fair and accurate representation -- is that photograph a fair and accurate rendition of how the Post Office looked in November of last year?

A    All except the front door.

Q    What is different about the front door?

A    The front door wasn't glass.

Q    But other than that exception is that pretty much the

same?

A    Yes.

Q    And that is a photograph of what?

A    The Fleming Post Office.

MR. FRENTZEN:  May I offer Government's Exhibit 1A, Your Honor.

THE COURT:  Yes.

MR. BELL:  No objection, Your Honor.

MR. FRENTZEN:  Could we publish that for the jury, please.

THE COURT:  Yes.

Q    Ma'am, could you tell us when you came into the Post Office in the morning, what were your usual -- what was your usual practice or habit?

A    When I get there in the morning, come in, knock on the door so that Sallie with open up the door for me, went in and start preparing the mail to get ready to deliver it to the homes on the route.

Q    Where would you prepare the mail?

A    Inside.  Well, I walked through the lobby inside where and clerk and case would be.

Q    Okay.  Let me show you on the monitor Government's Exhibit 1B.  Ma'am, do you recognize what that is photograph of?

A    Yes.

Q    What is that a photograph of?

A    My work station and the case.

        MR. FRENTZEN:  Your Honor, I would offer Government's Exhibit 1B.

        THE COURT:  Received.

Q    Ma'am, that shows where you would work?

A    Yes.

Q    In relation to this space, where would Sallie work?

A    Just back behind me.

Q    Okay.  Ma'am, let me show you what has been marked at Government's Exhibit 1C.  Ma'am, do you recognize Government's Exhibit 1C?

A    Yes.

Q    What is that?

A    P. O. boxes and where the cash drawer and the service window would be.

        MR. FRENTZEN:  Your Honor, I would offer Government's Exhibit 1C.

        THE COURT:  Received.

        MR. FRENTZEN:  May I publish it for the jury?

        THE COURT:  Yes.

Q    Ms. Washington, this particular photograph, was this something you could see from your work space?

A    Yes.

Q    Okay.  Let me direct your attention to November 30th of

2002.  Were you working that particular morning?

A    Yes.

Q    Do you recall what time you arrived that morning?

A    Around about 8:00 o'clock.

Q    When you arrived, was there anyone else already at the Post Office?

A    Sallie.

Q    What was she doing?

A    Sorting flats.

Q    Sorting what?

A    Flats, magazines.

Q    Okay.  And what did you and Sallie do after you arrived there that morning?

A    We talked.  And I start preparing the mail.  We talked about her children that day, a sweater that she had brung in, wanted to know what would go with the sweater.  And, you know, as customers came in, she greeted them and tended to them at the window.

Q    Was there one particular customer who came in that morning that you recall?

A    Yes.

Q    Can you tell us about that particular customer coming in?

A    The one that went had in P. O. Box 327, Sallie asked him -- she greeted him, good morning, how are you.  And then

she asked -- he went into P. O. Box 327.  She said, "oh, they left you in charge of the key today."  And I didn't recall him saying anything.  So, she asked him, "which one are you?"  Ask he said something, but she didn't understand what he said.  And she said again who, or what did he say, and he said it again.

By the third time, I stepped back to see.  And he was going out the door.  Because I think he was saying -- it began with the M, whatever, the first three names that he said.  And then as he was going out the door, he said Jason.

Q    Were you able to visibly see this individual?

A    Just the back of him going out the door.

Q    Were you able to identify him at all?

A    No.

Q    Could you identify the race of the man?

A    He was black.

Q    Are you aware of who gets their mail from P. O. Box 327 in Fleming?

A    Not all of the people that get mail out of Box 327, no.

Q    Generally, are you aware of which particular people get their mail out of Box 327?

A    Yes.

Q    Who is that?

A    The Morgans and Browns.

Q    Where do the Morgans and the Browns live; do you know?

A    On Leroy Coffer Highway.

Q    Leroy Coffer Highway, and what?  Is it near any other --

A    Fleming Loop.

Q    That is Fleming Loop Road?

A    Fleming Loop Road, yes.

Q    Is Leroy Coffer Highway known by another name?

A    Yes.

Q    What is that?

A    196.  I'm not sure.

Q    Do you where Sallie Gaglia lived?

A    Yes.

Q    Where did she live?

A    At the end of low Roy Coffer Highway and Fleming Loop Road.

Q    Also on that Fleming Loop Road?

A    Yes.

Q    Ma'am, just one thing about this photograph here.  You said that the individual checked Box 327.  How do you know he checked that particular box?

A    Sometimes when people come in, and you hear the key, I will kind of look and if you look and they open up the box, you see the mail slide out or a light shine through.  And that's what I seen that day.

Q    You are able to see it as on this photograph, it is one

of those boxes?

A    Yes.

MR. FRENTZEN:  Nothing, Your Honor.

**CROSS-EXAMINATION**

BY MR. BELL:

Q    Ma'am, my name is William Bell.  I just a few questions for you.  Some of these jurors may not know where Fleming, Georgia is.  But it is about Midway between here and Hinesville; correct?

A    Yes.

Q    All right.  There is Highway 196, which is also called Leroy Coffer Highway; true?

A    Yes.

Q    When we say Fleming Loop Road, off of 196, if you take a right and go down to Fleming Loop Road to the Post Office; correct?

A    Correct.

Q    And it loops all the way around and comes back again on 196; doesn't it?

A    Correct.

Q    Okay.  So you guys are at the very end of Fleming Loop Road next to fire station; right?

A    Yes.

Q    And I think there is a couple of mobile homes on the west side of the Post Office; true?

A    Yes.

Q    All right.  And people live there full time; correct?

A    I suppose.

Q    All right.  Right across the street on the other side, there are some house; aren't there?

A    Across the street?

Q    Yes, Ma'am.

A    As in where?

Q    Right on Fleming Loop?

A    Yes.

Q    All right.  If you look right across, if you were standing in front of the Post Office, and looking straight out the door, the first thing you would see would be the railroad tracks; true?

A    Correct.

Q    If you take the road, if you go down the first part of Fleming Loop Road -- let me get this.  Can you see this?

A    Could you turn it up a little bit.  Okay.

Q    Can you see that?

A    Yes.

Q    If I-95 would be over here, and you would turn down 17 and come on Leroy Coffer Highway, it would run this way.  And if you go all the way down, you would, in one turn, get to Hinesville, Georgia; true?

A    Yes.

Q    All right.  So, if this is Leroy Coffer, 196, this is an aerial photograph.  If you take a right here, go all the way down Fleming Loop Road, here's the Post Office.  It would right here, true?  These are the railroad tracks.

A    Okay.

Q    All right.  If you came all the way around here, you would be back on 196 again; true?

A    True.

Q    Okay.  So, we've got some people living in those mobile homes right next to the Post Office; correct?

A    In one of trailers, yes.

Q    And there are houses over here; correct?

A    Correct.

Q    And then here's the railroad tracks where the trains runs fairly frequently down that track; correct?

A    Correct.

Q    And then some folks live over here; true?  Across the railroad --

A    Yeah, people live across the railroad tracks.  Yes.

Q    Okay.  So this is where we're talking about in Fleming, Georgia; right?

A    Correct.

Q    And this is the only Post Office, I think, in Fleming, Georgia; true?

A    Correct.

Q   And it gets a fair amount of traffic, especially on Saturdays; doesn't it?

A   I couldn't tell you that, because I don't know how much traffic goes through there.

Q   Okay.  Do more people come on the last day of the month getting checks, and things of that nature?

A   No.  During the first part of the month.

Q   Now, Ms. Sallie worked at the Post Office; correct?

A   Yes.

Q   She was a part time employee; true?

A   True.

Q   How often did she work?  It was about one day a month; wasn't it?

A   She worked every Saturday.

Q   She did work every Saturday?

A   Every Saturday.

Q   Who worked the rest of the time?

A   The postmaster.

Q   All right.  Now, did I understand your testimony to be that morning you heard the person come in and speak with Ms. Sallie, and identify themselves by name; correct?

A   Sallie spoke to him, "good morning, how are you."

Q   And he said his name was Jason?

A   When she asked which one was he, he said -- as he walked out the door, he said Jason.

Q    And that is all he said.  He didn't say Meier Jason Brown; did he?

A    I think he said Meier.  And she couldn't understand what he was saying.  He said it about three times.  And then after she couldn't understand what he was saying, as he walked out the door, he say Jason.

Q    Okay.  So, what you clearly heard was him saying Jason?

A    Yes.

Q    Now, you did not get a look at person; did you?

A    Not in the face, no.

Q    You didn't get to look at the person at all; did you?

A    I seen the back of him as he was going out the door.

Q    Now, you have talked to go the number of Postal Inspectors; true?

A    Yes.

Q    And do you recall speaking with Inspector Jess Sims on December 2nd about two or three days after this occurred?

A    Jess --

Q    Maybe you don't remember him by name?

A    No, I don't remember.

Q    But two or three days later, you spoke the Postal Inspectors right?

A    Yes.

Q    Where did they talk to you?

A    Some talked to me -- well, two or three days later,

they called me at home.

Q    All right.  And you are telling Inspector Sims that you *did not see Jason because she was standing at her rural case and could not see the customer counter line or the box lock?*

A    I'm going to stay at the Post Office I can see the Post Office boxes.

MR. BELL:  Your Honor, may I approach?

THE COURT:  Mr. Frentzen?

MR. FRENTZEN:  Judge, I don't think this is appropriate line of questioning.

THE COURT:  I'm not sure that it is either.

MR. BELL:  Your Honor, she has testified that she --

THE COURT:  I understand that.

MR. FRENTZEN:  May we be heard at side bar, Your Honor.

THE COURT:  Yes.

[NOTE:  Sidebar Conference.]

MR. FRENTZEN:  Judge, he can't impeach by asking her questions about what an inspector may have put in his report.  This is not her statement.

THE COURT:  That is what I was thinking.  This is what I understood to be a statement made by an officer after an interview he had.  She didn't adopt his statement.

MR. FRENTZEN:  That's correct.

THE COURT:  So, the objection is sustained.

[NOTE:  Sidebar Conference Concluded.]

THE COURT:  Ladies and gentlemen, this is what somewhat allegedly recorded.  The witness did not write this down.  So, therefore, it cannot used since she has not written it.  It is what someone wrote down as saying when she said.  This is not sufficient -- if she says that is not what she said, then that is the end of that.

BY MR. BELL:

Q   Ma'am, you didn't identify anybody that you saw in the Post Office that morning; true?

A   No.

Q   Okay.  And just so we're clear, do you deny telling Inspector Sims that you did not see anybody?

A   I don't remember.

Q   So, you are not saying that you did or you didn't.  You are saying you don't recall?

A   I don't recall.

MR. BELL:  That's all.

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q   Ma'am, what time did you leave the Post Office that morning?

A   About 9:30 or 9:45.

MR. FRENTZEN:  Nothing further, Your Honor.

THE COURT:  Ms. Washington, you say step down. Remain outside of the courtroom until the lawyers -- is the witness excused; or, could she remain in the area.

MR. FRENTZEN:  She's excused, Your Honor.

THE COURT:  You are excused.  You may leave the courthouse.

[NOTE:  Witness left the stand.]

THE COURT:  Your next witness.

MR. FRENTZEN:  Your Honor, our next witness will be by deposition.  And it has, I believe, been placed on the DVD.  And we will be able to show it on the monitor.

THE COURT:  Ladies and gentlemen, the word *deposition* is it meaning is here, we have a witness -- this doesn't happen very often in cases of this nature -- the witness could not be available to come and testify today. So, I have authorized the lawyers, in the presence of a court reporter and a videotape operator, to take that witness' testimony.  The defendant and his counsel were available to cross examine that witness.

You are to judge credibility of this witness insofar as that is possible using the same standards that I will inform you that you are to use, and I have touched on earlier.

So, a deposition is a statement made outside of

the court under oath, the parties or their representatives present.

You may proceed.

**JENNIFER ZECH**, after having been duly sworn, testifies by deposition as follows.

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q   Ma'am, can you please state your name and spell your last name?

A   Jennifer Lee Zech, Z-e-c-h.

Q   Ms. Zech, where do you live?

A   2585-A Oak Level Road.

THE COURT:   Turn up the volume.

Q   Ms. Zech, if you could you please speak up a little bit that would be helpful.   Thank you.

You said 2585-A Oak Level Road.   Where is that?

A   Cairo, Georgia.

Q   Are you currently working, Ma'am?

A   No.

Q   Why not?

A   Because of my pregnancy.

Q   How far along are you in your pregnancy?

A   Thirty-nine weeks.

Q   And you are expecting soon.   Is that right?

A   Right.

Q    And do you understand that's why we're having this deposition rather than your appearance in court?

A    Yes.

Q    Ms. Zech, in November of 2002, where were you living at that time?

A    68 Beasleyville Road, Fleming, Georgia.

Q    Let me direct your attention to November 30th of 2002. On that morning, did you go to the Fleming Post Office to your recollection?

A    Yes.

Q    Do you remember specifically what time you went to the Fleming Post Office that morning?

A    Not specifically, no.  It was in the morning.

Q    Where you were headed that morning when you went to the Post Office?

A    To the Flying Frog.

Q    And what is the Flying Frog?

A    It is a child amusement facility.

Q    Why were you going to the Flying Frog?

A    We were going to take my daughter.

Q    You said we were going to take your daughter.

A    Yes.

Q    When you say we, who are you referring to?

A    My boyfriend and I.

Q    What's your boyfriend's name?

A     Steven Nichols.

Q.    Was Mr. Nichols with you on that day when you went to the Post Office in Fleming?

A.    Yes.

Q.    How did you and Mr. Nichols go to the Post Office that morning?

A.    Well, he drove.

Q.    What was he driving?

A.    My car.

Q.    Where did you come from at the time you went to the Post Office?

A.    From my house.

Q.    And at that time that was in Fleming?

A.    Yes.

Q.    Ma'am, if I could, let me refer you to this map that's present in the courtroom.  Could you describe, please, how you traveled from your home to the post office on that particular morning?

A.     If you are coming from down here –- we went this way, and then up from Loop Road to the Post Office.

REPORTER:  She's going to have to speak up.

Q    Ma'am, if you could please speak up that would be helpful.

A.    From this direction to the Fleming Loop Road to the Post Office.

MR. DARDEN:  To perfect the record, on which side of the map is that on.  It would be on the left side -- the Fleming Loop Road on the left side of the map.

A.   The left side.

MR. FRENTZEN:  Was all of that on the camera.  Was it able to indicate where she had pointed?

VIDEOGRAPHER:  Yes, sir.

MR. FRENTZEN:  Great.  Yes.

Q.   Ms. Zech why were you going to the Post Office that particular morning?

A.   To check for Steven's unemployment check.

Q.   And that again is Stephen Nichols --

A.   Correct.

Q.   -- your boyfriend.  Do you recall where you parked when you arrived at Post office?  Could you describe it for us?

THE COURT:  Is that the actual volume?

MR. FRENTZEN:  Yes, sir.

MR. DARDEN:  I am having a difficult time hearing it.

THE COURT:  Yes.

MR. DARDEN:  I am wondering if the jurors on the back row can here this.

THE COURT:  Are you able to hear this, ladies and gentlemen?

JUROR:  Yes.

THE COURT:  They say they can.

MR. DARDEN:  Thank you, Your Honor.

THE COURT:  But there's some deficiency in this. You need to have more volume.

A    Kind of catercornered on the left-hand side of the Post Office.

Q.    Is that the left-hand side of the Post Office as you're facing the front of the Post Office?

A.    Correct.

Q.    What did you do when you arrived at the Post Office?

A.    I got out and went inside.  They were holding our mail for us.

Q.    When you say they were holding your mail for you --

A.    Uh-uh.

Q.    Who?

A.    The postal lady.  They would hold our mail for us because we didn't have a mailbox set up yet.

Q.    So, generally that was how you would get your mail?

A.    Yes.

Q.    Was there anyone in there that morning that you saw when you were in --

A.    No.

Q.    -- to get your mail?  What did you see inside the Post Office?

A.    Nobody or nothing.  Just empty.

Q.   What did you do when you saw that it was empty?

A.   Well, I just waited a couple of minutes.  I thought maybe she was in the back room, or --

Q.   When you say she, you mean who?

A.   The postal lady.

Q.   Did you the postal lady come out?

A.   No.

Q.   What did you do after this couple of minutes of waiting?

A.   I started to look around in the back area to see if maybe she was out of the corner of my vision in the sides.

Q.   Can you can describe for us, as you go into the Post Office, how would you look into the back area?

A.   The counter -- say this was the counter, and then straight ahead was a door.  And then this way, you would have to lean a little bit to see around the corner on both sides.

Q.   Okay.  You referred to a door.  Do you mean a door, an actual whole door, or do you mean sort of a smaller --

A.   A whole door.

Q    Okay.

A    Like it was an entranceway into a back room.

Q.   But what you are actually looking through to see into that back area?

A.   I guess just a counter area.

Q.    Okay.  Were you able to see anybody back there just by standing and looking through the window?

A.    No.

Q.    Did you do anything to right and get a better view back there?

A.    I put my hands on the counter and leaned over.

Q.    Ma'am, if you could raise your hands up so they could get caught on the camera and shows us how you placed your hands on the counter?

A.    Just completely flat to get a good brace to look over to see if I could see any further, the sides.

Q.    What did you see when you leaned over the counter?

A.    At first it look like just a balled—up jacket on the floor that had was just like fallen out of a chair.

Q.    Ms. Zech, do you normally wear glasses?

A.    Yes.

Q.    Were you wearing your glasses on that day?

A.    No.

Q.    Did it take you a second then to realize what you were looking at?

A.    Yes.

Q.    Did you eventually notice that was not just a jacket on the floor?

A.    Yes.  When I had looked over even farther, that is whenever I saw the pool of blood around here.

Q.    When you say her, who are referring to?

A.    The postal lady.

Q.    Ms. Zech, could you describe for us what you saw?

A.    A lady on the ground.  It looked like she was in the fetal position, just balled up.

Q.    Was she in front or anything?

A.    The desk.

Q    There is a desk back there?

A    There is a desk on the left-hand side.

Q.    Is that on the left-hand side as you are looking through?

A.    Yes.

Q.    Which way were her feet positioned?

A.    To the left.

Q.    Also to the left?

A.    Uh-uh.

Q.    Could you see her face at all?

A.    The side of it.

Q.    Which side?

A.    I guess it would be her right side.

Q.    Was her fact -- was she facing towards you or away from you?

A.    Towards me.

Q.    Her face was towards you.

A.    Yes, sir.

Q. How was her back?

A. Up.

Q. You say she was in the fetal position. Was she -- was she sort of on her side or on her stomach?

A. Pretty much she was just balled down.

Q. Did you see whether or not the body was moving at all?

A. No.

Q. Did you hear her making any sounds at all?

A. No.

Q. What did you do after you saw this and realized the lady was just lying there?

A. I kind of stood there for a minute. And then ran outside to get my boyfriend.

Q. How did you get your boyfriend?

A. I started screaming.

Q. What did Mr. Nichols do?

A. He came running inside.

Q. He got out of the car?

A. Yes.

Q. What did he do when he came inside?

A. Went behind -- and then he went running back outside. And I'm still at the door. And we just went to go find help.

Q. How did you try to find help?

A. We tried to flag down a truck. And then I ran next

door to the trailer that's right beside the Post Office.

Q.   As you are facing the front of the Post Office, on which side is this trailer?

A.   On the right.

Q.   About how far away from the Post Office was it?

A    A couple of yards.

Q.   What did you do when you got to trailer?

A.   I started banging on the door until they answered.

Q.   When you say that, who was there?

A.   A man and a woman.

Q.   What did they do?

A.   Called 911.  I just kept saying that she's been shot. She's been shot.

Q.   At that time, did you believe the woman had been shot?

A.   Yes.

Q.   Why did you think that?

A.   Because there was a spot on her back.  She had on hunter green, I guess a sweater, and there was a spot on her back that was like rusted or brown color.

Q.   Did you think that was blood?

A.   Yes.

Q.   And you were yelling she had been shot, what did the people in the trailer do?

A.   Called 911.

Q.   Who was in the trailer?

A.    I'm guessing the gentleman that lived there, and another female.

Q.    Who called 911?

A.    The female.

Q.    Were you there while she called 911.

A.    Yes.

Q.    What was she telling the people on the 911 call?

A.    I couldn't tell you.

Q.    After the woman dialed 911, what did you do?

A.    I went back over the Post Office and say in my car 'til the police and First Response and everybody else showed up.

Q.    Do you know -- do you have any recollection of how long that took?

A.    I'm guessing five minutes tops.

Q.    During the time that you were in the car, what were -- what was Mr. Nichols and the neighbor doing?

A.    They were trying to figure out a way to get to her.

Q.    Get to who?

A.    The postal lady.

Q.    Ms. Zech, in April of 2001, did you plead guilty to a sale of ecstasy?

A.    Correct.

Q.    As a result of that, what was your sentence?

A.    Five years probation.

Q.    Was that part of the First Offender Program?

A.    Right.

Q.    And are you completing that probation?

A.    Correct.

Q.    Do you have some chance for early completion of that program?

A.    May 1st of 2004.

Q.    What county was that in, Ma'am?

A.    Bryan County.

        MR. FRENTZEN:  I have no further questions.

**CROSS EXAMINATION**

BY MR. DARDEN::

Q.    Ms. Zech, you indicated that you went to the Post Office with your boyfriend, Stephen Nichols.  Is that correct?

A.    Correct.

Q.    Now, you went into the post office and you didn't see anyone?

A.    Correct.

Q.    Did you hear anything?

A.    No, sir.

Q.    You couldn't hear any noises coming from the rear of the Post office?

A.    No.

Q.    Let me ask you this.  You indicated that you wear glasses.  Do you also wear contacts lenses?

A.    No, I do not.

Q.    So, you don't have your glasses on today; do you?

A.    Correct.

Q.    You can see me okay, I assume?

A.    You're a little fuzzy, but I can see you.

Q.    A lot of people say that.  Let me -- you indicated that you placed your hands over the counter, and you looked over the counter.  Is that correct?

A    Correct.

Q    Did you see anything on that counter?

A    No.

Q    Did you see any blood on the counter?

A    No.

Q    Did you see any footprints on the counter?

A    No.

Q    Okay.  And that opening you were looking in is the only opening in that wall.  That's where you buy stamps, and money orders, and things like that.  Is that correct?

A.    Correct.

Q.    And that's only way you can look into the rear of the Post Office.  And that opening is about 3 feet by 3 feet.  Isn't that pretty close?  I'm not sure of the measurements.  I've seen it.  But that is pretty close; is it not?

A.    Guessing.

Q.    It is one of those things where they open up and you

look --

A.    It's a counter window.

Q.    Okay.  And again you didn't see anything, any type of substances, any type of liquid, footprints or anything on that counter top; did you?

A.    Not on the counter top.

Q.    Okay.  However, you indicated in your testimony that you could clearly see a pool of blood around the body.  Is that correct?

A.    That was in the floor.  Correct.

Q.    Okay.  And that body was located a greater distance away from you that counter top would have been?

A.    Correct.

Q.    In fact, you were leaning right over that counter top.  And I believe that, according to your statement that you gave, that you had actually get on your tiptoes to see in the rear.  Is that correct?

A.    Correct.

Q.    So, your face would have been very close to that counter top?

A.    Yes.

Q.    Is that correct?  Okay.  Now, you went outside and you got your boyfriend?

A.    Uh-uh.

Q.    To your knowledge, did he ever go to rear of the Post

Office and in an attempt to assist the lady?

A.    I didn't see him.  I didn't see him.

Q.    Okay.  You indicated in your statement earlier that you gave to the Postal Inspector that at one time he was a First Responder.  Is that correct?

A.    Correct.

Q.    So he would have experience in that?

A.    Yes.

Q.    Okay.  Again let me ask you this:  You say you didn't see him go back there.  When you went to the house next door to get someone to call 911, did he go with you?

A.    No, he did not.

Q.    Did he remain in the Post Office?

A.    As far as I know, yes.

Q.    Who was he in the Post Office with?

A.    He was by himself.

Q.    He went in there by himself.

A.    No.

Q.    When you went back, did he come out of the Post Office?

A.    Yes.

Q.    Did you see any blood on him anywhere?

A.    I don't recall.

Q.    Did you see any blood on his hands?

A.    No.

Q.    Okay.  Was it your -- let me just -- well, and you say

you don't know whether he went back there or not?

A.    He told me afterwards he did.

Q.    Okay.  He told you he actually went back?

A.    Yes.

Q.    Okay.  I assume then what he did was he climbed through that window?

A.    Yes.

Q.    Because he didn't have a key to the door, and the door was locked.  Is that correct?

A.    Correct.

Q.    So, it is your understanding that he did go back there to assist her.  Is that correct?

A.    That he told me, yes.

Q.    Okay.  Do you know whether he attempted to make any phone calls from the rear of the building?

A.    No.

Q.    You don't know that?  All you know is he went back there in the attempt to assist her?

A.    Right.

Q.    Did he offer an opinion as to whether she was already deceased?

A.    I don't know.

Q.    Let me ask you this.  Did you see any evidence that would indicate to you that she was alive when you saw her?

A.    No.

Q.   Okay.  Did you think she was already deceased?

A.   I never found anybody --

Q.   Yes, Ma'am.

A.   -- in that condition before.  So, I wouldn't know.  She wasn't moving, and she wasn't talking, so --

Q.   Yes, Ma'am.  I would assume you were very upset.  I mean, this would be an upsetting situation?

A.   Oh, yeah.

Q.   Okay.  Now, you stated that you went in on Fleming Loop Road, the one on the left side.  Is that correct?

A.   Correct.

Q.   Did you also -- when you left there -- you remained there, I believe, until someone arrived.  Is that correct?

A.   We remained there for quite a while.

Q.   Okay.  A lot of people arrived?

A.   Yes.

Q.   A lot of people in and out of the Post Office?

A.   Yes, sir.

Q.   Did you of go back into the Post Office?

A.   No, sir.

Q.   So, you don't know what was going on inside at that time.  Is that correct?

A.   Yes, sir.

Q.   This child you were taking to the Flying Frog, did he or she remain in the car while all of this was going on?

A.    She wasn't with us yet.

Q.    Okay.  Now when you left, did you go back out the same way you went in?

A.    No.

Q.    Okay.  Did you go out Fleming Loop road around the right side of the map?

A.    Correct.

Q.    So, you made the complete loop there.  You went in on the left and came out on the right?

A.    Yes.

Q.    When you drove in that morning -- and you've indicated you don't know what time it was.  Is that correct?

A.    Correct.

Q.    Can you even estimate what time?

A.    I'm guessing around 10 or so.

Q.    Okay.  But you are not sure about that?

A.    Not --

Q.    It could have been at late as 10:30?

A.    It could have been.

Q.    10:45?

A    I'm not sure.

Q    You really don't know; do you?

A.    Correct.

Q.    When you went in and you went to the Post Office, did you see anyone on the Fleming Loop Load?

A.    I wasn't paying attention.

Q.    Did you see anybody -- did you meet any cars; or do you recall?

A.    Not at that I recall.

Q.    Did you see anyone on a bicycle that you can recall?

A.    No.

Q.    You don't recall seeing anyone.  Is that correct?

A.    Correct.

Q.    And I would assume during this interview, after you remained there and the inspectors came and the police came, they asked you if you had seen anyone, and you said no.  Is that correct?

A.    Correct.

Q.    Okay.  When you left the area and you went back out on Leroy Coffer Highway, did you see anyone?

A.    I couldn't tell you.  I wasn't driving, and I was in --

Q.    You were upset at that point?

A.    -- shock.

Q.    Of course, you weren't paying much attention to anything at that point, I would assume.  Is that correct?

A.    Correct.

Q.    Okay.  Do you know the defendant in this case?  Do you know this young man?

A.    No, I don't.

Q.    Okay.  You indicated, I believe, you live in Fleming.

Is that correct?

A.    Temporarily.  I lived there almost a year.  But we had just moved there, and I didn't really know anybody.

Q.    Okay.  Did you ever see -- you ever seen him around to your knowledge?

A.    No.

Q.    Okay.

MR. DARDEN:  Do you have anything?

MR. BELL:  No.

MR. DARDEN:  That's all the questions we have.

THE COURT:  Is that the completion of the deposition, Mr. Frentzen?

MR. FRENTZEN:  Yes, Your Honor.

*[Deposition concluded.]*

THE COURT:  Call the next witness.  And if you play any more, make sure they have volume.  I think that was woefully inadequate volume on that.

MR. FRENTZEN:  I apologize, Your Honor.

THE COURT:  That's all right.

MR. FRENTZEN:  Your Honor, the government calls Stephen Nichols.

CLERK:  For the record, sir, please state your name and occupation.

WITNESS:  Stephen MacArthur Nichols, electrician.

**STEPHEN NICHOLS,** after having been duly sworn, and

calls as a witness by the government, testifies as follows.

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q    Mr. Nichols, where do you live?

A    Live Oak Drive, Richmond Hill.

Q    How long have you been living there?

A    Going on four and a half months.

Q    Back in November of 2002, where do you live at that time?

A    Fleming.

Q    Where in Fleming?

A    Sixty-eight Beasley Bill Road, lot 28.

Q    Mr. Nichols, let me direct your attention to November 30th of 2002.  Did you go to the Post Office on that morning?

A    Yes, sir.

Q    Do you recall around what time you went to the Post Office?

A    About 10:45.

Q    What were you going to the Post Office for?

A    To check our mail.

Q    How did you get to the Post Office?

A    Drove up Fleming Loop Road.

Q    And what were you driving?

A    A '96 Hyundai Elantra.

Q    Were you with anyone when you went to the Post Office?

A    Yes, sir.

Q    Who were you with?

A    My girlfriend.

Q    What is her name?

A    Jennifer Zech.

Q    Do you recall where you parked when you got to the Post Office?

A    Facing the fire department on the left-hand side of the Post Office.

Q    Is that the left-hand side as you face the front of the Post Office?

A    Yes, sir.

Q    What happened when you got to the Post Office?

A    Jennifer went inside to check the mail while I stayed in the car.

Q    Do you recall how long you waited outside in the car?

A    Say five to eight minutes.

Q    Did Ms. Zech eventually come back outside the Post Office?

A    Yes, sir.

Q    What was she doing when she came back outside of the Post Office?

A    Screaming and hollering.

Q    Do you know what she was screaming and hollering about?

A    No, sir, not at the time.

Q    What did you do?

A    I jumped out to see what was bothering her.

Q    Where you did you go?

A    Toward to the Post Office.

Q    Where did you go from there?

A    Inside the Post Office.

Q    What did you see inside the Post Office?

A    I guess the postal lady laying behind the counter.

Q    What did you see about the lady lying behind the counter?

A    She was injured.

Q    How did you know she was injured?

A    There were two half-dollar size blood spots on her back.

Q    Where was her body?

A    I guess just laying right in front of her desk.

Q    How was she laying?

A    She was laying in a semi fetal position.  Her back was towards me.  She was facing the wall.  She was laying kind of like in her mid to side area.  And her head was kind of pulled down to her chin a little bit.

Q    What did you do when you saw her?

A    I tried to call her, get her attention, to see if she needed help.

Q    Did she respond?

A    No, sir.

Q    What did you do after she didn't respond?

A    I ran outside and told Jennifer to find some help.  And then I seen a truck coming across the railroad tracks.  I tried to wave him down.

Q    Did the truck stop?

A    No, sir.

Q    What did you do after that?

A    I ran back inside, tried to get her -- just get her attention, hollering through the window.  I tried the door to see if it was unlocked.  And then I went back outside and flagged a younger guy down.

Q    As you stand in the inside of the Post Office -- you said you tried the door?

A    Yes, sir.

Q    As you're standing inside the Post Office facing that counter, where is the door?

A    To your left-hand side.

Q    When you went back outside, did you get any help?

A    Yes, sir.

Q    Who did you get help from?

A    I don't recall his name, but he's an younger guy.  He stopped when I flagged him down.

Q    What did he do?

A    He asked what was wrong.  And I told him that we needed the EMT or First Respond, or the ambulance or anybody.  And he proceeded to call his mother to try to get her to call 911, because for some reason, his phone wouldn't dial 911 from it.  He had a cellular phone.

Q    Were you trying to get into the back part, that work part of that Post Office during this time?  You said you had tried to door?

A    Yes, sir.  The front door.

Q    Did you decide to try a different way to get back in that back part?

A    At first, I thought about trying to make get a screwdriver and jimmy the door open.  But instead, I just went through window.

Q    How did you go through the window?

A    Just stuck my head in first, reached over and grabbed the counter, and tried to pull myself in toward the window, and then swung my feet -- once I got far enough in, I swung my feet on around.

Q    What did you do when you got into that back part of the Post Office?

A    I tried to get her attention again.

Q    Did she respond?

A    No, sir.

Q    Did you see her moving at all?

A   Not to my knowledge.

Q   Did you hear her make any sounds?

A   No, sir.

Q   What did you do then?

A   I opened the door where once help got there that could help her, they could get in.

Q   What did you do after you opened that door?

A   Walked out -- went outside.

Q   Were you interviewed that day after people arrived?

A   Yes, sir.

Q   Did you give a statement?

A   Yes, sir.

Q   What kind of shoes were you wearing that day?  Do you know what brand?

A   Adidas.

Q   Mr. Nichols, in May of 1999, were you convicted of a burglary?

A   Yes, sir.

Q   Where was that?

A   In Decatur County, Georgia.

MR. FRENTZEN:  Nothing further, Your Honor.

THE COURT:  You may examine.

**CROSS-EXAMINATION**

BY MR. DARDEN:

Q   Mr. Nichols, you indicated it was about 10:45 in the

morning.  Is that correct?

A    Yes, somewhere around there.

Q    You are pretty sure of that; aren't you?

A    Well --

Q    Let ask you this.  Do you recall making a statement to investigators where you indicated that the clock in the car indicated 11:05, and you told him that your girlfriend is always 20 minutes ahead.  Is that correct?

A    Yes.  So she will be at work on time.

Q    Okay.  So, you are pretty sure around the 10:45 time frame.  Is that correct?

A    Yes, sir.

Q    Let me ask you something.  As you came into the Post Office that morning, did you see anyone?

A    A gentleman standing across the road, across the railroad tracks.

Q    All right, sir.  Can you describe that gentleman?

A    He's -- from where I was standing, he was a elderly guy.  He was working in the garden.

Q    All right, sir.  That would have over on Tooney Miller Road, across from the railroad tracks?

A    Yes, sir, on the opposite side.

Q    Okay.  As you came in on Fleming Loop, did you see anyone on the Fleming Loop that you recall?

A    No, sir.  Not that I recall.

Q    Do you recall seeing anyone driving a car -- did you meet any cars that you can recall?

A    No, sir.

Q    Did you anyone on a bicycle?

A    No, sir.

Q    Before I forget, when you left that day, did you see anyone?

A    No, sir.

Q    Okay.  You indicated, I believe, that Ms. Zech remained inside the Post Office from five to eight minutes.  Is that correct?

A    Yes, sir.

Q    Okay.  What were you doing?  Just sitting in the car listening to music or something?

A    Yes, sir.

Q    Okay.  And she came out.  Now you went inside the Post Office, and you couldn't get the door opened.  When you walked inside this Post Office, this foyer area, it is a very small area; correct?

A    Yes, sir.

Q    It is a tiny post office?

A    Yes, sir.

Q    It is a little country post office.  So, you finally decide that what you would do is you would go through the window.  Is that correct?

A    Yes, sir.

Q    And there's only one window?

A    Yes, sir.

Q    How tall are you, Mr. Nichols?

A    I'd say about 6'2 and a half.

Q    All right, sir.  How much do you weigh?

A    175, 180, somewhere around there.

Q    Then you are about my size.  I would assume then you would have had some problems getting through window.  I mean, you just couldn't jump up on counter and go through.  You had to pull yourself through.  Is that correct?

A    Yeah.

Q    I mean, it is a rather small opening; is it not?

A    Yes, sir.  It's, I'd say, three and a half by a foot and a half or two feet, or something like that.

Q    All right, sir.  Three and a half feet high, and the about two feet wide?

A    Something.

Q    Let me ask you the this.  It is not the type of opening where you can get up in the opening and crouch down like this and sit in the opening; is it?

A    Oh, no, sir.  I couldn't.

Q    So, you would have to pull yourself through like you did?

A    Yes, sir.

Q    All right, sir.  Now, as I understood your testimony, you said when you noticed Ms. Sallie that she was facing away from you.  Is that correct?

A    Yes, sir.

Q    Toward the rear wall?

A    Yes, sir.

Q    Toward the rear of the Post Office?

A    Yes, sir.

Q    Okay.  Now, did you touch her?

A    No, sir.

Q    You never laid a hand on her?

A    No, sir.

Q    Did you -- you indicated that you didn't see any evidence of any life.  Is that correct?

A    Not to my knowledge.

Q    At one time were you a First Responder?

A    Yes, sir, back home.  Well EMT fire department.

Q    Okay.  How much experience did you have in that?

A    Three and a half years.

Q    All right.  Was it your impression when you saw her that she was already deceased?

A    To my knowledge.

Q    That's what you felt.  Is that correct?

A    Yes, sir.

Q    And I guess then you opened the door and came out.  Is

that correct?  This was a substantial amount of blood on the floor in the rear of the Post Office.  Is that a fair statement, to the best of your knowledge?

A    I couldn't say.  I didn't see any blood on the opposite side toward the wall.

Q    All right, sir.  You didn't see my blood on that counter you crawled through, either; did you?

A    I couldn't tell you.  I didn't notice.

Q    Well, let me ask you this.  You testified that you slid across that counter and you pulled yourself in.  Is that correct?

A    Yes, sir.  To the best of my knowledge, that is what I done.

Q    When you got home, did you notice any blood on your clothing?

A    No, sir.

Q    Did you notice any blood on your shoes?

A    I mean, I wasn't looking.

Q    Yes, sir.  But you didn't notice any blood on you?

A    No, sir.

Q    And certainly, if there had been some on there, you would probably have noticed it.  Is that a fair assumption?

A    If it would have been noticeable.

Q    Yes, sir.  Again, you didn't see anyone; did you?

A    No, sir.

Q    Did you just go behind the counter one time?

A    Yes, sir.

Q    About how many minutes do you think you were back there?

A    I wouldn't even say minutes.  Maybe, at the most a minute.

Q    All right, sir.  You just went back there, analyzed the situation, open the door and left?

A    Yes, sir, because --

Q    Did anyone else go back there that you saw before -- let me ask you this.  Before the authorities arrived, did anyone go back there?  You said you stopped a man in a pickup truck.  Is that correct?

A    Yes, sir.

Q    You don't remember him.  But did he go back there?

A    No, sir.  He stayed outside the whole time.

Q    Okay.  It is your testimony that you were the only person that went back there until the authorities arrived. Is that correct?

A    First Response, when they got there.

Q    First Response?

A    Yes, sir.

Q    All right.  And you didn't see anyone else go back there?

A    No, sir.

MR. DARDEN:  Okay.  That is all I have, Your Honor.

THE COURT:  The witness is excuse, Mr. Frentzen?

MR. FRENTZEN:  Judge, just one question.

THE COURT:  All right.

**REDIRECT EXAMINATION**

BY MR. FRENTZEN:

Q    Mr. Nichols, is there a reason why you tried to get out of the back of that Post Office quickly?

A    I assumed that the dots on her back were from a gunshot when I first arrived.  And the back door to the office leading to back room was shut.  And I didn't know if anybody was still in there or not.

MR. FRENTZEN:  Nothing further, Your Honor.

THE COURT:  The witness is excused.

[NOTE:  Witness left the stand.]

MR. NEWMAN:  Call Linda Ashcraft, please.

CLERK:  For the record, Ma'am, please state your name and your occupation.

WITNESS:  My name is Linda Ashcraft.  I work for Liberty County Board of Education.  I drive a school bus.

**LINDA ASHCRAFT**, after having been duly sworn, and called as a witness by the government, testifies as.

**DIRECT EXAMINATION**

BY MR. NEWMAN:

Q    Ms. Ashcraft, what is a First Responder?

A    We are a team that arrives before the EMS arrives.

Q    How does one become a First Responder?

A    We have to take a course.

Q    Who gives that course?

A    EMS.

Q    In Liberty County?

A    Sometimes; though, you can go to Forsyth to the training center and take it.

Q    What did you do, Ma'am?

A    I took it in Liberty County.

Q    Are you given any equipment to assist you in your work as a First Responder?

A    We have to purchase it all.

Q    What is the equipment that is given to you or that you purchase?

A    Anything medical stuff that a normal EMT would use.

Q    How do you generally get word that your services as a First Responder are needed?

A    We are paged through the 911 system.

Q    Are you given a pager for that specific purpose?

A    Our fire department owns those, but each member has one.

Q    Are you also a volunteer firefighter?

A    Yes, sir.  I'm a certified firefighter.

Q    How long have you been a volunteer firefighter?

A    Twelve years.

Q    In your area there of Liberty County, how many volunteer firefighters are there, and how many First Responders are there?

A    In our department, we have fourteen firefighters, and five First Responders.

Q    Ma'am, where do you live?

A    723 Fleming Loop.

Q    Okay.  Where would that be in relation to the Post Office in Fleming?

A    Probably about a couple of hundred yards down the street.

Q    All right.  Where is the fire station that you work out of?

A    Right next to the Post Office.

Q    All right.  As you are looking at the front of the Post Office from the Fleming Loop Road, would the fire station be on the left hand?

A    Yes, sir.

Q    And to the right of the Post Office, is there a trailer, mobile home?

A    Yes, it is.

Q    Where would your home be?

A    Right beyond from that.

Q    On the same side as the mobile home trailer?

A    Right.  Right.

Q    And how far would you say it is again from the Post Office to your home, Ma'am?

A    About as far from here to Broughton Street out there.

Q    All right.  And if you would direct your attention back to Saturday, November 30, in the morning hours, do you recall where you were?

A    Yes.  I was at my home in my kitchen.

Q    And was there something you were doing that you recall?

A    Yeah, I was cooking a pot of chilli.

Q    All right.  And did you receive some type of call for your assistance?

A    A gentleman come up.  And my husband was outside, which he's also a First Responder and firefighter, came up and told him that somebody needed help at the Post Office, for us to come there.  So, we grabbed our radios, and I grabbed my key.  And we went out and got in my Blazer and rushed down there, because that is where we keep all of our equipment.

Q    To your knowledge, did either you or your husband make any call for assistance?

A    My husband called on the radio to 911.

Q    Okay.  When he would be calling for assistance, where

would he be calling, Ma'am?

A     911 central office in Hinesville.

Q     That would be the county seat of Liberty County?

A     Yes, sir.

Q     By way, this Post Office, Fleming Post Office, that, of course, is in Liberty County?

A     Right.

MR. NEWMAN:  Excuse me, Your Honor.

Q     So, when you and husband were headed down in your Blazer toward the Post Office, tell the jury what you encountered when you got there?

A     Well, we pulled up to the Post Office.  I jumped out, and was putting on my gloves.  And my husband jumped out and ran around to the back of the Blazer to get our equipment.  And he told me to go on in.

There was a car sitting there.  And I thought that was who we were going to.  There was a lady sitting there with her hands -- her head down in her hands, and her feet on the ground.  And I thought that was who we were going to.  And they said, no, it is the lady in the Post Office.

So, at time I turned and went do the door of the Post Office.  And I stepped in the first door, and I didn't see anybody.  So the door was opened to the back office.  I stepped to the back door, and that's when I seen Sallie laying in the floor.

Q    Now, the person that you saw laying on the floor, you referred to as Sallie.  Did you know her?

A    Yes, I did.

Q    How did you know her?

A    I grew up with her.  I lived within a quarter of a mile of her, within a mile of her all my life just about.

Q    Was she commonly referred to by many who knew her as either Sallie or Ms. Sallie?

A    Yeah.

Q    When you saw her, what did you do?

A    The first thing I did is went over.  When I seen her, she was laying facedown.  And about from her hips down, it was kind of turned sideways.  And her body was laying facedown, and which there was a lot of blood.  So I reached over and felt for a pulse.  And I didn't get anything.

So, I called back to my husband to get in there a hurry.  And I noticed two little holes in the back of her sweater.  She had on a sweater, a green sweater blouse.  And I picked it up, and that's when I seen the knife wounds. So, I put them back down, felt for her pulse again.  By that time, my husband walked in the door.  I told him to give me my stethoscope.  So, he gave me that.  So, I listened again for another heart beat.  And we still couldn't get one.

But her body was still warm, so I told him to listen.  So, he listened, and he couldn't hear anything.

So, we decided at that time to start CPR.  So, we knew that we had a situation there.  So, we carefully rolled her body over so we could start CPR on her.

Q    How did you and your husband go about trying to accomplish that, Ma'am?

A    Well, we both took her body and just kind of rolled it over right.  We tried to leave it in the same spot that was in.

Q    And then with the CPR, did you and your husband perform specific roles in the giving or administering of CPR?

A    Yes.  Well, I can't remember which took her body, and which took her head.  But we both, you know, rolled her over.  And then I started -- because I was already done there with her and I started.  But it was a phone laying there, where she had evidently tried to call for help.  And I had picked the phone up where we had rolled the body over and sat it up on her desk.

And we went back and I started doing compressions. And he was going to get the ambu bag.

Q    What is that, Ma'am?

A    It is a mask that you put over the face, instead of having to do mouth-to-mouth, it is an ambu bag which has air in it.

Q    And did you do that?

A    Yes.  And I was doing compressions.  So we worked on

her, and continued to work on her.  And at that time, Bart Eaton come in.

Q    Who was that, Ma'am?

A    He's another one of our firefighters and a First Responder.  And I had asked him -- the blood was coming out of her chest every time we done a compression where the knife wound was in her chest, it would come up out.  So, my husband said "let's put something over that to keep it from coming out."

So, my bag was sitting there.  And Bart didn't know where anything was at.  So, I said Bart, you trade places with me.  So I could get stuff, you know, I could do it a lot quicker than he could.

So, at that time, we switched places.  But I had evidently left my pager in my vehicle.  And I couldn't hear anything from 911, whether EMS was coming or not.  So, I had reached back up at that time and picked the phone back up. And I was going to call them.  And I noticed that it was still on.  So, I laid it down beside me for some reason at that point.  I had laid it down beside me.  So, at that time, I got up and I started getting bandages to put over the knife wounds in her chest and all so that the blood wouldn't come up out, so, she wouldn't lose any more blood.

Q    From your recollection, did your husband and you cause any improvement, so to speak --

A    No, sir.

Q    -- in the condition of Ms. Sallie?

A    There was nothing we could do.

Q    Now, you said that Bart Eaton is a First Responder.  Is that correct?

A    Yes, sir.

Q    At some point did an EMS person arrive with some deputy sheriffs?

A    Yes.  It was shortly after that.  And we hooked the monitor up to her.  And we couldn't get -- we couldn't get any signal off of that.  So they called her.

Q    And was it an EMS technician who kind of was the first official person to say that Ms. Sallie was dead?

A    Yes.  We can't do that.  They have to.

Q    What did the EMS person say there to all those present?

A    Said there was nothing.  For us to go ahead and stop, there was nothing for us to do, that we could do for Sallie.  She was dead.

Q    That she was dead?

A    She was dead.

MR. NEWMAN:  Your Honor, would the Court note that Fleming, Georgia, the Fleming Post Office is located in Liberty County, which is in the Southern District of Georgia?

THE COURT:  The Court will so note.

Ladies and gentlemen, I take judicial notice and instruct you that Fleming, Georgia is in Liberty County, and that is within the Southern District of Georgia, and in the Savannah Judicial Division of the Southern District of Georgia.

MR. NEWMAN:  The witness is with you.

**CROSS-EXAMINATION**

BY MR. BELL:

Q    Ms. Ashcraft, good afternoon.

A    Good afternoon.

Q    My name is William Bell.  You and I have spoken before. Let me show you this map just to make sure I'm straight on exactly where your house is and so that the jury knows.

This is an aerial photograph of the area.  And this is the Post Office, this dot up here.

A    Uh-uh.

Q    Do you live this way?

A    No.  I live back the other way.

Q    You live back here --

A    Right before you get to the curve.

Q    Right here.

A    No.  Well, right before you get into the curve there.

Q    Okay.  Right in here?

A    Right in here, yeah.

Q    All right.  So, you are right there almost?

A    Yeah.

Q    And you were in your kitchen.  And you are cooking chilli.

A    Right.

Q    All right.  And you got the notice.  And you ran over there as soon as you could?

A    That's correct.

Q    And your husband and you went over there about the same time?

A    We went together in my vehicle.

Q    Okay.  When you got there, you found that there was a door, this door right here was opened; wasn't it?

A    Yes, it was.

Q    Okay.  So, when you and your husband entered the Post Office, you guys entered on through there; true?

A    Yes, sir.  I went in first, and the door was opened. So, I walked to the second door.  And there was nobody in there but Sallie.  And she was laying on the floor right in front of the desk there, between the chair and the desk. Right.  And the other door was closed.

Q    This back door?

A    That was closed.

Q    Now, you said that Ms. Sallie was laying facedown.  I want to make sure I understand exactly what you mean by that.  Was her face facing the back wall?

A    No.  It was kind of --

Q    Was she --

A    Actually, it was kind of pointed towards --

Q    Towards the window there?

A    The window there.  The window for -- where they give you mail at.

Q    All right.  I have should have left this up there.  Her face was actually facing this way?

A    Well, kind of catercornered there.

Q    Okay.

A    And she had one arm kind of out stretched.

Q    All right.  Sort of facing out towards this way?

A    Uh-uh.

Q    All right.  So you could clearly see the right side of her face?

A    Well, it was facedown and she had her glasses on.

Q    Okay.  All right.  Now, when you and your husband got there, there was a lot of blood on the floor; wasn't there?

A    Yes, it was.

Q    Okay.  In fact, this isn't a Post Office with a rug or anything.  It is a cement floor?

A    Yes, I believe it was.

Q    Okay.  And there was quite a bit of blood around the body; true?

A    Right.

Q    And then the two of you tried to administer CPR?

A    Right.

Q    All right.  Now, when you came out of your house on Fleming Loop Road, you went over there on foot; didn't you?

A    No.

Q    Or did you --

A    We went in my vehicle.

Q    Your station wagon?

A    A Blazer.

Q    Okay.

A    Because all of my equipment is in the back of it.

Q    So, y'all went over there.  When you pulled out on Fleming Loop Road, did you see anybody?

A    No, I didn't.  Well, I wasn't -- we didn't know what we had.  So, we didn't know, you know, to look for anybody.

Q    But you don't recall seeing anybody on the road?

A    No, I don't remember seeing anyone, other than the couple that was there when we arrived at the Post Office.

Q    You didn't see any vehicles, anybody on the bicycle?

A    I didn't, no.  I didn't pay attention, you know, because I wasn't alerted to anything.

Q    All right.  And you're sure you didn't see Meier Jason Brown out there that morning?

A    I didn't see anybody.  I seen the couple that was there when we -- was all I can remember seeing.  There might be

other vehicles we passed.  I don't know.

Q    Now, I take it that the phone was in her hand; correct?

A    No.  It was not in her hand.  It was laying beside her. One hand was up under her and the other hand was out stretched out like this.

Q    Okay.  So, it was right --

A    But the phone was laying right here beside her.  And it was still on.

Q    All right.  Did you surmise from that that she tried to make a phone all?

A    I assumed she tried to call.  That's with reason I didn't turn it off or anything.  I just left it like it was.

Q    All right.  Let me --

A    After I picked it up the second time.

Q    That lady there is typing everything we say.  So, let me finish this question.  I know you answered exactly what I was asking.

A    Okay.

Q    But you surmised from what you saw that after the attack, Ms. Sallie had got the phone and tried to call for help?

A    Right.

        MR. BELL:  All right.  That's all I have.

        THE COURT:  May we excuse the witness?

        MR. NEWMAN:  Yes, Your Honor.

MR. BELL:  Yes, sir.

THE COURT:  Ma'am, you are excused.

[NOTE:  Witness left the stand.]

THE COURT:  Marshal, we'll take the 15-minute recess.

MARSHAL:  All rise.

[NOTE:  Brief Recess.]

THE COURT:  Are we ready to proceed, gentlemen.

MR. NEWMAN:  Yes, Your Honor.

MR. BELL:  Yes, sir.

THE COURT:  I will tell you this, gentlemen, so that you may schedule your witnesses.  I do not anticipate going much beyond 5:30.  My anticipation is we will recess before 6:00 o'clock.

You may call your next witness.

Marshal, bring in the jury.

MARSHAL:  All rise.

*[Jury in box*.]

MR. FRENTZEN:  Your Honor, the government calls Frank Kania.

CLERK:  For the record, please states your name and occupation.

WITNESS:  Frank Kania, I'm a mover for Two Men and a Truck.

COURT REPORTER:  Spell your last name.

WITNESS:  K-a-n-i-a.

**FRANK KANIA**, after having been duly sworn, and called as a witness by the government, testifies as follows:

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q    Mr. Kania, if you could speak up and into that microphone, that would be helpful.

Where do you currently live?

A    78 Sleepy Hollow Drive, Fleming, Georgia.

Q    How long have you lived there?

A    About two years.

Q    Are you originally from Fleming?

A    No.

Q    Where are you from?

A    Savannah.

Q    How long have you lived in Fleming?

A    Total, about three and a half years.

Q    Let me direct your attention to November 30th, 2002. Did you go to the Fleming Post Office on that morning?

A    Yes, sir.

Q    Do you recall around what time you went to the Post Office?

A    About 10:25, 10:30.

Q    How do you recall what time it was on that morning?

A    From my watch.  I just happened to check my watch.

Q    How did you get to the Post Office in Fleming?

A    I drove my truck.

Q    When you got to the Post Office, where did you park?

A    Just to the -- if you are facing the Post Office, just to the left of the handicap parking.

Q    Which way were you facing?

A    I was facing towards, kind of facing towards the road to the opposite direction.

Q    Let me show you what has been marked as Government's Exhibit 2.  On the front of the Post Office there, can you describe for the jury where your truck was, and were you were?

A    Yes.  I was --

Q    Where you were facing?

A    In the bottom left-hand corner of the picture, I was kind of facing towards the road, because I had come and did a u-turn, and come back around, and I was like on the other side of the handicap parking there.

Q    So as you are facing on the left-hand side --

A    Well, the front of the truck wasn't facing it.  The driver's side door was kind of facing it.

Q    What did you do when you got to the Post Office?

A    I got out, went in and, ask if all of the mail was out. She said, yes.  And I grabbed my mail, and went back to the truck and looked through it.

Q    When you say she, who are you referring to?

A    Ms. Sallie.

Q    Is that what you knew her by, Ms. Sallie?

A    Yes.

Q    Who was Ms. Sallie?

A    The lady at the Post Office, that worked at the Post Office.

Q    Did you have any conversation with her that morning?

A    Just besides asking her if the mail, if all the mail was out, and thank you, no, sir.

Q    Did you have any mail that morning?

A    Yes, sir.

Q    After you got that mail, where did you go?

A    Back do my truck, and thumbed through it.

Q    Thumbed through what?

A    My mail.

Q    How long do you think you sat in your truck in front of the Post Office?

A    I'd say about a minute and a half to two minutes, opening it up and reading it and all.

Q    As you were sitting in your truck, did you notice or see anyone else approaching the Post Office?

A    I seen someone on a bicycle across the railroad tracks from where I was sitting.

Q    In which direction would that have been in relation to

Case 4:03-cr-00001-JRH    Document 366    Filed 09/24/08    Page 282 of 333    630

you sitting in your truck?

A    To the right of me.

Q    What can you tell us about the person that you saw?

A    That they --

Q    Can you describe them?

A    I know it was a black fellow.  He was riding a bicycle, and he had a hooded sweatshirt on.

Q    In which direction was he headed?

A    Toward the Post Office, coming off of Mount Olivette onto Fleming Loop.

Q    Where was he when you first saw him in relationship to the railroad tracks?

A    On Mount Olivette.

Q    Were you able to see front of this person?

A    Vaguely.  I seen very little of it.

Q    What did this person do as you were able to see him?

A    He was just riding his bicycle.

Q    Did you stay there in front of the Post Office as he approached?

A    No.  As he came over the train tracks, I had finished looking through my mail, put it on the dash, and I was starting to pull off.

Q    As you were pulling off, did you notice anything that the man you saw approaching, did you notice anything that he did?

A    He got off of his bicycle and walked into the Post Office, as I was leaving.  I was like in front of Ms. Ashcraft's house.  And I happened to look in my rear view mirror, and he was walking?

Q    Walking into where?

A    The Post Office.

Q    You were able to see that as you were driving away?

A    Yes, because I had -- like I say, I have a tendency of looking in my rear view mirror.

Q    After you saw this individual, did you later on have any reason to bring this to anyone's attention?

A    I figured it might have been something, because after I drove off, I really didn't think any more about it until I heard about what happened.

Q    How did you hear that something had happened at the Post Office that day?

A    A friend of mine had told me that something happened to Ms. Sallie.

Q    What did you do when you heard that?

A    I just like I couldn't believe it.

Q    Well, did you try to get in touch with anyone to tell them about what you had seen?

A    Not right not at that moment.  No, sir.

Q    Did you eventually?

A    Yes, sir.

Q    When was that?

A    When -- I think it was like a couple of days later, I had got a letter in the mailbox stating, you know, if anybody has any information.  And, you know, I figured I would give them that, what I had seen, that it might have been helpful.

Q    Who did you contact?

A    I can't recall the name.  But it was a postal inspector.

Q    Did the postal inspectors interview you?

A    Yes, sir.

Q    Directing your attention to the evening of December 5th 2002, did the postal inspectors interview on that evening?

A    I believe so.  Yes, sir.

Q    Did they show you anything when they interviewed you?

A    A lineup, a lineup of some people.

Q    If you could, Mr. Kania, take a look at the monitor there.  I would like to show you what has been marked as Government's Exhibit 3.  Can you make that out on the monitor, sir?

A    Yes, sir.

Q    Do you recognize that?

A    Yes, sir.

        MR. BELL:  Your Honor, can we approach for just one moment?

THE COURT:  Yes.

[NOTE:  Sidebar Conference.]

MR. BELL:  As to the lineup and all, I would ask -- I understand the Court's ruling on our previous objection.  But if you could give the jury a cautionary instruction with regard to mug shots?

THE COURT:  I will do it.  But I don't think I will interrupt now.  But it will be done.  You have not waived your objection.

MR. BELL:  All right, sir.

[NOTE:  Sidebar Conference Concluded.]

THE COURT:  You may proceed.

MR. FRENTZEN:  Thank you, Your Honor.

BY MR. FRENTZEN:

Q    At the time that you were shown Government's 3, were you asked to do anything with that document?

A    Yes, sir.

Q    What were you asked to do?

A    Sign my name below the name that I believed was the one I had seen.

Q    Did anyone pick any of the photos out for you, or --

A    No, sir.

Q    -- tell you anything about any of the photos in particular?

A    No, sir.  Only me.

Q    And you recognize Government's 3?

A    Yes, sir.

Q    What is it?

A    That is the lineup that I was shown.

        MR. FRENTZEN:  Your Honor, we would offer Government's 3 into evidence.

        THE COURT:  Subject to the previous ruling of the Court and objection to the exhibit, it is received.

        MR. FRENTZEN:  May I publish it to the jury, Your Honor?

        THE COURT:  You may do so.

Q    Mr. Kania, do you recognize your signature on Government's 3?

A    Yes, sir.

Q    And is it also dated?

A    Yes, sir.

Q    Why did you sign and dated that particular photograph.

A    Like I said, it resembled the man that I seen.

Q    The man that you saw where?

A    On the bicycle.

Q    When?

A    At the Post Office coming off of Mount Olivette.

        MR. FRENTZEN:  Nothing further, Your Honor.

                        **CROSS-EXAMINATION**

BY MR. BELL:

Q    Mr. Kania, you and I have met before.  My name is William Bell.  Do you recall meeting me before at your house on a Saturday morning some months back?

A    No, sir.

Q    Do you recall meeting this lady sitting at that bench right there?

A    No, sir.

Q    Let me ask you about what you do recall on November 30th, 2002.

A    Okay.

Q    You went to the Post Office to pick up your mail; correct?

A    Yes, sir.

Q    And my understanding is you really didn't have any particular place you had to be at a certain time that morning.  Is that true?

A    Yes, sir.  I was heading to Savannah to my cousin's house.

Q    Okay.  You were going to go to Savannah.  But you didn't have an appointment anywhere; did you?

A    No, sir.

Q    Okay.  And so, it was kind of a routine visit to the Post Office; true?

A    Yes, sir.

Q    All right.  Nothing out of the ordinary at the time, at least as far as you knew then; true?

A    True.

Q    All right.  So, you went into the Post Office, and you spoke with Ms. Sallie briefly.  And you went back out and were thumbing through your mail; correct?

A    Yes, sir.

Q    All right.  So, if I am straight on where you are -- this is an aerial photograph.  That is the Post Office right there.  And here is the Loop Road.  Where were you parked? Were you parked over here on this east side?

A    In front of the Post Office.  Yes, sir.

Q    Okay.  And you used to live in one of these places right here; correct?

A    Correct.

Q    And I think from what you told me previously on another occasion, you lived in front of -- you parked right in front of the place you used to live; true?

A    No.

Q    Okay.  Which one did you live in?

A    I lived in, not the first one, but the second one.

Q    The second one.  Okay.  So, you parked right over here?

A    Towards -- near the fire department.

Q    Okay.  And which way is your truck facing?

A    Back towards my old place.

MR. BELL:  Can he come down and show me, Judge.

THE COURT:  Yes.

Q     That's the Post Office right there.

A     Right.  I was parked right here on this side of the handicapped place.

Q     Okay.  So, you were parked between the Post Office and the fire department?

A     Right to -- as you are facing it, right to the left of the handicapped side.

Q     All right.  And which way is your truck facing?

A     Back towards this way.

Q     Back this way.  Okay.  I've got you.  You can resume your seat.

All right.  Now, we're straight on that.  And you went back out to your truck, and you are alone; true?

A     That's right.

Q     And still nothing outstanding had occurred that morning; correct?

A     That's right.

Q     And you are just kind of thumbing through your mail, and you noticed someone on a bicycle?

A     Yes, sir.

Q     Where was that person on the bicycle coming from?

A     Off of Mount Olivette Church Road.

Q     All right.  Now, Mount Olivette Church Road is this

road right here?

A    Right.

Q    All right.  And your truck was facing in the opposite direction?

A    Right.  Because what I had done, is I come up, did a u-turn, because I don't go down this other road.

Q    I understand.

A    I come up and did a u-turn.  And the way I was facing, I was kind of slanted.

Q    All right.

A    Because I could seat Mr. Pat's house from where I was sitting.

Q    All right.  But if you are facing this way; correct?  You're facing west?

A    Right.

Q    And the person that was coming on the bicycle was behind you?

A    Well, no.  Because the way I was facing, I could look out my passenger side window and see.

Q    You would to look back this way, to the east?

A    Yeah, east, I reckon.

Q    You are facing to the west; correct?

A    Yes, sir.

Q    All right.  And you described it -- I think you described it as the person was riding a mountain bike.  Is

that correct?

A    Yes.

Q    Would you tell the jurors what you mean by a mountain bike?

A    A mountain, I guess just a mountain bike.  It's hard to explain.

Q    What distinguishes a mountain bike?  Is it a little bit thicker framed and made for off-terrain kind of stuff?

A    Yeah.

Q    You have to say --

A    Yes, it is.

Q    Okay.  Is it sometimes shorter and it has got a bigger seat so that you can, you know, when you off terrain you don't fall or something?

A    No.  It's normally got like a regular -- not a regular bicycle seat, but a little larger bicycle seat.

Q    Well, it is different from the regular --

A    Right.  It is different from a regular BMX bike.

Q    All right.  It is different from a regular ten-speed type bike; correct?

A    Right.

Q    Okay.  And so you saw a person riding a mountain bike.  And the person was wearing a blue or black hooded sweatshirt?

A    A sweatshirt.  Right, it was a dark colored sweatshirt.

Q    And which would be the opposite of wearing a light colored piece of clothing; correct?

A    Right.

Q    All right.  And they were wearing dark jogging type pants, too; correct?

A    Correct.

Q    All right.  So, if I've got the picture right, the guy on a mountain bike, this off-terrain type bike, he's got what appears to be matching, I guess, dark jogging suit on; correct?

A    Yes.

Q    And this is the kind of jogging suit that has that hood thing to it; correct?

A    Correct.

Q    All right.  And the hood was this use; wasn't it?

A    Yes, it was like about that far down [gesturing].

Q    All right.  So you didn't get a good look at this person at all; did you?

A    No.  Like I said, I vaguely seen his face.

Q    So, a vague side of a face; true?

A    Yes.

Q    All right.  Now, you made contact with the authorities, and they came and talked to you; correct?

A    That's right.

Q    Where did that occur?

A    At my house.

Q    And that is the end of that cul de sac; true?

A    Where I live at, no.

Q    Yeah, you live on the end.

A    Yes.

Q    All right.  They came and talked to you, and they showed you those photographs; correct?

A    Correct.

Q    All right.  And the one that picked out, you didn't make any positive identification; did you?

A    I told them that's the closest resemblance to the man that I seen.

Q    Right.  And you told them that you are leaning towards that one because he was a slender fellow; right?

A    Right.  Yes.

Q    Okay.  So, you were leaning towards the one photograph that you put your initials below; correct?

A    Correct.

Q    This is not a positive identification; true?

A    True.  Like I said, it is the closest to person I seen.

Q    Right.  He had a slender face; correct?

A    Right.

Q    And that was what you were focusing on; true?

A    That's right.

Q    All right.  I mean, I'm not getting on you.  I'm just

trying to get it straight so that I understand.  Have you ever been shown a photograph of that jogging suit since that day?

A    No, I haven't.

Q    Okay.  And the person, I take it, that you saw rode all the way up the to Post Office; correct?

A    That's right.

Q    Did you see him get off the bicycle?

A    Yes.  When I was -- when I happened to look in my rear view mirror, he was walking in.

Q    All right.  And you didn't see the person wearing gloves or anything of that nature; did you?

A    No.

Q    Okay.  All right.  And how long after the person went in the Post Office did you drive off?

A    I was in the process of driving off when I seen that.

Q    All right.  Did you see any other cars before you drove off?  When you were thumbing through your mail, did you see any other vehicles going across the railroad tracks down Mount Olivette onto Loop Road or anything of that nature?

A    No, I didn't.

Q    Okay.  So, as far as you know you were the only vehicle on the road when you pulled out.

A    Yes, sir.

Q    All right.  And the distance between where you were and

the Post Office's front door is was not very far; was it?

A    No, not at all.

Q    Have you been shown any clothing to identify?

A    No, I haven't.

MR. BELL:  Okay.  That's all I have.  Thank you, Judge.

**REDIRECT EXAMINATION**

BY MR. FRENTZEN:

Q    Mr. Kania, was there anyone else in the Post Office at the time you left other than Ms. Sallie?

A    No, there wasn't.

MR. FRENTZEN:  Nothing further, Your Honor.

THE COURT:  The witness is excused.  Sir, you are free to leave.

[NOTE:  Witness left the stand.]

THE COURT:  Call your next witness.

MR. FRENTZEN:  Your Honor, the government calls Chris Bowen.

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  Chris Bowen, retired.

**CHRIS BOWEN**, after having been duly sworn, and called as a witness by the government, testifies as.

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q    Mr. Bowen, where do you live?

A    Fleming, Georgia.

Q    How long have you lived in Fleming?

A    Oh, approximately 35 years, 40 years.

Q    You say you are retired.  What sort of work were you doing before you retired?

A    Construction work.

Q    Let me direct your attention to November 30th of last year.  Did you drive by the Post Office that morning?

A    Yes, I did.

Q    Do you recall around what time that was?

A    It was around 10:30, 10:35, somewhere in that neighborhood.

Q    Let me show you this map.  Can you describe for the jurors on that particular morning -- the Post Office is here; you have Fleming Loop Road -- where you were coming from?  What road were you driving then on?

A    I was driving on Mount Olivette Road, which connects into Fleming Loop.

Q    Okay.  And that would be up here.  Is that right?

A    Right.

Q    At the railroad tracks?

A    Yes; right.  I was crossing the railroad tracks, and the Post Office was just directly in front of me.  I was

coming on to the Fleming Loop Road.

Q    Where were you headed that morning, sir?

A    To Hinesville.

Q    Where were you coming from?

A    My house.

Q    What were you driving?

A    My truck.

Q    As you were headed there on Mount Olivette Road, were you facing the Post Office as you were facing the Post Office as you were driving?

A    Right.  Right.  Uh-uh.

Q    Did you see anyone in front of the Post Office that morning?

A    Yes, I did.

Q    Can you describe him for us, please?

A    He was a black individual.  He was on a bicycle.  And he was a slender built fellow, maybe 5'10, 6' foot tall, dressed in dark clothing.

Q    Where was he in relationship to the Post Office?

A    He was right at the front door.

Q    Which way was he facing?

A    He was facing me as I went by.  As I drove by, he was facing away from the Post Office.

Q    And was he actually riding his bicycle?

A    No, sir.  He was sitting there at the front door on the

bicycle.

Q    So, was he moving at all as you were approaching?

A    No.  You would have to -- you would have to shove him out the way yourself to get in the front door, you know.

Normally, I have stopped and go in and check my mail.  But that particular morning, I kept on going.

Q    Do you have any recollection about what the individual was wearing?

A    He had -- it was dark clothing.  Some type of suit, I believe.  You know, he had a hood over his head, maybe a little jogging suit, jump suit, something, you know, I'm not sure.  Something of that type, it was dark in color.  And he had white gloves on his hands.  That's what caught my attention.  He was wearing white gloves, and, you know, I don't believe it was all that cold that morning, and 10:30 in the morning.

Q    Okay.  So you noticed he had something on his hands?

A    Yes.  They were white.  Whether it was socks or gloves, that is what caught my attention mainly.  You don't, you know, normally see that down there.

Q    And as you were driving and approaching the Post Office --

A    Right.

Q    -- do you go by the Post Office or away from the Post Office?

A    Yes, when you go by the Post Office, you are approximately 30 feet from the front door.

Q    Did you drive by the Post Office that morning?

A    Right.  On my way to Hinesville; right.

Q    What was he doing the whole time as you are approaching and driving by the Post Office?

A    He was watching me, and I was watching him, you know, checking him out to see what he was doing, you know, dressed like he was, you know, kind of throwed me a curve.  Like I say, it was kind of warm that day, that morning.

Q    Were you essentially face to face with him?

A    Right.  Yeah, we are staring one another basically.

Q    You were both looking at each other.  Okay.  Did he ride his bicycle at all as you were able to see?

A    No, no, he didn't.  He didn't move an inch.

Q    How about fast were you going?

A    Oh, ten maybe, not fast at all.

Q    Did you come back by the Post Office later on that morning?

A    Yes, after I got through my business in town.  Yes, it was 11:30, somewhere around there.

Q    What was going on at the Post Office at that time?

A    I seen a bunch of people there.  I thought it was --

Q    All right, sir.

A    I thought maybe the fire department was having some

kind of meeting.

Q    Did you stop at that time?

A    Yes, I slowed down.  Yes.  And a friend of mine had stopped me.  And I asked what was going on and she told me.

Q    Were you interviewed at that particular time?

A    No.  Not right then.

Q    At some point, did somebody come and interview about what you had seen this morning?

A    Yes, they did.

Q    Was that -- when was that in relation to the day, the morning that you saw what you saw?

A    Well, after I came back from Hinesville, and I seen the people there, and a friend told me what was going on, you know, I went on down the road toward the house.  And I thought about, you know, who I had seen at the Post Office. And so, I stopped and turned around, and, you know, told them what I had seen.

Q    Okay.

A    And they told me to wait, because -- told me to wait, because the deputy sheriff or somebody would want to, you know, get my statement.

Q    Okay.  Did you give a statement?

A    Yes.

Q    Did you give another statement several days later?

A    Right.  Yeah, there was some officials that came to the

house later on.

Q   Did they show you anything when they came back by?

A   Yes, they did.  Some pictures.

Q   Sir, Mr. Bowen, if you could take a look on that monitor there in front of you.

A   Uh-uh.

MR. BELL:  You know, we want to reserve our same objection.

THE COURT:  The Court will note counsel's timely motion and will rule according to the previous.  But it is reserved.

BY MR. FRENTZEN:

Q   Mr. Bowen, could you take a look on that monitor.  That is a 2-page document.  Take a look at the first page and then the second page, and see if you recognize that.  And this has been marked as Government's Exhibit 4.

A   Yes.  I recognize it.

Q   Take a look at the second page there for a moment.  Do you recognize that?

A   Yes.

Q   What is that, the two pages together?

A   These are the one -- the pictures that were brought to my house for me to try to identify the individual.

Q   Okay.  Did they tell you which picture to pick out?

A   No.  No, they didn't have to.

Q    Did they give you any hints about which picture to pick out?

A    No.  No.  They just laid them in front of me, and asked me to look them over, and point out the one that I seen.

Q    Did you do that, sir?

A    Yes.

MR. FRENTZEN:  Your Honor, I would offer Government's Exhibit 4 into evidence.

THE COURT:  Received subject to all previous objections.

Q    Mr. Bowen, could you take a look at the first page of that document -- and if I could publish it to the jury, Your Honor.

THE COURT:  You may do so.

Q    Mr. Bowen, did you make any mark on Government's Exhibit 4?

A    Yes, I initialled it at the bottom and dated it.

Q    Why did you initial that particular photograph?

A    Because I felt sure this was the fellow that I had seen at the Post Office that morning when I went by.

MR. FRENTZEN:  For the purposes of the jury, could you we show them -- publish both pages?

THE COURT:  You may do so.

MR. FRENTZEN:  Thank you, Your Honor.

Q    You were shown all of those?

A    Right.

MR. FRENTZEN:  Your Honor, I have nothing further at this time.

THE COURT:  The witness is available for examination.

**CROSS-EXAMINATION**

BY MR. BELL:

Q    Mr. Bowen, my name is William Bell.  I believe you and I have spoken before?

A    Yes, we have, on the phone.

Q    Are you doing all right today?

A    Okay.

Q    Listen if you need a little time out or something, you just let me know, because I'm not trying to put you through any ordeal.

Let me first ask you about this identification of the photo spread.  Okay?

A    Uh-uh.

Q    Isn't it true that you told the photographs -- told the investigators when you looked at the photographs something like, "if anything, I'd have to say it is this fellow right here."  You were not positive about your identification; isn't that true?

A    I couldn't say exactly a hundred percent.

Q    You were doing the best you could?

A    Yes.

Q    And you couldn't be positive about it, but you told him you thought it might be that photograph?

A    Right.

Q    Okay.  Well, you didn't make a positive identification, but you did look at two sheets of photos; correct?

A    Right.

Q    And you have lived in Fleming for 30 or 35 years; true?

A    Right.

Q    All right.  You know the defendant; correct?

A    Sort of, yeah.

Q    I mean you know him from seeing him around?

A    Right.

Q    You, for years, have seen him walking around at the Shortcut Store and things of that nature; correct?

A    Once in a great while; right.

Q    Okay.  You know that the defendant lives over here on 196 in one of these trailers; correct?

A    Right.

Q    If this is Loop Road.  And if you go on farther down this road, like you go to Hinesville, the Shortcut Store is down here; right?

A    Yes, it is on the right.

Q    Okay.  There's not much else commerce wise in Fleming; is there?

A    No, sir.  No, sir.

Q    There's a Shortcut Store, and there is --

A    It is a little country town.

Q    Yes.  So, it is a real small place.  And every time I've been there, it is the kind of place when I driving by, people are still waving and doing --

A    Sure.  Right.

Q    Okay, all right.  The first time you talked to the investigators was November 30th, the day that all of this happened; correct?

A    Took place.  Yes.

Q    All right.  You told the detective who interviewed you that had never seen that person before; didn't you?

A    I don't recall.

Q    Do you recall talking to Detective Marty Adams from Liberty County?

A    Right, uh-uh.

Q    You didn't say, "hey, that was Meier Brown?"

A    No.

Q    You told him you didn't recognize the person.  You hadn't seen him before; didn't you?  Something to that effect?

A    Maybe.

Q    Okay.  Now, to the best of your knowledge in those two sheets of photos, is Meier Brown the only Fleming resident

whose picture are in those photo spreads?

A    Yeah, I don't recognize any of the other ones.

Q    Okay.  So, it's a fair statement that Meier is the only person in there that you have seen before; correct?

A    Right.

Q    Okay.  Now, we do know this.  That the person you saw on the bicycle was a black male; true?

A    True.

Q    And we know this for sure, that the person you saw on the bicycle was wearing dark clothing.

A    True.

Q    Like a jogging suit; correct?

A    Correct.

Q    The top and the pants part, they both matched.  I mean, they were both dark.  I mean, one could be blue and one could be black.  But this guy is wearing a dark blue or black jogging suit; true?

A    True.

Q    Okay.  And it was about 10 or 10:30 in the morning; correct?

A    Right.

Q    Somewhere in there.  I mean, you are not exactly --

A    10:30, between 10:30 and 10:45.

Q    Okay.  You are not exact on the time frame?

A    I can't pinpoint it down, no.

Q    Did you have any appointment or place that you had to be at any certain time?

A    No certain time, no.

Q    All right.  So would it be fair to say that time really wasn't important to you when you drove by the Post Office that morning?

A    No.

Q    Okay.  That's a fair statement; isn't it?

A    Right.

Q    Okay.  It was only later when the investigators are talking to you that they are trying to get you to estimate your as best you can; correct?

A    [Witness nods affirmatively.]

Q    You have to say yes or no for this lady.

A    Yes.

Q    So, you gave them the best estimate that you could; true?

A    True.

Q    All right.  Now, you didn't see any facial hair on this black male on the bicycle; did you?

A    As best I can remember, no, because it was kind of dark.  No.

Q    I mean, you didn't get a look at the person; correct?

A    I got a good enough look at him.

Q    Huh?

A    I got a good enough look at him.

Q    Did you see any facial hair?

A    He might have had some slight mustache or something.

Q    Did you tell the investigators you didn't see any facial hair?

A    I don't remember.

Q    Okay.  Is your description different now than it was before?

A    No, I can't -- not much, no.

Q    You agree with me it should stay the same; shouldn't it?

A    Well, I remember, you know, like flashbacks or something.  I can, you know, see him a little better.

Q    All right.  Was the person riding a mountain bike?

A    Now, that, I don't know what kind of bike he had, you know.

Q    And the bicycle was green in color; true?

A    I believe so.  True.

          MR. BELL:  Your Honor, that is all I have.

          THE COURT:  Any redirect, Mr. Frentzen.

          MR. FRENTZEN:  Nothing further, Your Honor.

          THE COURT:  The witness is excused.  Thank you, sir.  You are released.

                    [NOTE:  Witness left the stand.]

          THE COURT:  Call your next witness.

MR. FRENTZEN:  Dietrechusn Davis, Your Honor.

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  My name is Dietrechusn Davis.  I'm unemployed.

**DIETRECHUSN DAVIS**, after having been duly sworn, and called as a witness by the government, testifies as follows:

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q    Mr. Davis, where do you live?

A    Indian Orchard, Massachusetts.

Q    How long have you lived there?

A    About eight -- ten months.

Q    Where did you live previously to living in Indian Orchard, Massachusetts?

A    150 Louie Baker Road, Midway, Georgia.

Q    How long had you lived in Midway?

A    Twenty-six years.

Q    Was that most of your life?

A    Yes, sir.

Q    Why did you move to Massachusetts in January of this year?

A    It was something my mom wanted me to do a long time ago.  I just -- I did it when she passed, like my sister

passed last year.  She passed the year before that, in 2002, 2001, whenever it was.

Q    At the time that you lived in Midway, would you sometimes stay in Fleming as well?

A    Yes, sir.

Q    Who did you know in Fleming?

A    I got family in Fleming.

Q    Who is your family in Fleming?

A    Morgans.

Q    Who are the Morgans, what relation are they to you?

A    Aunts, uncles and cousins.

Q    And are there other family members, other than the Morgans, in Fleming?

A    Nope.

Q    Are they all named Morgan, Mr. Davis?

A    No.  They got different last names.  But everybody basically is a Morgan.

Q    What are some of the other last names?

A    Bizzard, Brown, and me, I'm a Davis.

Q    Where do the Morgans stay in Fleming?

A    Off of Leroy Coffer Highway.  I don't exactly like know the physical address.

Q    But it is off of Leroy Coffer?

A    Yeah, 196.

Q    Now, among those Morgans, do you have any aunts?

A    Yes, I have several.

Q    What are their names?

A    Rosie Lee Johnson, Willie Bell Williams, Sadie Brown,
Alice Bizzard, a couple of them.

Q    Sadie Brown is your aunt?

A    Yes, sir.

Q    Do you know Meier Jason Brown?

A    Yes, sir.

Q    Are you related to him?

A    Yes, that is my cousin.

Q    Let me direct your attention to the night of
November 29th, 2002.  Were you staying in Fleming on that
night?

A    Yes, sir.

Q    Where were you staying?

A    At my Aunt Mary Alice's house.

Q    Can you describe the residences there, the Morgan
residences?  How many homes are there on that property?

A    Four.

Q    What type of homes are they?

A    There is three trailers and a house, a wooden house.

Q    If you are facing the property from 196, can you
describe from left to right the different residences and who
lives in the residences?

A    My Aunt Mary Alice, she will live to your right --

well, if you was like -- she would live to your right.  And then next door would be to like -- next door to the left would be my Aunt Sadie.  And next more to her would be my Uncle Kirk, but he passed.  So, it would be like my Uncle Junior house.  And around the corner would be my cousin Spud.

Q    What is Spud's real name?

A    Cedric.

Q    Cedric what?

A    Morgan.

Q    So, which of those trailers were you staying in on the night of November 29th?

A    The first one I mentioned, Mary Alice.

Q    Who else was staying there that night?

A    Latoya Bizzard and her kids, as far as I can remember.

Q    Is Latoya a relation to you?

A    Yes, sir, that's my cousin.

Q    Where were you staying in that trailer that night?

A    In the front room floor.

Q    How did you wake up the following morning, the morning of November 30th, 2002?

A    My cousin Jason walked in the door.

Q    When you say Jason, who are you referring to?

A    Meier.

Q    I'm sorry.  Say that again?

A    Meier.

Q    Meier?

A    Yes, sir.

Q    That is what you call Meier Jason Brown?

A    Yes, sir.

Q    So, there is no question, is Mr. Brown in the courtroom here today?

A    Yes, sir.

Q    Can you identify him, point him out, and identify something that he is wearing?

A    He has on a white shirt.

        THE COURT:  The record will indicate the witness has identified the defendant.

        MR. FRENTZEN:  Thank you, Your Honor.

Q    After you woke up from Mr. Brown coming in the room, what did you see?

A    He came in there and handed my cousin some mail.

Q    Did he do anything else?

A    Yeah, he asked her to use the cell phone.

Q    What did she say?

A    I don't think she said anything.  She gave it to him.

Q    What did he do after that?

A    He made a phone call.

Q    Did you hear his end of the conversation?

A    Yes, sir.  It went something like, "are you coming to

get me."

Q    Did he say anything else that you recall?

A    He said -- I don't exactly remember like word for word what he said.  But it was like, "you coming to get me, and you gonna take me through these changes, or do we have to go through these changes".

Q    Did you notice what Mr. Brown was wearing when he came in?

A    He had on a brown jacket with like a brown sheep skin in the inside.

Q    Do you remember anything else that he had on?

A    No, sir.

Q    Do you recall around what time this was?

A    Between like 9:30 or 10:00 o'clock.

Q    Mr. Davis, I would like to show you what has been marked Government's Exhibit 5.

MR. FRENTZEN:  May I approach, Your Honor?

THE COURT:  Yes.

Q    Mr. Davis, do you recognize this?

A    Yes, sir.

Q    What is that?

A    That's Meier's jacket.

MR. FRENTZEN:  Your Honor, I would move Government's 5 into evidence.

THE COURT:  Received.

Q    Is that the jacket Mr. Brown had on, on the morning November 30th when he came in the trailer?

A    Yes, sir.

Q    After this phone call on Ms. Bizzard's cell phone, what did the defendant do?

A    He left.

Q    Did he come back?

A    Yes, sir.

Q    About how much longer did he come back?

A    About ten minutes.

Q    What did he do when he came back?

A    He asked to use the phone again.

Q    Was he allowed to use the phone again?

A    Yes, sir.

Q    What did he do with the phone at that time?

A    I don't know.  He went outside.

Q    He went outside?

A    Yes, sir.

Q    So he was out of your view?

A    Yes, sir.

Q    You couldn't see him any longer?

A    No.

Q    Did he come back inside?

A    Yes, sir.

Q    After about how long?

A    About seven, maybe ten minutes, five or seven minutes. It wasn't long.

Q    A little later on that morning, did you leave your Aunt Alice's trailer?

A    Yes, sir.  We left.  We went across the street.

Q    When you say we, who are you talking about?

A    Me and Latoya.

Q    Where were you going?

A    Across the street to our cousin Jerk's house.

Q    On the way there, did you see anyone pull up in the front of the property?

A    No, sir.  On the way there, we seen my cousin's girlfriend, Diane, like headed toward Savannah.

Q    How did you know it was your cousin's girlfriend, Diane?

A    Because the truck came out of my Aunt Sadie's driveway and it was her truck.

Q    You recognize Diane's truck?

A    Her truck.  Yes, sir.

Q    When you say your cousin's girlfriend, Diane, you are talking about Mr. Brown's girlfriend?

A    Yes, sir.

Q    Do you know Diane's last name?

A    No, sir.

Q    Do you know what kind of truck that was?

A    A Durango.

Q    Do you remember about what time that was?

A    No, sir.

Q    About how much later in the day was it then when Mr. Brown had come in and made those phone calls?

A    Probably an hour, an hour and a half.

Q    Mr. Davis, let me direct your attention to December 5th of 2002.  Were you present at that same property when investigators came out to conduct searches?

A    I was next door to my Aunt Sadie's house.

Q    And at some point were you questioned by investigators?

A    Yes, sir.

Q    Did you agree to talk to them?

A    Yes.

Q    Did you give them a statement?

A    Yes, sir.

Q    Did you give them the statement there; or, did you go somewhere else to give the statement?

A    No.  I gave one there, and one at the Liberty County Sheriff's Department.

Q    Did you come back to that property when you left the Liberty County Sheriff's Office?

A    Yes, sir, later on.

Q    Where did you go at that time?

A    To my Aunt Sadie's house.

Q    Was anyone there when you got there at that point?

A    My cousin Rodney came out the front door, and met me in the driveway.

Q    Was anyone else at your Aunt Sadie's at that time?

A    No.  I'm not sure.  I didn't go in.  I walked around the corner like at that moment.

Q    Where did you go around the corner to?

A    We went to our cousin Spud's house, but he wasn't home.

Q    What did you do when he wasn't at home?

A    We went back to my Aunt Sadie's residence, which took about like 15 or 20 minutes.

Q    Did you go inside the residence at that time?

A    Yes, sir.

Q    Was there anyone there then?

A    Just Aunt Sadie.

Q    Do you remember about what time that was?

A    About 6 or 6:30.

Q    Was it dark out?

A    Yes, sir.

Q    While you are there, did the phone ring?

A    Yes, sir.

        MR. BELL:  Judge, can we approach for just one moment?

        THE COURT:  Yes, sir.

                [NOTE:  Sidebar Conference.]

MR. BELL:  I'm anticipating that --

MR. FRENTZEN:  You anticipate correctly.

MR. BELL:  That he is going to ask him about a conversation where a phone call came in.  And it would be hearsay.  He's trying to get into a statement Sadie Brown may have made supposedly on a telephone conversation at that point.  And it is pure hearsay coming out of the witness' mouth.

I can't unring the bell, so that is why --

MR. FRENTZEN:  And, Judge, it is not being offered for the truth of the matter asserted.  It is being offered as verbal acts, as the reaction of Sadie Brown to having a phone call from the defendant in which he confessed.

MR. BELL:  Sadie is dead.  I mean, she died.  So, I can't cross examine her.  So, I'm completely helpless here if the Court let's in that type of hearsay.

What is the probative value of this?

THE COURT:  Go ahead.

MR. NEWMAN:  We don't object, Your Honor, to a limited instructions from the Court.

MR. BELL:  Well, a limited instruction would not cure the ill that I'm complaining about.

MR. NEWMAN:  Her unavailability really, Your Honor, I think, is not a factor that the Court should consider in weighing the admissibility for the limited

purpose for which it is offered.

THE COURT:  What is the purpose?

MR. BELL:  The fact that Sadie has since passed away --

THE COURT:  No.  I mean what is the purpose for which you are offering this evidence, Mr. Frentzen?

MR. FRENTZEN:  This is to confirm a phone call to Sadie --

THE COURT:  What does that tend to prove?

MR. FRENTZEN:  The defendant called his mother, and confessed to his mother.

MR. BELL:  Well, I don't mind them talking -- they have other proof --

THE COURT:  Are you wanting to get into the conversation?

MR. NEWMAN:  Just her exclamations.

MR. FRENTZEN:  Her exclamation and reaction to what she heard.

MR. BELL:  And that is what, of course, we're complaining about.

THE COURT:  Well, it is part of the res gestate, a sudden and exclamatory --

MR. FRENTZEN:  I believe it is, Your Honor.

MR. NEWMAN:  Yes.

MR. BELL:  This is days later.  This is by a

witness that everybody could have taken her deposition.  She was known to be sick.

THE COURT:  Okay.  I will monitor it closely.  I'm not going to impose anything now.

[NOTE:  Sidebar Conference Concluded.]

THE COURT:  Go ahead, Mr. Frentzen, have you got another question?

MR. FRENTZEN:  Yes, Your Honor.

BY MR. FRENTZEN:

Q    Mr. Davis, were you able to hear the end of the conversation that took place in the trailer?

A    My cousin Rodney answered the phone.

MR. BELL:  I object to the --

THE COURT:  Objection overruled.  Just answer the question.

A    My cousin Rodney answered the phone, and he gave the phone to his mother, which is Aunt Sadie.  And she was like, "Meier, where you at?  Meier, you didn't kill that lady, no."  She started crying, and I left.

MR. FRENTZEN:  Nothing further, Your Honor.

**CROSS-EXAMINATION**

BY MR. BELL:

Q    Mr. Davis, my name is William Bell.  How are you doing this afternoon?

A    I'm doing all right.

Q    I want to ask you some questions about November 29th and November 30th, okay.

A    Sure.

Q    Now, you told the jury that you went over to your cousin Latoya on the evening of November 29th; correct?

A    Yes, sir.

Q    That was your testimony today; correct?

A    Yes, sir.

Q    And when you say there are four residences -- your cousin Spud, you're talking about Cedric?

A    Yes, sir.

Q    If this is 196, Cedric lives here or there, depending on which one it is in this aerial photograph.  And on this 196, there's Uncle Junior's, there's the church, Uncle Junior, Sadie's, and Latoya was living there; correct?

A    Yes, sir.

Q    So, there's three trailers on 196.  And when you talk about cousin Spud, Cedric Morgan, he's around --

A    Around the corner.

Q    -- on Fleming Loop.  So, he's on a different road?

A    Yes, sir.

Q    Okay.  Not too far, but about a half mile.

A    Around the corner.

Q    Or a third of a mile.

A    I'm not sure.  It is around the corner.

Q    Now, you lived in Midway, but you went over there to crash at Latoya's; correct?

A    Yes.

Q    All right.  And what you left out of your story is that actually you didn't get there on the 29th.  You got there on November 30th.  You came in about 4:00 o'clock in the morning; true?

A    No, sir.

Q    That is not true?

A    No, sir.

Q    Okay.  What time did you get to Latoya's?

A    I was there basically the whole day.

Q    You didn't get in about 4:00 o'clock?

A    No, sir.  Everyone else went out; I didn't, me and Latoya.

Q    You testified in front of the grand jury; correct?

A    Yes, sir.

Q    And you were under oath and sworn to tell the truth; correct?

A    Yes, sir.

Q    The same oath you have taken today.  Isn't that true?

A    Yes, sir.

         MR. BELL:  Judge, may I approach?

         THE COURT:  Just read it and ask if that was his

statement.

MR. BELL:  Okay.

Q    You have seen these guys before.  They were at the grand jury; weren't they?

A    Yes, sir.

Q    All right.  And that is where you were telling your tale, in front of the grand jury; true?

A    Yes, sir.

Q    Under oath.  And Mr. Frentzen is the one that questioned you while you were under your oath; isn't he?

A    Yes, sir.

Q    All right.  And he asked you.

                    Question:  What time did you get
        in and go to sleep on that night, if you
        recall?

                    And you answered:   *It was about
        four in the morning.*

A    That's when I went to sleep.  I was there the whole day.

Q    He asked you what time you got in; didn't he?

A    He asked me -- like everyone else went out.  Me and Latoya didn't.  We stayed in.  We were suppose to go out that night, but we didn't.

MR. BELL:  Can I show him the question just so there is no misunderstanding?

THE COURT:  Sure.  Show it to him.  But that is not necessary.

MR. BELL:  Page 9, line 16.

Q    Question: *What time did you get in and go to sleep that night, if you recall.* Answer?

A    About 4 in the morning.

Q    All right.  So, in front of the grand jury in May of this year, you got in at 4:00 o'clock in the morning; true?

A    I went to sleep at about 4 in the morning, sir.

Q    And you had been partying that day; hadn't you?

A    Yes, sir.

Q    And you had been partying pretty much every day for years; hadn't you?

A    Yes, sir.

Q    All right.  You have been smoking marijuana since you were seven years old?

A    Yes, sir.

Q    And you told the people in the grand jury that you had been smoking every day for at least a year coming up do that day in May?

A    Yes, sir.

Q    All right.  What time did you testify in front of the grand jury?

A    I'm not sure.  I'm not even sure of the day.

Q    In the morning or afternoon?  I don't care about the

date.

A    It was afternoon.

Q    Were you stoned?

A    No, sir.

Q    Okay.  Did you get stoned later that day?

A    No, sir.

Q    So, that is the first day in years when you go in front of the grand jury that you decided to quit; right?

A    I didn't decide to quit.  I just didn't.

Q    And that is the first time in years you hadn't, that day; true?

A    Basically, yeah.

Q    And is today day two?

A    No.  It's been about a week now.

Q    Okay.  Now, you weren't sleeping in the bed; were you?

A    No, sir, I was on the floor.

Q    You crashed out on the floor; right?

A    Yes, sir.

Q    Were you passed out?

A    I was passed out.

Q    All right.  Had you been drinking the day and night before?

A    Yes, sir.

Q    All right.  What had you been drinking?  Hard liquor or what?

A    A couple of beers.

Q    You passed out from a couple of beers?

A    A couple of beers, a couple of blunts.

Q    Okay.  So you were pretty trashed the night before having a good time; right?

A    Yes, sir.

Q    All right.  Now, smoking marijuana since you've been seven years ago, you have that -- what do they call it, a short term memory loss?

A    That's speculation.  I'm not a doctor.

Q    Has it affected your memory?

A    Yes, sir.

Q    And it has affected it in the negative way; hasn't it?  Or has it improved your memory?

A    No.  It might be in a negative way, according to how you look at it.

Q    Now, when Jason came over, you didn't see any blood on him; did you?

A    No, sir.

Q    He wasn't acting in any way out of the normal; was he?

A    No, sir.

Q    And it was about 9:30 or 10:00 o'clock; right?

A    Yes, sir.

Q    All right.  Now, you claim that you saw him with that jacket on; right?

A    Yes, sir.

Q    Do you know who was wearing that jacket about 45 minutes later that day?

A    No, sir.

Q    All right.  Now, you are his cousin.  Ms. Sadie is -- you guys are second cousins.  Is that right?

A    Yes, sir.

Q    Okay.  But Sadie, you consider her your aunt; true?

A    Yes, sir, she is.

Q    Now, when we talk about Sadie, that is his mother, your aunt, and she used to live in that middle trailer there; correct?

A    Yes, sir.

Q    All right, sir.  And would it be fair to say that like Latoya let you come in and crash and stuff, people come and go in these trailers; correct?

A    Yes, sir.

Q    All right.  Y'all have about 102 cousin; right?

A    Probably more than that.

Q    All right.  And Meier has a gang of brothers; doesn't he?

A    Yes, sir.

Q    Okay.  So people come in and out of these trailers all the time; true?

A    Yes, sir.

Q    Latoya's next door and Ms. Sadie's also; correct?

A    Yes, sir.

Q    All right.  And Ms. Sadie, you didn't stay at her place.  Was that because she was sick?

A    No, sir.  That was where I was staying, next door, to Aunt Alice's house.

Q    All right.  But she had been sick for quite some times; right?

A    Yes, sir.

Q    His mother had the sugar back then, and she was blind in one eye, and didn't have one of her legs; true?

A    Yes, sir.

Q    All right.  Do you know how many people went through Sadie's trailer that day and that morning?

A    No, sir.

Q    Okay.  Now, you testified to the U.S. Attorney that it was about an hour and a half after you saw Meier using the phone that you saw the Durango leave; correct?  Do you recall saying that?

A    Yes, sir.

Q    Okay.  That was your testimony; right?  I'm not trying to trick you.  You have to say yes or no?

A    Yes, sir.

Q    All right.  But you testified differently in front of the grand jury; right?  Or do you even recall?

A    I don't recall.  Short term memory loss.

Q    All right.  Would I be correct in saying you just really don't recall the hour and a half.  You just kind of pulled it out?

A    It was a while ago, sir.

Q    So you really don't remember; do you?

A    I don't remember.

Q    Okay.  And you don't remember that you testified differently in front of the grand jury than you did today; correct?

A    I could tell you what happened.

Q    Okay.

A    I didn't feel like it was important then.

Q    So, you just kind of threw it out, threw some number; right?

A    No.  That was about what time it was.

Q    But you really don't remember; do you?

A    I really don't remember, not the exact time, no.

Q    All right.  Because you are somewhat impaired with a short term memory loss?

A    A short term memory loss.

        MR. BELL:  That's all I have.

        THE COURT:  Any redirect, Mr. Frentzen?

        MR. NEWMAN:  Yes, Your Honor.

        THE COURT:  All right, let's proceed.

MR. FRENTZEN:  Nothing further, Your Honor.

THE COURT:  All right.  You may step down, sir. You are excused.

[NOTE:  Witness left the stand.]

THE COURT:  Ladies and gentlemen, I have signed an order of sequestration that instructs the Marshal that you are in the Marshal's custody.  Of course, the Marshal and the Court want to make you as comfortable as possible.  I realize that you are going to be in a hotel.  Nevertheless, we have to have certain control upon you.

Now don't discuss the case with one another. Don't allow anyone to discuss it with you.  The Marshal is instructed what to allow you to read and how to monitor and control their custody of you.

They will be getting you up in the morning in order to get back to the courthouse at 8:30 a.m.  Last week, I believe it would have been 9:30 a.m. so, maybe that won't create any undue.  The time change has resulted in that extra time so that our bodies are probably still accustomed to the other time, the Daylight Saving Time.

I don't want to impose any hardship, but I think that the old proverb that a trip of a thousand miles begins with the first step.

So, we will work from 8:30 a.m. in the morning. The Marshal will try to accommodate all reasonable requests.

Remember, when they say that can't do anything, they are under the operation of the Court and under the directions of the Court.

They will look for your comfort. If you will cooperate, we will all be through this and allow you to resolve the critical issues in due time.

Gentlemen, we'll see you back at 8:30 in the morning.

MARSHAL: All rise. The jury will return to the jury room.

*Court adjourned for the evening.*

STATE OF GEORGIA,

CHATHAM COUNTY.

C E R T I F I C A T E

I, Lora H. Carter, do hereby certify that the above and foregoing pages is a true, complete, and accurate transcript of the evidence and proceedings adduced in the trial of the captioned matter.

This the 12th day of December, 2003.

_____

Lora H. Carter

*U.S. Court Reporter*
*Southern District of Georgia*
*Savannah Division*
*P.O. Box 8552*
*Savannah, GA  31412*
*(912)650-4065*