IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA       .

                               .

            vs.                .  CR 403–001

                               .

MEIER JASON BROWN             .  Savannah, Georgia

                               .  November 5, 2003

                                  VOLUME III of V

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE B. AVANT EDENFIELD

UNITED STATES DISTRICT JUDGE

Court Reporter:      Lora H. Carter
                     Official Court Reporter
                     United States District Court
                     P. O. Box 8552
                     Savannah, Georgia 31412
                     Tel.  912–650–4065

*Proceedings reported by stenotype; transcript
produced by computer-aided transcription.*

A P P E A R A N C E S:


FOR THE GOVERNMENT:

        WILL FRENTZEN
        JOSEPH NEWMAN
        ASSISTANT U.S. ATTORNEY
        P. O. Box 8970
        Savannah, GA  31412



FOR DEFENDANT:

        RICHARD DARDEN
        219 W. York Street
        Savannah, GA 31412


        WILLIAM BELL
        420 W. Broughton St.
        Savannah, GA 31401

*[Whereupon, Court opened by the Marshal at 8:30 a.m.]*

THE COURT:  Good morning, ladies and gentlemen. You have arrived on time.

And you may call your next witness.

MR. DARDEN:  Judge, may we approach just very briefly?

THE COURT:  All right.

[NOTE:  Sidebar Conference.]

MR. DARDEN:  Judge, I would like to perfect the record for whatever happens.  There is an article in the paper this morning about an execution in Georgia last night.

I have discussed it with the marshals.  They have assure me that there's no possible way that the jurors could have read that article.  I just want that on the record, because somebody is going to find it.  There's going to be a question raised.

THE COURT:  Okay.

MR. NEWMAN:  Judge, one other thing while we're here.  On this next witness that the government has, Mr. Frentzen would like to recall him later in the case for chronology.

THE COURT:  All right.

[NOTE:  Sidebar Conference

Concluded.]

THE COURT:  Your next witness.

MR. FRENTZEN:  Your Honor, the government calls Postal Inspector, Henry Reeves.

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  Henry A. Reeves, United States Postal Inspector.

**HENRY A. REEVES**, after having been duly sworn, and called as a witness by the government, testifies as follows:

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q.   Mr. Reeves, how long have you been a Postal Inspector?

A.   Fourteen years.

Q.   How long have you been with the United States Post Postal Service?

A.   Twenty-one years.

Q.    Where are you currently stationed, sir?

A.   Atlanta, Georgia.

Q.   What are your responsibilities as a Postal Inspector?

A.   I'm assigned to the Security Team.  I investigate all crimes against the Postal Service.

Q.   Sir, let me direct your attention to November 30th of last, on that day did you learn of a killing of a postal employee in Fleming, Georgia?

A.   Yes, sir, I did.

Q.   What did you do after your heard about that?

A.   I was told to get clothes and proceed directly to Fleming, Georgia?

THE COURT:  Speak up, Mr. Witness.

A.   I was told to get clothes and proceed directly to Fleming, Georgia.

Q.   Did you do that?

A.   Yes, I did.

Q.   When did you arrive in Fleming?

A.   Somewhere after or around, or just after 6 p.m.

Q.   Okay.  At the time you arrived in Fleming, where did you go?

A.   We went directly to the Fleming, Georgia Post Office.

Q.   What was going on at the Post Office at the time you arrived?

A.   There was a crime scene.  They had a lot officers around the facility.

Q.   Did you participate that evening in the investigation of the crime scene?

A.   Not at the crime scene.  No, sir.

Q.   At some point that evening did you participate in what you call an accountability study?

A.   Yes, sir, we did.

Q.   What is an accountability study?

A.    You go in and you determine the financial stability of an office.

Q.    How do you do that?

A.    You count the stock, count the monies, and try to come up how much money should be in the office at that time.

Q.    Did you yourself do the accountability?

A.    No, sir.

Q.    Did you participate or oversee the accountability?

A.    Yes, sir, I did.

Q.    Who did the accountability?

A.    Linda Gordon from the Allenhurst Post Office.

Q.    Did anyone else participate?

A.    Yes, sir, the Post Master of the Fleming, Georgia Post Office.

Q.    Do you recall her name?

A.    Fay Woods.

Q.    Do you recall what was the conclusion or the determination from that accountability study?

A.    The office was short a sum money.

Q.    Do you recall approximately how much money?

A.    I think it was around 1200, a little over $1,200.

Q.    Are these accountability studies regularly done the course of the business of the Post Office?

A.    Yes, sir, periodically.

Q.    Are they ordinarily kept in the records of the Post

Office?

A.   Yes, sir, they are.

Q.   If you could take a look at that monitor that's in front of you, Mr. Reeves, I would like to show you what has been marked as Government's Exhibit 7.  Do you recognize what that is, sir?

A.   It looks like the account form from the audit, sir.

Q.   Okay.  If we could show you the bottom of that form. Does that show an amount of money missing from the Post Office for that particular day?

A.   Yes, sir, it does.

        MR. FRENTZEN:  Your Honor, I would offer Government's Exhibit 7 into evidence.

        THE COURT:  Received.

        MR. FRENTZEN:  If we could publish that first page for the jurors, please.

Q.   Inspector Reeves, if you could indicate for the jurors the figure that indicates the amount of money missing from the post office on that particular day?

A.   $1,266.59.

Q.   Okay.  If we could scan up on the document for just a bit.  Does it show an amount of money missing, or an amount of money that should be there for money orders, the receipts for money orders?

A.   Yes, sir.  It would be included in the 1195.

Q.    Okay.  So, there was 1195 in money orders, in money for money orders that should have been there?

A.    Yes, sir.

Q.    Mr. Reeves, do you recall how the ladies who did the accountability study performed that study?

A.    They counted the cash in the drawers, and then they counted the stock accountability, and then they added up the receipts and then backed that out.

Q.    Do you know what they did the adding on?

A.    They used a calculator that was in the --  an adding machine that was in the Post Office.

Q.    Do you recall where that adding machine was located?

A.    It was on the desk behind the window section of the -- toward the back wall of the Post Office.

Q.    Was anything done where that adding machine before the ladies used it to try to do the accountability study?

A.    Yes, sir.

Q.    What was done?

A.    There was a tape in the adding machine.  And, I forwarded it out and pulled it out of the machine.

Q.    I would like to show you what has been marked as Government's Exhibit 6.  Take a look at that, Mr. Reeves. Do you recognize that?

A.    Yes, sir.  It looks like tape from the adding machine.

        MR. FRENTZEN:  Your Honor, I would offer

Government's Exhibit 6 into evidence.

THE COURT:  Received.

MR. FRENTZEN:  May I publish it for the jury?

THE COURT:  Yes.

Q.   Mr. Reeves, if you could take a look at Government's Exhibit 6.  What seems to be indicated on there?

A.   There was -- someone was adding up money orders, it seems.

Q.   Mr. Reeves, how much was on that adding tape was on the tape before you sort of totalled it out and took it out of the machine?

A.   It had stopped at $175.

Q.   Okay.  On that line, with the $175?

A.   Yes, sir.

Q.   Inspector Reeves, was that piece of adding machine tape -- what was done with it after you took it out?

A.   It was taken out and laid on the counter.

Q.   Okay.  And was it later taken into the evidence?

A.   Yes, sir, it was.

Q.   Inspector Reeves, did you make notes as to particular money orders and the serial numbers of those money orders that were missing from the Post Office on that day?

A.   Yes, sir, I did.

Q.   Did you make -- you recorded than on some notes?

A.   Yes, sir.

Q.    As you sit here today, you recall the serial numbers of those particular notes?

A.    Not off hand, sir.

MR. FRENTZEN:  Your Honor, may I approach?

THE COURT:  You may.

Q.    Inspector Reeves, I'm going to show you what I'm going to marked as Government's Exhibit 7A.  Do you recognize that?

A.    Yes, sir, I do.

Q.    What is that?

A.    This is a PS Form 13 from a pad where I wrote down the serial numbers.

MR. FRENTZEN:  Your Honor, I would offer that into evidence.

THE COURT:  Received.

Q.    Inspector Reeves, if you could just read for the jurors -- not the serial numbers -- but the amounts of the money orders that were missing from the Post Office on that day?

A.    $20, $500, $500, and $175.

MR. FRENTZEN:  Your Honor, I have nothing further of this witness at this time.

THE COURT:  You wish to recall this witness?

MR. FRENTZEN:  We do, Your Honor.

THE COURT:  All right.  After this examination

he will have to leave the courtroom.

MR. FRENTZEN:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. BELL:

Q.   Good morning, Mr. Reeves?

A.   Good morning.

Q.   The amount of cash that was left in the till -- do you have Government's 7.  To set the scene, when you were in there, you verified there was money in that drawer; true?

A.   Yes, sir.

Q.   And all the money that was in the cash drawer was in there fairly neatly; correct?

A.   As far as I recall, sir.

Q.   It didn't look like anybody rifled through the cash drawer; true?

A.   That's correct.

Q.   And you determined that $1266.59 was missing from the Post Office; correct?

A.   Yes, sir.

Q.   And you understand that Mr. Brown was only accused of taking money orders in the amount of $1175; correct?

MR. FRENTZEN:  Objection.  Foundation.

THE COURT:  What do you say?

MR. BELL:  Well, that is the accusation in the case, and I think he is well --

THE COURT:  Is it in the indictment?

MR. BELL:  Yes, sir.

THE COURT:  Objection overruled.

BY MR. BELL:

Q.   I mean, you understand that is the accusation in this case.

A.   Could you repeat the question again, sir?

Q.   Mr. Brown is accused of stealing $1,175; correct?

A.   Yes, sir.

Q.   But the amount that is missing is $1266.59; true?

A.   Yes, sir.

Q.   The cash drawer appears to be untampered with; true?

A.   Yes, sir.

Q.   The keys are in the cash drawer; true?

A.   I don't think the keys were in the drawer, sir.

Q.   All right.  We'll come to that photograph, I think, later in the case.

The difference between the 1266 and the 1175 is 90 something dollars, that would account -- that is approximately 50% of the cash in the drawer; correct?

A.   Yes, sir.

Q.   All right.  I mean, that's a major noticeable difference.  There was $103.91 left in the cash drawer; true?

A.   Yes, sir.

Q.   So almost half the cash is gone, and it's gone and he is not charged with taking that; true?

A.   I believe so, sir.

MR. BELL:   That's all I have.

THE COURT:   Redirect?

MR. FRENTZEN:   Nothing further questions, Your Honor.

THE COURT:   All right.   You may step out.   And you remain under the rules of sequestration.

[NOTE:   Witness left the stand.]

MR. FRENTZEN:   Fay Woods.

CLERK:   For the record, Ma'am, please state your name and your occupation.

WITNESS:   Dedra Fay Woods, Post Master, Patterson, Georgia.

THE COURT:   Speak up a little.   All of the people in the courtroom have to be able to hear you.

**DEDRA FAY WOODS**, after having been duly sworn, and called as witness by the government, testifies as follows:

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q.   Ms. Woods, where are you currently employed?

A.   Patterson, Georgia.   Well, actually Townsend, Georgia. I'm the officer in charge there.

Q.   What do you do there?

A.    I am the Officer-in-Charge.  It's like the duties and responsibilities of the Post Master, temporarily.

Q.    How were you employed in November of last year?

A.    Post Master of Fleming, Georgia.

Q.    How long have you been with the Postal Service.

A.    Over 26 years.

Q.    From what time period were you the Post Master in Fleming, Georgia.

A.    I believe I went there in '97, in May of '97.

Q.    Okay.  And when did you leave?

A.    Well, I was appointed Post Master in Patterson September 20th of this year.

Q.    Did you know Sallie Louise Gaglia?

A.    Yes, sir, I did.

Q.    How did you know her?

A.    She was my Post Master Relief in Fleming.

Q.    What days would Sallie work?

A.    Whenever I was off, mostly every Saturday.  And if I was out of the office doing other work for the Post Office, she would take my place.

Q.    Did you know something about Ms. Gaglia's working practices?

A.    Yes, sir, I did.

Q.    What time did Ms. Gaglia usually arrive at the Post Office.

A.    Between 7:30 and a quarter till 8.

Q.    How would she get in to the Post Office when she arrived in the mornings?

A.    She would unlock the office door from the lobby to go in.

Q.    Generally, would she be the first person there?

A.    Yes.

Q.    What were her responsibilities after she arrived at the Post Office?

A.    She would have to sort the mail and get it ready for the carrier to deliver the -- to case and deliver the mail, and she would also have to put up the box section mail, open the window, and wait on customers.

Q.    Are you aware of Ms. Gaglia's habit and practice if she would sell postal money orders?

A.    Yes, I have observed her selling postal money orders.

Q.    And if I could like to show you what has been marked Government's Exhibit 2?  Do you see that, Ms. Woods?

A.    Uh-uh.

          THE COURT:  Answer, Ma'am.

A.    Yes.

Q.    Ms. Woods, is that a fair and accurate representation of the Fleming Post Office if the roof was removed?

A.    Yes.  I think the carrier case took up a little bit more space, but yes, it is.

Q.   Other than that, is it fair and accurate rendition.

A.   Uh-huh.

MR. FRENTZEN:  I am going to offer Government's Exhibit 2, if I have not already, into evidence.

THE COURT:  Received.

Q.   Ms. Woods, if you would, can you tell us, please, Ms. Gaglia, if she would sell a postal money order -- and let me put it where you can point it out for the juror -- what would she do and where would she do it at?

A.   Okay.  The money order imprinter would be on the other side -- let me see.  It would be on the other side of where this window opened.  And she would imprint the money orders. And what she did, she always took the voucher out of the money order.  And she would slide those underneath the money order machine.

And then even though I have a small battery-operated calculator for the window, she never liked to use that one.  She would go over to the desk, and she would use that calculator to add the money orders up and tell the customer how much they owed, if it was more than one money order.

Q.   If you added up the money orders for sale to a customer, what amounts would you be adding up?

A.   You would add the amount of the money order itself and then the money order fees.

Q.    What were the money order fees?

A.    Up to $500 was 90 cents.  And then after that, and after that $1.25.

Q.    So 90 cents for any money order up to 500?

A.    Right.

Q.    Ma'am, I would like to show you Government's Exhibit 6 which has already been admitted into the evidence.  If you could look that monitor in front of you, Ma'am.  Can you see that?

A.    Yes, I can.

Q.    Do you recognize Government's Exhibit 6?

A.    That was the money order --

        THE COURT:  Speak up?

A.    That was the adding machine tape that was in the adding machine that day.

Q.    By that day, you mean November 30th, 2002.

A.    Yes, sir.

Q.    Can you take a look at the very bottom, that last line, can you read that out for us, please, if you can make that out?

A.    175.

Q.    And what symbol --

        THE COURT:  I can't hear you.  Speak up.

A.    175.

Q.    Ms. Woods, what symbol is after the 175?

A.    A division.

Q.    Is there any reason at all in adding up these postal money orders why someone would hit the division key?

A.    No, sir, there's not.

Q.    Ms. Woods, are you familiar with one of the Post Office boxes in Fleming, Box Number 327?

A.    Yes, sir.

Q.    Do you know who has access to Box 327?

A.    Well, a lot of different people got mail in that box. It was Morgans and Browns.  I think some of them were cousins, and brothers, and aunts.

Q.    I would like to show you, please, Government's Exhibit 8 on your monitor there.  Do you recognize Government's Exhibit 8?

A.    Yes, sir.

Q.    What is Government's Exhibit 8?

A.    It's the Post Office box application for that Post Office Box 327.

        MR. FRENTZEN:  Your Honor, I would offer Government's Exhibit 8 into evidence.

        THE COURT:  Received.

        MR. FRENTZEN:  Now, if we could publish it for the jurors.

Q.    If we could scan in on that.  Well, let them take a look at it first.  And then if we could scan in on that

second piece of paper there from the bottom.  Ms. Woods, what is that list of names?

A.   Those are the names that they had put on the back of the application of people that were authorized to receive mail in that Post Office Box.

Q.   From the top down, the third line there, can you read us what is there?

A.   Meier Brown.

MR. FRENTZEN:  Nothing further, Your Honor.

**CROSS EXAMINATION**

BY MR. DARDEN:

Q.   Good morning, Ms. Woods.

A.   Good morning.

Q.   My name is Richard Darden.  I don't know whether you remember me or not, but I met you a few days after this incident took place down at the Post Office.

A.   Uh—uh.

Q.   How many people does this Post Office serve?

A.   The population of Fleming is about 1,000.  The rural carrier serves like probably about 350 something boxes.  And we have a 100, a little over 100 boxes in Fleming.

Q.   Okay.  Given the fact that is Box 327 that the Morgan Compound used, that does not suggest they were 327 postal boxes.

A.   No, sir.

Q.   You think there were about how many, 175?

A.   I can't remember exactly.  I know there was over 107.
Probably about a 140 or something like that.

Q.   Okay.  And these people would come daily to get their
mail.  Is that correct?

A.   Not daily.  They didn't come every day.  Oh, are you
talking about 327?

Q.   No, Ma'am.  I'm taking about --

A.   People in general?

Q.   Yes, sir.

A.   Oh, yes, sir.  They had access to the Post Office
twenty-four hours.

Q.   Okay.  So, there was a substantial amount of traffic in
that Post Office given the fact that it was a very small
town?

A.   Well, at times, yeah.

Q.   A hundred or so people would come in every day?

A.   Well, I'm not sure a hundred people would come in every
day, but I don't think that many people would come in ever
day.

Q.   Ms. Sallie filled in for you.  Is that correct?

A.   Yes, sir.

Q.   How about often would you take off?

A.   Well, I would take vacation two or three times a year,
but then I would be out of the office sometimes during the

week.  I was on a Periodical CAD routine, and then I would be out a couple of days sometimes during the week.

Q.   Approximately how many days did she work a month, several days a month?

A.   Yes, sir.

Q.   She was not a full-time employee?

A.   No, sir.

Q.   Okay.  You've indicated to this jury what her procedures were for selling money orders.  Certainly, you are not suggesting that she did it exactly like that in every case; are you?

A.   Ever time that I observed her, she did it the same way.

Q.    Let me ask you this.  This list, this government's list, Exhibit No. 8, this list showing the Morgan application for the use of the Post Office Box.

         MR. DARDEN:  Would you put that up again please?

Q.    On the bottom of that list is probably about a dozen names.  Is that correct?

A.   Yes, sir.

Q.    In fact, those names, are those the names of the individuals that had access to that postal box?

A.    If they had a key, they had access to it.  But those were the ones that they had authorized to pick up the mail with a key or to receive mail in that box.

Q.    Well, the fact of the matter is that you had had some

problems with many of these people coming in and getting mail.  Is that correct?

A.    That's correct.

Q.    But I think in the statements you made during the course of the investigation, you indicated that you didn't know Meier Brown?  Is that correct?

A.    I only know one other occasion that he had been in the office, in the Post Office.

Q.    There had never any other problems with him coming in and picking up the mail or mishandling the mail, or anything of that nature.  Is that correct?

A.    Not that I'm aware.

Q.    Is one of the problems you had with some of these family members is they would come in and give a false name and try to get the mail?

A.    The main problem that I had is they wanted to come in and ask for all the mail without the key.  And we had problems with that, because I think everybody wasn't getting their mail.

Q.    So you had some complaints from people who were supposed to be getting mail, "hey, we are not getting our mail."

A.    That's correct.

Q.    So, perhaps there checks or things of value in there that were missing.  Is that correct?

A.    Correct.

Q.    Those were the types of complaints you were having?

A.    That's correct.

Q.    But you only remember on one occasion when Meier came in to pick up the mail; correct?

A.    Right.

Q.    And there had never been any complaints about his mishandling anything or taking anything.  Is that correct?

A.    Not that I can remember.

Q.    Let me ask you this:  If you were handling a transaction and you were in the middle of adding up these money orders or whatever, if a customer came in and asked would you interrupt what you were doing and handled that problem, and then go back and finish your accounting on the sale of the money order?

A.    No, sir.

Q.    You wouldn't do that?

A.    No, sir.  I would finish the money orders first.  I would say, you know, I will be with you in just a minute.

        MR. DARDEN:  That's all I have.

        MR. FRENTZEN:  Nothing further, Your Honor.

        THE COURT:  We will excuse the witness.

         Ma'am, you are free to leave.

                    [NOTE:  Witness left the stand.]

        MR. NEWMAN:  Diane Brown.

CLERK:  For the record, Ma'am, please state your name and your occupation.

WITNESS:  Diane Brown, Security Guard.

**DIANE BROWN**, after having been duly sworn, and called as a witness by the government, testifies as follows:

**DIRECT EXAMINATION**

BY MR. NEWMAN:

Q.    Ms. Brown, where did you go to high school?

A.    Jenkins County High, Millen, Georgia.

Q.    And did you at some point thereafter join the U.S. Army?

A.    I did.

Q.    How long did you serve in the U.S. Army?

A.    Three years.

Q.    What specific job did you do in the Army?

A.    I was a military police.

Q.    Did you serve overseas in that capacity?

A.    I did.

Q.    When did you leave the Army?

A.    October of 1982.

Q.    What was your nature or type of discharge?

A.    Honorable.

Q.    Did there come a time when you lived outside the State of Georgia after you had left the Army?  Did you live in a place other than Georgia when you got out of the Army?

A.    I did, yes.

Q.    Did there come a point in time when you returned to Georgia?

A.    I did.

Q.    What year was that, Ma'am?

A.    I returned I think around '83, 1983.  I left again, went back to Germany, and returned again in 1986.

Q.    When you returned in 1986, in what part of Georgia did you live in?

A.    I came back to Savannah.

Q.    Then directing your attention to the fall of 1989, did you take a job at that time in the Savannah-Chatham County Georgia area?

A.    I did.

Q.    What was that?

A.    Coastal State Prison.

Q.    What was your position you took at the Coastal State Prison?

A.    Correctional officer.

Q.    Until approximately when did you hold that correctional position at Coastal State Prison?

A.    December of 2002.

Q.    Now, you know the man on trial in the courtroom, Meier Jason Brown.  Is that correct?

A.    I do.

Q.   How did you first meet him?

A.   I was going to friend's house, to a cookout.

Q.   Ms. Brown, try and keep your voice up, if you would, please.

A.   Okay.  And I pulled over and talked to him, and we exchanged phone numbers.

Q.   You were in your car and he was in another car.  Is that pretty much what you're saying?

A.   Right.

Q.   And where did this -- do you recall where this meeting occurred?

A.   In Hinesville.

Q.   When was this now?

A.   The last Saturday, the last Saturday in May of 2002.

Q.   When did you first see Meier Jason Brown after this exchange of phone numbers?

A.   About three days later.

Q.   What happened?

A.   He called.  I invited him over, and he came over.  And we talked.

Q.   At that time, and presently, where do you reside?

A.   131 Laurel Wood Drive.

Q.   Where is 131 Laurel Wood Drive?

A.   The southside of Savannah, a subdivision off of Quacco Road.

Q.   What is the name of the subdivision?

A.   Laurel Wood.

Q.   How long have you lived at that location?

A.   Three years and a half.

Q.   Did you begin to see Mr. Brown socially?

A.   I did.

Q.   How did you call him, by which name?

A.   Jason.

Q.   At the time you met Mr. Brown was he working?

A.   He had just started.

Q.   Where?

A.   At Kentucky Fried Chicken in Hinesville.

Q.   How long did he work there?

A.   I don't know.  Maybe a month and a half, a couple of months.

Q.   Do you know why he left that job?

A.   I think it was because of the hours that was promised to him.  They were cut.

Q.   Where did he work after that?

A.   Ramada Inn in Richmond Hill.

Q.   What type of work did he do for that business?

A.   It was maintenance.

Q.   How long did he work there?

A.   Really, I could give you approximate.

Q.   Yes, Ma'am.

A.    Probably four months, something.

Q.    And after that job where did he next work?

A.    I don't know the name of the company.  It was through a friend of his.  A friend of his owned this company, but I don't know the name of it.

Q.    What type of work did this company do?

A.    They laid pipes, from my understanding they laid pipes in the grounds before they built.

Q.    All right.  Where was the location jobsite where Mr. Brown went to work?

A.    It was over behind Home Depot in Pooler.

Q.    The new Home Depot on the west side right next to Interstate 95?

A.    Right.

Q.    Now, did there come a time when Meier Jason Brown began to reside with you at your Laurel Wood Drive home?

A.    Yes.

Q.    When was that?

A.    Almost immediately after I met him.

Q.    And then did something happened in the fall of '02 involving you that caused you to have some financial hardship?

A.    Yes.

Q.    What was that?

        MR. DARDEN:  May we approach briefly?

THE COURT: No, go ahead.

Q. Just with regard to what --

A. Do you want me go to go back all the way from the beginning?

Q. No, Ma'am. Just tell me what type of criminal charge was placed against you, Ma'am.

A. Yes. I was arrested for hindering the arresting officer -- well, obstruction and hindering her investigation.

Q. And under your job with the State of Georgia Prison there, were you required to tell your employer any time you have a contact like this with another law enforcement agency?

A. Yes, sir.

Q. And did Coastal State Prison, Georgia Bureau of Prisons, take some action against you?

A. I was suspended.

Q. All right.

MR. NEWMAN: Could we have 10-B, please?

Q. Now, Ms. Brown, if you would direct your attention to the monitor in front of you there. Do you recognize that, Ma'am?

A. Yes, sir.

Q. What is it?

A. When I was first suspended, because I was a seasoned

officer, I was suspended two weeks with pay. And that ran into time that would be before my court date. So, on November 8th, the two weeks would have been up. The court date was on November 12th. So, on November 8th, when the two weeks was up, I had to be placed on two weeks without pay.

Well, not really two weeks, just suspension without pay, pending the court.

Q.    Government's Exhibit 10-B is a letter from Coastal State Prison to you. Is that correct?

A.    Yes, it is.

Q.    All right.

MR. NEWMAN:  Your Honor, as identified by the witness, we tender it into evidence and request permission to publish same.

THE COURT:  Received.

Q.    And as the process with the court and your employment with Georgia State Prison continued to move along, were you ultimately suspended without pay and in effect functionally terminated or fired from your position at Coastal State Prison?

A.    I wasn't fired. I resigned.

Q.    What date would that be?

A.    December 11th, but I think they have it as December 12th, in their letter.

Q.    Okay.  And from the period of this court problem that first began with the charge by the local authorities, what sort of financial situation did you find yourself in at that time?

A.    It was a big setback.

Q.    Were you at that time also in bankruptcy?

A.    I was.

Q.    And as part of your bankruptcy plan, did you have regular payments to make to some official from the bankruptcy court?

A.    Yes, sir.

Q.    Who was that that you had to make payments to?

A.    The trustee.

Q.    In what amounts did you have to make such payment?

A.    I think at that time it was a 175 a month.

Q.    $175 a month?

A.    No.  Every two weeks.  I'm sorry.

Q.    Every two weeks.  And what was your status with your payment on your home, your mortgage?

A.    I think it was $652 at that time.  And the Court had added $250 up to January, I think it was, so that I could catch it up.

Q.    So, would two figures, if added up, what would that figure come to about?

A.    Almost 2,000.

Q.    And the defendant was living with you during this period of time.  Is that correct?

A.    Yes.

Q.    Did you talk with Mr. Brown, Jason as you called him, about your financial situation?

A.    Yes, he knew what was going on.

Q.    Would you consider yourself, that your situation could be described as increasingly desperate; or, would you say wouldn't be true?

A.    No.  I wouldn't say that would be true.

Q.    How would you describe it?

A.    I wasn't desperate.  I was -- I mean, I was behind in the payments.  But at the same time, with me resigning, I knew I was going to have the money coming in to do what I had do.  So, no, I wasn't desperate.

Q.    Now, did you visit Jason where he and his family had lived down in Liberty County?

A.    I have been there, yes.

Q.    And do you get to Jason's family's residence down in Liberty County?

A.    To my house, would be 17 to 196.  And they live on 196 in a trailer.

Q.    Is Highway 17 in Chatham County called the Ogeechee Road?

A.    I think it is -- in my area, it's called 17.  Farther

down, going towards town, it turns, and they call it Ogeechee Road.

Q.   Does it in fact cross over the Ogeechee River between Bryan and Chatham Counties?

A.   Sir, I don't know what river that is.

Q.   All right.  Now, tell the jury what Meier Jason Brown living situation was on 196?  How would you describe it?

A.   I don't understand the question.

Q.   Well, was it a home or was it a mobile home?

A.   It was a mobile home.

Q.   Were there any other mobile homes in the immediate vicinity?

A.   Yes.  There was one on each sides of his mother's trailer, mobile home.

Q.   And in that middle trailer that you say was Mr. Brown's, who lived there all the time, as far as you knew?

A.   His mother, his younger brother, and his two twin brothers.

Q.   What is his younger brother's name?

A.   I know him as Rodney.  I can't think -- Rodney, I guess that might be nickname or middle name.  But I can't think of his name.

Q.   What sort of condition, physical condition was Mr. Brown's mother in, Ms. Sadie?

A.    She had some health problems.

Q.    What were they?

A.    I don't know all of them.  I know she was diabetic, and she was blind in one eye.  She was in the wheelchair.

Q.    Can you estimate how many times you stayed overnight in the Ms. Sadie Brown and Meier Jason Brown residence there in Liberty County in the Fleming area?

A.    Two.

Q.    And you are familiar with how the home is laid out inside.  Is that correct?

A.    To a point.

Q.    All right.  Would you direct your attention to the diagram that is on the screen there that is shown for identification Government's Exhibit 11.  Do you recognize that?

A.    I can't see it.  I mean, I guess it is glare, but...

        MR. NEWMAN:  Your Honor, may I approach?

        THE COURT:  Yes.

Q.    I show you what has been marked for identification as Government's Exhibit 11.

A.    Yes, I recognize it.

Q.    What is that?

A.    It is a diagram of Ms. Sadie's trailer.

Q.    And you recall the second occasion that you spent the night in that trailer?

A.    I do.

Q.    Do you recall the date of that occasion?

A.    November 29th.

MR. NEWMAN:  May I retrieve the exhibit, Your Honor?

THE COURT:  Yes.

MR. NEWMAN:  As identified by the witness, Your Honor, we tender into evidence the letter and ask that it be published.

THE COURT:  Received, and you may do so.

Q.    How is it that you remember with such clarity that the date was November 29, 2002?

A.    I probably wouldn't have remembered the date until all of this came up.  And I do know that this lady was murdered on the 30th.  And I could back up one day.

Q.    All right.  Where did you spend the night in that trailer, in that home?

A.    In one of the bedrooms.

Q.    Which bedroom?

A.    Jason said it was his bedroom.

Q.    Which bedroom would that be?

A.    The one right behind the kitchen.

Q.    All right.

MR. NEWMAN:  Your Honor, may I approach the witness again?

THE COURT:  Yes.

Q.   Approaching the witness with that same map you've identified and a green felt pen, could you put a mark where you recall you spent that evening with Jason?

A.   Just a mark?

Q.   Yes, ma'am.  Just indicate which room it was.

A.   (witness complies).

Q.   Thank you.

MR. NEWMAN:  May I approach and retrieve, Your Honor.

THE COURT:  Yes.

Q.   And you've put a green mark in a room that would be in, as you're looking at it, toward the top right of that diagram.  Would that be correct, Ms. Brown?

A.   Yes, sir.

Q.   And the morning of the 30th, what -- can you describe what your activities were that day?

A.   Well, the morning or the whole day?

Q.   Let's start with the morning?

A.   We woke up.  We talked, and we had discussed spending the day together.  I got up, and went home, because I told him I needed to check my house.  And I left.

Q.   How long does it take you to go from Meier Jason Brown's residence there on 196, back up 17 to your house in the Laurel wood subdivision?

A.    Approximately 20 minutes.

Q.    What type of car were you driving then?

A.    My truck.

Q.    What make is that truck?

A.    It is a '99 Dodge Durango.

Q.    When did you next hear from Meier Jason Brown?

A.    He called me at my home that morning.

Q.    And did you and he have any type of method, code, manner of calling one another with regard to phone calls?

A.    Yeah, because I have a set amount that I pay for my long distance.  We didn't want to charge them on his mother's phone.  Or I never charged them on there.  So, he would call me, and if I know him, then he would just hang up, and I would call him back, because it wouldn't be a charge, a different charge for.

Q.    All right.  And how many phones did you have, Ma'am?

A.    In my home?

Q.    Did you have more than just a cell phone?

A.    In my home?

Q.    Yes, ma'am.

A.    Four.

Q.    Okay.  Well, how many numbers -- did you have a hard line number at your house, let's say with BellSouth?

A.    Yes, just one.

Q.    Okay.  Do you recall the number of that?

A.   No, I have two.  But I can't remember the other one.

Q.   What was the number of the one you recall, Ma'am, in your house, the BellSouth number?

A.   927-9120.

Q.   And the person that you were most recently married to, Ma'am, what was that person's last name?

A.   Brown.

Q.   And do you have an ex-husband named Boggs?

A.   I did.

Q.   And to your recollection, in what name is the 927-9120 service delivered?

A.   Brown, Diane.

Q.   And what is the number of the cell phone you had?

A.   308-8463.

Q.   And what carrier, provider of cellular service did you have that cell phone service with?

A.   Cingular I.

        MR. NEWMAN:  Your Honor, may I approach the witness, please?

        THE COURT:  Yes.

Q.   I hand you what has been marked as Government's Exhibit 13-A.  What does that appear to you to be, Ma'am?

A.   I don't know -- I don't know what it is.

Q.   Does it appear to be a record from the cell phone company, Ma'am?

A.   Perhaps.  I have never seen one like this before.

Q.   All right.  Well, does it appear to have a phone number on it?

A.   Yes, it does.

Q.   What phone number is that?

A.   927-9120.

Q.   Would that be your phone?

A.   Yes.

Q.   What is the service address of that phone?

A.   131 Laurel Wood Drive.

Q.   Would that be your address?

A.   Yes, it is.

Q.   And who is the name that service there is being provided under or to?

A.   It shows Diane Boggs.

Q.   Were you ever known as Diane Boggs?

A.   I was.

Q.   Thank you.

        MR. NEWMAN:  Your Honor, may I approach and retrieve?

        THE COURT:  Yes.

        MR. NEWMAN:  Your Honor, pursuant to stipulation, the government offers into evidence its Exhibits 13-A and B being the two phone records that Ms. Brown has referenced.  And we will publish them later.

THE COURT:  All right.

Q.   So, back again to the morning of the 30th, you got a call from Mr. Brown.  And then what again did you do in response to that call?

A.   I called him back.

Q.   All right.  And did you have a conversation with him?

A.   Yes.

Q.   What came from Mr. Brown's side of this conversation?

A.   He told me to come -- he asked -- well, he told me to come get him.

Q.   And based on that conversation, what did you do?

A.   I told him that it would be a little bit, because I hadn't gotten myself together.  I was still just sitting on the side of bed, because my house was cold when I got there. So, I had to get myself together before I came.

Q.   And after some period of time, did you in fact make your way down toward Fleming, Georgia?

A.   I did.

Q.   Did you go, after you got yourself together, did you directly go to Meier Jason Brown's residence?

A.   I did.

Q.   And when you got there, where was Mr. Brown?

A.   In the yard in front of his mother's trailer or mobile home.

Q.   All right.  And did you have any conversation with him

at that time?

A.    He got in the truck.  And it had already been discussed that they were going to spend the day together.  I was driving at that time.  So, I asked him which way when we got to the top of the driveway he wanted to go, if it was left or right.

Q.    And if it was a right, where would that mean you would be going?

A.    Right would have been towards Hinesville.

Q.    And had you and he previously spent time in the Hinesville area?

A.    We visit his aunt and some of my friends.

Q.    All right.  Which way did Mr. Brown say?

A.    Left.

Q.    When he said left, what did that indicate to you where he wanted to go?

A.    To my house.

Q.    And did you go directly to your house; or, did you stop somewhere?

A.    We stopped.

Q.    Where did you go?

A.    First we stopped at the Racetrac Convenient Store in Richmond Hill to get some cigarettes.

Q.    One second, Ms. Brown.  Where would that be located in relation to I-95, the interstate highway?

A.   It would be like -- if I am mistaken, it would probably sit between the two ramps.

Q.   All right.  And who went and -- you say you stopped for cigarettes.

A.   Yes.

Q.   Did you go any place after getting the cigarettes?

A.   We walked next door to the package shop.

MR. NEWMAN:  14-A, please.

Q.   Ms. Brown, if you would direct your attention to Government's Exhibit 14-A, a photograph.  Do you recognize that?

A.   I do.

Q.   And that is what?

A.   On the left is the Racetrac, the convenience store. And on the right, it shows the liquor store we went to.

Q.   And that would have been on the morning of November 30th.  Is that correct?

A.   Yes, sir.  Yes, sir.

Q.   And who went into the liquor store?

A.   I went in first.  And then he came in behind me.

Q.   Did you purchase anything?

A.   Yes.

Q.   And what did you purchase?

A.   A liter of Seagram's.

Q.   And what, if anything, did Meier Jason Brown buy?

A.    I don't know if I got it or he got it, but a six-pack of Schlitz Malt Liquor beer.

Q.    All right.  Who paid for the cigarettes, and who paid for the malt liquor and gin?

A.    He paid for the cigarettes.  And I don't know, I think he gave me the money to pay for the alcoholic beverages.  I can't remember.

Q.    At that point in time was Mr. Brown working?

A.    No, he wasn't.

Q.    How long had it been since he had worked?

A.    I don't know, maybe a couple of weeks.

Q.    Would that have been from the pipe laying job?

A.    Yes.

Q.    And after --

        MR. NEWMAN:  I tender and request permission to publish 14-A, Your Honor.

        THE COURT:  Permission granted.

Q.    And after you got these provisions, so to speak, where did you go?

A.    We went to my home.

Q.    What do you do the rest of that day?

A.    I don't know.

Q.    Does that mean you got heavily into that bottle of gin?

A.    I wouldn't say heavily.  It don't take a whole lot for me.  And then normally, I go to sleep.  So, I...

Q.   Now, when you left the liquor store that day, do you recall Meier Jason Brown showing you anything?

A.   Yeah.  Yes, sir.

Q.   What was it that he showed you?

A.   He showed me three money orders.

Q.   Did you -- were you able to see the dollar amounts of the money orders?

A.   Yes, sir.

Q.   What were they?

A.   Two of them was for $500, and one of them was for $175.

Q.   What, if anything, did Mr. Brown say to you concerning these money orders?

A.   He said that the two for $500 should be enough to take care of the mortgage.  And the one for 175 would take care of the bankruptcy.

Q.   And in fact, those were the dollar amounts that you precisely needed.  Isn't that correct, Ms. Brown?

A.   I didn't need a thousand for the mortgage.

Q.   What was the figure you needed, Ma'am?

A.   I had sent them $927.

Q.   All right.  Was there any discussion about where and how these money orders, Mr. Brown came by them?

A.   No.

Q.   You didn't ask?

A.   No.

Q.    And he didn't offer?

A.    No.  I don't remember him -- I didn't ask.  And I don't remember him offering.  Let me put it like that.  Because if he did, I don't remember it.

Q.    Who kept the money orders from when you first saw them in the car after the Racetrac and liquor store stops until you got to your house?

A.    He kept them.

Q.    When you picked up Meier Jason Brown on the morning of 30th, when you found him outside his residence there, what condition was he in?

A.    He was the same as when I left him earlier that morning.

Q.    Which was what?

A.    Just Jason, calm.  I meant, I didn't see any difference.  I don't know that you --

Q.    Did he appear to have been drinking in any way?

A.    No.

Q.    Did he appear to have been using any illegal drugs of any kind?

A.    No.  And I say that, because, you know, you could use drugs and I wouldn't know it.  He didn't, in my eye.

Q.    There was nothing about him that suggested that to you?

A.    No.

Q.    Is that what you're saying?

A.    Right.

Q.    You said that the rest of that day you don't recall much of the rest of that day.  Is that correct, that Saturday?

A.    Right.

Q.    How about the next day, the Sunday?

A.    No, it was just Sunday.

Q.    Do you recall what you and Mr. Brown did?

A.    No, I don't, because I didn't know I was suppose to be remembering this stuff, you know, keeping up with it.  So it was day by day.

Q.    All right.  How about the next day, the Monday?

A.    We went to Fleming on Monday evening.

Q.    Did you do anything with regard to the money orders?

A.    Yes.

Q.    What do you do first; or, where did you go first?

A.    We went to the bank I used, First Union on Ogeechee Road, and we cashed one of the $500 ones.

Q.    How long have you been banking at that branch of First Union there?

A.    Approximately 16 years.

Q.    All right.  And you say you cashed one of the money orders there?

A.    Yes, sir.

Q.    Is there a reason why you didn't cash all of the money

orders?

A.   Because we was going -- we were going to send the money orders off.  But we didn't need -- I didn't need the whole amount, the whole thousand.  So, we cashed one of them at my bank and used some of the money from that to buy a money order at the Post Office to go with the other money order.

Q.   All right.  If you would -- I direct your attention to Government's Exhibit 20, please.

MR. NEWMAN:  This is a compound exhibit, Your Honor.

Q.   Does that appear to be a photograph, Ms. Brown?

A.   Yes, sir.

Q.   And who appears in that photograph?

A.   Myself and Jason, and somebody else in the background.

Q.   All right.  On how many occasions had Meier Jason Brown accompanied you into the First Union Branch down on Ogeechee Road?

A.   None that I can remember.

Q.   And does that photograph that you are looking at, being part of Government's Exhibit 20, indicate a date on the top left portion?

A.   12-2-02.

MR. NEWMAN:  Your Honor, this is one of the stipulated exhibits, 20.  We tender that compound, multi-photos, and request permission to publish them as

well.

THE COURT:  Received, and you may do so.

Q.  There are a series of photographs here now that the evidence technician is to show you and the jury, Ms. Brown. If you would please just keep your attention focused on the monitor.

(Brief Pause.)

MR. NEWMAN:  Thank you.  Mr. Hooper, you may stop there.

Q.  Do those photos capture you and Mr. Brown in that bank cashing that first money order?

A.  Yes, sir.

Q.  And when you got to your bank, did you walk out with $500 cash?

A.  No.

Q.  What happened?

A.  I had a minus on my account.  And I think it was like $32.  And that had to be cleared up.  So they took that out of the $500.

MR. NEWMAN:  Your Honor, pursuant to stipulation, the government offers into evidence, and declines to publish now, but will send out with the jury at the conclusion, its Exhibit 21, being bank records from the First Union showing the status of Ms. Brown's account there.

THE COURT:  All right.

Q.  Then where did you and Mr. Brown go, Ms. Brown?

A.  From there, we went to the Post Office on Fahm Street.

Q.  All right.  And what transaction took place there?

A.  I went up and bought a money order.

Q.  In what amount, Ma'am?

A.  It had to be like $427, because the money order that was sent off the mortgage company should have been 927.

Q.  All right.  Let me direct your attention to another stipulated exhibit, Government's Exhibit 22 that will come up on your monitor there, Ma'am.

Are you able to recognize that?

A.  It appears to be a receipt.  But I didn't look at the receipt when it was given to me.

Q.  All right.

MR. NEWMAN:  Your Honor, I will take the liberty of extracting some information -- this is a stipulated exhibit -- if I may.

THE COURT:  You may do so.

Q.  Is there a time shown on that document in the right portion of that middle exhibit, Ms. Brown?

A.  4:09 p.m.

Q.  All right.  What is the dollar amount shown right there in the middle?

A.  $423 dollars.

MR. NEWMAN:  Request permission to publish 22, Your Honor.

THE COURT:  You may.

Q.   And that was to be added to the 500.  Is that correct?

A.   That's correct.

Q.   To make up your, what you owed on your house?

A.   Yes, sir.

Q.   Now, let's look at the money order themselves.

MR. NEWMAN:  If I could have Government 15-A put up there.

Q.   Does that appear to be a money order?

A.   Yes, sir.  Yes, sir.

Q.   In what dollar amount is that one?

A.   $500.

Q.   And whose names appear on that money order?

A.   It would be paid to me, Diane Brown.

Q.   Would that address below that be your actual address, Ma'am?

A.   Yes, sir.

Q.   Who would be the person say issuing it?

A.   Jason Brown.

Q.   What address would be given as shown there for him?

A.   64 -- correction 6724 Leroy Coffer Highway, Fleming, Georgia.

Q.   And whose handwriting is that?

A.   Jason's.

Q.   All right.  I direct your attention to the next money orders, please.  Whose handwriting is shown on that second money order?

A.   Jason's.

Q.   And who is this money order made payable to?

A.   Chase Manhattan Mortgage.

Q.   In what amount?

A.   $500.

Q.   And under that Chase Manhattan Mortgage there, is there is certain number written in that starts 15?

A.   Yes.

Q.   What number does that correspond to?

A.   It appears to be my account number.  But I'm not for sure.

Q.   All right.  If you would direct your attention to the third money order.  Again, whose handwriting, first, is that?

A.   Jason's.

Q.   And does that appear to be coming from someone other than that Jason, so to speak?  Whose name appears to the right side of that money order?

A.   It is my name, Diane Brown.

Q.   And whose is that made payable to?

A.   The Chapter 13 Trustee.

MR. NEWMAN:  Your Honor, we tender into evidence Exhibits 15-A through C, as identified by the witness, and request permission to publish same.

THE COURT:  Received.

MR. NEWMAN:  All right.  One at a time, if you would, sir.

Q.   Now, after that business was taken care of by you and Mr. Brown on December 2 there, what did you do the rest of that day?

A.   Later that evening, we went to his mother's mobile home in Fleming.

Q.   And did you hear any type of conversation between Jason's mom, Jason Meier Brown's mom, Ms. Sadie, concerning someone who wanted to get a hold of Mr. Brown?

A.   Yes.  She gave him a card and said that this man wanted him to call him.

Q.   And did you see or read what was on that card?

A.   I'm not sure.  If I did, it was after we got back to my house.  But I'm not sure, because I've seen a card like it since.

Q.   Do you recall what sort of card was that?

A.   At that time, no.

Q.   And based on that conversation and that card, did Mr. Brown make a call anywhere in your presence?

A.   Later that day.  No, I'm sorry.  The following day, if

I am right, he called.  I don't know who he called.  He didn't call the name.

Q.   Was this call made in your presence?

A.   Yes, sir.

Q.   Where were you and Mr. Brown when this call was made?

A.   En route to Tybee Beach.

Q.   In whose vehicle?

A.   My vehicle.

Q.   At that point in time, did Mr. Brown own a car?

A.   No.

Q.   And on whose phone was this call made?

A.   On my cell phone.

Q.   All right.  And just relate what you heard from Mr. Brown's side of that conversation?

A.   It was like come back, or I'm not coming back right now, or I'll see you later.  I'll talk to you or call you later, something like that.

Q.   Who did you understand Mr. Brown was talking to?

A.   I didn't know who it was at that time.  I knew it was something somebody in the Sheriff's Department.

Q.   Which county?

A.   Liberty County.

Q.   At that point in time had you heard of what had happened at the Post Office in Fleming?

A.   On that previous evening when we was at Ms. Sadie's

mobile home, it was just talk.  I think she said, the mother said something like, "I know y'all -- did y'all hear about somebody -- y'all know somebody stabbed Ms. Sallie around at the post office."  And in return, I didn't know Fleming had a post office, that is what I said.

And, you know that is how I found out about it.

Q.   Did you spend the next several days where Meier Jason Brown?

A.   I did.

Q.   And directing your attention to that Thursday, which would have been December 5, had you made any decision about Meier Jason Brown staying at your house?

A.   No.  Because he wasn't living there.  He was living in Fleming.  On the 30th is when he came back to my house, and then up to the 5th.  But it was never that he came to stay.

Q.   During that time period, were you also in contact with your former husband?

A.   Yeah.  I was trying to think if it was within those six days or was it just day, the day before the six days, that Friday.  I'm pretty sure I talked to him during those six days.

Q.   All right.  Did you ever ask Meier Jason Brown if he called a person named Moran in the Sheriff's Office?

A.   No.  I asked him -- no.  I asked him when he was going

to call the man that he was suppose to call back.  And I didn't know that it was Moran or who it was.

Q.    All right.  Then moving ahead to the mid afternoon hours there on Thursday, December 5, where were you and Meier Jason Brown mid afternoon, Thursday, December 5?

A.    At my house.

Q.    And did some people come to pay you a visit?

A.    Yes, sir.

Q.    Who was that?

A.    The Sheriff's Department, Postal Inspectors, the dogs.

Q.    And did anybody speak with you?

A.    Yes, sir.

Q.    Do you recall the name of the person who spoke with you?

A.    No, sir.

Q.    Was it a man or a whom?

A.    It was a man.

Q.    Was the man -- racially, was he black or white?

A.    He appeared to be white.

Q.    Did he explain to you the purpose or the reason he was there?

A.    He did.

Q.    What was that?

A.    He said -- he said he didn't have a search warrant, but he would like consent to search my home, my property and my

vehicle.

Q.   Your vehicle being the Durango?

A.   Yes, sir.

Q.   And what did you tell him?

A.   I would give him consent.

Q.   Pursuant to the consent that you gave him, was there a search undertaken of your residence?

A.   There was.

Q.   When that search was going on, what did you do?

A.   I was there.  First they started in my den.  First they started in my den that I saw.  And then I don't know where they was at in the other part of the house.  But where was at, they started in the den, and from there, we went into the bedroom.

Q.   When you say we, did you accompany these law enforcement officers as they searched; or, were you not in there immediate presence when they searched?

A.   They was with me at all times.  So, I mean, we was together at all times.

Q.   All right.  Let me first your attention to 16-A, if you would.  Look at the monitor, please Ma'am.  Government's Exhibit, do you recognize that?

A.   Yes, sir.

Q.   What is that, Ma'am?

A.   That is picture of my home.

Q.   All right.

MR. NEWMAN:   We tender 16-A, and move to publish it.

THE COURT:   Received.

Q.   And if you would next direct your attention at the next exhibit, which will be 16-B, Ma'am.  What does that appear to you it be, 16-B?

A.   A diagram of my home.

Q.   Does it appear to be an accurate layout of the rooms, halls, beds, commodes in your house?

THE COURT:   Repeat the question.

Q.   Does that drawing fairly show the arrangement of the rooms in your house, Ms. Brown?

A.   Yes, sir.

MR. NEWMAN:   I tender and move to publish 16-B, Your Honor.

THE COURT:   Received, and you may do so.

Q.   Could you again take --

MR. NEWMAN:   Approach the witness, Your Honor.

THE COURT:   Yes.

Q.   Approach the witness with admitted Exhibit 16-B.  Could you take that green felt pen -- is it still there in front of you, Ms. Brown?

A.   No, I gave it back to you.

Q.   All right.  Excuse me.  Mark where your bedroom is,

where your bed is, and the room that has a little chest next to the bed?

A.    You want me to mark the bed and the chest?

Q.    Yes, ma'am.

A.    (Witness complies).

Q.    All right.  And did you see the law enforcement officers take anything into their possession and custody when they were searching your house?

A.    Yes, sir.

Q.    What were some of the things you saw them taking?

A.    They took three money order receipts.  No, correction. I think they took two money order receipts, because one I couldn't find.  They couldn't find.

Q.    All right.  And was there any pair of shoes that you recall them taking?

A.    They took a pair of Jason's shoes.

Q.    How would you describe those shoes?

A.    Blue suede sneakers.

Q.    Did Mr. Brown have any other pairs of shoes at your house?

A.    No, sir.

Q.    Was this the pair of shoes that he was wearing when you picked him up November 30th in Fleming, and brought him back to your house in Chatham County?

A.    Yes, sir.

Q.   I would like for you to identify some photographs, if you would, starting with 16-C for identification.  What is that photograph of?

A.   That's the night stand on the side of my bed.

Q.   Immediately next to your bed, would that be?

A.   Yes, sir.

MR. NEWMAN:  I tender and move to publish, Your Honor.

THE COURT:  You may do so.

Q.   Was there anything to your knowledge that was in that drawer that was of interest and taken by those law enforcement officers?

A.   That's the drawer where they got the receipts from.

Q.   16-B, please.  What would that be, Ms. Brown?

A.   Appears to be a envelop maybe one of my old tax returns was in, a copy of it.

Q.   Is that -- would that be a closer up photo of the previous photo, so some extent?

A.   I think so.

MR. NEWMAN:  I move to tender and publish 16-B, Your Honor.

THE COURT:  Received.

Q.   16-E, please.  What does that appear to be a photograph of?

A.   The two money order receipts laying on top, laying on

top of the envelop.

MR. NEWMAN:  Moved to tender and publish 16-E, Your Honor.

THE COURT:  Received, and you may do so.

Q.   16-F, please.  Can you identify that?

MR. NEWMAN:  Could you back it up, please.

A.   The three money orders -- three money order receipts.

MR. NEWMAN:  Move to tender and publish 16-F.

THE COURT:  Received, and proceed.

Q.   16-G, please.  If you will look at 16-G, the photograph there.  What does that appear to be a photograph of?

A.   Jason's tennis.

MR. NEWMAN:  I tender and publish 16-G, Your Honor.

THE COURT:  Received.

Q.   16-H, please.  What is that, 16-H?

A.   A photo of the same shoes.

Q.   Would that be closer up?

A.   Yes, sir.

MR. NEWMAN:  I move to tender and publish.

THE COURT:  Received, and you may do so.

Q.   17-A through C, please.  What does that appear to be, 17-A?

A.   A copy of the money order receipt for $500 going to Chase Manhattan Mortgage from Diane Brown, myself.

MR. NEWMAN: I tender, and move to publish.

THE COURT: Received, and you may publish.

Q. The next money order receipt, please, or next exhibit. What is that?

A. The money order receipt for $175 paid to the order of the Chapter 13 trustee from myself.

MR. NEWMAN: Mr. Hooper, could we have an exhibit shown on that, just the tag number in the top left there for a second, 17-B. Thank you.

I move to tender and publish, Your Honor, 17-B.

THE COURT: You may so do.

MR. NEWMAN: The previous exhibit, Your Honor, was 17-A.

THE COURT: So noted.

Q. Okay. And finally 17-C, please. What is that?

A. It is a money order receipt for $423.08 paid to the order of Chase Manhattan.

Q. Is that the one that you got at the Fahm Street Post Office?

A. Yes, sir.

Q. That is just right about right around the corner from where we are, is that right, Ms. Brown, so to speak?

A. It's pretty close.

Q. 18 upon the screen, please, for the witness.

MR. NEWMAN: Excuse me, was that published to

the jury.  Please publish 17-C, I move to tender and publish 17-C.

THE COURT:  You may do so.  It is received.

Q.   Exhibit 18 for the witness, please.  What does that appear to be?

A.   It appears to be the little piece of paper that they took out of my house on the night of the 5th.

Q.   When the agents were searching your house?

A.   Yes, sir.

Q.   In whose handwriting is that note?

A.   The top and bottom is mine, and the middle is Jason's.

MR. NEWMAN:  I move to tender and publish 18, Your Honor.

THE COURT:  Received, and publish.

MR. NEWMAN:  Permission to approach the witness.

THE COURT:  Yes.

Q.   Ms. Brown, I show you what is marked for identification as Government's Exhibit 19.  Would you examine that, please, without taking at out of the bag, would you, please.  What does that appear to be?

A.   Jason's shoes.

Q.   Would those be the same shoes that you had earlier described as blue suede tennis shoes?

A.   They appear to be.

Q.   Do they look in about the same condition as they were

when they were in your house, December 5?

A.    Sir, I guess so.

           MR. NEWMAN:  I tender, Your Honor, Exhibit 19.

           THE COURT:  It is received.

           MR. NEWMAN:  May I have one moment, Your Honor?

                        (Brief Pause.)

Q.    I ask you to look at one more exhibit, Ms. Brown, 15-D
pulled up on the screen.  Do you recognize that?

A.    Yes, sir.  Yes, sir.

Q.    And would that appear to be the face of a money order?

A.    Yes, sir.

Q.    One that you've earlier testified to concerning?

A.    I didn't see this one before.  I saw the receipt to it.

Q.    Okay.  You testified to the transaction concerning
that.  Is that correct?

A.    Yes, sir.

Q.    All right.

           MR. NEWMAN:  I move to tender publish 15-D, and
publish same, Your Honor.

           THE COURT:  Permission granted.  It is received.

Q.    And which money order is that, Ms. Brown?

A.    That is the one for $423.08 paid to the order of Chase
Manhattan Mortgage from myself.

Q.    All right.  Where did you obtain that one?

A.    At the Post Office on Fahm Street.

MR. NEWMAN:  May I have one moment, Your Honor, please?

I turn the witness over for cross.

THE COURT:  Marshal, I believe this is a good time for a recess.  We will reconvene at 10:30.

MARSHAL:  All rise.  Ladies and gentlemen of the jury, file into the jury room, please.

[NOTE:  Brief Recess.] jury returned.

THE COURT:  Mr. Darden, you may examine.

**CROSS EXAMINATION**

BY MR. DARDEN:

Q.   Good morning, Ms. Brown?

A.   Good morning.

Q.   Ms. Brown, I believe you indicated initially in your testimony that Meier resided with you.  Is that correct?

A.   At one time, yes, sir.

Q.   The truth of the matter is he was back and forth a lot.  Would that be a fair statement?

A.   Yes, sir.

Q.   And I believe his mom was in real bad health.  Is that correct?

A.   She was.

Q.   And, of course, he was concerned about her.  So, he spent a lot of time with her.  Is that correct?

A.    Yes, sir.

Q.    Okay.  And I believe you indicated that you had slept over at that residence on two occasion?

A.    Yes, sir.

Q.    The last occasion being the 29th of November?

A.    Yes, sir.

Q.    And y'all slept in that bedroom up by the kitchen.  Is that correct?

A.    Yes, sir.

Q.    And you indicated in your testimony that Meier told you that was his bedroom.  Is that what you said?

A.    Yes, sir.

Q.    Were you aware that at other times when he was in the home that he actually slept in the bedroom with his mama?

A.    No.  I thought he slept on the couch.

Q.    All right.  There were a lot of people living in that house.  Is that correct?  I mean, I believe you indicated they had three other brothers living there?

A.    Yes, sir.

Q.    And on the occasions you were in that home, did you see a lot of people coming and going?

A.    Yes, sir.

Q.    Okay.  They called this the Morgan Compound, and there was a lot of people in and out, a lot of brothers, a lot of cousins, a lot of people.  Is that a fair statement?

A.    Yes, sir.

Q.    Okay, you indicated that you were having some financial problems.  You had lost your job as a result of some legal problem you were having.  Is that correct?

A.    No, sir.

Q.    Well, you had been suspended without pay?

A.    Yes, sir.

Q.    Okay.  Now, the fact of the matter is that you were awaiting during this period of time -- you were awaiting a lump sum payment for your unused vacation time.  Is that correct?

A.     no, sir.  Can I explain?

Q.    Yes, ma'am.

A.    During the time I was suspended without pay as -- that started November 8th, pending the court November 12th, I was still employed.  After the court and the charge that the officer had on me, they dropped it to a lower misdemeanor, it still had to go through the department's legal system.

Q.    Yes, ma'am.

A.    So, waiting on that, I was still employed.  So, while I was employed, I couldn't touch any of my annual leave, retirement, or anything like that.  On the 5th of December when this happened with Jason, I was still on suspension.  And after thinking about it a while, I decided on the 11th to go ahead and resign.  Okay.

I resigned because at that time I was still waiting on an answer from the department, our legal system. When this came up, it didn't make things no better. There's not room for error with the department. And that was an error, even though I didn't get arrested or anything on this. It's still, as they say, my boyfriend was arrested at my house. So that brought attention to the department.

So, I went ahead and resigned.

Q. Yes, ma'am.

A. Then I could get what I had, my money.

Q. And that's why you indicated earlier while you were having some money problems, you didn't consider it to be serious; did you?

A. Yeah. I didn't consider it to be -- no. He asked if I were desperate.

Q. Yes, ma'am. You were not in that type of situation?

A. No, sir.

Q. Because you knew you had some money coming to you?

A. Right. Yes, sir.

Q. Okay. Now, when you left on the morning of the 5th -- I'm sorry. On the morning of the 30th, November 30th, did Jason Meier walk you out to the car; or, did you just leave or what?

A. I think he did walk me out to the truck. Yeah, he did.

Q. How was he dressed?

A.   He had on a like a blue and white striped Polo shirt, a pair of light blue bluejeans and I guess wore these shoes. And I'm not for sure if he had his jacket on.

Q.   Okay.  And that is a red and white Nautica jacket, a real colorful jacket?

A.   I think it is red and blue.

Q.   Red and blue.  And that was the jacket that he normally wore.  Is that correct?

A.   He had been wearing it lately.

Q.   Okay.  And you indicated that you later received a phone call from him.  Is that correct?

A.   Yes, sir.

Q.   And he was calm.  He simply wanted you to come pick him up; correct?

A.   Yes, sir.

Q.   And y'all were planning to spend the day together?

A.   Yes, sir.

Q.   And when you picked him up, he was dressed the exact same way he was when you left at 8:00 o'clock that morning. Is that correct?

A.   Yes, sir, the same.

Q.   And you didn't notice anything unusual, and he didn't appear to be unusual?

A.   No, sir.

Q.   Okay.  It was just an every day occurrence?

A.   Yes, sir.

Q.   Okay.  Now, you indicated y'all went to the liquor store and you got a liter of gin, and you got some Schlitz Malt Liquor.  And then later, you were talking about these money orders that he showed you.  Is that correct?

A.   Yes, sir.

Q.   By that time, you were pretty much into the gin.  Would that be a safe statement?

A.   No, sir.  I didn't drink any of the gin until I arrived back at my house.

Q.   Okay.  Well, did you see the money orders before you got to the house or after you got to the house?

A.   I saw the money orders at the Racetrac.

Q.   Okay.  Now, in your statement, you indicated after you got back to the house and got into the gin, the rest of the day was pretty much blank.  Is that correct?

A.   Yes, sir.

Q.   I mean, you apparently became highly intoxicated.  Is that a fair statement?

A.   I wouldn't say highly intoxicated.  But it just wasn't my day to notice what I was doing.  I mean, I didn't know I was to be noticing, so, I just -- I just went by my normal routine, whatever that is, because I didn't know I was suppose to be noticing things on this day.

Q.   Let me ask you this:  It is apparent from those

photographs and those exhibits you keep a very neat house. Is that correct?

A.   Yes, sir.

Q.   Okay.  And you testified that Meier lived over on Leroy Coffer in a mobile home.  Is that correct?

A.   Yes, sir.

Q.   A rather old, run-down mobile home?

A.   Yes, sir.

Q.   Ramshackled mobile home; correct?

A.   I don't want do put anybody down.  It was kind of rundown.

Q.   Yes, ma'am.  Certainly in comparison to where you lived, it was rundown?

A.   Yes, sir.

Q.   Now, on the 5th when the police came in, you are indicated there were postal inspectors, sheriff's department, and dogs.  Is that correct?

A.   Yes, sir.

Q.   And I assume they came in where guns drawn?

A.   Yes, sir.  They did.  When I first heard the knock on the door, I went down the hall, and I don't close my living room window blinds or anything, I could see what appeared to be sheriffs, deputy sheriffs standing in the window with a shotgun, outside with a shotgun.

Q.   And these people are stationed outside your house,

surrounding your house.  Is that correct?

A.   I don't know where they were.  They kept knocking.  By that time, Jason was behind me coming down the hall.  I opened the door, and however many it was, I thought it was like ten or twelve came in, guns drawn.  I don't know if they was around my house, you know.  I don't know if they were surrounding my house.  But I know I saw about ten or twelve came in, guns drawn.

Q.   And certainly they would be in view from anyone in the front of the house.  Is that correct?

A.   What do you mean, in view?

Q.   If you looked at a window, you would be able to see that people?

A.   My window, or anybody else's window?

Q.   How about the living room window?

A.   Yes, sir.

Q.   You would be able to see them?

A.   Yes, sir.

Q.   How about the dining room window?

A.   No, sir.

Q.   But the living room; correct?

A.   Yes, sir.

Q.   And the window you were looking out.

A.   Well, I was looking out my living room window when I got to the end of my hall.  It's not like I had to go to the

window to look out of it, because it is opened all the time. And that's when I saw the man with the -- the deputy sheriff or the sheriff with the shotgun in the air.

But they -- when I saw them, it was still beeped -- knocked on the door, a beep. And I went ahead and opened it. And when I did, that's when they rushed in. And they -- one of them snatched the chair from my dining room table, snatched it around and told Jason to sit there and don't move. And one of them kind of -- he didn't shove me, but kind of moved me to the side. And then they was just hollering, "anybody else in the house, any weapons in the house" and they was running from room to room to room.

You know, there wasn't nothing I could say. But being affiliated law enforcement, I know, you know, the area had to be cleared. But nobody asked me about -- I mean, they just rushed in.

Q.   It was frightening?

A.   Oh, it was very frightening.

Q.   Yes, ma'am.

A.   It is still frightening.

Q.   And you overheard one of the officers tell Meier to sit down and don't move?

A.   Yes, sir.

Q.   Let me ask you this. Did they separate you two?

A.   Yes, sir.

Q.   Did they do that initially, or did they do that later?

A.   Initially.

Q.   Okay.  Now, these money orders that were found in that bedroom of yours, in that drawer on that dresser, that is where you kept all of your -- apparently where you kept your important papers.  Is that correct?

A.   Receipts and real important things.

Q.   Yes, ma'am.  And I believe from what you can see in the photograph is a tax return.  Is that correct?

A.   Yes, sir.

Q.   And you placed those receipts in that drawer; did you not?

A.   I don't recall who placed the receipts in the drawer. I don't recall who had the receipts when we left the post office.

Q.   Okay.  Do you recall you --

A.   Whether I had them or he had them when we left the post office.

Q.   Well, let me ask you this.  That particular dresser is on your side of the bed; is it not?  I noticed the telephone is there.

A.   No.  I could say yeah, I sleep on that side.  But it wasn't a big thing when Jason was there on what side I slept.

Q.   I understand that.  But most of us keep important

papers, when you keep them like that, you keep them near where you -- in your area of the room?

A.   That is not the reason they're kept there, sir.  Like I say, I might sleep anywhere, on either side of my bed.  I don't know sleep on that side because the phone is there.  No.

Q.   Let me ask you this.  When you went back on the 1st -- I'm sorry.  On the 30th, to pick him up, about what time did you arrive back at the mobile home that day?  Do you know?

A.   I thought it to be something after 10.  I wasn't looking at the clock or my watch.  But from -- when I left there that morning I thought I was leaving like after 8.  And I went home.

Q.   How long does it take you to drive from that mobile home to your house?

A.   Approximately twenty minutes.

Q.   Okay.  About how long do you think you were at your house before you received a call from Meier?

A.   I don't know, sir.  I'm going do tell you the truth.  I was sitting on the side of the bed watching T V with my jacket on, because I was cold.  I have no idea how long it was.

Q.   You recall what was on T V?

A.   No, sir.

Q.   You indicated it was cold in the house.  Is that correct?

A.   Yes, sir.

Q.   And I assume when you went in the house and you noticed it was cold you immediately turned the heat on.

A.   Yes, sir.

Q.   Would that be a fair statement?

A.   Yes, sir.

Q.   Apparently you hadn't been there long enough for the house the reach a comfortable enough temperature for you to remove your jacket?

A.   Right.  I guess that to be right.  I still had it on.

Q.   How large is this house?  Is it a three-bedroom house or what?  Do you know how many square feet you have?

A.   I can't remember.  It is a three bedroom, though.

Q.   Okay.  But by your own testimony, you probably got home around 8:20 that morning.  Is that correct?

A.   I would think --

Q.   Certainly no later than 8:30?

A.   Yes.

Q.   Okay.  How long does it normally -- let me ask you this.  Do you recall how cold it was that morning?

A.   No.  It was cold outside.  It was cold outside.  And I don't know temperature wise.

Q.   Well, how long did it normally take to warm your house

up?

THE COURT:  There again, that would depend on how the temperature was.  Let's move along.

Q.    Well, do you have any idea how long you have been in that house before you received that call?

A.    I would think a little over an hour, maybe.

Q.    Okay.  Could it have been as much as two hours?

A.    I don't think I was there two hours.

Q.    When you went back to pick him up at the mobile home, did you see anyone else there?  You indicated that he was outside.  Is that correct?

A.    That's correct.  And no, when I went back I didn't.  I didn't see anybody else.

Q.    Okay.  How often did you go do that home during these several months you were involved in this relationship?

A.    Pretty often, because he was close to his mother.  He was real close.  So, I wouldn't say every day, but, you know, pretty often.

Q.    Given the number of people there normally when you went to that location, would you see other people there when you would go over?

A.    Yes, sir.

Q.    So, it was unusual that you didn't see anyone else that morning.  Would that be a fair statement?  If not, just tell me?

A.    Yeah.  But at the same time, I didn't think it was unusual because it was cold and it was still early to me.

Q.    You had indicated in your earlier testimony about some type of business card.  And you indicated, I believe, that Meier had actually tried to call the person that was on that business card.  Is that correct?

A.    Yes, sir.

Q.    Okay.  He wasn't trying to avoid that person or anything; was he?

A.    He called and somebody was arguing, like somebody was fussing at him on the other line.  And then it seemed like he started to talk to somebody else.  So, no, he wasn't avoiding him.  I don't think so.

Q.    But he, on his own, attempted to call.  Is that correct?

A.    Well, I had asked him just as reminder, you know, when he was going to call him.

Q.    And he did call them?

A.    He did call.

Q.    Let me ask you this.  When you saw these money orders on the date of the 30th, those three money orders that you talked about, the two for 500 and the one for 175, do you recall seeing those?

A.    Yes, sir.

Q.    Did you see any stains on them of any type?

A.   No, sir.

Q.   Any type of stain?

A.   No, sir.

Q.   Nothing unusual about them?

A.   No, sir.

Q.   Okay.  When they came on the 5th, and came in the house to conduct this search, only you and Jason were there. Is that correct?

A.   Yes, sir.

Q.   Approximately what time did they arrive?

A.   I thought it to be between 2:30 and 3.

Q.   About how long did they remain, just to the best of your recollection?

A.   Probably 10, 10:30.

Q.   That might?

A.   That night.

Q.   Okay.  So, they were there six or seven hours?

A.   Yes, sir.  I'm not for sure.

Q.   Okay.  But certainly they were there until later in the evening?

A.   Yes, sir.

Q.   You have a daughter.  Is that correct?

A.   Yes, sir.

Q.   How old is that child?

A.   She's 15 now.

Q.    Okay.  What time does she normally get home from school?

A.    At 3:10.

Q.    Okay.  She was not brought home on that date.  Is that correct, at that particular time?

A.    During the sometime that they were having me sign the consent form, I was also looking out my den window trying to catch her before she got -- I knew she was coming.  And I was trying to catch her before she got there, so she wouldn't even get involved in what was going on.  I mean, we had people every where.

       And one of the inspectors, she went out, when I did see her walking up the sidewalk.  She went out, and I told her to ask her -- to tell her to go to her friend's house.

Q.    And Meier was expressing concern about that as well; was he not?

A.    Yes, sir.

Q.    He didn't want to child to be brought in during that period of time?

A.    That's right.

Q.    Okay.  In fact, he told you later the reason that he talked to the police is because he was concerned about you and the child.  Is that correct?

A.    That's when he said he confessed because they said they

were going to arrest me and take my child from me.

MR. DARDEN:  That's all I have, your Honor.
Thank you.

MR. NEWMAN:  Yes, Your Honor.

### REDIRECT EXAMINATION

BY MR. NEWMAN:

Q.   In fact, Ms. Brown, concerning what Meier Jason Brown said in the conversations to the Liberty County Sheriff or Deputy, he said something about going to South Carolina; didn't he?

A.   Yeah, he did.  He said we was on our way to South Carolina.

Q.   Was that true then?

A.   No.  We was on our way to Tybee.

Q.   Whose idea was it to say that you were going to South Carolina?

A.   It was his.

Q.   And in fact, when you testified in the grand jury early in the proceedings, many months ago, you also testified that you were going to South Carolina.  Isn't that correct?

A.   Yes, sir.

Q.   You weren't asked what did Jason say.  You were asked where were you going, and you said you were Government's Exhibit to South Carolina.  Isn't that correct?

A.   Yes, sir.

Q.   Why did you so testify then?

A.   I didn't see it of important, sir.  I'm going to tell you the truth.  Tybee or Hilton Head, we was riding.  I didn't see it of importance.  I mean, I know the importance of it now, because you have explained it to me.  But at that time I didn't.

MR. NEWMAN:  Nothing further Your Honor.

THE COURT:  The witness may step aside.

[NOTE:  Witness left the stand.]

THE COURT:  Call your next witness.

MR. NEWMAN:  Ms. Sapp.

CLERK:  For the record, Ma'am, please state your name and occupation.

WITNESS:  My name is Catherine Sapp.  I'm employed as a Special Agent with the Georgia Bureau of Investigation.  And I hold the capacity of a Crime Scene Specialist.

**CATHERINE SAPP**, after having been duly sworn, and called as a witness by the government, testifies as follows.

**DIRECT EXAMINATION**

BY MR. NEWMAN:

Q.   How long have you been employed by the GBI, Ms. Sapp?

A.   I've been employed by the GBI for just around eight years.

Q.   What does it mean to be a Crime Scene Specialist?

A.    A Crime Scene Specialist with the GBI, we go through the normal basic routines special agent practice that every other GBI agent goes through.  In addition to that, I have been selected as a Crime Scene Specialist.  For that title, that gives me additional training in reconstruction of crime scenes, all types of crime scene.  And I continuously maintain that training.

       I've been equipped with more technological advanced equipment than a regular basic special agent.  But every special agent starts off the same.  It just evolves into a Crime Scene Specialist.

Q.    And have you had any specialist training to perform such function?

A.    I have.

Q.    Would you detail that for the jury before, please?

A.    As I said before, I went to the regular basic special agent school that involves crime scene training in itself.  But beyond that, I have been through in-state schools in Forsyth.  That is where the Police Academy up near Macon, and also sorts of reconstruction of crime scene, whether it be homicide schools.  I have gone through schools for shooting, bullet reconstruction, trajectory reconstruction.  I have been in out-of-state schools on other reconstruction, bullet trajectories, clandestine grave schools learning about hidden graves.  Fingerprinting classes, I have been

through classification.  I'm certified to identify fingerprints, and classify fingerprints, all types of additional -- my training is ongoing.

Q.    Have you had experience in processing homicide scenes?

A.    Yes, I have.

Q.    Can you estimate how many you have so process?

A.    I was processed around approximately 150 homicide scenes.

Q.    Directing your attention back to last year, November 30th, did you receive a call from your supervisor, John Edwards of the GBI?

A.    I did.

Q.    And what did Mr. Edwards direct you to do?

A.    Mr. Edwards told me to contact Dennis Davis, who is a captain with the Liberty County Sheriff's Office.  They had a person that was found deceased in the Post Office in Fleming, which is in Liberty County.  And I was to contact Dennis Davis for information on how to get to that scene and the information that he may have to enable me to work the crime scene.

Q.    And, approximately what time was it that you were able to arrive at the scene of the Fleming Post Office in Liberty County?

A.    I arrived at approximately 1:50 in the afternoon.

Q.    Could you tell the jury the situation you found there,

and then go into what steps you took to process the scene, so to speak?

A.   Okay.  The situation that I found, I first met with Investigator with Jay Cortez, who is also with the Liberty County Sheriff's Office.  And he gave me information thus far.  And I explain to you that I come as a GBI crime scene specialist to help with Liberty County.  So, there were no other GBI agents there.  So, that is why I'm talking Investigator Cortez.

He explained to me the information that they had so far.  That a lady named Sallie Gagila had been found in the Post Office.  And she apparently had been murdered.

I entered the Post Office through the back of the building.  It is a small with building.  Excuse me.  Walking through a hallway into the office area, if you will, and found this Ms. Gagila's body on the floor of the office area.  And beyond that was the reception area where customers would come to.  And there were some stains in the floor in there.  So, I processed that flooring also.

Q.   Did you take any photographs of the scene?

A.   I did.

Q.   What sort of equipment did you use to take these photographs?

A.   A 35-millimeter camera.  And I also have a digital camera.  And I took photographs both 35-millimeter and

digital.

Q.    We would like you to first direct your attention to the monitor where Government's Exhibit 9-A will first be shown for you.

A.    Excuse me.  There's a little bit of a glare.

Q.    Yes, it is?

A.    Okay.

Q.    Do you recognize that?

A.    I do.

Q.    And what does that appear to be?

A.    That is the customer area of the Post Office in the Post Office.

Q.    And is that the way it appeared back on November 30, 2002?

A.    It did.

        MR. NEWMAN:  I tender and publish 9-A Your Honor.

        THE COURT:  Received, and proceed.

Q.    Move on to 9-B, Ms. Sapp.

A.    Yes, I recognize this one also.  This is the -- this is front customer area.  It is the flooring of the -- what looks like white envelopes to you all, those were put there by the Liberty County Sheriff's employees before you got there.  Those denote where those bloodstains were on the floor.

MR. NEWMAN:  Tender and publish 9-B, Your Honor.

THE COURT:  Received, and proceed.

MR. NEWMAN:  9-C, Mr. Hooper.

A.   This is also the customer area of the post office.  It is just slightly to the right of the last picture you just saw.  The envelopes in the floor again are where the bloodstains were on the floor.  And it is just a different counter shot.

MR. NEWMAN:  I tender and publish.

THE COURT:  Received.

Q.   9-D, please?

A.   All right.  In this photo, I'm standing in the office area of the post office, taking the photo towards the door that separates the office from the customer service area.  And the machine that you see on the counter, that would be the office area of the post office.

MR. NEWMAN:  Tender and publish.

THE COURT:  Received.

Q.   Ms. Sapp, now it is only at this point that the jury has this photograph on the screen.  And you are referring to what instrument?

A.   I'm sorry.  The black instrument on the counter and it is got kind of a red handle to it.  Yes, thank you.

Q.   9-E, please.

A.   This is, this is a counter top area -- I'm sorry.  This

is not clear. I'm trying to see it. The picture is -- can you turn the picture the other way. You've got it sideways. Yes, thank you very much.

This is the counter top. And it is the foot print that was found on the customer side of the counter top. The counter top runs from the office area to the customer side. It runs through the doorway, the little window way, which is on the customer side. And it looks dirty, because it is black fingerprint powder that I put on there trying to find that foot print. And that is what you see.

Q. There appears to be a L-shaped instrument to demote measurement. Is that clear in that photograph?

A. It is not in this photo.

Q. Okay. All right. When it does appear, would you have put that there?

A. Yes.

Q. All right. 9-D --

MR. NEWMAN: I tender and publish, Your Honor.

THE COURT: Received. We will experiment with the lights momentarily. Go ahead.

MR. NEWMAN: Thank you, Your Honor.

Q. 9-F, please.

A. This would be a same photograph with the scale put in. It is the same print that was on the other, previous photograph. It just had a measurement scale in it.

Q.   All right.

MR. NEWMAN:  Tender 9-F, and move to publish, Your Honor.

THE COURT:  Proceed.  Yes.

A.   This is again the same photograph.  It is just closer in so you can see more detail.  It is of the footprint on the counter with the scale involved.

MR. NEWMAN:  Mr. Hooper, what exhibit number is that, sir?

That is for the record, Your Honor, 9-G.  I tender and publish.

THE COURT:  Received.

Q.   9-H, please, what is that, Ms. Sapp?

A.   This is on the counter top area that I mentioned before.  The counter top area runs from the customer service to the office area.  This is the office side of the counter top.  There was a dragged style hand mark on the office side of the counter top.  And I used that fingerprint power to try to enhance that drag mark.  So, that is what you see in this photograph.  It is a dragged mark with the measurements still in there on the counter top.

MR. NEWMAN:  I tender and publish.

THE COURT:  Received.

Q.   9-I, please.

A.   This is the same hand print with a different, a

slightly different angle.  And the measuring device has been removed.

MR. NEWMAN:  Tender and publish.

THE COURT:  Received.

Q.   9-J, please.

A.   This picture depicts the office side of the counter. It is the side of the machine that I mentioned earlier that the gentleman pointed to with the handle.  And as depicted in the photograph, there is a set of keys that's almost against the wall behind some wiring.  And I'm take a photograph of these keys.

MR. NEWMAN:  Tender and publish 9-J, Your Honor.

THE COURT:  Received.

Q.   And in that last photograph, was there some paperwork on the bottom left portion of that photograph?

A.   There was.  Yes.

Q.   9-K, please.

A.   This picture is the same shot of the photo.  It is just closer in to depict the keys a little lit more clearly.

MR. NEWMAN:  Tender and publish.

THE COURT:  Received.

MR. NEWMAN:  9-K that was, Your Honor.

Q.   9-L, please.

A.   When I entered the Post Office, I mentioned that I entered through the back.  And there's a type of a hallway.

there's a door that separates that hallway from the office area.  This photo is a picture of that open doorway looking into the office area.  And it is focused on a 5-drawer -- 4-drawer -- a 5-drawer stack shelf.  It is the counter that I've been speaking of, but it is on the office side.

MR. NEWMAN:  I tender and publish 9-L, Your Honor.

THE COURT:  Received.

Q.   9-M, please?

A.   This photo is another photo depicting the same shot, just a little more definition.

MR. NEWMAN:  I tender and publish 9-M, Your Honor.

THE COURT:  Received.

Q.   9-N, please?

A.   This is the interior office of the Post Office.  The work boxes, I guess, where paperwork and postal items are kept.  But it is the interior of the Post Office, the office itself.

MR. NEWMAN:  I tender and publish 9-N, Your Honor.

THE COURT:  Received.

Q.   9-O, please.

A.   This photograph depicts the body of Sallie Gagila as I found her when I entered the Post Office.

MR. NEWMAN:  Tender and publish.

MR. DARDEN:  Judge, our objection remains on this photograph.

THE COURT:  I note your objection.

You may publish.

Q.  9-P, please?

MR. DARDEN:  Note the objection, please.

THE COURT:  Objection noted.  You may publish.

A.  This is also the body of Sallie Gagila as I stood behind her head.  And that's the direction of the photograph.

MR. NEWMAN:  I tender and publish 9-P, Your Honor.

THE COURT:  Received.

Q.  9-Q, please.

MR. DARDEN:  A continuing objection, Your Honor.

THE COURT:  So noted.

MR. DARDEN:  Thank you.

A.  This is also a photograph of Ms. Gagila's body from a slightly different angle.

MR. NEWMAN:  Tender and publish 9-Q, Your Honor.

THE COURT:  Received.

Q.  9-R, please.

THE COURT:  May I see counsel at side bar?

MR. NEWMAN:  Yes, Your Honor.

[NOTE:  Sidebar Conference.]

THE COURT:  I want you to have adequate opportunity to demonstrate the position of the body.  But I think this is enough.

MR. NEWMAN:  Yes, sir.  And it was the defense's cross-examination as to the position of the body that has made these photographs more relevant that they might have been at the start of the proceeding.

THE COURT:  Which witness was it that he questioned --

MR. NEWMAN:  It would be Ms. Ashcraft he question ostensibly about the position of the body.

THE COURT:  Help me capture that.

MR. NEWMAN:  She was the First Responder from --

THE COURT:  Okay.

MR. NEWMAN:  But we'll streamline it, Your Honor.

THE COURT:  All right.

MR. NEWMAN:  Thank you, Your Honor.

MR. DARDEN:  Judge, just let the record note that we have a continuing objection to this.  And I won't do it every time, to save time.  Thank you.

THE COURT:  All right.

[NOTE:  Sidebar Conference

Concluded.]

MR. NEWMAN:  One moment, Your Honor.

THE COURT:  All right.

(Brief Pause.)

Q.    9-T, please, Ms. Sapp?

A.    This photograph is also of Ms. Gagila.  It focuses on the left side of her face and the left side of her shoulder and breast area.

Q.    Does it depict the wound?

A.    Yes, it does.  It depicts -- you can see the wound in her chest area in this photo.

MR. NEWMAN:  I move to tender and publish Government's Exhibit 9-T, Your Honor.

THE COURT:  Received.

Q.    9-X, please.

A.    This is a picture of Ms. Gagila's back as we rolled her to one side.  It depicts wounds on her back area.

MR. NEWMAN:  I tender and publish 9-X.

THE COURT:  Received.

Q.    9 Y, please?

A.    There you go.  This picture depicts Ms. Gagila's body at the bottom of it.  But the center of the photograph is on the desk area and contents of the desk.

MR. NEWMAN:  I tender and publish 9-Y, Your Honor.

THE COURT:  Received.

Q.   9-Z, please?

A.   The photograph is the desk in the office area.  And it shows the contents on the desk itself.

MR. NEWMAN:  Tender and publish 9-Z, Your Honor.

THE COURT:  Received.

Q.   9-AA, please.

A.   This is a closeup picture of the desk.  It shows Ms. Gagila's glasses on the far right corner of the desk, an adding machine with bloodstain on it, and a red paper folder that is lying open that has several bloodstains on it.

MR. NEWMAN:  Tender and publish 9-AA, please.

THE COURT:  Received.

Q.   BB, please?

A.   This is the far left corner of the desk.  It is a base of the cordless phone on the desk, and a part of some paperwork that was on her desk.

MR. NEWMAN:  I tender and publish 9-BB, please.

THE COURT:  Received.

Q.   CC, please.

A.   This picture depicts a closeup of the photograph of the base of the phone showing transferred bloodstains on the phone.

MR. NEWMAN:  Tender and publish 9-CC.

THE COURT:  Received.

Q.   DD, please.

A.    This is a closeup of some paperwork that was on her desk.  It has the measuring still in the photograph, measuring the bloodstain that has been dropped onto the paper.

MR. NEWMAN:  Tender and publish 9-DD.

THE COURT:  Received.

Q.    As a Crime Scene Specialist, is there some other information you could discern from that blood spot?

A.    I can show -- I can tell you the directionality of the bloodstain itself.  That bloodstain was traveling from the lower right quadrant to the upper left quadrant.  It's traveling in the direction of the spines that you see coming off it.

Q.    9-EE, please.

A.    This is a closeup picture of the adding machine that I spoke of earlier.  It contains a bloodstain.  This bloodstain is almost a 90 degree drop, which just means that it is almost dropped straight down onto this -- onto the adding machine.

MR. NEWMAN:  I tender and publish 9-EE, Your Honor.

THE COURT:  Received.

Q.    What is the figure shown on the adding machine there?

A.    The figure that is lit up is 175 -- 175.

Q.    9-FF, please.

A.   It is a closer picture of that adding machine centering on the stain itself with the measuring device in it.

MR. NEWMAN:   I tender and publish 9-FF.

THE COURT:   Received.

Q.   9-GG, please.

A.   This is the closeup picture of an adding machine tape that comes out the machine as you tally numbers.  And it depicts the numbers 500 plus .90, plus 500 plus .90, and then 175 with a division sign.

MR. NEWMAN:   Publish 9-GG, Your Honor.

THE COURT:   Received.

MR. NEWMAN:   And tender it.

THE COURT:   It is received.

Q.   HH?

A.   The photograph depicts the bloodstain, the hand set of the phone, the cordless phone.  And it is lying on the floor next to her desk.

MR. NEWMAN:   Tender and publish 9-HH, please.

THE COURT:   Received.

Q.   9-II, please.

A.   This picture shows the office area of the Post Office, and it's showing in the lower right corner, a portion of Ms. Gagila's body, but it is also showing towards the left center a chair that holds her purse with its contents and its belongings in the purse.

MR. NEWMAN:  Tender and publish 9-II, Your Honor.

THE COURT:  Received.

Q.   9-JJ, please.

A.   This picture is that same purse, but it's looking straight down into the purse showing the contents as I found them.

MR. NEWMAN:  Tender and publish 9-JJ, Your Honor.

THE COURT:  Received.

Q.   9-KK, please.

A.   This picture shows a closeup photo of an envelop that was sticking up from the inside of her purse.  And it has blood splatter on envelop itself.

MR. NEWMAN:  I tender and publish 9-KK.

THE COURT:  You may do so.  And proceed.  It is received.

Q.   9-LL, please?

A.   This is the same photograph, however a measuring scale is used in the photograph to measure the stains.

MR. NEWMAN:  Tender and publish 9-LL.

THE COURT:  Received.

MR. NEWMAN:  Approach the witness, Your Honor.

THE COURT:  Yes.

Q.   I show you what will be marked as Government's Exhibit,

for identification, 9-MM?

A.   Yes.  I recognize this.  This is a photo of the window leading into the office area, but I'm standing in the customer service area of the post office.  But it is a picture of the window counter area shooting into the office.

          MR. NEWMAN:  Tender 9-MM into evidence.

          THE COURT:  Received.

          MR. NEWMAN:  And move to publish it, Your Honor.

          THE COURT:  Yes.

          MR. NEWMAN:  The witness is with you.

                    **CROSS EXAMINATION**

BY MR. DARDEN:

Q.   Ms. Sapp, how are you today?

A.   Fine, thank you.

Q.   Without going through each individual picture, am I to assume that if there is a photograph of a white-looking envelop that detects a bloodstain.  Is that correct?

A.   The white envelopes that were in the customer service area on the floor.

Q.   That would indicate the presence of blood?

A.   That would indicate where the stains were located. Yes.

Q.   Let me ask you this.  You looked at those stains; did you not?

A.   I did.

Q.   Were they drops or smears?

A.   I would to refresh my memory with a photograph, but I believe they were drops.

Q.   Okay.  And that would indicate to you that, however, they got there they dropped from someone.  Is that correct?

A.   Or something, yes.

Q.   Or something.  If they had been smears, that would indicate that they would probably be placed by the shoeprint or something like that or a hand print?

A.   Or an object, yes.

Q.   Or an object.  Is that correct?

A.   That is.

Q.   Okay.  You indicated there was blood out in the customer service area; correct?

A.   There were stains in the customer service area.

Q.   Stains?

A.   Yes.

Q.   Okay.  And there was a substantial amount of blood in the rear of the Post Office where the body was located; correct?

A.   Yes, there was.

Q.   Let me ask you this.  How many crime scenes have you been to, if you just had to estimate?

A.   Other than homicide investigations, probably --

Q.   No, just homicides?

A.    Homicides, approximately 150.

Q.    Okay.  Did you on previous occasion been to a homicide location involving stab wounds?

A.    Yes.

Q.    Wouldn't it be a true statement that the amount of blood found at this location is not unusual for a stabbing.  Is that correct?

A.    Any type of wound can emit different variations of the amounts of blood.  So, what you are considering normally could be normal, yes in this instance.  It may not be for another instance.  It just depends on the wound itself.

Q.    And a lot depends on at what time -- at what time the victim expires.  Is that correct?

A.    Yes, it does.

Q.    Now, in looking at those photographs, 9-E was a counter top, a 5-drawer counter top.  And there was a key in that counter top.  Is that correct?

A.    Yes, in the top drawer.

Q.    Do you recall that?

A.    In the top drawer, yes, there was.

Q.    Did you see any evidence as to where that had been gone through or rifled in anyway?

A.    I don't believe I ever looked in that drawer itself.  I believe the postal inspectors did that, because it is postal property.

Q.    Okay.  But you saw the key, and it is in the photograph?

A.    Yes.  Yes.

Q.    Okay.  Did anyone indicate to you at you at your time of arrival at 1:30 that the scene had been preserved?

A.    Investigator Jay Cortez told me that the scene had been preserved awaiting my arrival.

Q.    Well, obviously the body had been moved.  Is that a fair statement?

A.    I was told that it was, yes.

Q.    Right.  And there is some evidence that some medical procedures had been performed?

A.    That's right.

Q.    So the position that you found the body in was not a true and accurate representation of where it was located at the time the crime scene as initially discovered; correct?

A.     That's true, yes.

Q.    It had changed?

A.    Yes.

Q.    Okay.  The telephone, you had a photograph of the base of the telephone up on the desk?

A.    Yes.

Q.    There was some transfer stains there; correct?

A.    Yes.

Q.    Explain to us what that means?

A.    Transfer stain is basically when you have blood in one location, but say, for instance, I have blood on the counter top, I put my hand in the blood, and then I touch something else.  When I remove my hand, that will leave a transfer stain.  It is transferred from one place to another.  It wasn't originally dropped there.

Q.    Did that -- and also, there was a photograph of the actual hand set itself on the floor near the body; correct?

A.    That's right.  That's right.

Q.    And there were of transfer stains on that as well?

A.    There were.

Q.    Did you conclude from that that the victim had attempted to use the telephone, more than likely?

A.    More than likely, but somebody who had been in contact with the blood had tried to use the phone.

Q.    Okay.  This hand print in 9-I on the counter top --

A.    Yes.

Q.    -- did that hand print indicate to you that they were left by someone without gloves?

A.    Yes.

Q.    Okay.  This customer service window, during the course of your investigation and getting all of this information together, did you measure that window?

A.    I don't believe I did measure the window itself.

Q.    It is not very big?

A.   No, it's not.  It is smaller than this counter top. The window itself is probably a couple of feet.

Q.   And about how tall, if you had to guess.?

A.   If I had to guess, it would probably be maybe two and a half to three feet tall.

Q.   Okay.  It would be the type of opening that someone would have to slide through and drag them through.  Is that correct?  I mean, you couldn't jump up on the counter and walk through?

A.   No, sir.

Q.   Or wobble through or something like that.  You would have to pull yourself through?

A.   Yes.

Q.   Okay.  In looking at your report, I believe you located a couple of hairs as evidence.  Is that correct?

A.   I did.

Q.   Can you tell the jury where they were located?

A.   I can.  One was on the floor underneath her left wrist. The other was on her chest between her breast, but underneath her bra, the center of her bra.

Q.   Can you describe those hairs?

A.   They were dark in color.

Q.   Did you make any kind of determination as to what type of person left those hairs?

A.   That is beyond my area of expertise.

Q.   You wouldn't know whether it was Negroid or Caucasian; would you?

A.   No, sir.

Q.   Okay.  Did you mark that evidence?

A.   Yes, I did.

Q.   Okay.

A.   Well, now, let me -- I collected the evidence and marked the containers.  I didn't obviously mark the hairs.

Q.   Yes, ma'am.  This purse that was photographed in the chair.

A.   Yes.

Q.   And there was also a closeup of that purse in a photograph?

A.   Yes.

Q.   Did you see any evidence as to where anyone had gone into that purse?

A.   It didn't appear such, but I can't tell you that, because I don't know what was laying on top of the contents.  Her contents were in there orderly.  The contents were not strewn all about the floor or outside the purse.  But if you had something lying on top of those contents, you know, somebody could have taken that out or whatever.  But no, it wasn't dumped.  Her purse was not dumped.

Q.   Yes, ma'am.  It is obvious from the photographs that was what appears to be a chain purse located inside of that

purse.  Is that correct?

A.    I believe so.  Yes.

Q.    And that had not been disturbed?

A.    It did not appear to have been.

Q.    And that is the type of purse where normally people keep money, it is a chain purse that snaps that you put money down inside?

A.    I don't.  But I mean, yeah, you could.

Q.    Okay.

A.    Yeah.

Q.    Did you look the items in the purse?

A.    Other than looking down at them, I did not take out and inventory the contents of the purpose.  I believe the Postal Inspectors or Investigator Cortez did.

Q.    Okay.  That would have been, I guess, beyond your pay grade, I guess.  Some other professional would look at that, I guess.  Is that correct?

A.    Some other professional would do that, yes.

Q.    Okay.  You don't have any responsibilities in obtaining fingerprints or anything like that; do you?

A.    From people or from evidence?

Q.    From evidence?

A.    Yes, I would do that.

Q.    Oh, okay.  Did you dust any of this area for prints?

A.    We dusted the counter top area, which you saw the

photos of.  You saw the black powder that was on that.  We dusted that for prints.  But the other areas were very paper strewn.  The telephone, the base, and the hand set were very stained with blood, which is, of course is going to obliterate fingerprints.

Q.    Did you find any usable prints?

A.    No.

Q.    Anywhere in this Post Office, no usable prints or comparison purposes?

A.    No.

Q.    Would it be your responsibility to obtain -- do you know what a moulage is?

A.    I haven't heard that term before.

Q.    It is a casting of a footprint or whatever.

A.    Yes, I do casting.

Q.    Okay.  And we don't have any of that as well.  Is that correct?

A.    The footprint that I located on at that counter top was located -- was an impression.  I found it with fingerprint powder.  You can't cast that, because it is on a flat -- a casting has to be something like a footprint in mud.  You can cast that, because you can lift it up out and make it 3-D.  But you can't a print.

Q.    Okay.  All right.  And you say you raised that print using the fingerprint dust.  Is that correct?

A.    We accentuated it, yes.

Q.    Okay.  And I assume you took photographs of it?

A.    I took photographs of it.

Q.    Was the counter top itself removed as evidence?

A.    No, it was not.  Not while I was there.

Q.    Okay.  After you took the photographs, it was counter top cleaned or what?  Or do you know?

A.    It wasn't cleaned of the fingerprint powder.  I believe Investigator Cortez may have taken some impression liftings of that footprint itself.  But no, we didn't remove or clean the counter top.

Q.    Did you during the course of this investigation go to any other location other than the Post Office to conduct your investigation?

A.    I did not, no.

Q.    Were you asked to review or look at any other type of evidence, any type of physical evidence, be it a motor vehicle, a bicycle or, clothing, or anything?

A.    No.

Q.    So, the only evidence you collected in this case was located at the scene itself:  Is that correct?

A.    At the scene itself.  Yes.

        MR. DARDEN:  May I have just a minute?

        THE COURT:  Yes.

                (Brief Pause.)

MR. DARDEN:  Would you please display that?  It was earlier shown by the government.

Q.   What do you see on this screen?

A.   This is a computer sketch of the Post Office that I composed.

Q.   Okay.  And that front area would be one, two, three, and four --

MR. DARDEN:  Has this been published to jury as well?

MR. NEWMAN:  Yes.

MR. DARDEN:  Thank you.

Q.   The areas indicating one, two, three, and four --

A.   Those depict the stains which is marked with envelops earlier in the other photos.

Q.   Okay.  And this area out in that front area is really a very small area.  I think it is like 24 by 8 feet or something like this?

A.   I have measurements but I don't recall.  It is not very big.  Yes.

Q.   Right.  And you see the location where did counter is, is that correct?

A.   It is.

Q.   So, whomever left the blood in one, two, and four, went to that side of the area.  Is that correct?

A.   That would be a logical conclusion, yes.

Q.    Okay.

MR. DARDEN:    Could you put the next one up, please?

Q.    I just wanted you to look at this photograph.  It was shown earlier.  Where exactly is this located?

A.    The counter top -- I talked about the window, the customer service window.  It has a door that swings to the office side.  What you are looking at is the blade of that door.

And what I mean by the blade is when you open that door, that little short part that means the jam, that is bloodstains that were taken.  This is a measuring device. But that is what that is.  It is blood splatter on the door, the jam of that door, the blade of that door.

Q.    And these appear to be blood droplets.  Is that correct?

A.    No, sir.  One is.

Q.    Right.

A.    They are castoff, technically.  And what that means is, castoff means it is coming from another source.  If somebody hits somebody with a baseball bat, as a bat swings, it is going to cast off blood off the bat or the person.  So, that is what this is.  This is castoff stains.

The one that appears to be a drop or a drip, that is a heavier castoff.  And because of gravity, it flows

faster and longer.

MR. DARDEN:  Thank you.  That's all I have.
Thank you very much.

MR. NEWMAN:  Nothing further Your Honor.

THE COURT:  The witness is excused.

[NOTE:  Witness left the stand.]

THE COURT:  Call your next witness.

MR. FRENTZEN:  Dr. Mark Kaponen.

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  Certainly.  My name is Dr. Mark Kaponen, and I work as the Deputy Chief Medical Examiner for the Georgia Bureau of Investigation Medical Examiner's Office.

**MARK KAPONEN,** after being duly sworn, and called as a witness by the government, testified as follow:

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q.   Dr. Kaponen, where is the GBI Forensic Laboratory?

A.   Its main headquarters is in Decatur, Georgia.

Q.   Sir, you are a medical doctor?

A.   Yes, sir.

Q.   What are your duties for the Georgia Bureau of Investigation?

A.   My duties as the Deputy Chief Medical Examiner are to

assist local law enforcement and county coroners with death investigations under the auspices of the Georgia Death Investigation Act.  Most commonly, that revolves around the performance of an autopsy examination.  And then as Deputy Chief Medical Examiner, I have some administrative duties.

Q.    What is your specialty, sir?

A.    My specialty is forensic pathology.

Q.    What is that?

A.    Forensic pathology deals with applications of medicine for the law, and most commonly revolves around the performance of an autopsy examination where we recognize, document, and interpret natural disease and injury and causes that contributes to death.

Q.    Can you tell us a little bit about your education?

A.    Certainly.  I went to Medical School at the University of North Dakota, which is where I'm originally from.  I went to medical school from 1982 until 1986.

While I was in medical school, I wished to pursue pathology as an full time career.  Pathology quite literally is the study of injury and natural disease.  I went to the University of New Mexico in Albuquerque, where I did a residency program.

A residency program is that period of time after medical school in which you specialize in a particular field of medicine.  I did my residency in anatomical and clinical

pathology.  And the program was five years all.  I studied clinical pathology, which deals with the hospital laboratory.  You go to your doctor, and they draw blood from your arm.  That blood goes to the laboratory where the pathologist is in charge to make certain that the tests are performed properly, and that the results are meaningful.

Anatomical pathology deals with tissues.  An individual has their gallbladder taken out, or a woman as a lump removed from her breast, that goes to a pathology, who looks at it both through his naked eye and through the microscope to find out what is wrong with that issue.  Is there an infection or is there a cancer?

Now, autopsy pathology is a part of anatomical pathology, which is examination of deceased individuals.

While in New Mexico, I worked part time at a medical examiner's office.  And during that time, I decided I wish to pursue forensic pathology as a full time career.

Now, before I left New Mexico, I took a examination given by the American Board of Pathology.  And I passed that examination, and I'm board certified in both anatomical and clinical pathology.  I then came to Atlanta to the Fulton County Medical Examiners' office where in conjunction with Emory University there's a Fellowship in forensic pathology.

A Fellowship is period of time after your

residency in which you specialize in a very narrow field of medicine. I studied under a number of other board certified forensic pathologists. At the end of that year, I took another examination again given by the American Board of Pathology and I passed that exam. And I'm also board certified in forensic pathology.

I stayed at on staff at the Fulton County office from 1992 until 1997. At that time, a position opened up at the state medical examiners office, where I have been since.

Q. You are licensed, sir?

A. Yes, I'm licensed to practice medicine in the states of Georgia, New Mexico, Arizona, and Montana.

Q. Can you tell us how many autopsies have you performed?

A. Well, approximately 3,490.

Q. Have you been qualified before as an expert to testify in court?

A. Yes, I have.

Q. How many times?

A. Approximately 191, 192 times.

MR. DARDEN: Judge, we'll stipulate the doctor is qualified.

THE COURT: Ladies and gentlemen, normally a witness may not express his opinion regarding any matter, but the laws makes an exception for those who have special training that is not available to the jury or to the

public in general.  Those people are designated expert witnesses, and may give you their opinion in assisting you to arrive at any decision you are called upon to make.

The parties have stipulated that the witness doctor is an expert.  And therefore, he qualifies.  But the same with all witnesses, the credibility and believability is for you to believe and you to make.

MR. FRENTZEN:  Thank you, Judge.

BY MR. FRENTZEN:

Q.  Dr. Kaponen, did you perform an autopsy of Sallie Louise Gagila?

A.  Yes, I did.

Q.  Do you recall when you performed that autopsy?

A.  That examination was performed on Monday, the 2nd day of December of 2002.

Q.  Where was that autopsy performed?

A.  The autopsy examination was performed in the mortuary facility at the GBI headquarters laboratory in Decatur, Georgia.

Q.  And did you make any initial observations about Sallie Gagila herself when you received the body?

A.  Yes, I did.

Q.  Can you tell about those observations?

A.  Yes.  Sallie Gagila was a well-developed, well-nourished Caucasian female.  She weighed 153 pounds,

and she was 63 inches in height.  And she appeared compatible with her stated age of 48 years.

Q.   Did she appear to be -- other than wounds inflicted on Ms. Gagila, did she appear to be otherwise healthy?

A.   Yes, sir.

Q.   What observations did you make about any wounds to the body of Sallie Louise Gagila?

A.   Okay.  First of all, it was very obvious that she had a number of what we called sharp force injuries or stab wounds.  And these were examined and documented.

MR. FRENTZEN:  Your Honor, I would like to show you --

Q.   If you can take a look on that monitor there.  First I would like to show you Government's Exhibit 23-A.

MR. DARDEN:  Judge, our continuing objection --

THE COURT:  So noted.  You may proceed.

MR. DARDEN:  -- if it may continue.

Q.   Dr. Kaponen, do you recognize that?

A.   Yes, sir.

Q.   What is it?

A.   This is a photograph that we take of every one who comes through our office.  When an individual comes to our office, they are within a zippered disaster bag.  And when the bag is opened, a photograph is taken to document the state exactly in which we receive the body.

MR. FRENTZEN:  Your Honor, I would offer Government's 23-A.

THE COURT:  Received.

MR. FRENTZEN:  I would like to publish it, please.

THE COURT:  Yes.

Q.   Dr. Kaponen, how did you initially find the body of Sallie Gagila?

A.   Okay.  Sallie Gagila was in a zippered disaster bag. And she was dressed in a green pull-over sweater.  She was wearing a bra.  She had a floral print skirt, female undershorts, a pair of knee high socks, a pair of anklet socks, and black lace up shoes.  She was always wearing a pair of earrings.  She had a white colored metal necklace about her neck.  She was wearing four rings on different fingers.  And she was also wearing a wristwatch.

Q.   I would like to show you what has been marked as Government's Exhibit 23-B.  Can you identify that?

A.   This stab wound -- this injury depicts a stab wound. And this is the stab wound that I listed in my report as stab wound number one.

Q.   Now, you number the stab wounds in your report.  Is that right?

A.   That's correct.

Q.   Is there any significance to the numbering?

A.    No.    These are numbered for the purposes of description only.  And they don't refer to a particular order in which these injuries were received, because I can't determine which order the injuries were received in.  And nor do they reflect the order of severity, or that one is more or less severe than number four or five.

MR. FRENTZEN:  Your Honor, I would like to order to offer and publish 23-B.

THE COURT:  Proceed.

Q.    Doctor, which stab wound, as you numbered them, does this depict?

A.    Okay.  This depicts stab wound number one.

Q.    Can you tell us about this particular wound?

A.    Certainly.  This stab wound was up in the right upper inner quadrant to the breast.  It was an inch in length. And it was nearly horizontally oriented.  And there was a blunt extremity and a sharp extremity.  And when you think of a knife, one edge of the knife has a blunted edge and the other edge is sharp.  And that can be reflected or seen in the stab wound injury.

This wound passed through the skin in the subcutaneous tissues or the fatty tissue beneath the skin and the muscles, and the pass between the fourth and fifth ribs.  This wound then, the stab wound then entered what is known as the media sternum, which is the area above the

heart, and passed through these soft tissues, but didn't your any major blood vessels.  And the overall length of this stab wound, as I measured, was approximately three to four inches.

And the right pleural cavity which is the right chest cavity, contained approximately 200 ccs of blood.  A 1,000 ccs is a quart.  So, that is relatively minor amount of blood.

Q.   I would like to show you Government's 23-D as in dog, Doctor, do you recognize this photograph?

A.   Yes, sir.

Q.   What is -- generally what is this photograph?

A.   Okay.  This photograph depicts what is labeled in my report as stab wound number two, and also very adjacent a minor wound.

MR. FRENTZEN:  Your Honor, I would offer Government's Exhibit 23-D, and would like to publish.

THE COURT:  Received.

Q.   Doctor, can you discuss stab wound number two, please?

A.   Yes.  Stab wound number two was in the upper outer quadrant of the left breast.  That wound was an inch in length, and it was nearly horizontally oriented.  And circumscribing the wound was a contusion.  A contusion is a bruise.

Both extremities on this particular wound appeared

to be sharp.  The wound track passed through the body wall, which is skin and the subcutaneous tissues in the muscles. And then passed into the -- we called it the right ventricular outflow track.  The wound passed into the heart. And it passed into the portion of the heart where blood is being pumped from the right ventricle into the lungs.  And the wound in the heart was approximately a half inch in length.

And the pericardial sac, which is the sac in which the heart sits, contained approximately 120 ccs of blood, and in the left pleural chest cavity contained approximately 300 ccs of blood.

Q.   What is the affect of a wound of this type, Doctor?

A.   Okay.  A wound much of this sort bleeds into the pericardial sac.  The pericardial sac is an tough fibrous sac.  It doesn't stretch much.

So, when this sac fills up full of blood quickly, there comes a point soon where the heart really doesn't have any more room to beat.  The pressure inside the heart is the same as the pressure outside of the heart.  And the heart will then very quickly be unable to pump efficiently.  And death will quickly ensue.

Q.   I would like to show you what has been marked as Government's Exhibit 23-G and ask you if you can identify that?

A.   Yes, sir.

Q.   What is 23-G?

A.   State's Exhibit 23-G is a photograph of the back of Ms. Gagila, which depicts a number of wounds.

MR. FRENTZEN:  Your Honor, I would offer 23-G and ask to publish it.

THE COURT:  Received.

Q.   Doctor, can you, starting with wound number three, and moving through the wounds depicted in this photograph describe those wounds?

A.   Certainly.  Stab wound number three is the stab wound of the right upper back.  Now, one thing you have to remember when I describe wounds is that the rights and lefts and ups and downs are given in relation to the victim.  And they are given as though the individual was standing in front of me, and if their arms are at the sides, and the palms are forward.  So, if I say it is right side, it's the individual's -- it's the decedent's right side.

So, this is in the right upper back, and it's just below -- we call the interior angle of the scapular, and at the bottom of the shoulder blade.

This wound was 9/10ths of an inch long.  And it was nearly horizontally oriented.  And it had a sharp extremity and a blunt extremity.  This wound passed forward and downward, and passed through the back, the skin and the

subcutaneous tissues of the muscle, and passed through a portion of the chest cavity.

Then after it passed through chest cavity, it passed into the diaphragm.  The diaphragm is the thin muscle that separates your chest cavity from your abdominal cavity.  And just below the duodenum diaphragm at this point is the right lobe of the liver.  This stab wound passed for a short distance into the right lobe of the liver.  And it resulted in a small amount of blood that was in the peritoneal cavity, which is the abdominal cavity.  And then also there was an amount of blood that was found in the right pleural cavity, which we mentioned earlier.

Q.   What about stab wound number four, Doctor?

A.   Stab wound number four, as you look at this photograph is the upper wound on the left side.  This wound is 9/10ths of a inch in length.  Both extremities appeared sharp.  This stab wound passed through the posterior body wall.  Again the skin, fatty layer beneath the skin and the muscles, and entered into the very bottom portion of the pleural cavity.

And from this point, the wound just barely entered into the pleural cavity.  It didn't cause any other injury. The overall length of the wound is two to three inches.  And the lung on the right pleural cavity wasn't injured by the particular wound.

Q.   Wound number five, Doctor?

A.   Wound number five is the wound on the left hand side. It was 6/10ths of an inch in length.  One wound was -- one margin of the wound was beveled.  One margin of the wound was undermined, which tells me that the wound went in a downward direction.  And with this wound, it passed through the skin and into the subcutaneous tissues, and was very superficial, and didn't enter into any of the underlying body cavities, and was approximately an inch and a half to two and a half inches in length.

Q.   Is wound number six depicted by this photograph?

A.   Not well.

Q.   Could we take a look at Government's Exhibit 23-H, please?  Does that depict it better, Doctor?

A.   Yes, sir.

Q.   Okay.  And do you go Government's 23-H?

A.   Yes, sir.

Q.   What is Government's Exhibit 23-H?

A.   Government's Exhibit 23-H depicts stab wound injuries that are labeled in my report as six, seven, and eight.

MR. FRENTZEN:  Your Honor, I would offer 23-H and ask to publish it.

THE COURT:  Received.

Q.   Doctor, could you describe wounds six, seven and eight, please?

A.   Yes, sir.  Stab wound income six is the upper of these

three wounds.  As seen on this screen, it is the one that is on the left-hand side and this wound is three-quarters of an inch in length.  And this wound passed from -- it's the left side of her chest, just behind what we call the posterior axillary line.  If you drew a line from the back of the axillar or the armpit downward, this wound would be just behind that line.  And this wound passed through the skin and subcutaneous tissues and muscles of the body wall, and entered the left pleural cavity between the eighth and ninth ribs.

The underlying lung was collapsed, and it contained no injuries.  So the stab wound did not penetrate into the lung.  And as previously mentioned, the pleural cavity contained 300 ccs of blood.  The overall depth of the stab wound was between two to three inches.

Q.   Doctor, can you explain for us what is -- at the time this stab was inflicted, apparently the lung was already collapsed?

A.   This lung was probably already collapsed, because there was no injury to the lung.  And for this stab wound to have passed through the body wall and not your the lung is perhaps one of the explanations why.

Q.   How or why would the lung have already collapsed?

A.   The lungs are inflated by the fact that there is no air in the pleural space.  Your lungs reside in the pleural

cavity, which is the chest cavity.  In between the lung and the body wall, there is no air, which is what allows your lungs to expand.  You expand your lungs not by forcing air into your lungs, but by expanding your chest cavity.  And then as you expand your chest cavity, the air rushes in to your mouth and to your trachea and to your lung.

Now, this only happens is when there is no air in this chest cavity.  Now when air gets in there, the lung collapses and when that lung collapses, obviously it gets smaller.  And when you have a penetrating chest injury, it may result in the lung not being injured.

Q.    What about wound number seven, Doctor?

A.    Stab wound number seven is the wound on the -- as you look at the three wounds, it is the wound on the right hand side.  Now this would was 9/10th of an inch.  It was a gaping wound.  It gapped a quarter of an inch in width.  It was a blunt extremity and a sharp extremity.  And this wound passed through body wall and entered the right pleural cavity -- left pleural cavity -- excuse me -- left pleural cavity very briefly, and then passed into the abdominal cavity, and then as a consequence, small amounts of omentum, which is the fat that surround the intestines, was extracted or extruded through this defect.  And none of the underlying internal organs that are in this portion of the abdominal cavity were injured.

Q.   The next wound, wound number eight?

A.   Stab wound number eight is a very small, very superficial wound.  It's between stab wounds number six and seven, and this wound is a quarter inch stab wound.  It is very small in length.  And it extents very shortly, or for a short distance in the underlying body wall.  It travels through the skin and the subcutaneous tissues between a quarter and a half an inch, and did not penetrate the chest cavity.

Q.   I would like to show you now what has been marked as Government's Exhibit 23-F, please.  I hope I'm getting these right, Doctor.  Does this reflect stab wound number nine?

A.   Yes, sir.

          MR. FRENTZEN:  Your Honor, I would offer Government's 23-F, please, and ask to publish.

          THE COURT:  Received.

Q.   Can you describe stab wound number nine, please, Doctor?

A.   Yes, sir.  On the anterior surface of the left foreman, and again as I mentioned earlier, the wounds I describe are as though the arms are at the side and the palms forward.  That makes -- this is the anterior, front surface of the arm.  And this wound was a half of an inch in length and it passed through the skin and subcutaneous tissues, and impacted on the underlying bone, which at that point is the

ulnar.

So the wound extended only for a short distance, approximately half an inch to an inch into the arm, and did not injury any major blood vessels.

Q.   And I would like to show you Government's Exhibit 23-E. Do you recognize 23-E?

A.   Yes, sir.

Q.   What is it?

A.   State's Exhibit 3-E depicts stab wound number ten. Stab wound number ten is on the posterior or the back of the left wrist.

Q.   Doctor, just a second.

MR. FRENTZEN:   Judge, I would like to offer 23-E and publish it for the jury, please.

THE COURT:   Received.

Q.   Thank you.  Can you proceed, Doctor?

A.   The stab wound is on back of the left, on the left wrist.  It is three-quarters of an inch in length.  This wound passed through the skin and subcutaneous tissues, and terminated or impacted upon the bones of the wrist, and so it extended only for short distance into the wrist.  And again, it severed no major blood vessels.

Q.   With respect to stab wounds number nine and ten, do you have any way of characterize those as defensive wounds.

A    When an individual receives multiple stab wounds or

other injuries that occur multiply, and injuries are found on their extremities, they are classically described as being defensive type of injuries.

Q.    Excuse me.  In addition to the ten stab wounds, Doctor, were there additional abrasions found on the body of Sallie Louise Gaglia?

A.    Yes, they were.

Q.    Take a look at Government's Exhibit 23-I, please.  Do you recognize 23-I?

A.    Yes, sir.

MR. FRENTZEN:  Your Honor, I would ask 23-I be admitted and asked to publish it.

THE COURT:  Received.

Q.    Can you describe, please, for the jury those abrasions, and describe the abrasions?

A.    Certainly.  This photograph depicts two superficial abrasion, and these are the abrasions that are in the bottom half of the screen as I'm looking at it.  Now, an abrasion is like a scraping of the skin.  Like a child falls down on the sidewalk and scrapes their knee.  The medical term for that is an abrasion.  And these two abrasions are triangular shaped.  They have one blunt end and one sharp end, and each of these wounds is approximately 6/10ths of an inch in length.  And they pass -- they abrade the superficial layer of skin, and they do not extend any farther.  They do not

extend into the underlying subcutaneous tissues or penetrate in the body wall.

Q.   Do you have any opinion about what may have caused these abrasions?

A.   I have seen injuries in this pattern before in other instances of multiple stab wound injuries.  And in those instances, injuries that are similar to this occurred when the knife was broken, and the individual was stabbed several times with the broken edge of the knife.  And since it is no longer sharp, all you end up with is the triangular abrasion that results from the broken end of the knife.

Q.   Based on the injury to Sallie Louise Gaglia, did you come to any conclusion about what type of weapon may have inflicted the wounds?

A.   It was a sharp cutting instrument of some sort.  And it would be a knife of some sort.

Q.   Can you say any more about it than it was a knife of some sort?

A.   No, sir.  Stab wounds are very difficulty to characterize.  They are not like bullets where you can retrieve the bullet and match it back to a firearm.  A stab wound injury, it may be an inch in length, but depending on how the knife was insert, the wound maybe longer than the knife is wide.  And conversely, the skin is elastic and stretches.  And so if the knife is on the dull side, the

skin may stretch more than it is cut.  And so the wound may actually be a little bit -- it may be not as long as the width of the blade truly is.

And then also, if you have a long blade and you inserted only half the length, the stab wound doesn't tell you anything about the length of the blade.  And conversely, if someone is stabbed with great force, the body wall may collapse a little bit, and so the wound may then in turn be a little bit longer than what the blade actually is.

And so other than saying it is a knife of some sort, there is not much more that I can say to characterize the weapon.

Q.   But the weapon appeared to have some sort of sharp point?

A.   Would be pointed and have a blunt edge and a sharp edge.

Q.   Okay.  By a blunt edge and a sharp edge, you mean along the --

A.   Yes.  One edge -- in my report, I call it the extremities.  One edge is blunted; the other edge is sharp, and at the very tip you have a point.

Q.   Which of the wounds, wounds numbered one through ten, which of these wounds in your opinion would have been life threatening?

A.   Stab wound number two which entered the heart obviously

is a fatal wound.  And then also, the stab wound, which is stab wound number three, which entered into the liver, was potentially a fatal stab wound if medical treatment was not available within a reasonable amount of time.

The other stab wounds in and of themselves were not rapidly fatal, but if an individual were to receive these wounds and not received appropriate medical care within a reasonable amount of time, they may become life-threatening wounds.

Q.   And given the overall collection of the wounds, all ten of these wounds, how long in your medical opinion could you expect someone to live after receiving these blows?

A.   The wound that is most serious is the stab wound to the heart.  And as I mentioned earlier, the pericardial sac fills up full of blood and prevents the heart from beating. This happens very rapidly.  This condition is known as pericardial tamponade.  And the heart may effectively stop beating within a very short period of time, and unconsciousness and death very quickly ensues.  And we're talking a period of minutes here; not of a half hour or an hour.

Q.   With regard to all of these wounds -- well, with regard to the critical wounds, the wounds inflicted to the body, do you have any opinion about whether or not these wounds could have been caused by some sort of accident, some sort of

tripping and falling into someone?

A.    We are asked that question often.  In such instance, I would expect wounds to be longer.  If someone is falling into someone, the knife blade would most probably be traveling downward or in some other direction.  And so that the wound would be long have superficial parts and then a deep part.  And I don't see that in any of these wounds.

There are two wounds that are superficial.  There is the wound that is characteristic or is labeled stab wound number eight.  And then also, on the front of the chest, adjacent to stab wound number two, there is a very superficial puncture wound.  It's conceivable that those two wounds are, because of their superficial nature.

Q.    That those are -- neither of those was any type of a critical wound that would have caused somebody -- neither of those was life threatening?

A.    That's correct.

Q.    After you conducted your autopsy, did you collect a sample of Sallie Gagila's blood?

A.    Yes, I did.

Q.    How did you retain that with blood?

A.    The blood is retained in several different forms. First of all, we retain blood for toxicological analysis. That blood is placed in test tubes, some of which contain a preservative.  That blood is also submitted on what is known

as a FTA card.  It's a filter paper card that contains chemicals for preserving the blood is preventing mold and bacteria growth.  And that particular card is sent to DNA laboratory.

MR. FRENTZEN:  The Court's indulgence for a moment, Your Honor.

THE COURT:  Yes.

MR. FRENTZEN:  Nothing further, Your Honor.

**CROSS EXAMINATION**

BY MR. DARDEN:

Q.   Good morning.  How are you today?

A.   Fine, sir, and you?

Q.   You indicated that you thought maybe the knife that was used perhaps had broken off.  Is that correct?

A.   That is certainly a possibility.  The only other time I've seen that particular pattern of injury is when that particular instance happened.  Unfortunately, in this instance, it is my understanding that the weapon was never found.  So, I can only render an opinion that is what those may have been the result of.

Q.   And you did not find any parts of the knife inside the body; did you?

A.   That's correct.  In a multiple stab wound, the body is x-rayed in our office, looking for the knife, a knife blade. And none was found.

Q.    Let me ask you.  In all of these photographs there appears to be what is bruising.  And it is bruising.  But would it be safe to state that what appears to be all of those bruises or actually a settling of the blood in the body?

A.    Yes.  There is some what is called postmortem lividity, which is settling of the blood.  And sometimes it can be accentuated around wounds.

Q.    And when you see those types of bruises, you can't draw any conclusions and relate to any type of struggle; can you?

A.    I described in my report lividity.  And then also around one of wounds, I believe that I said there was small amount of bruising around the wound.  Now, that is true bruising.  That occurred when the wound was inflicted.

Q.    Correct.

A.    But the discoloration that is seen in the photograph is a consequent of lividity.  It is the settling of blood.

Q.    Very good.  You talked about a collapse lung.  It is possibly to have a collapsed lung and be alive; is it not?

A.    That's correct.  As long as the other lung is not collapsed also.

Q.    Okay.  Right.  So, there's really no correlation you can draw between having a collapsed lung and death.  I mean, the possibility exists, a very good possibility that you have hear of it often where a person has a collapsed lung

for whatever reason?

A.    That's correct.  But if that was the only injury, then that would it be not immediately life threatening.

Q.    Now, as you indicated, there were some superficial wounds.  And isn't it through that even with superficial wounds you can get a substantial amount of bleeding?

A.    It depends on the location of the wound.  Stab wounds to the torso, because the blood supply of the superficial tissues, the skin, the subcutaneous tissues isn't great. And so, there may not be a great deal of bleeding there. Superficial wounds of the head and neck, and the extremities, the hands and arms, they tend to bleed a great deal.

Q.    Yes, sir.  Now, again, you can't determine sequence in which these wounds occurred?

A.    That's correct.

Q.    And there is no way you can rule out the possibility that the last wound inflicted was the wound that ultimately caused death?

A.    That's correct.

Q.    Number three?

A.    That's correct.

Q.    That could have in fact been last blow.  Is that correct?

A.    Yes.  Stab wounds number two and three were fatal

wounds.  Number two was to the heart.  And number three into the liver.  But you are correct.  They are numbered in my report for the purposes of describing them in generating the report.

Q.   Correct.  Did you find any evidence in your examination of any sexual assault?

A.   No, sir.

Q.   Did you see any evidence of any mutilation?

A.   No, sir.

Q.   Did -- if I understand your testimony then, you can't conclude based on your examination that there were any injuries to this body above and beyond what was necessary to cause death.  Is that a fair statement, since you don't know the sequence of the wounds?

A.   I'm not certain how to answer that question, sir.

Q.   Well, you say you don't know when the fatal wounds was administered.  Is that correct?

A.   That's correct.

Q.   It could have been the last one?

A.   That's correct.

Q.   Well, based on that, there's no way that you can conclude that there are any injuries above and beyond those necessary to cause death.  Is that a fair statement?

A.   That's not an unreasonable statement.

MR. DARDEN:  Thank you very much.  That's all I

have.

MR. FRENTZEN:  I have nothing further.

THE COURT:  Doctor, so that I understand, are you testifying that the wounds, in your opinion as a medical examiner, caused the death of the victim.

A.   Yes, sir.

THE COURT:  All right.  You may step aside.

WITNESS:  Thank you, Your Honor.

THE COURT:  May we excuse this witness?

MR. FRENTZEN:  We may, Your Honor.

[NOTE:  Witness left the stand.]

THE COURT:  May I see counsel at side bar.

[NOTE:  Sidebar Conference.]

THE COURT:  How many more witnesses do you plan to call.

MR. FRENTZEN:  Judge, I left my list on the table.  I think we've got in the neighborhood of about six.

THE COURT:  Then you are going to finish today.

MR. NEWMAN:  Absolutely.

MR. FRENTZEN:  Yes.  They should be fairly quick.

MR. DARDEN:  The next ones will go quicker.

THE COURT:  All right.

[NOTE:  Sidebar Conference

Concluded.]

THE COURT:  Ladies and gentlemen, this seems to be an appropriate time to recess for lunch.  The marshals tell me that your lunch will be here, or it has just arrived.  Then I will instruct the marshal to take you for a walk.  Remember, you are in the Court's supervision and direction.  And I have passed that responsibility to the marshals.

We will reconvene at 1:15, marshal.

MR. DARDEN:  And do not discuss the case.

THE COURT:  And do not discuss the case.

MR. DARDEN:  Thank you, Your Honor.

MARSHAL:  All rise.

*[Luncheon recess.]*

MARSHAL:  Court is back in session.  Be seated and come to order.

THE COURT:  Call your next witness.

MR. FRENTZEN:  Judge, briefly we have the next human witness, we have a certified copy of Sallie Gagila's death certificate.  It has been marked as Government's Exhibit 24.  We would just like to offer it.  It is self authenticating.

THE COURT:  The Court will receive it.

MR. FRENTZEN:  And we would like to publish it briefly to the jury.  Thank you, Your Honor.

MR. NEWMAN:  Call Raymond Voorhees.

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  My name is Raymond Voorhees, V-o-o-r-h-e-e-s.  And I work for the United States Postal Inspection Service in their Crime Laboratory in Dulles, Virginia.

**RAYMOND VOORHEES**, after having been duly sworn, and called as witness by the government, testifies as follows:

### DIRECT EXAMINATION

BY MR. NEWMAN:

Q.   Thank you, sir.  What is your occupation?

A.   I'm a forensic scientist.  I specialize in the field of comparison microscopy.  That would be ballistics, tool marks, tire prints, shoes prints, things like that.

Q.   All right.  What is tool mark?

A.   A tool mark is a mark left by a tool on the substrate, so that it could be anything from a hammer mark on a painted door surface, pry mark on an attack post office screen line drawer.  One of the contacts that we work here today would be that of the print left by the shoe or tire.

Q.   What is your educational background?

A.   I have an undergraduate degree from American University in the administration of justice.  And I have a master's

degree in forensic science from Antioch School of Law.

Q.    Or both of those schools in the Washington, D.C., metropolitan area?

A.    Yes, sir.  Well, the American University is still doing very well.  Antioch, the graduate school, folded and the University is now in the yellow springs, Ohio.

Q.    All right.  How about have you been working in the forensic field?

A.    Since the fall of 1971.

Q.    Did you previously work for the District of Columbia Police Department?

A.    Yes.  I worked in their firearms laboratory from 1971 until the spring of 1983.

Q.    And following that, did you join the Postal Service?

A.    Yes.  I came with the Postal Inspection Service when I was hired as a firearms and tool mark examiner.  And I'm now the manager of the physical sciences unit of that crime laboratory system.

Q.    Have you issued any publications in the field in which you work?

A.    Yes, I've been published by the American Academy of Forensic Science, the Association of Firearms and Tool Mark Examiners, and I have also contributed to works by National Academy of Science, and some justice programs as well.

Q.    Have you testified as an expert in your field in both

state and federal courts?

A.    Yes, sir, I have.

Q.    How many times, sir?

A.    Well, considering all of the disciplines, something about 400 occasions over last 32 years.

Q.    And in the area of shoeprints, how many times would you say you've testified as an expert?

A.    Very infrequently, sir.  Certainly fewer than the dozen times in the twenty years that I have been doing it with the Postal Inspection Service.

        MR. NEWMAN:  I offered the witness qualifications as an expert in the field of comparison microscopy and tool mark identification.

        MR. BELL:  Judge, I'm not sure he has established him as an expert in the shoeprint field with his training.

        THE COURT:  I do not either.

Q.    Mr. Voorhees, with regard to shoeprint comparison, what is the standard practice in your field discipline for comparison work with regard to such items?

A.    Are you talking about the training thereof, sir?

Q.    Yes, sir.

A.    Well, the training that I have taken has been with the International Association for Identification, and by attending annual seminars given by them.  And I have

attended three of those.

I also have worked within the field with others who are experts in the field.  And I also, in the last couple of years, have been working with a Marks Working Group for the European Forensic Science Community who approach this discipline a little differently than it is often approached here.

Tool mark is the parent study that I am familiar with.  Depending on the laboratory that you work with, you might, as a shoeprint examiner be in the crime scene people.  You might be with the tool mark people, and you might be with handwriting examiners.  So, it is really a subset discipline of a number of the comparison fields.

We, in our laboratory, have chosen to assign this work to the tool mark folks.

Q.   And in the tool mark discipline, how is the work of shoe comparisons, known and unknown prints, how is the work, the comparison work done and accomplished?

A.   It is a comparison process whereby one looks at the tread characteristics and the pattern characteristics of the known by any one of a number of means.  I happened to ink this shoe, and then rolled that ink impression as one would a fingerprint of the known fingerprint for the standard. And then looking at the actual, physical characteristics of that pattern, that impression, look for the very substrates

submitted for examination and see if I can find some congruency, or indeed all the way to the identical.

Q. And would congruence or congruency mean points of identification?

A. Well, they may or they may not. It could be that, again, like class characteristics. For instance, if one were to have brand new shoes that were manufactured consecutively, it may be that the prints they left would be indistinguishable one from another until certain wear characteristics or accidental marks were introduced to the tread.

So the first step is, as with tool mark or ballistic work as well as, to look for those class characteristics which would allow you to eliminate all but certain subject items. And then go from there to the search for the uniquely identifiable little accidental marks, the little scratches or mold flaws, cut marks, things like that.

Q. What role does photography play in shoeprint identification?

A. Well, it can have a number of roles. One would be the actually collection of image of the suspect print or impression at the scene. And it could be then that particular work product would be enlarged or in some way, for instance in the case like we have here, colors reserved to facilitate the comparison process.

And then on a rare circumstance, one would also do a photograph to photograph comparison, if the shoes were in such as state that an actual, physical ink impression were unavailable, if they were in such a state of decay or such -- for instance, a letter shoe that had been out in the weather for some time, it is not going to be amenable to that particular technique.

Q.   And dealing with the known sample, a known sample, have you worked both from the actual item itself, such as a shoe, and also from a photograph of the print of the known Item?

A.   Yes, I have worked both mediums, certainly having the actual questioned item in front of me is much, much better for the comparison process.

Q.   All right.  And have you had occasion to work with molds and lifts of the questioned print on -- I believe the term you used was a substrate in trying to conducted your analysis?

A.   Yes, sir.  That's a standard process, and one we teach in our crime scene schools, not only just a photograph, but also using a gel lifter to try -- particularly in dust impressions -- to lift those impression and return them to the laboratory.

Q.   And in the more general area of tool mark identification, do you hold any position with regard to the maintenance of the standards in the field nationally?

A.   I have addressed those.  But no, at this moment in time, I haven't written any of those standards.  I have written for accreditation efforts the analytical protocols that are used in our office today.  And I have worked with the ASCLD accreditation process.

Q.   And those goals are followed by the Postal Service throughout the United States?

A.   Well, all of those involved in the comparison of shoeprint identification would be using these protocols in our laboratory system, yes.

MR. NEWMAN:  Your Honor, I retender the witness's qualifications.  And I think that within the broader field of tool mark identification, I dare say that this Court is probably never had a witness more qualified than this person.  But I submit the witness or voir dire from the defense, if they care to engage in such.

**VOIR DIRE AS TO QUALIFICATIONS**

BY MR. BELL:

Q.   Is the lab accredited?

A.   No, sir, we are in the process.  We have had the preliminary examination and our list of deficiencies, and we're working on those now.

Q.   All right, sir.  And you have testified just a few times on shoeprints.  Isn't that correct, sir.

A.   That's correct.

Q.    All right, sir.  And the majority of your work would not include shoeprint work.  Is that true?

A.    Recently, sir, it is a significant minority part of the work.

Q.    I think that overall -- you and I have talked before -- that is approximately 2% of what you do?

A.    In the history of my career of more than 30 years, that's correct.  2 or 3%, right.

Q.    And you don't belong do any shoeprint societies or --

A.    Well, again, that's --

Q.    I'm talking about that subspecialty.

A.    To my knowledge, there are none.  The International Association of Identification, I hold a membership there. And they are, at least in this country, the parent organization.

THE COURT:  How do you obtain membership in that?

A.    Well, sir, Your Honor, at this moment, you write a check, and then you attend certain meetings.

THE COURT:  Right.  May I see counsel side bar?

[NOTE:  Sidebar Conference.]

THE COURT:  Joe, I'm not going to qualified him as an expert.  I don't think there is even a field.  He has not talked about peer review, what the standards are, that his work has to be peer reviewed.  I think he does

have knowledge that he could make a comparison, to show where they are similar, but I will not let him make the final leap that says in my opinion the shoeprint came from the same shoes.

MR. NEWMAN:  Your Honor, will the Court allow me to ask him about those particular area?

THE COURT:  Sure.  But **Daubert** is the seminal case, and it applies in criminal as well civil cases.  And I just simply will not accept that which I would have accepted two or three years.  I think the law has improved by **Daubert**.

MR. NEWMAN:  Yes, sir.

[NOTE:  Sidebar Conference Concluded.]

BY MR. NEWMAN:

Q.   Mr. Voorhees, what sort of procedures are there, or arrangements, are there among people who do engage in shoeprint identifications to review the work of those who engage in that particular field.

A.   If the laboratory question -- I'm going to only talk about the ASCLD lab standards that we would follow, that the work would be reviewed if in a particular identification -- and I mean in that the strongest sense of the association -- an identification were affected so that a questioned shoe was in the opinion of the analyst identified as having made

a given print or impression to the exclusion of all others, that would be reviewed by someone with the same training and experience.

In a class characteristic nature, that is one that says that the geometry of tread design or the size of the pattern or the nature of the pattern, then one could render an opinion without a review in that particular instance, at least as of the way we have written our protocol.

Q.   And the review that you are speaking there, is that internal within your laboratory?

A.   Yes, sir.

Q.   So, let's say in the instance case where you have examined some items the field of shoeprint comparison, after you write up your initial report, what then happens to your report before, let's say, before it would be the sent out the laboratory that the Postal Service employs you in?

A.   In this particular instance at hand, it was reviewed for two things.  First of all, for administrative accuracy, misspellings and make sure the numbers are all correct. And also, for technical completeness, that indeed I had followed protocols, protocols were reflected in my notes and that my notes and photographs bore sufficient material to support the conclusions stated in the report.  And then the individual who does the review, Mr. Bob Moberly in this instance, December 31st of '02 signed off on my report.

Q.    And who was that individual, and could you spell his last name for the record, please?

A.    Robert M-o-b-er-l-y, Robert Moberly.  He is a senior scientist with the Postal Inspection Service.

Q.    Does he told the same certifications that you hold?

A.    No, sir.  He is principally an instrumental chemist. He also does a lot of building material reviews, but he is one of the members of the laboratory who are making sure we are following the accreditation path properly.  He also has credentials having worked a lot of crime scene work.  And again as I said earlier, a lot of preliminary shoeprint work is crime scene work.  And he is the principal instructor for our national crime scene training program.

Q.    Within the field of shoeprint comparison, what sort of peer review work is there between laboratories, between, let's say, your laboratory and some other laboratory in some other location.  Is there any interaction, exchange of information between such laboratories?

A.    Certainly, the exchange of information is at the International Association of Identification Groups, and that meets annually in the United States at the national levels, and there are a number of local membership groups as well, and certainly one of the topics of conversations -- and there are several, certainly -- is that of shoeprint comparison work, and then there is also -- again I've been a

member now for two years of the European Working Group on shoeprints.

Q.    Then where does the European shoeprint Group me?

A.    Well, they most recently met in Turkey.  I was not privileged to go.  That was in September of this year.  The year before it was in Potsdam, Germany.

Q.    Were you able to attend that meeting?

A.    Yes, sir, I did?

Q.    And what sort of dialogue goes on there between members of different -- representatives from different laboratories?

A.    Well, in that particular instance, certainly the identification process is discussed, and ways to enhance, and photographs, and actually the mechanic of doing the job. But that last group meeting in Potsdam focused a great deal on the Bayesian theory for identification in the first place, the mathematical reasoning and logic of why one can establish an identification.  And there was a great debate as to whether or not it was even applicable, the Bayesian theory was applicable in the United States, and also there was a great deal of discussions as to whether or not qualified opinions ought to be introduced; that is, probably, highly probably, things like that.

Q.    Is the manner of experts in this field in Europe in making comparisons similar to the methodology employed by you and other tool mark identification persons in the United

States?

A.    Yes, sir.  The methodology, the mechanics of doing the work are the same.

Q.    And could you run through that quickly?

A.    Again, it is a side by side Q to K comparison.

Q.    Q being Questioned and K being Known?

A.    Q is Questioned; K, Known.  Yes, sir.  I'm sorry.  The gross geometry in tread design are compared.  And then a certain comparisons are made, usually either micrometer -- well, not micrometer, but a tool that would allow one to, like a compass, establish that the distance between two points on the one Q side is the same as that one on the K side.  And it is simply going over and over and over the pattern looking to the left and then to the right.  And then if one can optically overlay in some instances the known impression over the questioned impression, to see whether or not we do have the same size in geometry of tread design.  And that would be there merely to establish the class characteristics.  And then going beyond the class characteristics, one would look for the accidental marks that had been generated during the use of the shoe.  Or, perhaps a mold mark that was a void in the casting itself that would be unique to that sole.  And then if it does show up in the questioned print or impression used to establish a stronger relationship that the class characteristics.

Q.    Is there an divergence or a difference of opinion on certain mathematical formulations that are more favored in Europe than in this country in regard to these comparisons?

A.    Yes, sir.  There are strong difference of opinions.  In Europe, The Bayesian Theory tends to hold sway. Certainly --

Q.    What is that -- could you spell that word for the court reporter?

A.    B-a-y-e-s-i-a-n.

Q.    What does that mean, sir?

A.    Well, it is a over -- I can oversimplify.  That would be establish that if a given mark appeared in one sole in ten, and another given mark in another one sole in ten, that to find both of them on the same sole, that would be one in ten times one in ten, and the one in one hundred.

Now, it would be my argument that first of all to establish that a given mark was one in ten on any sole would be something of a number just pulled out of the atmosphere so as to start the mathematic process rolling.  And in and of itself is a conclusion that would be hard to defend.

The other -- and we're going now beyond class characteristics.  Now we're talking about the actual identity of a Q to K; not just the mere establishment of the class characteristics.  The establishment of class characteristics is simply a mechanical circumstance that

says this is essentially a overlay of that in the gross structure.

Q.   What sort of opinions or hypothesis, or hypothecations, do your European counterparts regularly employ that are not yet favored or disfavor in the United States?

A.   Well, again, that concept of Bayesian mathematic has not met with approval here in the United States nor in Canada to my knowledge.  It is still an ongoing debate.  But at this moment in time we still favor the classic side-by-side comparison, and then rendering an opinion by virtue of one's training and experience.

Q.   And is there any yardstick or minimum number of points of comparison within which a footprint or a shoeprint comparison expert would feel comfortable in stating that there is a similarity, or in simple terms, a match?  Is there any hard mathematical line there?

A.   Well, the answer is no, but I believe we're talking about two separate things.  One the gross class characteristics to the extent that the questioned impression or print offers the analyst the opportunity to study, we're looking to see if there are any unexplainable differences. In the absence of those unexplainable differences, then one will say that indeed the shoe at hand, the known, might possibly have made that print or that impression.

If we're talking about specific identity, I

believe, as in this shoe made the impression to the exclusion of all others, not just that it is possible for this shoe to have made this print, then we're talking about, at least in my experience, the individual analyst's training and experience, and his or her comfort level in establishing and making those statements.

That is why I said, depending upon the person doing the work, you may or may not find qualified opinions. For instance, as a tool mark examiner, I will either give one of three:  I can identify it.  I can't identify it in that it is not of the subject shoe, or that it could be, it's still within the realm of possibility.

There are, however, sir, those disciplines which would allow well, I'm 70% sure, or 80% sure, or 90%, and that is not the road I chosen to follow.

Q.    Is that view shared by other tool mark identifiers or identification experts in the United States?

A.    That is the standard of that the Association of Firearms and Tool Mark Examiners has as its hard and fast rule, that we do not offer qualified opinions.  And that group, I've been a member of that group since the middle of 1970s.  I visit one of their training programs at least once every three year on average.  And I haven't heard anything to the contrary in the more than thirty years I've been doing work with them.

Q.    Again, as footprint/shoeprint expert, how many times have you been qualified as an expert upon to testify in a court?

A.    Again, very infrequently.  I don't go to court very often as a federal employee.  Fewer than a dozen times, I don't believe, because I've done some research, I don't think more than that two or three times have I actually given expert witness testimony in the field of shoeprint identification.

MR. NEWMAN:  One moment, Your Honor.  Approach the bench, Your Honor?

THE COURT:  Yes.

[NOTE:  Sidebar Conference.]

THE COURT:  Joe, I still don't think he has demonstrated if there are standards out there, as there are with other prints, that these must be reached and checked off, and peer reviewed, and they do meet the standards.  He has talked about various societies.  Now, obviously, he has the experience both in the academic setting and in practical experience to compare.

I would suggest -- and I not trying to tell you how to prove your case -- you go ahead on that basis, but I would not tell the jury that he is not an expert.

MR. NEWMAN:  Yes, sir.

THE COURT:  I assume he can point to the jury

the similarities.

MR. NEWMAN:  Yes, sir.  Thank you.

[NOTE:  Sidebar Conference

Concluded.]

BY MR. NEWMAN:

Q.   Mr. Voorhees, in this case, the matter now before the Court, were you called upon to do some work?

A.   Yes, sir.

Q.   And in the course of such work were certain items sent to you and your lab?

A.   Yes, sir.

MR. NEWMAN:  Approach the witness, Your Honor?

THE COURT:  Yes.

Q.   I show you what has been admitted into evidence as Government's Exhibit 19?

A.   Yes, sir.

Q.   What is Government's Exhibit 19?

A.   Exhibit 19, sir, is a pair of Lugz brand athletic shoes.  My initials appear right on the side of the sole of both the left and right shoes.

Q.   Do those shoes appear substantially in the same condition as when you received them?

A.   Yes, sir.

Q.   And when was it that you received them, sir.

A.   If I may refer to my notes just specifically.  The

examination I actually began on December 17th, having received them from Stephanie Smith, who coordinated a great deal of this work, on December 16th of 2002.

Q. All right. Were certain photographs also sent to you?

A. Yes, sir. A number of rolls of film were submitted to me. I had them developed and returned to Ms. Smith. And that was in December of 2002, as well.

Q. I would like to direct your attention to three of those photographs, first what has been admitted into evidence as Government's Exhibit 9-EE, please.

A. Yes, sir.

MR. NEWMAN: Your Honor, this has been admitted. Can it be published?

THE COURT: Yes, I recognize it.

MR. NEWMAN: Can it be publish to the jury?

THE COURT: Yes.

Q. And what did you understand or what information were you furnished concerning the photograph 9-EE?

A. That was one of our rolls of film. And pardon me. The question was to determine if any of the submitted pairs of footwear, four of which in total, might have been able to or could be associated with either shoeprint lifts or the footwear prints visible in the photographs. And this was one of three that I removed from the roll of -- from the prints to study.

Q.   All right.  I would like to direct your attention to 9-FF.

        MR. NEWMAN:  This may be published, too, Your Honor?

        THE COURT:  Yes.

Q.   Do you recognize that exhibit, sir?

A.   I recognize it.  Yes, I do, sir.

Q.   All right.  And is there a purpose to be served by having a measuring device placed along side the area of a photograph?

A.   It is critical, sir.

Q.   How so?

A.   In that the comparison one conducts is actually a side-by-side, one-to-one comparison.  If you were to photograph without the scale, it would be impossible, or next to it anyway, to actually make the print to a one-to-one scale.  So, you would not -- one would not be able to conduct a side-by-side laboratory comparison and measure these very real, physical characteristics, the dimensions of which are being matched, Q to K, in every instance.

Q.   All right.  I would like to direct your attention to a third photograph, 9-GG, which has also been admitted into evidence.

A.   Yes, sir.  I do recognize that as well.

Q.    Now, upon receiving these photographs and others which you mentioned, what sort of work did you undertake?

A.    I, first of all, employed the aid of the forensic photographer in our laboratory to take the print and develop a one-to-one enlargement of the actual snapshot sized print that we got back from the photo shop.

Q.    Enlarged to what size reference or size frame, sir?

A.    So that the scale depicted in the snapshot to were enlarged to where it was actually printed to life size, one to one.

Q.    And life size means with regard to what other thing or object?

A.    Another scale of identical, or the same scale. Lighting Power Company, as you can see on this, is a supply house for a lot of forensic products.  We happen to have the same sort of scale in our laboratory.

Q.    With regard to Government Exhibit 19, the blue Lugz shoes that you just put your hand on --

A.    Yes, sir.

Q.    -- how did your enlargement relate to that pair of shoes?

A.    Well, the enlargement, sir, is specific to the print.

Q.    Right.

A.    That facilitates then the comparison between the working model that I'm going to be using of this photograph

and the shoes.  So, if there is a relationship, they will be the same size.

Q.   All right.  With regard to your known, your K there, Government's Exhibit 19, what did you do with the sole of that item?

A.   They were actually inked imprinted just as one would expect to roll a fingerprint.  It's the standard, is the impression or the print left by the sole of that particular shoe.

MR. NEWMAN:  All right.  I would like 25-A put on the screen but not shown to jury at this time, Mr. Hooper.

It is a compound, two-part exhibit, Your Honor.

Q.   As you are looking at that, sir, on the right there is an item or a picture of greater clarity.  Would that be the case, sir?

A.   Yes, sir.  That is the inked impression of the right, the sole of the right shoe of Exhibit 19.

Q.   Yes, sir.

A.   Government's Exhibit 19.

Q.   All right.  And underneath that, there is an another document.  Is that correct?

A.   Yes, sir, there is.

Q.   Tell the Court what that is?

A.   That is the enlargement and color-reversed working

model taken of the photograph taken from the roll of film that we in the laboratory enlarged.  And I have the color reverse so that I would be looking at positive against positive.  And that is the actual one half of my working notes for this particular examination.

Q.    And when you say color reversed, what two colors are reversed?

A.    Well, the black goes to white and the white goes to black.  There's actually no color at all in there.

Q.    And is that photograph itself an enlargement?

A.    It is an enlargement of the original print.  That is correct.

Q.    To try to bring it up to what approximate size?

A.    One to one, to life size.

Q.    To match -- would that be Government's Exhibit 19, or your 25-A exhibit?

A.    Once again, we work to match the scale in the picture.  I'm really not concerned about the shoes until I get the scale right.

Q.    All right.

A.    And then I can make the comparison.  Other than that, we don't do any work.

Q.    So, you worked against 25-A.  Is that correct?

A.    Yes, sir.

Q.    The lift or the roll --

A.    No, no, no.  When we enlarge, we enlarge to match our standard scale in the laboratory with the scale depicted in the image.  That's when we know we got the size right.  And then and only then can we do the comparison against the shoe or anything else.

Q.    In trying to affect and make a comparison, or just see if there is a comparison, you work between, is it correct, the two items shown in Government's 25 --

A.    That is correct.  Yes, sir.

Q.    -- A and B.

A.    That's correct, sir.

        MR. NEWMAN:  At time, Your Honor, I would tender into evidence Government's Exhibit 25 A and B.

        THE COURT:  They are received.

Q.    Mr. Voorhees, could you explain to the jury what was the result of your study and comparison of Exhibits 25 A and B?

A.    Yes, sir.  The comparison of the two, I observed in one of the photographs -- and the photograph actually depicted on the screen now -- that the tread design in the print that was photograph was similar in size and geometry of tread design to the inked of the ball and great toe area of the right sole of Government's Exhibit 19.

        MR. NEWMAN:  One moment, Your Honor.

Q.    Can you point out on the screen --

MR. NEWMAN:  Will the Court allow the witness to stand in front of the jury?

THE COURT:  Sure.

Q.    Thank you.  Go ahead?

A.    This is the one-to-one photograph with the colors reversed of the actual photograph that was developed, taken at the scene and brought into our crime laboratory, and developed.

And as you might be able to see, there is some tread design right here.  Now this is the toe area, and this is the left ball and toe of the foot.  Okay.  And this is the inked impression, and this is the right side of the inked impression of what I took in the laboratory.  And that was of the right sole of the shoes in question, the Lugz blue athletic sole.  And the geometry that is available to me is shown here.

And the reason I laid it in this particular fashion is because the strongest area, that which is the most readily identifiable, and you can see it in this photograph, you can see it the same size and geometry of tread design.  Now beneath this, there are a few other smaller marks less distinct, probably of the nature of the fact the photograph has gone through several -- I can't say enhancements, because they are not.  They have been enlarged, and the density of the photograph itself may have

been changed during the process.

But you can still see certain design characteristics here that you will also pick up here.  But these are not anything more than what I had said earlier.  They are similar in size and geometry of tread design.

Q.   Thank you, Mr. Voorhees.  Was it your conclusion in that regard in this case reviewed by the internal standards of your laboratory?

A.   Yes, sir.  Mr. Robert Moberly reviewed, observed indeed the corresponding features, and signed off.  And he was in agreement with my conclusions, and again signed or cosigned the letter or initialed my copy of the letter on December 31st, 19 -- excuse me -- 2002.

Q.   And in fact, was your report forwarded to Postal Inspector Marla McLendon of your agency and in turn to the U.S. Attorney's Officer here in Savannah?

A.   Yes, sir.  We mailed it out.  The report itself is dated December 27th, but it didn't go out until Mr. Moberly had a chance to review it.

Q.   And in fact, Mr. Bell, the attorney here, mentioned earlier that he had questioned you concerning your work in this case.  Is that correct?

A.   Yes, sir.  We've had, I believe, two telephone conversations and then we chatted again today.

Q.   And when you had the conversations with Mr. Bell, had

he the benefit, to your knowledge, of having a copy of your report in front of him?

A.    I don't know absolutely, but -- let me see when it might have been.  I would believe the answer is in the affirmative but I don't know for certain, sir.

Q.    And you did note the first time you spoke to Mr. Bell?

A.    I just looked at my notes, and I did not put that on a date.  No, sir, I'm sorry.  I did not date the note.

Q.    And, was there a time where Mr. Bell tried to reach you where you refused his call or did not return his call?

A.    Oh, no, sir.  That is not part of our laboratory operations.

        MR. BELL:  Judge, I will stipulate he has been extremely cooperative with us.

        THE COURT:  Very good.

        MR. NEWMAN:  Nothing further, Your Honor.

        THE COURT:  You may examine.

**CROSS EXAMINATION**

BY MR. BELL::

Q.    Mr. Voorhees, how are you doing today?

A.    Very good, sir.

Q.    And just to reiterate, you and I have spoken on the phone.  And I was pleased to meet you in person outside today.

A.    Thank you, sir.  The pleasure is mine.

Q.    Let me ask you something:  This shoeprint that is on --

A.    Well, was on.

MR. NEWMAN:  Government 25.

MR. BELL:  Okay.  You can take it down now.

Q.    That shoeprint that was on the counter, you looked at the shoes themselves; correct?

A.    Yes, sir.

Q.    You blew up the photograph that was taken.

A.    Let me say I had it done for me.  Competent photographers, yes, sir.

Q.    Okay. And then you did your comparison work; true?

A.    That's correct.

Q.    In the government's openings, they said the shoeprint and the shoes were matched, but isn't it true that is not your opinion?  You are not declaring this a match?

A.    Not in the classic identification, no, sir.

Q.    What your opinion is, is that the tread design is of similar size and geometry to the defendant's Lugz shoes?

A.    To the right ball toe area, yes.

Q.    Okay.  And that is different from the classic declaring a match; true?

A.    The word match in my vocabulary is something a much stronger association.  Yes, sir.

Q.    Right.  Now, the photographs were made by, you know, folks down here shortly after this event happened in the

Post Office.  You were not a part of that; correct?

A.   That's correct, sir.

Q.   Were you also aware that, I think, they tried to make -- well, they took a number of photographs; true.

A.   Yes, sir.  There were a number of photographs.

Q.   You had some criticisms of the photography work; correct?

A.   I would rather classified that the quality of the product that I had to work with limited the scope of my examination.

Q.   Right.

A.   That could have been because of the abilities of the individuals.  It could have been it was just a rotten thing to work with to begin with, sir.  So, I really can't characterize beyond that.

Q.   Well, if the shoeprint is there, or whatever is on the counter, these photographs were kind of taken at an angle; true?

A.   There is certainly evidence to that on at least two of the instances.  Yes, sir.

Q.   All right.  To do your comparison type of work, it be beneficial if the photograph is taken with the camera directly above?

A.   Yes, sir.  The film plane ought to be in the same plane as the substrate upon which the print was resting.

Q.   All right.  So, you were challenged in your work by the qualify of the photographs you had to work?

A.   There were certain limits inherent in the photographs; yes, sir.

Q.   Now, rubber lifts were made; correct?

A.   Gel lifts were taken, yes.

Q.   All right.  And they were of very limited number?

A.   That's correct, sir.

Q.   In fact, I don't think you used them very much at all.

A.   No, sir, I did not.

Q.   The counter could have been removed, or a section taken out, or the whole counter taken out.  You could have worked with that; correct?

A.   Yes, sir.

Q.   All right.  That would have help you in the type of work you would have had to have done?

A.   It may have.

Q.   All right.  Now, you don't know if the shoe that made the shoeprint is the same size shoe as the shoes right at your right elbow; do you?

A.   That's correct.  I did some research after the initial laboratory analysis to be able to provide a little more information than I had initially.

Q.   All right.  What size are those shoes?

A.   I believe, sir, they are sized 9 and one half if we go

by the U.S. designation.

MR. BELL:  Judge, could I approach and look at those shoes?

THE COURT:  Yes.

Q.   So, you can't even say that the shoe that made those prints is 9 and a half; correct?

A.   That's correct, by research with the Lugz Company.

Q.   All right.  And you have heard of knockoff shoes?

A.   I have indeed, yes.

Q.   And for the jury's edification, a knockoff shoe, very briefly, would be some people out there counterfeit shoes and their designs, including the design of the treads; correct?

A.   Yes, sir.

Q.   All right.  And we don't know if the shoes that made the print on the counter in the Post Office was a knockoff of a genuine Lugz; do we?

A.   In a manner of speaking, I can Lugz knows of no knockoffs of this product.  I don't have firsthand knowledge atal.

Q.   We don't know it is a knockoff or not?

A.   That's correct.  I do not, sir.

Q.   Okay.  All right.  You can't tell if the print on that counter made by a man's shoe; true?

A.   That's correct.

Q.  You can't tell if it was made by a woman's shoe; true?

A.  That's correct.

Q.  Or you can't tell if it was made by a kid's shoe; true?

A.  As long as the size and geometry are the same, I could not distinguish.

Q.  All right.  Now, you have looked at some other photographs of shoeprint in this case?

A.  Yes, I have.

Q.  That were on the floor.

A.  Yes, sir. I must preface that.  These were done after the initial examination.  I have no written report.

Q.  You've seen photographs of -- have you ever seen a photograph of that shoeprint?

A.  Yes, sir, I have.

Q.  Is that shoeprint a shoeprint that is taken, I guess, in the blood that was on the floor?

A.  There are certainly images that appear to be blood.  I can't give you the absolute source of it.  But yes, it appears to be so.

Q.  And, have you looked at photographs that supposedly were taken of everybody that went into that Post Office; you know, EMTs, and detectives, and so forth, to see if --

A.  I can't qualify the word everybody, but I have looked at a number of photographs.

Q.  All the ones that you were given you looked at; true?

A.    That's correct, sir.

Q.    All right.  And that doesn't match it; does it?

A.    No, sir, it does.

Q.    These don't match it; do they?

A.    No, sir, they do not.

Q.    This one doesn't match; does it?

A.    No, sir, this does not either.

Q.    So, we've got an uncounted print.  And that also doesn't match the blue Lugz?

A.    No, sir.  They certainly weren't -- they're not the Lugz shoe.

Q.    All right. So we've got an unaccounted print on the floor of that Post Office; true?

A.    There is one that I have been not been able to associate.  That's correct.

          MR. BELL:  That's all I have.  Thank you.

A.    Yes, sir.

                    **REDIRECT EXAMINATION BY**

BY MR. NEWMAN::

Q.    Mr. Voorhees, in doing your work in this case you had occasion to talk to the head office of Lugz, L-u-g-z, shoes. Is that correct?

A.    Yes, sir.  I had e-mail and telephonic correspondence with those folks.

          MR. BELL:  I'm going to interpose an objection

to hearsay.  He is going to testify --

THE COURT:  He is following exactly what you did.  Objection overruled.  You opened it.

Q.    Is that correct, Mr. Voorhees?

A.    Yes, sir, but again telephonically and e-mail correspondence with Mr. Jay Salminski, which is the Director of Logistics for JSSI, which is the Jack Schwartz Shoe Company and they are the importers of the Lugz athletic footwear.

Q.    Where are these Lugz shoes made?

A.    I understand they are made in China.  JSSI is in the New York City, the SoHo District.

Q.    Did you discuss specifically with that individual whether the Lugz company had every found anybody knocking off of their shoes, so to speak?

A.    That was one of the seven questions I posed to him specifically, and he gave me a written e-mail response and the answer was that to their knowledge no knockoff of this product that had come to their attention.

THE COURT:  Now, that is far enough.  Go ahead.

MR. NEWMAN:  Yes, Your Honor.

Q.    Now in those photos that defense counsel had shown you, was there any of those photos that appeared to be the photo of a Lugz shoe?

A.    No, sir.

Q.   Were any of those photos of a print that matched the print found on the counter as shown in the 9 series, three photographs, that you looked at for your work in this case?

A.   No, sir, not that I could tell.

Q.   And the only shoe that you would have any knowledge of that would match up with the print on the counter would be a Lugz type shoe as shown or exemplified --

MR. BELL:  Judge Honor, I'm going to object to the word *match*.   He has already testified he can't say it is a match.

THE COURT:  Yes.

Q.   Would have similarities, would be similar to the Lugz shoe as introduced into evidence as Government's Exhibit No. 19?

A.   To the best of my knowledge, that is correct, sir.

Q.   And in your talking and communications with the ownership or management of Lugz, did tell you that particular sole pattern would have the same geometry in several size ranges?

A.   That's correct.

Q.   About how many would that be?

A.   I believe the response was either four or five.  Yes, four or five could be overlapping the same size and geometry of tread design.

Q.   Would that be counting the half sizes, sir?

A.   Yes, sir.  That is what I interpreted their response to mean.

Q.   And did you note the size of Lugz shoes that you were working with there, sir?

A.   These were marked as 9 and one half U.S.

Q.   So four would be -- if the range would be four, it would be say eight and a half, nine, nine and a half, ten, and ten and a half?

A.   I think that --

Q.   And if it were five, it would be one more on either end, either lower or higher.  Would that be correct?

A.   I think that could be determined it be accurate.  Yes.

        MR. NEWMAN:  Nothing further.

        MR. BELL:  A few follow-up.

        THE COURT:  Sure.

**CROSS EXAMINATION**

BY MR. BELL:

Q.   I don't think we really explained to the jurors.  You and I know what a knockoff is.  But a knockoff, we probably need to explain to the jurors.  That is an illegal --

        MR. NEWMAN:  Your Honor, Mr. Bell has --

        THE COURT:  You have already said that.  You said that it was a counterfeit.  There is no need to back into that.

Q.   You wouldn't expect --

THE COURT:  It is something that masquerades as being from the manufacturer who has the named brand.

MR. BELL:  Correct.

Q.  People making knockoffs, they don't --

THE COURT:  Okay, the witness may step aside. Call your next witness.

MR. BELL:  Judge, can I ask him another question?

THE COURT:  No, I think that is enough.

MR. BELL:  Judge, could we note our exception?

THE COURT:  Always.  You don't have to note your exception.  It is in the record.

[NOTE:  Witness left the stand.]

MR. FRENTZEN:  Your Honor, the government calls Matthew Meuller.

CLERK:  For the record, sir, please state your name and occupation.

WITNESS:  Matthew James Meuller, M-u-e-l-l-e-r. And I'm employed as the DNA Analyst II with the Bode Technology Group, B-o-d-e.

**MATTHEW JAMES MEULLER**, after having been duly sworn, testifies as a witness called by the government as follows.

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q.    Mr. Meuller, what is the Bode Technology Group?

A.    The Bode Technology Group is a company located in Springfield, Virginia.  And we do a variety of testing in mostly DNA related cases, and criminal cases in particular. But we do a lot of identifications, paternity cases, and things along those lines using forensic DNA technology.

Q.    How long have you been employed by the Bode Technology Group?

A.    I've been employed for about two and a half years.

Q.    You say you're a DNA Analysis II.  What are your responsibilities?

A.    My responsibilities including performing a laboratory analysis on samples we receive, preparing case reports, and testifying in forensic cases.

Q.    And where were employed prior to the Bode Technology Group?

A.    Prior to working at Bode, I worked for the Fairfax Identity Laboratories, which is another private lab located in Fairfax, Virginia, and doing similar kind of work to what I do now.

Q.    How long were you employed there?

A.    About seven months.

Q.    Can you tell us a little bit about your education?

A.    Yes.  I received my bachelor of science in biological sciences from the University of Notre Dame in 1998.  And I

received my master in forensic science from the George Washington University in 2000.

Q.    Do you have any continuing education relevant to your job in DNA testing?

A.    Yes.  As part of our analyst program, I attend at least one conference per year, professional conference of which professionals in the forensic DNA field get together and present new, new methods and talk about interesting developments in the field.

Q.    How many samples have you yourself processed using DNA analysis?

A.    Just during the time I've been at Bode alone I've analyzed thousands of DNA profiles in a variety of settings.

Q.    And you talked about DNA analysis.  Can you tell the jury, first of all, what is DNA?

A.    Yes.  Well, DNA stands for deoxyribonucleic acid, and it is referred to as the blueprint of life.  Basically, it houses the genetic code, and all the information that makes people what they are, that makes people unique, that is where, you know, we find on the Code there are such things as eye color, hair color, and all those things, traits like that.

And the DNA basically is inherited one half from your mother and one half from your father.  So, that is how it is transmitted.  And that is why it is referred to as the

blueprint of life.

Q.    What specific type of DNA analysis do you use?

A.    The kind of a test, and the kind I employed in this case is called STR analysis.

Q.    What is STR analysis?

A.    Well, STR analysis involves instead of looking at the entire genetic code of a sample, we concentrate on 13 regions.  And they are called STR regions, because these particular regions are found to be variable amongst people.

STR stands for Short Tandem Repeats.  And what that basically means is that these areas vary in the number of repeated units so that you receive one number of repeated units from your mother and one from your father.

So, at any one of these 13 locations, for instance, I might have 13 units from my father, inherited, and 12 from my mother.  Therefore at that particular location, my profile would be labeled as a 12,13.  And then we look at 13 such STR locations to determine the overall DNA profile, which is unique to an individual.

Q.    Excuse me.  How many cases has the Bode Technology Group laboratory processed, using STR technique?

A.    Currently, our estimate of casework that we have done is greater than 8,000 cases.

Q.    Are there other laboratories in the U.S. employing these same techniques?

A.    Yes.  There are.  Actually.  I think our estimate is that there are is at least 150 laboratories in the United States using STR analysis for casework.

Q.    Was the Bode Technology Group recently involved in some high profile DNA analysis?

A.    Yes.  Actually, most recently, we were involved with identifying some remains from the World Trade Center tragedy in New York.

MR. BELL:  If it may help, we're not going to make a **Daubert** challenge.

THE COURT:  Okay.

MR. FRENTZEN:  Judge, I still think the jury is entitled to hear about his experience and what it is that I does.

THE COURT:  Go ahead.  That means you can spend less time qualifying him.  But you have every right to demonstrate his expertise.

MR. FRENTZEN:  Thank you, Judge.

BY MR. FRENTZEN:

Q.    Mr. Meuller, are there standards for STR testing?

A.    Yes, there are.  We follow the so-called SWIG DAM Guidelines.  That is just stands for the Scientific Working Group on DNA Analysis Methods.  And this is a group of professionals in the field that have developed these standards.  And then they publish them for use when

laboratories are audited for accreditation purposes.

Q.   And are you accredited?

A.   Yes.  We have a number of accreditation.  One of which is referred to as the ASCLD LAB accreditation.  And that stands for the American Society of Crime Laboratory Directors, Lab Accreditation Board.

And another one we have is the NFSTC, which stands for the National Forensic Science Technology Center.

And these basically, like I said before, they consist of external and internal audits of all our quality assurance procedures and our testing methods to make sure that we are properly applying the techniques that we use.

And on top of those two, also for some of the work we have done with the State of New York, we had to undergo an audit by the New York State Department of Health.  So, we have that accreditation as well.

Q.   Is the STR technique of DNA analysis, has that been tested through the years?

A.   Yes, it has.

Q.   And has it subjected to peer review and analysis?

A.   Yes.

Q.   Is it generally accepted in the scientific community?

A.   Yes.

MR. FRENTZEN:  Your Honor, I would offer Mr. Meuller as an expert in the area of DNA analysis, and

specifically STR.

THE COURT:  The Court will accept him as such. With the same instructions that I gave you earlier regarding the consideration of expert testimony, you are to judge, and you are the exclusive judges of the credibility of the witnesses.

You may proceed.

MR. FRENTZEN:  Thank you, Judge.

BY MR. FRENTZEN:

Q.   Mr. Meuller, did you have any or did you perform any DNA testing in connection with this case?

A.   Yes, I did.

Q.   And what techniques did you use in testing the items you analyzed in this case?

A.   Well, I utilized the STR techniques that I mentioned briefly before.

Q.   Okay.  Can you tell the jury specifically how you go through the process of STR analysis?

A.   Uh-uh.  Well, generally you have some sort of sample, perhaps like a biological stain from a crime scene or a sexual assault swab.  Any sort of sample can be used for a STR analysis.

And it's actually -- it is a very simple concept. The first step of which is just to use -- we use some chemicals to release the DNA from the materials.  So, if you

have like a stained piece of fabric or something along those lines, the first step is to isolate and release the DNA from that material.

Now, once we have the DNA released from the rest of the material that is in there, what we do is we go in and we make copies of those regions I referred to earlier, those 13 STR regions, because otherwise, you have the entire genetic code.  And it makes it easier to detect if we go and make copies of the areas of interest.

So, we generate copies of those 13 areas, which we're able to detect and interpret the DNA profiles by looking at those areas.

Q.    Did you receive items of evidence in this case?

A.    Yes, I did.

Q.    What did you receive?

A.    May I refer to my notes?

Q.    I believe that would be okay.

THE COURT:  Sure.

A.    Well, I received the evidence items on January 13th of 2003 in connection with this case.  And on January 21st, 2003, I received a known blood standard.

Q.    What were the items -- first off, what were the items that you received?

A.    Okay.  Okay.  The evidence items that were received on January 13th, 2003 are labeled as a sealed packaging

containing a brown handle knife.

Item 2 was labeled as a sealed packaging containing a black handle knife.

Item 3 was labeled as a sealed packaging containing a brown handle knife, broken tip.

Item 4 was labeled as sealed packaging containing bicycle seat.

Item 5 is labeled as a sealed packaging containing handle bars from bicycle.

Item 6 labeled as sealed packaging containing knife.

Item 7 labeled as sealed packaging containing nylon jacket.

Item 8 labeled as sealed packaging containing swab, driver's head rest.

Item 9 labeled as sealed packaging containing swab, driver's middle row seat.

Item 10 labeled as sealed packaging containing swab, driver's side rear door.

Item 11 labeled as sealed packaging containing swab, passenger side front door.

And, Item 12, labeled as sealed packaging containing swab, black tool case.

Q.    And did you attempt to conduct a DNA analysis with regard to each of those items of evidence?

A.   Yes, I did.

Q.   How did you receive those items of evidence?

A.   Those items were hand delivered by Stephanie Smith of the U.S. Postal Inspection Service.

Q.   Let me direct your attention specifically to one particular item, which has been admitted into evidence as Government's Exhibit 5?

MR. FRENTZEN:  May I approach, Your Honor?

THE COURT:  Sure.

Q.   If I can just maybe just hold this for you. Mr. Meuller, do you recognize Government's Exhibit 5?

A.   Yes.

Q.   What do you recognize it as?

A.   I recognize this item as the referred to Item 7, a sealed packaging containing a nylon jacket.

Q.   If I can just hang this here, because I'm going to ask you to point out certain items on that.  Can you tell the members of the jury what you did with Government's Exhibit 5 in order to be able to conduct the DNA analysis?

A.   Okay.  Sure.  Well, the first step was to remove it from the sealed packaging from which it was received in a brown paper bag packaging and sealed with evidence tape.

So, at that point I removed it from the packaging and took some pictures of it and put in the case file.  Then the two samples that I used for testing was -- there was an

circled area on the right sleeve, a stained area.  And then there was also a similar stained area on the back of the jacket, kind of where the flap opens up, that was also circled.

And I took a small cutting from each of those two locations, and used those for the STR testing that I talked about.

Q.   You said there was a stain visibly.  What type of stain was it?

A.   If I can refer to my notes, I can give you my -- well, the two circled areas on the jacket were what I understood to be the portion of the letter of submittal in which it described a nylon jacket recovered from the residence of M. J. Brown bearing human blood.  And these two stains that I sampled, the areas, were indicative of that.

Q.   Okay.  Can you tell us again how you took those samples?

A.   Yes.  Basically, I took roughly a smaller than the size of a dime cutting from each of the stained areas leaving enough additional stain to be tested again if necessary.

Q.   And then what did you do with those cuttings?

A.   Then I used those cuttings to develop the DNA profile as a previously described.

Q.   Did you develop a DNA profile from those cuttings prior to receiving a known sample of blood from Sallie Gagila?

A.    Yes.

Q.    Do you know when you got the results of the analysis of the two cuttings?

A.    I can check in my notes if you want the date.

Q.    It was some time prior to receiving the known sample?

A.    That is correct.

Q.    Okay.  What did you do with the known sample when you received that?

A.    Well, the known sample was treated similar to the other, to the evidence samples in that first I noted the conditioning of the packaging and that it was sealed.  At which point, I took some pictures of it again to put in the case file, and withdrew a small volume of the blood sample to use for my testing, and packaged up the rest of it.

Q.    And then what did you do with that small sample?

A.    With that sample, I did the same sorts of testing for STRs that I described before.

Q.    Did you then gain results or a DNA profile from the sample of Sallie Gagila's blood?

A.    Yes, I did.

Q.    Did you make some comparison between that and the two -- and the analysis of the two cuttings that you had taken?

A.    Yes, I did.

Q.    What were the results of your analysis?

A.   Well, the results of my analysis were that the major component, STR profiles taken from each of the two cuttings of the jacket matched the known STR profile of Sallie Gagila.

Q.   I would like to show you what has previously been marked as Government's Exhibit 27, Mr. Meuller.  Do you recognize that?

A.   Yes.

Q.   What is it, generally?

A.   What that is table indicating the DNA profiles for the two cuttings from the jacket, and then also the blood standard from Sallie Gagila.

       MR. FRENTZEN:  Your Honor, I would ask that Government's Exhibit 27 be admitted.  And I would like to publish it for the jury.

       THE COURT:  It is received.  And you may publish it.

       MR. FRENTZEN:  Thank you, Your Honor.

BY MR. FRENTZEN:

Q.   Mr. Meuller, if you could, so that members of the jury can see that, can you please describe Government's 27, and the significance of Government's 27?

A.   Yes, I can.  Is it okay if I approach the exhibit?

       THE COURT:  Yes.  There is a pointer.  You may turn it around a little, Mr. Frentzen, so that we can

observe him.

MR. FRENTZEN:  May he have permission to come down, Judge?

THE COURT:  Yes.  I would rather he stay there. But let him go down.

A.    Okay.  What this table shows is down these three columns, we have -- this is the cutting taken from the right sleeve of the jacket.  This is the cutting from the rear flap area of the jacket.  And this is the blood standard, the known blood standard from Sallie Gagila.

And, basically what these numbers refer to down the sides, these are the 13 locations that I referred to, what we looked at, plus the amelogenin location, which is used to type the gender of the samples.  You see that we have an XX, an XX, and XX, which is indicative of a female.

And, basically, I referred to before that these numbers, they vary in the number of repeated units.  So, that at this location, we see a 15 and a 16, meaning that from one of their parents, the person, you know, that has this type, inherited the 15, and from the other they inherited the 16.  And we look at all those 13 areas.  And that is what we see.

So, for comparison purposes, you can just go along this row for each location.  So, we can make a comparison between the known standard, which is 17/17, and then each of

the evidence samples.  So, we see that they match at each one of these locations.

Additionally, you will notice of the presence of a couple of numbers in parenthesis, in brackets.  And what those numbers are referring to is a very low level minor component profile that is observed, which is very common in types of stains that you might take from a jacket or from other things that are involved in the environment, so that there might be DNA that was already on the jacket prior to the depositing of the blood or other biological fluid, so that sometimes when you tests those kind of samples, you might get a major component STR profile, but in this case, then you might have a few low level contributors.  And that's what is indicative here, is just a very low level minor component.

But we can see clearly that the clear major component matches the profile of Sallie Gagila.

Q.   Thank you, Mr. Meuller.  Would it be helpful to explain to the jury how you can distinguish between a major component and a minor component or a stutter peak to show them something from your report?

A.   Yes.

Q.   If we could show him Government's Exhibit 29, please. I'm sorry, 28.  I apologize.

Mr. Meuller, do you recognize Government's Exhibit

28?

A.   Yes, I do.

Q.   What is it?

A.   This is a copy of a so-called electrotheragram. Basically it is the results for one of the samples that we tested, depicted graphically.

        MR. FRENTZEN:  Judge, I would like to offer and publish Government's Exhibit 28.

        THE COURT:  It is received, and you may proceed.

Q.   Mr. Meuller --

        MR. FRENTZEN:  Is it published now?

        VIDEOGRAPHER:  Yes.

Q.   Mr. Meuller, if you could, if you could just describe for the members of the jury how you distinguished between a major component and a minor component or a stutter peak. And if you need it moved up or down, just ask?

A.   Okay.  Well, starting from the -- if you notice the upper left corner, there is a peak on the graph, and it is labeled as 17.

        As you can see, we can see that is a very large peak.  It actually has a numeric value below the 17, which stands for the intensive of that peak.

        So, that location is actually also the D 13 -- the D 3 location that we saw on the table.  So, at that location, that would be called a 17,17.  There's only one,

there's only one peak there.  And that is indicative of inheriting the same one from both of your parents, so having two copies of the same number of repeated units.

Moving to right to that second location, with those two peaks of the same intensive, 9 and 11, similarly, at that location, the type would be called 9,11.  And that's another one of the locations from the chart.

Going down to the next row of data, we see a large peak with a X designation.  So, that is like I referred to earlier, gender determination, females generally have XX chromosomes.  So, that is why this profile is indicative of a female.

And moving along that row, the next location, we see two peaks of similar intensities.  You see there the 6 and the 9.3 peaks are virtually the same intensity and much stronger.  We see a very little blip of a peak that is 7 in between there.  And that is one of those peaks there were listed on the table in parenthesis indicated as a minor component peak.

And, like I said before, that is indicative of some other low level contribution of DNA to the sample, and does not in any way, as we can see, doesn't in any way hinder the interpretation of the major profile, which as we can see, stands out amongst these other peaks.

I would also show you the last peak in that row

labeled as 10.  We also see a very small 12, again, just showing up as a blip there, very small, and just above -- actually there's a detectable limit.  So, again, that is another example of a minor component.

And an example of another kind of peak, we noticed these were peaks that were depicted on the chart in brackets.  If we go to the third row, the last row there, and we see the 8 and 11 -- excuse me -- the 9 and 12 larger peaks, and next to, to the left of each of those left peaks, there's a 8 and 11.

And those are labeled as possible stutter during the analysis because while they could be low level contributions similar to the other ones we observed, there's also an explanation that is the observable and that we see all the time in this kind of analysis that is called stutter band, which just shows up one repeated unit smaller than the larger peak.  And so, sometimes, you know, it shows up just to the left of that large peak.

And we call it possible stutter knowing that this is a very common occurrence.  And it can either be attributed to what we said as possible stutter peak, or it could be contributed to a very low level minor contributor.

Q.    Thank you, Mr. Meuller.  Now, back to the matches that you did find between the two cuttings from the jacket and the known sample from Sallie Gagila, what is the statistical

significance of the match that you found?

A.    Okay.  Well, whenever you have a profile of the matches, a profile from a crime scene matching a known profile that you have, you want to know what the significance of that profile or that match, meaning you are interested to know does that mean that the person is likely to be the source of the DNA that was left at the crime scene sample; or, could you select someone at random that has that same profile.

So, what we calculate is called a Random Match Probability.  And what this number tells us basically is that this is -- if you just wanted to just pick at random and find someone with this profile, this is the number of people you would to look at in order to find that.  So, that is what the Random Match Probability is.

In this case, we calculated the Random Match Probability for each -- generally in our report, we are include four major racial groups that are common in the United States.  And we include those on the report.  But they could be calculated for a variety, you know, population groups.  So, we include these four calculations.

Q.    What were your conclusions or your calculations with respect to the odds of this match?

A.    Okay.  I'm reading from Page 3 and 4 on the case report. *The probability of randomly selecting an unrelated*

*individual with the STR profile associated with Items 07 A and 07 B -- which are the cuttings from the jacket -- is one in 25 quadrillion from the Caucasian population, one in 100 quadrillion from the African-American population.*

THE COURT:  What is a quadrillion?

A.    Well, a quadrillion is the next line of numbers if you are looking at powers of ten, you have a billions, millions, trillions, and then you have quadrillions.

Another way of looking at it is --

THE COURT:  How many people are on earth presently?

A.    Presently on earth, there is roughly 6 billion people.

THE COURT:  Okay.

A.    In the neighborhood of 6.3 billion, I think at the last count I saw.

THE COURT:  And you say it is one in how many quadrillions?

A.    The calculation, yes, is one in 25 quadrillion from the Caucasian population.  And what that refers to is just if in fact that this match was not a true match and you were pulling it randomly this is how many people you would to look at.

THE COURT:  That would be --

A.    That is what that number looks at.

THE COURT:  -- five times the earth's

population.

A.   It would be much greater than that.  It is roughly like 9 million times the current population.

THE COURT:  I forgot about the --

MR. FRENTZEN:  If I might approach, Your Honor.

THE COURT:  Yes.

BY MR. FRENTZEN:

Q.   Mr. Meuller, if you could write down what 25 quadrillion looks like, please.

A.   (Witness complies.) I apologize for my handwriting.

MR. KNOCHE:  Your Honor, if I might publish this briefly to the jury.

THE COURT:  You may do so.

Q.   That is 25 quadrillion, Mr. Meuller?

A.   Yes.

Q.   And so --

THE COURT:  Give or take an few billion.

A.   Right.

Q.   It could also be described as a million billion.  Is that right, Mr. Meuller?

A.   Yes.  One quadrillion, it is -- I mean, one way you can generate that number is to multiply, take a billion and multiply a million by it.  And then you would get one quadrillion.  So, 25 quadrillion would be the same as, you know, one million times 25 billion.

Q.   Does that assist you in coming to some type -- do those types of odds assist you in coming to some type of mathematical or scientific conclusion about whether or not Ms. Gagila was the source of the DNA on that jacket, Government's Exhibit 5?

A.   Yes, it does.

Q.   What is that conclusion?

A.   My conclusion is that within a reasonable degree of scientific certainty, Sallie Gagila is the source of the major component profile obtained from the cuttings of the nylon jacket.

        MR. FRENTZEN:  Nothing further, Your Honor.

                        **CROSS EXAMINATION**

BY MR. BELL:

Q.   How are you doing, sir?

A.   Pretty good.

Q.   The jacket, do you think it is important for the jury to know exactly where the DNA, the cuttings were made?

A.   Sure.

Q.   Do you recall that one cutting was made under the right cuff area, right about here?

A.   Yes.  I actually have pictures of that.  Yes, one of the circled areas was below the right --

Q.   Underneath here, [gesturing]

A.   Yes.

Q.   Okay.  And the other area where the DNA was found was back here, [gesturing]

A.   Right.  Near the flap of the jacket.

Q.   Right at the bottom down here, [gesturing]

A.   It was actually higher up than just the bottom.  It's basically where the jacket splits around there.

Q.   Would you show them with the actual jacket?

A.   Do you have any -- do you guys have any gloves?  I don't usually like to handle this.

Q.   Can you turn it around and --

A.   Yeah, I can try to show it without opening it.  Sure.
     There is the right sleeve.  It is kind of hard to see.  You can see the circled area with the black marker.  I don't know if all can see that.  That is the right sleeve.
     I'm trying to --

Q.   Can I help you with it?

A.   Here it is.  Yes, here's the other than one area, [gesturing]

Q.   All right.  Thank you.

A.   You can see where it is marked with a circle.  It is hard to actually see the actual cutting.  It must be on the other side of the circled area.

Q.   So, it is roughly back here, [gesturing]

A.   Roughly, right.

Q.   All right.  You didn't find any DNA in the front of

this jacket; did you?

A.    I did not test the front of the jacket.  Those are the only two areas that I tested.

Q.    Okay.  And the source of the DNA, you did not include or did not test to make sure the source of the DNA was blood; correct?

A.    I did not test that, although, it was indicated on the letter.  But no, I did not test for blood, no.

Q.    You don't know if the source for the DNA is blood; correct?

A.    I do not know.

Q.    All right.  Because DNA can come from several sources; true?

A.    Yes.

Q.    It can come from your salvia; correct?

A.    Yes.

Q.    You have to say yes or no?

A.    Yes.

Q.    It can come from your skin, things of that nature?

A.    Yes.

Q.    All right.  And the DNA test that you did doesn't tell us who was wearing the jacket at the time the DNA came to be on the jacket; does it?

A.    No, it does not.

Q.    Okay.  The DNA testing you did, this jacket was taken

in evidence on December 5th, and the incident happened November 30th.  This DNA test doesn't tell us when the DNA came to be placed on the jacket; does it?

A.    No, it does not.

Q.    When people cough and things like that, are they spreading DNA in addition?

A.    Yes.  There is salient material in I think most sorts of mucus or anything, so, yes.

Q.    All right.  If you went to a place where I lived and worked regularly, you would probably find my DNA by taking those swabs and doing that; couldn't you?

A.    Yes.  Depending on, you know, how recently it was left and so forth.

Q.    Sure.

A.    But you might find some; right.

Q.    Okay.  But if there's some there every day.  And DNA can be transferred; correct?

A.    Yes.  DNA can be transferred.

Q.    If DNA is on this, you know, and I touch it with that, I might have DNA from these folks on my jacket; correct?

A.    Yes.  You could be correct.  You might have DNA on your jacket.

Q.    Now, the DNA that you checked, that you testified about, was the cutting from the right sleeve and the cutting from the rear flap.  But you did other testing; didn't you?

A.    Yes.

Q.    All right.  You testified some bicycle pedals; correct?

A.    No, no pedals.

Q.    What else did you test?  You tested the knives?

A.    Correct.

Q.    All right.  And you found no DNA linked to the victim?

A.    Correct.

Q.    All right.  So, what the investigators at the scene do is they go around and try to collect DNA from various places where they think the suspect has been and gone; correct, and then they send it to you guys to analyze; true?

A.    I mean, I just test what is submitted.  I don't know exactly what they are looking for.

Q.    Yeah, but that is generally how it works.  They go out and collect it.  So, you didn't find any that was submitted on the sample from Diane Brown's car; correct?  I think two samples from her car.

A.    Which items exactly are you referring to?

Q.    On the first chart you did --

A.    Right.

Q.    The chart that you guys talked about in its cut-down version.  All of that was negative; wasn't it?

A.    If you are referring to the case reports, there are other items that we tested that yielded profiles.  That is correct.

Q.    Okay.   Item 09 was the middle row seat in the Durango; correct?

A.    That's what I was labeled to be, yes.

Q.    All right.   No match?

A.    No.   It was not consistent with the blood standard we had.

Q.    All right.   Passenger side front door of the Durango, no match?

A.    Right, no match.

Q.    Black tool case, no match?

A.    That is correct.

Q.    And you didn't find anything on the knifes in this case; correct?

A.    We tested the knives.   The item labeled as 06, we tested that knife.   And no, it did not, it did not generate a DNA profile from that.

Q.    Now, what you have done in this case is on this chart, shows -- these are locations; aren't they?

A.    Yes.

Q.    They're genes; correct?

A.    They are not generally -- most of those are not genes. What they are is, like I said, these variable regions of the DNA.   Usually they don't code for any sort of protein.   And sometimes they might be in Exxon in the portion of a larger gene.

Q.    Okay.  This is known as 01; correct?

A.    Yes.

Q.    01 is one that shows some other DNA in there; correct?

A.    Right.

Q.    All right.  Did you take a sample or test a known sample from my client, Meier Jason Brown?

A.    No, we did not -- we did not have another sample.

Q.    Is that unusual not to test a sample from the suspect? It is not the norm; is it?

A.    It is not the norm to not test samples that was received.  However, we did not receive one.  And if there's -- if I think the intent of the testing is to associate a victim with pieces from a suspect possession, then it might not be the practice to test the suspect.

Q.    Is it the norm or not to test the sample from a suspect?

A.    I think if you are testing, like if you are testing for something that belonged to a victim, it might be more of a norm to test the suspect.  But if you are, you know, oftentimes we don't have a reference from either a suspect or a victim, you know, depending on the investigation.

Q.    I'm talking about where you have known victims and known suspects.  You generally test for both; don't you?

A.    Oftentimes we do.

Q.    Okay.  And that was not done in this case?

A.    That is correct.

Q.    All right.  Did you do any -- you know, this is the gene or location that tells us about sex; correct?

A.    Yes.

Q.    All right.  And you've checked 13 locations; true?  You have to say yes or no?

A.    In addition to that, yes.

Q.    All right.  The old standard for DNA testing and matching used to be you would test six locations; correct?

A.    I'm not sure which standard you are referring to.

Q.    Well, it used to be that they checked of these locations and then it moved up to seven.  And then it went to something like nine.  And now it is up to 13; correct?

A.    Right.  You could have tested any number of these.  The practice now is to test 13.

Q.    But it used to be a lot less; didn't it?  I know --

A.    I mean, as STRs initially got up, yes.  13 are now tested usually.

Q.    Okay.  It used to be something like six.  You have to answer out loud?

A.    Right.  I'm not sure what it used to be six locations, but right, there are systems that only test six, that test four and those have been used in the past.

Q.    Generally, you know that the standard has increased.  The number of locations that is tested has increased through

the years; correct?

A.   That is correct.

Q.   All right.  You tested 13 locations.  And if you checked a 14th location and it did not match Sallie Gagila, she would be excluded; true?

A.   Yes, that would be true.

Q.   All right.  Now, DNA consist of base pairs; doesn't does it not?

A.   Yes.

Q.   And there's like three billion in a cell; correct?

A.   Well, there's roughly three billion base pairs into human genome.

Q.   Okay.  And we are identical, white men, white female, me and this black male client of mine, we are identical for the vast majority of our DNA; aren't we?

A.   That's correct.

Q.   Okay.  And what you tested in this case was a very small fraction of way less than one percent of the DNA for this person; correct?

A.   That is correct.  But we know these regions to be highly variable between individuals.  And of all the years of doing STRs and compiling data bases, we don't typically more than, you know, three or four matches between individuals.  So, that is how -- you know, you might have two or three of the same profiles at two or three of the

locations. But it has never been observed in all the years of testing to have anywhere near 13, or not even six, in common. So, we know these to be variable between people. And that is how we generate those probabilities.

Q. Are you familiar with the *Easton* case?

A. Excuse me?

Q. The *Easton* case?

A. No.

Q. Okay. You are not familiar with the *Easton* out of Britain where did guy was tested for --

THE COURT: Wait. He says he is not familiar with. So, he cannot go ahead and testify.

Q. Are you not familiar that there was a specific case that caused everybody to question whether six locations were sufficient?

A. I'm not familiar with this case.

Q. And again, you've been doing this for how many years?

A. A little over three years.

Q. For a very short time?

A. Well, STR testing generally has only been around, not for about ten years. So --

Q. Do you do anything to double check the sex gene?

A. I don't follow.

Q. Do you double check the sex gene? You have an XX result; correct?

A.    Yes.

Q.    Do you do anything -- did you check another location to verify sex?

A.    Well, our amplification uses two systems that overlap at that region.  So, we observed the XX on actually two different subsamples for that sample.  So, we saw that twice for that particular sample.

Q.    But for the same location?

A.    For the same location, yes.

Q.    Did you check another location?

A.    No.

Q.    All right.  Have you ever heard of what is called deleted amelogenin males?

A.    Yes.

Q.    And those are males who the -- males are XY; correct?

A.    Male humans have an X and a Y chromosome, yes.

Q.    All right.  And amelogenin deleted males are males that appear to be normal males that the Y doesn't copy; correct?

A.    Right.  What amelogenin is, it is an analog.  It is, you know, genes that are different length on the X and Y chromosome.  But it is not actually looking at the X and the Y chromosome.

Q.    Well, I mean, you are seeing if they copy?

A.    Right.

Q.    All right.

A.    Well --

Q.    Because what you do in the PCR business is you are replicating and checking it; correct?

A.    Right.  We replicate the locations that we are looking at to generate higher copies of them.

Q.    The amelogenin deleted male would show up -- would not show up XY; would he?

A.    That's correct.  He would not.

Q.    And isn't there criticism and isn't there talk in your field of expertise that another locus should be checked to verify sex?

A.    I am familiar with other locations, yes.

Q.    Okay.  And are you familiar with the criticism in your field about not double checking for the sex?

A.    I'm not familiar with widespread criticism about checking.

Q.    Are you familiar with the *International Journal of Legal Medicine?*

A.    It sounds familiar.  But I'm not.

Q.    Have you ever read the article *Is The Amelogenin Sex Test Valid?*

A.    May I see it a copy?

                    (Brief Pause.)

A.    No, I have not read this article.

Q.    In that same journal, but read the article *Is The*

*Amelogenin Reliable?*

THE COURT:  Have you read the article or read anything out of there, Mr. Witness?  No, before you look at that, have you read it?  Answer my question.

A.    Right.

THE COURT:  Are you familiar with this publication?

A.    I'm familiar with the publication, but I don't believe I have read any of these articles.

THE COURT:  But you are familiar with the publication.

A.    Right.  It is not one the general peer reviewed by forensic literatures in the United States.

THE COURT:  All right.  Let's move on.  He is not familiar with it, and he doesn't recognize it.

Q.    Are you familiar with the term *mutations*?

A.    Yes.

Q.    And if a location has mutation, it will not copy; will it?

A.    If the mutation for that location makes it incompatible with the primers that are used in the PCR process, this is the process that amplifies these regions.  So, occasionally it is observed that some individuals would have this deletion such that the primers are not able to attach and are not able to make copies of that location.

Q.   And that can also account for a false reading of XX in a DNA testing; can't it?  The primer didn't attach to the Y side?

A.   Well, I believe that is the same phenomenon that is observed in the deletion.  A deletion or a mutation could lead to improper primer binding.

Q.   Okay.  Now, you also checked a bicycle seat; didn't you?

A.   Yes.

Q.   Did you find anything there?

A.   No.

Q.   Did you ever -- were you ever asked to check for DNA on a blue or black jogging suit?

A.   No, I was not.

Q.   Were you ever asked to check for DNA on those shoes that are sitting right at your elbow?

A.   No, I was not.

        MR. BELL:  That's all I have of.

**REDIRECT EXAMINATION**

BY MR. FRENTZEN:

Q.   Mr. Meuller, is the work performed by the Bode laboratory generally tested?

A.   Could you repeat the question?

Q.   Yes.  Is the Bode laboratory reviewed in any capacity, their work, the accuracy of their work?

A.    Yes, it is.

Q.    By who?

A.    Well, there's several stages of review.  We undergo internal audits from our QA Department as well as external audits by some of the accreditation boards that I mentioned earlier where they come in and look at our protocols and our methods, and make sure what we're doing is compatible with the guidelines for testing laboratories.

And additionally, each analyst is required to undergo proficiency testing twice a year, which proficiency testing basically is an external laboratory will send samples to us similar to this kind of sample we've received in a case.  And then we're suppose to work those and analyze those as we normally would.  And then we send the results back to them to make sure -- obviously, we don't the answers.  They check it and make sure that we are getting the right answers, that our work is accurate and reliable.

Q.    Was your specific work in this case reviewed by other members of the Bode Technology Group?

A.    Yes, it was.

Q.    By how many people?

A.    This case was reviewed by three people.

Q.    And briefly, can you tell us how much collective experience they have in the area of DNA testing?

A.    Well, I would say years and years of DNA testing

experience.  Our Laboratory Director, Mitchell Holland has been involved from the onset of Mitochondria DNA and STR testing.  And some of the other individuals.  Our forensic technical leader has been working the field for many years and has reviewed and actually worked on hundreds of forensic cases.

Q.   And all of the evidence that you received in this case, you tested it, but in addition, did you also preserve the evidence?

A.   Yes, that is correct.

Q.   So, any additional tests could have been performed on any of the items you received?

A.   That is correct.

        MR. FRENTZEN:  Nothing further Your Honor.

        THE COURT:  The witness may step aside.

                [NOTE:  Witness left the stand.]

        THE COURT:  Call your next witness.

        MR. NEWMAN:  Your Honor, the government calls John Holder.

        CLERK:  For the record sir, please state your name and your occupation.

        WITNESS:  John Holder, United States Postal Inspector.

        **JOHN HOLDER,** after having been duly sworn, and called as a witness by the government, testifies as follows.

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q.    Inspector holder, how long have you been with the U.S. Postal Inspectors?

A.    Twelve years.

Q.    Where have you been stationed during your career with them?

A.    My first assignment was Birmingham, Alabama, and then in Atlanta, Georgia.

Q.    Let me direct your attention to November 30th, 2002, were you notified of a murder of a postal employee in Fleming, Georgia?

A.    Yes, sir, I was.

Q.    What did you do when you received that information?

A.    I responded to Fleming.

Q.    And when you got to Fleming, generally speaking what did you do during the course of that week?  Did you become part of the investigation?

A.    Yes, sir, I did.

Q.    Let me direct your attention now to December 5th of 2002, did you participate in the search on Leroy Coffer Highway?

A.    Yes, sir, I did.

Q.    What is your understanding of what location was being searched?

A.    It was my understanding that was the residence of Sadie Brown.

Q.    Inspector Holder, I would like to show you on that monitor in front of you what has been marked as Government's Exhibit 29.  First I would like to ask you if you recognize that?

A.    Yes, sir.  That appears to be the layout of the property and area where Sadie Brown's residence is located.

        MR. FRENTZEN:  Your Honor, I would offer Government's 29.

        THE COURT:  Received.

        MR. FRENTZEN:  And asked to publish it.

        THE COURT:  Proceed.

Q.    Inspector Holder, if you could tell us when you arrived at that location, can you tell us, sort of describe for us the diagram and what is there?

A.    This diagram consist of mobile homes all located there on the property.  The building over here to the left where the cross is, is a church that sets up on the corner.

Q.    Okay.  And in particular, which trailer were you involved in searching?

A.    The one that is marked with the last three numbers 501.

Q.    What time did you arrive at that location?

A.    Mid to late afternoon.  I don't remember the exact time that we arrived.

Q.   And were you there -- were you one of the first inspectors to go into the residence?

A.   Yes, sir.  Once that we had been advised that we could commence the search, I was one of the first ones in.  Yes.

Q.   Okay.  Were you present inside the trailer when consent was obtained to search the trailer?

A.   No, sir, I was not.

Q.   But at some point you were told that you could proceed with the search?

A.   Yes, sir, that's correct.

Q.   And I would like to show you what I believe is already admitted into the evidence.  If I could show you up on your screen Government's Exhibit 11, which is already in evidence.  I believe it can be published to jurors as well.

          Do you recognize that, sir?

A.   Yes, sir, I do.

Q.   What do you recognize it to be?

A.   It is the general layout and floor plan of the trailer that is designated as Sadie Brown's residence.

Q.   Can you tell where in that trailer you searched, sir?

A.   I assisted searching all of the rooms which are designated as bedrooms.

Q.   Did you locate or find at some point a jacket in that trailer?

A.   Yes, sir, I did.

Q.   Can you tell us where you found the jacket?

A.   The jacket was lying on the bed, and the bedroom is the one up here immediately to your right as you're looking on the screen of the room where the washer and drier are.

Q.   Okay.  Can you describe moving from the right over, which room that is?

A.   From the right over, it is the room -- do you see the room where it says washer/drier, and it is the bedroom immediately to the right of that.

Q.   Okay.  So, that is the room with the green mark in it?

A.   Yes, sir.

Q.   Can you describe for us what you found in that room?

A.   In the room, there was just a bed and on that bed there was a brown jacket and a baseball cap.

Q.   And I would like to show you on the monitor what has been marked as Government's Exhibit 30-A.  Do you recognize what that is, sir?

A.   Yes, sir.

Q.   What is it?

A.   That appears to be the jacket and ball cap that was located on the bed.

         MR. FRENTZEN:  Your Honor, I would offer Government's Exhibit 30-A.

         THE COURT:  Received.

         MR. FRENTZEN:  And I would ask to publish it to

the jurors.

THE COURT:  Yes.  Is it turned upside down?

MR. FRENTZEN:  I don't believe so, Your Honor. I believe it is up against the wall there.

Q.   Can you describe, Inspector Holder, what is there on that photograph?

A.   A brown, what I would call a cargo or field type jacket, and a ball type cap that consisted of a tan bill and a greenish colored upper portion of the cap.

Q.   Did you find other identifying items in that room?

A.   No, sir, I didn't.

Q.   Did you take that jacket into your possession as evidence?

A.   Yes, sir, I did.

Q.   Can you take a look at Government's Exhibit 5, which is hanging next to you on your left there.  And I ask you if you can identify that?

A.   Yes, sir, that appears to be the same jacket.

Q.   Inspector Holder, did you find anything else of significance in Ms. Brown's trailer?

A.   We later found a duffle bag which contained identifying items of Meier Jason Brown.

Q.   Was that found in the same room as the brown jacket?

A.   No, sir, it wasn't.

Q.   Which room was that found in?

A.   That was found in the bedroom that was identified to me as being Ms. Brown's bedroom.

MR. FRENTZEN:  Nothing further Your Honor.

THE COURT:  You may examine.

**CROSS EXAMINATION**

BY MR. DARDEN:

Q.   You didn't find any dark type jogging clothing in that mobile home?

A.   No, sir, I didn't.

Q.   Okay.  And you've indicated that you didn't find anything else in that bedroom that would indicate that bedroom belonged to the defendant; did you?

A.   No, sir, I didn't.

Q.   You didn't find any papers or anything like that?

A.   No, sir.

Q.   In fact, everything you found that would indicate he lived in that house, you found in the mother's bedroom?

A.   That's correct, sir.

Q.   And at the time you searched on the 5th day of the month, were you aware that he had not been in that home for several days?

A.   No, sir, I wasn't.

Q.   Okay.  Now, you talked to a lot of people during the investigation of this case; did you not?

A.   I talked to a few, yes, sir.

Q.   And during the course of investigation, you developed many leads.  Is that correct?

A.   Yes, sir.

Q.   And you received various information concerning various descriptions of various suspects.  Is that correct?

A.   Yes, sir.

Q.   And in fact, this mobile home is not the only place you conducted an investigation.  I believe you conducted an investigation across from the railroad tracks as well.  Is that correct?

A.   I'm sorry.

Q.   Did you go over on the railroad track side, on the railroad track line to look for any physical evidence?

A.   Yes, sir, we did.

Q.   Okay.  That was a result of some information you had received, I believe, from a Mr. Edders involving a suspect standing over there.  Is that correct?

A.   I believe so.  Yes, sir.

Q.   Okay.  And that was important because he said the present of the male was --

         MR. FRENTZEN:  Objection.  That is hearsay and outside the scope, Your Honor.

         THE COURT:  Objection sustained.

         MR. DARDEN:  That's all, Your Honor.

         THE COURT:  Okay.  The witness may step aside.

[NOTE:  Witness left the stand.]

THE COURT:  Marshal, let's take a 15-minute recess.

MARSHAL:  All rise.  Remain standing while the jury leaves the box, please.

[NOTE:  Brief Recess.]

MARSHAL:  Court is back in session.  Be seated and come to order.

THE COURT:  Your next witness.

MR. FRENTZEN:  Your Honor, before we call our next witness, we would like to offer a stipulation by the parties.

THE COURT:  All right.

MR. FRENTZEN:  If I may read it into the record, Your Honor.

THE COURT:  Yes.

MR. FRENTZEN:  A stipulation by the parties.

*It is hereby agreed and stipulated by the parties, the United States of America and defendant --*

THE COURT:  First, let me tell you what a stipulation is, ladies and gentlemen.

Normally, everything has to be the proven.  But when the parties agree to something, they call that a stipulation.  That itself, you must accept as truthful, and you do not have to have a witness to tell you about it.

Go ahead.

MR. FRENTZEN:  Thank you, Your Honor.

*It is hereby agreed and stipulated by the parties, the United States of America and the Defendant, Meier Jason Brown, that the jury may accept as proven fact the following:*

*That Stephanie Smith, Senior Forensic Chemist for the United States Postal Inspection Service, conducted a presumptive test for blood on Government's Exhibit 5, a brown jacket recovered from 6724 Leroy Coffer Highway, Fleming, Georgia, which test indicated the presence of human blood on the right sleeve of the jacket in the same area tested for DNA analysis by the Bode Technology Group.*

Agreed this 4th day of November, 2003, and signed by myself, Mr. Darden and the defendant, Meier Jason Brown.

Your Honor, the government calls Jim Rushwin.

CLERK:  For the record, please state your name and your occupation.

WITNESS:  My name is James Thomas Rushwin.  I'm a United States Postal Inspector.

**JAMES THOMAS RUSHWIN**, after having been duly sworn, and called as a witness by the government, testifies as follows.

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q.   Mr. Rushwin, how long have you been a Postal Inspector?

A.   Sixteen and a half years.

Q.   Where are you currently stationed?

A.   Atlanta, Georgia.

Q.   Prior to becoming a Postal Inspector, did you have any law enforcement experience?

A.   I was a military policeman for ten years.

Q.   Let me direct your attention, sir, to December 5th of 2002.  Did you participate in a search on that day?

A.   Yes, sir, I did.

Q.   Do you recall where that search took place?

A.   It took place at 131 Laurel Wood Drive in Savannah, Georgia.

Q.   Whose residence did you understand that to be?

A.   This was a residence of Diane Brown.

Q.   Do you recall what time approximately that search was conducted?

A.   It was conducted at 3:45 in the afternoon.

Q.   How many -- who was present for this search?

A.   Present were Postal Inspectors, two Chatham County officers, and one Liberty County officer.

Q.   In all, how many law enforcement officers were there?

A.   Eight.

Q.   Who approached the door of the residence first?

A.    I approached the residence.

Q.    What did you do when you first went up to the residence?

A.    When I first approached the residence, I knocked at the door.  The defendant, Jason Brown, answered the door.

Q.    Could you see anyone else in the residence when the door was answered?

A.    Yes, I could.

Q.    Who was that?

A.    Diane Brown.

Q.    At the time that you knocked at the door and the door was opened, were any of the inspectors or officers, did anybody have their weapons drawn?

A.    No, sir.

Q.    What conversation took place at the front door?

A.    When the door was opened, I immediately said police to the defendant.  Ms. Brown walked up behind him.  At that point, I addressed her.  And I said I would like to talk to you about searching the house, Ma'am, and asked her if we could step into the another room to talk.

Q.    Did law enforcement officers bust in the door?

A.    No, sir.

Q.    Did they go running into the house and check around the house?

A.    No, sir.

Q. Were you allowed to come into the residence?

A. Yes, sir.

Q. Where did you go?

A. We went into a small sitting room, which was a converted one-car garage to the left of the doorway.

Q. When you say *we*, who are you referring to?

A. I refer to Diane Brown and myself.

Q. What took place in that room?

A. I identified myself further to Ms. Brown. I told her I was Inspector Rushwin, a United States Postal Inspector, and we were investigating the murder of Sallie Gagila and the robbery of the Fleming, Georgia Post Office.

I further told her that we were talking with people who may have been at the Post Office the day of the robbery and murder. I asked her if she would be willing to let us search her residence.

Q. What did she say?

A. She said yes.

Q. Did you at any time tell her whether or not you had a search warrant?

A. No, sir.

Q. Did you in fact have a search warrant?

A. Yes, sir.

Q. Did you ever reveal that search warrant or execute the search warrant?

A.    No, sir.

Q.    What did you tell -- I'm sorry.  Did you offer Diane Brown an opportunity to sign consent to search forms?

A.    Yes, I did.  Two forms, one for her automobile and one for the residence.

Q.    And what did she say about those forms?

A.    Well, she said of course, she will cooperate.  She said she was a corrections officer.

Q.    During this period of time, was anyone running around the house with their guns drawn?

A.    No, sir.

Q.    Did Ms. Brown sign those forms?

A.    Yes, she did.

Q.    After she consented to the search, what did you do, sir?

A.    After she consented, I did a walk through of the house, just to get an idea of what was in the house, and what the house looked like.  I walked through each bedroom.  I walked through Diane Brown's bedroom also, and the kitchen and the dinette.

Q.    During the course of your walk through, did you notice anything that caught your attention?

A.    Yes, sir.  In Diane Brown's bedroom, I noticed a dark colored pair of tennis shoes.  I picked these tennis shoes up and looked at the bottom of the tennis shoes.

Q.   What was the significance of the bottom of the tennis shoes?

A.   I had responded to the crime scheme the day of the murder and had witnessed -- there was a footprint developed on the service window counter line at the Post Office, and had witnessed the developing of that footprint, and also the lifting.

     And I felt the pattern on the bottom of those shoes I looked at looked similar to that print.

     MR. FRENTZEN:  I'm sorry, Your Honor.  May I approach the witness, Your Honor.

     THE COURT:  Yes.

     MR. FRENTZEN:  Thank you.

Q.   I'm going to hand what has been admitted into evidence as Government's Exhibit 19.  Do you recognize those?

A.   Yes, sir.

Q.   What do you recognize them to be?

A.   This is the pair of shoes that I noticed in this area in Diane Brown's bedroom.

Q.   Did you take those shoes into your custody at that time?

A.   Not at that time, no, sir.

Q.   What did you do after your walk through?

A.   After the walk through, I approached Jason Brown.  I identified myself to him.  I showed him my credentials.  I

told him I was a United States Postal Inspector.  I was investigating the murder of Sallie Gagila and the robbery of the Fleming, Georgia Post Office.

I further explained to him that we were talking to people that may have been at the Post Office the day of the robbery/murder, and asked if he would speak with me.  And he said yes.

Q.    Where was he at the time you approached him?

A.    He was in the living room of the house.

Q.    What was he doing?

A.    He was sitting down smoking.

Q.    What did Mr. Brown say when you told him that you wanted to speak with him?

A.    He said he would.  He said he would have to get a pair of shoes on.  He was in his stocking feet at the time.  He started to walk down towards Diane Brown's bedroom.  And I told him that I would be walking -- I would walk with him for safety purposes, his safety and mine.

He went into the bedroom.  He went to pick up these particular shoes right here.  And I told him that Diane Brown had already consented to let us search this residence.  And I felt that those -- the pattern on those shoes looked similar to the pattern developed on the counter line at the Fleming, Georgia Post Office.  And I told him that he would be taking these as evidence.

I asked him further if he had other shoes that he could wear.

Q.   What did he say?

A.   He didn't reply.  He walked back out into the living room, dining room area.  And I had noticed a pair of tennis shoes on the washer or the drier in the residence when I did a walk through.  And I asked him if he could wear this particular pair of shoes.

Q.   What did he say?

A.   He said no.  He said those belonged to Diane Brown's ex-husband and he said he couldn't wear those shoes.

I then asked him if he could -- if he wanted to go in his stocking foot.

Q.   What did he say?

A.   He said no.

Q.   Did you force him to go?

A.   No, sir.

Q.   Did you ask him if he would still agree to speak with you there at the residence?

A.   Yes.

Q.   What did he say?

A.   I asked him if he would speak to us at the residence.  And he said, yes.

Q.   Do you start a interview of Mr. Brown at that time?

A.   Well, at that time, I told him that -- I notified

Inspector Woodall, who I was working with on this case, and notified him that he wanted to be interviewed at the house, and that he would come to the house.

We sat down at the table. And we started to talk about the robbery and the murder at the Post Office. At that point, I asked one of the other agents how long would it take Woodall to get to the residence, not wanting to start and stop and, start all over again.

One of them said five minutes. So, I decided to hold up the interview until Detective Woodall got there, which I did.

Q.   Did Detective Woodall arrive at some point?

A.   Yes, he did.

Q.   And after Detective Woodall arrived, did y'all ask Mr. Brown if he still was willing to speak with him --

A.   Yes, we did.

Q.   -- with you?  What did he say?

A.   He said he was willing to talk to us.

Q.   Did you start the interview at that time?

A.   Yes, sir.

Q.   Can you tell us about the interview?

A.   Yes.  Jason Brown said he went to the post office, the Fleming, Georgia Post Office about 8:30 a.m. on Saturday, the 30th.

He said he rode his Uncle Junior's bike, which was

a rust colored bike.  He said he went to the Post Office, went inside.  And he said there was a white man talking to Sallie Gagila, something about liking the walk.  And he said that Sallie asked him -- well, she mentioned to him, "are you in charge of the key now," the key to the post office box.  He said he replied yes.

He asked her -- she asked him his name, and he said Jason.  She then asked him if he was Meier, and he said yes.  He then said he got the box, the mail from Box 327, got his mail, wished him a happy holiday and left the post office.

He said he went from there across the tracks to Annie Jo Scott's house.  He said he visited with her approximately twenty minutes.  And she gave him some canned goods in a bag for his mother.  He left, rode the bike back home.  He said he distributed the mail to his family members, to his cousin, Cedric Morgan, his Uncle Junior, his Aunt Alice and his mother.

Q.   Did you ask him at that point in time about whether or not he had gone back to the Post Office that day?

A.   Yes, we did.

Q.   What he tell you about that?

A.   We asked him that questions twice.  And he denied going back to the Post Office.

Q.   What did he tell he had done the rest of that day?

A.    He had mentioned that Diane Brown had stayed with him at Sadie Brown's the previous night, that she had got up about 7:00 o'clock in the morning and came back to Savannah to check on her house.

He said he called Diane Brown from his mother's house.  She called him back and he said, "come and get me."  He said a short while later she did.

Q.    Following that first version of events on November 30th, did he change his story?

A.    Yes, he did.

Q.    What was the next story that he told you?

A.    He further told us that he knew his cousin, Cedric Morgan, had money buried in a can in the woods behind his house.  We asked him how much money, and he said $1,300.

He said he stole this money, and he went to the Post Office, and he bought three money orders; one for 500, the second for 500, and the third for $175.

He said that these money orders from for Diane Brown's bills, and were to pay the bankruptcy court and also the finance company for her mortgage.

Q.    Following that second version of events, did he tell you another version of the events?

A.    Yes, he did.

Q.    What did he tell you on the third time?

A.    The third time he told us -- excuse me -- he had a

knife and he went to the Post Office to rob the lady.  He said he went to the Post Office.  He rode to the bike to the Post Office.  He went in and he ordered three money orders, one for $500, the second for $500 and, $175.

He said that the lady imprinted the money orders and, turned around and went to the desk to use the calculator that was on the desk.  He said at that point he jumped over the counter, and he fell and tripped, and fell into her.  And he said he cut her.

Q.    What did he say he did after he cut her?

A.    He said after he cut her, he said, he said, "I could do the time for the robbery if I got caught," but he said, "damn, she knows me.  So, I had to kill her ".

Q.    What did he tell you he had done?

A.    He had killed Sallie Gagila.

Q.    What did he tell you he did after he killed her?

A.    Afterwards, he said he crawled back out through the window, the service window at the counter, back got the bike and went home.

Q.    Did he tell you whether or not he had taken anything while he was in the Post Office?

A.    Yes.

Q.    What was that?

A.    He talked about taking Sallie Gagila's wallet out of her purse.  He said there was only a few dollars in there.

He took the few dollars.  There were credit cards, but he didn't mess with the credit cards.  He said he took the wallet and took it back home and buried behind his Uncle Junior's house.

Q.    Did he tell you where the purse was located?

A.    Yes.  He said the purse was located on the chair in the Post Office next to the desk.

Q.    Did he tell you what he had done with the knife or the socks?

A.    Yes, sir.

Q.    What did he tell you about that?

A.    He said he rode the bike back home.  And he said he took the socks he had been wearing on his hands and wiped the blood from the knife.  And he said he threw these alongside of the road on the way back to his mother's house. And he motioned to his in a backhanded manner, he said, "I through them alongside the road".

Q.    What did he tell you he did after he got to the house?

A.    He said he got home.  He said his mother was washing clothes at the time, and he threw his in.

He also told us that he got the knife from his mother's kitchen.

Q.    Did he tell you anything else about Diane Brown?

A.    Yes.  He said he called Diane Brown, and she called back.  He called her collect.  And she called back a short

while later.  He told her to come and pick her up -- him up.  Excuse me.

He later said she came and picked him up in about 45 minutes to an hour.  I asked him if he heard the sirens on the police cars that day, and he said yes.

Q.   Did he tell you what, if anything, he had done with the money orders that he had taken?

A.   Yes.  He said he gave the money orders to Diane Brown on Sunday.  And he said that he told her that he crossed a friend, ripped off a friend, and that's how he got the money to pay for the money orders.

Q.   What did he do after he told you all of this?

A.   After he told us all this, a slight momentary pause, we picked up the phone and dialed it, and someone answered.  And he said, "bitch," he said, "just give the phone to Mom."  And then he said, "Mom, I love you.  It was an accident.  Don't hate me, Mama.  It was an accident.  Bye, Mama, bye."

Q.   Following this statement by Mr. Brown, was a decision made to place him under arrest?

A.   Yes, there was.

Q.   Did you place him under arrest?

A.   Yes, I did.

Q.   And at that point in time did you inform him of his *Miranda* rights?

A.   Yes, I did.  I advised him for a standard PS Form 1067,

a Warning and Waiver of Rights Form.

Q.   Prior to that time, had he agreed to speak with you?

A.   Yes, he did.

Q.   And prior to that time was he under arrest?

A.   No, sir.

Q.   Were you required to read him his rights prior to that time?

A.   No, sir.

Q.   I would like to show you on that monitor in front of you, sir, what has been marked as Government's Exhibit 31. Do you recognize those, sir?

A.   Yes, sir.

Q.   Generally what is that?

A.   That is a standard PS Form 1067.  It is a warning and waiver of rights form.

         MR. FRENTZEN:  Your Honor, we would move Government's 31 into evidence and ask to publish it.

         THE COURT:  Received, and you may do so.

         MR. FRENTZEN:  Thank you.

Q.   How long had all of this taken, Inspector Rushwin, from the time that you first got there?

A.   Slightly over four hours.

Q.   During that time, did you stay in one single room?

A.   No.  We initially started in the dinette, and moved to the converted portion of the garage, which was a sitting

room.

Q.    Was the entire time spent asking questions and talking with him; or, were there pauses?

A.    No.  There were pauses.  He smoked.  He drank sodas, watched television at one point.  He and I talked about the Atlanta Falcons, and small talk at times, too.

Q.    All right.  This is the form -- these are rights you informed him of?

A.    Yes, sir.

Q.    And is that your signature at the bottom there?

A.    Yes, sir.

        MR. FRENTZEN:  If you will just move that up slightly.

Q.    That is witnessed also by who?

A.    Inspector Reeves.

Q.    And is that -- you did witness Mr. Brown's signature there?

A.    Yes, sir.

Q.    After you informed him of his **Miranda** rights, did he agree to speak with you further?

A.    Yes, he did.

Q.    What did he tell you?

A.    Basically, we went back through his entire confession again.

Q.    What, if anything, did he say at that point about the

shoes?

A.   I asked him if he wore these shoes to the Post Office Saturday, the day of the robbery and murder, and he said, "probably."

Q.   At any point was Diane Brown brought into the room?

A.   Yes, she was.

Q.   What happened when she was brought into the room?

A.   She was brought into the room and sat down with Jason. And he told her that he went to the Post Office to rob her. He said that he fell into her and cut her.

     And --

Q.   Did he tell her anything more than that?

A.   I further explained that he had told me that he wore socks on his hands, and he got the knife from his mother's kitchen.

Q.   Okay.  But that was you to Diane Brown?

A.   Right.  Right.

Q.   At any time did you threaten to arrest Diane Brown?

A.   No, sir.

     MR. FRENTZEN:  With the Court's indulgence for one moment, Your Honor.

     THE COURT:  Yes.

          (Brief Pause.)

     MR. FRENTZEN:  I have nothing further Your Honor.

THE COURT: You may examine.

**CROSS EXAMINATION**

BY MR. DARDEN:

Q. Mr. Rushwin, you indicated that you got there about 3:45. Is that correct?

A. 3:45?

Q. Yes, sir.

A. Yes, sir. Yes, sir.

Q. And you guys sat around and talked for quite a while before Woodall arrived about various subjects, football, all types of things; correct?

A. We didn't do too much talking, no.

Q. But Mr. Brown was pleasant and personable, and he talked to you; did he not?

A. Yes, sir.

Q. You made it clear to him when you arrived that he was not under arrest, and he was free to go if he wanted to?

A. Yes, sir.

Q. And he didn't go. He remained there. Is that correct?

A. That's correct.

Q. And at no time did he express to you that he wanted to leave?

A. That's true.

Q. Okay. Now, during this conversation, he did indicate to you that he was concerned about Diane Brown and her

daughter; did he not?

A.   Yes, he did.

Q.   Okay.  And one of his concerns was, is that he didn't want the child to be brought home from school while all of these law enforcement people were there.  Is that a fair statement?

A.   Well, Diane Brown had brought that up.  He didn't.

Q.   Okay.  But he was very much concerned about her.  Is that correct?

A.   He said he was.

Q.   Yes.  And in fact, there was some conversation -- and I'm not suggesting anything -- but there was some conversation between you and he about whether she would be arrested or not.  Is that correct?

A.   Well, he asked that if he told us the truth would we not arrest her.

Q.   Right.

A.   And we further explained to him that if she was involved, she would be arrested, too.  But if she wasn't involved, naturally, we couldn't arrest her.

Q.   Right.  I'm not suggesting that you promised anything.  That was his statement to you.  And he was concerned about whether she was going to be arrested, and if he talked to you, she wouldn't be arrested.  And you said no, if she is involved, she will be arrested; right?

A.    Right.

Q.    Okay.

A.    To a degree there.

Q.    Okay.  Now, how long have you been a investigator?

A.    Sixteen and a half years.

Q.    And I would imagine during that period of time you have interrogated many, many defendants; have you not?

A.    Yes, sir.

Q.    And it is normal that when you first begin this interrogation they are not always honest with you; are they?

A.    A lot of times, yes.

Q.    Right.  Most of the time, they are not.  I mean, that's why they train you guys to interrogate people, because people change their story, and you keep going back over it, and you look at the inconsistencies.  And that is how you get information.  The point being it is very rare that you sit down with a defendant and you tell them I want to talk to you about this crime, and they immediately tell you everything happened.  That is rare; isn't it?

A.    It is rare, but it does happen.

Q.    It would make your job easier, but it just doesn't happen; does it?

A.    Sometimes.

Q.    Now, isn't it true that Mr. Brown is the one that indicated to you he really wanted to talk to Mr. Woodall?

Is that a fair statement?

A.    No.  No, sir.

Q.    Did you suggest that?

A.    That was my suggestion.

Q.    Okay.  What was his response to that?

A.    I didn't ask him if he wanted to talk to Detective Woodall.  I had explained to him that Detective Woodall was going to be part of the interview team.  And I said initially we were going to go the Chatham County Police Department for the interview.  And then he changed his mind.  And I further told that Inspector Woodall would come to the house.

      It was at my suggestion.

Q.    All right, sir.  And he indicated to you that he threw the knife, the wallet, and the socks on the side of the road.  Did you ever find any of those items?

A.    He threw the knife and the socks alongside the road.

Q.    Okay.  I believe he indicated he buried the wallet?

A.    He buried the wallet.  Yes, sir.

Q.    Did you ever find any of those items?

A.    No, sir.

Q.    And I assume that you went do the locations in which he directed to look for them.  Is that correct?

A.    I didn't, but over agents did.

Q.    Okay.  And you were one of the lead investigators.  And

you know from -- you know that they were not found.  Is that correct?

A.   Well, I know they were found, but I was not a lead investigator.

Q.   All right, sir.  During this interview, at the time he finally admitted to you or told you that he had been involved in this, how would you describe his demeanor?  Did he appear to be upset?

A.   No, he was relatively calm.

Q.   Did he cry any?

A.   He got -- his eyes watered at one point after he confessed.

Q.   Okay.  And you indicated that he called his Mom and told her, "I love you.  Don't hate me.  Bye, Mama, bye."  Is that correct?

A.   Yes, sir.

Q.   And I believe he told you that he wanted to tell his mother.  Is that correct?

A.   He had said he was going to call his mother.

Q.   And tell her right?

A.   Well, no, he didn't what he was going to say.  He just said --

Q.   He just said he wanted to call his mom?

A.   He wanted to call his mother.  Yes.

Q.   And you said that then Diane came into the room?

A.    Yes, sir.

Q.    And what did he say to her?

A.    He said to her that -- he said he went to the Post Office.  He had a knife to rob her.  He said he went over the counter, and he tripped and fell into her, and cut her.

Q.    Okay.  And that was somewhat consistent or it was in fact consistent with what he had told his mom, that it was an accident, and then he killed her because she knew him.  Is that correct?

A.    Yes, sir.

Q.    Okay.

        MR. DARDEN:  Could I have just one moment?

        THE COURT:  Yes.

                    [Pause.]

        MR. DARDEN:  That's all I have, Your Honor.  Thank you.

        MR. FRENTZEN:  Nothing further Your Honor.

        THE COURT:  The witness may step aside.

                [NOTE:  Witness left the stand.]

        MR. FRENTZEN:  Your Honor, the government would ask to recall inspector Henry Reeves.

        THE COURT:  All right.

        CLERK:  Once again for the record, please state your name and your occupation.

        WITNESS:  Henry A. Reeves, Postal Inspector.

**HENRY REEVES**, having been recalled by the government, testifies as follows.

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q.   Inspector Reeves, following your participation in the accountability study at the Post Office, directing your attention to December 5th, 2002, did you participate in a search on that day?

A.   Yes, I did.

Q.   Initially, at what location did you go to?

A.   6724 Lee Roy Coffer Highway.

Q.   And whose residence did you understand that to be?

A.   That was the Browns' residence.

Q.   What did you do at that location?

A.   I provided rear security of the house.

Q.   Did you participate in any way in the search of that residence?

A.   No, sir, I didn't.

Q.   After you provided the rear security, and inspectors were in the residence, what did you do?

A.   I was directed to go to 131 Laurel Wood Drive in Savannah.

Q.   What's your understanding of what was there?

A.   That was Diane Brown's residence.

Q.   Did you in fact go there?

A.    Yes, I did.

Q.    What was going on there when you got there?

A.    Meier Brown was seated in the middle of the floor and there was officers around.  And I went into the den area.

Q.    Okay.  When you say he was seated in the middle of the floor, was he sitting on something?

A.    Yes.  He was in a chair.

Q.    And what did you do when you got to 131 Laurel Wood?

A.    I went to the den area where Ms. Diane Brown and Inspector Rushwin were sitting.

Q.    Okay.  What was going on?

A.    They were sitting there talking.

Q.    And following that, did you participate in a search of the residence?

A.    Yes, sir, I did.

Q.    Where did you search?

A.    We searched the den area initially.  And then we moved into the master bedroom.

Q.    Okay.

        MR. FRENTZEN:  If we could show Government's 16-B, which is already in evidence.  It can be published to the jury.

Q.    Inspector Reeves, can you describe for us where you conducted searches?

A.    The den is located to the left upper area.

Q.    All the way to the left?

A.    Yes, sir.

Q.    Okay.  Did you find of anything of significance in the den?

A.    No, sir, we didn't.

Q.    Where did you go after the den?

A.    We went into the master bedroom, which is on the top right.

Q.    Is that where there is a green mark?

A.    Yes, sir, it is.

Q.    All right.  Did you find anything in that master bedroom?

A.    Yes, we did.

Q.    What did you find?

A.    We found three money order receipts, and a pair of Lugz tennis shoes.

Q.    And did you take these items into the evidence?

A.    Yes, sir, we did.

Q.    Were you present when Mr. Brown was read his *Miranda* rights at 131 Laurel Wood?

A.    Yes, sir, I was.

Q.    Okay.

          MR. FRENTZEN:  The Court's indulgence for you one moment, Your Honor.

          THE COURT:  Yes.

[Pause.]

Q.   Just to be the clear, Inspector Reeves, the items that you found in the master bedroom, the money orders, where did you find those?

A.   They were found in like a night stand next to the bed.

Q.   To your knowledge, was that search and the location where you found those items, was that photographed?

A.   Yes, sir.

Q.   Let me direct your attention to the following morning, December 6th, 2002.  Did you participate in an interview of Mr. Brown on that morning?

A.   Yes, sir, I did.

Q.   Was Mr. Brown read his **Miranda** rights again in your presence?

A.   Yes, sir, he was.

Q.   Inspector Reeves, I would like to show you -- and if you would take a look at that monitor at what has been marked as Government's Exhibit 32-A.  Do you recognize that, sir?

A.   Yes, sir.

Q.   What is that generally?

A.   That is a form for a rights warning and waiver of rights.

        MR. FRENTZEN:  Your Honor, I would offer Government's Exhibit 32-A into evidence.

THE COURT: Received.

MR. FRENTZEN: And publish it to the jury please.

Q. Inspector Reeves, are these the rights that were read to Mr. Brown on December 6th?

A. Yes, sir, it is.

Q. Did you witness that?

A. Yes, sir, I did.

Q. Whose signatures are those at the bottom of that form?

A. My signature and Officer Chuck Woodall from, I think it is Liberty County.

Q. And is it signed by Mr. Brown?

A. Yes, sir, I did.

Q. What is the time indicated there, if you can read that?

A. 8:01 a.m.

Q. Did you then conduct or participate in the interview of Mr. Brown?

A. Yes, sir.

Q. Was that interview tape recorded?

A. Yes, sir, it was.

Q. And have you reviewed the audio cassette tape of that interview?

A. Yes, sir, I have.

Q. Is it a fair and accurate rendition of the interview that took place on December 6th, 2002?

A.   Yes, sir, it is.

Q.   Did you as well listen to a digital recording of that audio tape?

A.   Yes, sir, I did.

Q.   Is that a fair and accurate recording of the interview that took place on December 6th, 2002?

A.   Yes, sir, it is.

Q.   Did you also review a transcript of that interview?

A.   Yes, sir.

Q.   Is that transcript a substantially accurate rendition of the interview that took place on December 6th, 2002?

A.   Yes, sir, it is.

Q.   And is it substantially accurate in terms of identifying the speakers and the contents of the statement?

A.   Yes, sir.

          MR. FRENTZEN:  May I approach, Your Honor?

          THE COURT:  Yes.

Q.   Inspector Reeves, I'm handing you what has been marked for identification as Government's Exhibit 32-B and 32-D. Do you recognize those?

A.   Yes, sir.

Q.   First with respect to 32-B, what do you recognize that to be?

A.   This is the audio tape from the interview.

Q.   Okay.  And 32-D, do you recognize what that is?

A.    Transcripts from that interview.

Q.    And, as well, 32-C is the digital recording that you previously said you listened to.

MR. FRENTZEN:  Your Honor, I would offer Government's Exhibits 32-B, 32-C, and 32-D into evidence.

THE COURT:  Received.

MR. FRENTZEN:  Your Honor, at this time, I would like to play for the members of the jury the digital recording of the confession.  And we have a scrolling copy of the transcript that should come up on monitors with that.

MR. DARDEN:  Judge, could you instruct the jury they are to rely on what they hear and not what they read in the transcript?

THE COURT:  I will do so.

MR. DARDEN:  Thank you.

THE COURT:  I had planned to do that.

Ladies and gentlemen, you heard the announcement from the prosecutor that they propose to play a transcript or play a recording of a statement made by the defendant. You heard the circumstances of that.

Also, they plan to scroll -- that is, to allow you to read what is being said.  Now, the evidence, the evidence is the recording, what someone said.

Of course, the transcript or the scroll that will

be printed out is what someone has typed after having listened to it.

There might be inconsistencies; or, you might understand the voice to say one thing and the typed portion of the transcript to be something else.  Of course, saying the primary evidence, the evidence is the recording, the oral part of it, if there is any inconsistencies; or, if your understanding is different from that that is in the transcript, you, of course, must rely on the recording. That is, the voice.

You may proceed.

MR. FRENTZEN:  Your Honor, if I might inquire as well, we have copies of the transcripts for the jurors just in case they would prefer to read rather than watch a scroll.

THE COURT:  Pass them out.

I remind you that this is only to aid your recollection, to aid your understanding.

Now, pass those out.  Do not begin to read them until you hear the voices.

Okay, proceed, Mr. Frentzen.

*[NOTE:  The taped interview is played.]*

*MR. WOODALL:  Today is the 6th of December, 2002.  It is currently 8:03 in the morning.  This is an interview with Meier Jason Brown.*

*Present in the interview is Meier, myself, Detective Woodall, and Inspector.*

*MR. REEVES:  Henry Reeves.*

*MR. WOODALL:  Henry Reeves from the U.S.  Postal Inspection Service.*

*Okay, Meier, prior to us starting this taped interview, have you been advised of your rights.*

*MR. BROWN:  Yeah.*

*MR. WOODALL:  Okay.  Meier And did you waive your rights and agree to talk to us.*

*MR. BROWN:  Yes.*

*MR. WOODALL:  Okay.  You were picked up last night.  We talked some.  And at your request, we terminated the interview until this morning.  You told us you wanted to really get some rest and talk to us this morning.  Is that correct?*

*MR. BROWN:  Yeah.*

*MR. WOODALL:  Okay.  Have you had some sleep?*

*MR. BROWN:  Not much.*

*MR. WOODALL:  Okay.  You were given the opportunity to sleep, and just tired -- I mean just stressed out over the whole thing?*

*MR. BROWN:  Yeah, yeah, yeah.*

*MR. WOODALL:  Okay.  Do you feel okay other than that?  I mean, I know you bought a lot, a lot on your*

*mind.*

*MR. BROWN:  Uh, you know, uh, last night I told you a lot of things that you know I feel like yesterday was the last day of my life, honestly, you know.  You know, I'm not okay.*

*MR. WOODALL:  Well, it's -- when I ask you that, it -- I know that.*

*MR. BROWN:  I'm not on drugs, alcohol, or none of that shit okay?*

*MR. WOODALL:  You are under a lot of stress, I know that.*

*MR. BROWN:  I'm going to tell you the truth. Okay.*

*MR. WOODALL:  That's the only thing that I have asked you all along is to do that, and I think you -- I think you're there.  I really do.  What I'm going to do is ask you a series of questions.  And, Henry is going to take some notes over here.  And we can't write down everything that you say, and that is why I have asked your consent to tape this.*

*So, if you see him taking some notes, don't worry about that.  He is just trying to jot down some things that I might forget.  Okay.*

*We picked you up or actually we came to your house yesterday, and talked to you at your girlfriend's house or*

*fiancee's house. And you told us basically what happened out at the post office in Fleming. This was last Saturday, I believe. Okay. Real briefly, how many times did you -- okay. First of all, Friday night, where did you stay at?*

MR. BROWN: *I stayed at my mama's house.*

MR. WOODALL: *Which is there in Fleming?*

MR. BROWN: *Yeah, that is where I live.*

MR. WOODALL: *Right. Okay. That Saturday morning, you got up and went to the post office. Just briefly walk me through what happened, and then I will go back and ask you specific questions. Okay.*

MR. BROWN: *Uh, I went to the post office twice Saturday morning.*

MR. WOODALL: *Okay. The first time you went down there.*

MR. BROWN: *The first time I went down there, it was a man and two women in the post office. Uh, I got our mail out the box with a key. I spoke to everybody, uh and I left.*

MR. WOODALL: *How did you get to the post office?*

MR. BROWN: *I rode a bicycle.*

MR. WOODALL: *Okay. Whose bike was it?*

MR. BROWN: *My Uncle Junior's.*

*MR. WOODALL:  Briefly tell me what that bike looks like.  Looks like a little kids bike, a male bike, a female bike, a 10-speed, 12 speed?*

*MR. BROWN:  I don't know the different sizes, but it is an adult bike, a rust colored, I guess.*

*MR. WOODALL:  Went down had, what happened in the post office?  Was there some kind, any kind of conversation between you and the people, or the lady working behind the post -- inside the post office?*

*MR. BROWN:  Yeah, she asked me was I in control of the key now.  And I said I guess, 'cause like I said, I live with my mama, and as long as it's me and my mama's house at the time, so you know I went to the post office and get the mail.*

*MR. WOODALL:  You did have the key that morning?*

*MR. BROWN:  Yeah.*

*MR. WOODALL:  You didn't have to ask her for the mail.*

*MR. BROWN:  No.*

*MR. WOODALL:  Okay.  The lady that was working there, briefly tell me what she looked like?  Old, young, black, white?*

*MR. BROWN:  There was a white lady and a black lady in there.  The white lady is the lady that is always in there.  The black lady, I had never seen before, so.*

MR. WOODALL:  Did she work there?

MR. BROWN:  Yeah.  There was a white male, but the white male didn't work there.  He was on the side of --

MR. WOODALL:  Customer side?

MR. BROWN:  Right.

MR. WOODALL:  Okay.  So, you got your mail and then left.  Where did you go to?

MR. BROWN:  I went to deliver the mail to my uncle's house, my mom's house, and my aunt's house, and one of my cousins' house.  Those people all had mail that day.

MR. WOODALL:  Okay.  And then what happened?

MR. BROWN:  Uh, I went back to rob the lady honestly.  But I went to Ms. Annie Jo's house first.

MR. WOODALL:  Okay.  Ms. Annie Jo is not related to you; is she?

MR. BROWN:  I always thought of her as an aunt.  Uh, she is an older lady.  She always -- I don't know, she just a nice woman.

MR. WOODALL:  Where does she live at in relation to the post office, though?

MR. BROWN:  From my mom's house, you have to pass the post office, cross the railroad tracks.

MR. WOODALL:  Cross the railroad tracks and then

go which way?

MR. BROWN:  Left on the dirt road.

MR. WOODALL:  Just go down the dirt road.

MR. BROWN:  Yeah, you go down.  Her house is on the right.  I don't know which number house it is, but --

MR. WOODALL:  You went there.  What did you do there?

MR. BROWN:  I visited with her for about 20, 30 minutes I guess.

MR. WOODALL:  Did you pick up anything from her?

MR. BROWN:  Yeah, she gave me some things to give to my mom.  Some canned goods.

MR. WOODALL:  What did you do with the canned goods when you left there?  Did you take them with you?

MR. BROWN:  Yeah.

MR. WOODALL:  Where did you go when you left her house?

MR. BROWN:  I was on my way back to, back to my mom's house, but, you know, like I said, the purpose of the trip was I was gonna steel something.  So, that's --

MR. WOODALL:  What were you going to steal when you went to the post office?

MR. BROWN:  Sigh.

MR. WOODALL:  I know this is where it gets hard for you, but these are the kind of specific questions that

*I am trying to get from you.  Because there is not a whole lot in the post office to steal.*

*MR. BROWN:  I know.  Just some money orders, man.*

*MR. WOODALL:  What did you do with the canned goods and stuff that you had?  You didn't take them?*

*MR. BROWN:  Left them outside on the bicycle, hanging on the handle bars, just hanging on the handle bars.*

*MR. WOODALL:  Where was the bicycle at during the this time?*

*MR. BROWN:  It was parked in front of the post office.*

*MR. WOODALL:  When you went into the post office, tell me what happened?  When you first walked in, did you just -- were you --*

*MR. BROWN:  Don't put words in my mouth.  I went inside, and I asked the lady for the money orders.  She made them.  Uh, I jumped across the little thing, and I tripped, and accidentally cut her.  And when I cut her, I got scared as hell, man.  I didn't go there to hurt her, honest to God I didn't.*

*MR. WOODALL:  Well, we asked you that several times last night, and you have been adamant about that. When you went in there, you had no intention of hurting*

her.

MR. BROWN:  I know a lot of people not going to believe that.  But that's the God honest truth.

MR. WOODALL:  I don't have any reason not to believe it, because you have always been straight with me. When you went into the post office -- now let me back up. How did you happen to have a knife with you when you went down there?  What was the purpose of the knife?

MR. BROWN:  Like I told you yesterday, I told you the purpose of the knife was to intimidate the lady, not to injure her.  Yeah, I mean, man.

MR. WOODALL:  When you did you pick the knife up to take it down there with you?  At miss -- at the -- where did the knife come from?

MR. BROWN:  From my mom's house.

MR. WOODALL:  So, back at your mom's house is when you decided I'm gonna go down there and try to get a little money.

MR. BROWN:  Yeah, I mean.

MR. WOODALL:  Were you wearing -- we talked last night, and I asked you if you were wearing gloves.  And you told me that you were not, that you had something else on your hands.  What was that?

MR. BROWN:  The socks.

MR. WOODALL:  When did you put the socks on your

hands?

MR. BROWN:  Uh.

MR. WOODALL:  You didn't have the socks on when --

MR. BROWN:  I didn't walk into the post office with them.  I didn't walk in the post office with them on my hands.

MR. WOODALL:  I mean, that seems like it would be kind of obvious if you did that.  So --

MR. BROWN:  I guess after she turned her back, she turned her back -- no, really, no, she didn't turn her back.  Ah, man.

MR. WOODALL:  That's okay.  I'm just trying to picture where she was at.

MR. BROWN:  Man, you told me to be specific and details, and all of that stuff, man.  And --

MR. WOODALL:  As much as you can.

MR. BROWN:  The counter, because my hands were below the counter, you know what I am saying?  You know, the way the post office is?

MR. WOODALL:  Yes.  Right, I know where the counter is.

MR. BROWN:  You know, just like this desk, my hands were down here.  So, I don't know when -- she might have been looking at me when I did it, you know, because

she couldn't see any hands, you know.

MR. WOODALL:  What kind of money orders did you ask her for?  How many money orders were there?

MR. BROWN:  I asked her for three.

MR. WOODALL:  Any particular reason those three amounts or that number?

MR. BROWN:  Yeah.  Man, can we stop that tape for a second, man?

MR. WOODALL:  I can, but --

MR. BROWN:  We have to start all over again?

MR. WOODALL:  Yeah, I don't really want to do that.

MR. BROWN:  Man, yeah.

MR. WOODALL:  This is you explaining to me so that I will have a record of it.  Meier, is all it is.  It is not -- you don't have to mention anybody's names if you don't want to.  If that is bothering you, and I know it does.

MR. BROWN:  Man, to me, it's messed up.  I asked for three money orders.  I told you the amount yesterday. Two of them were for one bill, and the one was for another.

MR. WOODALL:  I'm not real familiar with the post office.  Does she just stand in front of you and write out the money orders?  Is that -- or do you --

*MR. BROWN:  Uh, I think so.  I'm not sure, you know, 'cause I was scared, because that is probably why I tripped because I was nervous.*

*MR. WOODALL:  Well, last night you said something about she went to a desk or was doing something.*

*MR. BROWN:  Yeah, she went to -- she went to the little desk back there and she has a calculator on there.*

*MR. WOODALL:  Okay.*

*MR. BROWN:  And she was adding.  And that is when I came across and --*

*MR. WOODALL:  What startled her?  Did you hit your head or something like that; or, do you remember?  Was it just the noise of going through the thing?*

*MR. BROWN:  I don't know.  I don't know.  You know, I tripped and accidentally cut her right there.  And I was scared as hell, man.  I don't know, you know.*

*MR. WOODALL:  Did you have to finish jumping down; or did you fall down off that counter?*

*MR. BROWN:  I didn't fall.*

*MR. WOODALL:  You just weren't in total control.  You --*

*MR. BROWN:  Yeah, I didn't fall or hit my head on the ground or nothing like that.*

*MR. WOODALL:  What did she say when she saw you?*

*MR. BROWN:  She didn't say anything.  She is in*

*kind of shock.  I guess because, you know, because I accidentally cut her and I guess that she is just in shock.  I don't know.*

*MR. WOODALL:  Did she ever say anything throughout the whole thing?*

*MR. BROWN:  No.  I don't recall her saying nothing.*

*MR. WOODALL:  So, after you accidentally cut her, what was the next thing you remember happening?*

*MR. BROWN:  Honestly, me throwing that knife.*

*MR. WOODALL:  So, what happened after you cut her?  What was the next thing that happened?  Did you -- where were the money orders at?*

*MR. BROWN:  They were on the desk.*

*MR. WOODALL:  So, did you grab those?*

*MR. BROWN:  I had them.*

*MR. WOODALL:  You already had the money orders?*

*MR. BROWN:  I grabbed them.  She set them beside the calculator on the thing, man.*

*MR. WOODALL:  Then what did you do?*

*MR. BROWN:  I got out of the post office, man, you know.*

*MR. WOODALL:  Prior to going out of the post office, was there anything else that you took?*

*MR. BROWN:  I took her wallet.*

MR. WOODALL:  Where was it at?

MR. BROWN:  In her purse on a chair.

MR. WOODALL:  On a chair.  Okay.  How did you get back out of the post office?

MR. BROWN:  Through the front door.

MR. WOODALL:  Out of the -- where?  Back in the back where she was at, how did you get out of there?  Did you go through the door; or, did you go back out through the window?

MR. BROWN:  I went out the way I came in, man.

MR. WOODALL:  Got back on your bicycle, and took off.  Okay.  Go ahead and walk through briefly what you did then.

MR. BROWN:  I rode the bicycle, jumped on the bicycle fast, was scared, just threw the knife and threw the socks, and went home.

MR. WOODALL:  What happened when you got back to the house?

MR. BROWN:  I was scared, man.

MR. WOODALL:  I can understand you were scared and nervous.  Okay.  You threw the knife and threw the socks.

MR. BROWN:  Yeah.  I don't know.  My mom was -- I think she was in the kitchen if I'm not mistaken, or in her bedroom; one or the other.  And she had the washing

*machine running.  So, I took my clothes off, you know, and threw them in the washing machine, and I got dressed.  And then I called my girlfriend, and told her to pick me up.*

*She had nothing to do with it.  If I had known she would have gotten in trouble for picking me up, God knows I would have never called her.*

*MR. WOODALL:  That is one of the things that you have been stressing to us all along.  Did you ever tell her where you got the money orders from?  Did you ever tell her anything that happened at the post office?*

*MR. BROWN:  No.*

*MR. WOODALL:  Matter of fact, last night you told us that you never told anybody what happened until you sat and talked to us.*

*MR. BROWN:  Yeah.*

*MR. WOODALL:  You kind of passed over one question that I asked you last night.  What happened to the wallet?*

*MR. BROWN:  I told you last night, man.*

*MR. WOODALL:  But you didn't tell me this morning, and I'm trying -- we went back to look where you told us last night, but we didn't have any luck finding it.*

*MR. BROWN:  It was dark back there.*

*MR. WOODALL:  You are right, it was.*

MR. BROWN:  After I got off the phone with her, I told her to come pick me up, you know.  She, uh, she usually pretty much will come if I call her to pick me up, no questions asked.  Even though, she had left, she had left that morning, but she had spent the night.  She said she wanted to go home and check on her home and her child.  But I knew she would come right back and pick me up, you know.  So, that is why I called her.  I just wanted to get away.

MR. WOODALL:  Something had happened, and you really were not happy with what happened because you didn't intend for it to, and you just wanted to get the heck away from the there.  You haven't been back to Fleming that much either; have you?  You've been back, but you haven't been staying down there that much.

MR. BROWN:  No, I haven't slept there.

MR. WOODALL:  You haven't done much sleeping at all; have you?

MR. BROWN:  No.

MR. WOODALL:  I was talking to you last night. I told you that I could look at you and see this is eating you up.

MR. BROWN:  And I'm not a bad person, man.

MR. WOODALL:  After you called her, what happened to the wallet?

MR. BROWN:  Oh, man, I walked back into the field where I told you, and got the money out of her wallet.  And I just threw it up under some -- I told you, in a tin yesterday.  But --

MR. WOODALL:  Yeah.  We must have picked up some 50 pieces of tin last night.

MR. BROWN:  It wasn't tin.  I described exactly where it was.

MR. WOODALL:  You get to the barbecue pit --

MR. BROWN:  You get to the barbecue pit, you pass it.

MR. WOODALL:  Just continue to walk passed it.

MR. BROWN:  Walk straight.

MR. WOODALL:  How much farther would you estimate?

MR. BROWN:  Oh, it's a -- can't exactly tell you where it is at, man, please.  There should be a refrigerator or something on the right-hand side.  An old refrigerator or something, some beer cans on the left-hand side, and something I thought was tin.  It might be a part of an old couch or something.  I just slung it up under there.  I figured no one would ever look up under there.

MR. WOODALL:  So, when we get to where the refrigerator is at, we should be in the immediate area.

MR. BROWN:  It's under -- yes.  It's under the

*tin.*

*MR. WOODALL:  Or whatever is there.*

*MR. BROWN:  Aluminum cans or shit.*

*MR. WOODALL:  Now, inside Ms. Sadie's house, your mom's house last night, we found a knife in one of the rooms.  Is there any possibility that that's the knife that you used down at the post office?*

*MR. BROWN:  No.*

*MR. WOODALL:  Tell me what that knife looked like that you went down to the post office with?  I mean, because the reason that I'm asking is that, this was your mom's knife, and you are not the kind of person to throw away your mom's stuff, I mean, you are not.*

*MR. BROWN:  It was a black handled knife, man.*

*MR. WOODALL:  Like a --*

*MR. BROWN:  Just a --*

*MR. WOODALL:  Not a hunting knife or anything, but a kitchen knife or steak knife.*

*MR. BROWN:  Kitchen knife, kitchen knife, man, I threw that knife away.*

*MR. WOODALL:  You have demonstrated to me that you threw it with your right hand.*

*MR. BROWN:  Yeah, because I am right handed.  If you found a knife in one of those rooms, then I didn't put it there, you know.*

*MR. WOODALL:  Well, it is not unusual to find something in the house.  I mean, there is a lot of stuff if that house, but that is not --*

*MR. BROWN:  That is not what I had, not if it was in my mom's house.*

*MR. WOODALL:  The only other thing, you have given me pretty much the same thing you told me last night, not a lot more detail, some of the stuff I can see. I can look at you and see you are trying to forget what happened.  Inside the post office, this is where it gets tough.  Do you have any idea how many times that woman was stabbed?  Just as best as you can remember, now that you have told me that you were in the panic, and you were scared, and --*

*MR. BROWN:  Scared.  I don't know.*

*MR. WOODALL:  Where was she stabbed at?*

*MR. BROWN:  I don't know.  I don't know.  All I know is I was scared and I panicked.  And after I cut the lady, I just panicked.  Okay.  Honest to God, man.  That is the God's honest truth.*

*MR. WOODALL:  You say she never said anything. Did she ever try to reach for a weapon or try to reach out for you or anything like that?  I wasn't there.  I have got to ask, Meier.*

*MR. BROWN:  Chuck, man, I've already told you*

what happened, man.  I did.  I told you what happened, man for real.  You said you would help me.

MR. WOODALL:  I have told you that I would come, and I am.  But you told me the that you would give me a little bit more details of the actual --

MR. BROWN:  I told you everything.  I told you everything, honest to God.

MR. WOODALL:  I have an obligation to everybody to find out exactly what happened.

MR. BROWN:  I told you exactly what happened, Chuck.  I told you, and --

MR. WOODALL:  You never told anybody else what happened at the post office?

MR. BROWN:  You mentioned last night that somebody called you and told you that I showed them some money, and said I did it.  And I told you that it was a damn liar.  That is the God's honest truth.

MR. WOODALL:  That's why I keep asking you.  Did you tell anybody because there are people out there swearing that they know.

MR. BROWN:  There are people swearing to you are liars, Chuck.  This is what I'm telling you, man, that I told no one no shit like that.

MR. WOODALL:  So, they are just swearing to lies?

MR. BROWN: They are lying to you. They are lying to you. You, those officers that was in there last night, and Diane are the only people in this world that I told, and I told her last night.

MR. WOODALL: Right, and that was something key, because I have asked you and you told her in front of me last night.

MR. BROWN: I told her last night in front of you. And --

MR. WOODALL: That was the hardest thing that you ever did; wasn't it?

MR. BROWN: Eeh, eeh, she, she also agreed to take a polygraph test to tell you guys, but after you said yeah, it was probably the best that you tell her what is going on. I know she can't pass a polygraph test.

MR. WOODALL: She had questions. You sat there with them and I sat will, and listened, and she had all of these questions, and it was hard for you to tell her.

MR. BROWN: I didn't want to tell her.

MR. WOODALL: I know that.

MR. BROWN: I didn't. I didn't. I love her so much, man. And the only reason that I did tell you guys, man, was because --

MR. WOODALL: You wanted --

MR. BROWN: He said he was going to lock her up,

man.

MR. WOODALL:  Is what you told us last night and this morning the truth?

MR. BROWN:  Yeah.

MR. WOODALL:  You haven't lied to protect anybody?

MR. BROWN:  No, man, I told the truth to protect --

MR. WOODALL:  To protect her?

MR. BROWN:  Yeah, because she didn't know, man. She didn't know.

MR. WOODALL:  But you can understand how we thought she would know.  She came and picked you up.  We found things inside of her vehicle that made us believe that she may have participated.

MR. BROWN:  Chuck, I ride with her, man.  You knew what you were looking for in the car.  I ride with her, man.  Don't set her up like that, man.  She --

MR. WOODALL:  I am not.  I told you that once you talked to us and told us the truth, it would clear her and it has.  I'm not going back on her.  Meier, listen to me.  I am not going to go back on this lady.  It seems like you are telling me the truth.  I have got to go with my gut.

MR. BROWN:  Man, I ain't trying to hurt her,

man.

MR. WOODALL: I am not trying to hurt her. I've sat there in your house with you last night and told you that.

MR. BROWN: If I had known she could get any charges for giving me a ride, Chuck, I swear I would have --

MR. WOODALL: You'd have never involved her in this thing; would you?

MR. BROWN: No. I'd never have called her. I'd have hitchhiked a ride.

MR. WOODALL: Relax, calm down some. Meier, listen to me.

MR. BROWN: I ain't trying to hurt her.

MR. WOODALL: Is there anything else you can tell me about what happened down there?

MR. BROWN: I told you everything else. I told you everything, Chuck. Man, I told you everything. I told you everything, man.

MR. WOODALL: When you left your mom's house, going back home, you had changed clothes. What about the jacket that you were wearing?

MR. BROWN: I think I took it off. But I'm not sure, man.

MR. WOODALL: I'm sorry. I can't understand

*you.  Compose yourself.  You're okay.*

*MR. BROWN:  I believe I did, man.  I believe I did.*

*MR. WOODALL:  You believe you did what?*

*MR. BROWN:  I changed clothes because the coat that you guys took from my house last night --*

*MR. WOODALL:  That Nautica coat?*

*MR. BROWN:  Yeah.  I don't believe that -- I don't believe that I went over there with that coat.*

*MR. WOODALL:  What kind of coat would you have been wearing, because it was chilly that day.  Because last night when you told us you said you were wearing that Nautica jacket.*

*MR. BROWN:  No.  I told you I had a Nautica jacket in the closet.*

*MR. WOODALL:  Okay.  I'm sorry.*

*MR. BROWN:  That's what I told you, Chuck.*

*MR. WOODALL:  What jacket were you wearing when you were over at your mom's house when you went to the post office.*

*MR. BROWN:  Probably my brown coat, man.*

*MR. WOODALL:  Would it still be at your mom's house?*

*MR. BROWN:  I don't know.  Somebody else might have took it and wore it.  I don't know, Chuck.*

MR. WOODALL:  And that does happen there. Everybody wears stuff.

MR. BROWN:  I don't know.

MR. WOODALL:  You don't remember her ever saying anything, grabbing anything or anything like that? Without putting words in your mouth, there are a couple of little things that I am trying to elicit from you that happened inside there.  It's like you told me about you slipping and cutting her.  I told you we did find some cuts that didn't look like stabs.

Those are important things to me, because they are things that I can't explain.  There are some things inside that post office that I saw that I'm trying to explain without really telling you what I'm looking for.  That is where -- did she ever -- you told me about the calculator.

MR. BROWN:  I told you --

MR. WOODALL:  You don't know --

MR. BROWN:  I told you as best as I could recall that scene in my life.  Chuck, I told you.  Okay?

MR. WOODALL:  Okay.  Let me ask you this.  At the point that you accidentally cut her, what happened to her?  Did she stand there?  Did she run out a back door? What happened to her?

MR. BROWN:  Chuck, she -- the back door never opened, Chuck.

MR. WOODALL:  Okay.

MR. BROWN:   I don't know.  She might have fell back through.  I don't know.  She may have.  I don't know, Chuck, honestly.  I don't know.

MR. WOODALL:  Do you recall where you last saw her at?  When you were leaving, where was she at?

MR. BROWN:  Oh, God.  Sigh.

MR. WOODALL:  Was she sitting on a chair?  Was she standing up by the corner?  Or, had she already sit down or what?

MR. BROWN:  She was lying on the floor, Chuck.

MR. WOODALL:  She was lying on the floor.

MR. BROWN:  I didn't go in there to do that, Chuck.

MR. WOODALL:  You honestly never went there to hurt that woman?

MR. BROWN:  I just went there to rob the lady, man.  Just to get a robbery charge.  I didn't go there to kill nobody, man.

MR. WOODALL:  Did you expect that you might get caught for robbing her?

MR. BROWN:  Yeah.  Yeah.  I know you guys are not stupid, man.

MR. WOODALL:  And actually, neither are you, Meier.  You are not.

*MR. BROWN:  I made a stupid decision, man.*

*MR. WOODALL:  You did make a bad decision.  I will agree with that, wholeheartedly.*

*MR. BROWN:  And I will live the rest of my life with that, man.*

*MR. WOODALL:  She had just talked to you that morning.  So there was no way that she wouldn't recognize you.*

*MR. BROWN:  That's why I wanted to just scare her, put her in shock with the knife, man, and if she is in shock, she is not going to be coherent, you know.*

*MR. WOODALL:  When she heard you coming through the window, though, things just went bad.*

*MR. BROWN:  Sighing.  I just wish I never went back down there.*

*MR. WOODALL:  Huh?*

*MR. BROWN:  I wish I had never went down there, Chuck.*

*MR. WOODALL:  Honestly, I do, too.  Because one person has lost her life.  And the other pen is sitting here with it eating him up.  And your girlfriend is sitting up there wondering what in the world she can do.*

*MR. BROWN:  She had nothing to do with it.  She really didn't, man.  I mean, I pray to God you believe me.*

*MR. WOODALL:  I've got no reason not to.  I*

*mean, there are some things.*

*MR. BROWN:  This guy here believes me.*

*MR. REEVES:  Oh, I believe you.*

*MR. BROWN:  I pray to God all of you people believe me, that she had absolutely nothing to do with it. Uh, she is the most honest person that I know.*

*MR. WOODALL:  And nobody else had anything to do with it.  You told us that repeatedly.  There was nobody else.*

*MR. BROWN:  I didn't tell anybody after it happened.  I didn't tell a single soul until last night when you came by.*

*MR. WOODALL:  Even just sitting around talking to people, you never even in any way at all told anybody.*

*MR. BROWN:  Chuck, I wasn't in Fleming that long after the incident.  If somebody in Fleming told you, they're lying to you.*

*MR. WOODALL:  Let me ask you a quick question. A couple of days ago, or was it yesterday, when we -- when you called here, you actually called here.*

*MR. BROWN:  I called that day I went to Fleming to borrow some money from my mama.*

*MR. WOODALL:  Okay.  Where did you go?  Were you in Fleming when you called?*

*MR. BROWN:  No.  I -- we were going to go.  We*

*was gonna go to the beach, were gonna go.*

*MR. WOODALL:  Yeah, because you told us you were going to South Carolina.*

*MR. BROWN:  Right, and the officer I spoke to, is like come in now or some shit, man.  And --*

*MR. WOODALL:  And panic set in; didn't it?*

*MR. BROWN:  Yeah.  You don't want to come to the detective's office and sit down and have them interrogate you, knowing that you are guilty.  You don't want to do that, honestly.*

*MR. WOODALL:  Let me ask you a question.*

*MR. BROWN:  Go ahead, man.*

*MR. WOODALL:  Are you sorry for what happened?*

*MR. BROWN:  I am very much so sorry, Chuck.*

*MR. WOODALL:  Does it help to have to quit having to hold it inside you?  It's hard, I know, to talk about it.  But look what you've been holding inside of you for a week now.  Now, it had to he eating you up.*

*MR. BROWN:  Hardest week of my life, man.  The worst.  I'm just scared.  You just can't begin to imagine, man.  I took someone's life, (sobbing).*

*MR. WOODALL:  All over trying to get -- come up with some money to help somebody.*

*MR. BROWN:  I just, I took someone's life, man.  Sobbing.  You know, I never done no shit like that, man.*

I never had that in mind, to go and take someone's life, man.  I never --

MR. WOODALL:  To all of my knowledge, you never really been a violent person.

MR. BROWN:  I am not a violent person, Chuck, no.

MR. WOODALL:  Could there have been some other -- I mean, I am sitting here wondering if there was some other way to scare her into giving you the money, you know.

MR. BROWN:  Chuck, man, it was an accident, man. Okay?  It was an accident, I am so sorry.

MR. WOODALL:  Oh, I know what I was going to ask you.  Do you remember anything, what might have happened to her hand?  There was something, her hand, there was something on her hand, something done to her hand, and again, I don't want to put any specifics.

MR. BROWN:  I don't know.

MR. WOODALL:  Did she ever swing at you or anything like that?

MR. BROWN:  She, she --

MR. WOODALL:  Do you recall?

MR. BROWN:  She never swung at me.

MR. WOODALL:  You basically just do not remember everything happened inside that place; do you.

MR. BROWN:  I know that lady did not swing at me, Chuck.

MR. WOODALL:  To this day, has anybody -- well, I know I haven't.  Do you know how many times she was cut or stabbed?

MR. BROWN:  No.

MR. WOODALL:  Would it surprise you if it was more than three?

MR. BROWN:  Yeah, it would.  How many times was it, Chuck?  Canned.

MR. WOODALL:  Honestly, I don't know.  I've seen her, and I was out there all day.  But it was more than three.  That's kind of why we were trying to figure out what happened and how things happened.  It's like were all of them in the upper body, were they in the front, or were they in the back.  Things like that, things -- it explains things to us.  Something that was on the her hand, you know, that's why I was trying to see if you remembered anything about her hand.  Those things, it explains, it helps us understand what happened.

MR. BROWN:  I told you, man.  I told you the best that I can remember what happened, that whole scene, Chuck.

MR. WOODALL:  When you slipped and the knife hit her, do you have any idea where it cut her at?  Because

that will be the only time you actually saw her get cut. Do you remember where that was at?

MR. BROWN:  All I know is I felt the knife hit her.  And I knew she was cut because it was a sharp knife, Chuck.

MR. WOODALL:  Was it a pointed knife.

MR. BROWN:  Yeah.

MR. WOODALL:  I'm trying to picture -- I wasn't out at the house.  I don't know what was found.  You told me that's not the knife.

MR. BROWN:  That's not the knife, Chuck.  I swear to God, it ain't.  Unless someone went and got it and put it in there.

MR. WOODALL:  That would kind of suck; wouldn't it?  Have you told me everything that you can remember about what happened?

MR. BROWN:  I told you the God honest truth, Chuck.

MR. WOODALL:  And it's as much as you can remember.

MR. BROWN:  I told you everything I remember, Chuck.

MR. WOODALL:  What I am going to do is I'm going to go ahead and terminate the interview.  You have come back here this morning as you promised.  And you said you

*wanted to talk to us, and you have done that.  I do respect the fact that you have sat here and told us the truth.  As far as I am concerned, you told the truth.  I am going to believe you.*

*MR. BROWN:  I did tell you truth.*

*MR. WOODALL:  Well, initially, yesterday, there were some things that you told us that wasn't true.*

*MR. BROWN:  Yeah, I know.  I know, cause you got to respect, man.*

*MR. WOODALL:  It's hard to sit here and say I screwed up; ain't it?  I mean, it is, and you are sitting here and, you know, every time you say I took that lady's life, I can see tears well up in you.*

*MR. BROWN:  Am I inhuman, you know?*

*MR. WOODALL:  And you are not inhuman.  I can see that by sitting here looking at you.*

*Is there anything else you can think of that we need to ask him?*

*MR. REEVES:  No.*

*MR. WOODALL:  We have covered as much as detail as you possibly can remember, and I do understand that once, once what started happening inside that post office, it happened so fast that it is not impossible that you can't remember what happened.*

*MR. BROWN:  I won't forget.*

*MR. WOODALL: You will never forget it.*

*Okay. I'm going to go ahead and terminate the interview. It is still the 6th of December, 2002. This terminates the interview with Meier Jason Brown.*

*[NOTE: Taped concluded.]*

MR. FRENTZEN: No further questions, Your Honor.

MR. DARDEN: No questions, Your Honor.

THE COURT: You may step aside.

[NOTE: Witness left the stand.]

MR. FRENTZEN: Your Honor, the government calls inspector Marla McLendon.

CLERK: For the record, Ma'am, please state your name and your occupation.

WITNESS: My name is Marla F. McLendon. I'm an United States Postal Inspector.

**MARLA F. MCLENDON,** after having been duly sworn, and called as a witness by the government, testifies follows.

MR. FRENTZEN: Your Honor, before I proceed, should I collect the transcripts.

THE COURT: Yes, collect all of those transcripts.

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q.   Ms. McLendon, how long have you been with the United

States Postal Inspectors?

A.    I've been the Postal Inspector over ten years.  I've been with the United States Post Office over 22 years.

Q.    And where you have been stationed as a Postal Inspector?

A.    I began my career with the Postal Inspection Service in New Orleans, Louisiana.  I was domiciled for nine years.  And then I transferred this past year to the Savannah, Georgia domicile.

Q.    Are you originally from the area?

A.    Yes, I am.

Q.    Do you recall what date you were transferred from New Orleans to Savannah?

A.    My effective date was in June, but I actually began work in Savannah in September of 2002, September 17th.

Q.    And are you the case agent on the case of the United States versus Meier Jason Brown?

A.    Yes, I am.

Q.    And from what date have you been involved in the investigation and prosecution of this case?

A.    From the date of the homicide, November 30th, 2002.

Q.    I would like to show you a series of records related to telephone calls.  Have you analyzed phone records that were collected in this investigation?

A.    Yes, we have.

Q.   And did you analyze those records trying to put something together in terms of timing and times on November 30th, 2002?

A.   Yes.  We had information from various witnesses of phone calls that were made between parties that we felt were involved there the robbery and homicide.  And we did subpoena the records.  And I have reviewed the records to confirm that there were phone calls made.

Q.   And if I might, I guess probably start out with the Government's Exhibit 13-A, which has been admitted already.

A.   I recognize the document.  It is the telephone listing for the residential telephone of Diane Brown.  The record is in the name of her previously married name, Diane Boggs.  The address is 131 Laurel Wood.

Q.   All right.  If we could take a look at what I think is page two of that document, and maybe zoom in a little bit.  Does that indicate telephone calls being made on the morning of November 30th, 2002?

A.   Yes.  That indicates that there was a telephone call received at 10:45 at Diane Brown's residence from the residence of Sadie Brown.  It was carried -- handled by a long distance carrier.  And also at 10:45, there was a telephone call made from Diane Brown's residential line to the residence of Sadie Brown's house.

Q.   And you recognize both of those telephone numbers?

A.   Yes, I do.  (912)927-9120 is the telephone number of a Diane Brown.  It is a residential line.

(912)884-4346 is the residential line of Sadie Brown.

MR. FRENTZEN:  Your Honor, I think we will be offering what has been agreed upon by stipulation Government's Exhibit 13-D, which I believe shows that in fact that number is registered and serviced to Sadie Brown at the Lee Roy Coffer address.

THE COURT:  All right.

BY MR. FRENTZEN:

Q.   Is there any other significance to Government's 13-D, Ms. McLendon?

A.   No.  I recognize that as the Coastal Communication record of Sadie Brown's residential line, of the number I previously mentioned.

Q.   So following the two phone calls at 10:45 in the morning, could we see Government's Exhibit 13-C, which is admissible pursuant to another stipulation.

What is Government's Exhibit 13-C, Ms. McLendon?

A.   These are the cell phone records of Latoya Bizzard.

Q.   And what does this particular record reflect?

A.   It reflects that the subscriber of the cell phone is Latoya Bizzard.  And her cell phone number is (912)570-7073.

MR. FRENTZEN:  Your Honor, since this was

offered pursuant to stipulation, could I publish it for the jury, please?

THE COURT: Yes.

Q. Okay. I'm sorry. Inspector McLendon, if you could just repeat that for the jury, please?

A. This is Latoya Bizzard's cell phone record. Her cell phone number is (912)570-7073.

Q. Is there another record attached there that reflects a telephone call made on the day in question, Inspector McLendon?

A. I recognize this as the Hargraves Communication record. Hargraves went to a different program so that their records appear to be different. This is a record of the same telephone number.

At the top of this listing, it shows the record number. There's another line that is highlighted. The second line that is highlighted shows the subscriber is the number I previously mentioned, Latoya's cell phone, 570-7073.

The third highlighted line, it says *terminating number* which indicates the number she called -- or that was called from the cell phone is 308-8463.

The last section shows that this called was made on November 30th, 2002, at 10:58 a.m., and the call lasted three minutes and twenty seconds.

Q.    Then, if we could take a look at Government's Exhibit 13-B, which was previously admitted.

MR. FRENTZEN:  Is that being shown to the jurors?

VIDEOGRAPHER:  Yes, sir.

A.    These are -- this is the cell telephone record for Diane Brown.  This is a same number that I just mentioned, Latoya Bizzard's cell phone.  This number was dialed at 10:58.  This is the cell phone record for (912)308-8463 which is listed to Diane Brown at 131 Laurel Wood.

Q.    If we could take a look at the following page.  Are there telephone calls of significance on that record?

A.    Yes.  Diane Brown's cell telephone record confirms that she did receive an incoming cell telephone of approximately four minutes at 10:57 a.m.

The next record below that indicates that she made a call from her cell telephone to the residence of Sadie Brown at 11:25.  Sadie Brown's number again is 884-4346.

Q.    And all of those being on that same date, November 30th?

A.    That is correct.

Q.    Okay.  Further in trying to establish some sort of time, are you aware of what time that morning a call, a 911 call was placed to report the incident at the Post Office?

A.    Yes, I am.  Bryan County 911 Services received an

emergency telephone call reporting the incident at

10:51 a.m.  Liberty County Sheriff's Office has an incident

report dispatching officers to the scene at 10:54 a.m.

Q.   Let me move now, if I could, to Government's -- to

several exhibits.  First Government's 7-A, and then --

Ma'am, that has already been admitted into the evidence, I

believe, as Inspector Reeves' notes of the money orders

missing from the Post Office on that morning.

Were you able to correlate the serial numbers with

any of the other evidence found in this case?

A.   Yes, I was.  The first serial number is a money order

that was sold earlier on the morning of November 30th to a

postal customer.  We did confirm his purchase of the

20-dollar money order.

The other three money orders for 500, 500, and 175

related to the money orders that were cashed, and that we

saw previously as exhibits to pay Diane Brown's bills or

from Jason Brown to Diane Brown.

And also, we found receipts for two of these money

orders in Diane Brown's residence.

Q.   And are you aware of a search conducted of a purse

located on the chair at the Post Office in Fleming, and

whether or not that purse contained a wallet in it?

A.   Yes, I am aware of the search.  I conducted an

inventory of the purse that was at the crime scene.  We did

inventory.  There was no wallet.  There was what appeared to be a chain purse that contained sinus medicine, makeup, gum, and an about a dollar's worth of coins.

Q.    Was there any cash in there?

A.    Not in the chain purse, other than the coins, no.

Q.    Were there any other items you might expect to find in a person's wallet such as personal identification, driver's license, or credit cards anywhere in that purse?

A.    There was no driver's license, no credit cards.  The only form of identification was Ms. Gagila's Post Office work ID.

        MR. FRENTZEN:  The Court's indulgence for one moment.

                    [Pause.]

Q.    Inspector McLendon, in trying to establish some sort of time, did you time a drive between the Morgan residences, 6724 Lee Roy Coffer Highway and the Fleming Post Office.?

A.    Yes, we did.  We drove the route, and videotaped it. And we approximated it at 10-mile an hour speed throughout the whole trip, although we couldn't be certain how fast could pedal a bicycle.  We just kept it a consistent 10 miles per hour.

Q.    And how long did it take you to drive that route at about 10 miles an hour?

A.    I would to review the video again.  But I believe it

was approximately five minutes.

MR. FRENTZEN:  Nothing further Your Honor.

MR. DARDEN:  No questions.

THE COURT:  The witness may step aside.

[NOTE:  Witness left the stand.]

MR. FRENTZEN:  Your Honor, that is it for witnesses.  We have a number of stipulations and exhibits that will come in through those stipulations that I would like to offer at this time.

THE COURT:  I'll see counsel at side bar.

[NOTE:  Sidebar Conference.]

THE COURT:  What are the stipulations?

MR. DARDEN:  The chain of custody.

MR. FRENTZEN:  Some of then are for chain of custody.

THE COURT:  Then are you going to rest.

MR. FRENTZEN:  And one of them involves the Post Office at Fleming.  Other than that, we will rest.

THE COURT:  Are you going to have any evidence in this phase?

MR. DARDEN:  It won't take long.  For your information, at the conclusion, I will be making a 29 A motion, a motion for acquittal just to perfect the record.

THE COURT:  All right.

[NOTE:  Sidebar Conference

Concluded.]

THE COURT:  I am told by counsel that there will be stipulations.  In other words, the parties have agreed on these matters.  Therefore, there is no need for any evidence, any witness or any other document.

So, will you go through the stipulations?

MR. FRENTZEN:  I will, Your Honor.

Multiple stipulations are to the admissibility of certain documents which have already been placed into evidence.  I will simple tender those stipulations.

Additionally, let me read the stipulations by the parties.

*It is hereby agreed and stipulated by the parties, the United States of America and the defendant, Meier Jason Brown, that the jury may accept as proven fact the following:*

*That the following items of evidence from the time they were taken into custody by law enforcement officers were maintained within known custody of those law enforcement officers or their agents, and handled in a manner to protect the integrity of the evidence.*

*Government's Exhibits 17 A through C, three postal money order receipts.*

*Government's Exhibit 18, a sheet of note paper from Diane Brown's night stand.*

*Government's Exhibit 6, adding machine tape removed from the Fleming Post Office.*

*Government's Exhibit 20, video stills taken from video tape at First Union, 3500 Ogeechee Road in Savannah, Georgia.*

*Government's Exhibit 19, one pair of blue Lugz sneakers.*

*Government's Exhibit 5, one brown jacket removed from 6724 Lee Roy Coffer Highway, Fleming, Georgia.*

*Government's Exhibit 32 B, audio tape of Meier Jason Brown taken December 6th, 2002.*

*Additionally, it is hereby agreed and stipulated by the parties, the United States of America and the defendant, Meier Jason Brown, that the jury may accept as proven fact the following:*

*The sample of blood not admitted into evidence taken by Mark Kaponen, MD from the body of Sallie Louise Gagila was maintained in the known custody of law enforcement officers or their agents and handled in a manner to protected the integrity of the evidence and delivered finally to the Bode Technology Group, Springfield, Virginia, for analysis by the Bode Technology Group, agreed this 4th day of November, 2003, and signed by the parties.*

Another stipulation by the parties: *This is hereby agreed and stipulated by the parties, the United States of*

*America and the defendant Meier Jason Brown, that the jury may accept as proven as fact the following.*

*That Government's Exhibit 35 is admissible in evidence as authentic copy of a lease between Dora Louise Coffer and the United States Postal Service, and by which the United States Postal Service leased the Fleming Post Office located at 797 Fleming Loop, Fleming Georgia, for the period beginning May 24, 1998 and ending May 23, 2003, which reflects that on November 30th, 2002, the Fleming Post Office was within the special territorial jurisdiction of the United States.*

*Agreed this 30th day of October, 2003.  And signed by the parties.*

I would tender that stipulation, Your Honor.  And pursuant to that stipulation, moves into evidence Government's Exhibit No. 35, which is a copy of that lease.

THE COURT:  All right.  Received.

MR. FRENTZEN:  Another stipulation by the parties.

*It is hereby agreed and stipulated by the parties, the United States of America and the defendant, Meier Jason Brown, that the jury may accept as proven fact the following.*

*That Government's Exhibit 36 is admissible in evidence and is an authentic copy of the employment contract*

*between Sallie Louise Gagila and the United States Postal Service, which reflects that on November 30th, 2002, Sallie Louise Gagila was employed by the United States and the United States Postal Service as a Postmaster Relief for the Post Office located in Fleming, Georgia.  Agreed this 30th day of October, 2003.  It is signed by the parties and accompanied by Government's Exhibit No. 36, which is a copy of that employment contract.*

THE COURT:  Received.

MR. FRENTZEN:  And finally Your Honor, we would offer Government's Exhibit 34, which is a certified copy of the birth certificate from Meier Jason Brown.  And as such, it is self authenticating and admissible into evidence.

THE COURT:  Received.

MR. FRENTZEN:  Your Honor, the government rests at this time.

THE COURT:  May I see counsel at side bar.

MR. FRENTZEN:  Yes, sir.

[NOTE:  Sidebar Conference.]

THE COURT:  Are you going to rest?

MR. DARDEN:  We are, Your Honor.  I want to put the defendant up and go over his rights to testify, and make sure that he understands.

THE COURT:  You want to do that out of the

presence of the jury.

MR. DARDEN:  Absolutely, and make a record.

THE COURT:  All right.

Marshal, take the jury out.

MARSHAL:  All rise.

*[Jury out.]*

MR. DARDEN:  I think it would also be appropriate at this point to make sure that he is satisfied with our services.  I always do that in death penalty cases.

THE COURT:  You ask him that.

MR. DARDEN:  I will ask him.

*[NOTE:  Sidebar concluded.]*

THE COURT:  The government has announced they have rested.

MR. DARDEN:  Judge, just for the record, and to perfect the record, I would make a 29(a) motion for acquittal in the case.

THE COURT:  The motion is denied.

MR. DARDEN:  Yes, sir.  Judge, I would like to call the defendant, Jason Brown, to the stand.

THE COURT:  You may do so.

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  Meier Jason Brown.  I'm currently

unemployed.

**MEIER JASON BROWN,** after having been duly sworn, and called to the witness stand outside the presence of the jury, testifies as follows.

**DIRECT EXAMINATION**

BY MR. DARDEN:

Q.   Mr. Brown, Mr. Bell and I have been representing you for approximately a year.  Is that correct?

A.   Yes, sir.

Q.   And we've met with you on several occasions and gone over all of the facts of the case, and we've had motion hearings.  And we've been out to see you and all that.  Is that correct?

A.   Yes, sir.

Q.   At this point in the proceedings, are you satisfied with our services?

A.   Yes, sir.

Q.   Let me ask you this.  You understand you have a right to testify in this case?

A.   Yes, sir.

Q.   You understand that?

A.   Yes, sir.

Q.   You have a right to testify in your own defense?

A.   Yes, sir.

Q.   You understand that if you testify you would be subject

to cross-examination by the prosecutor.  Do you understand that?

A.    Yes, sir.

Q.    Do you understand if you chose not to testify, the Judge has already instructed the jury, and I'm sure he will do it again, that they cannot draw any inference hurtful or harmful against you for your failure to testify.  Do you understand that?

A.    Yes, sir.

Q.    They cannot even consider that.  You understand that?

A.    Yes, sir.

Q.    We have discussed this on several occasions as to whether you would testify in this case; have we not?

A.    Yes, sir.

Q.    And it is my understanding it is your desire not to testify, although you have a absolute right to do that.  Is that your answer?

A.    That's correct.

Q.    You do not wish to testify?

A.    No, sir, I do not wish to testify.

Q.    And that -- okay.  And that decision is the decision you made.  And I understand we discussed it.  But the final decision is your choice.  Do you understand that?

A.    Yes, sir.  I came to that conclusion myself.

Q.    And that is your choice?

A.   Yes, sir.

MR. DARDEN:  Does the Court have any questions as to this?

THE COURT:  One question.  Did your lawyers try to prevent you from testifying?

A.   No, sir.  My lawyers, they advised me -- when I brought the question up, they advised me their opinion of things.  I decided, you know, just last night --

THE COURT:  You don't have to tell me anything.

Q.   You don't have to go into our conversations.

THE COURT:  Did anyone else, has anyone, postal inspectors, the government agents, has anyone threatened you if you testify?

A.   No, sir.

THE COURT:  All right.

MR. DARDEN:  You may step down.

                    [NOTE:  Defendant left the

                    stand.]

MR. BELL:  Judge, we would like to perfect the record on the previous motions, objections, requests for expert services.  We would like to renew all of the objections.

THE COURT:  I don't think you have to do that.  Of course, they are in the record.

MR. DARDEN:  Yes, sir.  We just want to make

sure the record is perfected.

THE COURT:  Yes.

MR. DARDEN:  And I think the Court can understand why.

THE COURT:  Okay.  Does the defendant rests?

MR. DARDEN:  We do, Your Honor.

THE COURT:  Well, we will begin closing arguments in the morning.  I don't want to put you or the jury through the stress of doing that.  We have talked about time.

And I would like to talk to you here again at side bar.

[NOTE:  Sidebar Conference.]

THE COURT:  My charges have been prepared.  You have them.  I will have to delete certain things now.  So, I will work on it tonight.  And I will give you a clean copy when you arrive.

I have taken a cold.  So, don't get too close.

MR. DARDEN:  Okay.  I wouldn't get too close anyway, Judge.

THE COURT:  We'll come back at 8:30.  I will give some preliminary instructions to the jury, what I refer to as the broiler plate.  Then one of you will make closing.  And then you may save time for rebuttal.  I believe I authorized 25 minutes total.

MR. FRENTZEN:  That was for the opening, Judge, we haven't discussed closing time.

THE COURT:  Okay.  How much time do you need?

MR. FRENTZEN:  Total, Judge?

THE COURT:  Yes.  It is just the guilt or innocence on this phase.

MR. FRENTZEN:  Yes, sir.  Thirty-five will be fine.

MR. BELL:  Are you guys splitting?

MR. FRENTZEN:  Yes.

THE COURT:  Well, it is the goosey-gander rule.

MR. DARDEN:  We won't take that long.

THE COURT:  So, you have 35 minutes to divide.

MR. BELL:  Judge, there is some confusion in our minds about when the proper time for us to move for a directed verdict on the statutory aggravating factors.  I take it from --

THE COURT:  I believe you need --

MR. BELL:  We would like to move now just in case, and renew it at the end of the penalty phase.

THE COURT:  I think that is a good point.

MR. BELL:  You want me to do it here at side bar.

THE COURT:  Yes.

MR. BELL:  We move for a directed verdict on

the, first, statutory aggravating factor, the especially heinous.  Under the law, they have to prove various things that it is especially heinous, and so forth.  And in your charge, you set forth what the jury would have to find.

And one of those factors --

THE COURT:  I think it is properly premature.  But you may go ahead.

MR. BELL:  And we'll renew it again.  We just want to be very careful.

Dr. Kaponen testified --

THE COURT:  You don't have to go through it all.

MR. BELL:  Okay.

THE COURT:  I'm not going to deem you have waived anything.

MR. BELL:  Okay.  Thank you.  And we also move with regard to the second statutory aggravating factor, pecuniary gain.  If you would allow me to -- I take it you aren't requiring us to make an argument --

THE COURT:  No.  You may make that after the end of the first phase.

MR. BELL:  Thank you.

THE COURT:  You have put enough in to keep the door open.

MR. BELL:  Right.  We don't think they have made a sufficient showing on either statutory aggravating

factor.

THE COURT:  I understand you are talking about aggravating and mitigating.

MR. BELL:  Yes, sir.

MR. DARDEN:  We certainly don't think they have proven the first one.

THE COURT:  Well, I'm not a connoisseur --

MR. DARDEN:  I'm not either, Judge.

MR. BELL:  I don't think they have proven pecuniary gain either.  Because Meier testified he had the money orders and then basically, I think it came out in his confession he killed her to --

THE COURT:  Well, it is a close call.  Remember, I have about 45 years of experience.

MR. DARDEN:  I understand.

MR. BELL:  And we're not doing anything but relying on those same cases we gave you on the jury charge.

MR. DARDEN:  And we're not doing anything you wouldn't do.

THE COURT:  I understand.  But don't be so defensive.

MR. DARDEN:  I'm not.

MR. BELL:  We're relying on those same cases that we submitted to you.

MR. FRENTZEN:  By the same token, Judge, I understand there's at least several mitigating factors they've offered which are now willing to waive.

MR. DARDEN:  We have deleted those.  And I will show you a copy of the mitigating circumstances that I plan to put on the board and talk about.

THE COURT:  Let me ask you this.  How long do you anticipate -- and I don't know how long the jury will be out -- we're speculating.  But that is immaterial.  How long do you think your second phase will last.

MR. NEWMAN:  Two hours at the most.

THE COURT:  How about yours?

MR. DARDEN:  Two hours at the most.  In my experience, these witnesses are very brief.  I mean, there is only so much you can ask them.

THE COURT:  This is my first federal death penalty case.

MR. DARDEN:  Mine, too.

THE COURT:  No one has an abundance of experience in this.  So, I think we'll begin the second charge tomorrow.

MR. DARDEN:  I believe tomorrow afternoon.

THE COURT:  Okay.

MR. NEWMAN:  Judge, maybe the two hours was a short estimate.

THE COURT:  Well, I'm not going to hold you to that.  I just wanted to get some idea in mind about when I needed be ready to give the second charge also.

MR. NEWMAN:  We have not received any proposed stipulation about the plea offer.  You haven't given us anything to look at.

MR. DARDEN:  You'll have it first thing in the morning.

THE COURT:  That is mighty late.

MR. DARDEN:  Well, he has reviewed it.  I showed it to him.  It was written out on a piece of paper.  He has seen it.  He knows what it is going to be.

THE COURT:  Well, show it to him tonight.

I will recess now.  You may go out there in that conference room and give it to him.

MR. DARDEN:  In fact, I have it for you to sign now.

THE COURT:  Wait a second.  Go out in that conference room.  How is that conference room working.

MR. DARDEN:  It is fine.  If the air conditioning worked, it would great.

THE COURT:  You see, you can't ever satisfy lawyers.  We spent about $50,000 to do it.  And now you are complaining.  I had to try cases with no air conditioning.

MR. DARDEN:  You know, when you spent $50,000 of government money, you get a hundred-dollar air conditioner.

THE COURT:  Okay.  You want to be cute.

Bring the jury back in.

[NOTE:  Sidebar Conference Concluded.]  Jury seated.

THE COURT:  Ladies and gentlemen, we have reached a point in the case that I feel you've had a long day, and the lawyers have.  And we are going to recess at this point.

You recall the cautionary instructions I gave you at the outset of the case.  That you sit as judges.  You are not to discuss the case with anyone, not even among yourselves, because you have not heard everything.  And you certainly have not heard the Court's instructions to you.

The marshal will take custody of you now.  They tell me that you got along fairly well.  I know it is a strange environment.  But try to relax and get some rest this evening.  We will begin back again at the same time in the morning at 8:30.

Gentlemen, we'll stand in recess.

MARSHAL:  All rise.

*[Whereupon, Court was adjourned for the evening at 5:04 p.m.]*

STATE OF GEORGIA,

CHATHAM COUNTY.

C E R T I F I C A T E

I, Lora H. Carter, do hereby certify that the above and foregoing pages is a true, complete, and accurate transcript of the evidence and proceedings adduced in the trial of the captioned matter.

This the 15th day of December, 2003.

_____

Lora H. Carter

*U.S. Court Reporter*
*Southern District of Georgia*
*Savannah Division*
*P.O. Box 8552*
*Savannah, GA  31412*
*(912)650-4065*