UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA    .

.

vs.    .  CR 403-001

.

MEIER JASON BROWN    .  Savannah, Georgia

.  November 6, 2003

Volume IV of V

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE B. AVANT EDENFIELD

UNITED STATES DISTRICT JUDGE

Court Reporter:    Lora H. Carter
Official Court Reporter
United States District Court

P. O. Box 8552
Savannah, Georgia 31412
Tel.  912-650-4065

*Proceedings reported by stenotype; transcript
produced by computer-aided transcription.*

A P P E A R A N C E S:




FOR THE GOVERNMENT:


WILL FRENTZEN
JOSEPH NEWMAN

deletes if empty)

(deletes if empty)

(deletes if empty)

FOR DEFENDANT:


RICHARD DARDEN
WILLIAM BELL

(deletes if empty)

(deletes if empty)

(deletes if empty)

[November 6th, 2003, Court opened.]

THE COURT:  Good morning, ladies and gentlemen. I hope you had a reasonably good evening.  Somehow yesterday I started getting a cold.  I sneezed and it seemed like I had an Niagara Falls as a drainage.  I hope you don't get it.

Let me bring you up to date.  You have heard all of the evidence regarding the case.  It becomes my obligation or duty under the law to charge you; that is, to give you the instructions.  I mention that at the outset.  Of course, you are bound or obligated to follow the instructions as I give them to you.  I'm going to give them to you in two different parcels.  You will hear part of the instructions.  And then the lawyers will have an opportunity to argue the case to you.

As I said at the outset, what they tell you is not evidence, but the lawyers have worked with the case. And obviously, they have opinions regarding the case.  You listen to them, but they are not evidence.  But the value is they might point out things that otherwise have escaped your attention.

Pardon me if I sniff or have to drink water during this.  But we'll get through it.

At the outset, Mr. Clerk or Mr. Marshal, will you pass out the first phase of the instructions.

**CHARGE OF THE COURT**

THE COURT:  It is now my duty to instruct you on the rules of law that you must follow and apply in deciding the guilt/innocence phase of this trial.  When I have finished the other part, you will go to the jury room and begin your discussions -- what we call your deliberations.  There, it will be your duty to decide whether the government has proved beyond a reasonable doubt the specific facts necessary to find the defendant guilty of the crime or crimes charged in the indictment.

You must make your decision only on the basis of the testimony and other evidence presented here during the trial.  You must not be influenced in any way by either sympathy or prejudice for or against the defendant or the government.

You must also follow the law as I explain it to you whether you agree with that law or not; and, you must follow all of my instructions as a whole.  You may not single out, or disregard, any of the instructions on the law.

As I said at the outset, the indictment or formal charge against the defendant is not evidence of guilt.  Indeed, every defendant is presumed by the law to be innocent.  The law does not require a defendant to prove his innocence or to produce any evidence at all.  If

a defendant elects not to testify, you cannot consider that in any way during your deliberations.  The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the defendant not guilty.

Now, while the government's burden of proof is a strict or heavy burden, it is not necessary that a defendant's guilt be proved beyond all possible doubt.  It is only required that the government's proof exclude any reasonable doubt concerning the defendant's guilt.  A *reasonable doubt* is a real doubt based upon reason and common sense, after careful and impartial consideration of all the evidence in the case.

Therefore, proof beyond a reasonable doubt is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.  If you are convinced that the defendant has been proved guilty beyond a reasonable doubt, say so.  If you are not convinced, say so.

Now, as I said earlier, you must consider only the evidence that I have admitted in the case.  Now, the term *evidence* includes the testimony of the witnesses and the exhibits admitted in the record, and the stipulations, of course.  The stipulations need no further proof of any

kind.  The parties have agreed that was true.  So, you accept the stipulations that they made.

Remember, beyond that, that anything the lawyers say is not evidence in the case.  It is your own recollection and interpretation of the evidence that controls.  What the lawyers tell you is not binding upon you.  Also, you should not assume from anything I may said that I have any opinion concerning any of the issues in this case.  Except for my instructions to you on the law, you should disregard anything I might have said during the trial in arriving at your decision concerning the facts.

Now, in considering the evidence, you may make deductions and reach conclusions which your reason and common sense lead you to make.  You should not be concerned about whether evidence is either direct or circumstantial.

*Direct evidence* is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. *Circumstantial evidence*, on the other hand, is proof of a chain of facts and circumstances tending to prove, or disprove, any fact in dispute.  The law makes no distinction between the weight you may give either to direct or circumstantial evidence.

Now, in saying that you must consider all of the evidence, I do not mean that you must accept all of the

evidence as true or accurate.  You should decide whether you believe what each witness had to say and how important that testimony was.  In making decision, you may believe or disbelieve any witness, in whole or in part.  Also, the number of witnesses testifying concerning any particular dispute is not controlling.

In deciding whether you believe or do not believe any witness, I suggest that you ask yourself a few questions such as:  Did the witness impress you as one who was telling the truth?  Did he or she have any particular reason not to tell I the truth?  Did he or she have a personal interest in the outcome of the case.  Did the witness seem to have a good memory?  Did the witness have the opportunity and ability to observe accurately the things he or she testified about?  Did the witness appear to understand the questions clearly and answer them directly?  Did the witness' testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact; or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something, which was different from the testimony the witness gave you before during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or remember some things other things inaccurately.

So, if a witness has made a misstatement, you need to consider whether it was simply an innocence lapse of memory or an intentional falsehood.  The significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

When the government offers testimony or evidence that a witness made a statement or admission to someone after being arrested or detained, the jury should consider the evidence concerning such statement with caution and great care.  It is for you to decide whether the defendant made a statement, and secondly, if so, how much weight to give it.  In making these decisions, you should consider all of the evidence about the statement including the circumstances under which the defendant may have made it.

Now, when knowledge of a technical subject matter might be helpful to the jury, a person having special training or experience in that technical field is permitted to state an opinion concerning those technical matters, such as the DNA person who testified regarding that.  I designated him as expert witness.  Merely because

such as a witness has expressed an opinion, however, does not mean that you must accept that opinion. The same with the pathologist. The same as with any other witness, it is for you to decide whether to rely upon it.

In any criminal case the government must prove, of course, the identity of the defendant as the person who committed the alleged crime. When the witness points out and identifies a defendant as the person who committed the crime, you must first decide, as with any other witness, whether that witness is telling the truth. Then if you believe the witness was truthful, you must still decide how accurate the identification was.

Again, I suggest that you ask yourself a number of questions. Did the witness have an adequate opportunity at the time of the crime to observe the person in question? What length of time did the witness have to observe the person? What were the prevailing conditions at the time in terms of visibility or distance and the like? And had the witness known or observed the person at earlier times?

Remember that mere presence at the scene of a crime, or mere knowledge that a crime is being committed, is not sufficient to establish that the defendant committed the crime, unless you find that the defendant actually committed or participated in the crime.

You may also consider the circumstances surrounding later identification as well including, for example, the manner or context in which the defendant or photographs of the defendant were presented to the witness for identification, and the length of time that elapsed between the incident in question and the witness' identification of the defendant.

In this case, several witnesses testified that they viewed a photograph of the defendant as a part of a photographic lineup in which they were asked to identify the man that they saw at or around the scene of the crime. The fact that the investigators had the defendant's picture does not mean that he committed the charged crime or any crime, for investigators collects pictures of many people from many different sources and for many different purposes. So, that fact alone would have no effect upon your consideration of the case.

After examining all of the testimony and evidence in the case, if you have a reasonable doubt as to identity of the defendant as the perpetrator of the offense charged, you must find the defendant not guilty.

As you have heard, specified Government's Exhibits have been identified as typewritten transcripts of the oral conversation that can be heard on the tape recordings received the evidence. The transcripts also

purport to identify the speakers engaged in the conversation.

As I told you at the time, I have admitted the transcript for the limited and secondary purpose of aiding you in following the contents of the conversation you listened to on the tape recording, and also to aid you in identifying the speakers.

However, you are specifically instructed that whether the transcript correctly or incorrectly reflects the contents of the conversation or the identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony you have heard concerning the preparation of the transcript, and from your own examination of the transcript in relation to your hearing of the tape recording which is primary evidence of its own contents.  If you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

In this case, you have been permitted to take notes during the course of the trial.  Most of you, I don't know, I have seen some of you from time to time appear to be taking notes.  You will have those notes available to you during your deliberations but you should make use of them only as an aid to your memory.

In other words, you should not give your notes

any precedent over your independent recollection of the evidence or the lack of evidence; and, neither should you be unduly influenced by the notes of other members of the jury.

Now, I emphasize that notes are not entitled to any greater weight than the memory and impression of each of you as a member of the jury as to what the testimony has been.

Now, Mr. Frentzen or Mr. Newman.

MR. NEWMAN:  Mr. Frentzen will give that argument.

Your Honor, just a brief sidebar with defense counsel.

THE COURT:  All right.

[NOTE:  Sidebar Conference.]

MR. NEWMAN:  Your Honor, isn't the rule of sequestration still in effect because it is --

THE COURT:  Well, I guess it is.

MR. DARDEN:  Is sequestration in effect?

THE COURT:  Yes.

MR. DARDEN:  It is.

MR. NEWMAN:  Yes, Your Honor.  All right.

THE COURT:  After the concluding argument, it will not be.

MR. NEWMAN:  Yes, Your Honor.

[NOTE:  Sidebar Conference Concluded.]

MR. FRENTZEN:  May I proceed, Your Honor.

THE COURT:  Sure.

MR. FRENTZEN:  May it please the Court, members of the jury, at this point in the case, there is no doubt about what happened on November 30th, 2002, about happened in that Post Office, about what happened to Sallie Gagila, and that the defendant, Meier Jason Brown, is man who robbed and killed Sallie Gagila.

The short version of the evidence, ladies and gentlemen, is that the defendant was seen at the scene of the crime, that his own clothing ties him to the crime with other physical evidence, and that he confessed.  He confessed a number of times and he confessed to a number of different people that he had gone there to the Post Office to rob the Post Office, and that he killed Sallie Gagila.  That's it.  Case closed.

But let's take a look and let's go back through the evidence more thoroughly than that.

The first thing we know is that the defendant that the motivation to rob this Post Office.  For whatever reason, he was so enamored with Diane Brown that he wanted to help her with these bills that she had.  He wanted to stay in her good graces.  Why that would be sufficient

motivation is beyond me.  But you can hear his voice on the tapes.  You can hear him talking about it.  That's what he was trying to do.  He was trying to satisfy those particular debts that Diane Brown in those particular amounts.

So, he went down to Post Office.  You heard about how he went there earlier that day, and how he had already identified himself to Sallie Gagila when he got the mail.  But then he went back down there right around 10:30, is what Frank Kania put it at.  And Mr. Kania, when he was coming out of the Post Office, and thumbing through his mail, sitting in his truck off to his right hand side, seeing the defendant coming up on a bicycle.  And he picked the defendant out of the photo lineup, which is Government's Exhibit 3, that you were given an opportunity to take a look at, and you will have with you in the jury room for your deliberations.

The defendant went into the Post Office.  There is the crime scene.  The Post Office, evidence that was found from that Post Office.  And there's a number of significant pieces of evidence found from that Post Office.

As you heard, there was a discrepancy.  There was the missing money orders.  There were four money orders sold that day.  One of them, as you heard from

Inspector McLendon, was accounted for.  Three of them in the amounts of $500, $500, and $175 were not accounted for.  Those were stolen from the Post Office.

And there's a very significant thing that was in that post office when the investigators got there.  That was the adding machine, that calculator.

Government's Exhibit 6 is a piece of tape from that adding machine.  Government's Exhibits 9-EE and 9-GG were photographs taken by Ms. Sapp at the crime scene of that adding machine.

And I think you may recall what was on that adding machine, but in the small screens of the adding machine was 175, the last digits punched in on the adding machine.  And on that piece of tape, from the photograph, you heard how Inspector Reeves had taken the tape out of the adding machine in order for them to be their accountability study.  But what was on the tape at the time the investigators got there, $500 plus 90 cents, the charge for the money order, plus $500 plus 90 cents plus 175, and then the division key.

You heard from Ms. Woods this is how Sallie Gagila would ring up money orders when they were purchased from the Post Office.  You also heard there is no reason on earth while she would be hitting that division key in adding them up.  And you can see from the tape she never

got a chance to add the 90-cent charge for that $175 money order. It is during that very transaction that she was attacked.

You know that just from the evidence from the crime scene. This standing alone, along with the fact that the defendant, who we know has the three money orders, 500, 500, and 175 in his possession, showing them to Diane Brown, and showing up at Diane Brown's bank after that, that alone tells you she was attacked during this transaction. The money orders that the defendant later had in his possession.

The other piece of evidence from the crime scene, the shoeprint, a shoeprint left on counter. Government's Exhibits 25-A, and 25-B show that print. I invite you to take a look at it when you get back into jury room. Take a look at it closely. Take a look at the photograph that was taken. And take a look at certain points inside the photograph and the compare them to lift that was later taken from defendant's pair of Lugz's brand shoes.

Mr. Bell can argue about whether or not it is a technical match. I invite you to take a look at it. Take a look at some of these triangulated Ls, and the lines, and the little triangles. This is a match.

Back outside the Post Office after the attack,

after he stabbed her ten times. And according to Dr. Kaponen, there were other bruises that he tried to stab her additional times. After that brutal attack and he left her laying there on the floor, and he taken those money orders, then he took her wallet.

Back outside the Post Office, as he's trying to get away, Chris Bowen comes driving by. And he locked eyes with the defendant. He was watching him, and he was sitting up on his bicycle with his back to the Post Office, about to get away. And you heard how Mr. Bowen was able to pick him out of a lineup, Government's Exhibit 4. You will be able to take a look at the lineup. Mr. Bowen picked him out of it.

A few days later, on December 2nd, 2002, a couple of days after robbery and after the attack, you have the video stills of Diane Brown and the defendant at Diane Brown's bank cashing in one of the 500-dollar money orders. And you heard from Diane Brown how it was just about an hour after the attack that he showed her the three money orders, the 500, 500, and 175. You will be able to take a look at those stills. And you've got the money orders themselves, the money orders that were negotiated.

One made out from Diane Brown to her mortgage company that you heard they mailed from Post Office.

Another made out were Diane Brown to the Chapter 13 trustee for $175, the exact amount that she needed for her bankruptcy payment, and the reason why he ordered this money order for $175.

And then you've got the one they negotiated at the bank from who?  Jason Brown, made out to Diane Brown.

Then you have the searches, the searches of two residences, Sadie Brown's residence, and Diane Brown's residence.  At Sadie Brown's residence, they found Government's Exhibit 5, the brown jacket.  And you heard from the DNA experts and you heard from the stipulated presumptive test that this jacket has blood on it.  The blood was Sallie Gagila's.

The odds of it being someone else were one in 25 quadrillion, something -- a number larger than all the people on earth.  Sallie Gagila's blood is on this jacket in a room that Diane Brown said she and the defendant stayed in the night before.  And the jacket, which in his confession -- I'll read you that in a second -- in his confession, the defendant identified as probably what he was wearing when he went down there to the Post Office and attacked Sallie.  One piece of clothing that he forgot to wash, forgot to clean off.

At Diane Brown's residence, they found the shoes, Government's 19.  These are Lugz brand shoes.  You

heard from Inspector Rushwin when they were going to go at first to Chatham County to conduct the interview of the defendant, and he needed to put on a pair of shoes, he was headed right for these shoes, to pick up these shoes. These are his shoes. These the shoes that the print was taken from that was -- that you can take a look at. That was lined up, the print taken from the counter top in the Post Office, the defendant's shoes.

Also, at Diane Brown's residence, there were receipts for the three money orders. One of the 500-dollar money orders, the 175-dollar money orders. And also the receipt for the 423-dollar money order, which was the one after cashing after at the bank, they went and got from the Fahm Street Post Office.

And then at Diane Brown's residence was the defendant. He was interviewed. And you heard how first he told the story about going down there that morning to get the mail the first time he had gone down, and being asked about his name and who he was, the same as you heard from Darlene Washington, the rural carrier when she was there.

And then he said he didn't go back, had never gone back. And then he made up his story about stealing $1,300 from his cousin, and how he had gone back and he bought those money orders.

And then he told that he had gone down there, that he brought the socks, that he had brought the knife, and that he had gone into the Post Office, and had gone over the counter after ordering the money orders, and when her back was turned.  And he says he accidentally tripped and fell into her and cut her.  And then he said, "man, I went down there just to do a robbery, just to get a robbery charge.  But I couldn't do that.  She knew me.  I had to kill her."

Then he confessed to Diane Brown.  You heard that from Inspector Rushwin.  He made the phone call to his mother to tell his mother what had happened.  You heard about that from Inspector Rushwin who was in the room with him when he picked up the phone and made the call.  And you also heard about that from Mr. Davis, who was at Sadie Brown's residence, and heard Sadie Brown, heard the mother's reaction, when she heard what had happened and what he had done.

There's no doubt in this case, ladies and gentlemen.  None.  The evidence is clear.  When you consider the evidence and you apply to the Court's instructions, you will have not doubt that the defendant committed this crime, the defendant killed Sallie Gagila.

The Court is going to instruct you on the law. You should follow the Court's instruction.  There is one

thing I want to address about the instructions and about the what you.

The first two counts, Count 1 and Count 2, they both charge murder. One charges murder on federal property at a post office. And you heard there was a stipulation that the Post Office was in the possession of the Postal Service; and, therefore, was within the special federal jurisdiction, which is one of the elements of that crime.

Count 2 is slightly different in that it involves Sallie Gagila being a federal employee, an employee of the Post Office. You heard that she had this employment contract. She was employed about the as a Postmaster Relief. So, if those two elements are proved, that is the only difference between Counts 1 and 2.

Now, both of those counts charge something called felony murder. The Court is going to instruct you on that. But for this purpose, for this phase of the trial, the only intent that the government needs to show is that the defendant intended to commit a robbery, and as a result he caused her death.

At this point, we don't have to show premeditation. And I want to read just a couple of excerpts from the interview of Mr. Brown you heard yesterday that address that specific issue.

And again, as the Court has instructed you, you can listen to this and your recollection of what was heard on the tape should control. This is from the transcript. You will have the transcript out there to review. And we submit that it is accurate. This is from the transcript.

*Brown: I went back to rob the lady honestly. But I went to Ms. Annie Jo's house first.*

*Inspector or Detective: Where did you go when you left her house?*

*Brown: I was on my way back to -- back to my mom's. But, you know, like I said, the purpose of the trip was -- I was going to steal something. So, that's --*

*Detective: What were you going to steal when you went to the Post Office?*

*Brown: Sigh.*

*Detective: I know there is where it gets hard for up. But these are the kind of specific questions I'm trying to get from you. Because there's not a whole lot in the Post Office to steal.*

*Brown: I know. Just some money orders, man.*

This is another section. The detective asks: *Where did the knife come from?*

*Brown: From my mom's house.*

*Detective: So, back at your mom's house is when you decided I'm going to go down there and try to get a*

*little money.*

*Brown:  Yeah, I mean.*

And finally with regard to this issue, why was he going to the Post Office?  Why did he go to the Post Office.

*Brown:  I just went to rob the lady, man, just to get a robbery charge.*

Is there any question that he intended to commit this robbery, and as a result he caused her death?  No.

Now, we'll get into the issue of whether or not this was an accident at all.  We don't think the evidence shows it was an accident in any respect.  But for this part of the trial, for this segment, to determine his guilt or innocence of those two charges, all you have to be convinced of is that he intended to rob her, and he caused her death.  And that is absolutely clear.

I want to cover just an few more excerpts from the confession.  The reason for this is there are details of that confession that fit and match the evidence.  Details of that confession, I submit that only the killer would know this type of detail.  And I would like to talk you about a few of those.

This again is from that interview.

*Detective:  Were you wearing -- we talked last night, and I asked you if you were wearing gloves.  You*

*told me you were not.  That you had something else on your hands.  What was that?*

*Brown:  Socks.*

Remember, Mr. Bowen, when he was driving by and he saw this man outside the post office, who he picked out as the defendant and they locked eyes, and he took a look at him.  And the one thing that he noticed -- he may not have noticed exactly what the guy was wearing -- one thing he noticed because he thought it was strange was that the guy's hands were covered with something white.  He thought they were gloves.  Those were those socks.  These are the kind of details that match the defendant's confession to the evidence.

Another detail:  The money orders that were stolen.  The amounts of the money orders and what the reason for the money orders were.

*Detective:  What kind of money orders did you and her for, how many money orders were --*

*Brown:  I asked for three.*

*Detective:  Any particular reason those three amounts or that number?*

*Brown:  Man, it is messed up.  I asked for three money orders.  I told you the amount yesterday.  Two of them were for one bill, and one was for another.  The two 500 to cover Diane Brown's mortgage.  And the $175 was for*

*the bankruptcy payment.*

The kind of details that the killer would know.

And this relates to that adding machine, to that calculator, this particular detail here.

*Brown:  Yes, she went to -- she went to a little desk back there.  And she has a calculator on there.*

*Detective:  Okay.*

*Brown:  And she was adding.  And that's when I came across.*

The kind of detail that only the killer would know.  That he attacked her right when she was on that adding machine, when she punched in 175.  She was probably getting ready to punch in a plus and a 90 cents, and he attacked her.  And she wound up hitting somehow the division key.

He knew exactly when she was attacked.  The kind of a detail that only the killer would know.

*Detective:  Prior to going out of the Post Office was there anything else that you took?*

*Brown:  I took her wallet.*

*Detective:  Where was it at?*

*Brown:  In her purse on a chair.*

And you heard from the crime scene that is exactly where her purse was.  On that chair over by the door.  And you saw -- you can see from the photographs

that it was opened up.

As you heard from Inspector McLendon, yeah, there was a change purse in there, but there was no wallet.  The wallet was missing.  No identification card.  No driver's license, no credit cards, and no cash to speak of.  That change purse had some sinus medication and a few coins in it.

He had taken her wallet.  And he knew exactly where her purse was at, on that chair.  The kind of a detail that only the killer would know.

*Detective:  What jacket were you wearing when you were over at your mom's house when you went to the Post Office?*

*Brown:  Probably my brown coat, man.*

The same coat that was found at Sadie Brown's residence in the room where the defendant stays.  The same coat on two spots, two different locations, on the right sleeve and on the right hand side, on that flap down there, is Sallie Gagila's blood.  The kind of detail only the killer would know.

*Detective:  Do you recall where you last saw her at?  When you were leaving, where was she at?*

*Brown:  Oh, God -- sigh.*

*Detective:  Was she sitting on a chair?  Was she standing up by the corner?  Had she already sat down or*

*what.*

*Brown: She is lying on the floor, Chuck.*

Where she was found?  The kind of detail only the killer would know.

The evidence is in, ladies and gentlemen.  Apply it to the Court's instructions and the law.  Follow the evidence.  Follow those instructions.  I submit to you that you will come to the only verdict consistent with the evidence and consistent with the law that the defendant was the man that was at the Post Office on November 30th, 2002, that the defendant robbed and killed Sallie Gagila.

MR. BELL:  That's it.  Case closed.  He confessed.  Is it really?

How many times have we heard that?  His closing argument is all about the confession, and what you have already heard from the Court and what we're going to talk about is confessions and statements made by the police.

The Court has instructed you with regard to the confessions and statements.  I submit to you that confessions and statements by defendants and witnesses are some of the most unreliable evidence there is.

Look at the physical evidence.  And when you look at the physical evidence, it doesn't match in many respect to the confession.

The law recognizes how confessions are not "that's it, case closed".

Several months ago, we heard a famous example. The Central Park jogger case, four guys spend 12 or 13 years imprisonment.

MR. NEWMAN:  Objection, Your Honor.  Not in evidence.

THE COURT:  Objection sustained.

MR. BELL:  Judge, that is a famous example.

THE COURT:  I understand.  I sustain the objection.

MR. BELL:  Yes, sir.  I submit there are many examples.  You have heard of cases where people get off death row, confessions, eyewitness testimony put them there.  And then years later, it turns out it is not correct.

Well, how did they get that information?  Well, Jason Meier Brown, you heard his confession.  It was on tape.  And you also heard that the police were with him four hours by one estimate, and seven hours by another. What do you think was going on in that four to seven hours?

This is the finished product.  What about a tape of the give and take before that?  We found this jacket at your mother's house.  It is presumptive.  We sprayed it

and got some blood on it.  Were you wearing the brown jacket?

Questions back and forth.  That is how in these other cases people make what we call false confessions. And that's why the law tells you that should consider statements made by a defendant with great caution and great care.

And that's one of the few cautionary instructions the law gives you with regard to closely examining these things.  Take a look at it.  Compare it to the physical evidence.  Look at the jacket.

We've got a brown jacket.  And we've got DNA. We don't if it is blood, salvia, stuff that has been rubbed on.  Ms. Sallie's DNA is all in there.  Whether someone else was wearing the jacket weeks before, and the DNA got on there.  But I've got several questions about this evidence.  One, why a brown jacket?

Meier Jason Brown was wearing a jogging suit. We've got Chris Bowen.  We've got Frank Kania.  They see him ride up there.  We don't deny that Meier Brown went to the Post Office that day.  He collected the mail and went back and bought money orders.  And he told the detectives that with regard to getting money from his cousin Cedric Morgan.

Where is the jogging suit?  This is a huge

jacket. It's big on me, and I'm way bigger than him.

How could -- and this is thick. He's wearing a jogging suit with the hooding. And there's DNA on a brown jacket. Where is the jogging suit that we know he was wearing because their two witnesses proved that.

The DNA is found in places where it would be odd for you to expect DNA to be found in an attack such as this.

We've got -- and you can look at this stuff. Right under there, and the back here. [gesturing]. A huge jacket.

And, if I am wearing this jacket in a knife attack, we know there's blood all over the scene. We know there's castoff blood. What about the DNA here? This isn't washed. This isn't washed.

Question: How did it get on the brown jacket if he is in a blue and black jogging suit by their own evidence?

Two witnesses Frank Kania is parked in the truck. He's about twenty feet away. He's parked in front of his old spot. He sees a guy riding up all the way to the Post Office, get off bicycle, and go in. He didn't have time to change clothes.

That question has never, never been answered. We don't even know if it is blood. We've got this

presumptive test that there's blood on the jacket.  And we submit that when you are in a trial it is important, or any other trial, don't presume.  We need proof.

We don't know if that DNA is from a cough, from weeks before.  We don't know any of that.  The DNA doesn't tell who was wearing the jacket.  The DNA doesn't tell us when it was put there.  The DNA doesn't tell us anything about what this jacket is doing for five days in a trailer that people are going to, to and fro.  The DNA doesn't address the fact that Meier Jason Brown, by their witnesses' testimony, he's in a red Nautica jacket.

Diane Brown, he gets up.  She leaves and goes and warms up her house, and he's wearing a red Nautica jacket.  She comes back.  He has got the same thing on.

Who puts this on my client?  Deit Davis.  Can we all agree that Deit Davis is about the most unreliable, untrustworthy witness that has walked in this courtroom?

You know, this guy has been smoking pot since he has been seven years old.  And he was stoned for about at least a year every day.  But he would have us believe -- I mean, maybe he should come in court and testify more often, because this is about the only time where he gets off the weed.  And he is the only person who says Meier had on a brown jacket.  Deit Davis.  He's Mr. Short Term Memory Loss.

And you don't convict someone on testimony of anybody of the ilk of Deit Davis.

I feel sorry for Deit.  I mean, I'm not getting on him.  Someone who has been stoned since he was seven years old doesn't speak much about the older folks around there.  The guy probably didn't have much of a chance.  But some of the stuff he said here, Mr. Short Term Memory Loss, that is unreliable.

So, who puts Meier in this besides Mr. Short Term Memory Loss?  Who explains where this was for five days when my client is in a red Nautica jacket?  Who explains or rules out that the DNA was placed there before someone else afterwards?

This Morgan Compound, we know, people are coming going.  And I'm not going to sit here and tell you I have the answers, because I don't.  But they have to prove this case beyond all reasonable doubt.  And they haven't done so.

The confession, the law tells you that you have to look at those things with great care.  I want you to look at some of the details, too.  Some of the things that only the killer would know.

Where is the knife?  If he really, honestly did this, someone who confessed to something that is going to send him away for a life or make him eligible for the

death penalty, would they have any qualms about telling the cops this is where I put the knife?  And they went and looked at the place, but it wasn't there.

See, what the detectives do is they go out, after they get a confession, they know they are sometimes unreliable.  They know about these other cases.  People have been eyewitnessed and made statements.  So, they go out can and try to verify the confession.  They look for the knife.  It is not there.  They look for the socks.  It is not there.  They look for the wallet.  It is not there.

And believe me, these people have the resources. We've got Liberty County cops looking, postal inspectors, all of these guys.  Only the killer should really have known that.  So, they go out to look for that, and verify it, and they can't find it.

These shoes, you're going to have these out. And you can look at them, and you can touch them.  And what you're going to see is we're going to call these dirty blue Lugz.  And you heard the evidence from Mr. Voorhees, who was not qualified as an expert, it is not a match.  It is similar.  I don't know if it is a 9 and a half.  I don't know if it is a size 10.  I don't know if it is a size 8 and a half.  I know it is similar.  I don't know if it is a knockoff.  I know it is similar.

And I want you to look at this very carefully.

[gesturing]. 25-A and B. Look up here. This one squigs up. The pattern goes right there and it goes up. This one squigs down.

Your Honor, permission to publish.

THE COURT: Yes. Stay near the lectern, though.

MR. BELL: Okay.

Squigs up, goes up. On the real shoes, squigs down on the other. You're going to have this. You're going to have this out with you. Root through this stuff. Root through all the evidence. Look at this very carefully. But even if it were a match, we don't if it is a 9 and a half and what kind of shoe. But the physical evidence would also seem to rule out that it is his shoe.

The reason I mention this those is dirty is because it hasn't been washed. And we've got a bloodily crime scene. We've still got dirt and grime in the crevices down here.

We've got a fabric type thing here that would absorb water, blood, things of that nature. There's lots of blood on the floor. There's no way someone is getting out of that Post Office without blood on the shoes. And there's no blood on these blue Lugz.

Shoeprints? We've got another shoeprint that no one has explained. Their expert was up there. They took photographs of the bottom of everybody's shoes so that

they could compare them to what was on the counter and what was on the floor.

There is one -- it's clear that it doesn't match. It doesn't match his shoes. It doesn't match their shoes. And I don't have the answer for you. But that is something that is unexplained in this evidence, something that is unexplained in the confession.

When you think about confession, think about the length of the interrogation. When I get pulled over by a police officer for a ticket, something of that nature, I'm nervous. We're all nervous because we're all human.

These guys are coming in there, as Diane Brown said, with shotguns outside, guns drawn. They go through and clear it. Tell them where to sit. Interrogate them. Reject the first statement, reject the second one. He is worried about the one person he loves more than anybody in the world besides maybe -- with the exception of probably his mother -- is Diane Brown. And he says to them, and it is in the statement, "promise me you won't arrest her if I make this statement."

You hear that. She's facing a potential charge in a death penalty case. That is motivation.

You know, I don't know that size matters, but he is not a very big guy. And you wonder about how people would stand up in these police encounters. I get nervous.

Y'all probably do, too.  People make false confessions. We know about the famous cases.  I won't quote them to you.

You've got guys, harden guys, these al-Qaeda guys that when we seize them we're trying to keep it secret for a couple of days, because they are going to start making statements.  And we don't torture people. Some of their statements are true.  Some are not.  So, you have to go back and compare it to this stuff.  The hard evidence:  The coat, the shoes.

He's wearing a blue and black jogging suit.  You have to explain to me how with all the blood at that scene and the blood drops in the foyer and the castoff blood, there's no blood here when you've got these.  There's no blood here.  And there's no blood here [gesturing]

And how do you explain that?  The case isn't closed when someone makes a confession.  You've got to look at all the evidence.  And what this case is about is reasonable doubt.  And reasonable doubt is going to be charged to you, and has somewhat already been by the Judge.

I submitted to you that a reasonable doubt can be made up and shown in about three different ways:  From the evidence, from lack of evidence, and from conflicts in the evidence.  When you look at it, you have to be

convinced beyond all reasonable doubt.

Now, there is no magical number formula that we can plug and decide when someone has proved their case beyond a reasonable doubt or not.  Because the government never has to prove a case beyond all doubt.  That is not a standard that anybody can prove.  But when we began this case a few days ago, we start out with all of you agreeing that he is presumed innocent.  The indictment means nothing.  So, there is no evidence at that point.

If this is a guilt projection or meter, and here we have absolute uncertainty.  And here, we have absolute certainty, we start out over here.  [gesturing].  We haven't heard anything.  We don't knowing anything about the evidence.  And when you really sit down and look at the evidence, you have to decide how it goes.  Have they met their burden?

Let's go through it.  I saw y'all taking notes.  But if you plow through these witnesses and decide where we go, we don't go very far on this meter.  We have Darlene Washington.  She's the lady who was at the Post Office earlier that morning.  It is undisputed that Meier came in and got the mail that day.

She says that she saw someone getting the mail out of that Box 327, and that they left.  And there's a dispute about whether she told the investigators or not

that she saw the person's back as they left.

She doesn't really move the meter much, because she doesn't know anything about the robbery. But I do have to mention this to you, because if she saw the person's back, and he was wearing this, you would know about it. So, apparently, she doesn't see the brown jacket.

So, we're still way over here.

And then you have Jennifer Zeck, and Steve Nichols. Jennifer Zeck and Steve Nichols are the ones who found Ms. Sallie first at the Post Office. And they traveled down that long part of Loop Road. And they didn't see anybody on a bicycle, which if he, in his blue/black jogging outfit should have been riding, facing this way, if he was leaving on a bicycle from the murder scene.

So, they don't move the meter. Jennifer Zeck doesn't see anything on the counter. And furthermore, they tell you that Steve Nichols, who is a pretty tall guy. I think he was 6" 2', 185, something like that. He squirms through that little opening, and supposedly, we have still have a shoeprint, and supposedly with blood on the counter. He doesn't get any blood on him.

So, they don't move the meter at all either.

We have Linda Ashcraft, who is a First

Responder, who tried to save Ms. Sallie. And she doesn't know anything about the robbery either. So, we don't move -- we still haven't budged. But she does know there's blood on the floor and the bloody footprints, which goes to the bloody footprint that is unexplained in this evidence.

Frank Kania, does he move the meter? Blue/black jogging outfit. Supposedly a positive ID. But you know, people try real hard in court. When he first testified under direct, did you see the person in the photo spread, yes. Did you pick him out. Yes. Cross-examination, well, kind of sort of looked like this fellow here. So, we're uncertain of that. But if you accept that was Meier Jason Brown, he's in a blue/black jogging outfit.

So, even if you assume that Frank Kania saw my client ride up to the Post Office, it doesn't explain this. It raises more questions about clothing. So, I don't think we move on the meter.

Chris Bowen, he reinforces dark jogging outfit. Did you see if the photo spread? Yes. Cross-examination, well, he's sort of slender like this fellow here. Again, that is not a positive ID. So, let's accept for the sake of argument that was Meier. We don't move the meter because it doesn't explain the clothing. Wrong outfit.

Chris Bowen is also critical because we asked

him just a very few questions, but one thing we asked him was by the bicycle.  We don't have did actual handle bars in court.  But they have been examined.  We've seen them.  Chris Bowen said that the guy who came out on that morning -- and there's a difference on how chilly it was.  But I suggest that Diane Brown didn't go warm up her house for an hour or so on the hot morning.  He comes out the Post Office.  And we asked him.  You associated him with the bicycle because he was getting on it, put his hands on the handle bar.  Yes.

No blood on the handle bar.  You see what investigators do in a case where there's blood at the scene is they follow the trail.  And we know there was a trail in this case, because we've got the blood in the work area.  We have the blood droplets.  We have a castoff.  So, there should be blood on the bicycle.

Pedals, seat.  There is blood in the back of this huge jacket, and Meier is wearing it.  He is going to be probably sitting on it, on the seat.  So, the blood trail ends.  There's nothing in the bicycle.

They checked the Durango to follow this blood trail and there's nothing there.  They followed the blood trail to Diane's house, and there's nothing there.

So, we go through Chris Bowen, and I suggest to you that we don't move on the meter.

We come to Deit Davis.  If anything, he helps. 9:30, 10:00 o'clock, Meier is there.  He's trying to use the phone.  Well, if he's there trying to use the phone, then he can't be at the Post Office.

But I suggest to you this about Deit Davis, erase him.  Nothing he says good for us about time, which he creates a time problem for the government.  Nothing good for us should be relied on and nothing bad for us should be relied on.  He is too unreliable.  I don't think it would be fair for me to stand up here and say, well, he puts Meier at the house at 9:30 or 10:00 o'clock.  That rules Meier out.

This guy doesn't know what he is talking about, anything.  So, we're still over here.  [gesturing]

Inspector Reeves is the next witness.  Well, he's talking about $1,266.59, which might be consistent with a subsequent transaction where the Post Office had a lot of money from him buying three money orders.  He comes in and tells you the amount that was taken was $1,266.59.

He is not even charged with that.  There is no explanation for that.  He is charged with $1,175.  We still don't move the meter because he's just talking about the amount that was missing.  Maybe that is the wrong amount.  But it is unexplained unless there was a subsequent transaction.

We've got GBI Agent Sapp.  She's got the photos. And I hate that y'all had to see those photographs of the crime scene.  But this is a murder case.  And sometimes we have to deal with unpleasant testimony and photographs. But I will suggest to you this.  Ms. Sallie had been worked on by the First Responders, the Ashcrafts and Bart Eaton, and her body had been moved.  And there's really no relevance to showing those pictures.

We're people.  We work on emotions.  I'm emotional.  You've got emotions.  But when you go back in that jury room, you've got to be analytical.  And the emotions that come out from showing what we deem unnecessary photographs of the victim, please guard against that, because there was no evidentiary relevance to showing you those pictures, except for your emotions.

And she's the one who sets the scene about the blood droplets.  And she doesn't move the meter.

Dr. Kaponen, he just testifies about the wounds. And he said he can't say which wound was inflicted first, last, can't say any wound beyond that necessary to cause death was inflicted.  No sexual assault.  No mutilation. He doesn't move a meter.

Steve Voorhees, the shoe guy, it's not a match. And he talks about it could be these other sized shoes. He doesn't know that it is this shoe.  And look at this

thing.  Take a close look at it.

So, you have to decide if he moves the meter.  You may decide that he does, and moves it this way.  But if it is not a match, he doesn't move it much.

And then we come do the DNA guy, who can't establish who was wearing this, when it got on, whether it is salvia, stuff from a cough, whether it is ruboff DNA.  He doesn't answer any of those questions.  But he probably does establish to your satisfaction that DNA is on this coat.  But he doesn't explain the who was wearing the jacket, when it got there, any of those things.

He moves the meter, but you need to know the who, what, when, and where to have any certainty.  And he doesn't do that.

He also tells you that he can't explain what may have happened to this in the five days it was sitting that trailer, or whether it was sitting in that trailer, we don't know.

He says there was no DNA on the bike, the pedals, the handles, the car that he was in.  And he never examined the jogging suit.  Today, no one has ever come in the Court.  Dr. Kaponen, Mr. Muller, nobody has come in and talked about Meier's DNA being on the victim.

You know in a rape case that is the really conclusive DNA, when you find DNA from the assailant on

the victim.  And we don't have that this in case.

Inspector Holder, he just testifies about finding if jacket.  You but that all of Meier's effects were in the bedroom.  He doesn't know what was happening with this in those other days or when it got on there.

We come to Diane Brown who puts him in the red Nautica jacket.  And she gets called from him from his mother's at 10:45.

We talked to Dedra Woods out there.  And she talked about the adding machine slip, 500, 500, and 175 divided.  And then you have the 90 cents.  They don't rule that another transaction happened after that.  500, 500, 175, that's pretty easy to add up.  And there's no blood on that.

And then we come to just about the end of the case.  We've gone through the witnesses.  Then we come to the confession.  Whether Meier, if he is the real killer should have known that he took $1,266 instead of just money orders.  You have to listen to that confession and compare it to this.

You have to compare it to this.  You have to look at this.  You have to compare it to the Zechs.  And everybody else and decide whether you believe that is proof beyond a reasonable doubt.

There is no trace evidence in this case.  If he

is wearing gloves, and he is behind that work area, there should be fibers. What about fingerprint? Well, they will argue fingerprints shouldn't be there because he's wearing gloves or socks on his hands. Of course, we don't have fibers, and we can't find the socks on the guy who confessed and told them everything he knows. You would have to believe he is willing to plead guilty and tell you everything, you know, that he did in the murder, but then he is unwilling to tell you where some socks are.

Does that make sense? If he planned to commit a crime like that, is he going to ride a bicycle there? Does that sound logical? Where he can be seen on the road? Does it sound logical for him to go in the Post Office and commit a crime with Frank Kania who obviously drove off in his truck after being parked twenty feet away from him where he would be seen by someone outside that post office? Is it logical for him to have done that when riding a bicycle down the road? I don't think so.

The government has the burden throughout entire case. And think about these things that we've talked about. And I know you have grave concern about his statement.

When we got up here and Mr. Darden spoke in the beginning of the case, we told you there's some evidence in this case. We're not going to tell you there is no

evidence.  There's a statement you have to consider and you have to go back and sift through this, and try to answer these questions.

Don't presume something is right.  We need proof.  Sift through it.  There is evidence for you to consider.  But they have the burden to prove it beyond all reasonable doubt.  Look at these things.

You know, this is a serious case.  I know it has affected a lot of people on both sides.  And, you know, we can see it y'all's face and we were doing the jury selection and picking the people who were going to be put in the box.  I saw the pressure.  There's pressure on all of us.  It is a serious matter.  But back there, there is no pressure.

Y'all are kings.  There is no time pressure.  When you go back there, you don't have to explain your decision to anybody.  You must make the decision.  You've got wade through the evidence.  And it is serious for both sides, the victim's family, his family and friends, and decide did this go far enough.

There's really only one piece of evidence, the confession.  Did it match the lack of the knife and the gloves?  Did it get not to a hundred percent certainty, because they don't have to do that?  Did it get beyond all reasonable doubt?

If you can explain blood on a brown jacket when he is in a blue and black jogging suit, then you may be able to explain this beyond all reasonable doubt. But I can't explain that. The evidence can't explain that.

As much as we may want finality and certainty for both sides, this is a hodgepodge of evidence. And it doesn't meet the burden, the very heavy burden that they have. And because it doesn't, despite the seriousness of the case, you have to come back with a verdict that speaks the truth.

The Judge told in the beginning of this case that the word *voir dire* means speak the truth. I'm not sure if that is French or Latin. But the word *verdict* also has meaning, the same thing. Speak the truth.

The truth in this case is when you render your verdict. It is not so much guilt or innocence when you look at it in legal terms. Have they proven their case beyond all reasonable doubt, beyond all reasonable doubt. Have they explained this, when he was wearing a different outfit?

You have to be able to answer that with certainty. And you can't, not based on this evidence.

Thank you.

THE COURT: Mr. Newman.

MR. NEWMAN: I wonder if Mr. Bell's magical

meter will bring back Sallie Louise Gagila to life, because he can do so many other things.  He can turn things upside down and inside out.

When you came into this courtroom, nobody told you to please check your common sense at the door.  Nor has Judge Edenfield so instructed you, nor will he.

Of course, there's some inconsistencies in the evidence, particularly concerning how the killer, Meier Jason Brown, appeared to be the dressed when seen heading to the Post Office.  But if this were ever a case where everybody came in and said the person was wearing an olive hunting jacket, and the next witness came and said he was wearing a brownish green jacket.  The next person comes in, he was wearing a field jacket of brown olive, then you would have some concerns.  Then you would have some doubt.  Then you would have some worries that the agents and investigators who worked on this case aligned up those witnesses and shaped their testimony and formed their testimony, and gave them new memories, memories which they didn't have before.

But what you have in this case is the unvarnished, occasionally clashing, unsubsidiary, secondary, substantially unimportant things about the evidence in this case.

Just think, if there weren't in this case the

scientific evidence, would Mr. Bell have stood right here and said where is the scientific corroboration?  Where is the DNA?  Where is the footprint?  Wouldn't that have been what he would have pounded upon?

But the postal inspectors led by Ms. McLendon here, who takes her job seriously, as did every Post Office employee that you saw take this stand, and just like a captain in the United States Army, when they have one of their people down in the field, they're going to bring them back and they're going to do everything they can do lawfully and properly so that justice is done, so that a proceeding like this is conducted by this Judge in a courtroom like this, with equipment like this, so you can make a fair, proper, reasoned, calm decision that follows the law that Judge Edenfield will soon give you, and that says in very simple terms that Meier Jason Brown killed Sallie Louise Gagila on federal property, that Meier Jason Brown killed Sallie Gagila while she was working as a Postmaster Relief in Fleming, Georgia, and that Meier Jason Brown went to that Post Office to rob $1,175 in money orders, because his girlfriend, Diane Brown, needed it.

Mr. Bell challenges the absolute lack of complete matching between the rolled print which forms the overlay in Government's Exhibit 25 and photograph of the

counter, the other part of Exhibit 25.  Remember how that print on that counter was made, when Meier Jason Brown was leaping over that counter.  The whole purpose of having little nubs on a shoe such as this is so that it provides some traction, so that the rubber gives like the tread on the tire of your car.

Shoes we wear, the office type shoes that have a smooth sole like this, you don't need nubs on them.  But if you are going on the tennis court or basketball court, you do have to have some little indentations, in grooves and marks.

You heard that confession from Meier Jason Brown in his own words.  You heard in nuance in his voice.  Who, when they are confessing to some horrible, horrible act, wants to bring the only person, the only person close to them in to it to share this moment of pain?  Diane Brown, Mama, Ms. Sadie.

It all matches up.  Mr. Frentzen hasn't misled you in the slightest, from every word he said to you in his opening statement, every word he said to you in his closing argument.

Remember, the Judge has already charged you that reasonable doubt means, in essence, a doubt for which you can give a reason.  A fair, impartial consideration of the evidence.  And when you do that, the government submits to

you, I submit to you that there is no reasonable doubt in this case.  There is no doubt for which you can give a reason.

A reasonable doubt left this courtroom yesterday when you saw and after what you heard about the horrible events of November 30th, 2002, in the Fleming Post Office, when you saw the bank video stills from that First Union Bank on Ogeechee Road, and you saw those photographs, and then you heard that on December 5th, when he asked to go to Chatham County Police Station to be questioned by Detective Woodall, Meier Jason Brown went to put on his shoes, this pair of shoes.

We ask you to return a verdict at that speaks truth in this case.  Those verdicts are guilty, guilty, guilty.

Thank you.

THE COURT:  We will resume with the charge, ladies and gentlemen.

**CHARGE OF THE COURT**

THE COURT:  At this time, I will explain the indictment which charges three separate offenses called counts.  You will be given a copy of the indictment for reference during your deliberations.

In sum, the defendant, Meier Jason Brown, is charged with three counts.

Count 1 charges that on or about November 30th, 2002, in Liberty County, which is within the Southern District of Georgia, in the United States Post Office, Fleming, Georgia, a place within the special territorial jurisdiction, the defendant, with malice aforethought did unlawfully kill Sallie Louise Gagila, by stabbing, and knowingly willful perpetration of a robbery of the Post Office.

Title 18 of the United States Code, Section 111 makes it a federal crime or offense for anyone to murder another human being during the perpetration of a crime of robbery within the territorial jurisdiction of the United States.

The defendant can be found guilty of that offense charged in Count 1 only if the government proves all of the following fact beyond a reasonable doubt.

*(1) that the victim named in the indictment was killed;*

*Secondly, that the defendant caused the death of the victim as charged;*

*Thirdly, that the death of the victim occurred as a consequent of and while the defendant was knowingly and willfully engaged in perpetrating the crime of robbery as charged;*

*Fourth, that the killing occurred within the territorial jurisdiction of the United States.*

The crime charged here is known as *felony murder.* That is, a killing that occurs during the knowing and willful commission of some other specified felony offense.  It is not necessary, therefore, for the government to prove that the defendant had any premeditated design or intent to kill the victim.  It is sufficient if the government proves beyond a reasonable doubt that the defendant knowingly and willfully committed the crime of robbery as charged in the indictment, and that the killing of the victim occurred during and as a consequence of the defendant's commission of that crime.

If you find beyond a reasonable doubt that the offense occurred at the location alleged and described in the indictment, the U.S. Post Office, Fleming, Georgia, you are instructed that the location would be within the territorial jurisdiction of the United States.

Count 2 charges that on or about November 30th, 2002 in Liberty County, within the Southern District of Georgia, the U.S. Post Office, Fleming, Georgia, the defendant, with malice aforethought, did unlawfully kill Sallie Louise Gagila, an Postal Service Postmaster Relief, an employee of the United

States while she was engaged in the performance of her official duties, by stabbing in the knowing and willful perpetration of a robbery in the Post Office.

Title 18 of the United States Code, Section 1114, make it a federal crime or offense for anyone to murder a federal employee engaged in the performance of their duties during the perpetration of a crime of violence.  The defendant can be found guilty of that offense charged in Count 2 of the indictment only if the government proves all of the following facts beyond a reasonable doubt.

First, that the vicrtim named in the indictment was killed.

Secondly, that defendant caused the death of the victim as charge.

Thirdly, that the death of the victim occurred as a consequence of and while the defendant was knowingly and willfully engaged in perpetrating the crime of robbery as charged.

Fourth, that the victim was a federal officer or employee, and was, at the time of the killing, engaged in the performance of her official duties.

The crime charged here is also a felony murder, a killing that occurs during the knowing and willful commission of some other, specified felony offense.  As

with Count 1, it is not necessary for the government to prove that the defendant had any premeditated design or intent to kill to the victim.  It is sufficient if the government proves beyond a reasonable doubt that the defendant knowingly and willfully committed the crime of robbery, as charged in the indictment.  And the killing of the victim occurred during, and as a consequence of, the defendant's commission of that crime.

Count 3 charges that on or about November 30th, 2002, in Liberty County, within the Southern District of Georgia, the defendant knowingly and willfully assaulted U.S. Postmaster Relief, Sallie Louise Gagila, a person having lawful charge, custody, and control of mail matters, money, and other property of the United States with the intent to rob, steal, or purloin such property; that is, the three U.S. Postal Money Orders totalling $1,175 in value, and in effecting such robbery did wound or place in jeopardy the life of Sallie Louise Gagila, through the use of a dangerous weapon, that is, a knife.

Title 18 of the United States Code, Section 2114 makes it a federal crime or offense for anyone to assault with the intent to rob a person having a lawful charge, custody, or control of mail matter, money order, or other property of the United States, and in the process wounds

or places in jeopardy the life of such a person with the use of a dangerous weapon.  The defendant can be found guilty of that offense charged in Count 3 only if the government proves all of the following facts beyond a reasonable doubt:

> *First:  That the defendant assaulted Sallie Louise Gagila when she had lawful charge, control, and custody of mail matter, money, or other property of the United States.*

> *Secondly:  That while committing the assault the defendant intended to rob or steal such mail matter, money, or property of the United States.*

> *Thirdly:  That in committing such robbery, the defendant wounded Sallie Louise Gagila or put her life in jeopardy by use of a dangerous weapon.*

> *And fourthly:  That the defendant acted knowingly and willfully.*

You will note that the indictment charges that is the offenses were committed on or about certain dates or a certain date.  The government does not have to prove with certainty the exact date of the alleged offense.  It is sufficient if the government proves beyond a reasonable doubt that the offenses were committed on the a reasonably

near the date alleged.

The word *knowingly,* as I defined it earlier, and I will redefine it, as that term is used in the indictment and in these instructions means that the act was done voluntarily and purposely and intentionally, and not because of mistake or accident.

The word *willfully,* as that term is used in the indictment or in these instructions means that the act was committed voluntarily and purposefully, with the specific intent to do something the law forbids; that is, with bad purpose, either to disobey or disregard the law.

Now, ladies and gentlemen, a separate crime or offense is charged in each count of the indictment. Each charge, and the evidence pertaining to it, should be considered separately. The fact that you find the defendant guilty or not guilty as to one of an offenses charged should not affect your verdict as to the other offenses charged.

I caution you that you are here to determine from the evidence in the case whether the defendant is guilty or not guilty only as to these specific offenses charged in the indictment. Also, the question of punishment should not be considered by you in any way in deciding the guilt or innocence of the defendant. As I stated before, if the defendant is convicted, the

punishment will be considered later in a separate sentencing phase.

Any verdict you reach in the jury room, whether guilty or not guilty must be unanimous.  In other words, to return a verdict, you must all agree.  Your deliberations, of course are secret.  You will never have to explain your verdict to anyone.

But it is your duty as members of the jury to discuss the case with one another in the effort to reach an agreement if you can do so.  Each of you must decide the case for yourself, but only after a full consideration of the evidence with other members of the jury.  While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you were wrong.  But do not give up your honest beliefs solely because the others think differently or merely to get the case over with.

As I said at the outset, and I remind you again, that in a very real sense, a very real way you are judges. You are judges of the facts.  And your only interest is to seek the truth from the evidence in the case.

Now, when you go back in the jury room, you will select one of your member to act as your foreperson.  That person will preside over your deliberations and will speak for you here in Court.

Now, I have prepared a verdict form for your convenience.  It sets forth the three counts against the defendant.  I remind you again that you are to consider each count separately, and that your verdict as to each guilty or not guilty must be unanimous.  You take that verdict form to the jury room and when you have reached a unanimous agreement, you will have your foreperson to fill in the verdict form, date and sign it, and then return it to the courtroom.

Now, if you should desire to communicate with me at any time, please write down your message or question, and pass the note to marshal who will bring it to my attention.

Now, ladies and gentlemen, you are judges of the facts.  There's no point in asking me was something proven or was it convincing or anything of that nature.  I cannot tell you.  You are the jury and exclusive judges of the facts.  But nevertheless, if you send me a note, I will show it to the lawyers, and I will respond as quickly as I can.  Sometimes that takes a while.

I caution you, however, with regard to any message that you might send me, never tell me how you may be divided in the jury room.

Now, the verdict form is styled *United States of America vs Meier Jason Brown.  Count 1, Felony Murder*

*within the Territorial Jurisdiction of the United States.*

*(1)  We, the jury, find the defendant, Meier Jason Brown* -- and there is a blank space.  You will write either the word *guilty or not guilty* as charged in Count 1 of the indictment.

*Count 1, Felony Murder of an Officer or Employee of the United States.*  That simply says, *we, the jury, find the defendant, Meier Jason Brown,* and you will write in the word *guilty or not guilty* as your verdict calls for in Count 2 of the indictment.

*Count 3, Assault with Intent to Rob a Mail Matter, Money or Other Property of the United States.*  And it asks this. *We, the jury, find the defendant, Meier Jason Brown,* and you will write once again, the word *guilty or not guilty* as charge in Count 3 of the indictment.

*So, say we all.*  That will be signed by your foreperson and dated, and returned here in open court. And then you will be asked by me, each one of you individually, if that is your verdict.

Now, may I see counsel at side bar?

[NOTE:  Sidebar Conference.]

THE COURT:  Any objections to the charge from the government?

MR. FRENTZEN:  No objections, Your Honor.

THE COURT:  Any objection?

MR. DARDEN:  What we earlier noted, Your Honor.

THE COURT:  All right.

MR. BELL:  You've addressed five of them.  And we know you ruled against us on the second degree murder, and voluntarily.  We just renew that for the record.

THE COURT:  I understand.

[NOTE:  Sidebar Conference
Concluded.]

THE COURT:  Ladies and gentlemen, you will be going into the jury room in just a minute.  The Clerk will bring you all of the evidence that was admitted into the record.  Sometimes there are matters that lawyers refer to called demonstrative, the charts.  Not all of those probably were admitted.  So, do not ask for them.  I cannot send you anything that is not already in evidence.

Now, Ms. Jervis, Mr. Gordon, Chris Neal, and Mary Ann Brock, you will be carried to another room.  You are not to discuss the case.

Of course, the others of you are to discuss the case.  We will try to make you reasonably comfortable.  But you are under the supervision of the marshal.

Marshal, take the jury to the jury room.

MARSHAL:  All rise.

THE COURT:  Take up all of that material except

their note pads.

[Jury out for deliberations.  After a period of deliberations, Court continued as follows:]

MARSHAL:  All rise.  This Court is back in session.  Be seated and come to order.

THE COURT:  Mr. Little, are you the foreman of the jury?

JUROR:  Yes, sir.

THE COURT:  Has the jury arrived at a unanimous verdict in this case?

JUROR:  Yes, we have.

THE COURT:  Deliver it to the marshal.

Mr. Clerk, will you publish the verdict and poll the jury?

CLERK:  I will, Your Honor.

In the United States District Court for the Southern District of Georgia, Savannah Division.  In the matter of the United States of America vs Meier Jason Brown, Criminal Action 403-001, Count 1, Felony Murder within the Territorial Jurisdiction of the United States, "We, the jury, find the defendant Meier Jason Brown guilty as charged in Count 1 of the indictment".

We, the jury find the defendant, Meier Jason Brown, guilty as charged in Count 2 of the indictment.

We, the jury, find the defendant, Meier Jason

*Brown guilty as charged in Count 3 of the indictment.*

*So, say we all, Bruce L. Little, foreperson.*
*November 6th, 2003.*

Ladies and gentlemen, as I call your name, would you please stand and answer two questions.

Mr. Little, is the verdict as read and published still your verdict?  Is the verdict as read and published still your verdict?

JUROR:  Yes, sir.

CLERK:  Was it freely and voluntarily made?

JUROR:  Yes, sir.

CLERK:  Thank you, sir.  Mr. Capers, is the verdict as read and published still your verdict?

MR. CAPERS:  Yes, sir.

CLERK:  Was it freely and voluntarily made?

MR. CAPERS:  Yes, sir.

CLERK:  Thank you, sir.  Ms. Cota, is the verdict as read and published still your verdict?

MS. COTA:  Yes, sir.

CLERK:  Was it freely and voluntarily made?

MS. COTA:  Yes, sir.

CLERK:  Ms. Coleson, is the verdict as read and published still your verdict?

MS. COLESON:  Yes, sir.

CLERK:  Was it freely and voluntarily made?

MS. COLESON:  Yes, sir.

CLERK:  Ms. McClinton, is the verdict as read and published still your verdict?

MS. McCLINTON:  Yes, sir.

CLERK:  Was it freely and voluntarily made?

MS. MCCLINTON:  Yes, sir.

CLERK:  Ms. Rentz, is the verdict as read and published still your verdict?

MS. RENTZ:  Yes, sir, it is.

CLERK:  Was it freely and voluntarily made?

MS. RENTZ:  Yes, sir, it was.

CLERK:  Ms. Taylor, is the verdict as read and published still your verdict?

MS. TAYLOR:  Yes, sir.

CLERK:  Was it freely and voluntarily made?

MS. TAYLOR:  Yes, sir.

CLERK:  Thank you, Ma'am.  Mr. Cooper, is the verdict as read and published still your verdict?

MR. COOPER:  Yes, sir.

CLERK:  Was it freely and voluntarily made?

MR. COOPER:  Yes, sir.

CLERK:  Ms. Taylor, is the verdict as read and published still your verdict?

MS. TAYLOR:  Yes.

CLERK:  Was it freely and voluntarily made?

MS. TAYLOR:  Yes, sir.

CLERK:  Ms. Brewer, is the verdict as read and published still your verdict?

MS. BREWER:  Yes, it is.

CLERK:  Was it freely and voluntarily made?

MS. BREWER:  Yes, it was.

CLERK:  Mr. Polese, is the verdict as read and published still your verdict?

MR. POLESE:  Yes, sir.

CLERK:  Was it freely and voluntarily made?

MR. POLESE:  Yes, sir.

CLERK:  Ms. Knight, is the verdict as read and published still your verdict?

MS. KNIGHT:  Yes, it is.

CLERK:  Was it freely and voluntarily made?

MS. KNIGHT:  Yes, it was.

THE COURT:  So say you all.  The verdict of the jury becomes the judgment of the Court.

Ladies and gentlemen, we will takes a recess at this point.

Marshal, is the food here?

MARSHAL:  We're bringing it in now Your Honor.

THE COURT:  They are bringing you your food.  We will go back through the same things that we did yesterday.

Counsel are free until 1:00 o'clock for lunch. We will resume promptly for lunch.

Take the jury for a walk if they desire.  And we will meet back here in open court at 1:00 o'clock.

MARSHAL:  Yes, sir.  All rise.

[NOTE:  Luncheon recess.  Jury out.]

THE COURT:  The jury has returned its verdict and found the defendant guilty of all three counts, two murder counts and a robbery count.  Now, the Court will be going into the second phase; that is the penalty, deciding whether or not the death sentence will be imposed.

I have had the clerk to retrieve all of the evidence from the jury room.  It is there for your use and inspection if you need to use it during the next phase.

I shall give them very, very brief -- I won't call it a charge -- remarks.  And then I will allow each side to have ten minutes of opening statements.  I think it might be beneficial for the jury to understand again, even they were told in their individual voir dire and their group voir dire, that if he were found guilty of a capital offense then they must decided the penalty.  I have no doubt they understand that.  Nevertheless, a short, a very brief statement about what the proof is and what you expect to show might be beneficial.

Does the government wish an opening statement,

Mr. Frentzen?

MR. FRENTZEN: We do, Your Honor.

THE COURT: Does the defendant?

MR. BELL: Yes, sir.

MR. DARDEN: Very brief.

THE COURT: All right. No more than that ten minutes.

Gentlemen, I don't want you to make this a closing argument. I just simply want you to discuss with them rationally you feel the evidence will be and how it meets the test, or how it does not meet the test, but no colorful arguments, no harangue, nothing of that nature.

Yes, Mr. Newman.

MR. NEWMAN: Your Honor, again revisiting the sequestration issue, the government intend to call in its case two non-family members and three family members. And after the three family members testify, we would like them to be able to continue to view the proceeding.

And we will state in our place that we will make no attempt to recall them as rebuttal of any of defense's witnesses.

MR. DARDEN: We have no objections to that.

THE COURT: All right. Fine, they may remain then.

MR. NEWMAN: Thank you, Your Honor.

MR. DARDEN:  Judge, just to prefect the record, once again, we will renew all of our objections and exceptions to the Court's rulings that we have not agreed with.

THE COURT:  That is noted, and the Court adheres to its rulings.

MR. DARDEN:  And also the request for expert services.  We are not waiving anything.

THE COURT:  I understand that.

MR. DARDEN:  And I think the Court understands.

THE COURT:  There is one thing.

The normal rules of evidence do not apply.  We are all familiar with that.  This is one of those rare occasions.  Well, I say rare.  It is more akin to a sentencing hearing where the Court who is going to set the punishment is allowed to hear matters that are hearsay or outside the normal pale of evidence.

So I would not anticipate many problems with the evidence.  But the Court will not allow any witness to make a recommendation to the jury that you should take his life or that you should spare his life.  That is a direct invasion of the jury's province.

MR. DARDEN:  I understand that, Your Honor.

THE COURT:  So, don't ask and don't encourage.  And hopefully I will not have to rebuke anyone for going

that far.

MR. DARDEN:  We have instructed all of your witness, Your Honor, about that.

THE COURT:  Good.

MR. FRENTZEN:  Judge, if I might, I don't want to stir up a problem here, but there's a deposition witness.

THE COURT:  I know.  That is what alerted me to it.

MR. FRENTZEN:  That's correct, Your Honor.  He was specifically asked that question.  Now, we have not redacted or edited that tape which I expect the defense will want to play to the jurors.

MR. DARDEN:  We had written Mr. Frentzen a letter indicating that we had no problem with that, if in fact, it is redacted.

THE COURT:  Well, If you were going to present it, it was your obligation to edit.  So, I will not allow it in an unedited form.  In other words, that must be deleted.  I do not know how long it will take to get it out there.

MR. DARDEN:  If we can play it to that question and stop it, it is the last question.

THE COURT:  Okay.  Be on the alert for it.

Okay.  Marshal.  I want the alternates brought

back.

MARSHAL:  Yes, Your Honor.

THE COURT:  Bring them back up there.  Marshal, bring in the jury.

MARSHAL:  All rise.

[Jury seated.]

THE COURT:  Ladies and gentlemen, if you will listen to me for a moment or so.  I need to explain some matters to you.  I think you already know this, but we will review them.

You have unanimously found the Defendant guilty of Counts 1 and 2 of the indictment which charged the Defendant with felony murder within the special territorial jurisdiction of the United States, and felony murder of a federal employee.

Title 18 of the United States Code, Section 1111 and 1114 provide that punishment for those offenses may be death.

You will now hear additional evidence and will then decide whether to impose a sentence of death or life imprisonment without the possibility of parole.  You cannot impose a sentence of death unless you first find that the defendant is eligible for the death penalty.  To do this, you must find that the defendant is at least eighteen years of age at the time of the offenses, and

that certain threshold eligibility and aggravating factors exist.  If you do find these requirements to exist, you must then decide whether the aggravating factors sufficiently outweigh any mitigating factors to justify a sentence of death.  Or, in the absence of mitigating factors, whether the aggravating factors alone or sufficient to justify a sentence of death.

Now, a *aggravating factor* is a fact or a circumstance which might indicate, or tend to indicate, that a sentence of death may be justified.  A *mitigating factor* is any fact or circumstance that might indicate, or tend to indicate, that the sentence of death may not be justified.

Now, as in the guilt phase of the trial, the burden here is on the government to prove both that the defendant is eligible for the death penalty and that the death penalty is justified.  The law does not require the defendant to prove that the death penalty is undeserved or that the life sentence is more appropriate.  Nor, is he required to produce any evidence at all; and, if the defendant elects not to testify, you cannot consider that in any way in your deliberations.

You will now hear evidence relevant to your determination of whether the defendant's requisite age, threshold eligibility and aggravating and/or mitigating

factors exist.  After this evidence is presented, I will give you additional legal instructions which will guide you during your deliberations.

I am going to afford each side a brief opportunity to make an opening statement and review with you what they feel is critical.  It is not be argumentative, but factual.

Mr. Frentzen.

MR. FRENTZEN:  Thank you, Your Honor.

May it please the Court and members of the jury, you have now made your determination that the defendant is guilty of Counts 1 and 2 of the indictment.  And now it will be upon us to present additional evidence to you, and then it will be your determination about the appropriate sentence in this case:  A sentence of death or a sentence of life imprisonment.

We understand that this is a difficult task and a difficult responsibility for which you have taken your oath.  And that is part of the reason why the law provides certain guidance for you in these circumstances in order to attempt to give you some direction and guidance in your decision, and deliberations, and your final determination.

And as the Judge has instructed you, there are certain findings that you need to make, certain findings that you need to consider in coming to an eventual

decision in this case about what the appropriate sentence is for the killing of Sallie Louise Gagila.

I have tried to lay some of these -- or lay these decisions out on these boards.  And I'll just use this.  I will read them to you and use this to give you some idea of what type of evidence you are going to hear.

The first thing to consider is that you have already heard much of the evidence that you will need to consider in your deliberations.  And that is the evidence with regard to the murder and with regard to what the defendant, Meier Jason Brown, did in that post office to Sallie Louise Gagila.  So, all of the evidence from the first part, the first phase of the trial, you should consider that and you can consider that in come to your decision about what the appropriate sentence is.

There are additional findings that you need to consider, that you need to make in coming to that eventual decision.

The first thing is the threshold age that the defendant was eighteen years of age or older at the time of the offenses.  That is simple.  Already in evidence is a copy of his birth certificate.  He was 32 years of age at the time he killed Sallie Louise Gagila.  No issue about his maturity or his age in this case.  So, that should be an easy determination for you.

Threshold intent.  And when the Judge gives you the final instructions and directions, there will actually be a list of different levels of intent that he must have at the time of the killing.  The Judge will instruct you on that.

I've only listed one here, because I'm fairly competent you will be able to make this finding that the defendant intentionally killed Sallie Louise Gagila.  And as we go through this and when we have another opportunity to speak to you at the end of this phase of the trial, I will tell you a little bit more about that.  But for now, let me just say that the evidence does not indicate that this was an accident by the defendant, Meier Jason Brown.

And I don't want to get too much into argument at this point.  But we believe the fact this she knew who he was, and he brought those socks down to the Post Office that he knew he had to kill her to get away with that robbery.  And that he went to the Post Office intending to kill her.  And there was no accident.  And that the stab wounds, the ten stab wounds, those don't look like any kind of an accident.

But even accepting maybe for a moment that the first wound was an accident, we believe the evidence shows that he then made the decision, a rational, cold-blooded, calculated decision to kill Sallie Gagila, and then

stabbed her nine more times.

So, I don't think there's going to be any issue that the defendant intended and intentionally killed Sallie Gagila.

The next two factors are statutory aggravating factors.  You must find at least one of these in order to move onto the other aggravating factors.

The first one is *the defendant committed the offenses in an especially heinous, cruel, and depraved manner, and that they involved torture and serious physical abuse to the victim.*

The Judge will define these terms for you.  You will be able to see the photographs.  You may have already looked at those photographs.  And while they are difficult to look at, they are relevant for your determination. They are relevant because he stabbed her over, and over, and over again, inflicting serious bodily harm upon Sallie Louise Gagila.

The next factor is that *the defendant committed the offenses in the expectation and the receipt of anything of pecuniary value.*

Why did he do this?  He did this to steal those money orders.  And then he looked around and he found her wallet.  And he stole her wallet.

So, did he commit this murder in the expectation

of the receipt of anything of pecuniary value?  It just basically means something of economic value.  Of course, he did.  He did it in order to be able to steal those money orders in order to be able to, as it turns out, to get her wallet.

No. 5 here, you get through, and you make those findings in at least one of those statutory aggravating factors, you then may consider the non statutory aggravating factors.

*As demonstrated by the victim's personal characteristics as a individual human being and the impact of her death upon her family, the defendant caused injury, harm, and loss to the victim and her family.*  You will hear from her family here today, and about what this death has meant to them.

*The manner of the defendant's commission of the offenses was intended to reduce the likelihood of detection of the defendant's involvement in the underlying federal robbery offense and in the assault on the victim, Sallie Louise Gagila.*

Why did he kill her?  He killed her to rob her. And he killed her so that she would not be a witness against him.

*The victim, Sallie Louise Gagila was an employee of the United States and United States Postal Service, and*

*was killed while she was engaged in the performance of her official duties.*

Does this mean that the life of a post master is worth or a federal employee in general is worth more than the life of anyone else? No, of course, not. But Sallie Gagila was killed that day simply performing a public service, simply because she was there at work and working on that day.

*The defendant has committed an array of other criminal acts, some, but not all, of which have resulted in convictions.* You will hear about some of the defendant's prior offenses here today, which include another robbery, somewhat similar to this one, but where he left the victim alive, and was caught for it.

*Repeated prior efforts rehabilitate and to deter the criminal conduct have failed.* The defendant has spent time in jail. The defendant has been part of rehabilitative programs, yet he continued to chose to commit criminal acts, culminating in this terrible criminal act.

At the conclusion of the evidence, we'll get another opportunity to speak to you. And at that point in time, I expect we will ask you to return the sentence that justice demands in this case and impose a death sentence.

Thank you.

MR. BELL:  Ladies and gentlemen, I'm going to start out by telling you that we don't have any argument with your decision.  You made the decision, and we don't have any argument about that.  But I do want to talk to you a little bit about some of things that the U.S. Attorney has gone over about the process that we're going to start now.

You are going to find that the evidence is not going to justify a sentence of death.  And when we talk about a sentence between life and death in Federal Court, meaning it is different than in state court.  In state court, it used to be that all life sentences, the person was eligible for parole.  But what we're really talking about in this case is a sentence of death or life without possibility of release or parole.  That's what it is in Federal Court.  You never are released.  You never are paroled, period.

And you will not hear anybody tell you any different.  That is the law in Federal Court.  There are no other choices than the rest of your life in prison or be put to death.  That is where we are.  So, there is no doubt about release.

The phase, the process that we're going to go through in this case starts out as I told you at the threshold eligibility factors.  He is over eighteen.  Some

of the eligibility factors, you've already found by virtue of your decision in the penalty phase, because it talks about intent and was there a killing, et cetera.

So, then it moves to statutory aggravating factors. And there are only two in this case. The government's alleged that the first one, that it was committed in the especially heinous manner, in that they must prove that it involved torture, which they concede it did not. Or, that it involved serious physical abuse to the victim, meaning that the significant or considerable amount of injury or damage to the victim's body, which the defendant specifically intended to inflict -- this is important part -- in addition to killing.

And you heard Dr. Kaponen's testimony as to that aspect. So, I think that is very clear.

Then in the second question, whether the murder -- not the robbery -- they must show that the murder was committed for pecuniary gain, the murder itself. If you find that the murder was committed to avoid detection or a report to the police, that does not satisfied that. And that's some of the evidence you've already heard in this case.

Then he listed the non statutory aggravating factors. And then there are going to be mitigating factors. You've already heard some of that. You've going

to hear more but when one of the most important mitigating factors that you will hear in this case you've already heard.

You heard it with your own ears when they played his statement.  And you have to consider his remorse, his sobbing.  Did he realize the seriousness of what he did?  Was he remorseful?  Did he cooperate?  Things of that nature are mitigating factors.

We're going to present evidence about Meier's background.  We're going to dig a little bit deeper into that Morgan Compound, and you're going to find out some things about where he comes from, what it was like in that house, his family.  He has been in trouble before, robbery at a convenient store; no weapon, no injury.

It is not like he just -- no injury in that case at all.  And some other crimes.  And he has done some time in jail.  And he has done some time in the state prison system, a couple of years, maybe three.

And we're also going to present as mitigating evidence, since we're talking about life without possibility of release or parole, or death, how Meier is when he finally gets into a structured environment.  A model prisoner, a trustee.  That's the kind of stuff you're going to hear.  We're going to bring people who have been acquainted with him in jail and in prison to

talk about that aspect of his life.

There will be other mitigating factors that we're going to present to you. And you're going to see them as they unfold. And then the Judge is going to give you the case to you at some point after arguments are made and the evidence is closed. Then the law requires you to perform the weighing process. And despite how you weigh aggravating factors and mitigating factors, and it is not effortless game, you are never ever required to impose death.

The statutory and non statutory aggravating factors, the government has to prove those beyond a reasonable doubt. And these mitigating factors, they just have to be proven by what is called a preponderance of the evidence. And that's like if you were in a civil case, a car accident case, the scales just have to tip every so slightly to prove a point or not prove a point.

So, that is the phase, the process that we are going to go through. Again, we don't argue with your decision. We fully accept it. And he has accepted responsibility with his cooperation. And we ask that you do the same thing you've been doing, pay close attention to all of the evidence. We're really in, you know, it was important before, but we're in the most important phase of any trial anywhere. And I appreciate the attention that

you have given to us.

Just remember, it is life without possibility of parole or release, or death.  And death is never required despite numbers or aggravating factors or mitigating circumstances.  It is never required.

Thank you.

THE COURT:  The government may begin its presentation.

MR. NEWMAN:  Yes, Your Honor.  Call Mr. Frazier.

CLERK:  For the record, sir, please state your name and occupation.

WITNESS:  My name is Irwin Frazier.  I'm a Training Instructor and Field Support Rep for the State Board of Pardon and Parole.

**IRWIN FRAZIER,** after having been duly sworn, and called as a witness by the government, testifies as follows.

**DIRECT EXAMINATION**

BY MR. NEWMAN:

Q.   Sir, what was your formal position with State Board of Pardon and Parole?

A.   I was a parole officer.

Q.   From when to when, sir?

A.   From around 1998, September of '98 up until April of 2002.

Q.    Where were you working, sir?

A.    Where?  The Jesup Parole Office.

Q.    Did that office serviced Liberty County?

A.    Yes.

Q.    In your official capacity, did you come into contact with an individual named Meier Jason Brown?

A.    Yes.

Q.    And how was it that you had such contact, sir.

A.    I became his supervising parole officer in June of 1995.

        MR. NEWMAN:  Your Honor, may I approach the witness?

        THE COURT:  Yes.

Q.    I hand you a series of document variously labeled Government's Exhibits 37-A through 37-G.  Directing your attention to the first document, 37-A, sir, could you tell the Court what that is?

A.    It's a Final Disposition or an Affidavit from the Clerk of Court.  Is it all right if I --

Q.    Yes, sir.  Take it out.

A.    It is a final disposition for Meier J. Brown for the offenses of DUI and speeding.  And it was filed November of 1990.

Q.    All right.  If you would put that back in the clear folder, sir.  And directing your attention to 37-B,

please.

A.   All right.  37-B is another final disposition of Meier J. Brown.  This was an adjudication of guilt.  It is in like February of 1995 for the offenses of forgery in the first degree, three counts.

Q.   All right.  Does that document indicate whether it was a trial or a guilty plea, sir?

A.   This one is an adjudication of guilt, which means there was a -- he was under probation supervision by this. It also states that the balance of probation is to now be served in a detention center.

     It looks like a probation revocation.

Q.   All right.

A.   It was a probation revocation showing that Mr. Brown had violated his probation.  The judge revoked the balance of that probation and sentenced him to a detention center.

Q.   All right.  Put that back, sir, and move onto 37-C.

A.   Final disposition, State of Georgia vs Meier J. Brown, for the offenses of open container and driving while license suspended.

Q.   What was the date, sir?

A.   The disposition was December of '95.

Q.   All right.  If you would put that away and go on to D, sir.

A.   D is a final disposition, State of Georgia vs Meier

J. Brown for forgery in the first degree, adjudicated September of 1997.

Q. Okay. Put that away. And take out 37-B, sir.

A. Final disposition, State vs Meier Brown for the offenses of robbery, adjudicated September of 1997.

Q. What the sentence imposed in that case, sir?

A. The sentence imposed was five years.

Q. A custodial sentence? A custodial jail sentence?

A. Yes, a prison sentence.

Q. Thank you. Okay, 37-F, sir?

A. Final disposition, the State vs Meier J. Brown for the offense of theft by taking, driving with the suspended license and DUI, adjudicated, September of 1997.

Q. Would that be a felony theft by taking, sir?

A. Yes, a felony theft by taking.

Q. All right. What was the sentence in that case, sir?

A. It shows here four years and twelve months to run concurrent with 96 R 7833, which is the previous adjudication we just --

Q. The robbery?

A. Yes.

Q. All right. And 37-G, if you would next look at.

A. 37-G is an accusation, State vs Meier Brown.

Q. For what charge, sir?

A. Showing Count 1, financial transaction count --

financial transaction card fraud, felony.  That is a financial transaction card fraud.

Q.   What is the date of that alleged offense, as alleged in that charge?

A.   The date I'm showing here, September 4th of 2000.

Q.   Okay.  Now, sir, when did you -- from when to when did you supervise Mr. Brown?

A.   From about June of 1999 until February of 2001.

Q.   All right.  And what happened in February of 2001 that broke your supervision?

A.   In February of 2001, Mr. Brown's parole was revoked based on a parole violation.

Q.   Was that parole violation the new charges as set forth in the last document you have just read to the jury?

A.   Yes.

Q.   And when Mr. Brown reentered the Georgia correctional system, what would have been his maxed out date based on that revocation?

A.   Based on that revocation, it would have been November 14th of 2001.

        MR. FRENTZEN:  With the Court's indulgence, Your Honor.  I'm sorry.  I hate to interrupt.  May I have a moment with counsel?

        THE COURT:  Sure.

                (Brief Pause.)

MR. NEWMAN:  May I approach the bench with defense counsel?

THE COURT:  Yes.

[NOTE:  Sidebar Conference.]

MR. NEWMAN:  Mr. Frentzen informs me that perhaps I misunderstood the Court's ruling about the family victim.

THE COURT:  Mr. Darden said he had no objection to them remaining.

MR. NEWMAN:  Right.

MR. BELL:  After they testified.

THE COURT:  That is what I understood.

MR. NEWMAN:  I had them come in because I thought --

THE COURT:  I thought that is what you said.

MR. DARDEN:  No, sir.  He said they would testify and then they would remain for the balance.

THE COURT:  Well, I don't want to embarrass them and ask them to leave now.  You go and do that.

MR. NEWMAN:  All right, sir.

[NOTE:  Sidebar Conference Concluded.].

MR. NEWMAN:  Your Honor, we tender into the evidence portion of this proceeding the documents 37-A through G as identified by the witness, Mr. Frazier.

THE COURT: Received.

Q. Mr. Frazier, in your supervision of Mr. Brown, how often did you have occasion to see him face to face?

A. On the average of at least once a month.

Q. And you see Mr. Brown in this courtroom?

A. Yes.

Q. Would you point him out, please?

A. The gentleman over there.

Q. And the gentleman is wearing --

THE COURT: What kind of shirt is he wearing, Mr. Witness.

A. He's wearing a white shirt with the red top.

THE COURT: The record will reflect that the witness has identified the defendant.

MR. NEWMAN: The witness is with you.

MR. DARDEN: No questions.

THE COURT: The witness is excused.

[NOTE: Witness left the stand.]

MR. NEWMAN: Call Mr. Garman, please.

CLERK: For the, sir, please state your name and the occupation.

WITNESS: Corporal Randy Garman, Savannah-Chatham Metropolitan Police Department.

**RANDY GARMAN**, after having been duly sworn, and called as a witness by the government, testifies as

follows.

**DIRECT EXAMINATION**

BY MR. NEWMAN:

Q.    I imagine that is the first time people in this room have heard the term Chatham Metropolitan -- Chatham-Savannah Metropolitan Police Department?

A.    Yes, sir, probably.

Q.    How long have you been employed by them, sir?

A.    Eight years, sir.

Q.    And prior to that, where were you employed?

A.    I was a detective with the Liberty County Sheriff's Department.

Q.    And from when to when were you a detective there?

A.    I worked there from October 9th, 1989 to October 24th, 1996.

Q.    Did you work as an investigative detective trying to do follow-ups on crimes?

A.    Yes, sir.

Q.    And did you pick up the investigation of a robbery that occurs in Liberty County on March 26th, 1996 at the Lil' Champ quick mart type store near the intersection of Highway 84 and 38?

A.    Yes, sir.

Q.    In Midway, Georgia?

A.    Yes.  Highway 17 and --

Q.    Excuse me.  Highway 17.

A.    Yes, sir, on March 26th, 1996, approximately 2307, 11:07 at night, I was informed of an armed robbery that had occurred at the Lil' Champ store by Sergeant Danny Pittman.  I was dispatched to that location.

Q.    And did you interview the victim?

A.    Yes, I did.  I interviewed the victim, a Petra Grant.  She was a clerk in the store at the time of the incident.

Q.    Did she relate that you what had happened?

A.    Yes, sir.  I'm not familiar with the full statement, because I didn't get the full statement.  She did relate the armed robbery that had occurred.

Q.    All right.  And did you pick up the investigation?

A.    Yes, sir.  We recovered some surveillance film from a hidden camera that was in the store at the time of the robbery.  It depicted what -- we received the surveillance film back, it had a photograph of three black males in it.

      At that time, one of the deputies who worked at a sheriff's office with me was a warrant server, deputy Lamar Cooke.  He identified one of the subjects in the surveillance photo as a Clinton Allen Morgan.

Q.    Did you track down Mr. Clinton?

A.    Yes, sir, I was given a -- I tracked him down.  He lived at 1308 Regency Apartment in Hinesville.  And on March 28th, of 1996, at 2108 hours at night, I executed

a search warrant at 1308 Regency Apartment, which was the apartment of Clinton Allen Morgan.

Q.   And what did you find there, sir?

A.   At which time, we recovered a shirt, a pair of pants, and a pair of shoes.

Q.   Was there anything distinctive or unique about this pair of pants?

A.   Yes, sir.  It had a set of initials on the back part of a tag on it.  It had a set of initials request a MB on them.

Q.   And had you seen those pants previously in your investigation and collection of evidence?

A.   Yes.  It was on the surveillance film.

Q.   And did you interview this Mr. Clinton Morgan?

A.   Yes, sir.  On March 28th, 1996, at 11:32 at night, I interview Clinton Allen Morgan.  Mr. Morgan was advised of his **Miranda** rights.  And he waived them.  At which time he rendered a handwritten statement explaining his part in the robbery of the Lil' Champ.

     Mr. Morgan also identified two other offenders who were with him at the time of the offense.

Q.   And who did he identify?

A.   He identified a Jason Meier Brown and a Robert Earl Bizzard, B-i-z-z-a-r-d, who was a juvenile at the time.

Q.   All right.  And this interview with Mr. Morgan took

place at approximately two days after the robbery?

A.    Yes, sir.

Q.    And then how long did you take you to catch up with Mr. Brown?

A.    On March 29th, 1996, at 12:23, we brought -- we were able to find Mr. Meier Jason Brown, which we brought him into the Liberty County Sheriff's Department.  At that time, I read Mr. Brown his **Miranda** warning.  He waived the **Miranda** warnings and agreed to a interview.  And during the interview, he rendered a handwritten statement also explaining his part in the incident that occurred at the Lil' Champ.

Q.    Did Mr. Brown immediately, upon your first conversation or interchanges with him admit to his involvement in the Lil' Champ robbery?

A.    No, sir, he did not.

Q.    Tell the jury how it went?

A.    Well, at the time we had -- I had the surveillance photos from the Lil' Champ.  And I would them laid out on the desk.  I showed him the surveillance photos.  He denied that was not him.  He said that was not him in the photograph.

Then we had -- during the warrant, as I stated before, we had recovered a pair of shoes, a pair of pants, and if I'm not mistaken, I believe a multi-colored

blue/yellow shirt, a button up shirt, which in the surveillance photos Mr. Brown was wearing.

During the course of the interview, we were talking. I offered him a cup of coffee and a coke. And he had taken it. We are sitting there, and I had laid the photographs out. And he was denying any part of it. We kept talking to him, and kept talking with him. And he still denied it. So, that is when I pulled out the pair of -- the shirt that was in an evidence bag, which I had inside my office.

At the time, Mr. Brown's hands starting shake with the cup in it. I pulled the shirt out and laid it out. It still denied it. We kept going. The shoes come out of the bag, which matched the footprint that we had found at the scene. He still denied it.

And when I pulled the pants out with the tag on it, he had the cup of liquid in his hand, and he spilled it all over the office. And that's when he decided we would go ahead and render the handwritten statement and his part in it.

MR. NEWMAN:  Your witness.

**CROSS EXAMINATION**

BY MR. DARDEN:

Q.  Mr. Garman, I'm somewhat confused.  You related to us the facts of this robbery that took place at the Lil'

Champ.  I have an incident report and I have reviewed all

of the reports.  And I don't see anything in any of those

reports that indicate this is an armed robbery.  It was a

robbery; was it not?

A.   Yes, sir, it was.

Q.   Okay.  And the reason I bring that out is because you

have referred to on two occasions as an armed robbery.

And it was not an arm robbery; was it?

A.   No, sir.  It was a robbery.

Q.   Thank you very much.

A.   No weapon was ever shown.

Q.   Thank you.  By the way, no one was hurt in that

incident; were they?

A.   No, sir.

Q.   Thank you.

          THE COURT:  Anything else from this witness.

          MR. NEWMAN:  No, Your Honor.

          THE COURT:  The witness is excused.

               [NOTE:  Witness left the stand.]

          MR. FRENTZEN:  The government calls Darlene

Washington.

          CLERK:  You remain under oath, Ma'am.  If you

would be seated, and once again for the record, please

state your name and your occupation.

          WITNESS:  Darlene Marie Washington, Rural

Carrier.

**DARLENE WASHINGTON,** after having been duly sworn, and recalled as a witness for by the government, testifies as follows:

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q.   Again, Ms. Washington, you worked with Sallie Gagila. Is that right?

A.   Yes.

Q.   About how often would you say each month, how many days you and Sallie work together?

A.   We worked four days together.  But some days she would be there a little more.  So, about ten days.

Q.   About ten days every month?

A.   Give or take some days.

Q.   How did people know Sallie Louise Gagila around the post office?

A.   They called her Ms. Sallie.

Q.   Would you consider yourself as having developed only a working relationship with Ms. Gagila?

A.   No.

Q.   How would you consider your relationship, how was that, with Ms. Gagila?

A.   We became friends over the years that we worked together.  And, you know, I confided in her.

Q.   How was Sallie Gagila around the post office to your observation?

A.   She was pleasant to everybody.  She always spoke. She was nice, helped people any way she could.

Q.   What has the loss of Ms. Gagila, how has that impacted you and the people at the post office?

A.   It is a great loss to the community, because Sallie helped everybody.  I had known her to do anything, you know, bad, treat anybody bad.  We heard nothing like that. She was a sweet person, a real sweet person.

        MR. FRENTZEN:  Your Honor, may I approach?

        THE COURT:  Yes.

Q.   Ms. Washington, I'm showing you what has been marked as Government's 38.  Do you recognize that?

A.   Yes.

Q.   What is that?

A.   Sallie's badge.

        MR. FRENTZEN:  No further questions, Your Honor. Except, I would move 38 into evidence for the purpose of this phase.

        MR. BELL:  Judge, we have no objection.  And we don't have any questions.

        THE COURT:  Thank you, Ms. Washington.  You may remain in the courtroom; or, you are free to leave.

                [NOTE:  Witness left the stand.]

MR. FRENTZEN:  Ms. Webb.

CLERK:  For the record, Ma'am, please state your name and your occupation.

WITNESS:  My name is Catherine Webb.  And I am a Media Specialist for the Liberty County School System.

**CATHERINE WEBB**, after having been duly sworn, and called as a witness by the government, testifies as follows.

**DIRECT EXAMINATION**

BY MR. NEWMAN:

Q.    How long have you held such a position as a Media Specialist, Ma'am?

A.    I've been a Media Specialist for thirteen years, as a Media Specialist.

Q.    What is your relation to Sallie Gagila?

A.    Sallie was my baby sister.

Q.    How many years younger than you was she?

A.    She was -- I'm almost five years older than Sallie. So, her birthday is in September and mine is in January.

Q.    Ms. Webb, where do you live?

A.    I live in Fleming at 7003 Leroy Coffer Highway in Fleming.

Q.    Where is that in relation to where your sister Sallie lived?

A.    Well, it is right next door in Fleming terms.  It is

just -- we live within just a second -- a few minutes walking.

Q.   How long have you lived there in that house?

A.   In that house, I've been there for twenty-one years.

Q.   All right.  Was your late sister married?

A.   Yes, she was.

Q.   Who was she married?

A.   She was married to Joe Gagila.

Q.   And what career path did Joe Gagila take?

A.   Joe was -- he retired from the military.  He was in the Army.  And then he retired, and they moved to Fleming, and settled in Fleming after his retirement.

Q.   Did they have any children?

A.   She had two children, Scott and Craig.

Q.   How old are they?

A.   Scott is 23, and Craig turned 18 in July.

Q.   Where did the boys go to school, middle school and high school?

A.   Savannah Christian in Savannah.

Q.   Where is the older boy, Scott, right now?

A.   Scott is at Georgia Tech.  He should be graduating this year.  He has been in the Co-Op Program.

Q.   Where is Craig right now?

A.   Craig is at Fort Sam Houston in Texas.  He is finishing up his medic training there in the United States

Army.

Q.    When did he join Army?

A.    He joined the Army in June of this year.

Q.    Where would that be in relation to his graduation from high school?

A.    He graduated in May, and he left June 10th.

Q.    Prior to certain events, had Craig planned to go to college?

A.    Yes.  He had planned to go to college.  He scored 1150 on the SAT, which would have gotten him into any college basically.  And his -- but he felt under his emotional state of mind that he could not do it at this time.  He could not concentrate to go onto college.  And he decided to enlist in the Army for a two-year program, and hopes that at that time he would be in such a state of mind that he could concentrate on his education.

Q.    Where is your former brother-in-law, Joe Gagila, today?

A.    Today, as a matter of fact, I just spoke with him just a few minutes ago.  He could not appear.  His emotional state, he is going through therapy.  This has been extremely difficult for him.  And we remain very close.  And he -- I have kept him in touch all along the way.  And he knew that under the advise of his therapist, and a counseling group that he had gone to with other

family members that have lost closed loved ones, that he could not, he could not manage to go through this court hearing.

Q.   Ms. Webb, could you give this Court any sense of what kind of a person your sister Sallie was?

A.   She -- my sister was a very good person. She, she -- anyone that came to that post office can tell you that she was more than willing to help anyone. A lot of people, the elderly people especially that need things, or that are visually or physically challenged, she was always willing to help them.

She was a very, very active member in the church in working with the women's group there. She had supervised our church *Bible* school several summers.

She was very much a caretaker for our mother, with us, before our mother passed away. My granddaughter is recovering from cancer. And she knew that she liked to look at birds. And she bought her a bird house, so we could put it outside the window for the birds.

And she was very caring, very giving, very family oriented. Her children were her upper most in her mind at all times. Even her -- even as a senior, her 17-year old son, he would call her. When he was driving to school, he would call her when he arrived there. He would call her if she happened to be at work and not be at home when he

arrived home.  He would call her at work and say, "Mama, I'm home now".  Very close relationship.

I can't think of anybody that could have anything to say about her except for being a wonderful person.

Q.   Did she have a role in an annual Easter Egg Hunt held in the Fleming community?

A.   Oh, yes.  We have an annual Easter Egg Hunt since I took pictures in black and white.  And that's been a while back.  Every year we've had that.  It is family, but it is neighborhood.  I would say in that family and extended family.  And that is an annual activity for us, us and our family.

When I started looking at pictures of this, it seems like I was either always behind the camera, so I'm not in any of these pictures.  And she was always kind of sideways, because most of the times she was taking pictures, too, doing something else.  But very active in our family and community Easter Egg Hunt.

MR. NEWMAN:  Your Honor, may I approach the witness?

THE COURT:  Yes.

Q.   I'm going to hand you a series of items, four photographs and a book, starting with 39-A.  Can you tell us what is 39-A in front of you, Ma'am?

A.   That is a picture of Sallie when she graduated from

high school.  She has her senior robe, her cap and gown. And it is taken at our parents' home.

Q.    And if you would go onto 39-B?

A.    This was a picture that was taken at the Post Office. My mother was recovering from breast cancer.  And they had a breast cancer awareness event at the post office.  And my sister, my mother, and my older -- my sister Sallie on the right end, and my mother holding her certificate.  And then my older sister Betty.  And then I'm standing right by my sister Betty, holding my granddaughter, Taylor.

I'm thinking about the time frame for this.  If I'm not very much mistaken, this was probably taken about a month before my granddaughter was diagnosed with cancer. I think it was about a month before she was diagnosed.

Q.    All right.  Now, if you go onto 39-C, Ms. Webb?

A.    Okay.  This is at our Easter Egg Hunt.  And this is -- actually, this is a picture -- in that picture is my mother, my sister Betty, and my sister Sallie.  And I had several nieces and nephews in the background.  And you can see in the background -- in here, you can see Sallie's home.

Q.    All right.  And 39-D.

A.    And that is another picture of -- it is a different Easter Egg Hunt.  It is not the same Easter Egg Hunt.  It is another year.  And Sallie is in this picture, and a

close friend of our family, Kathleen Hires, and again nieces and nephews in the background of this picture.

Q. All right. And finally?

A. 39-E is -- it's the 1999 church directory from 1999.

Q. What is the name of your church?

A. Mount Olivett United Methodist Church.

Q. Where is it located?

A. In Fleming, Georgia on Mount Olivett Church Road across the railroad tracks.

Q. All right. Does your family have any connection to the land on which that church sits?

A. Yes. Our great, great, great -- I don't know how far it goes -- in the early 1800s, our great, great, great, grand father donated land that the church and cemetery are now on.

Q. Is there a directory of members in that?

A. Yes. This is a directory -- this is a directory of the members. And since this picture was taken, we have gone -- we're going through a growth period in our church. And we have actually added a new social hall and additional Sunday School classrooms in the back of the church.

Q. And does your picture appear in that with some of your family members?

A. Yes. My picture is in here with my daughter and my

former daughter-in-law.

Q.   Is your late sister's picture in there?

A.   Yes, it is.

Q.   And does that --

A.   My sister's picture is in there with her husband and her two children.

Q.   All right.

        MR. NEWMAN:  I tender all of that into evidence, Your Honor.

        THE COURT:  Received.

        MR. NEWMAN:  I turn the witness over for cross. And can I publish those items for the jury?

        THE COURT:  Yes.

        MR. BELL:  No questions.

        THE COURT:  Ma'am, you may step down.  You are free to remain in the courtroom; or, you may depart.

                [NOTE:  Witness left the stand.]

        MR. NEWMAN:  Call Ms. Cox.

        CLERK:  For the record, Ma'am, please state your name and your occupation.

        WITNESS:  My name is Betty Cox.  And I am retired.

        **BETTY COX,** after having been duly sworn and called as an witness by the government, testifies as follows.

**DIRECT EXAMINATION**

BY MR. NEWMAN:

Q.   Ms. Cox, what relation are you to Sallie?

A.   I'm her sister.

Q.   All right.  And are you retired now?

A.   Yes.

Q.   What are you retired from?

A.   Coastal utilities.

Q.   What was your position there, Ma'am?

A.   Telephone supervisor.

Q.   How often would you use to see your sister?

A.   Maybe twice a week.  Sometimes every day.  Sometimes every other day.

Q.   Where do you live right now, Ma'am?

A.   Leroy Coffer Highway.

Q.   And where on Leroy Coffer Highway?

A.   Right next door to Sallie's home.

Q.   How long have you been living there, Ma'am?

A.   About two weeks.

Q.   Where did you previously live?

A.   129 Oak Hill Road in Richmond Hill.

Q.   How has Sallie's loss affected you, Ma'am?

A.   A very great loss.  We were buddies.  And I was her little sister.

Q.   What sort of things did you use to do with your

sister Sallie?

A.   We would go shopping.  We went to church together. And just regular visits.

Q.   How about with your mother, what role did Sallie have there with in mother's later years?

A.   Sallie was by Mama's side practically ever day.

Q.   What was your mother's condition?

A.   Heart condition and cancer.

MR. NEWMAN:  Your witness.

MR. BELL:  We don't have any questions.

THE COURT:  Ma'am, you may step down.  You are free to remain in the courtroom; or, you may depart.

[NOTE:  Witness left the stand.]

MR. FRENTZEN:  Your Honor, the government calls David Clark.

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  My name is David Clark.  I'm an engineer at Coastal Communications in Hinesville.

**DAVID CLARK**, after having been duly sworn, and called as a witness by the government, testifies as follows:

**DIRECT EXAMINATION**

BY MR. FRENTZEN:

Q.   Mr. Clark, how long have you worked with Coastal

Communications?

A.    Thirty-two years.

Q.    What do you do there?

A.    I'm the engineering manager.

Q.    What was your relationship to Sallie Louise Gagila?

A.    Sallie was my baby sister.

Q.    At some point in time were you and Sallie coworkers?

A.    Yes, we were.

Q.    When was that?

A.    I went to work with the phone company in 1971, and Sallie was working there at that time.  And we worked together until she got married and moved away.

Q.    At some point, Sallie returned to Fleming.  Is that right?

A.    Yes, sir, she did.

Q.    Approximately when was that?

A.    I don't know exactly.  But it was around ten years ago when her husband retired from the military.

Q.    After she moved back at some point, did she start working at the Post Office?

A.    Yes, she did.

Q.    Would you visited her regularly?

A.    Yes, I tried to go every Saturday to get my mail and chat with her.

Q.    Did she enjoy her job, to your knowledge?

A.   Yes, she did.  I watched her there.  And she seem to be delighted in meeting people as they came in.

THE COURT:  Speak up a little more.

Q.   Mr. Clark, did you visit Sallie on November 30th of 2002?

A.   Yes, I did.

Q.   Would you give the Court and the jury just some idea of Sallie as a person?

A.   Sallie was a real nice, generous person, and outgoing.  She liked meeting people.  She liked doing things for people.  And she even liked joking with people. She would do anything for anybody.  And she was kind of an organizer or a pull-it-together.  She would organize family events, and organize things for the church.

She liked giving to people, sharing with people.

Q.   Can you tell the jury what the loss of Sallie has meant to you and to your family, and to her family?

A.   Well, she was my baby sister.  And it is somebody that I have seen from the time she was born until she died.  And she was very much a part of my life, as well as a part of the community and part of our church.  She is a part that can never be replaced.

MR. FRENTZEN:  Nothing further, Your Honor.

MR. BELL:  No question.

THE COURT:  Sir, your service is over as a

witness.  You may remain in the courtroom or depart.

[NOTE:  Witness left the stand.]

MR. NEWMAN:  That closes our evidence, Your Honor.

THE COURT:  All right.

MR. BELL:  Pelham Brown.

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  My name?

CLERK:  Yes, sir.

WITNESS:  My name is Pelham Brown.  I'm 65 years old.  And I came to testify for my son.  I ask the Court to have mercy --

MR. BELL:  Let me stop you here.  Let me direct you a little bit.  Okay.

**PELHAM BROWN,** after having been duly sworn, and called as a witness by the defense, testifies as follows:

**DIRECT EXAMINATION**

BY MR. BELL:

Q.   You are Meier's father; correct?

A.   Right.

Q.   All right.  You were married to his mother, Sadie Brown; correct?

A.   Right.

Q.   Is Sadie still living?

A.    I beg your pardon.

Q.    Is your wife, is Sadie still living?

A.    No.

Q.    When did she pass?

A.    A month ago.

Q.    In June of this year.

A.    Something like that.

Q.    Did you ever live on Leroy Coffer Highway in those trailers with your son?

A.    Yeah, for a while, and then I left.

Q.    All right.

A.    I think I left when he was about seven, and I ain't been back.  Something like that.

Q.    You left when Meier was seven or eight.  Is that what you're saying?

A.    Uh-uh.

Q.    Can you tell the jury what caused you to leave that house hold?

A.    Well, me and my oldest boy couldn't get along.  So, I figured I would get myself in trouble.  And I left, you know.

Q.    All right.  You and the oldest boy couldn't get along; correct?

A.    Right.

Q.    And that would be Roy Morgan?

A.    Right.

Q.    All right.  Is he -- he is not your son; is he?

A.    No, sir.

Q.    How many people were living there?

A.    About five.  I think there were five of us.

Q.    How many children did Sadie Brown have?

A.    Eight.

Q.    Eight?

A.    Eight boys.

Q.    Eight boys?

A.    Yeah.  One of them died a while back.

Q.    All right.  And where is Meier as far as those boys go age wise?

A.    Age wise, when he was coming up?

Q.    Yeah.

A.    He was nice and he was always --

Q.    Well, is he the oldest, the youngest.

A.    He's the third oldest.

Q.    Do you think maybe he is the second oldest; or, are you sure of that?

A.    Yeah.  He is next to it.  No, Walton is next to him.

Q.    Okay.  Walton is the youngest; correct?

A.    Yeah.

Q.    All right.  Now, you said you left the house when Meier was seven or eight years old because you couldn't

get along with Roy.  Was there an incident between you and Roy?

A.    Yeah.  We had a little incident at the time.  Of course, it was a long time ago.  But he had drawed -- I was scared I would hurt him.  He cut me one time.  And I just -- I had my pistol and I shot him.  And --

Q.    What was he trying to do?

A.    He was fixing to cut me.

Q.    What did he have?

A.    Huh?

        THE COURT:  Speak up.  We're having problems hearing him.

Q.    Talk as loud as you can.

A.    Okay.

Q.    You shot his brother, Roy.  What did Roy have?  Did Roy have a weapon?

A.    He had a razor.

Q.    Okay.  Was he trying to cut you?

A.    Yeah.

Q.    And is that what caused you to leave?

A.    Yeah.

Q.    All right.  Why did you decide to leave after that?

A.    Because I figured it might cause some more other stuff, you know.  And that's the time, I homestead a while before that trouble.  I didn't want to get in no more

trouble.

Q. You didn't want to get in any more trouble; right?

A. Right.

Q. Where was it -- what were those -- the people call it the Morgan compound; don't they? Those three trailers there?

A. I can't say that now.

Q. Well, I will call it the Morgan Compound just for the sake of today. Okay.

A. I don't think they call it that. They ain't no compound.

Q. All right.

A. Because when I left there, it wasn't all of those trailers there.

Q. All right, sir. When you were there, what was it like in terms was there any violence or trouble going on there?

A. No.

Q. Besides you shooting Roy?

A. No, not that stuff. I didn't stay that long. That happened, so I didn't want no part of that.

Q. All right. Did you stay in contact -- you saw Meier later in life when he worked for the city of Richmond Hill; right?

A. Right.

Q.   After you moved out of that trailer with Sadie and your son, are you aware of continuing trouble that used to occurred there at that trailer?

A.   Oh, I don't hear nothing.  I don't how it go that way.  I don't how it go that way.

Q.   All right.  Now, Meier had a job for a while at Richmond Hill; didn't he?

A.   Yes.  We worked with the city.

Q.   All right.  Your son has been in jail for a year now; hadn't he?

A.   Right at about it.  Right, half a year.

Q.   How many have you gone to see him?

A.   I went to see him once time.  Because I don't drive none.  I don't have a way to get around.

Q.   You live out where?  You live in Richmond Hill?

A.   I live on 17 South, Richmond Hill.  This side of Liberty and Bryan.

Q.   You also stay with your daughter Beverly Bonaparte in Pooler?

A.   Yes.  I go around with her.  Yeah.  I be with them every weekend.

Q.   All right.  And that's just a few miles from the Chatham County Jail; isn't it.

A.   Yeah.

        MR. BELL:  That's all we have.

MR. NEWMAN:  No questions.

MR. DARDEN:  You may step down.

[NOTE:  Witness left the stand.]

THE COURT:  He may remain in the courtroom.

MR. BELL:  Ms. Andrews.

CLERK:  For the record, please state your name and your occupation.

WITNESS:  Alexis Andrews, retired from Liberty County Sheriff's Department.

**ALEXIS ANDREWS**, after having been duly sworn, and called as a witness by the defense, testifies as follows.

**DIRECT EXAMINATION**

BY MR. BELL:

Q.   Ms. Andrews, my name is William Bell.  You and I have met a time or two; haven't we?

A.   Correct.

Q.   All right.  Where do you -- what city do you presently live?  Is that Hinesville?

A.   Hinesville, Georgia.

Q.   All right.  And I'm going to go back in time.  Okay. I'm going to ask you when you were -- in years passed, did you ever live in Fleming, Georgia?

A.   Yes, I did.

Q.   Can you explain to the jury where it was that you

lived?

A.    I lived across the street or across the way from the Morgan family.

Q.    Okay.  Would I be correct in saying that if this was Meier's mother's trailer here, that you lived over here?

A.    That is correct, sir.

Q.    All right.  How long did you live there?

A.    About twelve or thirteen years, maybe longer.

Q.    All right.  Did you know of Meier Brown when he was a child?

A.    Well, I knew of him.

Q.    Okay.  Y'all were neighbors; correct?

A.    Well, in a way of speaking, yes.

Q.    All right.  You were certainly aware -- did you know his mother, Sadie Brown?

A.    Yes, I did.

Q.    Did you become well aware of Sadie Brown and her residence there on Leroy Coffer Highway?

A.    Yes, I did.

Q.    Can you tell the jury -- and by the way, this period of time when you lived out there, how many years ago was that?

A.    Oh, about twelve, thirteen or maybe longer.

Q.    All right.  And you lived there for how many years?

A.    Oh, about, about thirty or fourteen years, maybe

longer than that.

Q. All right. So, you lived there when he was a young child; correct?

A. That is correct, sir.

Q. All right. Tell us what it was like at the Sadie Brown's trailer, what knowledge do you have of that?

A. Well, let me put it to you like this. It was a lot of bad activities going on over in the Morgan area, at Ms. Sadie's in a manner. Okay. There was a lot of fights, and a lot of misbehavior, things going on like drinking, fighting, drugs and the lot of misbehavior going on. All kinds of weird activities.

Q. And this was when he was a child?

A. When he was a younger adult or a young kid.

Q. Was there any shootings or shots being fired over there?

A. Yes. There has been shots fired numerous of times.

Q. All right. Coming from where this man grew up?

A. Yeah, from that area.

Q. Are you aware of any stabbings?

A. Yes. I'm aware of stabbings.

Q. A child drowning in the septic tank?

A. Correct.

Q. You know about the scaldings? If you don't, that's okay?

A.    No, I don't.

Q.    How often would it be that the police would be over there at Sadie's trailer when Meier was a young boy?

A.    I will say it like this.  In that area, there has been the Sheriff's Department coming over with quite frequency in that area.

Q.    Now, did you go to the church that is there by the trailer?

A.    No, I did not.  But my grandmother, which was 100 years old or older and which my sister is a mute, they attended that church quite frequency.

Q.    Did you know Sadie Brown much at all?

A.    Yes, I did.

Q.    Can you tell the jurors about how long ago it was when Sadie starting taking sick?

A.    Well, I move out of the area, but I knew she was very ill.

Q.    Do you know Pelham Brown, the man who just testified, Meier's father?

A.    Yes, I did.

Q.    Did he stay -- did he see him much in Fleming after he left out of there?

A.    No, I did not.

Q.    Okay.  Were you aware that he shot Meier's brother in the trailer?

A.    I was aware of that.

Q.    Have there been a number of things of that ilk that have gone over there?

A.    There's been many things that has been going on.

Q.    Can you share with these people some of the type of things that have gone on there?

A.    It was a lot of times there was a lot of unpredictable misbehavior, things that was going on over there.  And when I'm saying, not Sadie Brown, but in that family, neighborhood, that area that was going on there.

Q.    You and your family sometimes used to sit out on the porch; didn't you?

A.    Yes.  Because my grandmother and my sister used to sit out on the porch.  And that was one of my reasons why I moved my family from that area.  Because I used to be really worried about them a lot.  Because, where I was working, I used to call to check on them all the time, because I was getting home very late at night.  And I was concerned about my grandmother, which was 100 years old at that time, and my sister, which was a mute, and she still is.  My grandmother is deceased.

And, you know, it was hard.  And my grandmother was the type of person that loved to work out in her garden.  So, I was really concerned about it, you know.

Q.   So, you moved away to get away from that?

A.   Well, correct.

Q.   What kind of things would you hear sitting on the porch with your family?

A.   A lot of cursing, loud noise, music, things in that sort.

Q.   Gunshots?

A.   Oh, yes.

Q.   That was not an unusual occurrence to be coming from the Morgan's place?

A.   No.

Q.   I think you told me that you guys worried about a ball, meaning a bullet coming your way?

A.   Naturally, I was.

Q.   What was -- I know he was a young child back then, but when he was a young child, what was he like?  What was Meier like?

A.   He always was mannerful to us, to my family.  And he would always speaks when he passes by.  One thing for sure, I would say with the Morgan kids or the family, when they passed by Ms. Annie Niley, it would always be on the right hand side.  Correction.  They would always walk on the left hand side, which we were living on the right hand side.  But when they were coming by Ms. Annie Niley's house, they would all be on the left hand side, when they

passed by.

But they always, when they see her on the porch, that was the first thing they would do is say, "hi, Ms. Annie," or whoever was on the porch.  And they keep walking by.

Q.   Would it be fair to describe the environment -- did Meier grow up in the normal environment?

A.   Not really.

Q.   Would it be fair to describe it as chaotic?

A.   It was a bad chaotic, very bad.

Q.   What were the living conditions there?

A.   It was very poor.

Q.   And what do you mean by that?

A.   It was a lot of kids living and the lot of family living will.  And they have had to live with whatever they had, because, you know, it was -- they didn't have that much.  And they had to try to do with whatever they could make with, whatever they had, and do with whatever they had with the living conditions and everything.

Q.   Did you get the feeling that Ms. Sadie was actively raising these kids?

A.   Well, she did all she could.  And she tried.

Q.   Essentially did these kids kind of a raise themselves?

A.   In a way of speaking, yes.

Q.   Did you ever call the police to go to the Morgan

compound?

A.    Yeah, it has been times that they have an aunt that has came over to my house.  And, yes.  There were times that I had to call for her because she was so upset.  Yes.

Q.    Okay.  Because of what was going on over there?

A.    Yes.

Q.    What was going on over there?

A.    Fighting and stuff like that going on.

Q.    Can you estimate for us how many times you had to call the police yourself?

A.    Oh, my God.  No, I can't.  But it was numerous of times.

Q.    Meaning it was a regular occurrence?

A.    Well, it was more than two or three times now.

Q.    Okay.  Now, you said you were retired.  What kind of work did you retire from?

A.    I was the Assistant Jail Administrator.

Q.    And is that the Liberty County jail?

A.    That is correct, sir.

Q.    All right.  And have you -- what was your most, the last position you held before retirement?

A.    That position, as the Assistant Jail Administrator.

Q.    Okay.  How many years did you work at the jail?

A.    30 years.

Q.    Did you ever see Meier go through the Liberty County

jail?

A.    Oh, yes, I have.

Q.    All right.  And would you tell the jurors about that?

A.    He was a very good inmate, as long as he was in our jail.  And not only him, any inmate that came there with -- after being in there for a certain length of time, and they had a good attitude, and a good disposition, a very clean inmate, and if we need a trustee, whoever it was, didn't care about the color, race, creed or ethical, whatever, we would pull a trustee out.

      And it happened so one day he was one of a trustees we pulled out.

Q.    Do you have to be -- I mean, what does it take to be -- do you just chose anybody to be a trustee?

A.    No, sir.

Q.    All right.  What does it take to be selected as a trustee?

A.    Number one, he has to be clean, very mannerable.  He has to go through skin tests, and everything, before we take them out to be a trustee, definitely.

Q.    And Meier was selected as trustee?

A.    Yes, he was.

Q.    And how did he perform as a trustee?

A.    A very good trustee.

Q.    All right.  How many contact would you have with him

when he was incarcerated?

A.    I had contacted with him face to face.

Q.    Every day?

A.    Every day.

Q.    Did y'all have a church in the jail?

A.    Oh, yes.

Q.    Tell us did Meier participate in the church activities?

A.    Oh, yes, he did.  Yes.

Q.    Tell the jurors about that?

A.    He was a good singer.  He was real good in his **Bible**. And he knew his **Bible**.  And he would get different, other guys in the cells with him to sing.  And he was a good singer.  I was shocked myself when I heard him singing. But from his family, they are real good singers.

So, I was just like shocked when I would hear him singing.  I'm going like, boy, all of this good singing, and you in this place, what are you -- you know, you are wasting your sometime here.  You know, you should have been out there making money or whatever.

But he was good in singing.

Q.    Did he ever cause any -- ever get in any fights or cause any disciplinary problems?

A.    We had no problems with him.

Q.    Did any of his family ever go through the Liberty

County jail?

A.   Oh, yes.

Q.   Would it be fair to say just about all of them, a lot of the time?

A.   Quite a few of them.

Q.   Brothers?

A.   Yes.

Q.   Cousins?

A.   Oh, yes.

Q.   Did you know Ms. Sadie?

A.   Yes, sir.

THE COURT:  You have already asked her that and she said, yes.

MR. BELL:  Okay.

Q.   What was your reaction when you heard that Meier had been charged in this case?

A.   Shocked.  Very shocked.

MR. BELL:  Thank you, Ma'am.

**CROSS EXAMINATION**

BY MR. FRENTZEN:

Q.   Ms. Andrews?

A.   Yes, sir.

Q.   My name is Will Frentzen.  Ms. Andrews, how did you know Sallie?

A.   Because I once used to live in the area.  And just by

knowing people and by working with the Sheriff's Department.  That's how I knew her.

Q.    Okay.  And we're talking about Sallie Gagila here. You knew Sallie Gagila?

A.    Yes.

Q.    Where did she live in relation to where you lived?

A.    I'm not quite sure where she lived, but I knew her, because I went in the area to visit some of the other families that was living in the area.

Q.    And during the times that you knew Mr. Brown at the Liberty County jail, he was a trustee; right?

A.    That is correct.

Q.    Okay.  Being a trustee is sort of a privilege for the inmates; isn't it?

A.    That is correct.

Q.    Okay.  Does it have any benefits, possible benefits for the inmates if they are seeking parole?

A.    No, sir.

Q.    But it is a privilege for them while they are at a jail.  Is that right?

A.    That is correct.

Q.    Okay.  And it is your belief that Mr. Brown understood right from wrong.  Isn't that right?

A.    That is correct.

Q.    He was able to follow the rules of the prison.  That

is how he got to be a trustee; right?

A.    That is correct.

Q.    He was able to understand the rules?

A.    Yes, sir, because we read the rules out to him.

Q.    And I believe you commented before that you thought he should have been out in the world and able to make some money.  Is that right?

A.    With his singing, that is correct.

MR. FRENTZEN:  Nothing further.

THE COURT:  The witness is excused.  You may step aside.  You may remain in the courtroom or depart.

[NOTE:  Witness left the stand.]

THE COURT:  Call your next witness.

MR. BELL:  Ms. Bonaparte.

CLERK:  For the record, Ma'am, please state your name and your occupation.

WITNESS:  I'm Beverly Bonaparte.  I'm a sister.

Occupation?

COURT REPORTER:  What is your job?

WITNESS:  Okay.  Housewife.

**BEVERLY BONAPARTE**, after having been duly sworn, and called as an witness by the defense, testifies as follows.

**DIRECT EXAMINATION**

BY MR. BELL:

Q.   Beverly, how are you related to Meier?

A.   Sister.

Q.   And how are you guys age wise?  Who is older and who is younger?

A.   Well, I'm older.

Q.   Did you grow up in his household?

A.   Huh-uh.

        THE COURT:  You need to answer.

Q.   Talk a little louder into that microphone?

A.   No.

Q.   Okay.  You and Meier shared the same father?

A.   Yes.

Q.   That Pelham Brown that we heard from earlier?

A.   Yes.

Q.   All right.  Growing up, did you have much contact with Meier?

A.   No, only on holidays and stuff, and he would come visit me.  And when I was small, I used to go to church down there.  And I might see him like that.

Q.   All right.  So, you would see him occasionally as he grew up; correct?

A.   Yeah.

Q.   Did you continue to see him like that throughout the years?

A.   Well, yeah, like on Thanksgiving and Christmas and

things like that.  Because he didn't hardly visit, though.

Q.    All right.  Did you know his mother at all, Sadie Brown?

A.    Yes.

Q.    What was Meier's relationship like with his mother?

A.    Like a mother and son.  To me, he always taken care of her.  He was with her the majority of time.  And usually when I go like to the Social Security board or to the doctor with my husband anywhere, he be there taking her you know to see her doctor or something like that.

Q.    All right.

A.    And I visit with them when she making a doctor visit.

Q.    You are aware of Meier, you know, used to have various jobs; correct?

A.    Uh-uh.

Q.    All right.  Did he ever lose any jobs because of his mother?

A.    I know once he said he had to take her to the doctor. I don't know it was Robert or something.  And when he got back, I think they told him not to come back or something. But it was a couple of jobs that he had to go take her to the doctor and stuff.

Q.    All right.  Did Sadie have do go to dialysis?

A.    Uh-uh.

Q.    You have to say yes or no?

A.   Yes.

Q.   Was that here in Savannah?

A.   It was here in Savannah, and I think in Hinesville.

Q.   All right.  Would Meier transport her to the dialysis?

A.   Uh-uh.

Q.   After he dropped her off -- she would have to be there for a while.  Did he ever come visit you?

A.   When he used to take her to the -- not mostly, he used to come, but when he used to stay like with his brother, I would pick him up from his brother, then he go back to pick her up or whatever.  He will come by and holler at me, and say I've been there for you.  I'll come to see you or something like that.

Q.   All right.  Did -- was one of the jobs that Meier held at McDonald's in Pooler?

A.   Uh-uh.  Yes.

Q.   Did you work close by?

A.   Right in the back of him to the motel.

Q.   And how long approximately did he work at the McDonald's next to where you worked?

A.   To me, about four or five months, most likely.

Q.   Would you ever get to see him?

A.   Mostly every day when he was working.

Q.   Tell the jurors about how you would get to see him?

A.   To work.  Mostly, at lunchtime, he brings me lunch every day and he would sit with me and talk, and ask me how I'm going and what, you know, and how everybody is doing.  So, mostly, I just see him like that until it is time for him to go home.  And he might come back.  Because he get off like two or three o'clock.  And he might still come over there and sit with me until his ride could take him home.

Because he used to get up about five in the morning and catch a ride.  And he would just come sit with me until it is time to go.  And when he get a way, he would come and visit.

Q.   You know Meier has been in trouble in the past; don't you?

A.   Uh-uh.  Yes.

Q.   All right.  And he has been convicted of serious crimes in this case.  You understand what we're here about today; don't you?

A.   Yes.

Q.   Tell me as a person how would you characterize him. I know he has been in the trouble in the past, but how do you view him as a person?

A.   Well, to me he is quiet.  You know, he'll do anything for anybody.  And back when he was growing up, I didn't spend much time with him.  But when he used to go there,

they have to be in church every Sunday.  That is what their family do, make them go to church every Sunday.

So, we -- I used to go down there sometime to his aunt, because she calls us in Savannah, you know, on Sundays.  And when they have little outages and stuff, I just to go down there.  That is how I seen him, because I didn't stay with them.

Q.   Are you aware of any troubling things that would happen in Fleming where Meier grew up?

A.   No.  Like everybody say, you know, say, you know, as far as Meier, I don't -- he didn't hardly give no trouble. He was in trouble with somebody else, you know, because he just -- if you ask him to do like or do that, you know, he ain't gonna tell you no.

Q.   All right.

MR. BELL:  That's all I have.

THE COURT:  The witness may step down.  You are free to leave or to remain in the courtroom.

[NOTE:  Witness left the stand.]

MR. BELL:  Joseph Bonaparte.

CLERK:  Please state your name and your occupation.

WITNESS:  My name is Joseph Bonaparte.

**JOSEPH BONAPARTE,** after having been duly sworn, and called as a witness by the defense, testifies as

follows.

**DIRECT EXAMINATION**

BY MR. BELL:

Q.    Sir, where do you live, what city?

A.    Pooler, Pooler, Georgia.

Q.    All right.  Are you the husband of Beverly who just walked out of the courtroom?

A.    Yes, sir.

Q.    That would make you Meier's brother-in-law?

A.    Brother-in-law, uh-uh.

Q.    You live in Pooler, Georgia; correct?

A.    Yes, sir.

Q.    All right.  How long have you known Meier Brown?

A.    I knowed him about fourteen years.

Q.    Okay.  Was that since he was about fourteen years old?

A.    Yeah, uh-uh.

Q.    And tell me what he is like as a person?

A.    Oh, Meier is a nice person.  He'll do anything for you.  And I ain't know nobody never had any problems with him.

Q.    So, he is a likeable person; correct?

A.    Yes.

Q.    Now, you know he has been in trouble before; right?

A.    Yes, sir.

Q.    Have you ever gone to see him in jail before?

A.    No, I ain't went to see him.

Q.    Have you ever gone to see him in prison or anything?

A.    No.  Huh-uh.

Q.    You know about Meier having jobs and working in the community at times?

A.    Yeah, uh-uh.

Q.    What kind of work would he do?

A.    I know him when he was working in Garden City.  I forgot what the motel name was.

Q.    Okay.  What kind of work did he do there?

A.    I think he was maintenance.

Q.    All right.  You know about -- obviously, you knew Meier's mother?

A.    Yeah, uh-uh.

Q.    Sadie.  She took sick some years ago; right?

A.    Yes, sir.

Q.    Would Meier help take care of his mother?

A.    Oh, yeah.  Oh, yeah.

Q.    Would you tell the jury what kind of relationship he had with his mother?

A.    Oh, he loved his mama.  Yeah, he loved her.

Q.    Were there ever times where he lost jobs because he was taking her to and from doctors?

A.    Yeah, uh-uh, because he had to get off from work and

take her to the doctors, and his boss told him "if you leave, you fired."  So, he told him his mama come first.

Q.   I know you are nervous?

A.   Yeah.

Q.   Listen, these people have an important decision to make.  Tell them what you think of Meier as a person and human being.  I mean, you've known him since he was fourteen years old?

A.   Yes, sir.  Uh-uh.

Q.   Tell them?

A.   Well, Meier is a nice person.  He get along with everybody.  And I ain't never know he give anybody no problems, you know, or nothing like that.  He's not that type of person.

Q.   And you came here today to give him what support you could; didn't you?

A.   Yes, sir.

Q.   When Meier was staying over at his mother's trailer, do you know where he slept?

A.   As far as I know, he slept right there in the room with her.  And I think he was sleeping right there by the floor, because he didn't want to get too far from her.

Q.   Okay.  And that's been from the time he was a child to now?

A.   Yes, sir.

Q.   When he got arrested?

A.   Uh-uh.

Q.   He slept with his mother?

A.   Yeah.  Uh-uh.

MR. BELL:  That's all I have.

**CROSS EXAMINATION**

BY MR. NEWMAN:

Q.   Mr. Bonaparte, did Meier ever tell you about the robbery he pulled down in the Midway area in '96?

A.   No, sir.  We didn't never talk about that.

Q.   So, he didn't tell you about jumping on the German woman working behind the desk and grabbing her around the mouth, so his buddies could empty out the till?

A.   No, sir.

Q.   And do you know any of the facts of this case here?

A.   Any of the facts?

Q.   Yes, sir.

A.   How you mean by facts?

Q.   What happened November 30th?

A.   I just knowed what they said.  I don't know too much about that.

Q.   And what do you understand is what they said happened?

A.   They say Meier went down there, but ain't nobody -- you know, that about all I know.

Q.   That he went down there and what?

A.   And he came back.

Q.   And he came back?

A.   Yeah.

Q.   Did anybody happen between the time he went there and the time he came back?

A.   No, sir, not as far as I know.

Q.   Not as far as you know?

A.   Yeah.

Q.   Come on down?

A.   Okay.

        MR. BELL:  I just have one question.  I think there is some confusion.

**REDIRECT EXAMINATION**

BY MR. BELL:

Q.   You know he has been convicted -- charged and convicted of murder; right?

A.   Yes, sir.  Uh-uh.

        THE COURT:  Does the jury need a recess?

        JUROR:  Yes.

        THE COURT:  Marshal, let's take fifteen minutes.

        MARSHAL:  All rise.

              [Brief Recess.]

        MARSHAL:  This Court is back in session.  Be seated and come to order.

THE COURT:  You may proceed.

CLERK:  For the record, please state your name and occupation, sir.

WITNESS:  My name is John T. Wilcher.  I'm a Major with the Chatham County Sheriff's Department, and Assistant Jail administrator.

**JOHN T. WILCHER**, after having been duly sworn, and called as a witness by the defense, testifies as follows.

**DIRECT EXAMINATION**

BY MR. BELL:

Q.   Major, do you have inmate by the name of Meier Jason Brown?

A.   Yes, sir, I'm housing one for the U.S. Marshal, sir.

Q.   Can you tell me the time period when you have housed Meier Jason Brown?

A.   He first came to our jail on 9/10 of '02 from the Pooler Police Department on some misdemeanor traffic charges, bonded out.  And came back on 12/6 of '02, and brought in by the U.S. Marshals.  Stayed there until 7/29 of '03.  Was discharged, and he was returned on 9/26/03 by the U.S. Marshals, sir.

Q.   Has he ever engaged in any acts of violence during the time he has been housed by the Chatham County jail?

A.   None in my jail, sir.

Q.   Any disciplinary problems whatsoever?

A.   None in my jail, sir.

MR. BELL:  That's all I have.

MR. NEWMAN:  No question.

MR. BELL:  Thank you, Major.

[NOTE:  Witness left the stand.]

THE COURT:  Call your next witness.

CLERK:  For the record, please state your name and your occupation.

WITNESS:  My name is Linda Jones.  I'm a teacher at Bradwell Institute.

**LINDA JONES**, after having been duly sworn and called as a witness by the defense, testifies as follows.

**DIRECT EXAMINATION**

BY MR. BELL:

Q.   How long have you been employed as a teacher at Bradwell?

A.   Twenty-seven years.

Q.   Do you know my client, Meier Jason Brown?

A.   Yes, I do.

Q.   Could you explain to the jurors how you know Meier Jason Brown?

A.   I had Jason in my English class in 1984 and '85, and '85 and '86.

Q.   That would have been what grade for him?

A.    Ninth grade.

Q.    How old are people in the ninth grade when they start it the first time?

A.    Fourteen, some fifteen.

Q.    Can you describe the course of his going through school as far as you had contact with him?

A.    Well, he was a well mannered young man.  He had difficulty in learning the first year.  He failed all of his subjects.  The next year, he passed all of them, I think, except one.

Well, the first year, he passed one.  He passed science, Mr. Cole.  But he had missed too many days.  And so, I had called the parent, and I had talked -- tried to talk with the parent.  And I had sent home on the report card "parent conference requested".  And I had done everything I could do contact the parent.  Finally, I got the mother one evening.  And she told me she would do what she could, you know, to help him.  She would talk to him.

But he wasn't going to get credit for his courses.  So, I asked the chairman of the attendance committee if I could sit in as his parent.  Of course, that had never been done before.  But I've been known for doing stuff like that.

And they allowed me to stand in as his parent.  And he got credit for his courses.

Q.   Why wasn't his parents there?

A.   I don't know.  Because I never saw his parents.

Q.   They never showed enough interest to come in?

A.   No, sir.

Q.   Did they ever show enough interest to respond to any of those notes?

A.   No, sir.

Q.   And you finally succeeded in contacting her one time; right?

A.   One time.

Q.   What was he like as a person, as a young -- as a child of that age?

A.   Well, he was kind of a little scrony fellow, never was big.  But he was always polite.  You know, he came in tardy a couple of times for class after break.  And I kept him in for detention.  He stayed.  And I think maybe he might have even gotten suspended, not by me, but a couple of days during that second term that caused some of those absences.  But he never gave me any problem.  I never had any problem with him.

Q.   Are you aware of a fire at his house one time?

A.   Yes.  I didn't know about it.  I noticed that he had missed three days right before the attendance hearing. And I always ask the kids do you know what is wrong.  They know more than we do anyway about what is going on.  So,

they told me that Jason's house had burned.  And when he came back, I asked him.  And he said, yes.  That caused him to go over those numbers of days that he had for attendance.

Q.   I'm reading here that you got the impression that he was sad what that he had no one.  What did you mean by that?

A.   Well, sometimes he would sit in class and he wouldn't say very much.  I mean, you know, he was sort of -- he stayed to himself.  You have to watch that quiet student just as much as you have to watch the other students, because they don't say anything.  And you never know what is wrong or what they're thinking or anything.

But he never bothered anybody.

Q.   What was your reaction when you heard he was charged with robbery and murder?

A.   I felt to myself that he must have let an awful lot of anger out at that time that he had pinned up from all those years to do something like that.

As a ninth grader, I never imagined that he would ever do anything like that.

MR. BELL:  That's all I have.

**CROSS EXAMINATION**

BY MR. FRENTZEN:

Q.   Ms. Jones, is that right?

A.    Yes.

Q.    Ms. Jones, are you aware that Mr. Brown was tested to have a 113 IQ?

A.    No, sir.  That was not his permanent record stated.

Q.    What did that state?

A.    Your Honor, am I allowed to tell it?

        THE COURT:  Sure.  Tell him.

A.    When I looked at it, it had a 99.

Q.    Okay.  How does that -- how does a 99 --

A.    That is average.

Q.    Were you aware that later on he was tested to have a 113 IQ?

A.    No, I'm not.

Q.    And I believe you said he left your -- you were no longer his instructor after about '85.  Is that right?

A.    Correct.

Q.    Okay.  Did you keep track of him and his activities after he graduated from school?

A.    No.  I taught over in the H wing.  And that's kind of like away from the rest of the school.  So, I didn't never see him after the tenth grade.

        MR. FRENTZEN:  Nothing further.

        THE COURT:  Ma'am, you are excused.  You may remain in the courtroom; or, you are free to depart.

        WITNESS:  Thank you.

[NOTE:  Witness left the stand.]

MR. BELL:  Ms. Parker.

CLERK:  For the record, Ma'am, please state your fame and your occupation.

WITNESS:  My name is Vanessa Montgomery Parker. And I'm employed by the Liberty County Board of Education, as a school social worker.

**VANESSA MONTGOMERY PARKER,** after having been duly sworn, and called as a witness by the defense, testifies as follows.

**DIRECT EXAMINATION**

BY MR. BELL:

Q.    Do you know my client, Meier Jason Brown?

A.    Yes, I do.

Q.    Could you explain to the jurors how you know Mr. Brown?

A.    I know Mr. Brown because I served him as his school social worker, when he was a student in the Liberty County School System.

Q.    How many years ago was that?

A.    I can't remember just how many.

Q.    A long time, though; wasn't it?

A.    Yeah, a long time ago.

Q.    Approximately 15 years?

A.    Ten or 15, yeah.

Q.   Tell us about how you came to know him through your work?

A.   Okay.  I came to know -- well, we called him Jason. I came to know him through the referral process.  I received a referral from the director of the lead school. And that was referral necessitated my going into the home to visit with his parent and to talk with him at the school.

Q.   Tell us about those visits?

A.   When I went into the home, I talked to his mother, Ms. Sadie.  And we talked about the issues that were before us about the school.  It could have been like transportation on the bus or it could have been some medication or something, you know, of that nature.

Q.   All right.  How did those visits go with her?

A.   They went very well.  She was very, very receptive, wanted to know how she could help and to assure me that she was doing all that she could do to make sure that Jason was successful in school.

Q.   Okay.  Did you ever speak to her in relation to any issues with his medication?

A.   Yes, sir.

Q.   What medication was that?  Do you recall?

A.   I don't recall what it was.

Q.   All right.  Is this medication so that he could

perform at school or something?

A.    Probably so.

Q.    All right.  Do you know what his problem was?

A.    No., no, I didn't know, not particularly.  But there may have been some discipline issues.

Q.    Did you ever go pick up any medication?

A.    Yes, sir, I believe I did.

Q.    Are you the person who insured that he took at school?

A.    No, I'm not the person that insured that he took it at school.  I was just to make sure that it got to the school nurse, so that if he needed, he could take it.

Q.    All right.  Do you know what grade he was in when you had with contact with him?

A.    No, sir, because in the alternative school, they work sort of like on paces.  So, he could have been scheduled for one grade, and may be working on a couple of grades in order to catch up.

Q.    What was your impression of him as a young child?

A.    He was, he was very well mannered, very even tempered young man.  There was a little anger, but it wasn't anger directed at me or at the school officials.  I don't know whether it was his situation or whatever.  But it wasn't a very overt kind of anger, but it was a tenseness sort of anger.

MR. BELL:  That's all I have.

MR. FRENTZEN:  No questions, Your Honor.

THE COURT:  You are excused, Ma'am.  You are free to remain; or, you may depart.

WITNESS:  Thank you.

[NOTE:  Witness left the stand.]

MR. BELL:  Ms. Morgan.

CLERK:  For the record, Ma'am, please state your name and occupation.

WITNESS:  Patricia Morgan, homemaker.

**PATRICIA MORGAN,** after having been duly sworn, and called as a witness by the defense, testifies as follows.

**DIRECT EXAMINATION**

BY MR. BELL:

Q.   Ma'am, do you know my client Meier Jason Brown?

A.   Yes, I do.

Q.   Are you related to him by blood or marriage?

A.   Yes, by marriage.

Q.   Tell us about that?

A.   I am married to his brother.

Q.   All right.  What is his brother's name?

A.   Carlton Morgan.

Q.   How long have you known Meier?

A.   Probably about six years.

Q.    Where did you first come to know him?

A.    In Atlanta, Georgia.

Q.    All right.  How did you meet him there?

A.    He came to stay with one of his brothers who was working at the property where I lived in the apartments where I lived.

Q.    Okay.  Did he get a job there?

A.    Yes.

Q.    What kind of work did he do?

A.    He worked for a friend of mine who owns a motor shop. And he was a mechanic for him.

Q.    All right.  What was he like when you met him up in Atlanta?

A.    Jason?

Q.    Yes.

A.    He was very sweet, very good natured, very down to earth, very funny.

Q.    How long did he stay up there?

A.    I think probably six to eight months.

Q.    All right.  Do you know what caused him to move back to Fleming?

A.    I believe he missed his mother and his family.

Q.    I take you've been to Fleming?

A.    Yes.

Q.    And I take it you've spent some time in Sadie's

trailer; correct?

A.   Yes.

Q.   You presently live in Orlando; correct?

A.   Yes, I do.

Q.   Did you stop off there and live there for the short time, moving from Atlanta to Orlando?

A.   Yes, for about two to three months.

Q.   Can you give the jury an idea of what life was like at that location?

A.   Well, for me, it was hard.  It was harder like for me, because I'm not originally from there.  And it was just -- there was not very much to do there.  You were just -- and if you don't have a car, you're sort of just stuck there.  But there's a lot of relatives that live on the same property.

But there's not very much to do there.  It is very hard to get around.  It's very hard like if you need to go to the store, to get to the store or sort of like get basic needs and stuff.  If you don't have transportation to get there.  There is not very much to do.  It's really not much to do.

Q.   Well, I mean, what was life like in the house itself?  How did people interact with each other?

A.   Well, some people interacted okay.  But some people did not interact okay.  You could have times -- there were

times where everything was peaceful. And then in a moment, you know, somebody is yelling at you, or screaming at you, and wanting to gut you.

So, it was kind of hard.

Q. Did you ever have any problems or see any violence out of him, out of Jason?

A. No, I never ever, since I've known Jason, had a problem with Jason, never.

Q. But would be it fair to say the atmosphere was chaotic and violent?

A. It could be. At times it could be.

Q. All right. Let me show you what we've marked as Defendant's No. 1. Can you describe who is shown in that picture?

A. Jason Morgan.

Q. I believe you are the one that provided me with that photograph. Is that correct?

A. Yes.

Q. All right. And does that show him as a young child?

A. Yes.

Q. And is that at Easter?

A. I believe so. Yes.

Q. Let me show you what we've marked as Defendant's 2. What does that photograph depict?

A. This is a picture of Jason and Gayle. And Gayle is

the person that used to date his brother.

Q.   Which brother is that?

A.   Nida Morgan.

Q.   Is he still living?

A.   No.

Q.   And let me show you what we've marked as 3.  What does that show?

A.   This is one time that Jason, and I, and Dexter, his brother and my nephew, and a few other relatives went to Six Flags.  And so, they're on the train riding in the kiddie area.  We're taking my nephew on the little truck. It looks like a train.

Q.   Okay.

        MR. BELL:  Permission to publish these to the jury.

        THE COURT:  Sure.

        MR. BELL:  Judge, can I just hand them.

        THE COURT:  Sure.

        MR. BELL:  Okay.

Q.   You understand the reason we're here today is because he was charged and has been convicted of robbery and murder.  Is that correct?

A.   Yes, I do.

Q.   All right.  Can you sum up for us -- and you know he has been in some trouble with the law in the past;

correct?

A.    Yes.

Q.    Can you sum up with this that despite your feelings and thoughts about him as a person?

A.    I just really know him to be a true person, a true and good hearted person.  I know that he cared deeply about his mother.  And I know that he cares deeply about his family.

You know, every time I have spoken to him he has just been so good natured and sweet, and down to earth, and he always asked about how I'm doing or how my kids are doing, my children are doing.  And I just know him to be just a very good hearted person.  You know, so much to the fact that I just even, you know, I listed him on my emergency card if something happened you know, as far as putting him -- so that he could keep my children until my mom could come, because out of, you know, all of my husband's brothers, he's just up, sweet and a down-to-earth person.

And you know, he is asking for things, to borrow things or whatever, and I never really told him, yes to anything.  But he always, he's always taking with a grain of salt and with humor.  And so, I loved that about him, because he's always very loving and caring about you and your situation, or, you know, people and their situation.

Q.    Would it be fair to say that of your husband's

brothers, he's the favorite?

A.    Yes.  We even wanted to put him in our wedding.  He just couldn't get there to get, you know, the things.  But we wanted him in our wedding.  He's -- yes.  He's my favorite, and he's also my husband's favorite.

Q.    What city did you get married in?

A.    In St. Augustine, Georgia.

Q.    And how many years --

A.    I mean, Florida.

Q.    -- ago was that?

A.    Three years.

Q.    Did Sadie come?

A.    Yes, she did.

Q.    Meier come with her?

A.    Yes, he did.

Q.    Can you tell me what role they played?

A.    We're Catholic, and so the mother is life, the unity candle.  And he was the one that was responsible for making sure, because his mother was in the wheelchair.  So, he made sure that she -- he pushed her to take her up onto where we got married, like the little platform.  And he pushed her up so she could do her role.

And also, he also stood so that she could hold on so she could be a part of like photos and everything else that she needed to be a part of.  Basically, he was caring

for her, you know, so that she could be a part in our wedding also.

MR. BELL:  That's all I have.

**CROSS EXAMINATION**

BY MR. NEWMAN:

Q.    You say, Ms. Morgan, you got married three years ago?

A.    Yes.

Q.    How long were you going with Carlton before you got married?

A.    About three and a half years.

Q.    So, some of those photos that have been handed around, you didn't even know Jason when they were taken. Isn't that right?

A.    Some of the photos -- excuse me?  Say again.

Q.    That were just being shown to the jury, did you know Jason at the time those photos were taken?

A.    Not all of them.  Not when he was a child, the photo from when he was a child, no.

Q.    Did you ever know Jason to be called by any other name besides Jason?

A.    Yes.

Q.    And what name would that be?

A.    Meier.

Q.    And your husband, Carlton, is he a half brother, quarter brother, or a whole brother to Jason?

A.   He would be a half brother.

Q.   All right.  Did he grow up in the trailer with Ms. Sadie?

A.   Did my husband grow up in the trailer?

Q.   Yes, ma'am.

A.   He grew up I think half the time with his other grandmother, his grandmother.

Q.   All right.  Where did he go to school?

A.   Bradwell Institute.

Q.   How far did he go in school?

A.   To what grade?

Q.   Yes, ma'am.

A.   Twelfth.

Q.   What did he do after high school?

A.   Well, when I met him, he was doing maintenance.  He did maintenance up until I met him.

Q.   Where was that?

A.   Where did I meet him doing maintenance?

Q.   Yes.

A.   In Atlanta.

Q.   You know reside with your house in Orlando?

A.   Yes.

Q.   What type of work does he could there?

A.   He does maintenance.

Q.   And in Atlanta, how many different jobs did he have

in Atlanta while you were with him?

A.    He only had -- he did maintenance for two different properties, but it was a same company.

Q.    All right.

A.    And then after that, he worked at a store, and that was it.

Q.    Has your husband ever been arrested for forgery?

A.    He has been arrested for forgery, yes.

Q.    Was it with Jason?  Did it involve Jason?

A.    No.

Q.    Your husband has never been arrested for robbery; has he?

A.    No.

Q.    How old are your children?

A.    I have a three-year old, and a new born, three weeks old.

Q.    Prior to last Thanksgiving, can you remember when it was before that you last previously saw Jason?

A.    Okay.  The time I'm thinking that I saw him would be with his mother.  We came for a visit.  And I had my daughter.  I don't believe I was pregnant yet.  So, I had my daughter and his mother was staying -- it was the time that his mother was staying with her other son, Glenn. And that's when I saw Jason.  He was there.

MR. NEWMAN:  Nothing further.

THE COURT:  You may step down.  You are excused.

WITNESS:  Thank you.

[NOTE:  Witness left the stand.]

MR. DARDEN:  Steve Murray.

CLERK:  For the record, sir, state your name and your occupation.

WITNESS:  I'm Steve Murray, and I'm manager at McDonald's.

**STEVE MURRAY**, after having been duly sworn, and called as a witness by the defense, testifies as follows.

**DIRECT EXAMINATION**

BY MR. DARDEN:

Q.   Mr. Murray, how long have you been employed at McDonald's?

A.   Since '98.

Q.   You indicated you are a manager?

A.   Uh-uh.

Q.   Do you know the defendant in this case, Meier Jason Brown?

A.   Yes, sir.

Q.   You understand that he has been convicted of murder in this case; do you not?

A.   Yes, sir.

Q.   Let me ask you this.  Did he work for you at one time?

A.  Yes, sir.

Q.  For how long?

A.  About eight months.

Q.  About eight months.  What location was that?

A.  The Pooler store.

Q.  Okay.  What was his responsibility?

A.  He was the maintenance man.

Q.  Okay.  What time would he come in, in the morning?

A.  5:00 a.m.

Q.  What time did he get off?

A.  About 1:00 o'clock.

Q.  Was he a dependable worker?

A.  Yeah.

Q.  Always showed up.  Was he a good worker?

A.  Yeah.

Q.  Do you know the circumstances of why he left his employment?

A.  I believe it was he had no transportation or there was a transportation problem.

Q.  He wasn't fired or anything like that?

A.  No, no.

Q.  Because you indicated he was dependable.  Was he nice to customers?

A.  Yes, actually he was very nice.

Q.  What was your reaction when you heard that he had

been charged with these crimes?

A.    Shocked.  I was shocked.

Q.    Was the Jason that you knew?

A.    No.

MR. DARDEN:  Thank you.  That's all I have.

MR. FRENTZEN:  No questions, Your Honor.

THE COURT:  You are excused.

[NOTE:  Witness left the stand.]

MR. DARDEN:  Elder Williams.

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  Sir?

MR. DARDEN:  Your name, sir.

WITNESS:  What name?  My name is Williams, Davis Williams, Pembroke, Georgia.

**DAVIS WILLIAMS**, after having been duly sworn, and called as a witness by the defense testifies as follows.

**DIRECT EXAMINATION**

BY MR. DARDEN:

Q.    Mr. Williams.

A.    Yes, sir.

Q.    Face me, sir.  Face me.  Turn your chair around.  All the way around.

A.    Thank you.

Q.   Mr. Williams, do you know Meier Brown?

A.   I know of him, yes.

Q.   How long have you known him?

A.   Not too overly long.  I known him around the church.

Q.   All right, sir.

A.   Come in at the church.

Q.   What church is that?

A.   St. Paul's Baptist Church in Fleming.

Q.   Okay.  Does he attend that church?

A.   He attended it some.

Q.   Did you know his mom, Sadie?

A.   Yes, sir.  Yes, sir.

Q.   How well did you know her?

A.   I know her from a young missy girl up until this day of her death.

Q.   Okay.  And I believe she just recently died back in the summer.  Is that correct?

A.   Sir?  Yes.

Q.   Okay.  Would Meier come to church with her?

A.   He had brought his mother.  She wasn't able to walk, and he attend and bring his mother in several different times.

Q.   Okay.  So, he would bring her to church occasionally. Is that correct?

A.   Yes, sir.  Yes, sir.

Q.    Did any of the other boys ever bring her to church?

A.    I never did see none of the others bring her.  But mostly, I seen him.

Q.    Okay.  What was your impression of Meier?

A.    What?

Q.    What did you think of him?  I mean --

A.    I think that he was a well-trained child, and a humble child to me.

Q.    Did he always have good manners towards his elders?

A.    Yes, sir, the way I heard tell or any way, I would see him and he didn't see me, and he was walking very respectable.

Q.    You didn't ever see him misbehaving in church or anything like that?

A.    Never did.  No, sir, never did.

Q.    And you said his mama was in bad health and he would bring her to church.  Is that correct?

A.    Yes, sir.  Yes, sir.

            MR. DARDEN:  Thank you.  That's all I have.

            MR. FRENTZEN:  No questions.

            THE COURT:  Help him down.

                        [NOTE:  Witness left the stand.]

            THE COURT:  May I see counsel at side bar?

                        [NOTE:  Sidebar Conference.]

            THE COURT:  How much more --

MR. DARDEN:  Fifteen, twenty more minutes, that's it.

THE COURT:  Okay.  You are going over and over on this type --

MR. DARDEN:  Well, that may be.

THE COURT:  Let me tell you this.  I will allow you to do so.  But don't give  me any smart answer.

MR. DARDEN:  Judge, I'm not, and I apologize.

THE COURT:  I said don't.

MR. DARDEN:  Yes, sir.

THE COURT:  I will let you do it.  But this is so repetitious.

Okay.  You've both got my instructions.  I want you to look at them.

MR. NEWMAN:  Yes, sir.

THE COURT:  How long do you want for closing arguments?

MR. NEWMAN:  Twenty.

THE COURT:  How much for the defendant?

MR. DARDEN:  Closing, sir?

THE COURT:  Yes.

MR. DARDEN:  Probably about 20 or 25 minutes.

THE COURT:  That is most reasonable.  I will give you 30 and you get 30.

MR. FRENTZEN:  We're going to split it.

THE COURT:  All right.

[NOTE:  Sidebar Conference Concluded.]

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  My name is, sir, Paster B. T. Smith.

**B. T. SMITH**, after having been duly sworn, and called as a witness by the defense testifies as follows.

**DIRECT EXAMINATION**

BY MR. DARDEN:

Q.    Reverend Smith, do you know Jason Meier -- Meier Jason Brown?

A.    Yes, I do.

Q.    How long have you known him?

A.    All his life.

Q.    How do you know him?

A.    Well, I know him through by the family, and then I married in the family.

Q.    All right, sir.  You knew his mom as well.  Is that correct, Ms. Sadie?

A.    His mother was not one of my best members.

Q.    All right, sir.  You understand that he has been convicted of a murder in this case.  Do you understand that?

A.    Yes, I heard.

Q.    Of Ms. Sallie over at the Post Office?

A.    Right.

Q.    You know that.  Is that correct?

A.    Know what?

Q.    You are aware of that; are you not?

A.    Right.  I'm aware of that.

Q.    All right, sir.  And you indicated that notwithstanding that you wanted to come and just say a few words on his behalf.  Is that correct?

A.    Right.  Right.

Q.    What would you like to say?

A.    Who I be talking to?  You?

Q.    Yes, sir.  All of us?

A.    The jury, too?

Q.    Yes, sir.

A.    Thank you.  Well, I would like to say that as I say, I've been knowing this family for a long time.  I ain't go back to his great grandfather, Reverend Harley and Sister Mary Harley.  When I started preaching 43 years ago, I used to go out there to her house and Sister Bernice Morgan was my -- that was their father.  And that was my mother-in-law.  She raised those children.

      And ain't no doubts about it.  In my heart, she raised them, and they was all raised up in the church. They was God-fearing people down there.  And they still

is. Very, very, very, God-fearing people. And I've been down there going on 15 years.

I know I have run several revivals down there. Fine people. And I would like as to that in my heart and to the Judge and to all of you. And I've got to meet justice when I go before God, that if you find it in your heart, spare his life.

MR. DARDEN: Thank you, sir. That's all I have.

THE COURT: Any questions.

MR. FRENTZEN: No questions.

THE COURT: You may step aside. You are free to remain in the courtroom or leave.

[NOTE: Witness left the stand.]

MR. DARDEN: Mr. Wainwright.

CLERK: For the record, sir, please state your name and your occupation.

WITNESS: Jimmy Wainwright. I'm a subcontractor.

**JIMMY WAINWRIGHT**, after having been duly sworn, and called as witness by the defense, testifies as follows.

**DIRECT EXAMINATION**

BY MR. DARDEN:

Q. Mr. Wainwright, where do you reside?

A. Fleming, Georgia.

Q. Okay. Do you know the defendant in this case, Meier Jason Brown?

A. Yes, sir, I do.

Q. How long have you known him?

A. Since he was about fifteen years old, sir.

Q. All right. Do you live what is known as a Morgan compound down there?

A. Yes, sir.

Q. So, you knew him growing up?

A. Yes, sir.

Q. Let me ask you this. Tell the jury what you know about that Morgan compound and what you have seen going on down there?

A. Well, at least every weekend something, either arguing, fighting, shooting, stabbing. It is a crack house.

Q. Have you seen people using drugs down there?

A. Oh, yes, sir.

Q. Who have you seen using drugs?

A. Everyone there, basically, except the older people.

Q. Except the older people?

A. Yes, sir.

Q. Do you know his daddy, Pelham?

A. Yes, sir, I do.

Q. How well do you know him?

A.    I know him very well.

Q.    Have you ever seen him use drugs?

A.    Yes, I have.

Q.    In the presence of the defendant?

A.    Yes, sir, I have.

Q.    What type of drugs?

A.    Crack cocaine.

Q.    Have you seen Meier use drugs?

A.    Yes, sir, I have.

Q.    Okay.  Well, let me ask you this.  Did you go down there to buy drugs or what?

A.    No, sir.  I was just -- we was mutual friends.  He worked for me, and I was there -- we were friends.  We used to drink together.  And he sometimes would ride around with me and go fishing.

Q.    What type of business are you in?

A.    Framing houses.

Q.    And he works for you on occasion?

A.    Me and him worked together for about nine years.

Q.    Okay.  You hired him?

A.    Yes, sir.

Q.    Okay.  Was he a good worker?

A.    Yes, sir, he was.

Q.    Was he always calling you asking for work?

A.    Yes, sir, on a regular basis.  If we got slack, he

would be the first one to call to see when we're going back to work.

Q.   Was he dependable?

A.   Yes, sir, he was.

Q.   And the dealings you had with him, was he honest?

A.   Yes, sir, he was.

Q.   You trusted him to do a good job?

A.   Yes, sir.

Q.   Did he ever complain?

A.   No, sir.

Q.   How about on Friday when you didn't make parole, did he complain then?

A.   No, sir.  We've had problems not having our quota done by Wednesday, so, we wouldn't get our draws on Friday.  Well, everybody would show up at my house, I would have sometimes ten or fifteen people sitting there arguing, screaming, cussing, you know, I'm going to do this and that.  Meier would be the first one, the first one to say, "Jimmy, I'll see you Monday, Buddy.  I know we'll get it straight."

Q.   What did you -- what was your reaction when you heard that he had been charged with this crime?

A.   I felt like somebody set him up.  I mean, I just couldn't -- unbelieve.  Never a belief in my mind that he could so it.

Q.   You realized he has been convicted of it?

A.   Yes, sir, I do.

Q.   And notwithstanding that, you wanted to come in and say a few words on his behalf.  Is that right?

A.   Yes, sir.

MR. DARDEN:  That's all I have.  Thank you.

**CROSS EXAMINATION**

BY MR. NEWMAN:

Q.   Mr. Wainwright, do you attend church down in the Fleming area?

A.   Yes, I do.

Q.   And how old are you, sir?

A.   38.

Q.   And how long have you operated this framing, constructing, contracting business?

A.   For myself, six years.

Q.   Yes, sir.  And how does a person who is only 38 years old manage to have a 15-page criminal history sheet, Mr. Wainwright?

A.   Because I was a bad alcoholic.  I've had several DUIs, and I've been arrested several times for my temper.

Q.   Yes, sir.  Were you drunk when you bit the man's ear off?

A.   I don't know what you're talking about.  I ain't never bit nobody's ear off.

Q.    Was it a piece of his lip?

A.    I don't know what you're talking about.  I ain't never bit nobody's lip off.

Q.    So, then you deny you were convicted of aggravated battery?

A.    No, I didn't say that.

Q.    So, you are admit that you were convicted of aggravated battery?

A.    Yes, sir, I have been.

Q.    What part of the man's head was it that you bit off?

A.    I didn't bit off no man's head.  I've bit people.

Q.    You've bitten people?

A.    A guy I got in the fight with, I bit him.  But nothing came off of his head.  His ears, nose, and his lips, nothing.

Q.    Well, what kind of miscarriage of justice resulted in your being convicted of aggravated battery?

A.    Sir?

Q.    How was it that you got convicted of aggravated battery?

A.    Because I said I done it.  I didn't lie.

Q.    And how bad was this other party at end of your little setto with him?

A.    Excuse me?

Q.    What condition was he in?

A.    He had a bite mark on his cheek.

Q.    A bite mark on his cheek?

A.    Yes, sir.

MR. NEWMAN:  You can come on down.

THE COURT:  The witness is excused.

[NOTE:  Witness left the stand.]

MR. DARDEN:  Dexter Morgan.

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  Dexter Morgan, maintenance supervisor.

**DEXTER MORGAN**, after having been duly sworn, and called as a witness by the defense, testifies as follows.

**DIRECT EXAMINATION**

BY MR. DARDEN:

Q.    Mr. Morgan, where do you live?

A.    I live in Orlando.

Q.    Do you know the defendant, Meier Jason Brown?

A.    Yes, I do.

Q.    He is your brother.  Is that correct?

A.    Yes, he is.

Q.    You indicated that you just wanted to come in and briefly make a statement.  Is that correct?

A.    Yes.

Q.    You may go ahead?

A.    I'm truly sorry for what Meier has been prosecuted

of.  And I'm sure he is.  He's a really loving guy.  I don't know what happened.  I just hope you guys can find it in your hearts to show him some mercy.

MR. DARDEN:  Thank you, sir.  That's all I have.

MR. FRENTZEN:  No question.

THE COURT:  You may step down.

[NOTE:  Witness left the stand.]

MR. DARDEN:  Detective Woodall.  And that's our last witness, Your Honor.

CLERK:  For the record, sir, please state your name and your occupation.

WITNESS:  My name is Charles Woodall.  I'm a Detective with the Liberty County Sheriff's Department.

**CHARLES WOODALL**, after having been duly sworn, and called as a witness by the defense, testifies as follows.

**DIRECT EXAMINATION**

BY MR. DARDEN:

Q.   Detective Woodall, you were one of the investigators on this case.  Is that correct?

A.   Yes, sir.  That is correct.

Q.   And I believe you are the Chuck that Meier was referring to in his confession that he gave.  Is that correct?

A.   Yes, sir.  That's correct.

Q.    And if I'm not mistaken, I believe Meier indicated -- and the reason you came down is because he wanted to talk to you.  Is that correct?

A.    That's true, sir.

Q.    And I believe he wanted to do that because you and he had a prior history, and he knew you.  Is that a fair statement?

A.    Yes, sir.  That's a fair statement.

Q.    How long had you known Meier?

A.    I've known Meier probably eight years.

Q.    About eight years?

A.    Yes, sir.

Q.    Let me ask you this.  Before you came to work as a detective down at Liberty County, what did you do?

A.    I've been with the Sheriff's Department for ten years.  Prior to that, I spent 20 years as a special agent for the Army Criminal Investigation Command.

Q.    All right, sir.  And you have investigated a lot of cases, I guess?

A.    Yes, sir.

Q.    Homicides and otherwise.  Is that correct?

A.    Yes, sir.

Q.    So, you've known Meier about eight years?

A.    About seven or eight years.

Q.    How did you come to know him?

A.    In a professional manner.  We used to have a lot of calls out to the area where Meier lives at.  It is called the Morgan residences.  I got to knowing him through responding to calls out there, and also through some cases that Meier was actually involved in.

Q.    Yes, sir.  About how many -- do you have any estimate of the numbers of times you or other officers responded out to the Morgan Compound over the years that you have known him?

A.    In ten years, I couldn't estimate a guess.  Once a week sometimes.  Sometimes as many as five or ten times a week.  It just depended on what was going on, what time of the year it was.  We were out there a lot.

Q.    What was it like there?  I mean --

A.    An active place.  It's -- even though we called it the Morgan residence, it is a series of residences.  The family owns all the property in that area.  There's a lot of calls for law enforcement.  A lot of times it's just call for services, fights, domestic problems, shootings, stabbings, alcohol, drug sales, robberies.  I mean, there is just a lot of stuff that goes on in that community.

Q.    And that's where he grew up.  Is that correct?

A.    Yes, sir.

Q.    Did you know his mom?

A.    Yes, sir.

Q.    And did you know her to be in bad health?

A.    Yes, sir.

Q.    Were you aware of the type of relationship Meier had with her?

A.    Not particularly as far as their relationship.  Any time I would go out there, I had a respectful relationship with her also.  She treated me decent.  I treated her decent.  And I would see her, I would talk to her.  If I needed Meier or any of the other people, she would assist me in getting to those people up to talk to them.

      As far as her relationship with Meier or specifically about any of the boys, I really can't tell you.

Q.    I assume on occasions you went inside that mobile home; did you not?

A.    Yes, sir, I did.

Q.    What was it like in there?

A.    In a bad state of repair.  She tried to keep it clean.  I don't want -- I don't want to disparage her.  She was a very nice lady.  She tried to keep it clean within her limited capabilities.  Unfortunately, there was a lot of people always coming and going in there.

      One of her sons is disabled.  And he wasn't a lot of help a lot of the times.  I don't want to use the word squaller because it is not quite that bad.  But they lived a very poor life.  But they lived.  I mean, they survived.

Q.    Were you aware of an incident where his sister drowned in the septic tank in the yard?

A.    Yes, sir, I am.

Q.    You are.  As you indicated, you've worked in law enforcement.  I guess you indicated that -- you know the facts of this case; do you not?

A.    Yes, sir, I do.

Q.    And you know Meier?

A.    Yes, sir.

Q.    And you are aware of his background?

A.    Yes, sir.

Q.    And given all of that, you indicated to us that you wanted to come in and say something on his behalf.  Is that correct?

A.    I was asked to come and give my opinion about this case or my thoughts on this case as it pertains to this particular homicide.  Having talking to Meier, and having been familiar with the case and all the facts of the case, I --

          MR. NEWMAN:  Your Honor, we're get into the prohibitive area.

          THE COURT:  I think so, too.  Would you --

BY MR. DARDEN:

Q.    Let me just ask you this.

          THE COURT:  You may go over and talk to him.

MR. DARDEN:  That's okay.

Q.  Let me ask you this.  You took his confession; did you not?

A.  Yes, sir, I did.

Q.  Okay.  And during the confession, it was very obvious that he was remorseful.  Would that be a fair statement?

A.  Yes, sir, I would say that.

Q.  Okay.  In fact, he was sobbing and crying during most of this confession?

A.  Yes, sir, he was.

Q.  And he indicated to you during the confession that he was telling you the truth; correct?

A.  Yes, sir.  He said that.

Q.  You indicated to him "I believe you".  Is that correct?  It's in the statement?

A.  Yes, sir, I did tell him that.

Q.  Okay.

MR. DARDEN:  May I have just one moment?

THE COURT:  Sure.

[Pause.]

MR. DARDEN:  That's all I have.  Thank you.

**CROSS EXAMINATION**

BY MR. NEWMAN:

Q.  Good morning, Detective Woodall, how are you doing?

A.  Fine.

Q.   You worked with our office.  You met with Mr. Frentzen and myself on more than one occasion in connection with this matter.  Isn't that right?

A.   That's true, sir.

Q.   And you've had a long history with Meier Jason Brown; haven't you?

A.   Yes, sir, I have.

Q.   What would you say about his intelligence?

A.   Meier is an intelligent person.  He has a lot of good common sense, what we call street sense.  He is very street smart.  I'm honestly not sure how much formal education he has.  But he's a smart person.

Q.   And could you even estimate how many times in your law enforcement career, you've been face to face and had a face-to-face conversation with Meier?

A.   Face to face, 20 to 25 times maybe.

Q.   And from that, a certain rapport has been built up between the two of you.  Isn't that correct?

A.   Yes, sir, that's true.

Q.   In your opinion, does Meier Jason Brown know right from wrong?

A.   Yes, sir, absolutely.

Q.   And if you will recall back to your interview with him on December 6th, down in Hinesville, which human being did he expressed the greatest concern for?

A.    He was remorseful for the killing.  He was --

Q.    Please answer the question, Detective Woodall?

A.    Well, when you say the most, it's hard.  He showed remorse for two people that day.  One of which was not himself.  It was more the victim of homicide, and for his fiancee.

Q.    That would be Diane Brown?

A.    Yes, sir.

Q.    When the defendant, if you will recall, was sobbing in that interrogation you had with him, was that at a moment when Ms. Sallie Gagila was being discussed or Diane Brown?

A.    Honestly, sir, at that point, he was talking about himself.  He was saying his life was over with.  And he was sobbing.

        MR. NEWMAN:  Nothing further.

        MR. DARDEN:  You may step down, sir.

                [NOTE:  Witness left the stand.]

        THE COURT:  May I see counsel again at side bar.

        MR. DARDEN:  Judge, we have one other piece of evidence, a stipulation, if I could read.

        THE COURT:  Okay.  Sure.

        MR. DARDEN:  Judge, this is a stipulation --

        THE COURT:  Now you will recall, ladies and gentlemen, I told you a stipulation is an agreement

between the parties that needs no further evidence.

MR. DARDEN:  This is a stipulation.  It has been a signed by myself, Mr. Frentzen, and the defendant, Meier Jason Brown.

*In United States of America vs Meier Jason Brown, Stipulation:  The defendant in the above-named indictment, Meier Jason Brown, agreed to plead guilty to the charges set forth in the indictment in exchange for a life sentence with no possibility of parole.*

Thank you, Your Honor.  We rest.

THE COURT:  Anything from --

MR. FRENTZEN:  Nothing additional.

THE COURT:  May I see counsel at side bar.

[NOTE:  Sidebar Conference.]

MR. FRENTZEN:  Judge, the only thing I think should be noted for the jurors, probably through the Court taking judicial notice, is that life in imprisonment is the minimum sentence possible for this offense.

MR. DARDEN:  I don't think that is appropriate.

THE COURT:  Well, I think I've given them a choice, either life or death.  We're not talking about --

MR. FRENTZEN:  I understand that, Judge.  I just want them to understand that as a result of the stipulation that his offer to plead was for the minimum sentence.

THE COURT: Okay. You can argue that. I don't think it needs to come from the Court.

MR. FRENTZEN: Okay.

THE COURT: Have you had a chance to read the charges?

MR. DARDEN: Yes, sir.

MR. FRENTZEN: Yes, sir.

THE COURT: Do you need a recess to organize your thoughts?

MR. NEWMAN: I leave it to Mr. Frentzen.

MR. FRENTZEN: I think so, Judge, only because there's a couple of exhibits I've got to locate.

MR. DARDEN: Judge, this is so difficult, I just want to get it over with.

THE COURT: Okay. You want a brief one.

MR. FRENTZEN: A brief one is all I need, Judge.

THE COURT: How about ten minutes?

MR. DARDEN: That will be fine, sir.

MR. FRENTZEN: That's fine.

                    [NOTE: Sidebar Conference

                    Concluded.]

THE COURT: Ladies and gentlemen, you will be hearing the Court's instructions and the lawyers arguments. But before we start that, I'm going to give you a very brief recess.

Let's say ten minutes.  Marshal.

MARSHAL:  All rise.

[NOTE:  Brief Recess. Jury out.]

THE COURT:  I misunderstood.  I thought there were no objections to the charge.  Does the government have any objections?

MR. FRENTZEN:  Judge, I noticed two lines, two of the mitigating factors that are listed for the defendant.  It is my understanding that the defendant doesn't have any interest in arguing, and had in fact told us he was not going to argue, which is why he didn't put on any mental health evidence.

THE COURT:  Okay.

MR. FRENTZEN:  In the current -- go ahead.  I'm sorry.

THE COURT:  Which number is that?

MR. DARDEN:  9 and 11.

MR. FRENTZEN:  9 and 11, Your Honor.

THE COURT:  All right.  We'll remove those.

MR. BELL:  Judge, on our part, we would like to just restate the objections that we filed October 28th, without restating them.

THE COURT:  You may do so.

MR. BELL:  Judge, could we also renew all of your objections, motions --

THE COURT:  You may do so.

MR. BELL:  We specifically want to renew our motions for directed verdict as to the sufficiency of the evidence in Counts 1, 2, and 3, and the sufficiency of the evidence for the statutory aggravating factors.

With the Court's permission, and I know how the Court has ruled, I would like to file a trial brief in support of our position on the pecuniary gain evidence.

THE COURT:  Has it been filed previously?

MR. BELL:  No, sir.

THE COURT:  Well, I think it is too late.  But go ahead and tender it.

All right.  I will reproduce those before I give them to the jury.  That is Page 7.

MR. DARDEN:  Page 7.

THE COURT:  So, we will reproduce that.  Of course, they will not get that until you have made your remarks.

Bring the jury in.

MARSHAL:  All rise.

*[Jury in.]*

MARSHAL:  Court is back in session.  Be seated and come to order.

THE COURT:  Mr. Frentzen, you may reserve a portion of your time.

MR. FRENTZEN:  Thank you, Judge.

May it please the Court and members of the jury, as we discussed earlier, you have already made your decision that Mr. Brown, the defendant, is the man who committed this horrible crime, that he is the man who inflicted this terrible loss in killing Sallie Louise Gagila.

And now, as we discussed before, it's time for you to chose the proper punishment.  And as I said before, we understand that is not a simple task.  It is not an easy task.  And it hasn't been easy to listen to this kind of evidence and this kind of testimony.

And as we discussed before, that is why you have certain guidelines under the law, and why you have the right to ask the question why is this the appropriate punishment, why is the death sentence the appropriate punishment, why is that the just punishment, why is this justice?

Well, first off, this is justice because the defendant intentionally killed Sallie Louise Gagila.  As I mentioned previously, the notion as a result of his confession that somehow this was an accident simply doesn't fit with the evidence.

Think about it for a minute.  He says he went down to that Post Office just to rob her and just to get a

robbery charge.  But she knew who he was.

He had been in there earlier that morning, and he had told her his name.  And from the P.O. Box he had gone into and that application, she knew exactly where he lived.  Think about it.

If he had robbed her, and not killed her, gotten back on his bicycle, would he have even made it back to his home that mile ride on his bicycle before the police came and got him?

He had to kill her.  And he went there intending to kill her.

There is another piece of evidence that shows that.  Think about those socks that he put on his hands. While she was imprinting the money orders, or while she was turning her back and going to that adding machine, she knew who he was, and where he lived.

Why do you worry about fingerprints if you are going to leave the witness alive?  He wasn't going to leave her alive.  He was going to kill her.  That is why he brought those socks, and that is why he brought that knife.  He intend to skill Sallie Gagila when he went there.

That is what the evidence shows.  And even if you believe his story about it being an accident, that he cut her accidentally the first time, and then he decided

in a cold-blooded calculation, "my escape is worth than this woman's life, so, I've got to kill her".  That was what his confession was.

Again, that doesn't fit the evidence.  That doesn't fit those socks.  But in any event, one way or the other, he intentionally killed Sallie Louise Gagila.

Why is this justice?  Because he committed the offenses in an especially heinous, cruel, and depraved manner involving serious physical abuse to the victim.

You've seen the photographs of the crime scene, and what he did to Sallie Gagila.  You heard from Dr. Kaponen, and you saw from the autopsy photographs. You saw what he did to her.

Did that involve serious physical abuse?  Of course, it did.

Ten stab wounds, and he tried to stab her more times.  Maybe the tip broke off of the knife.  There were those additional bruises.  He just kept stabbing her and stabbing her.

The Court is going to instruct you on the law. I expect that he is going to tell you about serious physical abuse, that it means a significant or considerable amount of injury or damage to the victim's body.  And that was clear.

It may be inflicted either before or after

death, and does not require the victim be conscious of the abuse at the time it was inflicted.  But the defendant still must have intend the abuse in addition to the killing.

Pertinent factors in determining whether a killing was especially heinous, cruel or depraved include an infliction of gratuitous violence upon the victim above and beyond that necessary to commit the killing.

Dr. Kaponen told you there were two life threatening stabs.  I mean, and the remainder of those stabs, he just continued to stab her.

Needless mutilation of the victim's body.  She was certainly, certainly that was true.

The senselessness of the killing.  And what could be more senseless than this killing?  A killing to get $1,175 for Diane Brown's bills.  And the helpless of the victim.

I want you to think about Sallie in that little Post Office, trapped in that small space, with him coming through that little window, and the doors locked, and him jumping on her, and stabbing her over and over again.  Was she helpless?  Of course, she was.

Why is this justice?  The defendant committed the offenses in the expectation of the receipt of anything of pecuniary value.  And that is obvious.  He went there

to rob her.  He went there to get these money orders.

$1,175 in money orders, and her wallet.  That is what her

life was worth to him.  It was worth taking for that.

Why is this justice?  The loss to Sallie Gagila

of her life and the loss to her family.  And you heard

from her family.  And you heard about Joe and the kids,

Scott and Craig, and why they could not be here.  I don't

think I can say anything more about this than what they

said themselves.

Why is this justice?  Commission of the offenses

was intended to reduce the likelihood of detection of his

involvement in the offense.  Basically, to wipe her out as

a witness against him so that he could get away.

Why is this justice?  She was an employee of the

United States, and United States Postal Service, and kill

while she was engaged in performance of her official

duties.

Now, as I told you before, we're not saying that

her life was any more valuable than anyone else's, but she

was only there and she was only killed because she was

working at the Post Office on that Saturday, a

Thanksgiving weekend, and providing a public service.

Why is this justice?  The defendant has

committed an array of other criminal acts; some, but not

all of which, have resulted in convictions.  You heard

about those prior convictions.  You heard about his other prior crimes, including that prior robbery where he went over the counter and grabbed the woman and restrained the woman while his buddies robbed the money out of the till.

You know what?  He left her alive.  They left her alive.  And he did time for it.  He learned.  He wasn't going to leave Sallie Gagila alive, not this time.

Why is this justice?  Repeated prior efforts to rehabilitate and to deter the defendant from criminal conduct have failed.

There was not a whole lot of evidence offered with respect to this.  But you heard that he was a trustee at the Liberty County jail.  You heard that he had been in prison before.  You heard that he had been on parole and probation before.  You heard that he understood right from wrong.

Why is this justice?  You heard some evidence in mitigation.  But did they really mitigate the crime?  I don't think so.  There is no denying Mr. Brown came up in an impoverished -- with an impoverished background with some rough characters and some rough stuff going on.

But you heard from the witnesses that he did understand right from wrong, that he knew how to follow rules, that he knew how to behave himself when it was to his benefit.

He was not made into a killer, ladies and gentlemen. He chose to be a killer. He understood. He was a nice guy and mild manner when he wanted to be. He chose this.

Why is this justice? Because of all of those choices that he had to make in order to commit this crime, any one of which he could have stopped, and spared Sallie Louise Gagila.

He chose to go to the Post Office that morning. He chose to return. He chose how to go about his crime. He chose to bring those socks. He chose to bring a knife. He chose what amounts of money he wanted to order. He chose to order those money orders. He chose to jump through that window. He chose then to stab her.

And right then, he would have been right up close to her. Able to see her. Able to see what he was doing to her. And yet, he continued to chose to stab her.

Ten stab wounds. You hear it, you think about it. What does that really take to get that close to a person, to another human being, to Sallie Gagila. Starting off when her back is turned to you in that little Post Office and to stab her at least ten times, and probably a few extra times. What does that take?

[Gesturing]. That's ten. Every one of those. How many times when he had a chance to show mercy, to show

mercy to Sallie Gagila?  And he chose not to.

Now, another point that they may offer you in mitigation, what they want to introduce to you, that they have introduce in evidence is a picture of this small boy. This is not the man before you.  This is not the man you have to judge.  This is not the man who chose to take another person's life and to brutally stab her.

That is the man you have to judge, the man who made that decision.

And they talk about remorse, and they want to talk about a demonstration of remorse.  Did he confess to the crime?  Yes.  I submit to you, however, in that confession, he was still lying.  He was still lying, because he said it was an accident.  And you know the evidence demonstrates that was no accident.

Was that really remorse?  Was he showing remorse when he was in that Post Office?  Like I said, as many times as he stabbed her, and had a chance to turn away, to stop, was he showing remorse when he left here lying there, bleeding, on the floor?  When she may have still been alive, because we know the phone was off the base. Was he showing remorse then?

Was he showing remorse shortly after that when he was grabbing those money orders?  Was he showing remorse when he then had the presence of mind -- and this

was no panic -- when he then had the presence of mind to look around and find her purse and go it in or her wallet? Was he showing remorse then?

And a couple of days later, the man you have to judge -- and this will be back there with you in the jury room, but this is a photograph of the man a couple days later at the bank on December 2nd, 2002 with Diane Brown.

And I know you can't see this photograph from here, but this is the man cashing in a 500-dollar postal money order that he had gotten after robbing and killing Sallie Gagila.  And he's smiling and enjoying a good laugh as he cashes in that money order.

Is this the face of remorse?  Because this is the man that you have to judge; not that small child.

Why is this justice?  Because he did what he did because he chose to do what he did.

Mr. Newman will get a chance to address you. We'll ask you to follow the guidance that the law gives you.  And we understand it is not an easy choice.  But the just punishment in this case is a sentence of death.

Thank you.

MR. DARDEN:  Good afternoon, ladies and gentlemen.  Well, you know, I have this text prepared. And I was just looking through it.  And I guess it is

about 20 or 30 pages. And I'm sitting over here thinking, you know, what can I tell these people.

I told you people the other day that I was scared to death. I'm absolutely petrified today. What this case has been reduced to now is a moral issue. And that's where we are. This case has never been about guilt and innocence. It never was.

He confessed from day one. And as you know, he offered to plead guilty in this case in exchange for a life sentence in December of last year.

We don't want to be here. I didn't want to put this family through this. I didn't want to put you through this. Unfortunately, circumstances bring us to this point. And for that, I apologize.

What we're really talking about here is justice. And it is a difficult thing to explain. It really is. I mean, what words do you use to try to explain to someone what justice and mercy is? You really have to look into your heart for that.

I don't think lawyers are trained to do this. I don't know who is. Unfortunately, we have to do it. This is our responsibility. I hate these days. I've done this before and I absolutely hate it. This is an awesome responsibility.

I have been representing this man for a year. I

know him.  Life is precious.  And I don't want you to kill him.  It is just that simple.  Life is just too precious.

We talked a lot about background in this case. Mr. Frentzen showed you that photograph.  And that's a photograph of a little boy.  You know, when I talk about this case, people expect lawyers to do things.  You see on TV, lawyers come up with all these trick defense, all of these excuses, all of these reasons.

I'm not blaming anybody.  There is the man to blame right there.  His daddy never killed anybody.  His brother never killed anybody.  His relatives never killed anybody.  I'm not making excuses.  I would be crazy to do that.

An excuse is a failure to accept responsibility. He has done that.  I'm not here to insult your intelligence.  But you need to know all of this.  Because you need to know what brought us from the point of this little boy right here to this man right there.

You can't operate in the dark.  You can't find justice in the dark.  If you don't know what got us here, you can't find justice.  And that is why we bring that information to you.

I'm not only talking about justice for my client, although I certainly seek that.  That is what this is all about, you giving justice.  That is the purpose of

this whole process.  I'm talking about justice for Sallie Gagila as well.

You know, this is a terrible crime.  And I will never, never say anything to minimize this crime.  It is absolutely awful.  I feel so sorry for her brothers and sisters who came in here and testified, her children who are trying to copy with life.  And can you imagine the hell her husband is going through?  It is an absolutely tragedy, it really is.

But you can't compound the tragedy by doing the wrong thing here.  This is an important decision.  You each will have to make that decision on your own.  It is an individual decision.  You are guided by the law, but the most important thing I will tell you as it relates to the law is this:  You are absolutely never, never required to come with a vote for to death penalty under any circumstances.  I don't care how bad the circumstances are.

You have that individual choice.  And you are not required to do so.

We're not talking about forgiveness in this case either.  You know, there is only one person that can forgive that man.  And she's dead.  You can't forgive him. I don't forgive him.  They don't forgive him.  We shouldn't forgive him.  That is not our place.  What we're

here for is to administer justice to everybody that is involved in this case.  That's why we're here.

We are not here playing the blame game.  We're not trying to dodge anything.  There's no abuse excuse.  But again, all of those factors are important.

You know, the death penalty is reserved for the worst of the worse cases.  We all know that.  We read about them in the paper ever day.  And what I submit you, ladies and gentlemen, as horrible as this is -- and it is horrible -- this case is not the worst of the worse.  It is a terrible case, yes.  And it is a terrible tragedy, and it is a terrible loss.  But it's simply not the worst of the worse.

You know, when we hear family members come in and testify, they call those victim impact statements.  And they talk about the impact that this terrible crime has had on the family.  You do need to consider that.  But, you know, all murders have impacts on families.  And there's really nothing in this case in terms of impact on the family that goes above and beyond the killing itself.

And I'm not trying to minimize everything.  But if you think about it, we have drive-by shootings every day.  People are killed.  It is a terrible tragedy.  Families suffer terribly.

We have robberies every day that end in murder.

People suffer terribly.  They don't seek death penalties in all of those cases, and neither should they.

The point I'm making is that as tragic as this is -- and it is terrible.  I am not saying anybody to minimize it -- the impact on the family itself does not go beyond what it does in any murder.  Every murder is a tragedy.

Mr. Frentzen comes up.  And he is doing his job. He gives you every reason in the world to return the ultimate sentence in this case.  Well, to that, I would tell you this:  You only need one reason or you need absolutely no reason to return a verdict of life imprisonment.  You can return it without any reason whatsoever.  That is your own free choice and your own free will.

He tells you that Meier did not show this victim mercy.  I agree.  He did not.  But, you know, we're sitting here in a court of law.  And surely, we have a better understanding of mercy than the killer does.  If we don't, we shouldn't be in the courtroom.  And if we don't, that is not showing justice.  That is revenge.  And it is absolutely wrong.

What you have to do in this case is find justice, not only for the victim but for the defendant, and the defendant's family as well.

Let's talk just a moment about these aggravating circumstances. If you would just put that up just a moment.

There's just a couple of points I want to make. It has been indicated to you earlier of these statutory aggravating circumstances, there's two of them. And you really have to get by these two aggravating circumstances before you can even consider the death penalty in this case.

The first one is did the defendant commit the offense in an especially heinous, cruel, depraved manner that involved torture or serious physical abuse?

Again, I'm not going to say anything to minimize the seriousness of this case. But I would ask you to recall the testimony of Dr. Kaponen. Dr. Kaponen told you that he can't be sure when the final blow was inflicted in this attack. He didn't rule out the possibility that there was no force used above and beyond what was necessary to cause death.

And all of that may sound very cold. But it is an absolute fact. And you must consider it when you look at this aggravating circumstance. And I would submit to you that the government has failed to prove that first aggravating circumstance beyond a reasonable doubt.

As to second one, the pecuniary gain. If you

recall, during the confession that Meier gave to the detective on the 6th day of December, he told the detective -- and this is important -- that he already had the money orders in his hand, had possession of it, and he told the detective, "I killed her because I knew she could identify me".

And you know, the detective says, "yeah, I believe you."  Well, that is exactly what that goes to, this pecuniary gain.

They must show, and they didn't, that he killed for the purpose of committing the theft itself.  And while there is overwhelming evidence that he did kill her, and that he did take the money, the evidence in the case indicates that he took the money before he killed her.  And he killed her with the intent of her not being able to identify him.  And that does not meet the test.

Now, you may ask the question, you know, why are we here?  Well, we're here because this incident occurred on federal property.  And we're here because the victim in this case was a part time postal worker.  And that's just the truth of the matter.  That is why we're in this particular venue.  And that's why the death penalty is going sought in this case.  You need to look at those factors as well.

This murder was not planned, ladies and

gentlemen.  They talked about my client having an IQ of 113.  And I don't know whether this is the case or not.  But I will say this.  My client doesn't have the ability to organize a murder.  Obviously, if he did, he would have never been arrested.  But if you just think about it for a moment, he lives near the Post Office.  Everybody knows him.  He gets on the bicycle.  He takes a knife.  He puts socks on his hands, and he rides a bicycle down to the Post Office and commits a robbery.  Gets on the bicycle and rides back home.

Now, is that the plan of someone that is going to commit a murder?  You need to think about that.  That is insane.  That's not a plan of someone who is premeditating to do anything.  And the fact is when he told the detective, "I didn't go there to do that.  I went there, I was just going to rob the woman."  And the detective says, "I believe you".  Well, if the detective believes him and there is no other evidence to dispute that, you should believe him as well.

We've talked a lot about some mitigating factors.  And we called a lot of witnesses in this case.  And again, the reason we called these witnesses is because it is important that you understand where Meier came from.  Only when you understand that can you find real justice in the case.

If you would just put up that list just a moment, I want to touch on some of these.

If you look at the first one, we know that Meier has responded well in prison in a structured environment. We know that. The warden -- he has not given any problems here in the county jail. The lady came in who was the jail administrator from Liberty County. He was a trustee. They had absolutely no problems with him. And he's just been a model prisoner.

The reason we wanted to show you that is because if you return a sentence of life in prison without parole, he poses no further threat to society. You know, he will be in that structured environment. And obviously, he thrives in that structured environment. And that is what you should consider.

Number two, he confessed and he cooperated with the authorities. Really, his confession, I think, aided the authorities really in resolving this case. I mean, on day four, I guess it was, or five, he told them everything they wanted to know. He told them everything. And they didn't -- it really shortened their investigation, saved the government all kinds of money. But he was cooperative. He told them what he did. He was remorseful. And he cooperated fully.

The next one, he is remorseful. I submit to you

that he has been remorseful.  He cried throughout that statement.  You heard that statement.  And I know many of you probably heard him today here in court during the testimony of all of these mitigation witnesses, how he just broke down and cried, particularly when they talked by his mom, talked about his childhood.  The reaction that he had was a tremendous reaction.  It really was.  He was sobbing.  He could not control himself.

He has accepted responsibility.  We now know that he did everything he could to try to plead guilty to this case.  He submitted an offer to the government, and said, "look, we won't go to trial.  I will do the rest of my life in prison."  I will never be released.  He has accepted responsibility.

If you should so direct, he would be sentenced to life in prison.

Let me talk to you a little something about prison.  First off, if you chose to give him life in prison, and that's what I'm asking for, he is going to be there for the remainder of his life.

You know, Meier Brown is going to die in prison.  That is not the issue.  The issue is when.  Is it going to be soon, or is it going to be 30 or 40 years from now?  But he is going to die in prison, I will assure you of that.  He is going nowhere.  He will never be released.

Prison is not a nice place.  It's really not. One day is like the next.  That day is like the next one after it.  Minutes become hours, hours becomes days, days becomes weeks, weeks become years, years become decades. It always adds up.  30 or 40 years, deprived of all rights.

I know you see these prisons on TV doing all kind of things.  This man is going to the maximum federal prison.  You can believe me on that.  They are going to tell him when to turn the lights on, when to turn the lights off, when to go to the bathroom, what time to go to bed, when to eat, what time to get up.  He'll never experience freedom again.

He will never go to the beach, never feel the touch of a woman.  No freedom at all.  Just sit there, one day after the next.

He told the detective in his statement, "I'll think about it the rest of my life."  Let him think about it.  He can think about it every day.  He needs to be the punished.  He needs to be punished severely.  He needs to be sent to prison for life.

There are those that say life in prison is worse than death.  You know, that may be.  I still don't want you to kill him.

It is an awful existence.  It is a man-made

hell, is what it is.  And he can go there.  He deserves to go there.  He deserves no less.

One thing about all of this evidence we've presented is, you know, without playing the blame game again, childhood does matter.  You know that is why we all love our children.  We take care of them.  We try to protect them from all this stuff.  It matters.  I will assure you when Meier was a baby 32 years ago laying in that crib down there in that mobile home he was an innocent child.  Something got him to this point.  Something brought him here.

His father came in and testified.  You know, I mean, I don't like to talk about people.  His father tells you that he's there and he leaves when Meier is about seven years old.  And he leaves because of all of this violence.  And he leaves Meier there.  He doesn't take him with him.  Awash in all of that drugs and violence.  His sister ends up drowning in the septic tank.

What kind of environment is that?  Talk about a dysfunctional family.

We heard from Detective Woodall in this case. You know, he was one of the detectives that worked this case.  He knows about this case, and he knows the defendant, that he wanted to come in and say a few words for him.  He felt that it was important.  And I think it

was important, too.

I've been doing this quite a while.  And I certainly don't ever recall any detective on any case I've ever worked coming in and testifying on the behalf of a defendant.  I have never seen it happen.  I'm sure maybe he got some pressure from his coworkers.  I don't know.  But he is a honorable man and I appreciate what he did.

Before I forget, let me just make this comment.  You know, during the trial of a case, a lawyer does a lot of things.  If I have said anything during this case that offends any of you or if I have done anything -- and I don't think I have; I certainly hope not -- please don't hold it against my client.  I accept responsibility for it.  But don't hold it against him.

Let's talk a little bit about your deliberations.  You each have your own individual vote in this case.  You know, I think taking the life of someone probably carries with it a tremendous amount of baggage.  I think this may be the eighth or ninth death penalty case I've been involved in.  I absolutely hate them.  Every time I try one of these cases, I go home and tell my wife I'm never going to do this again.  I mean, they keep you up all night.  You worry, is there anything I can tell these people that would possibly make a difference.  I mean, it is an awesome responsibility.  I mean, for one

year, I mean, this man's life has been on our shoulders. In a moment, he's going to be on yours.

But it is an awesome responsibility.  And you are so afraid that you don't do something or you don't say something that can actually make a difference.  And it is a tremendous burden, it really is.  You wake up in the middle of the night thinking about it.

But in a moment, we're going to return this case over to you.  And you are going back in that room, and you're going to deliberate all of this evidence.  And you go you are going do decide the fate of this man.  That's what you are going to do.

As I indicated, I imagine there is a lot of baggage to taking someone's life.  Don't make somebody else take that baggage for you.  You all have an individual vote in the case.  I expect you to discuss the case.  I want you to listen to the opinions of others. But if you have a position in this case, don't change just to get out of court, just to go home.

You've been locked up in the hotel three days. But you are not hostage here.  Stick with what you believe.  It is important.  Don't give somebody else your vote.

Justice is a tough thing.  It really is.  I mean, you've got all this horrible evidence.  And it is

horrible.  I mean, I wish there was something I could do to change all of this, but I can't.  You know there is nothing you can do either.  Unfortunately, Ms. Sallie is not going to come back.  He has seen to that.  And whether you take his life or not, that won't bring her back.

You know, we know she was a loving woman, hard working woman, out there just minding her own business, trying to make a living for her family, until he shows up.

What kind of memorial is it to her to put him to death.  You know, we don't honor her through his death.  We honor her by listen to all of her family members coming in here and talking about what a fine person she was.  And she was.  That's the way you honor people.

As you people can tell, I really don't want to give this case to you.  I really don't.  I'm afraid.  I mean, what are you going to do?  Where are we going from here?  I mean, the man has been convicted.  I mean, it is a terrible thing.  But what do we do now.  That is what you have to decide.  And it is an awesome responsibility.

You know, I heard the story once.  And I don't think the Judge will stop me.  I just want to tell a very short story.

There was a man who lived in the village.  He knew everything.  This was a man who had knowledge about everything.  And there's another young man in the village

that didn't like him.  And he thought, well, I'll play a trick on him, and I'll make him look like a fool.  He says what I'll do is I'll go out in the forest and I'll catch a bird, and I'll put in my hand.  Then I'll walk up to this wise man, and I'll say "wise man, is bird dead or is the bird alive?"  And if he says the bird is alive, I'll crush the bird and throw it to the ground.  And if he says the bird is dead, I'll let the bird fly away.

He goes out in the forest, and he catches the bird.  And he walks up to the old man.  And he says, "old man, I have a bird in my hand.  Is the bird alive or is the bird dead?"  And the old man said, "I know not young man, the bird is your hand."

Ladies and gentlemen, the bird is in your hand. Is it alive or is it dead?

Thank you.

MR. NEWMAN:  May it please the Court, Mr. Darden, ladies and gentlemen of this jury, we appreciate the seriousness with which you have taken on your responsibility to decide this manner.  It hasn't been of your choosing, but you have accepted the responsibility and discharged it in the best way that anybody could possibly ask for.

As Mr. Darden says, here we are late Thursday afternoon, 4:30.  We've been at this for four days this

week, Thursday last week, and if you just felt like you've had enough with wrestling with the issues here, and you want to take the path of least resistance, and go into that jury room, and return a quick life sentence, no one can criticize you for that.

And if you believe Meier Jason Brown and his version of what happened, as set forth in his December 6th confession that the killing was an accident, then that is probably the appropriate decision that you should make.  If you believe the defendant's story that this was a terrible accident, then the crime doesn't warrant the ultimate sanction.

But if you don't believe that is what took place here, then you've got a difficult task to wrestle with.

We submit, as Mr. Frentzen has already told you, that Ms. Gagila's fate was sealed when Meier Jason Brown left the Leroy Coffer Highway residence with the kitchen knife and the pair of socks, never intending to leave Ms. Sallie alive and breathing after he got those money orders.

Now, Detective Woodall has had a relationship with Meier Jason Brown.  And in a small community like Liberty County, a detective on the police department or a sheriff's department is a very powerful person.  It is almost an exalted position.  But Detective Woodall's power

doesn't extend passed the confines of Liberty County.  And you as a jury sitting here representing not only the Savannah Division of Federal Court with people from Liberty, Bryan, and Effingham and Chatham Counties, you speak a verdict for the Southern District of Georgia.

Judge Edenfield is a Judge of the United States District Court for the Southern District of Georgia.  Mr. Frentzen and I are prosecutors for the United States Attorney Office for the Southern District of Georgia.  You do not take your marching orders from Detective Chuck Woodall of the Liberty County Sheriff's office.

And why has the Congress of the United States chosen to give a trial jury such as yourselves this ultimate, and this difficult power?  Because some crimes are so horrible that the easy way out is not the right course to take.  It is a difficult course where you go back into that jury room, and you discuss the case.  And everybody sets their piece out.  And everybody talks about just how much remorse Meier Jason Brown has shown for what is left of Sallie Louise Gagila.

As Mr. Frentzen has pointed out to you, it is the real Meier Jason Brown what is shown in that bank video still from the First Union, leering and grinning with Diane Brown, that sorry excuse for a human being, as they are cashing in the chips, as they are exchanging the

value of Sallie Gagila's life, $1,175, plus what was in here wallet, equals one human life, who raised two fine boys, who was a wonderful wife to her husband, a wonderful sister to her sisters and her brother, who was the pillar of the community, whose life had more value than words can of express, and who had never harmed a sole in her life. And then the little insight and vignette you had into her life, you know she was as fine a person as a person could be.

And she has raised these two fine boys, one of whom is in the early days of his service in the United States Army.  When he gets sent to Iraq or Afghanistan, and the buddy in the next cot, bunk, is writing home to his mom, he'll think for a second and say "I can't do that.  I don't have a mom.  Meier Jason Brown took my mom from me in a deliberate, calculated, horrible, heinous way."

This is Sallie Louise Gagila before Meier Jason Brown.  And this is Sallie Louise Gagila after Meier Jason Brown.

A community, a country can deal with dangers from without.  December 7, 1941, we made a response. September 11, 2001, we made a response.  I submit to you that November 30th, 2002, calls for, demands a response which sanctifies, recognizes the life of Sallie Louise

Gagila and says by your verdict of the ultimate punishment that yes, your life has great value.  It has a great value beyond what Dr. Kaponen dealt with when he unzipped that bag in Atlanta, Georgia.

And that even though it is a difficult, difficult task we're asking you to undertake, we believe, we have confidence that you will accept the responsibility, this awesome responsibility, that after you have been qualified by the District Court, approved and selected by counsel for both sides in this case and carefully, carefully weighed the evidence -- and we don't expect any decision in one hour on this matter.  We expect the most careful consideration, sifting and thorough, of all the evidence in this case to see the calculated nature of the crime here, the absolute certainty of the acts that Meier Jason Brown performed here to see that Sallie Louise Gagila would not see lunchtime November 30th, 2002.  Because if you return that lesser, that easier verdict in this case, you are letting Meier Jason Brown win in this sense.

Detective Garman, a Savannah officer who was formerly a law enforcement officer in Liberty County, said that when he questioned Meier Jason Brown on the robbery at the convenient store that he didn't readily admit to his guilt.  He had to show him some photos.  He had to

show him the yellow and blue shirt.  He had to show him the pants that had the initial let's, MB on the back.

And what did we hear about Meier Jason Brown's confession in this case and the manner that it dribbled out to Postal Inspector Rushwin.  As Yogi Berra would say, it was de javu all over again.

No, I didn't do it.  I went to the Post Office one time.  Wait, I went back there after I ripped off my cousin Cedric.

Version three.  I went down there.  I meant to rob the place.  Went through window, accidentally cut her.  Then panicked.

That's not how it happened.  We know that.  You have all the evidence.  The defendant had never admitted at any time exactly what he did on November 30th.  And if he hasn't done that, how can the word remorse be used to describe his conduct from 10:30 November 30 until the time you get out in that room?  It can't be done.  Because it doesn't apply.

Mr. Frentzen and I, we will accept your verdict.  But we hope you issue a verdict that speaks the truth and that speaks the will of this community to address the enormity of Meier Jason Brown's criminal conduct.

Thank you.

THE COURT:  Would you like to stand just a

moment.  I will have to charge you again.  I thought you might like to stand where you are.

Once again, ladies and gentlemen, I apologize for the lack of the clarity in my voice.  But I think maybe you can understand what I have to say, but you will have it written.

### CHARGE OF THE COURT

THE COURT:  As I told you before, you must now consider what punishment to recommend for the defendant. The word *recommend* is probably not very artful, because what punishment the defendant is to received would be more applicable.

Now that you have heard all of the evidence and arguments from both sides, I will instruct you as to the law applicable to the very serious question of whether the defendant should be sentenced to death or life imprisonment without the possibility of parole.

Some of the legal principles that you must apply to this sentencing decision duplicate those you followed in reaching your verdict as to guilt or innocence.  Others are different.  Therefore, it is important that you pay close attention to and follow my instructions on the law.

You have found the defendant guilty of two capital offenses, Counts 1 and 2 of the indictment.  You must now decide two questions as to his punishment.

*First:  Is the defendant eligible for the death penalty; and,*

*Secondly:  Is imposing the death penalty upon him justified in this case?*

If you fail to unanimously answer either one of these questions in the affirmative, then the Court must impose a sentence of life imprisonment without the possibility of release or parole.  This means that the defendant would remain in prison for the rest of his life. If, however, you unanimously find that the defendant is eligible for the death penalty, and that it is justified here, the Court will be bound by your decision to impose a sentence of death.  The burden of proving both eligibility and justification rest at all times on the government. Your decision must be unanimous.  So, if, after a fair and impartial consideration of all the evidence, all twelve of you are not unanimously persuaded that the defendant should be sentenced to death, then you must return a decision against the death penalty.

Again, I remind you that the law does not require the defendant to prove that the death penalty is undeserved or that life imprisonment is more appropriate. Nor is he required to produce any evidence at all; and if the defendant elects not to testify, you cannot consider that in any way in your deliberations.

There are a number of special findings you must make during in your sentencing deliberations.  A Special Verdict Form has been prepared to help guide you.  I'm furnishing each of you with a copy in case you want to consult it as I instruct you on how to fill it out.  But, of course you, all collectively will fill out and return just one copy.

To first decide whether the defendant is eligible for the death penalty, you must make three special findings and thus unanimously find beyond a reasonable doubt.

*(1) that the defendant was eighteen years of age or older at the time of the offense.*

*(2) that at least one threshold eligibility factor exists; and,*

*(3) that at least one statutory aggravating factor exists.*

I will define *threshold eligibility factor* and *statutory aggravating factor* for you shortly.  In the meantime, I remind you that a *reasonable doubt* is a real doubt based upon reason and common sense after careful and impartial consideration of all of the evidence.  It is proof of such a convincing character that you would be willing to rely and acted upon it without hesitation in the most important of your own affairs.

As I just stated, you must first find that the defendant was eighteen years of age or older at the time of the offenses.  The government bears the burden of proving this beyond a reasonable doubt.  If you unanimously find that the defendant was at least eighteen years of age at the time of the offense or offenses, then you should so indicate in Section I of the Special Verdict Form, and continue with your deliberations.  If you do not find that he was at least eighteen years of age at the time of the offenses, you should also so indicate, and as the special verdict instructs, no further deliberations will be necessary.

If you find that the defendant was at least eighteen years of age at the time of the offenses, you must then determine whether the government has proven, beyond a reasonable doubt, the existence of at least one threshold eligibility factor.  Threshold eligibility factors define the defendant's intent and role in committing the offenses.  Thus, you must unanimously find beyond a reasonable doubt that the defendant:

*(a) intentionally killed the victim, Sallie Louise Gagila; and/or --*

and/or means and, or you may use it to mean or.

*(b) intentionally inflicted serious bodily*

*injury resulting in the death of the victim;*

*and/or.*

> *(c) intentionally participated in an act, contemplating that a life would be a taken or intending that lethal force would be used, and the victim died as a direct result of that act; and/or.*

> *(d) intentionally and specifically engaged in an act of violence, knowing the act created a grave risk of death, such that the participation in the act constituted a reckless disregard for human life and the victim died as a direct result of that act.*

Now, if you find any of these threshold eligibility factors to exist, you should so indicate in Section II of the Special Verdict Form, and continue with your deliberations.  If you find that none of these threshold eligibility factors exist, you should also so indicate, and as the special verdict form instructs, no further deliberations will be necessary.

Now, if you find that at least one threshold eligibility factor exists, then you must determine whether the government has proven beyond a reasonable doubt the existence of at least one statutory aggravating fact.

*Statutory aggravating factors* are facts or

circumstances specified by the law and alleged by the government which might indicate, or tend to indicate, that the sentence of death may be justified.  Again, the government bears the burden of proving these facts beyond a reasonable doubt.  Thus, you must unanimously finds beyond a reasonable doubt that:

> *(1) that the defendant committed the offenses in an especially heinous, cruel, or depraved manner in that they involved torture or serious physical abuse to the victim; and/or.*

> *(2) the defendant committed the offenses in the expectation of the receipt of anything of pecuniary value.*

Now either one or both of those factors.

*Heinous* means extremely wicked or shockingly evil as to set it apart from other killings.  *Cruel* means that the defendant intended to inflict the high degree of pain in addition to killing the victim.  *Depraved* means that the defendant relished in the killing or showed indifference to the suffering of the victim.  *Torture* includes mental as well as physical abuse of the victim. In either case, the victim must have been conscious of the abuse at the time it was inflicted, and that the defendant intended to inflict such mental or physical pain or

suffering upon the victim, in addition to killing her.

*Serious physical abuse* means a significant or considerable amount of injury or damage to the victim's body.  Unlike torture, it may be inflicted either before or after the death, and does not require that the victim be conscious of the abuse at the time it was inflicted.  But the defendant still must have intended the abuse in addition to killing.

Pertinent factors in determining whether a killing was especially heinous, cruel, or depraved include:  An infliction of gratuitous violence upon the victim above and beyond that necessary to commit the killing; the needless mutilation of the victim's body; the senselessness of the killing; and the helplessness of the victim.

*Pecuniary gain* means the expectation of the receipt of anything of economic value, benefit, or advantage.  There is no requirement that the government prove that something of value actually changed hands, only that the defendant expected to receive something of value.

If you find any of these statutory aggravating factors to exist, then you should so indicate in Section III of the Special Verdict Form and continue with your deliberations.  If you find that none of those statutory aggravating factors exist, you should also indicate, and

as the Special Verdict Form instructs, no further deliberations will be necessary.

If you unanimously find beyond a reasonable doubt the defendant was at least eighteen years of age at the time offense, and that at least one threshold eligibility and one statutory aggravating factor exist, then you have found that the defendant is eligible for the death penalty in this case.

In that case, you must then go on to answer the second question -- whether imposing the death penalty upon the defendant in this case is justified. Your first step in doing this is to make findings as to non-statutory aggravating factors. Like statutory aggravating factors, non-statutory aggravating factors are facts or circumstances alleged by the government which might indicate, or tend to indicate, that a sentence of death may be justified. The only difference is that non-statutory aggravating factors are not specifically provided for by the federal statute. Nevertheless, they must be considered by you in reaching your final determination as to whether the death penalty is justified in this case.

Before you can consider these non-statutory aggravating factors, however, you must unanimously find beyond a reasonable doubt that they exist. Once against,

the burden of proving these factors beyond a reasonable doubt is on the government.  The non-statutory aggravating factors alleged by the government in this case are:

(1) as demonstrated by the victim's personal characteristics as an individual human being and the impact of her death upon her family, the defendant caused injury, harm, and loss to the victim and her family.

(2) the manner of the defendant's commission of the offenses was intended to reduce the likelihood of detection of the defendant's involvement in the underlying federal robbery offense, and in the assault on the victim, Sallie Louise Gagila.

(3) the victim, Sallie Louise Gagila, was an employee of the United States and was killed while he was engaged in the performance of her official duties.

(4) the defendant has committed an array of other criminal acts, some, but not all, of which have resulted in convictions.

(5) repeated prior efforts to rehabilitate and to deter the defendant from criminal conduct have failed.

You must decide unanimously and beyond a reasonable doubt which of these non-statutory aggravating factors exist.  If you unanimously find a non-statutory aggravating factor to exist, then you should so indicate in Section IV of the Special Verdict Form.  If you do not,

then you should also so indicate.  Regardless of how many, if any, of these factors you find to exist, you should, as the Special Verdict Form instructs, continue with your deliberations.  Unlike your findings on threshold eligibility factors and statutory aggravating factors, you are not required to find any non-statutory aggravating factors in order to continue with your deliberations.

In addition to statutory and non-statutory aggravating factors, you must also consider any mitigating factors there are present. *Mitigating factors* are any facts or circumstances that might indicate, or tend to indicate, that a sentence of death may not be justified. Unlike the other factors you have considered, the existence of a mitigating factor does not require unanimous or even majority agreement.  Any one of you may find that a mitigating factor exists on your own.  The burden to prove the existence of a mitigating factor is on the defendant, who must prove its existence by a preponderance of the evidence.

*Preponderance of the evidence* means an amount of evidence which is enough to persuade you that a mitigating factor is more likely present than not.  It is a less demanding standard of proof than beyond a reasonable doubt, the standard by which eligibility and aggravating factors must be proved by the government.

Mitigating factors for you to consider include the following:

(1) defendant has invariably responded well to structured environments such as jails and prison, and would likely make an adaptation to prison as a well-behaved inmate if he were sentenced to life in prison without the responsibility of parole.

(2) defendant confessed and cooperated with authorities.

(3) defendant is remorseful for the crimes he committed.

(4) defendant accepted responsibility for the crimes he committed by offering to plead guilty.

(5) defendant committed the killing upon sudden impulse or panic and without substantial planning.

(6) defendant was introduced to drugs and alcohol as a child, and was supported and introduced into drug use by his family.

(7) defendant was deprived of proper paternal guidance and protection as a child, and/or was subjected to emotional and physical abandonment and neglect as a child.

(8) defendant grew up in an impoverished and sometimes violent environment, and was exposed to violence as a child.

(9) defendant does not have a violent prior criminal record.

Now, these mitigating factors are listed on the Special Verdict Form in Section V, but there is no place for you to indicate whether or not you find them to exist, because, unlike the eligibility and aggravating factors, it is up to you individually to decide whether the particular mitigating factor has been proven.  Thus, there is nothing for you collectively as a jury to write down in regards to mitigating factors.  Your individual determinations as to mitigating factors will be reflected in your recommendations of punishment in Section VI of the Special Verdict Form.  However, the fact that you have nothing to write down should not affect your consideration in any mitigating factors.

This, however, does not mean that you should not collectively discuss and give proper attention to mitigating factors in your deliberations.  In fact, it is your duty to consider all of the factors, both aggravating and mitigating in your deliberations.  Even though the final decision as to whether you believe a mitigating factor exists by a preponderance of the evidence is for you to make individually.

Your final task is to weigh the aggravating against the mitigating factors in deciding whether a death

sentence is justified here.  That weighing process, however, is not a mechanical one.  The law contemplates that different factors may be given different weights or values by different members of the jury.  Thus in your decision making process, you, and you alone, are to decide what weight is to be given to the particular factor.  However, you are only to consider those aggravating factors that you as a group unanimously have found to exist beyond a reasonable doubt.  In contrast, you may consider any mitigating factor you have individually found to exist by a preponderance of the evidence.

From this you are to determine whether the aggravating factors found to exist sufficiently outweigh the mitigating factors; or, in the absence of mitigating factors whether the aggravating factors alone are sufficient to support a finding that a sentence of death be imposed regardless of your findings with respect to aggravating and mitigating factors, however, you individually or collectively are never required to recommend a sentence of death.  But, if you do decide to recommend a sentence of death, you must do so unanimously.  Section VI of the Special Verdict Form, where you will enter your recommendations, reflect there.  If you do not unanimously recommend a sentence of death, then the Court must impose a sentence of life imprisonment without the

possibility of parole.

In reaching your findings concerning aggravating and mitigating factors in this case, the instructions I gave you prior to your deliberation in the guilt phase of the trial regarding determination of credibility issues apply equally here.  In other words, you alone determine the credibility of the witnesses and the weight to give their testimony and to the other evidence.  Also, in determining whether to recommend a sentence of death, you must avoid any influence of passion or prejudice.  Your deliberation and verdict should be based upon the evidence you haveseen and heard, and on the law which I have instructed.

While it is your duty to follow the instructions of the Court, any statement, question, ruling, remark, or other expression that I have made at any time during this time, during the guilt phase or during the sentencing phase should not be considered by you as an indication of any opinion I might have on the sentence that you should impose.

In considering whether or not to recommend a sentence of death, you shall not consider the race, color, religious beliefs, national origin or sex of the defendant or the victim.  And you should not recommend a sentence of death unless you conclude that you would recommend a

sentence of death for the crime in question no matter what the race, color, religious belief, national orgin, or sex of defendant or the victim may be.

Section VII of the Special Verdict contains a certification to this effect.  And each of you must sign it.  Your only interest, ladies and gentlemen, is to seek the truth from the evidence and to determine in the light of the evidence and the Court's instructions whether to recommend a death.

We spent considerable time questioning you and each you individually and collectively about your ability to follow the law.  Each of you have met the test imposed by the Court, by the government, and by the defendant.

The first thing you should do, once again, is to elect a foreperson.  That person you selected will serve you during the guilty phase.  Or you may select someone else, of course.  He or she will preside over your deliberations, and speak for you here in Court.

When you have arrived at a verdict, he or she will fill out, and sign, and the date the Special Verdict Form as you progress through your deliberations.

Once again, if you should desire to communicate with the Court, the marshal will be stationed immediately outside.  Write your message down.  He will pass the note to me.  I will show the note to counsel for the government

and for the defendant.  And I shall respond as fast I can. Sometimes it takes a great deal of time.

You are the sole judges of facts of this case. And I have given you the law both in writing and orally.

Once again, I tell you, and I caution you, never reveal to the Court how you may be divided numerically.

Now, I have prepared, and each one of you will have a copy of this special verdict.  I want to go over it with you now.  You may put down the document you have and, pick this one up.

Okay.  There will only one filed out.  Let's go over it.

It says *Special Verdict Form* and the name of the case above.

Age of Defendant:

(1) You would answer *We, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Meier Jason Brown, was eighteen years of age or older at the time of the offenses.*

You will fill in yes or no, and the foreperson will sign that.

Of course, if you answer that *No* with respect to determination of this section, then you stop.  Your deliberations will be over.  You will cross out Sections

II, III, IV, V, and VI of this form, and proceed to Section VII.  Each of you then should carefully read the statement in Section VII and sign in the appropriate place if the statement accurately reflects the manner in which you have arrived at your decision.  You should then advise the Court that you have reached a decision.

Now, if you answered *Yes*, that is, he was eighteen years of age with respect to the determination in this Section, proceed to Section II, which follows:

Threshold Eligibility Factors:

*We, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant intentionally killed Sallie Louise Gaglia.*

You will answer that yes or no.

(2) *We, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injuries which resulted in the death of Sallie Louise Gaglia.*

You answer that yes or no.

(3) *We, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant intentionally participated in one or more acts contemplating that the life would be a taken or Iintending that lethal force would be used and Sallie*

*Louise Gaglia died as a result of the act.*

You will answer that yes or no.

(4) *We, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death such that the participation in the act constituted a reckless disregard for human life, and Sallie Louise Gaglia died as a direct result of that act.*

Answer yes or no.

And signed by the foreman.

Instructions:  If you answered *No* with respect to all of the determinations in this section, then stop your deliberations, cross out Sections III, IV, V, and VI of the form and proceed to Section VII.  Once again, each member should carefully read the statement in Section VII and sign in the appropriate place if the statement accurately reflects the manner in which you have made your decision.  You should then advise the Court that you have reached a decision.

If you answered *Yes* with respect to one or more of the determination in this Section II, then you will go to Section III.

That is called *Statutory Aggravating Factors:*

Instructions:  For each of the following, select

yes or no.

(1)  *We, the jury, unanimously find that government has established beyond a reasonable doubt that the defendant committed the offense in an especially heinous, cruel, and depraved manner in that they involved serious physical abuse to Sallie Louise Gaglia.*

Answer yes or no.

(2)  *We, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant committed the offense in the expectation of the receipt of anything of pecuniary value.*

Answer yes or no.  And that will be signed by the foreperson.

Instructions:  Now if you answered *No* with respect to all of the statutory aggravating factors in this Section III, then stop your deliberations, cross out Section IV, V and VI of the form and proceed to Section VII.  Once again, read it and sign it after you have carefully read it.

But if you have answered question with respect to one or more of the aggravating factors in this Section III, proceed to Section IV, which follows:

Non-Statutory Aggravating Factors:

Instructions:  For each of the following select yes or no.

(1)  *We, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant caused injury, harm, and loss to Sallie Louise Gaglia and to her family and that this factor tends to support the imposition of the death penalty.*

Yes or no.

(2)  *We, the jury, unanimously find that the government has established beyond a reasonable doubt that the manner of the defendant's commission of the offense was intended to reduce the likelihood of detection of the defendant's involvement in the underlying federal robbery offense, and in the assault on the victim, Sallie Louise Gaglia, and this factor tends to support the imposition of a death penalty.*

Answer yes or no.

(3)  *We, the jury, unanimously find that the government has established beyond a reasonable doubt that the victim Sallie Louise Gaglia, was an employee of the United States Postal Service, and was killed while she was engaged in the performance of her official duty, and that this factor tends to support imposition of the death penalty.*

Answer yes or no.

(4)  *We, the jury, unanimously find that the government has established beyond a reasonable doubt that*

*the defendant has committed an array of other criminal acts, some but not all of which have resulted in convictions and that this factor tends to support the imposition of the death penalty.*

Yes or no.

(5)  *We, the jury, unanimously find that the government has established beyond a reasonable doubt that the repeated prior efforts to rehabilitate and to deter the defendant from criminal conduct have failed and the this factor tends to support the imposition of the death penalty.*

Yes or no, and signed by the foreperson.

Now, instructions:  Regardless of whether you answered yes or no with respect to the Non-Statutory Aggravating Factors in this Section IV, proceed to Section V, which follows:

Mitigating factors.

Instructions:  Below is list of mitigating factors presented by the defendant.  Whether these factors are established does not require a unanimous finding beyond a reasonable doubt.  Each of you, as members of the jury, should decide for yourself whether the defendant established each mitigating factor by a preponderance of the evidence.  Thus, you need not make any special findings as to these factors.

*(1) defendant has invariably responded well to structured environments, such as jails and prison, and would likely make an adaptation to prison as a well-behaved inmate, if he were sentenced to life in prison without the possibility of parole.*

*(2) the defendant confessed and cooperated with authorities.*

*(3) defendant is remorseful for the crimes he committed.*

*(4) defendant accepted responsibility for the crimes he committed by offering to plead guilty.*

*(5) the defendant committed the killing upon sudden impulse or panic and without substantial planning.*

*(6) defendant was introduced to drugs and alcohol as a child, and was supported and introduced into during use by his family.*

*(7) defendant was deprived of proper paternal guidance and protection as a child and/or was subject to emotional and physical abandonment and neglect as a child.*

*(8) defendant grew up in an impoverished and sometimes violent environment, and was exposed to violence as a child.*

*(9) defendant does not have a violent prior criminal record.*

Now, recommendations.  Yes or no.

*Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factors found to exist, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death therefore is the appropriate sentence in this case, we, the jury, recommend by unanimous vote, that the sentence of death be imposed.*

Answer yes or no.

(2) by answering no, *We, the jury, must recommend that a sentence of life imprisonment without the possibility of parole be imposed.*

*So, say we all.* The foreman will date and sign that.

Then on section VII, each of you must print your name, and sign this one, regardless.

*By signing below, each juror certifies that consideration of race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding the sentence for the crime or crimes in question regardless of the race, color, religious belief, national origin or sex of the defendant or the victim.*

I remind you that you are all under oath.  That would be dated and signed.

May I see counsel at side bar?

[NOTE:  Sidebar Conference.]

THE COURT:  Exceptions.

MR. BELL:  We renew all of our same objections.

THE COURT:  All of the objections of the defendant are renewed.

MR. NEWMAN:  No, Your Honor.

[NOTE:  Sidebar Conference

Concluded.]

THE COURT:  Ladies and gentlemen, I will separate the alternates again with the same instructions.  Do not discuss the case or whatever you think the verdict will be.  Do not discuss anything about the case.

They will separate you as you have before.  I have asked that some snacks be brought to you.

Take the jury out.

MARSHAL:  All rise.

*[NOTE:  Jury commences deliberations.]*

THE COURT:  Have a seat.  The jury has had a very long day.  They have had to deliberate one time.  I'm sure they are exhausted.  So, I think I shall send them back to the hotel for the evening meal.  I fed them a take-out lunch.

But let me say this to the prosecutors and to the defense counsel. I appreciate the thoroughness with which you tried the case. I appreciate the questions you asked. I thought they were generally questions that should be asked. So, not knowing what the verdict will be, I commend you, both prosecution and defense for having as clean a trial as we could under the circumstances.

The jury has been alerted.

MARSHAL: Yes, sir. They are standing by.

THE COURT: All right. Bring them in.

*[Jury returned.]*

MARSHAL: You may be seated.

THE COURT: Ladies and gentlemen, you have had a long, hard day. I'm aware of it. You are up early in preparation for coming here. And you have had a long time in that windowless room back there. So, I'm going to have the Marshal take you back to your hotel, unless you were to tell me you don't need very long. And I do not hear that.

I want to make sure that you are instructed and you understand that the only place, and I mean the only place, you discuss the case is in that jury room.

Sometimes, as you eat or meet someone, there is almost an irresistible impulse to say well, I'm going to do this, or I believe this. That is completely wrong.

All of your deliberations, all of your deliberations and discussions regarding the case are for the jury room.

All of the evidence is still back there.

CLERK:  That's correct, Your Honor.

THE COURT:  The courtroom will be sealed.  It will be under lock and key.  I want you to leave all of your notes, your legal pads.  You have your name on them. Everything will be in order for you.

I will not instruct you in the morning when you arrive at 8:30.  But you are to go immediately to the jury room.

And we will separate you four as we have this afternoon.

Do not begin your deliberations until everyone is in the jury room.  Of course, everyone has to be available and in the jury room during your deliberations. So I strongly suggest that you try to think of something else this evening.  Put this out of your mind.  Come back tomorrow refreshed, and continue with your deliberations.

Marshal, you may see the jury back to the jury room.

Counsel are excused until 8:30 in the morning.

*[NOTE:  Court adjourned for the evening.]*

STATE OF GEORGIA,

CHATHAM COUNTY.

C E R T I F I C A T E


          I, Lora H. Carter, do hereby certify that the above and foregoing pages is a true, complete, and accurate transcript of the evidence and proceedings adduced in the trial of the captioned matter.


          This the 29th day of December, 2003.


_____

Lora H. Carter


*U.S. Court Reporter*
*Southern District of Georgia*
*Savannah Division*
*P.O. Box 8552*
*Savannah, GA  31412*
*(912)650-4065*