IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DIVISION


UNITED STATES OF AMERICA    –

                –vs–                  – CR 403-01

MEIER JASON BROWN    –

_____


Transcript of **MOTIONS HEARINGS** held on the day

of 9th day of July, 2003, with the HONORABLE G. R. SMITH,

Magistrate Judge, Presiding


A P P E A R A N C ES


FOR THE GOVERNMENT  WILL FRENTZEN
                              JOSEPH NEWMAN
                              AUSA
                              P. O. Box
                              Savannah, GA 31412


FOR THE DEFENDANT   RICHARD DARDEN
                              WILLIAM BELL

                              Savannah, GA  31412


*Proceedings recorded electronically and*

*transcript produced from a sound recording thereof*.

THE COURT: Good morning.

MR. FRENTZEN: Good morning, Your Honor.

THE COURT: Sound the case.

CLERK: The Court calls the case of the United States of America vs Meier Jason Brown, Criminal Case No. CR 403-01.

THE COURT: We're here today to address the pretrial motions filed by the defendant in this capital case, which are rather numerous, as well as the motions which the government has filed.

The defendant is present, along with his counsel, Mr. Richard Darden and Mr. William Bell.

The government is represented by William Frentzen and Mr. Joe Newman.

The Court has set this hearing for over a period of three days because of the large number of motions. I am advised that it may not take that long. That is a welcome development, but we're prepared to stay for the duration in order to address all of the pending motions. And counsel don't need to feel rushed about it.

A number of motions will require the taking of evidence.

How many witnesses, Mr. Darden, do you anticipate calling?

MR. DARDEN:  Judge, we subpoenaed two witnesses. Detective Woodall, as I understand, was in fact served.

Also, we requested the appearance of Diane Brown.  Unfortunately, the marshals have had a difficult time contacting her.  We have attempted to locate her, and have been unsuccessful in doing so.

It may be that we will not need her.  It depends on how the evidence develops in the case.  But what we would like do is move forward.  And if we do need her, make additional attempt to have her appear at a later date.

But as it appears now, I don't believe we will need her testimony.

THE COURT:  Will, have you many witness will be the government be calling?

MR. FRENTZEN:  Judge, we anticipate calling four witnesses with respect to the suppression motions.  There was a request for evidentiary hearings with regard to the out-of-court identifications.  We don't think a hearing is necessary on those.  However, we are prepared to call two additional witnesses should a hearing be required with regard to that motion.

THE COURT:  Okay.

MR. DARDEN:  And, Judge, we, too, believe that those are the two are primary motions that will require an

evidentiary hearing.

And as to the eyewitness identification, we believe that it would be necessary for the state to present some evidence in that.

I'm sorry, Your Honor.  There was an additional motioned.  We requested an evidentiary hearing on similar acts.

THE COURT:  Yes, I know you filed that.

MR. DARDEN:  Right.  We would request is evidentiary hearing on that particular motion as well.

THE COURT:  All right.  Well, I will take that up later.

MR. DARDEN:  All right, sir.

THE COURT:  Unless the parties have a preference, the Court could go ahead and address the evidentiary matters first, and save the motions requiring argument for last.  But if you had rather take it in reverse order, I'm perfectly acceptable to that.  That is okay with me.

MR. FRENTZEN:  The Court's preference will be fine with the government, Your Honor.

MR. DARDEN:  That's fine, Your Honor.

THE COURT:  Two matters before we get into any evidence.  First, the government's motion for determination of mental competency, which we just

addressed back in chambers, I just want to put on the record that I have been advised by counsel that neither side is moving, really, for determination or a belief that man is incompetent to stand trial.

Is that correct, Mr. Darden?

MR. DARDEN:  That is correct, Your Honor.

THE COURT:  All right.  And the defendant has not filed a notice of insanity defense under Rule 12.2(a), and does not intend to do so.

MR. DARDEN:  That is correct, Your Honor.

THE COURT:  But you have given notice, however, of the desire or intent to use some expert testimony relating to mental disease or defect.  And that notice, which is entitled, as the government pointed out, a little broadly, but during the body of the motion you talk about using that evidence during the penalty phase of the trial. And that is indeed when you intend to use it.

MR. DARDEN:  If used, that will be when we use it, Your Honor.

THE COURT:  Okay. All right.  So that would be a notice, therefore, under Rule, Criminal Rule 12.2 (b). And the government is, therefore, seeking an evaluation which the Court may order upon the government's motion.  I will take that up.  I think the Court is wanting him to be evaluated probably at Butner, North Carolina.  And the

Court will consider that, and issue an order in short order.

MR. DARDEN:  Judge, just in response and for the record, we would indicate that it would be our preference that be done locally.  We don't to be placed in the position where our client is out of state for a period of 30 days or longer.

THE COURT:  I understand.

MR. DARDEN:  And we would object to that.

THE COURT:  I understand.

MR. DARDEN:  Thank you.

THE COURT:  The other matter is the defendant's motion to close these proceedings.  I issued an order yesterday addressing that.

Did you get a copy of that?

MR. DARDEN:  I didn't get a copy, but I can somewhat speculate what your response would be.  I don't believe there is anyone here from the press.

We would ask that the witnesses in this case be sequestered.  I think the only witness here is Ms. McLendon.  And it is my understanding that she is the case agent.  So, we wouldn't have any objections if she remained in the courtroom.  But the remaining witnesses, we would request that they be sequestered.

THE COURT:  Well, certainly we will order that.

MR. FRENTZEN:  Your Honor, Ms. McLendon is the only witness currently in the courtroom.

THE COURT:  I determined yesterday there was no real need to hold these hearings *in camera*.  And I expected perhaps we would have more of a showing of the press or other observers.  The courtroom is pretty empty, as you have just noted.

So, I guess that an additional reason --

MR. DARDEN:  I would add that press did contact me, but I failed to give them any information.

THE COURT:  They may downstairs in Judge Moore's courtroom, or in my courtroom before Judge Moore.

All right.  Lora, I think the court reporter is going to be needed by Judge Edenfield in about twenty minutes.  But I am prepared to go ahead and launch into the evidence, if the parties are ready to do that.

Which motion are we hearing first?

MR. DARDEN:  We would leave that up to the Court, Your Honor.  Perhaps, if we are going to lose our court reporter, may be we can just go through these.  I think a number of these motions may be put off to a later time.

Many of them involve housekeeping details as to how the trial being conducted, the voir dire and things of that matter.  I would imagine that Judge Edenfield would

probably make those decisions.  That's just my feelings.  I don't know what Court's position on that is.

THE COURT:  Well, I noted in reviewing the motions there are a good number of them that are pretty well discretionary with the District Judge.

MR. DARDEN:  Yes, sir.

THE COURT:  And I am going to reserve those motions for his attention.

MR. DARDEN:  Yes, sir.

THE COURT:  But we can address those specifically.  I think you've listed motions that you wanted to have argument on.  And I was assuming that was before me.

But my ruling was going to be that some of those motions should be reserved for the attention of Judge Edenfield.

MR. DARDEN:  Perhaps, if we could find a motion that would take less time, maybe we could discuss motion No. 12, Precluding the Admission of Gruesome and Prejudicial Photographs of the Deceased.  That is just a suggestion; whatever the Court wants to do.

THE COURT:  Well, perhaps that would be best.  I thought we would launch into the evidence, but since we've limited time before we lose our court reporter, let's ahead and address the motions that require argument, or at

least as many of them as we can hear.

MR. DARDEN: And also in conjunction with that would be motion No. 11, a Motion in Limine as it relates to the autopsy photographs.

THE COURT: Yes.

MR. BELL: Good morning, Judge. We're asking the Court to preclude the government from using some crime scene photographs that we believe any evidentiary value is outweighed by the potential for prejudice that would go against the defendant.

I have colored photographs. I don't know how the Court can rule upon these without looking at the photographs. So, I have colored photographs of the crime scene photos, and the autopsy photos which are pertaining to our motion.

THE COURT: Well, I know you want to have this matter heard pretrial. This is, as you mentioned, is one of those things that requires the balancing analysis under Rule 403 of the Federal Rules of Evidence.

MR. BELL: Yes, sir.

THE COURT: And there's a great deal of discretion with respect to the admission of evidence of this kind.

Would it not be best for the trial judge who is actually handling these proceedings to address this matter

during the course of the trial?

MR. BELL: We would like -- I think it is important for us to know when we stand up to start this case in front of the jury what evidence is going to come in and what is not going to come in. And I don't mind in Judge Edenfield is the one who makes the ruling on it, because he is going to be conducting the trial.

But we want to know what we're facing and what is going to come in. And that would effect how we conduct the defense of this case. And I think the government would probably like to know. And we want to get exhibits ready, and so forth. So, I think it is important for both sides to know going into the trial when we stand up to begin the trial in front of the jury what is going to come in.

THE COURT: Well, we have some time. The trial has not been scheduled. We have some time to get ready for this kind of matter.

I would prefer to reserve this matter for Judge Edenfield. You have a motion in limine. And I could refer it to him. He could make a determination, if that is what he wants to do. If he wants to send it back to me, then that is fine, and we'll handle it and address it at that time. We might have to call the parties back for that purpose.

But my inclination would be that this is such a matter of discretion with the judge who is actually conducting the trial proceedings that I may have one opinion it and might exercise my discretion in one way, and the district judge trying to case may have a very different view of it.

MR. BELL:  And I understand.  Our only request then would be that if possible that we could resolve this issue at least 30 days before the start of the trial of the case.

THE COURT:  Well, I can't promise you that, but I can make that known.

MR. BELL:  Yes.  That would be our request.

THE COURT:  Any comment?

MR. FRENTZEN:  Judge, I think that is fine.  I think perhaps the parties can make some sort of request of Judge Edenfield to have some sort of a pretrial hearing in front of the District Court with respect to this matter, and perhaps some other housekeeping matters.

MR. BELL:  Judge, just housekeeping, motion No. 7, Motion to Identify Witnesses Claiming Cash Rewards. Mr. Frentzen and I spoke yesterday.  I think we have resolved that issue.  I think this is going to be some paperwork coming from the government to us addressing that issue.

Based on the conversation that we had yesterday and what I --

THE COURT:  What number did you say it was?

MR. BELL:  7.

THE COURT:  Okay.

MR. BELL:  We requested argument.

THE COURT:  Yes.

MR. BELL:  But based on our conversation of yesterday and what I expect to be coming to us in the mail, I think that motion is pretty much resolved.

And my guess is that is the Court going to address the issue of the similar transactions?  Or, is that another motion where we could join the government in requesting a pretrial hearing?  Or, I don't know if they want to join us on that.  But that again, we would like to know before the start of the case -- and I think it is important for the defendant to know before his attorneys stand up to give their opening statement before a jury -- what the Court's ruling is going to be on -- I think there is a prior conviction for a robbery that the government is going to try to introduce in the guilt or innocence phase, you know, as a similar transaction.

And I think it is important for us to know whether the Court is going to allow that or not on a pretrial basis.

THE COURT:  Well, I thought we might hear argument on that today.

MR. BELL:  Okay.

THE COURT:  You are opposed.

MR. FRENTZEN:  No, Your Honor.  I'm not opposed to argument on that issue today.  I guess there was some question with regard to that matter.  They had noticed an intention to have an evidentiary hearing with regard to that matter.  And I was simply at a loss at what sort of evidence we would be presenting on that.

I am certainly prepared to make argument about that matter.  But it seems to me that the District Court -- that is one of the things that the District Court can hear, at least, with respect to evidence.  I'm not sure what type of evidence, nor was I sure after speaking with defense counsel over the phone what sort of evidence would need to be presented with respect to that matter.

MR. BELL:  You know, my experience is you just call whatever witnesses there were to the prior incident to establish the similarity to the allegations, you know, in this case.

THE COURT:  I have never seen that procedure done in the court.  I have never seen it done.  And I wanted to know why you feel like it is absolutely required here.

MR. BELL:  I don't know how you determine whether or not it is similar.  I mean, you've got -- just because it is a robbery case and there's a robbery allegation, an armed robbery allegation in this case, doesn't establish the similarity in and of itself.

So, I think you have to call the witnesses and, you know, establish how the first one occurred.  And then they can enumerate how they think the allegations are in this one that would be similar to it.

THE COURT:  Well, I thought generally the District Judge would hold a side bar and, the government would make a proffer about what type of evidence it is about to offer, and then rule it in or out.  That's generally what happens in a criminal trial.

MR. FRENTZEN:  I think that's correct, Your Honor.  And in addition, from a proffer, from the description of the events and probably from the facts laid out in the conviction, I think the Court can make some type of determination under **Beechum** about whether or not the events are similar enough to warrant their admission.

THE COURT:  Have you provided -- I know you provided notice of intent to use 404(b) evidence.

MR. FRENTZEN:  We have additional provided to the -- is the question about discovery, Your Honor?

THE COURT:  Yes.

MR. FRENTZEN:  We have provided full discovery with respect to all of the evidence we have gathered to date with regard to the prior offense.

THE COURT:  What is it?

MR. FRENTZEN:  It was a robbery of the Shortcut Convenience Store located in Fleming, Georgia or between Fleming and Hinesville.  The facts generally were that the defendant, along with some other individuals, went into this convenience store.  There was a female clerk working at the convenience store.  The defendant vaulted the counter, and physically restrained that clerk while the other individuals robbed items from the store.  And then they departed.

THE COURT:  When was this conviction?

MR. BELL:  I want to say '96 or '94.

MR. FRENTZEN:  I wanted to say '96, Your Honor.  But we can get that for you.  It was the mid '90s.

MR. BELL:  And the dissimilarities with this case would be mode of transportation, no weapon involved in the prior.  There was a weapon allegation in this case.  Multiple participants.

I question whether a witness would really say he vaulted the counter or whether he, you know, or some person walked around, the method of leaving, et cetera.

MR. NEWMAN:  Your Honor, the Court well knows

from its reading of the Eleventh Circuit case law that the similarity covered by Rule 404(b) is generally addressed by the elements of the indicted offenses compared against the elements of the extrinsic offense.

And with the government's proffer here of the prior certified copy of the conviction, then if it on its face it is sufficiently similar judged against the rule as interpreted by Eleventh Circuit case law, then that should really be the total inquiry as to similarity that the Court needs to consider.

This is not the *modus operandi* exception, that is the exception within the exception here that is involved. Frequently the Court sees this come up in sex crimes offenses. But the government has no intention of going into the particulars. And all we want to do is put the prior certified conviction into evidence, and leave it, that is, the presentation to the trial jury at that.

MR. BELL: Well, the prior certified conviction, I mean, there are questions about the plea that was taken in that case. The defendant wasn't advised of certain things at the time of the plea. And we have given that with our notice.

The **Boykin** questions weren't all asked, as far as they didn't and him if he had been promised or induced, you know, to enter the plea. I believe that the court

misinformed the defendant at this time of the plea of this '94, '96 robbery offense as to the wrong particulars as far as what the offense carried.  And I think the federal courts have held that, you know, information about the consequences to a plea go to the voluntariness of the plea.

So, I don't think that a certified conviction -- you know, there's a lot of questions as to it.  I don't think it would pass the **Boykin** analysis.

MR. FRENTZEN:  Judge, our response to that is perhaps there should have been a collateral attack in the state court proceeding.  But I'm not sure of the propriety of raising that issue here before the Court.

THE COURT:  I'm not either.

MR. FRENTZEN:  In addition, Your Honor, just to inform the Court, the event we're talking about was in March of 1996.

THE COURT:  And the purpose the government would be seeking to introduce this other crime under Rule 404(b) would be for what specific purpose?

MR. FRENTZEN:  Judge, I think that this additional evidence goes to demonstrate a number of the appropriate uses for which you can use prior criminal acts, to include motive, intent, preparation, plan, and identity.

THE COURT:  I don't see the need for taking of evidence on this issue.  And I don't think that we're at the point here of ruling this in or out.  I know you would like to know in advance.  But I hate to leave too many things for Judge Edenfield.  And he may send them right back to me.  But my preference would be that for matters regarding 404(b) evidence, a lot of times the determination about the admissibility of that is sort -- it is a fluid analysis.  It depends upon the flow of evidence during the trial itself and the need for that evidence.

District judges, even within this District, vary about their approach to Rule 404(b).  I think the government is aware of that.  And even in an individual case, the judge may, in one case, allow something like that, and in another case disallow it.  And I don't know Judge Edenfield's thinking about it.  And given the magnitude and the importance of this case, he may want to consider this, you know, prior to trial or reserve it for the ruling at trial.  He is used to making these kinds of determinations on the fly during a criminal case.

I think we can alert him that the parties are seeking a pretrial ruling.

Your motion is not a motion in limine; is it?

MR. BELL:  They actually, I think, filed notice,

and we filed a response in opposition.

THE COURT:  What number is your motion?

MR. DARDEN:  It is No. 8.

THE COURT:  For a pretrial hearing to determine the admissibility.  Yes.

MR. BELL:  Actually it is No. 77.

THE COURT:  Okay.  I see nothing on the surface that would absolutely preclude any type of admissibility under Rule 404(b).  But I think it is highly discretionary with the district judge.  And there are a number of a factors to be considered.

So, my preference is -- if you are seeking a pretrial ruling from me to declare it completely inadmissible, I am unprepared to do that.  I will deny that.  But in terms of whether it will be admissible, I think that is a matter for Judge Edenfield to take up either during the trial, or if he prefers, prior to trial.

All right.

MR. BELL:  Judge, if we have a few moments for another sort of housekeeping matter while we have the court reporter, it will just take probably five minutes.

THE COURT:  I don't know that we have five minutes.

MR. BELL:  Okay.  We'll wait.

THE COURT:  All right.  Let's take a recess so

we can have our court reporter here when we need her.

MARSHAL:  All rise.

[Court placed in recess until 11:00 o'clock.]

THE COURT:  All right.  Where were we?

MR. BELL:  I think really we should probably just go to the motion to suppress, and get into the evidentiary issues.

THE COURT:  All right.

MR. FRENTZEN:  Judge, I think that is fine. We're prepared to go forward with the motion to suppress.

I suppose the first thing that we might want to take up is the out-of-court identification, since there is one witness -- although I will probably be calling him last, there is one particular witness who we have to address to that, could additional address that issue.

We don't any there is reason to address the out-of-court identification.  I think that all of the weight of the case law -- and I direct the Court's attention to **Watkins vs Souders**, a Supreme Court decision, is that the defense has to make some showing of extraordinary suggestiveness to get into the issue of an out-of-court identification to require a pretrial evidentiary hearing.  There's simply been absolutely no showing of that in this case.

With regard to both of the out-of-court identifications, agents went out with photographic spreads, in one instance a 6-person photographic spread, and another 12-person photographic spread, all photographs of people similar in appearance to the defendant, and showed those spreads. There's been absolutely no indication from the defense about why they think it was suggestive in the slightest, let alone the type of extraordinary suggestiveness that the case law has held is necessary to require some sort of a pretrial showing by the government.

THE COURT: Of course, their response is well, it is very difficult for us to make that showing since we weren't present or allowed to be present during the photo display.

MR. FRENTZEN: They were not present, Your Honor. However, they have received copies of the spreads that were shown. And they have received the memoranda of interview that were generated as a result of those meetings and interviews, and the demonstration of the photographic lineups.

THE COURT: Well, within the past two years or so, maybe three, we had another dealt penalty case in this District, in this courtroom. And we had evidence on a very similar photographic display where the government

agreed that we ought to go forward with a hearing and have a showing made about the manner in which the display was conducted.

The defendant in this case has filed almost verbatim the same motion that was filed in that case. Why aren't we going to hear it here, whereas we heard it in an earlier case?

MR. FRENTZEN: Judge, I was not aware of that. And perhaps I can't speak to other government counsel and their position. Our position is that it's simply not necessary. It is an effort, I think, to get two bites at the apple, to have some kind of -- have some sort of pretrial testimony adduced with regard to this matter, when it's simply not necessary.

And I think the case law is all to that effect. I don't know that counsel cited any cases in which such a showing was required.

THE COURT: Do you wish to be heard?

MR. DARDEN: Judge, I will be very brief. The government has indicated that there was a photographic spread. And that is in fact correct. And while that may go to the issue of whether this photographic spread was suggestive or not, it does not go to the issue of the reliability of the identification made by the witnesses.

It is a two-prong test. First, you have to

determine whether the out-of-court identification was suggestive. And it may not have been. But then, there's a second test. You have to look at the opportunity of the witness to view the suspect, the degree of attention, the prior descriptions given, level of certainty, and the time between the actual crime itself and the identification that was made.

I don't know how the Court can make a decision on that unless you actually hear the witnesses that made the identification. They are subject to cross-examination. And we can determine their degree of certainty, whether they gave prior descriptions. And I believe that in order to determine that we would in fact need an evidentiary hearing on that issue.

THE COURT: I don't believe we reach those concerns that you have just alluded to until there's a showing of suggestiveness. I think that is the pretty clear case law in this District, in this Circuit, that suggestiveness must be established before you get into the **Neal** and **Biggers** factors.

MR. DARDEN: Well, there is a question in this case as to whether the witnesses -- what types of admonishments they were given. I know in state court they have this form they sign off on, and the witnesses sign. And they go through a reading. It is kind of like a

*Miranda* warning actually.

But we don't have that in this case.

I think we also have a situation in this case where we have mother and a child who made an identification in this case as a result of photographic lineup.  It's my understanding that those two particular witnesses, prior to that identification, had in fact got together with someone and made an artist rendition as to how this person looked.

And that would certainly raise the question of perhaps they were influenced by that, since they participated in that procedure.

MR. FRENTZEN:  Judge, can I address that one specific issue?

THE COURT:  Yes.

MR. FRENTZEN:  That is not accurate, Your Honor.  There was in fact a sketch, a composite created at the time that they were looking for the suspect.  Prior to the arrest of the defendant, there was a mother and a daughter, a 13-year old daughter -- that was addressed by defense counsel in a motion to try and keep out the sketch that was created.

I believe that our position with respect to that was that we don't intend to offer that into evidence anyway.

Those two individuals were never shown photographic spreads and asked to pick -- or, if they were, they did not make an identification.

This is mixing apples and oranges.  That issue with regard to whether or not the 13-year old girl should have had her mother present or not for the preparation of this sketch has absolutely nothing to do with any out-of-court identification.

And I don't know if counsel has just got to two events mixed up and combined.  But there are two male individuals who made positive identifications of the defendant.  And neither of them were involved in this sketch preparation.

THE COURT:  And they did so on the basis of the photographic display which you have produced for the defendant.

MR. FRENTZEN:  That's absolute correct, Your Honor.

MR. DARDEN:  We have -- we don't have the actual photographs.  What we have photostatic copies of the photographs.  It is entirely different.

MR. FRENTZEN:  They are certainly entitled to view the originals as they have been informed that they were entitled to view the originals of all the evidence that we have gathered in this case.

THE COURT:  Weren't there -- from reading the motions, wasn't there a witness who was unable to make an identification when shown the photo display.

MR. FRENTZEN:  That's also correct.  And all of that information has been produced to defense counsel as well.  And actually, I believe there were two individuals, as it turned out, who eventually were unable to -- did not positively identify the defendant.

Obviously, we're not going to be presenting a misidentification or a failure to identify.  So, the notion of pretrial suppression seems irrelevant.

THE COURT:  How would the government propose to introduce this evidence at trial?  How are you going to go about it?

MR. FRENTZEN:  It would be our intention to call the two individuals who made the positive identifications.  And quite possibly call the inspectors who showed the photographic spreads and created the photographic spreads to those two individuals to testify about their identification.

THE COURT:  I don't know that we need -- we did it in an earlier case.  But the government there did not oppose holding a hearing.  And there may have been some indication of -- and I can't remember specifically -- there may have been some indication about a suggestive

procedure being used.

You haven't seen the original photographs.  You are certainly allowed to see them.  And if, after viewing them, that causes you to think that some type of suggestive technique was used in this case, then the Court will be pleased to, upon a showing of that, hold a hearing.  And we'll get into what the courts require us to review, if it is a suggestive thing.

I think we could do that prior to trial.  But some showing of suggestiveness of the technique, I think, must be made by the defendant.  So, I'm not inclined to proceed with an evidentiary hearing at this time.

Do you have something else?

MR. FRENTZEN:  No, Judge.  I was just going to let the Court know that with that ruling we're prepared to move forward on the evidence of the motion to suppress.

THE COURT:  All right.  How many witnesses are in the courtroom that need to be excused?

MR. FRENTZEN:  None, Your Honor.  There is only one witness, and again, that is the case agent, Inspector McLendon.

THE COURT:  Okay.  All right.  Call your witness.

MR. FRENTZEN:  Judge, we'll go ahead and call witnesses.  We would like to note for the record that we

don't waive our challenge to the defendant's lack of standing with respect to these searches. We don't feel there has been any showing of the defendant's standing.

No affidavits were filed that I am aware of that adequately demonstrated standing with regard to any of the searches conducted.

We would happy to proceed with evidence, but we would like to maintain that challenge for the record.

THE COURT: Do you want to respond to that?

MR. DARDEN: Judge, with respect to the searches, it is my understanding that although a search warrant was issued for both locations that there was a consent to search given by the residents of the property, if I'm not mistaken.

THE COURT: That's what the government is contending, yes.

MR. DARDEN: And quite frankly, I think that is probably what the evidence will show. As to standing on the part of the defendant, what I do believe the evidence will show is that perhaps he was living at both of these locations. One of the searches was conducted at his mom's house. The other search was conducted at the home of his with girlfriend. And I believe what the evidence is going to show is that he in fact resided part time at both of these residences.

He didn't have any one residence where he resided. He was back and forth between the two. We believe that is what the evidence will show.

THE COURT: That is sort of the impression I got from reading the material, the motions. And I think that the government is contending that his personal effects were seized from both of those residences.

MR. DARDEN: That is correct. And if that is the case, then he would in fact have standing.

THE COURT: Well, you can personal effects at residence, I suppose, where you don't have standing.

MR. DARDEN: Well, I understand. But I think what the evidence is going to show that he in fact resided at both residences.

THE COURT: All right.

MR. FRENTZEN: Judge, then again, if I could just be clear. That may well be what the evidence demonstrates. But there has been no affidavit, and there's been no evidence, and there is been no showing to this point.

THE COURT: I'm not going on the lack of the affidavit to say we don't need to hold a hearing. I think we need to go forward.

MR. FRENTZEN: I understand. We're prepared to go forward, but we don't want to waive that challenge.

THE COURT: All right.

MR. FRENTZEN: Thank you. Your Honor, the government calls Postal Inspector James Rushwin.

CLERK: State your full name and your occupation for the record, and spell the last name.

WITNESS: My name is James Thomas Rushwin. I'm a United States Postal Inspector. That is spelled R-u-s-h-w-i-n.

**JAMES THOMAS RUSHWIN,** after having been duly sworn, testifies as follows.

GOVERNMENT'S WITNESS TESTIFIES AS FOLLOWS

DIRECT EXAMINATION

BY MR. FRENTZEN:

Q.   How long have you been a Postal Inspector, Mr. Rushwin?

A.   Sixteen and a half years.

Q.   And where were you stationed during those sixteen and a half years?

A.   Atlanta, Georgia.

Q.   Were you a member of a Task Force investigating the murder of Sally Louise Gaglia during the early part of December, 2002?

A.   Yes, sir, I was.

Q.   During that time, where were located, where were you working out of?

A.   I was working out of Atlanta.

Q.   At the time you are working on the Task Force where were you working out of?

A.   No.  Liberty County.

Q.   What agencies were involved in that Task Force?

A.   Liberty County Sheriff's Office and the U.S. Postal Inspectors Services.

Q.   Related to that Task Force and that investigation, let me direct your attention to December 5th, of 2002. Were you present for the search conducted at 131 Laurel Wood Drive in Savannah, Georgia?

A.   Yes, I was.

Q.   What was your understanding of whose residence that was?

A.   It was residence of Diane Brown.

Q.   What is Diane Brown in relationship to investigation?

A.   Diane Brown was the girlfriend of the defendant.

Q.   What time did you arrive at 131 Laurel Wood Drive on a day?

A.   3:45 p.m.

Q.   How many agents, officers, and inspectors were present with you when you arrived?

A.   A total of seven.

Q.   Can you describe briefly for the Court the residence, what type of residence?

A.    I guess it was a one story, single family residence.

Q.    What type of neighborhood?

A.    Nice neighborhood, mainly houses.  You know, who apartments, residential.

Q.    At the time you arrived where did you and the other agents involved in the Task Force do?

A.    We have arrived at the residence and walked up to the front door.

Q.    You yourself walked up to the front door?

A.    Yes, sir.

Q.    What were the officers wearing?

A.    Some of the officers -- we had two Chatham County officers with us who were wearing their regular uniform. The Postal Inspectors were wearing vests with police and badges on them.

     We had one Liberty County officer with us.  And I think he was just in regular clothes.

Q.    Did any of the officers have their guns drawn?

A.    No, sir.

Q.    What did you do when you got to the front door of the residence?

A.    I knocked on the door of the residence.

Q.    Did the door open?

A.    Yes.

Q.    Who opened the door?

A.   Jason Brown opened the door.

Q.   Did you say anything at the time you knocked or at the time the door was opened?

A.   Well, at the time the door opened, I said police.

Q.   Who could you see inside the residence?

A.   I could see Diane Brown -- well, Jason, and also Diane Brown.

Q.   What was Diane Brown doing at the time you saw her?

A.   She was in the living room, probably three steps or so behind Jason.

Q.   What did you do after the door was opened?

A.   I looked past Jason, and I said to Diane, 'I would like to talk to you about searching the residence,' and said to her, 'could we step into an another room and talk.'

Q.   What did she say to that?

A.   She said yes.

Q.   Did you or any of the other officers force your way into the house?

A.   No, sir.

Q.   You asked Diane Brown about speaking in the other room you said?

A.   Yes, sir.

Q.   What did Diane Brown say in response to that?

A.   Well, she said yes.

Q.   What did you do at that time?

A.   We went to a side room that I refer to as a sitting room.  And I explained to her, I explained who I was.  I was a United States Postal Inspector.  We were investigating the murder of Sally Gaglia, the robbery of the Fleming, Georgia post office.

I had said we would like to search the residence for items associated with the robbery.  And I went over certain items with her, such as clothes, hat, jacket, shoes, money, money orders, a knife.  I told her we would like to search the residence and also her car, and would also like to look for any blood residue.

Q.   What did she say about your request to conduct these searches?

A.   She said she would -- she said it was okay.  She said, "I'll cooperate".  She says, "I'm a corrections officer."

Q.   At that time did she have any specific concerns about the search?

A.   No concerns about the search.  She mentioned that her, I think, 13 year-old daughter was about to come home from school; she said in about twenty minutes.  And she really didn't want the daughter to see what was going on.  And she said -- she mentioned if her ex-husband found out about this, he may try and get custody of the daughter.

Q.   In spite of these concerns, she still consented to search.  Is that right?

A.   She did.  Yes.

Q.   Did Ms. Brown do anything or make any efforts to make any contact with her daughter?

A.   Yes.  She immediately started calling her daughter's cell phone, which was repeatedly busy.  And we were in the side room facing the street, and she kept looking out the window up the street in the direction where the daughter was going to be coming down after she got off the bus.

Q.   At the time when she was concerned -- demonstrated some concern about her daughter what were you doing?

A.   At the time, I pulled out two forms.  She said she would consent to a search of the house.  I pulled out two forms, and just started filling out the top part of the forms and started explaining the form to her.

        MR. FRENTZEN:  May I approach the witness, Your Honor?

        THE COURT:  You may.

Q.   Inspector Rushwin, I'm going to show what has been marked for identification as Government's No. 1 and Government's No. 2.

        Inspector Rushwin, can you take a look at what are marked as Government's No. 1.  Can you identify what that document is?

A.    Yes, sir.  This is the consent to search form for residence at 131 Laurel Wood Drive in Savannah, Georgia.

Q.    And did you explain this form to Diane Brown?

A.    Yes, I did.

Q.    Did you read the form to her?

A.    Yes, I did.

Q.    And did she sign and execute that form?

A.    Yes, she did.

Q.    What is Government's Exhibit No. 2?

A.    Exhibit No. 2 is the consent to search form for her 1999 Dodge Durango.

Q.    And again, did you read the form to her?

A.    Yes, sir.

Q.    Did you explain the form to her?

A.    Yes, sir, I did.

Q.    Did she sign the form?

A.    Yes, sir.

        MR. FRENTZEN:  Judge, I would offer Government's Exhibit 1 and 2 into evidence at this hearing.

        MR. DARDEN:  No objection.

        THE COURT:  Admitted.

Q.    About how long did it take to get the forms filled out and to get Diane Brown's signature on those forms?

A.    It took approximately 20 minutes.  Her main concern was her daughter.  And she repeatedly tried to call her

daughter on the cell phone, and looked up the street looking for her daughter. And each time she did that, I basically started over when we got back to the paperwork. And it took quite a while.

Q. During this time, are you aware of where the defendant was in the house?

A. Yes, sir.

Q. Where was he located to your knowledge?

A. Well, he wasn't in the room where we were. So, he was out in the living room, dinning room area.

Q. You weren't present in the same room with him during this time?

A. No, sir.

Q. Okay. What did you do after you received consent from Diane Brown?

A. After she signed the forms, I did a walk-through through the residence.

Q. Can you describe for the Court the interior of the house?

A. Yes, sir. The front of the house had a living room with a dinette and kitchen off of it. To the left of the living room was what I believe was a converted one-car garage into a sitting room. The residence had three bedrooms, a bathroom off the master bedroom, and also another separate bedroom.

MR. FRENTZEN:  May I approach, Your Honor?

THE COURT:  You may.

Q.    Inspector Rushwin, I hand you what I've marked as Government's No. 3.  What is that document?

A.    That is a drawing or a sketch of the inside of residence.

Q.    Is that a fair and accurate representation of the residence as it was on December 5th, 2002?

A.    Yes, sir.

Q.    Can you describe for the Court in relationship to the entranceway where this sitting room was that you had your conversation with Diane Brown and obtained consent?

A.    The sitting room was to the left of the doorway, through the living room, into a small room.

Q.    Is that living room the room immediately above with it says sidewalk?

A.    Yes, sir.

Q.    And then as you enter that room off to the side on the left as you're facing the front of the house is the sitting room?

A.    Yes, sir.

Q.    Did you notice anything in particular during your walk through of the house?

A.    Yes, sir.  In a bedroom identified as Diane Brown's bedroom was a pair of sneakers underneath a chair in that

bedroom.

Q.   What type of sneakers?

A.   It was a dark colored pair of sneakers.  I think Lughe or something is the brand name.  Something beginning with a L.  I'm not pretty sure about that name, but it was a dark color pair of a sneakers.

Q.   What was significant to you about those sneakers?

A.   I picked the sneakers up and looked at the print on the bottom of the sneakers.  And I felt that looked similar to the footprint developed on the pattern line of the Fleming, Georgia Post Office, the date of the murder.

Q.   Had you viewed the print that was lifted from the counter at the Fleming Post Office?

A.   Yes, I viewed the print and also the print before it was lifted.

Q.   How did you examine the shoes when you first saw them through the walk-through?

A.   I picked them up, turned them over and looked at the bottom.

Q.   Did you keep the shoes at that time?

A.   No, I didn't.

Q.   What did you do with them?

A.   I placed the shoes back where they were.

Q.   Did you complete your walk-through of that residence at that time?

A.   Yes, I did.

Q.   Did you notice anything else significant during the remainder of your walk-through?

A.   I noticed a pair of white sneakers that were on the washer or drier.  And I also checked the bottom of those.

Q.   Did those appear to be similar to the print that you knew had been taken from the Fleming Post Office.?

A.   No, sir.

Q.   What did you do after you completed your walk-through of the house?

A.   After I completed the walk-through, I introduced myself to Jason Brown.

Q.   And where was he at that time?

A.   He was in the living room/dinning room area.

Q.   What was he doing?

A.   I believe he was smoking at the time.

Q.   What did you tell Mr. Brown when you approached him?

A.   I identified myself.  I showed him my credentials.  I said, 'I'm Inspector Rushwin, U.S. Postal Inspector.  I'm investigating the murder of Sally Gaglia and, the robbery of the Fleming Post Office..'

Q.   And you talked to Mr. Brown about having a conversation with him at that time?

A.   Yes, I did.  I said -- I asked him -- I told him that we were talking with everyone that may have been on the

Post Office on Saturday, the day of the murder, and asked if he would talk with us.

Q. What did he tell you at that time?

A. And he said he would.

Q. Did you advise him of anything with regard to his custodial status?

A. Yes, I did.

Q. What did you tell him?

A. I advised him that he was not in custody. He wasn't under arrest, and that he was free to go at any time.

Q. What his response to that?

A. He said "I'll talk to you."

Q. Did you begin the interview at that point?

A. No, we didn't. I told him that Detective Chuck Woodall was at the Chatham County Police Department, and asked if he would go there for an interview.

Q. To your knowledge, did Mr. Brown know Detective Chuck Woodall?

A. Yes, he knows him.

Q. What did Mr. Brown say about traveling to the Chatham County police?

A. He said, "yes, I'll go." He said, "yes, I'll go. I have to get a pair of shoes on."

Q. What did he do at that time?

A. He walked into Diane Brown's bedroom, and was going

to be pick up the dark colored pair of tennis shoes.

Q.   The same shoes that you had noted had a similar tread to the print from the Fleming Post Office.?

A.   Yes, sir.

Q.   At the time you followed him, why were you following him?

A.   I told him that I was coming with him.  And I said for my safety and yours, for safety reasons.

Q.   Is that your standard procedure while a search is being conducted?

A.   Yes, sir.

Q.   When Mr. Brown went to put on those shoes, what did you tell him?

A.   I told him that Diane Brown had already consented to let us search the residence.  And I had looked at the shoes, and thought they looked similar to the pattern it at the Fleming Post Office, and said that we would be taking those as evidence.  And said that he would have to wear another pair.

I asked him if he had another pair.  And he talked back out into the -- at that point walked back out into the living room.  I mentioned the white pair of sneakers that was on washer.  And I said how about those.  And he said "no, those are her ex-husband's.  I can't wear those."

At that point, I asked him if he wanted to go in his stocking feet.  And he said no.  At that point, I said 'would you talk to us here.'  And he said yes.

Q.   At that point, Mr. Brown decided not to go to Chatham County.  Is that correct?

A.   Yes, sir.

Q.   Did you force him to go to Chatham County?

A.   No, sir.

Q.   Did you tell him he had to go to Chatham County?

A.   No, sir.

Q.   After asking him whether or not he would agreed to talk to you at the house, what did he say?

A.   Yes.  He said he would talk to us here at the house.

Q.   Did you start the interview at that point?

A.   Well, first I had Detective Woodall notified that Jason wanted to be interviewed at the house.  And then we sat down at the table.

Q.   For clarification, why did you want Detective Woodall there during the interview?

A.   He was familiar with Jason.  And that was -- he and I had discussed the -- my supervisor informed me that he wanted me in on the interview.  And I suggested that since it was a joint investigation and since they were familiar with each other that they have Detective Woodall in on the investigation or the interview also.  And he agreed.

Q.    At that time what was your understanding of where Detective Woodall was located?

A.    At that point, I believe he was at the Chatham County jail, Police Department -- excuse me -- Police Department.

Q.    Did you go ahead and decide to start the interview at that point; or, did you decide to wait?

A.    Well, we sat down at the dinning room table.  And I again informed Jason that he wasn't under arrest, not in custody, and he was free to go at any time.  I again explained that we were talking to people that may have been at the Post Office on Saturday.  And he said he understood.

And at that point, I asked one of the other agents how long would it take Woodall to get from Chatham County to the residence.  And he said five minutes, and I decide to just hold up the interview until he got there.

Q.    Did Detective Woodall arrive after five minutes?

A.    No.  He arrived in approximately 40 minutes or so.

Q.    To your knowledge what was Mr. Brown doing during that 40 minutes?

A.    I had informed him that we were going to wait for Detective Woodall.  And he sat around and smoked, and did whatever he wanted to do.

Q.    After Detective Woodall arrived, what did you do?

A.    When Woodall arrived, I went outside and I briefed

him on what had happened so far.  I told him that the owner had consented to a search of the residence.  I had found shoes that I thought similar, the print on bottom looked similar to the print developed on counter line at the Post Office.  And I said initially he, you know, agreed to come over there and talk to you, both of us over there, and then he changed his mind.

THE COURT:  Was the search in progress during this 40-minute delay?

A.    I believe it had started.  Yes, sir.

Q.    But you were not participating in the search?

A.    No, sir.  No.

Q.    All right.

A.    I also told him that he's not under arrest -- he hadn't been arrested and he wasn't in custody.

Q.    What did you and Detective Woodall do after that conversation?

A.    We went inside.  Woodall and Jason Brown shook hands and said how are you doing, called each other by first name.  We sat down.  We all sat down at the dinning room table.

Q.    Did Detective Woodall ask Mr. Brown something at that point?

A.    Yes.  He said, "I heard you were mad at me."  And Jason said no, no, and further explained that he had

called the Liberty County Sheriff's Office, had talked with Detective Adams, and he said I tried to talk to him, and felt he was hung up on by the detective. And he called and talked with the Chief Deputy Moran, and said the same thing happened. Again, he felt he was hung up on.

And Woodall just said no. He said, "you know, I believe you had a bad connection on the phone. That's what the problem was."

Q. Did you again ask for Mr. Brown's consent to speak?

A. Yes. He again was advised by both Detective Woodall and I that he wasn't under arrest, in custody and, you know, he was free to leave at any time. He said he understood Detective Woodall. And I said that we're trying to talk to everyone that may have been at the Post Office. And he said, "yeah, I know."

Q. At that time, did you start the substance of the interview?

A. Yes, I did.

Q. What was the first story that Mr. Brown told you in brief?

A. In brief, he said he went to the Fleming Post Office. about 8:30 on Saturday morning. He said there was a white male in the Post Office at the time talk to go the white lady who was Sally Gaglia. And he said the white male was

talking something about liking the walk.  He said he heard -- he said it was a black female carrier in the back of the Post Office.  He said Ms. Gaglia asked him if he was in charge of the key now.  And he replied yes.  And she said what is your name.  He said Jason.  And then she asked him are you Meier.  And he said yes.

He said he got the mail from Box 327, and wished them a happy holiday and he left.  He said he was probably in there two or three minutes.  Then at that point, he said he went to Annie Joe Scott's house.  And she lives adjacent to the Post Office.  He said he went over just to visit.  She didn't know he was coming.  And she said gave him some canned goods in a bag for his mother.

He said he was there maybe twenty minutes.  He left there, went back home, delivered the mail to his cousin Cedrick.  He said he gave it to the daughter, gave mail to Al, who is Alice Bizzard, his aunt, Junior, who is his uncle, and to his mother.

Q.   What, if anything, did he say during that first statement about a returned trip to the Post Office?

A.   He said no.  He said -- he said that they had stayed in the Fleming the night before at his mother's house, and Diane Brown was with him.  And she got up about 7:00 a.m. or so and, came back to Savannah to check on her house. He said he called her, and told her to come and pick him

up, and said she arrived at about 10:00 o'clock.

Q.    Were any questions asked about Diane at that point?

A.    Yes.

Q.    What was asked?

A.    He was asked if Diane Brown was involved.  And he kind of sharply said no.

Q.    Did Mr. Brown continue to deny the second trip to the post office at that time?

A.    Yes.  We questioned him about that.  And the two times, you know, he was asked if he went down towards the Post Office or went back down to the Post Office.  And he said no.

He then mentioned that about his cousin Cedrick.  He said, "you know, I can't tell you I stole from my cousin Cedrick."  He said he delivered the mail to his cousin. And he knew that he had money in a can buried in the backyard.  And we asked how much, and he said $1,300.

He said he stole that money, went to Post Office, and bought three money orders; two were for $500, and one was for $175.  And he said he went back home and he gave those money orders to Ms. Brown on Sunday.

Q.    So, he admitted making a second trip to the Post Office at that point?

A.    Yes, he did.

Q.    Did those amounts of money for those money orders

match either the amounts of money or money orders missing from the Post Office from the day of the murder?

A.    Yes, they did.

Q.    Did Mr. Brown say why he bought the money orders?

A.    He said the money orders were for the bankruptcy court and the finance company or her mortgage.

Q.    And who was -- what was your understanding, what did he tell you about who was in bankruptcy?

A.    Ms. Brown.

Q.    And for whose mortgage?

A.    Diane Brown.

Q.    During these first statements that he makes to you, where are you guys conducting the interview?

A.    At the table in the dinning room.

Q.    At some point, did you move the interview into another room?

A.    Yes, we did.

Q.    Why was that?

A.    Well, the search was going on, and there was a lot of law enforcement people in there, and Diane Brown would go back and forth, and, you know, there was a lot of traffic out where we were.

Q.    Did you notice anything about Mr. Brown when Diane Brown would walk by?

A.    Well, she seemed to look at him, and he would look at

her, and, you know, really kind -- you know, every time that happened, it broke up the interview.

Q.    For that reason, did you ask to move the interview into an another room?

A.    Yes.

Q.    Who asked?

A.    Detective Woodall.  And he just said "hey, would it be better for if you, you know, if we went to another room for the interview."  And he said yes.

Q.    Did you order Mr. Brown to move to another room?

A.    No, sir.

Q.    Did you tell him he had to move to another room?

A.    No, sir.

Q.    Did Mr. Brown do anything on his own while you were moving into the other room?

A.    He got a soda out of refrigerator, and also got a cigarette.

Q.    Which other room did you move to?

A.    We moved to the TV sitting room.

Q.    That is the same room where you got consent from Diane Brown?

A.    Yes, sir.

Q.    Tell me about the conversation after you moved into the other room?

A.    The conversation started with -- we asked him if he

had a job. And he explained to us that he worked for Atlantic Pipe. And he said they lay pipe. We didn't really get into that part of it. He said that he had been fired about three weeks prior to us being there.

And he went onto explain that he wouldn't volunteer to work on the weekend. And he got fired on his day off. And we talked a little bit about that.

Q. At some point, did you back to questioning him about the events of November 30th, 2002?

A. Yes, sir.

Q. Tell me about that conversation?

A. We again asked if, you know, he had gone back to the Post Office, and, you know, wanted more details as far as what happened, you know, and what he did.

Q. Was he providing any more details at that time?

A. Not at that time, no.

Q. At some point, did one of the interviewer leave the room?

A. Yes. Detective Woodall did.

Q. What happened after Detective Woodall left the room?

A. When Woodall left, Inspector Martin came into the room, and spoke with Jason, and basically said, you know, the other agents, you know, didn't feel that he was -- heard his story and didn't feel like he was telling the truth. And, you know, further explained that we were just

trying to find out what happened, you know, and we are trying to get to the truth.

Jason didn't reply to him, and the inspector left.

Q.   Did Detective Woodall return?

A.   Yes, he did.  He returned at the end.

Q.   Did he return before or after Inspector Martin left?

A.   Just a few seconds before Martin left.

Q.   Did you continue to question Mr. Brown about the events of that day?

A.   Yes, sir.

Q.   What did he tell you at that time?

A.   At that time he said -- he said "well, I know if I confess, my life is over.  This is a last day of my life." And we just, you know, reiterated to him, you know, that we're not, you know, after you to confess.  We want to what happened, you know, exactly happened at the post office.

And then he said well, he said, "some of what I told you the the second time was not true."  He said, "what I told you the first time was about my visit to the post office."  He mentioned that he went to the Post Office to rob the lady.  He says, "I didn't go to kill her."  He said, "I had a knife which I was going to use to threaten her."  He said he rode the bike, again was on the bike, went to the Post Office.  He ordered the three money

orders.  The white lady cut the money orders or imprinted them, and then she turned around and went to the desk to a calculator on desk.

And then at that point he said he went over the counter line.  And as he was going through the counter line, he tripped and fell.  And on the other side of the counter line, he fell into the woman and stabbed her at that point.

And he said if -- I said, "I knew if you guys caught me, I could do the time for the robbery."  He said, "but damn, she knows me," and he said "I had to kill her."

Q.   During the course of or leading up to this eventual confession by Mr. Brown, did he make some requests about talking to his mother and to Diane Brown?

A.   Yes, he did.

Q.   What was that request?

A.   He had said that he wanted to talk to Diane Brown, and also call his mom on the phone.  And he was told, you know, that he could do whatever he wanted to do, and had been told that throughout the interview.

Q.   At that time, did he seek to talk to Diane Brown or to talk to his mother at that particular time?

A.   No.

Q.   Was Mr. Brown told that at some point during these conversations that evidence was found in the house linking

someone to murder?

A.   Yes, sir.

Q.   Tell me about that conversation?

A.   We had previously stated that Diane Brown was not involved.  And he said that he wasn't involved.  And so, you know, we asked him.  We said, 'you know, we found things in the house that indicates someone here is involved.  And, you know, you say you are not involved.  You say Ms. Brown is involved.  You know, but things we have found indicate differently.'

Q.   Did Mr. Brown ask you for a promise at that time regarding Ms. Brown?

A.   Well, he said, "if I tell you what happened," he said, "will you not arrest Ms. Brown."

Q.   What did you tell him?

A.   And we told him that if she's involved, you know, yes, we will arrest her.  And, you know, if she is not involved, then we couldn't arrest her.

Q.   Did you ever make any promises to him with regard to Ms. Brown or Ms. Brown's -- whether or not Ms. Brown would be arrested?

A.   No, sir.

Q.   Did you make any restrictions on Mr. Brown's movement or his actions during the course of your interview with him?

A.    No, sir.

Q.    Did you ask for more details regarding what Mr. Brown had told you about the murder?

A.    Yes, sir.

Q.    What did he say in response to that?

A.    Well, he said he had got the little black handle knife from his mother's kitchen.  And he had worn socks on his hands.  He said he wore a hat.  He pulled it down over his eyes.  He didn't have a mask or or anything like that.

When he left post office, he crawled back out through the window, got on the bicycle.  And he says he went home.  He said his mother was washing clothes, and he threw his clothes in the wash -- with what was in the washer.

He further explained he had wiped the blood from the knife with socks that he had on his hands, and he threw them along beside road on the way home.  And he kind of motioned to us like he threw them alongside of the road in a backhanded motion.

And he said he got home.  He called Diane from his mother's house.  And they have some kind of prearranged signal where he calls, and he just says call back.  And by doing that, they don't, apparently, incur a long distance charge.

He said he told her to come and get him.  And he said that she said okay.  And probably 45 minutes or so later,

she showed up and picked him up.

Q.   Did you try to get back into details of the actual killing with Mr. Brown --

A.   Yes, we did.

Q.   -- inside the Post Office?

A.   Yes, we did.

Q.   What was his response to those questions?

A.   He had a real hard time dealing with the actual killing itself.  And he said he just couldn't -- he said he'd never kill anybody any more.  And he couldn't talk about that, about actual killing.

Q.   Did you indicate that he might be willing to talk about that at some other time?

A.   Yes.  He said he would talk to us in the morning. And he said that he would only talk with Detective Woodall and myself.

Q.   At that time was he attempting to cut off the entire interview to your understanding; or --

A.   No.

Q.   -- simply with respect to the details of the killing?

A.   No.  Simply the details of the killing itself.

Q.   Did Detective Woodall ask him any questions designed to explore his knowledge of things that may or may not have been public?

A.   Yes, he did.

Q.    What did he ask him about?

A.    He asked him if he had taken anything else from the Post Office besides the money order.

Q.    What was his response to that?

A.    And he said yes.  He said he saw Sally Gaglia's purse on the chair in the Post Office, and he took the wallet out of the purse.  He said he took a few dollars -- there was only a few dollars in the wallet.  He didn't mess with the credit cards, because he had problems with credit cards before.  And he said he took the wallet home, and he buried it under some trash behind his Uncle Junior's house by the barbeque pit.

Q.    At any time -- well, at that particular time, did Mr. Brown attempt to make a phone call?

A.    Yes, he did.

Q.    Do you know who he called?

A.    Well, he never said who he was calling.  He just picked up to phone and called.  But what he say -- by what he said, someone -- apparently someone else answered the phone, and he said, "bitch, just give the phone to Mom." And then he said, "Mom," he says, "I love you."  He said, "it was an accident."  He said, "don't hate me, Mama."  He said it was an accident.  And he said "bye, Mama, bye." And hung up.

Q.    Did he ask for permission to use the phone?

A.    No, sir.

Q.    Did anyone else come into the room after that phone call?

A.    Diane Brown.  Yes, sir.

Q.    Why was Diane Brown brought into the room?

A.    Well, he had wanted to talk to her.  And she agreed to come and talk to him.

Q.    When Diane Brown came into the room at that point, did you remain in the room?

A.    No.  I left at that point.

Q.    Where did you go?

A.    My boss was outside the door.  And I talked with him.

Q.    Were any decisions made at that point about whether or not  to place Mr. Brown in custody?

A.    Yes.  Yes, sir.

Q.    What was that decision?

A.    The decision was he should be arrested.

Q.    Who placed him under arrest?

A.    I did.

Q.    Did you bring anyone else with you back in the room when you placed Mr. Brown under arrest?

A.    Yes.  I brought Inspector Reeves.

Q.    After Mr. Brown was placed under arrest, did you inform him of his *Miranda* rights?

A.    Yes, I did.

Q.    How did you inform him of those?

A.    We have a standard warning and waiver of rights form. I read that to him, and he voluntarily signed the warning portion and waiver portion.  And I explained the form to him.

Q.    Approximately what time did the actual interview take place or begin after Detective Woodall had arrived?

A.    Approximately 5:00 o'clock.

        MR. FRENTZEN:  May I approach, Your Honor?

        THE COURT:  You may.

Q.    Do you know what time you placed Mr. Brown under arrest?

A.    Yes, sir.

Q.    Approximately what time was that?

A.    Approximately 9:14 p.m.

Q.    Inspector Rushwin, I've handed you what I have marked as Government's Exhibit 4.  Can you take a look at that and tell us whether or not you recognize that?

A.    Yes, sir.  This is the warning and waiver that I advised Jason Brown with.

Q.    Is this the form that you read to Mr. Brown?

A.    Yes, sir.

Q.    And is that his signature?

A.    Yes, it is.

Q.    And the signature is on there twice, both that he has

read the statement and understands his rights, and as to waiver of the rights?

A.    Yes, sir.

Q.    Okay.  And whose is it witnessed by?

A.    It is witnessed by Inspector Reeves.

Q.    And also by yourself?

A.    Yes, sir.

Q.    What time is indicated on the the form?

A.    The time on the waiver portion is 9:17.

Q.    And the initial time at the top of the form?

A.    Is 9:14.

Q.    After Mr. Brown waived his **Miranda** rights, did you go back into the substance of his prior statement?

A.    Yes, sir, I did.

Q.    Did you go through the entire confession?

A.    Yes, sir.

Q.    Did he add any additional facts in his confession after the **Miranda** warnings?

A.    I asked him if he wore the dark colored pair of tennis shoes to the Post Office the day of the robbery—murder.

Q.    What did he say to that?

A.    He said probably.

        MR. FRENTZEN:  Judge, I omitted to offer No. 4 into evidence.

MR. DARDEN:  No objection.

THE COURT:  Admitted.

Q.  Did Mr. Brown make any additional request after repeating his confession to the murder of Sally Gaglia?

A.  He asked to be taken somewhere other than the Chatham County jail.

Q.  Did he also make an additional request to talk to Diane Brown?

A.  Yes, he did.

Q.  What did you do at that point?

A.  Again, Diane Brown was asked if she, you know, wanted to come and speak with him.  And she did.

Q.  Were you there?  Were you present for that?

A.  Yes, sir.

Q.  Can you tell the Court about that conversation?

A.  Yes.  Basically, he told her it was an accident.  He went there to rob her.  It was an accident.  He fell into her, and he cut her.  And she gave me kind of a blank look.  I further explained to her that he had said that he wore socks on his hands, and got the black handle knife from his mother's kitchen.

Q.  Did Mr. Brown agree to continue talking the following morning?

A.  Yes, he did.

Q.  Who did he want to talk to the following morning?

A.   Detective Woodall and myself.

Q.   Why didn't he want to continue talking at that point?

A.   You say why didn't he?

Q.   What was his stated reason for not continuing to talk at that point?

A.   Well, we had asked for more details about the actual killing itself.  And he, you know, he was just broke up about that part of it.  And he said he just couldn't right then.

Q.   You mentioned that he made a request to go to Liberty County.  Is that right?

A.   Yes, sir.

Q.   Do you know why?

A.   He said that there was some people in, inmates in the Chatham County jail that didn't like him.

Q.   To your knowledge was he taken to Liberty County that night?

A.   Yes, sir.

Q.   Were you able to participate in an interview with him the following morning?

A.   No, sir.

Q.   Why not?

A.   I was scheduled in court in Gainesville, Georgia the following morning.  And it couldn't be rescheduled.

          MR. FRENTZEN:  I have nothing further, Your

Honor.

CROSS EXAMINATION

BY MR. DARDEN:

Q.   Inspector, approximately what time did you arrive at Laurel Wood on the 5th?

A.   Approximately 3:45 p.m.

Q.   Well, let me ask you this.  You testified previously about some problems involving Diane Brown's child.  Is that correct?

A.   Yes, sir.

Q.   Do you recall a time when there was someone actually sent out to intercept the school bus so she would not come in the house?

A.   No.  Her daughter actually ended up coming home.

Q.   Yes, sir.

A.   She got off the bus at some point and walked up to house.  I don't know that anyone went out to try and intercept the school bus.  No.

Q.   Okay.  But it is your testimony that you believe you arrived about 3:45 in the afternoon?

A.   Yes, sir.

Q.   It couldn't have been as early as 2:00 p.m.?

A.   No, sir.

Q.   Okay.  Now, you are aware that when you go out and execute a search warrant you go through a certain

protocol; do you not?  There is a plan had placed into effect.  Is that correct?

A.   Yes, sir.

Q.   And I believe in this instance you indicated there were about seven officers involved; correct?

A.   Yes, sir.

Q.   And according to plan, some of the officers remained outside of the residence.  Is that correct?

A.   Yes, sir.

Q.   Now, isn't it true that while you may not have gone in the house with any guns drawn -- and I believe that was your testimony.  Is that correct?

A.   Yes, sir.

Q.   There were officers outside of the house, and they had shotguns; correct?

A.   That was one officer with the shotgun.

Q.   Where was that officer located?

A.   That officer was in the front yard.

Q.   In the front yard?

A.   Yes, sir.

Q.   And many of these interviews with Mr. Brown took place in the front part of the house.  Is that not correct?

A.   Well, the dinning room is at the back of the house.

Q.   Well, let me ask you this.  There are windows and you

can see outside of the house; can you not?

A.   Yes, sir.

Q.   Okay: So, anyone standing inside the residence could ready see someone outside the house with the shotgun; correct?

A.   Yes.

Q.   Okay.

A.   Those officers were not there, though.  The shotgun was there for the initial contact.

Q.   How long did they remain?

A.   How long did they remain?

Q.   Yes.

A.   Those officers remained but the shotguns went back in the cars.

Q.   What was the the purpose of having those officers there?

A.   To have a marked police car and marked officers that are recognizable, maybe a little bit more than a postal inspector.

Q.   Yes.  The question is: What would be a purpose of having those officers present?  It has been your testimony that you went there to simply execute this search warrant. Now, I know the search -- it is your position, the search was conducted by consent and not by the search warrant. But when you went to that location, you had a search

warrant;; did you not?

A.   Yes, sir.

Q.   And you took these armed officers with you; correct?

A.   Yes, sir.

Q.   There were officers in the front and there were officers covering the rear; correct?

A.   There were no officers in the rear.

Q.   Of the home?

A.   There were officers stationed at the front of the house covering the sides.  But no one went in the back.

Q.   All right.  Well, the question is:  If the people inside the house were free to come and go, what were the the purposes of having -- what was the purpose of having the officers presented and armed?

A.   Okay.  When we do a search warrant, and it -- no matter what the jurisdiction we are going into, be it Liberty County, Chatham County or whatever, we always notify the local agency that we're going to be in -- within their jurisdiction and executing a search warrant. So that if any of the neighbors see what is going on, the police know.  And we like to have the police there.

Q.   So, it is your testimony these officers were there simply for the neighbors to understand what was taking place?

A.   No.  They were there at our request.  And it is

always a safety issue.

Q.    Well, this protocol which was placed into effect, it indicated in the the plan itself the defendant Jason Brown is a suspect; correct?

A.    What protocol do you refer to, sir.

MR. DARDEN:  May I approach the witness, Your Honor.

THE COURT:  You may.

Q.    Page 2 indicates suspects, target, main players, mayor Jason Brown.

A.    Okay.  Here, sir, this protocol is for the location in Fleming, Georgia; not the location I was in.

Q.    Okay.  There was one also filled out for the location --

A.    No.  There wasn't.  There was a verbal, a verbal briefing.

Q.    Okay.  Let me ask you this.  This was -- this was filled out on the same date as the Laurel Wood address; was it not?

A.    Yes, sir.

Q.    So, you were aware at the time you went there that Jason Brown was a suspect; correct?

A.    Well --

Q.    That he was a target of the investigation?

A.    Well, we had a call to silent witness that said he

was the person that committed the the murder.

Q.    The question is:  You were aware that he was in fact a suspect and a target; were you not?

A.    Yes, sir.

Q.    He was a suspect in this case in your mind; correct?

A.    Yes, sir.

Q.    And also contained within this, and you had to be aware, because you were the officer -- and although this is not true, it indicates the suspect had a previous arrest for armed robbery; correct?

A.    I believe so.

Q.    Surely, would you have been aware of that; would you not?

A.    Yes, sir.

Q.    Okay.  So, wouldn't it be fair to assume that these armed officers that went to that location with you was there in case Mr. Brown was there?

A.    If he wasn't there -- okay.  We didn't to the house to arrest him.  We went to the the house to search the house.  We would followed this same procedure.

Q.    When you went inside the house, I assume someone told Mr. Brown where to sit.  Is that a fair assumption?

A.    Okay I immediately --

Q.    Go ahead.

A.    I immediately went that side room with Ms. Brown.

And, you know, I can't answer that.

Q.    Okay.  You were not there when he had a conversation with the other officer, and the other officer directed him where to sit?

A.    No, sir.

Q.    Okay.  Now, throughout your testimony you have indicated that Mr. Brown was free to do whatever he wanted to do.  Is that correct?

A.    Yes, sir.

Q.    Okay.  So, is it your testimony that the moment you got there and he was there, if he had just got up and walked out, that would have been fine with you?

A.    Yes, sir.

Q.    Okay.  But you've also testified that his movements throughout the house, that you would follow him to these different locations for your own protection?

A.    Yes, sir.

Q.    Okay.  So, when he moved throughout the house, you would be with him at all times?

A.    Yes, sir.

Q.    But you were repeatedly telling him that you can leave any time you want to?

A.    Yes, sir.  Inherent to law enforcement are, you know, substantial risks.  And it is part of our job to manage those risks.  And what we do --

Q.   I understand that.  I'm not being critical.  I'm just trying to find out what the facts are.  It is also inherent in law enforcement when you interview someone you are not entirely truthful with them.  Is that correct?

A.   No, sir.

Q.   Well, I mean, isn't it standard -- well, let me ask you this.  One of the reasons you wanted Woodall will throughout the interrogation is because he knew the defendant.  Is that correct?

A.   Yes, sir.

Q.   And they had a relationship?

A.   Yes, sir.

Q.   And you felt that Woodall could interrogate him and elicit incriminating information.  That's fair; isn't it?

A.   I felt that they knew each other.  They had a first name -- they were on a first name basis.  I knew Woodall, according to his fellow detectives, was a good interviewer and the good officer.  And we were going to match up one inspection service personnel with one Liberty County personnel for the purpose of the interview.  It was a joint investigation.  And I suggested to my superior that it would be Woodall.  Yes, sir.

Q.   So, I guess the answer to the question is yes.  The purpose of why you were bringing Woodall is because he had a better relationship with the defendant.  He could

interrogate him and elicit more information that you could possibly could.  Fair enough?

A.    Possibly.

Q.    Okay.  Now, according to your testimony, you arrived about 3:45.  I guess from 3:45 until about 5:00 o'clock or so, what were you doing with the defendant during that period of time?

A.    Initially, I was with Diane Brown, getting the forms, the consent to search forms signed and, explaining to her why we were there.  And again, as I stated previously, that took twenty minutes or better.  After that, I did a walk through the house, just a general walk-through, looking in the house.

After that, I talked with Jason Brown shortly.  When the decision was made to have Woodall come to the house, I decided to stop the interview, because I thought he was going to be there relatively soon.  As it turned out.  It took him 40 minutes or better to get to the house.  And the reason for that was he had to come from Fleming, Georgia as opposed to coming from the police station.

So, that took up all that time there.

Q.    At what time during that process, at approximately what time did you seize the shoes of Mr. Brown?

A.    When I did my walk-through and, decided that those shoes looked pretty similar, I put them back down.  He

wanted to put them on.  He told him then that we were going to be taking those shoes as evidence.

Q.   What was the purpose of his wanting to put the shoes on?

A.   To go to Liberty County -- excuse me -- Chatham County for the interview.

Q.   Okay.

A.   He was in his stocking feet.  He didn't have shoes on.

Q.   But you indicated at that time that he couldn't have the shoes.  So, he didn't have any shoes, so he was not able to leave at that time, unless he chose to leave in his stocking feet.  Is that correct?

A.   Or wear the other pair of shoes.

Q.   Which were not his?

A.   Right.

Q.   This was in December.  Is that correct?

A.   Yes, sir.

Q.   So, it was in the middle of the winter?

A.   Yes, sir.

THE COURT:  Middle of the Savannah winter.  What time did you say Mr. Woodall arrived.

A.   5:00 o'clock, Your Honor.

THE COURT:  All right.

Q.   So you were there with him approximately an hour and

fifteen minutes prior to arrival of Woodall.  Is that your testimony?

A.    No, sir.

Q.    I thought you indicated y'all arrived about 3:45?

A.    We did.  But I had previously said I was with Diane Brown twenty minutes signing the forms, maybe a few minutes after that.  And then I did a walk-through.  So,, you know, say --

Q.    During the periods of time you were --

A.    Take away 25 minutes.

Q.    Okay.  Well, during that 25 minutes who was in the presence of Mr. Brown?

A.    Other officers.

Q.    Who were those other officers have been?

A.    Well, exactly who?

Q.    Right?

A.    You know, I mean there were other officers with us. And that was the purpose -- my job was to talk to Diane Brown.  And theirs was to talk with Jason.  Exactly who and did they, you know, do it in shifts you know, I couldn't tell you that.

Q.    So, at the time prior to arrival of Detective Woodall, the other officers were primarily the ones talking to him.  Is that your testimony?

A.    Yes.  Yes.

Q.    Do you have a lot of contact with him?

A.    Well, we -- as I stated a few minutes ago, we sat down, I started a interview, basically told him that we were trying to talk to everyone that was at the post office the day of the the murder.  I asked someone how long it was going to take for Woodall to get there.  And they said five minutes.  So, I decided to wait for him.

      Other than that little brief conversation with him, that was it.

Q.    Between the -- let me skip ahead a little bit. Between the time that you initially arrived about 3:45 according to your testimony, until you departed, I guess, about 11:00 o'clock that night, would that be about right?

A.    I think by the time transport got there, I think more like 10:15.

Q.    Okay.  During that period of time, was the defendant offered any food?

A.    He was not offered food.  But he was told that he could do whatever he wanted to do.

Q.    Okay.

A.    He got sodas for himself and --

Q.    And I guess when he got that soda from the refrigerator, you or someone went with him and stayed with him at all times; correct?

A.   Well, we were on the way from the dinning room to that room.  And it was in the line of travel.  And he just opened the refrigerator, and pulled out --

Q.   There was never --

A.   Yes.

Q.   All right.  There was never any time when this defendant was just allowed to stand up and wander anywhere in the house he wanted to go; was there?  Someone was always in his presence; correct?

A.   Yes, sir.  Yes, sir.

Q.   Okay.  Now, one of the main concerns of Mr. Brown was in fact Diane.  Is that correct?

A.   Yes.

Q.   And her child?

A.   Yes.

Q.   And in fact, I believe in the statement, the memorandum that you prepared, there was some conversation between you and the defendant concerning her.  Is that correct?

A.   I don't believe there is anything in there.

        MR. DARDEN:  May I approach the witness?

        THE COURT:  You may.

Q.   In the middle of page four, Mr. rush win, if you could just read that to yourself.  And I will ask you about it.  Okay.

A.   Okay.  You're just talking these four sentences.

Q.   Yes, sir.

A.   Yes, sir.

Q.   Again, do you recall that one of his concerns during the interview process was Diane Brown's well being.  Is that correct?

A.   Yes.

Q.   And he was also concerned by her child?

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   And by your own testimony, Diane Brown was concerned about this as well.  She had indicated to you that she was afraid she would lose custody to her husband if it became aware that this was going on.  Isn't that correct?

A.   Yes, sir.

Q.   Okay.  And in fact, what the defendant was asking you is that "if I give you a statement, will you promise not to arrest Diane."  He asked that question; did he not?

A.   He said, "if I told you to truth, would you not arrest her?"  Okay.  But in that statement you just showed me, there's nothing there concerning her daughter, though.

Q.   Okay.  The statement only concerns Diane; correct?

A.   Yes, sir.

Q.   But your own admission, the child is also of a

concern as well; correct?

A.    Yes, sir.

Q.    Okay.  Did you participate in the -- well, I don't guess you did -- interrogation at the Liberty County jail on the morning of the 6th?

A.    Yes, sir.

Q.    You were not there for that?

A.    No, sir.

Q.    Okay.  Do you recall any time when the defendant told you the only reason he was getting a statement was to protect Diane and the child?

A.    No, sir.

Q.    Okay.  But your own admission, he did ask you about that?

A.    He said if we -- if he told us the truth, would we not arrest her.  And both of us told her -- told him, that if she's involved, she would be arrested.

Q.    Do you know how much education the defendant has?

A.    No, sir.

Q.    Did you ask him if he could read and write the English language?

A.    No, sir.  When I explained the forms to him, though, I asked him if he understood.  He said yes.  And he had no questions of me.

Q.    Okay.  And as I understand your testimony, these

interrogations started out -- well, he had given two statements prior to Woodall even arriving at 5:00 p.m.  Is that correct?

A.   Which are those, sir?

Q.   He had made two separate statement.  Initially, he is -- I believe in the initial -- he gave you an initial statement.  And then he gave an additional statement and changed a few things.  And then Woodall came.  Is that correct?

A.   No, sir.

MR. FRENTZEN:  Judge, perhaps we could define statement.  Clearly, Mr. Brown was saying yes, I'll talk to you.  But in terms of getting into the substance of the interview, I believe the evidence was that didn't occur until Detective Woodall arrived.

Q.   Is it your testimony that he didn't make any statements whatsoever until Woodall arrived at 5:00 p.m.?

A.   Yes, sir.

Q.   None?

A.   Yes, sir.

MR. FRENTZEN:  Again, just a clarification of statement, as to the substance of the events of November 30th, or a statement such as, yes I'll talk to you.

Q.   He was simply saying I'll talk to you.  Is that your testimony?

A.   Yes, sir.

Q.   And then only after Woodall arrive but actually begin the interrogation.  Is that correct?

A.   The the interview.  Yes, sir.

Q.   Okay.  You have a problem with that word *interrogation*; don't you?

A.   You like it.

Q.   It is not a dirty word, believe me.  It happens all the time.  Were you aware or did you become aware of any of the interviews or interrogation, or whatever, that one of the concerns the defendant had was the fact that Diane Brown had been fired from a previous job because of some problems he had had, and it implicated her in?  Were you aware of that?

A.   No, sir.

Q.   So, at that time you were not aware of that?

A.   No, sir.

Q.   Okay.  And I believe, if I understand your testimony, it was you who arrested the defendant about 9:15 p.m. or 9:14.  Is that correct?

A.   Yes, sir.

Q.   So, at that time, he was in federal custody; correct?

A.   Yes, sir.

Q.   Notwithstanding he was held at the Liberty County jail, he was actually in federal custody?

A.    Yes, sir.  We don't have a lockup.

Q.    I know that.

A.    Yes, sir.

Q.    I just wanted to clarify that he was in federal custody at 9:15 on the 5th.  Is that correct?

A.    Yes, sir.

Q.    Okay.  How far is it from here to Liberty County, the jail?

A.    I would say 45 minute to an hour.

Q.    Driving time?

A.    Probably 45 minutes.

Q.    And I believe you indicated you were unable to to appear with the defendant on morning of the 6th because you had a previous commitment in another court.  Is that correct?

A.    Yes, sir.

Q.    Of course, there were other agents involved in this case other than you?

A.    Yes, sir.

Q.    I mean, Ms. McLendon, I believe, is the lead agent on it.  Is that correct?

A.    That's true.

Q.    So, she was available; correct?

A.    Yes, sir.

Q.    Who else was involved that would have been available?

A.   I think we had a team of maybe eight, eight or ten inspectors.

MR. FRENTZEN:  Judge, I don't see the relevancy of naming everybody else on the Task Force.

MR. DARDEN:  I'm just trying to establish that there were people that were available that could bring him for a first appearance.

There's a question in this under 3501.  As you know about the 6-hour rule.  He was taken into custody at 9:15 in the evening.  He was interrogated next morning, I think, about 8 or 8:30 at Liberty County jail.  And I think the government has the burden of showing the reasons for that, the reason I'm going into that.

THE COURT:  All right.  Proceed.

Q.   Well, without giving names, approximately how many people would have been available to make an appearance in court with the defendant?

A.   I would say eight.

Q.   Approximately eight people?

A.   Yes, sir.

Q.   Okay.  And you say it is about a 45-minute drive?

A.   I believe so.

MR. DARDEN:  May I have just a moment, Judge.

THE COURT:  Yes.

(Brief Pause.)

Q.   When you entered the home, you previously testified there were no weapons drawn.  Is that correct?

A.   Yes, sir.

Q.   Ask you make any attempt to clear the house of anyone other than the defendant and Ms. Brown?

A.   I believe the agents stood in the living room area right there.  And you could pretty much see the whole house.

Like I said, I immediately went to that room, and I really can't testify to that.

THE COURT:  Well, was there anyone else present in the home, other than the defendant and Ms. Brown.

A.   No, no, sir.  No, Your Honor.

Q.   Well, let me ask you this.  Is it normal procedure to execute a search warrant at the home where the defendant may live or the prime suspect may be located and go in without weapons being drawn?  Is that customary?

A.   Yes, sir.

MR. FRENTZEN:  Judge, I would just like to clarify that was not the execution of a search warrant.

THE COURT:  Well, clearly had consent been denied, I think the search would have proceeded; would it not, pursuant to warrant?

MR. DARDEN:  Of course, it would have.  And they would not have gone there if they didn't have a search

warrant.  I mean, they just can't go around the neighborhood, knocking on doors, saying can we search your house.

THE COURT:  Well, you can with consent.

MR. DARDEN:  Well, you can, but only -- unfortunately, there are people who agree to that.

THE COURT:  No, fortunately, there are people who agree to that.

MR. DARDEN:  I guess it depends on how you look at it, Judge.

THE COURT:  Well, I'm looking at it the way a Supreme Court looks at it.

BY MR. DARDEN:

Q.   Did you ever hear -- were you in the room when Detective Woodall; or, did you ever hear Detective Woodall make the statement to the defendant after he arrived, you know, "we've got the cuffs on her now.  What are you going to do?"

A.   No, sir.

Q.   You never heard that?

A.   No, sir.

MR. DARDEN:  That's all I have.

MR. FRENTZEN:  Nothing further Your Honor.

THE COURT:  Let me ask the witness this.  You said earlier that you did not ask the defendant if he

could read and write the English language.  Explain to me how you went over this warning and waiver of rights form with him?  Did you read the form to him?

A.    Yes, I did.  And then when I get to the portion such as on the warning portion, I say you have the right to remain silent.  I say, do you understand.  And if I get an affirmative answer, I go to the next line.  And I make sure everyone knows what I'm asking of them.  And if they don't -- if they have a question, I will explain it to them.

THE COURT:  All right.  Thank you.  You may go down.

[NOTE:  Witness left the stand.]

MR. NEWMAN:  Next witness, Your Honor.

THE COURT:  Yes.

MR. NEWMAN:  Detective Woodall, please.

CLERK:  State your full name and occupation for the record, please.

WITNESS:  My name is Charles Woodall.  I'm a detective with the Liberty County Sheriff's Department, Hinesville, Georgia.

Charles Woodall, after having been duly sworn, testifies as follows.

GOVERNMENT'S WITNESS, SWORN, TESTIFIES AS FOLLOWS

DIRECT EXAMINATION

BY MR. NEWMAN:

Q.   How long have you been so employed by the the Liberty County sheriff's office, sir?

A.   I've been with the sheriff's department for ten years, sir.

Q.   What rank or title do you presently hold?

A.   I'm a detective lieutenant.

Q.   Detective lieutenant?

A.   Yes, sir.

Q.   Were you previously in the United States Army?

A.   Yes, sir, I was.

Q.   And what general type of work did you do in the army?

A.   I spent twenty years as a criminal investigation special agent.

Q.   How much of that was at the Fort Stewart Military Reservation?

A.   The last five years.

Q.   In your ten years with the Liberty County sheriff's office, have you had contact and come to know the defendant in court today, Meier Jason Brown?

A.   Yes, sir, I did.

Q.   And was your assistance requested by federal postal investigators in the days following the murder of a postal relief worker, Sally Gaglia?

A.   Yes, it was.

Q. And directing your attention to December 6th, the morning of December 6th, did you have occasion on that day to be in the presence of the defendant, Meier Jason Brown?

A. Yes, sir, I did.

Q. And at that day, did you find yourself in Liberty County -- day and time, did you find yourself in Liberty County, Georgia?

A. Yes, sir, I did.

Q. And at what time did you first see or encounter Mr. Brown on the morning of December 6th?

A. Approximately 8:00 o'clock in the morning.

Q. Where did you first see Mr. Brown?

A. I had come into the office to do some work and to actually conduct an interview of him.

Q. What time again was that you first saw Mr. Brown?

A. Roughly 8:00 o'clock.

Q. Where did you first see him?

A. He was being held in the detention there at Liberty County jail. I went back and picked him up and carried him up to an office where I could sit down and talk to him.

Q. What office did you take him to?

A. A spare office. I think it was the chief deputy's office we actually used.

Q. Were you accompanied by one of the other

investigators involved in this effort?

A.   Yes, I was.  A postal the inspector.

Q.   Do you recall that gentleman's name?

A.   Offhand, no, sir, I don't know.  I didn't really know the inspectors.

Q.   Did you seek to conduct a further interview of Mr. Brown at that time?

A.   Yes, sir, I did.

Q.   And where did you decide that interview would be best to be taking place?

A.   There in the office that I was using, the chief deputy's office, where we would have room to be able to sit and face to face with each other and talk.

Q.   And what procedure did you follow with Mr. Brown and this other postal officer who was present on the morning of December 6th?

A.   Initially, I introduced Jason to the postal inspector.  He had met him the day before.  And I told him that I wanted to talk to him and asked him if would be okay for this particular postal inspector to sit with us, because I needed somebody else in the room.

He acknowledged that would be okay.  We went into the office and sat down.  I told him that what we were going to do was we needed to go back over what he had discussed previously.  And that this postal inspector was going to

advise him of his rights prior to doing that, and asked him if he understood that. And he agreed that is what we would do.

MR. NEWMAN: May I have approach the witness, Your Honor.

THE COURT: You may.

Q. I hand you what has been marked Government's Exhibit 5 for identification, sir. Do you recognize that?

A. Yes, sir, I do.

Q. What is that?

A. This is a copy of a rights waiver warning certificate that the postal inspector used that morning. I was sitting there present with him when he went over it with Meier. And I also signed it.

Q. Do you recall what procedure the postal inspector followed in obtaining a *Miranda* waiver at that time?

A. Yes, sir. Basically, he had this form. He filled out -- he read it to him verbatim. He asked Meier a series of questions, if he understood the rights. I think he had him -- well, looking at it, he had him date and time it. And then he handed to me for me to sign as a witness.

Q. And do you recognize your signature at the bottom?

A. Yes, sir, I recognize my signature, and Mr. Reeves was an inspector's name. And he signed it in front of me.

I remember him signing it, and also Jason.

Q.   What was Mr. Brown condition on the morning of the 6th?

A.   As far as what, sir?

Q.   Just his general physical deportment?

A.   He was feeling a little more relaxed.  He was -- well, I can't say he was happy.  He was happy to see me. He and I had talked extensively.  And I think he felt relieved to see me in there that morning.  That is why I had asked him if it was okay to have to other inspector come into the room.

He was calmed down.  He did later on become agitated a couple of times.  And he became extremely upset.  But he was in -- he had slept good.  I talked to him about that, because we had been late getting there that night.  I asked him if he had ate breakfast.  I mean, he was very cordial, very friendly toward me.

Q.   In fact, going to your delivery and placing Mr. Brown into jail the night before, did you have anything to do with securing some food for Mr. Brown?

A.   Yes, sir.  Once we left Savannah en route back to Liberty County, I contacted the deputy transporting him by radio to ask Jason if he wanted something the eat.  He asked me to stop by and get him a couple of hamburgers with anything but mayonnaise and onions.  So, I stopped

and bought him some food and carried it to him out at the jail. We sat and talked a couple of minutes, and he ate.

Q. Who transported Mr. Brown to the Liberty County jail?

A. One of the deputies, sir. I don't recall offhand who.

Q. It was not you?

A. No, sir, it was not.

Q. And going then back -- moving, jumping forward again to the morning of December 6th, after Mr. Brown signed the warning and waiver on Exhibit 5 there, what took place?

A. I told him that we needed to discuss in detail what had occurred that we were investigating. I told him that we were going to be recording the conversation. And I explained to him why, that rather than just have me be able to say what he said, I wanted to have a record of what was going on. And I wanted his permission to record that conversation. And he gave that.

Q. Did Mr. Brown voice any objection to that?

A. Not to the recording. At one point during the recording, he asked if he could speak to me off the tape, because there was some names of people that he didn't particular want mentioned on the tape. And when I got too close to that, he asked me to momentarily stop. And I explained to him that we would just skip those names. And he agreed to continue to tape the interview.

Q.   Did you then conduct an full interview of Mr. Brown?

A.   As full as was possible, yes, sir.

Q.   And did the tape recorder work as it was suppose to?

A.   Yes, sir.  It recorded the conversation.  I actually afterwards, played it back to listen to it to make sure it was a good representation of what went on in there, that mic had picked up everything, and it was an adequate recording.

Q.   Have you had an opportunity to review a transcript of that interview?

A.   Yes, sir, I have.

MR. NEWMAN:  May I approach the witness, Your Honor, with Government's Exhibit 6.

THE COURT:  Yes.

Q.   Do you recognize that, sir?

A.   Yes, sir.  This is a copy of the transcript of the taped interview that I had with Meier that morning of the 6th.

Q.   And you have had occasion to read that transcript, sir?

A.   Yes, sir, I have.

Q.   Does it appear to be substantial accurate as to conversation, questioning of you, and Mr. Brown of the morning of December 6th, 2002?

A.   Yes, sir, it is.  I've read it several times since

then, and it is an accurate transcript of what was said.

MR. NEWMAN:  Your Honor, we are prepared to play, to present to the Court the audio version of that interview at that time, if the Court would like to hear that.

THE COURT:  Is there any necessity for that? Can't I listen to it in chambers.

MR. NEWMAN:  Yes, you can, Your Honor.  And I have provided Ms. Flanders a compact disk of that, and defense counsel.

THE COURT:  Is that okay with you.

MR. DARDEN:  Yes, sir, that is fine with us.

MR. NEWMAN:  Well, Your Honor, at the point in time then, we would tender the Exhibits 5, 6, and the unmarked 7.  It is hard to put a tag on a compact disk.

One moment, Your Honor.

THE COURT:  This is the original, the one you're giving us?

MR. NEWMAN:  It is actually a copy, Your Honor.

THE COURT:  I think there is no difference really.

MR. NEWMAN:  Correct, Your Honor.

THE COURT:  Just for the purposes of marking it, she can put a label on the case.

MR. NEWMAN:  Yes, absolutely, Your Honor.

I turned the witness over, Your Honor.

CROSS EXAMINATION

BY MR. DARDEN:

Q.   Deputy Woodall, at approximately what time did you arrive at the residence?

A.   At the residence?  Which one?

Q.   Diane's home on Laurel Wood?

A.   On the 5th, roughly 5:00 o'clock.

Q.   About 5:00 o'clock?

A.   Yes, sir.

Q.   Let me ask you this:  In looking at the summary of your interview as well as the transcript, there are a number of times when the defendant talks to you about Diane Brown.  Is that correct?

A.   Yes, sir.

Q.   And his concern for her?

A.   Yes, sir.

Q.   Is that correct?

A.   Yes, sir.

Q.   And in fact, isn't it true that when she was brought into the room, the defendant himself told her "the only reason I made a statement in this case is to protect you?" You recall that?

A.   Yes, sir.

Q.   Okay.  And I believe he indicated that again on the

morning of the 6th when you taped this interview out at the county jail.  Is that correct?  Do you recall that?

A.   Yes, sir.  He expressed concern that she was being drug into it.  Yes, sir.

Q.   Okay.  And in fact, in that interview, he indicated to you and the postal inspector, you know, that is the only reason I gave a statement, to keep her from being arrested?

A.   I think he said that.  Yes, sir.

Q.   Yes, sir.  Now, when you arrived, the postal inspectors had already talked to him on the 5th.  Is that correct?

A.   Talked to who, sir?

Q.   To the defendant?

A.   I can't say.  The way I was briefed was that once I got there, he had requested to talk to me.  And that initially, he was going to actually come to sheriff's department in Chatham County, and talk to me.  But he had said he would rather me come there.  So, as far as I know, nobody actually talked to him until I got there, as far as going into any specifics or any details.

Q.   And as indicated in your report, you were told when you arrived by the postal inspectors that he was not under arrested.  Is that correct?

A.   Yes, sir, that's correct.

Q.    But nowhere in your summary report do I see where you advised him he was not under arrest.  You simply talked to him; correct?

A.    No, sir.  I told him initially he was not under arrest.  I told him numerous times that -- I mean, that he was free to leave.  Several times he asked about getting things.  And we talked about -- I told him specifically he could do anything he wants.  We were in his house with his consent and the consent of the young lady.

Q.    Did he move about the house?

A.    Yes, sir.

Q.    And I guess when he moved about the house, he was accompanied by officers.  Is that correct?

A.    To the extent.  By officers, the only persons in the room with him was myself and one other inspector.  And that was done after the initial interview.  It was obvious that Meier was not comfortable talking in front of people.

He's person -- he stays to himself a lot.  And he doesn't like to be around a lot of people.  And once I realized that was the problem, I asked if he would be more comfortable moving into another room.  And he agreed that he would.  So, that's what we did.

Q.    You have a pretty good relationship with him?

A.    Yes, sir.

Q.    You know him?

A.   Yes, sir.

Q.   And he had talked to you?

A.   Yes, sir.

Q.   He feels comfortable with you?

A.   I think so.

Q.   And that was the reason you were brought in.  I mean, he was requesting you, but they felt that they could use you to get information.  Is that correct?

A.   I think that they thought we had a better chance of him talking to somebody that he knew.  He did not know the inspectors.

Q.   When you arrived at the house, did you notice the officers outside of the home?

A.   We were met -- when I first got there, I was met by some postal inspector outside the house who initially briefed me that they were conducting the search and that he was -- that they had found him at the house, and that he was not under arrest.

    There were inspectors doing various things.  I don't know what they were doing, though.

Q.   Did you see any sheriff's deputies there, any county officers?

A.   I want to say there was a K-9 unit of some sort.  I really -- I wasn't involved in processing the scene.  So, I really wasn't paying attention to what was going on

outside the house.  My sole purpose in being there was to make Meier feel comfortable and see if he wanted to sit down and tell me what happened.

Q.   Did you see any weapons?

A.   I'm sure if there was officers there, they have weapons.  I don't carry a weapon when I'm doing interviews.  And I don't allow weapons in the room where I'm doing interviews.  So, none of us had weapons.  But I'm sure -- I mean, there were police officers doing a search.  I'm sure there had to be weapons there.

Q.   That would be standard procedure; would it not?

A.   Yes, sir.

Q.   I mean, you wouldn't go to a house to search it without weapons; would you?

A.   Would I personally?  No.

MR. DARDEN:  Could I have just a moment with Joe.

(Brief Pause.)

MR. DARDEN:  Judge, I would just state for the record, I had many questions to and him.  However, since you have a transcript of the actually interview itself, all of my questions were related to the interview.  And it will become apparent as to what is in the statement.  I don't see any need in me asking him to repeat everything you are going to hear.

THE COURT:  All right.

MR. DARDEN:  That's all I have.

MR. NEWMAN:  No other questions of the witness, Your Honor.

THE COURT:  All right.  The witness is excused.

[NOTE:  Witness left the stand.]

MR. FRENTZEN:  Next witness, Your Honor,.

THE COURT:  Yes.

MR. FRENTZEN:  The government calls Inspector McLendon.

CLERK:  State your full name and your occupation for the record.  And spell both your first and your last name.

WITNESS:  My name is Marla McLendon, spelled M-a-r-l-a M-c-l-e-n-d-o-n.  I'm an United States postal inspector.

*MARLA McLENDON*, after having been duly sworn, testifies as follows:

GOVERNMENT'S WITNESS TESTIFIES AS FOLLOWS

DIRECT EXAMINATION

BY MR. FRENTZEN:

Q.   Inspector McLendon, how long have you been a postal inspector?

A.   I've been a postal inspector a little over ten years. I've been with the postal service over twenty-two years.

Q.   During your time as a postal inspector, where have you been stationed?

A.   I began my career with the Inspection Service in New Orleans, Louisiana.  I transferred to the Savannah, Georgia domicile in September of 2002.

Q.   Are you the case agent investigating the murder of Sally Louise Gaglia?

A.   Yes, I am.

Q.   In that capacity, on December 5th, 2002, did you apply for and obtain search warrants for two locations?

A.   Yes, I did.  We obtained -- applied for and obtained search warrants for Leroy Coffer Highway, the residence of Sadie Brown, and also 131 Laurel Wood address of Diane Brown.

Q.   Did you and other members of the Task Force attempt to conduct searches later on that day?

A.   Yes, we did.  We conducted simultaneous searches at both sites.

Q.   Did you make a decision at that time with regard to whether or not to execute the search warrant?

A.   We decided to attempt to a consent to search if possible.  If not, we did have a search warrant to execute.

Q.   What the purpose for conducting the searches as consent searches?

A.   Well, it is always preferable to have consent, to have the parties willing, and also it is a more receptive is environment for us to be working and to obtain cooperative information.

Q.   Did you go out to one of a search sites that afternoon?

A.   Yes.  I was present at a Leroy Coffer Highway search.

Q.   What time did you conduct that search?

A.   We got there at approximately a quarter till 4.

Q.   And again, these two searches were designed to be conduct simultaneously?

A.   Yes.  We were in contact with the party at the other search site.

Q.   In the search site you went to on Leroy Coffer, whose residence was that?

A.   That's the residence of the defendant's mother, Sadie Brown.

Q.   Could you describe the location there at 6724 Leroy Coffer Highway?

A.   Yes.  That address is a tan-colored mobile home, double wide.  It sits about a hundred feet off the road. It is the center trailer.  There are three trailers that belong to family members that are commonly referred as to Morgan residences.  And this is the center trailer.

Q.   How many officers and inspectors did you have with

you?

A.   We had five postal inspectors, one -- initially one Liberty County detective and one uniformed deputy.

Q.   Where did the agents or where did the inspectors and officers, where were they located when you first approached the trailer?

A.   We had two inspectors in the woods behind the trailers.  And the rest of the agents were in the front of the trailers.  Myself and another inspector, and uniformed officer approached the door.  The other agents were in the front yard.

Q.   What were the officers wearing?

A.   The inspectors were wearing either our marked raid jackets or our vests, which are identified.  The uniformed officer, of course, wore his uniform.  And the Liberty -- I'm not sure what the Liberty County detective wore.  I think it was just casual clothes.

Q.   Did any of the officers involve at the initiation of the search, did any officers have guns drawn?

A.   No, we did not.

Q.   I believe you said that the number of the officers were front of the trailers, those who did not approach the door.  How far from the front of the trailer were they positioned?

A.   I was at the door.  And they were behind me, I would

say, anywhere from probably 10 to 50 feet.  I'm not sure exactly where they were staged.

Q.    You said you approached the door.  Who knocked at the door?

A.    It was either myself or inspector Gary Roberts.  I believe it was me.

Q.    What happened after you knocked on the door?

A.    The door was opened by Leo Morgan, the defendant's brother.  We could see several individuals in the living area of a trailer, Sadie Brown was visible from the door. She was sitting in her wheelchair in front of the television not far from the front door.

Q.    Where did you go?

A.    I saw her sitting there.  I identified who we were and told her that we needed to -- that we would like to talk to her, if we could come in, that I had a few things I wanted to discuss with her.  And she agreed.

Q.    She agreed to what?

A.    She agreed for me to come in why I told her that we were there; we wanted to search her residence.  I explained that we were there in connection with the robbery/homicide at the Fleming Post Office..  And that is why we wanted to search her residence, the surrounding area, and any vehicles.

Q.    At her invitation, did you enter the room?

A.    Yes, we did.

Q.    And did you attempt to obtain her consent on a consent form?

A.    Yes, we did.  After I briefly explained to her what we were there for, and she immediately started assenting for us to do whatever we needed to.  But I took a little more time to go over what we were there for, and went over the form with her, advised her that it was within her right to refuse the search.  But she was agreeing to the search from the moment we entered.

        MR. FRENTZEN:  May I approach, Your Honor.

        THE COURT:  Yes.

Q.    Inspector McLendon, I'm handing you what has been marked as Government's Exhibit No. 8.  Do you recognize that?

A.    Yes.  This is is the consent form that I reviewed with Ms. Sadie Brown and that she had agreed to and signed.

Q.    Did you read the form to Ms. Brown?

A.    Yes, I did.

Q.    And did you explain it to her?

A.    Yes, I did.

Q.    And is that her signature at the bottom of the form?

A.    Yes, it is.

Q.    Along with yours?

A.    With my signature and inspector Gary Roberts' signature, yes,.

Q.    After filling out the form, did the officers begin a search of that residence?

A.    Yes, they did.

Q.    Did you participate in search itself?

A.    No, I did not.

Q.    What did you do?

A.    After Ms. Brown consented to the search, there were several individuals that were in the the living room.  We didn't know their identity.  I asked one of them who he was.  He identified himself, and I asked if he would be willing to talk with us.  He agreed, and we went outside.  And I interviewed -- Inspector Gary Roberts and I interviewed him in a vehicle.

Q.    Who was he?

A.    Tee tricks Davis.

Q.    When you concluded that interview, did you attempt to interview anyone else?

A.    Yes.  When we concluded the interview of tee tricks Davis, I approached one of the other individuals in the residence who identified himself as Nicholas owe say Johnson.  And he asked him if he would talk with us.  And he came outside, and we again got in a vehicle to conduct an interview.

Q.   Did you conduct any more interviews out in the vehicle?

A.   No, we did not.

Q.   Was the search finished prior to your conducting any further interviews?

A.   Yes.  One of the detectives tapped on the car while we were talking to Nicholas owe say Johnson, and said that they were finished with the search.

Q.   Were you involved in the preparation of the inventory as a result of the search?

A.   They were preparing the inventory at that time.  They reviewed with me what they had found, and then prepared the inventory.

Q.   Can you give the Court a summary of what was found at that location?

A.   Yes.  There was a jacket that was found in one of a bedrooms, along with a baseball type cap, a black handle knife.  There were several pairs of a tennis shoes that were seized.  There were clothing articles that were seized from the laundry area.  And there was a bicycle that was seized from outside, along with a single shoe.

Q.   Do you know where the bicycle was taken from?

A.   The bicycle was leaning against the trailer next to Sadie Brown's, the one that is commonly referred to as Uncle Junior's trailer.

Q.   Do you know whether or not -- or, do you know where in relationship to trailer the bicycle was leaning?

A.   I believe the bicycle was leaning on the front of the trailer, facing the road as you pull in.

Q.   Was it clearly visible?

A.   It was visible from the highway.  Yes, it was clearly visible from the yard as well.

Q.   After you learned that the search had been concluded, did you conduct any further interviews at that location?

A.   Yes.  I went back inside the residence at that time. The only other occupants, Leo Morgan and Sadie Brown had not been interviewed.  And I briefly interviewed both of those individuals.

Q.   Did you give Sadie Brown an inventory from the search?

A.   Yes, we did.  We left it with her.

Q.   What did you do at that time?

A.   At that time, I proceeded to the other search site. We had been advised that the defendant was present at that location.

Q.   Do you know approximately what time you arrived at the other location?

A.   It was approximately -- I did not make note of it.  I would say it was approximately 8:00 o'clock.

Q.   What was going on at the other scene when you were

arrived there?

A.    When I arrived, there were several agents in the front yard, basically waiting.  I was advised that Detective Woodall and Inspector Rushwin were talking to the defendant at that time.  And I was apprised of several of the items that had been found in the search.

Q.    What type of items had been found at that other location?

A.    I was advised about the shoes, the blue Lugtz shoes that had been seized.  Also, there were three money order receipts, two of which were the missing money orders from the postal robbery and homicide.  There was some paper with some writings on it, and a jacket, I believe.

Q.    At some point after you arrived at that location, did you take some action to gain some guidance about whether or not to place Mr. Brown under arrest?

A.    Yes.  Earlier in the week I had made contact with the U.S. Attorney's office, as you know.  And you were the duty inspector that week.  I contacted you to advise you of the proceedings up to that point.

Q.    Was a decision made at that time about whether or not to place Mr. Brown under arrest?

A.    No.  We did not make a decision at that time.  We were discussing the amount of evidence that we had in

trying to reach a decision on what we were going to do.

Q.   What interrupted that discussion?

A.   Woodall, Detective Woodall came out and told me that he had gotten a confession from the defendant.

Q.   At that point in time, obviously, was a decision made to place Mr. Brown under arrest?

A.   Yes.

Q.   Do you know who did that?

A.   Inspector Jim Rushwin arrested the defendant.

Q.   Were you present when he was placed under arrest, Mr. Brown?

A.   No, I was not.

Q.   At some time following Mr. Brown being placed under arrest, and additional time speaking with Mr. Brown, did you have a conversation with Mr. Brown?

A.   Yes, I did.  I talked with Mr. Brown briefly before he was transported to Liberty County.

Q.   Can you tell us about that conversation?

A.   Yes.  I introduced myself to Mr. Brown.  I told him that I would the case agent for this investigation, that we would have several court proceedings where we would see each other.  And I told him I understood that he had confessed to the robbery and homicide at the post office and that I wanted to corroborate some of the information.

     Mr. Brown indicated to me that yes, he had confessed

to it, but he was reluctant to go over it again.  And I wanted to get some corroborating bit of the information. He was reluctant to go into it again.  I asked him if anything -- if Ms. Gaglia had said anything.  He said no, she didn't say anything.

I asked him where she was when he left.  And he said that she was on the floor.  I asked if she was sitting or laying on the floor.  And he just shook his head.  And I didn't ask him any further questions.

Q.    Did you ask him anything about attempting to find the wallet?

A.    Yes.  Yes, I did.  He was talking with his girlfriend, Diane Brown, at the time when Rushwin and Woodall were telling me the conversation and the events that transpired in their interview with him.  And they told me about the wallet.  I walked into the room where the defendant and his girlfriend were talking.  I asked him if he would be willing -- he was going to be -- the decision had already been made he would be transported to Liberty County.  I asked if he would be willing to go by the site that he indicated the wallet was and show us exactly where it was.

And he said that he had already told exactly where it was, and that he was tired.  And I said okay.

Q.    To your knowledge was he taken to Liberty County at

that time?

A.   Yes, he was.

Q.   Did you make any efforts either directly or indirectly to make some notification to the Federal Court staff about this arrest?

A.   Yes.  I contacted you, told you that he -- well, as you knew, that he was being arrested, and it is my understanding that you made contact with the Court that night, or with the Court officials that night.

Q.   What was your understanding about the availability of the magistrate and the ability to present Mr. Brown to the Court.

A.   That there was no availability that night, that arrangements would be made the next morning to bring him in.

Q.   Did you or to your knowledge anyone else involved in this investigation make any efforts to delay Mr. Brown's appearance before the magistrate?

A.   No, not at all.


                    CROSS EXAMINATION

BY MR. DARDEN:

Q.   Did I understand your testimony that arrangements would be made the next morning, that would be the 6th, to bring them before the magistrate?

A.   That's correct.

Q.   Okay.  Of course, that was not done; was he?

A.   He was brought before the magistrate the next morning.

Q.   What time?

A.   I think it was scheduled, initially scheduled for 10. There was some scheduling conflict.  I'm not sure exactly. I think it was closer to 1 before he finally made it.  But I know he was available.

Q.   This bicycle that you seized at the trailer of Uncle Junior --

A.   Yes.

Q.   Did you have a search warrant to search that property?

A.   Uncle junior's trailer is immediately adjacent to Sadie Brown.  And the bicycle was readily visible from the highway, from the the doorway.  And it was by the occupants of the house, it was community bicycle.

Q.   The question is:  Did you have a warrant to search that property?

A.   Yes, I believe we did.

Q.   Okay.  Did you receive a consent from Uncle Junior to search the property?

A.   No, but I believe the consent I received covered the bicycle.

Q.    Okay.  But this mobile home was located next door or adjacent to his mom's house.  Is that correct?

A.    Yes.

Q.    Was it understanding when you went to that location that perhaps the defendant resided at that residence at least part of the time?

A.    Yes.

Q.    And in fact, in this protocol that I talked about earlier, he's listed as a suspect.  Is that correct?

A.    Yes.

Q.    And I assume that is why you went there with the number of officers you did in case he was there.  Is that a fair assumption?

A.    Yes.  We really didn't expect him to be at either location, but with we knew it was reasonable to assume that he could be at either location.  And we wanted to be prepared for that.

Q.    Okay.  And if he had been at that location, what steps would you have taken to detain him at that location?

A.    Probably the exact steps that were taken at the other location.  We would have, of course, identified who he was, and then attempted to talk to him if he had given consent.  But at that point, we didn't have enough to make an arrest, and he would not have been placed under arrest immediately, no.

Q.    So, it is your testimony he would have been free to leave the area even if he had been at his mom's house?

A.    Yes.

Q.    Okay.

MR. DARDEN:  That's all I have.

MR. FRENTZEN:  Nothing further Your Honor.

THE COURT:  Do you feel like you had a warrant to enter this other mobile home, Uncle Junior's mobile home?

A.    No, not to enter the premises.  But I felt the bicycle was in close proximity of Sadie Brown's.  It was clearly visible from --

THE COURT:  How close was it.

A.    You had to pass within -- I'm very bad at distance. But I would say within ten to fifteen feet if you go straight down the driveway of Sadie Brown's door, you pass within ten to fifteen feet of where the bicycle.

THE COURT:  And you say the bicycle was leaning up against the mobile home of this Uncle Junior.

A.    Yes.

THE COURT:  And how far from the curtilage -- let's say the front door of her mobile home to that bicycle.

A.    I would approximate maybe fifty feet.  But it was more in the direct line.  It was not, you know, off to the

side.  It was more in the direct line from the roadway and the driveway straight to her door.

THE COURT:  From her residence, could you see the bicycle.

A.   Yes.

THE COURT:  Thank you.  You may go down.

[NOTE:  Witness left the stand.]

MR. FRENTZEN:  The government calls inspector Dewayne Martin.

CLERK:  State your full name and your occupation for the record, and spell the first name.

WITNESS:  My name is Herbert Dewayne Martin, H-e-r-b-e-r-t.  And I'm an U.S. postal inspector.

Herbert Dewayne Martin, after having been duly sworn, testifies as follows.

GOVERNMENT'S WITNESS, SWORN, TESTIFIES AS FOLLOWS

DIRECT EXAMINATION

BY MR. FRENTZEN:

Q.   Inspector Martin, how long have you been a postal inspector?

A.   About thirteen months.

Q.   Where you are currently stationed?

A.   Jackson, Mississippi.

Q.   Did you have experience in law enforcement before you became a postal inspector?

A.    Yes, sir, I did.

Q.    What experience was that?

A.    I was a police officer with various state agencies in Mississippi for approximately ten years before becoming a postal inspector.

Q.    Directing your attention to late November or early December of 2002, did you participate in the Task Force investigating the murder of Sally Louise Gaglia?

A.    I did.

Q.    Directing your attention to December 5th, of 2002, were you present for a search at 131 Laurel Wood Drive in Savannah, Georgia?

A.    I was.

Q.    Were you present with Inspector Rushwin when he initially knocked at the front door of that residence?

A.    I was.

Q.    Could you tell us what happened immediately after Inspector Rushwin knocked at the door?

A.    Inspector Rushwin, we approached the door.  I was beside him.  He knocked on the door.  Mr. Brown came to the door first, and then Ms. Brown was, you know, shortly behind him.  You know, she was in a different room.  So, it took her a little bit longer.

      And Inspector Rushwin asked Ms. Brown if he could speak to her in private.

Q.   Did she agree to that?

A.   Yes, sir, she did.

Q.   What did you do following that brief conversation between Inspector Rushwin and Ms. Brown?

A.   I stood at a doorway, and I asked Mr. Brown if he could have a seat in a chair right there.

Q.   What did he say about that?

A.   He sat down in the chair.

Q.   Why did you ask him to sit in the chair?

A.   It was the officer's safety, just to, you know, prevent anybody from misunderstanding somebody's intention.

Q.   Did you order him to sit in the chair?

A.   No, sir.

Q.   Did you tell him he had to sit in the chair?

A.   No, sir.

Q.   At that particular time did you recognize him to be Meier Jason Brown?

A.   I thought it was him, you know, but I wasn't absolutely sure.

Q.   Would you have taken any different steps had it been anyone else?

A.   No, sir.  If there had been multiple people in there, I would have asked him to do the same.

Q.   Did you ask Mr. Brown anything else about his

movements or his actions while he was sitting in the chair?

A.    The only other thing I told Mr. Brown is that if he did do anything like gets up, like go into his pockets or anything, if he would just let me know before he did do that, just so that I would understand what his intentions were and wouldn't take them as a threat to myself or the other officers.

Q.    What was the purpose of this?

A.    It is the officer's safety.  I didn't want him to go into the his pockets, if he had a weapon or make a move that he would try and attack an officer or anything.  That was solely my purpose for that.

Q.    During the time that he was there in that chair, did he -- did he get up out of the chair.

A.    Yes, he did.

Q.    Did you do anything else while he was sitting in the care?

A.    Yes, sir.  I mean, he scratched his head.  And I think he smoked there one cigarette.  I'm not sure.

Q.    About how long was he there in that chair?

A.    I want to say maybe, maybe fifteen minutes or so.  I don't know exactly the time.

Q.    What happened to break  up your being in his presence while he was there in that chair?

A.    Inspector Rushwin asked to speak with him.

Q.    What did you do after Inspector Rushwin approached him?

A.    I was told by the inspector to begin the search of the residence.

Q.    What was your role in the search of the residence?

A.    I was the photographer.  I photographed the evidence obtained during the search.  And also assisted in doing the search of the house, the residence and the property.

Q.    At some point later on in the evening, were you asked to go into the room where Mr. Brown was being interviewed?

A.    I was.

Q.    What was the purpose of you going into that room?

A.    Just to give a fresh -- I guess someone fresh to talk to Mr. Brown, and during -- I mean, during the interview kind of the bad cop thing.

Q.    Who asked you to go in there?

A.    What was the deputy sheriff's name, Investigator Chuck -- I cannot remember his last name right now.

Q.    You are remember his first name as Chuck?

A.    Chuck; right.

Q.    What did you tell Mr. Brown when you went into his room?

A.    I briefly -- I was not a real bad cop.  I briefly gave him a history of the Inspection Service.  And

informed him what postal inspectors are and what we do, and our history, and our good we are at our job.

Q.    Did you tell him that you and some of other inspectors didn't believe his story?

A.    I did.

Q.    Did you ask him any questions during the time you were in there?

A.    No, sir, I didn't.

Q.    About how long were you in that room with Mr. Brown?

A.    I would say around 30 minutes, maybe -- probably not that long exactly.  It was less than an hour.  I know that.

Q.    I'm sorry.  The time that you went into this room to talk with him, to play bad cop or provide a fresh, how long were you in that room at that time?

A.    Yeah, I would say somewhere between a 30 minutes and an hour.  I couldn't tell you exactly.  I wasn't watching my watch.

Q.    Then you were present for the interview?

A.    Correct.

Q.    Okay.  What happened that caused you to leave?

A.    Well, the deputy investigator chuck -- is it may field.  I can't remember.  He gave me a nod that I was through.

Q.    At that time did you leave?

A.    I did.

Q.    Were you present for the search there the remainder of the night?

A.    I was.

Q.    Did you have any more contact with Mr. Brown?

A.    I didn't.

MR. FRENTZEN:  The Court's indulgence for one moment, Your Honor.

THE COURT:

(Brief Pause.)

MR. FRENTZEN:  Nothing further Your Honor.

CROSS EXAMINATION

BY MR. DARDEN:

Q.    Sir,, approximately what time did you arrive at the residence on Laurel Wood, the best you can recall?

A.    I think it was somewhere around 4, the 4:00 o'clock hour.  I can't remember exactly.

Q.    All right.  When you approached the home, there were several agents there.  Is that correct?

A.    There were a couple of postal inspectors and some of the local police department, uniformed officers.

Q.    Guns were drawn?

A.    I don't if everybody had a gun drawn, but some where.

Q.    So, you did see some weapons?

A.    Well, one of the deputy sheriff's had a shotgun that

was outside.  He didn't go inside.

Q.   And he stood outside during this entire search.  Is that correct?  He remained on the scene?

A.   Yes, sir, I believe so.

MR. DARDEN:  Okay.  Thank you.  That's all I have.

MR. FRENTZEN:  Nothing further Your Honor.

THE COURT:  Thank you.  You may go down.

[NOTE:  Witness left the stand.]

MR. FRENTZEN:  Your Honor, that is all of evidence that we have with respect to the searches and the confession.

THE COURT:  You don't have any witnesses on this --

MR. DARDEN:  Judge, I will call the defendant for the limited purpose of determining the admissibility of the statement, for a very limited purpose.  I don't anticipate it will take long at all, if you want to move forward.

THE COURT:  Well, we're going to have take a recess at some point to come back to hear, I think, argument on some additional motions.  Is that right?

MR. BELL:  Just briefly.

MR. DARDEN:  We have some brief argument on some other motions, yes.

THE COURT:  Well, my plan was to hear the evidence and then come back.  And then later on hear argument on these motions after a lunch recess.  We can take your witness now --

MR. DARDEN:  That's fine, however, you want to handle it, Your Honor.

THE COURT:  It doesn't matter to me.  If you want to take your witness now, we can do it.  If you want to wait until after a lunch recess, we can do that.

MR. DARDEN:  Perhaps we could come back in one hour.

THE COURT:  All right.

MR. DARDEN:   Thank you.

[NOTE:  Lunch Recess.]

THE COURT:  Richard, you wished to call your client.

MR. DARDEN:  Yes, sir, very briefly.

MR. FRENTZEN:  Judge, if I might briefly, I omitted to offer Government's No. 3 and Government's No. 8 into evidence previously.  I would like to offer those now.

MR. DARDEN:  I don't have any objection.

THE COURT:  Admitted.

MR. FRENTZEN:  Thank you.

CLERK:  State your full name for the record, and

please spell the first name.

WITNESS:  Meier Jason Brown, M-e-i-e-r.

**MEIER JASON BROWN,** after having been duly sworn
testifies as follow:

DEFENDANT TESTIFIES AS FOLLOWS

DIRECT EXAMINATION

BY MR. DARDEN:

Q.   Mr. Brown, let me call your attention to December
12th, 2002, the date this search took place.  Do you
recall that date?

A.   It was on the 5th.

Q.   I'm sorry.  I'm sorry.  December 5th.  Do you recall
that date?

A.   Yes, sir.

Q.   Mr. Brown, where were you living at that time?

A.   At my mom's residence.

Q.   At your mom's?

A.   Yes, sir.

Q.   Okay.  Was that primary residence?

A.   Yes, sir.

Q.   And I believe you in fact shared room there with your
mom in the back of the residence.  Is that correct?

A.   Yes, sir.

Q.   Did you spend some time at the home of Diane Brown?

A.   Yes, sir.

Q.   And I believe you were involved in a relationship with her at that time.  Is that correct?

A.   Yes, sir.

Q.   Okay.  Now, when the officers came out that day, when they entered, what happened, just very briefly?

A.   They came in.  I opened the door for them.  They knocked on the door first.  I thought that was odd, because we have a doorbell.  So, I opened the door.  I see a lot of police officers.  I back up, take a couple of steps back, hold my hands up like this, because they had their guns drawn.

Q.   Why did you hold your hands up?

A.   He has his gun drawn.

Q.   Okay.

A.   The first guy coming in.  He yells police.  I identifies himself as "police, search warrant".  That's what he said.  I take a couple of steps back, hold my hands up.  The first guy comes in.  He grabs Diane by the arm.  He walks by me and grabs Diane by the arm.  He puts on her a short couch in the living room.  After he puts her there, he grabs a chair from the dinning room table, puts it behind me, searches me and tell me to sit down.

Q.   Okay.  So, you were directed to sit in the chair?

A.   Yes, sir.

Q.   During the entire process, during the entire time

that this took place, were you free to move about the house at will?

A.    No, sir.

Q.    Okay.  When you did change locations, were you always accompanied by the officer?

A.    Yes, sir.

Q.    Was there any time when any of the officers told you you were free to leave at any time?

A.    No, sir.

Q.    Okay.  Where were you sitting in the house, what room?

A.    He took a chair from the dinning room table and put it in the living room in the middle of the floor.  So, in the living room in the middle of the floor.

Q.    Okay.  Could you see out of the house?

A.    Yes, sir.

Q.    Okay.  Are there windows there you can see out?

A.    Yes, sir.  There's two windows in the front.

Q.    Okay.  When you looked out, what did you see?

A.    Several police officers.  One had a shotgun.  The rest of them, they have their pistols.  Their cars is at the house across the street, things of that nature.

Q.    Was there ever a period of time when you decided to leave, or that you wanted to leave, or that you thought you could leave?

A.   They never -- I wanted to leave when they first came. They never indicated that I could leave, you know.  One officer even stated, the guy that was standing at the door, he stated if I get up that was going to be the worse mistake I could possibly make.

Q.   Okay.  Is that one of the officers that testified today?

A.   Yes, sir.

Q.   Which officer was that?

A.   I don't remember his name.

Q.   Was that that little short fellow from Mississippi?

A.   I don't know where he's from.  But he is the one that says he was an inspector for 13 months.

Q.   Okay.  Now, apparently through the testimony of the officers, there was a great deal of discussion concerning Diane Brown and her child.  Is that correct?

A.   Yes, sir.

Q.   Okay.  What were you told concerning Diane Brown and her child?

A.   What was I told?

Q.   Yes.  Did the officers talk to you about that?

A.   Yeah.  One officer referred -- well, he didn't refer. He told me I had ruined my life; don't ruin hers.

Q.   Okay.  Did they ever indicate to you that they were planning to arrest her?

A.    Yes, sir.

Q.    Okay.  And what was said concerning that?

A.    Throughout the night -- well, the afternoon, throughout the afternoon, they were telling me, you know that she could be charged with a crime.  Woodall, Detective Woodall, he told me -- well, I have to tell you where we're at in the house first.  We are in the sitting room in the house.

Detective Woodall comes into the room, and he says "I've got handcuffs on her, what are you going to do?"

Q.    What did you do in response to that statement?

A.    I made --

Q.    Did you make a statement?

A.    Yeah.  I made a statement then.

Q.    Okay.  Without saying what you said, you then talked to them.  Is that correct?

A.    Yeah.

Q.    And made a statement?

A.    He left me no alternative.

Q.    You didn't feel that you had any alternative, that you had to make a statement?

A.    He told me that he had the handcuffs on her, and what was I going to do.  I looked at the window, and I see a police car.  The police car was never there -- there was never a marked police car there.  There were only unmarked

cars, you know.  When I looked out the window, I see the Sheriff's Department car, the Chatham County Sheriff Department.

That was not out there prior to this conversation. So, naturally I thought that they were going to arrest her.  I thought that was the purpose of the car being there, to take her to jail.

Q.   What did you think would be accomplished by your giving a statement at that time?

A.   I thought that well -- not thought, I knew, because I told him, I said -- well, I don't know how to put this, but there was an agreement there basically that she would not be locked up, and she would not lose her child.

The thing was he wanted to take her child.  That was really what the whole shebang was, I guess.

Q.   Tell the Judge exactly what was told to you concerning the child by the officers.

A.   The officer said they were going to lock her up, and take her child.  You don't want her child -- no, he said, "you don't love her.  If you did love her, then you would tell us you did this.  If you love her, you wouldn't ruin her life.  Your life is already ruined."

MR. DARDEN:  May I have just a moment, Your Honor.

THE COURT:  You may.

(Brief Pause.)

MR. DARDEN:  That's all I have.  Your witness.

CROSS EXAMINATION

BY MR. NEWMAN:

Q.    Good afternoon, Mr. Brown?

A.    Good afternoon.

Q.    How many times before December 5, 2002, do you think you were face to face with Detective Chuck of Liberty County?

A.    How many times prior to --

Q.    Yeah.

A.    -- the interview?

Q.    Yeah.

A.    I'd have to go back and count them for you.  My first encounter with Detective Woodall was, I guess, about '92, very briefly.

My next encounter was 2000 -- I want to say 2000, 2000.  It was 2000.

Q.    So, it is your recollection you only had -- there are only two occasions where you spoke with him?

A.    I spoke with him in 2000.  He was the lead detective on a different case.  I spoke with him during the initial interview.  I spoke with him throughout his investigation.

So, we've been face to face, and we've talked, I guess, five or six times.

Q.   And you felt that you knew him and you felt that he knew you.  Isn't that right?

A.   I know him.  Whether he feels he knows me or not, I can't answer for him.  But I know -- I can identify him if I see him.  He is a detective for the Liberty County Sheriff's Department.

Q.   And you know him from your prior dealings as someone that you thought was a straight shooter, so to speak; he didn't make stuff up?

A.   Well, I don't want to get into a different case, because that case is not relevant here.  As far as him being a straight shooter, I can't say that.  But we never went to court on the case.  So, I really don't know.  I never heard him testify on that case.

Q.   But in your dealings with him, you found him to be someone who dealt with you politely and courteously.  Is that right?

A.   Yeah.  I mean, he, he -- that is his mentality. He's -- how can I put this.  He's a people's person.  He know how to talk to a person.

Q.   And you felt comfortable with him?

A.   Honestly, I don't feel comfortable around any police officers.

Q.   Well, you asked him to speak with him; didn't you?

A.   Excuse me.

Q.   You asked that he be the person that you would speak with; didn't you, back on December 5?

A.   Initially, no, sir.

Q.   But you said, you asked -- you told him you would speak to him the next morning, December 6th?

A.   Yes, sir, I did.  But initially, I did not because the inspector told me that he wanted to speak with me, that he would end the interview.

Q.   And you say the inspector, you mean the first gentleman that testified here today, Rushwin?

A.   Yes, sir.

Q.   Now, you have had a fair experience in dealing with the police in different circumstances; haven't you?

A.   Yes, sir.

Q.   You had extensive contact on your robbery conviction from 1996; right?

A.   Extensive contact with?

Q.   Law enforcement?

A.   Yes, sir.

Q.   And more recently, you and Diane Brown had a little incident with a Chatham County police officer here in Chatham County.  Isn't that right?

A.   No, sir.  She was a City of Pooler police officer.

Q.   A Pooler police officer?

A.   Yes, sir.

Q.   But in Chatham County?

A.   Yes, sir.

Q.   And on that occasion, you gave the police officer a name that was not yours?

MR. DARDEN:  Judge, I object to these questions, unless he can show the relevance of this previous conduct. I don't see where it has anything to do with the admissibility of this statement.

MR. NEWMAN:  The relevance is his credibility, Your Honor, and the implausibility of his saying his will was overborne.

THE COURT:  I suppose it touches on that.

Q.   So isn't that right, Mr. Brown?

A.   Can you repeat the question?

Q.   The question is that when this Pooler police officer stopped you driving the car on a suspicion of driving under the influence, you gave the police officer another name; didn't you?

A.   Yes, sir.  I gave another name.  But she stopped me for speeding.

Q.   And what was the name you gave the police officer?

A.   Raulston Brown, my youngest brother's name.

Q.   All right.  And when was that you owned up to someone that you were not Raulston Brown, or it was not Raulston driving car on that date?

A.    I told my brother the next day that I used his name when I got stopped.

Q.    And when did you tell someone connected with the Pooler Police Department or a court or judge in Chatham County?

A.    A court -- excuse me.  I didn't mean to interrupt you.  The day of court.

Q.    The day of court?

A.    Yes, sir.

Q.    And did you plead guilty to obstruction of an officer?

A.    Did I?

Q.    Yes, sir.

A.    No, sir, I never went to court for that.

Q.    Okay.  Now, going back to the December 5, when you were at Diane's residence that afternoon, the officers let you smoke some cigarettes; didn't they?

A.    Yes, sir.

Q.    They let you drink a couple of sodas; didn't they?

A.    Yes, sir.

Q.    Did you ever specifically ask them for something to eat?

A.    No, sir.

Q.    Did you ever specifically say you wanted a lawyer present to talk with you before you spoke with them?

A.    No, sir.

Q.    And did you tell Detective Woodall late on the afternoon or evening of December 5 that you would speak with him the next day and give him more details about what had happened in the Fleming Post Office?

A.    That's a yes and no question, sir.

Q.    Explain, if you would.

A.    Yes.  I told him I would speak to him the next day. No, I did not tell I would give any more intimate details, as you put it.

Q.    But in fact, did you, didn't you, give him more details the following day?

A.    I basically repeated what I told him the day before.

Q.    Now, when you were taken from the Laurel Wood residence to the Liberty County jail, you were at that point tired and hungry; weren't you?

A.    Sir, food was really not on my mind, not to disrespect you or anything.  But I really wasn't tired or hungry.

Q.    When the officer who was transporting you asked you about some food, you had a very specific request, in fact, as to how you wanted your hamburger fixed up.  Isn't that right?

A.    He asked me what did I want on it.  And I told him I don't eat onions or mayonnaise.

Q.    And in fact, two hamburgers and some other stuff was brought to you that night?

A.    Yes, sir.

Q.    And did you have a full night, approximately eight hours of sleep in the Liberty County jail?

A.    No, sir.

Q.    You didn't?

A.    No, sir.

Q.    How much did you sleep?

A.    I don't know, sir.  But was I given the opportunity for eight hours of sleep, yes.  Did I sleep eight hours, the answer would be no.

Q.    Well, the following morning, did you tell Detective Chuck Woodall that you were tired in any way?

A.    That I was tired?

Q.    Yes, sir.

A.    I don't recall making that statement.

Q.    And the tape doesn't -- the transcript doesn't show you making any statement like that; does it?

A.    Not that I read.

Q.    And just to clarify something.  You can read and write adequately; can't you?

A.    Yes, sir.

Q.    And in fact, you can just about recite a *Miranda* warning from memory; can't you?

A.    I know the basics of it.  Yes, sir.

Q.    So, on the morning of December 6th, when Detective Woodall and the other postal inspector came in front of you, you had been locked up all night.  You had eaten dinner the night before, right before you went into the jail cell.  And you had breakfast served to you by the Liberty County Detention Center.  Isn't that right?

A.    I didn't eat dinner.  I did drink a soda that they bring me.  I didn't eat breakfast because I didn't feel like eating anything.  That should be understandable.

Q.    But it was brought to you?

A.    But it was presented to me.  Yes, sir, it was.  I had the opportunity to.

Q.    And when Detective Woodall and the postal inspector advised you of your so-called *Miranda* rights, you knew what that process was; right?

A.    I know what the *Miranda* rights are, if that's what you're asking.

Q.    And you signed the first line saying you understood your rights; didn't you?

A.    Yes, sir.

Q.    And then you signed the second line saying you waived those rights; didn't you?

A.    Yes, sir.

Q.    Diane Brown wasn't in the next room at that point;

was she?

A.    I don't know, sir.  I didn't know at that time.

Q.    Well, you didn't have any concerns about her at that point; did you?

A.    Yes, sir, I did.  In fact, I asked the Detective Woodall to call her prior to him taping our conversation. He told me it would be to have after we taped the conversation.

Q.    Going back to the night before, when you asked the detectives if you could speak to Diane and tell her what had happened, was that your idea or the police officers, the law enforcement officers' idea that you tell her what had happened at the post office?

A.    I asked to speak to Diane.  I wanted to explain to her why I was going to be arrested from my house.  I told her I wanted to get these people out of her house as quickly as possible.

Q.    It was your idea; not the law enforcement officers' idea.  Isn't that correct?

A.    Yes, sir.  I asked to speak to her.

Q.    And by the same token, when you called your mother at her home on Leroy Coffer Highway, that was your idea and not the law enforcement officers' idea; wasn't it, that night on the 5th?

A.    Yes, sir.  I wanted to speak to my mom.

Q.   And Detective Woodall and Inspector Rushwin, they weren't threatening you, saying you had better confess to your mom now, nothing like that; was it?

A.   No, sir.

Q.   So, jumping ahead again to the morning of the 6th, and you're face to face with Woodall who is doing all the talking; right?

A.   Yes, sir.

Q.   And this other postal inspector who you don't know really, have not seen much, or he happens to be a black gentleman; isn't that correct?

A.   Yes, sir.

Q.   Woodall didn't play any tricks or games with you, or ploys, on the 6th; did he?

A.   I don't understand what you mean playing tricks.

Q.   Well, no one came in and said that these are the two smartest cops in the world, and if you don't tell them, you know your left toe is going to be cut off.  Nothing like that?

A.   No, sir.

Q.   And you spoke with Woodall for a pretty good while on the morning of the 6th; didn't you?

A.   Yes, sir.

Q.   And what you told him on the morning of the 6th was completely voluntarily on your part.  No one forced you to

say those things that you said.  Isn't that right?

A.    Sir, as I said before, it was -- I was put between a rock and a hard place, so to speak.  He didn't threatened me, physically harm me or anything like that.  No, sir, he did not.  But he did made -- he did make it more or less that Diane was still going to be arrested.  He made that known.

Q.    And whatever is in the transcript, whatever is on that tape that the Judge is going to listen to, is going to bear that out.  Is that what you're saying?  The Judge will see that coercion from Detective Woodall to you on the morning of the 6th?

A.    Sir, I did make a statement on tape about that.  But as far as him telling me that she was still possibly could get arrested, that is not on the tape, sir.

Q.    It is not on the tape because it didn't happen.  Isn't that correct?  It wasn't said by Detective Woodall on the morning of the 6th.  Isn't that right?

A.    No, sir, that's not -- that's incorrect.

Q.    Why is that incorrect, sir?

A.    He told me, he told me, you know, the only way that he could -- we could be sure that Diane does not get arrested is that I confess, is that I make a statement on tape.

Q.    And when did he say that to you?

A.   It was after midnight when he came with the hamburgers, and he made that statement then.

Q.   Back on the 5th, you are saying, or whether it was after midnight on the 5th or not, but it was not in the morning interview session with Detective Woodall and Inspector Reeves; was it?

A.   No, sir.

Q.   So, what is in that transcript, what is on that tape that the Judge has, that's what happened once that tape was turned on, after you signed that *Miranda* waiver. Isn't that right?

A.   Once the tape was turned on, it never went off, sir, if that is what you're asking.

Q.   Yes, sir.

        MR. NEWMAN:  The witness is back with you.

        MR. DARDEN:  That's all.  You may step down.

                [NOTE:  Witness left the stand.]

        MR. DARDEN:  Judge, that is all the evidence we have.

        THE COURT:  All right.  That's all on the evidentiary matters.  Is that correct?

        MR. FRENTZEN:  That's correct, Your Honor. That's my understanding.

        MR. DARDEN:  That's correct.

        THE COURT:  There were other motions that were

mentioned in your submission about the large number of motions you wanted heard, that you wish to have argued even no evidence was necessary on those motions.

MR. BELL:  A lot of those, we have resolved or either reserved today for a later time.  Most dealt with the photographs and similar transaction evidence.

I would like to address just briefly the motion for discovery.  There is a couple of outstanding little discovery issues, just housekeeping matters, if this time is appropriate.

THE COURT:  It is.

MR. BELL:  It's my understanding from talking to Mr. Frentzen that the Court has had an *in camera* submission made to it by the government regarding certain evidence which we think we know the general nature of it, feels it is exculpatory.  And we would ask that be disclosed to us.

And I think there is some information about an informant from the Liberty County jail, and perhaps more information about a witness who saw a white Lincoln speeding from the area shortly after the robbery and murder occurred.

So, we would like to get any and all information that deals with that.  We think it is **Brady.**

And the only other thing I would bring up as far

as discovery goes -- and I think Mr. Frentzen and I have pretty much resolved this and come to an understanding. My understanding is that the postal lab in Dulles, Virginia, has photographs and other information regarding shoes and shoe print comparison.  And they are kind of getting that out to him.  And when he gets that, he's going to provided that to us so, that we can do what we need do with that.

So, we just want everything that has been generated by the forensic laboratory in Dulles.  And I think he has agreed to give that to us as he gets it.

MR. FRENTZEN:  That's correct, Your Honor.  And they have a fair amount of information from the lab --

MR. BELL:  Yes.

MR. FRENTZEN:  -- in Dulles.  We have not gotten -- we haven't gotten everything from them.  Once we have everything, we'll go ahead and turn it over.

MR. BELL:  And with that understanding, I think that resolves the outstanding discovery issues.  He has been giving us stuff as I think he has been getting from other agencies.  And we've got some information, I understand, is coming to us today in the mail that went out earlier in this week.  And he has let me glance as it today.

THE COURT:  All right.  Regarding the matter

that you mentioned he produced for my *ex parte* examination, I reviewed that package.  And it seems like the what you are trying to -- you are trying to protect two things.  One, you're trying to protect the identity of this informant who came forward, whom you say really, certainly was not percipient witness to the events, and information that witness had was hearsay information, and therefore, you do not intend to call that witness at trial.

MR. FRENTZEN:  That's correct, Your Honor.

THE COURT:  But you want to protect the identity of that person.

MR. FRENTZEN:  That's correct, nor do we think there is anything exculpatory within those materials.

THE COURT:  I read the materials, and the one thing that I saw was what Bill just mentioned, and that is the fact about some reference to another vehicle, and it had nothing to do with it.  But you already knew about that.

MR. BELL:  We know a little bit about it, very little.

THE COURT:  What I am suggesting that we do is -- my inclination is to order you to produce those materials that you have given to me redacting the name of the individual.

MR. BELL:  We're not interested in the name of the CI.  So that's fine with us.

THE COURT:  All right.

MR. FRENTZEN:  Judge, just with a slight suggestion of modification.  If we could come back -- and it's been a little while since I've seen it.  My notion is we would be agreeable to turn it over redacting the name. The only thing I would add is that there may be other information in there that would easily identify him.

THE COURT:  All right.  And any other identifiers.

MR. FRENTZEN:  Thank you, Your Honor.

THE COURT:  And submit a copy.  I have the original that is unredacted.  Submit a copy to me that is the redacted version that you're going to produce.

MR. FRENTZEN:  That won't be a problem, Your Honor.

THE COURT:  All right.  Regarding the other material that is in that package, that is information that the government's investigators have gathered themselves in anticipation of using that as rebuttal evidence, and should any mitigation testimony be placed into the record by the defendant.  Is that correct?

MR. FRENTZEN:  That's correct, Your Honor.

THE COURT:  I have reviewed that as well.  And

I'm not seeing exculpatory evidence in that.  It's background information.  It is people who knew -- I mean, I'm sure you have had similar investigations done.  The government doesn't have the benefit of that.  It is just their interviews of people about the defendant's life, and their relationship with him, and knowledge of him, employers, and teachers, and things of that kind.

I don't think that information, if it is *Brady*/*Gigilio*, certainly the defendant is entitled to it.  But it is not leaping out at me that is *Brady* or *Gigilio* material.

Now, sometimes the parties can see something because it is their case that I miss.  But it is not evident to me that it is *Brady* or *Gigilio* material at this point.

MR. FRENTZEN:  Judge, I can rereview that material with an eye, a more informed eye at this point towards *Brady* or *Gigilio* material.  And we are cognizance of our obligation also to actually turn over information which may mitigate the punishment --

THE COURT:  Yes.

MR. FRENTZEN:  -- in a capital case.  So, I will look back through it with an eye toward that as well.  And if we feel there is additional disclosures that have to be made, we will be making those.

THE COURT:  Okay.

MR. BELL:  Judge, with that, with what we're going to get, I would like to know if we have all the information about the white Lincoln.

THE COURT:  It will be -- yes.  It will be in that package.  It is a brief reference, I can tell you that right now.  It is a brief reference.

MR. BELL:  We don't even have the information on the witness who communicated that to the police.  And if they have it, we certainly need that.

And we would like that other information.  We do think it can go to punishment that you are not inclined to provide to us.  I know that he is going to rereview it.

MR. FRENTZEN:  Judge, I believe there is some additional information about those reports that is in the materials that were sent out, should have been sent out Monday.  I had assumed that they would have received them by today.  I'm not sure, exactly sure what happened.  But I believe there is an additional information about that, and about that the source of that information contained in that package of materials that we have already attempted, at least, to turn over.

THE COURT:  Okay.  Well, go ahead and redact the information about, the identifying information about the confidential informant.  Turn all of that over in the

redacted version.  And I understand that the government will go through the package again about its interviews and will look specifically for information that might be useful for the defense in terms of mitigation in this case.

I didn't see anything that pertained to guilt or innocence in there.  But in terms of mitigation that might be pertinent to the defense, reveal that as well.

Are there other motions that you issued to specifically argue?

MR. BELL:  I think that covers everything.

THE COURT:  Well, I have a list here of 82 motions that were listed by the defense as motions that I guess are pending and unresolved.  And I have gone through these trying to match them up with the government's response.  And sometimes it was sort of difficult for me to do.

And some of these are going to take additional work in the form of a report and recommendation, or perhaps an order.  Some of them I feel comfortable after reviewing the motions and the response of ruling here today on those.

Now, if anybody wishes to have argument on any particular motion, simply let me know.  But I'm going down the list of motions.

Certainly, the Motion for Declaration that the Federal Death Penalty Act is Unconstitutional is not something we can rule on here. If that is a motion that is still pending, I'm going to rule on that in the form of a report and recommendation.

No. 2, the Motion to Suppress, we have heard today. And that will also take a R&R.

The motion for an order, No. 3, granting the defendant adequate time to prepare for trial, I think has already really been granted and is now moot. This case has been lingering for some time. Not lingering really, but it has been delayed because of the nature of the case and the number of motions. And the Court has extended the time for pretrial motions.

We have yet to have a time for trial set by Judge Edenfield. And he is probably waiting for us to get through this process before he does that. So, I think that the defendant has had adequate time for trial.

The series of motions, 4, 5, 6, deal with striking things from the indictment or dismissing aggravating circumstances which I think the government has listed in its notice of intent to seek the death penalty.

Is that right, Will?

MR. FRENTZEN: That's correct, Your Honor. I believe that's correct.

THE COURT:  Or a Plea in Bar to Prevent the Government from Seeking the Death Penalty on the Grounds of Disproportionality, all of those things I think we can address in an R&R.

No. 7, the Motion to Identify Witnesses Claiming Cash Award and Excluded Informant Testimony, you have told me has been resolved.

MR. DARDEN:  Yes, sir.

THE COURT:  And No. 8, as well as No. 77 regarding this Similar Act Evidence, I'm going to reserve that for the District Judge.

Motion to Suppress Photographic Identification, I don't really see that the defendants have urged that as a motion to suppress as much as to hold a hearing to see if it was, to force the government to demonstrate the factors that are normally required in order to get a suggestive identification process in the record.  But maybe I'm misreading that.

Is that indeed a motion to suppress?  Is that what that is.

MR. BELL:  I think you are reading it correctly.

THE COURT:  So, I think we've ruled on that, that there's really been no showing.  I did give the defendants an opportunity to come back -- the defendant, to come back additional information about any suggestive

procedure.

That would apply to No. 10 as well.

Nos. 11 and 12 are reserved for the District Judge regarding the photographs.

No. 13, Motion for Disclosure of Electronic Surveillance is moot.  The government has made a full disclosure of that.

No. 14, Disclosure of Deals with Witnesses, the government assures me in its response that it has made all that information available.  So that is moot.

Motion to Restrict the Use of the Word *Murder*, Defendant's Motion No. 15.  And the numbers that I'm giving here are those listed in your filing with the Court.  I know they don't match up with our docket numbers.  But I'm just going down your list.  I don't see that there is any merit to that motion.  And I will deny it.

Motion to Prevent the Use of Terms *Not Guilty, Innocent*, or *Innocence*, surely the government knows not make improper argument regarding matters referring to people as guilty before there's any determination of such.  And I don't think there is any risk of that.  But the District Judge certainly can control improper argument.  And I will deny that motion.

No. 17, Motion to Prevent Prejudicial Security

Measures.  You know, we have trials routinely here.  And we have marshals in the courtroom.  I don't think there is any unnecessary display of force or any impropriety in the way we conduct our proceedings.  I don't think this trial would be any different.  If there is something specific, once you see the trial proceedings going on that you need to bring to the District Judge's attention, you may do it.  But I'm going to deny No. 17.

No. 18, Motion to Notice by the Government of Intention to Rely Upon Other Crimes Evidence.  I think that is moot.

You have made that notice available of what you intend to rely upon.

MR. FRENTZEN:  That's correct, Your Honor.

THE COURT:  Nos. 18 and 22, I think are the same motion.  Motion for Notice of Aggravating Circumstances and Evidence, I think the government has given that notice.  And therefore, that is moot.

No. 20, Motion for an Order Requiring the Production of Mitigating Evidence Known to the Government.  And you have made your *ex parte* presentation.  And that's what we talked about a minute ago.

MR. FRENTZEN:  That's correct, Your Honor.  That would be the **Brady** with regard to mitigating evidence.

THE COURT:  Well, I will deny the motion, but

like I said, I didn't see any **Brady** or **Gigilio** material in there.  But the government is going to review that with an eye to seeing if there is material that might be useful to the defendant in his mitigation presentation.

No. 21, Motion for Disclosure of Seized Evidence the Government Intends to Rely Upon at Trial.  I suppose that is moot.  The government has made its disclosure of all evidence seized in this case.

MR. FRENTZEN:  Judge, that's correct.  And we've provided all of the documentary discovery we can with regard to that.  And also, as counsel know, they have been free to physically examine and inspect the evidence that was seized during the course of the searches.

And in fact, I was there in Dulles at the lab when one of their experts did examine all of the physical evidence that he wanted to examine.

THE COURT:  No. 22, Motion for Notice -- well, we've addressed that.

23, Motion for an Order Directing the Government to Provide Dates of Birth, Social Security Numbers, that is moot.  The government has done that.

24 and 25 --

MR. FRENTZEN:  Judge, if we could back up just a second.  I don't think that we have -- I mean, we have provided what we have in discovery.  We have not put

together a list of dates of birth and Social Security numbers of all our witnesses.  It is my understanding that the intention of that motion was to have that information so that they could seek out whether or not people had criminal histories.

And then they also filed a motion for production of criminal histories on any of our witness, claiming that they couldn't research whether or not they had criminal histories, which is a little conflicting.

But it was our determination that we would go ahead and provide criminal histories on any of our witnesses where, by a search of NCIC, we could determine that they had in fact criminal histories, which I think obviates the needs for them to have Social Security numbers and dates of birth.

THE COURT:  Have you already produced the criminal histories?

MR. FRENTZEN:  I don't think we've done an exhaustive search with respect to every witness.  I'm not sure that right now we know exactly who every witness will be.  But they'll certainly have it at some point outside of trial, certainly in time to be able to use for any possible impeachment.

THE COURT:  All right.  24 and 25, Prohibit Use of Prior Convictions, which I guess really pertains to

what you intend -- the only way you would be introducing those is for purposes of 404(b).  Is that correct?  Unless the defendant testifies.

MR. FRENTZEN:  That's true.

THE COURT:  All right.  I will reserve that for the District Judge.

25, to Disqualify Potential Jurors Who Knew or Who Were Acquainted With the Victim and Their Families. That is something I think the District Judge can address during his jury selection.  So, I will reserve that.

No. 26, Motion for the Discovery of Institutional Records and Files Necessary to a Fair Trial. I think the government contends that is moot.

MR. FRENTZEN:  Judge, if I recall correctly, I think they were asking for something that I had never heard of, which was something along the lines of asking us to research the mental health history of any of our witnesses, or something along that line.  I mean, I think what we agreed to was if we were aware of any such information that, you know, assuming there wasn't some privacy rights violated, that we would disclose those.

But I'm certainly not going to go around trying to investigate the psychiatric history of everyone we talked to.

THE COURT:  No.  Well, I'm just going by what

you say in your motion, your response on Page 39.  You say that *the discovery of institutional records and files is moot.*  You say *to the extent that they are in the possession of the government they have been produced to the defendant.*

MR. DARDEN:  I think No. 26 was to seek his institutional records, the defendant's.

THE COURT:  Is that what that is?

MR. DARDEN:  I believe that has been done; hasn't it?

MR. BELL:  No.  It has not been by the government.  And we've gotten the -- the answer is no.  It has not been provided by the government.

THE COURT:  Do you have it?

MR. BELL:  I do not.  The Court has issued a Rule 17(b) subpoena because of the difficulty we've had in getting cooperation from these institutions.  So, that is where we stand.

THE COURT:  We've given you the subpoena.

MR. BELL:  Yes, sir.  Well, the first form that we got, there was something wrong with it.  So, we're trying to get that corrected to the Court now.

THE COURT:  All right.

MR. BELL:  But if they have that material, then I think it is discoverable.

THE COURT: He is talking about prison records, jail records.

MR. FRENTZEN: Everything we have with regard to the defendant's prison record I believe we have produced. There was a package of materials that we produced with regard to prior convictions may have had -- possessed some material related that. I know there was high school information which we produced that. I mean, with regard to the defendant, I think we've produced everything we've got on him with the exception of our own investigation into his background that we may be using in rebuttal of any efforts to mitigate, which I don't think is discoverable.

And as we noted in our opposition, they have the ability to issue 17(c) subpoenas.

THE COURT: Yes. Well, to the extent that you have it, you've produced. So, the motion for discovery from the government is moot. Certainly, the defendant may continue to pursue that information through their own devices.

No. 27, Motion for Discovery of Police Reports and Law Enforcement Documents. The government contends that is moot, except with respect to work product, which you do not seek to produce. I don't think they are required to that. But they have gone pretty well beyond

the requirements of Rule 16.  So, I think that motion is also moot.

28, Motion for Disclosure of All Criminal Records of Government Witnesses.  The government does not oppose that, and has every intention of doing that.  So that it is granted.

Motion to Invoke the Rule of Sequestration Prior to Voir Dire, that is reserved for the District Judge.  Well, actually I don't think the rule of sequestration applies in that context.  I believe it applies once trial begins.  That is your position; isn't it?

MR. FRENTZEN:  That's correct, Your Honor.

THE COURT:  I don't know of any legal basis for that.  I'm going to deny that motion.

No. 30, Motion to Conduct Closed Evidentiary Hearings, we've already determined that is to be denied.

No. 31, Motion for Discovery and Inspection, and Memorandum of Law, that motion has been complied with. And counsel has raised some additional concerns about discovery, which we've addressed that here.  So it appears that is moot.

But preliminary motion to suppress is sort of, I think, as a protective motion that was filed.  And it has been more particularized in the other specific motions to suppress.  So, I don't think that is any longer a valid

motion.

No. 33, Motion for Discovery of Records and Reports Relating to Facts or Data Underlying Expert Opinions. The defendant is entitled to that. And I think the government really is not opposing that.

MR. FRENTZEN: Judge, we are not opposed to that. As soon as we -- and we have actually provided certain information related to several experts who may be called upon to testify. As we get closer to trial, we will have a much better sense of exactly which experts we'll be calling to testify. And we reserve the right to add additional experts. But we will certainly provide the notice required by the rules.

THE COURT: The motion is granted. The government is not -- in the defendant's list, the government is also seeking reciprocal discovery here.

MR. FRENTZEN: That's correct.

THE COURT: And you're asking for information about experts, not the reports, but which experts are going to be used in order that the government might prepare any necessary rebuttal expert. And you wanted a deadline, I think in June, which I didn't grant.

MR. FRENTZEN: Judge, I think that was specific to the issue of the mental competency that we wanted a notice provided with regard to any effort to submit

evidence or experts related to the defendant's mental condition. That -- well, the notice that eventually was filed, I take it, was in response to that. And that's what caused the government to file its motion for the evaluation.

We didn't consider that we needed a June deadline for all experts. Although, we would like, I suppose, some sort of deadline for reciprocal discovery set. As often happens in these cases, we provide everything as early as we can. And we usually receive nothing until shortly before trial. And obviously, we would like as much time as possible to prepare, especially for expert testimony that may be coming from the defense.

THE COURT: You're not in a position to make that disclosure at this time. Is that right, Richard?

MR. DARDEN: That's correct, Your Honor.

THE COURT: All right.

MR. DARDEN: I can assure the Court, though, as soon as we get the information it will be provided to the government.

MR. FRENTZEN: Perhaps, if we could have some window of time, some date certain prior to trial for disclosure of reciprocal discovery, that would be certainly helpful in the case proceeding --

THE COURT: All right. I'm going to order it to

be produced 30 days from today or two weeks prior to trial, whichever is later.

MR. DARDEN:  All right, sir.

THE COURT:  No. 34, Motion for Early Disclosure of Jencks Act Material is moot.

No. 35, Motion for a List of Government Witnesses, that is something that the defendant is entitled to since this is a capital case.  So, that motion is also moot.

No. 36, Defendant's Motion for Production and Inspection of Grand Jury Proceedings.  I'm not sure the government responded specifically to that.

MR. FRENTZEN:  We may not have, Your Honor.  But we have turned over the grand jury transcripts in this case.

THE COURT:  All right.  Then that is moot.

MR. FRENTZEN:  I believe both for the indictment and the superseding indictment.

THE COURT:  No. 37, the defendant indicates on the form that motion is resolved.

No. 38, Motion for Evidentiary Matters to be Heard *In Camera* is denied.

39, Motion to Preserve Evidence and Memorandum of Law, I see no reason not to grant that motion.  The government, I think, is preserving everything that has

been seized in this case.

No. 40, Motion to Control Prejudicial Publicity, I'm not sure I remember what that is about.  Or I don't think the government responded specifically to it.

MR. FRENTZEN:  Judge, we're well aware of our obligations under the ethical rules as regard to efforts to influence the media.  And no such efforts are being made in this case.

THE COURT:  Well, the motion is granted as unopposed.

MR. FRENTZEN:  Judge, I suppose before I consent to it being granted -- I cannot recall specifically what they were requesting.  If what they were requesting is exactly in line with the ethical rules, then we have no objection.  If they're asking for something more, maybe they can tell us, and I can respond specifically to that.

THE COURT:  I can't remember what it is.

MR. BELL:  That's the bulk of it.  It also dealt with the media, which I understand the Court can control.

THE COURT:  Well, I don't think we've had the media really out of line in this case.  They didn't even make an appearance today.  And there have only been a couple of articles in the paper about this case.  So, I don't think -- to the extent that you are trying to prevent the government from making improper statements to

the media, the motion is granted.

No. 41, Motion Reserving the Right to File Additional Motions.  I have twice -- well, I had extended the motions period for a long time.  And I'm not going to extend it any more.  Of course, if there is some kind of matter that comes up, and you can make a showing of good cause why that motion needs to be filed outside of the motions period, then we would consider it.

No. 42, the defendant indicates it is resolved.

No. 43, Motion for Discovery of Information Regarding the Government's Experts, I think that maybe repeats another motion which is granted.  The defendant has a right to the disclosure under Rule 16.  And the government understands that.

No. 44, Motion for Disclosure of Improper Bias or Prejudice Grounds for Legal Claim or Bias or Disqualification of the United States Attorney, I'm not sure I saw any specific response to that, or even remember what that motion is about.

Can you clarify that?

MR. BELL:  Well, I'm satisfied that there is -- if they have any conflicts or anything of that nature, then I'm satisfied that they would relay that to us.

MR. FRENTZEN:  Judge, I'm certainly not aware of any conflicts on the part of our office.  I can't

necessarily speak to court personnel.

THE COURT:  Well, I am aware of none.  So, it appears that motion is moot.  If anybody has got any conflicts, they need to come forward and tell us.

No. 45, Motion for Disclosure of Psychiatric History of the Government's Witnesses.  I have read the briefs, and that motion is denied.

No. 46, Motion to Inspect, Examine, and Test the Physical Evidence, I don't think there's any objection to that.  That really has already been done, and it is moot.

47, Motion to Determine the Existence of Confidential Informant.  The existence of the confidential informant, the government has made that known, that there was an informant.  In terms -- so the motion is moot to that extent.  I think there is a request to disclose the identity, which I have denied.

No. 48, Motion for Reduction of Statements and Memorandum of Law.  I think all statements have been produced.  That is moot.

No. 49, Immediate Discovery of Audio Tape Recordings, that is moot.

No. 50, Produce the Defendant's Prior Records, you've already done that; have you not?

MR. FRENTZEN:  We have, Your Honor.

THE COURT:  That is moot.

51, Exclude Members of the Police Department from Sitting in the Courtroom in Uniform.  You know, from time to time uniformed officers appear during criminal proceedings.  I don't think the courtroom in this case is going to be packed with a battalion of uniformed officers.  But if you see something during the trial proceedings that alarms you, you feel like that needs to be brought to the District Judge's attention, you may do it.  But at this point, that motion is denied.

No. 52, Motion to Prohibit Prosecutorial Misconduct and to Limit the Prosecutor's Opening Statement and Closing Argument.  The government indicates that it doesn't intend to make any improper argument.

MR. BELL:  As the trial unfolds, if we see anything, we'll bring it to the trial court's attention.

THE COURT:  All right.  Well, I will treat it as moot.  If it comes up, address it.

53, Motion to Cause Witnesses to Confer with Defense Counsel.  To cause them to confer?

MR. BELL:  Or a better way, I'll restate that.  Our motion is not cause them not to confer with us.

THE COURT:  Well, I'll grant that to the extent that you don't want the government to prevent a witness.

I think you know this is your duty.

MR. FRENTZEN:  We understand that, Your Honor.

THE COURT:  All right.  The way it's written, though, is to cause them to confer.  And I suppose the motion should be denied.  But with the stipulation that the government understands it is not to in any way interfere with a witness who does want to communicate.

54, Motion to Submission of the Attached Juror Information Questionnaire to All Prospective Jurors.

MR. BELL:  I tell you from our point of view, we think it is critical to have a jury questionnaire.  And I think it will move voir dire along.

And in state court it is done I think in every case.  And it moves the process along, and I think it helps everybody.

But we have submitted a form for the Court and the government to consider.  We're certainly willing to listen to suggestions about additional questions and things of that nature.  But we would like to have a form submitted.

MR. FRENTZEN:  Judge, we have no objection to the use of a jury questionnaire.  The actual questions that will be asked on the form, however, we would like to -- I think what we proposed in our motion was that we would submit to defense counsel our own proposed jury questionnaire, and then confer with them and resolve what questions, those questions that we can agree on before

presenting two different versions to the Court.

I don't know what Judge Edenfield's position would be with regard to a jury questionnaire. But I expect this may be something that he would want to take up.

THE COURT: I will reserve that for his attention, No. 54. But I will ask the parties to go ahead and do as you suggest. And that is, to try to confer and resolve any differences that you might have.

No. 55, Motion to Extend Time for ClosIng argument. That is reserved for the District Judge.

56, Motion for an Order Expanding Time for the Preparation of Jury Selection. Also, I think the District Judge is going to give you adequate time for jury selection. So, if you have problems with it, take it up with him.

57, Motion for an Order Allowing Defendant to Voir Dire Prospective Jurors Regarding Parole Eligibility. Also reserved. You can put that in your questions.

58, Motion to Prohibit Jury's Exposure to Victim's Family or Friends. I don't think the government opposes that.

MR. FRENTZEN: Judge, I don't recall what this motion asks for. I just don't --

MR. BELL: It is preventing them from mingling

with each other.

THE COURT:  I don't think that is going to happen really.

MR. FRENTZEN:  Oh, no.  If that's what it is asking for, no, we have no objection to the jurors not being permitted to mingle during the course of the trial.

THE COURT:  All right.  That's unopposed. Granted.

59, Motion for an Order Adopting Specific Defined Procedures for Setting Forth Challenges to Jury Strikes Pursuant to **Batson**.  Again, I think that can be reserved for Judge Edenfield.

I'm not sure you really oppose that.

60, Motion for an Order Providing for Bifurcated Voir Dire with Respect to Jurors with Regard to Guilt or Innocence.

I think the government does oppose that; do you not?

MR. FRENTZEN:  We do.  I don't think -- under **Jackson**, I don't know that that is even legal, Your Honor.

THE COURT:  Well, I'm not sure either.  I have never seen that done.  That's denied.

61, Motion for an Order Directing that Alternate Jurors not be Publicly Identified until the Deliberation Process Begins, that is reserved and a matter for Judge

Edenfield.

62, Motion in Limine to Preclude Prejudicial Information in the Indictment, Names of the Grand Jurors from Being Revealed to the Trial Jurors.  I have never seen such occur.

MR. FRENTZEN:  Judge, I'm not sure how the trial jurors come to a decision without the indictment.

THE COURT:  No.  I'm not talking about the indictment.  He's talking about -- oh, I agree.

MR. FRENTZEN:  It might be sort of difficult to resolve Counts 1, 2, and 3, if they don't know what they are.

THE COURT:  I missed that part, the indictment itself.  I think we have to deny that.  Now, in terms of the names of grand jurors, I don't think they'll have access to that.

MR. FRENTZEN:  I have no objection to that, Your Honor.  I'm not quite sure what specific information they may have covered under the blanket of prejudicial information in this motion.

MR. BELL:  We just don't want the names of the grand jurors going out to the trial jurors.

THE COURT:  Well, to that extent --

MR. BELL:  They may know people and feel bound by their earlier decision.

THE COURT:  Well, all of the grand jurors don't sign the indictment.  Only the foreperson does.

MR. FRENTZEN:  That's correct.

THE COURT:  And that name will be on the indictment.  I'm not going to exclude that name.  The indictment has to be presented to the jury, of course.  But in terms of the grand jurors, yes, it is granted.

63, Motion for Instruction at Start of Trial on the Grand Jury Indictment Procedures.  That's all reserved for Judge Edenfield.  He'll handle that.

64, Motion to Permit Extensive Voir Dire on the Issue of Racial Bias.  I think you oppose that; do you not?

MR. FRENTZEN:  I believe that we did, Your Honor.  Again, I don't know how extensive --

THE COURT:  Well, the parties are getting together.  And to the extent you can agree on any type of questionnaire or voir dire questions to be presented, go ahead and do so.  But I think that is a matter for Judge Edenfield to consider.

65, Motion for Disqualification from the Venire of All Potential Jurors Who Cannot Adequately Consider Mitigating Evidence or Who Are Not Automatically -- what are you seeking there?

MR. BELL:  Fair-minded jurors.  I think by law

if they can't consider mitigating evidence, they should be stricken for cause, and we shouldn't have to use a strike on them.  I mean, this is going to be a death penalty certified jury.  And they've got to be able to consider mitigating evidence even though they are not opposed to the death penalty.

MR. NEWMAN:  Your Honor, the whole process of the jury selection should be reserved for the District Court.

THE COURT:  I agree.  65 is reserved.

66, Motion for an Order Requiring Production of All Matters Involving Victim Impact Evidence.  Is there such evidence the government has?

MR. NEWMAN:  Well, Your Honor, we do intend to put up evidence concerning the impact of this crime upon the victim, the victim's family, and we reserve the right to put that up, both in the case in chief to some extent, and in the more particularly and more pointedly in the sentencing phase.

MR. FRENTZEN:  And that was specifically the holding of what was approved, I believe, in *Payne vs Tennessee.*

THE COURT:  Well, what they want is production of that evidence.  Has it been produced?

MR. NEWMAN:  Well, in essence, Your Honor, it is

testimonial evidence.

THE COURT:  It is.

MR. NEWMAN:  The testimony of the husband, the testimony of the older son and the younger son.  And they're as well equipped to interview these individuals as anybody is.  We have not sought to cut off or impede their access to these witnesses.  And they know who they are, and they know where they live, where they go to school.

THE COURT:  It is denied to the extent that you are trying to get work product from the government.

67, Motion to Assure that Mitigating Circumstances Receive Their Due Weight and Attention from the Jury.  That's a matter for Judge Edenfield.

68, Motion to Prevent the Death Qualification -- I don't see how we could do that.  That is denied.

69, Motion to Require the Jurors' Handwritten Notes to be Made a Part of the Record of this Case.

MR. BELL:  That's at the end of the trial, not that we would have access to it in any way during the trial, but for post conviction review purposes, we would ask that be done.

THE COURT:  Let Judge Edenfield address that. I'm not even sure he will allow them to do notes.  Does he do that in every case?

MR. NEWMAN:  Just any case more than of a day's

duration, he will generally allow that, Your Honor.  We strenuously oppose that motion.  We think that is an intrusion on the jury deliberation process.  In fact, we said in our response, Your Honor, that we think that at the conclusion of the verdict, whatever the verdict is, the notes should be collected, presented to the District Judge for the marshal for destruction.

THE COURT:  That's normally what happens.  I have never seen a motion like this.  You can ask Judge Edenfield for that at the end of the trial.

No. 70, Motion for Individual Voir Dire and Sequestration of the Jurors.  That is reserved for Judge Edenfield.

No. 71 is also reserved for the District Judge.

72, Allowing the Defendant to Exercise His Challenges for Cause Outside the Presence of the Panel Members.  I think Judge Edenfield and most district judges frequently do a side bar on cause issues; do they not?

MR. DARDEN:  Yes, sir.

THE COURT:  But that is his discretion.  I will reserve that for Judge Edenfield.

73, Allowing the Defendant to Examine All Jurors Prior to Exercising Peremptory Challenges, reserved for Judge Edenfield.

74, Demand for Jury Trial is certainly granted.

75, Bar the Death Penalty Because the Government is Arbitrarily and Discriminatorily Seeking the death Penalty on Impermissible Racial Grounds.  I don't think there has been any showing of that.  That seems to relate to other reasons why this case should not go forward as a dealt penalty case.  And we'll reserve that for the R&R.

76, Discovery Motion Requiring the Prosecution to Disclose Evidence Favorable to the Defendant Under *Brady* and *Gigilio*.  That is granted.  The government doesn't oppose it.

77, Defendant's Response in Opposition to the Government's Notice of Other Acts Evidence.  We've already addressed that in terms of defense motion No. 8.

78, Motion for Appropriate Clothing.  The government doesn't oppose that.  It is granted.

80, Supplemental Motion to Inspect, Examine, Test Physical Evidence is granted.

MR. BELL:  81 is moot, Your Honor.  They have stated they are not going to seek to introduce any artist's drawings.

THE COURT:  All right.  That is moot.

And 82, Defendant's Motion for Additional Time to Request Adequate Resources.  I think the defendant can always seek resources from the court.  So, the time for filing motion is granted.  But to the extent that the

defendant needs to come to me regarding some resource they might need, sure.  That is allowed.

All right.  That covers all of the motions that we can dispose of today.  And those others that we cannot, we will address through a report and recommendation, or Judge Edenfield will address them during the trial proceedings.

Is there anything else from the government?

MR. FRENTZEN:  Nothing else, Your Honor.

MR. DARDEN:  No, sir.

THE COURT:  All right.  I want to see defense counsel.  There's something you filed that puzzled me a little bit.  And I want to -- it is something that can be heard *ex parte*.  It doesn't pertain to the government. And I'll just see you very briefly.

MR. DARDEN:  All right, sir.

MARSHAL:  All rise.

*[Proceedings adjourned]*

GEORGIA

CHATHAM COUNTY


CERTIFICATE OF REPORTER


I, Lora H. Carter, do hereby certify that the above and foregoing pages of typewritten matter is a true, correct, and complete transcript of the evidence and proceedings in the captioned matter.


This the ____ day of _____, 2003.



LORA H. CARTER
U.S. Court Reporter
Southern District of Georgia


P. O. Box 8552
Savannah, GA  31412
(912) 650-4065