IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DIVISION


UNITED STATES OF AMERICA     –

            –vs–              – CR 02–531

MEIER JASON BROWN    –

---------------------------------------------


Transcript of **PRELIMINARY EXAMINATION and**

**DETENTION HEARING** held on the day of 12th day of December,

2002, with the HONORABLE G. R. SMITH, Magistrate Judge,

Presiding


A P P E A R A N C ES


FOR THE GOVERNMENT  WILL FRENTZEN
                              P. O. Box
                              Savannah, GA 31412


FOR THE DEFENDANT   WILLIAM BELL

                              Savannah, GA  31412

*Proceedings recorded electronically and*

*transcript produced from a sound recording thereof*.

CLERK:  The Court sounds the case of the United States of America versus Meier Jason Brown, Complaint No. 02- 531.

MR. FRENTZEN:  The government is ready, Your Honor.

THE COURT:  We saw Mr. Brown the other day for an initial appearance on this criminal complaint.  In the meantime, the Court has appointed counsel to represent Mr. Brown.

Mr. Bell, we certainly appreciate your serving as appointed counsel.

Have you had an opportunity to meet with your client and discuss the charges with him?

MR. BELL:  Yes.

THE COURT:  We have the case called today for a preliminary examination and a detention hearing.  The government has the burden of establishing probable cause if it is going to be seeking detention.  You are seeking pretrial detention in this case.

MR. FRENTZEN:  We are, Your Honor.

THE COURT:  And, of course, a preliminary examination, the defendant is entitled to such in a case that is on a criminal complaint, and a probable cause finding must be met for that purpose as well.

So, we will hold this hearing for both a

preliminary examination and detention purposes.

How many witnesses does government intend to call?

MR. FRENTZEN:  One witness, Your Honor.

THE COURT:  Are the parties ready?

MR. BELL:  If there any other witnesses or potential witnesses in court, then I would ask that they be sequestered.  And I think there probably is at least one.

Ms. Holmes -- I'm not sure if she is a potential witness in the case, but if she is, I would like her sequestered.

MR. FRENTZEN:  Who?  I'm sorry.  I missed that, Your Honor.

MR. BELL:  I believe Ms. Holmes.  Or you don't work at that Post Office.

WITNESS:  No.

MR. BELL:  You are with the Postal Services, but not connected with this.

WITNESS:  No.  I'm not even with the Postal Service.

MR. BELL:  Okay.

MR. FRENTZEN:  Judge, we would ask the same, any potential witnesses for the defense also be sequestered.

MR. BELL:  We have none here.  And there's none

to sequester.

THE COURT: All right. Proceed to call your witness.

MR. FRENTZEN: Judge, briefly before I call the government's witness, since the witness we will be calling is Ms. McLendon, she had previously sworn to affidavits in connection with two search warrants. And those were filed under seal.

THE COURT: Yes.

MR. FRENTZEN: I would just like to move to you unseal those for the purpose of providing them to counsel for the defense since her statements will be discoverable for the purposes of this proceeding.

THE COURT: All right. The Court will unseal those. Do we have them here?

CLERK: I don't have them.

THE COURT: You have copies.

MR. FRENTZEN: Judge, I have actually given copies to defense counsel.

Your Honor, the government will call Postal Inspector, Marla McLendon.

CLERK: State your name and your occupation for the record. Please spell both the first and last name.

WITNESS: My name is Marla McLendon, and first name is M-a-r-l-a, last name M-c L-e-n-d-o-n. I'm a

United States Postal Inspector.

**MARLA McLENDON,** after having been duly sworn, testifies as follows.

GOVERNMENT'S WITNESS, SWORN, TESTIFIES AS FOLLOWS

DIRECT EXAMINATION

BY MR. FRENTZEN:

Q.   Ms. McLendon, are you the case agent with regard to the complaint against Mr. Brown?

A.   Yes, I am.

Q.   Have you familiarized yourself with the facts and the circumstances leading to that complaint?

A.   I have.

Q.   How did you familiarize yourself with, in general, with the case against Mr. Brown?

A.   I have been working on this case since it started. We have a task force assembled of other law enforcement agents.  And they report their findings to me.

Q.   Can you tell us when this matter first came to your attention?

A.   Yes.  On November 30th at approximately 12:30, I received a telephone call at my residence from the Inspection Service in Atlanta, who reported that we had an employee who had been murdered.

Q.   Where were you told that murder had taken place?

A.   In the Fleming, Georgia Post Office, which was open

for business that day.

Q.    What did you do when you heard that?

A.    I immediately responded to the scene.  When I arrived, the scene had been secured by agents from Liberty County Sheriff's Department.

Q.    What is your understanding, what was your understanding at that time of what had taken place there that morning?

A.    Well, the victim, Ms. Sally Gaglia, was deceased. She was on the floor at the time.  And we tried to establish a motive which a preliminary investigation determined it was possibly robbery.

Q.    What demonstrated that it could have been a robbery?

A.    There was no, no cash that we saw that she would have had.  And we saw vouchers on the counter indicating that she had sold approximately $1,175 -- excuse me -- $1,195 in money orders.  And we didn't see the cash that would have been associated with the sale of those money orders.

      After the crime scene was processed, we did a thorough review of the office, and audited it.  And in fact, the monies from the sale of those money orders was indeed missing.

Q.    Did you receive any preliminary reports regarding the victim and the method of the killing?

A.    Yes.  When the crime scene was processed, the agent

who processed the scene determined that it appeared to be stab wounds, multiple stab wounds.

We have since receive in a report from the medical examiner who confirmed that the victim did die from multiple stab wounds.  She had two wounds to her chest area, six wounds in her back and two stab wounds in her wrist.

Q.   What was the victim's, Gaglia, position at the Fleming Post Office?

A.   She was a Post Master Relief.  That position entails whenever the Post Master -- this was a small operation. There was only one person who waited on customers at a time in this Post Office.  When the Post Master was unavailable to fill that position, for example on weekends or vacation days, or if she had other assignments elsewhere in the Post Office, Ms. Gaglia was Post Master relief who filled in for her.

She was a permanent part time employee of the United States Postal Service.

Q.   The Post Office in Fleming is in Liberty County.  Is that right?

A.   That's correct.

Q.   At what point during the course of your investigation did your attention turn to Mr. Brown?

A.   We received a -- we received information from a

confidential source that he was the perpetrator, and the source provided on a scenario that was plausible with the facts we had uncovered to date.

We were able to further corroborate information from the source. And that's when we focused on Mr. Brown.

Q.   What did the source tell you?

A.   The source told us that Jason Meier Brown had asked his family members, who lived near the Post Office, for money on the morning of the robbery. And his family members had declined to provide him with any money.

He made a statement to the effect that he would go get some. He disappeared on bicycle, and returned a short time later, and in an agitated state, and in an frantic state, tried to contact his girlfriend for a ride.

His girlfriend resides in Savannah, Georgia. And he left a short time later with his girlfriend. And he had money at that point.

Q.   And you talked about corroborating that statement. Can you tell us some of the steps that you took to corroborate that statement?

A.   Well, the very night that we had received this information from the source, Mr. Brown contacted a Liberty County detective, and asked if we were looking for him.

The detective asked him to come in so that he could be interviewed. Mr. Brown declined, and stated he was en

route to South Carolina, and was not available.  However, the detective's display showed a telephone number.  One of the chief -- the chief of the detectives for Liberty County called that telephone number.  Mr. Brown answered the phone, and again stated that he could not come in for an interview.

He confirmed he had gone to the Post Office on morning of November 30th, and then the line went dead. There seemed to be a bad connection.  It was a cell phone.

The Chief of the detectives called that number again later that night and spoke to an individual who identified herself as Ms. Brown.  He confirmed that Jason Meier Brown had used her cell phone to call the detectives that night, and that she had just taken him to Richmond Hill and dropped him off.

We traced the cell phone number back to Ms. Diane Brown at her Savannah address, and subpoenaed the telephone records.  The subpoenaed telephone records confirmed that a call had been placed to that number, I believe at approximately 10:57, and that someone from that number had contacted Ms. Sadie Brown, Jason Meier Brown's mother, at her residential telephone shortly thereafter.

Q.   By that time, had you been able to establish or estimate the approximate time of the incident?

A.   Yes.  We have witnesses who had actually spoken with

Ms. Sally Gaglia at approximately 10:30 to 10:35.  We had the 911 call came in at 10:51 from the first two witnesses who discovered her body.

And based on their accounting, we were able to establish the time frame of her death as being approximately 10:40 to 10:50.

Q.   So, those phone calls shortly after that time were consistent with what the source had told you --

A.   Yes, they were.

Q.   -- had taken place?

A.   Yes, they were.

Q.   Incidentally, did the source claim to have any first-hand knowledge of what had taken place?

A.   No, he did not.  The source said he was told by someone who was present there Saturday morning.

Q.   And the source was interested in a reward?

A.   We had publicized the reward for information leading to arrest and conviction of the individuals responsible for this crime.

Q.   Were you able to show any photographs of Mr. Brown to any eyewitnesses?

A.   Yes.  We prepared a photo spread consisting of twelve photos.  We had an eyewitness who saw an individual in the area, holding a bicycle in front of the Post Office at approximately the time we suspect the attack occurred.

He stated the individual was wearing what appeared to be white gloves.  And he provided a description of his clothing.  We showed this individual a photo spread containing the photo of Meier Jason Brown, and he positively identified Meier Jason Brown as the individual he saw in front of the Post Office wearing what appeared to be white gloves and holding a bicycle at the approximate time of the attack.

Q.    Were there any other identifications of Mr. Brown?

A.    We showed his -- a photo spread to another individual who had seen a black male in the area matching his general description.  And they were also able to positively identify Meier Jason Brown.

Q.    Had there been an identification of a Jason being in the Post Office a morning from another witness?

A.    Yes.  We had two postal employees in the Post Office on the morning of November 30th.  Ms. Gaglia, the Post Master Relief, and a rural carrier.  She stated that prior to actually leaving on her route to deliver mail, when she was in the office casing mail, that an individual came into the Post Office, and there was -- and she overheard an exchange between Ms. Gaglia and the individual.  The individual identified himself as Jason.

Q.    With the information you had collected at that point, what did you try do next?

A.    We felt it was appropriate to obtain a search warrant for the residence where Meier Jason Brown had been staying, at his mother's residence, Ms. Sadie Brown, on Leroy Coffer Highway.

And also, since he had immediately left the area and gone that of his girlfriend in her vehicle, we felt it was appropriate to get a search warrant for her residence as well.  And we obtained those warrants on December 5th.

Q.    With those warrants in hand, did you proceed to attempt to conduct searches?

A.    Yes.  We conducted simultaneous searches at both residences.  Ms. Sadie Brown, we explained the nature of our being at her residence at that time, and asked for consent to search which she granted.

We did the same with Ms. Diane Brown at her residence.  We explained the nature of our visit and what we were there for.  And she also consented to the search of her residence and vehicle.

Q.    Did both of those individuals sign consent to search forms?

A.    They did.

Q.    Tell us about the search at Sadie Brown's residence? What did you find, if anything, there?

A.    At Sadie Brown's residence, we found a jacket matching the description provided by eyewitnesses, who had

placed Meier Jason Brown at the scene at the approximate time of the attack.  On the cuff of the sleeve of the jacket, it appeared to be a spot of blood.

We also recovered a bicycle.  And on the seat of the bicycle, there appeared to be a spot of blood on the seat.

We also found a knife near the belongings of Meier Jason Brown that matched the medical examiner's description of the murder weapon.

Q.    What type of knife was that?

A.    It was a standard kitchen knife.  It had a blunt end approximately, I would say approximately a 4-inch blade.

Q.    What, if anything, did you find at the residence or in the vehicle of Diane Brown?

A.    On vehicle, in the front seat, the initial swabbings determined it was substance consistent with blood.

We have had a cadaver dog who alerted on a jacket at that scene that belonged to Meier Jason Brown.

We also found shoes belonging to Meier Jason Brown that appeared to match a shoe print that was left on the counter line on the day of the attack against Ms. Gaglia.

And we also found money order receipts.  There were three missing money orders at the Post Office.  We found money order receipts for two of those.  And an additional customer money order receipt for a postal money order that had since purchased.

Q.   Was Mr. Brown at Diane Brown's residence when you went there to conduct the search?

A.   Yes.  Mr. Brown answered the door.

Q.   Did agents or officers make an attempt to ask him any questions?

A.   Yes.  Mr. Brown was advised of the reason for our presence there, and that consent had been given to search the residence.  He was asked if he would consent to an interview.  And he agreed.

Q.   Was he told that this interview was consensual?

A.   Yes, he was.  He was advised this was non custodial, and that he was free to leave.

Q.   Can you tell about that interview and what Mr. Brown told the agents during that first part of this interview?

A.   Mr. Brown told agents initially that he had indeed gone to the Post Office on the morning of Saturday, November 30th, but had only retrieved the mail and returned home.

He later said -- he changed his story to say that he had gone back do the Post Office to purchase money orders with money that he had stolen from his cousin.

Then later, he went into another story where he confirmed that he had gone back to the Post Office to purchase money orders, but he had no money, and he carried a knife, and white socks, which he put over, placed over

his hands, and he leaped over the counter with the intention of stealing the money orders.  And he stated that he accidentally tripped and fell into Ms. Gaglia.

Q.   And by accidentally tripping and falling into her, he would have stabbed her once.

A.   Correct.

Q.   Did he say anything else about the multiple stab wounds?

A.   He stated words to the effect that -- you know, I believe he said, "damn", and indicated that essentially he had no other choice at that point, that he had "messed up", were his words.

Q.   After making that confession, did Mr. Brown make any telephone calls?

A.   Yes.  He picked up the telephone.  He was in the den of Ms. Brown's residence.  And the telephone was there. He picked up the telephone, and he called his mother.  And essentially told her that he was sorry.  He apologized for it, and told his mother that it had been an accident, and that he loved her.

Q.   After this confession, was Mr. Brown informed that he was under arrest?

A.   Yes.  Mr. Brown was placed under arrest.  He was advised of his rights.  He remained in the den of the residence.  And he provided further details.

Q.    Did he also sign a waiver indicating that he understood his **Miranda** rights and waiving those rights?

A.    Yes, he did.

Q.    In addition to confessing to the agents and officers who were interviewing him, did Mr. Brown ask that anyone else could come into room?

A.    He asked to speak with Diane Brown.  She came into the room and he subsequently confessed to her and apologized to her as well.

Q.    How did the interview conclude on that day?

A.    Mr. Brown was transported back to the Liberty County jail.  He stated that he would be willing to talk with agents the following day.  He stated he was tired that evening.  So, he was transported to the jail, and he was -- agents talked to him again the following morning.

Q.    So, it would have been December 6th of this year?

A.    Right.

Q.    Can you tell us what took place during that interview?

A.    On the morning of December 6th, Meier Jason Brown was advised of his rights.  He again signed that he understood and waived his rights.  He spoke with a detective and a Postal Inspector.  It was a tape-recorded conversation. And he again confessed to the murder and robbery at the Fleming, Georgia Post Office on November 30th.

MR. FRENTZEN:  Judge, I have no further questions.

CROSS EXAMINATION

BY MR. BELL:

Q.   Ma'am, you prepared an affidavit to get the arrest warrant from the Judge.  Is that correct?

A.   That's correct.

Q.   Was that affidavit complete and true to the best of your knowledge?

A.   Yes, it was.

Q.   And then you also prepared two affidavits for search warrants.  Is that correct?

A.   That's correct.

Q.   And those are the search warrants of the girlfriend's and mother's residence; correct?

A.   Right.

Q.   Now, your best estimate of the time the attack is what time that morning?

A.   Approximately 10:40 to 10:50.

Q.   And did that based on -- there were some witnesses who saw someone on a bicycle.  Is that correct?

A.   We're basing on witnesses who actually saw her alive.

Q.   Okay.  Who --

A.   And then when witnesses discovered her dead and called 911.

Q.    All right.  There was a lady who was a postal worker who was inside the Post Office in Fleming that morning; correct?

A.    That's right.

Q.    And she alleged heard a conversation between the victim and a black male who was in the Post Office.  Is that true?

A.    That is true.

Q.    And that black female employee was not present at the time of the attack.  Is that correct?

A.    That is correct.

Q.    What time did she leave the Post Office?

A.    By her estimate, she was finished casing her mail at approximately 9:30.  She loaded her vehicle and had some conversation with Sally Gaglia.  She estimates that took approximately 15 minutes.

So, she believes that she would have left the facility at approximately 9:45 a.m.

Q.    And then there were at least two witnesses who saw someone on a bicycle outside the Post Office; true?

A.    That's correct.

Q.    Who are these witnesses?

A.    The one -- we have several witnesses.

Q.    Okay.

A.    And I'm sorry.  I apologize.  I have to refer to my

notes.  I know that the Ms. Cindy Cooke placed a black male fitting Meier Jason Brown's description on a bicycle near the time of the incident.

The witness who positively picked him from a photo spread standing in front of the Post Office, I do not have his name.  I do have it in our file.

Q.   All right.  I believe when you initially testified under cross-examination of the U.S. Attorney, you said that two witnesses had positively identified the defendant, I believe, from a photo spread.  Is that what you testified to?

A.   That is -- yes.

Q.   In the affidavit, doesn't it state that one witness was unable to identify him?

A.   That's an additional witness.

Q.   So, how many witnesses do we have making statements that placed someone on a bicycle at or near the Post Office that morning?

A.   I can recall approximately four.  And again, I would have to refer to my files.  We have numerous witnesses in this case.  And again, a lot of these interviews were conducted by other law enforcement personnel.

Q.   All right.  Out of the four, were all four shown photo spreads?

A.   I know that three were.  I know that we had one who

was unable to identify them.  And I know we had two positive IDs.  There may have been more.

Q.   Do you know the names of either of the two people who made a positive ID?  I know the one you don't recall.

A.   Right.  I apologize, I don't.  But I will be glad to get the information as soon as I possibly can.

Q.   All right.  Who was the witness who said they could not identify anybody from the photo spread?

A.   Cindy Cooke.

Q.   That was Cindy Cooke?

A.   Right.

Q.   Okay.  Did she make a selection?

A.   No, she did not.  She stated that she was unable to identify the person she saw.

Q.   Did Cindy Cooke give a time of seeing somebody?

A.   Her estimation was -- and she did a countdown backwards.  And I will relay to you what she told me.

     She met her husband at 10:42, approximately one mile from the Post Office, which she had left the Post Office directly to meet him.  Prior to that, she had run by a friend's house.  And so, by her estimation, it would have been approximately 10:35 that she saw a black male on a bicycle approaching the Post Office.

Q.   What about the others, what time frame did they give?

A.   The others, the time frame they gave is between

10:30 and 10:45.

Q.    Did they give physical descriptions of the person they saw on the bicycle?

A.    Yes, they did.

Q.    And one of them described the person on the bicycle as being stocky built; correct?

A.    That's correct.

Q.    All right.  And my client is not stocky built; is he?

A.    No, he was not.  But his jacket was bulky.

Q.    Well, he is the opposite range.  He is very thin; isn't he?

A.    Yes, he is.

Q.    His entire body and even his facial features that would not be covered by a jacket, and his face is thin. Is that correct?

A.    I would characterize his face as average.

Q.    Who was the witness who described this stocky black male?

A.    I believe was A. C. Edders.

Q.    Did he look at the photo spread?

A.    I do not believe he did.  I did not personally interview him.  And again, I apologize.  I would have to review his file.

Q.    What about clothing descriptions?  What did the civilian witnesses give?

A.    They had -- some of them had slightly different descriptions.  For example, Ms. Cooke described him as wearing a brown or a gold coat, a baseball cap with neutral colors and riding a bicycle.

We had -- I believe Mr. Edders' description had him holding a bag or a jacket over his arm.

And again, the witness who positively identified him stated that he was also wearing what appeared to be white gloves.

Q.    The witness who positively identified him, what about his clothing description, his jacket, things of that nature?

A.    I would have to refer to the file.  But it was consistent -- I don't know the exact terms he used to describe the clothing.  But it was consistent with the descriptions we had gotten from other witnesses.

Q.    Well, was the coat actually seized?

A.    Yes, it was.

Q.    What color is it?

A.    Golden brown.

Q.    Did they all describe a golden brown jacket?

A.    No.  Some -- I believe some used the words tan or light colored.  And maybe even one used the term gray.

Q.    Did any of them describe the shoes?

A.    No, they did not.

Q.    So, some people had jacket on; some people had jacket off.  Is that correct?

A.    That's correct.

Q.    Some people had gloves or something covering his hands, and some did not.  Is that correct?

A.    That is correct.

Q.    How did they describe the bicycle?

A.    We had -- I know we had at least one who described it as a green bicycle.

Q.    Okay.

A.    We had Ms. Cooke, who described it as a ten speed.

Q.    What color?

A.    As a ten speed, but she didn't identify the color.

Q.    And wasn't there someone who described it as a red bicycle?

A.    I don't recall someone describing at a red bicycle. I know that the bicycle we seized was red.

Q.    Okay.  Any other bicycle descriptions?

A.    Not that I recall.

Q.    And was everybody on board, all the witnesses, that it was a black male that they saw?

A.    Yes.

Q.    And the age descriptions, they varied somewhat, too; didn't they?

A.    Yes.  We had them ranges in 20s and 30s on the age

description.

Q.   And is it possible that -- it sounds like they are describing two different people, possibly.  Is that correct?

A.   It is possible.

Q.   Now, in the affidavit it said that the victim appeared that she might have been prepared for closing.  Is that true?

A.   That is what -- that was our initial thought when we were conducting the investigation.  We have since revised that based in part on Mr. Brown's statement as to us. They had requested money orders and she -- and now we believe that she was actually cutting and preparing those money orders for sale to Mr. Brown when she was attacked.

Q.   What are the hours of the Post Office on that day?

A.   8:00 a.m. to 11:00 a.m.

Q.   Is there any video surveillance at that site?

A.   No, there's not.

Q.   None inside or none outside?

A.   No, there is not.

Q.   Is there any video of any stores that are closed by to the Post Office that have been checked?

A.   It is an extremely rural area.  It is next to the fire department.  And on the other side is a residence. And there are no video available.

Q.    Are there any inside alarms that can be tripped by postal employees in case of a robbery?

A.    No, there's not.

Q.    Did it appear that any attempt had been made by the victim to get to the telephone or things of that nature?

A.    It is possible.  The first responders were on the scene prior to law enforcement.  And one of a first responders made the statement that she attempted to use the telephone, but it was already engaged, meaning that she did not have a dial tone.

Q.    Can you tell me who the people were who found the victim?

A.    Yes.  They were Stephen Nichols, S-t-e-p-h-e-n N-i-c-h-o-l-s, and Jennifer Zeck, last name, Z-e-c-k.

Q.    What was their best estimate of time?

A.    Stephen Nichols estimated that they were at the Post Office five to six minutes before they discovered her body, that Jennifer -- he waited in the vehicle while Jennifer Zeck went in to retrieve the mail they expected.

She stated that no one came to the counter to help her.  He estimated that he waited outside five to six minutes before Jennifer Zeck came out screaming, after she discovered Ms. Gaglia's body.

Q.    What time did they say they arrived at the Post Office?

A.    They are not clear on the time they arrived.  We're basing their arrival time on their account, and the 10:51 911 call.

Q.    Did they see anybody else, any other customers inside?

A.    No, they did not.

Q.    There are boxes in there where people can go in and get the mail without interacting with the employees.  Is that set up there?

A.    That is correct.  There are Post Office boxes.

Q.    Did they see any persons leaving or in the vicinity as they drove up to the Post Office?

A.    They stated they did not.

Q.    Now, can the sometime of the money order transaction -- are these done on a machine that records the time the money order is generated?

A.    Some of our larger office do have that capability.  Unfortunately, Fleming Post Office does not.  It was a manual system.  And there is no way to record the time.

Q.    Do you know the order that the money orders were generated, like 175, 500, 500, 20; or, can you tell that?

A.    Yes.  By the sequence of them.  And I would have to refer to the notes on sequence.  But based on the adding machine tape that I witnessed in the facility, I would say the order was 500, 500, 175.

Q.   Wasn't there a 20-dollar transaction?

A.   The 20-dollar transaction was issued to a customer earlier in the day.

Q.   Were there any transactions on the tape that were in between those?

A.   Well, she does not have the equipment to run a time lapse tape so that you can tell the order of any transactions.  When she prepares a recap, it is just a total.  Like these are all of the box rents for today.  These all of the money orders.  But there is no way to sequence the transactions.

Q.   One of things that lead you to believe that robbery was the motive was the victim pocketbook was missing.  Is that true; or, at least the wallet had been taken out?

A.   Based on statements by her family, she would have had a wallet there.  There was no wallet in her pocketbook or purse at the time.

Q.   Has that ever been recovered?

A.   No, it has not.

Q.   And credit cards are missing.  Is that true?

A.   That is true.

Q.   And things like driver's license, and all that kind of stuff is missing.  Is that true?

A.   That is true.

Q.   All right.  And you testified that the defendant has

allegedly made some statements, which you categorize as admissions that he did this thing; correct?

A.   That's correct.

Q.   Was he able to provide any details which would corroborate that by saying, you know, where this wallet is, where these credits are?

A.   Yes.

Q.   And where did he say the wallet was?

A.   He stated that it was in a wooded area behind the trailer, facing his mother's trailer.  There is a trailer on the left.  He stated this was in the wooded area behind that trailer, passed a barbecue pit, and underneath tin.

Q.   And I assume that has been checked out?

A.   Yes, it has.

Q.   And it has not been found?

A.   It has not.

Q.   So, that detail was not corroborative; correct?

A.   Correct.

Q.   Were any of the credit cards used?

A.   No, they have not been.

Q.   Were any fingerprints found at the scene?

A.   Yes.  Fingerprints were found at the scene, as well as the shoe print on the counter line that I mentioned earlier that matched, appeared to match Mr. Brown's shoes.

Q.   Let's talk about the fingerprints.  Were those

dusting prints?

A.    They were -- it was a latex gel lift.

Q.    Okay.  Have those been attempted to be matched with the defendant?

A.    Yes, they have.  We have submitted them to the Postal Inspection Service crime laboratory.

Q.    What were the results?

A.    We do not have a results from our crime laboratory. We did run a preliminary AFIS check, and they did not appear to match Mr. Brown.

Q.    Where were those prints lifted?

A.    On the counter line.

Q.    Okay.  Where you would have suspected the attacker to have been; correct?

A.    As well as customers, and based on Ms. Zeck's testimony, exactly where she placed her hands, to lean over to look for Ms. Gaglia.

Q.    So, did the prints match Ms. Zeck?

A.    They have not been compared yet.

Q.    Have any white socks or white gloves been found?

A.    There were white socks in a duffle bag belonging to Meier Jason Brown at his mother's residence.

Q.    Would be I correct in saying that they do not appear to have any bloodstains or anything of that nature?

A.    They were laundered socks, and they did not have any,

what appeared to be blood.

Q.    Did you check the washing machine to see if there were any blood traces that could be found in or around the washing machine of the residence?

A.    We did not see any, what appeared to be blood in or around the washing machine.

Q.    So, we don't have any white socks or gloves with any trace evidence.  Is that true?

A.    No.  The socks were submitted to the crime lab to see if any trace elements can be determined.

Q.    Have any other prints been lifted at the scene, other than the ones we're just talking about?

A.    No, they have not.  However, we have submitted documents and other materials to the lab to further determine if there are any prints available.

Q.    Now, from the affidavits, didn't you state that there was some blood imprints?

A.    There were blood smears.  As I said earlier, the first responders were on the scene before it was secured by law enforcement personnel.  And they attempted to revive Ms. Gaglia.

Q.    To the best of your determination, would those smears have been made by the victim or the attacker?

A.    They could have been made by the victim.  They could have been made by the attacker, or the first responders.

Q.    Where exactly inside the post office was she located?

A.    She was directly --

MR. FRENTZEN:  Your Honor, I object.  This sounds more like a discovery episode that any question relating to the purpose for which we're here today.

MR. BELL:  I don't see how the question can be any more basic than as to where she was found, and, you know, in the preliminary examination --

THE COURT:  I will allow the question.

Q.    Where was she found?

A.    She was located directly behind the counter line.  As you are facing the counter line, she would be slightly to the left, laying on the floor.

Q.    And where were those blood smears that were destroyed?  Were they rightly adjacent to her body?

A.    Most of the blood was contained directly adjacent to her body with few exceptions.

Q.    Could you tell from any of the smears whether or not they were consistent with a person having on gloves or socks?

A.    No, we could not.

Q.    Did you find any trace element, like fibers that might be matched up to socks that someone might wear on their hands?

A.    Nothing that was apparent to the naked eye, no.

Q.    All right.  And was close examination made of the blood and the surrounding area to look for white sock fibers, and things of that nature?

A.    Yes, it was.

Q.    To the best of your knowledge was there any blood on the scene that may have been left by the attacker?

A.    None that we could identify.  But as I said, it has been submitted for examination, thorough examination by our lab.  And we have not received the results.

Q.    Do you have any evidence that the victim had any scrapings under her fingernails or anything like that?

A.    Her fingernails were retained and submitted to the lab for review.

Q.    Do you know if there is any trace evidence?

A.    We have not received the results.

Q.    Were any hairs or any other fiber material collected?

A.    Yes, there were.

Q.    And any results of that?

A.    We have not received any results, no.

Q.    The postal worker who was in the Post Office that morning who allegedly heard a conversation between the victim and a black male who was in the Post Office, did that lady ever see -- did that postal worker ever see who the victim was speaking to?

A.    No, she did not, but she did know which Post Office

box had been accessed.

Q.    All right.  How did she determine that?

A.    The Post Office box that was accessed is right next to her work station.

Q.    So, did she see it open and close?

A.    Uh-uh.

Q.    Was that her statement, that she saw that?

A.    No.  I think based on the conversation she was able -- and too, there are many individuals who collect the mail from that particular Post Office box.

Q.    Is your outline of what she said about that encounter in your affidavit, is that complete and accurate?

A.    It is not complete.  In the affidavit, it stated that she overheard the conversation.  We have further determined that she was actually able to pinpoint which Post Office box in further interviews with the employee.

Q.    How much later was she asked to do that?

A.    Well, there was -- one of the detectives felt that she had provided the information, but we wanted to err on the side of caution whether she actually had.  I re-interviewed her again yesterday.  And she did confirm that she had provided that information.

Q.    Okay.  But she didn't see it.  She just -- how did she identify the specific box?  She didn't see it open and close; correct?

A.    No.    She did not.

Q.    She's talking about the general area where the box is located; true?

A.    With this particular Post Office box, there has been a history of problems with individuals picking up mail and not delivering it to the intended recipients.  So, the Post Office had an informal guideline of only releasing mail to the individual to whom it was addressed instead of the entire contents.

It unusual for some individuals to have a key to the box.  So, the employee stated her interest was piqued and this individual enter the Post Office and Ms. Gaglia stated words to the effect, "oh, they've given you a key. Someone has put you in charge of the box for today."  And she said she knew immediately which box she was referring to.

Q.    Based on that, she's assuming that it is the same box that there has been trouble with before?

A.    I'm sure based on that, and then the box opening immediately to her right and someone retrieving the mail. She knew that it was this P O box.

Q.    Can you tell me who the confidential source that is referred to in Paragraph 7?

MR. FRENTZEN:  Objection, Your Honor.  That is privileged information.

THE COURT:  Sustained.

Q.   Actually that confidential source is relaying information to that source that he received, or she or he received from another source.  Is that correct?

A.   That's correct.

Q.   And that other source is not labeled as confidential. Can you tell me who that source was?

MR. FRENTZEN:  Same objection, Your Honor.

THE COURT:  I sustain it.

Q.   Have you obtained any statements from the confidential source's source?  Have you met that person?

A.   Agents on our task force have, yes.

Q.   Have you?

A.   Some of the information has been corroborated.

Q.   All right.  And what has?

A.   I would say the agitated state.

Q.   Have you corroborated -- is there any family member of the defendant who says that he was refused money that morning?

A.   No.

Q.   So, that has not been corroborated either; true?

A.   We do have a family member who stated, who described a similar incident that happened a couple days prior to November 30th.

Q.   But that is not with the source, the confidential

source; is that true?

A.   Essentially it is the same story, but the timing is slightly different.

Q.   You described the knife as being a kitchen type of knife with a blunt edge?

A.   Uh-uh, with a blunt end.

Q.   A blunt end.  Are you talking about the blade end being blunt?

A.   No.  It's a normal blade, just the end of it, instead of coming to a sharp point, it is more of a rounded blunt end.

Q.   Is this a steak knife?

A.   Yes.

Q.   Were any similar knives found in either the residence of the defendant's girlfriend or the mother?

A.   No.

Q.   Did the knife had a handle guard?  Do you know what I mean by that?

A.   I would say that it was a -- I assume you mean a small protrusion.  It had a small protrusion, which I would characterize as a handle guard.

Q.   Right.  If I am holding a knife and this is the blade, between the handle and the blade, there would be, you know, something sometimes maybe to protect a kid, and things of that nature?

A.    Right.  I would say there was a small protrusion.

Q.    Okay.  Do you have any photographs of the knife?

A.    No, I do not.

Q.    Okay.

A.    Let me state, I'm sure that photos are taken at the search site.  But our film has not been developed.  It was all submitted to the crime lab.

Q.    Right.  How small was this protrusion, how small was this handle guard?

A.    I would say it was the standard for a steak knife.

Q.    For a eating knife and not a hunting knife; correct?

A.    Correct.  More an eating utensil than a hunting utensil.

Q.    And the reason I ask you is that in attacks of this nature, if there is not a large guard there, the attacker himself would be cut with the knife.  Was there any evidence like that found on the defendant's hands or arms?

A.    No.

Q.    Okay.  Was there any trace evidence located on the knife itself?

A.    It has not been evaluated.  It has been submitted.

Q.    All right.  What about the -- I guess the jacket has been submitted.  And you don't know the answers; correct?

A.    No, we do not.

Q.    Do you even know blood typing yet?

A.    We have none samples of Ms. Gaglia's blood that has been submitted for comparison.

Q.    So, we don't have any comparison whatsoever at this point?

A.    Not at this point, no.

Q.    All right.  The tennis shoes -- at the Post Office, there were tracks; correct?

A.    There was a shoe print lifted from the counter line, correct.

Q.    Okay.  And was the shoe print implicated that the person was coming back over the counter after the attack?

A.    It appeared that the shoe print was entering the Post Office prior to the attack.

Q.    So, what was the print left -- was it preserved, things of that nature?

A.    Correct.

Q.    And has anything other than cursory comparison been done at this point?

A.    No.  The shoes and the print have been submitted. But a cursory exam, it is consistent with the shoes seized that were Ms. Brown's residence, belonging to Meier Jason --

Q.    What type of shoe was that?

A.    A blue, and the spelling was L-u-g-t-z, I believe. Blue Lugtz.  I'm not familiar with the brand.

THE COURT:  This print you're talking about left by the shoe, was that a blood print?

A.   No, it was not.

THE COURT:  What kind of print was it?

A.   It was more, I would say dirt and just from the impression on the counter, similar to a fingerprint.  When it was dusted.  It was not evident until it was dusted that there was a print there.

THE COURT:  I see.  And this was consistent with somebody vaulting the counter?

A.   Yes, it was.

Q.   Were there any other footprints left on the outside of this rural Post Office, things of that nature?

A.   None that we were able to lift.

Q.   Now, the statement that was allegedly first taped from the defendant was one that was made at his girlfriend's house.  Is that correct?

A.   Yes, sir.

Q.   Y'all had search warrants; true?

A.   We did.  We did not execute them.

Q.   All right.  How was entry made?  Who knocked on the door?

A.   We had --

THE COURT:  I think we're getting beyond probable cause here.

MR. BELL:  Could I just ask a few more, and then I will be done.

THE COURT:  If it is relevant, yes.

Q.   There has been a shooting at the scene of the Post Office.

A.   Not to my knowledge.

Q.   There hasn't been a robbery of anybody in that same Post Office or an employee of that Post Office?

A.   Not to my knowledge.  I have been investigating in the Savannah area only since September.  In my experience here, there has not been a robbery.

Q.   I show that --

MR. FRENTZEN:  Judge, I'm not sure of the relevancy of this, especially in light of the fact that the witness has indicated she is not aware of it.

Q.   The reason I ask is checking the computer, newspaper articles stated that there was a -- authorities were investigating a shooting at the Fleming Post Office in northeast Liberty County Saturday evening.  And I guess this was -- the article was December 2nd, 2002.  It was a December 1st shooting.  That would be three days later; correct?  Or two days?

A.   I'm sure that article stems from the initial assumption by many of the local residents that Ms. Gaglia had been shot instead of stabbed.

THE COURT:  You are not aware of any subsequent shooting after this event?

A.  No.  I'm certain there has been no shooting since this event.

THE COURT:  Okay.

Q.  Because if there was a shooting that day at the same Post Office, you think you would know about it for sure; correct?

A.  I am certain I would know about it.

Q.  When do you expect the crime lab to come back with some results?

A.  We expect to be advised today how long each of the different areas of evidence we have submitted will take. On some of the initial, I'm sure that possibly matching the shoe print would be fairly soon.  But I can't give you a definite time.

Q.  Is it true that y'all were at this defendant's girlfriend's house for approximately eight or nine hours on the day the search was conducted?

A.  No, not that long.  We were there, I would say it would be closer to probably six hours.

Q.  All right.  And he was held there the entire time; correct?

A.  He was not held there.  He was walking around, drinking soda.  He was free to go.  He was not interviewed

for that entire time, no.

Q.    Do you recall him asking, trying to leave and trying to get his shoes and being refused permission to take some sneakers?

A.    Yes.    He was going to -- he was asked to go to Chatham County.  And he agreed to go.  But when he started to put his shoes on, the Inspector who saw his shoes had also been at the crime scene and saw the similarity, the immediate similarities between the shoe print, and told him that he would have to wear other shoes to leave, but he could not wear those shoes, but he could wear other shoes to leave.

Q.    Did he ever ask for a lawyer?

A.    No, he did not.

Q.    He was extremely upset about the prospect of his girlfriend being arrested; true?

A.    He stated that he was.

Q.    And she was in another room, and she was crying and extremely upset; wasn't she?

A.    She was moving about the house as well.  Her daughter came and left a couple of times.  And it is my understanding that she was -- although she did consent to the search, it was my understanding that she was not very happy with the circumstances that possibly Mr. Brown had brought into her home.

Q.    So, it was -- he was told that she would be taken to jail if he didn't make a statement.  Isn't that true?

A.    That is not true.

Q.    He was not or she was not told that she was going to be arrested also?

A.    No.  They were both advised that if the evidence supported the investigation, whatever evidence was uncovered there, appropriate steps would be taken in whatever direction evidence the warranted.

Q.    How many times did he deny any involvement before he allegedly said that he had done something?

A.    I'm not sure of the individual number of times.  What I do know, as I stated earlier, that he provided two different scenarios before he confessed to the attack.

Q.    She was not arrested.  Is that correct?

A.    That is correct.

Q.    Was that based on his cooperation?

A.    No.  It was based on the evidence that was recovered.

        MR. BELL:  That's all I have.

        MR. FRENTZEN:  Nothing further, Your Honor.

        THE COURT:  Were there any names found on the postal money order receipts?

A.    Yes.  One --

        THE COURT:  You may have mentioned this earlier, and I missed it.

A.    I didn't.  One money order was from Jason Brown to Diane Brown.  Another money order was from Diane Brown to her mortgage company.  And I believe the third was from Diane Brown to her bankruptcy payment.

THE COURT:  Thank you.  You may go down.

[Note:  The witness left the stand.]

MR. FRENTZEN:  Your Honor, the government has no additional witnesses.  We would proffer the defendant's criminal history from the Pretrial Services for the Court's consideration.  But with respect to the issue of detention, other than that, we have no further evidence.

THE COURT:  Any evidence from the defendant?

MR. BELL:  No, I'm not going to introduce any testimony.

THE COURT:  The cumulative weight of the evidence presented by the government's witness is more than sufficient to establish probable cause to believe that defendant planned and executed a robbery at the Fleming Post Office.  And in the process, he perpetrated a vicious attack with a knife upon the defenseless postal employee, killing her by inflicting multiple stab wounds.

There is, of course, his later confession.  But in addition, there is positive identifications by witnesses who were at the Post Office that morning, and who could place the defendant at the scene about the time

of the attack.

The defendant was known to have left his home on a bike and to have returned, and entered his girlfriend's car. There was a bike seen at the Post Office as well.

Clothing matching the perpetrator's clothing or the person who was seen at the Post Office about the time of the attack was found in the defendant's mother's residence. Bloodstains, apparent bloodstains are on that clothing. A bike was recovered also containing a spot of blood.

There was blood in the front seat of the girlfriend's vehicle, and at her residence were a pair of shoes that matched a print that has been obtained from the counter of the Post Office. Money order receipts were also found at the girlfriend's residence. And as I said, the defendant ultimately has confessed to the robbery and to killing Ms. Sally Gaglia.

So, the Court finds probable cause.

The Pretrial Services report indicates that the defendant really has no substantial resources. His work history is spotty. He has a number of prior arrests and convictions, mostly for misdemeanors. There have been possession of marijuana, a misdemeanor back in 1990, some DUIs over various periods of time, a robbery in 1996 for which he received five years confinement, and he was

paroled and his paroled was ultimately revoked about a year later for new convictions.

There was also a conviction for theft by taking an automobile.  And he has some pending charges.  And among those are September arrests where he is charged with contempt of court, obstruction of officers, given a false name, tampering with evidence, and a new suspended license charge, and DUI.

On balance, the Court finds that the defendant is not a suitable candidate for pretrial release.  I will order that he be detained in the custody of the marshal pending further proceedings in the case.

I do view him as a risk of flight and a danger to the community.

The government has a duty where a case is on a criminal complaint to present its case to the Federal Grand Jury within thirty days after a defendant's initial appearance.  The next grand jury session that will be available to government will be meeting in, I guess it is second week of January.

Is that right?

MR. FRENTZEN:  That's correct, Your Honor. That's my understanding.  It will be a 7th of January, will be the first day.

THE COURT:  And you intend to present this case

at that time.

MR. FRENTZEN:  We do.

THE COURT:  All right.  I am going to take a recess before we get to the next matter.

MARSHAL:  All rise.

*[Proceedings adjourned]*

GEORGIA

CHATHAM COUNTY


CERTIFICATE OF REPORTER


I, Lora H. Carter, do hereby certify that the above and foregoing pages of typewritten matter is a true, correct, and complete transcript of the evidence and proceedings in the captioned matter.


This the ____ day of _____, 2002.



LORA H. CARTER
U.S. Court Reporter
Southern District of Georgia


P. O. Box 8552
Savannah, GA  31412
(912)232-4777

i n d e x

MARLA McLENDON, direct          5

                cross          17


COURT'S FINDINGS               44