UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA   .

.

     vs.       . CR 403-001

.

MEIER JASON BROWN      . Savannah, Georgia

. October 30, 2003

TRANSCRIPT OF JURY QUESTIONNAIRE INSTRUCTIONS

BEFORE THE HONORABLE B. AVANT EDENFIELD

UNITED STATES DISTRICT JUDGE

Court Reporter:     Lora H. Carter
                        Official Court Reporter
                        United States District Court
                        P. O. Box 8552
                        Savannah, Georgia 31412
                        Tel.  912-650-4065

*Proceedings reported by stenotype; transcript produced by computer-aided transcription.*

A P P E A R A N C E S:


FOR THE GOVERNMENT:

       WILL FRENTZEN
       JOSEPH NEWMAN
       P. O. Box 8970
       Savannah, GA  31412


FOR DEFENDANT:

       RICHARD DARDEN
       219 W. York Street
       Savannah, GA 31412


       WILLIAM BELL
       420 W. Broughton St.
       Savannah, GA 31401

*[Court convenes on the 30th day of October at 9:00 a.m. with the first panel of veniremen called in.]*

CLERK:  Please answer as your name is called so that we can get a complete count of the roll this morning. Sound out and let me know you are here.

Jackie Alexander?  Jackie Cooley Alexander?

Tracy Amick?

JUROR:  Here.

CLERK:  June Archer.

JUROR:  Here.

CLERK:  Tara Avinger?  Tara Avinger.

Holly Ann Baker?  Holly Ann Baker.

JUROR:  Here.

CLERK:  Please speak up, Ms. Baker.

JUROR:  Here.

CLERK:  William Barber, William C. Barber.

Marie Barnes.

JUROR:  Here.

CLERK:  Victoria Barnwell.

JUROR:  Here.

CLERK:  Robert Beattie.

JUROR:  Here.

CLERK:  Ginger Becton.

JUROR:  Here.

CLERK:  Sherry Bennett.

JUROR:  Here.

CLERK:  Kenneth Mitchell Bevill.

JUROR:  Here.

CLERK:  Karen Biggins, Karen A. Biggins.

Nicole Blount, Nicole J. Blount.

George Boettcher.

JUROR:  Boettcher.

CLERK:  Boettcher.  Thank you, sir.

Julie Bolton, Julie L. Bolton.

William Carson Boswell.

JUROR:  Here.

CLERK:  Alan Boutwell.

JUROR:  Here.

CLERK:  Carmen Branchi, Carmen Martyella Branchi.

John Branham.

JUROR:  Here.

CLERK:  Tamara Brewer, Tamara Brewer.

Mary Ann Brock.

JUROR:  Here.

CLERK:  Barbara Brown.

JUROR:  Here.

CLERK:  Okay.  We've got two Barbara Browns.  We've got a Barbara A. and a Barbara J.

JUROR:  Barbara A.

CLERK:  Is Barbara J. here as well?

JUROR:  Yes.

CLERK:  Thomas Larry Brown.

JUROR:  Here.

CLERK:  Leon Bryant, Jr.

JUROR:  Here.

CLERK:  Shenetta Bunn.

JUROR:  Here.

CLERK:  Stacy Burgess.  Stacy E. Burgess.

Annie M. Cannon.

JUROR:  Here.

CLERK:  Charles Capers.

JUROR:  Here.

CLERK:  Ann Marie Carver.

JUROR:  Here.

CLERK:  Amber A. Cobb.

JUROR:  Here.

CLERK:  Patricia Ann Colson.

JUROR:  Here.

CLERK:  Paul Cooper.

JUROR:  Here.

CLERK:  Catherine Corson, Catherine M. Corson.

Linda Cota or Cotta.

JUROR:  Here, Cota.

CLERK:  Cota.  Thank you, Ma'am.

Leah Marie Cox.

JUROR:  Here.

CLERK:  Kay Diane Croy.

JUROR:  Here.

CLERK:  Roger Derthick, Roger W. Derthick.

Donald Devegter.

JUROR:  Here.

CLERK:  Rebecca Dufrain.

JUROR:  Here.

CLERK:  Ellen Elze, Ellen Gay Elze, or Elese.

Kristin Fahey.

JUROR:  Here.

CLERK:  Heather Ferguson.

JUROR:  Here.

CLERK:  James Fielding.

JUROR:  Here.

CLERK:  June Fogle.

JUROR:  Here.

CLERK:  Alethia Foy, Alethia Regean Foy.

Edwin Gains.

JUROR:  Here.

CLERK:  Gwendolyn Gillis, Gwendolyn B. Gillis.

Brenda Joyce Gordon.

JUROR:  Here.

CLERK:  Donald Green.

JUROR:  Here.

CLERK:  Gwendolyn Green.

JUROR:  Here.

CLERK:  Kenneth Hadwin.

JUROR:  Here.

CLERK:  Linda Harris.

JUROR:  Here.

CLERK:  Brenda Head, Brenda T. Head.

Benjamin Hilderbrandt.

JUROR:  Here.

CLERK:  Cheryl Hill.

JUROR:  Here.

CLERK:  Thomas Roy Hill.

JUROR:  Here.

CLERK:  Jesse Mae Hills.

JUROR:  Here.

CLERK:  Okay.  Ladies and gentlemen, I'm going to go back through the list one more time.  If you hear your name, please sound out.

Jackie Cooley Alexander.

JUROR:  Here.

CLERK:  Tara Avinger, Tara A. Avinger.

JUROR:  Here.

CLERK:  That was you.  Okay.  Thank you.  William C. Barber.  William C. Barber.

Karen Biggins.  Nicole Blount, Julie Bolton.

Tamara Brewer, Stacey Burgess, Catherine Corson, Roger Derthick.

Ellen Gay Elze, Alethia Regean Foy, Gwendolyn Gillis, Brenda Head.

Are there any prospective jurors in the room at this time whose name I did not call.

Would you please stand and give me your name.

JUROR: Pamela Metts.

CLERK: Metts.

JUROR: Metts, M-e-t-t-s.

THE COURT:

CLERK: Okay, No. 94. Okay. Any other prospective juror whose name I did not call this morning?

Thank you. Ladies and gentlemen, would you all please stand and raise your right hand. I need to place you under oath at this time, and answer I do at the completion of the oath.

Do you, and each of you, solemnly swear ask true answers make to call questions put to you, touching upon your qualifications as juror, so help you God.

JURORS IN UNISON: I do.

CLERK: You may be seated, please. I have a very short series of the questions to go over. If you would simply answer as a group, please.

Are each of you citizens of the United States?

JUROR:  Yes.

CLERK:  Have each of you reached the age of 18 years?

JUROR:  Yes, sir.

CLERK:  Have each of you resided in the Southern District of Georgia for the past year in one of the following counties:  Bryan, Chatham, Effingham or Liberty?

JURORS IN UNISON:  Yes.

CLERK:  Any exceptions to that?  Thank you.

Have any of you ever been convicted in a state or a federal court of a crime punishable by imprisonment for more than one year and not have had your civil rights restored by pardon or by amnesty?

JURORS IN UNISON:  No.

CLERK:  Are each of you able to read, write, and speak and fully understand the English language?

JURORS IN UNISON:  Yes.

CLERK:  Is anyone present a registered agent for a foreign principal, in other words, do you work for someone who does not reside in the United States?

JURORS IN UNISON:  No.

CLERK:  Are any of you incapable by reason of mental or physical infirmity to render efficient jury service?

JURORS IN UNISON:  No.

CLERK:  Is there anyone here who is in the Armed Forces full time?  Anyone who is full time police officer or a fireman?  Anyone who works for an EMS, rescue type organization, any of that type of work?  Thank you.

Ladies and gentlemen, this young lady to my left is Lora Carter.  She is Judge Edenfield's court reporter. It is her official duty to take down each and every word that is spoken in this courtroom.  Each and every word.

When you have a question or you have an answer, please remember to let us know who you are at first.  Just give us your name when you stand.  Just give us your name, and then answer the questions or ask the questions.  It is very important that we know who is speaking.  These people are trying to keep a record.  These people are trying to keep a record.  It is extremely important.

Your name, Ma'am?

JUROR:  Elze.

CLERK:  Ms. Elze, would you come forward quickly, please.

*Whereupon the oath was administered to the juror, and qualified by the standard qualification questions.*

CLERK:  Ladies and gentlemen, if you would mark your list, Ms. Elze is present, No. 42.

Ms. Burgess, would you come forward, please.

*[Whereupon the oath was administered to the*

*juror, and qualified by the standard qualification questions.]*

CLERK:  Ladies and gentlemen, if you would mark your list, Ms. Burgess is present, Juror No. 28.

MARSHAL:  All rise.

*[Court opened by marshal].*

THE COURT:  Good morning.  You have sounded those absent.

CLERK:  Double time.  Yes, sir.

THE COURT:  All right.  I want the jury clerk down here.  And I want those people called, Mr. Fritts. And if there are not here, I will have them arrested and brought in.  And also, start calling that other shift.  I'm not going to accept any juror not showing up.

CLERK:  Yes, sir.

THE COURT:  Marshal, get ready to issue subpoenas, and arrest those absent jurors.

MARSHAL:  Yes, sir.

THE COURT:  Ladies and gentlemen, when I was in the army, people who were late created some consternation, and so those who were on time were fussed at about the inconsiderate attitude of being late.  Well, I shall not do that, because I thank you for being here and on time.

Service on the jury, I recognize, is an intrusion.  That is one of the things that you normally

don't schedule during the year, that I will be called upon to serve on a jury.

Let me reflect with you for just a moment about jury service.  Most of you recall from school that we have what we call a federal system of government.  Federal means dual.  There is a state court system.  And the courthouse is over here.  We're all citizens of the State of Georgia. The State of Georgia has a judicial system that is very active.

And we are called upon to serve as members of the jury.  I am called over there to serve.  She is called, and he is called, and he's called.  And I always go.  I have never been selected, but it is my duty to go.  But I sit around over there and make myself available.  And my key employees, officers of the Court whom I rely on, when they are called, I never seek to have an excuse for them. Indeed, my wife is called.  And I have sometimes gone without much to eat.

So, I recognize that it is an imposition.  In addition to that, we have this federal system, the United States, the federal government has a court system.  We refer to that as a federal court.  That is where you are this morning.

Some of you might have very recently served in the state court.  But we are required by law to try cases

within a parameter that protects the constitutional right of citizens to have matter adjudicated within the length of time.  That is guaranteed by the Constitution.  The Congress has defined what a speedy trial or a timely trial is.

We cannot function as a society and as a court without a jury.  Many, many years ago, during the foundation of this country, and as it was being formed, our forefathers determined that they wanted citizens involved in the judicial system.  The ultimate authority over the courts rests with its citizens.  And that is why you are here, because, indeed, people refer to me as a judge, but the people who will occupy those chairs over there are also judges.  They will judge the facts.  And they will, in certain instances, go beyond the facts and decide sentences.

So, you can see, I hope, that with this very brief statement how important it is to have you here.  And you were selected completely at random.  I did not select, nor did the government select you, and I refer to the government as the prosecutors, the United States Department of Justice.  The defense lawyers are on this side.  They did not select you.

We blame it on a computer.  We simply say we need so many citizens here.  And that computer at random

selected your name.  And that is how you are here.  We do blame a lot on the computer, but in this case, that is absolutely true.

The case that you have been summoned here for is what we refer to as a criminal case.  That means that the government has brought charges, and those charges were brought before a grand jury, and the grand jury returned an indictment charging a defendant with having violated certain laws of the United States.

While we refer to it at as a criminal case, that is only as a means of identifying it from a civil case.  In a criminal case, of course, a person enters the trial, enters the case with the presumption of innocence.  We will talk about that more in a few minutes.

But let me acquaint you with some background here.  This is the case of the United States of America versus Meier Jason Brown.  You are a potential juror.  I will be selecting, with the assistance of the lawyers, sixteen people.  They will serve as the jurors or the judges of the facts.

Now, what I will be doing here today and later is asking you a number of questions to determine your eligibility, your ability to fairly and impartially decide the facts in dispute, and if necessary, the proper punishment.  And this brings me to an important point.

Most criminal cases, the jury decides guilt or innocence and the Court decides the punishment.  But this is a federal death penalty case.  And the jury must decide whether or not the defendant is guilty, and the jury must decide the sentence, specifically whether the defendant should be punished by death or life imprisonment without the possibility of parole.

The defendant, and he is in court here today.  I will identify him, is Meier Jason Brown of Fleming, Liberty County, Georgia.  Now, he is represented by Mr. Richard Darden and Mr. William Bell.  Mr. Darden ask Mr. Bell are standing.  And if you will have your client stand also.

MR. DARDEN:  Meier, please stand up.

THE COURT:  Mr. Meier Jason Brown is the gentleman in the white shirt.

You may have a seat.

Representing the United States here is the United States Attorney, Mr. Richard Thompson.  Mr. Thompson, I do not believe will participate in the regular trial.  But he is the person who is in charge of the office.  He will be assisted by assistant United States Attorney, William Frentzen.  Mr. Frentzen is standing.  And, Mr. Joseph Newman, Assistant United States Attorney.

Also sitting at government's table is United States Postal Inspector, Marla McLendon.

You may have a seat.

The victim or the person who was killed is identified as Sallie Louise Gaglia.  Is that the right pronunciation, Mr. Frentzen?

MR. FRENTZEN:  Gaglia.

THE COURT:  Gaglia, G-a-g-l-i-a.  She was a resident of Liberty County, Georgia at the time of her death.

Now, Mr. Brown, that is Meier Jason Brown, has been indicted for three crimes.  In a indictment, they are called counts.  They are alleged to have occurred on or about November 30th, 2002, in the United States Post Office in Fleming, Liberty County, Georgia.

The first of these counts charge the murder of a federal employee, that is Sallie Louise Gaglia.  The second charge or count is the commission of murder within the special territorial jurisdiction of the United States.  In other words, the Fleming, Georgia, Post Office.  The third count or charge is an assault with intent to rob government property, and that was from the same Post Office.

Now, let me remind you again.  An indictment or a charge is no evidence of guilt.  That simply sets the charge so the defendant will know what he is charged with, the government knows or learns what it most prove beyond a reasonable doubt, and the Court obviously has some idea

what the relevant evidence must relate to.

So, while I have said and used these words, and use the word *murder*, that does not make it true.  It would be for the government to prove beyond a reasonable doubt to the satisfaction of a fair and impartial jury whether or not the facts as alleged are true.

The defendant has entered a plea of not guilty. And he is presumed by law to be innocent.  The obligation, we refer to as the burden, is on the government to prove beyond a reasonable doubt that the defendant is guilty of the crimes charged.  Now, the defendant does not have prove his innocence.

What we will do is begin this trial, jury selection partially today.  We will obtain certain information from you, and we would have you come back Monday.  There will be other people who will be coming in later today.

And, of course, my personal opinion is the case would be over next week.  That doesn't mean that it is true, because I have not done anything but meet with the lawyers.  The trial will be split into two phases.  The first, in the first phase, the jury will determine whether the defendant is guilty or not.  Then if the jury find the defendant guilty of one or more of the capital offenses charged, the trial will go to the second phase.  And the

jury will decide whether the defendant should be sentenced to death or life without parole.

Today, you are only going to be asked to complete a questionnaire. I will be giving that to you in a few minutes. Let me stress to you, ladies and gentlemen, that this asks you personal information, as well as your opinion about the death penalty and other pertinent matters. I have gone over those questions with the lawyers carefully. They, nor the Court, desire to intrude into your personal affairs or beliefs unnecessarily. But I have told you that those people who are selected will be judges. And necessarily, when one sits in judgment, we have a right, indeed, the Court and the lawyers must know certain matters regarding matters that otherwise you might wish to keep confidential.

Now, the answers will only be used to determine, of course, whether you can fairly and impartially decide the case before you. Keep in mind that the questionnaires are kept confidential. And they will not be given to anyone other than to counsel. And we will take them up whenever they are finished with them.

Now, I do not want you to discuss the questionnaires with anyone else. These two young men over here are my legal assistants. If there's any questions, I will have them standing back there. And if they feel like

it is a question that I should answer, I will have you brought up, and I will try to answer the questions. But do not discuss it with anyone else.

You are already sworn and under penalty of law to give true and complete answers to the very best of your ability.

Now, there are no right or wrong answers. There is nothing right or wrong. The only thing we want are truthful answers. And I instruct you under your oath, and again, I remind you, you are under oath to give truthful answers.

Now, the questionnaire is only part of the jury selection process. On Monday, that is November 3rd, that is this Monday, you are to return to this Court at 12:30 promptly. That means have your lunch before you come, and be here a little before 12:30. We will continue with the selection process and ask follow up questions.

Before you begin, I would like to define a few terms to help you in answering your questionnaire, because these words are used. Hopefully they are capable of self definition. But I want to tell you what I mean when you see these words.

As used in these instructions and the questionnaire, *guilt* means the determination that the defendant committed the crime charged.

The term *aggravating factor* will be a word or a term that you will be asked about. *Aggravating factor* is a fact that might indicate or tend to indicate that a sentence of death may be justified.

*Mitigating factor,* and that's a term you will be asked about, is a fact that might indicate or tend to indicate that a sentence of death may not be justified and some lesser punishment might be appropriate.

*Capital Count*, and that is a term I will be using in these questionnaires, *capital count* means a criminal offense punishable by death; capital punishment, capital count.

Now, I want to ask you some questions before I give you the questionnaire. If you have a yes answer, you stand, and give your name when I turn to you.

In this case, the defendant, Meier Jason Brown, is on my right. Of course, as I told you, he is charged with the murder of Sallie Louise Gaglia, a U.S. postal worker, during an alleged robbery of money orders from the Fleming Post Office. Now, Fleming is Liberty County, Georgia. That is, Hinesville is the county seat. The charges allege that the defendant committed these crimes on or around November 30th, 2002.

The question: The victim in this case is Sallie Louise Gaglia of Liberty County, Georgia. Do any of you

know or have any of you heard of Ms. Gaglia, or her family before today?  If so, please stand.

Would you please come up here, Ma'am.

[NOTE:  Sidebar Conference.]

THE COURT:  Good morning.  Don't nervous.  Your name, Ma'am?

JUROR:  Diane Croy.

THE COURT:  Ms. Croy, how is that you know Ms. Gaglia?

JUROR:  I'm a teacher, and her nephew, her great nephew was in my class last year.

THE COURT:  Now, do you know of anything about the alleged crime itself?

JUROR:  I just heard that she was killed in the Post Office.

THE COURT:  Yes.

JUROR:  I don't know anything other than that.

THE COURT:  Do you feel knowing that that you could sit in judgment of the case and, render a true verdict based on the facts that you hear in the courtroom.

JUROR:  I believe I could.

THE COURT:  Putting all other things aside, and listen to the evidence here in the courtroom, and on that, under your oath, you could decide the sufficiency and insufficiency of the evidence.  You understand that.

JUROR:  Yes, sir.

THE COURT:  And you feel that you can do that.

JUROR:  Yeah, I can do that.

THE COURT:  We will ask you more questions later. But I wanted to hear you.

[NOTE:  Sidebar Conference Concluded.]

THE COURT:  Now, the defendant in this case is Meier Jason Brown of Fleming, Liberty County, Georgia.

Mr. Brown, will you please stand again.  You may have a seat.

Do any of you know or have any you heard of Mr. Brown or any member of his family before today?

[NOTE:  No response from the jury panel.]

THE COURT:  Now, Mr. Frentzen, the lawyer here on my left, will be one of the lawyers or as we refer to them, as the prosecutor, the government.  I will use both of those.

Mr. Frentzen, would you read a list of people who may be, who may be called as a witness.

Listen very carefully, and if you do not understand a name or want more identification, then we will supply you whatever identification we can.  And then I will ask you if you know any of these people.

Mr. Frentzen.

MR. FRENTZEN: Thank you, Your Honor. Marty Adams, Sharon Andrews, Gene Ashcraft, Linda Ashcraft, Deborah Boatwright, Chris Bowen, Diane Brown, Mike Carroll, Jay Cortez, Dietrechsun Davis, John Holder, Mitchell Holland, Frank Kania, III, Mark Kaponen, Tracy Knight, Robert Carlton Lane, Billy McTeer, Keith Moran, Cedric Morgan, Matthew Mueller, Steven Nichols, Bryan Pease, Henry Reeves, Jim Rushwin, Kathy Sapp, Stephanie Smith, Genie Tillman, Raymond Voorhees, Darlene Washington, Chuck Woodall, Dedra Fay Woods, Jennifer Zech, Phil Arp, Travis Barnell, Nancy Bradbury, David Clark, Betty Cox, Erving Frazier, Randy Garman, Joseph Gaglia, Craig Gaglia, Scott Gaglia, Petra Grant, and Catherine Webb.

THE COURT: Now, do any of you know any of the possible witnesses? Now, I can tell you that almost with certainty, or with certainty, I feel, not all of those people will be called. But they are people, depending upon how the case proceeds that might be called, because they might have something that the prosecution or the government feels that would be relevant.

Do any of you know any of these people, however slightly?

Yes, sir.

JUROR: I may know a David Clark. He is a cousin of mine.

THE COURT:  Your name, sir.

JUROR:  William Boswell.

THE COURT:  Mr. Boswell, what is his name now, Mr. Boswell?

JUROR:  David Clark.

THE COURT:  Can you identify more closely who he is, Mr. Frentzen?

MR. FRENTZEN:  In Clark works at Coastal Communications in Hinesville, Georgia, if that will help to identify him.

JUROR:  I think it is the same person.

THE COURT:  Now, do you have a close relationship with him.

JUROR:  No.  He is a first cousin.

THE COURT:  I'm sorry.

JUROR:  He's a first cousin, but I do not have a close relationship with him.

THE COURT:  Could you listen to his testimony and judge it based on what he says here in courtroom and the cross-examination, disregarding your knowledge of him or your relationship to him?

JUROR:  Yes.

THE COURT:  And nothing else would intrude in your decision.

JUROR:  No.

THE COURT:  All right.  You may have a seat.

MARSHAL:  Stand up, Ma'am.

THE COURT:  Yes.

JUROR:  Deborah Boatwright.

THE COURT:  And how is it that you -- and your name, Ma'am.

JUROR:  Rebecca Dufrain.

THE COURT:  How is it that you know Ms. Boatwright?

JUROR:  I believe I taught with her when I worked with Richmond Hill.

THE COURT:  You taught with her or you think you taught with her when.

JUROR:  Yes, sir.

THE COURT:  When was that?

JUROR:  Probably about five or six years ago.

THE COURT:  Are you a public schoolteacher?

JUROR:  I'm not any more.

THE COURT:  But you were then.

JUROR:  Uh-uh.

THE COURT:  Did you have a very close relationship; or, were you just members of the faculty?

JUROR:  We were friends.

THE COURT:  Were you.  Now, when people sit -- and I'm pointing to that witness stand, they take an oath

to tell truth.  Unfortunately, not all people tell the truth, or they forget things or misconstrue them.  You would be sitting over there.  And you must determine from what you hear in the courtroom the truthfulness, the believability, the credibility of every witness.  Could you do that in her instance and every other person's instance?

JUROR:  Yes.

THE COURT:  It would be no problem for.

JUROR:  No.

THE COURT:  All right.  She says not.  You may have a seat.

MARSHAL:  Stand up, Ma'am.

THE COURT:  Yes.

JUROR:  June Fogle, Your Honor.  I recognize the name of Kathy Sapp as Catherine Sapp.

THE COURT:  Could someone, Mr. Frentzen, identify further?  That name is not that unlikely there would be two.

MR. FRENTZEN:  Catherine Sapp works for the Georgia Bureau of Investigation, Your Honor.

JUROR:  Is she an ex-probation officer?

MR. FRENTZEN:  Yes, she is.

JUROR:  Then I know Ms. Sapp.

THE COURT:  All right.  Your name, Ma'am.

JUROR:  June Fogle.

THE COURT:  How is it that you know Ms. Sapp?

JUROR:  I was a prosecutor in the District Attorney's Office, Spencer Lawton.  And I believe I have worked with her on several occasions.

THE COURT:  Well, you know the test as well as I do.  Knowing her and having worked with her, would that influence your decision as to her credibility in the slightest?

JUROR:  Not at all.

THE COURT:  All right.  You could weigh the evidence as you hear it, and make your judgment upon what will come forth in courtroom or its insufficiency.

JUROR:  I can do that, Your Honor.

THE COURT:  Yes.  You may have a seat.

Now, Mr. Darden or Mr. Bell is going to read to you a list of their potential witnesses.  There again, this does not mean that these people will come, but they might come.

Mr. Darden?

MR. DARDEN:  Judge, may we approach the bench?

THE COURT:  Sure.

[NOTE:  Sidebar Conference.]

MR. DARDEN:  Judge, I don't want to delay or cause problems, but Williams Boswell, who says he knows David Clark.  It is my understanding that David Clark is

the brother of the deceased.

PROSECUTOR:  Brother-in-law.

MR. DARDEN:  Brother-in-law.  So, I don't know how he would know David Clark but not know the deceased.

THE COURT:  I will call him up before you get to that.  I won't stop now.  But that is certainly something that I will inquire into it.  It could be -- it seemed like he didn't know his cousin very well.

MR. DARDEN:  Right.  I understand that.

THE COURT:  But call your witnesses.

MR. DARDEN:  Judge, the other question is we only have one witness in the guilt or innocence, or one positive witness.  We would not like to cite the names of the witnesses in mitigation.

THE COURT:  Well, go ahead and cite them all because this is the only time I get to qualify the jury.

MR. DARDEN:  Judge, by doing that, we would have to reveal the name of our mitigation witnesses to the prosecution.

THE COURT:  It doesn't make any difference.  It makes no difference.  You've got to give the witnesses' name.

MR. DARDEN:  Could I just note an exception to the ruling?

THE COURT:  Sure.  All right.

[NOTE:  Sidebar Conference

Concluded.].

MR. BELL:  Ladies and gentlemen, I am going to read a list of our potential witnesses, not all that we call will be called.

Alexis Andrews, Frank Bennett.

THE COURT:  Speak up a little more.

MR. BELL:  Latoya Bizzard, Mary Bizzard, Beverly Bonaparte, Joseph Bonaparte, Gloria Boyd, Pelham Brown, Jerome dare, A.C. Edders, Brenda Johnson, Brenda Jones, Francine Kelly, Dexter Morgan, Leo Morgan, Levi Morgan, Patricia Morgan, Roy Morgan, Lily Bell Morgan, Steven Murray, Vanessa Parker, Rufus Riggs, Reverend B. T. Smith, Ollie Morgan Smith, Jimmy Wainwright, Ms. Jimmy Wainwright, Major Wilcher, Davis Williams, also known as Elder Williams and Detective Chuck Woodall, who is also on their list.

THE COURT:  Yes.  Will you please stand, those who know some of these potential witnesses.

Yes, Ma'am, your name.

JUROR:  Tara Avinger.

THE COURT:  A-v-e-n-g-e-r?

JUROR:  It is A-v-i-n-g-e-r.

THE COURT:  All right.  Ms. Avinger, who do you know?

JUROR:  Latoya Bizzard.

THE COURT:  Say again?

JUROR:  Latoya Bizzard.

THE COURT:  How is it that you know her?

JUROR:  I was her manager at the truck stop in Richmond Hill about four years ago.

THE COURT:  And how long were you and she co-employees?

JUROR:  About eight months.

THE COURT:  Did you know her before she came to work there?

JUROR:  No.

THE COURT:  Have you kept up the relationship with her since she left?

JUROR:  No.

THE COURT:  You heard the questions I have asked of these other potential jurors.  If you are sitting in that jury box over there and that witness is testifying from that witness stand, could you judge her credibility, her believability based upon the probability or improbability of testimony given in the courtroom and lay aside all previous associations or relationships with her.

JUROR:  Yes, sir.

THE COURT:  Would that present any problem to you?

JUROR:  No, sir.

THE COURT:  Now, if you will stand, Ma'am.

JUROR:  June Fogle, Your Honor.

THE COURT:  You know Major Wilcher, I'm sure.

JUROR:  I know Major Wilcher.  I have known him for years.  It is a professional relationship.  And I believe that I know Beverly and Joseph Bonaparte, also through an professional relationship.

THE COURT:  Now, I will ask you the same questions you heard.  Will you, and can you, judge their testimony based upon the credibility or the lack of credibility of what you hear here in courtroom?

JUROR:  I could do that, Your Honor.

THE COURT:  Putting aside any personal relationships.

JUROR:  I could do that, Your Honor.

THE COURT:  And your name again.

JUROR:  June Fogle.

THE COURT:  Ms. Fogle, thank you.

Does anyone else know any of the -- Yes, Ma'am.

JUROR:  Major Wilcher.

THE COURT:  Major --

JUROR:  Wilcher.

THE COURT:  Wilcher.  In your name, Ma'am?

JUROR:  Pam Metts.

THE COURT:  Ms. Metts, how is it that you know

Major Wilcher?

JUROR:  Professionally.

THE COURT:  What position did you --

JUROR:  I'm a paralegal for Clay Metts.

THE COURT:  You know him as a member of the Savannah Police establishment.

JUROR:  Exactly.

THE COURT:  Would that influence you either for or against the government or the defendant?

JUROR:  No, sir.

THE COURT:  Could you weigh his testimony and base your decision upon the credibility that you believe that it should carry here on the evidence given in the courtroom, and nothing else?

JUROR:  Yes, sir.

THE COURT:  Thank you.  Anyone else.  Yes, Ma'am.

JUROR:  Major Wilcher.

THE COURT:  Your name, Ma'am.

JUROR:  Ellen Elze.

THE COURT:  Ms. Elze, how do you know Major Wilcher?

JUROR:  He's a friend.

THE COURT:  Can you put aside that friendship if you are called upon to judge the credibility of his testimony?

JUROR:  I believe so.  Yes.

THE COURT:  You believe.

JUROR:  Yes.

THE COURT:  You can.  And under your oath, you will do that.

JUROR:  Yes.

THE COURT:  Thank you.  You may have a seat.  Anyone else?

Now the United States Attorney for the Southern District of Georgia is an appointed position by the President of the United States and confirmed by the Congress.  It is a fairly significant sized law office.  The United States Attorney employs any number of other lawyers, paralegals, and so forth to assist him.  Of course, Mr. Frentzen here, who will be the lead prosecutor, and Mr. Newman, the co-lead prosecutor, are assistant United States Attorneys.  I'm going to ask Mr. Frentzen to review with you a list of all the United States Attorneys, both here in Savannah, and in Augusta, Georgia.

I will be asking you if you know any of these people.

MR. FRENTZEN:  Certainly, Your Honor.

Of course, there is Richard S. Thompson, the United States Attorney, who is here in the courtroom.

In the Savannah office of the United States

Attorney, Robert M. Brennan, Jeffrey J. Buerstatte, Amy Lee Copeland, James L. Coursey, Jr., Frank J. DiMarino, James D. Durham, myself, William Frentzen, Delora L. Grantham, Cameron Heaps Ippolito, Karl I. Knoche, Frederick Kramer, Lawrence B. Lee, Darrin McCullough, Melissa S. Mundell, Mr. Newman, Joseph D. Newman, Lamar C. Walter, and Ruth H. Young.

In the Augusta office of the United States Attorney, Edmond A. Booth, Jr., the first assistant, Kenneth D. Crowder, Kenneth C. Ethridge, J. Michael Faulkner, Richard H. Goolsby, Nancy Greenwood, Patricia Johnson, and Lee H. Little.

THE COURT:  Now, the question is, do you any of you know any of these, the U.S. Attorney, or any of the Assistant United States Attorneys?

Now, I will not ask him to review all the employees.  They have secretaries and research assistants, paralegals, and so forth.  But do you know any of the Assistant United States Attorneys or any of the employees that are employed in the United States Attorney's office for the Southern District of Georgia to the best of your ability.  Would you please stand, if you know --

Yes, Ma'am.

JUROR:  Your Honor, I'm Mary Ann Brock.  And while I have never met Karl Knoche, he is an elder at the

church where I am employed, and I have had some contact with him through my church.

THE COURT:  Would that predispose you in his favor or against him?

JUROR:  Neither way, sir.

THE COURT:  All right.  Thank you.

Please stand, all the remainder of you.  Ma'am, I have forgotten your name.

JUROR:  June Fogle.

THE COURT:  Ms. Fogle, you know them as --

JUROR:  Please don't remember it.

THE COURT:  You know many of these people, no doubt.

JUROR:  Just on professional relationships.  I'm a member of the Bar here.  So, I have been appointed to represent defendants in Federal Court.  To be honest with you, I don't remember who I worked with.  But it was a very pleasant experience.

THE COURT:  Once again, would that influence your decision either for or against the government or the defendant?

JUROR:  Not at all, Your Honor.

THE COURT:  Ms. Fogle, thank you.

Anyone else?  Yes, Ma'am, your name.

JUROR:  Pam Metts.

THE COURT:  Ms. Metts, you know them as members of the legal community.

JUROR:  Yes, sir.

THE COURT:  Is there any one or more that you have a better knowledge or a longer relationship with?

JUROR:  Mr. Newman.

THE COURT:  Mr. Newman.  Would that influence you either for or against the government in any respect?

JUROR:  No, sir.

THE COURT:  Thank you.  You may have a seat.

Now, Mr. Bell or Mr. Darden, would you call out for the jury any legal partnership relationships that you may have?

MR. DARDEN:  Yes.  My name is Richard Darden.  I have two law partners, Jennifer Burns and David Burns.  And our office is here in Savannah.

THE COURT:  Do any of you know Mr. Darden or either of his colleague?  If so, please stand.

Yes, Ma'am, I will go in this direction.  Your name?

JUROR:  Ann Carver.  My father is a defense attorney here in town.  So, I have heard him or frequently to met Mr. Darden before.

THE COURT:  Yes.  Would that either influence you for or against Mr. Darden or the government?

JUROR:  No, it would not.

THE COURT:  All right.  Thank you.

Yes, Ma'am.

JUROR:  Pam Metts.  And I know Mr. Darden, and his associates.

THE COURT:  Would that make any difference, however slight, either for or against the government's government or the defendant in this case?

JUROR:  No, sir.

THE COURT:  You may have a seat.

JUROR:  I know all three.

THE COURT:  And it would make no difference?

JUROR:  It would not.  Mr. Darden and I have worked together on cases before.  And it still would not make any difference, Your Honor.

THE COURT:  All right.  I assume you were on opposite sides.

JUROR:  Actually, no.  We have worked together on the case before.

THE COURT:  All right.  Thank you.

Yes, Ma'am.

JUROR:  Heather Ferguson.  Mr. Darden defended my son.

THE COURT:  How recent was that?

JUROR:  Four years ago.

THE COURT:  That was over in state court.

JUROR:  Yes, sir.

THE COURT:  Your name again.

JUROR:  Heather Ferguson.

THE COURT:  Ms. Ferguson, did you develop a relationship of friendliness with Mr. Darden?

JUROR:  No.

THE COURT:  Would his defense of your son in any way influence your judgment for or against Mr. Darden or his client or the government?

JUROR:  No, sir.

THE COURT:  It would make no difference.  You could be completely neutral at the beginning.

JUROR:  Yes, sir.

THE COURT:  All right.  Was there someone else?

All right, Mr. Bell.

MR. BELL:  My name is Bill Bell, and I'm associated with Don Donaldson and his son, Jeff, Jeffrey Donaldson.

THE COURT:  Don Donaldson is a lawyer here, a prominent lawyer who has practiced law for a number of years.  And his son is in with him.  He and Mr. Bell are in the same firm.

The same question, do you know Mr. Bell or any of his legal associates?

Yes, Ms. Metts, you know him.

JUROR:  I know, Mr. Bell, Mr. Donaldson, and the other Mr. Donaldson.

THE COURT:  And you know the question, too.

JUROR:  And it would not influence me.

THE COURT:  What is the answer?

JUROR:  No.

THE COURT:  It would not influence your decision.

JUROR:  No, sir.

THE COURT:  Yes, Ma'am.

JUROR:  My father used to be in the office with Don Donaldson, but I don't know him personally.

THE COURT:  Would that influence you either for or against the government or the defendant?

JUROR:  No, sir, no, it would not.

THE COURT:  Your name again.

JUROR:  Ann Carver.

JUROR:  June Fogle, I know them all.

THE COURT:  No difference.

JUROR:  No difference, Your Honor.

THE COURT:  Fine.  Now, are any of you presently working for the United States Post Office or have you been employed by the United States Post Office in the past?

MARSHAL:  Stand up, please.

THE COURT:  Or, do any of you have members of

your family who are, or in the past, employed by the United States Post Office, please stand?

Yes, Ma'am.

JUROR:  My name is Jesse Mae Hills, and I have a niece that is employed.

THE COURT:  Where is she employed?

JUROR:  Off of Montgomery Street.

THE COURT:  Her name is.

JUROR:  Latrina Davis.

THE COURT:  You heard me say, Ma'am, that Ms. Gaglia, who is the alleged victim, or killed while she was performing services as a United States employee, postal office employee.  Can you serve in this case with you having a niece, would that influence your decision in any way in making a judgment in this case?

JUROR:  No, sir.

THE COURT:  Your name again.

JUROR:  Jesse Mae Hills.

THE COURT:  Ms. Hills, you may have a seat.

The gentleman in the rear.

JUROR:  Donald Green.  I retired from the Postal Service.

THE COURT:  What was your position and where did you work, Mr. Green?

JUROR:  I was a window clerk, and I worked

basically in all of the stations over a period of time.

THE COURT:  And how many years were you employed?

JUROR:  Eighteen years.

THE COURT:  Would that influence, the fact that a postal employee and a Post Office was the scene of an alleged crime, and the government has brought charges against the defendant, can you sit in judgment and render a true verdict based upon the evidence or the insufficiency of the evidence, laying aside any feelings you may have regarding a postal employee?

JUROR:  Yes, sir.

THE COURT:  Would it influence you in any way?

JUROR:  No, sir.

THE COURT:  You may have a seat.

Yes, sir.

JUROR:  Benjamin Hilderbrandt, my cousin works at the post office in Missouri.

THE COURT:  And do you see that cousin very often?

JUROR:  Yes, sir.

THE COURT:  Mr. Hilderbrandt, the fact that you have a cousin whom you have some close relationship working as a United States postal employee influence your decision in this case.

JUROR:  No, sir.

THE COURT:  Yes, sir.

JUROR:  Kenneth Bevill, my brother was a postal employee.  Well, he is deceased now.

THE COURT:  You know the question I'm going to ask you.  Would that influence your decision in any way in making any decision in this case?

JUROR:  No, sir.

THE COURT:  Yes, Ma'am.

JUROR:  Gwendolyn Green, my father Martin Hill, works at the Post Office on Fahm Street.  And I have worked at the Post Office before.

THE COURT:  What was your position when you worked for the Post Office?

JUROR:  I was a window clerk.

THE COURT:  Now, having a father who is a current employee, and having been employed yourself by the United States Postal Service, would the fact that the alleged victim was an employee of the U.S. Postal Service, and the events occurred in the Post Office influence your decision in any regard?

JUROR:  No, sir.

THE COURT:  You may have a seat.

Under our system of law, there are certain fundamentals.  They are sometimes referred to as the bedrock of our judicial system.  I will begin with this.

Under the law, a defendant is presumed innocent until proven guilty by evidence brought forth in the courtroom that removes all reasonable doubt of innocence.

Now, the question I ask you:  Are any of you unable to, or do you think it would be difficult in any way to, accord the defendant in this case the presumption of innocence?  If so, please stand.

[NOTE:  No response from the jury panel.]

THE COURT:  The next question.  The government, under our system of law has the same burden, obligation of proving the defendant guilty beyond a reasonable doubt; that is, that this defendant committed the crime as charged in the indictment.  Now the defendant does not have to prove his innocence.  Are any of you unable to, or do you believe that it would be difficult, or are you unwilling to accept and abide by this principle that the defendant is presumed to be innocent, and he does not have to prove anything?

Is there any of you who cannot adhere to this principle of law; or, would have difficulty or be equivocal about it?

[NOTE:  No response from the jury panel.]

THE COURT:  Under the Constitution -- another question -- the defendant is not required to testify.  He may do so if he choses.  If the defendant does not testify,

would any of you be unable to or unwilling to continue to accord him the presumption of innocence?  In other words, would you draw an inference adverse to the presumption of innocence if he fails to testify?  He does not have to testify or prove anything or give any evidence.

Are any of you unable, unwilling, or do you believe that would be difficult to obey this principle of our law?

[NOTE:  No response from the jury panel.]

THE COURT:  By your silence, ladies and gentlemen, I accept, and the government and the defendant accept, that you would have no difficulty obeying the law as I have defined it for you.

Now, ladies and gentlemen, you will be receiving a questionnaire.  I want to review it with you in slight detail.  I will read the first page again.  You will be getting this identical copy in a moment.

The instructions are *Please complete the following questionnaire to assist the Court and the lawyers* -- and we refer to lawyers as counsel -- *in selecting a jury to serve in this case alleging a violation of the criminal code of the United States.*

*The purpose of these questions is not to ask unnecessarily about personal matters, rather it will be used to help determine whether you, as a prospective juror,*

*can fairly and impartially decide the case.*

Now, ladies and gentlemen, you are sworn to give true and complete answers to the best of your ability. Your answers are confidential. They will be available only to the Court and the lawyers whom you have met.

Remember again, do not discuss the questionnaire with anyone. It is not what someone thinks. It is what you think. That answer should be yours and yours alone. Remember, there are no right or wrong answers. The only thing we want are truthful answers.

Then we will ask you on the first page or Page two, your name, date of birth, place of birth, current address, county, how long you've lived there, whether you rent or own your home, have you ever lived outside of Georgia, what your religious affiliation is, if any, and what race do you consider yourself as, African-American, Asian, Caucasian, or white, native American Indian, Hispanic or other.

Then Question 11 is the highest grade of education completed. That would begin in grade school or elementary, and go through college or graduate work.

12, are you currently employed? Answer yes or no, and what is your occupation. And list any other significant employment during the last five years.

Question 14 asks your marital status, whether you

are married, separated, divorced or whatever, and the number of years you have been married, if you are married, and your spouse's occupation.

Question 15 is have you ever raised or adopted children, and their ages, and how many.

Question 16 is have you ever served in the military.

Question 17 is list any organization of which you belong or of which you participate, including church, religious, fraternities, social, recreational service, business, political unions, and any office you have held in the organization.  If you are a member of the Baptist church, the American Legion, the NAACP, I guess the quarterback club.  So long as you support the University of Georgia that is the acceptable answer.  But that is the sort of thing we want.

The next question, have you ever served on the grand jury.  You will answer that yes or no.  That is either state or federal, and then it asks where.

Have you ever served on a trial jury?  Yes or no, and a little about that, whether it is a civil case or a criminal case.

Now, a civil case is generally where money is sought or some remedy against a private party, or sometimes the government is sought.  A criminal case is where one is

being prosecuted for having violated the law.

Then question 20, have any of you or any member of your family ever been the victim of a crime, house burglary or something like this, or murder, or anything.

Question 21, have you or any member of your family ever been employed by law enforcement, a deputy sheriff, United States Marshal.  FBI, GBI, the whole thing, or a prosecutor.

22, have you or any member of your family ever been involved or contributed to a crime prevention society or a victim rights program, neighborhood watch or any of those?

Have you or any member of your family, on 23 ever been convicted of a felony.  Answer yes or no.  And if so, explain.

24, is what is your primary news source, television, the internet, radio, magazines, newspaper or other.

25, *Have you read or heard anything about this case before today*?  Yes or no.  If so, relate.

26, *Has anyone talked to you about this case before today*?  Yes or no.  If so, when and what was the conversation.

27, *Have you formed any opinion as to whether the defendant is guilty or not guilty,* and then a series of

questions.

28, *To the best of your knowledge are you related with, or otherwise, the defendant, the victim, the attorneys, their families or parties involved in the case.* Yes or no, and you will relate.

29, *Do you or are you religiously, morally or personally opposed to capital punishment or the death sentence.* Yes or no, and if so, explain. We would probably have to ask you more questions. But you are required to answer that.

Then there's a series of questions as to 30. *Regarding the death penalty, which of the following statements best represent the way you feel.* One, you would make a check, *I strongly support the death penalty as a punishment.*

Two: *I support the death penalty as a punishment.*

Three: *I have no opinion about the death penalty as a punishment.*

Four: *I oppose the death penalty as a punishment.*

Five: *I strongly oppose the death penalty as a punishment.*

31, *Would your opinion regarding the death penalty influence you in deciding the guilt of the*

*defendant?* In other words, you might say well, I could determine whether or not he is guilty, I just simply couldn't impose the punishment. So, the question is yes or no, and then you would explain.

32, *If the defendant were found guilty and the evidence and aggravating factors convinces you that the death penalty is the appropriate sentence, could you vote for the death penalty.* You will say yes or no.

33, *If the defendant were found guilty of a capital count, would you automatically vote for the death penalty.* In other words, is that all it would take; or, would you listen to the mitigating and aggravating circumstances. Your answer yes or no.

34, *If the defendant were found defendant were found guilty of a capital count, and the evidence and mitigating factors convince you that life imprisonment without the possibility of release or parole is the appropriate sentence, could you vote for it.* Yes or no. That is after hearing all of the evidence.

35, *If the defendant were found guilty of a capital count, would you automatically vote for life imprisonment without the possibility of release or parole regardless of the facts or the aggravating evidence.* Yes or no.

36, *Regarding the death penalty, which of the*

*following statements best represent the way you feel*:

*I feel strongly that the death penalty is applied unfairly against minorities.*

Secondly*:  I feel that the death penalty is applied unfairly against minorities.*

Three*:  I have no opinion whether the death penalty is applied unfairly against minorities.*

Four*:  I feel that the death penalty is applied fairly against minorities.*

Five*:  I feel strongly that the death penalty is applied fairly against minorities.*

37, *Do you think race discrimination against African-Americans in the United States is a problem*?  Select one of these answers:

*Yes, it is definitely a problem.*

Second*:  Yes, it is often a problem.*

Thirdly*:  Yes, it is occasionally a problem.*

Four*:  I'm not sure it is a problem.*

Five*:  No, it is usually not a problem.*

Six*:  No, it is rarely a problem.*

Seven*:  No, it is not a problem at all.*

38 asks you this question: *Would the race of the defendant affect your opinion as to guilt*?  Yes or no.

39, *Would the race of the victim* -- and I will tell you the race of the victim was white.  The race of the

defendant is African–American or black. *Would the race of the victim affect your opinion as to quilt? Yes or no. And if so, explain.*

40, *Would the race of the defendant affect your opinion as to whether or not to impose the death penalty or life imprisonment without the possibility of parole? Yes or no.* And if so, explain.

41, *Would the race of the victim affect your opinion as to whether or not to impose the death penalty or life imprisonment without the possibility of release or parole? Yes or no.*

Now, Mr. Clerk, are there enough legal pads for everybody to have something to write on?

CLERK:  Everyone was issued one as they entered the courtroom.

THE COURT:  That legal pad is simply for you to have something stable to write on.  Each one of you were given a pencil.  Now, I want to keep the legal pad and the pencil.  I will be asking these same questions later today. So, don't walk out with the pencil.

There is a pencil sharpener here, so if you break the point, let us know, and we will have somebody there promptly.

Remember, there are only truthful answers. Answer them, and when you have completed the questionnaire,

there will be somebody there.  If you will raise your hand, they will take it up.  Don't ask anybody anything unless it is one of these two people here.  They have been instructed by me if the question is more than a form question, to bring it to me.

Mr. Clerk, proceed.

CLERK:  Ladies and gentlemen, on the second page, upper right-hand corner, please put the jury number you were provided when you arrived this morning.  It is very important that you do that.

Now, if there is anyone who did not get a questionnaire, just stand, and we will pass you one.

[Pause.]

THE COURT:  Ladies and gentlemen, we are not trying to rush you.  You take all the time you need.  Just give us complete answers.

(Brief Pause.)

THE COURT:  Ladies and gentlemen, our air conditioning broke about 8:00 o'clock this morning.  They are working on it.  I see some of you uncomfortable.  But Monday, it will be fixed.  It is kind of a Murphy's law.

*[WHEREUPON, the prospective jurors complete the questionnaire.]*

THE COURT:  Let's come to order.

Ladies and gentlemen on the jury, has everyone

completed and turned in their questionnaire?

[NOTE:  Affirmative response from the jury panel.]

THE COURT:  I'm going to let you go in just a minute, but I want you to listen very carefully to what I say.

We will have another group in a few minutes, and then another group.  Leave the pencil, the writing material, the legal pad all in your seat.

Now, you are under oath, and under your oath, you are not to discuss this case with anyone.  I'm not keeping you here.  You are under your oath.  You are accountable to this Court, to the prosecutors, to the defendant, and your own conscience that you will keep your own counsel, that you will not discuss, not even with your spouse, your best friend or anyone anything about this case, or any philosophical discussions that might occur regarding anything surrounding the case or the punishment.

You are required to be here no later than 12:30 Monday, November 3rd.  You will come properly attired.  For men, that is a coat and tie.  If you can't find one, we have some that we will let you borrow.

We will then begin the actual selection of the jury.

Have I omitted anything, Mr. Frentzen?

MR. FRENTZEN: No, Your Honor.

MR. DARDEN: Judge, the possibility of a newspaper or TV. I don't anticipate anything, but there may be.

THE COURT: Yes. Very good.

Now, there could occur in the media, television, newspaper, or other sources, some discussion of this case. I instruct you to not read it, not listen to it. And if there is any group of people who start discussing anything regarding this case, you absent yourself.

Now, if anyone persists in discussing it with you, when you arrive there will be marshals standing out there. I want you to give them the name of the person or any information you have. And then, of course, the Court will assume that as its business.

But I do not want you to have any unpleasant experience. You are required to serve. I want you here promptly. I assure you that if you will be here promptly and answer the questions truthfully, we will get through this. And it will be an experience for you. We're absolutely dependent upon your good faith, your honest. If you do that, the system works.

With that, Marshal, we will take a recess until 11:00 o'clock.

MARSHAL: All rise. Court is in recess.

*[WHEREUPON, the second group of prospective jurors appear.]*

CLERK:  Good morning, ladies and gentlemen. as you hear your name, would you please sound out so that we can get a correct count on the attendance role this morning.  Please answer when you hear your name.

Teresa Horstmeyer.

JUROR:  Here.

CLERK:  James Horton.

JUROR:  Here.

CLERK:  Barbara Hunter.

JUROR:  Here.

CLERK:  Michael Hyatt.

JUROR:  Here.

CLERK:  Pamela Denise Jenkins.

JUROR:  Here.

CLERK:  Katherine Jervis.

JUROR:  Here.

CLERK:  Kenneth Johnson.

JUROR:  Here.

CLERK:  Joey Jonas.

JUROR:  Here.

CLERK:  Mary Jones.

JUROR:  Here.

CLERK:  William Jones.

JUROR:  Here.

CLERK:  Holly Keane.

JUROR:  Here.

CLERK:  Esaw Kelly.

JUROR:  Here.

CLERK:  William Keith Kirk.

JUROR:  Here.

CLERK:  John Kitchell.

JUROR:  Here.

CLERK:  Richard Klenke.

JUROR:  Here.

CLERK:  Is that correct, sir?

JUROR:  Yes, sir.

CLERK:  Donna Knight.

JUROR:  Here.

CLERK:  Eric Knight.

JUROR:  Here.

CLERK:  Evelyn Kramer.

JUROR:  Here.

CLERK:  Donnie Kusic.

JUROR:  Here.

CLERK:  Kenneth Lamar.

JUROR:  Here.

CLERK:  Hele Lee.

JUROR:  Here.

CLERK:  Could you help me with that, Ma'am.  Is that correct?

JUROR:  That's good enough.

CLERK:  Okay.  Bruce Little.

JUROR:  Here.

CLERK:  Catherine Lurtz.

JUROR:  Here.

CLERK:  Mary Ann Lynah.

JUROR:  Here.

CLERK:  Manual Maez.

JUROR:  Here.  Maez.

CLERK:  Thank you, sir.  William Markesteyn.

JUROR:  Here.

CLERK:  Joey Bird Marshall.

JUROR:  Here.

CLERK:  Takiyah Martin.

JUROR:  Here.

CLERK:  Shannon Mastopoulos, Shannon K. Mastopoulos.

Ruth Mayo.

JUROR:  Here.

CLERK:  Helen McClinton.

JUROR:  Here.

CLERK:  William McGee.

JUROR:  Here.

CLERK:  Gloria McIvory.

JUROR:  Present.

CLERK:  Sonja McRae, Sonja McRae.

Frederick Middleton, Frederick B. Middleton.

Shirley Middleton.

JUROR:  Here.

CLERK:  Betty Mikell.

JUROR:  Here.

Christina Miles.

JUROR:  Here.

CLERK:  Charles B. Miller.

JUROR:  Here.

CLERK:  Randall Miller.

JUROR:  Here.

CLERK:  Paul Mimbs.

JUROR:  Here.

CLERK:  Orlando Montoya.

JUROR:  Here.

CLERK:  Valerie Moody.

JUROR:  Here.

CLERK:  Paulette Moore.

JUROR:  Here.

CLERK:  Christy Murray, Christy Adams Murray.

Christopher Neal.

JUROR:  Here.

CLERK:  Janine, Janine M. Neal.

Rondoll Newsome, Sr.

JUROR:  Here.

CLERK:  Rick Nichols.

JUROR:  Here.

CLERK:  Louis Nobles.

JUROR:  Here.

CLERK:  Roland Padrick.

JUROR:  Here.

CLERK:  Mary Parker, Mary J. Parker.

Katsum Patel.

JUROR:  Here.

CLERK:  Patricia Payne.

JUROR:  Here.

CLERK:  Robert Peigler.

JUROR:  Here.

CLERK:  Kathleen Pellicano.

JUROR:  Here.

CLERK:  Sylvia Perry.

JUROR:  Here.

CLERK:  Florence Perry-Stephens.

JUROR:  Here.

CLERK:  Robin Phillips.

JUROR:  Here.

CLERK:  Mike Polese, Mike Polese, Polese.

Angie Poythress.

JUROR: Here. All right. Ladies and gentlemen, if you hear your name, please sound out.

Shannon Mastopoulos.

Sonja McRae.

Frederick Middleton.

Christy Adams Murray.

Janine Neal.

Mary Parker.

Mike Polese.

Are there any prospective jurors in the room at this time whose name I did not call? Would you please stand?

First on the front row.

JUROR: Julie Bolton.

CLERK: I'm sorry.

JUROR: Bolton, B-o-l-t-o-n.

CLERK: Bolton, thank you, Ms. Bolton. You may have a seat, please.

Your name, Ma'am.

JUROR: Nicole J. Blount, B-l-o-u-n-t.

CLERK: Okay, Ms. Blount, you may have a seat.

Yes, Ma'am.

JUROR: Gwendolyn Gillis.

CLERK: You may have a seat, Ms. Gillis.

Yes, sir.  Yes, Ma'am.  I'm sorry, I can't see that far.

JUROR:  Mary Catherine Register.

CLERK:  Ms. Register, No. 125.

Yes, Ma'am.

JUROR:  Alethia Foy.

CLERK:  I'm sorry.

JUROR:  Alethia Foy, F-o-y.

CLERK:  Ms. Foy, yes, Ma'am.

Anyone else present whose name I did not call.

Would all of the prospective jurors please stand. I need to place you under oath at this time.  Would you each raise your right hand, and would you answer as a group at the completion of the oath.

Do you and each you swear that you will give true answers to all questions put to you touching upon your qualifications as jurors.  So help you God.

JUROR:  I do.

CLERK:  If you will be seated please, I have a very short series of questions to ask you.

Are each of you citizens of the United States, and if you will just answer yes or no?

JURORS IN UNISON:  Yes.

CLERK:  Have each of you obtained the age of 18 years?

JURORS IN UNISON:  Yes.

CLERK:  Have each of you resided in the Southern District of Georgia in one of the following counties for the past year, Bryan, Chatham, Effingham and Liberty?

JURORS IN UNISON:  Yes.

CLERK:  Any exceptions to that?

[NOTE:  No response from the jury panel.]

CLERK:  Have any of you ever been convicted of a crime punishable by imprisonment for more than one year and not had your civil rights restored by pardon or by amnesty?

JURORS IN UNISON:  No.

CLERK:  Is there anyone present who is a registered agent of a foreign principal, or do you work for someone who does not live in the United States?

JURORS IN UNISON:  No.

CLERK:  Are each you able to read, write, and speak and under the English language?

JURORS IN UNISON:  Yes.

CLERK:  Are any of you incapable by reason of physical or mental infirmity to render efficient jury service?

JURORS IN UNISON:  No.

JUROR:  Yes.

THE COURT:  The Judge will need to address that, sir.  Your name, sir.

JUROR:  Esau Kelly.

CLERK:  Mr. Kelly.

JUROR:  Yes, sir.

CLERK:  Is anyone present a member of the Armed Forces?

JURORS IN UNISON:  No.

CLERK:  Is anyone present a sworn police officer?

JUROR:  I'm a member of the --

JUROR:  Georgia National Guard.

CLERK:  Your name, sir.

JUROR:  Knight.

CLERK:  Your name, sir?

JUROR:  Georgia Air National Guard.

CLERK:  Your name?

JUROR:  Klenke.

CLERK:  Yes, sir.

JUROR:  Georgia Air National Guard.

CLERK:  You are National Guard.

JUROR:  Yes, sir.

CLERK:  And I know you, sir.

JUROR:  Federal investigator.

CLERK:  All right.  Anyone here who works for the EMS rescue squad, ambulance or anything of that nature.

JURORS IN UNISON:  No.

CLERK:  Thank you very much.  This young lady to

my left is Lora Carter.  She is the official court reporter for Judge Edenfield.  Every word that is spoken in the courtroom is made an official record.  If you need to ask a question, or if you need to answer a question, please remember first to tell us who you are.  We have to know your name.

Everybody in here wants to know who you are when you speak, and we need to keep the record very clear.  So, please give us your name first.  It is very important.

Thank you.

MARSHAL:  All rise.

*[Whereupon Court was opened by the marshal for the jury questionnaire to the second panel.]*

THE COURT:  Mr. Marshal, how many that are not here presently they were suppose to be.

CLERK:  Six.

THE COURT:  I am going to ask you, Mr. Clerk, to make sure that they got the notice.  If they got it, I will issue a warrant for the arrest for every one of them.

CLERK:  Yes, sir.

THE COURT:  Ladies and gentlemen, we are trying to operate a court.  We cannot make any apology to you.  We have to have people here.  Of course, we can do it voluntarily or involuntarily, but you will come.  I'm not going to fuss at you, of course.  You are here.

I want to welcome you to the United States District Court. Some of you obviously are here for the first time. Under our system of law, there are dual or two systems of court. There is the state court, the State of Georgia, of which we're all citizens, most of us are, and it has a courthouse over here, and it is in continual operation.

There is a legislature that serves the State of Georgia at the state capitol. Then there is a federal legislature with the Federal Supreme Court in Washington. We are independent of each other. Many of you have served from time to time on state juries. Undoubtedly, some of you have served on either a federal jury or the Federal Grand Jury. It is one of the responsibilities of citizenship.

When this country was founded, the fathers spread the responsibility and authority into a federal, or a dual, system. Then they created an executive department, which is headed by the President, a legislative dual system of a Senate and a House of Representatives, and a Federal Court system.

Within the Federal Court system, they carved a role, an essential role, in fact, in many ways, and I think without a doubt, the most essential role is for members of the public, that is citizens, to make the critical

decisions. That is why you are here today.

Now, we do not individually select you. Your names are in the federal jury box. You were selected by our computer system. We simply say how many people we need, and it makes a random selection. The clerk's office then mails you your notice that you are to be here.

A judge sits, of course, in all cases and occupies the position I'm in. There is a jury box over there. And a number of you will serve on this jury. You, too, are judges. You are the sole and exclusive judge or judges of the facts, and the facts as you find them to be under your oath and under the guidance of the Court, who will guide you according to the law. You are the sole judges of the facts. You will arrive at the facts from the evidence that will come before you in this courtroom. That is sworn evidence that is admissible. The Court, that is the judge, will determine whether or not it is admissible.

Then upon that admissible testimony, you will determine whether the government in this case has proven its case beyond a reasonable doubt. I will define what reasonable doubt is, but it is not beyond all doubt, because all of us can come to some fanciful reason for explaining a position, but an intellectually honest doubt.

Now, they have received the oath; have they not, Mr. Clerk?

CLERK:  They have, Your Honor.

THE COURT:  All of you are under oath.  I am aware that a courtroom is not a place that most people want to spend a lot of time.  Undoubtedly, there are things that occur in courts that are unpleasant.  You have been summoned here to try, to judge, a case that is referred to as a criminal case, which means that there has been an investigation.  A grand jury has been impaneled, that is seated, and they have returned an indictment.

The indictment charges a person with having violated concern laws of the United States.  But that indictment is no evidence of guilt.  The indictment simply sets forth the charges.  And the jury, under the guidance of the judge but the jury alone, will make a decision whether or not the evidence warrants a conviction.

Now, in this case, you have been called as jurors or prospective jurors in the case of the United States vs Meier Jason Brown.  And all day here we will be going through this process with other citizens.  Then on Monday, we will resume it.

There will be 16 individuals selected to serve as members of the jury.  We will make the decision, the lawyers -- and I'm talking about the federal prosecutors and the defense lawyers, whom you will meet in a moment, will make certain selections.  The Court has compiled

certain questions that you are going to be asked.  I'm going to ask some of them orally, and some of them will be in the form of a written statement.

Now, you are under oath, and you have an obligation to answer those questions fairly and impartially as you will if you are selected to decide the facts in dispute.  In this case, unlike most case, you will decide the proper punishment.  That is a very important part.

In most criminal case in the federal system, in almost all of the cases, the jury decides whether a person is guilty or not guilty by virtue of the evidence produced in the courtroom.  The Court, meaning the judge, imposes the sentence, decides the proper punishment.  But you have been brought here in what is referred to as a federal death penalty case.

In this case, the jury must decide the sentence, specifically whether the defendant should be punished by being put to death or life imprisonment without the possibility of parole.

As I said, the defendant is Meier Jason Brown of Fleming, Liberty County, Georgia.

Mr. Brown, would you please stand and face the jury.  This is the defendant.

He is accused of having violating certain laws of the United States which I will refer to as murder.  He is

represented by local Savannah attorneys, Mr. Richard Darden and Mr. William Bell.

Gentlemen, would you please stand?

Representing the government is the United States Attorney for the Southern District of Georgia, Mr. Thompson.

Mr. Thompson, would you please stand?

He is assisted and indeed the trial lawyers will be assistant U.S. Attorney, Mr. William Frentzen and Mr. Joseph Newman.

Also sitting a government's table is the United States Postal Inspector Marla McLendon.

Now, the dead person, the victim in this case, as alleged in the indictment, is Sallie Louise Gaglia, spelled G-a-g-l-i-a, of Liberty County, Georgia.  Liberty County, Georgia is part of the Southern District of Georgia and its principal city, county seat is Hinesville, Georgia.

Now, Mr. Brown has been indicted for three crimes.  We call them counts.  They are alleged to have occurred on or about November 30th, last year, 2002, and at the United States Post Office in Fleming, which is a small rural Post Office as I understand it in Liberty County, Georgia.

The first count, the first charge charges him with the murder of a federal employee, Sallie Louise

Gaglia. The second charge or second count is the commission of murder within the special territorial jurisdiction of the United States, that is the Fleming Post Office. It is alleged to be part of the property of the United States that meets the requirement as a special territorial jurisdiction of the U.S.

The third charge charges Mr. Brown with the assault with intent to rob government property from the same Post Office.

Now, let me point out at this time, remember this, these are only allegations against the defendant. An indictment and a charge is no evidence of guilt. The purpose of an indictment and the accusation is to define for the defendant what the charges are so that he may understand those and act accordingly.

It instructs the government what it must prove beyond a reasonable doubt, something we call essential elements. And it defines for the Court, the judge, in some way what the evidence must relate to, so that I can control or assist the lawyers in bringing evidence that is relevant and excluding that which is irrelevant.

Now, the defendant has entered a plea of not guilty. The law presumes him to be not guilty. The burden, the obligation is on the government to prove beyond a reasonable doubt that the defendant is guilty of the

crimes charged.  The defendant does not have to prove anything.

We are beginning this jury selection process, this part of it will take you about two hours.  You will have obligations when you leave here to come back Monday.

The actual trial is not going to be that long. The jury selection process will last probably, and I am speculating -- I don't know -- it will last about as long as the trial, two or three days, I would suppose.  But I could be wrong.  That trial will be split in two phases.

In the first phase, the jury will be solely concerned with whether or not the government has proved the defendant guilty beyond a reasonable doubt.  Then and only then, if the jury finds the defendant guilty of one of the capital offenses the trial will go to the second phase. The jury will then decide whether the defendant should be put to death or sentenced to death, or is to have life with no parole.

Now, today, you will only be completing a special questionnaire that I have met with the lawyers, and I have constructed this questionnaire.  That questionnaire asks you to provide certain personal information, as well as your opinion regarding the death penalty and other pertinent matters.  The purpose of the questions is not to delve into your personal affairs.  We all have a right to

some privacy.  But when you serve on a jury -- and I know you didn't volunteer for this -- I have to asked under authority of the law regarding certain opinions.  You, under your oath and the obligation you owe the Court, government, and the defendant, are bound to reply and to reply truthfully.

We have constructed this questionnaire to intrude into your personal affairs at a minimum.  Those questions and the answers will be used only in this courtroom.  They will be use to help determine whether you can fairly and impartially decide the case before you.  These questionnaires are going to be kept confidential.  They will be under the control of the Court.  They will be seen by no one other than court personnel, including the lawyers.  As such, you should not discuss your questionnaire or any answer you gave.

You are already sworn not to discuss anything, because that is the direction of the Court.  There will be a penalty if you do.

You are to give truthful and complete answers to the very best of your ability.  There are no right or wrong answers.  There are only truthful answers.  You are to act accordingly.

As I indicated, the questionnaire is the first part of the jury selection process.  On Monday, November

3rd, on time so that a marshal doesn't come arresting you and putting you in the backseat of a marshal car, you be here. You be here at 12:30 and no later. We would like to have you checked in before 12:30. We will continue the selection process.

You will be asked individually follow-up questions. Most of those questions will be asked you in private. All of it is done, and I remind you, ladies and gentlemen, not to make anything unpleasant for you but simply to try to get a fair and impartial jury. So, it is critically important that you answer all questions asked honestly.

You are going to have certain terms asked of you, or certain words will be used in these questionnaires and here orally. I will help or review for you certain definitions.

As used in these instructions and in the questionnaire, the word *guilt* appears. That means the determination that the defendant committed the crime charged, that is what it means, guilt, or he did not.

*Aggravating factor* is a term that most of you might not be familiar with. That will be asked of you. *Aggravating factor* is a fact that might indicate or tend to indicate that a sentence of death may be justified.

*Mitigating factor* is a fact that might indicate

or tend to indicate that a sentence of death may not be justified.

*Capital Count* means a criminal offense punishable by death.

Once again, and I will remind you once more, we will begin again on Monday at 12:30, November 3rd.

Now, I'm going to ask you certain questions here before we pass out the questionnaire.  If you have an affirmative response, meaning if your answer is yes, you will please stand and give me your name.  And I will ask you a question.

In this case, the defendant, Meier Jason Brown, is charged with the murder of Sallie Louise Gaglia, a United States postal worker.  It is alleged to have occurred during an alleged robbery of money orders from the Fleming Post Office in Liberty County, Georgia.  The charges allege that the defendant committed these crimes on or around November 30th, 2002.

The victim, once again, is Sallie Louise Gaglia down in Liberty County, Georgia.  The first question:  Do any of you know or have you ever met to the best of your ability Ms. Gaglia or her family?  Do you know anything about her before today?  If so, please stand.

Yes, Ma'am.

JUROR:  My name is Robin Phillips.  My

mother-in-law lives in Fleming, and she was the best friend of the victim's before she passed away.

THE COURT: Well, you probably had discussions with your mother regarding her.

JUROR: My mother-in-law. Yes, sir.

THE COURT: Did you know Ms. Gaglia personally?

JUROR: No, I did not. I had met her.

THE COURT: I want you to help me judge you. Under the facts and circumstances, can you sit over there under your oath and decide this case, putting aside everything that you have heard in the case and make your decision only on what comes before you here in the courtroom?

JUROR: Yes, sir, I think I could.

THE COURT: Please remain standing.

JUROR: I'm sorry.

THE COURT: You are helping me judge. Where you are, if you were that defendant, and the situations were reversed, would you have any fear of him being impartial in your case?

JUROR: Probably so.

THE COURT: Then would that fear be justified?

JUROR: I haven't meet the defendant either.

THE COURT: Right. You are telling me, and I think I'm hearing this, that to the best of your knowledge

you could be fair and impartial and put aside everything. Now, obviously, if my wife were being tried, or many other things, I could not be impartial. You understand that.

JUROR: Yes, sir.

THE COURT: We all find by the nature of something that occurs that we have an opinion, or it would be hard to overcome certain information we have. And I'm not trying to embarrass you. If you say yes, you can do that, then you are going it be on this jury. If you say no, I will excuse you.

JUROR: I honestly think that I could be fair.

THE COURT: That's good enough.

Yes, Ma'am.

JUROR: Yes. I'm Teresa Horstmeyer. And I'm a carrier at the Midway Post Office.

THE COURT: I'm sorry. I didn't hear that.

JUROR: The first post office that I worked at, sir, was the Fleming Post Office.

THE COURT: Okay.

JUROR: And I'm now employed at the Midway Post Office, but I knew Sallie.

THE COURT: You are a postal employee.

JUROR: Yes, sir, and I worked with Sallie.

THE COURT: I think I will excuse you. Thank you.

JUROR:  Thank you.

THE COURT:  You worked at Fleming at one time.

JUROR:  Yes, sir.  That was my first office.

THE COURT:  Did you know Ms. Gaglia?

JUROR:  Yes, sir.

THE COURT:  All right.  I will excuse you.

Yes, sir.

JUROR:  My name is James Horton.  I live in Riceboro.  I have a son named Glen.  I knew her sister, coached her nephew in ball, and I knew her, but I hadn't seen her in twenty years or longer.

THE COURT:  Would you tell me your name again?

JUROR:  James Horton.

THE COURT:  Mr. Horton, having this, not real close, but indirect relationship, can you listen to the evidence, putting aside personal relationships, knowledge, anything you might have heard and decide based on the evidence or the insufficiency of the evidence brought forth in the courtroom the guilt or innocence of the defendant?

JUROR:  Yes, sir.

THE COURT:  No question in your mind.

JUROR:  No question in my mind.

THE COURT:  All right.  You may have a seat.

The next question:  The defendant, of course, has stood.  He is Meier Jason Brown of Fleming, Liberty County,

Georgia.  I will ask you Mr. Brown to stand again.

You may have a seat.

Do any of know or have any of you ever heard of Mr. Brown or his family before today?

MARSHAL:  Stand up, please.

THE COURT:  Do you know him personally?

JUROR:  No.

THE COURT:  You have heard of him then.

JUROR:  Yes.

THE COURT:  And still having heard of him, you said you didn't know him in response -- your name, we had better get it on the record.

JUROR:  Robin Phillips.

THE COURT:  Could you still decide the case based upon the evidence here in the courtroom?

JUROR:  Yes, sir, I could.

THE COURT:  Yes, sir.

JUROR:  Just the same.  I have heard the name.

THE COURT:  All right.  Now, lawyers occupy unique positions in a courtroom.  They are charged with investigating the case, and in interviewing witnesses, making all appropriate positions and arguments to the Court.  Most of us, of course, know lawyers and employ them from time to time.  Sometimes lawyers do things that upset people, aggravate them, and they do not get over it.  Now,

do you any of you know the federal prosecutors, Mr. Rick Thompson, Mr. Will Frentzen, or Mr. Joseph Newman?

Yes.  I will start on this side this time.  Yes, sir.

JUROR:  Yes, sir, my name is Randall Miller.  I know Mr. Newman.  We use the same gym for a number of years.  He also lives in my neighborhood, and I see him occasionally there.

THE COURT:  He is one of the prosecutors, and you know him.

JUROR:  Yes, sir.

THE COURT:  Would that make any difference in any decision you are called upon to make in this case?

JUROR:  No, sir.

THE COURT:  You could put all the friendship or whatever relationship you have aside and listen to the evidence in this courtroom.  Is that correct?

JUROR:  Yes, sir.

THE COURT:  All right.

JUROR:  John Kitchell, I'm a court security officer in this building.

THE COURT:  Yes, and you know Mr. Newman because he comes and goes.

JUROR:  That's correct.

THE COURT:  Has he ever done anything to offend

you?

JUROR:  No, sir.

THE COURT:  Has he ever done you a favor?

JUROR:  No, sir.

THE COURT:  Would the fact that you know him influence your decision, Mr. Kitchell?

JUROR:  No, sir.

THE COURT:  Thank you.  Yes, Ma'am.

JUROR:  Kay Register.  My husband works for several of the prosecutors.

THE COURT:  I'm sorry.

JUROR:  My house works with several of the prosecutors.

THE COURT:  What does he do?

JUROR:  He is a federal agent.

THE COURT:  Do you know Mr. Newman and Mr. Frentzen, and Mr. Thompson?

JUROR:  Yes, sir.

THE COURT:  Would you be influenced by that?

JUROR:  No, sir.

THE COURT:  You are absolutely certain of that under your oath.

JUROR:  Yes, sir.

THE COURT:  All right.

JUROR:  Angie Poythress.  I have met Joe Newman

several years ago.  He was a friend of former friend of mine, who is no longer with us.

THE COURT:  I didn't get your name.

JUROR:  Angie Poythress.

THE COURT:  You know him from way back.

JUROR:  Yes, sir.  It has been several years since I have seen him, probably ten or twelve.

THE COURT:  You considered him a friend or acquaintance at that time.

JUROR:  He was an acquaintance.  He was a friend of a friend of mine.

THE COURT:  Now, you understand if you occupy this seat over here or one of those seats you've got to be completely impartial and put aside friendship or antagonism or anything.  Can you do that?

JUROR:  Yes, sir.

THE COURT:  All right.  Now, Mr. Frentzen, will you read or identify -- now, Mr. Thompson has many lawyers in his office.  He has offices in Augusta and Savannah.  Savannah is the headquarters.  We call these people Assistant United States Attorneys.  We will identify others.  Then if you know any employee -- they have paralegals, secretaries and other staff.  I'm not asking him to identify all staff.  But if you know anybody who works there not a lawyer, I want you to stand whenever he

finishes.

MR. FRENTZEN:  Thank you, Your Honor.  Of course, there is Richard S. Thompson, the United States Attorney. In the Savannah office, we have Robert M. Brennan, Jeffrey J. Buerstatte, Amy Lee Copeland, James L. Coursey, Jr. Frank J. DiMarino, James D. Durham, myself, William Frentzen, Delora Grantham, Cameron Heaps Ippolito, Karl I. Knoche, Frederick Kramer, Lawrence B. Lee, Darrin McCullough, Melissa S. Mundell, Mr. Newman, Joseph D. Newman, Lamar C. Walter, and Ruth H. Young.

In the Augusta office, we have Edmond A. Booth, Jr., Kenneth D. Crowder, Kenneth C. Ethridge, J. Michael Faulkner, Richard H. Goolsby, Nancy Greenwood, Patricia Johnson, and Lee H. Little.

THE COURT:  Now having heard those, do any of you know any of those employees, Assistant United States Attorneys or any other employee that might be working for the United States Attorney's office?

Yes, sir.

JUROR:  William Markesteyn, I know one of the attorneys in the Savannah office.  She is a parent of my daughter's friend at school.

THE COURT:  Who is that?

JUROR:  Melissa Mundell.  I also have serviced the computer equipment in the U.S. Attorney's office.

THE COURT: All right. Did you get to know any of them; or, you were just in and out, and recognize them.

JUROR: Just in and out.

THE COURT: And your child attends the same school and is a friend of Ms. Mundell's child.

JUROR: Yes, sir.

THE COURT: Would that influence you in any way in any decision you are called upon to make, either for or against the defendant or the government?

JUROR: No, sir.

THE COURT: Yes, sir.

JUROR: John Kitchell, just contact through the court, Your Honor.

THE COURT: Would that influence any decision? You see them coming and going from the courthouse.

JUROR: That's correct.

THE COURT: Would that influence your decision in any way?

JUROR: No, sir.

THE COURT: All right. Yes, Ma'am.

JUROR: Kay Register. I know half the attorneys that were named.

THE COURT: Do you have a real close social relationship with any of them?

JUROR: Yes.

THE COURT:  Which ones?

JUROR:  Cameron -- I can't say her last name very well.  Ippolito.

THE COURT:  I have trouble with that name also.

JUROR:  Frank DiMarino, Fred Kramer.

THE COURT:  I believe I shall ask you to step aside on this.  I'm not doubting you, but I think I will just ask you to step aside.

CLERK:  Your name again, Ma'am.

JUROR:  Kay Register.

THE COURT:  You are excused, Ms. Register.

Yes, Ma'am.

JUROR:  Angie Poythress.  I think I have met Fred Kramer at the same time that I met Joe Newman.

THE COURT:  All right.  And the answer is the same, I would assume.

JUROR:  Yes, sir.

THE COURT:  All right.  Mr. Darden is one of the attorneys, and Mr. Bell.  Mr. Darden, would you identify yourself and your legal colleagues.

MR. DARDEN:  Yes.  My name is Richard Darden. I'm law partners with Jennifer Burns and David Burns who practice law here in Savannah.

THE COURT:  Mr. Bell, will you do likewise?

MR. BELL:  My name is Bill Bell, and I practice

law with Don Donaldson and his son, Jeff Donaldson.

THE COURT:  Now, do any of you know Mr. Darden, Mr. Bell, or their colleagues in practice of law.

Yes, sir.

JUROR:  I know Mr. Donaldson's brother.  I coached his son in baseball about fifteen years ago.

THE COURT:  Your name?

JUROR:  Charlie Miller.

THE COURT:  Mr. Miller, would that relationship have any influence or any decision you are called upon to make if you are seated as a juror?

JUROR:  No, sir.

THE COURT:  Absolutely not.

JUROR:  Absolutely not.

THE COURT:  Now, ladies and gentlemen, if any of you don't understand a name, don't be hesitant.  We want you to understand the names.  With that said, I will ask Mr. Frentzen to identify all of the potential witnesses. Keep in mind when we say potential it is that.  Not all of these people with testify, but there always exist the possibility that they might testify.  Many people have common names.  So, if you hear a name and you know someone by that name, you simply let us know, and we'll try to make more precise identification.

Mr. Frentzen?

MR. FRENTZEN:  The potential witnesses for the government in this case are Marty Adams, Sharon Andrews, Gene Ashcraft, Linda Ashcraft, Deborah Boatwright, Chris Bowen, Diane Brown, Mike Carroll, Jay Cortez, Dietrechsun Davis, John Holder, Mitchell Holland, Frank Kania, III, Mark Kaponen, Tracy Knight, Robert Carlton Lane, Marla McLendon, Billy McTeer, Keith Moran, Cedric Morgan, Matthew Mueller, Steven Nichols, Bryan Pease, Henry Reeves, Jim Rushwin, Kathy Sapp, Stephanie Smith, Genie Tillman, Raymond Voorhees, Darlene Washington, Chuck Woodall, Dedra Fay Woods, Jennifer Zech, Phil Arp, Travis Barnell, Nancy Bradbury, David Clark, Betty Cox, Erving Frazier, Randy Garman, Joseph Gaglia, Craig Gaglia, Scott Gaglia, Petra Grant, and Catherine Webb.

THE COURT:  Yes, Ma'am.

JUROR:  My name is Robin Phillips, Keith Moran was married to a cousin of mine.  Chris Bowen is a friend that I have known for probably 15 years, and Marty Adams is married to high school friend of mine.

THE COURT:  I believe I will ask you to step aside.

Yes, sir.

JUROR:  Roland Padrick, and I went to school with Marty Adams, and I attend church with Marty.

THE COURT:  Well, if he should come testify, and

you are on that jury over there, can you listen to his testimony, putting your knowledge of him completely aside, make your decision as to his believability or credibility upon what you hear here in the courtroom and the plausibility or implausibility of it?

JUROR: Yes, sir.

THE COURT: That would not present you any problem.

JUROR: No, sir.

THE COURT: All right. You may have a seat.

Yes, sir.

JUROR: Shirley Middleton. Marty Adams is a very good friend of mine.

THE COURT: Now, if my wife were to be brought here, and I were on jury, believe it or not, I would believe what she said.

JUROR: And I would believe what Marty said, knowing Marty.

THE COURT: Okay. Sometimes a witness can make a mistake. You understand that, and with good intentions, not a deliberate misstatement, but a mistake. I'm ask you to help me judge you.

JUROR: Certainly.

THE COURT: Would you be willing to put aside that friendship, knowledge, and listen to the evidence and

base any decision you are called upon to make, and understand that literally, life or death might hold in the balance?

JUROR:  Absolutely, Your Honor.

THE COURT:  All right.  Yes, sir.

JUROR:  Esau Kelly.  I know Keith kind of professionally, and we have lunch at the same place.

THE COURT:  Keith who?

JUROR:  Moran.

THE COURT:  Moran.

JUROR:  He's the chief deputy.

THE COURT:  All right.

JUROR:  We have lunch at the same place maybe three or four times a month.

THE COURT:  I will ask you to help me judge you.  Knowing this friendship you have with this particular witness, could you listen to his testimony and judge his credibility based upon what he says here in the courtroom, putting aside the friendship or relationship?

JUROR:  I believe so, Your Honor.

THE COURT:  Can you assure us under your oath that would you do that and could do that?

JUROR:  Yes, sir.

THE COURT:  All right.  Yes, sir.

JUROR:  James Horton.  I know Marty Adams.  I

have known him for years.

THE COURT:  That is a deputy sheriff.

JUROR:  Yes, sir.  And I know Linda, the Ashcrafts, they are First Responders.  Chris Bowen, I grew up with him.

THE COURT:  I believe I will excuse you.  Your name.

JUROR:  James Horton.

THE COURT:  Thank you, Mr. Horton.  This is certainly no reflection on anyone.  It is my duty to try to get people qualified.

Yes, sir.

JUROR:  Ricky Klenke, I know all the detectives because I work on their equipment.  They have the radios in their car.

THE COURT:  You have a professional or a business relationship.

JUROR:  Yes, sir.

THE COURT:  Are they social friends of yours?

JUROR:  No, sir.

THE COURT:  Well, knowing them in the business way, can you sit in judgment of their testimony and make your decision based upon the credibility or plausibility of what they say, and that alone, what you hear here in the courtroom.

JUROR:  Yes, sir.

THE COURT:  No problem?

JUROR:  No problem.

All right.  Now, Mr. Darden and Mr. Bell, would you identify potential witnesses?

MR. BELL:  The list of the potential witnesses for the defendant are Alexis Andrews, Frank Bennett, Latoya Bizzard, Mary Bizzard.  Beverly Bonaparte, Joseph Bonaparte, Gloria Boyd, Pelham Brown, Theron Darieng, A.C. Edders, Brenda Johnson, Brenda Jones, Francine Kelly, Dexter Morgan, Leo Morgan, Levi Morgan, Patricia Morgan, Roy Morgan, Lily Bell Morgan, Steven Murray, Vanessa Parker, Rufus Riggs, Reverend B. T. Smith, Ollie Morgan Smith, Jimmy Wainwright, Ms. Jimmy Wainwright, Major Wilcher, Davis Williams, also known as Elder Williams, and Detective Chuck Woodall.

THE COURT:  Do any of you know any of these potential witnesses?  Yes, sir.

JUROR:  Esau Kelly, again, Francine Kelly is my sister-in-law.  I know the second person he called.  He works for the jail -- I mean she works for the jail.  I know her, and I know Gene as well.  I was a lieutenant commander in the Navy.  And her father was my crew chief.  And there was one other person that I know.

THE COURT:  All right.  Now you know witnesses.

What is your occupation?

JUROR:  I'm a federal investigator.

THE COURT:  Which agency or by whom are you employed?

JUROR:  The Defense Department and the Department of --

THE COURT:  Well, knowing these witnesses, you know some that have been identified as potential witnesses for the prosecution and for the defendant.  Have you worked with them in various investigations.

JUROR:  Well, I do backgrounds, I have worked with almost everybody.  I'm not trying to be evasive.

THE COURT:  Oh, no, I know.

JUROR:  And I live next door to my sister-in-law.

THE COURT:  I think I will excuse you.  Thank you.

Yes, sir.

JUROR:  William Markesteyn, I know Major Wilcher through work; not personally.

THE COURT:  Would that make any difference to you?

JUROR:  No, sir.

THE COURT:  Yes, Ma'am.

JUROR:  I know Major Wilcher.  I worked with him for twenty something years.

THE COURT: By whom are you employed?

JUROR: The Sheriff's Department.

THE COURT: He is a co-employee. He is a fellow employee.

JUROR: Right. Yes, sir.

THE COURT: If you are selected for the jury -- your name again.

JUROR: My name is Mary Jones.

THE COURT: Ms. Jones, can you decide the case based on what you hear here in the courtroom even with Major Wilcher's testimony; or, would you let me that relationship affect you in any way?

JUROR: No, sir.

THE COURT: You would decide the case based upon what you hear here in the courtroom.

JUROR: Yes, sir.

THE COURT: You may have a seat.

Yes, sir.

JUROR: Judge Edenfield, my name is Rick Nichols. And I believe one of the names was Theron Darieng. If that is the gentleman from Richmond Hill, I do know him.

THE COURT: Okay. Could you help us, Mr. Bell?

MR. BELL: That's him. I think he may have just retired from the City of Richmond Hill.

JUROR: That's correct.

THE COURT:  Have you known him over the years?

JUROR:  Since I've been in Richmond Hill, four years or so.

THE COURT:  Do you have a very close relationship; or, is he just a person you see?

JUROR:  No personal relationship.  Just see him occasionally.

THE COURT:  Would that relationship influence even in the slightest any decision you are called upon to make as to his credibility or believability?

JUROR:  No, sir.

THE COURT:  Thank you.  Yes, sir.

JUROR:  Okay.  I believe you did say a Mary Bizzard.

THE COURT:  I believe I heard that name.  Is that correct, Mr. Bell?

MR. BELL:  Yes, sir.

JUROR:  Okay.  I used to work with her.  And I had, you know, a good working relationship with her where I worked at.

THE COURT:  How long ago was that?

JUROR:  Okay.  Let's see.  Well, she stopped working there about, I'd say about nine months to about a year ago.  And I worked with her for about three, about three years.

THE COURT:  Now, you had a good relationship as a co-employee.  If you are sitting over there in that jury box and she is on this witness stand, can you listen to her testimony and make any decision you are called upon to make without fear or favor or without bending any rule to make her more plausible or less plausible?

JUROR:  I believe I could.  But I also believe I would pretty much believe what she said though, because I had a lot of respect for her.

THE COURT:  You couldn't put it out of your mind.  You just would be prong to believe what she told you, even if it might be contradicted, you would weigh more heavily in believing it.  Is that correct?

JUROR:  It would have some kind of influence.

THE COURT:  You may step aside.

JUROR:  Okay.

CLERK:  Your name, sir.

MR. BELL:  I didn't catch his name.

THE COURT:  Your name, sir.

JUROR:  William Kerr.

THE COURT:  All right.  Mr. Kerr.  Thank you.  Yes, sir.

JUROR:  Richard Klenke, the same thing with Major Wilcher and Chuck Woodall, just through the communication business, plus I played softball with Major Wilcher for

about five years.

THE COURT:  Could you listen to the testimony and be completely objective?

JUROR:  Yes, sir.

THE COURT:  Thank you.  Are any of you postal employees?

[NOTE:  No response from the jury panel.]

THE COURT:  Do any of you have a member of your family who is now or in the past who has been a postal employee; or, have you in the past been a postal employee?

Yes, Ma'am.

JUROR:  My sister-in-law, Angela Westcoff delivered the mail in Statesboro.

THE COURT:  Her name.

JUROR:  Her name is Angela Westcoff.

THE COURT:  Your name.

JUROR:  Donna Knight.

THE COURT:  Thank you.  Ms. Knight.

JUROR:  My name is Christina Miles.  My brother-in-law was a postal employee.  He is now deceased.

THE COURT:  His name.

JUROR:  Fred Miles.

THE COURT:  Are you from Metter?

JUROR:  No, I'm from Savannah.

THE COURT:  All right.  Thank you.

Yes, Ma'am.

JUROR:  My former daughter-in-law is a postal employee.

THE COURT:  Her name.

JUROR:  Teresa Michael, Sullivan now.

THE COURT:  All right.  Thank you.

Yes, Ma'am.

JUROR:  I have a stepdaughter who delivers mail in South Carolina.

THE COURT:  Her name.

JUROR:  Andre Stephens.

THE COURT:  Yes, Ma'am.

JUROR:  My name is Paulette Moore.  My father was a postal employee.  He is deceased now.  And I have two cousins in Atlanta who are postal employees.

THE COURT:  All right.

MR. DARDEN:  Could we get her name, please?

JUROR:  Paulette Moore.

THE COURT:  What?

JUROR:  Paulette Moore.

THE COURT:  Did you get it?

MR. DARDEN:  Yes, sir.  Thank you.

THE COURT:  Yes, Ma'am.

JUROR:  My name is Takiyah Martin.  And I have a cousin that was a former postal employee in Savannah.

THE COURT:  That name.

JUROR:  Keisha Davis.

THE COURT:  Do you know how long ago she served with the postal service?

JUROR:  It was more than that five years ago.  It has been right at maybe five or six years ago.

THE COURT:  All right.  Now, ladies and gentlemen, listen very carefully to this.  There are some fundamental principles guaranteed by the Constitution of the United States.  They have been fundamental to this nation and all the states.  Under the law, a defendant is presumed innocent until proven guilty beyond a reasonable doubt.

Are any of you unable to or unwilling to give and accord the defendant this presumption of innocence?  If you just can't bring yourself to do that, please stand.  Under your oath, you are required to.

Yes, sir.

JUROR:  My name is Shirley Middleton.  Your Honor, I am in favor of the death penalty, if that is the --

THE COURT:  No.

JUROR:  I beg your pardon.  I misunderstood you. I'm sorry.

THE COURT:  Being in favor of the death penalty,

of course, that is the law in certain instances.  I said the defendant is presumed to be innocent.  Do you disagree with that?

JUROR:  No, sir.

THE COURT:  All right.  The next question I ask you.  Under the law, the government, that is the prosecutors over here, have the obligation or burden to prove the defendant guilty under evidence that would pass muster here in this court.  The proof must remove all reasonable doubt.  I'm not talking about fanciful or speculative doubt, but a reasonable doubt of a fair, intelligent person.  And the defendant does not have to prove his innocence.  The defendant does not have to prove anything.  So the government has the total burden, obligation, to prove his guilt.

Are there any of you who you could not abide by that principle of law?

[NOTE:  No response from the jury panel.]

THE COURT:  The next question.  Under the Constitution, a defendant is not required to testify or incriminate himself.  A defendant has a right to remain silent.  If the defendant does not testify, would any of you hold that against him in any way or draw an inference adverse to the presumption of innocence?

[NOTE:  No response from the jury panel.]

THE COURT:  By your silence, I assume that you could obey the law as I would define it and will define it for you at a later time.

Now, momentarily we are going to pass out these questionnaires.  Each of you, I assume, Mr. Clerk, has been provided a legal pad.

CLERK:  They have, Your Honor.

THE COURT:  And writing material.  The legal pad is simply to put this on so you can steady it.

The first page says, *Please complete the following questionnaire to assist the Court and the lawyers in selecting a jury to serve in this case.*

In this case, it is alleged certain violations of the criminal code of the United States.  The purpose of these questions is not to ask unnecessarily about personal matters, rather it will be used to help determine whether you, as a prospective juror, can fairly and impartially decide the case.

Now, I remind you again, ladies and gentlemen, you are sworn to give true and complete answers to the very best of your ability.  Your answers are confidential.  We are not going to put them up on a bulletin board or a computer.  I will show them to the lawyers, and that is all.  We will take them up.  They will become part of the record of the Court, but no one will have access to them

except other judges, if that should be necessary.  So your answers are confidential.

Do not discuss this questionnaire with anyone. There are no right or wrong answers.  The answers are yours and yours alone.  Only truthful answers are required.

The first page you will see will ask you something about yourself; your name, age, date of birth, et cetera, et cetera, et cetera, and county you live, whether or not you own a home or you rent, and how long you lived in Georgia, what religious affiliation you have, whether you consider yourself Asian-American, African-American, Caucasian, or American Indian, Hispanic or other.

The next page asks you about your education, the highest you went in school, either grade school or professional school.

Question 12 asks you whether you are employed and what is your employment, and any employment you might have had over the last five years of any significant duration.

Question 14 will ask about your marital status, whether you are married, ever been married, divorced, or separated.

Question 15 will ask you about your children, if you have you ever adopted or reared children, and their ages.

Question 16 will ask if you have served in the

military.

Question 17 will ask you to list any organization to which you belong or of which you participate, such as the Baptist church, or the NAACP, or the American Legion; matters of that kind, or any political, if you are an officer of a political party or something like that.

Then Question 18 will ask you if you have served on a grand jury. That is either state or federal. The answer is yes or no. Then it will ask you whether it was federal or state.

The next question, 19, if have you served on a trial jury, and where, was it a civil case or a criminal case.

We break down cases in two categories generally. Criminal cases are that someone has allegedly violated the federal criminal law. A civil case is when someone is suing for damages or an injunction, or wanting money or whatever.

Question 20, *Have any of you or a member of your family ever been victim of a crime?* Have you ever been assaulted, had your house burglarized, your car stolen, and then it will ask you to identify.

Question 21, *Have you or any member of your family ever been employed in law enforcement*? Some of you are going to answer yes, I have heard, because of what I

know now, and then identify the agency, the sheriff, GBI, FBI, State Patrol.

22, *Have you or any member of your family ever been involved or contributed to a crime prevention or a victim rights program, such as a sheriff's posse or given money to post rewards for the apprehension of a criminal*?

That doesn't disqualify you.  We simply want to know that.

Then 23, *Have you or any member of your family ever been convicted of a felony*?  Drug possession and drugs have permeated our society.  A lot of us have family who have been involved in it.  So you are called upon to disclose that.

24 asks you what is your primary source of the news; television, internet, radio, magazines, newspaper or other.

25 *asks you Have you read or heard anything about this case before today*?

26, *Has anyone talked to you about this case*?

27, *Have you formed any opinion as to whether the defendant is guilty or not guilty,* and then it asks more detailed questions.

28, *To the best of your knowledge are you related with or acquainted or familiar with the victim, the alleged victim, the defendant, the lawyers, their families or*

*parties involved in the case.* And explain.

All right, Question 29 *asks you this: Do you or are you religiously, morally or personally opposed to capital punishment or the death sentence*? If you do, say yes. If you don't, say no.

Now, further amplification in the question*: Regarding the death penalty, which of the following statements best represent the way you feel.*

The first one: *I strongly support the death penalty as a punishment.*

Two*: I support the death penalty as a punishment.*

Three*: I have no opinion about the death penalty as a punishment.*

Four*: I oppose the death penalty as a punishment.*

Five*: I strongly oppose the death penalty as a punishment.*

31, now you recall I told you there would be two phases. The first phase of the trial will be to determine whether or not the defendant is guilty of the crime or crimes charged in the indictment. That is what we refer to as the "guilt or innocent" phase. But this question asks you: *Would your opinion regarding the death penalty influence you in deciding the guilt of the defendant?*

Two scenarios.  Someone says well, I don't want to decide anybody is guilty that should be put to death, so I would let that influence me, and I would find him not guilty, because I wouldn't have to reach that second question.  On the other hand, someone may say well, there is something I don't like, so I will find him guilty in order to give me the choice.  And there would be others.

32, *If the defendant were found guilty and the evidence and aggravating factors convinces you that the death penalty is the appropriate sentence, could you vote for the death penalty.*  Answer yes or no.

The converse to that question is next.  *If the defendant were found guilty of a capital count, would you automatically vote for the death penalty.*  Even if he is found guilty, you may impose life without parole.  But if under all circumstances, if you are opposed to the death penalty, then we need to know that.

34, *If the defendant were found guilty of a capital count, and the evidence and mitigating factors convince you that life imprisonment without the possibility of release or parole is the appropriate sentence, could you vote for it*?  Yes or no.

35, *If the defendant were found guilty of a capital count, would you automatically vote for life imprisonment without the possibility of release or parole*

*regardless of the facts and the aggravating evidence*?  Yes or no.

Now, regarding the death penalty in Question 37, you will be asked, *Which of the following statements best represent the way you feel.*  You will select only one.

*I feel strongly that the death penalty is applied unfairly against minorities.*

Two, you may chose this one*:  I feel that the death penalty is applied unfairly against minorities.*

Three*:  I have no opinion whether the death penalty is applied unfairly against minorities.*

Four*:  I feel that the death penalty is applied fairly against minorities.*

Five*:  I feel strongly that the death penalty is applied fairly against minorities.*

37, *Do you think race discrimination against African-Americans in the United States is a problem*?  You have several choices:

*Yes, it is definitely a problem.*

Two*:  Yes, it is often a problem.*

Three*:  Yes, it is occasionally a problem.*

Four*:  I'm not sure it is a problem.*

Five*:  No, it is usually not a problem.*

Six*:  No, it is rarely a problem.*

Seven*:  No, it is not a problem at all.*

Then in Question 38 you will be asked this: *Would the race of the defendant -- the defendant is an African-American or black -- affect your opinion as to his guilt?* Yes or no. And explain.

39, *Would the race of the victim -- she was alleged to be Caucasian or white -- would that affect your opinion as to guilt?* Yes or no.

40, *Would the race of the defendant affect your opinion as to whether or not to impose the death penalty or life imprisonment without the possibility of release or parole?* Yes or no.

41, *Would the race of the victim affect your opinion as to whether or not to impose the death penalty or life imprisonment without the possibility of release or parole?* Yes or no. And if yes, explain.

Now, ladies and gentlemen, the clerk -- I apologize. When I got here at 8:00 o'clock this morning, the first news I heard was the air conditioner was out. Now, I am not going to reprimand anyone for taking their coat off. But Monday, it will be fixed, and coat and ties will be mandatory.

Now, the clerk will pass out this. These two gentlemen here, they are my legal assistants. They are going to be in that center lane. If you have any question, ask them. They have been told how to respond. They are

not to give you any advice on any subject.  If there's any questions of anything other than form, they will bring the question to me.

Remember, you are answering it only for yourself.  It is confidential.  All we want, both sides and the Court, and your oath requires, is the truth.

You may proceed, Mr. Clerk.  Pass them out.

If your pencil or pen won't write, we'll get you an extra.  When everyone has completed that, of course, we will take them up, and then I will excuse you until 12:30 Monday.

The clerk will explain further what we want to do the first thing.

CLERK:  Ladies and gentlemen, when you arrived this morning, you were given a card with a number on it to retain.  On the second page of the questionnaire where you begin to fill in the questions, the upper right-hand corner, write in that number.  Thank you.

*[NOTE:  Jurors commence completing the questionnaire.]*

THE COURT:  I am told that the air-conditioning is running now.  Of course, it will take hours to get this hot air out of here.

*(Pause for the completion of the questionnaire.)*

THE COURT:  Mr. Clerk, have we received questionnaires from every one of the prospective jurors?

CLERK:  We have, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, I'm going to release you in a minute.  But listen very carefully to what I say.  You have taken an oath.  Each of you individually are bound by that oath.  Among your obligations is not to discuss this case with your wife, your best friend, or anyone.  If you are selected, you become the judge, and you alone are accountable to obey the law and the facts.  Our system cannot work or function without your conscientious observance of all rules.

Secondly, we do not control the media in the United States.  They have a right to write, speak, as they wish.  I'm not going to require you to isolate yourself, nor will I ask the marshal to take care of you and sequester you.  But you have an obligation not to read anything, if anything should occur in the print media, to listen to accounts of it in television or radio or any other source.  Comply with this.  It is easy.

You have another obligation, that is to answer truthfully every question that has been asked of you and will be asked of you.  We're going through this process all day.  And there will be another group in in a little while.

They will go through same process that you have, and the same process that the group did before you arrive one.

One thing that a Court cannot tolerate tardiness or absenteeism.  And I do enforce those rules zealously.  So, make a commitment to be on time, 12:30 November 3rd, that is Monday.  If you are here and checked in, we will make no provisions for food for you.  So, whatever your dinning habits, eat before you come.  We do not allow any food or drink to be brought in.

We will provide water at an appropriate time.

Do not bring any newspapers, magazines or any reading material, not even your **Bible**.  That will be taken up by the marshals as you check in.  So, don't burden them with it.  We want you to remain focused upon the job.

You will be questioned individually.  That is, out of the presence of any other juror.  That will be done behind this wall here in that room.  So, you will have to wait your turn.  In that time, you are not to talk or discuss anything.  I assure that I want this process to be completed as soon as it can be consistent with due process, fairness, and thoroughness.  So, I am mindful that you have jobs, obligations, work, commitment, and yet this is a commitment that surmounts or triumphs all of those.

Now, if you have any questions regarding this, your obligation, let the marshal know on your way out.  And

we will address those.

Mr. Frentzen, is there anything else I need to tell this jury?

MR. FRENTZEN:  No, Your Honor.

THE COURT:  Mr. Darden?

MR. DARDEN:  No, Your Honor.

THE COURT:  All right.  Remember, promptly 12:30 Monday.  Coats and ties for all males.  I hope that we will have the air conditioning fixed.  I am working on it.  I shall product all responsible people.

Marshal, we will take a recess.

MARSHAL:  All rise.

*Luncheon recess.*

CLERK:  Good afternoon, ladies and gentlemen.  If you will sound out loudly when you here your name is called, I need you to in order that we can get the correct count on the role.  Just answers here or present when you hear your name.

Pamela Prince, Pamela Elaine Prince.

Ann Regean.

JUROR:  Here.

CLERK:  Madora Reese.

JUROR:  Here.

CLERK:  Michael Renderio, Michael R. Renderio.

Dorothy Rentz.

JUROR:  Present.

CLERK:  Tana Joy Reynolds, Tana Joy Reynolds.

William Henry Richie, William Henry Richie.

Paul Larry Rigo.

JUROR:  Rigo.  Here.

CLERK:  Thank you, sir.  Karen Rutland.

JUROR:  Here.

CLERK:  Darrell Shields, Darrell K. Shields.

Michelle Shields.

Ernest Maxwell Shuman.

JUROR:  Here.

CLERK:  Mary Shuman.

JUROR:  Here.

CLERK:  Eva Sillers.

JUROR:  Here.

CLERK:  Is it Sillers or Sellers?

JUROR:  Sillers.

CLERK:  Yes, Ma'am.  I just want to make certain.

James Simmons.

JUROR:  Here.

CLERK:  Robert Derrick Sims.

JUROR:  Here.

CLERK:  Steven Skinner, Steven L. Skinner.

Claudia Smalls.

JUROR:  Here.

CLERK:  Ann Stewart Smith.

JUROR:  Here.

CLERK:  Dell G. Smith, III.

JUROR:  Here.

CLERK:  Crystal LaKeshia Snipe, Crystal LaKeshia Snipe.

Richardine Stephens.

JUROR:  Here.  Richardine.

CLERK:  Richardine.  Thank you Ma'am.

Glenis Stewart-Williams.

JUROR:  Here.

CLERK:  Tim Stillwell.

JUROR:  Here.

CLERK:  Kathy Stokes.

JUROR:  Here.

CLERK:  Charles Sutlive.

JUROR:  Here.

CLERK:  Nancy Sutton.

JUROR:  Here.

CLERK:  Paula D. Swart.

JUROR:  Here.

CLERK:  Barbara Sweat.

JUROR:  Here.

CLERK:  Patricia Carol Taylor.

JUROR:  Here.

CLERK:  Rose Mary Taylor.

JUROR:  Here.

CLERK:  Jennifer Thornhill, Jennifer Diane Thornhill.

Paul Tindol.

JUROR:  Here.

CLERK:  Kinh Dinh Tran.

JUROR:  Here.

Josephine Tucker, Josephine Tucker.

Jo Dene Valentine.

JUROR:  Here.

CLERK:  Julie Vann.

JUROR:  Here.

CLERK:  Lynette Waldhour.

JUROR:  Here.

CLERK:  James Wallace, Sr.

JUROR:  Here.

CLERK:  Bobby Washington.

JUROR:  Here.

CLERK:  David Washington.

JUROR:  Here.

CLERK:  Eugene Washington.

JUROR:  Here.

CLERK:  Elizabeth Watkins, Elizabeth Watkins.

Samuel Watkins.

JUROR:  Here.

CLERK:  Eugene Weith.

JUROR:  Weith.

CLERK:  Weith, thank you, sir.

William Welch.

JUROR:  Here.

CLERK:  Larry Whitman, Larry C. Whitman.

Delores Williams.

JUROR:  Here.

CLERK:  Demetra Williams.

JUROR:  Here.

CLERK:  Forrest T. Williams.

JUROR:  Here.

CLERK:  Jerry Williams.

JUROR:  Here.

CLERK:  Ruth Williams.

JUROR:  Here.

CLERK:  Gracey Willford.

JUROR:  Here.

CLERK:  Catherine Wilson, Catherine Wilson.

Lamont Wilson.

JUROR:  Here.

CLERK:  Mark Allen Wolfe.

JUROR:  Present.

CLERK:  Franklin Yarborough.

JUROR:  Here.

CLERK:  Nakia Young.

JUROR:  Here.

CLERK:  Glen Scott Zimmerman, Glen Scott Zimmerman.

Once again, if you hear your name, please sound out.

Pamela Prince, Michael Renderio.

JUROR:  Here.

CLERK:  That would be you, sir, that just walked this.

JUROR:  Yes, sir.

CLERK:  All right, sir.  Tana Reynolds, Tana Joy Reynolds.

William Henry Richie, Darrell Shields.

JUROR:  Here.

CLERK:  Michelle Shields, Steven Skinner.

JUROR:  Here.

CLERK:  Crystal LaKeshia Snipe, Crystal LaKeshia Snipe, Jennifer Diane Thornhill, Josephine Tucker, Elizabeth Watkins, Larry Whitman, Catherine Wilson.

JUROR:  Here.

CLERK:  Glen Scott Zimmerman.

Is there anyone here whose name I did not call, would you please stand?

Your name, Ma'am.

JUROR:  Tamara Brewer.

CLERK:  Thank you, Ms. Brewer.

Your name.

JUROR:  Crystal Snipe.

CLERK:  Okay.  You may have a seat.

Your name, Ma'am.

JUROR:  Shannon Mastopoulos.

CLERK:  Your name, sir.

JUROR:  Michael Polese.

CLERK:  Thank you, Mr. Polese, you can have a seat.

Your name, sir.

JUROR:  Frederick Middleton.

CLERK:  Mr. Middleton, you can have a seat, Mr. Middleton.

Your name.

JUROR:  Janine.

CLERK:  Neal.

JUROR:  Yes.

CLERK:  Thank you, Ma'am.  You can have a seat.

Your name, sir.

JUROR:  William Barber.

CLERK:  Thank you, Mr. Barber.

Is everybody here announced present?

Would all prospective jurors please stand at this time. I need to place you under oath. If you would each raise your right hand and if you would answer I do at the completion of the oath.

Do you and each of you solemnly swear that you will true answer make to all questions put to you touching upon your qualifications as jurors?

JURORS IN UNISON: I do.

CLERK: I have a very quick series of questions for you. Are each of you citizens of the United States? Answer as a group.

JURORS IN UNISON: Yes, sir.

CLERK: Each you of have reached the age of 18 years.

JURORS IN UNISON: Yes, sir.

CLERK: Have each of you reside in the Southern District of Georgia for the past year in one of the following counties, Bryan, Chatham, Effingham, and Liberty?

JURORS IN UNISON: Yes.

CLERK: Have any of you ever been convicted in a state or a federal court of a crime punishable by imprisonment for more than one year and not had your rights restored by pardon or amnesty?

JURORS IN UNISON: No.

CLERK: Are each of you able to read, write, and

speak the English language?

JURORS IN UNISON:  Yes.

CLERK:  Is anyone present a registered agent of a foreign principle?  In other words, do you work for someone who does not reside in the United States?

JURORS IN UNISON:  No.

CLERK:  Are any of you incapable by reason of mental or physical infirmity to render efficient jury service at this time?

JURORS IN UNISON:  No.

CLERK:  Thank you very much.

This young lady to my left is the official court reporter.  Every word that is said in this room today is being recorded and will be a part of the transcript.  One thing you need to remember.  If you need to ask a question or you need to answer a question, please tell us your name first so that we will know who is speaking on the record.  It is very important.  If you have an answer, say "my name is" and then give the answer.  It is very important to remember that.  Thank you very much.

MARSHAL:  All rise.

*[Court opened by the marshal for the third panel of prospective jurors].*

THE COURT:  Good afternoon, ladies and gentlemen.  Mr. Clerk, what is the count?

CLERK:  57 present, and 6 unaccounted for.

THE COURT:  Marshal, we have six unaccounted jurors.  Ascertain if you can if they got the message.  And if they did, arrest them and bring them in.

MARSHAL:  Yes, sir.

THE COURT:  Ladies and gentlemen, I will not fuss with you, you are here.  You didn't volunteer for this service.  It is part of your obligation of citizenship.  We cannot operate the courts without you here.

Now, Mr. Clerk, has the oath been administered?

CLERK:  The oath has been administered.

THE COURT:  Very good.  Ladies and gentlemen, I'm in this courtroom or some courtroom almost every day.  It is easy for me and these officials to forget how intimidating, our impersonal it is to you who are not in a courtroom very often.

I want you to relax.  No one is going to do anything to you.  I want you to listen very carefully to what I say.  But the big thing, the paramount thing, the supreme thing is to get the truth.  Why is that important?

We have a dual system of government in this nation, and have from the outset.  Dual is referred to as federalism.  The states have a system of law.  In fact, most of the trials that occur in the United States, in fact, the overwhelming majority occur within the state

courts.

I am a citizen of the State of Georgia and have been all my life.  Most of you have, and all of you are presently if you are on the jury.  The state systems are completely independent.

Federal system.  By the judiciary act, one of first acts after the organization and the passing of the Constitution was the creation in 1789 of a federal judiciary.  You are sitting in one of the 13 original courts.  Of course, at the time the Constitution was passed, Savannah was the capitol of Georgia.  In fact, it didn't extend much down the road.  So, Georgia had a Federal Court, and the court has existed since then.

The founding fathers broke down the government even further, checks, balances, counterchecks, and provided that the government would have three pillars of power or rulers.  The executive, they created a President.  And he is the Chief Executive of the United States.  Whether you voted for the President or not, once he is sworn in, he becomes the Chief Executive and our President.  He has defined responsibilities.

The second pillar of government is the Congress, the legislative.  And that is separated in two different branches, the House of Representatives elected for two-year terms, and the Senate of the United States elected for

six-year terms.  All money measures, both for the judiciary and for the executive, must come from the legislative. They also pass all the laws, including the criminal laws, and they define what punishment will be appropriate.

Then there's a federal judiciary.  When the legislative and the executive cannot agree, then it is for the judiciary to determine where is the responsibility.  If the Congress passes a law that violates the Constitution, it is the duty of the federal judiciary to declare it invalid or unconstitutional.

Further in the judiciary, they provided for judges, and I hold one of those positions, but they did give, nor did they entrust power exclusively to judges. They left the great responsibility to you as citizens.  You alone decides whether anyone who comes in this court is guilty or not guilty.  You are made the judges of the facts when you become a member of the jury.  No judge can decide what the facts are.  This is reserved for the citizens. So, when you received your subpoena, all of this was set in motion over 200 years ago and even longer, if you go back to the Magna Carta some 1100 years ago.

I give you that as a little lesson as to why you are here and your responsibility.  I have said that you will decide the facts.  You will sit in judgment of the facts.  I have to sit in judgment of the law.  Sometimes I

find that I'm disqualified from serving in a case.

My brother is a lawyer.  Of course, I would never preside or have anything to do with any case in which he is a lawyer.  I'm disqualified.  I probably would be fair, but it would be questionable.  And certainly I shouldn't serve, and therefore I chose not to serve.  If my wife were involved in litigation, of course, I would not preside.

All of us find sometimes because of our relationships or certain beliefs that we have that we cannot serve.  Now, my obligation and yours, and the only way I can meet my obligation is to sit 16 people over here who will decide the case honestly, without fear or favor, neither for or against the government or the defendant in this case.

Now that brings me to tell you something about the case.  There again, I ask you and I implore you to tell the truth.  Nothing that is asked of you is meant to embarrass you or humiliate you.  It is simply when one is serving as a judge we need to know something about you.  Before I became a judge, I had to -- after the President nominated me, I had to go before the Internal Revenue Service, and answer all questions.  I had to go before the Department of Justice, and I completed questionnaires that were voluminous, asking me more things than I had ever considered.  And then I had to go before Congress and

submit myself to questions of the Congress.  So, the imposition here today is somewhat slack.

You have been summoned here as potential jurors in the case of the United States vs Meier Jason Brown.  We call this a criminal case even though there is a presumption of innocence.  But that is the way of distinguishing it from a civil case where money or some property generally is at issue.

The Court will try to qualify you by asking you a number of question to determine your ability to fairly and impartially decide the facts in dispute, and if necessary, the proper punishment.  This is a very important part of this case.  In almost all criminal cases brought in this Court and all federal courts, the jury decides guilt and innocence.  That is all you do, you decide whether or not the defendant is guilty or not guilty, based upon the evidence.  The Court imposes the punishment.  But this, what you have been summoned here for is a federal death penalty case.  And in this instance, the jury must decide the punishment.

The jury must decide the sentence, and specifically whether the defendant should be punished by death or life imprisonment without the possibility of parole.  The defendant has been indicted by a grand jury. The defendant, once again, is Meier Jason Brown of Fleming,

Liberty County, Georgia.

The grand jury indictment is no evidence of guilt. It simply defines for the defendant what he is charged with having done. But he is presumed to be innocent. It defines for the prosecutor over here what he must prove. And it defines for the Court what would be relevant evidence and what should be excluded as irrelevant. So, place no emphasis on the fact that there has been an indictment.

The defendant is represented by attorneys Richard Darden and William Bell, both of the Savannah Bar. The United States is represented by Mr. William Frentzen and Mr. Joseph Newman.

Also in the court is the United States Attorney, Mr. Rick Thompson, who is sitting over here at government's table.

And Marla McLendon, who is a United States Postal Inspector.

The victim, the person who has allegedly killed by the defendant, was named Sallie Louise Gaglia, G-a-g-l-i-a, of Liberty County, Georgia.

Mr. Brown has been indicted for three crimes. We call them counts. They are all in the same indictment, but they are all separate charges or counts. They are alleged to have occurred on November 30th, 2002 at the U.S. Post

Office in Fleming, Liberty County, Georgia.  The first count is he is charged with the murder of a federal employee, Sallie Louise Gaglia.

The second charge is that in the commission of the murder he was within the special territorial jurisdiction of the United States.  Areas like Fort Stewart fall under the federal jurisdiction, not the state.  Post Offices fall under the federal jurisdiction.  And it is alleged that Post Office at Fleming, Georgia is within the Southern District of Georgia, because it is in the Liberty County, and it is within the federal jurisdiction of the United States District Court for the Southern District of Georgia.

The third count or charge is an assault with intent to rob from government property, from that same Post Office.

Once again, let me hasten to tell you these are only allegations.  They have no proof.  The proof must come here in the courtroom.  And you will judge the capability and weight of that alleged proof.  It is what occurs at the trial, not what has occurred before the trial, that will either provide sufficient proof or make it not sufficient for a conviction.

Mr. Brown has entered a plea of not guilty.  That will form the issue, generally, about which the case will

resolve itself.  I remind you again.  He is presumed to be not guilty.  The obligation, the only obligation is the government's obligation to convince a fair and impartial jury with proof sufficient to remove all reasonable doubt except that he is guilty.

I didn't say all doubt because all of us can come up with a fanciful or spurious doubt.  But all reasonable doubt, the doubt of a fair and impartial person without any interest in the outcome, in other words, without any axe to grind.

Now, we began this morning.  Indeed, the lawyers and the Court began earlier trying to make sure this case was tried within the legal limits.  We have been working all day meeting with people like yourself to discuss your responsibility and to ask you questions.  Then we will resume Monday after we get more information from you.

The trial will be split in two phases, two separate trials in effect.  In the first phase, you, the jury, the ones that are selected will determine the defendant has been proven guilty beyond a reasonable doubt.  Of course, if there is no conviction, that would be the end of the case.  If and only if the jury finds the defendant guilty of one or more of those capital offenses the trial will go into the second phase.  That second phase, as I alluded to a moment ago, will decide whether the defendant

shall be sentenced to death or whether he is to be sentenced to life without parole.

Now, let me interrupt here. There is one law that never fails and that is Murphy's law. You heard about it. This morning when I arrived here very early, they told me the air conditioning was out. I assure you it is warmer under these lights and within this robe than it is anywhere else.

If you will bear with me, we will be out of here in about an hour and a half. I have instructed, and I am told they are flying parts in to complete the air conditioning, and that it will be done. I have accepted that, and I have told some people what the consequences will be if it is not completed.

Now, in a few minutes we are going to be give you a questionnaire. It has a number of questions. I will review them in a few minutes with you. It asks you certain personal information as well as your opinion about the death penalty and other pertinent matters. Now, the questionnaire is not to intrude into your personal life beyond what we absolutely need to have known to the government prosecutors and to the defendant and his lawyers.

Your answers, of course will be used to help determine your qualifications to serve. That is, to render

a fair and impartial verdict in this case.

These answers are going to be kept confidential. The lawyers will see them. But they will remain in the possession of the court under my supervision. The only use of them will be a judicial use, either in this court or some other court if the need should arise.

Now, do not discuss the questionnaire with anyone else. There are no right answers. There are no wrong answers. There are only truthful answers. You have sworn under penalty of law to give true and complete answers to the best of your ability.

This questionnaire is only part of the jury selection process. On Monday, this coming Monday, November 3rd, at 12:30, you will be required to come back. As I told the others, I sure prefer you not having to be brought in by the marshal and in the backseat with all of those bars, but if necessary, that is where you will find yourself. I cannot beg. I can enforce the law. So put aside all of your other obligations and return here.

The jury selection process is rather lengthy. The trial, I'm told by the lawyers who are all experienced, is not going to be a long trial. It will last a couple or three or four days. I don't know. But it is not going to be one of those west coast marathon cases. Now, 12:30 Monday, and I will ask you in the presence of the

lawyers and the defendant back here in this room other questions out of the presence of any of the other jurors.

In this questionnaire, I use certain terms.  Let me talk about some of those.  You will see the word *guilt*.  For purposes of these instructions that means a determination that the defendant committed the crime charge.  That is guilt.

Regarding the death penalty, there are two things that you will be asked about.  *Aggravating factors,* insofar as that can be defined, aggravating factor is an fact that might indicate, or tend to indicate, that a sentence of death may be justified.  The law talks about aggravating factors.  I will explain more of that to you later.

*Mitigating factors* is another term that will be used.  Generally, it says even if the defendant committed the crime, and you were to find him guilty of having committed the crime, there might be mitigating factors so as to justify some sentence less than a death sentence.

Now, I'm going to ask you certain questions at this time.  If your answer is yes, or you need inquiry, you will stand.

Repeating, in this case the defendant, Meier Jason Brown, is charged with the murder of Sallie Louise Gaglia, a United States postal worker during an alleged robbery of money orders from the Fleming Post Office in

Liberty County, Georgia.  The charge is alleged that the defendant committed these crimes on or around November 30th, 2002.  The victim in this case is Sallie Louise Gaglia of Liberty County, Georgia.

Do any of you know or have any of you heard of Ms. Gaglia or know her family, or heard of her family before today?  If so, please stand.

Yes, Ma'am, what is your name?

JUROR:  Ruth Williams.

THE COURT:  How is it that you know Ms. Gaglia?

JUROR:  I don't know her.  But I have heard it like on TV and newspaper.

THE COURT:  All right.  Did you form any opinion as to the guilt or innocence of Mr. Meier Jason Brown as a result of what you heard in the newspaper?

JUROR:  From what I heard, I don't know if I can make an opinion on just what I heard and about this hearing.

THE COURT:  Well, let me ask you another question.  Have you heard anything that would prevent you from listening to the evidence in this case, and making your decision on what you hear here, and putting all that you might have heard on radio or TV, or gossip, or statements from friends or family, putting that aside, and making your decision based on the evidence brought forth in

the courtroom?

JUROR:  Well, I could.

THE COURT:  You could.  Would you have any problems with that?

JUROR:  Making a decision?

THE COURT:  Making the decision on what you hear here and not what you had heard beforehand.

JUROR:  No.

THE COURT:  You could give this man a fair trial. Is that correct?

JUROR:  Yes.

THE COURT:  Could you give the government a fair trial?

JUROR:  Well, giving one and giving the other is about the same thing; isn't it?

THE COURT:  Not sometimes, but theoretically you might be right.  But I asked you a question.  Can you be fair to the government?

JUROR:  Yes.

THE COURT:  If the government proves beyond a reasonable doubt the guilt of the defendant, can you return a verdict that speaks your conviction?

JUROR:  I don't know if I understand that.

THE COURT:  First of all, you said you could listen to the evidence in the courtroom and make your

decision upon that alone.

JUROR:  Uh-uh.

THE COURT:  Say yes or no.

JUROR:  Yes.

THE COURT:  You are under oath.  I asked you if you could then be fair.  Do you have any fear or favor associated with this case so that you could not be fair to the defendant?

JUROR:  Oh, no.

THE COURT:  Do you have any fear or dislike toward the government so that you could not be fair to the government and render a decision if the evidence called for it in their favor?

JUROR:  Yes.

THE COURT:  All right.  Have a seat.

Yes, sir.

JUROR:  Your Honor, my name is Charles Sutlive. For a number of years, my former wife and I lived right outside of Fleming.  We knew Ms. Sallie.

THE COURT:  Would that association and knowing the alleged victim make it difficult for you to sit and render a judgment here, and putting aside everything?  You simply have to help me judge yourself, Mr. Sutlive.

JUROR:  Your Honor, it would be difficult.

THE COURT:  I can understand that.  And I will

excuse you.  I appreciate your candor.  You are excused. Thank you.

Yes, sir.

JUROR:  My name is William Welch.  I've been in and out of the Post Office there where she worked and everything.  And I sold her husband a car a couple of months after it happened.

THE COURT:  Well, you tell me.  Would this, or are you fearful that this might make you less than fair and objective?

JUROR:  Yes.

THE COURT:  All right.  I will excuse you.  Your name again, sir.

JUROR:  William Welch.

THE COURT:  Mr. Welch, thank you.

JUROR:  My name is Eugene Weith.  I also heard about the case and saw it on TV, and read about it in the newspaper.  But I don't know Ms. Gaglia or Mr. Brown.

THE COURT:  Could you listen to the evidence brought forth in this courtroom and render a fair verdict both to the defendant and to the government?

JUROR:  Yes, sir.

THE COURT:  Could you put aside any information you had obtained from other sources?

JUROR:  Yes, sir.

THE COURT:  Would you do that under your oath?

JUROR:  Yes, sir.

THE COURT:  Have a seat.  Yes, Ma'am.

JUROR:  I read about it in the paper.  I have heard it on the news.  My name is Madora Reese.  I'm sorry.  I had an aunt that used to work at the Post Office.  Honestly, I could not be fair.

THE COURT:  All right.  Your name is.

JUROR:  Madora Reese.

THE COURT:  Thank you, Ms. Reese, you are excused.

Yes, Ma'am.

JUROR:  Jo Dene Valentine, and I am a friend to Ms. Sallie's sister.

THE COURT:  When you talk about Ms. Sallie, you are talking about the victim.

JUROR:  Yes, the victim.

THE COURT:  The deceased.  Your name?

JUROR:  Jo Dene Valentine.

THE COURT:  Ms. Valentine, my obligation and yours is to be candid.  I cannot look into your heart and your mind.  If you serve on this jury, could you be completely fair and impartial to the defendant and to the government?

JUROR:  It would be difficult, but I could do it.

My fear would be what her family may think.

THE COURT:  Well, sometimes knowing the family you are going to have meet them and be around them might be a deterrent to you.  It might influence your decision.

JUROR:  It possibly could.  Yes.

THE COURT:  I think I will excuse you.

Yes, sir.

JUROR:  Dell Smith.  And I just read in the news.

THE COURT:  Did you form any impression or come to any decision regarding the guilt of the defendant?

JUROR:  Just in the papers.

THE COURT:  I ask you, are you convinced or can you put that aside, and listen to the evidence and make your decision from the evidence in the courtroom or the lack of evidence?

JUROR:  I can.

THE COURT:  Your name again.

JUROR:  Dell Smith.

THE COURT:  Thank you, Mr. Smith.

Yes, sir.

JUROR:  My name is Frank Yarborough.  My wife was a friend of the victim.

THE COURT:  Would that influence your decision; or, are you fearful that it would influence your decision?

JUROR:  Yes, sir, it would.

THE COURT:  You are excused.

Yes, Ma'am.

JUROR:  My name is Dorothy Rentz.  I also read it in the newspaper and heard it on the news through the radio, and watched a couple of interviews that was on the TV.  And at the time, I thought how terribly sad it was that her life was cut short.  However, I think I can be fair in the fact that at this time it is not clear who committed the murder.

THE COURT:  All right.  I will accept that.

Yes, Ma'am.

JUROR:  I'm Barbara Sweat.  I read about it in the newspaper, but I believe I could be fair.

THE COURT:  You read an account in the newspaper.

JUROR:  Yes, sir.

THE COURT:  Can you listen and put aside anything you might have remembered -- and that has been a year ago -- and listen to the evidence here, and base your decision upon the evidence or the insufficiency of the evidence and the law as I will define it for you?

JUROR:  I can.

THE COURT:  Fine.  Yes, Ma'am.

JUROR:  My name is Delores Williams.  My nephew and his wife or both postal inspectors in Alabama.  I think he sort of mentioned this to my mother a couple of weeks

ago, how dangerous his job is.

THE COURT:  Would that have any influence upon you?

JUROR:  A little.

THE COURT:  Then you are fearful that would influence you so that you could not be fair and impartial to the government and to the defendant.

JUROR:  I'm sure.

THE COURT:  Wait.  You said you are sure.  You are sure you could not be fair.

JUROR:  I am sure I could not be fair.

THE COURT:  All right.  I will excuse you.

JUROR:  Judge Edenfield, I was the victim of a beating and robbery about a year and a half ago.  I was hospitalized.  And the plastic surgeon had to work on my face to get my lip straightened out I was beaten so bad by a 33 year-old man who blindsided me.  And I've read about this, you know.  I really don't believe I could be.

THE COURT:  Now, there are two factors.  Of course, what someone did to you was illegal.  It was a violation of the criminal law.

JUROR:  Yes, sir.

THE COURT:  But does that mean you would be against every defendant in every case?

JUROR:  No, sir, it doesn't.

THE COURT:  We will ask you more about that, and how it would relate to you.

JUROR:  All right.

THE COURT:  But if you know already that just knowing what I have told you that you could not be fair, of course, there would be no point in continuing that.

JUROR:  Yes, sir.

THE COURT:  We will ask you, and in fact the questionnaire will ask you if you or any member of your family have been victims of crime.

JUROR:  Yes, sir.

THE COURT:  Most of us have had some victimization, burglaries, car stolen, bicycle stolen.  But most of us recognize and can obey the precept that a person is presumed to be innocent.

JUROR:  Sir, I would be dead if it hadn't been for my next door neighborhood who heard me hit a show case and break the glass.  I wouldn't be here, sir.

THE COURT:  Okay.  I recognize that.  But do you feel from what you know right now you could not sit in judgment in this case, and be a fair and impartial juror?

JUROR:  Sir, I don't believe I could.

THE COURT:  You are excused.

CLERK:  Your name, sir.

JUROR:  Jerry Williams.

THE COURT:  You are excused, Mr. Williams.

Now, counsel for each side will read a list of maybe witnesses.  They will list a lot of witnesses; not all of these people will come or will be called.  The question at the end of it will be if you know any of these people, and that does not disqualify you, but it will prompt additional questions.

Will the government read the list of potential witnesses?

MR. FRENTZEN:  We will, Your Honor.

Marty Adams, Sharon Andrews, Gene Ashcraft, Linda Ashcraft, Deborah Boatwright, Chris Bowen, Diane Brown, Mike Carroll, Jay Cortez, Dietrechsun Davis, John Holder, Mitchell Holland, Frank Kania, III, Mark Kaponen, Tracy Knight, Robert Carlton Lane, Marla McLendon, Billy McTeer, Keith Moran, Cedric Morgan, Matthew Mueller, Steven Nichols, Bryan Pease, Henry Reeves, Jim Rushwin, Kathy Sapp, Stephanie Smith, Genie Tillman, Raymond Voorhees, Darlene Washington, Chuck Woodall, Dedra Fay Woods, Jennifer Zech, Phil Arp, Travis Barnell, Nancy Bradbury, David Clark, Betty Cox, Erving Frazier, Randy Garman, Joseph Gaglia, Craig Gaglia, Scott Gaglia, Petra Grant, and Catherine Webb.

THE COURT:  Now, do any of you know or think you might know any of the people identified by Mr. Frentzen as

a potential witness?  If so, please stand.

Yes, Ma'am.

JUROR:  My name is Dorothy Rentz.  I have a cousin named Diane Brown who lived in or did live in Savannah until very recently, who was a victim of an act of crime.  But I don't know if it is the same Diane Brown or not.  She has been --

THE COURT:  How old is she?

JUROR:  She is roughly about 53.

THE COURT:  What is her occupation?  Do you know?

JUROR:  She worked at the Marriott Hotel.  She is in security and did work in the hotel until that crime.

THE COURT:  Mr. Frentzen, could you help us?

MR. FRENTZEN:  I am fairly confident that is not the same Diane Brown.

THE COURT:  All right.  Yes, Ma'am.

JUROR:  We are friends with Keith Moran.

THE COURT:  What is Mr. Moran's occupation?

JUROR:  He is -- I knew you were going to ask me. He is in law enforcement in Liberty County.  I can't recall that right now.

MR. FRENTZEN:  Judge, that is him.  He is a deputy chief in Liberty County.

THE COURT:  Could you listen to his testimony here and on the basis of his testimony in the courtroom

under oath, give it such credibility or want of credibility as you feel that it deserves?

JUROR:  Yes.

THE COURT:  All right.  Yes, sir.

JUROR:  I'm an acquaintance with Ms. Boatwright. I'm Ernest Shuman.

THE COURT:  What is Ms. Boatwright occupation?

JUROR:  I have no idea.  I am a friend of her husband, if it is the same one.

THE COURT:  Mr. Frentzen, could you or one of the counsel help me with who this Ms. Boatwright is?

MR. FRENTZEN:  Your Honor, I'm told she is in her 30s.  I'm not quite sure of her occupation.  And I believe she resides in Fleming, or at least did reside in Fleming as of a year ago.

THE COURT:  That would probably be the person you know then.  Now, help me judge you.  That person might come into the courtroom and give testimony.  You know her through her husband, as I gather.

JUROR:  Yes, sir.

THE COURT:  Could you put aside that relationship you have with her husband, decide all the issues in this case, including the credibility or believability of this witness the same as if she were a stranger?

JUROR:  Yes, sir.

THE COURT:  All right.  Your name again.

JUROR:  Ernest Shuman.

THE COURT:  Yes, Ma'am.

JUROR:  My name is Tamara Brewer, and I believe I know Linda Ashcraft as a friend of the family, my mother.

THE COURT:  What is Ms. Ashcraft's occupation, do you know?

JUROR:  Does she work for the Liberty County Board of Transportation, the school board?

MR. FRENTZEN:  That's the same, Your Honor.

THE COURT:  How long have you known this potential witness?

JUROR:  Maybe ten years.  I don't know her well.

THE COURT:  You do not know her -- you know her as a member of the community.

JUROR:  I know her through my parents.

THE COURT:  Okay.  If you are sitting over there, and you are judging the facts, can you judge her testimony -- and I have no idea what her testimony would be -- based upon what you hear and do not hear in the courtroom, putting aside anything you might know or any relationship you or your family may have with her?

JUROR:  She is a very close friend of my mother.  I don't believe I would be influenced by what she said.

THE COURT:  Have a seat.

Yes, sir.

JUROR:  My name is Larry Whitman.  I live in Hinesville, and I am aware of who Keith Moran is.  However, I'm not a personal friend of his, but I do know him.

THE COURT:  I assume from what you say you could sit in judgment if you are called upon to do so.

JUROR:  Yes, sir.

THE COURT:  And based upon the evidence or want of evidence make your decision on that alone.

JUROR:  Yes, sir.

THE COURT:  All right.  Now, would you read the list of potential defense witness.

MR. BELL:  Alexis Andrews, Frank Bennett, Latoya Bizzard, Mary Bizzard, Beverly Bonaparte, Joseph Bonaparte, Gloria Boyd, Pelham Brown, Jerome dare, A.C. Edders, Brenda Johnson, Brenda Jones, Francine Kelly, Dexter Morgan, Leo Morgan, Levi Morgan, Patricia Morgan, Roy Morgan, Lily Bell Morgan, Steven Murray, Vanessa Parker, Rufus Riggs, Reverend B. T. Smith, Ollie Morgan Smith, Jimmy Wainwright, Ms. Jimmy Wainwright, Major Wilcher, Davis Williams, also known as Elder Williams, and Detective Chuck Woodall who is also listed with the government.

THE COURT:  Now, do any of you know any of the people identified by the defense as potential witnesses?

Yes, sir.

JUROR:  My name is Lamont Wilson.  I know Mr. A.C. Edders, I believe.

THE COURT:  Do you know him real well or just casually?

JUROR:  We worked together for two or three years.

THE COURT:  Has that been some time in the remote past or in the recent past?

JUROR:  It has been probably just over a year or so ago.

THE COURT:  Help me judge you, and help these lawyers and the parties judge you.  Knowing what you know about that person, could you judge him and his testimony based on what you hear in the courtroom, putting aside all other relationships and information you know about him?

JUROR:  Yes, sir.

THE COURT:  You may have a seat.

JUROR:  My name is Kevin Rutland.  I believe I know Major Wilcher.

THE COURT:  Now, Major Wilcher is a prominent local law enforcement official.  Are you a very close personal friend of his?

JUROR:  He's a friend of my family, in the family business.

THE COURT:  Could you listen to his testimony and

based upon whatever he says here in the courtroom make your decision regarding all issues affecting the jury and that alone?

JUROR:  Yes, sir, I could.

THE COURT:  All right.  You may have a seat.

Yes, Ma'am.

JUROR:  I know a Steve Murray.

THE COURT:  Would you help identify who this Steve Murray is?  That is not an uncommon name.

MR. BELL:  He's employed with McDonald's.

JUROR:  No, sir.

THE COURT:  Now, the United States Attorney as I have told you is Mr. Rick Thompson.  Mr. Thompson, will you please stand?

The prosecutor in this case or prosecutors, Mr. Frentzen, who will stand, and Mr. Joseph Newman.  They are Assistant United States Attorney.

The postal employee, who is the case agent -- I have forgotten the name already --

MS. McLENDON:  Marla McLendon, Postal Inspector.

THE COURT:  Do any of you know Mr. Thompson, Mr. Newman, Mr. Frentzen, or Ms. McLendon?

JUROR:  Your Honor, I'm Nancy Sutton, before I was married, I dated --

THE COURT:  Yes.  You know Mr. Barfield.

JUROR:  Yes.

THE COURT:  One of their colleagues.

JUROR:  Yes.

THE COURT:  And you are also my neighbor.  I haven't seen you.

JUROR:  Yes, sir.

THE COURT:  And you know these lawyers or these prosecutors.

JUROR:  No.  I remember Mr. Newman.

THE COURT:  Ms. Sutton, would that influence your decision in any way?

JUROR:  No, sir.

THE COURT:  Okay.  Anyone else know any of those potential?

Now, I will ask Mr. Frentzen to identify the people in the United States Attorney's office, that is the assistant United States attorneys, and if you know any of these people or if you know anyone -- and I will not ask him to identify every secretary or paralegal in there -- but if you know anybody who works for the United States Attorney's office, please let us know that, and specifically let us know about these lawyers.

Mr. Frentzen.

MR. FRENTZEN:  The attorneys in the United States Attorney's office for the Southern District of Georgia are

Richard S. Thompson, U.S. Attorney.  In the Savannah office, Robert M. Brennan, Jeffrey J. Buerstatte, Amy Lee Copeland, James L. Coursey, Jr., Frank J. DiMarino, James D. Durham, myself, William Frentzen, Delora L. Grantham, Cameron Heaps Ippolito, Karl I. Knoche, Frederick Kramer, Lawrence B. Lee, Darrin McCullough, Melissa S. Mundell, Mr. Newman, Joseph D. Newman, Lamar C. Walter, and Ruth H. Young.

In the Augusta office of the United States Attorney, Edmond A. Booth, Jr., the first assistant, Kenneth D. Crowder, Kenneth C. Ethridge, J. Michael Faulkner, Richard H. Goolsby, Nancy Greenwood, Patricia Johnson, and Lee H. Little.

THE COURT:  Now, the question:  Do you know any of these lawyers with the United States Attorney's office; or, do you know any employee?

Ms. Sutton, I will excuse you from this one, because I assume that your answer would be same, that it would have no influence.

JUROR:  Yes, sir.

THE COURT:  If you know any employee or any of the other people.  Yes, sir.

JUROR:  My name is Gene Weith.  I know Robert Brannen, but he was with Falligant & Inglesby.

THE COURT:  I think that is a different lawyer.

This lawyer is from Atlanta.  He came about a year ago.  Is that right, Mr. Newman?

PROSECUTOR:  Yes, it is, Your Honor.

THE COURT:  Yes, Ma'am.

JUROR:  I'm Rose Mary Taylor.  I know Frank DiMarino and his wife, Susan, are casual acquaintances, and also church.

THE COURT:  Would the fact that you know Mr. DiMarino's and his wife, and he is employed by the government and in the same office of these prosecutors, make any difference to you whatsoever, however slight, in any decision you are called upon to make?

JUROR:  No, sir.

THE COURT:  All right.  You may have a seat.

Yes, Ma'am.

JUROR:  My name is Julie Vann, and I know Melissa Mundell.

THE COURT:  She is an assistant United States Attorney.  Do you have a very close relationship with her?

JUROR:  No, sir.  Our daughters go to school together.

THE COURT:  Would that make the slightest bit of difference in any decision you are called upon to make?

JUROR:  No, sir.

THE COURT:  Now, Mr. Darden and Mr. Bell will

identify the people with whom they are associated in the practice of law.

MR. DARDEN:  Good afternoon.  My name is Richard Darden.  My law partners are Jennifer Burns and David Burns.

MR. BELL:  My name is Bill Bell, and I practice law with Don Donaldson and his son, Jeffrey Donaldson.

THE COURT:  Now, do any of you know Mr. Darden or Mr. Bell, or any of the people they identified as people with whom they are affiliated in the practice of law?

Yes, Ma'am.

JUROR:  I know Mr. Darden.

THE COURT:  You know who?

JUROR:  Mr. Darden.

THE COURT:  Did Mr. Darden ever represent you?

JUROR:  My son, yes.

THE COURT:  How long ago was that?

JUROR:  Roughly five years.

THE COURT:  Now, was that a trial?  Was that a case, a trial?

JUROR:  Yes.

THE COURT:  It was over here in the superior court or the Chatham County courthouse.

JUROR:  It was in the courthouse.

THE COURT:  Did you develop a good relationship

with Mr. Darden?

JUROR:  No.

THE COURT:  Did you develop a bad relationship with him?

JUROR:  What it is, it didn't come through for me, since he went up for a plea.

THE COURT:  Would that make any difference to you?

JUROR:  Yes.

THE COURT:  Ma'am.

JUROR:  Yes, sir.

THE COURT:  In other words, you could not be fair and impartial.  Is that what you're saying?

JUROR:  No, because I be thinking about what I've been through.

THE COURT:  I will excuse you.

MR. DARDEN:  What is her name?

CLERK:  She hasn't told us.

MR. DARDEN:  What is your name?

CLERK:  Your name, Ma'am.

JUROR:  Ruth Williams.

THE COURT:  Say again.

PROSECUTOR:  Your first name.

JUROR:  Ruth Williams.

THE COURT:  You are excused.

Yes, sir.

JUROR:  I just met Don Donaldson a year ago.

THE COURT:  Would that make any difference to you, the fact that Mr. Bell is associated in the practice of law with Mr. Donaldson.

JUROR:  No, sir.

THE COURT:  Not any whatsoever?

JUROR:  No, sir.

THE COURT:  What is your name, sir?

JUROR:  Dell Smith.

THE COURT:  Anyone else?

Are any of you currently postal employees?  Have you ever been employed by the United States Post Office, or has any member of your family been employed or currently employed as a postal employee?

Yes, sir, you were the first to stand.

JUROR:  My wife was a postal carrier in the Ellabell Post Office.  Tim Stillwell.  I'm sorry.

THE COURT:  You say she was.  How long ago was that?

JUROR:  Approximately eight years.

THE COURT:  How long was she so employed?

JUROR:  Probably four years.

THE COURT:  That was in Ellabell, Bryan County, Georgia.

JUROR:  Yes, sir.

THE COURT:  Would that make any difference to you in this case?

JUROR:  No, sir.

THE COURT:  Have a seat.  Yes, Ma'am, your name.

JUROR:  My name is Mary Shuman, and my ex-brother-in-law is employed with the Post Office.

THE COURT:  Where is he employed?

JUROR:  He is employed in Statesboro.

THE COURT:  In Statesboro.  What is his name?

JUROR:  Ricky Kangetter.

THE COURT:  Ricky Kangetter.  Would the fact that he is employed make any difference in this case to you whatsoever.

JUROR:  No, sir.

THE COURT:  All right.  Yes, Ma'am.

JUROR:  My name is Crystal Snipe, and I have an aunt that works in the Garden City Post Office.

THE COURT:  Her name.

JUROR:  Lavern Boatwright.

THE COURT:  Now, how long has she been employed? Do you know?

JUROR:  She's not working with them any more.  It has been about three years.

THE COURT:  Was she terminated; or, did she

resign or retired?

JUROR:  She resigned.

THE COURT:  Would that fact make any difference in any decision you are called upon to make in this case?

JUROR:  No, sir.

THE COURT:  You may have a seat.  Yes, Ma'am.

JUROR:  My name is Catherine Wilson.

THE COURT:  Who was it that was employed?

JUROR:  I was employed with the Post Office service about thirteen years ago.

THE COURT:  How long were you employed?

JUROR:  About a couple of years.

THE COURT:  Which office did you work in?

JUROR:  I worked in New York.

THE COURT:  In New York.  Do you have any resentment toward the Postal Service.

JUROR:  No, I don't.

THE COURT:  You may have a seat.  Yes, Ma'am.

JUROR:  My name is Nakia Young, and I have a relative --

THE COURT:  Would you say that name again?

JUROR:  Nakia Young.

THE COURT:  Yes.  Go ahead.

JUROR:  I have a relative who is retired recently from the Postal Service in Washington, D.C., as well as one

of my students' parent works for the Post Office.

THE COURT:  Would those facts, having those two relationships with two different employees, make any difference, would it interfere with any decision you are called upon to make?

JUROR:  I think so.

THE COURT:  You do.

JUROR:  Yes, sir.

THE COURT:  You are afraid you could not be completely fair and impartial in this case.

JUROR:  Correct, I would put myself in that situation.

THE COURT:  All right.  You are excused.

Now, there are certain principle that are operative in every instance in a United States courtroom, and when I say the United States, I'm talking about the broader field including state courts.  Under the law that is existing, a defendant in this case, Meier Jason Brown, is presumed innocent.  That presumption of innocence remains with him until the government produces evidence here in the courtroom that removes all reasonable doubt save that of guilt.

Are any of you unable or unwilling to grant or accord the defendant this presumption of innocence?

[NOTE:  No response from the jury panel.]

THE COURT: Secondly, under the law, binding upon all people who serve as members of the jury, the government has the obligation -- we in court call it the burden -- of proving a defendant guilty beyond a reasonable doubt. And I will define later, more precisely what I mean about reasonable doubt. But they have the burden to prove that the defendant committed the crime charged. The defendant does not have to prove his innocence. The defendant does not have to prove anything. He is presumed to be innocent.

Are any of you unwilling or unable to accord him this protection and obey the law in this regard?

[NOTE: No response from the jury panel.]

THE COURT: Thirdly, again under the Constitution the defendant is not required to testify. He has a right to remain silent. He does not have to incriminate himself or answer any questions. If he does not testify, would any of you be unwilling to grant him the presumption of innocence; or, would any of you draw a inference that he must be guilty by virtue of the fact that he exercises his constitutional right not to testify?

[NOTE: No response from the jury panel.]

THE COURT: All right. Now, ladies and gentlemen, each of you will have a pencil. Each of you were given a legal pad. The legal pad is simply to put this questionnaire on so you will have some stability when

you fill out this form.

Remember, again, that there are no wrong answers; there are no right answers.  The only thing we want are truthful answers.

Page 1 says this *Please complete the following questionnaire to assist the Court and the lawyers in selecting a jury to serve in the case alleging violation of the criminal code of the United States.  The purpose of these questions is not to ask unnecessarily about personal matters, rather, it will be used to help determine whether prospective jurors with fairly and impartially decide the case.*

You are sworn.  You remain under oath to give true and complete answers to the best of your ability.  Once again, the answers are confidential.  The Court and counsel, which are officers of the Court, are the ones that the use of these will be restricted.

Now, the first page will ask you about your name, your date of birth, your address, how long you have lived there, and what county you lived in, whether you own or rent, have you lived outside of Georgia, what is your religious affiliation, if any, if you are a Baptist, or if you are not a member of any, or if you are a Muslim, or whatever.  You just write that in.

Then the other question, Question 10, and what do

you consider yourself, African-American, Asian, Caucasian, white, native American-Indian, Hispanic or others.

Question 11 asks you the level of your education, grade school through graduate or professional school.

Question 12 asks you are you currently employed. Yes or no, and if so, what is your occupation. And list all other significant occupation during the last five years.

Question 14 will ask you your marital status; that is, if you are married, divorced, separated, and how long you have been married to your current spouse, and your current spouse's occupation.

Question 15 asks if you ever reared any children, adopted any children and, if so, how many and what their current ages are.

16, if you ever served in the military and what branch and when.

17, list any organizations to which you belong and which you participate, including church, religious, fraternal, social, recreational service, business, political union, and any offices you have held in the organization.

If you are a Baptist, if you are a member or officer of the Republican's Woman's Club, you write that down. If you are a member of the NAACP or the American

Legion, you are write that down.

Have you ever served on a grand jury is Question 18, yes or no. If so, when and where, federal or state, if you were over in the building, or the Augusta or Brunswick or Statesboro if you were federal. And just write it down. And whether it is civil or criminal cases.

Question 20, and most of us have been a victim, and it asks you if you or any member of your family have been the victim of a crime. Yes or no, and if so, house burglary, bicycle stolen, automobile stolen, assault, whatever.

Have you or any member of your family ever been employed in law enforcement? Yes, I have a son who is a deputy sheriff or GBI or FBI agent, or whatever.

22, have you or any member of your family ever been involved or contributed to a crime prevention society or victim rights program? Yes or no, and if so, which group is it.

23, have you or any member of your family ever been convicted of a felony? I remind you that you are under oath. This is a question that we always ask. Many, many family, indeed most of our families, have been touched with drugs or some violation and children or people convicted. So, write it.

24, what is your primary source of news? TV,

radio, magazines, newspapers, all of the above.  And have you read anything about the case?  Well, some of you have already responded.  You would write very briefly.

Have you talked to anyone about the case?  Some of you have and write that down.

Have you formed any opinion as to whether the defendant is guilty or not guilty?  Yes or no.  If question, what is your opinion?

Then would you set that opinion aside and return a verdict based upon the evidence presented the trial?  Yes, I definitely could.  I probably could.  Not sure.  Probably could not.  No, I definitely could not.

28, to the best of your knowledge, and I think this has been asked but nevertheless, it is here again.  Are you related, acquainted with or otherwise familiar with the defendant, the victim, the attorneys, and their families or other parties involved in the case?  Yes or no.  If yes, explain.

29, very, very important now.  Do you religiously, morally or personally or otherwise oppose the death penalty?  Yes or no.  If yes, explain.  If it is no, you don't need to make an explanation.

Most of these questions are like that.

30, regarding the death penalty, which of the following statements best represent the way you feel.  You

will select one.

*I strongly support the death penalty as a punishment.*

Two*:  I support the death penalty as a punishment.*

Three*:  I have no opinion about the death penalty as a punishment.*

Four*:  I oppose the death penalty as a punishment.*

Five*:  I strongly oppose the death penalty as a punishment.*

31, *Would your opinion regarding the death penalty influence you in deciding the guilt of the defendant?*

I told you there will be two phases of this trial.  One will be to decide whether he is guilty or not guilty of committing the crime as charged in the indictment.  That is a stand-alone question.  But the fact that later you might have to impose the death penalty, would that influence your decision say not to find him guilty because you would not want to make that choice; or, on the other hand, you would find him guilty because you figured somebody had to pay.  I don't know what reason, but that is the reason for the question.

32, *If the defendant were found guilty and the*

*evidence and aggravating factors convince you that the death penalty is the appropriate sentence, could you vote for the death penalty?*  Yes or no.

33, *If the defendant were found guilty of a capital count, would you automatically vote for the death penalty.*  In other words, would you not consider the mitigating factors that might be present.

34 asks that question*:  If the defendant were found guilty of a capital count, and the evidence and mitigating factors convince you that life imprisonment without the possibility of release or parole is the appropriate sentence, could you vote for it?*  Yes or no.

35, *If the defendant were found guilty of a capital count, would you automatically vote for life imprisonment without the possibility of release or parole regardless of the facts and the aggravating evidence.*

In other words, I could find him guilty, but I would never go, I would automatically vote to impose a life sentence.

36, *Regarding the death penalty, which of the following statements best represent the way you feel.*

*I feel strongly that the death penalty is applied unfairly against minorities.*

Two*:  I feel that the death penalty is applied unfairly against minorities.*

The word *strongly* is the only thing that separates them.

Three:  *I have no opinion whether the death penalty is applied unfairly against minorities.*

Four:  *I feel that the death penalty is applied fairly against minorities.*

Five:  *I feel strongly that the death penalty is applied fairly against minorities.*

37, *Do you think race discrimination against African-Americans in the United States is a problem*? Select one:

*Yes, it is definitely a problem.*

Two:  *Yes, it is often a problem.*

Three:  *Yes, it is occasionally a problem.*

Four:  *I'm not sure it is a problem.*

Five:  *No, it is usually not a problem.*

Six:  *No, it is rarely a problem.*

Seven:  *No, it is not a problem at all.*

You will be asked under your oath on all of these questions to respond truthfully.

38 asks you to answer this question: *Would the race of the defendant affect your opinion as to guilt?*  The defendant is African-American or black.  You will answer yes or no.  If yes, explain.

39, *Would the race of the victim affect your*

*opinion as to quilt?* The race of the victim as I am given to understand is that she was Caucasian, white. You would answer that yes or no. And if yes, explain.

40, *Would the race of the defendant affect your opinion as to whether or not to impose the death penalty or life imprisonment without possibility of parole?* Yes or no. And if you answer yes, explain.

41, *Would the race of the victim affect your opinion as to whether or not to impose the death penalty or life imprisonment without the possibility of release or parole?* Once again, if yes, explain it.

These are two legal assistants of mine. We're going to pass out these. The marshals and the clerks will pass these out. They will be in the center aisle. If you have any question, ask them. If it is anything of any great substance, they will have to come to me to get the answer.

Now, there is no time limit. We do want truthful answers.

Mr. Clerk and Marshals, will you pass out the questionnaire?

CLERK: Ladies and gentlemen, as you came into the courtroom this afternoon, you were given a card with a number on it. Please write that number on the second page of the questionnaire in the upper right-hand corner where

you begin to answer your questions.  Not on the instruction sheet, but on the second sheet in, put that number in the top right-hand corner, please.

[WHEREUPON, the prospective jurors commence completing the questionnaire.]

MR. NEWMAN:  Your Honor, could we approach?

THE COURT:  Yes.

[NOTE:  Sidebar Conference.]

MR. NEWMAN:  We filed this motion to quash this subpoena on their Mr. Thompson.

THE COURT:  Oh, I am going to quash it.  Tell Rick he can go and spend the taxpayers' money.

I will write a little order, Richard.

MR. DARDEN:  This is an issue we need to address. It involves the admissibility of the proffer to plea.

THE COURT:  I know that.

MR. DARDEN:  Yes, sir.

THE COURT:  I think there is no question, but I will listen to it.

MR. DARDEN:  I think the bottom line is -- you know, we've worked out a lot of stipulations with the government.  We have tried to work out an acceptable stipulation with them, but, of course, they won't do it.

THE COURT:  Well, I think, I will tell you what my thoughts are, that it is not admissible, the fact of

plea negotiations.

But, Mr. Newman, what is your feeling?

MR. NEWMAN:  Judge, the defense can put in evidence that --

THE COURT:  Well, I think I know where you are going.

MR. NEWMAN:  --  the defendant was offering to plead guilty.

MR. DARDEN:  The Court has so ruled, and that is as far as we want to go.

MR. NEWMAN:  You can do.

MR. DARDEN:  I know that.  The question is how do you we get into evidence.

THE COURT:  Are you going to put the defendant up?

MR. DARDEN:  Not necessarily.

THE COURT:  Okay.  Well, I've got to figure it out then if he is not going to object to it.  I think you can do it.  Well, think about it.

MR. DARDEN:  What they are trying to do is force us to put the defendant up to get it into evidence.  And I think there are other ways we can get it into evidence.

THE COURT:  Of course, you want to call --

MR. DARDEN:  It comes in the mitigation, and not in the guilty or innocent phase.  And hearsay is

admissible.  I think we can show it really by the detective if he is called to testify.

THE COURT:  You will not stipulate to that, Joe.

MR. NEWMAN:  Which detective?

MR. DARDEN:  Woodall.

MR. NEWMAN:  He hasn't seen this.

MR. DARDEN:  If I show him a copy of it where my client signed it, he would see it.

THE COURT:  You can't stipulate to it?

MR. NEWMAN:  Judge, could we get back to you tomorrow.

THE COURT:  Well, Monday morning is fine. Because this is something we will not be getting until Tuesday, Wednesday or Thursday anyway.

MR. DARDEN:  That's true.

THE COURT:  But I agree that he has got to have a vehicle if he is going to get it in.  And I do not like calling lawyers.  But, of course, I might have to.  Of course, you could call one of these guys if it comes to that.

MR. DARDEN:  I believe so, too.  What would be the problem, Joe, in just letting us --

MR. FRENTZEN:  The difficulty from our side is all we have a hearsay upon hearsay.  All we can say that the Richard came to our office and said he would --

THE COURT:  Well, how about if he writes out a statement, and he has it signed, notarized, sworn to, that yes, I do offer this?

MR. DARDEN:  Why can't I offer our plea offer that our client submitted with his signature on it as an exhibit?

THE COURT:  If you are going to lay it out, you would say something like I have been explained all of these rights and I do not have to do this.  And the jury has a right, et cetera, et cetera.  And I have at some time authorized my lawyers to offer to the government the following plea.

This is coming spontaneous.  I think that might be it.

MR. DARDEN:  I think so.  The rules of evidence --

THE COURT:  Now, but I'm not ruling up here now. I will walk my way carefully through this.  If you agree it is admissible, and I so held that --  as I recall in one of those orders, in the mitigation phase only.

MR. DARDEN:  Yes, sir, Judge.

THE COURT:  Now you don't go into what they have said and he said.

MR. DARDEN:  I understand.

THE COURT:  But that it was communicated to them.

The burden is on you, Richard.

MR. DARDEN:  I understand.

[NOTE:  Sidebar Conference

Concluded.]

THE COURT:  Would counsel come to side bar.

[NOTE:  Sidebar Conference.]

THE COURT:  I will have copies for you at 9:30 in if morning up in Wayne's office.  I'm going do give the government one copy and you one copy.  I don't want you to duplicate that.  I'm not going to say absolutely you can't. But I have told those people, those things, when you get through with them, will be turned back in.  If you take an exception to anything, it is going to be upstairs, and I would authorize you to come look at it.  But I want those protected.  I don't want those out on the street.

If you ever have to come over, you just look at the record, and make such notes as you want.  But I want those questionnaires back in the possession of the Court when the government and the defense gets through with them.

MR. DARDEN:  That would be at the conclusion of the trial.

THE COURT:  Yes, sir.

MR. DARDEN:  Or the conclusion of jury selection.

THE COURT:  Certainly at some time, probably the end of the trial, unless you want to get rid of them when

you are through with the jury.  But they were going to be available if you need to go and look at them.

MR. DARDEN:  I understand.

[NOTE:  Sidebar Conference Concluded.]

THE COURT:  Ladies and gentlemen, listen very carefully to me again.  I will be repeating myself in some regard.

You will remain under oath.  You have taken an oath, and you understand the responsibility of what some of you are going to have to undertake.  You are going to become judges no less than I am.  The rules are clear, and they are enforceable.  I really believe that citizens do a good job generally as members of the jury, but when they fail, they fail not only themselves, but there is a distrust by people in general of the judicial system.

We have had some failures in recent years who an overwhelming number of people felt that justice was not done.  One of the ways that we fail sometime is that people do not take their oath seriously.  In this case, you are not to discuss the case with anyone, not your wife, your husband, that is your spouse, your best friend, your employer or to the person to whom you repose great confidence, because you are the judge of the facts.

Now, we have a free and robust media in the

country that are given certain rights pursuant to the constitution.  They may editorialize, they may give statements, and many times those statements are completely distorted.  I do not know whether there are any press here in the courtroom.  They have every right to be.  They may write about it, or there might be something on the television or radio.  I instruct you under our oath you are to disregard and turn off any reference, any news story, whether written or in any form of media or private conversations.

I know the lawyers, who are officers of the Court, will not try to see you or influence you.  But others might.  If anyone should approach you, you tell them that you are on the jury, that you have taken an oath not to discuss the case except here when you are in the courtroom under the supervision of the Court.

If they persist, then you are to call my office or the United States Marshal's office, and when you arrive here Monday before 12:30, you let one of these marshals know.  And don't discuss it with the other members of the jury should I or I should not.  You report it to them.  They will bring it to my attention.

We will begin an individual voir dire.  Let me explain that word.  It is from the French.  And either way it is pronounced is all right and correct.  But it means to

speak the truth.  We will be occupying this room back here. The defendant, his lawyers, the government through its lawyers, and various clerical personnel.

I will ask you certain questions as you come in. You are not to reveal when you leave what was asked of you or your response.  You will more often than not be returned to the courtroom.  We do not want your answers to be influenced by the answer of anyone else.

I promise you that it will go as fast as possible.  But the law mandates certain requirements in this type of case.  And it is my obligation to enforce those requirements to the very best of my ability.  And I can do it better with your cooperation.

Once again, I apologize that the air conditioning is out.  I do want to emphasize with all sincerity the importance of you being here on time.  We will check you in.  You will be identified by that number.  And we are cognizance of your time and its value.

Is there anything else I need to announce, Mr. Frentzen?  Have I covered everything?

MR. FRENTZEN:  You have, Your Honor.

THE COURT:  Mr. Darden.

MR. DARDEN:  Nothing from the defense.

THE COURT:  Mr. Clerk, is there anything else?

The clerk has reminded me that you know from your

experience how difficult it is to find parking place here. So, allow for that time. And as I said, I will have whatever I plan to eat before 12:30 because I expect to go continually after that.

Now, you will have, of course, bathroom facilities. But there will be no food provided for you or drink, other than water. For those of you who might have a weight problem, that will be no problem at all. But don't bring any sandwiches.

Do remember 12:30 or before on Monday.

Marshal, we will stand in recess.

MARSHAL:  All rise.

[Proceedings adjourned.]

GEORGIA,

CHATHAM COUNTY.


CERTIFICATE OF REPORTER



I, Lora H. Carter, do hereby certify that the foregoing is a true and correct transcript of the proceedings held in the captioned matter.




This 15th day of December, 2003.




_____
Lora H. Carter
U.S. Court Reporter
Southern District of Georgia

P. O. Box 8552
Savannah, GA 31412
(912) 650-4065