IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| MEIER JASON BROWN | : | |
| Petitioner, | : | CIVIL ACTION |
| | : | |
| vs. | : | No. 4-07-cv-85(BAE)(GRS) |
| | : | No. 4:03-cr-001 |
| UNITED STATES OF AMERICA | : | CAPITAL CASE |
| Respondent. | : | |
| | : | |

MOTION FOR NEW TRIAL AND/OR TO ALTER OR AMEND JUDGMENT

COMES NOW Meier Jason Brown, by and through counsel, and hereby

moves the Court, pursuant to Fed. R. Civ. P. 59 (a) and 59(e), to grant a new trial

and/or alter or amend its Judgment issued September 29, 2008, denying Movant's

motion for post-conviction relief pursuant to 28 U.S.C. § 2255.  In support of this

motion, Movant states the following grounds:

Introduction

A material mistake of law or fact allows a district court to alter or amend its

judgment. *See, e.g., Deutsch v. Burlington Northern Railway Co.*, 983 F .2d 7 41,

744 (7th Cir. 1992).  A district court's failure to notice or consider arguments or

authorities that justify relief also constitutes an appropriate ground to grant a Rule

59(e) motion if these failures affected the correctness of the court's decision.

*Hicks v. Town of Hudson*, 390 F.2d 84, 87-88 (10th Cir. 1967).  Under Rule 59(e),

relief is also appropriate to consider evidence that was not available to the court when it issued its decision or to prevent manifest injustice. *See, e.g., Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).  All of these settled grounds for granting Rule 59(e) relief exist in this case.  Movant submits affidavits in support of this Motion, as allowed by Rule 59(c).

<u>FDPA – Claim VIII</u>

Movant alleged that the Federal Death Penalty Act (FPDA) results in discriminatory and arbitrary imposition of the death penalty.  This Court rejected this claim.  Petitioner has additional evidence in support of his claims and requests that this Court consider this evidence.  If Movant is correct in his allegations, it would be manifestly unjust to allow his execution.

A.  The white-female victim effect

Lauren Cohen Bell, Ph.D, has analyzed date regarding the federal death penalty.  *See* Appendix 1.  Dr. Bell is an associate professor of political science and Associate Dean of the College at Randolph-Macon College in Ashland, Virginia.  *See*, Appendix 2, Curriculim Vitae of Dr. Lauren Cohen Bell, Ph.D.  Dr. Bell was provided data on the federal death penalty by Kevin McNally, Esq., of the Federal Death Penalty Resource Counsel Project,  *see* Appendix 3 and Appendix 4, hereto, and conducted an analysis on that data "focusing on the

dynamics of death sentencing in cases involving white female victims in comparison with the dynamics of death sentencing in cases not involving white female victims." Appendix 1, ¶ 5.

Dr. Bell concluded that

defendants who kill white female victims receive the death penalty at a substantially higher rate than defendants whose victims are not white women and that this correlation between white female victims and death sentencing is highly statistically significant, systematic, and not the result of chance.

*Id*. at ¶ 8. With respect to all cases that have been authorized as death penalty cases:

A defendant charged with killing a white female victim was more than three times (3.02) more likely to be sentenced to death than a defendant charged with killing a victim who was not a white female. The results are statistically significant at the $p < .001$ level, indicating that the probability that this relationship has been observed by chance is essentially zero.

*Id*. at ¶ 11. With respect to authorized cases that proceeded through to a capital sentencing trial:

[A]mong those for whom life or death decisions were made by judges or juries, defendants in cases involving a white female victim received a death sentence 59.5 percent of the time (in 25 of 42 cases). Defendants in cases where there was no white female victim were sentenced to death 25 percent of the time (in 35 of 140 cases). A defendant in a federal capital trial thus was almost two-and-one-half (2.38) more likely to be sentenced to death in a case involving a white female victim that a defendant in a case in which there was no white

female victim.  These results are statistically significant at the p<.001 level, indicating that the probability that this relationship has been observed by chance is essentially zero.

*Id.* at ¶ 12.  Dr. Bell concluded

13.  Based upon the bivariate results discussed here, I conclude without  hesitation that there is a statistically significant and systematic correlation between the presence of a white female victim and the likelihood of a death sentence in a federal capital case. Defendants who killed white female victims are overrepresented among federal death-sentence defendants.  They represent 19.1 percent of all authorized prosecutions (76 of 397) and 23.1 percent of authorized prosecutions completing a penalty phase of trial (42 of 182); however, they represent 41.7 percent of death sentences (25 of 60).

14.  The analyses reveals a robust correlation between the presence of a white female and the imposition of a death sentence. ....Given the robust quality of these findings, it is my opinion to a reasonable degree of scientific certainty that this correlation of more severe sentencing outcomes and white female victims is unlikely to disappear even in the presence of other potentially explanatory variables.

*Id.*[1]

A substantial body of social science research has examined the role of

victim's race (alone, and not combined with gender) as a distinct predictor of

harsher sentencing outcomes in capital cases.  This literature, which relies on state

_____

[1]This Court did not have this data and Dr. Bell's opinions before it earlier because she only recently completed her analysis and because the Court denied an evidentiary hearing and discovery.

court data, has repeatedly demonstrated that criminal defendants are substantially more likely to be sentenced to death in cases involving white victims than non-white victims.  In addition, research commissioned by state governments in, for example, California, Maryland, Nebraska, and Illinois has found that defendants convicted of killing white victims are more frequently sentenced to death than defendants convicted of killing non-white victims.  *See, e.g.,* Paternoster et al., "An Empirical Analysis of Maryland's Death Sentencing System with Respect to the Influence of Race and Legal Jurisdiction."[2]

Although the significance of victim race in death sentencing outcomes has been discussed for at least twenty years, very little prior research has examined whether the combined effect of victim race and gender affects sentencing outcomes in capital cases.  This area has only recently gained the attention of researchers.

Movant has identified just three empirical studies, all very recent, that considered the joint effects of victim race and gender in capital prosecutions. Relying on state court data in Colorado, Georgia and Ohio, each study found that defendants were treated most harshly when a white female victim was present.  A Colorado study examined prosecutors' decisions to seek the death penalty after

---

[2]*See* www.newsdesk.umd.edu/pdf/finalrep.pdf.

conviction, while Georgia and Ohio studies looked at capital sentencing outcomes.

In a 2006 study of Colorado death penalty cases from 1980 to 1999, researchers found  that prosecutors were more likely to seek the death penalty in cases involving white, female victims than they were in cases involving victims of any other race/gender combination.  S*ee* Hindson, Potter and Radelet, "Race, Gender, Region and Death Sentencing in Colorado, 1980-1999," 77 *Col. L. Rev*. 549 (2006).  The authors concluded:

> the death penalty is sought for defendants who kill white females at a rate much higher than it is sought for any other victims. White females, who account for only 17.9 percent of all homicide victims, make up 34.5 percent of victims in death penalty cases. Thus, death sentences are pursued against those who kill white women at almost twice the rate as their rate of homicide victimization

Hindson, Potter, and Radelet, 77 *Col. L. Rev*. 549, 577.

A November 2007 study[3] analyzed state court data from Georgia cases in the  1970's and concluded:

> Defendants who murder females are more likely to receive a death sentence than defendants who murder males. Furthermore, we show that large differences exist in the likelihood of receiving a death sentence when the variables "victim race" and "victim gender" are considered jointly. Cases that involve white female victims are treated the most harshly…"

---

[3]Williams, DeMuth and Holcomb, "Understanding the Influence of Victim Gender in Death Penalty Cases:  The Importance of Victim Race, Sex-Related Victimization and Jury Decision Making," 45 *Criminology* 4, 865 (2007).

Williams, DeMuth, Holcomb, 45 *Criminology* 4, at 885.

In a 2004 Ohio study, the same research group found that death sentences were a product of a strong association between one victim race-gender group – white female victims – and the imposition of a death sentence. Holcomb, Williams, DeMuth, "White Female Victims and Death Penalty Research," 21 *Justice Quarterly* 877-902 (2004).

These recent research findings underscore the issue of unfairness and discrimination raised by the analysis presented in Dr. Bell's new declaration. As this Court found, the issue of the "white victim effect" has been raised before. Doc 74 at 16. What is new is the detailed information about the "white female victim effect" which has not previously been addressed by any court. When the gender of the victim is considered, the evidence of an arbitrary factor, and the evidence of prejudice and discrimination becomes apparent.

Previous cases have cited generalized, incomplete statistics involving white victim cases with no gender component or specific case comparisons. *See Jones v. United States,* 287 F.3d 325 (5th Cir. 2002) (statistics about white victim cases insufficient). However, the *Jones* Court stated that: "sufficiently 'stark' statistics

might open a *prima facie* case." *Id.* at 334.[4]   Movant recognizes the *McCleskey*

---

[4]*See also United States v. Roman,* 931 F.Supp. 960, 968 (D. RI 1996) (Roman "chose not ... to present any information … [regarding] potential federal death penalty cases, wherein the government elected not to seek the death penalty... Roman's proffer has also failed to identify other non-Hispanic defendants whose offense subjected them to the imposition of the death penalty, but they were not so prosecuted."); *United States v. Sepulveda,* 952 F.Supp. 94 (D. RI 1997) (defendants were not similarly situated to female members of organization who were forbidden from holding decision making positions); *United States v. Holloway,* 29 F.Supp.2d 435 (M.D. TN 1998) (white defendant presented only three allegedly comparable cases, but the Court found them distinguishable); *United States v. Cuff,* 38 F.Supp.2d 282, 287 (S.D. NY 1999) (Cuff "would have to show that others who have committed numerous drug related murders have not been targets of the death penalty ..."); *United States v. Gilbert,* 75 F.Supp. 12, 15 (D. MA 1999) ("Defendant has not shown, let alone attempted to show, that the Attorney General has failed to authorize the death penalty for similarly situated non-white defendants ... she herself has not proffered an example of a case which even approaches the allegations present here."); *United States v. Bin Laden, et al.,* 126 F.Supp. 2d 256, 261, 263 (S. D. NY 2000) (the only other "mass terrorist bombing" involved white defendants who were targeted for the death penalty - McVeigh and Nichols)  (Arab defendants/many black and white victims); *United States v. Shakir,* 113 F.Supp.2d 1182, 1191 (M.D. TN 2000) (apparently no showing at all by defendant Young); *United States v. Edelin*, 134 F. Supp. 2d 59, 86 (D.D.C. 2001) ("The Court will not ignore the Supreme Court's decision in *McCleskey v. Kemp* and find that the statistics included in the DOJ Study are sufficient evidence to support the defendant's claim of racial discrimination in the government's capital charging practices.") (male black defendant/victims); *United States v. Minerd*, 182 F. Supp. 2d 459, 463-467 (W.D. Pa. 2002) (refusing discovery because white defendant who killed his white girlfriend has "failed to produce 'some evidence' that the decision to seek the death penalty… was made with discriminatory purpose or that it had a discriminatory effect") and *United States v. Sampson*, 275 F. Supp. 2d 49, 88-94 (D. MA 2003) (white defendant who murdered three white men fails to make a "comparable showing" under *Bass*).

decision.[5]  However, it is time the issue is revisited in the federal arena.  In *United States v. Sampson II*, 275 F. Supp.2d 49, 89-94 (D. MA 2003) and *United States v. Sampson VIII*, 332 F. Supp.2d 325, 335-40 (D. MA 2004), the court rejected a related complaint, based on much less data and without a gender argument, but also noted that "a rigorous, honest study of the federal system illuminating this issue would be valuable." *Id.* at 339.

Accordingly, this Court should find that the "white female victim" effect renders any death sentence in this case unconstitutional and/or in violation of 18 U.S.C. §§3593 (f) and 3595 (c)(2)(A).  The Court should sentence Movant to life in prison or, in the alternative, conduct a new sentencing hearing with protective measures in place.  Alternatively, in light of the new information presented in this case, the Court should at least order discovery to inquire into the relationship between the "white female victim" effect and the imposition of the federal death penalty, and thereafter conduct an evidentiary hearing on this Claim.

B.  The correlation between costs and a death sentence

On Thursday, October 9, 2008, the Office of Defender Services of the

---

[5]*McCleskey v. Kemp,* 481 U.S. 279, 331 (1987) (denying challenge to the constitutionality of Georgia's capital-punishment scheme based on a statistical study suggesting that the killers of whites were 11 times more likely to face a sentence of death than the killers of non-whites.)

Administrative Office of the United States Courts published on its webpage a

report entitled "Update on the Cost, Quality, and Availability of Defense

Representation in Federal Death Penalty Cases;  Preliminary Report on Phase One

of the Research."  *See* www.uscourts.gov/defenderservices/FDPC_Contents.cfm.[6]

In this report, "cost data on federal death penalty cases between 1998 and 2004

have been collected and analyzed."  Appendix 5, at 2.  Among other things, this

report concludes that there is a direct correlation between costs in federal capital

cases and the outcome of the sentence:

> Specifically, as Table 12 (p. 40) shows, individuals whose defense
> received less that $320,000 in combined attorney and expert
> assistance – the lowest one-third of federal capital trials – had a 44
> percent chance of being sentenced to death at trial.  Individuals whose
> total representational costs were above that amount – the remaining
> two-thirds of defendants – had a 19 percent chance of being
> sentenced to death.  Defendants in the low cost group thus were more
> than twice as likely to be sentenced to death.

*Id.*, at 39-40.

Movant's case was tried between 1998 and 2008.  The total costs in his case

were well under $200,000, placing him in the low-low end of the "low cost

group."  Because of this utterly arbitrary fact, he was more than twice as likely to

be sentenced to death than defendants who, for whatever reason, received more

---

[6]Dissemination of this report was approved by the Judicial Conference
Committee in June 2008, but the report was not released until last Thursday.

funding.  This arbitrariness and discrimination violates the FDPA and/or renders it unconstitutional.[7]

Evidentiary hearing

This Court summarily denied Brown's 2255 motion.  Movant contends that this was error and that the Court should have held an evidentiary hearing.  *See* 28 U.S.C. § 2255, ¶ 2.[8]  Rather than hold an evidentiary hearing, this Court simply looked to the papers.  *See e.g.* Doc 74 at 8 ("It perhaps was not as adroitly presented as it is now, in habeas briefs."); *id.* at 10 ("Saying it more colorfully and comprehensively in hindsight–which is what Brown's brief does here.").  But Movant was not attempting to prove his claims through his papers.

This Court cited the law on the requirement for evidentiary hearings, including the law that "bald assertions and conclusory allegations will not suffice"

---

[7]This Court found that "'Brown never identifies what expert witnesses he wished to call or what additional time trial counsel wanted to spend in preparation for this case but could not do so because of funding concerns,'" quoting the Government's pleading.  Doc. 74 at 16.  The death penalty struck Movant like lightning, which makes out the constitutional violation.  But Movant did show what money could have provided, *i.e.*, mental health experts (from Butner FCI, and/or private experts), a real mitigation investigation, and a non-future-dangerousness expert.  Indeed, this Court referred (disparagingly) to Movant's experts' "'money quote.'" *Id.* at 11.

[8]*See also Massaro v. United States*, 538 U.S. 500, 504-506 (2003); *Machibroda v. United States*, 368 U.S. 487, 494-495 (1962);  *Aaron v. United States*, 291 F.3d 78, 715 n.6 (11th Cir. 2002).

to get one.  *Id*. at 2.  Movant's allegations were neither bald assertions nor

conclusory allegations, and they were even supported by affidavits to show they

were made in good faith.  For example, Movant alleged that sentencing counsel

introduced damaging evidence about Movant's brother thinking that it was about

Movant.  This allegation was to be taken as true.  Movant filed an affidavit in

support of the request for an evidentiary hearing to show that this allegation was

neither bald nor conclusory.  This Court rejected this proffer made in support of a

request for a hearing  [*i.e.*, the Court wrote that it was  "a hearsay based affidavit

(which this Court rejects on those grounds)"] rather than conduct a hearing.  *Id*. at

9, n. 6.  Again, Movant was not attempting to prove his case through briefs and

proffers.  Movant contends that this Court erred by not holding an evidentiary

hearing[9]

---

[9]Two other examples illustrate why an evidentiary hearing was proper.   On
the issue of ineffective assistance of counsel for telling the jurors at sentencing
that Movant had offered to plead guilty, this Court apparently concluded, or at
least implied, that Movant rather than his counsel was responsible for introducing
the "offer-to-plea-guilty" stipulation at sentencing. The Court wrote that
"[s]omeone like Brown unquestionably is entitled to make the Government prove
its case against him.  Someone like Brown is thus legally entitled to 'flip-flop'
(claim innocence at the liability phase, then admit that he was guilty all along once
in the penalty phase)."  Doc 74 at 8.  At an evidentiary hearing Movant would
show that counsel made the decisions in this case, not Movant.  Second, this Court
discounted Movant's mental health experts' opinions because they were "*post-
conviction* mental health findings," *id*. at 11 (emphasis in original), suggesting that
they were not relevant to 2003.  Had the Court taken testimony these experts

12

<u>Ineffective Assistance of Counsel</u>

Movant contends that this Court's legal analysis of his ineffective assistance of counsel challenges was flawed.

1.  Two-edged sword

This Court takes several key facets of Petitioner's background and social history and speculates that a juror might find in that history a reason to vote for death.  *See, e.g.,* Doc 74 at 15 (government expert who found that Mr. Brown was not a danger in a prison setting also found he had a normal IQ); *id*. at 11 (being a caring and gentle person who has committed murder could be seen as having a scary "Dr. Jekyll and Mr. Hyde" personality); *id*. at 12 (being a model prisoner could mean that you so want to please others that you "could be easily nudged into killing again").  This culminated with the Court's suggestion that it was reasonably probable that some jurors would have wanted to exterminate Petitioner if they were actually told the true and complete facts of his life:

> the disputed McClendon passage contained information that was potentially harmful:  "On almost every occasion, persons in the residences routinely flee at the site [sic] of arriving law enforcement officers." Doc. # 51 at 80. What current counsel seem to constantly overlook is the reasonable probability that at least some jurors could view such information as *justification* for imposing a death sentence. It is not exactly bizarre for some to believe that criminals beget

would have testified that their conclusions related to 2003.  *See* Exhibit 6.

criminals, and thus "three generations of [criminals] are enough."

Doc 74 at 17.  This "double-edged sword, " and "open[ing] the door," defeat of

Movant's post-conviction mitigating evidence is a central theme of the Court's

Order.  *Id* at 15.[10]

This reasoning is at odds with Supreme Court law.   In *Wiggins v. Smith*,

539 U.S. 510, 535 (2003), the Court found that "Petitioner thus has the kind of

troubled history we have declared relevant to assessing a defendant's moral

culpability."  The Court then cited and quoted from other of its decisions:

> *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d
> 256 (1989) ("'[E]vidence about the defendant's background and
> character is relevant because of the belief, long held by this society,
> that defendants who commit criminal acts that are attributable to a
> disadvantaged background ... may be less culpable than defendants
> who have no such excuse'"); *see also Eddings v. Oklahoma*, 455 U.S.
> 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (noting that
> consideration of the offender's life history is a " 'part of the process of
> inflicting the penalty of death' "); *Lockett v. Ohio,* 438 U.S. 586,
> 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (invalidating Ohio law
> that did not permit consideration of aspects of a defendant's
> background).

*Id.*  In *Williams v. Taylor,* 529 U.S. 362 (2000), the Court recognized,  as this

---

[10]At the same time, however, the Court writes that trial counsel actually presented the evidence which Brown claims they did not (*i.e.*, sentencing counsel "got the basic message across," Doc. 74 at 10, and "pretty much all of the mitigation evidence purportedly missed by counsel was, in substance, presented," *id*. at 8).

Court did, that when the mitigation from one's disadvantaged background is presented as mitigation the State [it was a state case] can always find some aggravation to present, through cross-examination or otherwise. Certainly "not all of the available [post-conviction] evidence was favorable to Williams," *Williams, supra*, 529 U.S. at 396, or to Movant.

Indeed, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court further explained that Williams "had a record of violent conduct that could have been introduced by the State to offset" his mitigation. Nevertheless, Williams was granted habeas corpus relief because his attorneys failed to investigate and thoroughly present background and social history mitigating evidence. *Williams, supra,* 529 U.S. at 396 ("Trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."); *id.* at 415 (counsel's duty is to conduct the "requisite, diligent" investigation into client's background)(O'Connor, J., concurring); *Wiggins, supra*, 539 U.S. at 522 ("'[counsel has] an obligation to conduct a thorough investigation of the defendant's background'")(quoting *Williams*).

Thus, Movant contends that this Court incorrectly denied relief based upon background evidence being "two-edged."

2. Hypothetical strategies

15

Movant claims that trial counsel had no coherent strategy at sentencing because they did not conduct the constitutionally required investigation into Mr. Brown's background and social history.   Rather than address what counsel actually did and did not do in this case, this Court speculated about what a reasonable attorney "may have" done, how the attorney's actions "could be seen," and what an attorney thought "might have appealed to some of the jurors." Doc 74 at 6.   The Court even wrote that "[i]t is debatable...that competent counsel would have used the [pre-trial] report" of Dr. Johnson "at all," *id.* at 15, when trial counsel actually swore that they would have used her.   *See* Doc 53 (Motion for Evidentiary Hearing And/Or to Expand the Record), App. 1 para 13, and App. 4, para. 8.

Again, this Court's reasoning conflicts with Supreme Court law.  While Movant concedes that some decisions from the United States Court of Appeals for the Eleventh Circuit do hold that the proper inquiry is whether "'the course of action taken by counsel would not have been taken by any competent counsel,'" Order at 4 (quoting *Blankenship v. Hall*, 2008 WL 4191952 at * 16 (11th Cir. 9/15/08), the Supreme Court holds otherwise.  In *Wiggins v. Smith*, 539 U.S. 510, 526 (2003), cited by this Court at page 4 of its Order, the Supreme Court stressed that it is what trial counsel actually did and thought that matters and that any other

analysis, such as the one this Court undertook, "resembles more a post hoc rationalization of counsel's conduct rather than an accurate description of their deliberations prior to sentencing."

### 3.  Prejudice

This Court wrote that while sentencing counsel here did not present all that was available in mitigation, they "got the basic message across," Doc 74 at 10, and "pretty much all of the mitigation evidence purportedly missed by counsel was, in substance, presented." *Id*. at 8. "[S]aying it more colorfully and comprehensively in hindsight – which is what Brown's brief does here – simply does not meet the IAC standard." *Id*. at 10.  While Movant disagrees with this depiction of the facts, prejudice can still be shown in post-conviction proceedings where trial counsel presented multiple witness in the penalty phase and yet post-conviction counsel presents the comprehensive picture of mitigation.  *See*, *e.g., Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999) (reversing death sentence and finding counsel ineffective, despite the fact that counsel called ten witnesses at the penalty phase); *Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006) (reversing death sentence and finding counsel ineffective for failing to put on additional evidence of childhood abuse, despite the fact that such evidence was presented at trial, because the trial presentation likely failed to give the jury a  comprehensive understanding of the

abuse given the discrepancy in depth and detail between the trial evidence and the habeas evidence);  *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991).

### *Witherspoon/Witt*

In his Motion to Vacate or Set Aside, Mr. Brown raised three separate allegations relating to the lack of *Witherspoon/Witt* questioning of juror Dorothy Rentz: (1) his Sixth Amendment rights were violated when trial counsel failed to ensure a *Witherspoon/Witt* inquiry was undertaken on Ms. Rentz (Claim IX, ¶22); (2) his Fifth and Eighth Amendment rights were violated when Ms. Rentz was seated as a juror without determining her opinion on the death penalty; and assuming Ms. Rentz was asked the *Witherspoon/Witt* questions (Claim XVI), (3) his Fifth, Sixth and Eighth Amendment rights to a meaningful appeal were denied by the lack of a complete record, *i.e.,* the transcription of Ms. Rentz's *Witherspoon/Witt* voir dire (XVII).  In resolving the second two issues, this Court found the claim to be procedurally defaulted stating that Mr. Brown "was too late [because] these matters should have been raised on direct appeal, and therefore cannot be heard now."  Doc. 74 at 24.  The finding that Mr. Brown did not raise these issues on direct appeal is clearly erroneous and this Court should vacate its previous order, grant permission to conduct discovery and hold an evidentiary hearing on the matter.

On direct appeal, Mr. Brown specifically asserted:

> It appears that a juror who actually sat and rendered a verdict on both guilty [sic] and punishment, Dorothy Rentz, was never questioned as to here [sic] beliefs on the death penalty.  If this is true, Mr. Brown's sentence must be reversed.  However, if this Court believes further factual development on this issue is in order, Mr. Brown herein requests this Court stay the instant proceedings and remand to the trial court for a determination on whether Ms. Rentz was, in fact, never death qualified.

Doc. 50, Ex. A,  pg. 17, n. 6.[11]  Further, in the first Claim raised in his direct appeal brief, Mr. Brown asserted that this Court erred in denying him the right to be present and the right to cross-examine witnesses in any proceedings associated with the Eleventh Circuit's remand of the case for construction of the record. (Doc. 50. Ex. A, pp 24-29).   As part of that Claim, Mr. Brown argued:

> The district court's summary denial of Appellant's request to correct the record in the lower court – a denial that was not preceded with any notice to the attorneys, or any fact-finding – also resulted in the inability of counsel to correct and supplement the record on two other matters. . . .  Second, a review of the voir dire seems to indicate to Appellant's counsel that one of the jurors who was selected to serve on the jury, Dorothy Rentz, was possibly never questioned.  Though her name was called out during the initial role, and though the attorneys for both sides apparently agreed that she would sit on the jury, Appellant's counsel have not been able to locate her actual questioning by the court and counsel.  Every other juror was

---

[11]The Eleventh Circuit briefs were made part of the proceedings before this Court when the Government filed its Response to Mr. Brown's Motion to Vacate or Set Aside Pursuant to 28 U.S.C. §2255 and attached them as exhibits. *See* Doc. 50.

individually questioned.  Appellate counsel recognize that they may have overlooked some transcript, or that the juror's voir dire may be otherwise not apparent, but, nevertheless, this was another issue that counsel had intended to raise in the lower court during the remand hearing.  The trial judge's summary disposition, however, deprived counsel of the ability to raise either of these issues.

Doc. 50, Ex. A, pp 29-30, n. 11.

As these citations to Mr. Brown's direct appeal brief establish, the "Rentz matter" was brought up on direct appeal and this Court's finding of procedural default was mistaken.  As the issue was raised on direct appeal and not resolved by the Eleventh Circuit, there can be no finding of *res judicata*.  *Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("Under res judicata, *a final judgment on the merits* of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (Emphasis added).  Thus, this Court should vacate its Order of September 29, 2008, grant discovery on the "Rentz matter" and conduct an evidentiary hearing on the issue.[12]

## Conclusion

For the foregoing reasons, this Court should alter and/or amend its order of

---

[12]The Court was also in error in writing that "current counsel — detected the 'Rentz' admission but not the 'Amick' omission."  Order at 24.  The only thing this Court could conclude from the state of the record is that current counsel did not raise any issue regarding the Amick omission.  For this Court to conclude that current counsel "missed" it is to assume facts.

September 29, 2008.

Dated, this the 14th day of October, 2008.

Respectfully submitted,

*s/Jeffrey L. Ertel*
JEFFREY L. ERTEL
State Bar No. 249966

FEDERAL DEFENDER PROGRAM, INC.
100 Peachtree Street
Suite 1700
Atlanta, Georgia 30303
(404) 688-7530

ATTORNEY FOR MR. BROWN

CERTIFICATE OF SERVICE

I hereby certify that the forgoing has been electronically filed and served

upon Counsel for the Government as follows:

>Amy Lee Copeland, Esq.
>Assistant United States Attorney
>P.O. Box 8970
>Savannah, Georgia 31412

Dated, this the 14th day of October, 2008.


*s/Jeffrey L. Ertel*