# Update on the Cost, Quality, and Availability of Defense Representation in Federal Death Penalty Cases

# Preliminary Report on Phase One of the Research

**Jon B. Gould**
**Lisa Greenman**

**In June 2008, the Judicial Conference Committee on Defender Services approved dissemination of the Preliminary Report on Phase One**

# Table of Contents

I.    Introduction.................................................................................................................1

II.   Decisions by the Department of Justice to Seek the Death Penalty: Their Implications
      for Defense Costs.......................................................................................................3

      A.  Defendants Subject to Capital Prosecution:  Potential Death Penalty Cases,
          1989-2007 ..........................................................................................................3

      B.  The Attorney General's Decision-Making and How It Has Changed ....................4

      C.  Resolution of Authorized Cases...........................................................................7

      D.  Geographic Distribution of Authorized Cases.....................................................11

III.  Costs of Defending Federal Capital Cases................................................................16

      A.  Cases Examined..................................................................................................16

      B.  Data Examined....................................................................................................19

IV.   Findings...................................................................................................................22

      A.  Total Case Costs ...............................................................................................22

      B.  Comparison to the Spencer Report ...................................................................24

      C.  Attorney Costs ..................................................................................................26

      D.  Expert Costs......................................................................................................29

      E.  Transcript Costs ...............................................................................................30

V.    Explanations for and Predictors of Case Costs .......................................................31

      A.  Hypotheses........................................................................................................31

      B.  Use of Experts...................................................................................................33

      C.  Case Characteristics..........................................................................................35

      D.  Capital Culture...................................................................................................36

      E.  Attorney General Making the Authorization Decision.........................................37

i

F.  Geography ..............................................................................................38

G.  Other Factors ........................................................................................39

VI.     Influence of Case Costs on Outcome ...........................................................39

VII.    Conclusion ................................................................................................41


Appendix A:  Spencer Report Recommendations .........................................................43

Appendix B:  Data Examined ..................................................................................48

Appendix C:  Supplemental Data .............................................................................49

## Figures and Tables

**Figure or Table**
**Page**

Figure 1:  Potential Federal Capital Defendants, by Calendar Year ....................................... 4

Figure 2:  Federal Capital Authorization Decisions, by Authorization Year .......................... 7

Figure 3:  Number of Federal Capital Defendants Tried, by Calendar Year .......................... 8

Figure 4:  Number of Federal Death Sentences, by Calendar Year ....................................... 10

Table 1:  Federal Death Penalty Prosecutions, 1989-2007 ................................................... 11

Figure 5:  Number of Authorized Capital Defendants by Circuit .......................................... 12

Figure 6:  Federal Capital Trials by State, 1989-1997 .......................................................... 14

Figure 7:  Federal Capital Trials by State, 1998-2007 .......................................................... 15

Figure 8:  Federal Death-Eligible Cases Studied, 1998-2004 ............................................... 18

Table 2: Total Cost for Defense Representation in Federal Capital Cases, 1998-2004 ......... 24

Figure 9:  Cost Variance in Authorized Capital Cases, Trials vs. Pleas ............................... 24

Table 3: Total Case Cost, Spencer Report Compared to Update ........................................... 25

Table 4:  Attorney Cost, 1998-2004 ...................................................................................... 26

Table 5:  Attorney Hours, Spencer Report Compared to Update ........................................... 27

Table 6:  Attorney In-Court Hours, Spencer Report Compared to Update ............................ 28

Table 7:  Attorney Out-of-Court Hours, Spencer Report Compared to Update ..................... 28

Table 8:  Expert Costs, Spencer Report Compared to Update ............................................... 30

Table 9:  Transcript Cost Per Defendant, 1998-2004 ............................................................ 31

Figure 10:  Division of Expert Costs for Trial Cases ............................................................ 34

Figure 11:  Division of Expert Costs for Plea Cases ............................................................. 34

Table 10:  Factors that Predict Increased Case Cost, Bivariate Relationships ...................... 36

Table 11:  Effect of Attorney General's Decision-Making on Case Length ........................... 38

Table 12:  Relationship Between Trial Case Cost and Death Sentence ................................. 40

Figure C.1:  Number of Federal Capital Defendants Going to Trial/Trials Commencing, by Calendar Year ........................................................................................................ 49

Figure C.2:  Population of Federal Death Row by State and Circuit..................................... 50

## I.    Introduction[1]

Ten years ago, in May 1998, the Subcommittee on Federal Death Penalty Cases of the United States Judicial Conference Committee on Defender Services approved the document entitled "Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation," which has become known as "the Spencer Report," after the Subcommittee Chair, Judge James R. Spencer. The Subcommittee's recommendations (provided as Appendix A, p. 43) were subsequently adopted by the Judicial Conference of the United States in September 1998 and have been heavily relied upon by courts and defense counsel since then.

Much of the Spencer Report remains as relevant in 2008 as it was in 1998 – for example, its detailed description of the characteristics of federal death penalty prosecutions and its discussion of the special duties such cases impose on defense counsel. Similarly, the majority of its recommendations remain sound, as they endorse policies derived from core values consistently enunciated by the Defender Services Committee: the need for high standards for appointed counsel, fair funding for the defense that is predicated on sound case-budgeting practices, and an appreciation of the scope and depth of counsel's responsibilities. The recommendations encourage the Administrative Office of the U.S. Courts to provide training and technical support for court-appointed counsel, and promote strategic case management and other approaches intended to contain costs while maintaining high-quality representation.

---

[1] For the research and writing of this report, the Office of Defender Services of the Administrative Office of the U.S. Courts thanks Jon Gould, J.D., Ph.D., Director of the Center for Justice, Law, and Society at George Mason University. Professor Gould was assisted by Lisa Greenman, staff attorney with the Federal Public Defender Organization for the District of Maryland. Sylvia Fleming, Information Technology Specialist in the Office of Defender Services, compiled extensive quantitative data from the CJA payment system, and Holly Stevens, doctoral candidate at George Mason University, provided valuable technical and editorial assistance.

1

On the other hand, case-related data in the Spencer Report, including the cost information frequently relied upon by defense counsel and the courts in assessing the reasonableness of individual case budgets, is substantially outdated. The Spencer Report examined cases from 1989 to 1997, the first years of the modern federal death penalty.[2] Only a limited number of cases had reached resolution in the trial courts by that time, and no case had proceeded through the appellate and post-conviction stages. There is now an additional decade of experience in the federal courts to draw upon, during which time there have been significant changes in the way cases are charged, investigated, and litigated. As of early 2008, more than 400 federal death penalty prosecutions have been authorized, resulting in more than 175 federal death penalty trials involving about 230 defendants. Direct appeals for approximately 60 death sentence cases have been resolved or are pending, and approximately 30 capital post-conviction proceedings pursuant to 28 U.S.C. § 2255 have concluded or are underway.

For these reasons, the Administrative Office's Office of Defender Services has undertaken this re-examination of the cost, quality, and availability of defense representation in federal death penalty cases since the time of the Spencer Report. Research for this update is progressing in two phases. In this, Phase One, cost data on federal death penalty cases between 1998 and 2004 have been collected and analyzed. The preliminary findings that follow summarize quantitative data on the costs associated with capital representation and employ statistical techniques to elucidate the factors that affect case cost. Phase Two will

---

[2] Congress revived the federal death penalty in 1988, when it authorized capital punishment for the narrow category of "drug kingpin" murders. 21 U.S.C. § 848, *codifying* Pub. L. 100-690, 102 Stat. 4382 (1988), *recodified* in 2006 as 18 U.S.C. § 3599. In 1994, Congress passed the Federal Death Penalty Act, which expanded the number of federal crimes punishable by death from one to approximately 50. 18 U.S.C. § 3591-3598, *codifying* Pub L. 103-322, 108 Stat. 1959 (1994).

2

examine these statistical findings through interviews and other qualitative research techniques to understand the effect these factors may have on the cost, quality, and availability of defense representation in federal death penalty cases. Phase Two also will re-evaluate the Spencer Report's recommendations and, as appropriate, offer new recommendations.

## II. Decisions by the Department of Justice to Seek the Death Penalty: Their Implications for Defense Costs

### A. Defendants Subject to Capital Prosecution: Potential Death Penalty Cases, 1989-2007

Although this study focuses primarily on what happens after the Attorney General has authorized capital prosecution for a defendant ("authorized" cases), both the total number of potential capital prosecutions ("death-eligible" cases) and the process by which the Department of Justice chooses the defendants against whom it will seek the death penalty (the death penalty "authorization" process) have profound consequences for defense representation.[3] It is therefore necessary to develop an understanding of patterns and trends.

As previously noted, in 1994 Congress expanded the number of offenses punishable by death from one to 50. As a result, in the second half of the 1990s there was a sharp jump in the number of federal defendants potentially subject to the death penalty. According to the Federal Death Penalty Resource Counsel Project, which monitors federal prosecutions for the Defender Services program (see note 4, *infra*), there were 26 death-eligible defendants in 1993, 63 in 1994, and then upwards of 150 in almost every subsequent year.

---

[3] The number of such "death-eligible" prosecutions affects the availability of qualified capital defense attorneys and the cost of representation because, pursuant to 18 U.S.C. §3005, any defendant charged with an offense punishable by death must be appointed two counsel, at least one of whom has special qualifications, and who are paid, pursuant to 18 U.S.C. § 3599, at the increased rate applicable to death penalty cases. These appointments remain in effect, and the higher rate of compensation applies, unless and until the Department of Justice notifies the court that it will not seek the death penalty against the defendant.

3

Figure One illustrates this trend, showing the number of prosecutions alleging offenses punishable by death between 1989 and 2007. These numbers should be viewed as a good estimate, but not a precise count of each and every such case.[4]

**Figure 1:**
**Potential Federal Capital Defendants, 1989- 2007, by Calendar Year**



### B.    The Attorney General's Decision-Making and How It Has Changed

The Department of Justice does not permit a federal prosecutor to seek the death penalty for a defendant unless specifically authorized to do so by the Attorney General of the

---

[4] The Federal Death Penalty Resource Counsel Project provided the data underlying Figures One through Seven. Since comparable numbers are not readily ascertainable from information made public by the Department of Justice, a request for this information will be made in Phase Two of the research. The Federal Death Penalty Resource Counsel Project, funded by the Administrative Office's Office of Defender Services, provides training and advice to appointed counsel and the courts. (Spencer Report at 29.)

4

United States.[5]  Prior to 1995, the Attorney General would review only those death-eligible cases in which a United States Attorney sought permission to seek the death penalty.  If local federal prosecutors wished to seek the death penalty, the Attorney General could authorize it or not.  There was, however, no scenario in which a capital prosecution would be sought in the absence of a local request.  Furthermore, if the death penalty was authorized by the Attorney General, discretion to resolve the case reverted back to the local U.S. Attorney, and a plea agreement could be negotiated between the parties without further involvement from the Attorney General.

Beginning in 1995, Attorney General Janet Reno promulgated a formal protocol that centralized death penalty decision-making and required review of all death-eligible cases by the Attorney General, regardless of whether the local U.S. Attorney viewed death as the appropriate punishment.[6]  For the first time, it became possible that capital prosecutions would be ordered in cases in which they were not desired by local prosecutors; however, following the authorization decision, discretion still returned to the local U.S. Attorney to accept a plea bargain for a less-than-death sentence.  In practice, according to the Federal Death Penalty Resource Counsel, Attorney General Reno rarely exercised her authority to overrule a U.S. Attorney's recommendation against the death penalty.  When she did, each such case was ultimately resolved through a negotiated plea agreement resulting in a sentence less than death.  These plea agreements were facilitated by the previously described policy that returned decision-making authority respecting plea bargains to the local U.S. Attorney's Office after an authorization decision was rendered by the Attorney General.

---

[5] U.S. Attorney's Manual, Title 9-10.000.

[6] Id.

5

Death penalty decision-making changed again in 2001, with the next Attorney General, John Ashcroft, showing less deference to local prosecutors. The number of capital prosecutions authorized without the recommendation of the local U.S. Attorney increased substantially.[7] Attorney General Ashcroft also instituted a formal policy requiring approval from Washington before an authorized case could be settled by plea agreement. Over time, proportionally fewer cases have reached a negotiated resolution and a greater proportion of cases have gone to trial.[8]

Figure Two (p. 7) reflects the number of defendants for whom the Attorney General authorized a capital prosecution each year between 1989 and 2007, a total of 435. The pattern of prosecutions in Figure Two matches the trend in death-eligible offenses found in Figure One (p. 4), with cases rising significantly following passage of the 1994 Federal Death Penalty Act and then remaining at or above that level thereafter. Interestingly, the number of cases authorized by the Department of Justice has varied from 2002-2007, rising in 2003 and 2006 and dropping in 2007.[9]

---

[7] The Federal Death Penalty Resource Counsel Project has determined that Attorney General Reno required a death penalty prosecution without a request for permission from the local prosecutors 14 percent of the time (26 of 182 authorization decisions) and that Attorney General Ashcroft did so 30 percent of the time (42 of 139 authorization decisions).

[8] The Justice Department's reluctance to approve settlements proposed by local prosecutors has provoked expressions of concern in Congress and from some judges and former U.S. Attorneys. *See, generally, Oversight of the Death Penalty: Hearing Before the Senate Committee on the Judiciary,* 110th Cong. (2007); John Gleeson, *Supervising Federal Capital Punishment: Why the Attorney General Should Defer When U.S. Attorneys Recommend Against the Death Penalty,* 89 Va. L. Rev. 1697, 1699-1700 (2003); Adam Liptak, *The Death Penalty: A Witness for the Prosecution,* N.Y. Times, Feb. 15, 2003, at B9.

[9] The sharp decrease in 2007 coincides with the resignation of Attorney General Alberto Gonzales. As a point of clarification, Figure Two does not reflect the total number of authorized federal death penalty cases pending in the courts each year, but rather the number of times the Department of Justice authorized a capital prosecution.

**Figure 2:**
**U.S. Department of Justice Authorization Decisions, 1989-2007,**
**by Year of Authorization**



### C.    Resolution of Authorized Cases

By the end of 2007, 233 authorized cases were tried.[10]  Figure Three (p. 8) shows

the number who went to trial each year between 1989 and 2007.  There were a total of 176

---

[10] The vast majority of these 233 defendants proceeded through both guilt and penalty phases, though in some instances a two-phase capital trial was not completed (e.g., the guilt phase verdict acquitted the defendant of the capital charge), and in others the case was resolved in another fashion (e.g., after trial commenced, there was a negotiated guilty plea to a sentence less than death or withdrawal of the death penalty authorization).  Cases are assigned to the calendar year in which trial began.

trials for these 233 defendants, reflecting the fact that some trials involved more than one capital defendant.[11]



**Figure 3:**
**Number of Federal Capital Defendants Tried, 1989-2007, by Calendar Year**

The number of capital trials has risen at a relatively consistent rate between 1989 and 2007, even while the number of death penalty prosecutions authorized by the Attorney General has varied. Stated differently, regardless of the number of federal capital prosecutions authorized, fewer authorized defendants each year are resolving their cases through pretrial guilty pleas, and a greater proportion are going to trial. As explained later, capital trials are more expensive than cases resolved through plea agreements. Thus, if the

---

[11] A chart showing both the number of capital trials and the number of defendants tried by calendar year is provided in Appendix C (p. 49).

trend identified in Figure Three (p. 8) continues – i.e., fewer capital defendants plead guilty – costs may continue to rise even if the total number of capital prosecutions stabilizes.

Among the authorized cases that proceeded to trial, only a quarter ended with the defendant being sentenced to death (defendants almost never plead guilty and accept a death sentence). Through the end of 2007, 61 of the 233 capital defendants who proceeded to trial were sentenced to death.[12]   Figure Four (p. 10) shows the number of death sentences obtained each year from 1989 through 2007, and Table One (p. 11) provides summary data. A chart reflecting the number of defendants presently under sentence of death, and the states and federal circuits in which their cases were tried, is provided in Appendix C (p. 50).

---

[12] Among the 435 defendants for whom capital prosecution has been authorized, the cases of many of those authorized later in the time period are still pending. Of the 233 that went to trial, two defendants were sentenced to death twice, the second death sentence following an appellate reversal and retrial; for purposes of this report, each such defendant is counted only one time.



**Figure 4:**
**Number of Federal Death Sentences, 1989-2007, by Calendar Year**

**Table 1:**
**Federal Death Penalty Prosecutions, 1989-2007**

| | |
|---|---|
| Defendants Authorized | 435 |
| Capital Trials | 176 |
| Capital Defendants Tried | 233 |
| Defendants Sentenced to Death | 61 |
| Death Verdicts as a Percentage of Capital Defendants Tried | 26% |

**D.    Geographic Distribution of Authorized Cases**

The geography of the federal death penalty has changed as well. In the first ten years after the federal death penalty was reinstated, capital prosecutions clustered mainly in states with active state court death penalty practices, such as Texas, Virginia, Missouri, and Georgia. Subsequently, however, the Department of Justice has sought to eliminate this geographic disparity by authorizing capital prosecutions more broadly.[13] Thus, an increasing proportion of prosecutions has been brought in places with little or no death penalty

---

[13] "[T]he goal of the Department's death penalty review and decision-making process is nationwide consistency in the fair and even-handed application of federal capital sentencing laws in appropriate cases, irrespective of geography or local predisposition for or against the death penalty." Statement of Barry Sabin, Dep. Ass't Att'y Gen. of the United States. *Oversight of the Death Penalty: Hearing before the Senate Committee on the Judiciary,* 110th Cong. (2007).

11

experience, some of them jurisdictions that have chosen not to have a state death penalty.[14] Figure Five illustrates this trend. In the first decade of the federal death penalty, cases were authorized in each of the 12 federal circuits, although the distribution was uneven. Capital prosecutions were most numerous in the Fourth Circuit, while the Seventh Circuit had the fewest authorized cases.

**Figure 5:**
**Number of Authorized Federal Capital Defendants, 1989-1997 and 1998-2007, by Circuit**



---

[14] Puerto Rico, where a number of federal capital prosecutions have been authorized, has a constitutional prohibition against the death penalty. The District of Columbia has rejected by referendum an effort to establish a local death penalty. Additional non-death penalty states where federal capital prosecutions have been authorized include Iowa, Michigan, West Virginia, Vermont, and Massachusetts. *See also,* Rory K. Little, *Good Enough for Government Work? The Tension Between Uniformity and Differing Regional Values in Administering the Federal Death Penalty*, 14 Fed. Sentencing Rep. 7 (2001); Benjamin Weiser & William Glaberson, *Ashcroft Pushes Executions in More Cases in New York*, N.Y. Times, Feb. 6, 2003, at A1.

A decade later, the Fourth Circuit still had the largest federal capital caseload – about one-fifth of all federal death penalty cases brought nationwide – but the proportional shares among the circuits changed significantly. Whereas the Ninth Circuit had only four percent of federal capital cases between 1989 and 1997, its proportion increased threefold to 13.8 percent of the national docket in 1998-2007. Similarly, the Second Circuit's percentage rose from 8.5 percent to 12.5 percent of the national capital caseload, while the Fifth and Eleventh Circuits represented a smaller share of the expanded national docket. In the period between 1998 and 2007, the number of authorized federal capital prosecutions increased in each circuit except the Tenth.

These dynamics are displayed at the state level in Figures Six and Seven (p. 14 and 15). Although Figure Five (p. 12) includes all authorized cases, both pleas and trials, Figures Six and Seven portray the geographic distribution of the trial cases, comparing the period of the present study with the years addressed in the Spencer Report. As these maps illustrate, the Department of Justice has brought the federal death penalty to a larger group of states in the past decade, resulting in more cases being tried in jurisdictions that have not frequently experienced death penalty prosecutions.

13

**Figure 6: Number of Federal Capital Defendants by State, 1989-1997**



| State | AL | AR | CA | CO | FL | GA | IL | KS | LA | MI | MO | NJ | NM | NY | OK | PA | TX | VA |
|-------|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| # Def. | 1 | 2 | 1 | 2 | 3 | 1 | 4 | 2 | 2 | 1 | 2 | 1 | 2 | 3 | 3 | 1 | 6 | 12 |

14

**Figure 7: Number of Federal Capital Defendants by State, 1998-2007**



No. Defendants

| | |
|---|---|
| | 1 |
| | 2 - 3 |
| | 4 - 5 |
| | 6 - 9 |
| | 10 - 15 |
| | 15 or more |

Note: DC & Puerto Rico have 4 and 5 defendants, respectively, not reflected on this figure.

| State | AL | AR | AZ | CA | CO | CT | DC | FL | GA | IA | IL | IN | KS | KY | LA | MA | MD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # Def. | 1 | 3 | 1 | 14 | 1 | 3 | 4 | 5 | 3 | 2 | 4 | 3 | 1 | 1 | 1 | 2 | 4 |

| State | MI | MO | MS | NC | ND | NJ | NY | OH | OK | PA | PR | SC | TN | TX | VA | VT | WV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # Def. | 4 | 18 | 2 | 4 | 1 | 1 | 13 | 5 | 2 | 10 | 5 | 3 | 5 | 15 | 20 | 1 | 3 |

15

As later sections of this report explain, the changes initiated by Congress and the Department of Justice have had profound effects on the cost of defending federal capital cases. The Federal Death Penalty Act vastly increased the number of capital-eligible crimes, but the impact could not be fully captured at the time of the Spencer Report, two years later. In addition, in the past decade, the Department of Justice has authorized capital prosecutions more frequently, and more often without the request of local prosecutors, than at an earlier time. More of these cases are being brought in jurisdictions with little or no death penalty experience, and a greater percentage of federal capital prosecutions are proceeding to trial rather than being settled by plea agreement.

## III.    Costs of Defending Federal Capital Cases

### A.    Cases Examined

To analyze the cost of defense representation in authorized federal death penalty cases, a database of such cases was developed. As with the Spencer Report, research focused on panel attorney appointments – those cases in which a capital defendant is represented by attorneys appointed pursuant to the Criminal Justice Act (CJA), whose compensation by the federal courts is recorded in the CJA payment system. All federal death penalty representations that began in 1998-2004 and concluded in the district court by the end of 2004 were examined, and almost all were included in the database.[15]

Excluded from the database were those very few cases in which representation was provided, in whole or in part, by privately retained counsel, or by counsel whose services

---

[15] This time period immediately follows the years covered by the Spencer Report and represents a span in which the maximum rate of compensation for defense counsel in panel appointments remained constant at $125 per hour (the same hourly rate that applied during the Spencer Report). In a few cases, payments were made for services performed after December 31, 2004. Because the amounts were small and comparatively insignificant, these cases were retained in the research sample.

16

were provided *pro bono,* without compensation. For purposes of cost analysis, cases in which representation was provided, in whole or in part, by a federal defender organization were excluded because the cost of representation would not have been captured by the CJA payment system. These federal defender cases were identified, coded, and made part of the database for other purposes, however. Federal defender organizations were involved in a higher proportion of cases during the period of this study than during the period of the Spencer Report, and the significance of this increased responsibility for representation will be explored in Phase Two.

Also excluded from the database were authorized cases that did not proceed as capital prosecutions through ultimate disposition, either because the death penalty authorization was withdrawn by the Department of Justice or the notice of intent to seek the death penalty was dismissed.[16] In both sets of circumstances, the representation would have then gone forward as a non-capital matter and thus costs could not reasonably be compared with those in cases that proceeded to conclusion as capital matters. However, as with the Spencer Report, a companion sample of death-eligible, non-authorized cases was drawn in order to examine the increased cost of representation when the Department of Justice authorizes a death penalty prosecution.

All reported data refer to the defense of an individual defendant in a single case, or as the CJA payment system uses the term, a "representation." When the term "case" is used

---

[16] Authorization might be withdrawn if, for example, new information relevant to guilt or punishment convinced prosecutors and the Attorney General that death was not an appropriate sanction. Notice of intent to seek the death penalty might be dismissed upon the order of a judge for a legal reason, such as having been filed too close to an already established trial date, or because the defendant was diagnosed with mental retardation. Cases in which the defendant entered a plea of guilty to the death-eligible charge in exchange for the prosecution agreeing to a life sentence and dismissing the death penalty request were retained in the sample.

(e.g., "median case cost"), it refers to the representation of a single defendant who may or may not have been among multiple defendants joined in an indictment.

Figure Eight illustrates the dataset of federal death-eligible cases examined. For the period 1998-2004, the study examined 214 cases, of which 119 were authorized as capital prosecutions. Of these, 95 were CJA panel attorney representations and 24 involved representation by federal defenders. Thirty-three of the 95 authorized panel cases were resolved by plea agreement and 62 were tried. The costs from the 95 authorized panel cases were compared with the costs in 95 death-eligible but not authorized CJA panel attorney cases.[17]

## Figure 8

**Federal Death-Eligible Cases Studied, 1998-2004**



---

[17] The non-authorized cases were chosen at random from a list maintained by the Federal Death Penalty Resource Counsel Project. Because these 95 cases were selected for comparison of costs with the 95 authorized CJA panel attorney cases, only representations that did not involve a federal defender organization were included.

18

## B.    Data Examined

Phase One analyzes the cost of federal death penalty representations and examines the factors that may influence case cost. For each of the 95 CJA panel attorney representations reflected in Figure Eight, more than 40 sets of data were collected and coded. The list of recorded data is delineated in Appendix B (p. 48). Initially, seven elements of case cost were coded from data collected from the CJA payment system. These included:[18]

- Total case cost
- Cost of counsel
- Cost of experts
- Attorney hours
- In-court attorney hours
- Out-of-court attorney hours
- Cost of transcripts

These cost variables ("dependent variables") were matched against factors that may have influenced case cost ("independent variables"). The latter were collected from a variety of sources, including the CJA payment system, the federal courts' electronic case management system (PACER), and the Federal Death Penalty Resource Counsel Project. In some cases, the attorneys of record were contacted to obtain necessary information.

Some of the independent variables are straightforward and easily understood:

- Defendant's name
- Circuit of prosecution
- District of prosecution
- State of prosecution
- Whether the case was resolved by trial or plea
- How the case concluded – whether acquittal, dismissal, or verdict of guilt
- Defendant's sentence (if not acquitted or dismissed)
- Number of defendants named in the indictment

---

[18] "Total case cost" reflects the combined costs of counsel and experts (or, in CJA terminology, "services other than counsel"), but does not include transcript costs or certain travel costs that may be billed directly through the court rather than through CJA vouchers. "Cost of transcripts" reflects payments to the official court reporter for producing a record of court proceedings.

19

The remaining factors are more complex and are discussed in some detail in the paragraphs following this list. They include:

- Number of defense counsel
- Number of prosecutors
- Number of defendants
- Number of homicides alleged in the indictment
- Race, gender, and ethnicity of defendant and victims
- Involvement of victims in criminal activity
- Prosecution's allegation of "future dangerousness"
- Number of offenses alleged in the indictment
- Nature (magnitude) of offenses alleged in the indictment
- Case length
- Features of the Department of Justice's capital authorization process
- Experts utilized by the defense
- State history and experience with death penalty litigation

The number of attorneys who staffed each side of a case was noted. The recorded number reflects all lawyers whose appearance in the case, as reflected on PACER, lasted longer than 30 days. In all cases, defendants were represented by at least two lawyers (consistent with the requirements of 18 U.S.C. §3005), and in some cases more lawyers entered appearances, either to substitute for or to supplement the two statutorily required counsel. These numbers do not reflect additional counsel, if any, permitted to assist appointed counsel for limited purposes. The number of prosecutors showed greater variability, ranging from one to as many as seven lawyers who made a court appearance and remained in the case for longer than a month.

The numbers of defendants and of charged homicides in each representation were coded. These data included the number of codefendants joined in the case, regardless of whether they were charged with a capital crime, as one measure reflecting the size of the case. Also recorded was the number of homicides attributed in the indictment to the defendant named in the representation, as an indicator of the scope of criminal responsibility for that defendant. (The number of homicides alleged as "aggravating factors" in support of

20

a death sentence were not included in this figure, as the data could not be easily verified.) The race, ethnicity, and gender of victims and defendants, as well as whether victims were themselves connected to criminal activities, were recorded. Where prosecutors alleged "future dangerousness" of the defendant as an aggravating factor in support of the death penalty, these data were noted.

The total number of indicted offenses in each case, whether charged against that particular capital defendant or a codefendant, was recorded. In most cases, the capital defendant faced the greatest number of charges, but when he did not, this variable was another measure of the size and scope of the case. A category was created to note three types of indictments that are generally complicated and multifaceted, indicating case magnitude: continuing criminal enterprise (CCE), racketeering (RICO), and terrorism.

Several measures reflecting the length of a case were recorded. The date of the first appointment of counsel was noted as a "start date." The date on which the government filed notice of its decision to authorize capital prosecution was recorded, as was the date of conclusion in the district court, whether by acquittal, dismissal, or sentence. The data also indicate which of two Attorneys General authorized the capital prosecution (the study period encompassed part of the tenure of Attorney General Reno and the full tenure of Attorney General Ashcroft).

Several variables were collected to reflect the use of experts in each representation. The term "experts" is used here, as in the Spencer Report, to embrace the "services other than counsel" that are authorized under the Criminal Justice Act. 18 U.S.C. § 3006A(e). Thus, in addition to professionals traditionally thought of as experts, such as doctors or scientists, the term includes fact investigators, paralegal assistants, reproduction services, as well as fingerprint examiners, pathologists, mitigation specialists, jury consultants, etc. Information

21

was drawn from the CJA payment system reflecting notations contained in the form CJA 31 that defense counsel use when itemizing case expenses. The CJA 31 provides 24 potential categories of services other than counsel that may be used in a representation.[19] The data include these itemized costs from each case.

Finally, data were collected to reflect the history and experience of states with the death penalty. These variables are used later to examine the relationship between state capital practice and case cost in federal capital prosecutions. Data were collected indicating whether there was a state death penalty statute in the jurisdiction where the federal prosecution was brought; the number of years following *Furman v. Georgia*[20] before that state reinstituted the death penalty; the number of years following *Gregg v. Georgia*[21] before the state executed a defendant;[22] the number of defendants on that state's death row as a percentage of its population; the number of executions in the state post-*Gregg* as a percentage of its population; and the size of the state's death row as related to its crime rate.

## IV.    Findings

### A.    Total Case Costs

The costs of defending federal death-eligible cases spanned a wide range between 1998 and 2004. As Table Two (p. 24) indicates, the cost of death-eligible, non-authorized

---

[19] The CJA 31 was revised to capture these 24 categories in 1995, and includes a category designated as "other," for types of services not identified. Prior to that, only twelve categories (including "other") were available on the form.

[20] *Furman v. Georgia*, 408 U.S. 238 (1972), held death sentencing cruel and unusual under the Eighth Amendment based on its randomness, effectively bringing capital punishment to a halt while states re-evaluated their sentencing procedures.

[21] *Gregg v. Georgia*, 428 U.S. 153 (1976), upheld the constitutionality of capital sentencing statutes drafted to comply with *Furman* by providing for guided decision-making.

[22] In states that have not reinstituted the death penalty, these figures respectively reflect the time between *Furman* and *Gregg* and the present.

cases ranged from a high of $681,556 to a low of $1,613. The median cost was $44,809. Because the median reflects the middle case of a sample, it is generally a better measure of a "typical" case than an average, or mean cost figure.[23] Nevertheless, Table Two (p. 24) also provides the mean cost, which at $76,665 indicates that costs varied more extensively in cases above the median than in cases below the median (or, put another way, the highest cost cases were further from the median than were the lowest cost cases).

Authorized cases are substantially more expensive than non-authorized cases. The median amount of $353,185 for authorized cases in Table Two (p. 24) indicates that cases in which a capital prosecution was authorized cost seven times more than those death-eligible cases that were not authorized. Authorized cases ranged in cost from a high of $1,788,246 to a low of $26,526. As this wide range from high to low is present in the non-authorized cases as well, it probably reflects an inherently broad range of litigation complexity that exists in all death-eligible cases, authorized and non-authorized. As Table Two (p. 24) shows, the median cost for authorized cases that were tried ($465,602) is 2.3 times greater than for those that were pled ($200,933). It is not surprising that trials would generally be more costly than pleas. Nor is it surprising that, in the context of capital litigation, a case that is resolved with a guilty plea is, nevertheless, resource intensive, as Figure Nine (p. 24) illustrates. As the Spencer Report explained, in order to reach disposition in a capital case, defense counsel must thoroughly investigate and prepare for trial. Figure Nine contains two plea cases that are "outliers" by virtue of their high cost. If these are removed from the analysis, the range of plea costs narrows considerably.

---

[23] The median reflects the middle unit in a sample of cases. In a sample of 101 cases, for example, the 51st case would be the median. The mean, or average, adds costs from all of the sampled cases and divides by the number of cases.

**Table 2:**
**Total Cost for Defense Representation in Federal Capital Cases, 1998-2004**

| Type of Case | Median | Mean | High | Low |
|---|---|---|---|---|
| **Not Authorized** | $44,809 | $76,665 | $681,556 | $1,613 |
| **Authorized** | $353,185 | $491,905 | $1,788,246 | $26,526 |
| *Trials* | $465,602 | $620,932 | $1,788,246 | $67,366 |
| *Pleas* | $200,933 | $245,946 | $1,174,942 | $26,526 |

**Figure 9:**
**Cost Variance in Authorized Capital Cases, Trials vs. Pleas (1998-2004)**



**Comparison of Total Cost of Federal Death Penalty Cases by Type of Proceeding**

## B.    Comparison to the Spencer Report

Case costs have changed substantially since the period covered by the Spencer Report. As Table Three (p. 25) shows, costs have risen for each category of death-eligible cases, whether authorized or not, trials or pleas. Unfortunately, it is not possible to offer a

24

direct comparison between current data and those compiled in the Spencer Report. Although the Spencer Report published mean data on case cost, it excluded from its analysis some exceptional cases. The Spencer sample did not include certain cases that had atypically high costs (e.g., the Oklahoma City bombing cases), and included cases that would have been excluded from the present study because they had no penalty phase trial (for example, the jury's guilt phase verdict precluded the death penalty, or a guilty plea to a non-death sentence was entered before verdict).

It can be stated, however, that costs have risen across all categories of cases and that they have risen more considerably among authorized cases than in non-authorized cases, and in trials more than in pleas. Indeed, the most significant change in case cost between the time of the Spencer Report and the current update is that the cost of trials has risen considerably. Not only did more federal capital cases proceed to trial between 1998 and 2004 than at the time of the Spencer Report (Figure Three, p. 8), but also the cost of those trials was higher (Table Three). A later section of this report offers preliminary explanations for these developments, which will be explored in greater depth in Phase Two.

**Table 3:**
**Total Case Cost – Spencer Report Compared to Update**

| Type of Case | 1998-2004 Mean Median | Spencer Report Adjusted Mean Only |
|---|---|---|
| Not Authorized | $76,665 $44,809 | $55,773 |
| Authorized | $491,905 $353,185 | $218,113 |
| Trials | $620,932 $465,602 | $269,139 |
| Pleas | $245,946 $200,933 | $192,333 |

Some of the increase in total case costs is probably attributable to a rising Consumer Price Index (CPI) between the time of the Spencer Report and the present update. Over the

25

period of this update, the CPI rose at an annual rate of 2.45 percent. Inflation does not explain the entire rise in case costs since the time of the Spencer Report, nor does it distinguish between rates for authorized and non-authorized cases or pleas and trials, but the CPI does suggest that some portion of rising costs is due to forces outside of litigation. Although the maximum hourly rate for defense counsel remained fixed between both periods, expert expenses, attorney travel, and the cost of associates and paralegals were subject to inflation.

### C.        Attorney Costs

Defense counsel's time, both in- and out-of-court, and the use of experts on behalf of the defense influence case cost. Tables Four through Eight present these findings from the current study, and (in all but Table Four) compare these data with those presented in the Spencer Report. (It is not possible to compare total attorney cost from the most recent cases to those at the time of the Spencer Report because the earlier study did not produce these data as a portion of total costs.) Table Four provides data on attorney cost in the 1998-2004 sample. Similar to total case cost, the median expense for an attorney's time was significantly greater – 6.5 times more – in authorized cases than in death-eligible, non-authorized prosecutions. Attorney cost in authorized cases was 2.8 times greater in trials than for pleas.

**Table 4:**
**Attorney Cost – 1998-2004**

| Type of Case | Median | Mean |
|---|---|---|
| Not Authorized | $42,148 | $62,336 |
| Authorized | $273,901 | $363,776 |
| *Trials* | $352,530 | $462,037 |
| *Pleas* | $122,772 | $176,464 |

26

These same trends are reflected in Table Five, which presents the total attorney hours. In death-eligible cases between 1998 and 2004, defense attorneys spent 4.6 times more hours on authorized than non-authorized cases (comparing medians), and 2.6 times more time on trials than on pleas for authorized cases. The fact that the ratio between authorized and non-authorized cases is greater in Table Four (p. 26) than in Table Five probably reflects the fact that, in most instances, attorneys are paid a lower hourly rate in death-eligible cases that are not authorized as capital prosecutions than in those cases that are authorized. In addition, attorney cost includes certain travel and other expenses that do not correlate with hours, and these are presumably higher in authorized cases than non-authorized matters because of the more extensive nature of capital as opposed to non-capital defense.

**Table 5:**
**Attorney Hours – Spencer Report Compared to Update**

| Case Type | 1998-2004 Mean Median | Spencer Report Adjusted Mean Only |
|---|---|---|
| Not Authorized | 637 436 | 429 |
| Authorized | 2,815 2,014 | 1,464 |
| *Trials* | 3,557 2,746 | 1,889 |
| *Pleas* | 1,403 1,028 | 1,262 |

As previously mentioned, it is difficult to make a direct comparison to the Spencer data, since the information there reflects adjusted mean costs. Still, it is instructive to note that attorney hours have risen over time for each type of case, but much more significantly in authorized cases that go to trial. Whatever forces drive case cost – which this report addresses in a later section – they appear to influence attorney hours more extensively in authorized capital trials than in other representations.

Tables Six and Seven compare attorneys' time in- and out-of-court when representing death-eligible defendants. Attorneys spent more time in- and out-of-court in authorized cases than in non-authorized matters and more in trials than pleas. Moreover, attorney time has risen in all forms of representation from the time of the Spencer Report (even accounting for the hybrid quality of the Spencer data). The data clearly show that the ratio of attorney time spent in-court to out-of-court is greater for trials than pleas. In capital trials, defense counsel spent a median 353 hours in-court and 2,373 hours out-of-court. In pleas, they spent a median 42 hours in-court and 992 hours out-of-court.

**Table 6:**
**Attorney In-Court Hours – Spencer Report Compared to Update**

| Case Type | 1998-2004 Mean Median | Spencer Report Adjusted Mean Only |
|-----------|------------------------|-----------------------------------|
| Not Authorized | 106 34 | 38 |
| Authorized | 401 306 | 231 |
| *Trials* | 537 353 | 409 |
| *Pleas* | 142 42 | 61 |

**Table 7:**
**Attorney Out-of-Court Hours Spencer Report Compared to Update**

| Case Type | 1998-2004 Mean Median | Spencer Report Adjusted Mean Only |
|-----------|------------------------|-----------------------------------|
| Not Authorized | 531 350 | 391 |
| Authorized | 2,414 1,645 | 1,233 |
| *Trials* | 3,019 2,373 | 1,480 |
| *Pleas* | 1,261 992 | 1,201 |

28

### D.    Expert Costs

The use of experts has a substantial influence on case cost. As Table Eight (p. 30) indicates, experts were utilized in both authorized and non-authorized cases. There is a significant difference, however, in the prevalence, and hence cost, of expert assistance between authorized and non-authorized cases. Whereas the median for expert costs was $5,275 in non-authorized cases, it was $83,029 in authorized cases. Further, experts were utilized more extensively in capital trials, where the median cost for experts was $101,592, than in pleas, where the median was $42,049.

Although the comparison between the Spencer Report and the present update is imperfect, Table Eight (p. 30) suggests expert costs have risen substantially in capital trials. As discussed in Section V, this trend likely reflects, among other developments, the requirements for effective defense representation set forth by the U.S. Supreme Court in recent years in cases such as *Wiggins v. Smith*, 539 U.S. 510 (2003).[24] In addition, there has been a geographic shift in where federal capital prosecutions are authorized, and an increase in the complexity of prosecutions, which also may influence the use and cost of experts.

---

[24] *Wiggins* discussed defense counsel's responsibility to conduct a full social history investigation of a capital defendant and endorsed the American Bar Association's standards as guidance as to what constitutes reasonable performance of counsel in a death penalty case.

**Table 8:**
**Expert Costs – Spencer Report Compared to Update**

| Case Type | 1998-2004 Mean Median | Spencer Report Adjusted Mean Only |
|---|---|---|
| Not Authorized | $14,330 $5,275 | $10,094 |
| Authorized | $128,129 $83,09 | $51,889 |
| *Trials* | $158,895 $101,592 | $53,143 |
| *Pleas* | $69,482 $42,049 | $51,028 |

## E.        Transcript Costs

Finally, another contributor to the cost of defense representation is the expense of acquiring the transcript of district court proceedings.[25] These figures are not included in the data in Table Two (p. 24) that report total case cost; however their expense, especially in capital trials, is noteworthy, with a median cost per capital trial defendant of $10,269. Table Nine (p. 31) presents data on transcript costs per representation, which show a sizeable difference between costs expended for transcripts in capital trials when compared to other proceedings. It should be noted that transcript costs are incurred separately by each defendant in a case (as well as by the court and by the prosecution). That the mean expenses for non-authorized cases ($4,144) and capital pleas ($1,337) are substantially higher than the median costs in these cases ($210 and $82, respectively) indicates that there are some unusual cases in these categories that have substantially higher transcript costs than the other

---

[25] Although transcripts of all pretrial and trial proceedings must be produced for an appeal, they are also typically ordered for counsel's use during the pendency of a case in the trial court, as verbatim records are relied upon for pleadings, examinations, and arguments. Because some transcript costs reflected in the CJA payment system for the cases included in this analysis may have been incurred in connection with an appeal, while others were generated during the course of the trial representation, they were not included in the "total case costs." Regardless of when in the process they are incurred, the costs of transcript production are an expense associated with capital trials.

30

more "typical" cases. By contrast, whereas some transcripts in capital trials cost more than the median case, the relative similarity between mean and median costs ($16,487 versus $10,269) shows that most capital trials carry a considerable transcript expense.

**Table 9:**
**Transcript Cost Per Defendant, 1998-2004**

| Case Type | Median | Mean |
|-----------|--------|------|
| Not Authorized | $210 | $4,144 |
| Authorized | $5,223 | $11,274 |
| *Trials* | $10,269 | $16,487 |
| *Pleas* | $82 | $1,337 |

## V.    Explanations for and Predictors of Case Costs

### A.    Hypotheses

Numerous factors likely account for the increase in overall case costs in the ten years following the Spencer Report. The significance of some, like the changing geography of authorized capital prosecutions, can be established by analyzing the data presently on hand, and others remain hypotheses that will be explored in Phase Two. Although a fuller discussion will be made in the final report, several factors are presently clear.

- Inflation. Some of the increase in case costs is likely related to inflation. The rate of inflation from 1998 to 2004 averaged approximately 2.45 percent annually, which over six years could compound to approximately 15 percent. Although the CJA hourly rate of $125 remained constant between the time of the Spencer Report and this update, all costs other than legal fees, including those of experts, paralegals, associate counsel, travel, copying, technology, etc., were subject to inflation.

- Differences in cases studied. The sample of cases in the Spencer Report was constructed differently from the present sample. For example, the Spencer Report excluded certain high cost cases, like the two representations arising out of the Oklahoma City bombing, and included certain cases that did not proceed through a penalty phase trial, either because the government withdrew its request for the death penalty or because the defendants were acquitted of the capital charge. (See Spencer

31

Report at 8, n. 13.) For those reasons, costs reported in the Spencer study may have appeared lower than they would have using the current methodology.

- <u>Expanded areas of litigation</u>. Defense practice has continued to evolve and become more sophisticated since the first decade of the federal death penalty. For example, both the prosecution and the defense now make greater use of scientific evidence and experts and mount more extensive challenges to such evidence. The issue of the defendant's future dangerousness within the Federal Bureau of Prisons is one such area. Such changes in practice will be investigated through qualitative methods in Phase Two.

- <u>Pretrial litigation of mental health issues.</u> As a result of changes in case law and new Federal Rule of Criminal Procedure 12.2, governing mental health evaluations of the defendant, both the prosecution and defense now engage in more extensive pre-trial litigation over mental health issues. In addition to more time being spent on these issues, the hourly rate paid to mental health experts appears to have risen significantly since the time of the Spencer Report.

- <u>Higher expectations for performance of defense counsel in death penalty cases</u>. In recent years, standards of practice for providing constitutionally adequate defense representation have been clarified, particularly with respect to the duties of counsel vis-a-vis investigating and presenting evidence in mitigation of sentence. See *Wiggins v. Smith*, 539 U.S. 510 (2003) and the standards it endorsed, the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989) (Rev. ed. 2003).

- <u>Geographic shift</u>. As discussed earlier in this report, the Department of Justice has changed its charging practices and authorized more capital prosecutions in areas that historically have not embraced or have been resistant to the death penalty. Disparities between local practice and federal policy may well raise the cost of litigation. A lack of capital experience might require a greater investment of time to learn a new area, for example. In addition, a higher proportion of cases being tried in jurisdictions known for more extensive advocacy by both prosecution and defense, as discussed below, would increase cost.

- <u>Changing nature of capital prosecutions</u>. Preliminary data suggest that a greater proportion of the 1998 – 2004 cases involve highly complex issues at the guilt and penalty phases than at the time of the Spencer Report, requiring more extensive defense work. This hypothesis is supported by the increased number of in-court attorney hours, indicating that substantially more court time is being required for cases to reach resolution. This hypothesis, which will be delved into further in Phase Two of the project, suggests that a greater proportion of the overall number of prosecutions contains features that increase litigation costs. For example, many cases in the current sample include all or some of the following features:

  - Multiple codefendants

- Multiple homicides (in the indictment and/or as aggravating factors alleged in support of the death penalty)
- Complex offenses (such as CCE, RICO, and terrorism allegations that involve numerous instances of conduct over an extended period of time and in multiple locations, including outside the United States)
- Foreign national and/or non-English speaking defendants, family members, or victims
- Voluminous discovery

### B.   Use of Experts

Phase One connects several of the factors above to the cost of defending federal capital cases. As Table Eight (p. 30) illustrates, expert costs were higher during the period studied than during the period covered by the Spencer Report, but were the same percentage of overall case costs. As Figures Nine and Ten (p. 34) demonstrate, almost 60 percent of expert expenses were attributable to two types of experts, investigators and mitigation specialists. (Payments reflected in the "investigator" category on the CJA 31 voucher may reflect mitigation as well as guilt phase investigation.) Expenses for mitigation specialists could not be broken out for the Spencer Report analysis – the CJA payment system did not identify such costs at the time – but as the courts have come to authorize additional work for this important part of capital representations, mitigation specialists have become a significant portion (25 percent) of expert expenses. So too, investigative expenses represented almost one-third of total expert costs, likely reflecting the additional work necessary to investigate an increasingly complex set of capital authorizations, many involving multiple jurisdictions, or defendants or witnesses who reside in other countries.

Interestingly, while the total cost of expert expenses is different in capital trials than pleas, the proportions are similar. Regardless of whether it was resolved by trial or plea, a capital case required the same type of preparation, including the use of experts. Table Eight (p. 30) indicates that total expert expenses were almost 2.5 times greater in trials than pleas,

but Figures Nine and Ten demonstrate that in both types of authorized cases, investigation and mitigation experts accounted for about 30 percent of expert costs.

**Figure 10:**
**Division of Expert Costs for Trial Cases**



**Figure 11:**
**Division of Expert Costs for Plea Cases**



34

## C.    Case Characteristics

Quantitative research links higher costs with the presence of several factors that reflect a representation's complexity.  By testing these variables in bivariate, or one-to-one, relationships, the following factors predicted increased case cost, whether in capital trials or pleas:

- Number of offenses
- Number of defendants
- Number of victims
- Offense complexity
- Number of defense counsel
- Number of prosecutors

Most of these influences make intuitive sense and are shown in Table Ten (p. 36).  As the number of offenses, defendants, and victims rise in a case, so do the number of facts and circumstances that counsel must investigate.  In turn, they must devote additional attorney and expert time to a case.  Similarly, while every death penalty case is complex to defend, certain offenses – in particular CCE, RICO, and terrorism – present exceptionally multifaceted and wide-ranging fact patterns that require additional investigators, attorney time, and expert consultation.

It may also seem apparent that the number of defense counsel is related to case cost: generally, the greater the number of defense attorneys involved, the higher the cost.  But as data from both the Spencer Report and this update show, the number of prosecutors is an even stronger predictor of case cost, at least in trials.  Not only can the number of prosecutors be an effective signal for the complexity of a case – presumably the Department of Justice assigns additional prosecutors to those cases that are most involved and will require the greatest effort – but defense teams also require additional attorney time and expert assistance to keep pace with the prosecution's resources.

35

Table Ten provides additional details on the relationships between these factors and case cost, displaying all variables tested that had a statistically significant (i.e., reliable) relationship to case cost, whether at trial or in a plea. It is apparent that case length is positively correlated with case cost, meaning that the longer a case lasts the more expensive it is.[26]

**Table 10:**
**Factors that Predict Increased Case Cost – Bivariate Relationships**

| Factor | Case Cost Influenced | Bivariate Correlation | Statistical Significance |
|---|---|---|---|
| Case Length | Trial | .487 | .000 |
| Case Length | Plea | .428 | .015 |
| Number of Defendants | Trial | .244 | .058 |
| Number of Defendants | Plea | .748 | .000 |
| Number of Victims | Trial | .466 | .000 |
| Number of Victims | Plea | .557 | .001 |
| Number of Offenses | Trial | .530 | .000 |
| Number of Offenses | Plea | .414 | .019 |
| Number of Prosecutors | Trial | .612 | .000 |
| Number of Defense Counsel | Trial | .480 | .000 |
| Offense Type | Trial | .356 | .000 |
| State Capital Culture | Trial | -.370 | .007 |

### D.    Capital Culture

Table Ten also indicates that a state's "capital culture" – its history and experience with the death penalty – was negatively associated with trial costs. Federal capital trials are more expensive when brought in districts where there is no state death penalty, or where the state has neither sentenced to death nor executed many capital defendants. The specific factors underlying this phenomenon will be explored in Phase Two.

---

[26] In Table 10, the "Bivariate Correlation" column reflects the strength of the relationship between the variables in the first two columns. A negative number reflects a relationship that reduces cost. The last column, "Statistical Significance," indicates the degree of statistical significance the relationship has. Thus, "case length" has a strong positive correlation with the cost of both trial and plea cases, and increases cost.

### E.    The Attorney General Making the Authorization Decision

Case length is an important factor in determining cost, and case lengths varied considerably depending on the Attorney General who authorized the capital prosecution. As Table Eleven (p. 38) illustrates, trial cases authorized by Attorney General Janet Reno were completed in a median 688 days, compared to 836 days in cases authorized by Attorney General John Ashcroft.[27]  Capital cases involving guilty pleas were also shorter when they were authorized by Attorney General Reno, taking a median 578 days, compared to 744 days under Attorney General Ashcroft.  Put another way, the time required to prepare and complete capital trials was 22 percent shorter, and capital pleas were 29 percent faster, when begun under Attorney General Reno than Attorney General Ashcroft.  Moreover, authorized cases in this sample were much more likely to be resolved by a guilty plea when begun by Attorney General Reno (27 trials, 31 pleas) than Attorney General Ashcroft (48 trials, 12 pleas).  Since capital cases resolved by guilty pleas are less expensive to litigate than capital trials (see p. 25), and cases of shorter duration are generally less expensive than those that last longer (see p. 27), capital litigation was generally less costly for cases authorized by Attorney General Reno than Attorney General Ashcroft.

Some of these differences between Attorneys General are explained by the amount of time it took each to decide to authorize a capital prosecution, because the authorization process was faster in the Reno Justice Department than it was under Attorney General Ashcroft.  As Table Eleven (p. 38) indicates, the Department of Justice took a median 178 days to authorize capital prosecutions under Attorney General Reno.  With Attorney General

---

[27]  These statistics relate only to those death-eligible cases that were ultimately authorized for capital prosecution.  The sample analyzed here does not include case length data for death-eligible cases that were not authorized.

Ashcroft, the comparable number of days was two-thirds greater, at 297. These distinctions in case processing will be examined in Phase Two.[28]

**Table 11:**
**Effect of Attorney General's Decision-Making on Capital Case Length**
**and on Plea vs. Trial**
(Includes cases litigated by federal defenders as well as panel attorneys)

| Attorney General Who Authorized | Number of Capital Trials | Median Case Length | Number of Capital Pleas | Median Case Length | Median Days To Authorize |
|---|---|---|---|---|---|
| Janet Reno | 27 cases | 688 days | 31 cases | 578 days | 178 days |
| John Ashcroft | 48 cases | 836 days | 12 cases | 744 days | 297 days |

**F.        Geography**

As discussed in Section D (p. 11), the Department of Justice has "nationalized" federal death penalty prosecutions, increasingly authorizing federal capital cases in states that have limited or no local death penalty experience. In the past decade, a greater proportion of prosecutions have been both authorized and tried in cities such as New York, San Francisco, Los Angeles, Washington, D.C., and Boston -- places known for especially vigorous and hence more costly advocacy on both sides of the bar.[29]

The Spencer Report found no regional cost variation, but noted its sample was too small for meaningful analysis. Preliminary review of the current sample, which includes a larger number of cases, suggests that there are significant regional variations in the cost of capital trials. At this time, it is not known precisely what underlies these regional

---

[28] In 2007, the Judicial Conference adopted a policy designed to facilitate prompt resolution of whether the government will seek the death penalty. The policy urges judges to set reasonable deadlines for various stages of the authorization process. Section 6.04, "Scheduling of Federal Death Penalty Case Authorization to Control Costs," Guidelines for the Administration of the Criminal Justice Act and Related Statutes, Volume VII, *Guide to Judiciary Policies and Procedures.*

[29] Such differences in "local legal culture" have been well documented in socio-legal research, describing a process by which common experiences of litigation become shared norms for the local legal market. *See, e.g.,* Thomas W. Church, Jr. *Examining Local Legal Culture*, 10 Law and Social Inquiry 449 (1985).

differences; whether, for example, judges decline to fund defense requests for services, defense counsel do not request or expend resources, or these cases are less complex. Phase Two will try to illuminate the reasons for any regional variation in the cost of capital defense.

### G.      Other Factors

Finally, it is important to note those factors that did not predict case cost. None of a defendant's recorded demographics – his race, gender, or ethnicity – affected the cost of federal capital defense representation. The same was true for victims' demographics (race, gender, ethnicity) and their connection to criminal activity.[30] Finally, the prosecution's allegation of future dangerousness did not predict case cost.

## VI.      Influence of Case Costs on Outcomes

This update has focused on the cost of defending capital prosecutions and the factors that predict or explain case costs. These issues are vitally important, both to understand which case characteristics affect the cost of defending federal capital matters and also to recognize how and why these relationships have changed since the release of the Spencer Report. During the process of analyzing data for this report, however, another issue revealed itself: the relationship between case cost and the likelihood of receiving a death verdict. During the period of this study, defendants who received the least amount of attorney and expert time, and whose defense representation thus cost the least, faced a higher probability of receiving a death sentence. Specifically, as Table Twelve (p. 40) shows, individuals whose defense received less than $320,000 in combined attorney and expert assistance – the

---

[30] Interestingly, the interplay between a defendant's and a victim's demographics influenced case costs, but the small number of cases analyzed was insufficient to achieve statistical significance. In panel appointments, median total case cost for white defendants tried for capital offenses against white female victims was $631,382. By contrast, median total case costs for non-white defendants tried for capital offenses against white female victims were $248,477. Larger sample size or qualitative research could help to elucidate the nature of this relationship.

lowest one-third of federal capital trials – had a 44 percent chance of being sentenced to death at trial. Individuals whose total representation costs were above that amount – the remaining two-thirds of defendants – had a 19 percent chance of being sentenced to death. Defendants in the low-cost group thus were more than twice as likely to be sentenced to death.

**Table 12:**
**Relationship Between Trial Case Cost and Death Sentence:**
**Lowest One-Third of Case Cost vs. Remaining 2/3**
(Chi-square = .036)

| Total Trial Cost | Sentenced to Death | Other Verdicts | Total Cases |
|---|---|---|---|
| Lowest Cost Cases (under $320,000) | 44 percent | 56 percent | 18 |
| Remaining 2/3 of Cases | 19 percent | 81 percent | 43 |
| Total Cases | 45 | 16 | 61 |

The findings are similar when examining the influence of attorney costs and expert expenses separately on trial verdicts, although because of the smaller numbers involved, the results in both instances approach but do not reach the level of statistical significance. Similarly, these relationships remain when controlling for the type of offense charged. Examining those cases that did not involve RICO, CCE, or terrorism charges,[31] a defendant had a 50 percent chance of being sentenced to death if the representation cost less than $320,000. By contrast, a defendant had a 35 percent chance of receiving a death sentence if

---

[31] Cost is not a direct correlate of outcome for indictments that allege CCE, RICO, or terrorism offenses, largely because the total case cost in each of these representations is greater than $320,000.

the representation costs were more than $320,000.  Phase Two will explore these findings in greater detail.[32]

## VII.    Conclusion

Phase One of this update has examined the cost of defending federal capital cases and identified several factors that affect cost.  Although federal capital cases are now more expensive to defend than at the time of the Spencer Report, the largest increase has been in those federal capital cases that proceed to trial.  Several factors influence and predict the overall cost of defending federal capital cases, including the national inflation rate.  Cases with complex fact patterns, and those that involve several defendants, victims, and prosecutors, are likely to be more expensive.  But perhaps most predictive is the decision of the Department of Justice to authorize capital prosecutions in particular states.

Phase Two will go beyond the available quantitative data to offer more detailed observations about the sources of case cost while also considering issues of availability and quality of counsel.  Among such issues are continuity of counsel; counsel's experience and training; the availability of resources, including assistance from the Federal Death Penalty Resource Counsel Project; the significance of federal defender involvement; case budgeting; and the lessons learned from post-conviction proceedings.  As with the Spencer Report, judges and defense counsel will be interviewed and assistance from the Department of Justice will be sought to further illuminate these issues.  The final report will update the

---

[32]  In considering the cost of defense representation in cases where the possible outcome is death, it is interesting to note the cost of defense representation in complex white collar prosecutions.  The criminal defense of Enron Chief Executive Officer Jeffrey Skilling reportedly cost $70 million, and that of former HealthSouth CEO Richard Scrushy about $21 million.  Kenneth Lay's defense in the Enron prosecution was reportedly $25 million, and that of Cendant Corporation executive E. Kirk Shelton was $24 million.  In 2007 litigation in the Southern District of New York, predictions of the cost of representation for individual former partners at KPMG ranged from $10 million to $44 million.  Beth Bar, *Defense Cost Estimates Offered in KPMG Case*, New York Law Journal, July 13, 2007. *http://www.law.com/jsp/article.jsp?id=1184231199215*

41

findings and conclusions of the Spencer Report and also will examine the Report's recommendations.

### APPENDIX A: SPENCER REPORT'S RECOMMENDATIONS

**1. Qualifications for Appointment.**

a. <u>Quality of Counsel.</u>  Courts should ensure that all attorneys appointed in federal death penalty cases are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding type of litigation. High quality legal representation is essential to assure fair and final verdicts, as well as cost-effective case management.

b. <u>Qualifications of Counsel.</u>  As required by statute, at the outset of every capital case, courts should appoint two counsel, at least one of whom is experienced in and knowledgeable about the defense of death penalty cases. Ordinarily, "learned counsel" should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation.

c. <u>Special Considerations in the Appointment of Counsel on Appeal.</u>  Ordinarily, the attorneys appointed to represent a death-sentenced federal appellant should include at least one attorney who did not represent the appellant at trial. In appointing appellate counsel, courts should, among other relevant factors, consider:

> i. the attorney's experience in federal criminal appeals and capital appeals;
>
> ii. the general qualifications identified in paragraph 1(a), above; and
>
> iii. the attorney's willingness, unless relieved, to serve as counsel in any post-conviction proceedings that may follow the appeal.

d. <u>Special Considerations in the Appointment of Counsel in Post-Conviction Proceedings.</u>  In appointing post-conviction counsel in a case where the defendant is sentenced to death, courts should consider the attorney's experience in federal post-conviction proceedings and in capital post-conviction proceedings, as well as the general qualifications set forth in paragraph 1(a).

e. <u>Hourly Rate of Compensation for Counsel.</u>  The rate of compensation for counsel in a capital case should be maintained at a level sufficient to assure the appointment of attorneys who are appropriately qualified to undertake such representation.

**2. Consultation with Federal Defender Organizations or the Administrative Office.**

a. <u>Notification of Statutory Obligation to Consult.</u>  The Administrative Office of the U.S. Courts (Administrative Office) and federal defender organizations should take appropriate action to ensure that their availability to provide statutorily mandated consultation regarding the appointment of counsel in every federal death penalty case is well known to the courts. (See 18 U.S.C. § 3005.)

b. <u>Consultation by Courts in Selecting Counsel.</u>  In each case involving an offense punishable by death, courts should, as required by 18 U.S.C. § 3005, consider the recommendation of the district's Federal Public Defender (FPD) (unless the defender organization has a conflict) about the lawyers to be appointed. In districts not served by a Federal Public Defender Organization, 18 U.S.C. § 3005 requires consultation with the Administrative Office. Although not required to do so by statute, courts served by a Community Defender Organization should seek the advice of that office.

c. <u>Consultation by Federal Defender Organizations and the Administrative Office in Recommending Counsel.</u>  In discharging their responsibility to recommend defense counsel, FDOs and the Administrative Office should consult with Federal Death Penalty Resource Counsel in order to identify attorneys who are well qualified, by virtue of their prior defense experience, training and commitment, to serve as lead and second counsel.

**3. Appointment of More Than Two Lawyers.**

<u>Number of Counsel.</u>  Courts should not appoint more than two lawyers to provide representation to a defendant in a federal death penalty case unless exceptional circumstances and good cause are shown. Appointed counsel may, however, with prior court authorization, use the services of attorneys who work in association with them, provided that the employment of such additional counsel (at a reduced hourly rate) diminishes the total cost of representation or is required to meet time limits.

**4. Appointment of the Federal Defender Organization (FDO).**

a. <u>FDO as Lead Counsel.</u>  Courts should consider appointing the district's FDO as lead counsel in a federal death penalty case only if the following conditions are present:

> i. the FDO has one or more lawyers with experience in the trial and/or appeal of capital cases who are qualified to serve as "learned counsel"; and

> ii. the FDO has sufficient resources so that workload can be adjusted without unduly disrupting the operation of the office, and the lawyer(s) assigned to the death penalty case can devote adequate time to its defense, recognizing that the case may require all of their available time; and

> iii. the FDO has or is likely to obtain sufficient funds to provide for the expert, investigative and other services reasonably believed to be necessary for the defense of the death penalty case.

44

b. <u>FDO as Second Counsel.</u> Courts should consider appointing the district's FDO as second counsel in a federal death penalty case only if the following conditions are present:

> i. the FDO has sufficient resources so that workload can be adjusted without unduly disrupting the operation of the office, and the lawyer(s) assigned to the death penalty case can devote adequate time to its defense, recognizing that the case may require all of their available time; and
>
> ii. the FDO has or is likely to obtain sufficient funds to provide for the expert, investigative and other services reasonably believed to be necessary for the defense of the death penalty case.

## 5. The Death Penalty Authorization Process.

a. <u>Streamlining the Authorization Process.</u> The Department of Justice should consider adopting a "fast track" review of cases involving death-eligible defendants where there is a high probability that the death penalty will not be sought.

b. <u>Court Monitoring of the Authorization Process.</u> Courts should exercise their supervisory powers to ensure that the death penalty authorization process proceeds expeditiously.

## 6. Federal Death Penalty Resource Counsel.

a. <u>Information from Resource Counsel.</u> In all federal death penalty cases, defense counsel should obtain the services of Federal Death Penalty Resource Counsel in order to obtain the benefit of model pleadings and other information that will save time, conserve resources and enhance representation. The judiciary should allocate resources sufficient to permit the full value of these services to be provided in every case.

b. <u>Technology and Information Sharing.</u> The Administrative Office should explore the use of computer-based technology to facilitate the efficient and cost-effective sharing of information between Resource Counsel and defense counsel in federal death penalty cases.

## 7. Experts.

a. <u>Salaried Positions for Penalty Phase Investigators.</u> The federal defender program should consider establishing salaried positions within FDOs for persons trained to gather and analyze information relevant to the penalty phase of a capital case. FDOs should explore the possibility that, in addition to providing services in death penalty cases to which their FDO is appointed, it might be feasible for these investigators to render assistance to panel attorneys and to other FDOs.

b. <u>Negotiating Reduced Rates.</u> Counsel should seek to contain costs by negotiating reduced hourly rates and/or total fees with experts and other service providers.

c. Directory of Experts. A directory of experts willing to provide the assistance most frequently needed in federal death penalty cases, and their hourly rates of billing, should be developed and made available to counsel.

## 8. Training.

Federal Death Penalty Training Programs. The Administrative Office should continue to offer and expand training programs designed specifically for defense counsel in federal death penalty cases.

## 9. Case Budgeting.

a. Consultation with Prosecution. Upon learning that a defendant is charged with an offense punishable by death, courts should promptly consult with the prosecution to determine the likelihood that the death penalty will be sought in the case and to find out when that decision will be made.

b. Prior to Death Penalty Authorization. Ordinarily, the court should require defense counsel to submit a litigation budget encompassing all services (counsel, expert, investigative and other) likely to be required through the time that the Department of Justice (DOJ) determines whether or not to authorize the death penalty.

c. After Death Penalty Authorization. As soon as practicable after the death penalty has been authorized by DOJ, defense counsel should be required to submit a further budget for services likely to be needed through the trial of the guilt and penalty phases of the case. In its discretion, the court may determine that defense counsel should prepare budgets for shorter intervals of time.

d. Advice from Administrative Office and Resource Counsel. In preparing and reviewing case budgets, defense counsel and the courts should seek advice from the Administrative Office and Federal Death Penalty Resource Counsel, as may be appropriate.

e. Confidentiality of Case Budgets. Case budgets should be submitted ex parte and should be filed and maintained under seal.

f. Modification of Approved Budget. An approved budget should guide counsel's use of time and resources by indicating the services for which compensation is authorized. Case budgets should be re-evaluated when justified by changed or unexpected circumstances, and should be modified by the court where good cause is shown.

g. Payment of Interim Vouchers. Courts should require counsel to submit vouchers on a monthly basis, and should promptly review, certify and process those vouchers for payment.

h. Budgets In Excess of $250,000. If the total amount proposed by defense counsel to be budgeted for a case exceeds $250,000, the court should, prior to approval, submit such budget for review and recommendation to the Administrative Office.

46

i. <u>Death Penalty Not Authorized.</u> As soon as practicable after DOJ declines to authorize the death penalty, the court should review the number of appointed counsel and the hourly rate of compensation needed for the duration of the proceeding pursuant to CJA Guideline 6.02.B(2).

j. <u>Judicial Conference Guidelines.</u> The Judicial Conference should promulgate guidelines on case budgeting for use by the courts and counsel.

k. <u>Judicial Training for Death Penalty Cases.</u> The Federal Judicial Center should work in cooperation with the Administrative Office to provide training for judges in the management of federal death penalty cases and, in particular, in the review of case budgets.

## 10. Case Management.

a. <u>Non-Lawyer Staff.</u> Where it will be cost-effective, courts should consider authorizing payment for services to assist counsel in organizing and analyzing documents and other case materials.

b. <u>Multi-defendant Cases.</u>

   i. <u>Early Decision Regarding Severance.</u> Courts should consider making an early decision on severance of non-capital from capital codefendants.

   ii. <u>Regularly Scheduled Status Hearings.</u> Status hearings should be held frequently, and a schedule for such hearings should be agreed upon in advance by all parties and the court.

   iii. "<u>Coordinating Counsel.</u>" In a multi-defendant case (in particular a multi-defendant case in which more than one individual is eligible for the death penalty), and with the consent of co-counsel, courts should consider designating counsel for one defendant as "coordinating counsel."

   iv. <u>Shared Resources.</u> Counsel for codefendants should be encouraged to share resources to the extent that doing so does not impinge on confidentiality protections or pose an unnecessary risk of creating a conflict of interest.

   v. <u>Voucher Review.</u> In large multi-defendant cases, after approving a case budget, the court should consider assigning a magistrate judge to review individual vouchers. The court should meet with defense counsel at regular intervals to review spending in light of the case budget and to identify and discuss future needs.

## 11. Availability of Cost Data

The Administrative Office should improve its ability to collect and analyze information about case budgets and the cost of capital cases.

47

## APPENDIX B:  DATA EXAMINED

1    Defendant name
2    Circuit
3    District
4    Type of Counsel
5    Case proceeds to conclusion as death authorized
6    Case resolved by trial or plea
7    If tried, defendant guilty of the capital count
8    Sentence
9    Number of defense counsel
10   Number of prosecutors
11   Number of defendants
12   Number of indicted offenses
13   Category of offense
14   Exceptional offenses
15   Date defense counsel appointed
16   Date of authorization by DOJ
17   Attorney General who authorized
18   Date case ends (sentencing or acquittal)
19   Number of days from opening to authorization
20   Number of days from opening to closing of case
21   Number of victims
22   Categories of experts used
23   Expenses for each category of expert used
24   In-court hours by defense counsel
25   Out-of-court hours by defense counsel
26   Total hours by defense counsel
27   Total cost for experts and defense counsel
28   Total cost for experts
29   Total cost for defense counsel
30   Cost of transcripts
31   First and last dates of counsel payments
32   Victim's connection to criminal activity
33   Government alleges future dangerousness against defendant
34   Race of Victim
35   Race of Defendant
36   Gender of Victim
37   Gender of Defendant
38   Whether state had the death penalty at the time of indictment
39   Number of years post-*Furman* that the state (re-)instituted the death penalty
40   Number of years post-*Gregg* that state executed its first prisoner
41   Number of prisoners executed by the state post-*Gregg* on a per capita basis
42   State's current death row population on a per capita basis
43   State's current murder rate

## APPENDIX C: SUPPLEMENTAL DATA

### Figure C.1

**Number of Federal Capital Defendants Going to Trial/Trials Commencing,
by Calendar Year**





**Figure C.2**

**Current Population of Federal Death Row by State and Circuit**



Current as of June 1, 2008.
Total = 53 individuals presently on death row.

50