IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

MEIER JASON BROWN                    :
                                     :
                                     :          CIVIL ACTION No. CV407-085
      vs.                            :          CRIMINAL No. CR403-001
                                     :
                                     :
UNITED STATES OF AMERICA             :
                                     :

**APPLICATION FOR CERTIFICATE OF APPEALABILITY**

Comes now, MEIER JASON BROWN, Movant in the above-styled action, by and through undersigned counsel and hereby requests that this Court grant a Certificate of Appealability (hereinafter "COA") so as to allow an appeal of this Court's denial of Movant's Motion to Vacate or Set Aside Pursuant to 28 U.S.C. §2255, to the United States Court of Appeals for the Eleventh Circuit. In support of this Application Mr. Brown shows as follows:

**I. PROCEDURAL HISTORY**

On November 7, 2003, after a three day trial, a jury sitting in the United States District Court for the Southern District of Georgia, Savannah Division, Mr. Brown was sentenced to death for the killing of part-time post-mistress, Sally Gaglia. His trial counsel moved to withdraw and appellate counsel was appointed. The Eleventh Circuit Court of Appeals affirmed the convictions and sentences on March 13, 2006, and denied a timely filed Motion for Rehearing Suggestion for

Rehearing *En Banc* on May 19, 2006.  A timely filed Petition for Writ of Certiorari was denied by the United States Supreme Court on January 22, 2007.

On May 18, 2007, Mr. Brown filed in this Court a Motion for Appointment of Counsel seeking the appointment of undersigned counsel and co-counsel, Mark Evan Olive.  This Court granted in part and denied in part the motion, appointing only one attorney.  On January 22, 2008, Mr. Brown timely filed his Motion to Vacate or Set Aside Pursuant to 28 U.S.C. §2255 (hereinafter "2255 Motion").  As part of that Motion, Mr. Brown filed exhibits, one of which was an affidavit from the jury foreperson.  On February 4, 2008, this Court referred the matter of juror contact to the United States Attorney to determine if contempt proceedings against undersigned counsel for violating Local Civil Rule 83.8 should be pursued.

On March 12, 2008, the Government filed it response to Mr. Brown's 2255 Motion and the same day this Court entered an order outlining the manner and timing for the filing of further motions in support of the 2255 Motion.  Pursuant to the Court's scheduling order, Mr. Brown filed a Comprehensive Brief in Support of his 2255 Motion, a Motion for Discovery, and Motion for Evidentiary Hearing and/or to Expand the Record.  The Government filed is Responses to the Motions on July 10, 2008, opposing discovery.  The Government also opposed *most* of Mr. Brown's Motion for Evidentiary Hearing and/or to Expand the Record, but *did concede* that an evidentiary hearing on whether juror, Dorothy Rentz, was properly voir dired should be conducted.

On July 21, 2008, this Court entered an order directing that undersigned counsel show cause why he should not be held in contempt of court for contacting jurors.[1]   On August 8, 2008, based upon the pending contempt proceedings, undersigned counsel filed a Motion to Withdraw that this Court denied on September 15, 2008.  A contempt hearing was scheduled to take place on October 1, 2008.

On September 29, 2008, this Court entered an order denying Mr. Brown's Motion for Discovery, Motion for Evidentiary Hearing and/or to Expand the Record, and dismissing his 2255 Motion.  On October 1, 2008, before the contempt hearing was conducted, this Court canceled the hearing, abandoned the contempt proceedings, and instead reprimanded and fined undersigned counsel. Thereafter, Mr. Brown timely filed his Motion to Alter and Amend which this Court, on November 4, 2008, granted in part and denied in part.  On January 2, 2008, Mr. Brown timely filed his Notice of Appeal with this Court and this COA is likewise timely.[2]

---

[1]After this Court entered its February 4, 2008, order referring the juror contact matter to the United States Attorney for a determination of whether contempt proceedings should ensue, undersigned counsel voluntarily met with the United States Attorney's office and gave a deposition.  In addtion, the Government had the FBI interview the jurors who sat on Mr. Brown's case.

[2]A notice of appeal in a civil action to which the United States is a party must be filed within sixty (60) days of the final judgement, in this case the Court's final disposition of Mr. Brown's Motion to Alter and Amend.  *See, e.g., Mantecon v. United States*, 160 Fed.Appx. 948, 952 (11th Cir. 2005) (motion to alter and amend tolls time for filing of notice of appeal, and notice of appeal is timely filed if submitted within 60 days of denial of motion to alter and amend).

## II.  AUTHORITY FOR ISSUANCE OF A COA

Unless a circuit justice or judge issues a COA, an appeal may not be taken from the final order in a proceeding under 28 U.S.C. § 2255.  *See* 28 U.S.C. Section 2253(c)(1).   Rule 22(b) of the Federal Rules of Appellate Procedure states that in 2255 cases "counsel shall apply to the district court for a ruling on a certificate of appealabilility."  The standard for granting a COA is set out in *Barefoot v. Estelle*, 463 U.S. 880 (1983).[3]  While the movant is required to make "'a substantial showing of the denial of [a] federal right,'" the *Barefoot* standard does not require the movant to show he should prevail on the merits to be entitled to a COA.  *Barefoot*, 463 U.S. at 893 n.4.  Movant is entitled to a COA where "reasonable jurists could debate whether (or, for that matter, agree that) the petition [or motion] should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)(citations omitted), or when a claim is not "*squarely* foreclosed by statute, rule or authoritative court decision." *Barefoot* at 893 n.4 (emphasis added).  A COA is also required on some procedural matters, *i.e.*, where constitutional claims have been dismissed on procedural grounds,  *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595 (2000); *Henry v. Moore*, 197 F.3d 1361 (11th Cir. 1999), and should be granted under the same, low threshold, *Barefoot* standard.

---

[3]The standard under the AEDPA is "materially identical" to that under pre-AEDPA law.  *Hardwick v. Singletary*, 126 F.3d 1312, 1313 (11th Cir. 1997).

Regardless of whether the issue is a merits or procedural one, "in a capital case, the nature of the penalty is a proper consideration in determining whether to issue a certificate of [appealability...]." *Barefoot v. Estelle*, 463 U.S. at 893.

### III.  MR. BROWN IS ENTITLED TO A COA

Mr. Brown is entitled to the issuance of COA with respect to all of the claims presented in his Motion to Vacate or Set Aside Pursuant to 28 U.S.C. § 2255.  This is evident from the petition, appendixes, motions, and briefs filed, and the orders thereon by the Court.  Movant relies upon these prior pleadings and orders in this request and will not repeat the arguments and rulings heretofore made *in toto*.[4]  However, with respect to certain claims, Mr. Brown here briefly supplements the arguments made in prior pleadings and demonstrates that the claims and motions readily satisfy the low COA threshold.[5]

### A.  COA ON PROCEDURAL DEFAULT

As to those claims the Court found to be procedurally defaulted and thus did not evaluate on the merits, the issue of whether trial and/or appellate counsel performed ineffectively is a critical determination in the "cause" and "prejudice" analysis.  This Court should grant a COA on all of the default issues because

---

[4]All of the issues discussed in the Motion and in all pleadings filed by Mr. Brown are incorporated herein by specific reference.

[5]It is appropriate for this Court to grant a COA on all of Movant's claims in that many of them are intertwined or significantly related.  For example, the issue of whether Mr. Brown was provided constitutionally effective assistance of counsel at trial and on appeal is inextricably intertwined with whether he was denied due process by the failure to adequately fund his defense. *See* Claim VIII, petition, DOC # 8.

reasonable jurists could disagree about whether the claims were, in fact, procedurally defaulted and/or whether Movant established cause and prejudice to excuse any default.

For example, reasonable jurists *do* disagree with this Court's conclusions regarding claims the Court found to be defaulted because they were not raised on direct appeal. Undersigned counsel was also appellate counsel and as the circuit courts routinely hold could not have been expected to raise his own ineffectiveness in this Court as "cause" excusing any appellate procedural default. *See e.g., United States v. Henry*, 472 F.3d 910, 915 (D.C. Cir. 2007); *United States v. Weaver*, 281 F.3d 228, 234 (D.C. Cir. 202); *Whiting v. Burt*, 395 F.3d 602, (6th Cir. 2005); *United States v. Gordon*, 172 F.3d 753, 755 n.6 (10th Cir. 1999); *Sweet v. Delo*, 125 F.3d 1144, 1151, n.8 (1987) (not counsel's duty to raise own ineffectiveness); *Baker v. United States*, 7 F.3d 629, 634 (7th Cir. 1993)( "we do not expect a lawyer to raise the issue of their own ineffectiveness."). For each of the government's assertions of appellate procedural default, undersigned counsel responded:

> if this Court determines that this claim should have been raised on direct appeal, then Petitioner alleges that his appellate counsel were prejudicially ineffective for failing to raise the claim, which excuses any default. *Murray v. Carrier*, 477 U.S. 478 (1986). Current appointed counsel was also appointed counsel on appeal and this may pose a conflict if counsel must raise and litigate his own ineffectiveness.

*See e.g.* DOC # 51, Comprehensive brief at 10; 14; 21; 33; 51; 53; 62; 82; 83; 89, n. 39; and 94. This Court failed to address the issue at all, yet found some claims

6

to be defaulted, *i.e.*, the failure to timely disclose postal inspector's report, Order at 13; denial of meaningful appeal for failing to include peremptory strikes in transcript. Order at 24, DOC # 74.  Because reasonable jurists disagree with this Court's approach, *see Moormann v. Schriro*, 426 F.3d 1044, 1058-59 (9th Cir. 2005);  *Soraich v. Montana*, 264 Fed.Appx. 654, 656 (9th Cir. 2008)("post-conviction counsel had a conflict of interest in raising, during post-conviction proceedings, the issue of his own ineffectiveness as direct appellate counsel [and] [t]his conflict was sufficient cause to excuse the petitioner's procedural default in failing to raise an ineffective assistance of appellate counsel claim during post-conviction proceedings.")(citing *Moormann v. Schriro*, *supra*)), a COA should issue.

### B.  COA ON  WHETHER THIS COURT SHOULD HAVE APPOINTED TWO ATTORNEYS

Mr. Brown filed a motion for the appointment of counsel seeking to have undersigned counsel (who had represented Mr. Brown on direct appeal) and Mark Evan Olive appointed to represent him as co-counsel with respect to the filing of a 2255 motion.  DOC # 1.  This Court granted in part and denied in part, the Motion for Appointment of Counsel holding, in essence, that it would appoint either undersigned counsel *or* Mr. Olive.  DOC # 7.   The Court, in addressing Mr. Brown's assertion that appointment of two attorneys has been routine nation-wide, wrote that it had "no independent confirmation" of that fact and found that "good cause" had not been shown for the appointment of two attorneys.

A canvas of federal death penalty cases makes clear that this Court's conclusion is subject to debate amongst reasonable jurists. Of the indigent defendants currently on death row, 31 are in various stages of 2255 litigation.[6] Of those, 29 (93%) have been appointed two or more[7] attorneys. *See United States v. Shannon Agofsky* (E.D. Tex.), 1:07-cv-00511; *United States v. Billie Allen* (E.D. Mo.), 4:07-cv-00027; *United States v. Kenneth Barrett* (E.D. Okla.), 6:04-cr-00115; *United States v. Anthony Battle* (N.D. Ga.), 1:95-cr-00528; *United States v. Brandon Bernard* (W.D. Tex.), 6:99-cr-00070; *United States v. Alfred Bourgeois* (S.D. Tex.), 2:02-cr-00216; *United States v. Sherman Fields* (W.D. Tex.), 6:01-cr-00164; *United States v. Chadrick Fulks* (D. S.C.), 4:02-cr-00992; *United States v. Orlando Hall* (N.D. Tex.), 4:94-cr-00121; *United States v. David Hammer* (M.D. Pa.), 4:96-cr-00239; *United States v. Dustin Higgs* (D. Md.), 8:98-cr-00520; *United States v. Norris Holder* (E.D. Mo.), 4:03-cv-00923; *United States v. Richard Jackson* (W.D. N.C.), 1:04-cv-00251; *United States v. Angela Johnson* (N.D. Iowa), 3:01-cr-03046; *United States v. Cory Johnson* (E.D. Va.),

---

[6]From information obtained from the office of the National 2255 Resource Counsel, it appears that there are: 20 who are at the district court level of their 2255proceedings (including those who have already filed their 2255 motion, and those who are not yet filed but whose one year statute of limitations time has begun); 4 people whose 2255 case is in the circuit court; 1 person whose Petition for Writ of Certiorari is pending in the Supreme Court; and 6 who have completed their 2255 proceedings but whose executions are stayed pending lethal injection litigation in the district court of the District of D.C.

[7]In at least 7 of the 29, more than two attorneys have been appointed. *See United States v. Billie Allen, United States v. Chadrick Fulks, United States v. David Hammer, United States v. Dustin Higgs, United States v. Angela Johnson, United States v. Gary Sampson,* and *United States v. Richard Stitt.*

3:92-cr-00068; *United States v. Darryl Johnson* (N.D. Ill.), 1:02-cv-06998; *United States v. William LeCroy* (N.D. Ga.), 2:02-cr-00038; *United States v. Daniel Lee* (E.D. Ark.), 4:97-cr-00243; *United States v. Keith Nelson* (W.D. Mo.), 4:04-cv-08005; *United States v. Arboleda Ortiz* (W.D. Mo.), 4:04-cv-08001; *United States v. Jeffery Paul* (W.D. Ark.), 6:96-cr-60022; *United States v. Wesley Purkey* (W.D. Mo.), 4:06-cv-08001; *United States v. Julius Robinson* (N.D. Tex.), 4:00-cr-00260; *United States v. Gary Sampson* (D. Mass.), 1:01-cr-10384; *United States v. German Sinisterra* (W. D. Mo.), 4:04-cv-08003; *United States v. Richard Stitt* (E.D. Va.), 2:98-cr-00047; *United States v. Richard Tipton* (E.D. Va.), 3:92-cr-00068; *United States v. Christopher Vialva* (W.D. Tex.), 6:99-cr-00070; and *United States v. Bruce Webster* (N.D. Tex.), 4:94-cr-00121.

Thus, nationally, district courts, when faced with appointing attorneys to represent indigent defendants in 2255 proceedings have, in the overwhelming majority (indeed only one court other than this Court has not) of the cases, appointed two or more attorneys.  Reasonable jurists disagree with this Court's ruling, and a COA should issue.

### C.  COA ON WHETHER POST-CONVICTION COUNSEL HAD A CONFLICT OF INTEREST AND SHOULD HAVE BEEN ALLOWED TO WITHDRAW

When Mr. Brown filed his original 2255 Motion, Appendix A to the document was an affidavit signed by the jury foreman.  This Court reacted to this affidavit by referring a matter to the United States Attorney for the Southern District of Georgia, to determine if undersigned counsel should be subject to a

9

contempt prosecution for violating Local Civil Rule 83.8, which prohibits parties from contacting jurors after the conclusion of trial. DOC # 20. After undersigned counsel voluntarily consented to a deposition, this Court determined that undersigned counsel, with at the very least a reckless disregard, violated the Local Civil Rule and scheduled a hearing where undersigned counsel was to show cause why he should not be held in criminal contempt. DOC # 62. The United States Attorney for the Southern District of Georgia was to prosecute the case and this Court, without a jury, was to determine counsel's fate.

After the show cause hearing was announced, undersigned counsel filed a Motion to Withdraw citing the conflict of interest under which he had been operating, *i.e.*, he had to defend himself and/or appease the government and the Court while, at the same time, challenging the government/Court on behalf of his client. DOC # 68. The government took no position on the matter and this Court denied the Motion to Withdraw, in part because there is no Constitutional right to counsel in post-conviction, and, in part, because the Court did not believe undersigned counsel's position posed a conflict of interest. DOC # 72. This Court's position on this conflict of counsel is debatable amongst reasonable jurists.

## D. COA ON WHETHER DISCOVERY SHOULD HAVE BEEN CONDUCTED AND WHETHER AN EVIDENTIARY HEARING SHOULD HAVE BEEN GRANTED

Mr. Brown, pursuant to this Court's Order, filed a Motion for Evidentiary Hearing and/or to Expand the Record.  DOC ## 53, 56, 57.  On at least one issue[8] the Government conceded that an evidentiary hearing should be conducted. Movant contends that he was entitled to an evidentiary hearing and that, at the very least, reasonable jurists could differ on his right to have one.

"Unless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  28 U.S.C. § 2255, ¶ 2.  The files and records in this case did not refute Movant's allegations and he was entitled to an evidentiary hearing. *See Massaro v. United States*, 538 U.S. 500, 504-506 (2003);   *Machibroda v. United States*, 368 U.S. 487, 494-495 (1962) (movant entitled to evidentiary hearing where § 2255 claim "related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light.");  *Aaron v. United States*, 291 F.3d 78, 715 n.6 (11th Cir. 2002)("The law is clear that, in order to be entitled to an evidentiary hearing, a Movant need only *allege* – not prove – reasonably specific, nonconclusory facts that, if true, would entitle him to relief.  If the allegations are not *affirmatively contradicted* by the record and the claims are not

---

[8]The Government agreed a hearing was required on the issue of whether juror, Dorothy Rentz was in fact *Witherspoon/Witt* voir dired.

patently frivolous, the district court is *required* to hold an evidentiary hearing.  *It is in such a hearing that the petitioner must offer proof.")* (emphasis in original and emphasis added).

This Court's summary dismissal of the Motion was, at least debatably, error. Movant's contentions were not speculative but were reasonably pled in a non-conclusory manner.  This Court purported to resolve  facts without providing Movant the opportunity to prove facts.   Reasonable jurist could disagree with the manner in which this Court resolved the evidentiary hearing question.

This Court should also issue a COA on whether Movant's request and supplemental requests for discovery should have been granted.  DOC ## 52, 66. Movant sought discovery to obtain, *inter alia*, government information about how capital cases are prosecuted, how it is decided that a case ought to be capital, race and gender statistics, funding for capital cases, and other evidence.  This information was pertinent to Claim VIII.  Movant also sought to learn the race and gender of all jurors in this case, and information about the method of execution.

In his supplemental motion for discovery, Movant showed that in its Response to Petitioner's Motion for Evidentiary Hearing and to Expand the Record, the government stated:

> First, Brown has submitted for inclusion in the record, a "draft affidavit of Bobbye Gerard (unsigned)."  The government has been informed that Gerard has no intention of signing that affidavit, so the Court should strike it and not consider it in its resolution of this case.

DOC # 56 p. 2.[9]  Movant noted that although the government learned that Ms.

Gerard was not going to sign the affidavit, the government did not assert that Ms.

Gerard had indicated that anything in the affidavit was untrue.  Movant stated that

undersigned counsel and his representatives had spoken with Ms. Gerard and

based on that conversation had drafted the affidavit that had been sent to her.  Ms.

Gerard indicated that she would sign the affidavit and return it to counsel.

However, after that conversation, counsel was not been able to contact Ms.

Gerard.  Given those facts and circumstances, Movant sought permission to take

the deposition of Ms. Gerard, which this Court denied.  DOC # 74.

This Court denied all discovery.  DOC # 74.  Reasonable jurists could

disagree with this Court's ruling,[10] and the Court should issue a COA.

---

[9]  The government made a similar assertion in its Comprehensive Response
to Movant's Motion Pursuant to 28 U.S.C. §2255.  *See*, DOC # 54, p. 51, n. 15
("Brown relies partly on the unsigned affidavit of Bobbye Gerard, who formerly
worked Bell's secretary. [CV Doc 51-Pgs 28-29, n. 19] The government
understands that Gerard refuses to sign that affidavit. Thus, the Court should strike
it and not consider its contents in this proceeding.").

[10] *See Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997)("good cause" for
discovery in habeas proceedings is established "where specific allegations before
the court show reason to believe that the petitioner may, if the facts are fully
developed, be able to demonstrate that he is entitled to relief."); *Holley v. Smith*,
792 F.2d 1046 (11th Cir.1986)(the rules governing discovery in ordinary civil
cases are applicable to petitions for the writ of habeas corpus to the extent
authorized by the court for good cause shown); *Willis v. Newsome*, 771 F.2d 1445
(11th Cir. 1985)(in federal habeas corpus actions, where specific allegations before
the court show reasons to believe that the petitioner may, if the facts are fully
developed, be able to demonstrate that he is confined illegally and is therefore
entitled to relief, it is the duty of the court to provide the necessary facilities and
procedures for an adequate inquiry); *Willis v. Zant*, 720 F.2d 1212 (11th Cir.
1983)(petitioner's claim that young adults were under represented in the jury pool
remanded to the district court for an evidentiary hearing, and, if necessary,
discovery); *Horton v. Zant*, 687 F. Supp. 594 (M.D. GA.1988)(discovery ordered

### E.  COA ON INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Brown, in this 2255 Motion, raised a number of claims of ineffective assistance of counsel.  Reasonable jurists could disagree on the manner in which this Court disposed of these claims.

### 1.   Counsel Unreasonably and Prejudicially Addressed the Issue of the Local Prosecutors' Agreement That this Ought Not to Be a Death Penalty Case (Claim I)

At trial, counsel contested the Government's evidence of guilt.  The jury, however, rejected the defense and found Mr. Brown guilty on all counts.  The first piece of evidence offered in the penalty phase of the trial was a stipulation that Mr. Brown had accepted responsibility for his actions by offering to plead guilty to the charges in exchange for a sentence of life without parole.  The stipulation did not contain any information about when Mr. Brown had offered to plead guilty or that the local prosecutors, both state and federal, had agreed to accept the plea offer. Mr. Brown contends  that trial counsel's failure to include these key facts in the stipulation was performance that fell below an objective standard of reasonableness and that because of these omissions there was a reasonable probability that jurors were left with several critical misconceptions: (1) that Mr. Brown only offered to plead guilty *after* the jury had returned its guilty verdict; (2) that Mr. Brown offered to plead guilty but the prosecutors had rejected his offer

---

"to permit petitioner's counsel to ascertain the facts" to support his *Swain v. Alabama* claim);  *Murphy v. Johnson*, 205 F.3d 809, 813-814 (5th Cir. 2000) ("where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [is] entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry").

(when in fact, the local prosecutors had agreed); and (3) that a death sentence was the only sentence that would provide justice for Ms. Gaglia's family.

This Court rejected Mr. Brown's assertions first by finding that trial counsel's argument, *instead of evidence*, informed the jury of the timing of Mr. Brown's offer to plead guilty.  The Court further speculated that it could have been a reasonable trial strategy to not "super illuminate the when factor during trial but instead slip it in at closing."  (DOC # 74 at 5-6).  Whether this could, in fact, be a reasonable trial strategy is indeed debatable among reasonable jurists.  As this Court noted, the jury was instructed that nothing said by the lawyers constituted evidence.  However, the Court went on to find that the jury would have ignored this instruction and instead given Mr. Darden's argument the same weight as testimony coming from the witness stand.

It is elementary that jurors must be are presumed to have followed the instructions of the trial court.  *See e.g., United States  v. Mock*, 523 F.3d 1299, 1303 (11th Cir. 2008); *United States v. Williams*, 526 F.3d 1312, 1321 (11th Cir. 2008); *United States v. Caton*, 2008 WL 4293913 *6 n.7 11th Cir. 2008).  Further, the Eleventh Circuit has noted "with a properly instructed jury, there is nothing to show the jury relied on the prosecutor's remarks."  *Shriner v. Wainwright,* 715 F.2d 1452, 1459 (11th Cir.1983); *see also United States  v. Adams*, 2008 WL 3863501 (11th Cir. 2008).  Thus, this  Court's ruling is debatable and a COA should issue.

Not only is it debatable among *other* reasonable jurists but apparently also within this Court.   The Court's own prejudice analysis on this claim provides evidence that trial counsel did not act reasonably when presenting this evidence. On the one hand, the Court found that trial counsel acted reasonably in presenting the acceptance of responsibility part of the case, but on the other hand the Court found that pursuing this avenue was unreasonable because such a trial strategy would, by definition, alienate the jury.  The Court noted (and noted pretrial) that vigorously contesting innocence during the liability phase of the trial and then, upon being found guilty, offering evidence of Mr. Brown's willingness to plead guilty could and would be seen by lay people as "flip-flopping."  The Court went on to note that such flip-flopping, while understandable to lawyers and judges, would not be understandable to lay people whose "emotions and biases cannot be pretended away" and such a "flip flop might naturally incense" the jury.  (DOC # 74, Order at 6).   Thus, this Court's own order - - one where it finds trial counsel's decision to pursue this line of penalty defense reasonable[11] - - also finds that jurors (those people deciding Mr. Brown's fate) would never buy such a defense but instead would react by believing that Mr. Brown was "just another lying criminal"

---

[11]The Court speculated that Mr. Brown "insisted, as was his right, on denying guilt all the way through the liability phase of his trial."  There is nothing in the record indicating Mr. Brown was privy to any discussions about how the defense would proceed at trial.  Further, nothing indicates that Mr. Brown "insisted" on any avenue of defense, that it was Mr. Brown who made "the Government prove its case against him," or that it was Mr. Brown who adopted the "flip-flop" penalty phase defense.  Order. DOC # 74, at 8.  These are additional reasons the Court should grant a COA on whether discovery and/or an evidentiary hearing should have been conducted.

and "wasted [the jury's time] by claiming innocence." *Id.* Inasmuch as this Court is of two minds on the matter, other reasonable jurists might agree with either mind set.

### 2. Counsel Unreasonably and Prejudicially Addressed the Issue of the Victim's Husband's (And Other Family Members') Agreement with a Sentence of Life in this Case (Claim II)

Members of the victim's family testified at the sentencing proceeding. They testified about the impact of the victim's life on them, and about the special qualities the victim had possessed. This testimony carried with it the necessary implication that the family of the victim wanted the jurors to impose a death sentence when, in fact, the victim's husband and other family members did not want a death sentence in the case and had agreed to a life sentence.[12] Mr. Brown claims that defense counsel was ineffective in failing to argue (and respond to and rebut the prosecutor's arguments) that the victim's survivor's wanted life. This government asserted the claim should be procedurally barred (as opposed to procedurally defaulted) because Mr. Brown had, on direct appeal, raised a claim under *Brady v. Maryland*, that asserted the government withheld materially favorable evidence - - that Mr. Gaglia supported a sentence of life without parole. This Court appears to have agreed with the government ("Even were the claim not procedurally barred. . . ."). Reasonable jurists could and do disagree that raising a claim under *Brady v. Maryland* on direct appeal precludes raising an ineffective

---

[12]Before the United States Attorney's Office agreed to accept Mr. Brown's offer to plead guilty in exchange for a life without parole sentence, the victim's family was consulted and Mr. Gaglia agreed.

assistance of counsel claim under *Strickland v. Washington* in post-conviction. The fact that the information was disclosed was not apparent on direct appeal[13] and even if it were, ineffective assistance of counsel is not to be raised until post conviction proceedings. *Massaro v. United States*, 538 U.S. 500, 509 (2003).

This Court went on to also find that even if the claim was not procedurally barred, trial counsel was not ineffective because "no such victim impact is admissible in the penalty phase of a capital trial," citing *United States v. Brown*, 441 F.3d 1330, at 1351-52 (11th Cir. 2006). To be sure, such evidence *would* be admissible in rebuttal. In any event, the Court's conclusion is subject to debate among reasonable jurists as evidenced by the decision of the District Court for the Western District of Oklahoma in *Young v. Mullin*, 2005 WL 1828542 (W.D.Okla.,2005) ("This Court has held that a victim impact witness' opinion as to the appropriateness of the death penalty is admissible, but is limited to the simple statement of the recommended sentence without amplification. Conversely,

---

[13]Indeed, in his Initial Brief on Direct Appeal, Mr. Brown plead the *Brady* claim "upon information and belief" and noted

> At the time of the filing of this Brief, undersigned counsel is pleading this claim "on information and belief" based on conversations they have had with trial counsel wherein it was revealed that, sometime after verdict, it was revealed that the victim's husband had communicated with the Department of Justice that he supported the resolution of this case by a guilty plea and sentence of life in prison without the possibility of parole. Undersigned counsel is currently attempting to verify the accuracy of this information and should it turn out the information they are relying upon is inaccurate, this claim may be withdrawn.

DOC #50, Exhibit A, pg 87, n. 19.

18

we must also hold that a victim impact witness' opinion the defendant should not get the death penalty would also be admissible. To that extent, the trial court's refusal to allow the testimony was error.")

In addition, Movant alleged that counsel were ineffective regarding other mitigation evidence that was available.  A number of the victim's family members who testified as government witnesses had knowledge about Mr. Brown's background and social history and about the manner in which the Brown family had reached out to the victim's family that would have been compelling and relevant. (*See*, DOC #8, pp 11-14, ¶¶ 5-9).  Courts routinely find trial counsel ineffective for failing to elicit mitigating evidence that was known (or should have been known) to the defense.   Clearly, the evidence these witnesses could have provided was mitigating.[14]  Further, the impact of such testimony *coming from the*

---

[14] As Mr. Brown argued in his original 2255 Motion, Kathyren Webb, the victim's sister, testified at sentencing regarding the impact of her sister's death and defense counsel did not cross-examine her.  Ms. Webb had been interviewed by Postal Inspector T.E. Barnell and that report had been disclosed tot he defense approximately 10 days prior to trial.  Ms. Webb told the inspector that she knew the Brown family and that they "have a lot of problems....She said she knows there have been some problems with drugs, fighting among themselves, and alcohol abuse.  Ms. Webb went on to note that a toddler drowned in the septic tank on the property several years ago."

She also had personal knowledge of the family, as she taught one of them, Richard, and she knew "that he had mental problems."   She also said the Brown kids "had no motivation for school, no home base. She said the Morgan (Brown) kids were basically left to their own devices."  Ms. Webb was also aware that that "Leo Morgan went to Joe Gaglia's (Sallie's husband's) house after the homicide with Reverend Smith and apologized for the incident.  She said Leo told Joe Gaglia that if they had knowledge that Meier Jason would do something like this (the homicide) they would have tried to prevent it from happening." *Id*. at ¶¶ 6-7.

David Clark, the victim's brother, also testified at sentencing for the

*victim's family* cannot be understated.  Reasonable jurists can and do disagree with this Court's finding.  A COA should issue.

### 3.  Counsel Unreasonably and Prejudicially Addressed Detective Woodall's Conclusion as a Seasoned Detective that, from the Evidence and Meier Brown's History, the Victim's Death Was Not Planned, and That Woodall Agreed with the Local Prosecutors That Life in Prison Was the Appropriate Punishment (Claim III)

In his 2255 Motion, Mr. Brown pled that trial counsel were ineffective for failing to elicit compelling evidence in mitigation from Liberty County Sheriff's Department Deceptive, Charles Woodall, the police officer who obtained Mr. Brown's confession.  Woodall was not called by the government but did testify for the defense at the penalty phase of Mr. Brown's trial.  As this Court noted, the extent of his testimony was that he had known Mr. Brown for about 8 years; Mr. Brown grew up in squalor; and he believed Mr. Brown was remorseful during his confession.  (DOC #  74 at pg 7).

As Mr. Brown demonstrated, however, this was not all that Detective Woodall had to say in mitigation for Mr. Brown.  Detective Woodall would have testified that he knows Meier well and that the crime was completely out of

---

Government.  He discussed the victim's attributes and personality and how dearly she was missed.  Again, Mr. Clark and his wife Mary had been interviewed by PI Barnell and a report of that interview had been disclosed shortly before trial. Mary reported that "all of the Brown kids were expelled a lot and given little supervision."  She said that "at one time there were 11 children from the Morgan group on her bus, 11 children on another bus, and still some running around the trailers in diapers."  She said "the children never appeared to be taken care of properly with torn clothes, torn shoes, and no coats in the winter time."  Further, she said that at the Brown residence they would "always have parties during the week and weekend.  She said you can hear the loud music."

character for Meier. He would have told the jury that he did not believe Meier took the knife to the post office with the intent to stab anyone. As a seasoned law enforcement officer who had known many dangerous criminals he had made professional judgments about them for prosecutors for years. He would have testified that based on his experience, he knew Mr. Brown not to be a violent offender, and that Mr. Brown had never done anything to make Woodall expect he could or would be a danger to anyone. He would have further testified that it was his opinion that something happened at the crime scene that got Meier flustered. (DOC 8, pp16-17).

Detective Woodall, instead of just reporting that he believed Mr. Brown was remorseful, could have painted a vivid picture of the events in and surrounding the confession that would have spoke volumes. Detective Woodall could have testified that he and Meier talked for several hours. He would have described how Mr. Brown was "in a world of hurt" and needed someone to talk to. Because Mr. Brown came to trust Detective Woodall, he told Woodall he had "screwed up," that he had not meant to kill Ms. Sallie, and that he was only trying to help Dianne. Detective Woodall would have testified that in tears Mr. Brown said he was sorry for what he had done and he accepted full responsibility for Ms. Sallie's death. *Id.* pp 17-18

In denying this claim, this Court (as well as the government) appears to concede deficient performance but finds counsel was not ineffective because Mr. Brown cannot demonstrate prejudice. (DOC 8 pp 7-8). In short, the Court found

that "other mitigation witnesses supplied many of the facts that Woodall's post-conviction affidavit now fills in." *Id*.  Noting that the testimony would have likely resonated with the jury more thoroughly coming from a law enforcement officer, the Court none-the-less concluded that "the outcome reached here would not have been different." *Id*. at 8.  Reasonable jurists could disagree with this Court's conclusion for at least two reasons.

First, the standard for evaluating prejudice employed by the Court was erroneous.  Mr. Brown need not prove that the outcome would have been different.  Rather, he need only show a reasonable probability of a different outcome.  As one court has noted, the "burden is to show only a reasonable probability of a different outcome, not that a different outcome would have been certain or even more likely than not."  *Martin v. Barrett*, 279 Ga. 593, 596 (Ga. 2005).  *See also*, *Strickler v. Greene,* 527 U.S. 263, 297 (1999), Souter, J., and Kennedy, J., concurring ("the continued use of the term probability raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, more likely than not.").

Second, the Court does an injustice to the resonance of the proffered testimony by failing to taken into account that not only was Detective Woodall a law enforcement officer, he was *the law enforcement officer* specially called in by the Government to obtain a confession from Mr. Brown.  His role in the investigation of this case is perhaps the most critical of any other officer and his

22

graphic (rather than "basic message"[15]) testimony about the deplorable childhood Mr. Brown suffered through – not to mention that the crime was out of character -- would have had considerable impact on the jury.  Reasonable jurists can and do disagree with this Court's resolution of this aspect of Mr. Brown's ineffective assistance of counsel claim.

### 4.  Defense Counsel Unreasonably and Prejudicially Failed to Conduct the Diligent Investigation into Meier Brown's Background and Social History the Fifth, Sixth, and Eighth Amendments Require (Claim IV)

Mr. Brown pled that trial counsel failed to conduct an adequate investigation into his background and social history.  In support of this claim, Mr. Brown presented, *inter alia*, the affidavits of trial attorneys Richard Darden and William Bell who stated that, although they had been provided funds, and in fact hired a mitigation investigator, that investigator did not conduct *any* investigation. This Court was unmoved by trial counsel's affidavits in which they swore that a mitigation investigator, appointed and paid by the Court, did not do anything, an equanimity other reasonable jurists would not share.

The trial attorneys, with only a short amount of time to prepare, were forced to conduct a limited  investigation into Mr. Brown's background.  Although trial counsel presented witnesses at the penalty phase of the trial, many of those witnesses testified *in generalities* about what had come to be called "the Morgan compound."  The witnesses who knew Mr. Brown, although seven in number, testified to little other than he was a good guy (good brother, good to his mother,

---

[15]This Court described the mitigation evidence presented by Woodall as providing the "basic message" of Mr. Brown's life.  DOC # 74 at 10.

good inmate, decent worker or good brother-in-law.). There was no testimony about how Mr. Brown himself witnessed the violence, drug trafficking, drug and alcohol abuse, and general debauchery that was a part of daily life during Mr. Brown's childhood. This *generalized* testimony, as this Court itself noted, only provided, again, the "basic message" of Mr. Brown's life. (DOC # 74 at 10). The Court also noted that the evidence Mr. Brown has presented in support of his 2255 Motion is more comprehensive and colorful[16] and provided a more detailed and specific account of Mr. Brown's childhood. *Id*.

Nevertheless, the Court concluded that Mr. Brown could not establish deficient performance or prejudice under *Strickland*. In its performance analysis, the Court stated that Mr. Brown had to establish "that *no* objectively reasonable, competent attorney would have traveled the road taken." *Id*. at 10 (emphasis added). Further, the Court found that the new evidence presented in post-conviction proceedings would not have constituted a "tipping point." *Id*. at 11. The Court went on to find prejudice lacking because "every time a mitigation witness was called defense counsel ran the risk that such a witness could - - on cross - - be asked (and some where) whether they had heard of Brown's past crimes, thought Brown new the difference between right and wrong, and were aware of his normal-range IQ." *Id*. Reasonable jurists could disagree with this Court's reasoning.

---

[16]Mr. Brown interprets this Court's description of the new evidence as more "colorful" to mean that it is more vivid and detailed thus providing a more accurate and compelling rendition of his life.

24

First, no attorney acting reasonably would operate without a mitigation investigator in a capital case.[17]  Second, the prejudice standard used - - that the new evidence must reach a "tipping point" before a new trial is afforded - - is a standard found nowhere in the law of *Strickland* prejudice.  Movant is not required to tip anything – if Counsel's failure "to present any of this evidence seriously

---

[17]Trial counsel in this case did not conduct the type of investigation into Movant's background and social history that is constitutionally required. *Williams v. Taylor*, 120 S.Ct. 1495 (2000) and *Wiggins v. Smith*, 123 S.Ct. 2527 (2003), establish that under *Strickland* counsel must conduct a *complete* investigation into a defendant's background and social history before choosing a sentencing strategy.  *See Williams, supra*, 545 U.S. at 396 ("Trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." [citing 1 ABA Standards for Criminal Defense 4-4.1, Commentary, p. 4-55 (2d ed. 1980]); *id.* at 415 (counsel's duty is to conduct the  "requisite, diligent" investigation into client's background)(O'Connor, J., concurring).  "The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover **all** *reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'"  *Wiggins, supra,* 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty 11.4.1(c)), p. 93 (1989)").  The norm under the ABA Guidelines for performing this task is for counsel to assemble a team that includes a mitigation specialist:

> The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including impact on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to allow them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive case in mitigation.

Commentary to Guideline 4.1, 31 ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (rev. 2003), 31 HOFSTRA L. REV. 913, 959. There was, effectively, no mitigation specialist on the defense team here, and no member of the defense team performed the constitutionally required investigation into Movant's history.

undermines [] confidence in the application of the death sentence," *Brownlee v. Haley,* 306 F.3d 1043, 1074 (11th Cir. 2002), relief is required. "While this evidence may not have swayed every juror, [Movant] need only show a reasonable probability that one juror would have found death an inappropriate punishment." *Purcell v. Horn*, 187 F.Supp.2d 260, 2002 WL 161885 (W.D.Pa. Feb. 1, 2002).

Third, the Court's concern that mitigation witnesses could be cross-examined about various areas is misplaced and cannot be used as a reasonable strategic decision for not introducing the additional mitigation evidence presented in post-conviction. As the Court noted, trial counsel had 14 penalty phase witnesses and ran the same cross-examination risks with those witnesses as they did with any others. Thus, they had already made the decision to subject mitigation witnesses to cross examination. Furthermore, in *Williams v. Taylor,* 529 U.S. 362 (2000), the Court recognized, as this Court did, that when the mitigation from one's disadvantaged background is presented as mitigation the State (it was a state case) can always find some aggravation to present, through cross-examination or otherwise. Certainly "not all of the available [post-conviction] evidence was favorable to Williams," *Williams, supra*, 529 U.S. at 396, or to Movant. Indeed, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court further explained that Williams "had a record of violent conduct that could have been introduced by the State to offset" his mitigation. Nevertheless, Williams and Wiggins were granted habeas corpus relief because their attorneys failed to investigate and thoroughly present background and social history mitigating

26

evidence. *Williams, supra,* 529 U.S. at 396 ("Trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."); *id.* at 415 (counsel's duty is to conduct the "requisite, diligent" investigation into client's background)(O'Connor, J., concurring); *Wiggins, supra*, 539 U.S. at 522 ("'[counsel has] an obligation to conduct a thorough investigation of the defendant's background'")(quoting *Williams*).

Fourth, presenting the "basis message" of a defendant's life is not sufficient at capital sentencing. Prejudice is shown in post-conviction proceedings where trial counsel presented multiple witness in the penalty phase and yet post-conviction counsel presents the comprehensive picture of mitigation. *See*, *e.g., Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999) (reversing death sentence and finding counsel ineffective, despite the fact that counsel called ten witnesses at the penalty phase); *Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006) (reversing death sentence and finding counsel ineffective for failing to put on additional evidence of childhood abuse, despite the fact that such evidence was presented at trial, because the trial presentation likely failed to give the jury a comprehensive understanding of the abuse given the discrepancy in depth and detail between the trial evidence and the habeas evidence); *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991).

**5.  Defense Counsel Unreasonably and Prejudicially Failed to Present Expert Mental Health Testimony and Records, in Violation of the Fifth, Sixth, and Eighth Amendments (Claim V)**

This Court accepts as a given that defense counsel did not speak with any mental health expert about possible mitigation in Movant's case.  This is *per se* ineffective assistance of counsel.

Every expert, including the Government's, says that  Mr. Brown was dependant on alcohol and drugs, which are "serious disorders," he was unable to get treatment for his disorders,  he is not anti-social, he is not a danger in the future, and his crime was out of character.  This Court discounts all of this by writing that mental health experts can also be cross-examined and might thereby say things that would lead jurors to think the defendant is a "Dr. Jekyle and Mr. Hyde" type.  DOC # 74 at 12.  Other jurists could disagree with this speculation.

Movant's experts report that Movant's uncharacteristic conduct was directly related to his serious disorders:

> These substances are known to have disinhibiting effects on cognitive functioning and could cause a person to act in uncharacteristically dangerous and impulsive ways. *In a rapidly escalating situation,* a person who suffered the effects of intoxication and/or drug withdrawal would not likely exercise the usual caution and judgment another reasonable person might.

DOC # 8, p. 62 (emphasis added).  This fits nicely into the mitigation theory of the crime that, coupled with Woodall's available but not presented testimony, is anything but Jekyll and Hyde like–what happened at the post office was out of character and was driven by a serious disorder which will not manifest in violent

28

behavior in prison. Certainly other jurors could reasonably disagree with this Court's analysis.[18]

### 6. Other Instances of Ineffective Assistance of Counsel (Claim IX)

Mr. Brown alleged a number of other areas in which trial counsel performed deficiently whereby Mr. Brown was prejudiced.

a. Failure to introduce evidence at guilt/innocence

Trial counsel failed to use various items provided to the defense in discovery that supported their theory that someone other than Mr. Brown committed the crime. Specifically, trial counsel were ineffective for failing to introduce evidence from or about:

> **Penny Banks** - who would have testified that she and her husband were driving past the Fleming Post Office at 10:45 a.m., (the approximate time of the offense) and they saw an unoccupied blue car parked in front.[19]  As the government's theory of the case was that Mr. Brown rode his uncle's bicycle to and from the crime scene (a fact contained in his statement) and that no one other than Mr. Brown and the victim were present inside the post office, the presence of this vehicle undermines the government's case and undermines the reliability and believability of Mr. Brown's statement (the cornerstone of the case for guilt);

> **Pastor Alfred Banks**  - would have testified that he had information on Dean Gregory Carter that related to the post office killing.  In particular, Pastor Banks related that he was at Mr. Carter's  house on Sunday, the day after the murder, where he observed Mr. Carter as being stiff in the shoulder and upper body.  He also would have related that Mr. Carter told him that

---

[18]Movant also contends that reasonable jurists could agree that trial counsel performed ineffectively by not justifying their request for an expert on non-dangerousness.   James Aiken would have been able to testify not only about how secure federal prison facilities are but also about his evaluation of  Mr. Meier's personal history and actions, and counsel should have so advised the Court.

[19]Ms. Zech testified that her vehicle was parked "catercornered on the left-hand side of the Post Office."  (T. 584)

his aunt had told him that people get checks on Friday, and that the Post Office is busy with money orders on Saturdays and thus has a lot of money. Mr. Carter's wife drives a white Chrysler with tinted windows and Mr. Carter has a history of drug abuse. These notes (especially when taken in conjunction with the information from Alford Woods and about Levi Lecounte detailed below) supported the defense theory that someone other than Mr. Brown committed the offense;

**Alford Woods** - would have testified that on November 30, 2002, he and his daughter were riding horses on Freedman Grove Road toward Highway 196 when they heard the sirens from the emergency vehicles responding to the homicide. Approximately 5 to 10 minutes after hearing the sirens, Mr. Woods saw a White Lincoln (similar to the car driven by Mr. Carter) occupied by four black men flee from the direction of the homicide at a high rate of speed;

**Levi Lecounte** - law enforcement discovered that Levi Lecounte, an individual who lived in the area and had previous convictions for possession of a firearm by a convicted felon, armed robbery, possession of marijuana (1986), and armed robbery, aggravated assault and theft of a motor vehicle (1977) also drove a white Lincoln (like that described by Mr. Woods) and was at the Post Office on Saturday, the date of the crime; and

**May 27, 2003 Laboratory Report** - this document reveals that law enforcement found "hairs exhibiting Caucasian racial characteristics [] recovered from the clothing, body and adjacent surroundings of the decedent." Admittedly, the victim was Caucasian and the hairs could have come from her, but apparently no such comparison was made of the Caucasian hairs. Additionally, "a single hair fragment exhibiting Negroid racial characteristics was recovered from the decedent transport sheet." Again, although law enforcement had Mr. Brown in custody and could have obtained a known hair from him to compare with that "Negroid" hair found on the body, no comparison was made. The government's failure to do a comparison demonstrated that the Government was not interested in finding the true perpetrator, but instead was trying to protect the case it had against Petitioner. Obviously, had they tested it and had it not matched Mr. Brown, that fact could have and would have given rise to a reasonable doubt. Further, the Government had the ability to test the Caucasian hairs with EMT and others individuals who administered to Ms. Gaglia and/or her family to determine if they matched. A hair that did not come from law enforcement, the first responders, EMT's or others who attempted to assist her would have indicated the perpetrator could have been someone other than Mr. Brown - - *i.e.* a white person.

These omissions undermined the government's theory of the case and given the doubt already created at trial would have created a reasonable probability of a different verdict if not at the guilt phase, certainly at the penalty phase (residual doubt).  The Court singled out the Penny Banks related issue, finding that in light of Mr. "Brown's multiple confessions and overwhelming other evidence . . . this claim fails outright." (DOC # 74 at 16).  The Court then went on to hold "the same may be said for Brown's other assorted IAC claims . . . . [g]iven the overwhelming evidence of Brown's guilt. . .  It simply cannot be said that any of the claimed deficiencies acts and omissions would have altered the outcome of the proceedings were they not committed." *Id*.

Reasonable jurists could disagree with this Court's resolution of the remainder of Mr. Brown's ineffective assistance of counsel claims for at least two reasons.  First, the Court did not look at the omissions, deficiencies and/or errors cumulatively, but instead isolated that each, by themselves, did not prejudice Mr. Brown. Other jurists wold analyze this cumulatively.  See  *Hough v. Anderson*, 272 F.3d 878, 891 n.3 (7th Cir. 2001) ("We previously have pointed out that prejudice may be based on the cumulative effect of multiple errors. *See Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir.1989) ("Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient. *Id*.").  Second, reasonable jurists do disagree with the prejudice standard used by this Court.  The Court, in finding that "it simply cannot be said that any of the claimed deficient acts . . . *would have*

31

*altered* the outcome of the proceedings. . ." has employed an absolute outcome determinative standard, rather than a "reasonable probability of a different outcome." *See e.g., Martin v. Barrett*, 279 Ga. 593, 596 (Ga. 2005); *see also Strickler v. Greene,* 527 U.S. 263, 297 (1999), Souter, J., and Kennedy, J., concurring.

     b.  Trial Counsel was Ineffective in Litigating the Motion to Suppress

     Trial counsel were ineffective in litigating a Motion to Suppress Statements in two respects: (1) failing to ensure that Diane Brown was present to testify at the suppression hearing; and (2) failing to renew the Motion to Suppress after Diane Brown testified at trial.  (DOC # 8, pp 83-85; 112-113).  As to the first part of Mr. Brown's assertion on this matter, the Court found that: "Counsel subpoenaed her but she failed to appear.  DOC # 302 at 3.  Brown does not say what more they could have done." (DOC 74 at 19, n.11).  This, Mr. Brown assumes, is the Court's finding that trial counsel did not perform deficiently because they did all they could do to ensure Diane Brown's presence at the suppression hearing. Reasonable jurists can disagree with this finding as Ms. Brown was properly subpoenaed and therefore trial counsel could have sought to have the Court enforce the subpoena by issuing a bench warrant for contempt of court (F.R.Crim.P. 17(g); 18 U.S.C. §§ 401 & 403), *Simon v. United States*, 644 F.2d 490, 494, n. 6 (5th Cir.  May 7, 1981).  She could have been either brought before the Court for her testimony or held in custody until she complied.

This Court's prejudice analysis on the failure to renew the suppression motion after Ms. Brown's trial testimony is misplaced.  Assuming, as the Court has stated, that this Court would not have changed its mind on the suppression issue, the question becomes would the Eleventh Circuit have ruled as it did on direct appeal.  As noted, Mr. Brown asked the Eleventh Circuit to consider the entire record - - including Ms. Brown's testimony at trial - - in determining whether Mr. Brown was in custody[20] and a member of the Court asked counsel whether this, the district, court had been asked to reconsider after Ms. Brown's testimony - - a question counsel had to answer in the negative.  A reading of the Eleventh Circuit's opinion indicates that it did not consider Ms. Brown's testimony in deciding the *Miranda* issue.  Thus, it is not whether there is a reasonable probability that this Court would have ruled differently, the standard is whether there is a reasonable probability of a different outcome on appeal.  *Shere v. Secretary, Florida Dept. of Corrections*, 537 F.3d 1304 (11th Cir. 2008).

## F.  The Prosecutors Committed Misconduct in Violation of the Fifth and Eighth Amendments (Claim VI)

Movant contends that other reasonable jurists could disagree with this Court and find that a prosecutor's argument –  that Mr. Brown was a "sorry excuse for a human being," while the victim "had more value that words can express;" that justice would be brought to the victim's survivors if the death penalty was imposed (knowing that the widower did not want the death penalty);  to ignore the

---

[20]As it is uncontested that Mr. Brown was not advised of his *Miranda* warnings prior to making incriminating statements, the issue of whether he was in custody was critical.

33

"marching orders" of Detective Woodall;   and to treat this crime as if it was as bad as the terrorist attack on the World Trade Center –  was misconduct which "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*,  477 U.S. 168 (1986);  *Romano v. Oklahoma*, 512 U.S. 1 (1994).

Movant also argues in this claim that a report prepared by the Postal Inspector nine months before trial contained exculpatory information that was not disclosed until thirteen days before trial,[21] the defense was unable effectively to use the information in the report on the heels of trial,[22] and defense counsel unreasonably failed to seek a continuance based upon the late disclosure of the report.  This Court wrote that "the information, while material, in fact was disclosed to the defense.  It was late, to be sure, but not shown to be prejudicially so."  DOC # 74 at 13.  Other reasonable judge's could conclude that counsel did not perform "competently enough," *id*., especially given Movant's contention that counsel introduced affirmatively wrong and harmful information, not about Movant, but about his brother, hurriedly gleaned from this report.

---

[21]The exculpatory nature of the Postal report is set forth in the §2255 motion.  DOC # 8 at note p. 12, note 4, p. 13, n. 16, pp. 40, 44-46, 56, and DOC # 15.

[22]*See* Appendices 1 & 4, Motion for Evidentiary Hearing And/Or to Expand the Record.

34

**G.  This Court and the Government Violated Movant's Fifth, Sixth, and Eighth Amendment Rights by Not Disclosing the Government's Mental Health Expert's Report (Claim VII)**

Labeling this claim "baseless," the Court finds it perfectly constitutional for the Government to know and conceal from a capital defendant expert mental health evidence that is materially exculpatory.  Other court's might reasonably disagree with this Court and find it violates the Constitution for the Government to have an evaluation of (and other written reports about) a capital defendant and not disclose it when the evaluation/written reports:  find that the defendant will not be a danger in the future;  reflects a consensus of federal prison staff and experts that the defendant is not presently a danger; find that the defendant is not "just a criminal,"DOC # 74, p. 15, as this Court suggests a juror might; and that he was a likeable and non-manipulative individual who had the ability to express genuine concern and caring for others.  *See* Appendix 8, Motion for Evidentiary Hearing And/Or to Expand the Record; and  Doc ## 25-29.

Other reasonable judges might conclude that Movant was not suggesting that he wanted, at sentencing, to "cite[] to one portion of this [Government] report," DOC # 7 at 15, for the sentencers' consideration.  Movant avers that the government's Dr. Johnson, or some other defense doctor, could actually testify had defense counsel been provided with the exculpatory evidence.[23]  And other reasonable judges could conclude that just because there is some negative, along

_____

[23]Defense counsel would have called Dr. Johnson as a witness or obtained their own evaluation of Movant for sentencing had they been made aware of this exculpatory evidence.  Appendix 4, Motion for Evidentiary Hearing And/Or Motion to expand the record.

with the positive, evidence, that has been suppressed,  then that *necessarily* means that the claim is meritless.  *Id.*[24]

### H.  WHETHER THE DEATH PENALTY IS IMPOSED IN AN ARBITRARY AND DISCRIMINATORY MANNER UNDER THE FDPA (CLAIM VIII)

Movant proffered significant and new evidence that the federal death penalty is imposed in an arbitrary and discriminatory manner.   Lauren Cohen Bell, Ph.D, is an associate professor of political science and Associate Dean of the College at Randolph-Macon College in Ashland, Virginia, was provided data on the federal death penalty by Kevin McNally, Esq., of the Federal Death Penalty Resource Counsel Project last year.  She performed an analysis on that data "focusing on the dynamics of death sentencing in cases involving white female victims in comparison with the dynamics of death sentencing in cases not involving white female victims."  DOC # 78, App. 1,  para 5.   She concluded:

> defendants who kill white female victims receive the death penalty at a substantially higher rate than defendants whose victims are not white women and that this correlation between white female victims and death sentencing is highly statistically significant, systematic, and not the result of chance.

*Id*. at para 8.  With respect to all cases that have been authorized as death penalty cases:

> A defendant charged with killing a white female victim was more than three times (3.02) more likely to be sentenced to death than a defendant charged with killing a victim who was not a white female. The results are statistically significant at the $p < .001$ level, indicating

---

[24]This "double-edged sword" and "open[ing] the door" defeat of Movant's contentions (DOC # 74) is a centerpiece of this Court's order denying relief. Other judge's disagree with it. *See Williams v. Smith* and *Wiggins v. Smith.*

that the probability that this relationship has been observed by chance is essentially zero.

*Id*. at para. 11.  With respect to authorized cases that proceeded through to a capital sentencing trial:

> [A]mong those for whom life or death decisions were made by judges or juries, defendants in cases involving a white female victim received a death sentence 59.5 percent of the time (in 25 of 42 cases). Defendants in cases where there was no white female victim were sentenced to death 25 percent of the time (in 35 of 140 cases).  A defendant in a federal capital trial thus was almost 2-and-one-half (2.38) more likely to be sentenced to death in a case involving a white female victim that a defendant in a case in which there was o white female victim.  These results are statistically significant at the p<.001 level, indicating that the probability that this relationship has been observed by chance is essentially zero.

*Id.* at para 12.  Dr. Bell concluded

> 13.  Based upon the bivariate results discussed here, I conclude without  hesitation that there is a statistically significant and systematic correlation between the presence of a white female victim and the likelihood of a death sentence in a federal capital case. Defendants who killed white female victims are overrepresented among federal death-sentence defendants.  They represent 19.1 percent of all authorized prosecutions (76 of 397) and 23.1 percent of authorized prosecutions completing a penalty phase of trial (42 of 182); however, they represent 41.7 percent of death sentences (25 of 60).

> 14.  The analyses reveals a robust correlation between the presence of a white female and the imposition of a death sentence. ....Given the robust quality of these findings, it is my opinion to a reasonable degree of scientific certainty that this correlation of ore severe sentencing outcomes and white female victims is unlikely to disappear even in the presence of other potentially explanatory variables.

*Id*.  Other reasonable judges could disagree that this has "been addressed elsewhere" and with this Court's conclusion that "nothing new is presented here." DOC # 74 at 16.

In *United States v. Sampson II*, 275 F. Supp.2d 49, 89-94 (D. MA 2003) and *United States v. Sampson VIII*, 332 F. Supp.2d 325, 335-40 (D. MA 2004), the court rejected a related complaint, based on much less data and without a gender argument, but also noted that "a rigorous, honest study of the federal system illuminating this issue would be valuable." *Id.* at 339.   And the Court in  *Jones v. United States,* 287 F.3d 325 (5th Cir. 2002), while finding that statistics about white victim cases were insufficient, nevertheless wrote that "sufficiently 'stark' statistics might open a *prima facie* case."  *Id.* at 334.

Movant's new statistics reflect a rigorous and honest study, with sufficient, stark, statistics on arbitrariness and discrimination to at least warrant a COA on the constitutional questions raised.

Movant also,  particularly on rehearing, presented new and compelling evidence that his death sentence was directly correlated to the limited funding in his case.  On Thursday, October 9, 2008, the Office of Defender Services of the Administrative Office of the United States Courts published on its webpage a report entitled "Update on the Cost, Quality, and Availability of Defense Representation in Federal Death Penalty Cases;  Preliminary Report on Phase One of the Research." *See* www.uscourts.gov/defenderservices/FDPC_Contents.cfm. In this report, "cost data on federal death penalty cases between 1998 and 2004

have been collected and analyzed." Among other things, this report concludes that there is a direct correlation between costs in federal capital cases and the outcome of the sentence:

> Specifically, as Table 12 (p. 40) shows, individuals whose defense received less that $320,000 in combined attorney and expert assistance – the lowest one-third of federal capital trials – had a 44 percent chance of being sentenced to death at trial. Individuals whose total representational costs were above that amount – the remaining two-thirds of defendants – had a 19 percent chance of being sentenced to death. Defendants in the low cost group thus were more than twice as likely to be sentenced to death.

Movant's case was tried between 1998 and 2008. The total costs in his case were well under $200,000, placing him in the low-low end of the "low cost group." Because of this utterly arbitrary fact, he was more than twice as likely to be sentenced to death than defendants who, for whatever reason, received more funding. This arbitrariness and discrimination violates the FDPA and/or renders it unconstitutional, and other reasonable judge's could so find. Movant requests that a COA be granted.[25]

## I. COA ON WHETHER THE GOVERNMENT SUPPRESSED INFORMATION FAVORABLE TO THE DEFENSE (CLAIM X)

Mr. Brown pled that the government violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and its progeny when it failed to disclose a draft affidavit by case

---

[25]This Court found that "'Brown never identifies what expert witnesses he wished to call or what additional time trial counsel wanted to spend in preparation for this case but could not do so because of funding concerns,'" quoting the Government's pleading. DOC # 74 at 16. Other reasonable jurists could conclude that Movant did show what money could have provided, *i.e.*, mental health experts (from Butner FCI, and/or private experts), a real mitigation investigation, and a non-future-dangerousness expert. Indeed, this Court referred (disparagingly) to Movant's experts' "'*money* quote.'" *Id*. at 11 (emphasis added).

agent Marla McClendon which said that the environment in which Mr. Brown was raised was routinely visited by law enforcement officers who witnessed alcohol, illegal substances, weapons, and chaos. Specifically, Ms. McClendon asserted that, in relation to the "Morgan compound":

> It is the collective opinions (sic) of these local law enforcement officers that on nearly every instance there was excessive amounts of alcohol or illegal substances in use by persons residing or visiting the residence. On many of these occasions, the purpose of the visits by law enforcement were for crimes of violence in which weapons were often used to inflict serious harm to other persons at or in the residences. On almost every occasion, persons in the residences routinely flee at the site (sic) of arriving law enforcement officers

DOC # 8, at 103. There is no dispute that the document containing this information was not disclosed to the defense. And there can be little dispute that the information is favorable to the defense as it is classic mitigating evidence.

Reasonable jurists could disagree with the manner in which this Court resolved the Claim. Initially, the Court appears to have analyzed it under *Strickland v. Washington*, 464 U.S. 668 (1984) rather than under *Brady v. Maryland*, *supra* ("This, Brown contends, would have constituted powerful mitigation evidence . . . that counsel *should* have elicited. Had counsel acted reasonably. . .").[26] Second, the Court seems to assert that the government's failure

---

[26]The Court cites to DOC 51, at 81, n. 36, but an examination of that footnote indicates that Mr. Brown did not assert that trial counsel should have uncovered the information in the McClendon draft affidavit. Rather, Mr. Brown asserted that had trial counsel performed reasonably in relation to Detective Woodall, and had the government complied with its *Brady* obligation in relation to the McClendon draft affidavit, there is a reasonable probability the jury would not have sentenced Mr. Brown to death.

to disclose the information contained in the draft was justified. Specifically, the Court reasoned:

> the material was "omitted" . . . because it was, after all, a *draft* affidavit. Drafters make editorial judgements in light of the intended audience . . . and thus there is nothing nefarious about omitting this information then.

(DOC # 74 at 17) (emphasis in original). Other reasonable jurists could find it to be of no moment that the information was contained in a draft affidavit. The question is whether the information was favorable to the defense. The answer to that question being "yes", the government had an *obligation* to disclose it to the defense wether by giving the defense a copy of the draft affidavit or by other means.

Third, the Court's prejudice/materiality analysis is debatable among reasonable jurists for at least two reasons. First, the Court concluded that "it is not reasonable to conclude that it likely could have constituted a tipping point." A tipping point is defined as the critical point in an evolving situation that leads to a new and irreversible development - - *i.e.*, in this case, the point at which the evidence was so overwhelming that a different outcome would have unavoidably occurred. By applying a "tipping point" analysis, the Court's required Mr. Brown to prove the sentencing decision *would* have been different. Mr. Brown need not affirmatively show a different outcome, or even that a different outcome was more likely than not. Instead, the proper standard is whether there is a "reasonable probability of a different outcome." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("Although the constitutional duty is triggered by the potential impact of favorable

but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal."); *see also, Martin v. Barrett*, 279 Ga. 593, 596 (Ga. 2005) , and  *Strickler v. Greene,* 527 U.S. 263, 297 (1999), Souter, J., and Kennedy, J., concurring.

Moreover, in making its prejudice/materiality determination, the Court found that Mr. Brown's claim must fail because (at least in part) the information contained in the McClendon draft affidavit "was potentially harmful."  The relevant question is not whether the suppressed evidence was also harmful, but whether the suppressed evidence was materially favorable to the defense.  *Kyles v. Whitley*, 514 U.S. at 434-35 ("One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

## J.  COA ON WHETHER MR. BROWN WAS DEPRIVED OF HIS RIGHT TO BE PRESENT AT ALL PROCEEDINGS (CLAIM XIV)

It is undisputed that Mr. Brown was not present at the September 9, 2003, pretrial conference conducted in his case.  Mr. Brown pled in his 2255 Motion that he had been denied his right to be present at all critical stages of the proceedings against him in violation of the Fifth, Sixth and Eighth Amendments.  (DOC # 8, pp 115 & 116).   The Court, in resolving the issue, reasoned that the right to be present derives from the "Confrontation Clause of the Sixth Amendment and the

42

Due Process Clause of the Fifth Amendment" and noted that "it is debatable[27] whether a pretrial conference on *procedural* matters rises to a constitutional violation. . .".  (DOC # 74 at 20).  Ultimately, the Court determined that regardless of the rights afforded by the Constitution, F.R.Crim.P, 43 "resolves the issue" as that rule states that "[a] defendant need not be present at a conference or hearing upon a question of law."  (DOC # 74 at 21).  The Court further found that "Brown cites no "non-present moment in the process when anything but matters of law was discussed." *Id*.

Reasonable jurists could disagree with this Court's resolution of this claim. First, whether only matters of law were discussed at the pretrial conference is debatable.  Whether: (1) the announcement that trial counsel would not pursue mental health issues; (2) discussions about Mr. Brown offering to plead guilty and the admissibility of such evidence; and (3) a discussion between trial counsel and the Court[28] that could be interpreted as a co-strategy to thwart Mr. Brown's later attempts at challenging his convictions and sentences, are pure questions of law is clearly debatable.   That colloquy contained instances where this Court referred to post-conviction counsel who would represent Mr. Brown as "some dippy ACLU

---

[27]As the Court conceded it is debatable that Mr. Brown had a constitutional right to be present at the pretrial conference, *a fortiori* a COA COA should be granted on this issue.

[28]The Court attempts to minimize the impact and content of its colloquy with defense counsel by describing it as merely conveying the Court's experience with defendants who, upon conviction, later assert that their attorney would not allow him to testify.  (DOC 74 at 20).  However, the exchange was much more explicit and included discussions of tactics employed by defense counsel to thwart post-conviction claims by defendants.

type" who would assert that trial counsel failed to allow a defendant to testify, and where defense counsel, agreeing with the Court, noted that in order to thwart such a tactic he would put his defendant on the stand to "perfect the record."  Further defense counsel talked about how he would answer questions in post-conviction as "you had to be there," because "if its trial tactics, nobody will do anything about it."  (Cr. DOC # 259 at pp. 35-38).

Second, reasonable jurists could debate whether this Court applied the right definition for a "critical stage" of the proceedings - - a stage of the process where "his presence would contribute to the fairness of the procedure."  (DOC # 74 at 20).  The Supreme Court has noted that a critical stage is "a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused."  *Bell v. Cone*, 535 U.S. 685, 696 (2002).[29]

And reasonable jurists could disagree with this Court's conclusion that F.R.Crim.P. 43 trumps the Fifth and Sixth Amendments of the Constitution. Regardless of whether Rule 43 says a defendant's presence is not required when only matters of law are discussed, if the proceeding bears resemblance to a "step of a criminal proceeding that holds significant consequences for the accused," the defendant has a constitutional right to be present.

---

[29]*See* DOC 65, pg 53, *citing*, *Valentine v. United States*, 488 F.3d 325, 335 (7th Cir. 2007) and *Bell v. Cone,* 535 U.S. 685, 695-96, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

**K.  COA ON WHETHER MR. BROWN  WAS DENIED HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, AND A  RELIABLE CAPITAL SENTENCING PROCEEDING WHEN JUROR DOROTHY RENTZ WAS SEATED WITHOUT THE TRIAL COURT OR COUNSEL EXPLORING HER ATTITUDES ON THE DEATH PENALTY (CLAIM XVI)**

Mr. Brown pled that he was denied his right to be free from cruel and unusual punishment because a juror, Dorothy Rentz, who decided his fate, was not questioned on her attitudes on the death penalty.  The Court combined the analysis of this claim with a related but separate claim - - that Mr. Brown was denied his right to a meaningful appeal because there was no transcript of Ms. Rentz's *Witherspoon* voir dire.[30]  Initially, this Court found anything having to do with the "Rentz" issue procedurally defaulted because Mr. Brown had not raised it on direct appeal.  (DOC # 74 at 24).  In support for its finding, the Court noted:

> it cannot go unnoticed that one of Georgia's finest lawyers - - *current* counsel - - detected the "Rentz" omission but not the "Amick" omission, which the Court has unearthed *sua sponte*, *see supra* n. 13. If one of the *top* lawyers in the State missed that, how can trial counsel and appellate counsel be deemed ineffective for missing the "Rentz" transcript omission?

*Id* (emphasis in original).   However, Mr. Brown, in his Motion to Alter and Amend, pointed out that he did raise the "Rentz" matter in the Eleventh Circuit and that the Court could not conclude that he had missed the "Amick" only that counsel chose not to raise it.  (DOC # 78 at pp 18-20).  The Court noted that "it

---

[30]Mr. Brown plead the claim in the alternative.  Either she was not questioned about her attitudes toward capital punishment and he was therefore denied his rights under the Eighth Amendment (DOC # 8, Claim 16), or if she was questioned but the court reporter failed to transcribe it, or somehow lost that part of the transcription, he was denied meaningful appellate review (DOC # 8, Claim 17).

45

clearly erred" in finding the matter procedurally defaulted because Mr. "Brown did raise the 'Rentz' matter on direct appeal." (DOC # 83 at 4). Further, the Court also noted that it "erred in noting that Brown's current counsel failed to detect the missing "Traci Amick" voir dire testimony [because] closer examination of the record shows there wasn't any." *Id*., n. 4. The Court, however, found that the claim was without merit and that the Eleventh Circuit so "implicitly" found when "it denied the claim without comment." *Id*. The Court analogized this situation to one where a state court fails to expressly address an issue, and district courts are to "respect implicit or tacit state court rulings."

Reasonable jurists could disagree with this Court's analogy as evidenced by a recent decision of the Eleventh Circuit:

> While we typically give deference to state court decisions in this context, we have declined to do so if the state court failed to address the merits of a claim as asserted by the defendant. *See Davis v. Sec'y for the Dep't of Corr.,* 341 F.3d 1310, 1313 (11th Cir.2003). When a state court fails to address an issue raised by the defendant, its decision is reviewed *de novo. Espy v. Massac,* 443 F.3d 1362, 1365 (11th Cir.2006)

*Grissett v. Secretary, Dept. of Corrections, Florida Atty. Gen.*, 223 Fed.Appx. 846, 848 (11th Cir. 2007). A COA on whether Mr. Brown was denied his rights under the Fifth, Sixth and Eighth Amendments by errors associated with the qualification of Dorothy Rentz as a juror should issue.

**L.  COA ON WHETHER MR. BROWN WAS DENIED HIS RIGHT TO MEANINGFUL APPELLATE REVIEW BECAUSE OF AN INCOMPLETE RECORD COMPILED BY THE DISTRICT COURT (CLAIM XVII)**

One other portion of Mr. Brown's assertion that he was denied meaningful appellate review was the fact that the peremptory strikes utilized by the government, along with the race and gender of those struck, were not made part of the record.  Thus, Mr. Brown was denied his right to raise on appeal any challenge based on the government acting discriminatorily in its selection of jurors.  *See Batson v. Kentucky*, 476 U.S. 79 (1986) and *J.E.B. v. Alabama ex rel. T. B*., 511 U.S. 127 (1994).  This Court found this aspect of the claim to be procedurally defaulted because it could have been raised on direct appeal.

However, as noted above, reasonable jurists do disagree on whether this portion of the claim should have been procedurally defaulted as evidenced by the Ninth Circuit's holding that "post-conviction counsel had a conflict of interest in raising, during post-conviction proceedings, the issue of his own ineffectiveness as direct appellate counsel [and] [t]his conflict was sufficient cause to excuse the Movant's procedural default in failing to raise an ineffective assistance of appellate counsel claim during post-conviction proceedings." *Soraich v. Montana*, 264 Fed.Appx. 654, 656 (9th Cir. 2008), citing *Moormann v. Schriro*, 426 F.3d 1044, 1059 (9th Cir.2005).

## CONCLUSION

As shown in this application, his Initial Petition, and the briefs and pleadings before this Court, Mr. Brown has made the requisite showing for the issuance of a Certificate of Appealability.  Therefore, Mr. Brown respectfully requests that this Court issue a Certificate of Appealability.

Dated, this the 5th day of January, 2009.

Respectfully submitted,


*s/Jeffrey L. Ertel*
JEFFREY L. ERTEL
State Bar No. 249966
FEDERAL DEFENDER PROGRAM, INC.
100 Peachtree Street, Suite 1700
Atlanta, Georgia 30303
(404) 688-7530
jeff_ertel@fd.org

ATTORNEY FOR MR. BROWN

CERTIFICATE OF SERVICE

I, hereby certify that this Application for Certificate of Appealability has been electronically filed and served upon counsel for the Government at the following address:

> Amy Lee Copeland, Esq.
> Assistant United States Attorney
> P.O. Box 8970
> Savannah, Georgia 31412

Dated, this the 2nd day of January, 2009.

*s/Jeffrey L. Ertel*