UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


MEIER JASON BROWN,            )
                             )
            Petitioner,       )
                             )
vs.                          )      No. CV407-085
                             )      Underlying CR403-001
UNITED STATES OF AMERICA,     )
                             )
            Respondent.       )


## GOVERNMENT'S RESPONSE TO BROWN'S APPLICATION FOR CERTIFICATE OF APPEALABILITY


COMES NOW the United States of America, by and through Edmund A.

Booth, Jr., United States Attorney for the Southern District of Georgia, and

responds to Meier Jason Brown's application for a certificate of appealability

("COA"). [Doc 86]

A complete recitation of the relevant facts can be found in the government's

comprehensive response to Brown's 28 U.S.C. §2255 motion. [Doc 54] Briefly,

Brown stabbed to death a post-mistress in rural Fleming, Georgia.  After an

unsuccessful direct appeal, see United States v. Brown, 441 F.3d 1330 (11th Cir.

2006), Brown filed a §2255 motion in this Court. [Doc 8] The Court denied

1

Brown's motion. [Doc 75]

Brown now has filed an application for a COA, which may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). This standard requires a §2255 movant to "sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003). The COA determination "requires an overview of the claims and a general assessment of their merits,"but it "does not require full consideration of the factual or legal bases adduced in support of the claims." Id. A COA does not require the movant to show that the appeal will succeed, and a COA may issue in some situations "where there is no certainty of ultimate relief." 537 U.S. at 337, 123 S. Ct. at 1039.

Nonetheless, a COA need not always issue. Id. A §2255 movant "seeking a COA must prove something more than the absence of frivolity or the existence of mere good faith on his or her part." 537 U.S. at 338, 123 S. Ct. at 1040. Instead, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. "[T]he issuance of a [COA] generally should indicate that an appeal is not legally frivolous, and

that a court of appeals should be confident that petitioner's claim is squarely foreclosed by statute, rule or authoritative court decision, or is lacking any factual basis in the record of the case, before dismissing it as frivolous." Barefoot v. Estelle, 463 U.S. 880, 893, 103 S. Ct. 3383, 3395 (1983). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000).

Brown contends that a COA should issue as to every claim presented in his §2255 motion. [Doc 86-Pg 5]   As does Brown, the government relies on its prior pleadings and the record as a whole to support its contention that a general COA should not issue in this case.  In addition to this general claim of entitlement to a COA, Brown identifies 12 specific issues allegedly warranting a COA. [Doc 86-Pgs 5-47] The government now addresses these 12 specific claims.

## A.  Procedural default [Doc 86-Pgs 5-7]

Brown broadly claims that the Court "should grant a COA on all of the [procedural] default issues because reasonable jurists could disagree about whether the claims were, in fact, procedurally defaulted. . . ." [Doc 86-Pgs 5-6] Despite Brown's broad stroke, he specifically identifies only two such claims: "the failure

to timely disclose [the] postal inspector's report, Order at 13; [and the] denial of

meaningful appeal for failing to include peremptory strikes in transcript.  Order at

24[.]" [Doc 86-Pgs 6-7]

The record belies Brown's contention about the postal inspector's report.

Rather than merely finding that the claim had been procedurally defaulted, the

Court made these findings:

> . . . this claim is procedurally defaulted because it was not raised on appeal. . ., and Brown shows neither cause nor actual prejudice.  <u>Even if it were not defaulted, the Court agrees with the Government (doc. #54 at 59-61) that Brown can show no prejudicial (hence, §2255-relief-level error)</u> because, with a single exception,[] the report contains nothing beyond what counsel was able to competently enough present at trial (*i.e.*, that Brown had a pathetic childhood and was polite and respectful, helped his mother – all while developing a violent dark side that a sympathetic juror perhaps could excuse as an unfortunate byproduct of the pathetic childhood, etc.).  This claim is rejected because the information, while material, in fact was disclosed to the defense.  It was late, to be sure, but not shown to be prejudicially so.

[Doc 74-Pg 13][emphasis added] Brown's argument for a COA in this regard

proceeds from a mistaken premise – i.e., that the Court dismissed his claim only on

procedural default grounds.  Thus, Brown has not demonstrated entitlement to a

COA here.

Brown's other argument, concerning the "denial of meaningful appeal for

failing to include peremptory strikes in the record," apparently concerns the lack of

a record to make a <u>Batson</u> challenge. [Doc 74-Pg 24, Doc 86-Pg 7][1] While the Court found that the claim was "procedurally defaulted and no [ineffective assistance of counsel]-based cause can excuse it," the Court also observed that trial counsel were "*right there,*" could see the race of jurors struck, raised no objection, and never been the subject of an ineffectiveness claim "on that score." [Doc 74-Pg 24] As the government noted in its response, the record indicates that <u>Brown's</u> first 20 strikes were Caucasian venirepersons. [CR Doc 291-Pg 534, Doc 54-Pg 152] In any event, this ground does not serve as a basis for a COA.

## B.  <u>Appointment of two attorneys [Doc 86-Pgs 7-9]</u>

A COA issues "only if the applicant has made a substantial showing of the denial of a *constitutional* right."  28 U.S.C. §2253(c)(2) (emphasis added). "Prisoners, including those under a sentence of death, have no constitutional right to the appointment of counsel for postconviction proceedings."  <u>Arthur v. Allen</u>, 452 F.3d 1234, 1250 (11th Cir. 2006).  Brown, however, has a statutory right to the appointment of "one or more attorneys" in a post-conviction proceeding.  <u>See</u> 18 U.S.C. §3599(a)(2).  Brown seeks a COA on the Court's appointment of one attorney because (according to him) most courts appoint two or more attorneys.

---

[1]  The government addressed this issue at pages 152 to 154 of its comprehensive response.

[Doc 86-Pg 8]

Brown initially asked the Court to appoint two attorneys, but looking to the statutory language, the Court determined that Brown had not demonstrated good cause to warrant automatic appointment of a second lawyer. [Doc 1, CR Doc 328] It nonetheless invited him to make that showing and denied Brown's request for a second attorney without prejudice. [CR Doc 328] Brown apparently never did so.

Here, the Court should deny Brown's COA because his claim to a second attorney does not invoke a constitutional right; Brown had an attorney as required by statute; and Brown did not seek a second attorney despite the Court's allowing him to do so upon the proper showing.

## C.  **The conflict of interest claim [Doc 86-Pgs 9-10]**

Prior to filing Brown's §2255 motion, counsel contacted jurors in violation of the local rules and found himself in a contempt proceeding.  Citing that proceeding, counsel moved to withdraw. [Doc 68] The Court denied counsel's motion.  It found that counsel merely implied "that he does not want to further aggravate the same prosecutor who seeks his client's execution and thus, that he may unconsciously pull some punches here" and that counsel did not make an adequate factual showing of a conflict. [Doc 72]

The COA application claims that the "Court's position on this conflict of

counsel is debatable among reasonable jurists" [Doc 86-Pg 10], yet it cites no conflicting decisions among courts – or any decisions at all.  Additionally, the showing that counsel sought to make through the juror affidavits is an impermissible one.  As set forth in the government's comprehensive response at pages 16 to 24, the federal rules of evidence and binding precedent do not permit impeachment of the verdict by a juror's affidavit.  Given that any claim made by Brown based upon a juror's affidavit would not be appropriate (and would not be successful), it is difficult to see how counsel's representation of Brown could have been compromised.

**D.  <u>Discovery and an evidentiary hearing [Doc 86-Pgs 11-13]</u>**

Brown contends that he was entitled to an evidentiary hearing and discovery on various issues.  The matter of Dorothy Rentz and the missing voir dire have been discussed previously in the government's response and the Court's order. [Doc 54-Pgs 1, 152, Doc 74-Pgs 22-24]

Brown has not demonstrated entitlement to a COA on his other discovery and hearing based claims.  Brown identifies only a handful of issues that required a hearing.  First, Brown wanted "government information about how capital cases are prosecuted, how it is decided that a case ought to be capital, race and gender statistics, funding for capital cases, and other evidence" for his selective

prosecution claim. [Doc 86-Pg 12]   As set forth in the government's

comprehensive response, Supreme Court precedent establishes that Brown is not

entitled to discovery on these claims. [Doc 54-Pgs 79-81] Given that Brown's

discovery "claim is squarely foreclosed by . . . authoritative court decision,"

Barefoot, 463 U.S. at 893, 103 S. Ct. at 3395, a COA should not issue on this

regard.

Second, Brown submitted an unsigned affidavit to support his motion, and

the government learned that the affiant refused to sign the affidavit. [Doc 54-Pg 51,

n. 15, Doc 86-Pgs 12-13] Brown contends that this fact, and the fact that he "was

not able to contact" the affiant, allowed him to depose her. [Doc 86-Pg 13] It is

difficult to see how Brown's inability to track down a recalcitrant affiant rises to a

constitutional claim warranting the issuance of a COA.

## E.  Ineffective assistance of counsel [Doc 86-Pgs 14-33]

Brown's fifth claim lists various claims of ineffective assistance of counsel,

which the government addressed extensively in its comprehensive response at

pages 16-58 and 91-122.  The government relies primarily on that response,

although it addresses specifically some points made by Brown.

First, Brown discusses the Court's resolution of trial counsel's handling of

his offer to plead guilty and concludes that the Court found essentially that the jury

8

"ignored this instruction [about lawyers' statements not constituting evidence] and instead [gave] Mr. Darden's argument the same weight as testimony coming from the witness stand." [Doc 86-Pg 15] The Court did not handle the matter in this manner. [Doc 74-Pgs 4-7] It acknowledged its instruction but noted it reminded the jury that it should consider the attorney's arguments, there was no reason for jurors to disbelieve counsel's statements, and the fact that Brown had offered to plead guilty had been provided. [Doc 74-Pg 5] It also rejected the affidavits submitted by Brown as improper hindsight or improperly obtained from a juror. [Doc 74-Pgs 6-7]

Second, Brown's issue regarding the family's feelings about the death penalty has been addressed on direct appeal: The Eleventh Circuit found that it was not Brady material and that that evidence was neither relevant nor admissible. Brown, 441 F.3d at 1352. The Eleventh Circuit's order suggests, too, that asking the victim's family members about Brown would have been impermissible. See Brown, 441 F.3d at 1351.

Third, Brown believes that Detective Woodall should have testified at greater length about Brown's upbringing because Woodall's status in the community would have lent his statements more credence. [Doc 86-Pgs 20-23] Brown argues that the government apparently conceded deficient performance.

9

[Doc 86-Pg 21] In fact, it did not [Doc 54-Pg 34], and Strickland condones analyzing only one of the two prongs if it is dispositive. See Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. In any event, Woodall's proposed testimony would have echoed the testimony of Brown's 14 other penalty phase witnesses as described in the Eleventh Circuit opinion. See Brown, 441 F.3d at 1364.

Fourth, Brown contests the adequacy of the mitigation investigation. [Doc 86-Pgs 23-27] The government addressed the witnesses' testimony and other aspects of this claim at pages 34 to 51 of its comprehensive response, and the Court found that Brown essentially argued that trial counsel could have done a better job, not that they were constitutionally ineffective. [Doc 74-Pg 10]

Brown next asserts that trial counsel failed to present expert mental health testimony. [Doc 86-Pgs 28-29] The government addressed this claim at pages 51 to 58 of its comprehensive response. The Court found that the jury had been told repeatedly by lay witnesses of the every conclusion reached by Brown's post-conviction mental health experts and that some of his experts' opinions were a double-edged sword. [Doc 74-Pgs 11-12] As for Brown's future dangerousness expert claim [Doc 86-Pg 29, n. 18], that claim was resolved against him on direct appeal on slightly different grounds. See Brown, 441 F.3d at 1363-65.

Brown also raises three contentions relative to claim 9, his catch-all

10

ineffective assistance claim. First, Brown says that trial counsel failed to use various items to support a theory that someone other than he killed the victim. [Doc 86-Pgs 29-31] It is hard to fault trial counsel for failing to independently investigate these leads where the leads had been disproved by police and their client confessed to the murder, was found with shoes with a tread matching the distinctive footprint on the postal counter, and had in his possession money order receipts from the ones stolen. Indeed, the Eleventh Circuit noted "the overwhelming evidence of Brown's guilt." Brown, 441 F.3d at 1350. Given these factors, counsel did not perform deficiently when they did not corroborate Banks, Woods, and Lecounte's claims. See generally Strickland, 466 U.S. at 690, 104 S. Ct. at 2066 (stating that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").

Second, Brown says that the Court should have examined his allegations in claim 9 cumulatively [Doc 86-Pg 31], but many of those claims were only superficially raised. [Doc 54-Pgs 119-120]

Third, Brown faults counsel for failing to have Diane Brown present at the suppression hearing and failing to renew the motion to suppress after hearing her trial testimony. [Doc 86-Pgs 32-33] The government addressed this claim at pages 127 to 136. The Court found that trial counsel subpoenaed Diane for that hearing

and she failed to appear and that it would not have credited Diane's trial testimony given her close relationship to Brown, her demeanor, and "her obvious incentive to exaggerate and lie on his behalf."  [Doc 74-Pg 19, n. 11] On appeal, the government, too, argued that the Court could consider Diane's testimony in the resolution of the motion to suppress. [Doc 54-Pg 133]   This claim does not warrant a COA.

## F.  Prosecutorial misconduct [Doc 86-Pgs 33-34]

Brown labels as prosecutorial misconduct certain portions of the closing argument and the government's late disclosure of a postal inspector's report. [Doc 86-Pgs 33-34] The government addressed these claims at pages 58-70 of its comprehensive response.  The Court found that the claim about the postal inspector's report had been procedurally defaulted, or that Brown could show no prejudice. [Doc 74-Pgs 12-13] As for the closing argument claim, the Court found that the remarks were not so prejudicial that they rendered his trial fundamentally unfair. [Doc 74-Pgs 13-14]

The government relies on its prior extensive briefing to refute Brown's claim to a COA on this basis.

## G.  Disclosure of the mental health expert's report [Doc 86-Pgs 35-36]

Brown begins with the inflammatory proposition that this Court found it

12

"perfectly constitutional for the Government to know and conceal from a capital defendant expert mental health evidence that is materially exculpatory." [Doc 86-Pg 35] Brown ignores how the government obtained a mental health report: In response to a filing by Brown, the government invoked Fed. R. Crim. P. 12.2 and obtained a psychiatric and psychological examination of Brown. [CR Doc 167] The government's comprehensive response addresses this claim thoroughly. [Doc 54-Pgs 70-76]   The Court's order addresses it, too. [Doc 74-Pgs 14-15]  The government availed itself of a procedure specifically contemplated by a federal rule and did not disclose the report to Brown because of that rule and a Court order. [CR Doc 172-Pg 3] Because this "claim is squarely foreclosed by . . . rule," Barefoot, 463 U.S. at 893, 103 S. Ct. at 3395, it is not an appropriate subject for a COA.

## H.  The FDPA claim [Doc 86-Pgs 36-39]

Brown's COA application seeks to raise two issues relevant to the Federal Death Penalty Act ("FDPA").  First, Brown contends that statistical information demonstrates that the federal death penalty is imposed in an arbitrary and discriminatory manner, particularly where the victim is a white female.[2]  The government addressed this issue in its comprehensive response at pages 76-88, and

---

[2]  The victim, Sallie Gaglia, was white.

the Court found that Brown's claims were "meritless, as they have been addressed elsewhere (albeit in slightly different form), and nothing new is presented here." [Doc 74-Pg 16] As the government's comprehensive response discussed, the Supreme Court rejected a similar statistics-based challenge to the Georgia death penalty, see McCleskey v. Kemp, 481 U.S. 279, 282-83, 107 S. Ct. 1756, 1762 (1987), as has the Fifth Circuit respect to the FDPA.  See United States v. Jones, 287 F.3d 325 (5th Cir. 2002); cf. United States v. Brimite, 102 Fed. Appx. 952, 956 (6th Cir. 2004)(finding that Brimite's recitation of statistics from death penalty prosecutions not relevant to establishing that similarly situated individuals of other races could have been prosecuted but were not).

Brown's second FDPA claim relates to the funding provided in his case. [Doc 86-Pgs 38-39] As an initial matter, Brown misstates a key factor: He contends that his "case was tried between 1998 and 2008." [Doc 86-Pg 39] This is impossible, because Brown murdered Sallie Gaglia on November 30, 2002. [CR Doc 291-Pg 569-570] Rather than spreading out "well under $200,000" over a decade [Doc 86-Pg 39], the Court paid these funds over about half that time.

In any event, the government argued that Brown never identified what expert witnesses he wished to call or what additional time trial counsel wanted to spend in preparation for this case but could not do so because of funding concerns.

14

[Doc 54-Pgs 88-91] The district court agreed with this proposition. [Doc 74-Pg 16] Brown now claims that "[o]ther reasonable jurists could conclude that [he] did show what money could have provided, *i.e.,* mental health experts (from Butner FCI, and/or private experts), a real mitigation investigation, and a non-future dangerousness expert." [Doc 86-Pg 39, n. 25] As for the future dangerousness expert, the Eleventh Circuit concluded on direct appeal that this Court did not abuse its discretion in denying funding in that regard because lay testimony would suffice.  See Brown, 441 F.3d at 1364.  In its resolution of this issue, the Eleventh Circuit noted the "ample lay testimony presented on this topic, and the ease with which the jury could understand it. . . ." Id. at 1365.

As for the "real mitigation investigation," Brown did receive funds for a mitigation specialist, although he contended that she did not perform her job well and that that constituted ineffective assistance of counsel.  [Doc 51-Pg 26] The government addressed this issue at pages 44 to 51 of its comprehensive response. As for the adequacy of the mitigation presentation, the Eleventh Circuit addressed it in the context of the denial of funds for a forensic social worker (which performed a role similar to that of a mitigation specialist).  Here is what the Eleventh Circuit said about the adequacy of Brown's showing:

15

The district court concluded that the work of the forensic social worker would be unnecessary and duplicative because it had already approved funding both for a mitigation specialist and a psychologist. Brown says, nevertheless, that without a forensic social worker, he was unable to present coherent testimony relating to the background, upbringing, and social context of his life. That argument is contradicted by the record. At the penalty phase, Brown presented fourteen witnesses who testified about Brown and his childhood. Those witnesses described the deplorable conditions under which Brown was raised, noting that there were frequent fights in his home, that his parents used drugs, that his father left the home after shooting his stepson when Brown was seven, that a child died at Brown's home after drowning in a septic tank, and that the police were frequently called to break up fights, shootings, and stabbings. Brown offers no explanation for why neither his court-funded mitigation specialist nor his court-funded psychologist was called as an expert, nor why they could not offer additional evidence on precisely these points. Quite simply, the district court did not abuse its discretion in denying funds for the forensic social worker.

Id. at 1364.  This issue seems to be foreclosed by this determination on direct appeal.

As for Brown's request for funding for "mental health experts (from Butner FCI and/or private experts)," the government notes that funding has nothing to do with Butner, a Bureau of Prisons facility.  As for other (unidentified) mental health experts, the government relies on its comprehensive response at pages 47, 52-54, and 56-58.

## I.  The Brady claim [Doc 86-Pgs 39-42]

Brown seeks a COA to present a Brady claim alleging that the government

improperly failed to disclose a draft affidavit by its case agent; Brown labels it "classic mitigating evidence." [Doc 86-Pgs 39-40] The affidavit had been drafted to support a search warrant, although it was not used; the mitigating evidence Brown identifies is the case agent's impression of his home, the Morgan compound, as a place where alcohol, drugs, and violence existed. [Doc 74-Pgs 16-17, Doc 86-Pg 40] The government responded that <u>Brady</u> does not obligate the government to furnish a defendant with information he already has, and that Brown, as a denizen of the Morgan compound, understood well the conditions of his home. [Doc 54-Pgs 122-124]  Indeed, Brown called 14 witnesses to testify in the penalty phase of trial about his childhood and the "deplorable conditions" under which he was raised.  <u>See</u> <u>Brown</u>, 441 F.3d at 1364.  This Court rejected Brown's argument because the information was contained in a draft affidavit, was essentially the same as Brown's own mitigating evidence, and contained information harmful to Brown. [Doc 74-Pgs 16-18]

Given the similarity of information contained in the draft to the evidence held by Brown, and Brown's own acute awareness of his living conditions, there was no reasonable probability of a different outcome at trial had the draft affidavit been disclosed.  <u>See</u> <u>Bagley v. United States</u>, 473 U.S. 667, 678, 105 S. Ct. 3375, 3381 (1985)(recognizing that "a constitutional error occurs, and the conviction

17

must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial"). A COA should not issue on this claim.

## J. The right to be present [Doc 86-Pgs 42-44]

Brown was not present at a September 9, 2003, pretrial conference in his case. The government briefed this issue at pages 141-146 of its comprehensive response, and the Court found that "it is debatable whether a pretrial conference on *procedural* matters rises to a constitutional violation that breaks the harmless-error ban on direct appeal, much less [] supports relief on collateral review." [Doc 74-Pg 20] The Court then found that Fed. R. Crim. P. 43(b)(3) resolved the issue since it provides that a "defendant need *not* be present at 'a conference or hearing upon a question of law.'" [Doc 74-Pg 21] Brown quarrels with the Court's factual characterization of the hearing as involving issues of law, and then muses that the pretrial conference could be a critical stage of the proceeding. [Doc 86-Pgs 43-44]

The government's comprehensive brief on this issue discusses Rule 43, circuit precedent and persuasive authority about the presence requirement, and the matters discussed at the pretrial conference. The government also asks the Court to consider United States v. Moe, 536 F.3d 825, 830-831 (8th Cir. 2008), which was decided after the government briefed this case. The Eighth Circuit found that

18

Moe's absence from two continuance proceedings fell within the exception provided in Rule 43(b)(3).  Id.  First, the record indicated that the proceedings did not address a matter over which there was a factual dispute.  Id.  Moe's father died; this fact was known to the court at the continuance hearing; and Moe never presented any evidence "establishing any unusual ramifications or effects of his father's death that would enhance his request for a continuance."  Id.  Second, Moe had not requested to be present at the hearing.  Id.  As in Moe, there is no factual dispute that Brown could have resolved at the pretrial conference, and Brown's COA application does not suggest how his absence impacted on the fairness of the procedure or why the pretrial conference held significant consequences for him.

Brown states that the Court and trial counsel engaged in "a co-strategy to thwart [his] later attempts at challenging his convictions and sentences." [Doc 86-Pg 43] The government addressed this claim at 144-146 of its comprehensive response.  Brown also says that the "colloquy contained instances where this Court referred to post-conviction counsel who would represent Mr. Brown as 'some dippy ACLU type' who would assert that trial counsel failed to allow a defendant to testify, and where defense counsel, agreeing with the Court, noted that in order to thwart such a tactic he would put his defendant on the stand to 'perfect the record.'" [Doc 86-Pgs 43-44] Viewing this statement in context, the trial judge was

telling war stories of his day as a criminal defense attorney and how he had to remain attuned to the "ambience going on in the courtroom." [CR Doc 259-Pgs 36-37] The judge recalled "that moment when I used to meet with my client after all the evidence is in and say now you may take the stand, I will lose the closing argument." [CR Doc 259-Pg 36] But the judge was keenly aware that his client "was going to say if he . . . got convicted I wouldn't let him testify.  And that is one of the most treacherous moments I ever went through agonizing." [CR Doc 259-Pg 36] The judge thought "you've got to have the courage to say I don't think you ought to testify.  But you know you put a noose around your neck by saying that." [CR Doc 259-Pg 36] At that point, trial counsel said he perfected the record by putting the defendant on the stand and letting him "waive it on the stand." [CR Doc 259-Pg 37] At this point, the Court made the comment now highlighted by Brown:

> And then some dippy ACLU type is going to say oh, God.  But he has never been out there with his palm sweating and looking at the jury, and seeing maybe I've got a friend there, there is somebody that is an intangible.  I believe I have built up a little reservoir of goodwill here. And I've got to rely on it.  I don't have anything else.

[CR Doc 259-Pg 37]

It is hardly a constitutional violation for a district judge to recount his experiences as a criminal defense attorney or to speculate that a federal capital case will yield a habeas proceeding.  In light of these logical inferences and the rule and

20

case law indicating that Brown need not be present at a pretrial conference, any appeal on this issue would be frivolous.  A COA should not issue.

### K.  <u>The seating of Dorothy Rentz [Doc 86-Pgs 45-46]</u>

The trial transcript does not contain the voir dire of Dorothy Rentz, a juror who heard Brown's case.  The missing voir dire transcript is the subject of the Court's order on Brown's motion for reconsideration [Doc 83], and the government refers to that order in response.

### L.  <u>The lack of a transcript [Doc 86-Pg 47]</u>

Brown contests again the fact that peremptory strikes were not made part of the record, which he ostensibly would have used to analyze whether trial counsel should have made a <u>Batson</u> challenge.  [Doc 86-Pg 47] The government addressed this claim in pages 152 to 154 of its comprehensive response.  The Court denied Brown's claim because he has no right to raise it in a §2255 motion and because there was no allegation that counsel (who observed the jury selection process) were ineffective in failing to make a <u>Batson</u> challenge. [Doc 74-Pgs 23-24] As the government noted previously, the only specter of a <u>Batson</u> violation occurred in <u>Brown's</u> use of his first 20 peremptory strikes to remove white jurors. [CR Doc 291-Pg 534] In any event, the government relies on its prior response to refute Brown's claim to a COA.

For these reasons, the government respectfully requests the Court to deny

Brown's application for a certificate of appealability.

This 30th day of January, 2009.


                              EDMUND A. BOOTH, JR.
                              UNITED STATES ATTORNEY

                         BY:  s/ Amy Lee Copeland
                              Amy Lee Copeland
                              Assistant United States Attorney
                              Georgia Bar No. 186730
                              United States Attorney's Office
                              Post Office Box 8970
                              Savannah, Georgia  31412
                              (912) 652-4422

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

This 30th day of January, 2009.

EDMUND A. BOOTH, JR.
UNITED STATES ATTORNEY

BY:    s/ Amy Lee Copeland
       Amy Lee Copeland
       Assistant United States Attorney
       Georgia Bar No. 186730
       United States Attorney's Office
       Post Office Box 8970
       Savannah, GA  31412
       (912) 652-4422