[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

No. 09-10142

D. C. Docket No. 4:07-cv-00085

FILED
U.S. Court of Appeals
Eleventh Circuit

July 10, 2013

John Ley, Clerk

MEIER JASON BROWN,

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

Appeal from the United States District Court
for the Southern District of Georgia

(July 10, 2013)

Before DUBINA, Chief Judge, BARKETT and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In this death penalty case, Meier Jason Brown was found guilty of murder

and robbery, and sentenced to death after trial in the United States District Court

for the Southern District of Georgia.  His convictions and sentence were affirmed by us in United States v. Brown, 441 F.3d 1330 (11th Cir. 2006), cert. denied, 549 U.S. 1182 (2007).  In this collateral action, the district court rejected Brown's motion to vacate under 28 U.S.C. § 2255, holding, among other things, that Brown had failed to establish the ineffective assistance of trial counsel in investigating and presenting evidence about his background and mental health at the penalty phase, that Brown was procedurally barred from claiming there was no record of voir dire of one of the jurors, and, finally, that he was not entitled to new, conflict-free § 2255 counsel.  After careful review, we affirm.

## I.

### A.    The facts and the guilt phase of trial

On direct appeal, we offered a detailed description of the facts of this tragic case based on the trial testimony and the last of Brown's three confessions, which was presented to the jury by audiotape.  See Brown, 441 F.3d at 1337-38.  The murder occurred during the course of a robbery of $1,175 in money orders at a Fleming, Georgia post office.  As the robbery unfolded, Brown stabbed postmistress Sallie Gaglia ten times, while she tried to defend herself, and left her to die, alone and lying face down, on the floor.

Eyewitness and physical evidence led police to suspect Brown, who finally confessed to Sallie Gaglia's murder. In an interview conducted by Postal Inspector James Rushwin and Liberty County Sheriff's Department Detective Charles Woodall, Brown admitted that he had gone to the Fleming post office on the morning of November 30, 2002 to retrieve his family's mail from a post office box. Brown went home to distribute the mail. After telling police several different versions of what happened, Brown confessed that he then returned to the post office with a knife to rob Gaglia. At the post office, Brown asked for three money orders. When Gaglia turned to use an adding machine, Brown put socks on his hands, jumped over the counter, and -- according to Brown -- tripped, fell into her, and cut her with his knife. He told police that at this point he decided he had to kill Sallie Gaglia because she knew him. Thereafter, Brown grabbed Gaglia's wallet, crawled through the counter window, discarded the knife and the socks on his hands as he biked home, and threw his clothes into the washing machine. Brown then called his girlfriend, Diane Brown, to pick him up, and he gave her the money orders the next day. Brown was convicted of all three charges: 18 U.S.C. § 1111 (murder within the territorial jurisdiction of the United States); id. § 1114 (murder of a federal employee); and id. § 2114 (robbery of federal property).

**B.    Penalty phase**

3

We recount the penalty phase of the trial at some length since it bears directly on the claim that counsel was ineffective in the investigation and presentation of mitigation evidence. The government referred to the evidence of Brown's guilt already before the jury and presented the testimony of six more witnesses. Brown's state probation officer testified that Brown had convictions stretching from 1990 to 2001 for multiple DUIs, multiple forgeries, financial card fraud, theft by taking, and robbery of a convenience store, along with violations of the probated sentences he received for some of those crimes. Corporal Randy Garman offered testimony about the convenience store robbery, after which Brown had denied his involvement to police until presented with overwhelming physical evidence tying him to the crime.

The last government witnesses were victim postal employee Gaglia's co-worker and three siblings. One sister testified about the damaging impact the murder had on Gaglia's family. Gaglia's younger son, a high school senior when his mother was murdered, was rendered emotionally incapable of going to college and joined the Army instead. Gaglia's husband was in therapy and could not manage to attend the court hearing. As the witnesses described her, Sallie Gaglia was more than willing to help anyone, was an active member of her church, took care of their mother, and was devoted to her sons. They echoed that Gaglia's

murder was a great loss and that she could never be replaced. Her sister showed the jury pictures from Gaglia's life.

Brown then called fourteen witnesses in mitigation. According to several family members, Brown was a nice, quiet, loving, "true and good hearted" person, would do anything for anybody, cared deeply about his family, and as a child, never got into trouble. His brother begged the jury for mercy. His sister and brother-in-law added that the defendant had always loved and taken care of his mother, sleeping on the floor next to her because he "didn't want to get too far from her," and accompanying her to doctor visits and regular dialysis treatments. Brown lost several jobs because he cared for her, telling one employer that "his mama c[a]me first." That said, both Brown's friend Jimmy Wainwright, who had hired him to frame houses, and Steve Murray, Brown's former boss at McDonald's, testified that Brown was a good worker, honest and dependable. Brown was always the first to call Wainwright for available work.

Brown's father, Pelham Brown, testified that he left home and never returned when Brown was seven or eight years old, after Pelham shot one of Brown's older brothers who came at him with a razor. Brown's sister-in-law and Wainwright, who had known Brown since he was fifteen, described the chaotic and violent circumstances of life at the trailers owned by Brown's family (often

referred to as "the Morgan compound"), and discussed fighting, shootings and stabbings that regularly occurred there. Wainwright called the compound a "crack house" and added that everyone "except the older people" used drugs. In fact, Brown and his father Pelham used drugs; Pelham used drugs in Brown's presence; and Wainwright regularly drank with Brown.

A neighbor and retired Liberty County Assistant Jail Administrator, Alexis Andrews, testified that that she had lived near the Morgan compound for some twelve years, when Brown was a child. She too noted the poverty, drinking, fighting, and drugs on the compound. She said that gunshots were often heard, and she often called police herself because of the fighting. Indeed, Andrews was so worried about her family's safety from even stray bullets that she moved away. Andrews also offered that a child had drowned in a nearby septic tank, and that the children raised themselves. Despite all of this, Andrews testified that Brown always was "mannerful." Andrews and another jail administrator, John Wilcher, both told the jury that they had known Brown in jail, he was a very good inmate, and he never had disciplinary problems. Andrews recounted that Brown had been made a prison trustee, a position reserved for clean inmates with good manners, and participated in prison church services.

Brown also presented the testimony of Liberty County Sheriff's Department Detective Charles Woodall, to whom Brown had confessed killing Gaglia. Woodall had known Brown because he often responded to calls about violence at the Morgan compound over the years. Those calls happened anywhere from once a week to ten times a week, and involved fights, domestic problems, shootings, stabbings, alcohol, drug sales, and robberies. As he put it: "We were out there a lot." Woodall said that Brown's home was "[i]n a bad state or repair," and that the defendant and his mother "lived a very poor life." Detective Woodall also knew about the Morgan child who had drowned in the septic tank. Woodall added that when Brown confessed to the murder, he was remorseful -- sobbing and crying during most of the confession. On cross-examination, Woodall described Brown as intelligent, having "good common sense," and knowing right from wrong. And when pressed, Woodall admitted that while Brown was sobbing during the confession, he was saying that his own life -- not the life of his victim -- was over.

Linda Jones, a teacher, and Vanessa Parker, a school social worker, also testified that Brown was well mannered, polite, and never caused any problems. Jones said Brown had difficulty learning, failing every class except one in the ninth grade. Brown's mother evinced no interest in his education, never responding to any of Jones's repeated notes, and Brown had excessive absences from class that

7

were the result of a fire that burned his house down. After Jones learned that Brown had been charged with murder, she surmised that "he must have let an awful lot of anger out at that time that he had pinned up from all those years." Parker confirmed that she thought he had a little "tenseness sort of anger" that may have been the result of "his situation," and believed he was on some medication, but could not recall any details.

Several witnesses expressed shock upon learning about Brown's murder charges. Wainwright told the jury that he had initially thought that somebody set Brown up for the murder. Two church elders testified on Brown's behalf, and described his family as "God-fearing" and pled for Brown's life. Finally, Brown's attorneys offered a stipulation that Brown had agreed to plead guilty to the charges in exchange for a life sentence with no possibility of parole.

The jury unanimously found beyond a reasonable doubt seven aggravating factors: (1) the especially heinous, cruel, and depraved manner of the murder, 18 U.S.C. § 3592(c)(6); (2) the commission of the murder in expectation of the receipt of a thing of pecuniary value, id. § 3592(c)(8); (3) the injury, harm, and loss caused to Sallie Gaglia and her family, see id. § 3592(c) ("The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists."); (4) the commission of the murder to avoid detection of the

8

robbery of the post office and initial assault on Gaglia, id.; (5) the murder of an employee of the United States Postal Service engaged in the performance of official duties, id.; (6) the "array of other criminal acts" committed by Brown previously; and (7) the conclusion that prior efforts to rehabilitate and deter Brown from criminal conduct had failed, id. The jury was not asked on the special verdict form to find explicitly the existence of any mitigating factor, but concluded by the verdict either that no mitigating factors existed or they were outweighed by the aggravating aspects of Brown's crime. Thereafter, the district court sentenced Brown to die for the murder convictions, along with 300 months in prison for the robbery.

### C.    Direct appeal

Brown appealed his conviction and sentence to this Court, arguing, inter alia, that the district court made several evidentiary and constitutional errors, inappropriately conducted voir dire, and violated both Brady and Miranda. We rejected his appeal in its entirety. See Brown, 441 F.3d at 1374. Brown's trial counsel had been replaced by two new lawyers to handle his direct appeal. After we denied that appeal, Brown moved the district court for statutory compensation under 18 U.S.C. § 3599 for two lawyers, one of the same lawyers from his appeal and a new lawyer, to represent him in post-conviction proceedings. The district

court authorized compensation for only one lawyer, and J.L. Ertel, who had represented Brown on appeal, took the case.

### D.     Post-conviction proceedings

With Ertel as counsel, Brown collaterally moved under 28 U.S.C. § 2255 for post-conviction relief, which was denied by the district court. In the first claim relevant to this appeal, Brown urged that counsel were ineffective because they failed to competently investigate his background to support their remorse-sympathy-based penalty-phase strategy. However, the district court concluded that most of the mitigation evidence "purportedly missed by counsel" was presented through Brown's fourteen penalty-phase witnesses. Brown v. United States, 583 F. Supp. 2d 1330, 1342 (S.D. Ga. 2008). The court also noted that some of these witnesses, on cross-examination, admitted to sentence-aggravating facts. Id.

As for Brown's mental-health ineffectiveness claim, the district court observed that the most Brown's mental health experts concluded was that "it is probably the strength of [Brown's] relationship and the relentless desire to care for those he loves that, coupled with the effects of drugs and alcohol, [led] to the crime for which he is now sentenced to death." Id. at 1345 (citing expert report). The district court was unpersuaded, noting that "a speculation-based ('it is probably . . . .') explanation for why Brown resorted to violent means to 'help' others add[ed]

little to" Brown's mitigation case. Id. As for trial counsel's failure to present expert testimony about Brown's "future non-dangerousness," the district court observed that the jury repeatedly heard about Brown's non-violent side, including jailer testimony that he would be a model prisoner. Id. at 1345 n.8.

Brown also argued that juror Dorothy Rentz, who had joined in his verdict of death, had never been asked during voir dire about her views on the death penalty, as required by Witherspoon v. Illinois, 391 U.S. 510 (1968), and its progeny. Alternatively, said Brown, if Rentz had actually been "Witherspooned," then Brown had been denied a meaningful appellate review of her voir dire, since there was no transcript of that voir dire. In its original opinion denying § 2255 relief, the district court rejected the claim because Brown had not raised it on direct appeal and had waived it. Brown, 583 F. Supp. 2d at 1357. On reconsideration, the district court recognized that Brown had complained to the Eleventh Circuit in a couple of footnotes about juror Rentz. Brown v. United States, 2008 WL 4822542, at *3 (S.D. Ga. Nov. 4, 2008). Because the Eleventh Circuit had not expressly ruled on that argument, the district court concluded that our denial of the "Rentz" issue without comment on direct appeal was to be respected on collateral review. Id. Nevertheless, in granting a certificate of appealability ("COA") on this claim (and only on this claim), the district court questioned whether our decision --

11

which did not mention Rentz -- should be given deference. <u>Brown v. United States</u>, 2009 WL 307872, at *8-9 (S.D. Ga. Feb. 9, 2009).

Brown then moved this Court to expand the COA. We granted the application as to Claims IV (penalty-phase ineffective assistance of counsel -- failure to investigate mitigation) and V (penalty-phase ineffective assistance of counsel -- failure to investigate mental health). This timely appeal follows.

## II.

In considering the denial of a 28 U.S.C. § 2255 motion, we review questions of law <u>de novo</u>. <u>See McKay v. United States</u>, 657 F.3d 1190, 1195 (11th Cir. 2011). We review the denial of a motion to withdraw as counsel for abuse of discretion. <u>See United States v. Calderon</u>, 127 F.3d 1314, 1343 (11th Cir. 1997).

Brown has raised four arguments: (1) he received ineffective assistance of counsel because his penalty-phase counsel inadequately investigated and presented mitigating background evidence; (2) he also received ineffective assistance of counsel because his penalty-phase counsel inadequately investigated and presented mental health evidence; (3) he was denied a fair and impartial jury and a reliable sentencing proceeding in the absence of any record of one juror's voir dire; and (4) he was denied conflict-free § 2255 counsel. Because our ineffective assistance analysis requires us to weigh "the evidence in aggravation against the <u>totality</u> of

12

available mitigating evidence," Wiggins v. Smith, 539 U.S. 510, 534 (2003) (emphasis added), we consider his two ineffectiveness claims -- concerning mitigating background evidence and mental health evidence -- as one.

In order to succeed on a claim of ineffective assistance, Brown must show that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984); accord Wiggins, 539 U.S. at 521; Darden v. Wainwright, 477 U.S. 168, 184 (1986). If a defendant fails to satisfy either Strickland prong, we need not address both. See Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1248 (11th Cir. 2009) ("We need not determine whether counsel's limited investigation into Windom's background and mental health constituted deficient performance under the first prong of Strickland because we conclude that, even assuming counsel performed deficiently, Windom was not prejudiced thereby."); see also Hall v. Head, 310 F.3d 683, 699 (11th Cir. 2002). Because Brown has failed to satisfy Strickland's prejudice prong, we assume for purposes of our decision that he met its performance prong, and only explore Strickland prejudice.

For Brown to show prejudice,

13

> "It is not enough for the [petitioner] to show the errors had some conceivable effect on the outcome of the proceeding . . . ," because "[v]irtually every act or omission of counsel would meet that test." [Strickland, 466 U.S. at 693]. Nevertheless, a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id. at 693 []. Rather, where, as here, a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695 [].

Putman v. Head, 268 F.3d 1223, 1248 (11th Cir. 2001); see also Ferguson v. Sec'y for Dep't of Corr., 580 F.3d 1183, 1198-99 (11th Cir. 2009) (noting that Strickland asks if a different result is "reasonably probable," not if it is "possible"). Thus, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534.

For starters, the aggravators in this case were strong. The jury found beyond a reasonable doubt seven aggravating circumstances, including that the murder was heinous, cruel, and depraved, and caused harm to the victim and her family; that the murder was committed in expectation of pecuniary gain and to avoid detection of the post office robbery; that the murder was of a postal employee engaged in her official duties; and that Brown had committed various past crimes, and prior efforts to rehabilitate and deter Brown from criminal conduct had failed. See 18 U.S.C. § 3592(c).

14

The trial record amply supported these aggravators -- most notably, the cruelness of the crime. The medical examiner testified that the victim had been stabbed ten times, two of which could have caused Gaglia to die within a short period of time. The doctor further noted that two of the non-fatal wounds were to the victim's extremities: a half-inch laceration on the anterior surface of her left forearm and a three-quarter inch stab wound on the back of her left wrist. He explained that when an individual receives multiple stab wounds, cuts found on the extremities are classically described as "defensive" types of injuries. Further, not only did the jury hear the medical examiner's testimony about the victim's injuries, the jury also saw pictures of the injuries -- all of which painted a graphic and compelling picture of Gaglia's murder.

Moreover, the evidence showed that the killing was unnecessary and deliberate, not accidental. In Brown's confession, which was read to the jury, Brown told police that the initial knife cut had occurred when he jumped over the counter, tripped, and fell into her while she had turned away from the counter to calculate the amount due. However, Brown then admitted at that point he decided he had to kill Sallie Gaglia to avoid detection because she knew him. Additionally, Brown said he brought the knife with him to "intimidate" Gaglia and he had placed socks over his hands prior to jumping across the counter. Brown also has an

extensive criminal record. Brown's state probation officer testified that Brown had convictions for multiple DUIs, multiple forgeries, financial card fraud, theft by taking, and robbery, along with violations of the probated sentences he received for some of those crimes, that stretched over essentially all of Brown's adult life, from 1990 to 2001.

What's more, testimony about the victim was very sympathetic. Her siblings talked about the devastating impact the murder had on Gaglia's husband and two sons. Gaglia's younger son was emotionally incapable of going to college after the murder and joined the Army instead. Gaglia's husband was in therapy and could not bear attending the court hearing. Gaglia's siblings also noted that she was helpful to everyone, very involved in her church, and devoted to her family. They said she could never be replaced, and that her murder was a great loss.

We are obliged to weigh this aggravating evidence against the evidence presented at mitigation, along with the new evidence that could have been presented at mitigation. The central problem Brown faces is that much of the evidence he now offers is cumulative. See Ford v. Hall, 546 F.3d 1326, 1338 (11th Cir. 2008) ("Counsel is not required to call additional witnesses to present redundant or cumulative evidence."); Marquard v. Sec'y for Dep't of Corr., 429

16

F.3d 1278, 1307 (11th Cir. 2005). Indeed, as in Strickland itself, "[t]he evidence that [the petitioner] says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented." 466 U.S. at 699-700. If "the new mitigation is simply an extension of what the jury had heard," the situation is "critically different" from cases where "the new mitigation was not only powerful, but of a type that counsel did not present in the penalty phase at all." Rose v. McNeil, 634 F.3d 1224, 1246 (11th Cir. 2011) (citing as examples of the distinguishable type of case, Porter v. McCollum, 558 U.S. 30 (2009), Rompilla v. Beard, 545 U.S. 374 (2005), and Wiggins, 539 U.S. 510).

In essence, Brown claims his extremely impoverished background and the violence surrounding the Morgan compound where he grew up could have been presented more colorfully and in greater detail; that his counsel also should have presented testimony that he was a caring, non-violent person; and finally that Detective Woodall, if asked, would have testified the crime was out of character and he did not believe Brown had the intention to stab anyone. But our review of the record reveals that there is actually precious little new evidence to add to what had already been presented by counsel. As we've detailed, Detective Woodall, who was called as a defense witness during the penalty phase, said that he knew Brown for about eight years because he had often been called to the family

17

residence in response to reports of "fights, domestic problems, shootings, stabbings, alcohol, drug sales, and robberies," that Brown grew up in an unsavory environment, that Brown's mother was in bad health, and that Brown's family "lived a very poor life." Woodall also told the jury that one of Brown's young relatives had died by drowning in an open septic tank, and that Brown was remorseful when he confessed. Detective Woodall's testimony was amply corroborated by the testimony of many other witnesses. Thus, even though Woodall did not recite every detail Brown now offers, Woodall did give the imprimatur of a law enforcement officer's observations to the other testimony.

Moreover, many other defense witnesses during the penalty phase described Brown as a polite, loving and non-violent person, who cared deeply for his family. Witnesses uniformly expressed surprise or shock when they learned that Brown had been charged with murder. The jury also heard about Brown's devotion to his mother -- transporting her regularly to doctor visits, pushing her wheelchair down the aisle at a family wedding, and losing jobs because he needed to care for her. Brown's complete criminal history -- both violent and non-violent -- was detailed by two government witnesses. And, the administrators of two separate jails described Brown's model conduct while incarcerated.

18

These witnesses described as well the very chaotic circumstances and living conditions surrounding Brown's childhood, again noting that there were frequent fights in his home, that his relatives had used drugs in front of him, that his house had burned down, that his father had left the home after shooting his stepson when Brown was only seven, that a child had died at Brown's home after drowning in a septic tank, and that the police were frequently called to break up fights, shootings, and stabbings. At least one witness described Brown as a user of alcohol and drugs, and, a teacher described how Brown's parents never showed any interest in his education.

Since much of the "new" testimony introduced collaterally could only have amplified the themes already raised at trial (and extensively at that), we cannot find a reasonable probability that it would have had led to a different result. See Boyd v. Allen, 592 F.3d 1274, 1298 (11th Cir. 2010); Marquard, 429 F.3d at 1308 ("There is no reason to believe that added details about Marquard's troubled childhood and substance abuse -- which the sentencing court clearly recognized in imposing a death sentence -- would have had any effect on the sentence."); Robinson v. Moore, 300 F.3d 1320, 1347 (11th Cir. 2002).[1]

---

1       In fact, there are very few topics Brown now discusses that weren't touched on during the penalty phase. First, as for Brown's argument that the jury never heard that he murdered the victim in order to give money to his girlfriend, it is unclear how much this evidence would have helped his case -- since it may have indicated that he valued the $1,125 he stole from the post

Brown also claims that it was prejudicial for his trial counsel not to have presented lay and expert evidence about his non-dangerousness and his childhood alcohol and drug use. His § 2255 counsel has submitted an affidavit from a future-dangerousness expert averring that Brown did not pose a risk of future danger in prison when he was sentenced in 2003, and had not been involved in chronic criminal behavior. The mental health experts too concluded that Brown was an altruistic, generous, and caring person who did not suffer from antisocial personality disorder or violent tendencies. Moreover, the mental health experts opined that, from an early age, Brown was dependent on alcohol and crack cocaine. Brown notes that all of this evidence was confirmed by a mental health evaluation performed on Brown pre-trial, but counsel never introduced this evaluation during the penalty phase.

---

office for his girlfriend much more than he valued the life of Sallie Gaglia. But in any event, the jury heard from Brown's girlfriend Diane during the guilt phase of the trial, and she described at length her financial hardship at the time of the murder, including her bankruptcy proceedings. She specifically said that when Brown presented her with the money orders he'd stolen during the murder, he told her that "the two for $500 should be enough to take care of [her] mortgage. And the one for 175 would take care of [her] bankruptcy [payments]." Detective Woodall also described that when Brown confessed, Brown felt remorse both for the victim and Diane Brown.

Brown further complains that the jury never heard how nice he was to an epileptic aunt. However, defense counsel presented extensive testimony about how important his family was to him, and how well he took care of his mother. It is hard to find a reasonable probability that information concerning his care for yet another family member would have "altered the sentencing profile presented." Strickland, 466 U.S. at 700.

20

However, again, the jury heard much of this testimony through lay witnesses and in considerable detail. In particular, two different prison administrators testified that Brown had never engaged in violence or had any disciplinary problems while in jail. One also noted that during one of Brown's stints in jail, Brown had been selected to be a prison trustee, a position reserved for clean inmates with good manners, and was "[a] very good trustee." As for his drug and alcohol use, Brown's state probation officer testified that Brown had convictions for two DUIs, as well as an open container law violation, suggesting that he had a history of drinking while driving. Detective Woodall also testified about rampant alcohol and drug use on the compound. Altogether consistently, the defendant's childhood friend, Jimmy Wainwright, described life at the Morgan compound as a crack house with continual arguing, fighting, shootings, or stabbings. And in fact, Wainwright, who'd known Brown since he was fifteen, said that everyone "except the older people" on the compound used drugs, notably, including Brown and his father Pelham. Indeed, Wainwright had seen Pelham use drugs in Brown's presence; and Wainwright used to drink with Brown.

Thus, "this is not a case where the jury heard no evidence about the defendant's mental and emotional state." Rutherford v. Crosby, 385 F.3d 1300, 1315 (11th Cir. 2004). The jury heard about Brown's actual prison performance,

21

as well as his <u>actual</u> drug and alcohol use from someone who'd known him since he was fifteen. Again, Brown has not explained how there is a reasonable probability that expert testimony on these topics would have altered the mosaic of the sentencing proceeding. This is especially true here, since no evidence has been offered, in fact no suggestion has been made that Brown was intoxicated at the time at the crime. To the contrary, in his confession and in his pre-trial mental health evaluation, Brown expressly denied any drug or alcohol use during the murder, and denied having any symptoms of alcohol withdrawal.

Even more problematic, Brown has only provided expert affidavits about what alcohol/drug abuse could do to a person, not what it may have done -- much less did -- to Brown at the time of the murder. In the report, the experts opined: "[Drugs and alcohol] are known to have disinhibiting effects on cognitive functioning and could cause a person to act in uncharacteristically dangerous and impulsive ways. In a rapidly escalating situation, a person who suffered the effects of intoxication and/or drug withdrawal would not likely exercise the usual caution and judgment another reasonable person might." Like in <u>Hall</u>, where prejudice was lacking in part because the experts only discussed the <u>possibility</u> of psychological explanations for the defendant's behavior, Brown's expert explanations were wholly speculative. 310 F.3d at 704-05; <u>see also</u> <u>Suggs v.</u>

McNeil, 609 F.3d 1218, 1230 (11th Cir. 2010) (rejecting idea that failure to present mental health evidence prejudiced petitioner because the expert "did not explain how Suggs's [mental] inefficiency might have contributed to his decision to murder Casey or affected his moral culpability for that crime.").

The bottom line is this: Even if we could say that some of the information about Brown's childhood drug and alcohol abuse was new and relevant mitigating evidence, we cannot fairly conclude on this record that there is a reasonable probability the jury's balancing of the aggravating and mitigating factors would have been affected. Brown committed a brutal, unnecessary crime, his criminal record was lengthy, and the victim was beloved. Weighing all of the mitigation evidence (both as presented at trial and in his § 2255 motion) against the aggravating evidence, we see no reasonable probability of a different outcome. We, therefore, conclude that Brown has not satisfied Strickland's prejudice prong, and affirm the district court's rejection of the Strickland claims.

## III.

Brown also argues that he was denied a fair trial by an impartial jury in the absence of any transcript confirming that juror Dorothy Rentz was orally voir dired about her thoughts on the death penalty. We can only assume either that she was voir dired and it was not recorded, or that she was never voir dired.

23

What we know is this. At trial, Brown's attorneys requested and were granted an opportunity to explore the jury pool members' views on the death penalty. As part of the voir dire process, each prospective juror completed in advance a nine-page written questionnaire that included ten questions about the juror's opinions on the death penalty. Dorothy Rentz answered these questions in this way:

- 29. Do you religiously, morally, personally, or otherwise oppose the death penalty? [No]

- 30. Regarding the death penalty, which of the following statements best represents the way you feel? (giving options of strongly support, support, no opinion, oppose, strongly oppose) [I support the death penalty as a punishment]

- 31. Would your opinion regarding the death penalty influence you in deciding the guilt of the defendant? [No]

- 32. If the defendant were found guilty, and the evidence and aggravating factors convince you that the death penalty is the appropriate sentence, could you vote for the death penalty? [Yes]

- 33. If the defendant were found guilty of a capital count, would you automatically vote for the death penalty? [No]

- 34. If the defendant were found guilty of a capital count, and the evidence and mitigating factors convince you that life in prison without the possibility of parole is the appropriate sentence, could you vote for it? [Yes]

- 35. If the defendant were found guilty of a capital count, would you automatically vote for life in prison without the possibility of release or parole, regardless of the facts and the aggravating evidence? [No]

24

• 36. Regarding the death penalty, which of the following statements best represents the way you feel? (giving range of options regarding whether the death penalty is applied fairly or unfairly to minorities) [I have no opinion whether the death penalty is applied unfairly against minorities]

• 40. Would the race of the defendant affect you[r] opinion as to whether or not to impose the death penalty or life imprisonment without the possibility of release or parole? [No]

• 41. Would the race of the victim affect you[r] opinion as to whether or not to impose the death penalty or life imprisonment without the possibility of release or parole? [No]

Brown's attorneys were provided the questionnaires in advance of trial, and they used the questionnaires to identify jurors subject to challenges for cause.

After the questionnaires were submitted, the district court conducted oral voir dire and asked the jurors again about their views of the death penalty.[2] The

---

2        For example, one exchange went like this:

THE COURT: Now, in deciding the death sentence, you would look at whether or not there were aggravating circumstances that I would define for you that you must consider in determining whether or not he should be put to death. . . . Then you would have to look at whether there were mitigating circumstances that one have to look at, whether they should spare his life and impose life without parole in prison.

Could you do both of those?

. . . .

THE COURT: Now, you could consider aggravating evidence and mitigating evidence. Is that correct?

. . . .

25

transcript does not contain this additional oral voir dire of juror Rentz. Nor does the transcript reflect that anyone in the courtroom -- including Brown's attorneys, who had filed numerous motions regarding voir dire prior to the trial -- objected to the failure to further voir dire juror Rentz, even after she was selected as a trial juror, or that defense counsel ever sought to strike Rentz.

On direct appeal, Brown did not directly raise the Rentz issue, although he did mention it in three separate footnotes of his direct appeal brief. None of these footnotes, however, squarely argues the issue; the closest, which appears in the statement of the case, merely asserts:

> It appears that a juror who actually sat and rendered a verdict on both guilty [sic] and punishment, Dorothy Rentz, was never questioned as to here [sic] beliefs on the death penalty. If this is true, Mr. Brown's sentence must be reversed.

In the decision on direct appeal, Brown, 441 F.3d at 1372-74, we did not mention the Rentz matter at all, and Brown points to no effort to urge this Court to reconsider our judgment on the ground that we overlooked it. In fact, it was not until his post-appeal, § 2255 motion before the district court that Brown argued that without any record of Rentz's oral voir dire about the death penalty, he was denied his rights under Witherspoon and its progeny.

---

THE COURT: And you have no philosophical or moral repugnance or feeling against the death sentence. Is that correct?

## A.    Absence of the claim on direct appeal

First, affording Brown every benefit, we cannot fairly say that he sufficiently raised this claim on direct appeal. "[A] party seeking to raise a claim or issue on appeal must plainly and prominently so indicate." United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). Merely making passing references to a claim under different topical headings is insufficient. Instead, the party must clearly and unambiguously demarcate the specific claim and devote a discrete section of his argument to it, id., so the court may properly consider it.

In Jernigan, we held that the appellant had abandoned a FRE 404(b) claim even though his brief made

> four passing references to the evidence admitted under Fed.R.Evid. 404(b), each of which is embedded under different topical headings. First, he entitles one minor subsection within his statement of facts "[p]rior [b]ad [a]cts of [a]ppellant." Second, he mentions the prejudicial effect of this evidence in the last sentence in his "summary of the argument" section. Third, he mentions "the propensity evidence" in passing in the context of his third argument (alleging error in the denial of his motion for a judgment of acquittal at the close of the government's case). Finally, he concludes that same argument by asserting that "all the Government had in this case was a gun, found in a truck, and prior bad acts." Under our controlling law, we do not believe Jernigan has devoted a discrete section of his argument to claims regarding the evidence of his prior bad acts; instead, each mention of this evidence is undertaken as background to the claims he does expressly advance or is buried within those claims.

27

Id. As we explained, our rule "stems from the obvious need to avoid confusion as to the issues that are in play and those that are not." Id. We continued: "Our task in assessing an appeal is to adjudicate the issues that are fairly and plainly presented to us and of which the appellee is put on notice; it is not to hunt for issues that an appellant may or may not have intended to raise." Id.

So too here. Brown's opening brief on direct appeal contained three footnotes mentioning juror Rentz, but none of them expressly mentioned or applied Witherspoon to his argument. The closest one to do so, which we've quoted above, appeared in Brown's statement of the case. In Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989), we deemed an issue waived when its only mention in the party's brief was in the statement of the case. We have applied this abandonment rule both in direct criminal appeals, like Jernigan, as well as in post-conviction cases, see, e.g., San Martin v. McNeil, 633 F.3d 1257, 1268 n.9 (11th Cir. 2011); United States v. Futch, 518 F.3d 887, 895 n.10 (11th Cir. 2008). In fact, in a § 2254 appeal, we found that a petitioner had abandoned a due process claim where he presented "absolutely no argument or citation of authority in support of" his claim. Sweet v. Sec'y, Dep't of Corr., 467 F.3d 1311, 1318 n.2 (11th Cir. 2006). The argument section of Brown's brief on direct appeal similarly failed to cite to Witherspoon at all or make any legal argument

28

concerning why the failure to question Rentz constituted "reversible error." In short, Brown procedurally defaulted any claim about the voir dire of juror Rentz, unless Brown can establish cause and prejudice. See, e.g., Cross v. United States, 893 F.2d 1287, 1289 (11th Cir. 1990).

## B.    Cause and prejudice

To obtain collateral relief on errors that were not raised on direct appeal, Brown "must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 167-68 (1982). This standard is "a significantly higher hurdle than would exist on direct appeal." Id. at 166. To demonstrate prejudice, the second prong, Brown "must shoulder the burden of showing, not merely that the errors at his trial [or sentencing] created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial [or sentencing] with error of constitutional dimensions." Id. at 170.

The cause Brown offers here is the ineffective assistance of appellate counsel. "Constitutionally ineffective assistance of counsel can constitute cause" under Frady. Holladay v. Haley, 209 F.3d 1243, 1254 (11th Cir. 2000). "In order to do so, however, the claim of ineffective assistance must have merit." United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000).

29

In <u>Witherspoon</u>, 391 U.S. at 522, the Supreme Court held that jurors may not be excluded for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Exclusion for cause would be appropriate only when the trial court concludes that "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." <u>Wainwright v. Witt</u>, 469 U.S. 412, 424 (1985) (quotations omitted). The Supreme Court later extended the <u>Witherspoon</u> principle to set a similar standard for the removal for cause of jurors who are unalterably in favor of the death penalty. <u>See Ross v. Oklahoma</u>, 487 U.S. 81, 85 (1988). Failure to remove this type of juror renders any sentence of death invalid. <u>Id.</u>; <u>see also</u> <u>Morgan v. Illinois</u>, 504 U.S. 719, 729 (1992). Consequently, a defendant must be given the opportunity during voir dire to determine the jurors' views on the death penalty. <u>Morgan</u>, 504 U.S. at 735-36.

Here, unlike in <u>Morgan</u>, each juror (including Rentz) completed a written questionnaire that asked questions about the precise issues raised by <u>Witherspoon</u> and subsequent cases -- whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Rentz's answers reveal that she supported the death penalty as punishment, but did not support it "strongly"; her opinion of the death penalty

30

would not influence her decision on guilt; she would not automatically vote for the death penalty if Brown was found guilty; and she could vote for life if the evidence and mitigating factors convinced her. In fact, Juror Rentz's responses to the written jury questionnaire revealed nothing that would prompt additional questions on this topic. Juror Rentz even held views favorable to Brown (an African-American defendant): she expressed a belief that, generally, discrimination against African-Americans is "often" a problem.

Based on the detailed information found in Rentz's questionnaire, it seems clear that Rentz's views on the death penalty would not "prevent or substantially impair the performance of" her duties as a juror in Brown's trial. As the record shows, there was nothing contradictory about Rentz's answers, and her views were quite clear: she did not strongly support the death penalty and, notably, could vote for life if the evidence counseled her to do so. There is simply no way to read the questionnaire or her answers as suggesting that she held views on the death penalty that would "substantially impair" her duties as a juror. Brown's attorneys had substantial information from the written questionnaire to inform their exercise of Morgan-based challenges for cause.

Brown also claims that if Juror Rentz in fact was voir dired, the failure of the court reporter to transcribe that voir dire denied him meaningful appellate review.

31

However, "[n]ot every omission from a transcript entitles a defendant to a new trial." United States v. Medina, 90 F.3d 459, 462 (11th Cir. 1996), superseded on other grounds by statute, 46 U.S.C. § 70504, as recognized in United States v. Tinoco, 304 F.3d 1088, 1106 (11th Cir. 2002). Instead, a new trial is necessary only where "there is a substantial and significant omission from the trial transcript." Id. at 463. To determine whether an omission is "substantial and significant," we consider: (1) "the extent of the missing portions of the trial transcript as they relate to the remainder of the trial"; and (2) "the likelihood that error which could be pursued on appeal occurred during those parts of the trial for which we do not have a verbatim transcript." United States v. Preciado-Cordobas, 981 F.2d 1206, 1213-14 (11th Cir. 1993).

As for the first factor, the extent of the missing portion of the transcript constitutes the oral voir dire of one of the jurors. However, because we have Rentz's written views on the death penalty in her juror questionnaire, the omission of her oral answers is less significant. As for the second factor, the likelihood that any appealable error occurred during the missing voir dire of juror Rentz also seems remote. For there to have been any error, we would have to conclude that the missing transcript would reflect that juror Rentz expressed an irrevocable commitment to the death penalty that would have required her to be excused for

32

cause even though the district court wrongly failed to dismiss her for cause. Yet Rentz's written views do not suggest anything of the kind and in fact, show views favorable to Brown; and, notably, Brown's trial counsel did not try to strike Rentz from the jury.

In short, because there is so little merit to the Rentz claim, Brown cannot demonstrate that his appellate attorneys were ineffective by failing to raise it on direct appeal. Nyhuis, 211 F.3d at 1344. An attorney is not required under the Constitution or the Strickland standards to raise every non-frivolous issue on appeal, Jones v. Barnes, 463 U.S. 745, 754 (1983) ("Nothing in the Constitution or our interpretation of that document requires" an appellate attorney "to raise every 'colorable' claim suggested by a client."); Brown's attorneys can hardly be faulted for failing to raise what is likely a frivolous one. It is also crystal clear that there can be no showing of actual prejudice from an appellate attorney's failure to raise a meritless claim. Thus, Brown cannot satisfy Strickland, nor can he meet the cause and prejudice test. Nyhuis, 211 F.3d at 1344. Brown has procedurally defaulted this claim.[3]

---

[3]    As for his suggestion that he was an entitled to an evidentiary hearing on these Rentz claims, he is not entitled to one if his claims "are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (addressing issue in context of 28 U.S.C. § 2254) (quotations omitted). In any case, we would review the district court's denial of an evidentiary hearing for abuse of discretion. Aron v. United States, 291 F.3d 708, 714 (11th Cir. 2002). And

## IV.

Finally, Brown argues that he was erroneously represented by conflict-encumbered counsel in his capital § 2255 proceedings because his counsel, Jeffrey Ertel, was subject to prosecution for the manner in which he had represented Brown during the post-conviction proceedings. We are unpersuaded.

The background of Brown's argument is this. At the end of the guilt phase of Brown's original trial, the district court told the jurors that "Your deliberations, of course are secret. You will never have to explain your verdict to anyone." This instruction was consistent with the Southern District of Georgia's local rules, which provide that "[n]o party, attorney, or other person shall, without Court approval, make or attempt any communication relating to any feature of the trial of any case with any regular or alternate juror who has served in such case, whether or not the case was concluded by verdict." S.D. Ga. L.R. 83.8. Nevertheless, Ertel, appointed to represent Brown as an indigent §2255 movant under 18 U.S.C. § 3599, sent investigators to interview jurors without court permission and obtained the affidavit of the jury foreperson, who swore that some of the additional evidence gathered during the habeas process might have had an impact on the jury's deliberations.

---

as we've already discussed in detail, Brown has given us no credible reason to doubt Rentz's impartiality. Therefore, Brown has not shown that the district court erred in denying these claims, or abused its discretion in denying him an evidentiary hearing on these claims.

34

After the jury foreperson's affidavit was filed with the district court, the district judge asked the government to investigate Ertel for criminal contempt for contacting that juror and obtaining his affidavit without first securing the permission of the court.  Once the investigation was completed, the district court scheduled a hearing for Ertel to show cause why he should not be held in criminal contempt.  At this point, Ertel sought to withdraw from representing Brown, telling the district court that his own attorney had instructed him that he "needed to appease the government and the Court" for his own benefit, which made it impossible for him to vigorously represent Brown.  The district court denied Ertel's request to withdraw, concluding that Brown had failed to demonstrate that anything about the investigation adversely affected Ertel's performance.  Thereafter, the district court reported a negotiated settlement with Ertel on the criminal contempt charge, which included a public reprimand for Ertel, and required that he write letters of apology to each juror he contacted, and pay $2500 in fees and costs for the United States Attorney's investigation.

Brown claimed before the district court and now on appeal, see Harbison v. Bell, 556 U.S. 180, 183 (2009), that these circumstances amounted to an actual conflict of interest that entitle him to reset and start anew his post-conviction case with a new attorney.  In 18 U.S.C. § 3599, Congress created a statutory right to

35

counsel in all federal capital cases, separate and apart from 18 U.S.C. § 3006A, which provides for adequate representation to criminal defendants. In Martel v. Clair, 132 S. Ct. 1276 (2012), the Supreme Court considered these statutes and held that a defendant may request the court to substitute counsel if he can establish that it is "in the interests of justice." Id. at 1288. In making this determination, the court should consider a variety of factors, including "the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for the complaint, including the extent of the conflict or breakdown in communication between lawyer and client." Id. at 1287. Requests made after years of litigation on the eve of trial or when ruling on a dispositive motion may be denied. See id. at 1288 (endorsing the district court's denial of a motion to substitute counsel made ten years after litigation commenced and submitted when the court was putting the finishing touches on its denial of the plaintiff's habeas petition).

In Martel, the Court further explained that when determining whether to substitute counsel, the court must probe into why the defendant wants a new attorney. Id. at 1287. The trial court is obliged to explore the extent of the conflict and any breakdown in communication between the lawyer and the client. Because the inquiry is fact specific, the trial court's ruling may be overturned only for abuse

36

of discretion. Id. at 1281. In Martel, the defendant argued that his counsel had ineffectively investigated his innocence, and wanted to press his innocence claim further than his lawyers had in the district court. Id. at 1288. Noting the hurdles a new lawyer would have had at that point in the defendant's case, Martel observed that the court "acted within its discretion in denying Clair's request to substitute counsel, even without the usually appropriate inquiry. The court was not required to appoint a new lawyer just so Clair could file a futile motion." Id. at 1289.

The only potential consequence Brown has properly argued to this Court is that because Ertel purportedly "needed to appease the government" after the criminal contempt investigation had begun, he never adequately urged the district court to consider the jury foreperson's affidavit in the habeas proceedings. See Isaacs, 300 F.3d at 1253 & n.6 (noting that a party abandons any argument not raised in his initial appellate brief to us). However, on this record, it is simply not reasonable for any attorney to have argued further that the district court consider this affidavit.

Plainly, a district court could properly refuse to consider a juror's affidavit. See United States v. Venske, 296 F.3d 1284, 1291-92 (11th Cir. 2002) (finding no abuse of discretion where the district court excluded a juror's affidavit after the defendant violated the local rule prohibiting contact with jurors); see also Cuevas

v. United States, 317 F.3d 751, 753 (7th Cir. 2003) (finding no abuse of discretion in district court's refusal to consider in § 2255 motion evidence obtained from juror interviews done by Cuevas' private investigator in violation of court's no contact rule).

Further, and irrespective of the provisions of the local rule, the juror's affidavit on its face was not competent evidence:

> Upon an inquiry into the validity of a verdict . . . , a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith. . . A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

Fed. R. Evid. 606(b) (2008); see generally Venske, 296 F.3d at 1290 (noting Rule 606(b)'s exclusion of statements involving "the jury's deliberative process" and the "mental impressions of [a] juror"). Rule 606(b) sprang from the long-standing common-law rule against admission of jury testimony to impeach its verdict:

> [F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.

Tanner v. United States, 483 U.S. 107, 120-21 (1987); see also Davis v. United States, 47 F.2d 1071, 1072 (5th Cir. 1931) (stating common law rule against

38

impeachment of verdict). Rule 606(b) is reason enough that the district court would not have admitted the affidavit and operates altogether independent of whether Brown's counsel was conflicted. Quite simply, it would have been futile for the district court to have appointed new counsel in this case to further press the juror's affidavit, and thus the district court did not abuse its discretion in denying Ertel's motion to withdraw.[4]

In short, the district court's order denying § 2255 relief is AFFIRMED.

---

4    Not only would the appointment of new counsel have been futile, but Brown has failed to satisfy still another aspect of the Martel interests-of-justice test: delay. While this is not a ten-year case like Martel, the timeline nonetheless is not in Brown's favor. From January to August 2008, Ertel represented Brown while simultaneously being investigated, and never once requested to withdraw. During that time, he filed several motions for discovery, including corrected motions, and even a substantive brief in support of the § 2255 motion that relied on the very affidavit for which Ertel was being investigated. Not until six months after he was investigated and after all of the substantive work on the case has been completed (less than two months before the district court issued its decision on the § 2255 motion) did Ertel move to withdraw.

What's more, Ertel never availed himself of the specific process for substitution of counsel that the district court set at the start of Brown's § 2255 case. Brown initially asked that two attorneys be appointed to represent him -- Ertel and Mark Olive. The district court only appointed Ertel, but said that "[c]ounsel can switch, however, if they so choose (i.e., Ertel may exit in favor of Olive, upon prompt notice to this Court)." Thus, if Ertel had actually suffered a conflict, he could have immediately and automatically substituted Olive for himself as Brown's counsel at any time without the district court's leave -- but he never did so.

Scott L. Poff
Clerk, U.S. District Court
125 BULL ST RM 306
SAVANNAH  GA  31401-3762

July 10, 2013

**Appeal Number: 09-10142-P**
Case Style: Meier Jason Brown v. USA
District Court Number:  07-00085  CV-BAE-GRS (03-00001-CV-BAE-1)

CC:  Jeffrey Lyn Ertel

CC:  Mark Evan Olive

CC:  James C. Stuchell

CC:  R. Brian Tanner

CC:  Scott L. Poff

CC:  Hon. B. Avant Edenfield

CC:  Administrative File

# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia  30303

**John Ley**
Clerk of the Court

For rules and forms visit
www.ca11.uscourts.gov

July 10, 2013

MEMORANDUM TO COUNSEL OR PARTIES

**Appeal Number: 09-10142-P**
Case Style: Meier Jason Brown v. USA
District Court Number:  07-00085  CV-BAE-GRS (03-00001-CV-BAE-1)

Enclosed is a copy of the court's decision filed today in this appeal.  Judgment has this day been entered pursuant to Rule 36 of the Federal Rules of Appellate Procedure.  Fed.R.App.P. 39, 40 and 41, and the corresponding circuit rules govern costs and attorney's fees, petitions for rehearing, and mandate, respectively.

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2.  Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or rehearing en banc is timely only if received in the clerk's office within the time specified in the rules.  The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed <u>by any party</u> in the appeal.  <u>See</u> 11th Cir. R. 26.1-1.  In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc.  <u>See</u> 11th Cir. R. 35-6(k) and 40-1.

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal <u>no later than</u> 60 days after either issuance of mandate *or* <u>filing</u> with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

For questions concerning the issuance of this court's decision, please call (404) 335-6161, (404) 335-6151 or the "Reply To" number shown below. For all other questions, please call Tubbs, Jenifer (404) 335-6166.

Sincerely,

John Ley, Clerk of Court

Reply To: Jenifer Tubbs (404) 335-6166

Encl.

OPIN-1 (01-2006)